**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-565-GMS |
| v. | ) | |
| | ) | |
| ALLEN L. SESSOMS, Ph.D., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOARD OF TRUSTEES OF | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING MEMORANDUM IN SUPPORT OF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**


Robert L. Duston (Admitted Pro Hac Vice)   Kimberly L. Gattuso (No. 3733)
SAUL EWING LLP                             Michael R. Robinson (No. 4452)
2600 Virginia Avenue, N.W.                 SAUL EWING LLP
Suite 1000                                 222 Delaware Avenue, Suite 1200
Washington, DC 20037-1922                  Wilmington, Delaware 19801
(202) 333-8800 (telephone)                 (302) 421-6800 (telephone)
(202) 337-6065 (facsimile)                 (302) 421-5871 (facsimile)
rduston@saul.com                           kgattuso@saul.com
                                           mrobinson@saul.com

*Counsel for Defendants*                   *Counsel for Defendants*


DATED:  August 31, 2007

## <u>TABLE OF CONTENTS</u>

Page

NATURE AND STAGE OF THE PROCEEDINGS ..................................................1

SUMMARY OF THE ARGUMENT ........................................................................4

STATEMENT OF UNDISPUTED FACTS ..............................................................5

    I.      BACKGROUND ON THE PARTIES.......................................................5

    II.     THE INVESTIGATION INTO GRADE ADJUSTMENTS ....................6

    III.    THE AD HOC DISMISSAL COMMITTEE PROCESS AND HEARINGS ..........7

    IV.   THE AHDC REPORT AND RECOMMENDATIONS TO THE BOARD.............8

    V.    THE BOARD'S INITIAL CONCLUSIONS AND DR. GORUM'S WAIVER OF FURTHER CONTRACT RIGHTS. .....................................9

    VI.   THE ALLEGED PROTECTED ACTIVITIES .......................................10

ARGUMENT ...........................................................................................................13

    I.      ANY CLAIM RELATING TO ACTIONS OF PRESIDENT SESSOMS PRIOR TO SEPTEMBER 12, 2004, INCLUDING THE INITIAL INVESTIGATION AND SUSPENSION OF DR. GORUM, IS BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS...............................................14

    II.     ALL CLAIMS AGAINST THE BOARD OF TRUSTEES SHOULD BE DISMISSED BECAUSE DR. GORUM DOES NOT WANT REINSTATEMENT. .............................................15

    III.    NONE OF DR. GORUM'S IDENTIFIED SPEECH OR CONDUCT IS "PROTECTED ACTIVITY." ................................................16

          A.     Dr. Gorum's Alleged "Reputation on Campus" Is Too Vague to be Protected Speech or Association..............................17

          B.     Dr. Gorum's Alleged Speech and/or Conduct During the Hiring of President Sessoms Was Not Protected Activity.............................17

          C.     The Revocation of an Invitation to an Alumni Prayer Breakfast is Not Speech on a Matter of Public Concern. .............................18

          D.     Dr. Gorum's Assistance to Former Student DeShaun Morris Was Not Protected Conduct..............................19

IV.   DR. GORUM HAS NO ADMISSIBLE EVIDENCE THAT THE BOARD OF TRUSTEES OR PRESIDENT SESSOMS WERE AWARE OF HIS ALLEGED "PROTECTED ACTIVITY". ...................................................................................21

V.   DR. GORUM CANNOT OVERCOME PRESIDENT SESSOMS' QUALIFIED IMMUNITY FROM SUIT. ...................................................................................24

    A.   The Amended Complaint Fails to Allege, and the Facts Do Not Show, any Action by President Sessoms Within the Statute of Limitations that Violated Dr. Gorum's Constitutional Rights, So He is Protected by Qualified Immunity. ...........................................................................................25

    B.   Assuming President Sessoms Did Violate a Constitutional Right of Dr. Gorum, that Right was Not Clearly Established at the Time of the Alleged Conduct. ....................................................................................26

VI.   NO REASONABLE JURY COULD CONCLUDE THAT THERE WAS A CAUSAL CONNECTION BETWEEN THE ALLEGED PROTECTED ACTIVITY AND DR. GORUM'S TERMINATION FOR VIOLATIONS OF DSU'S GRADE ADJUSTMENT POLICIES AND PROCEDURES. ......................28

    A.   There is No Temporal Proximity Between the Allegedly Protected Activity and the Board's Termination Decision. .............................................28

    B.   There Was a Reasonable Basis for the Actions Taken by President Sessoms and the Board. .................................................................................29

        1.   The Initial Investigation, Which Was Not Initiated by President Sessoms, Provided a Reasonable Basis for Suspending Dr. Gorum and Proceeding with the Dismissal Process. ...................30

        2.   The Comprehensive AHDC Report, Signed by Five Faculty Members, Provided a Reasonable Basis for Concluding that there Was "Adequate Cause" Under the CBA to Terminate Dr. Gorum. .........................................................................................30

        3.   The Decision of the Board and the President to Reject Lesser Sanctions is Not Evidence of Retaliatory Motive. .............................31

        4.   The President and the Board Acted Reasonably, Exceeding the Requirements of Procedural Due Process, Before Taking Action Against Dr. Gorum. ..........................................................................32

    C.   There is No Admissible Evidence of "Disparate Treatment" Because there Are no Other DSU Faculty Who Were "Similarly Situated in all Respects" to Dr. Gorum. ..............................................................................................33

D.     Dr. Gorum's "Evidence" of Animus Is Based on Rumor and Inadmissible Hearsay, and Is Not Relevant or Probative of a Causal Connection to Any Protected Activity. .................................................................34

E.     In Determining Whether Plaintiff Has Produced Sufficient Evidence for this Case to Proceed, the Court Needs to Weigh the Deference Traditionally Accorded to Universities in Academic Matters. .....................35

VII.    PRESIDENT SESSOMS AND THE BOARD HAVE MET THEIR BURDEN OF PROVING THAT THEY WOULD HAVE TAKEN THE SAME ACTIONS IN THE ABSENCE OF ANY PROTECTED ACTIVITY........................................36

VIII.   THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT ON ALL CLAIMS FOR COMPENSATORY DAMAGES ARISING FROM DR. GORUM'S TERMINATION, AND ALL CLAIMS FOR PUNITIVE DAMAGES............................................................................................................37

CONCLUSION....................................................................................................................38

# <u>TABLE OF AUTHORITIES</u>

Page

### FEDERAL CASES

<u>Ambrose v. Township of Robinson</u>, 303 F.3d 488 (3d Cir. 2002) ................................................22

<u>Anderson v. Davila</u>, 125 F.3d 148 (3d. Cir. 1997) .......................................................................20

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S. Ct. 2505 (1986)......................................14

<u>Azzaro v. County of Allegheny</u>, 110 F.3d 968 (3d Cir. 1997) (en banc) ......................................16

<u>Blackburn v. United Parcel Service, Inc.</u>, 179 F.3d 81 (3d Cir. 1999).........................................14

<u>Bonenberger v. Plymouth Township</u>, 132 F.3d 20 (3d Cir. 1997) ...............................................24

<u>Brennan v. Norton</u>, 350 F.3d 399 (3d Cir. 2003).....................................................................26, 28

<u>Brown v. Armenti</u>, 247 F.3d 69 (3d Cir. 2001) ..............................................................16, 17, 18

<u>C.N. v. Ridgewood Bd. of Educ.</u>, 430 F.3d 159 (3d Cir. 2005) ....................................................24

<u>Carter v. Delaware State Univ.</u>, C.A. No. 99-672 GMS, 2002 U.S. Dist. LEXIS 4721
     (D. Del. Mar. 21, 2002)........................................................................................................36

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548 (1986) ...........................................13, 14

<u>City of Newport v. Fact Concerts, Inc.</u>, 453 U.S. 247 (1981) ......................................................37

<u>Cobb v. Pozzi</u>, 352 F.3d 79 (2d Cir. 2003) ..................................................................................17

<u>Connick v. Myers</u>, 461 U.S. 138, 103 S. Ct. 1684 (1983) ......................................................16, 21

<u>Dillon v. Coles</u>, 746 F.2d 998 (3d Cir. 1984) ..............................................................................15

<u>Dobrich v. Wells</u>, 380 F. Supp. 2d 366 (D. Del. 2005) ................................................................14

<u>Finch v. Hercules, Inc.</u>, 865 F. Supp. 1104 (D. Del. 1994) .........................................................33

<u>Galda v. Blonstein</u>, 686 F.2d 159 (3rd Cir. 1982), <u>cert. denied</u>, 475 U.S. 1065 (1986)...............35

<u>Garcetti v. Ceballos</u>, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) ...........................................16, 18

Green v. Philadelphia Housing Authority, 105 F.3d 883 (3d Cir.), cert. denied, 522 U.S. 816, 118 S. Ct. 64 (1997) .................................................................................16, 21

Greene v. Philadelphia Housing Authority, 105 F.3d 882 (3d Cir. 1997) .....................................20

Hafford v. Seidner, 183 F.3d 506 (6th Cir. 1999) .........................................................29

Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982) ..............................................27, 29, 35

Hill v. Borough of Kutztown, 455 F.3d 225 (3d Cir. 2006) ..................................................1, 25

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) .................................................16, 19

Johnson v. Cullen, 925 F. Supp. 244 (D. Del. 1996) ......................................................15

Johnson v. George, C.A. No. 05-157-MPT, 2007 U.S. Dist. LEXIS 42465 (D. Del. June 11, 2007) ...........................................................................18

Kerns v. Dukes, 153 F.3d 96 (3d Cir. 1998) ..............................................................15

Krough v. Cessford Constr. Co., 336 F.3d 710 (8th Cir. 2003) .............................................29

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986) ..........14

Mauriello v. Univ. of Med. & Dentistry of N.J., 781 F.2d 46 (3rd Cir. 1986), cert. denied, 479 U.S. 818 (1986) ..........................................................................35, 36

McKee v. Hart, 436 F.3d 165 (3d Cir. 2006) ...............................................................24, 26, 27

Mejia v. City of New York, 119 F. Supp.2d 232 (E.D.N.Y. 2000) .............................................33

Miller v. Delaware Dept. of Probation and Parole, 158 F. Supp. 2d 406 (D. Del. 2001) ..............33

Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568 (1977) ..........1, 16

O'Connor v. City of Newark, 440 F.3d 125 (3d Cir.2006) ...................................................14, 15

Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731 (1968) ...........................................16

Poteat v. Harrisburg School Dist., 33 F. Supp. 2d 384 (M.D. Pa. 1999) ...................................18, 19

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996) ............................................................20

Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214 (1985) .............................................35

Rodriguez v. Ritchie, 539 F.2d 394 (5th Cir. 1976) ......................................................33

Rumsfeld v. Forum for Academic & Inst. Rights¸ 390 F.3d 219 (3rd Cir. 2004),
    cert. granted, 544 U.S. 1017 (2005)...................................................................................35

Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001) ............................................................24

Schoonover v. Schneider Nat. Carriers, 492 F. Supp. 2d 1103 (S.D. Iowa 2007)........................29

Shanklin v. Fitzgerald, 397 F.3d 596 (8th Cir. 2005) ................................................................29

Sheelenberger v. Summit Bancorp, Inc., 318 F.3d 183 (3d Cir. 2003) ........................................28

Smith v. Wade, 461 U.S. 30 (1983)...........................................................................................38

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000) ...........................................................26, 27, 28

U.S. v. Brown Univ., 5 F.3d 658 (3rd Cir. 1993) ......................................................................35

Walden v. Georgia-Pacific Corp., 126 F.3d 506 (3d Cir. 1997)..................................................33

Warren v. Ohio Dep't of Pub. Safety, 24 Fed. Appx. 259 (6th Cir. 2001)....................................29

Waters v. Churchill, 511 U.S. 661 (1994) .................................................................................32

Watters v. City of Philadelphia, 55 F.3d 886 (3d Cir. 1995)........................................................1

Whiting v. Univ. of S. Miss., 451 F.3d 339 (5th Cir. 2006)........................................................28

## RULES AND STATUTES

Del. Code Ann. Title 10, § 8119...............................................................................................15

Del. Code Ann. Title 14, § 6503.................................................................................................5

Del. Code Ann. Title 14, § 6504(b).............................................................................................5

Del. Code Ann. Title 14, § 6505...............................................................................................25

Del. Code Ann. Title 19, §§ 1307(a), 1308 ...............................................................................10

Fed. R. Civ. P. 26 ....................................................................................................................2

Fed. R. Civ. P. 30(b)(6).............................................................................................................2

Fed. R. Civ. P. 56 ....................................................................................................................1

Fed. R. Civ. P. 56(c) ...............................................................................................................13

Fed. R. Civ. P. 56(d) ...............................................................................................................37

Fed. R. Evid. 402 and 403...................................................................................35

Fed. R. Evid. 613................................................................................................2

Fed. R.. Evid. 801 ..............................................................................................35

Fed. R. Evid. 804(b)(1) ........................................................................................2

28 U.S.C. § 1983.................................................................................1, 14, 15, 36

## NATURE AND STAGE OF THE PROCEEDINGS

The Board of Trustees of Delaware State University ("DSU Board") and Allen L.

Sessoms, Ph.D., President of DSU ("President Sessoms"), the Defendants in this case, jointly

submit this Memorandum in support of theirs Motion for Summary Judgment under Fed. R. Civ.

P. 56.  Plaintiff, Dr. Wendell Gorum was terminated in April 2005 by the DSU Board from his

position as Professor of Mass Communications.  He filed this action on September 12, 2006

under 28 U.S.C. § 1983 ("Section 1983"), alleging that Defendants had engaged in retaliation for

speech protected under the First Amendment.  (D.I. 1).  Dr. Gorum later conceded that DSU is a

state instrumentality immune from suit for damages under the 11th Amendment.  His Amended

Complaint clarifies that the DSU Board is a party purely to provide injunctive relief; there is no

claim the Board engaged in retaliation.  (D.I. 14 at ¶8).[1]  President Sessoms is being sued in his

individual capacity for compensatory and punitive damages.  (Id. at ¶7).  Fact discovery has been

completed, and the case is set for a seven-day jury trial starting January 7, 2008.

To state a retaliation claim under Section 1983, a plaintiff must produce evidence that

(1) he engaged in conduct protected under the First Amendment; (2) the defendant took an

adverse employment action against him; and (3) there was a causal connection between those

actions, i.e., the protected conduct was a "substantial or motivating factor" in the adverse action.

Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006); Watters v. City of Philadelphia,

55 F.3d 886, 892 (3d Cir. 1995).  A defendant may then defeat the claim by demonstrating that it

would have taken the same adverse action in the absence of the protected conduct.  Mt. Healthy

City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568 (1977).

---

[1]    The parties stipulated that the DSU Board could be named, in lieu of naming the individual members in their official capacities, as a convenience to the parties and the Court (D.I. 15); this does not change the standard or waive immunity.

The central facts in this case are undisputed. In January 2004, an inquiry by DSU's NCAA Compliance Officer triggered an internal review of student grade changes by the new Registrar, Glen Parker, and the newly-hired Vice President of Human Resources, Mark Farley. They identified dozens of grade adjustments by Dr. Gorum, in classes where he was not the professor of record, that violated DSU policies and procedures. Dr. Gorum raised various defenses that DSU investigated and rejected, based largely on credibility judgments. The facts gathered by Registrar Parker, Vice President Farley and others were presented to President Sessoms, who decided in March 2004 to suspend Dr. Gorum with pay and recommend termination. (3/5/07 Letter from A. Sessoms to W. Gorum) (A000129 – A000131).[2]

Dr. Gorum chose to pursue his administrative remedies under the Collective Bargaining Agreement ("CBA") by taking the issue to an Ad Hoc Dismissal Committee ("AHDC"). The Committee was charged with conducting an evidentiary hearing, making findings of fact and conclusions, and then making a recommendation to the President and the Board. The Committee heard over 1800 pages of testimony from 17 witnesses and admitted hundreds of pages of exhibits. On April 12, 2005, the Committee forwarded to President Sessoms a 20-page report finding that Dr. Gorum had knowingly violated DSU policies and procedures and the rights of other faculty members and that his conduct rose to the level of "adequate cause" for termination under the CBA, but recommended leniency and sanctions short of termination ("AHDC Report")

---

[2]         Relevant portions of deposition testimony taken in this case are cited herein by witness and page (e.g., "Sessoms Dep. at __"). Dr. Claibourne Smith, the Chair of the DSU Board of Trustees, was deposed under Fed. R. Civ. P. 30(b)(6). Testimony taken under oath in the Ad Hoc Dismissal Committee hearings is cited as Witness name, date, and "AHDC Tr. at ___." This testimony is admissible at trial in the same way as deposition testimony taken in this case, i.e., that DSU's witnesses will testify the same way; Dr. Gorum's prior testimony can be used for impeachment under Fed. R. Evid. 613 and, if witnesses are unavailable, this prior testimony will be admissible under Fed. R. Evid. 804(b)(1). To that end, under Fed. R. Civ. P. 26, DSU has filed sworn declarations from each of the witnesses over which DSU has control verifying that they could and would competently testify in the same manner that they did at the prior hearing. All declarations, exhibits and deposition testimony relied upon herein are included in the Appendix and are cited in this brief as "A__".

(A000020 – A000046).  President Sessoms transmitted the AHDC Report to the DSU Board, together with his own recommendation that termination was the only appropriate sanction. (4/14/05 Memo from A. Sessoms to Board of Trustees) (A000143 – A000145).  The Board reviewed the AHDC Report and unanimously agreed that termination was appropriate.  (4/21/05 Letter from C. Smith to W. Gorum) (A000147).

Dr. Gorum had the opportunity to "appeal" the Board's initial conclusion and present further argument to the Board, but he waived that right on the advice of counsel.  Dr. Gorum chose not to pursue his remedies under the CBA and makes no claim that he was denied due process.  Instead, nearly a year and a half later, he filed this suit alleging that the grade adjustments and AHDC Report were a pretext, and that President Sessoms' real motive was to retaliate for a series of actions by Dr. Gorum dating back to 2002.

## SUMMARY OF THE ARGUMENT

1.    All claims based on actions prior to September 12, 2004, including the initial investigation and suspension of Dr. Gorum, are time-barred.

2.    All claims against the DSU Board in its Official Capacity should be dismissed because Dr. Gorum does not wish to be reinstated and there are adequate remedies at law.

3.    None of the alleged conduct is "protected activity" under the First Amendment because the activities did not constitute "speech"; were made as part of Dr. Gorum's employment; did not involve issues of public concern; and/or were outweighed by the potential disruption to this public employer.

4.    There is no admissible evidence that President Sessoms or the DSU Board had actual knowledge of Dr. Gorum's alleged protected activity.

5.    President Sessoms has qualified immunity for his actions, and Dr. Gorum has failed to establish facts that would overcome that immunity.

6.    Dr. Gorum cannot produce sufficient admissible evidence to permit a jury to conclude that the actions taken by President Sessoms after September 12, 2004 were motivated by retaliatory animus for protected activity.

7.    President Sessoms and the Board have met their burden of proving that they would have taken the same actions regardless of any protected activity.

8.    President Sessoms cannot be held liable for compensatory damages resulting from Dr. Gorum's termination because, by law and by contract, only the Board of Trustees can terminate a tenured professor.  There is no evidence to support a claim of punitive damages

## STATEMENT OF UNDISPUTED FACTS

## I.    BACKGROUND ON THE PARTIES

Delaware State University was founded in 1891 as the State College for Colored Students, a land grant college for agriculture and mechanical arts.  DSU has evolved into a fully accredited, comprehensive university that encompasses six colleges and a diverse population of undergraduate and graduate students.[3]  DSU is an instrumentality of the state, with 11th Amendment immunity.  (D.I. 15).  DSU has all the rights and powers of a corporation.  Del. Code Ann. tit. 14, § 6503.  It is governed by a Board of Trustees, six of whose members are appointed by the Governor.  Del. Code Ann. tit. 14, § 6504(b).

Plaintiff Wendell Gorum was first hired by DSU in 1989 as a Professor of Mass Communications within the Department of English.  A discrete Department of Mass Communications was established in the 1990s.  After Dr. Gorum was removed as Department Chair in 1996-1997, he took a sabbatical to work at Claflin University.  Dr. Gorum returned to DSU in the fall of 1997 and he served as Department Chair and Professor of Mass Communications until his suspension in May 2004.  (Gorum Dep. at 10-15) (A000192-A000193).

Defendant Allen Sessoms became President of DSU on July 1, 2003.  Before he came to DSU, Dr. Sessoms was a Lecturer and Senior Researcher at the Kennedy School of Government at Harvard for three years, and before that was the President of Queen's College for five years.  (Sessoms Dep. at 3-4) (A000166).  Dr. Sessoms was one of several candidates recruited to replace the retiring President, Dr. William DeLauder.  (Claibourne Smith Dep. at 15-17) (A000154).  The search procedures included interviews by representatives of the Board, faculty,

---

[3]    http://www.desu.edu/future_students_at_a_glance.php.

and students, staff and alumni.  The Board offered Dr. Sessoms the position after he received

favorable recommendation of all groups.

## II.    THE INVESTIGATION INTO GRADE ADJUSTMENTS

During a routine certification process in January 2004, DSU's NCAA Compliance

Officer, Kim Walker, questioned how the grade of a student-athlete could change from a "W"

(withdrawn from course) to a "B".  Ms. Walker reported this to Registrar Parker and to Dean

Tommy Frederick (as the Faculty Athletic Representative).  (Walker, 8/30 AHDC Tr. at 47-48;

4/28/04 Letter from K. Walker to T. Frederick) (A000254; A000133 – A000136).  The matter

was referred to Mr. Farley.  (Sessoms Dep. at 30-32) (A000171).  Mr. Parker conducted an audit

of all grade changes submitted for the Fall 2003 semester, and manually checked to determine

whether the person who signed the forms was the instructor of record.  (Parker, 8/30 AHDC Tr.

at 144-148) (A000258 – A000258).  He found that Dr. Gorum had submitted 21 changes for the

Fall 2003 semester where he was not the instructor of record.  In many cases these changes kept

a student on the Dean's list, prevented students from going on academic probation, or ensured

that courses would count toward the major or for graduation.  (3/1/04 Memo from G. Parker)

(A000125 - A000126).  Mr. Parker then contacted the six instructors of record (Dr. Kopano,

Prof. Wickham, Prof. Hagos, Dr. Osei-Mensah, Mr. Dawkins and Ms. Jones), and all denied

having given permission to Dr. Gorum to submit or change grades in their classes.  (Parker, 8/30

AHDC Tr. at 152-171) (A000260 – A000265).  As the investigation proceeded, Mr. Parker

identified additional incidents from prior semesters.  When Ms. Walker and Dean Frederick

interviewed several student-athletes on this list, some indicated that they had not attended those

classes or did not realize that grades had been changed.  (Frederick, 8/31 AHDC Tr. at 90-91)

(A000270).  The summaries of Mr. Parker's findings were reported to Mr. Farley.  (Parker, 8/30

AHDC Tr. at144-46, 148-51; 3/1/04 Memo from G. Parker) (A000258 – A000260; A000125 - A000126).

Dr. Gorum met with Dean Frederick on March 3, 2004, pursuant to CBA § 10.4.4. (A000061). Dr. Gorum claimed that he had permission from Dean Frederick to change grades in Dr. Osei-Mensah's class; that he had Professor Wickham's consent; and that the students involved in Professor Wickham's and Professor Dawkins' classes had been in "independent study" the prior summer, and were merely auditing the classes. Dr. Gorum was given two days to produce documentation for the letter grade changes, and never did so. (Frederick, 8/31 AHDC Tr. at 95-98, 110-111, 114-15) (A000271 – A000272, A000274, A000275). Dr. Gorum then met with acting Provost Kenneth Bell. According to Dr. Bell, Dr. Gorum did not defend any grade changes other than those in Dr. Osei-Mensah's class. Dr. Gorum offered to resign as Chair of the Department, and to retire. (Gorum Dep. at 88-89; Bell, 9/28 AHDC Tr. at 176-79) (A000206; A000278 – A000279). President Sessoms agreed with Mr. Farley that the conduct was severe, that Dr. Gorum had presented no explanation or evidence that he had authority or permission of the instructor(s) or the Dean to make these grade adjustments, and so he instituted dismissal proceedings under CBA § 10.4.3. (Sessoms, 10/27 AHDC Tr. at 49, 120-23; Sessoms Dep. at 41-42; 3/5/04 Letter from A. Sessoms to W. Gorum) (A000294 – A000297; A000172 – A000173; A000129 – A000131).[4]

## III.    THE AD HOC DISMISSAL COMMITTEE PROCESS AND HEARINGS

Under the Collective Bargaining Agreement between DSU and the Association of University Professors ("AAUP"), tenured professors cannot be terminated without "adequate

---

[4]    In that same letter, President Sessoms suspended Dr. Gorum with pay, pursuant to the President's discretionary authority under CBA § 10.4.7. (3/5/04 Letter from A. Sessoms) (A-000129 – A-000131). Dr. Sessoms subsequently changed that suspension to one without pay, effective September 1, 2004, pending the outcome of the AHDC proceedings. (8/25/04 Letter from M. Farley) (A-000138 – A-000140).

cause". (CBA §§ 10.4.1, 10.4.2) (A000060). When confronted with recommended dismissal, faculty members can elect, as Dr. Gorum did, a hearing before an Ad Hoc Dismissal Committee. The CBA contains the process for selecting the members and hearing procedures. The Committee, made up of five faculty members, is charged with hearing witnesses, taking evidence, and making findings of fact and recommendations. (CBA §10.4.11; AHDC Rep. at 3-4) (A000063; A000025 – A000026). After pre-hearing discovery, the Committee conducted eight days of hearings. All testimony was taken under oath. The Committee requested a Court Reporter and a full transcript, which DSU paid for. Dr. Gorum and DSU were represented by the same counsel that appear in this case. Dr. Gorum was able to call witnesses and cross-examine DSU's witnesses. The burden of proof was on DSU. The record included 1800 pages of testimony and hundreds of pages of documentary evidence. (AHDC Rep. at 4) (A000026). The parties also submitted post-hearing briefs.[5] The DSU Board was advised of the initial investigation, received status reports on the AHDC process, and was provided with the parties' briefs. (Claibourne Smith Dep. at 21-25) (A000155 – A000156); (Mark Farley Dep., 8/29/05[6], at ____).

## IV.    THE AHDC REPORT AND RECOMMENDATIONS TO THE BOARD

The AHDC Report was sent to the President and both counsel on April 12, 2005. The 20-page report was signed by all five members. (AHDC Rep. at iii) (A000022). The Committee went through a summary of the evidence and the arguments of DSU and Dr. Gorum. The

---

[5]    Dr. Gorum made the argument in his AHDC direct testimony that his suspension and proposed termination was in retaliation for protected speech, specifically his prior assistance to student DeShaun Morris and the prayer breakfast invitation (discussed below). (Gorum 10/27 AHDC Tr. at 10-29; Gorum 10/29 AHDC Tr. at 221-227) (A-000285 – A-000290; A-000302 – A-000303). This claim was not mentioned in Dr. Gorum's post-hearing brief, or to the Board (Gorum Dep. at 204-05) (A-000232).

[6]    Mr. Farley's deposition, and several other witness depositions, had to be re-scheduled when DSU's counsel had a death in his family. The relevant portions of the transcript will be filed when they are received.

Committee found that DSU's policies and procedures on grade adjustments were not unduly vague, and that Dr. Gorum was aware of them.  (AHDC Rep. at 16) (A000038).  The Committee assessed the credibility of the witnesses, then rejected Dr. Gorum's claims that Dean Frederick had delegated authority to make certain grade adjustments, and that Dr. Gorum had consent from all professors to make grade adjustments.  (AHDC Rep. at 17) (A000039).  After finding that Dr. Gorum had made 48 grade adjustments between 2002 and 2004 that violated DSU policies and procedures, the AHDC Report concluded that DSU had met its burden of showing that Dr. Gorum's actions rose to the level of "adequate cause" for termination.  (AHDC Rep. at 17) (A000039).  Despite these findings, based upon the Committee's view of certain past practices under prior Administrations, the Committee recommended lesser sanctions: that the suspension be affirmed; that Dr. Gorum be barred from serving as Department Chair; and that he be reinstated without back pay, under a two year probation.  (AHDC Rep. at 18-20) (A000040 – A000042).

When President Sessoms transmitted the Committee's recommendation to the Board, he concurred with most of the Committee's findings, but disagreed with the Committee's recommendation that Dr. Gorum be reinstated.  President Sessoms' opinion was that the violations were so extensive and serious that the only appropriate sanction was termination.  (4/14/05 Memo from A. Sessoms; Claibourne Smith Dep. at 27-28) (A000143 – A000145; A000157).

## V.    THE BOARD'S INITIAL CONCLUSIONS AND DR. GORUM'S WAIVER OF FURTHER CONTRACT RIGHTS.

The Board reviewed the AHDC Report and the President's recommendation in a closed session on April 14, 2005.  President Sessoms and Vice President Farley answered questions.  The discussion lasted approximately 30-45 minutes.  The Board Members were unanimous in

their opinion that termination was the appropriate sanction for the conduct found by the

Committee.  (Claibourne Smith Dep. at 28, 31-39, 63-64; Sessoms Dep. at 69-73; 4/21/05 Letter

from C. Smith to Dr. Gorum) (A000157 – A000162; A000178 – A000179; A000147).

Dr. Gorum had a right under the CBA to appear before the Board and present further argument,

and possibly witnesses.  (CBA § 10.4.14, incorporating § 8.9.2) (A000064).  Dr. Gorum

knowingly waived this right upon advice of his counsel.  (Gorum Dep. at 203-04) (A000232).[7]

## VI.    THE ALLEGED PROTECTED ACTIVITIES

Dr. Gorum's Amended Complaint only describes one "protected activity," his alleged

support of student DeShaun Morris.  (D.I. 14, ¶¶13-22).  Dr. Gorum also made a broad allegation

that he had spoken out on and associated with individuals on other matters of public concern.

(Id. at ¶23).  His interrogatory responses are equally vague.  (Response to Interrogatory No. 12)

(A000012 – A000019).  In his deposition testimony, Dr. Gorum elaborated on the actions he

alleges are protected by the First Amendment.  (Gorum Dep. at 158-161) (A000221).

1.    Dr. Gorum's Alleged "Reputation."  Dr. Gorum claims that he had a reputation on

campus, known to retired President DeLauder, as an advocate on behalf of students and faculty

who had conflicts with the DSU administration.  (Gorum Dep. at 109) (A000209).  He variously

refers to his reputation as that of a spokesperson or leader for the faculty union, an advocate, or

as a "rebel rouser."  (Gorum Dep. at 114-15, 119-22, 124) (A000211 – A000213).  His wife,

Dr. Jacqueline Gorum, a former DSU Dean, described her husband's alleged reputation as a

"power broker" on campus, and someone to whom students or faculty would seek out to assist

with problems.  (J. Gorum Dep. at 20) (A000243).  Dr. Gorum believes that President Sessoms

---

[7]        If Dr. Gorum felt he had been disciplined for protected activities as a faculty member, he could have sought
relief through the Delaware Public Employee Relations Board.  Del. Code Ann. tit. 19, §§ 1307(a), 1308.
Dr. Gorum did not pursue that remedy.

wanted to make an example of him due to his alleged reputation and/or his union activities, and that he was "marked" by September 2003.  (Gorum Dep. at 110-12, 114) (A000210 – A000211).

2.    Dr. Gorum's Alleged Opposition to Dr. Sessom's Hiring.  Dr. Gorum claims that his opposition to President Sessoms' hiring was one factor in his later termination.  (Gorum Dep. at 48-52, 108) (A000200 – A000201).  The faculty was represented on the search committee by Dr. Osei, who was then President of the Faculty Senate.  The faculty had an opportunity to meet all of the candidates.  At a March 3, 2003 meeting, the Faculty Senate ranked the candidates. (Osei Dep. at 4, 6-7; Gorum Dep. at 135-38) (A000185 – A000186; A000215 – A000216). Dr. Gorum alleges that there was a small group of professors who met before the Faculty Senate Meeting and agreed to oppose the hiring of Dr. Sessoms, or any other candidate, and to recommend that the search process be re-opened.  He claims that he, Dr. Osei, and Dr. Samuel Hoff were among this group.  (Gorum Dep. at 48-50; 138-40) (A000200 – A000201; A000216). When the Faculty Senate met, Dr. Hoff took the lead in advocating that the search be re-opened, so Dr. Gorum "did not have to say that much."  (Gorum Dep. at 50, 139) (A000201, A000216). The Faculty Senate voted against that motion, then ranked Dr. Sessoms as the highest of three candidates.  (Osei Dep. at 6-7; 3/3/03 Faculty Senate Minutes) (A000186; A000105 - A000109).

3.    The Alumni Prayer Breakfast Invitation.  Dr. Gorum was the faculty sponsor of the DSU Alpha Phi Alpha fraternity and a member of its alumni chapter.  One of the alumni chapter's chief events was an annual prayer breakfast on Dr. Martin Luther King, Jr. Day. (Gorum Dep. at 124-25) (A000213).  In the Winter of 2003-04, Dr. Gorum was on the organizing committee.  He claims that another alumni, Cecil Wilson, erroneously extended an invitation to President Sessoms to speak at this event when another person had already been invited.  (Gorum Dep. at 126) (A000214).  Dr. Gorum believes that one of the reasons he was

terminated was because President Sessoms was upset over this revoked invitation.  (Gorum Dep. at 108) (A000209).

      4.    <u>Assistance to Student DeShaun Morris.</u>  In December 2002, DSU Campus police, acting on a tip, discovered a loaded pistol, other ammunition, and gang paraphernalia in the campus dormitory room of DeShaun Morris, an All-American football player.  (Gorum, 10/27 AHDC Tr. at 14, 18-19) (A000286 – A000287).  Morris was charged under DSU's Student Code of Conduct with a "zero tolerance" violation, which carried an automatic sanction of expulsion. (12/9/02 Charles Smith Letter to D. Morris) (A000102).  The DSU Student Handbook contains multiple levels of procedural due process.  (<u>See</u> Handbook at 114-119) (A000075 – A000080). Dr. Gorum agreed to act as Morris' "advisor" and assisted Morris in writing an appeal.  (Gorum Dep. at 168-70; Morris Dep., Chancery Ct., at 37) (A000223 – A000224; A000311).  At the third level of review, there was a discrepancy between the findings of the committee and the recommended sanction, and Dr. Gorum assisted Morris in his internal challenge.  (Gorum Dep. at 170-73; Morris Dep., Chancery Ct., at 64) (A000224; A000315).  Ultimately, Morris' case went to President DeLauder, who decided that Morris would serve a one semester suspension in the Spring of 2003, and would be barred from all activities except for football.  (Gorum Dep. at 170-75; 4/4/03 Letter from Charles Smith to D. Morris; Charles Smith Dep., Chancery Ct., at 20-21) (A000224 – A000225; A000110; A000324 – A000325).

      In early July 2003, DSU officials determined that if Morris was not eligible to take classes during the Spring semester because of his suspension, then under NCAA rules he would not be eligible to play football in the Fall.  Dean Charles Smith later testified that neither he nor President DeLauder was aware of that NCAA rule when they decided Morris' sanction.  (Charles Smith Dep., Chancery Ct., pp.5-8, 20-21) (A-000318 – A-000321, A-000324 – A-000325).

Dean Smith's prior testimony is that he spoke to newly-hired President Sessoms, who disagreed with, but did not reverse, President DeLauder's decision to merely suspend Morris for having a gun on campus.  (Charles Smith Dep., Chancery Ct., at. 33-34.  <u>See</u> <u>also</u>, Sessoms Dep. at 15-17, 81) (A000326 – A000327; A000169, A000181).

Morris filed suit in Delaware's Court of Chancery seeking injunctive relief to be allowed to play football.  (Morris Compl.) (A000113 - A000121).  Dr. Gorum assisted Morris in obtaining an attorney and paying the attorney a $600.00 retainer; meeting with Morris and his attorney; and made efforts to obtain witnesses to support Morris in his lawsuit against DSU.  Dr. Gorum did not appear with Mr. Morris at any hearing or deposition.  (Gorum Dep. at 176-77) (A000225).

After taking depositions of various witnesses, it was clear that even though there may have been a mutual mistake of fact over the effect of the suspension on Morris' eligibility to play football, and that it was theoretically possible that Morris could have kept his eligibility <u>if</u> he had requested and DSU had allowed him to register pending his appeals, there was no violation of his rights or a basis to challenge his eligibility under NCAA Rules.  Morris' case against DSU was voluntarily dismissed in October 2003.  (10/6/03 Letter from C. Hickey to President Sessoms; Stipulation) (A000122 - A000123; A000124).

## <u>ARGUMENT</u>

Summary Judgment is appropriate when the record evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing, by reference to evidence on record, that there are no genuine issues of material fact to be decided at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 320, 106 S. Ct. 2548, 2551 (1986).  A moving party can satisfy this burden by exposing an absence of evidence to support the nonmoving party's case.

Id. at 325, 106 S. Ct. at 2553.  A "genuine" dispute as to a material fact only exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986).  It is not enough for the non-moving party to show a genuine issue of material fact on some elements; he must produce evidence, in a form that would be admissible at trial, from which a reasonable jury could rule in his favor on *all* elements on which he has the burden of proof.  Anderson, 477 U.S. at 252; Blackburn v. United Parcel Service, Inc., 179 F.3d 81, 95 (3d Cir. 1999).  Dr. Gorum cannot establish any of the essential elements of a claim of First Amendment retaliation or overcome the qualified immunity of President Sessoms.

## I.    ANY CLAIM RELATING TO ACTIONS OF PRESIDENT SESSOMS PRIOR TO SEPTEMBER 12, 2004, INCLUDING THE INITIAL INVESTIGATION AND SUSPENSION OF DR. GORUM, IS BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS.

The Amended Complaint does not allege any act of retaliation other than Dr. Gorum's termination in April 2005.  (D.I. 14, ¶ 32).  President Sessoms took some interim steps under the CBA, including the suspension and initiation of termination procedures on March 5, 2004 and the conversion of this suspension to without pay effective September 1, 2004.[8]  It is not necessary for the Court to determine whether Dr. Gorum should be granted leave to add these actions, or whether they are otherwise actionable under Section 1983, because they occurred outside the applicable two-year statute of limitations.  O'Connor v. City of Newark, 440 F.3d 125, 126 (3d Cir.2006) (Section 1983 is subject to the statute of limitations for personal injury actions in the state in which the claim arises); Dobrich v. Wells, 380 F. Supp. 2d 366 (D. Del.

---

[8]    Dr. Gorum also speculates that President Sessoms might have been behind an effort in October 2003 to unseat him as Department Chair.  (Gorum Dep. at 79-81) (A-000205).

2005); Johnson v. Cullen, 925 F. Supp. 244, 248 (D. Del. 1996); Del. Code Ann. tit. 10, § 8119 (two-year statute of limitations for personal injury actions). Since First Amendment retaliation claims are always individually actionable, the statute of limitations starts when the alleged retaliatory act occurs. O'Connor v. City of Newark, 440 F.3d at 127-28 (applying AMTRAK v. Morgan, 536 U.S. 101, 122 S. Ct. 2061 (2002) to discrete acts, including suspension). This suit was filed on September 12, 2006. All actions taken by President Sessoms in connection with the initial investigation, suspension and the AHDC process occurred prior to September 12, 2004, and cannot be a basis for liability or damages.

## II.    ALL CLAIMS AGAINST THE BOARD OF TRUSTEES SHOULD BE DISMISSED BECAUSE DR. GORUM DOES NOT WANT REINSTATEMENT.

Dr. Gorum stipulated in filing his Amended Complaint that the DSU Board of Trustees, an entity protected by the 11th Amendment, was being named in their Official Capacities purely for the purposes of effectuating "prospective injunctive relief", and that he was not alleging that the Board Members, individually or collectively, violated his Constitutional rights or acted with retaliatory animus. (D.I. 14 at ¶8; D.I. 15). (Gorum Dep. at 241) (A000237). Injunctive relief is available under Section 1983 only when there is no adequate remedy at law. Kerns v. Dukes, 153 F.3d 96, 111 n.6 (3d Cir. 1998). Monetary damages for back pay and/or front pay are available remedies. Dillon v. Coles, 746 F.2d 998 (3d Cir. 1984). Dr. Gorum testified he has no desire to return to DSU. If the Court ordered him to return to DSU, he would—for a day. (Gorum Dep. at 196-98) (A000230 – A000231).[9] There is no case or controversy between Dr. Gorum and the DSU Board, no injunctive relief that he is seeking from the Board, and an adequate remedy at law. The DSU Board should be dismissed.

---

[9]    Dr. Gorum also testified that he is no longer seeking any positions in Higher Education. (Gorum 8/29/07 Dep. at ___.) The relevant portions of the transcript will be filed when they are received.

### III. NONE OF DR. GORUM'S IDENTIFIED SPEECH OR CONDUCT IS "PROTECTED ACTIVITY."

It is Dr. Gorum's burden to prove that his conduct was Constitutionally protected. Mt. Healthy, 429 U.S. at 287. After Garcetti, courts must now evaluate three factors in determining whether activity is protected under the First Amendment: (1) whether the employee spoke as a citizen, not as an employee; (2) whether the statement involved a matter of public concern, and (3) whether, under the Connick/Pickering balancing test, [10] the manner and content of the speech exceeded the government's interest in avoiding disruption in the workplace. Garcetti v. Ceballos, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006). There is also a threshold issue of whether there was "speech." These are all question of law for the Court. Azzaro v. County of Allegheny, 110 F.3d 968, 975 (3d Cir. 1997) (en banc); Green v. Philadelphia Housing Authority, 105 F.3d 883 (3d Cir.), cert. denied, 522 U.S. 816, 118 S. Ct. 64 (1997).

An employee's speech addresses a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993), quoting Connick v. Myers, 461 U.S. at 146. The public concern inquiry must be determined by reference to the "content, form, and context of a given statement." Connick v. Myers, 461 U.S. at 147-48. The test for determining whether a topic is a legitimate matter of public concern is functional, asking whether there is a public benefit in reporting a matter. Brown v. Armenti, 247 F.3d 69, 76 (3d Cir. 2001). Public speech, or speech occurring outside the workplace, is more likely to be a matter of public concern. Holder, 987 F.2d at 195.

---

[10] The First Amendment protection of public employees to speak freely on matters of public concern is balanced against the efficient operation of the workplace. Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684 (1983); Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S. Ct. 1731 (1968).

It is incumbent on Dr. Gorum to present particularized facts, including the context, form and content of the speech. He has failed to do so in his Amended Complaint and Responses to Interrogatories, and on that basis alone his claim could be dismissed  Even assuming, arguendo, that the Court permitted further amendment and supplementation, Dr. Gorum has still failed to provide the required degree of specificity. See Brown, 247 F.3d at 786.

### A.     Dr. Gorum's Alleged "Reputation on Campus" Is Too Vague to be Protected Speech or Association.

Dr. Gorum claims that he had a reputation as an "advocate" of students and faculty, but has not identified any specific prior statement or action, known by President Sessoms or the Board, that was protected activity. This is far too amorphous an allegation to be given First Amendment protection. Without any specific people, words or actions identified, the Court cannot evaluate whether his words or actions were made as an employee or citizen, whether they involved matters of public concern or personal concerns, or balance governmental interests. Assuming, arguendo, that Dr. Gorum chooses to claim his past support of students or faculty was "association" rather than "speech," he is still required to identify a specific group or individual and prove that it was on a matter of public concern. See Cobb v. Pozzi, 352 F.3d 79, 91 (2d Cir. 2003). He has failed to do this.

### B.     Dr. Gorum's Alleged Speech and/or Conduct During the Hiring of President Sessoms Was Not Protected Activity.

Dr. Gorum alleges that he engaged in behind the scenes discussions with several other faculty members orchestrating votes to re-open the search process. (Gorum Dep. at 138-40) (A000216). He has not identified any particular speech known by President Sessoms, merely the fact that he supported re-opening the search. When the Faculty Senate met, Dr. Hoff took the lead; if Dr. Gorum spoke, it was limited. (Gorum Dep. at 50, 139) (A000201, A000216). Dr. Gorum's conversations (public and private) were as his capacity as faculty member, not as a

public citizen, and thus were not protected under Garcetti.  (Gorum Dep. at 134-35) (A000215).

Dr. Gorum has not expressed any concerns beyond his role as a DSU employee concerned about

his future supervisor.  His opposition to Dr. Sessom's hiring, even if not purely personal, is not

considered of a "public" concern.  See, e.g., Brown, 247 F.3d at 79 (professor's criticism of a

University's administrative decision was not a matter of public concern); see also Johnson v.

George, C.A. No. 05-157-MPT, 2007 U.S. Dist. LEXIS 42465, at *21 (D. Del. June 11, 2007)

(attached hereto as Exhibit A) (criticizing administration's implementation of internal personnel

and operational matters not a matter of public concern).  This is especially true for persons, like

Dr. Gorum in his position as a Department Chair, to whom an administration looks to implement

its policies.  See, e.g. Poteat v. Harrisburg School Dist., 33 F. Supp. 2d 384, 395-96 (M.D. Pa.

1999).

## C.    The Revocation of an Invitation to an Alumni Prayer Breakfast is Not Speech on a Matter of Public Concern.

Dr. Gorum's role in planning the Prayer Breakfast was not purely as a private citizen.  He

was the official advisor to the undergraduate chapter, and used DSU facilities in preparing

brochures.  (Wilson Decl. ¶5) (A000333).  This is sufficient to bring his actions within Garcetti.

Dr. Gorum has not identified any "speech", only the fact of the alleged revocation.  The question

of whom to invite or not invite to speak at this function was solely of concern to the DSU

Alumni Chapter of the Alpha fraternity.  Even within that group, the content of Dr. Gorum's

"speech" was not opposition to the President himself, but the fact that someone else had already

been invited to speak, and that President DeLauder (an Alpha alumnus) had never been invited to

speak at similar previous breakfasts.  (Gorum Dep. at 126-29) (A000214).  This was not speech

on a matter of public concern.

**D.    Dr. Gorum's Assistance to Former Student DeShaun Morris Was Not Protected Conduct.**

There were two phases to Dr. Gorum's "assistance" to DeShaun Morris, the DSU football player who admitted having a loaded handgun in his campus dorm room.  The first part occurred between December 2002 and May 2003, under President DeLauder, when Dr. Gorum served as Morris' "advisor" during the internal Student Affairs judicial proceedings.  Dr. Gorum has failed to distinguish any "speech" (e.g., his conversation with President DeLauder) from association or conduct (helping Morris write an appeal; serving as his advisor).  Nor was the assistance "protected activity".  First, Dr. Gorum's actions were in his role as a DSU employee; only a member of the campus community can appear as an advisor, and he used University resources. (Student Handbook; Gorum Dep. at 168-69, 184-86) (A000068 – A000100; A000223, A000227 – A000228).  Second, any "speech" during the appeals process was a purely personal grievance of Mr. Morris regarding the appropriate sanction for his admitted violation of DSU's "zero tolerance" policy.

The second phase of Dr. Gorum's assistance to Mr. Morris occurred between July and October 2003, after DSU administrators determined that Mr. Morris was ineligible under NCAA rules to play football because of his disciplinary suspension the prior Spring.  The activity Dr. Gorum claims is protected includes his assistance in hiring a lawyer to represent Morris, paying a modest retainer, private conversations with Morris and his lawyer developing the case, and soliciting potential witnesses.  Paying a bill is not considered to be "speech."  See Poteat, 33 F. Supp. 2d at 394 (instruction to staff to not pay a contractor was not speech)  By analogy, the act of hiring an attorney to represent someone else is not speech.  The form and context of Dr. Gorum's "speech" indicate it was not on a matter of public concern.  See Holder, 987 F.2d at 195.  Dr. Gorum did not make any public statements and did not appear at depositions or

hearings; his actions and any communications were behind the scene.  (Gorum Dep. at 177) (A000225).

Dr. Gorum has not identified any specific "speech", but claims that his entire assistance to Morris is what motivated President Sessoms.  Whether this conduct is analyzed as a speech or association claim, Morris' lawsuit was a purely private grievance.  While recollections differ about what the President's office might have communicated to Morris in early July, it is clear from Morris' own Complaint that he was never expelled by DSU, and, in fact, permitted back on campus for the Fall Semester and registered to take classes.  (Morris Compl. ¶13; 8/1/03 Letter from C. Hickey to D. Arndt) (A000116; A000112).[11]  As Dr. Gorum testified, the lawsuit "was about [Morris'] future as a professional athlete."  (Gorum Dep. at 192) (A000229).

An employee's own lawsuit against his employer may be protected under the First Amendment as part of the right to petition.  Anderson v. Davila, 125 F.3d 148, 161 (3d. Cir. 1997).  Appearances of an employee in court, whether by subpoena or voluntary testimony, can be matters of public concern because of the public interest in the effective administration of justice.  Greene v. Philadelphia Housing Authority, 105 F.3d 882, 888 (3d Cir. 1997); Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996).  These lines of cases are not controlling or persuasive here, where Dr. Gorum was not a party to or a witness in Mr. Morris' lawsuit.

Even assuming that Dr. Gorum was acting as a citizen, and that Morris' challenge to an NCAA eligibility decision was a matter of public concern, this is a good example of where the Connick/Pickering balancing test comes into play.  Speech is not considered protected (and a

---

[11]    There is no admissible evidence—then or now—that Morris' sanction was changed by President Sessoms. (Charles Smith Ch. Ct. Dep. at 14; Sessoms Dep. at 15-17, 81) (A-000323; A-000169, A-000181).  Dr. Gorum's recollection was that Mr. Morris had never returned to DSU.  (Gorum Dep. at 190-191) (A-000229).  In fact, Morris was enrolled for the entire 2003-04 academic year, until he was suspended and later expelled for another weapons violations, and then arrested for attempted murder.  (A-000110; A-000141 – A-000142).

public employer may dismiss an employee for speech addressing a matter of public concern) if the state's interest (as an employer) in promoting the efficiency of its operations outweighs the employee's interest (as a citizen) in commenting upon matters of public concern. <u>Connick</u>, 461 U.S. at 142. The government's interest is generally impaired where the speech causes disruption in the workplace. A public employer need only show a significant potential disruption as a result of the plaintiff's speech, as opposed to actual disruption. <u>Id.</u> For example, in <u>Green</u>, the public interest in an officer's voluntary appearance as a witness at a bail hearing was substantially outweighed by the potential to discredit to his employer in the eyes of the public and concerns over possible dissension among co-workers. These risks of potential disruption were sufficient to remove the "speech" from protection. <u>Green</u>, 105 F.3d at 888-89.

Litigation is, by definition, burdensome, costly and disruptive to operations of a public university. It is likely that Mr. Morris would not have sued DSU in the absence of Dr. Gorum's assistance and encouragement. (Gorum Dep. at 188) (A000228). The suit had the potential to draw unwanted media attention. (Gorum Dep. at 192-99) (A000229 – A000231). It became clear during the discovery process that the student's claim was based upon a mutual mistake of fact over the effect of his prior disciplinary suspension on his football eligibility under NCAA rules. DSU also had an interest – which was undermined by Dr. Gorum's actions soliciting witnesses – that current employees who could potentially bind the institution not communicate with opposing counsel without the knowledge and presence of DSU's attorneys. These facts show both potential and actual disruption sufficient to outweigh the employee's interests.

**IV. DR. GORUM HAS NO ADMISSIBLE EVIDENCE THAT THE BOARD OF TRUSTEES OR PRESIDENT SESSOMS WERE AWARE OF HIS ALLEGED "PROTECTED ACTIVITY".**

The Third Circuit Court of Appeals has explained that "[i]t is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must

be aware of the protected conduct." Ambrose v. Township of Robinson, 303 F.3d 488, 493 (3d Cir. 2002), citing Allen v. Iranon, 283 F.3d 1070, 1076 (9th Cir. 2002). This is an issue of fact on which Dr. Gorum has the burden of proof. Id.

Dr. Gorum conceded at his deposition that he has no evidence that the Members of the Board were aware of his protected activity. (Gorum Dep. at 239-41) (A000237). President Sessoms has categorically denied having any knowledge of any opposition within the faculty to his hiring, or any purported role of Dr. Gorum therein (Sessoms Dep. at 6-7) (A000167); Dr. Gorum's alleged reputation (Sessoms Dep. at 31) (A000171); the alleged invitation to the prayer breakfast, or its revocation, or Dr. Gorum's role (Sessoms Dep. at 14-15) (A000169); and Dr. Gorum's role in the lawsuit brought by DeShaun Morris (Sessoms Dep. at 30-31) (A000171). President Sessoms testified that other than knowing that Dr. Gorum was a member of the faculty, he had no other knowledge or impression of him before the grade change issue was first brought to his attention by Registrar Parker. (Sessoms Dep. at 13-14) (A000168 – A000169).

**Alleged Reputation on Campus.** Dr. Gorum claims that former President DeLauder was aware of his reputation on campus, and speculated that President DeLauder, Dean Frederick or Dr. Osei may have disclosed that to President Sessoms during the transition. (Gorum Dep. at 119, 195-96) (A000212, A000230). Dr. Gorum claims unknown people told him that President Sessoms perceived him as a rabble rouser. (Gorum Dep. at 114-17) (A000211). This is all inadmissible hearsay. President Sessoms says that he received no briefing on issues or personnel from Dr. DeLauder. (Sessoms Dep. at 6-7) (A000167). Dr. Osei has denied discussing Dr. Gorum with President Sessoms. (Osei Dep. at 17) (A000187).

***Faculty Opposition During the Presidential Search.*** Dr. Gorum bases his claim concerning the President's knowledge of his private opposition during the search process on speculation and second or third hand hearsay concerning Dr. Osei and Dean Frederick. (Gorum Dep. at 50-51, 140-41) (A000201, A000216). Dr. Osei testified that he never mentioned Dr. Gorum to President Sessoms. (Osei Dep. at 17) (A000187). Dr. Gorum bases some of his speculation on conversations that his wife may have had with Dr. Osei or others. (Gorum Dep. at 140-41) (A000216). Dr. Gorum's wife denied ever speaking to Dr. Osei about the incident, testifying that she had no first hand—or even second hand—knowledge of any person who communicated information about her husband's activities or reputation to President Sessoms. (J. Gorum Dep. at 39-46) (A000245 – A000247).

***Alumni Prayer Breakfast Invitation.*** Dr. Gorum not only claims that DSU Alumni Cecil Wilson invited President Sessoms to speak at the January 2004 Prayer Breakfast, but also assumes that Mr. Wilson communicated the revocation to President Sessoms. Dr. Gorum relies on hearsay from unidentified parties to support his belief that the President was upset by this. (Gorum Dep. at 165-67; J. Gorum Dep. at 41-43) (A000222 – A000223; A000245 – A000246). Mr. Wilson, a retired school principal and a former President of the Central Delaware Chapter of the NAACP, categorically denies ever having extended a formal invitation to President Sessoms to speak at this Prayer Breakfast, or revoking it. He also denies ever mentioning Dr. Gorum to President Sessoms. (Wilson Decl. ¶¶ 10-12) (A000334).

***Dr. Gorum's Assistance to DeShaun Morris.*** Dr. Gorum bases his claim regarding President Sessoms' knowledge of his involvement with DeShaun Morris on three facts: (1) that his involvement with Morris before President Sessoms was hired (i.e., during his internal appeals) was known to other administrators; (2) that Ms. Sheila Davis, then Director of Human

Resources, told Dr. Gorum "they are out to get you"; and (3) a telephone call allegedly made to Dr. Gorum by Ms. Sandra Arnell, the President's secretary, before the suit was filed. (Gorum Dep. at 178-82) (A000226 – A000227).[12] Drawing all inferences in Dr. Gorum's favor, this evidence merely shows that some in the Administration, including the secretary who had served President DeLauder, knew Dr. Gorum had assisted Morris at the student judiciary level. There is no evidence pointing to actual knowledge by *President Sessoms* of Dr. Gorum's help.

## V.    DR. GORUM CANNOT OVERCOME PRESIDENT SESSOMS' QUALIFIED IMMUNITY FROM SUIT.

As a state official, President Sessoms has qualified immunity from suits. "Qualified immunity insulates government officials performing discretionary functions from suit insofar as their actions could reasonably be thought consistent with the rights they are alleged to have violated." McKee v. Hart, 436 F.3d 165, 169 (3d Cir. 2006). To determine whether an official has lost his or her qualified immunity, the court must first decide whether a Constitutional right would have been violated on the facts alleged, and then whether the right was clearly established at the time of the action. See Saucier v. Katz, 533 U.S. 194, 201-02, 121 S. Ct. 2151 (2001). Only if both answers are "yes" does a government official lose his right to immunity from suit. Id. The plaintiff must also prove that this individual defendant participated in the alleged Constitutional violation. C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005); Bonenberger v. Plymouth Township, 132 F.3d 20, 23-25 (3d Cir. 1997). These are issues of law to be analyzed by the Court based upon the scope of the Amended Complaint.

---

[12]    Dr. Gorum testified that Ms. Arnell later denied making such a call. (Gorum Dep. at 180) (A-000226).

A.    **The Amended Complaint Fails to Allege, and the Facts Do Not Show, any Action by President Sessoms Within the Statute of Limitations that Violated Dr. Gorum's Constitutional Rights, So He is Protected by Qualified Immunity.**

Assuming, <u>arguendo</u>, that Dr. Gorum engaged in any protected activity that was known to President Sessoms, the next step of the inquiry is whether President Sessoms, acting under color of law, took any action that violated Dr. Gorum's Constitutional Rights.  The only adverse employment action alleged in the Amended Complaint is Dr. Gorum's termination.  (D.I. at ¶28).  Dr. Gorum does not know who terminated him, or the process used.  (Gorum Dep. at 200-02) (A000231 – A000232).  The Collective Bargaining Agreement and state law provide that only the Board of Trustees can terminate a tenured professor.  CBA at § 10.4.14 (A000064); Del. Code Ann. tit. 14, § 6505.  President Sessoms could not, and did not, terminate Dr. Gorum.

The only actions taken by President Sessoms after September 12, 2004 were (1) his April 14, 2005, letter transmitting the AHDC Report to the Board and expressing his own recommendation, and (2) attending the Board's closed-session discussion where he reiterated these views and, along with Mr. Farley, answered the Board's questions.  (Sessoms Dep. at 68-74; Claibourne Smith Dep. at 63; Farley Decl. ¶¶9-11) (A000178 – A000180; A000162; A000330).  These actions are not identified in the Amended Complaint as Constitutional violations, and Dr. Gorum has not sought leave to amend.  The Court should grant summary judgment on the grounds that the Amended Complaint fails to allege any Constitutional violation *by President Sessoms.*

Moreover, any amendment would be futile, because these two acts (the letter and comments to the Board) did not violate Dr. Gorum's Constitutional rights.  The Third Circuit Court of Appeals has permitted claims against supervisors when they rose to the level of a constructive discharge, <u>e.g.,</u> <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 240 (3d Cir. 2006), or

involved a *pattern* of retaliatory harassment, e.g., Suppan v. Dadonna, 203 F.3d 228, 234-35 (3d Cir. 2000). The test is whether "the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." Id. at 235. In McKee, the court clarified Suppan by explaining that "not every critical comment—or series of comments— made by an employer to an employee provides a basis for a colorable allegation that the employee has been deprived of his or her Constitutional rights." McKee, 436 F.3d at 170, citing Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). In Suppan, the employee had been subjected to harassment for more than a year, and then given low ratings on evaluations, allegedly in retaliation for protected activity. 203 F.3d at 230-32. In contrast, in McKee, the employee was admonished a few times over performance issues. There, as in Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003), the court concluded that criticism, verbal reprimands, or even false allegations were not sufficient to have deterred a person of ordinary firmness from exercising his First Amendment rights. McKee, 436 F.3d at 171.

Dr. Gorum testified that he was not aware of the confidential transmittal letter sent by President Sessoms to the Board, or of what was discussed in the Board meeting. (Gorum Dep. at 201-04) (A000231 – A000232). It is difficult to see how a reasonable person could be deterred in exercising First Amendment rights by allegedly retaliatory comments that were never intended to be and were not disclosed to them. The only thing President Sessoms did was to express his opinion regarding the seriousness of the conduct and recommend that the sanction that was permissible under the CBA—termination—should not be mitigated.

> **B. Assuming President Sessoms Did Violate a Constitutional Right of Dr. Gorum, that Right was Not Clearly Established at the Time of the Alleged Conduct.**

The second part of the test to overcome qualified immunity is that the rights allegedly violated must be "clearly established rights," i.e., "with contours sufficiently clear that a

reasonable official would understand that what he is doing violates that right." McKee, 436 F.3d at 171, citing McLaughlin v. Watson, 271 F.3d 566, 571. General knowledge that employees are protected from retaliation for exercising their First Amendment rights is not enough. "There must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is Constitutionally prohibited." McKee, 436 F.3d at 171. This analysis "must be undertaken in light of the specific context of the case." Id., citing Brosseau v. Haugen, 543 U.S. 194, 125 S. Ct. 596 (2004).

None of the elements of Dr. Gorum's claim were so clearly established in May 2005. First, nothing in the case law would have put President Sessoms on notice that actions towards a professor based upon his past reputation, opposition to a hiring decision, revoking an alumni breakfast invitation or assisting a student who wanted to sue the University would be "protected activity" taking into account both the "public concern" standard and the Connick/Pickering balance. See, e.g., McKee, 436 F.3d at 172.

Second, President Sessoms' private communications to the Board of Trustees regarding the seriousness of grade changes, the findings of the AHDC, and the appropriate sanction, are a classic discretionary function by a public official on academic issues to which federal courts traditionally give great deference. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). Third, in 2005 (pre-Garcetti) these comments and opinions would have been considered to be protected speech *by President Sessoms* on matters of concern to DSU and the broader community. Nothing in Suppan or other precedent would have put President Sessoms on notice that such comments to the Board on the AHDC Report could give rise to a lawsuit. There is no precedent with sufficient particularity and factual similarity to this case to show that the alleged rights were "clearly established."

## VI. NO REASONABLE JURY COULD CONCLUDE THAT THERE WAS A CAUSAL CONNECTION BETWEEN THE ALLEGED PROTECTED ACTIVITY AND DR. GORUM'S TERMINATION FOR VIOLATIONS OF DSU'S GRADE ADJUSTMENT POLICIES AND PROCEDURES.

To avoid summary judgment and proceed to trial, Dr. Gorum must also have sufficient admissible evidence from which a reasonable jury could conclude that his protected speech (i.e., whatever the Court finds meets the 3-part test for "protected activity") was a "substantial or motivating factor" in some action by President Sessoms, within the statute of limitations, that violated Dr. Gorum's rights. See Suppan, 203 F.3d at 235, citing Mt. Healthy, 429 U.S. at 287. Unsupported allegations reflecting "a myopic interpretation of events wherein retaliatory motives permeated the defendants' every move" do not suffice to demonstrate the nexus between a plaintiff's speech and an adverse employment action. Brennan, 350 F.3d at 419-20; accord Whiting v. Univ. of S. Miss., 451 F.3d 339, 351 (5th Cir. 2006).

President Sessoms and the Board have denied knowledge of the alleged protected activities and that those incidents played any role in their actions. As in most First Amendment, Title VII or other retaliation cases, Dr. Gorum does not have direct evidence that President Sessoms acted with retaliatory motives. There is nothing in the record from which a reasonable jury could conclude that President Sessoms' articulated motives—the grade adjustments and the findings of the AHDC—were a pretext for retaliation.

### A. There is No Temporal Proximity Between the Allegedly Protected Activity and the Board's Termination Decision.

In some cases, the proximity in time between the protected activity and the adverse employment action may support a rebuttable inference of retaliation if the actions occurred "'very close'" in time. See, e.g., Sheelenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 n.9

(3d Cir. 2003) (10 days).[13]  <u>Accord</u> <u>Warren v. Ohio Dep't of Pub. Safety</u>, 24 Fed. Appx. 259, 266

(6th Cir. 2001) (quoting <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)) (11

months too long).  Gaps as little as two months have been held to be too long to infer causality.

<u>Hafford v. Seidner</u>, 183 F.3d 506, 515 (6th Cir. 1999) (2-5 months).  Conversely, a long gap in

time permits the inference that there was no causal connection.  <u>See</u>, <u>e.g.</u>, <u>Krough v. Cessford</u>

<u>Constr. Co.</u>, 336 F.3d 710, 712 (8th Cir. 2003) (nine months); <u>Shanklin v. Fitzgerald</u>, 397 F.3d

596, 604 (8th Cir. 2005) (10 months).  Most of the alleged protected activity occurred before

President Sessoms took office in July 2003, and the Morris case ended in October 2003.  The

recommendation to the Board was in April 2005, some 19 months after the <u>Morris</u> case ended.

There is no temporal proximity.

    **B.**     **There Was a Reasonable Basis for the Actions Taken by President Sessoms and the Board.**

One means of showing "pretext" is by demonstrating that the reasons given by the

decisionmakers were false—and they knew they were false.  Since this case is not an appeal

under the CBA, it is not the jury's role to decide whether there was "adequate cause" under the

CBA.  As in all employment discrimination or retaliation cases, it is not the role of the court or

the jury to second-guess the business judgments of the employer, or whether the employer's

reasons were good or bad, so long as the employer did not act based on the illegal motive

claimed by the plaintiff.  <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. at 818.

---

[13]    Even very short gaps in time do not automatically evidence causation.  <u>See</u> <u>Schoonover v. Schneider Nat. Carriers</u>, 492 F. Supp. 2d 1103 (S.D. Iowa 2007) (two weeks insufficient if no evidence decisionmaker knew of protected activities).

**1.     The Initial Investigation, Which Was Not Initiated by President Sessoms, Provided a Reasonable Basis for Suspending Dr. Gorum and Proceeding with the Dismissal Process.**

The initial investigation was initiated by Registrar Glen Parker, who was not acting at the request of the President, nor influenced in how he conducted his investigation, or why it focused on Dr. Gorum.  (Parker Decl. ¶4) (A000335).  The investigation was conducted with the input of the newly-hired Vice President of Human Resources, Mark Farley.  Dr. Sessoms acted after the initial investigation was completed, key witnesses interviewed, and Dr. Gorum had been given an opportunity to respond.  (See Stmt. of Facts, supra.).  Nothing in this "background evidence" permits an inference of retaliatory animus by President Sessoms

**2.     The Comprehensive AHDC Report, Signed by Five Faculty Members, Provided a Reasonable Basis for Concluding that there Was "Adequate Cause" Under the CBA to Terminate Dr. Gorum.**

The Ad Hoc Dismissal Committee Report stated that Dr. Gorum had violated the CBA, and that these violations were serious enough to be "adequate cause" for termination.  (AHDC Rep. at 16) (A000038).  The AHDC Report concluded that Dr. Gorum had personally signed and submitted change of grade forms, removed incomplete forms, and missing grade forms for 48 Mass Communications students, which contained misrepresented information (his signing as instructor for courses he did not actually teach); had not obtained the permission or approval of the instructor-of-record to execute grade modifications; had arbitrarily assigned grades to students for courses they were not registered in, and without any clear basis for evaluating the students; and had retroactively registered and assigned grades to students for classes taught by other instructors, without consultation with these instructors.  (AHDC Rep. at 16-18) (A000038 – A000040).  The AHDC Report considered and rejected all of Dr. Gorum's defenses.  (AHDC Rep. at 6-13) (A000028 – A000035).  The Committee was composed of colleagues of Dr. Gorum.  The AHDC Report appeared to be unanimous, and there is no evidence the Board or

the President knew otherwise at the time the Board terminated Dr. Gorum in April 2005.

(Sessoms Dep. at 47-48; Gorum Dep. at 236-38) (A000174; A000236 – A000237).[14]  Dr. Gorum

concedes that they followed the CBA, and had no retaliatory motives.  (Gorum Dep. at 206, 213-

14) (A000233 – A000235).

> ### 3.   The Decision of the Board and the President to Reject Lesser Sanctions is Not Evidence of Retaliatory Motive.

The AHDC's rationale for mitigating the sanction of termination, permitted by the CBA,

was alleged past practices by prior administrations and their conclusion that other Chairs had

engaged in similar conduct.  The majority of Dr. Gorum's conduct occurred after July 1, 2003,

when the new administration reiterated DSU policies and procedures.  As discussed below, there

was no evidence of comparable conduct by any identified chair.  President Sessoms has

explained why he viewed Dr. Gorum's conduct as being extremely serious, and termination the

only appropriate remedy.  (4/14/05 Memo from A. Sessoms to Board of Trustees; Sessoms Dep.

at 52-53, 68) (A000143 – A000145; A000175, A000178).  The fact that the Board of Trustees

unanimously agreed with that view is proof that it was reasonable.  (Claibourne Smith Dep. at

36-37, 63) (A000159, A000162).

---

[14]     Dr. Gorum alleged in his discovery responses and at his deposition that President Sessoms tainted the AHDC report, based on an alleged hearsay statement by a former employee, Drexall Ball.  (Gorum Dep. at 33-34, 211-13) (A-000196 – A-000197, A-000234).  At the continuation of his deposition, Dr. Gorum claimed that Mr. Ball had denied any personal knowledge of any draft report that pre-dated the final report sent to counsel. (Gorum Dep. at 211-13) (A-000234).  Dr. Gorum also claims, and may seek to introduce evidence, that some portions of the report were not seen by and/or approved by all five AHDC members.  Dr. Yaw Ackah, Chair of the AHDC, testified on 8/29/05 that there were no prior drafts distributed; no communications with the President or Board; and that all AHDC members had a chance to read the report and submit any concurrence before they signed. If there were flaws in the internal AHDC processes—which DSU does not know or concede—these are irrelevant to the case because they were not known by President Sessoms or the Board at the time of their actions.

**4.     The President and the Board Acted Reasonably, Exceeding the Requirements of Procedural Due Process, Before Taking Action Against Dr. Gorum.**

Dr. Gorum may argue that the actions of the President and the Board of Trustees were unreasonable because they failed to scour the entire AHDC record before drawing the conclusion that termination was an appropriate remedy.  The President and the Board Chair testified that they saw no reason to question the accuracy of the AHDC Report.  (Sessoms Dep. at 72-75; Claibourne Smith Dep. at 50-51) (A000179 – A000180; A000161).

This is not a procedural due process case.  The Amended Complaint does not allege that Dr. Gorum was deprived of his property rights in an arbitrary or capricious manner.  However, in assessing any argument that the President and Board acted unreasonably, it is helpful to compare the standard applied in procedural due process cases.  The U.S. Supreme Court has explained that public employees have a right to an objectively reasonable decision-making procedure, but they do not have a right to hiring decisions based on accurate information.  Waters v. Churchill, 511 U.S. 661, 679 (1994).  As long as the decision maker relied on a fact in good faith on information provided by others, the facts do not have to be accurate.  Id. at 682-83 (Souter, concurring).  The standard of care—in a procedural due process case—is only whether a reasonable employer would use the same amount and quality of investigation.  If reasonable employers would disagree about the credibility of a fact or the amount of investigation that is required, the employer has satisfied the standard.  Id. at 678.  An employer "can spend only so much of their time on any one employment decision."  Id. at 680.

Given the extensive record developed by the AHDC, their detailed findings of fact, and the provisions of the CBA, it was not unreasonable for the President and the Board to rely on the accuracy of the report.  Even Dr. Gorum concedes, albeit reluctantly, that there was record

evidence supporting all conclusions.  (Gorum Dep. at 228-29) (A000235).  The process more

than satisfied the Constitutional minimum for procedural due process.

In contrast, in a retaliation case, it is irrelevant whether the employer made a good or bad

decision, or acted quickly, or on limited information.  When the evidence shows that

decisionmakers acted based on the evidence available, there is no liability, even if the

information turns out to be false.  See, e.g., Rodriguez v. Ritchie, 539 F.2d 394, 407 (5th Cir.

1976); Mejia v. City of New York, 119 F. Supp.2d 232, 262-63 (E.D.N.Y. 2000); Finch v.

Hercules, Inc., 865 F. Supp. 1104 (D. Del. 1994).  That is why evidence pointing to alleged

errors or omissions in an investigation, or information that was not reviewed by the

decisionmakers at the time, is not considered relevant or admissible on the issue of motive or

pretext.  Walden v. Georgia-Pacific Corp., 126 F.3d 506, 514-15 (3d Cir. 1997).

### C.    There is No Admissible Evidence of "Disparate Treatment" Because there Are no Other DSU Faculty Who Were "Similarly Situated in all Respects" to Dr. Gorum.

In order to show disparate treatment between Dr. Gorum and others, the comparators

must be similarly situated in all respects, including the nature of the conduct and the same

decisionmakers.  Miller v. Delaware Dept. of Probation and Parole, 158 F. Supp. 2d 406, 411 (D.

Del. 2001).  Dr. Gorum claimed during his deposition, as he did before the AHDC, that other

Department Chairs had engaged in similar conduct.  Dr. Gorum refused to provide names, which

prevented DSU from investigating further.  (Gorum, 10/29 AHDC Tr. at 102-103) (A000300).

Dr. Gorum has now given a list of names, but has testified that he does not have any details

regarding what they did, when, which students were involved, or the circumstances.  (See, e.g.,

Gorum Dep. at 29-30, 40-42, 76-77) (A000195 – A000196, A000198 – A000199, A000204).

There have been no verified examples of similar conduct by current DSU employees.  (Sessoms

Dep. at 52-53; Farley Decl. ¶¶12-13) (A000175; A000330 – A000331).  There is no basis for this

Court or a jury to determine whether their conduct was comparable, or whether it was known to President Sessoms or his Administration.  More importantly, there were no comparators at or before the decision -- no other chairs identified by name, who violated procedures after President Sessoms was hired, against whom DSU gave lesser sanctions.  Dr. Gorum's argument amounts to a claim that at some point in the past others were engaged in speeding, and he is the first one that the new Sheriff caught and prosecuted.  That is not evidence of retaliation.

> **D.     Dr. Gorum's "Evidence" of Animus Is Based on Rumor and Inadmissible Hearsay, and Is Not Relevant or Probative of a Causal Connection to Any Protected Activity.**

Dr. Gorum testified to three statements by others that he alleges shows retaliatory animus by President Sessoms.  First, Dr. Gorum claims that President Sessoms asked another Mass Communications professor, Dr. Baruti Kopano, to get information that would "give him, Sessoms, my head on a platter."  He bases this claim on hearsay from three faculty who allegedly heard it from Dr. Kopano.  The rumor was that this was in exchange for a promised Department Chair position, which Dr. Kopano did not receive.  When he confronted Dr. Kopano, Dr. Kopano denied making any such statement to others, or having such a conversation with President Sessoms.  (Gorum Dep. at 42-47) (A000199 – A000200).  Second, Dr. Gorum claims that sometime in 2003, around the time of the DeShaun Morris student judiciary proceedings or lawsuit, former Human Resources Manager Sheila Davis told Dr. Gorum to that he needed "to be careful because they were out to get" him, but did not say from whom or why.  (Gorum Dep. at 67-70) (A000202 – A000203).  Third, Dr. Gorum points to statements made to him by Ms. Walker's former student aide, Ms. Nicole Gould, that someone, she could not recall who, told Athletic Department personnel that if they continued to provide information to Mr. Morris they would be fired.  (Gorum Dep. at 104-105) (A000208).  Dr. Gorum says that Mr. Morris heard

from coaches after he filed the lawsuit that "I can't talk to you anymore."  (Gorum Dep. at 99-107) (A000207 – A000209).

All of these statements are two, three or four levels of hearsay, and Dr. Gorum will not be able to establish exceptions for each level.  Fed. R.. Evid. 801.  The statements regarding the coaches did not concern Dr. Gorum, and the most logical inference is that DSU was seeking to coordinate its defense through its counsel.  None of these statements makes any link with the allegedly protected activities.  They are all inadmissible under Fed. R. Evid. 402 and 403.

**E.    In Determining Whether Plaintiff Has Produced Sufficient Evidence for this Case to Proceed, the Court Needs to Weigh the Deference Traditionally Accorded to Universities in Academic Matters.**

In deciding whether Dr. Gorum's claims against President Sessoms should be submitted to a jury, this Court must consider the direction of the Supreme Court that deference should be given to the judgments of Universities, especially in academic-related decisions such as the hiring, promotion and termination of faculty.  Harlow v. Fitzgerald, 457 U.S. at 818; Galda v. Bloustein, 686 F.2d 159, 166 (3rd Cir. 1982), cert. denied, 475 U.S. 1065 (1986).  The Supreme Court has long recognized that colleges and universities have a special role in society, enjoying a level of "autonomous decisionmaking," and has treated university decisions with "great respect." Rumsfeld v. Forum for Academic & Inst. Rights¸ 390 F.3d 219, 234 n.13 (3rd Cir. 2004), cert. granted, 544 U.S. 1017 (2005), quoting Sweezy v. New Hampshire, 354 U.S. 234, 250 (2003) and Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 226 n.12 (1985); Mauriello v. Univ. of Med. & Dentistry of N.J., 781 F.2d 46, 50 (3rd Cir. 1986), cert. denied, 479 U.S. 818 (1986).  Universities are accorded the greatest deference in matters implicating academic freedom or the First Amendment, such as decisions regarding who may teach.  U.S. v. Brown Univ., 5 F.3d 658, 678 (3rd Cir. 1993); Rumsfeld¸ 390 F.3d at 234 n.13.

The Board of Trustees and President Sessoms have stated that Dr. Gorum was fired for failing to follow procedures for grade adjustments and changing the grades of other instructors without their consent, thus undermining the integrity of the grading process and threatening the value of the DSU academic degree.  This falls into one of the core decisions warranting deference—who teaches at a university—and the paradigm of an academic decision, affecting the University's ability to enforce its academic standards and to preserve the integrity of DSU's community of scholars.  On such matters, courts will not overrule a university's academic decision unless it was "'beyond the pale of reasoned academic decisionmaking.'"  Mauriello, 781 F.2d at 50, quoting Ewing, 474 U.S. at 225.

DSU understands that faculty personnel decisions are not immune from scrutiny, especially in discrimination or retaliation cases.  What this doctrine reflects is a degree of deference to personnel decisions involving faculty that is akin to that seen in Section 1983 retaliation cases involving law enforcement agencies.  When weighing whether Plaintiff's evidence of First Amendment retaliation is sufficient to impose additional burdens of defending the lawsuit on a public university and its President, this doctrine should weigh heavily in favor of summary judgment.

## VII.  PRESIDENT SESSOMS AND THE BOARD HAVE MET THEIR BURDEN OF PROVING THAT THEY WOULD HAVE TAKEN THE SAME ACTIONS IN THE ABSENCE OF ANY PROTECTED ACTIVITY.

Assuming, arguendo, that Dr. Gorum can overcome all other hurdles, and demonstrate through admissible evidence that his protected speech or association was a substantial or motivating factor in some Constitutional violation by President Sessoms, summary judgment is still appropriate when the evidence is overwhelming that the defendants would have taken the same actions in the absence of protected conduct.  See, e.g., Carter v. Delaware State Univ., C.A. No. 99-672 GMS, 2002 U.S. Dist. LEXIS 4721, at *6-7 (D. Del. Mar. 21, 2002) (attached hereto

as Exhibit B).  Once the AHDC issued its Report, the key question was the sanction for the

conduct admitted by Dr. Gorum or included in the AHDC's findings.  President Sessoms has

consistently explained his view that these grade adjustments threatened the very integrity of the

grading process, the rights of other professors, and the reputation of a DSU degree, as well as

placing DSU in jeopardy with the NCAA.  (See, e.g., Sessoms 10/27 AHDC Tr. at 50-51)

(A000294).  President Sessoms strongly believed then, and still believes now, that termination

was appropriate for even one incident, and will seek that sanction whenever there is sufficient

proof.  (Sessoms Dep. at 52-53, 68; Sessoms, 10/27 AHDC Tr. at 66) (A000175, A000178;

A000295).  The Board unanimously concurred with this view.  (Claibourne Smith Dep. at 36-37,

63) (A000159, A000162).

## VIII.  THE COURT SHOULD GRANT PARTIAL SUMMARY JUDGMENT ON ALL CLAIMS FOR COMPENSATORY DAMAGES ARISING FROM DR. GORUM'S TERMINATION, AND ALL CLAIMS FOR PUNITIVE DAMAGES.

If the Court does not grant summary judgment on the entire claim, it is still appropriate

under Fed. R. Civ. P. 56(d) to narrow the issues for trial, including potential damages.  President

Sessoms cannot be held liable for damages arising from actions other than his own.  As noted

above, the DSU Board is the only entity with legal authority to hire and fire professors.

Dr. Gorum will not be able to rebut the evidence that the Board did an independent evaluation of

both the AHDC Report and President Sessoms' recommendation, debated the conduct and the

sanction, and decided to terminate Dr. Gorum.  The DSU Board does sometimes disagree with

President Sessoms, and is not a "rubber stamp."  (Claibourne Smith Dep. at 9-11) (A000152 –

A000153).  The Court should grant partial Summary Judgment on all claims for damages that

were proximately caused by the termination, including claims for back pay and front pay.

Governmental entities and public officials acting in their official capacities are immune

from liability for punitive damages.  City of Newport v. Fact Concerts, Inc., 453 U.S. 247

(1981).  To obtain punitive damages, there must be evidence that President Sessoms, in his

individual capacity, acted with reckless or careless disregard or indifference to Dr. Gorum's

Constitutional rights.  <u>Smith v. Wade</u>, 461 U.S. 30 (1983).  No such evidence exists.

## **<u>CONCLUSION</u>**

For the reasons stated above, Defendants Allen L. Sessoms, Ph.D. and the Board of

Trustees of Delaware State University respectfully request that the Court find that they are

entitled to summary judgment as a matter of law, dismiss the Amended Complaint with

prejudice, and grant such other further relief that the Court deems appropriate.

<table>
<tr><td></td><td>/s/ Michael R. Robinson</td></tr>
<tr><td></td><td>Kimberly L. Gattuso (No. 3733)</td></tr>
<tr><td><b>OF COUNSEL</b></td><td>Michael R. Robinson (No. 4452)</td></tr>
<tr><td>Robert L. Duston</td><td>SAUL EWING LLP</td></tr>
<tr><td>SAUL EWING LLP</td><td>222 Delaware Avenue, Suite 1200</td></tr>
<tr><td>2600 Virginia Avenue, N.W.</td><td>P.O. Box 1266</td></tr>
<tr><td>Suite 1000</td><td>Wilmington, Delaware 19899-1266</td></tr>
<tr><td>Washington, DC 20037-1922</td><td>(302) 421-6800</td></tr>
<tr><td>(202) 333-8800</td><td>kgattuso@saul.com</td></tr>
<tr><td>rduston@saul.com</td><td>mrobinson@saul.com</td></tr>
</table>

DATED:  <u>August 31, 2007</u>

# EXHIBIT A

LEXSEE 2007 U.S. DIST. LEXIS 42465



Analysis
As of: Aug 29, 2007

**MARGUERITE A. JOHNSON, Plaintiff, v. ORLANDO J. GEORGE, JR., and DELAWARE TECHNICAL AND COMMUNITY COLLEGE, Defendants.**

**Civil Action No. 05-157-MPT**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2007 U.S. Dist. LEXIS 42465*

**June 11, 2007, Decided**

**PRIOR HISTORY:** *Johnson v. George, 2007 U.S. Dist. LEXIS 35344 (D. Del., May 15, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendants, her former employer and a supervisor, alleging a free speech violation, retaliation and wrongful termination, that she was wrongfully deprived of a property interest by being placed on administrative leave without a grievance procedure, and that she was denied procedural due process with respect to a pretermination hearing. Defendants moved for summary judgment. The employee contested the motion.

**OVERVIEW:** The employee was a campus director of a community college. After she made especially antagonistic comments during a departmental meeting regarding a new campus policy, she was placed on paid administrative leave pending an investigation. A grievance was denied on the basis that such leave was not grievable. An investigation revealed that the employee abused her position by using personnel and materials for personal reasons, misused a college credit card, and was abusive toward employees. After a pretermination hearing, wherein the employee was permitted to present evidence to an independent impartial hearing officer, she was terminated. The court granted summary judgment for defendants. The employee's comments at the meeting were not protected speech because it did not target matters of public concern. The employee received due process because she had six months notice of the charges and an opportunity to present evidence at a hearing. There was no substantive due process violation because the termination decision was not malicious, arbitrary, or irrational. Defendants were entitled to qualified immunity since there was no violation of clearly established constitutional rights.

**OUTCOME:** The court granted defendants' summary judgment motion.

**COUNSEL:** [*1] Gary W. Aber, Esquire, Aber, Goldlust, Baker and Over, Wilmington, Delaware, Attorney for Plaintiff.

David H. Williams, Esquire, Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, Attorney for Defendants.

**JUDGES:** Mary Pat Thynge, U.S. Magistrate Judge.

**OPINION BY:** Mary Pat Thynge

**OPINION**

2007 U.S. Dist. LEXIS 42465, *1

## AMENDED MEMORANDUM OPINION

June 11, 2007

**Mary Pat Thynge, U.S. Magistrate Judge**

### I. INTRODUCTION

This is an employment discrimination case. On March 15, 2005, Marguerite A. Johnson ("Johnson") filed a complaint [1] against Orlando J. George, Jr., ("George") and the Delaware Technical and Community College (the "College" or collectively, "Defendants") alleging violation of her right of free speech under the *First Amendment* and *42 U.S.C. § 1983*. Johnson claims that her comments led to retaliatory action resulting in her wrongful termination. Johnson alleges that she was wrongfully deprived of a property interest by being placed on administrative leave from the College without a grievance procedure, and was denied her procedural due process rights in the events prior to and during a termination hearing.

1   D.I. 1.

[*2]   In support of their motion for summary judgment, Defendants argue that Johnson's statements are not protected under the *First Amendment*, that paid administrative leave does not deprive her of property rights, and procedural due process was more than adequate. This is the court's determination of that motion.

### II. BACKGROUND

Delaware Technical and Community College is a state-wide institution of higher education with campuses in Wilmington, Stanton, Dover (the Terry Campus) and Georgetown. Johnson began her employment 1970 as a GED Instructor and ultimately rose to one of the top leadership positions at the College in 1994. Johnson's success over the years was attributed to her being a "tough cookie who didn't pull punches." [2] Detracting from her successful record were reports of a change in Johnson's behavior. [3] In a November 26, 2002 letter to Johnson, [4] George expressed concern that her behavior was "all too frequently out of control," and asked that she either take remedial steps to correct her behavior or submit to a thorough investigation of the allegations. Ultimately, Johnson agreed to engage an outside consulting firm for counseling and behavior modification. [*3] Allegations of Johnson's abusive, contrary and

disrespectful behavior to both colleagues and subordinates continued through 2004. [5]

2   D.I. 115 at 5.
3   D.I. 108 at 3 (George first started hearing complaints about Johnson's behavior in 2002).
4   D.I. 109 at 128 (That letter also states that George was "deeply concerned because the unacceptable behavior described is strikingly similar to many anecdotal reports I have received concerning your behavior").
5   D.I. 108 at 6.

The complaints surfaced a final time in a report to George of Johnson's antagonistic comments during a departmental meeting. The meeting took place, in part, to introduce a new campus-wide technology policy. Prior to the meeting, and in an effort to consolidate business practices, the President's Council [6] decided to reorganize the Campus Information Technology ("IT") Division. With his Vice-Presidents' advice and agreement, George established the new IT strategy and leadership program, which included a directive to strictly support [*4] and follow the new IT director and his agenda. [7] During the November 19, 2004 meeting of the Terry Campus Department Chairs, Johnson's comments "left many with the sense that [she] was unaware of the changes brought about by the reorganization." [8] It was reported to George that Johnson's questions were antagonistic and inconsistent with those of a Campus Director, and expressed a negative attitude toward the new IT policy and disdain for Mr. Shoudy. [9]

6   The President's Counsel constituents were George and the six Vice-Presidents (including Johnson). During the latter half of 2005, George was the President of the College and Johnson was a Vice-President and Director of the Terry Campus.
7   D.I. 108 at 4 (Mr. Peter Shoudy, the school's Chief Technology Officer).
8   D.I. 109 at 33.
9   *Id.*

George, once again, suggested that an investigation be made into the allegations of improper conduct by Johnson to "get to the bottom and determine whether or not [the] incidents have any substance to [*5] them." [10] He suggested that Johnson either take an administrative leave while the investigation was ongoing, or alternately, accept an early retirement from her position. Johnson

replied that neither option was acceptable. [11] On January 3, 2005, George placed Johnson on administrative leave with full pay and benefits, pending an investigation which focused on the allegations about her behavior. In a confidential memorandum, George asked that Johnson gather her personal belongings and leave at the end of that day. The memo stipulated that she neither talk to College employees to discuss the investigation, nor visit College facilities without prior permission. [12] A general announcement was issued stating that Johnson was on administrative leave and that Daniel Simpson would be acting director of the Terry Campus. Johnson subsequently filed a grievance with Human Resources, which was denied on the basis that paid administrative leave is contractually a non-disciplinary and non-grievable action, [13] because Johnson was not adversely affected by the leave. [14] On March 15, 2005, Johnson filed the present matter.

[*6]

10  D.I. 108 at 6.
11  D.I. 116 at 49.
12  *Id.* at 50.
13  D.I. 119 at 3.
14  D.I. 109 at 87.

An investigation was undertaken by the College's attorney, David Williams, Esq., and an accountant from the Santora Baffone CPA Group. The investigation uncovered that Johnson abused her position at the Terry Campus by using personnel and materials for personal reasons, misused a College issued credit card, and was abusive toward employees. The CPA Group produced a report (the "Santora Report") outlining the abuses and sent it to Johnson on April 15, 2005. As a result of the investigation, George determined that a pre-termination hearing was in order. On April 26, 2005, upon the recommendation of counsel, the College's Board of Trustees adopted new rules of procedure for conducting termination proceedings to protect Johnson's due process rights, [15] which afforded rights that were not included in the College's Personnel Policy Manual. [16] Specifically, the new rules provided:

1. Notice of the reasons for termination.

2. A hearing before an independent, impartial Hearing Officer.

3. The right [*7] to confront and cross-examine witnesses testifying under

oath.

4. The creation of a stenographic record.

5. The burden of the College to establish one or more reasons for termination by a preponderance of the evidence.

6. The preparation of a written decision by the Hearing Officer.

7. A binding and final decision by the Hearing Officer. [17]

On the following day, Johnson was sent notification of the College's intention to terminate her employment which included the grounds for termination and the new hearing procedures.

15  D.I. 109 at 30 (George Deposition, November 30, 2005).
16  D.I. 108 at 9 (The College's Personnel Manual afforded notice of the reasons for termination, affidavits from persons supporting termination, a hearing presided over by the College's chief legal counsel, no right to address or cross-examine witnesses at the hearing, and a final recommendation by counsel to the Vice-President).
17  D.I. 109 at 43 (The new rules for a pre-termination hearing were to assure that a Vice-President would receive a hearing before an independent and impartial decision maker).

[*8] On May 11, 2005, retired Delaware Superior Court Judge Vincent Bifferato was appointed as the hearing officer in the matter. [18] On June 17, 2005, the College identified its witnesses and on June 28, 2005, Johnson received the College's hearing exhibits, and affidavits from witnesses. On the following day in a two-day hearing, the College presented 13 witnesses and 30 exhibits. Through counsel, Johnson cross-examined the College's witnesses. Johnson testified on her own behalf and presented 6 witnesses and 47 exhibits. Judge Bifferato reviewed the eight page report from the Santora Baffone Group to determine if Johnson's actions were consistent with College policy. The audit conducted by Santora Baffone was in accordance with standards established by the American Institute of Certified Public

2007 U.S. Dist. LEXIS 42465, *8

Accountants. [19] On July 19, 2005, after reviewing the evidence presented at the hearing, including the exhibits, Judge Bifferato issued a decision that Johnson be terminated for cause. He found that the College met its burden of proof by a preponderance of the evidence that "Johnson inappropriately used College personnel and materials for personal matters" and that "Johnson did not fully and [*9] equitably replay [sic] the College for such labor and materials." [20] In addition, he commented that Johnson followed a "pattern of abuse in the use of [her] College [issued] credit card." [21] Finally, he concluded that Johnson's actions clearly met the requirements for termination outlined in her employment contract. [22] Consistent with the findings of Judge Bifferato, Johnson's employment was terminated on July 19, 2005.

> 18    Bifferato was recommended by Hope Murray, head of Human Relations, and selected by George.
> 19    D.I. 109 at 46 (The report was reviewed by the State of Delaware Office of Auditor of Accounts. In the report, dated November 10, 2005, the Auditor concurred with the findings of the CPA Group and referred the case to the Office of Attorney General for the State of Delaware for review and any further action). D.I. 109 at 212.
> 20    D.I. 116 at 109.
> 21    *Id.* at 110.
> 22    *Id.* at 111.

## III. LEGAL STANDARD

### Summary Judgment

A grant of summary judgment [*10] pursuant to *Fed. R. Civ. P. 56(c)* is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [23] A *Rule 56(c)* movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case." [24] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." [25] To avoid summary judgment, a plaintiff must offer "concrete evidence from which a reasonable [trier of fact] could return a verdict in his favor" and may not rely on unsupported assertions or conclusory allegations. [26] Even so, the nonmovant must

be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the nonmovant. [27]

> 23    *Lujan v. National Wildlife Federation, 497 U.S. 871, 884, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).*
>
> [*11]
>
> 24    *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*
> 25    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).*
> 26    *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*
> 27    *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992).*

### *First Amendment* Protection

The United States Supreme Court's decision in *Garcetti v. Ceballos* [28] addresses whether a public employee's speech is protected under the *First Amendment*. In prior opinions, the Court "identified two inquires to guide interpretation of the constitutional protections accorded to public employee speech." [29] The first requires determining if the employee was speaking "as a citizen on a matter of public concern." [30] If not, there is no motivation for retaliatory action and therefore, no cause of action. [31] The second question is whether the employer had adequate justification to restrict the speech, relating the content of the speech to the employer's interest in promoting efficiency for the public [*12] service it performs. [32] Ultimately, the burden of showing that the speech is protected rests with the employee. [33] In *Garcetti,* the Court maintains the delicate balance of interests between when an employee speaks as a citizen addressing a matter of public concern, and when an employee is "simply performing [her] job duties, [where] there is no warrant for a similar degree of scrutiny." [34] It reasons that public employees occupy trusted positions in society, and therefore, when they speak out against government policy, the speech can impair the proper performance of government functions. [35] It found that "the *First Amendment* does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." [36] While the dissent in *Garcetti* argued that the need for balance does not

disappear "when an employee speaks on matters his job requires him to address," [37] an employee "should not prevail on balance unless he speaks on a matter of unusual importance and satisfies high standards of responsibility in the way he does it." [38] Eligible subject matter for comment would include: "official dishonesty, deliberately unconstitutional [*13] action, other serious wrongdoing, or threats to health and safety." [39]

> 28  *Garcetti v. Ceballos, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).*
> 29  *Id. at 1958* (citing *Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)*).
> 30  *Id.*
> 31  *See Mt. Healy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).*
> 32  *See Garcetti, 126 S. Ct. at 1957.*
> 33  *See Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995).*
> 34  *Garcetti, 126 S. Ct. at 1961.*
> 35  *See Id. at 1958.*
> 36  *Id. at 1954.*
> 37  *Id. at 1961.*
> 38  *Id. at 1967.*
> 39  *Id.*

Procedural Due Process

A government employee may be deprived of a property interest if not afforded due process in termination proceedings. The State cannot deny an expectation of continued employment without due process of law. [40] The *Fourteenth Amendment* [*14] does not, itself, create property rights, but rather, protects rights granted employees. [41] Property rights are determined from sources independent of the Constitution, such as, a state law or employee contract. [42] Prior to termination, a government employee is generally entitled to "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." [43] Notice is sufficient if "1) it apprises the vulnerable party of the nature of the charges and general evidence against him, and 2) if it is timely under the particular circumstances of the case." [44] A simple statement providing notice of the charges and nature of the evidence is enough. [45] The specificity required should provide the "opportunity to determine what facts, if any, within [the plaintiff's] knowledge

might be presented in mitigation of or in denial of the charges." [46] While advance notice is not required, "the timing and content of notice . . . will depend on appropriate accommodation of the competing interests involved." [47]

> 40  *See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*

[*15]

> 41  *Id.*
> 42  *See Board of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).*
> 43  *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*
> 44  *Gniotek v. City of Philadelphia, 808 F.2d 241, 244 (3d Cir. 1986).*
> 45  *See Id.*
> 46  *Id.*
> 47  *Goss v. Lopez, 419 U.S. 565, 579, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975).*

## IV.  POSITIONS OF THE PARTIES AND ANALYSIS

The College defends its conduct by arguing that Johnson's statements were made pursuant to her official duties, and she was not speaking as a citizen on a matter of concern for *First Amendment* purposes. It maintains that Johnson was not denied due process in the investigation and subsequent termination hearing and was not subject to adverse action as a result of having to choose between early retirement and paid administrative leave. Johnson disagrees. She contends that she was denied due process throughout her administrative leave and in her pre-termination hearing.

Johnson's Speech as Government Employee

The College explains that Johnson was a high ranking [*16] official with a leadership position during the Terry Campus meeting for Department Chairs. It asserts that Johnson's speech projected a lack of support for the new IT director and his policies, an area within her authority as Director of the Terry Campus. It states that personnel matters and department reorganizations are areas of concern for a campus Director, and not the general citizenry.

Johnson argues it was not her job to manage, direct

or control the IT department, and therefore, her comments were outside of her job responsibilities. She argues that as a Vice President, she was not required to attend every meeting on campus, nor supervise the IT department. She adds that she was not a regular attendee of Department Chair meetings and therefore, attendance was not part of her daily professional activities as Director. Johnson contends that she acted appropriately in discussing public concerns for the IT system at the meeting and was not subversive or insubordinate. In the alternative, she argues that if her comments are characterized as subversive and insubordinate, the characterization supports that she must have "acted outside of her job duties in raising those issues." [48] [*17]

48  D.I. 115 at 35.

In *Garcetti,* the Court concludes that when government employees speak in an official capacity and are "simply performing their job duties," [49] they have no *First Amendment* right, and the court need not balance that right and an employer's prerogative to restrict it. Johnson rationalizes the *Garcetti* opinion as "narrow," of "limited scope" and "inapplicable," explaining that a government employee's speech is always protected from discipline, except, when acting within the defined limits of her job description or as part of her specific, daily professional activities. Johnson's characterization is unpersuasive. *Garcetti* explains that the *"First Amendment* protects a public employee's right, in *certain* circumstances, to speak as a citizen addressing matters of public concern." [50] Johnson was acting in her capacity as the Campus Director, with overall responsibility for the needs of the students and faculty of the campus when attending and participating in the Department Chair [*18] meetings, the purpose of such included review of the College IT program, as well, as other campus related matters. Johnson argues that because she did not regularly attend these meetings, that they do not fall within her employment responsibilities. Johnson's logic of how attending a faculty meeting could be described as outside of her official capacity is unpersuasive. There is no indication that the public was invited to attend or participate in such meetings and there is no evidence that the meeting in question addressed matters unrelated to College issues. Following Johnson's argument to its logical conclusion means that *all* College matters are public issues. That argument eviscerates the principles of *Garcetti* because Johnson would always be addressing public concerns just by her position as a government

employee.

49  *Garcetti v. Ceballos, 126 S. Ct. 1951, 1961, 164 L. Ed. 2d 689 (2006).*
50  *Id. at 1957* (emphasis added).

Johnson contends that since she was not responsible for [*19] managing the IT department, her attendance was not required, nor within her employment duties. [51] Her argument is nonsensical, and contradicts Johnson's own admission of concern over the new IT strategy and its impact on campus services. In *Garcetti,* "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." [52] Johnson was responsible for the Terry Campus, and her attendance at the Chairpersons meeting is consistent with that role. Therefore, the College did not infringe Johnson's liberties by subjecting her to any resultant discipline for her conduct.

51  D.I. 115 at 34.
52  *Garcetti, 126 S. Ct. at 1960.*

Johnson's Speech as a Matter of Public Concern

The College maintains that Johnson's statements do not address any misuse of College funds [*20] or allegations of wrong-doing, and therefore were not a matter of public concern. It contends that Johnson's statements regarded personnel and operational matters or "personnel squabbles," are not matters of public interest and do not meet the definition of speech protected by the *First Amendment.* It submits that a dispute over departmental reorganization is, in essence, a power struggle between departments. Assuming such speech is protected, it argues that Johnson's speech was not a basis of Judge Bifferato's decision and not a motivating factor in the decision to terminate her employment.

Johnson argues that the subject matter of the meeting was one of public concern. She states that the IT department affected how the administrators, students and the outside public would interact with the school, and therefore automatically is a matter of public concern. Johnson admits that she had previous issues with the IT department and that her statements were relevant to how that department offered service to the Terry Campus. [53] Finally, in an affidavit dated July 17, 2006, Johnson

2007 U.S. Dist. LEXIS 42465, *20

suggests that the College offered off-campus interactive computerized classes through the IT department and [*21] as a result, her comments dealt with issues related to the public. [54]

> 53  D.I. 115 at 8.
> 54  D.I. 116 at 334.

Criticism of the College's IT strategy and leadership is not the type of speech protected by the *First Amendment* according to *Garcetti* and its progeny. The structure and function of the IT department are issues for the College faculty, staff and students, but such communications are not matters of *public* concern. *Garcetti* explains that "[o]fficial communications have official consequences, creating a need for substantive consistency and clarity" and a supervisor's communications must be "accurate, demonstrate sound judgment, and promote the employer's mission." [55] Johnson's comments at the Directors meeting did not "promote the employer's mission" because they questioned an agreed upon policy set forth by the College. If Johnson's superiors thought her comments were "inflammatory or misguided, they had the authority to take proper corrective action." [56] In his role as president of [*22] the College and Johnson's superior, George generated consensus regarding the new IT strategy, hired a program manager, and specifically called for the Vice Presidents to support the new policies. Johnson's comments were critical of the program, failed to promote the College's mission, and were subject to corrective measures. Even if the court balances Johnson's right to express her opinions with the College's needs, her comments are not protected speech. Her criticisms did not address nor were directed to "official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety." [57] Simply, Johnson's statements expressed her disapproval for George's choice of an IT director and his programs. Speech directed to internal personnel and operational matters is not protected by the *First Amendment*.

> 55  *Garcetti, 126 S. Ct. at 1960.*
> 56  *Id.*
> 57  *Id.*

In conclusion, Johnson acted in her role as director of the Terry Campus by her attendance [*23] and participation in the meeting of faculty chairpersons. She spoke on certain issues as director of the Campus. Her comments projected her dissatisfaction with the College's

choice in leadership and the IT strategy. Her speech did not target matters of public concern. Therefore, no genuine issue of material fact exists. Johnson's comments during the Campus Chairperson's meeting do not fall within any *First Amendment* protection.

Procedural Due Process

The College contends that the hearing procedures afforded Johnson exceeded the minimal due process required by the *Due Process Clause of the 14th Amendment* and under her employment contract. First, it explains that since Johnson was suspended with pay, she was not being disciplined, nor was she denied a property or liberty interest and therefore, no process was mandated before placing her on leave. It also states that she received advance notice of the charges against her in the Santora Report. [58] Witnesses were identified by the College on June 17, 2005, eleven days before the hearing. Johnson was provided with over one thousand pages of documents, in addition to the exhibits the College planned to rely on at the hearing. [*24] The College maintains that the process was both fair and adequate because Judge Bifferato was appointed as the hearing officer, and the College Trustees agreed to be bound by his decision.

> 58  The Santora Report included a detailed explanation of the allegations of improper conduct and misuse of College funds.

Johnson proposes that she has a constitutionally protected property interest in her employment and that the unfair nature of the proceedings denied her due process. [59] She contends that the College denied her due process rights by placing her on administrative leave without the right to a grievance procedure, and that the College's actions stigmatized her and damaged her professional reputation. She argues that her paid administrative leave was a disciplinary action, and a grievance procedure was guaranteed by her employment contract. Johnson complains that she was also denied the right to speak to College employees while the investigation was underway, and therefore, the investigation was generally unfair [*25] to her. She contends that the investigation and the Santora Report was "riddled with errors, omissions and contradictory facts" implying that the College manipulated the decision making process, resulting in a decision that was "intrinsically flawed." [60] Johnson alleges that she was unable to refute the testimony against her because the

College refused to "provide specifics concerning such testimony." [61] She also reasons that changes made by Defendants to the pre-termination hearing process did not eliminate the College's prior contractual obligation to provide her with affidavits from witnesses. Finally, she claims her procedural due process rights were violated because she did not receive a description of the evidence to be used to prove her abuse of employees.

59   D.I. 115 at 41.
60   D.I. 115 at 42.
61   *Id.* at 44.

Johnson's contention, that she was deprived of a property interest as a result of the College's termination procedure, is unsubstantiated. The court recognizes that Johnson has a [*26] property interest in her continued employment and turns to the issue of what process Johnson is due. The United States Supreme Court in *Cleveland Bd. of Educ. v. Loudermill*, states that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." [62] While the hearing "need not be elaborate," it must provide the "determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." [63] The adequacy of the hearing is dependant on the importance of the property interest being denied and the property right to one's livelihood is extremely important. [64] If post-termination proceedings are non-existent, then a more elaborate pre-termination hearing is required. [65]

62   *470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)*.
63   *Id.* at 545.
64   See *Hameli v. Nazario, 1994 U.S. Dist. LEXIS 20523, 1994 WL 827787, *4 (D. Del. Sept. 2, 1994)*.
65   *Id.*

[*27] Although "advance notice is not a per se requirement of due process," [66] Johnson received ample notice of the charges and had a reasonable opportunity to prepare a response. Johnson was aware that her activities were under investigation more than six months prior to the hearing. Two and a half months prior to the hearing, Johnson received the Santora Report which outlined the allegations of financial abuse which were the basis for her dismissal. Two weeks before the hearing, the College

provided notice of the witnesses it was going to call, and days before, the College offered all of the materials and demonstratives used at the hearing. Therefore, notice was sufficient as it provided the nature of the charges and the evidence against her, and was timely under the circumstances of the case.

66   *Morton v. Beyer, 822 F.2d 364, 369 (3d Cir. 1987)*.

Prior to April 2005, the College did not have guidelines for conducting a pre-termination hearing for a Campus Vice-President. The College's Board of [*28] Trustees approved the new guidelines to insure that both parties would be represented fairly and due process procedures were followed. During the two day hearing, Johnson was provided an opportunity to respond to the charges against her. The Constitution requires a proceeding to be "appropriate under the circumstances; [but] it does not require confrontation and cross examination in every proceeding." [67] The purpose of such a proceeding is to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." [68] At the pre-termination hearing Johnson could call and cross-examine witnesses and present evidence. Johnson was represented by counsel, and she was able to test the truthfulness of the accusations against her. Johnson testified on her own behalf and proffered 6 witnesses and 47 exhibits. Retired Superior Court Judge Bifferato, whose decision in the matter was final, reviewed all of the material presented. He found that there were reasonable grounds to believe that the charges against Johnson were true and supported her dismissal. In his report, the Judge determined that the College met its burden of [*29] proof by a preponderance of the evidence that "Johnson inappropriately used College personnel and materials for personal matters" and portrayed a "pattern of abuse in the use of [her] College [issued] credit card." [69] He concluded that Johnson's actions clearly met the requirements for termination outlined in her employment contract. [70] In conclusion, the hearing procedures afforded Johnson the due process provided by her employment contract and under the *14th Amendment*.

67   *Hameli v. Nazario, 1994 U.S. Dist. LEXIS 20523, 1994 WL 827787, *6 (D. Del. Sept. 2, 1994)*.
68   *Doherty v. Delaware, 424 F. Supp. 2d 729,*

734 (D. Del. 2006).
69   D.I. 116 at 213.
70   Id. at 214.

Substantive Due Process

Johnson claims that her substantive process rights were denied because the termination hearing did not "meet the basic requirements of speaking the truth." [71]. She primarily focuses on the Santora Report, claiming that because it is "riddled with errors" and "not designed to seek the truth, [*30] " Judge Bifferato's decision is intrinsically flawed and unfair. [72] Johnson links her substantive due process argument to a violation of procedural due process by claiming that she was stigmatized by negative newspaper articles about the investigation and dismissal. [73] Johnson also suggests that Judge Bifferato may have been biased because of an alleged conflict of interest. [74]

> [71]   Johnson argues, essentially for the first time in a lengthy *surreply* brief of thirty-four pages that the evidence at the pre-termination hearing was false and incomplete. In her fifty page answering brief (in excess of the page limitation authorized under the court's local rules), she alludes to a possible substantive due process claim. No where in her original or amended complaints is a substantive due process claim raised. Further, those complaints are absent of any allegations of fraud, which under the Federal Rules of Civil Procedure ("FRCP"), specifically *Rule 9*, are to be pled with specificity. Therefore, no notice of a substantive due process claim was provided. Johnson points to no discovery directed to such a claim.

> The primary evidence Johnson alleges as false is the Santora Report, a document she possessed for over two and a half months before the pre-termination hearing. Johnson cross-examined the investigator and author, David Dwyer, during that hearing.

> Johnson knew or should have known of a substantive due process claim *before* this action was filed. Johnson's back door amendment to the pleadings is inconsistent with FRCP and the Local Rules of Civil Practice and Procedure of this court.

[*31]

72   D.I. 115 at 42.
73   *Id.* at 48.
74   The firm with whom Judge Bifferato is associated as senior counsel represented the College in four matters which arose in the 1994-1996 time frame, nine to eleven years before the Johnson pre-termination hearing and four to six years before Judge Bifferato retired from the bench in April 2000. *See* www.courts.delaware.gov. The only reported matter ended in 1999, six years before the pre-termination hearing. Obviously, Judge Bifferato was not involved with the firm before his retirement. Moreover, a member of the firm served as a mediator in 2004 in a case in which the College was one of four of parties, which suggests that the firm was not representing and had not recently represented the College. Clearly, Judge Bifferato never represented any party in the present matter. Johnson never states that Judge Bifferato was biased: rather, she suggests that the selection process was partial.

To support a violation of substantive due process, government action must be so "ill conceived or malicious that it shocks the conscience" [75] or "arbitrary [*32] or irrational," [76] exceeding negligence and indifference to "reach a level of gross negligence." [77] "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." [78] In a substantive due process matter, a properly supported motion for summary judgment will require the nonmovant to produce some (more than a "scintilla") evidence in support of his position. [79]

> 75   *Miller v. Philadelphia, 174 F.3d 368, 374 (3d Cir. 1999).*
> 76   *Duffy v. Bucks, 7 F. Supp. 2d 569, 576 (E.D. PA 1999).*
> 77   *Miller, 174 F.3d at 376.*
> 78   *Id.*
> 79   *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

The College's decision to terminate Johnson's employment cannot be described as malicious, arbitrary or irrational. Johnson was placed on paid administrative leave. She was not arbitrarily dismissed for her alleged

behavior. Johnson was provided with a pre-termination [*33] hearing. The evidence proffered at the hearing supports Judge Bifferato's findings. Johnson argues that the Santora Report was false because it focuses on her abuses of College policy and not her merit-worthy behavior. [80] She claims that the procedure set forth by the College, limited the review, and therefore, rendered the analysis inaccurate. The investigation was to determine whether Johnson had violated College policy. The Santora Report determined that she had by converting College resources for her personal use. Johnson had over two months to prepare to rebut the charges and to counter the report. She had the opportunity to present facts and evidence at the hearing to address the alleged inaccuracies. An independent hearing officer determined the charges were founded.

    80  D.I. 115 at 14.

Finally, Johnson's argument that a denial of procedural due process directly results in a violation of substantive due process is a misinterpretation of case law. [81] Substantive due process violations must be supported [*34] with facts that Defendants acted "arbitrarily or irrationally" in a way that would "shock the conscience" of the court. Implying that Johnson might have been stigmatized by the College's actions does not meet this burden. Nothing Johnson has presented rises to the level of a substantive due process claim.

    81  Johnson's answer brief states: "In addition, the Court had found that in addition to the termination (on procedural due process) was without basis and fact. Accordingly, a violation of the substantive due process has also been established." *Morris v. Bd. of Edu. Of Laurel Sch. Dist., 401 F. Supp. 188, 211 (D. Del. 1975).* The facts in *Morris* are clearly distinguishable. There, the court held that the defendant breached the plaintiff's contract and violated her *14th Amendment* rights because it denied her the opportunity to be heard and failed to advise her of the charges (which the court determined were unfounded). As a result, the plaintiff's procedural and substantive due process rights were determined to be violated.

[*35] As a result, Johnson fails to state a viable substantive due process claim.

Qualified Immunity

Defendants assert that the doctrine of qualified immunity requires dismissal of the case against George since his conduct in performing his discretionary duties did not violate Johnson's statutory or Constitutional rights. Defendants contend that George is protected from civil liability, as long as, he did not knowingly violate Johnson's Constitutional rights. They note that "Johnson has not sufficiently alleged a violation of even colorable constitutional or statutory rights, much less 'clearly established' ones." [82]

    82  D.I. 108 at 27 (citing *Kodrea v. City of Kokomo, Indiana, 458 F. Supp. 2d 857, 2006 WL 1750071, at *12 (S.D. Ind. 2006)*).

Johnson concludes that if her "*First Amendment* rights were violated, it follows that those rights were clearly established [and] the defendant does not have qualified immunity." [83] Johnson contends that George would have reasonably known, because he had the advice of [*36] his attorneys, that denying her a grievance procedure and subjecting her to administrative leave would be a violation of the *First Amendment*.

    83  D.I. 115 at 48.

Generally, government officials are protected from civil liability when their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." [84] "The question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights." [85] The issue of qualified immunity requires a "careful examination of the record (preferably by the district court) to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)." [86] When public officials, however, "invoke administrative processes for a legitimate purpose, they are acting in conformity with the Constitution and cannot be violating 'clearly established' law (because they are not [*37] violating the law at all)." [87]

    84  *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).*
    85  *Grant v. City of Pittsburgh, 98 F.3d 116, 121 (3d Cir. 1996)* (emphasis in original)(citing *Anderson v. Creighton, 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*).
    86  *Id. at 122.*

87  *Id. at 125.*

Based upon a careful review of the facts, Defendants have established that George's conduct did not violate Johnson's clearly established rights. First, George acted to preserve Johnson's due process rights during the investigation and pre-termination hearing. George admitted that "it was counsel's advice to me as president that in order to protect Dr. Johnson's due process rights, that I should ask the Board of Trustees to adopt these rules of procedure." 88 Instead of clearly violating Johnson's rights, George sought and applied counsel's recommendations to preserve Johnson's property interest and due process rights. George provided Johnson with notice of the charges against her and [*38] an opportunity to be heard. He supported the College Board's approval of the revised hearing process that focused on providing Johnson with a fair and impartial hearing. George authorized the appointment of an independent hearing officer, whose recommendation would be final. Finally, George had a legitimate purpose in placing Johnson on administrative leave and proceeding with a the pre-termination hearing. Johnson was forewarned that her behavior would lead to an investigation of allegations of abuse. George ordered the investigation which required the temporary removal of Johnson from her position. The resultant report and findings of abuse directed the termination proceeding. These actions were not improper, nor infringe clearly

established rights. As a result, the doctrine of qualified immunity applies to George.

88  D.I. 109 at 31.

## V. CONCLUSION

For the reasons stated above, the College's motion for summary judgment is GRANTED. An appropriate order consistent with this memorandum will follow.

## [*39] ORDER

At Wilmington this **11**th day of **June, 2007.**

IT IS ORDERED that the Memorandum Opinion dated May 15, 2007 be corrected to substitute "*42 U.S.C. § 1983*" for the incorrect cite "43 U.S.C. § 1493" in the first sentence of the decision.

IT IS ALSO ORDERED that footnote number 26 be corrected to substitute citation "*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)*." for the incorrect cite "*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 343, 356 (1986) ."

/s/ Mary Pat Thynge

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

LEXSEE 2002 U.S. DIST. LEXIS 4721



Positive
As of: Aug 29, 2007

**DR. KATHLEEN CARTER, Plaintiff, v. DELAWARE STATE UNIVERSITY, DR.
WILLIAM B. DELAUDER, PRESIDENT, DR. JOHNNY TOLLIVER, DEAN
JACQUELYN W. GORUM, DR. ALETA HANNAH and DELAWARE STATE
UNIVERSITY BOARD OF TRUSTEES, Defendants.**

**C.A. No. 99-642 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 4721*

**March 21, 2002, Decided**

**SUBSEQUENT HISTORY:** *Affirmed by Carter v. Del. State Univ., 2003 U.S. App. LEXIS 7219 (3d Cir. Del., Apr. 16, 2003)*

**DISPOSITION:**    [*1] Summary judgment ENTERED in favor of the individual defendants on the § 1981 and *§ 1983* claims in Counts II and III.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff professor filed a *First Amendment* retaliation claim under *42 U.S.C.S. § 1983*. Defendants university president and board of trustees requested a judgment in their favor, arguing the professor's speech was not protected and it was not a substantial factor in the decision to deny tenure. The defendants also argued that other permissible factors supported their decision. The professor argued questions of fact remained as to motivation.

**OVERVIEW:** The professor's critical remarks about scheduling policies to her class were entitled to *First Amendment* protection. She alleged that the president admitted that her classroom statements were considered in the tenure process. If true, the court found the denial of tenure was at least partially based on the professor's remarks. Thus, the speech was a substantial or motivating

factor in the decision. The other factors were her service on a committee and her neutral evaluations, none of which were related to speech. Although the neutral evaluation and her performance on the committee were unrelated to speech, they were directly related to job performance. Her neutral evaluation and allegedly poor committee service established that her performance was, at times, marginal. Thus, there were sufficient grounds to deny tenure in the absence of her speech. She never provided any facts to rebut the assertions that her evaluations were neutral and that her performance on the committee was allegedly inadequate. If the president's decision would have remained the same in the absence of the professor's comments, it was sufficient. The court found that the decision would have been the same.

**OUTCOME:** The court entered summary judgment in favor of the defendants.

**COUNSEL:** For KATHLEEN CARTER, Dr., plaintiff: Laurence V. Cronin, Smith, Katzenstein, & Furlow, Wilmington, DE.

For WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, ALETA HANNAH, Dr., DELAWARE STATE UNIVERSITY

BOARD OF TRUSTEES, defendants: John D. Balaguer, White & Williams, Wilmington, DE.

For WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, defendants: Christian J. Singewald, White & Williams, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

**OPINION**

**MEMORANDUM AND ORDER**

On February 27, 2002, the court issued a memorandum and order disposing of all of the plaintiff's claims in the case except her § 1981 and *§ 1983* claims against the individual defendants in their official capacities. (D.I. 142 at 19-20.) On February 28, 2002, the court held a teleconference wherein the parties discussed how the remaining claims should proceed. Subsequent to the teleconference, the parties agreed that the § 1981 claim is not viable in light of the court's ruling on the Title VII claim. [*2] (D.I. 143.) However, the parties continue to dispute the validity of the *§ 1983* claim.

The defendants request an order entering judgment in their favor on the *§ 1983* claims. (D.I. 143, D.I. 145.) The defendants argue that the plaintiff cannot establish the elements of her *First Amendment* retaliation claim under *§ 1983* because her speech was not protected and it was not a substantial factor in the tenure decision. The defendants further submit that even if the plaintiff's speech was protected and that speech was a substantial factor in their decision to deny her tenure, other permissible factors support their decision to deny tenure to the plaintiff. The plaintiff argues that the claim is valid because questions of fact remain as to the motivation behind the decision. The court agrees with the defendant that the *§ 1983* claims should be dismissed. Therefore, the court will enter an order dismissing both the § 1981 and *§ 1983* claims against the defendants.

**II. STANDARD OF REVIEW** [1]

1  The facts of this case are fully set forth in the court's previous memorandum and order and will

not be repeated here. (*See* D.I. 142 at 4-7.)

[*3] Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999).* The nonmoving party, however, must demonstrate the existence of a material fact -- not mere allegations -- supplying sufficient evidence for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996)* (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not [*4] match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)* (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson, 477 U.S. at 249-50.* [2]

2  Although proper summary judgment briefs have not been filed on the present issues, treating this matter as a motion for summary judgment is appropriate for three reasons. First, since summary judgment motions have already been filed in this case, the plaintiff is on notice that her claims may be dismissed in this manner. Second, the defendants' remarks after the summary judgment motion indicate that they seek judgment in their favor on the *§ 1983* claims. (*See* D.I. 143 at 2 (noting that defendants will "provide a response and application for entry of judgment" after the plaintiff writes to the court)). Finally, the plaintiff argues that the court cannot dismiss her claims because issues of fact remain. (D.I. 144 at 2,4.) (arguing that claims should go to jury). Therefore, summary judgment is appropriate.

[*5] **III. DISCUSSION**

In order to establish that she was denied tenure in retaliation for exercising her *First Amendment* rights, Carter must first demonstrate that her speech was protected. *See Green v. Philadelphia Housing Authority, 105 F.3d 882, 885 (3d Cir. 1997).* She must then establish that her protected speech was a substantial or motivating factor behind the alleged retaliation. *See id.* Finally, if Carter can establish these two elements, the burden will then shift to the defendants to demonstrate that the same action would have been taken if the speech had not occurred. *See id.*

The parties do not dispute that Carter made certain unfavorable remarks about DSU's scheduling policies to her class. Instructors' remarks about university policies, even those critical of the university, are entitled to *First Amendment* protection. *See Eichman v. Indiana State University Bd. of Trustees, 597 F.2d 1104, 1108 (5th Cir. 1979)* (finding that district court erred in holding that professor's statements criticizing university's scheduling and curriculum were outside the scope of *First Amendment* protection). Thus, the court finds that the plaintiff's [*6] speech was protected.

The court further finds that the speech was a substantial or motivating factor in the tenure decision. A substantial or motivating factor need not be the only factor. Rather, a substantial or motivating factor is one that played "some substantial role" in the decision making process. *See Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000).* In the present case, Carter alleges that DeLauder admitted that her classroom statements were considered in the tenure process. Accepting Carter's allegation as true, the court finds that the denial of tenure was at least partially based on Carter's remarks. Therefore, Carter's speech was a substantial or motivating factor in the defendants' decision to deny her tenure.

Since Carter has demonstrated that her protected speech was a motivating factor in the tenure decision, the defendants must demonstrate by a preponderance of the evidence they would have taken the same action in the absence of the protected conduct. *See id. at 235.* The defendants have carried this burden. The court noted in its previous order that Carter's speech was one of four factors that motivated the tenure decision. (D. [*7] I. 142 at 11.) The other three factors were her service as department chair, her service on the NCATE committee, and her neutral evaluations. (*Id.*) [3] None of these

considerations were related to Carter's speech. A university may deny tenure for any non-discriminatory reason. *See Parate v. Isibor, 868 F.2d 821, 827 (6th Cir. 1989)* ("The university may dismiss a non-tenured professor for any reason, or no reason, and the professor has no recourse unless such dismissal abridges his exercise of a constitutionally protected right."). Here, although Carter's neutral evaluation and her performance on the NCATE committee were unrelated to her speech, they were directly related to her job performance. *See Coats v. Pierre, 890 F.2d 728, 733 (5th Cir. 1990)* (noting that the reasons for denial of tenure "[bore] at least some relation to [the professor's] effectiveness as a faculty member"). *See also Gerhart v. Hayes, 217 F.3d 320, 322 (5th Cir. 2000)* (finding that plaintiff's job performance was inadequate and she would have been denied tenure in the absence of her speech). Carter's neutral evaluation and allegedly poor NCATE service [*8] establish that her performance was, at times, marginal. Thus, the factual record supports a finding that there were sufficient grounds to deny Carter tenure in the absence of her speech.

> 3   The court will not consider Carter's service as department chair for the reasons stated in the previous memorandum. (*See* D.I. 142 at 12.)

Carter argues that the court should deny summary judgment because there are issues of fact regarding DSU's motivation for denying tenure. However, Carter never provided any facts to rebut the assertions that her evaluations were neutral and that her performance on the NCATE committee was allegedly inadequate. [4] Thus, Carter has failed to create a genuine issue of material fact on these points as is her burden. Therefore, there is no impediment to granting summary judgment in favor of the defendants on this claim. [5][6]

> 4   Indeed, rather than disputing the fact that her evaluations were neutral, Carter attempted to use this fact as proof of Dr. Hannah's racial bias against her.

[*9]

> 5   Carter argues that the defendants cannot claim they would have terminated her on other grounds because DeLauder did not know about her evaluations or her allegedly poor NCATE performance at the time he made his initial negative tenure recommendation. The court rejects this argument. The law on retaliation does

2002 U.S. Dist. LEXIS 4721, *9

not state that the protected speech cannot be considered -- it only requires proof that the defendants' decision would have been the same in the absence of the speech. Thus, if DeLauder's decision would have remained the same in the absence of Carter's comments, it is sufficient. Since the court finds that the decision would have been the same, Carter's argument on this point is rejected.

6    The court recently held that the final two prongs of a *first amendment* retaliation claim were questions of fact. See *Springer v. Henry, 2002 U.S. Dist. LEXIS 3975*, No. 00-885(GMS), 2002 WL 389136 (D. Del. Mar. 11, 2002). This case is distinguishable from *Springer*, however. In *Springer*, there were several areas of contested fact. In the present case, as previously explained, Carter does not dispute the outcome-determinative facts. Therefore, the court finds that although summary judgment was not appropriate in *Springer*, it is appropriate in this case.

[*10] **IV. CONCLUSION**

For all of the foregoing reasons, the court will grant summary judgment in favor of the defendants on the § 1981 and *§ 1983* claims.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

> 1. Summary judgment be and hereby is ENTERED in favor of the individual defendants on the § 1981 and *§ 1983* claims in Counts II and III.

> 2. The clerk shall close this case.

Dated: March 21, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

WENDELL GORUM, Ph.D.,     )
                                )
          Plaintiff,      )
                                )     Civil Action No. 06-565-GMS
          v.             )
                                )
ALLEN L. SESSOMS, Ph.D.,    )
                                )
          and          )
                                )
BOARD OF TRUSTEES OF     )
DELAWARE STATE UNIVERSITY,  )
                                )
         Defendants.     )

## <u>CERTIFICATE OF SERVICE</u>

       I, Michael R. Robinson, hereby certify that on August 31, 2007 I caused a true and

correct copy of the foregoing **OPENING MEMORANDUM IN SUPPORT OF**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to be served electronically via

CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Gilbert Shelsby, Esq.               Gregg L. Zeff, Esq.
Michael J. Logullo, Esq.           FROST & ZEFF
SHELSBY & LEONI                Pier 5 at Penn's Landing
221 Main Street                      7 North Columbus Boulevard
Stanton, DE 19804               Philadelphia, PA 19106

                                   /s/ Michael R. Robinson
                                   Michael R. Robinson (#4452)
                                   SAUL EWING LLP
                                   222 Delaware Avenue, Suite 1200
                                   P.O. Box 1266
                                   Wilmington, Delaware 19899-1266
                                   (302) 421-6800
                                   mrobinson@saul.com