**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-565-GMS |
| v. | ) | |
| | ) | |
| ALLEN L. SESSOMS, Ph.D., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOARD OF TRUSTEES OF | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX
IN SUPPORT OF DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Robert L. Duston
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037-1922
(202) 333-8800 (telephone)
(202) 337-6065 (facsimile)
rduston@saul.com


*Counsel for Defendants*

Kimberly L. Gattuso (No. 3733)
Michael R. Robinson (No. 4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19801
(302) 421-6800 (telephone)
(302) 421-5871 (facsimile)
kgattuso@saul.com
mrobinson@saul.com

*Counsel for Defendants*

DATED: August 31, 2007

## TABLE OF CONTENTS

### Relevant Pleadings and Discovery

Amended Complaint (D.I 14) ...........................................................................A000001 – A000008

Stipulation (D.I 15) ...................................................................................A000009 – A000011

Defendant's Interrogatory No. 12 and Plaintiff's
    Response ...........................................................................A000012 – A000019

### Documents

AHDC Report .................................................................................A000020 – A000046

Excerpts from the Collective Bargaining Agreement ....................................A000047 – A000067

Excerpts from the Delaware State University
    Handbook...........................................................................A000068 – A000100

12/9/02 Memorandum from C.J. Wyche to Charles
    Smith.....................................................................................................A000101

12/9/02 Letter from Charles Smith to DeShaun
    Morris....................................................................................................A000102

12/16/02 Letter from Charles Smith to DeShaun
    Morris....................................................................................................A000103

12/21/03 Letter from Charles Smith to DeShaun
    Morris....................................................................................................A000104

3/3/03 DSU Faculty Senate Meeting Minutes ................................................. A000105 - A000109

4/4/03 Letter from Charles Smith to DeShaun
    Morris....................................................................................................A000110

7/8/03 Letter from Charles Smith to Dr. Hallie
    Gregory ..................................................................................................A000111

8/1/03 Letter from Catherine T. Hickey to David A.
    Arndt ......................................................................................................A000112

8/22/03 Morris Court of Chancery Complaint................................................. A000113 - A000121

10/6/03 Letter from Catherine T. Hickey to
    Dr. Allen Sessoms............................................................................. A000122 - A000123

10/6/03 Stipulation of Dismissal with Prejudice ...............................................................A000124

3/1/04 Memo from G. Parker re fall 03 grade change audit ................................................................ A000125 - A000126

3/4/04 E-mail from Dr. Kopano to G. Parker re Alvarez........................................................................A000127 – A000128

3/5/04 Letter from A. Sessoms to W. Gorum .....................................................A000129 – A000131

3/18/04 Letter from Lowan Pitt to DeShaun Morris.........................................................A000132

4/28/04 Letter from K. Walker to T. Frederick ...................................A000133 – A000136

5/4/04 Letter from K. Moses to DeShaun Morris .............................................................A000137

8/25/04 Letter from M. Farley to W. Gorum (Bates Nos. 05861-05863) ...........................................................A000138 – A000140

1/7/05 Article from the "Delaware State News"...................................................................A000141

2/12/05 Article from the "Delaware State News".............................................................A000142

4/14/05 Memorandum from A. Sessoms to Board of Trustees ......................................................A000143 – A000145

4/14/05 Minutes of DSU Board Meeting...........................................................................A000146

4/21/05 Letter from Claibourne Smith to W. Gorum ...............................................................................A000147

2004-2005 DSU Board of Trustees Roll Call ................................................................A000148

### Gorum v. DSU Deposition Excerpts

Excerpts from Deposition Transcript of Claibourne Smith, Ph.D. dated June 26, 2007.......................................A000149 – A000163

Excerpts from Deposition Transcript of Allen L. Sessoms, Ph.D. dated June 28, 2007...................................A000164 – A000182

Excerpts from Deposition Transcript of Akwasi Osei, Ph.D. dated June 28, 2007 .....................................A000183 – A000188

Excerpts from Deposition Transcript of Wendell Gorum, Ph.D., dated June 6, 2007 .......................................A000189 – A000218

Excerpts from Deposition Transcript of Wendell Gorum, Ph.D., dated June 26, 2007 ......................................A000219 – A000239

Excerpts from Deposition Transcript of Jacqueline
    Gorum, Ph.D. dated Aug. 10, 2007 ..................................................... A000240 – A000250

## AHDC Hearing Excerpts

Excerpts from AHDC 2004 Hearing – Testimony of
    Glenn Parker dated August 30, 2004 .................................................. A000251 – A000266

Excerpts from AHDC 2004 Hearing – Testimony of
    Kim Walker dated August 30, 2004 ........................................................................ A000254

Excerpts from AHDC 2004 Hearing – Testimony of
    Dean Tommy Frederick dated August 31,
    2004 ..................................................................................................... A000267 – A000276

Excerpts from AHDC 2004 Hearing – Testimony of
    Kenneth Bell, Ph.D. dated September 28,
    2004 ..................................................................................................... A000277 – A000282

Excerpts from AHDC 2004 Hearing – Testimony of
    Wendell Gorum, Ph.D. dated October 27,
    2004 ..................................................................................................... A000283 – A000290

Excerpts from AHDC 2004 Hearing – Testimony of
    Allen L. Sessoms, Ph.D. dated October 27,
    2004 ..................................................................................................... A000283 – A000298

Excerpts from AHDC 2004 Hearing – Testimony of
    Wendell Gorum, Ph.D. dated October 29,
    2004 ..................................................................................................... A000299 – A000304

## Morris v. DSU Deposition Excerpts

Excerpts from Morris Chancery Court Action,
    Deposition Transcript of DeShaun Morris
    dated September 9, 2003 .................................................................... A000305 – A000316

Excerpts from Morris Chancery Court Action,
    Deposition Transcript of Charles Smith,
    Ph.D. .................................................................................................. A000317 – A000328

## <u>Declarations</u>

Declaration of Mark Farley...........................................................................A000329 – A000331

Declaration of Cecil Wilson .......................................................................A000332 – A000334

Declaration of Glenn Parker .....................................................................A000335 – A000336

Declaration of Allen Sessoms......................................................................................A000337

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| **WENDELL GORUM, Ph.D.,** | : | **CIVIL ACTION** |
| **55 Freedom Drive** | : | |
| **Dover, DE 19904,** | : | **NO. 06-565** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **ALLEN L. SESSOMS, Ph.D.,** | : | |
| **[Omitted]** | : | |
| **1200 DuPont Highway** | : | |
| **Dover, DE 19901,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **BOARD OF TRUSTEES OF** | : | |
| **DELAWARE STATE UNIVERSITY,** | : | |
| **1200 DuPont Highway** | : | |
| **Dover, DE 19901,** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Defendant.** | : | |

## CIVIL ACTION - AMENDED COMPLAINT

Plaintiff Wendell Gorum, Ph.D., by and through his attorneys, hereby brings this

Complaint against Defendants Allen L. Sessoms, Ph.D., **and the Board of Trustees of**

**Delaware State University** and in support thereof avers as follows: **All changes from**

**Plaintiff's original Complaint have been noted by "[omitted]" or have been placed in bold**

**where added.**

### I.  INTRODUCTION

-1-

A-000001

1.  This action for declaratory, injunctive, monetary and other appropriate relief is brought
    by Plaintiff Wendell Gorum, Ph.D. to redress the intentional violations by Defendant
    Allen L. Sessoms, Ph.D. of the rights secured to him by the laws of the United States of
    America and the State of Delaware.

## II.  JURISDICTION

2.  This action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth
    Amendments of the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§
    1331 and 1343(3) and the aforementioned statutory and constitutional provisions.

3.  Jurisdiction lies over state law claims based on the principles of supplemental
    jurisdiction, as codified at 28 U.S.C. § 1367.

4.  The amount in controversy exclusive of interest and costs exceeds the sum of One
    Hundred Thousand ($100,000.00) Dollars.

## III.  VENUE

5.  All the claims herein arose within the jurisdiction of the United States District Court for
    the District of Delaware and involve Defendants who reside within the jurisdictional
    limits. Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. § 1391(b) and
    (c).

## IV.  PARTIES

6.  Plaintiff Wendell Gorum, Ph.D. (hereinafter "Plaintiff") is an adult individual citizen of
    the State of Delaware, residing therein at 55 Freedom Drive, Dover, Delaware 19904.

7.  Defendant Allen L. Sessoms, Ph.D. (hereinafter "Defendant" and/or "Dr. Sessoms") is
    the President of Delaware State University (hereinafter "Delaware State"), a public

-2-

A-000002

institution of higher education of the State of Delaware, and corporation existing under 14 Del C. Chapter 65, located at 1200 DuPont Highway, Dover, Delaware 19901, [Omitted]. **Dr. Sessoms is sued in his individual capacity only.**

8.    **Defendant Board of Trustees of Delaware State (hereinafter the "Board"), named corporately, is the corporation existing under 14 Del C. Chapter 65, created to operate Delaware State, which is located at 1200 DuPont Highway, Dover, Delaware 19901. Defendant Board is an instrumentality of the State of Delaware that Plaintiff has stipulated is not a suable person under 42 U.S.C. § 1983 or the 11th Amendment. The individual members of the Board could be sued in their official capacities for prospective injunctive relief. Pursuant to the parties' Stipulation and Consent Order and for this suit only, Plaintiff is permitted to name the Board in lieu of each of its individual members, but this remains in essence a claim for only prospective injunctive relief against the individual members in their official capacities.**

## V.    FACTS

9.    Plaintiff was hired by Delaware State [omitted] in or about September 1989 as a Professor of English and Mass Communications.

10.    In or about January 1991, Plaintiff was named Director of Mass Communications.

11.    Plaintiff received tenure in 1992.

12.    In or about 2001, the Department of Mass Communications was created and Plaintiff was named Chair of the department.

13.    In or about December 2002, a Delaware State student and member of the football team

A-000003

was accused of possessing a firearm on campus and was expelled from school as punishment therefore.

14.  Plaintiff believed the charge to be unfounded.

15.  Plaintiff, acting as a student advisor, defended this student at his disciplinary hearing and advised him in his appeal of the disciplinary action taken against him.

16.  As a result of Plaintiff's efforts, then Delaware State President, William DeLauder, agreed to change the student's punishment to a one semester suspension, and to allow him to attend summer school to make up the course work and to continue to play football.

17.  The student served his suspension during the Spring 2003 semester and enrolled in summer school for the Summer of 2003.

18.  On or about July 1, 2003, Defendant Dr. Sessoms became the President of Delaware State.

19.  Shortly after assuming the position, Dr. Sessoms changed the student's punishment from a one-semester suspension, to a one-year suspension and prohibited him from playing football.

20.  When the football team protested this action, the football coach was advised by [omitted] **the Delaware State** Vice President that he would be terminated if he tried to put the student back on the team.

21.  Plaintiff openly supported the student and assisted him in retaining an attorney and instituting a lawsuit against Defendant.

22.  [Omitted] **Dr. Sessoms** was aware of Plaintiff's involvement in this matter.

23.  [Omitted] **Dr. Sessoms** was also aware that Plaintiff spoke out and associated with

-4-

individuals on matters of public concern related to Delaware State on a continuing and regular basis, including, but not limited to the Administration at Delaware State.

24. Sometime in the Fall of 2003, [Omitted] **Delaware State** Associate Director of Human Resource, Sheila Davis, warned Plaintiff "they are after you."

25. It was a standard custom and practice at Delaware State that instructors were permitted to change a student's grade during the first three weeks of the semester, without approval of the Dean or Department Chair.

26. In addition, it was also common practice for Department Chairs to change grades issued by another professor where an error had been made and the professor who had issued the grade could not be reached. This was also done without the necessity of Dean approval.

27. In or about the Fall of 2003, in accordance with the aforementioned customs and practices, and in consultation with Dean Frederick, Plaintiff changed the grades of several students in order to correct certain errors.

28. Subsequently, on or about April 21, 2005, following a hearing before the Ad Hoc Dismissal Committee, Plaintiff was terminated - allegedly, for changing student grades without authority.

29. The grounds asserted by [omitted] **Dr. Sessoms and Delaware State** for Plaintiff's termination were pretext for the true reason therefore - retaliation for Plaintiff's exercise of protected activities.

**COUNT I**
**42 U.S.C. § 1983**
**FIRST AMENDMENT VIOLATIONS**

30. Plaintiff incorporates by this reference herein as though recited verbatim at length the

A-000005

allegations contained in paragraphs 1 through 29 above.

31.     Defendant **Dr. Sessoms** violated the provisions of 42 U.S.C. § 1983, in that Defendant

**Dr. Sessoms**, acting under color of State law, deprived Plaintiff of the privileges and

immunities secured to him by the First and Fourteenth Amendments of the United States

Constitution and, in particular, his right to hold employment without infringement of his

First Amendment right to freedom of speech.

32.     Defendant **Dr. Sessoms** intentionally, wilfully, and recklessly terminated Plaintiff's

employment in order to deny Plaintiff his First Amendment right to free speech and

association.

33.     Defendant **Dr. Sessoms'** actions were to penalize and retaliate against Plaintiff for his

exercise of fundamental First Amendment rights.

WHEREFORE, Plaintiff, Wendell Gorum, Ph.D., respectfully requests this Honorable

Court:

1.     Enter a declaratory judgment that Defendant **Dr. Sessoms'** retaliatory acts

complained of herein have violated and continue to violate the rights of

Plaintiff as secured by the United States Constitution;

2.     [Omitted] **Award injunctive relief from Defendant Board of Trustees
of Delaware State University in the form of reinstatement of Plaintiff
to his former position and compensation as a tenured professor with
Delaware State University;**

3.     Award Plaintiff compensatory damages **from Defendant Allen L.
Sessoms, Ph.D. individually,** including but not limited to: pain, suffering,

-6-

past economic loss, future economic loss, back pay, front pay, wage

increases, loss of life's pleasures, loss of reputation, benefits, emotional

distress and other damages;

4,    Award reasonable costs and attorney's fees **from Defendant Allen L.**

**Sessoms, Ph.D. individually;**

5.    Award punitive damages **from Defendant Allen L. Sessoms, Ph.D.**

**individually;** and

6.    Grant any other relief this Court deems just and proper under the

circumstances.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**SHELSBY & LEONI**

Michael J.Logullo, Esquire
221 Main Street
Stanton, DE 19804
(302) 995-6210
mlogull.Gmslde.com
        and

Gregg L. Zeff, Esquire (Pro Hac Vice)
FROST & ZEFF
Pier 5 at Penn's Landing
7 North Columbus Boulevard
Philadelphia, PA 19106-1492
(215) 351-3333

*Attorneys for Plaintiff*

-7-

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Amended Complaint was filed with the Court on the
21 1+ day of _____ M*rch _____ , 2007 and was forwarded to the below-
listed counsel on that date via First Class Mail:

Kimberly M. Large, Esquire
Saul Ewing, LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19899

Robert L. Duston, Esquire
Saul Ewing, LLP
2600 Virginia Avenue, NW
The Watergate, Suite 1000
Washington, DC 20037

Michael J.Logullo, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,           )
                                )
        Plaintiff,              )
                                )           Civil Action No. 06-565-GMS
    v.                          )
                                )
ALLEN L. SESSOMS, Ph.D.,        )
Individually and as President of )
DELAWARE STATE UNIVERSITY,       )
                                )
        Defendant.              )

## STIPULATION AND ORDER REGARDING PLAINTIFF'S AMENDED COMPLAINT

The parties hereto, Wendell Gorum, Ph.D. ("Plaintiff") and Allen L. Sessoms, Ph.D.,

President of Delaware State University ("President Sessoms" or "Defendant," and collectively

with the Board of Trustees of Delaware State University, "Defendants"), by and through their

undersigned counsel, and subject to the approval of the Court, hereby memorialize their

agreement reached during the January 3, 2007 status conference before this Court (the "Status

Conference"):

1.      Plaintiff stipulated and agreed that the Delaware State University ("DSU") and

the legal entity that operates DSU, the Board of Trustees of DSU (the "Board"), are agencies or

instrumentalities of the State of Delaware that are protected by sovereign immunity under the

11th Amendment to the U.S. Constitution, and this immunity extends to all actions for damages

against President Sessoms in his official capacity.

2.      As raised by President Sessoms and agreed upon by Plaintiff at the Status

Conference, certain allegations of the Complaint were drafted as if Defendant Sessoms were an

agent or employee of a local governmental entity, and these allegations are no longer appropriate

given Plaintiff's stipulation that DSU is a state actor. Accordingly, Plaintiff agreed at the Status

Conference that he must file an Amended Complaint, which he would first review with counsel for Defendant. The Court indicated that such an Amendment would be permitted in order to avoid further preliminary motions.

3. Notwithstanding the established deadline of February 20, 2007 in the Scheduling Order of January 25, 2007, President Sessoms does not oppose Plaintiff's motion to amend his Complaint in the form attached hereto as Exhibit A, the contents of which have been reviewed and approved as to form by Defendants' counsel (the "Amended Complaint").

4. In his Answer and during the Status Conference, President Sessoms raised the defense that even in his official capacity he would not be the proper party as to some forms of prospective injunctive relief. Rather, the proper parties for most forms of prospective injunctive relief are the members of the Board of Trustees of DSU, who can be sued individually in their official capacities for prospective injunctive relief. Based on direction from Judge Sleet, and for purposes of ease of administration of this suit only, the Board agrees as follows:

a) to the extent that Plaintiff continues to seek any form of prospective injunctive relief, the Board as a corporate entity may be named as a party, and

b) the Board will accept service of process through its undersigned counsel, in lieu of Plaintiff naming and serving each and every current member of the Board in his/her official capacity.

Defendant and the Board agree to this amendment in order to minimize judicial involvement at this stage of the litigation and to avoid any procedural complications of including the members of the Board. It is understood by the parties and the Court that such a stipulation is not a waiver by the Board of its rights and privileges under the 11th Amendment, is not precedential, and that for all purposes the claim against the Board will be for prospective injunctive relief alone and

will be analyzed as if it were being brought against the individual Board members in their

official capacities.

    5.    Finally, this Stipulation is without prejudice to each and every defense of

President Sessoms and DSU, and the Defendants specifically disclaim any concession not made

explicit herein.

SAUL EWING LLP

_____
Kimberly L. Gattuso (No. 3733)
Kimberly M. Large (No. 4422)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6800
kgattuso@saul.com
klarge@saul.com

And

Robert L. Duston (Admitted Pro Hac Vice)
2600 Virginia Ave., NW
Suite 1000
Washington, DC  20037
Attorneys for Defendants
DATED:    March 16, 2007

SHELSBY & LEONI

_____
Gilbert Shelsby (No. 2833)  gshelsby@mslde.com
Michael J. Logullo (No. 3851) mlogullo@mslde.com
221 Main Street
Stanton, DE  19804

And

Gregg L. Zeff (pro hac vice)
Michael Ksiazek
Frost & Zeff PC
7 North Columbus Blvd. Suite 2
Philadelphia, PA  19106-1422
Attorneys for Plaintiff

SO ORDERED THIS ____ DAY OF _____, 2007.


                _____
                U.S. District Judge Sleet

A-000011

# EXCERPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-565-GMS |
| v. | ) | |
| | ) | |
| ALLEN L. SESSOMS, Ph.D., | ) | |
| Individually and as President of | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

Defendant Allen L. Sessoms, Ph.D. ("President Sessoms"), hereby requests that Plaintiff

Wendell Gorum, Ph.D. ("Dr. Gorum") answer the following Interrogatories under oath and in

full accordance with the applicable provisions of Rule 33 of the Federal Rules of Civil Procedure

within 30 days after service of these Interrogatories.

### INSTRUCTIONS

1.    The following interrogatories shall be continuing to the full extent permitted by

law.

2.    If any information is withheld on grounds of privilege, provide the following
information:

      a.    every person to whom such information has been communicated by
            plaintiff and from whom such information was learned by plaintiff;

      b.    the nature and subject matter of the information; and

      c.    the basis on which privilege is claimed.

3.    The terms "identify," "identification," "identity," or words of similar import,
when used in reference to: (a) a natural individual, shall require you to state his full name,
residential address, business address, and telephone number; (b) a corporation, shall require you
to state its full corporate name, and any names under which it does business, its state of
incorporation, the address and telephone number of its principal place of business, and the
address and telephone number(s) of all its offices; (c) a business, shall require you to state the
full name or style under which the business is conducted, its business address(es), and telephone
number(s), and the identity of the person(s) who own, operate, and control the business; (d) a

12.    Identify and describe in detail all "protected activities" that you contend were related to or the proximate cause of your termination, including, but not limited to each of the "individuals," "matters of public concern," the acts of "[speaking] out and associate[ion]", and the dates and locations of the alleged acts upon which you base your claim in Paragraph 22 of the Complaint, and any other activities referred to in Paragraph 28 of the Complaint.

Answer:

13.    Set forth in full and complete detail the factual basis upon which you assert in Paragraph 22 of your Complaint that President Sessoms "was aware" of the activities that Plaintiff contends were "protected activity."

Answer:

14.    If you contend that the Board of Trustees of DSU was aware of your "protected activities," describe all facts upon which you base that claim.

Answer:

**A-000013**

15.    Describe all facts upon which you intend to rely to support your claim that your advocacy on behalf of former DSU student DeShaun Morris was a proximate cause of or related to your termination by DSU.

Answer:

16.    If you contend that any findings of the Ad Hoc Dismissal Committee Report were made in error, identify which findings, and describe in full and complete detail the factual basis for your claim that those findings were erroneous.

Answer:

DATED: FEBRUARY 20, 2007                **SAUL EWING LLP**

Kimberly L. Gattuso, Esquire (No. 3733)
Kimberly M. Large Esquire (No. 2219)
222 Delaware Avenue
P.O. Box 1266
Wilmington, DE  19899
(302) 421-6800
klarge@saul.com

and

**A-000014**

Robert L. Duston (Admitted Pro Hac Vice)
Saul Ewing LLP
2600 Virginia Ave., NW
Suite 1000
Washington, DC 20037

Attorneys for Defendant Allen Sessoms

A-000015

EXCERPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-565 (GMS) |
| | : | |
| v. | : | |
| | : | |
| ALLEN L. SESSOMS, Ph.D., | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |
| | : | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES

### GENERAL OBJECTIONS

1.    Plaintiff objects to each interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, any other applicable privilege, where it would result in disclosure of the mental impressions, conclusions, opinions, memoranda, notes of summaries, legal research or legal theories of Plaintiff's attorneys.

2.    Plaintiff objects to each interrogatory to the extent that it seeks information that would result in disclosure of the mental impressions, conclusions or opinions of Plaintiff's non-attorney representatives respecting the value or merit of the claim or defense, or respecting strategy or tactics.

3.    Plaintiff objects to each interrogatory to the extent that it seeks to impose obligations or burdens beyond those set forth in the Federal Rules of Civil Procedure and the applicable

-1-

A-000016

6.    None in Plaintiff's possession.

7.    Objection. This Interrogatory calls for a legal conclusion which Plaintiff not equipped
nor qualified to answer.

8.    Professor and Chair of the Department of Mass Communications at Claflin University,
Orangeburg, South Carolina. Plaintiff has held this position for approximately two (2)
years. Plaintiff's salary is $75,000 annually.

9.    Please see Plaintiff's response to the preceding Interrogatory. In addition, Plaintiff
applied to numerous positions which were posted in the "Chronicle of Higher
Education."

10.    The wrongful actions of Defendant have caused Plaintiff to suffer severe depression, loss
of reputation, emotional distress and mental anguish, loss of social relationships and
contacts.

11.    Plaintiff will execute a Medical Authorization form authorizing Defendant to obtain his
medical records.

12.    Objection. This Interrogatory calls for a legal conclusion which Plaintiff is not equipped
nor qualified to answer. Without waiver of said objection, Plaintiff states as follows:

-10-

Please see Plaintiff's Amended Complaint in this action. By way of further response, Plaintiff states as follows: Plaintiff, acting as a student advisor, defended a student, DeShawn Morris, at a disciplinary hearing, advised him in his appeal of disciplinary action taken against him, openly supported him and assisted him in retaining an attorney and instituting a lawsuit against Defendant. Plaintiff spoke out and associated with individuals on matters of public concern related to DSU on a continuing and regular basis, including, but not limited to the Administration at DSU, which Defendant had knowledge of.

13.    Plaintiff was advised of this by multiple DSU faculty, staff and/or administration, including, but limited to DSU Associate Director of Human Resource, Sheila Davis, who warned Plaintiff in or about the Fall of 2003, that "they are after you."

14.    Plaintiff was told this by members of DSU faculty, staff and/or administration.

15.    At this time, Plaintiff has not determined each and every fact upon which he will rely in support of his claim that his advocacy on behalf of Mr. Morris was a proximate cause of his termination and discovery in this matter is ongoing. Notwithstanding, please see Plaintiff's Complaint in this action, as well as Plaintiff's responses to Interrogatories 12, 13 and 14 above.

16.    Plaintiff believes and claims in this action that the Ad Hoc Dismissal committee members

-11-

and their findings were influenced by Defendant.

Respectfully submitted,

**FROST & ZEFF**

GREGG L. ZEFF, ESQUIRE
Pier 5 at Penn's Landing
7 N. Columbus Boulevard
Philadelphia, PA 19106-1492
(215) 351-3333
*Attorneys for Plaintiff*

-12-

A-000019

# Delaware State University

## *Versus*

# Wendell Gorum Ph.D.

## Report of the Ad Hoc Committee Hearing

**Conducted on**

**August (30, 31); September (28, 29); October (27, 28, 29) 2004**

i

**A-000020**

DSU-02453

# TABLE OF CONTENTS

INTRODUCTION ................................................................... 1

BACK GROUND OF VIOLATIONS .............................................. 1

CONSTITUTION OF AD HOC COMMITTEE................................. 3

Committee Members............................................................. 3

HEARING............................................................................ 4

DOCUMENTARY EVIDENCE AND WITNESSES ........................ 4

a. Witnesses for Dr. Wendell Gorum....................................... 4

b. Witnesses for Delaware State University............................... 5

c. Assessment of Documentary Evidence and witnesses testimony................. 5

DID DR. WENDELL GORUM ADJUST (CHANGE GRADES,
SUBMIT MISSING GRADES, REMOVED INCOMPLETE)
THE GRADES OF FORTY-EIGHT (48) STUDENTS? ............................. 6

DID DR. WENDELL GORUM COMMIT ANY VIOLATIONS
IN THE PROCESS OF THE GRADE ADJUSTMENTS? ........................... 10

1. Removal of Incomplete.......................................................... 11

2. Missing Grades ................................................................... 11

3. Withdrawal ....................................................................... 12

4. Retroactive Addition of Students to Courses ............................. 12

DID DSU POLICIES DIFFER FROM PRACTICES AND
PROCEDURES FOR STUDENT GRADE ADJUSTMENTS? ..................... 13

CONCLUSIONS ....................................................................... 16

COMMITTEE'S RECOMMENDATIONS ......................................... 18

FINAL NOTE .......................................................................... 20

A-000021

DSU-02454

# COMMITTEE MEMBERS

**Yaw Ackah Ph.D.**
*(Professor, Sociology; Chair)*

**Filippo Toscano Ph.D.**
*(Associate Professor, Foreign Languages; Associate Chair)*

**Gabriel D. Gwanmesia Ph.D.**
*(Professor, Physics & Pre-Engineering)*

**Lapointe Davis Ph.D.**
*(Professor, Music and Visual Performing Arts)*

**Edward Jackson Ph.D.**
*(Professor, English)*

iii

**A-000022**

DSU-02455

## INTRODUCTION

This is a report of the Ad Hoc Committee (Gorum Ad Hoc Dismissal Committee) which was formed jointly by Delaware State University (DSU) and the DSU Chapter of the Association of University Professors (AAUP) in accordance with Article 10.4.6a to hold hearing in the matter of Dr. Wendell Gorum, former Chair of the Mass Communications Department, who has been charged with violating section 10.4.3, a, d, e (see details below) of the Collective Bargaining Agreement (CBA). According to the DSU allegation, these charges ensued from violation of university policies by Dr. Gorum, in submitting change of grades, removal of incomplete and missing grade forms for forty-eight (48) Mass Communications students between the period 5/19/03 and 1/08/04 (see attached statement of charges). The University alleges that Dr. Gorum changed the grades of students in courses taught by seven (7) faculty of the Department of Mass Communications without their permission or approval.

## BACKGROUND OF VIOLATIONS

The background of the alleged violations by Dr. Gorum is systematically outlined in the brief prepared by Mr. Robert Dutson, the DSU counsel, which to a large extent has been paraphrased in this section. Delaware State University alleges that following a routine verification of eligibility requirements for NCAA Certification or compliance of Delaware State University (DSU) athletes, in early January, 2003, Ms. Kim Walker, Associate Director of Athletics for Compliance discovered that Mr. Marques Grant, a Mass Communication student's grade had been changed from a "W" to a "B" in CRN:15333, *Sound Production I*. Ms. Walker reported the matter to Mr. Glenn Parker, the DSU Registrar, who initiated an audit of all grade changes submitted in Fall semester, 2003. Mr. Parker found that Dr. Gorum had submitted 21 grade changes for the fall 2003 semester for courses in which he was not the instructor-of-record, and that many of the changes affected the student's academic, or graduation standing. Upon contact, the six (6) instructors-of-record denied knowledge of the grade changes and also denied giving Dr. Gorum permission to make the changes in their classes. Further audit by Mr. Parker, uncovered additional grade changes by Dr. Gorum for prior semesters. According to DSU, the investigation which included interviews with nine of the students whose grades had been changed, revealed that change of grades, removal of incomplete and missing

1

A-000023

DSU-02456

grade forms for forty-eight (48) Mass Communication students, submitted by Dr. Gorum were inconsistent with DSU policies, as outlined in the DSU catalog.

Following a preliminary investigation into the allegation by the registrar of DSU, Dr. Gorum was invited to meet with Dr. Tommy Frederick, Dean of College of Mathematics, Natural Sciences and Technology on March 3, 2004 and subsequently with Dr. Bell, Acting Provost and Dean of Academic affairs on March 5, 2004, to discuss the issue. Representatives of both the AAUP and the Office of Human Resources were present at these meetings. Not being able to arrive at a mutual resolution on the issue at these meetings, at the recommendation of Dr. Tommy Frederick, Dr. Allen Sessoms, president of DSU issued a letter on March 5, 2004 to temporarily suspend Dr. Gorum from the university and to notify Dr. Gorum of his intent to commence dismissal proceedings. In the letter of suspension, DSU specifically alleged that Dr. Gorum:

a. Failed to perform professional responsibilities either through incompetence, persistent negligence, refusal to carry out reasonable assignments, or disregard for scholarly and professional standards and ethics.

d. Deliberately and gravely violated the rights and freedom of other members of the University community.

e. Committed grave personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community.
(CBA: 10.4.3 a, d, e)

We have attached the original copy of the specific charges by DSU which include details (specific title and course numbers, names of students involved, the nature of grade changes, dates when changes were made, names of instructors who taught courses in which grades were changed) of alleged violations. The detailed report of these violations fall into three main categories:

1. Violation of policy regarding registration and awarding of grades

2

A-000024

DSU-02457

2. Violation of policy regarding *Change of Grade*

3. Violation of policy regarding *Removal of Incompletes* and submission of *Missing grades*

In this report, we use the term *Grade adjustment* or *modification* to refer to the collective violations listed above to avoid confusion with *Change of Grade* which is a specific category of the violations above.

Upon receipt of Dr. Sessoms' notification of termination, and in accordance with section 10.4.4 of the CBA, Dr. Wendell Gorum indicated his intention to exercise his right to a hearing by an Ad Hoc Committee of his peers.

## CONSTITUTION OF AD HOC COMMITTEE

The Gorum Ad Hoc Dismissal Committee was formed on April 19, 2004, and consisted of five members and four alternates. However, most of the primary or initial members either declined the appointment or resigned for personal reasons, and it was only in late June, 2004, that a stable or steady committee consisting of the current members was established. According to the CBA section 10.4.11, the committee was charged with holding hearings to *make the findings of fact in the case by evaluating all documentary evidence, as well as witness testimonies from both parties, stating its conclusions and reasons therefore and making its recommendation* through the president of Delaware State University to the Board of Trustees, as to whether Dr. Gorum should be dismissed or not. The CBA further stipulates that the "burden of proof that *adequate cause* exists rests on the University and shall be satisfied by clear and convincing evidence in the record considered as a whole" (10.4.11.f). The Committee is satisfied that it performed its function in strict adherence to the CBA provisions.

## Committee Members
Yaw Ackah Ph.D. (Professor, Sociology; *Chair*)

3

A-000025

DSU-02458

Filippo Toscano Ph.D. (Associate Professor, English Foreign Languages; *Associate Chair*)

Gabriel D. Gwanmesia Ph.D (Professor, Physics & Pre-Engineering)

Lapointe Davis Ph.D. (Professor, Music and Visual and Performing Arts)

Edward Jackson Ph.D. (Professor, English Foreign Languages)

## HEARING

The hearing, including presentation of all witnesses by the University and Dr. Gorum was completed in seven sittings:

- August 30, 2004
- August 31, 2004
- September 28, 2004
- September 29, 2004
- October 27, 2004
- October 28, 2004
- October 29, 2004

All hearings took place in the MBNA building at DSU. Each session lasted from about 8 a.m to 4:30 pm with a one hour break at about noon. Dr. Wendell Gorum was represented by Mr. Gregg L. Zeff, attorney with Greg and Zeff in Philadelphia, while Mr. Robert Duston, of Schmeltzer, Aptaker & Shepard, and PC in Washington DC was counsel for Delaware State University. In accordance with the CBA, "verbatim recording of all testimonies" was taken by Ms. Tanya M. Congo, a Notary and Certified Professional Reporter. Although Dr. Gorum opted for a public hearing, apart from those listed above and the committee members, no outside person attended any of the hearings.

## DOCUMENTARY EVIDENCE AND WITNESSES

Both DSU and Dr. Wendell Gorum presented an extensive assortment of documentary evidence to the committee in support of their positions. In addition to Dr. Gorum's personal testimony, the committee heard testimony from a total of seventeen (17) witnesses – eight (8) for the university and nine (9) for Dr. Gorum, as outlined below.

4

A-000026

DSU-02459

### a. Witnesses for Dr. Wendell Gorum

Dr. Johnny Tolliver, former DSU Provost and Dean of Academic Affairs

Dr. Scott King, (Former Chair of English Department, now Retired)

Ms. Joyce Bowers (Former DSU Assistant Registrar, now retired)

6 students (all associated with the alleged grade changes)

### B. Witness for Delaware State University

Dr. Allen Sessoms (President, DSU)

Dr. Kenneth Bell, (former Acting Provost and Vice President for Academic Affairs)

Dr.Tommy L. Frederick (Dean of College of Mathematics, Natural Sciences and Technology)

Mr. Glenn Parker, (Registrar of DSU)

Ms. Kim Walker (Associate Director of Athletics for Compliance President)

Dr. Michael Osei-Mensah (A faculty whose grades were changed)

Dr. Baruti Kopano (A faculty whose grades were changed)

Dr. DoWayne Wickham (A faculty whose grades were changed)

The committee's general assessment of the hearing is that it was effective and fair. Both parties were granted adequate time to exchange documents and information in the stipulation of facts in the case. Whenever necessary, the committee granted reasonable adjournments to enable both parties prepare material or to locate and make arrangements for the appearance of witnesses (CBA 10.4.4d) Furthermore, whenever necessary, the committee recalled certain witnesses for further interrogations to clarify any issues pertaining to the finding of facts.

### Assessment of Documentary Evidence and Witness Testimony

The case against Dr. Gorum is about the "adjustment" of grades for forty eight (48) Mass Communications students. The committee's task was to determine whether or not in the process, Dr. Gorum followed DSU established policies. Secondly, to determine whether or not Dr. Gorum's actions were in conformity with the general DSU practices and procedures (if identified), which may have been different from the policies. We list below some critical questions that need to be reconciled through systematic evaluation of all

5

A-000027

DSU-02460

evidence and the review and assessment of all testimony, in order to facilitate the process of finding the facts.

1. Did Dr. Gorum *adjust* the grades of some or all the 48 Mass Communications students?

2. If yes, did he violate university policy in the process of the grade *adjustment*?

3. How did DSU practices and procedures for student grades adjustment differ from policies? (i.e. if there are policies on grade adjustment)

4. What are the Findings of Facts in this matter?

5. If it is determined that Dr. Gorum violated university policy, should any disciplinary action against him be taken under the *Unit* member status or in his capacity as chair of Mass Communications Department?

## DID DR. WENDELL GORUM ADJUST (CHANGE GRADES, SUBMIT MISSING GRADES, REMOVE INCOMPLETE) THE GRADES OF FORTY-EIGHT (48) STUDENTS?

In his post-hearing brief, Dr. Wendell Gorum's legal counsel, Mr. Gregg L. Zeff, argues that from a technical view point, Dr. Gorum can not and has not changed grades or improperly manipulated grades since he did not physically change the grades in the system. According to Dr. Gorum, the Registrar or his/her representative should be accountable for any violation of DSU policy resulting from the grade change which he submitted because, the office had the prerogative to accept or reject any grade adjustment forms that he submitted to the Registrar's office.

The committee finds this argument greatly flawed and unconvincing. First, the Registrar has no discretionary rights or power to effect grade changes. The registrar only enters grade changes into the system when submitted by an instructor or chair and only when

6

submitted in conformity with university policies. Secondly, documentary evidence clearly shows that in all cases, Dr. Gorum signed in the space provided for the instructor-of-record, instead of in the space designated for the chair. He did not even add an annotation that he was signing for the instructor, but represented himself as having taught the course or courses in which he was *modifying* grades. The committee strongly believes that Dr. Gorum purposefully and *consciously* misrepresented key information in the grade *adjustment* forms in order to mislead the Registrar, because he knew that the registrar would not have accepted any of the grade *adjustment* request forms if the Registrar was aware that Dr. Gorum substituted them without the permission or approval of the instructors-of-record. Mrs. Joyce Bower emphatically stated that she would never have accepted any adjustment of grade forms from Dr. Gorum had he indicated verbally or in writing that he had not obtained the permission of the instructor who taught the course to make such grade adjustment (Trans Sept. 29).

Throughout her testimony, Mrs. Bowers never claimed that she did not require the signature or approval of the instructor-of-record as condition for a grade adjustment. According to Mrs. Bowers she relied on *"...the integrity of them. Of all of them"*. She was referring to the chairs (see Trans September 29 Pages 251). She would not have accepted any grade change requests had any chair been *"dumb enough"* to inform her that he or she did not obtain the permission of the instructor-of-record. Mrs. Bowers adds *"...if the chair comes in and says, I tried to reach the faculty member, but couldn't I'd have to tell him. I'm sorry, I can't accept this. You are telling me you've not been authorized to put in this change. So I can not accept"* (*Trans Sept., 29; pp 251*).

Of critical importance in the fact finding in this case, is whether or not Dr. Gorum made any serious or significant effort to contact or obtain approval of the instructors-of-record before submitting grade modification forms for their classes. Dr. Gorum has stated that for most of the grade *adjustments* he obtained the approval of the instructors. For example, on January 8, 2004, Dr. Gorum submitted grade changes for twenty seven (27) students in courses taught by Dr. Dawkins, Dr. Osei-Mensah, Ms. Jones and Dr. Wickham. Dr. Gorum testified that he made several attempts to reach all of these

7

A-000029

DSU-02462

professors, and even had telephone conversations with them and obtained their approval to submit the grade changes. All the instructors have denied receiving any calls from Dr. Gorum or giving him permission to change grades in their courses. In all, Dr. Gorum effected grade adjustments in courses taught by seven Mass Communications instructors without their approval or without even consulting them.

More importantly, Dr. Gorum has not been able to provide any documents to support his claim that he received approval of the instructors to make any grade adjustments in the courses they taught. Although in his testimony, Dr. Gorum promised submitting phone logs from the Registrar's office and from his cell phone as proof that he made the calls to all the instructors on January 8, 2008, he never submitted them. The only logical conclusion we can draw is that Dr. Gorum did not make any attempt to contact the instructors as he claims, and that all seven Mass Communications instructors are telling the truth. Secondly, we can not find any motive for these professors to lie about these calls.

Nineteen (19) of the 27 grade changes effected by Dr. Gorum on January 8, 2004 were for *Broadcast Writing II* taught by Dr. Osei-Mensah in Fall 2003. Dr. Gorum increased the grades of nine of these students, removed incompletes and awarded grades to 4 students. He awarded grades to two students who where not on the roster and never attended the class. In the hearing, one of the students testified that several students had problems with Dr. Osei-Mensah because of his teaching style and his attitude towards students. Most of the students also complained that he had been using *Broadcast Writing I* syllabus to teach *Broadcast Writing II*. Dr. Gorum arranged for this particular student who had refused to take Dr. Osei-Mensah test, to complete only the projects outlined in the syllabus, and without taking the mid-term and final examination, Dr. Gorum issued an "A" grade to the student for the course. Upon cross-examination this student acknowledged that compared to other students who had completed the entire course content, she did not deserve the grade awarded to her by Dr. Gorum. She said" *I wouldn't say that I feel I should have received "A". No, I don't. Because as you say, I didn't take the midterm or the finals for the class. It was solely on the assignments in the syllabus"*

8

A-000030

Trans. Of Sept. 29, 2004; PG 75-76). The committee believes that part of Dr. Osei-Mensah's problem in the Mass Communications department could be attributed to personal conflict with Dr. Gorum. It is also conceivable that most of the students became rebellious because of Dr. Osei-Mensah's performance expectation compared to what they were accustomed to under Dr. Gorum.

None of the witnesses ever specifically stated that Dr. Tommy Frederick gave direct instructions to Dr. Gorum to make any form of grade adjustment without following due procedures. The general word used by most witnesses was that Dr. Frederick said that Dr. Gorum would *"adjust"* their grade. Given that there was evidence that Dr. Frederick had indeed returned some change of grade forms because they did not have the instructor's signature or did not have supporting documents, the committee concludes that Dr. Frederick did not instruct Dr. Gorum to effect grade changes for students without following due procedures.

Even after trying to convince the committee that Dr. Frederick specifically instructed him to change grade for students who had taken Dr. Osei-Mensah's course, Dr Gorum also claims that according to DSU practices a chair could change another professor's grade without requiring the Dean's signature. He cited the testimony of Dr. King who had testified that Dean Frederick specifically requested him (Dr. King) to assign grades to students on several occasions, to justify why he did not request Dr. Frederick's approval for the grade changes that he submitted. However, Dr. King cited an example of an adjunct teacher who had left the school without giving a grade to students and the discrepancies in the student's record and adjunct's record. It is in such a situation that the Dean will ask the chair to *"handle the matter"*. Dr. Gorum's case does not fit into any category that permitted him to change grades in courses taught by other instructors. Besides, several if not all, these professors could be reached by phone. Secondly, in most of the cases, the committee could not find any urgent reason for Dr. Gorum to change the grades without waiting for the return of the instructor, assuming that they could not be reached by phone.

9

A-000031

DSU-02464

In summary, the committee has determined and is convinced that Dr. Wendell Gorum effected grade adjustments by submitting *Change of Grade* forms, *Missing Grade* forms, *and Removal of Incomplete* forms for 48 Mass Communications students, as alleged by DSU. Secondly, that he effected these changes without the approval or permission of the instructors who taught the courses and without the signature of the appropriate dean, which is Dr. Frederick as contained in the University Catalog (Catalog 2001-2003, pg. 25).

## DID DR. WENDELL GORUM COMMIT ANY VIOLATIONS IN THE PROCESS OF THE GRADE ADJUSTMENTS?

Dr. Gorum's defense on the issue of violating university policies some how contradicts his argument that he did not *adjust* students' grades as charged by the university. Dr. Gorum argues that the motives for his actions are relevant to the finding of facts, because all his actions were taken in the best interest of the students and in accordance with past practices and goals of DSU which were *designed to encourage and promote graduation rates and maintain scholarship.* Secondly, Dr. Gorum asserts that some his actions were taken to resolve grade issues for students who were wrongfully purged from the system by DSU. Yet, the committee can not identify a single student out of the 48, whose grade was *modified* to accommodate financial purge. The committee agrees that motives are relevant and necessary, and especially if they provide the bases for assessing the guilt, as well as the magnitude or severity, of the violations, for example as presented by the university.

The committee disagrees with Dr. Gorum's argument that his "motive in changing students grades was predicated on his desire to help students and DSU, or that his modification of grades were in the best interest of the students. This committee finds it difficult to understand why Dr. Gorum can not comprehend the long term devastating impact and ramifications of his randomly and indiscriminately assigning grades to students who clearly have not acquired the subject matter in the course. The committee has assessed that Dr. Gorum's true motive was to selectively help student-athletes to inappropriately meet NCAA requirements. This is highly unprofessional and unethical.

10

A-000032

DSU-02465

The committee carefully examined documentary evidence submitted by both parties, and especially those submitted by Dr. Gorum on the *practices* and *Procedures* of DSU faculty and chairs regarding all categories of grade modifications at DSU, in order to clearly assess how these *practices and procedures* might differ from established DSU policies. The committee has carefully examined a random sampling of grade *adjustment* request forms that chairs and faculty of various departments have been submitting to the Registrar's office at DSU. We find that there is not a single grade modification form (removal of incomplete, supply of missing grades, change of grades) that was not correctly signed by the instructor-of-record, or the Dean, where applicable. In contrast, Dr. Gorum signed in the space allocated for the instructor in all the grade *modification* forms that he submitted to the Registrar's office. Although, there are rare cases where the chair signed change of grade forms for the instructor, Mrs. Bowers said that the Registrar's office would accept such requests *"as long as he had authorization from that faculty)*.

Rather than give a list of all violations, and the names of all affected students and instructors, the committee has elected to summarize each category of grade modification violation and cite examples. We have also agreed to exclude student's names from this report, in order to protect their privacy.

## 1. Removal of Incomplete

Under DSU policy (*see DSU Catalog 2001-2003, Pg. 25 and Removal of Incomplete form*), the only authorized signature on a *"Removal of Incomplete"* form is that of the instructor who teaches a course and gives the initial incomplete. *"Signature of Instructor required)* is clearly written at the bottom of the *Removal of Incomplete* form, and not even the chair or Dean's signature is required. Yet, evidence submitted to this committee by DSU, indicates that Dr. Gorum signed *Removal of Incomplete* forms for several students in classes that he did not teach. For example, in December 2003 Dr. Gorum signed and submitted *Removal of Incomplete* forms for two (2) students to the Registrar's office in violation of DSU policy. The incomplete was initially given by Dr. Oei-Mensah. On January 8 and 27, 2004, Dr. Gorum removed Incomplete for two students in a course that was originally taught by Ms. Jones. In January 2004, Dr. Gorum again removed an

11

A-000033

DSU-02466

incomplete for two students who were registered in Practicum taught by Ms. Jones in full semester, 2003.

## 2. Missing Grades

In the documentary evidence submitted to the committee by DSU, there are several illustrations of Dr. Gorum submitting *missing* grades for students in violation of university policy. For example, on July 17, 2003, Dr. Gorum submitted *missing* grade of "B" for a student in *Radio Stations Operations* (No. 55-362) taught by Dr. Kopano. According to Dr. Kopano there were only 15 students registered for this class and he could not recall this particular student having registered for the course.

## 3. Withdrawal (*DSU Catalog 2001-2003, Pg. 28-29*)

"W" or Withdrawal is a situation whereby a student officially withdraws from a course in order to avoid receiving a grade that might adversely affect his/her GPA. In principle, a "W" can not be changed, "except under some compelling reasons" (*DSU Catalog 2001-2003, Pg. 28*) or Administrative Withdrawal, and consequently there is no DSU form for removing a "W". However, a student received an "F" for Radio Station Operations: 55-362 (spring 2003) taken with Dr. Kapano (9/28, pp. 25-29). Dr. Gorum changed the grade from "F" to "W" and then from "W" to "A".

## 4. Retroactive Addition of Students to Courses

Dr. Wendell Gorum retroactively added and assigned grades to several students in courses in which these students were not officially registered and often without the knowledge or approval of the faculty teaching these courses. Dr. Gorum testified that such grades were awarded to students based on their participation in Practicum and Internship Programs organized by the Mass Communications Department. However *Practicum* and *Internship* were under the supervision or coordination of Ms. Dawn Jones and Professor Hagos. On May 8, 2003, Dr. Hagos submitted grades for 39 students in his capacity as coordinator of the Practicum, but between May 30, 2003 and September 12, 2003, Dr. Gorum, without consultation with Professor Hagos, submitted *missing* grades for an additional nine students, none of whom had been registered in this class. In addition Dr. Gorum gave all nine students "A" grade. In January 2004, Dr. Gorum also

12

A-000034

DSU-02467

removed an incomplete for two students, and submitted missing grade of "A" for three students who were not registered in Practicum taught by Ms. Jones in fall semester, 2003.

Documentary evidence presented by DSU is replete with several examples of arbitrary or indiscriminate grade changes by Dr. Gorum, and in almost all these cases Dr. Gorum has not satisfactorily explained to this committee the bases (material covered, time spent, grading system etc) that he utilized to fairly grade these students. Some students did not remember ever attending a course for which they were assigned grades by Dr. Gorum. This committee concludes that the unchecked gratuitous award of grades to students, the inappropriate and unjustified removal of incomplete and submission of missing grades, the selective retroactive registration of students by Dr. Gorum into courses taught by other instructors gravely violated the rights of the affected instructors and students of the Mass Communications department. He has violated the rights of other students to a fair and impartial evaluation in the educational process. Therefore, the actions of Dr. Gorum are highly reprehensible, and warrant the condemnation of the academic community at large.

Regarding sanctions for his actions, Dr. Wendell Gorum has argued that he should not be subject to termination for activities or actions which he performed in his administrative capacity as chair of Mass Communications department and not as a DSU faculty. The committee strongly disagrees with this line of argument. According to section 2.1.2 of the CBA Dr. Gorum is a unit member, even while performing the role of chair. As a unit member, he is bound by all rules and regulations applicable to that role. On the other hand, he is also entitled to the protection provided in the tenets of the CBA. We do not believe that faculty can at one level utilize the CBA as a shield for protection from CBA violators, while at another level use their own interpretation of sections of the same CBA as a sword to cut a road through which to escape their own violations of the CBA.

13

A-000035

DSU-02468

## DID DSU POLICIES DIFFER FROM PRACTICES AND PROCEDURES FOR STUDENT GRADE ADJUSTMENTS?

Notwithstanding the reprehensible actions of Dr. Gorum as outlined above, the committee was quite troubled and disappointed by the indirect role of former DSU administration in creating an atmosphere of pervasive laxity, lack of rule enforcement, and the absence of accountability at all levels that perpetuated and encouraged random and uncontrolled manipulations of student grades.

The chaotic state of practices and procedures for changing student grades at DSU was clearly summed up by Mr. Glenn Parker, DSU registrar who testified that on a scale of one to ten regarding procedures and practices at the Registrar's office, he would rank DSU as a five, based on his prior experience at other academic institutions (Trans 8/30/04, pg 139). According to Dr. Johnny Tolliver, former Provost and Vice President of Academic Affairs, when for example students were inappropriately purged from the system, chairs were allowed to evaluate their course work and assign grades. He emphatically stated in reference to Dr. Tommy Frederick, *"... as far as I know was allowing – this when I was Provost- he was allowing chairs in the College of Arts and sciences to do the same."* (Trans 10/27/04). Depending on a particular Chair's relationship with the staff in the Office of Records, in some instances he or she would go directly to the Record's Office and make grade changes without signatures from the Dean or the Vice President (Trans 10/27/04 pg 199).

There are several examples of inconsistencies in the administration's response to student academic problems and issues. For example, although not the covert "official policy", the administration often gave permission to some students to be given "special" assignments to improve their grades. Upon cross examination by counsel Zeff, Dr. Kenneth Bell, Former Acting Provost indicated that *"that would have been acceptable to me"* if Dr. Frederick had given Dr. Gorum permission to change Dr Osei-Mensah's grades. On the contrary, Dr. Sessoms in response to the same question said *"Dean's can't instruct somebody to change somebody else's grade"*. It is quite obvious to this committee that there is a pervasive lack of consensus on how to react to any given situation regarding student grade problems.

14

A-000036

DSU-02469

Quite disturbing to the committee, is Mr. Glenn Parker's admission that he looked at grade changes processed in the fall of 2003, but did not take any action regarding grade change forms that lacked the appropriate signatures (Trans of 8/30/04). This committee questions why Mr. Parker or the administration selectively chose to only pursue the violations by Dr. Gorum, while neglecting violations of other chairs and administrators, and even members of his office, who in one way or another have taken part in, condoned or assisted in the devaluation of DSU educational system.

There is a conspicuous lack of consensus in the administration as to the appropriate sanction for Dr. Gorum perhaps as a result of their varied knowledge of prior DSU practices and procedures. Dr. Kenneth Bell accepted Dr. Gorum's proposal to step down as chair of Mass Communications department and to retire at the end of 2003-2004 academic year and passed on this recommendation to the President, Dr. Allen Sessoms. On the other hand, Dr. Tommy Frederick recommended to Dr. Allen Sessoms that Dr. Gorum be terminated. However, upon cross examination, Dr. Frederick stated that he would have only recommended Dr. Gorum's removal as chair of the department, and not outright dismissal had he shown remorse for his conduct. Considering the "gravity" of the allegations against Dr. Gorum as DSU claims, it is unclear to this committee how serious violations of academic standards and the integrity of the education system could easily be mitigated by a simple remorse statement. We are also disturbed by the lack of unanimity in the administration concerning the most appropriate sanction for Dr. Gorum's conduct.

Throughout her testimony Ms. Bowers recounted several instances during which pressure imposed on the Registrar's office by the strong drive of the administration to increase graduation rates. Ms. Bowers explained that even up to the Friday before commencement, the Registrar's office would often call chairs to submit Missing grades. In fact, in one instance, the Registrar's office sent a DSU security officer to a chair's home to secure grades to complete requirements for graduation. It was implicit in her testimony that the Registrar's office was sometimes aware that the chairs could not have obtained the approval of the instructor-of-record, especially given the urgency of

15

A-000037

demand, but rather than deal with the truth, the office turned a blind eye. Dr. Johnny Tolliver also confirmed this practice. He testified that: *"The whole aim was to get students qualified for graduation"* (Trans. of 10/27/04 page 193) He further added, *"And in some cases where there was some controversy over some courses, we gave wide latitude in substituting courses so that students could meet graduation requirements"* (Trans. of 10/27/04)

In such an atmosphere of "subtle encouragement" to violate DSU procedures to meet graduation target or increase retention rate, it is not surprising that several individuals engaged in blatant, unprofessional and unethical conduct. As the committee has indicated, Dr. Gorum's case is only the "tip of the iceberg". This committee shudders to imagine the full extent of the iceberg that lies "submerged" or hidden!

## CONCLUSIONS:

    a. DSU has proven by clear and convincing evidence that Dr. Wendell Gorum violated section 10.4.3 (a), (d) and (e) of the Collective Bargaining Agreement (CBA) between the board of Trustees of Delaware State University and the Delaware State University Chapter of the American Association of University Professors (AAUP).

    b. Dr. Gorum submitted Change of Grade forms, Removal of Incomplete forms, and Missing Grade forms to all forty-eight (48) Mass communications students.

    c. In all cases, Dr. Gorum misrepresented information on the form by signing as instructor for courses that he did not actually teach.

    d. Dr. Gorum was aware that the Registrar's office would refuse any grade changes if he expressly stated that he was not the instructor-of-record or disclosed to the Registrar's office that he did not have the permission of the instructor-of-record to change his or her grade.

16

A-000038

DSU-02471

e. Dr. Gorum did not obtain the permission or approval of the instructor-of-record to execute modification of grade.

f. Dr. Gorum knew that DSU practices and procedures did not include signing of an instructor-of-record without indicating this fact on the form.

g. Dr. Gorum arbitrarily assigned grades to students for courses they were not registered in, and without any clear bases for evaluating the students.

h. Dr. Gorum retroactively registered and assigned grades to students for classes taught by other instructors, without consultation with these instructors.

i. Dr. Gorum awarded grades to some students in classes that the students had never attended.

j. There is no direct or convincing evidence that Dr. Frederick gave specific instructions to Dr. Gorum to change grades for any student.

k. Dr. Gorum is a Unit member of the CBA, and may be terminated for acts committed while discharging his professional responsibilities as chair.

l. The actions by Dr. Gorum violate the academic rights of faculty to solely control any grades they issue to students in classes they (the professors) taught.

m. Dr. Gorum's actions undermine the very tenets of the educational profession and rise to a level deserving condemnation by the academic community.

n. Dr. Gorum practiced favoritism, whereby selected students, especially athletes obtained grades in core courses in their major, without necessarily completing required course material.

17

A-000039

DSU-02472

o. Dr. Gorum's actions violated the rights of students to a fair and impartial evaluation in the educational process.

p. This Committee is convinced that DSU university administration engaged in practices and procedures that encouraged and promoted inappropriate manipulation of student grades.

q. Although DSU has established policies regarding student grade change, practices and procedures were in such significant conflict with these policies as to render then ineffective.

## COMMITTEE'S RECOMMENDATIONS

1.  The committee resolves that although Dr Gorum's unprofessional behavior is highly reprehensible, we do not recommend outright dismissal. We base our decision on the premise that the administration at Delaware State University, prior to Dr Sessoms term, had failed to stringently enforce accountability and violations of professional conduct, and thus created a climate within which several unit members violated university professional ethics. But for the grave, *outright misrepresentation on signatures* on forms submitted to the Registrar's office, some of the charges against Dr Gorum were endemic at DSU, and some sectors of the administration either by commission or omission participated in it. We strongly feel that Dr Gorum's case is the tip of the iceberg, and he is, in fact, the scapegoat (albeit a blamable scapegoat) whose investigation we hope has uprooted the roots of the poisonous tree and brought down all the poisonous fruits. We hope so!

    We must emphasize that this is not to condone Dr Gorum's conduct. We believe he deserves a severe sanction but short of dismissal.

2.  The committee joins the University's decision to relieve Dr Gorum of his position as chair. We join in this decision because we do not agree with Dr Gorum that he acted

18

A-000040

DSU-02473

in the capacity as chair and therefore cannot be sanctioned as a unit member. As a chair, Dr Gorum continues to be a unit member, and therefore bound by, and entitled to, the protections provided in the tenets of the CBA. We do not believe that faculty can at one level utilize the CBA as a shield to protect themselves from violators of the CBA, and at another level use their own interpretation of sections of the same CBA as a sword to cut a road through it to escape from their own violations of the CBA.

3. Dr. Gorum should be reinstated effective May 01, 2005, as a full professor and assigned his full teaching responsibilities

4. Dr. Gorum should not be allowed to derive any financial compensation for assumed or real hardships suffered as a consequence of the dismissal proceedings for the period September 01, 2004 through April 30, 2005.

5. Dr Gorum should not be allowed to hold any position of authority/responsibility at DSU because he flagrantly abused this position.

6. Syllabi for courses to be taught by Dr. Gorum and all grades assigned by him must be approved (have the Dean's signature) by the Dean before submission to Records office.

7. Dr. Gorum should be placed on a 2-year probation during which he must be of good professional behavior, a violation of which should result in summary dismissal.

8. The University should not engage in any action following this investigation that can be objectively inferred as a vindictive retribution, or a way to get back at Dr Gorum.

9. DSU should draft a clear comprehensive policy regarding Grade changes, Incompletes, Withdrawals and submission of Missing Grades. Corresponding sanctions must be spelt out clearly.

19

A-000041

10. This Committee strongly recommends that any future violator (whether faculty, Registrar, Deans or Administrators) of DSU policies regarding grade changes be severely sanctioned.

**FINAL NOTE:**

This Committee highly commends Dr. Allen Sessoms, President of Delaware State University for taking a bold step towards stamping out a tradition of unethical and unprofessional conduct that have gravely undermined and devaluated the DSU educational system. It is regrettable that because of the covert and overt contributions of his former administration to the present violations by Dr. Gomm, we could not recommend a dismissal sanction. However, there is no iota of doubt in our collective conscience that Dr. Sessoms has chosen the right path, and deserves our high commendation.

20

A-000042

DSU-02475

12/3/04

### Amended Specific Statement of Charges
### Against Dr. Wendell Gorum

In accordance with paragraph 10.4.3 of the Collective Bargaining Agreement, you have, through the conduct outlined below:

a.   Failed to perform professional responsibilities either through incompetence, persistent negligence, refusal to carry out reasonable assignments, or disregard for scholarly and professional standards and ethics.

d.   Deliberately and gravely violated the rights and freedom of other members of the University community.

e.   Committed grave personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community.

Page 25 of the University Catalogue states that "Grade changes must be approved by the dean of the college or school in which the student is a major during the semester of instruction immediately following the semester the grade was issues. Grade changes for undecided majors must be approved by the dean of the College of Arts and Sciences." In addition, Dr. Frederick, Dean of Arts and Sciences has given specific direction that all grade changes will be submitted for his approval (with backup justifying the grade change) — a requirement you have complied with in the past. There are also established procedures requiring that removal of incompletes must be processed by the Instructor for a course or, in the absence of that Instructor, in consultation with the Dean.

Specifically, you changed student letter grades and/or violated procedures as follows[1]:

Instructor: Prof. DeWayne Wickham (who denies that he gave permission for you to change the grade of a student in his class). Grade changes do not reflect approval signatures other than your own for:

*Ethics and the Media*, CRN 14899, Course No. 55-407 (Fall 2003)
  - Khary Fleming, changed from F to C, 1/8/04 [DSU Exh. 11]
  - Kenneth McClain, changed from D to C, 1/8/04 [DSU Exh. 11]
  - JoAo MiJi, changed from D to C, 1/8/04 [DSU Exh. 11]
  - Sharod Oliphant, changed from D to C, 1/8/04 [DSU Exh. 11]

---

[1]    DSU has removed from this Amended Statement of Charges all prior claims concerning Eric Dodson (TV Production III, Course No. 55-373, Spring 2003 in which a grade of A was entered on 5/19/03 for a missing grade for Marc Gorum, without the instructor's knowledge or permission, and reflecting only your signature) and one course taught by Dr. Gorum (TV and Radio Announcing, Fall 2003, a grade of B changed to A on 1/29/04 for Richard Taylor that did not reflect approval signatures other than your own). DSU has also removed the allegations regarding the Practicum, Course No. 55-425 (Spring 2002), Mark A. Dungee, entered a grade of A for 6 credits and Jill St. Jean, entered grade of A , where the instructor of record is listed as Dr. Marcia Taylor (nee Benson).

**A-000043**

**Instructor: Dr. Baruti Kopano** (who denies that he gave permission for you to enter a student grade in his class). Grades entered as missing (from the Spring 2003 and Fall 2002 semesters) were not with the instructor's knowledge or permission and reflect only your signature:

*Intro to Mass Communications*, Course No. 0055-208 (Fall 2002)
- Aaron Matthews, entered a grade of B on 5/27/03 [DSU Exh. 18]

*Radio Station Operations*, Course No. 0055-362 (Spring 2003)
- C. Asare, entered a grade of B on 7/16/03 [DSU Exh. 18]

*Sound Production I*, Course No. 055-223 (Spring 2003)
- Antonio Alvarez, original grade of F, changed from W to A on 9/12/03 [DSU Exh. 15]

**Instructor: Prof. Gary Dawkins** (who denies that he gave permission for you to change the grade of a student in his class). Grade changes do not reflect approval signature other than your own for the following courses:

*Sound Production I*, CRN 15333, Course 55-223 (Fall 2003)
- Aaron Matthews, changed from W to B, 1/8/04 [DSU Exh. 13]
- Marques Gantt, changed from W to B, 1/8/04 [DSU Exh. 13]

*Sound Production II*, CRN 15328, Course No. 55-361-90 (Fall 2003)
- Morgan Parker, changed from D to C, 1/8/04 [DSU Exh. 13]
- Fredo Sanon, changed from D to C, 1/8/04 [DSU Exh. 13]
- Tony Anderson, changed from C to B, 1/8/04 [DSU Exh. 13]

*Radio Station Operations*, CRN 15509, Course No. 55-362 (Fall 2003)
- Morgan Parker, changed from F to B, 1/8/04 [DSU Exh. 13]
- Kenneth McClain, changed from F to B, 1/8/04 [DSU Exh. 13]

**Instructor: Dr. Osei-Mensah** (who denies that he gave permission for you to enter a student grade in his class). Grade changes do not reflect approval of signature other than your own for:

*Broadcast Writing II*, CRN 14900, Course No. 55-409 (Fall 2003)

- Blake Saunders, changed from C to A, 1/8/04 [DSU Exh. 20]
- Kenneth McClain, changed from C to A, 1/8/04 [DSU Exh. 20]
- Serena Warren, changed from C to A, 1/8/04 [DSU Exh. 20]
- 
- Christopher Young, changed from C to A, 1/8/04 [DSU Exh. 20]

2

**A-000044**

DSU-02477

- Carl Muckelroy, changed from C to A, 1/8/04 [DSU Exh. 20]
- Christopher Stevens, changed from C to B, 1/8/04 [DSU Exh. 20]
- LaByron Rose, changed from C to B, 1/8/04 [DSU Exh. 20]
- Laurence Henry, changed from C to B, 1/8/04 [DSU Exh. 20]
- Korey Parker, changed from C to B, 1/8/04 [DSU Exh. 20]

In addition, a Removal of Incomplete Grade Form was submitted by you for this class as the instructor, 1/8/04, with no other signatures, showing the following grades. Several of these students had never registered for the class or have received other grades.

- Kelle Alston              A       [DSU Exh. 21]
- Veronica Brinney          A       [DSU Exh. 21]
- Cynthia Jones             A       [DSU Exh. 21]
- James Mitchell            A       [DSU Exh. 21]
- Lauren Ricks              A       [DSU Exh. 21]
- Kenneth McClain           A       [DSU Exh. 21]
- David Newman              A       [DSU Exh. 21]

These changes collectively reflect the majority of the students in this course.

---

## PRACTICUMS/INTERNSHIPS

**Instructor: Dawn Jones** (who denies that she gave permission for you to enter a student grade in her class). A Removal of Incomplete Grade Form/Missing Grade Form was submitted 1/8/04 by you, with no other signatures:

*Practicum*, CRN 15000, Course No. 55-425 (Fall 2003)
- Reginald Rizer, entered a grade of A      [DSU Exh. 23]
- Sparkle Williams, entered a grade of A    [DSU Exh. 23]
- Shannon Jennings, entered a grade of A    [DSU Exh. 23]
- Antonio Alvarez, entered a grade of A     [DSU Exh. 23]

Three of these students had not previously registered for or had dropped this course.

An additional Removal of Incomplete form for this course was submitted January 27, 2004, for:
- Marcus Lusby, entered a grade of A       [DSU Exh. 23]

---

**Instructor: Prof. Asgede Hagos** (who denies that he gave permission for you to enter a student grade in his class). Grades entered as missing (from the Spring 2003 and Spring/Fall 2002 semesters) were not with the instructor's knowledge or permission and reflect only your signature:

3

A-000045

DSU-02478

*Practicum,* Course No. 55-425 (Spring 2003)
- Riley Peoples, entered a grade of A on 7/15/03 [DSU Exh. 25]
- Jamie Goodman, entered a grade of A on 7/19/03 [DSU Exh. 25]
- Mandakova Clark, entered a grade of A on 7/28/03 [DSU Exh. 25]
- Anthony Leonard, entered a grade of A on 7/5/03 [DSU Exh. 25]
- Mecca Thomas, entered a grade of A on 9/12/03 [DSU Exh. 25]
- Chris Asare, entered a grade of A on 7/16/03 [DSU Exh. 25]
- Shannon Bellamy, entered a grade of A for 6 credits
  on 5/30/03 [DSU Exh. 25]
- Vanita Bentley, entered a grade of A on 5/30/03 [DSU Exh. 25]
- Antonio Alvarez, entered a missing grade of A for 6 credits
  on 5/19/03 [DSU Exh. 25]

*Internship,* Course No. 55-450 (Spring 2002)
- Serena Warren, entered a grade of A for 3 credits on 10/27/03 [DSU Exh. 25]

*Internship,* Course No. 55-450 (Fall 2002)
- Shannon Bellamy, entered grade of A for 3 credits on 5/30/03 [DSU Exh. 25]
- Aaron Matthews, entered a grade of A for 6 credits on 5/21/03 [DSU Exh. 25]

*Internship,* Course No. 55-450 (Spring 2003)
- David Kuti, entered a missing grade of A on 7/5/03 [DSU Exh. 25]

---

   In all specific cases, these changes were processed by you directly with the Registrar's Office, with your representation that you were the Instructor of the course. None of these forms were filed with the Dean's Office or show the signature of the Dean, who denies that he approved them.

   You were knowledgeable concerning the applicable policies and procedures. You were given an opportunity to provide the appropriate back-up documentation for grade changes or obtain the approval of the instructors and failed to do so.

HALIBRARY\DOCS\2951\295100\CORR\B68333.DOC

4

COLLECTIVE BARGAINING AGREEMENT

BETWEEN

THE BOARD OF TRUSTEES OF

DELAWARE STATE UNIVERSITY

AND

THE DELAWARE STATE UNIVERSITY CHAPTER OF

UNIVERSITY PROFESSORS

2000 - 2009

A-000047

DSU-06698

TABLE OF CONTENTS

ARTICLE I AGREEMENT ...........................................................................................1

ARTICLE II PURPOSE...............................................................................................1

ARTICLE III DEFINITIONS......................................................................................2

ARTICLE IV RECOGNITION OF UNIT .................................................................5

ARTICLE V NON-DISCRIMINATION ...................................................................6

ARTICLE VI RIGHTS AND PRIVILEGES OF THE PARTIES ...........................7
6.15    Professional Dues Deduction ........................................................................8
6.16    Access to Information ....................................................................................9
6.17    Management Rights ......................................................................................10

ARTICLE VII APPOINTMENT AND REAPPOINTMENT ................................10
7.1     General ..........................................................................................................10
7.2     Types of Contract .........................................................................................11
7.3     Qualifications for Appointment ...................................................................12
7.5     Reappointment .............................................................................................18

ARTICLE VIII PROMOTION AND TENURE .....................................................19
8.1     Basic Principles Underlying the Promotion and Tenure Process.............19
8.2     Definitions....................................................................................................20
8.3     Policies Governing Promotion.....................................................................21
8.4     Policies Governing Tenure...........................................................................23
8.5     Judgmental Criteria for Promotion and Tenure ........................................25
8.6     Procedures for Promotion or Tenure..........................................................26
8.7     Target Dates for Promotion or Tenure .......................................................29
8.8     General Provisions .......................................................................................30
8.9     Appeals .........................................................................................................31
8.10    Promotion of Librarians, Counselors, and Clinical Practitioners in Nursing ..................33

ARTICLE IX PROFESSIONAL DEVELOPMENT ..............................................37
9.1     Sabbatical Leaves.........................................................................................37
9.2     Professional Development Leave for Non-teaching (N/T) Unit Members ..................39
9.3     Professional Development Fund ..................................................................41
9.4     Short Term Professional Leave (Department Travel) ................................43
9.5     Grievability ..................................................................................................45
9.6     Academic Enrichment Fund.........................................................................45

--i--

A-000048

DSU-06699

ARTICLE X SEVERANCE PROCEDURES ................................................................46
10.2    Resignation ............................................................................................46
10.3    Non-Reappointment................................................................................46
10.4    Dismissal and Other Sanctions ..............................................................48
10.5    Termination.............................................................................................52
10.6    Termination Under Reduction or Discontinuation of Program ...........56
10.7    Termination for Disability ......................................................................57

ARTICLE XI ANNUAL EVALUATIONS ..............................................................58
11.10   General Procedures for Evaluations........................................................60
11.13   Evaluation of Chairpersons, Academic Directors, and Head Librarians .......................62

ARTICLE XII WORKLOAD .....................................................................................63
12.1    Work Year...............................................................................................63
12.2    Academic Load .......................................................................................63
12.3    Faculty Responsibilities and Obligations................................................66
12.4    Workload Assignment ............................................................................68
12.5    Availability of Teaching Faculty.............................................................69
12.6    Committee Service..................................................................................70
12.7    Overload..................................................................................................70
12.8    Funded Research .....................................................................................71
12.9    Outside Employment...............................................................................72
12.10   Job Descriptions and Assignments - Department or Library Assistant .............72

ARTICLE XIII WORKING CONDITIONS................................................................73
13.4    Commons Hours .....................................................................................74
13.5    University Facilities ................................................................................74
13.6    University Services ..................................................................................76

ARTICLE XIV GRIEVANCE AND ARBITRATION ..............................................77
14.4    Basic Provisions......................................................................................77
14.5    Formal Grievance Procedure: .................................................................78

ARTICLE XV PERSONNEL FILES.........................................................................81

ARTICLE XVI RELEASE TIME..............................................................................83

ARTICLE XVII SALARIES.......................................................................................84
17.1    Salary Minimum .....................................................................................84
17.2    Salary Adjustments.................................................................................84
17.3    Salary Adjustment for Promotion ...........................................................84
17.4    Overload/Summer...................................................................................84
17.5    Compensation of Department Chairpersons ...........................................85
17.6    Payment Schedule...................................................................................86

A-000049

DSU-06700

17.7   Preservation of Base Salary ......................................................................................86
17.8   Compensation for Unusual Services............................................................................86
17.9   Additional Compensation ...........................................................................................86
17.10  Excellence Awards.......................................................................................................87
17.11  Merit Compensation Program .....................................................................................87
l7.13  Additional Compensation for Off-Campus Activities .................................................89
17.14  Compensation for Instructors in the Child Development Laboratory............................89

ARTICLE XVIII FRINGE BENEFITS ......................................................................................90
18.1   Insurance Plan .............................................................................................................90
18.2   Information to Individuals ...........................................................................................90
18.3   Leave............................................................................................................................90
18.4   Bereavement Leave.......................................................................................................91
18.5   Leave for Court-Required Services ..............................................................................91
18.6   Military Leave..............................................................................................................92
18.7   Annual Leave for Twelve Month Unit Members...........................................................92
18.8   Holidays .......................................................................................................................93
18.9   School Closings ............................................................................................................94
18.10  Sick Leave....................................................................................................................94
18.11  Personal Leave.............................................................................................................96
18.12  Notification ..................................................................................................................96
18.13  Education Benefits ........................................................................................................96
18.14  Tuition Remission Program ..........................................................................................97

ARTICLE XIX GOVERNANCE .................................................................................................98
19.1   General Principles ........................................................................................................98
19.2   Departmental Governance............................................................................................98
19.3   Designation of Chairperson .......................................................................................100
19.4   University Governance.................................................................................................102
19.5   Participation on Search Committees ..........................................................................102
19.6   Administrative Equivalence.........................................................................................102

ARTICLE XX PAST PRACTICE ..............................................................................................103

ARTICLE XXI LEGISLATIVE CLAUSE ..................................................................................103

ARTICLE XXII IMPLEMENTATION OF AGREEMENT ........................................................103
22.1   Scope of Agreement....................................................................................................103
22.2   No Strikes or Lockouts ..............................................................................................104
22.3   Separability ................................................................................................................104
22.4   Notice.........................................................................................................................104
22.5   Non-Assignment of Agreement ...................................................................................105
22.6   Agreement Management ..............................................................................................105
22.7   Printing and Distribution of Agreement.....................................................................105

–iii–

A-000050

DSU-06701

ARTICLE XXIII EFFECT, DURATION, AND RENEGOTIATION ........................................106
23.1    Totality..................................................................................................................106
23.2    Effect......................................................................................................................106
23.3    Renegotiation .......................................................................................................106
23.4    Ratification............................................................................................................107
23.5    Execution ..............................................................................................................107

–iv–

**A-000051**

DSU-06702

## ARTICLE I

## AGREEMENT

1.1    This Agreement is made by and between the Board of Trustees of Delaware State University and the Delaware State University Chapter of the American Association of University Professors. This document sets forth the agreement of the parties on matters of collective negotiations pursuant to the Public Employee Bargaining Provisions of the Delaware Code.

## ARTICLE II

## PURPOSE

2.1    The intents and purposes of this Agreement are to improve the quality and effectiveness of education at Delaware State University by promoting the highest standards of academic excellence in all phases of instruction, research, and public service. To that end, this Agreement aims to insure a healthy and viable institution of higher learning, capable of supporting a quality program of teaching, research, and professional service. This Agreement aims at achieving and maintaining academic excellence, facilitating effective faculty participation in decisions affecting the welfare of the college, assuring fair and reasonable conditions of employment, and providing techniques and procedures for the peaceful adjustment of disputes, should these arise.

2.2    It is recognized by both the University and the Association that mutual benefits are to be derived from continual improvement of Delaware State University, and that participation with faculty and professional employees in the formulation of policies under which they provide their services is educationally sound.

2.3    While the Association, as the elected bargaining agent, retains the exclusive rights to negotiate and reach agreement on terms and conditions of employment for members of the bargaining unit, and the Board of Trustees, under law maintains the right to manage and direct the University, both parties recognize the desirability of a collegial system of governance for faculty and professional employees in areas of academic concern. It is, therefore, desirable that a collegial system of governance be maintained and strengthened at Delaware State University.

2.4    In such a collegial system, Departments and other units should play an active and responsible role in academic matters, including significant involvement in the recruitment of new faculty members and professional employees, the development of quality programs and other matters of professional concern. The collegial relationship is most effective when faculty work together to carry out their duties in the most professional manner possible.

–1–

**A-000052**

2.5     Collegiality in academic governance at Delaware State University can best be accomplished through a Faculty Senate elected by represented Departments and constituencies in accordance with the Faculty Senate Constitution as formally adopted by the faculty and approved by the Board. It is hoped that this Agreement will strengthen faculty involvement through the academic Departments, the Faculty Senate, and the full faculty in session which has authority over the Faculty Senate in the collegial governance of Delaware State University.

2.6     The parties acknowledge that the faculty must remain free to practice their profession in the performance of their work at the University without interference or harassment because of their opinions or beliefs. Toward that objective, the parties pledge to use their respective offices, authority, and influence to maintain an atmosphere of collegiality and academic freedom which must prevail at the University.

2.7     The purpose, as expressed in this Article, being a philosophical agreement between both parties, is not subject to the Grievance Procedure (Article XIV).

## ARTICLE III

## DEFINITIONS

3.1     "AAA" refers to the American Arbitration Association.

3.2     "AAUP", "Association", or "Chapter" refers to the Delaware State University Chapter of the American Association of University Professors which is the duly elected bargaining agent for the members of the bargaining unit as defined specifically in Article IV of this Agreement.

3.3     "Academic Dean" -The undergraduate School Deans hereafter referred to as Academic Deans, are administrators responsible to the President through the Provost and Vice President for Academic Affairs.    The Academic Deans have overall responsibility for the administration and supervision of the academic programs and other activities of their respective schools.

3.4     "Academic Department" refers to a Board of Trustees approved Department where students can declare a major and/or minor.

3.5     "Academic Director" refers to a unit member who is the functional head of an Academic Support Center or Program, i.e., Comprehensive Learning Center, Black Studies Program, Honors Program, Counseling Center.

3.6     "Academic Work Year" refers to two (2) semesters of approximately equal length commencing with the Faculty Institute, which shall not be held earlier than August 25, and end nine months later.

3.7     "Administration" or "Administrators" shall mean those persons employed by Delaware State University who have supervisory or managerial responsibilities and who are not unit members.

–2–

**A-000053**

3.8    "Bargaining Unit" refers to members of the unit represented by the Association as defined by Article IV of this Agreement.

3.9    "Base Salary" refers to the salary of the unit member by virtue of his/her appointment and shall not include compensation earned through overload teaching, evening sessions, summer sessions, or extra stipends for other duties.

3.10    "Board" refers to the Board of Trustees of Delaware State University.

3.11    "Calendar Day" or day refers to the normal days of the week, including weekends.

3.12    "Contractual Year" refers to a pay period designated on a unit member's individual contract or letter of appointment.

3.13    "Clinical Practitioner in Nursing" refers to a person holding an appointment in the Department of Nursing with an earned masters degree in nursing whose primary responsibility is teaching under the direction of the department chair. This position is non-tenure track and does not carry academic rank. This position may compromise no more than 30% of the total regular faculty positions in the Department of Nursing at any time.

3.14    "Department Chairperson" refers to a faculty member who is the functional head of a Board approved academic Department.

3.15    "Equity Funds" refers to monies used to adjust unit members' salaries as a result of any internal salary study done by Delaware State University, analyzing DSU unit members' salaries without reference to any other institution.

3.16    "Handbook" shall mean the Faculty Handbook of Delaware State University.

3.17    "Peer" - for the purpose of all evaluations, a peer is a unit member who holds rank equal to or above that of the unit member being evaluated. In the case of faculty the peer must be tenured. For other purposes a peer is a unit member who holds rank equal to or above that of the unit member being evaluated.

3.18    "Operating Budget" refers to the total, detailed budget of the University.

3.19    "Parity Funds" refers to monies used to adjust unit members' salaries as a result of any salary study comparing salaries at peer institutions with salaries at Delaware State University.

3.20    "Parties" shall mean the Board and the AAUP or Chapter.

3.21    "President," except as otherwise indicated, shall mean the President of Delaware State University.

3.22    " Professional Counselors" refers to those counselors within the bargaining unit holding full-time appointments and appropriate graduate degrees with primary responsibilities for rendering professional counseling services under the direction of the Director of Counseling.

--3--

**A-000054**

DSU-06705

3.23    "Professional Librarian" refers to those librarians within the bargaining unit holding appointments and appropriate graduate degrees from an ALA accredited program with primary responsibilities for rendering professional service under the direction of the Head Librarian. Librarians are expected to participate in library and other professional associations, and on University committees.

3.24    "Provost and Vice President for Academic Affairs" refers to the chief academic officer.

3.25    "Ranked Faculty" or "Voting Faculty" refers to all persons employed by Delaware State University who hold appointments in any of the following categories: Professor, Associate Professor, Assistant Professor, and Instructor, or the respective equivalent ranks, as described in Article VII of this Agreement.

3.26    "Reasonable Time" or "Reasonable Notice" as used throughout this Agreement shall refer to (15) calendar days. When "reasonable notice" is applied to situations where the Association has made written requests to the University or the University has made written requests to the Association, the notice period shall begin upon receipt of such request.

3.27    "Unit Member" refers to a member of the bargaining unit as defined in Article IV of this Agreement. It is understood that certain provisions of this Agreement concerning unit members who hold academic rank, i.e., Instructor or its equivalent and above, shall not be construed to apply to members of the bargaining unit who do not hold academic rank.

3.28    "University" refers to Delaware State University, a public land grant institution of higher learning, chartered by the State of Delaware whose principal office is located in Dover, Delaware. It is also considered to be the employer as mentioned in the Public Employees Law of the State of Delaware. For purposes of this Agreement the term "University" shall also be construed, unless otherwise indicated, as designating the Board of Trustees or its authorized agents. It is understood that in normal usage exclusive of this Agreement, the term "University" may refer to the entire University family, including the Board, the Administration, the Staff, the Faculty, and the Student Body.

3.29    "Voting" Voting for Department chairpersons and other personnel issues must be done by secret ballot. Voting in absentia is permitted and the department must insure anonymity of all ballots. Absentee ballots must be received prior to the actual voting.

3.30    "Working Days" are defined as days exclusive of Saturdays, Sundays, formal holidays, periods when Faculty Institute, Registration, classes and examinations are not scheduled, periods when the University is closed, and Summer Sessions.

3.31    "Year," unless otherwise noted, refers to the Academic Work Year.

3.32    <u>Rules of Construction</u>

3.32.1  The masculine, feminine, and neuter gender as used in this Agreement import one another, and the singular shall include the plural whenever applicable.

A-000055

DSU-06706

3.32.2  Titles and headings used herein are for identification purposes only and shall not be given any substantive effect in the interpretation or application of the provisions of this Agreement.

3.33    "Agreement" refers to the collective bargaining document as negotiated by and between the University and the Association and ratified by the Board of Trustees and the members of the Delaware State University Chapter of the American Association of University Professors.

## ARTICLE IV

## RECOGNITION OF UNIT

4.1    Delaware State University hereby recognizes the Delaware State University Chapter of the American Association of University Professors as the sole and exclusive bargaining representative as certified by the Department of Labor, State of Delaware, with respect to matters concerning wages, salaries, workloads, sick leave, vacations, grievance procedures, sabbatical leaves, and other terms and conditions of employment as specifically set forth in this Agreement, for all employees of the University in the collective bargaining unit designated by that certification dated May 10, 1977, as follows:

All full-time "voting" faculty as defined by Delaware State University, including Departmental Chairpersons and Academic Directors.

The Association shall also represent the following employees: Professional Librarians, Counselors, Research Faculty, Extension Agents, Department and Library Assistants, and Half-time Faculty and Clinical Practitioner in Nursing.

4.2    Excluded from the unit are the following:

All other employees, including administrators, deans, and assistant deans.

a.   The University may designate up to four (4) positions at any one time whose duties are primarily administrative in instructional related areas and who may teach no more than two (2) courses per person per semester. These individuals may be given the title of lecturer, a title not within the bargaining unit. Specific teaching responsibilities and evaluation shall be undertaken through the appropriate Academic Department.

4.3    The University shall not aid, promote, or finance any other group or organization, which purports to engage in collective bargaining on behalf of members in the bargaining unit covered by this Agreement.

4.4    The University shall notify the Association of any change of status, including promotion, termination or change from part-time employment or administrative status of any member of the bargaining unit within fifteen (15) days after such change is determined.

A-000056

DSU-06707

3. The ad hoc Appeals Committee is charged with the responsibility of reviewing the decision(s) made concerning the particular candidate(s) and all supporting documents in order to determine whether the decision was arrived at fairly and equitably based upon the criteria and procedures for promotion and tenure. The ad hoc Appeals Committee shall have the same authority as the Promotion and Tenure Committee to review, to seek further information, and to interview those who participated in the previous decision(s) or those who are appealing. Candidate(s) appealing the decision(s) shall not be permitted to submit any evidence in support of their appeal unless such evidence was submitted to and considered by the Promotion and Tenure Committee or unless such evidence relates to matters occurring subsequent to the rendering of the initial decision. When oral testimony contradicts written evaluations, the affected unit member shall be informed of the oral testimony and be given an opportunity to respond to it.

4. No later than three (3) weeks following the appointment of the ad hoc Appeals Committee, the Committee shall report its decision(s) to the appropriate Academic Dean. Copies of the decision(s) shall be sent to the Chairperson of the Promotion and Tenure Committee and the concerned unit member(s).

5. The basis for any decision which runs counter to the original decision of the Promotion and Tenure Committee shall be in writing and in detail. The recommendations of the ad hoc Appeals Committee, including the candidate's Promotion and Tenure dossier and all supporting documents, shall be considered by the appropriate Academic Dean and Provost and Vice President of Academic Affairs in submitting their recommendations to the President of the University.

6. The President of the University shall review all recommendations of the Ad Hoc Appeals Committee and the Provost and Vice President of Academic Affairs, and if necessary, all supporting documents, and shall submit his/her report to the Educational Policy Committee of the Board of Trustees.

8.9.2    Appeal of President's Action on Tenure and Promotion

1. Any candidate for promotion or tenure who has not been approved by the President may appeal the President's decision by writing to the Board in care of the Chief Executive Officer of the President within ten (10) working days of receiving written notice of the President's decision.

2. In appealing to the Board, a candidate shall state in writing whether he/she wishes to present the case personally to the Board on a date to be designated by the Board and whether or not he/she wishes to be accompanied by a representative of the AAUP at the appeals meeting. Such candidates may also elect to be represented by legal counsel. The Board or its designee shall meet with affected candidates as soon as possible after receipt of the written appeal. The candidate shall not be permitted to submit any evidence in support of his/her appeal, unless such evidence was submitted to and considered by the Promotion and Tenure Committee and/or the ad hoc Appeals Committee, or unless such materials related to matters occurring subsequent to the rendering of the decision of the Promotion and Tenure Committee. The candidate shall have the opportunity to review the material in the record for

A-000057

DSU-06734

completeness, and shall be permitted to present an oral argument (either personally and/or through his representative), but shall not be permitted to present oral evidence of other persons. The Board may request additional oral evidence at its discretion. Copies of the Board's decision shall be forwarded to the candidate, the President of the University, the AAUP, the appropriate Academic Dean, and the appropriate Vice President within ten (10) working days of the Board's decision.

8.10   Promotion of Librarians, Counselors, and Clinical Practitioners in Nursing

8.10.1  Judgmental Criteria For Promotion For Librarians

1. Professional Competence: Competence in the performance of library work at the university level is an absolute necessity for promotion of librarians.

2. Professional Service: Professionally relevant activities directed toward service to the library, the University, and the community shall contribute to favorable consideration for promotion. Librarians shall demonstrated dependability and meaningful participation as a member of University committees and shall have made significant contributions to the Library and the University as evidenced by:

a. Membership, participation, or holding office in local, regional and national professional organizations

b. Service on academic committees as a member or chair.

3. Professional Development: Librarians shall participate in workshops, conference, seminars, etc. Scholarship and other scholarly endeavors shall also be used as evidence of professional recognition. Other evidence may include awards, honors, and certificates.

8.10.2  Judgmental criteria For Promotion For Counselors

1. Professional Competence: Competence in Counseling is an absolute necessity for promotion to Counselor II. Insofar as they pertain to counseling competence, efforts by the Counselor at student workshop development, maintaining the highest levels of professional service offered the individuals to be served, and maintaining high standards of professional conduct are necessary for promotion of counselors.

2. Professional Service: Professionally relevant activities directed toward service to the Counseling Department, the University, and the community that contribute to favorable consideration for promotion include: effective group facilitating, providing outreach, professional counseling, and services to the community, effective membership on and participation in University committees, and other significant contributions to the Counseling Department, the University and the community.

3. Professional Development: Professional Development for Counselors shall be achieved through creative work impacting student retention at the University, workshop development and counseling strategies influencing Counselor effectiveness and student behavior modification. Scholarship and other scholarly endeavors shall also be used as evidence of Professional Recognition. Other evidence may include awards, honors, and certificates.

—33—

A-000058

2. The fund shall be administered by the Provost and Vice President for Academic Affairs, who shall make awards to unit members upon the recommendation of the appropriate Academic Dean (or other appropriate administrator in the case of non-teaching unit members).

3. Awards may be made for any of the following purposes: dues for professional organizations, subscriptions to professional journals, and travel to professional meetings appropriate to the unit members discipline; acquisition of books, software, and/or equipment for research purposes; tuition and other costs associated with obtaining advanced degrees; and other bona fide purposes relating to unit members' continued growth and development in their assigned duties at the University. The maximum award per unit member shall not exceed $5000.

4. Applications may be submitted to the appropriate Academic Dean (or other appropriate administrator in the case of non-teaching unit members) at any time, but no later than 1 November for awards to be made in the semester and no later than 1 March for awards to be made in the spring semester. Within fifteen (15) working days of their application to the appropriate Academic Dean (or other appropriate administrator in the case of non-teaching unit members), unit members shall be informed by the Provost and Vice President for Academic Affairs of the disposition of their applications.

5. No unit member shall receive more than one (1) award from this fund in any given fiscal year.

6. By the end of the semester following receipt of funding, recipients of Academic Enrichment funds shall file a written report of the activities and accomplishments of the award with the Department Chairperson    (or other appropriate administrator in the case of non-teaching unit  members) the Academic Dean, and the Provost and Vice President for  Academic Affairs.

## ARTICLE X

## SEVERANCE PROCEDURES

10.1   At times it may be necessary for the University or the individual unit member to sever their professional relationship. In order to protect the interests of both parties, various kinds of severance actions are here defined, and the policies and procedures related to each category are set forth.

10.2   Resignation

10.2.1  Resignation is an action by which a unit member terminates an appointment.

10.2.2  Upon receiving notification of the terms and conditions of an appointment, it shall be the professional obligation of a unit member to respond within thirty (30) calendar days. An extension, depending upon circumstances, may be granted by the appropriate Academic Dean or Vice President upon request. In all circumstances, a unit member is expected to reply in one (1) of three (3) ways: (a) acceptance; (b) declination or resignation; or (c) request for extension.

–45–

A-000059

DSU-06747

10.3.6 If the recommendation for non-reappointment is approved by the appropriate Academic Dean, he/she shall recommend non-reappointment to the Vice President who, if he/she approves, shall invite the affected unit member to meet with him or her to discuss the matter prior to making a final decision.

10.3.7 Written notice that an appointment is not to be renewed shall be given to the unit member in advance of the expiration of the appointment as follows:

a. Not later than March 1 of the first academic year of service if the appointment expires at the end of that year; or, if a one (1) year appointment terminates during the academic year, at least three (3) months in advance of its termination.

b. Not later than December 15 of the second academic year of service if the appointment expires at the end of that year; or, if an appointment terminates during the academic year, at least six (6) months in advance of its termination.

c. At least twelve (12) months before the expiration of an appointment after two (2) or more years of service at the University.

10.3.8 If possible, unit members whose positions depend in part or in full on external funding shall be afforded notification dates as contained in this section. The withdrawal of external funding may result in the termination of the position effective the expiration date of the external contract. The act or date of termination of the affected position is not subject to the grievance procedure. Such a bargaining unit member shall be provided an opportunity to apply for any University openings, provided that he/she meets the criteria established in accordance with the provisions of Article 7.4 of this Agreement. When transferred, such a bargaining unit member shall not be considered to be a new employee.

10.3.9 Final decisions concerning non-reappointment of a unit member shall not be subject to the Grievance Procedure of this Agreement. Alleged violations of the procedure for non-reappointment are subject to the grievance procedure.

10.4 Dismissal and Other Sanctions

10.4.1 Dismissal is an action taken by the University to permanently discharge from employment at the University a tenured member of the faculty or any other unit member prior to the end of a specified term. Dismissal may only be for "adequate cause" as hereinafter specified.

10.4.2 "Adequate Cause" for dismissal shall be predicated upon substantiated charges directly and substantially related to the fitness of the affected unit member to discharge professional responsibilities.

10.4.3 Dismissal proceedings may be instituted for any of the charges listed below:

a. Failure to perform professional responsibilities either through incompetence, persistent negligence, refusal to carry out reasonable assignments, or disregard for scholarly and professional standards and ethics.

–47–

**A-000060**

DSU-06749

b. Conviction of a criminal offense, the nature of which reasonably compromises the member's ability or fitness to perform his or her professional duties, or which render him or her unable to perform such duties.

c. Fraud or misrepresentation of professional preparation, accomplishments, or experience in connection with initial appointment or in the submission of materials for evaluation for promotion, tenure, or merit increases.

d. Deliberate and grave violation of the rights and freedom of other members of the University community.

e. Grave personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community.

f. Abandonment: Absence from scheduled responsibilities for ten (10) calendar days without proper notice to the University.

g. Failure to participate in and successfully complete an approved rehabilitation program by unit members whose professional performance is materially affected by drug and/or alcohol abuse.

10.4.4 Dismissal of any member of the tenured faculty or unit member before the end of the specified term of employment shall be preceded by a written invitation from an appropriate administrative officer (including for this purpose a Department Chairperson) to the affected unit member to meet to discuss the matter. The invitation shall call for a meeting to take place within five (5) days of the delivery of the invitation. If the meeting is held and a mutually acceptable resolution is reached, (which may include dismissal, or written reprimand or remedial plan or period of supervised probation) the issue shall be deemed resolved, and a statement of the terms of the settlement shall become part of the unit member's personnel file. The settlement shall not be inconsistent with the terms of this Agreement. A copy of the terms of the settlement shall be given to the unit member, the appropriate Academic Dean, the appropriate Vice President, and the President of the AAUP.

10.4.5 If the discussions prove inconclusive or the affected unit member elects not to participate in the discussions, the President of the University shall notify the affected unit member of his/her intention to commence dismissal proceedings, which notification shall be accompanied by a written statement of specific charges, and a copy sent to the President of the AAUP. Within ten (10) calendar days after receipt of the foregoing notification, the affected unit member may either resign, accept dismissal, or agree to a hearing before an Ad Hoc Dismissal Committee.

A-000061

DSU-06750

10.4.6.a. The Ad Hoc Dismissal Committee shall be appointed jointly by the appropriate Vice President and the President of the AAUP. It shall consist of five (5) unit members, preferably tenured, none of whom may be from the Department of the affected unit member. Prospective members of the committee deeming themselves disqualified for bias or interest shall promptly notify the appropriate Vice President that they are unable to serve. The President of the University and the affected unit member may each challenge only one proposed committee member without stated cause.

b. In cases involving non teaching unit members, the Ad Hoc Dismissal Committee shall be appointed by the appropriate Vice President and the President of the AAUP. It shall consist of five (5) unit members, none of whom shall be from the department of the affected unit members.

c. If the appropriate Vice President and the President of the AAUP cannot agree on the membership of the Ad Hoc Dismissal Committee within five (5) days of the election by the affected unit member to have a hearing, the Committee shall be chosen by lot from a list of unit members eligible to serve. Unit Members so elected shall serve on the Committee unless excused by both the President of the AAUP and the appropriate Vice President for substantial reasons of bias, conflict of interest, or conflict in schedule.

10.4.7 It is understood and agreed that the President of the University may take immediate and unilateral action to temporarily suspend a tenured member of the faculty or other unit member, if in his or her judgement to fail to do so would cause immediate and substantial harm to the University, students or other employees. In the event the continued presence of the unit member on University property would, in the reasonable judgement of the President result in serious disruption of University operations or place students or other employees in jeopardy, the President shall direct the unit member to remove him or herself from University property and suspend the unit member with pay.

In the event that the President suspends a unit member under the provisions of this section, he or she shall deliver written notice of such decision to the affected employee, and concurrently shall send a copy of the notice to the President of the AAUP and invite the President of the AAUP to meet to discuss the matter. In no event, shall the suspension eliminate the right of the unit member to have a hearing before the Ad Hoc Dismissal committee as set forth in this section.

10.4.8 The Ad Hoc Dismissal Committee shall promptly begin preparations for the hearings. The Committee may, with appropriate notice to the parties concerned, hold joint meetings with the parties in order to (a) simplify the issues; (b) effect stipulations of facts; (c) provide for the exchange of documentary or other information; and (d) achieve such other appropriate pre-hearing objectives as will make the hearing fair, effective, and expeditious.

10.4.9 The Ad Hoc Dismissal Committee shall serve notice of the hearing, with specific charges in writing, at least twenty (20) calendar days prior to the hearing.

10.4.10    The hearing shall be opened within thirty (30) calendar days after notification of hearing and shall be completed within fifteen (15) calendar days after the commencement of

–49–

A-000062

DSU-06751

the hearing. Each party shall have the right to request only one time extension which shall not exceed 15 calendar days. The extension must be mutually agreed upon by all parties.

10.4.11        The hearing shall be governed under the following rules:

a. The affected unit member shall determine whether the hearing should be public or private, and no adverse inference shall be drawn from such determination.

b. The unit member and the University shall be entitled to have legal counsel of his/her own choice attend and participate fully in the proceedings.

c. The Association and its counsel (if different from the individual's counsel) may also attend the proceedings.

d. The Committee shall grant reasonable adjournments to enable either party to investigate evidence to which a valid claim of surprise is made.

e. A verbatim record of proceedings shall be taken and a copy shall be made available to the

unit member, with the cost borne by the Administration.

f. The burden of proof that "Adequate Cause" exists rests with the University and shall be satisfied only by clear and convincing evidence in the record considered as a whole.

g. The unit member and the Administration shall be afforded an opportunity to obtain necessary witness and documentary or other evidence; both parties shall cooperate with the Committee in securing witnesses and making this evidence available.

h. The unit member and the Administration shall have the right to confront and cross-examine all witnesses. Where the witnesses cannot or will not appear, but the Committee determines that the interests of justice require admission of their statements, the Committee shall identify the witnesses, disclose their statements, and, if possible, provide for interrogatories.

i. In a hearing of charges of gross incompetence, the testimony shall include that of qualified unit members from this institution, of higher education, or qualified individuals from other institutions of higher education or recognized authorities in the appropriate disciplines or programs.

j. The Committee shall not be bound by strict rules of legal evidence, and may admit to any evidence which is of probative value in determining the issues involved. Substantial documented efforts shall be made to obtain the most reliable evidence available.

k. The findings of fact and the decision shall be based solely on the hearing record.

–50–

A-000063

DSU-06752

10.4.12    The Committee shall notify the President of the University and the unit member and the President of the AAUP of its recommendation in writing within seven (7) calendar days after the conclusion of the hearing. The Committee shall state its finding of fact, its conclusions and the reasons therefor, and its recommendation that the unit member either be dismissed or not dismissed.

10.4.13    The Committee shall also be empowered to recommend an appropriate remedy if it does not recommend for dismissal. (Which may include a written reprimand or remedial plan or period of supervised probation.)

10.4.14    The recommendation of the Ad Hoc Dismissal Committee shall be transmitted to the Board by the President of the University. The Board shall consider the recommendation and render a decision in writing to the affected unit member within thirty (30) calendar days after receipt of the Committee's recommendation. Copies of the Board's decision shall be provided the Presidents of the University and the AAUP, the appropriate Vice President, the appropriate Academic Dean, and the Chairperson of the Ad Hoc Dismissal Committee. In the event that the Board's decision is for dismissal, the affected unit member shall have the right to appeal directly to the Board and present evidence on his/her behalf. Such appeals shall follow the same procedures as stipulated in Article VIII, Section 9.2. In the event the Board chooses not to dismiss, it may determine an appropriate remedy.

10.4.15 If any tenured faculty member faces a dismissal for cause under incompetence charges which have been sustained and all hearings are completed, the Association may if its so desires, appoint two (2) representatives of its Executive Committee within five (5) calendar days of the Association's notice of the action being sustained, to meet with the appropriate Vice President in respect to the conditions of the dismissal once set on questions of compensation and/or benefits for the faculty member involved. In such discussion, previous service and performance shall be considered.

10.4.16 Dismissal, for abandonment, of any unit member may be effected only after the following procedures have been followed in the order listed:

a. If the unit member cannot be located and has failed to contact the University, he/she shall be suspended without pay effective from the first day of expected service pending contact for a period of forty-five (45) calendar days and shall be summarily dismissed at the end of that time if all efforts to contact the unit member have failed. Such efforts shall include telephone calls to the last known number; letters posted by certified mail, return receipt requested; and attempts to contact known relatives.

b. If the unit member is located within forty-five (45) calendar days from the date of suspension, the University shall evaluate the situation and either reinstate the unit member or institute dismissal proceedings as set forth in this provision.

10.4.17 If the Administration believes that the conduct of the unit member, although not constituting adequate cause for dismissal, is sufficiently grave to justify imposition of a sanction the procedures and standards outlined hereinabove for dismissal shall govern such a proceeding.

A-000064

DSU-06753

10.4.18 Dismissal for adequate cause as outlined in this section is not subject to the grievance procedure. Alleged violations of the procedure for dismissal for adequate cause are subject to the grievance procedure.

10.5    Termination

10.5.1 Termination is a severance action by which the University terminates the services of a unit member before the end of a specified term without prejudice to the performance of the affected unit member. Financial exigency, discontinuation or reduction of a program, or prolonged mental or physical disability are the only causes for termination of a unit member before the end of a specified term.

10.5.2 Financial exigency exists when the financial position of the University demonstrates that a financial crisis is imminent and that failure to retrench would seriously jeopardize the University. The following procedures shall be followed in the event of termination under financial exigency.

10.5.3 Should the Administration anticipate a financial exigency which may result in the termination of unit members, the data upon which this anticipation is based, including the amount of savings which it deems necessary to effect, shall be presented to the AAUP. It shall also provide such additional data which the AAUP may request within twenty (20) days following that presentation. The Administration and the AAUP may agree to submit either a joint recommendation or separate recommendations to the Board as to whether a financial exigency exists. Both the Administration and the AAUP agree not to submit a recommendation to the Board and the Board agrees not to accept recommendations from either party until thirty (30) days after the Administration has submitted the data upon which the anticipation of financial exigency is based. It is agreed that such data shall be accurate, complete and consistent.

10.5.4 Discussion by the Board leading to a Board action on financial exigency must take place in a public meeting. Termination of tenured faculty members under this section may not take place until the formal declaration of financial exigency has been made by the Board of Trustees, which must include a statement of the amount of money needed to relieve the exigency.

10.5.5 Following a declaration of financial exigency, a joint Financial Exigency Committee shall be formed and shall consist of five (5) members appointed by the Administration and five (5) members appointed by the Association. All appointments shall be made within ten (10) working days after the formal declaration of financial exigency. The purpose of the Committee shall be to develop recommendations to provide sufficient savings for relieving the exigency. The Committee shall have ninety (90) calendar days within which to develop the recommendations unless such time is extended by the Board.

10.5.6 In developing recommendations for relieving the exigency, the Committee shall use the following criteria and principles:

–52–

A-000065

23.4    <u>Ratification</u>

This Agreement is subject to ratification by majority vote of the membership of the American Association of University Professors, Delaware State University Chapter, and majority vote of the members of the Delaware State University Board of Trustees.

23.5    <u>Execution</u>

In witness thereof, the parties have caused this Agreement to be executed under these hands and seals:

For the University                    For the Association

_____              _____
President of the Board of Trustees        Chief Negotiator

_____              _____
President of the University          President of the DSU Chapter, AAUP

_____              _____
Date                                 Date

-104-

A-000066

DSU-06806



DELAWARE STATE UNIVERSITY

CHAPTER - UNIVERSITY COMMITTEE

Letter of Agreement

The Parties agree that the effective date of the 2006-2009 Collective Bargaining Agreement is July 1, 2006.

The Parties also agree that there are no retroactive provisions in the Agreement.

_____          _____
James S. King                            James R. Mims
Chief Negotiator, AAUP                   Chief Negotiator, University

_____          _____
Date                                     Date

APPENDIX H

1200 North DuPont Highway • Dover, Delaware 19901-2277 • (302) 857-6100 • FAX (302) 857-3123

-114-

A-000067

DSU-06816



CALENDAR PLANNER 2001-2004

Delaware State University

A-000068

DSU-06818



# POLICY GUIDELINES & CODE OF CONDUCT

## PREAMBLE

Attending an institution of higher learning is a privilege that many people cannot enjoy.

Students are expected to respect this privilege while attending Delaware State University on and off campus. Students will conduct themselves with propriety, conforming to the high standards of the University, and respect the rights and opinions of others. They are expected to comply with the University's policies , regulations, and rules such as visitation policies of the residence halls, academic regulations, drug policy, pledging and hazing policy, individual or group protest action policy, alcohol policy, missing property policy, search and seizure policy, disruptive behavior policy, illegal possession or unauthorized use of keys policy.

Students are expected to conform to recognized University standards of conduct, behave with decency, and dress appropriately while on and off campus and in academic settings, social events, extracurricular activities, and other public functions. Male students are expected to remove hats when the Alma Mater is being sung or played, and prior to entering any building on campus including the dining hall, library, classroom buildings, residence halls, and other buildings. All students are expected to stand when the Alma Mater is being sung or played.

Integrity must be practiced in all endeavors and relationships on and off campus. Students found to be dishonest and indulging in acts of serious misconduct including cheating on tests and examinations, plagiarism, alteration or misuse of college documents, records or identification cards, forgery, misrepresentation, unauthorized use of another's property, lying, fighting, theft, or receiving stolen goods will be subject to dismissal from Delaware State University. Students must refrain from using four-letter words and other obscenities that are not accepted standards of decency at Delaware State University to parents, students, visitors, professional staff, and others. Violations may be subject to judicial action under the category of verbal abuse.

## UNIVERSITY STANDARDS

Responsible individual behavior is a basic expectation of all students attending Delaware State University. All students are expected to main-

94

_____ **POLICY GUIDELINES & CODE OF CONDUCT**

tain high standards on and off campus. Students are reminded to observe the rules and regulations regarding student demonstrations, co-educational visitation in the residence halls, membership intake activities for fraternities and sororities, illegal drugs and alcoholic beverages, conduct in University buildings and at student activities. Any social behavior that might offend or violate University policy or criminal law is clearly inappropriate and may subject a student to discipline up to and including expulsion from the University. The University insists upon mature and appropriate behavior at all times.

Students who commit criminal acts may lose the privilege to attend Delaware State University. Negative representations by students on and/or off campus are in conflict with the high standards the University seeks to maintain. In addition to the specific infractions of community life and criminal law prescribed in this handbook, shoplifting, drug violations, violent acts, use of a weapon off campus, conveying bomb threats, and other obvious violations of criminal law may be dealt with through the criminal court system and/or the University disciplinary system. Students are expected to report all off campus arrests to the Office of the Vice President for Enrollment Management and Student Affairs. Failure to do so will be considered a violation of University policy.

## POLICY GUIDELINES
## ZERO TOLERANCE POLICY AND SANCTION

**ZERO TOLERANCE** means the University prohibits all illegal and unauthorized possession and/or use of weapons or drugs and/or fighting/assault and battery that directly contributes to the emotional or physical detriment of University personnel or enrolled students. The zero tolerance policy is effective as it relates to on-campus activities and University sponsored off-campus activities.

**ZERO TOLERANCE violation(s) will result in**
- speedy adjudication by the Zero Tolerance Subcommittee within 2-5 academic days from the time the infraction report is received in the Office of Student Judicial Affairs.
- if found responsible, minimum sanction of one (1) year suspension up to expulsion;
- immediate dismissal from University should violator be deemed dangerous to self or to others.

95



DSU-06820



## POLICY GUIDELINES & CODE OF CONDUCT

### ZERO TOLERANCE

The University has Zero Tolerance with regards to underage alcohol possession or consumption (legal drinking age in Delaware is 21), possession or consumption of drugs, fighting/assault and battery and weapons/firearms/explosives. In addition, any felonious action (including but not limited to sexual assault, burglary, robbery and arson) will be subject to judicial action under this policy. Any student charged with these violations will be referred to the Student Judicial System. If found responsible of underage alcohol violations, drugs, assault and battery and/or other felony violations, the minimum sanction will be suspension from the University for one (1) year. For weapons violations the sanction is expulsion from the University.

### ALCOHOL POLICY

Although the legal drinking age in Delaware is 21, University regulations prohibit any student from possessing or consuming alcohol in the residence halls, dining hall, at student functions and at off-campus University-sponsored or supervised functions, regardless of age. Any student found responsible for violating this policy will be subject to University disciplinary and/or criminal action.

### DELAWARE STATE UNIVERSITY ALCOHOL SANCTIONS
#### FRESHMAN STUDENT BEHAVIOR(S)

- Under age 21 possession and/or consumption
- Open container of alcohol in public
- Hosting a party involving illegal use of alcohol
- Dispensing alcohol to minors
- Intoxication
- Constitution of a public nuisance by being offensive to public order or decency

**FIRST OFFENSE**
- disciplinary probation for one year
- Alcohol education
- $50 fine
- Parental notification

96

A-000071

DSU-06821

## _____ POLICY GUIDELINES & CODE OF CONDUCT

**SECOND OFFENSE**
- Deferred suspension from Residence Halls for one year
- Substance abuse referral
- $100 fine
- Parental notification

**THIRD OFFENSE**
- Suspension from Residence Halls for one year. The student will be held responsible for the full cost of the residence hall for the remainder of the academic year
- Suspension from University for one year
- Parental notification

### UPPER CLASS
### STUDENT BEHAVIOR(S)
- Under age 21 possession and/or consumption
- Open container of alcohol in public
- Hosting a party involving illegal use of alcohol
- Dispensing alcohol to minors
- Intoxication
- Constitution of a public nuisance by being offensive to public order or decency

**FIRST OFFENSE**
- Disciplinary probation for one year
- Alcohol education
- $50 fine

**SECOND OFFENSE**
- Deferred suspension from Residence Halls for one year
- Substance abuse referral
- $100 fine

**THIRD OFFENSE**
- Suspension from Residence Halls for one year

97



A-000072

DSU-06822

## POLICY GUIDELINES & CODE OF CONDUCT

Sanctions may be altered based on the severity of the behavior. Offenses are accumulative throughout matriculation at Delaware State University.

## DRUG POLICY

The University will uphold the federal and state laws concerning the illegal use, possession, consumption, sale, trafficking, manufacturing, dispersing, and/or distribution of drugs, narcotics, controlled substances, counterfeit substances and drug paraphernalia. Any student found in violation of this policy will be referred to the Judicial System. If found responsible, he/she will be immediately suspended from the University for a minimum of one (1) year.

## FIGHTING/ASSAULT & BATTERY
### (Altercations Involving Physical Contact)

Fighting/assault and battery endangers the health or safety of any member of the University Community. Fighting/assault and battery includes but is not limited to beatings, muggings, physical torture, or any bodily injuries inflicted upon a person. Students who violate this policy will be referred to the Judicial System. If found responsible, student will be suspended from the university for a minimum of one (1) year.

## WEAPONS/FIREARMS/EXPLOSIVES

The use, possession and/or storage of firearms, ammunition or explosives and lethal weapons of any kind in motor vehicles, buildings or elsewhere on the University premises are prohibited. Students who violate this policy will be referred to the Judicial System. The penalty for being found responsible for possession of weapons is expulsion.

## DRUG-FREE SCHOOLS AND COMMUNITIES ACT OF 1989

The Drug-Free Schools and Communities Act Amendments of 1989, require an institution of higher education, as a condition of receiving funds or any other form of financial assistance under any federal program, to certify that it has adopted and implemented a program to prevent the unlawful possession, use or distribution of illicit drugs and alcohol by students.

98

A-000073

DSU-06823

## POLICY GUIDELINES & CODE OF CONDUCT

As a part of its substance abuse programs, Delaware State University annually distributes to its students in writing the following information.

Standards of conduct that clearly prohibit the unlawful possession, use or distribution of illicit drugs and alcohol on school property or as part of any school activities:

A description of the applicable legal sanctions under local possession or distribution of illicit drugs and alcohol:

A description of the health risks associated with the use of illicit drugs and alcohol:

A description of the applicable legal sanctions under local, state, or Federal law for the unlawful possession or destination of illicit drugs and alcohol:

A description of the health risks associated with the use of illicit drugs and the abuse of alcohol;

A description of any drug or alcohol counseling, treatment, or rehabilitation or re-entry programs that are available to employees or students:

A clear statement of the disciplinary sanctions that the University will impose on students, who violate the standards of contact.

The University will conduct a biennial review of its substance abuse progam to determine its effectiveness, implement need for changes and ensure that disciplinary sanctions are consistently enforced.

## STANDARDS OF CONDUCT

The illegal use possesion, sale or distribution, and consumption of drugs, narcotics, or other controlled substances or synthetic substance on University-owned or controlled property or at University-sponsored or supervised functions is prohibited.

The possession and/or consumption of alcoholic beverages on University property is prohibited.

## DISCIPLINARY SANCTIONS

The University will impose disciplinary sanctions on students who violate the above standards of conduct.

Students should be cognizant of the fact that for violation of these standards they will be subject to University disciplinary sanctions up to and including suspension or expulsion from the residence halls and/or the University and may be referred for criminal prosecution.

99



DSU-06824



# STUDENT JUDICIAL SYSTEM

## STUDENT JUDICIAL SYSTEM

I.  **STATEMENT OF PHILOSOPHY**

The aim of a judicial system serving an educational institution is to increase student responsibility and to provide maximum opportunity for students to participate in the governance of their own lives within the educational community. To that end, students have significant responsibility for the formulation and maintenance of standards of behavior and for sharing responsibility with the faculty and administration. To safeguard the rights of an individual who comes before the judiciary system, the rights of the individual must be clearly stated and the principles of procedural due process clearly explained. To protect that individual against possible errors in judgment that may occur in any judicial system, a right of appeal to a higher judicial body should be provided.

II.  **STATEMENT OF PURPOSE**

The Student Judicial System of Delaware State University is designed to cultivate in students a clear understanding of freedom and the responsibilities concurrent with that freedom. All enrolled students will at all times conduct themselves in a manner that will reflect credit upon the University that is congruent with the code of conduct. Regulations for student conduct are established for the purpose of maintaining standards of individual behavior which are consistent with the purposes of the University. To this end, the Student Judicial System of this University is designed to adjudicate alleged violations of University regulations governing student conduct and to discharge its duties irrespective of or concurrent with other civil or criminal proceedings.

NOTE: Students at Delaware State University are bound by local, state and federal laws as well as by the rules and regulations of the University. A student violating a law is liable for prosecution by the appropriate authorities. The University reserves the right to impose its own sanction for offenses committed by its students regardless of the outcome of criminal or civil prosecution proceedings.

114

A-000075

DSU-06839

## STUDENT JUDICIAL SYSTEM

III.    STUDENT RESPONSIBLITIES

Attending an institution of higher learning is a privilege that many cannot enjoy. Students are expected to respect this privilege while attending Delaware State University.

1. Students are responsible for using their time effectively in pursuit of educational goals and maintaining high standards of academic achievement.
2. Students will conduct themselves with propriety conforming to the high standards of the University.
3. Students will respect the rights and opinions of others.
4. Students are expected to preserve healthful, wholesome physical and hygienic conditions.
5. Student should actively participate in life at the University.
6. Students have the responsibility to comply with the University's policies, regulations, and rules that apply to students and student conduct.
7. Students have the responsibility to uphold the reputation and high standards of the University.
8. Students have the responsibility to attend classes punctually and regularly and to devote themselves earnestly to their studies in order to learn.
9. Students have the responsibility to assist and take pride in the maintenance and preservation of University property.
10. Students have the responsibility to adopt positive patterns of behavior and values in order to develop a wider understanding of themselves and society.
11. Students are expected to use their varied abilities to make their years at Delaware State University a meaningful experience.

IV.    STUDENT RIGHTS

Every student is entitled to certain rights and guarantees of due process in this judicial system. Nothing herein is intended to or shall be construed to limit or restrict these rights. However, in order to prevent abuse of the rights of others and to maintain public order appropriate to the University, students may be subjected to disciplinary action for violation of the rights indicated. The rights outlined below are not inclusive but serve as guidelines to ensure that all students are treated fairly. .



115

DSU-06840



## STUDENT JUDICIAL SYSTEM

1. No judicial action shall be taken nor a case file opened than infraction report has not been filed pertaining to an alleged offense.

2. To ensure effective investigation, timely reporting of violations is strongly encouraged.

3. In accordance with the Family Educational Rights and Privacy Act, a student may inspect and review his/her judicial file upon request to the Director of Student Judicial Affairs. Student disciplinary records are for intramural use only, and may not be released to any party outside the Judicial System without the written permission of the student. A student may obtain a copy of his/her disciplinary file from the Office of Student Judicial Affairs when the student is currently charged with an offense and a copy is needed to prepare his/her case for a particular University judicial hearing.

4. Students' disciplinary records will be retained until the student has left the University for the final time due to graduation, transfer or permanent academic dismissal. Upon completion of final matriculation, records related to serious violations, defined as those violations that result in suspension or expulsion will be maintained for a period of five (5) years.

5. Confidentiality of Records
   Before information in any student file may be released to anyone, the student must give prior written consent except in those instances stated below:

   (a) To administrators, faculty and staff for legitimate educational purposes.

   (b) To accrediting organizations to carry out their functions.

   (c) To appropriate personnel to protect the health and safety of students in emergencies with the understanding that only information essential to the emergency situation will be released.

   (d) If the petitioner has a valid court order, Vice President for Enrollment Management and Student Affairs or designee will release information from the student's file.

6. After formal charges have been filed and a hearing date has

116

A-000077

DSU-06841

**STUDENT JUDICIAL SYSTEM**

been scheduled, upon request and with the appropriate subpoena(s) the accused student shall have the right to be informed of the identity of known witnesses to the offense and to examine all documents, statements, or other evidence that will be presented at the hearing.

7.  Students should be aware that any attempt to contact or intimidate witnesses or officials by the accused or his/her agent(s) shall be considered a serious offense and will result in additional charges being filed.

8.  The accused student shall have the right to choose a hearing by the appropriate judicial hearing council or Director of Student Judicial Affairs.

9.  The Office of Student Judicial Affairs shall give reasonable notice in writing to the accused student. The written notice should contain the charged violation, date, time and location of the hearing before the appropriate judicial council at least three (3) academic days prior to the hearing. In the case of a Zero-Tolerance violation, this requirement is waived and the hearing may be scheduled anytime within the 2-5 days required by that policy. If after such notification the alleged offender does not appear at the hearing, the case may be heard and a decision rendered despite his or her absence. Students are responsible for notifying the Office of Student Judicial Affairs of any address change.

10. The accused student shall have the opportunity to discuss the findings of the judicial hearing with the Director of Student Judicial Affairs once the accused student has been notified in writing of the decision. This opportunity for discussion shall be stated in the notification letter sent by the Office of Student Judicial Affairs to the accused student.

11. Hearings before all University judicial bodies shall be closed. However, the accused student may request to be accompanied by no more than one advisor. The name of the advisor and any defense witnesses must be submitted to the Director of Student Judicial Affairs at least 24 hours prior to the hearing.

12. In a judicial hearing the accused student shall have the right to present his or her respective position by introducing evidence and witnesses, making statements and cross-examining

117

DSU-06842



## STUDENT JUDICIAL SYSTEM

opposing witnesses. However, no student will be required to give evidence against himself or herself in any judicial proceeding.

13. The accused student is entitled to a fair and impartial hearing and is presumed not responsible until proven responsible. No student shall be found responsible of any offense unless his or her responsibility is proven by the preponderance of evidence. The burden of proof rests upon the complainant.

14. The accused student and the complainant shall each have the right to request that any particular Judicial Hearing Council member not serve on their hearing committee for reasonable cause. The hearing officer of the case shall make the final determination in regard to which council members shall hear the case.

15. If found responsible the accused student shall receive one or more sanctions from the hearing council.

16. In the event an accused student, having received proper notice of the hearing, does not appear at the hearing, a default judgment of responsible shall be entered against the accused student.

17. No penalty may be levied by the University Judicial System with the exception of a temporary sanction, without a formal charge against the student or the finding of responsible before a judicial council. Temporary sanctions may be imposed in cases where the student poses a threat to the safety of himself, herself or others (see temporary sanction).

18. The accused student shall have the right to receive in writing the decision reached by the judicial council and any changes made to that decision by administrative review within fifteen (15) academic days after the decision has been made. In the case where temporary sanctions have been imposed, the decision must be communicated in writing within ten (10) academic days.

19. The accused student shall have the right to request an appeal of a judicial action taken against him or her. In cases involving suspension or expulsion from the University a student may be able to return to class once an appeal has been granted. In cases involving suspension or expulsion from the University

118

DSU-06843

_____ STUDENT JUDICIAL SYSTEM



the accused student may request a final administrative appeal
hearing before the Vice President for Enrollment Manage-
ment and Student Affairs after all other appeals and adminis-
trative reviews have been completed.

20. Failure to comply with the procedural requirements set forth
in the Student Judicial Code may be cause for dismissal of the
charge, if it is shown that such procedural error biases that case
or causes specific harm to the student.

21. In addition to adjudication through the University Judicial
System, the accused student and the complainant always have
the right to seek relief through a court of law.

V.   PROCEDURAL STEPS IN
     THE REPORTING OF VIOLATIONS

1.   The complainant informs the accused student that he/she is
being written up or the possibility of being written up. If the
accused student is not available to be informed at that time, the
complainant must make a notation of this fact on the infraction
report form. Thereafter, the accused student should be noti-
fied as soon as possible.

2.   An incident report must be filed within 3 academic days of the
date on which the complainant becomes aware that a violation
has occurred.

3.   The complainant writes the violation on the infraction report
form or carries out an investigation to see if a write up should
occur.

4.   The complainant writes the infraction report from the inves-
tigation or informs the accused student that there was not
enough evidence to do so at this time.

5.   The complainant submits the written infraction report form to
the Director of Student Judicial Affairs within five (5) aca-
demic days of the decision that the accused student should be
charged with a violation.

6.   Student(s) charged with a violation in the residence hall or on
campus in general can elect to have the case heard by the
Director of Student Judicial Affairs or designee, with the
exception of violations involving drugs, weapons, assault and
battery, sexual assault, rape and attempted rape.

119

A-000080

DSU-06844



## STUDENT JUDICIAL SYSTEM

VI.    JUDICIARY ORGANIZATION
    A.  Administrative Hearing
        1.  Membership
            (a)  The Director of Student Judicial Affairs or desig-
                nees will convene Administrative hearings.
        2.  Duties
            (a)  Informs both the accused student and the complain-
                ing individual, in writing, of the date, time and place
                of hearing.
            (b)  Conducts Administrative Hearings for students who
                elect this hearing process. May adjudicate all vio-
                lations committed with the exception of violations
                involving drugs, weapons, assault and battery, sexual
                assault, rape and attempted rape.
            (c)  The proceedings of the Administrative hearings are
                tape-recorded by the Director of Student Judicial
                Affairs or designee.
            (d)  The Director of Student Judicial Affairs or designee
                recommends in writing to the Assistant Vice Presi-
                dent for Student Affairs the decision of the hearing
                along with sanctions and penalties.
            (e)  All decisions made by the Administrative Hearing
                Officer are reveiwed by the Vice President for En-
                rollment Management and Student Affairs or desig-
                nee.
            (f)  All violations occurring during the summer months
                will be adjudicated by the Administrative Hearing
                Officer.
            (g)  The appeals body for cases heard by the Administra-
                tive Hearing Officer is the Student Disciplinary
                Appeals Council.
    B.  Residence Hall Judiciary Council
        1.  Membership
            (a)  The Director of Residence Life or designee will
                convene the Residence Hall Judicial Council.
            (b)  The Residence Hall Judiciary Council shall consist
                of an officer from Men's Council and an officer from
                Women's Senate or two students appointed by these

120

DSU-06845

## STUDENT JUDICIAL SYSTEM

organizations. Students who have been responsible of any violation within the past year as well as those who are on academic probation are ineligible to serve. The President of each group will decide which officer or student will sit on the Council. The person selected may change from one hearing to another. The Director of Student Judicial Affairs or designee will confirm a student's eligibility to serve.

(c) Two staff members selected by the Director of Residence Life will serve on the Council. Neither of these two staff persons may be the individual reporting or writing the alleged violations being heard.

(d) The Director of Residence Life or designee chairs the group but votes only in the case of a tie. The designee cannot be the individual reporting or writing the alleged violation being heard.

2. Duties

(a) The Office of the Director of Student Judicial Affairs informs the accused students and complainants in writing of the date, time and place of hearing and sends a copy to the Director of Residence Life or designee.

(b) The council members conduct hearings on the charges submitted.

(c) The proceedings of the Residence Hall Judiciary Council hearings are tape-recorded by that body. All tape recordings must be stored in the Office of Director of Student Judicial Affairs for possible future use. In event of an appeal, the accused student may request to review the tape recording, but they may not have a copy of the tape.

(d) After review, the council members meet in private to make their decision. The deliberation of this council is not recorded nor is it available for review.

(e) The council members make a determination of whether the accused student(s) are responsible or not responsible by secret ballot vote. At the conclusion of the voting, the chair opens and reads each ballot.

121



A-000082

DSU-06846

## STUDENT JUDICIAL SYSTEM



Only if a tie exists, does the chair vote.

(f) The chair submits a written report to the Director of Student Judicial Affairs which contains the result of the hearing and the recommended penalty(ies) to be imposed, if any.

(g) All decisions made by this council are reviewed by the Vice President for Enrollment Management and Student Affairs or designee.

(h) The Residence Hall Judiciary Council is responsible for conducting hearings on violations that occur within the residence halls.

(i) The appeals body for cases heard by the Residence Hall Judiciary Council is the Student Disciplinary Appeals Council.

C. Student -Faculty Judiciary Council

1. Membership

(a) A faculty member will convene the Student-Faculty Judiciary Council.

(b) The Student-Faculty Judiciary Council is composed of five students and six faculty members of the University.

(c) Faculty members are elected by the Faculty Senate.

(d) Student members are chosen by the Student Government Association according to its bylaws and those of the Faculty Senate. At least two full-time commuting students must be selected to serve on this committee. Choices are subject to approval by the Director of Student Judicial Affairs. Students who have been found responsible of any violation within the past year as well as those who are on academic probation are ineligible to serve on this council. Student members must have been enrolled in the University as full-time students for a minimum of one semester and be in good standing with the University. Student members shall not be removed without just cause. Just cause shall mean having less than a 2.00 grade point average or having been found responsible of a violation.

122

**A-000083**

DSU-06847

## STUDENT JUDICIAL SYSTEM

(e) There must be a minimum of three members present at each hearing, including one student.

2. Duties

(a) The Office of the Director of Student Judicial Affairs informs the accused student and complainants in writing of the date, time and place of the hearing, and sends a copy to the faculty member chairing the hearing.

(b) The Student-Faculty Judiciary Council reviews all alleged violations not occurring in the residence halls.

(c) The proceedings of the Student -Faculty Judiciary Council are tape recorded by that body so that the hearing may be heard again if there are questions as to what transpired during the hearing. In event of an appeal, the accused student may request to review the tape recording, but they may not have a copy of the tape. All tape recordings must be stored in the Office of the Director of Student Judicial Affairs.

(d) This council becomes active on the 15th day of August each year.

(e) Before the close of each hearing, the council will schedule the next hearing date, time, and place, and forward this information along with the hearing decision(s) to the Director of Student Judicial Affairs.

(f) After the hearing, the council members meet in private to make their decision. The deliberations of the Council are not recorded nor are they available for review.

(g) The chair of the Student - Faculty Judiciary Council submits a written report of the decision of the council along with recommended sanctions and penalties, if any, to the Assistant Vice President for Student Affairs.

(h) All decisions made by this council are reviewed by the Vice President for Enrollment Management and Student Affairs or designee.

123





## STUDENT JUDICIAL SYSTEM

        (i) The appeals body for cases heard by the Student-Faculty Judiciary Council is the Student Disciplinary Appeals Council.

  D. Zero-Tolerance Subcommittee

    1. Membership

        (a) The Director of Student Judicial Affairs or designees will convene the Zero-Tolerance Subcommittee.

        (b) The subcommittee shall consist of six (6) members drawn from the Residence Hall Judiciary Council and the Student Faculty Judiciary Council. Two will be faculty, two will be staff and two will be students.

        (c) All members must be able to meet at any time during the academic year with forty-eight (48) hours notice.

        (d) The chair of the subcommittee shall be selected from one of the faculty members.

        (e) A minimum of three (3) members must be present in order to conduct a hearing. These members may be any combination of faculty, staff and/or students.

    2. Duties

        (a) The Zero-Tolerance Subcommittee shall hear all cases involving Zero-Tolerance offences that occur any where in the University.

        (b) The proceedings of the Zero-Tolerance Subcommittee shall be tape recorded to create a permanent record. All tape recordings must be stored in the Office of the Director of Student Judicial Affairs. In event of an appeal, the accused student may request to review the tape recording, but they may not have a copy of the tape.

        (c) After the hearing, the subcommittee members meet in private to make their decision. The deliberations of the subcommittee are not recorded nor are they available for review.

        (d) The chair of the Zero-Tolerance Subcommittee submits a written report of the decision of the subcommittee, along with the recommended sanctions and penalties, if any, to the Vice President for Enrollment Management and Student Affairs, or designee.

124

DSU-06849

## STUDENT JUDICIAL SYSTEM



    (e) All decisions made by this subcommittee are re-
viewed by the Vice President for Enrollment Man-
agement and Student Affairs or designee.

    (f) The appeals body for cases heard by the Zero-
Tolerance subcommittee is the Student Disciplinary
Appeals Council.

E.  Student Disciplinary Appeals Council

  1.  Membership

    (a) A faculty member will convene the Student Disci-
plinary Appeals Council.

    (b) The Student Disciplinary Appeals Council is com-
posed of five faculty members elected by the Faculty
Senate according to its by-laws. The chair is a faculty
member.

    (c) The Student Disciplinary Appeals Council is also
composed of three students selected by the Student
Government Association according to its bylaws
and confirmed by the Director of Student Judicial
Affairs. Students who have been found responsible
of any violations within the past two years as well as
those who are on academic probation are ineligible
to serve. Student members of the council must have
been enrolled in the University as full-time students
for a minimum of one (1) semester and be in good
standing with the University. Student members shall
not be removed without just cause. Just cause shall
mean having less than 2.00 grade point average or
having been found responsible of a violation.

    (d) There must be a minimum of three members present
at each hearing, including one student.

  2.  Duties

    (a) The Director of Student Judicial Affairs will notify
the accused student in writing if an appeal has been
granted or denied.

    (b) If an appeal is granted, the Director of Student
Judicial Affairs will notify the chair of the Student
Disciplinary Appeals Council of the reason the ap-
peal was granted.

125

**A-000086**

DSU-06850



## STUDENT JUDICIAL SYSTEM _____

    (c) The proceedings of the Student Disciplinary Appeals Council are tape-recorded by that body so that the hearing may be heard again if there are questions as to what transpired during the hearing. All tape recordings must be stored in the Office of the Director of Student Judicial Affairs.

    (d) In event of an administrative appeal, the accused student may request to review the tape recording, but they may not have a copy of the tape.

    (e) The chairperson of the Student Disciplinary Appeals Council submits to the Director of Student Judicial Affairs in writing the results of the hearing. The Student Disciplinary Appeals Council may uphold or reverse a verdict and it may uphold, modify or remove any sanction.

    (f) All decisions made by this council are reviewed by the Vice President for Enrollment Management and Student Affairs or designee.

    NOTE: Any student who has a violation(s) pending shall not serve on a Judiciary Council.

F.   Administrative Review

    (a) The Vice President for Enrollment Management and Student Affairs or designee reviews all cases and appeals that involve suspension, expulsion or probation.

    (b) The Assistant Vice President for Student Affairs will review all other cases and appeals.

    (c) The results and recommended penalties and sanctions of all hearings are reported in writing to the appropriate administrative officer.

    (d) The administrator or designee will review the procedures, findings and recommended sanctions and penalties of these hearings to confirm that University policies or procedures have been followed during each hearing.

    (e) The administrative reviewer or designee may uphold or reverse any verdict and uphold, modify, or remove any sanction if there have been violations of

126

A-000087

DSU-06851

## STUDENT JUDICIAL SYSTEM



University policy or procedure during the hearing or appeal under review.

(f) The administrative reviewer or designee will notify the accused student of the results of the hearing and any modifications to the verdict or penalties that their review has found necessary, with a copy of this notice going to the Director of Student Judicial Affairs.

(g) In all cases where the administrative reviewer or designee has modified the verdict, sanctions or penalties in a case, the administrative reviewer or designee will provide a written justification and explanation for these modifications to the Director of Student Judicial Affairs.

G. Administrative Appeals Hearing

1. Membership
   (a) The Vice President for Enrollment Management and Student Affairs or designee will convene Administrative Appeals hearings.

2. Duties
   (a) In cases where an accused student has been found responsible and sentenced to suspension or expulsion, and where that sanction has been upheld by the Student Disciplinary Appeals Council and by Administrative Review, the accused student may request an Administrative Appeals hearing.
   (b) The same deadlines in effect for Student Disciplinary Appeals Council hearings will be in effect for Administrative Appeals hearings.
   (c) The Director of Student Judicial Affairs will notify the accused student in writing if an appeal has been granted or denied.
   (d) If an appeal is granted, the Director of Student Judicial Affairs will notify the Vice President for Enrollment Management and Student Affairs of the reason the appeal was granted and inform the accused student that he/she can only present on the basis that the appeal was granted.

127

## STUDENT JUDICIAL SYSTEM



    (e) The Vice President for Enrollment Management and Student Affairs will hear all appeals granted by the Appeals Review Committee.

    (f) The proceedings of the Administrative Appeal Hearing are tape-recorded so that the hearing may be heard again if there are questions as to what transpired during the hearing. All tape recordings must be stored in the office of the Director of Student Judicial Affairs. After the accused student is informed of the results of the hearing, the accused student may request to review the tape recording, but may not have a copy of the tape.

    (g) The Vice President for Enrollment Management and Student Affairs may uphold, modify, or remove a sanction.

    (h) The Vice President for Enrollment Management and Student Affairs will notify the accused student of the results of the hearing with a copy to the Director of Student Judicial Affairs.

    (i) The Vice President for Enrollment Management and Student Affairs will only hear cases involving suspensions or expulsion after being heard by the Student Disciplinary Appeals Council.

H.  Requests for Appeals

  1. Requests for appeals must be made in writing to the Director of Student Judicial Affairs within two (2) academic days of receiving notification of hearing results. The request must clearly specify one or more of the reasons listed below.

    (a) Lack of due process, i.e. when a student can show an error in the hearing; or arbitrariness in the finding against the weight of the evidence.

    (b) Lack of substantial evidence.

    (c) Evidence that was not considered or available that would subsequently change the nature of the case.

  2. The accused student will be informed within five (5) academic days of submitting the request for an appeal whether the appeal has been granted.

128

DSU-06853

## STUDENT JUDICIAL SYSTEM

3. Once an appeal has been granted, the appeal hearing will be scheduled within ten (10) academic days.

4. In cases of suspension or expulsion, a student may be able to return to classes once the appeal has been granted, except in cases of temporary sanction where the accused student is deemed a threat to himself/herself or others.

I. Procedures for Hearings

The procedures in the disciplinary process have been established to protect the rights of the student and the University in rendering equitable decisions. As such, any student involved is expected to cooperate fully in order to meet their responsibilities in these procedures. Any student who does not cooperate in these proceedings will be subject to immediate disciplinary procedures.

1. The attendance requirements for the council in question must be met.

2. The chair convenes the Council in order to review the charges.

3. Only the accused student, complainant, his/her advisor and witnesses may be present during the hearing.

4. The chairperson introduces accused student to the Council. The student is asked: Do you wish to challenge any member of the Council on the basis of bias? If there is a challenge, the hearing room is cleared and the Council deliberates in private to determine, by majority vote, (excluding member being challenged) whether the challenged member should be excluded and/or replaced. It there is no challenge, the hearing proceeds.

5. The chairperson asks the Council: Does any member of the Council wish to remove himself/herself on the basis of bias in this case? If so, the Council member is excused.

6. If as a result of removals, the attendance requirement for the particular council is no longer met, then the hearing must be postponed.

7. If there is an advisor present, the chairperson explains the role of the advisor in the hearing.

8. The chairperson explains his/her role and the role of the council members.

9. The charges are read to the accused student.

129





## STUDENT JUDICIAL SYSTEM

10. Anyone giving testimony shall be placed under oath or affirmation.

11. The complainant gives a statement. If the complainant is not present, their written statement or evidence shall be submitted instead.

12. The accused student shall then be asked to give appropriate testimony concerning the case. However, the accused student may refuse to give testimony and such refusal shall not be held against the accused student.

13. Witnesses may enter the room, give their testimony and leave after questioning. [The accused student has the right to cross-examine witnesses at this time.]

14. When all evidence has been presented and the accused student and complainant have given a final statement, the chairperson explains the appeals process to the accused student. After the appeals process has been explained, the chair closes the hearing and dismisses all those not on the council.

15. After the hearing, the council shall determine by majority vote whether the accused student has violated the Student Code cited in the infraction report.

16. The council's determination shall be made on the basis of whether it is more likely than not that the accused student violated the Student Code.

17. If the accused student fails to attend after have been properly notified of the hearing, a default judgement of responsible is entered against the defendant.

VII.  **VIOLATIONS**

A. Academic Dishonesty

1. Academic cheating includes, but is not limited to: (1) use of any unauthorized assistance in taking quizzes, test, or examinations; (2) dependence upon the aid of sources beyond those authorized by the instructor in writing papers, preparing reports, solving problems, or carrying out other assignments; or (3) the acquisition, without permission, of test or other academic material belonging to a member of the University faculty or staff.

2. Plagiarism includes but is not limited to, the use, by

130

A-000091

DSU-06855

**STUDENT JUDICIAL SYSTEM**

windows and storing food or beverages between windows and screens or the outside ledges.

C. Personal Violations

    1. Residents and their guests being partially or fully undressed when inside or outside the room during interdormitory visitation hours.

    2. Sleeping in the bed, etc., in residence halls of the opposite sex or permitting such behavior to occur in one's room.

D. Unauthorized Violations

    1. Having unauthorized animals and/or pets in residence hall rooms.

    2. Housing unauthorized guest(s) of the same sex.

    3. Possession of an unauthorized appliance.

    4. Making an unauthorized room change.

    5. Unauthorized entry or exit of a residence hall through any door or opening other than the main lobby doors.

    6. Unauthorized entry or use of laundry room - Only residents of the building are authorized to enter or use the laundry facilities within that building.

IX. Sanctions

A. Official Warning: The student receives a letter expressing disapproval of the violation committed.

B. Official Reprimand: The student receives a letter expressing the disapproval and severity of the violation committed.

C. Community Time: The student is expected to perform a required number of work hours (a specific task, labor) for the University without pay. If hours are given, there will be a minimum of five (5) hours, and a maximum of fifty (50) hours. Failure to fulfill one's community time will result in the unworked hours being charged to the student's account at the current work-study rate.

D. Fine: A sum imposed as punishment for an offense. If a fine is imposed, the minimum is $ 20 and the maximum is $200. Failure to pay a fine will result in the amount being charged to the student's account.

E. Disciplinary probation may occur with or without loss of designated privileges for a definite or indefinite period of time. When disciplinary probation involves lost of privileges,

139



## STUDENT JUDICIAL SYSTEM

it may include no participation in:

1. Varsity or non-varsity intercollegiate events
2. Debating teams
3. Plays (unless participation is a course requirement)
4. Any recognized club or organization or holding office
5. Any University program or activity
6. Selection of desired residence hall or room. Other conditions such as required counseling sessions and restitution to the University for property damage or theft of services may be imposed.

F. Suspension from the Residence Halls: The student is suspended from living in the residence hall for a minimum of one full semester. The person may remain a student and continue regular matriculation. The student is not entitled to a refund of residence hall fees but may be refunded unused boarding fees.

G. Residence Hall Expulsion - Permanent separation of the student from the residence halls.

H. Interim Suspension: May be imposed only: (a) to ensure the safety and well-being of members of the University community or preservation of University property; (b) to ensure the student's own physical or emotional safety and well-being; or (c) if the student poses a definite threat of disruption of or interference with the normal operations of the University. If a student is suspended without a hearing, a hearing shall be afforded the student at the earliest practical time providing that a request has been made.

I. Suspension from the University: The student is suspended from the University for a period of time (not to exceed three years). A review of the student's educational and personal history will be assessed prior to returning to the University by the Vice President of Enrollment Management and Student Affairs. The return of the student depends on the outcome of the review.

J. Indefinite Suspension from the University: The student is suspended from the University for an undetermined period of time. The student must make a request to return to school by letter. The student's letter, along with his/her educational and

140

A-000093

DSU-06865

## STUDENT JUDICIAL SYSTEM

personal history, will be reviewed by a University committee. The return of the student depends upon the outcome of the review.

K. Expulsion: The case is reviewed by the President of the University before the decision is final. Students who are expelled from the University cannot withdraw from the institution nor receive any refund which would be due under normal circumstances. It is possible after an extended period of time (minimum of three years) that the student might be permitted to return to the University by administrative approval. Expelled students may not come on the University grounds unless an emergency warrants their presence on the campus. In such cases, the student must contact the Office of Public Safety prior to arrival and must be escorted on campus.

L. Restitution – Compensation for loss or damage. This may take the form of appropriate service and/or monetary or material replacement.

M. Discretionary Sanctions: A requirement that the individual fulfill some specified act(s) or correction, including undergoing psychological or substance abuse evaluation or counselling; attending or presenting educational programs; or submitting written assignments.

X. Suspension, Withdrawals and Refunds
See Refund Policy under Student Services and Facilities.

XI. Administrative Authority
All suspensions from the residence halls or the University and expulsions or recommendations for consideration by the University President are the authority of the Vice President for Enrollment Management and Student Affairs.

XII. Administrative Review
All students who are recommended for disciplinary probation or suspension will have their case reviewed by the Vice President for Enrollment Management and Student Affairs before any action is taken.

XIII. Discretionary Responsibility
At Delaware State University, under the direction of the President, the Vice President for Enrollment Management and Student Affairs has been designated as the official responsible for student

141



A-000094

DSU-06866



## STUDENT JUDICIAL SYSTEM

conduct and maintaining discipline. The President of the University shall have the final authority. All students (commuting and residential) who use or dwell within University residence halls and all buildings owned, leased to, or operated in conjunction with the University, must conform to the University rules of conduct.

XIV. Emergency or Dangerous Situations

The Office of the Vice President for Enrollment Management and Student Affairs has been delegated responsibility pertaining to the conduct and welfare of all students. In an emergency, therefore, the Vice President for Enrollment Management and Student Affairs shall not hesitate to take necessary and appropriate action with the full understanding that established procedures will be initiated when the emergency has passed.

XV. Notification

The appropriate persons to receive notification of the suspension or expulsion of a student shall be the student, parents or guardians of the student ( if permission has been granted to the University), President, Department Chairperson (of the student) Registrar, Director of Financial Aid, Director of Residence Life ( if student resides on campus) and Director of Public Safety.

XVI. Interpretation and Revision

Any question of interpretation regarding the Student Code shall be referred to the Vice President for Enrollment Management and Student Affairs or designee for final determination. The Student Code shall be reviewed every three years under the direction of the Director of Student Judicial Affairs. Anything not covered in the Judiciary System will be administratively addressed by the Vice President for Enrollment Management and Student Affairs or the Assistant Vice President for Student Affairs.

XVII. Code of Ethics for Judicial Members*

A. The Judicial System exists to promote justice and fairness, and thus to serve the individual students, the campus and the public interest.

B. A member's public and official behavior should be beyond reproach and free from impropriety or the appearance of impropriety.

C. No case, pending or otherwise, before any committee should be mentioned, commented upon or discussed by any member

142

A-000095

DSU-06867

## STUDENT JUDICIAL SYSTEM



except when the committee is meeting to consider the case.

D. No member should hear or entertain the merits or prejudge any case or pending case, except when sitting as a member of the committee to hear or consider the case.

E. A member should not be swayed by partisan demands, public clamor, consideration of personal popularity or notoriety nor be apprehensive of unjust criticism.

F. A member should use the discretion to disqualify from a case which might justify the inference that a party could improperly influence the decision or unduly enjoy favor.

G. When considering a case, a member should always bear in mind to determine whether a particular rule or statute has been violated and not whether, in the his/her point of view, a social harm has been committed by the accused. A member should, however, consider social harm when deciding upon the disciplinary measure to be imposed on a responsible student.

H. Proceedings of the hearing should be conducted with proper dignity and decorum and should reflect the importance and seriousness of the hearing.

*A judicial member is any administrator, faculty, staff or student handling a student judiciary matter.

XVIII. Definitions

**Academic Day** – Any day in which regularly scheduled classes are in session.

**Accused Student** – An individual who is charged with committing a violation of the Student Judicial Code.

**Adjudicator** – A designated individual who meets with an accused student and affords him or her the opportunity to settle the case without a full hearing.

**Advisor** – Any member of the faculty, staff or student body of the University can serve as an advisor. The role of the advisors is to give assistance, and they may not question nor address anyone other than their advisee. An advisor may not be an attorney or someone who attends law school.

**Appeals Council** – Any person or persons authorized by the Vice President for Enrollment Management and Student Affairs to consider an appeal from a judicial council's determination that a

143

A-000096

DSU-06868



## STUDENT JUDICIAL SYSTEM

student has violated the Student Code or from the sanctions imposed by the Administrative Hearing officer.

**Appeals Hearing** – a hearing before the Student Disciplinary Appeals Council or the Administrative Appeals Officer, which will render a decision to either uphold, remand, modify or reverse the findings of the original judicial hearing committees.

**Burden of Proof** – The University has the burden of proof by substantial evidence ( not beyond a reasonable doubt, as in the courts). Burden of proof by substantial evidence may similarly be understood as proof by a clear preponderance, or it would seem more likely than not that the incident occurred given the existing evidence.

**Charge Letter** – states the alleged violation(s) and gives the accused student a choice of an Administrative or Council Hearing. The infraction report, which outlines the alleged violation(s)is attached to the charge letter.

**Cheating** – includes but is not limited to: (1) use of any unauthorized assistance in taking quizzes, tests or examinations; (2) dependence upon the aid of sources beyond those authorized by the instructor in writing papers, preparing reports, solving problems, or carrying out other assignments; or (3) the acquisition, without permission, or tests or other academic material belonging to a member of the University faculty or staff.

**Complainant** – The party that files the complaint against a student.

**Disciplinary file** – the student discipline record maintained by the Office of Student Judicial Affairs.

**Expulsion** – termination of student status with resultant loss of all student rights and privileges.

**Faculty member** – Any person hired by the University to conduct classroom activities.

**Full Hearing** – A hearing before a judicial council in which the complainant and the accused student have the opportunity to present testimony, evidence and arguments. A determination as to finding the accused student responsible or not responsible will be based upon the evidence presented at the hearing and, if the accused student is found responsible, appropriate sanctions will be levied.

144

A-000097

DSU-06869

## STUDENT JUDICIAL SYSTEM

**Hearing Option or Waiver Form** – The form on which the accused student pleads responsible and accepts the sanction(s) as presented; pleads responsible and requests a hearing on the appropriateness of the sanction(s); pleads not responsible and requests a full hearing before a judicial council; or pleads no contest and accepts the sanctions(s). The accused student receives the hearing option or waiver form along with the charge letter.

**Hearing Chairperson** – The designated individual who coordinates and convenes the appropriate judicial hearing committee, rules on the admissibility of evidence, and interprets and applies the rules of procedure as they relate to the power and duties of the hearing board without infringing on the rights of the party.

**Hearing Summon** – a letter of notice to the accused student stating that his/her judicial hearing will be held on a specified date, time and location.

**Infraction Report** – An accusation in written form which must be signed by an individual indicating that he or she has first-hand knowledge or strong reason to believe that a student has committed an offense.

**Judicial Council** – Any person or persons authorized by the Vice President for Enrollment Management and Student Affairs to determine whether a student has violated the Student Code and to recommend imposition of sanctions.

**May** – Is used in the permissive sense.

**Member of the University Community** – Any person who is a student, faculty member, University official or any other person employed by the University.

**Office of Student Judicial Affairs** – The administrative office of the University that is responsible for the efficient and fair operation of the University Judicial System.

**Plagiarism** – Includes, but is not limited to, the use, by paraphrase or direct quotation, of the published or unpublished work of another person without full and clear acknowledgement. It also includes the unacknowledged use of materials prepared by another person or agency engaged in the selling of term papers or other academic materials.

The term "policy" is defined as the written regulations of the University as found in, but not limited to, the Student Handbook,

145



DSU-06870



## STUDENT JUDICIAL SYSTEM

the Student Code of Conduct, Residence Life Manual and the University Code.

**Restitution** – compensation of loss or damage. This may take the form of appropriate service and/or monetary or material replacement.

**Sanction** – a penalty imposed upon a student after he or she either has admitted being responsible or has been found responsible by the judicial council of having committed a violation of the Student Judicial Code.

**Self defense** – In cases of assault and battery, a student will be able to claim his/her actions were in self defense only in cases where retreat or exit were impossible and all reasonable efforts to remove themselves from the situation have been exhausted. A situation of self defense will end when a safe retreat or exit become possible. The term "shall" is used in the imperative sense.

**Staff member** – Any University employee performing employment responsibilities, excluding faculty and Administrative personnel.

**Student** – All persons taking courses at the University, both full-time or part-time, whether they reside on campus or commute. Persons who are not officially enrolled for a particular term but who have a continuing relationship with the University are considered "students".

**Suspension** – The loss of student status for a specified length of time, not to exceed three years, with resultant loss of all student rights and privileges.

**Temporary Sanction** – A sanction imposed for a limited duration by the Vice President for Enrollment Management and Student Affairs, or designee in an emergency situation.

The term "**University official**" includes any person employed by the University, performing assigned administrative or professional responsibilities.

**University** – Means Delaware State University.

**University-owned or controlled property** – All land, buildings, facilities and other property in the profession of or owned, used or controlled by the University.

**Work Assignment** – A sanction involving work on a particular task or tasks for a specified number of hours.

146

A-000099

DSU-06871

## STUDENT JUDICIAL SYSTEM

**Written Notice of Hearing** – The formal written notification of
the date, time and place the appropriate judicial council will meet
to hear a case. The accused student must be given a minimum of
three (3) academic days notice prior to the scheduled convening
of the hearing, except in the case of Zero tolerance violations.



147

A-000100

DSU-06872

DEC-09-2002 11:39 FROM:    TO:3028576472    P.002/002



## MEMORANDUM

To:         Dr. Charles N. Smith, Vice President of Enrollment Management &
            Student Affairs

From:       C. J. Wyche, Chief of University Police

Date:       December 9, 2002

Subject:    Recommendation for Immediate Suspension pending a Hearing: Deshaun
            Morris – Case # 4170-527-02

---

On December 9, 2002 at approximately 2:00AM in Warren-Franklin Room #22A, a
student named Mr. Deshaun Morris was found to have in his room a .380 caliber loaded
weapon, other .380 caliber ammunition, 12 gauge shotgun shell ammunition, and gang
membership paraphernalia.

Mr. Deshaun Morris was very cooperative during this search and throughout the
investigation. However, I recommend that Mr. Deshaun Morris becomes suspended
immediately pending a hearing and removed from this campus community.

A-000101

DSU-06623



# DELAWARE STATE UNIVERSITY

### OFFICE OF THE VICE PRESIDENT
### FOR ENROLLMENT MANAGEMENT AND STUDENT AFFAIRS

December 9, 2002

Mr. Deshaun Morris
S.S.# 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
Warren-Franklin, Room 22-A
Delaware State University
Campus

Dear Mr. Morris:

As a result of the incident on December 9, 2002, you are being charged with the use, possession, and/or storage of explosives, firearms, or lethal weapons of any kind which is a violation of the zero tolerance policy, refer to pg. 134 D-7 of the student handbook.

Per the zero tolerance policy, effective immediately, you are hereby suspended from Delaware State University pending a hearing. You must contact Mrs. Kay Moses, Director of Student Judicial Affairs as to the date of your hearing.

During your suspension from the University, you are not permitted on campus or the University Courtyard Apartments until the date of your hearing. If found on campus or the University Courtyard Apartments you will be cited for trespassing.

Sincerely,

Charles N. Smith
Vice President for Enrollment Management
and Student Affairs

cc:    Dr. Doris Wooledge
       Mr. Willie Thomas
       Mrs. Kay Moses
       Mrs. Carylin Brinkley
       Mrs. Wanda Curry-Brown
       Mrs. Lowan Pitt
       Dr. Christopher Curry
       Chief Carl Wyche
       Mr. Darrell Dudley
       Ms. Claudette Gates

> **EXHIBIT**
> Morris 1
> cea 9|9|03

**A-000102**

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6300 • FAX (302) 857-6302

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.



# DELAWARE STATE UNIVERSITY

OFFICE OF THE VICE PRESIDENT
FOR ENROLLMENT MANAGEMENT AND STUDENT AFFAIRS

December 16, 2002

Mr. DaShaun Morris                    RE:    Possession of a firearm and
116 Varsity Rd. #1                            ammunition
Newark, NJ 07106                              December 9, 2002

Dear Mr. Morris:

As a result of the Zero Tolerance Subcommittee hearing on December 11, 2002, the Council has
found you responsible for the above actions. Therefore, per the zero tolerance policy, you are
hereby expelled from the University, effective immediately. During your expulsion, you are not
permitted on the campus of Delaware State University, or the University Courtyard Apartments.
If found on campus or the University Courtyard Apartments, you will be cited for trespassing.

If you desire to appeal this decision, it must be made in writing to the Office of the Assistant Vice
President for Student Affairs within two (2) days after receipt of this letter. The request must be
based on reasons listed below:

    (a)    Lack of due process, i.e. when a student can show an error in the hearing, or
           arbitrariness in the finding.
    (b)    Lack of substantial evidence.
    (c)    Evidence that was not considered or available that would subsequently change
           the nature of the case.

If you have questions regarding the request of an appeal, you may contact the Office of Judicial
Affairs at (302) 857-6470.

Sincerely,

Charles N. Smith
Vice President for Enrollment
Management and Student Affairs

C:    Mrs. Lowan Pitt         Dr. Doris Wooledge
      Mrs. Kay Moses         Mr. Willie Thomas
      Dr. Christopher Curry    Ms. Claudette Gates
      Mrs. Carilyn Brinkley    Chief Carl Wyche

A-000103

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6300 • FAX (302) 857-6302

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

DSU-06612



# DELAWARE STATE UNIVERSITY

OFFICE OF THE VICE PRESIDENT

FOR ENROLLMENT MANAGEMENT AND STUDENT AFFAIRS

February 21, 2003

Mr. DaShaun Morris                    RE:    Possession of a firearm and ammunition
S.S. # 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                             December 9, 2002
116 Varsity Rd. #1
Newark, NJ 07106

Dear Mr. Morris:

As a result of the Student Disciplinary Appeals Council hearing on February 13, 2003, you have been found responsible for the above violation. The sanction of expulsion from the University has been reduced to one year suspension, effective immediately. You may return to the University for the spring semester 2004. Before readmittance to the University, you must write a letter for readmittance to the Vice President for Enrollment Management and Student Affairs.

During your suspension, you are not permitted on the campus of Delaware State University, or the University Courtyard Apartments. If found on campus or the University Courtyard Apartments, you will be cited for trespassing.

Sincerely,

Charles N. Smith
Vice President for Enrollment
Management and Student Affairs

C:    Mrs. Lowan Pitt              Dr. Doris Wooledge
      Mrs. Kay Moses              Mr. Willie Thomas
      Mr. Keith Coleman           Ms. Claudette Gates
      Mrs. Carilyn Brinkley       Chief Carl Wyche
      Mr. Darrell Dudley          Mrs. Wanda Curry-Brown

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6300 • FAX (302) 857-6302

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

A-000104

DSU-06593

# FACULTY SENATE MINUTES

**March 3, 2003**

A meeting of the Faculty Senate was held on Monday, March 3, 2003 in room 309 of the MBNA America Building.  Those who signed the roster as present are check-marked below:

## SENATORS

Dr. Mopelola Adegoke√
Dr. Joseph Adepoju√
Dr. Joe Amoako √
Dr. F. Odun Balogun√
Dr. Richard Barczewski√
Dr. Janet Blade√
Ms. Ernestine Brittingham
Dr. Debra Catts√
Dr. Vivian Cebrick√
Dr. Walter Charles√
Mr. Milton Cooper*
Dr. Leonard Davis
Mr. Ronald Davis√
Dr. Peter DiMaria
Mr. Richard Driskill
Dr. Anuradha Dujari
Dr. John Gardner√
Mr. Paul Gibson√
Dr. Wendell Gorum√
Dr. Wei Guan√
Mr. H. Allen Hamilton
Dr. Ehsan M. Helmy
Dr. Sue Iovino√
Mr. Michael Katz √
Dr. Al-Sameen Khan√
Dr. Yanghee Kim√
Dr. Youngsik Kwak
Dr. Andrew Lloyd √
Dr. Williams Lustfield√
Mr. Michael Maciarello√
Dr. Elijah Mickel
Dr. Oriaku Nwosu√

Dr. Robert Oesterling√
Dr. Akwasi Osei √
Dr. Dandeson Panda
Ms. Barbara Qaissaunee√
Dr. Marwan Rasamny√
Dr. Michael Reiter√
Dr. Mohammad Sadoughi
Dr. Doris Screws√
Dr. Rayton Sianjina√
Dr. Teresa Singleton√
Dr. Bradley Skelcher√
Ms. Polly Steenhagen*
Dr. Ruth Steinbrunner√
Mr. Stephen Taylor√
Ms. Roberta Tucci
Dr. Ifeyinwa Udezulu
Dr. Charlie Wilson√
Dr. Shirley Wilson*
Dr. Bizuneh Workie√
Dr. Renee Young√
Dr. Es-Said Zerrad√

## NON-ELECTED

Dr. William DeLauder
Dr. Kenneth Bell√
Dr. Tommy Frederick
Dr. Jacquelyne Gorum√
Dr. John Graham
Dr. Cynthia Hammond√
Dr. Patrick Liverpool √
Dr. Hazell Reed√

## STANDING COMMITTEE CHAIRS

Dr. Cyril Broderick
Dr. Debra Catts√
Dr. Joseph Falodun√
Dr. Wei Guan
Dr. Youngsik Kwak
Dr. Robert Oesterling√
Dr. Hazell Reed√
Dr. Mohammad Sadoughi
Ms. Genevieve Tighe √
Dr. Charlie Wilson√

## EX-OFFICIO

Dr. Billie Hooker√
Mr. Ronald Parr
Dr. Charles Smith
Dr. Dorothy Talbert-Hersi
Mr. Willie Thomas√
Dr. Mary Wyche

Dr. Charles Fletcher*
Dr. Samuel Hoff √
Dr. Carl Wyche√

* Represented by an
alternate

The meeting was called to order at 4:15 p.m. by Dr. Akwasi Osei, Chair of the Faculty Senate.

1. Approval of Minutes
**It was moved and properly seconded to approve the February 3, 2003 minutes.** It was noted that the scholar athlete's name was misspelled; it should be "O'Dea" not "O'Day". Also noted, Dr. William Daniels should be removed from the Faculty Senate roster. **The minutes were approved with the noted corrections.**

2. Remarks by the President of the University – Dr. Delauder was unavailable to address the Senate.

3. Remarks by the Acting Provost and Vice President of Academic Affairs
Dr. Kenneth Bell addressed the Senate concerning the following issues:

    ◻  Dr. Bell asked the Senate for their view on the effect of the days missed as a result of the inclement weather (snow). He asked if the days needed to be made up or if there should be an adjustment for loss of class time. Dr. Gardner stated that in the past snow days have not been made up. Ms. Tighe stated that we could consider Reading day as an option because Monday, Wednesday, and Friday classes have really been affected by the loss of days. Mr. Taylor agreed with Ms. Tighe and also stated we need to extend the semesters anyway. Dr. Skelcher stated that we do have an Ad-Hoc committee working with Dr. Mary Wyche on the Academic Calendar, which is open to suggestions. Ms. Cebrick stated that the Nursing department requires those hours and are making necessary adjustments. Dr. Hoff said that he supports retaining Reading Day. Dr. Bell thanked the Senate for their comments and he will notify everyone of the final decision.

4. Old Business
Technology
Mr. Dave Surovec addressed the Senate in the stead of Dr. Fletcher. He stated that all P-1 computers have been replaced and if there are any left, the computer center should be notified.

*The floor was opened for questions:*
C: Dr. Adegoke stated she could not download a file because she did not have Acrobat Reader.
R: Mr. Surovec stated in the future she would need to call the Help Desk.
Q: Dr. Osei asked if all faculty should have access to Banner.
R: Mr. Surovec responded affirmatively. He stated that there is a form that should be completed and approved by Registrar.
Q: Dr. Reiter asked about the servers outside of the firewall.
R: Mr. Classe responded that he would give the issue number one priority.

5. New Business
New Presidential Interviews
Dr. Osei asked the Senate for feedback concerning the presidential interviews.
Q: Dr. Nwosu asked would the Senate's feedback really be considered or is it just a waste of our time. What is the strength of the faculty in this matter?
R: Dr. Osei responded that he has not felt that the faculty's view has been stifled. Dr. Carl Wyche also responded that he felt his voice for staff has been listened to.
C: Dr. Nwosu said she felt insulted personally to have only been given a quarter sheet resume on each candidate and be expected to decide the best candidate.
R: Dr. Osei agrees that it would have been better if more information had been made available. However, the Chair of the Search Committee felt there was an issue of confidentiality. Dr. Osei reassured the Senate that the consensus of the Senate will be presented to the Board; but the Board does have the final say.

Dr. Osei stated that initially there were eight candidates and the committee voted and narrowed it down to three. The committee has had access to everything that the candidates have submitted.

**Dr. Hoff moved and it was properly seconded that the Board reopen the search for a new President.** Dr. Hoff stated he could live with whoever was selected. Dr. Badu stated that for the faculty to say that we would like to reopen the search says that the process is flawed; therefore, if the process is not flawed then we should proceed. Dr. Hammond asked the cost of the search. Dr. Osei responded that he would find out. Dr. Sianjina said that there was a committee appointed to do this and he feels that it will have a negative impact on the committee to reopen the search. Dr. Osei stated that implications would be on him and he feels that he has credibility. He also stated that he looked at all 41 candidates and had to pick the top 8 and 2 of his 8 were selected. He said that he is comfortable with 2 out of the 3 that were selected. After some lengthy discussion, there was a call of the question. **The motion was not approved with 8 for, 19 against and 6 abstentions.**

**Dr. Balogun moved and it was properly seconded to approve the following proposed Senate resolution: "Having interviewed the three candidates vying for the position of President of DSU, and having also carefully considered the credentials as well as the interview performance of each of the candidates, the DSU Faculty Senate wishes to advise the DSU Board of Trustees that the interests of DSU as an academic institution will be best served if the candidates are ranked and selected according to the following order of preference: "** Dr. Hammond stated that this was not discussed in the department prior to this meeting. How do you know that you have the consensus of the people of your department? Dr. Balogun stated that the Senators are the representatives of the faculty. Dr. Osei stated that this represents a sense of the Senate. After lengthy discussion, there was a call of the question. **The motion was approved with 24 for, 5 against and 5 abstentions.**
**Results were as follows:**      1st - Sessoms
                        2nd – Judson
                        3rd - Jennings

A-000107

Committee-on-Committees
Dr. Debra Catts stated that she will have a list emailed of the available positions for the
Faculty Senate Committees and Sub-Committees. She also stated that the election will
take place at the April meeting for the 2003-04 academic year.

College of Arts and Sciences
Dr. Rasamny moved and it was properly seconded to approve curriculum changes to the
Computer and Information Sciences program. Due to time constraints and some faculty
not able to download the document; Dr. Osei deferred the approval of the changes to the
next meeting.

**Dr. Singleton moved and it was properly seconded to approve the following
revisions to the curriculum for a B.S. degree in Biotechnology:**

1. **Reduce the total credits of the curriculum from 132-134 credits to 124-127
   credits required for graduation.**
2. **Change the math requirement from Calculus I and Calculus II to Calculus I
   and Statistics (25-241).**
3. **Adopt the management course, Management Processes (41-102) as an
   elective for students who plan to work in industry or pursue an
   entrepreneurial career in research.**
4. **Adopt Calculus II as an elective.**
5. **Remove Sophomore and Junior seminar courses. Biotech majors will be
   required to participate in the Departmental Journal Clubs and Departmental
   Research Lab Meetings.**
6. **Movement of the Fitness and Wellness course (16-100) from the 1st semester
   of the Junior year to the 2nd semester of the Freshman year.**
7. **Movement of Biochemistry (24-403) from the 2nd semester of the Junior year
   to the 1st semester of the Junior year.**
8. **Require students to take the course Scientific Writing (30-349).**
9. **Change the course numbers:**
   a. **Senior Research in Biotechnology from 23-461 to 21-461**
   b. **Advanced Instrumentation in Biotechnology from 23-401 to 21-401**
   c. **Senior Research Project from 23-462 to 21-462**
10. **Remove Advanced Molecular Biology (23-410) as an elective. Require all
    Biotech majors to select a research project with a faculty member within the
    Department at the beginning of the junior year, and participate in all
    Journal Clubs and Research Lab meetings. Dr. Singleton reduced
    Biotechnology Curriculum**

**The motion was approved unanimously.**

General Education Committee
Ms. Tighe announced a meeting on March 18th in the MLK student center at 11:00 a.m.
for all freshman instructors, advisors, University Seminar instructors and chairs.

Council for Professional Education Committee
Dr. Falodun announced that the Council for Professional Education meeting is scheduled for 11:00 a.m. in the EH building, room 109. Also, that there is NCATE meetings scheduled for March 20th and 21st from 9:00 a.m. to 4:00 p.m. which are mandatory for all C.P.E members to attend.

Academic Affairs Committee
Dr. Skelcher stated that the February meeting failed to reach a quorum. He announced that the meetings are the third Thursday of every month at 11:00 a.m. in the Washington extension building. Dr. Mary Wyche asked that Dr. Skelcher establish an Ad-Hoc committee to assist with the Academic Calendar. He stated copies of the Academic Calendar were disseminated to Senators at the last meeting.

Honorary Doctorate Degrees Committee
**Dr. Skelcher moved and seconded that the Honorary Doctorate degree be approved for Mr. James H. Gilliam, Jr.** Mr. Gilliam has supported many endeavors of D.S.U. Dr. Charles stated that some information should have been given in advance. Dr. Skelcher stated that it was a unanimous decision at the committee meeting. Dr. Skelcher read all of Mr. Gilliam's credentials that were submitted to the committee. **The motion was passed with 1 nay and all others in favor.**

Dr. Hoff asked that meeting attendees/non-attendees be named. There is an attendance policy in the constitution. Dr. Catts stated that chair of the committee has the prerogative to remove habitual non-attendees. Dr. Osei made a suggestion to have attendance discussed at the next meeting.

6. Announcements
   - Roundtable on Affirmative Action February 4th.
   - Tickets are available for the NAACP conference.
   - Parking Committee meeting scheduled for February 6th at 11:00 a.m.

Dr. Carl Wyche informed the Senate that there was a fight at the UMES basketball game in Princess Anne, MD where 3 students were injured; of the 3 one was stabbed. The identification of the alleged offender has been confirmed.

7. Adjournment
The meeting was adjourned at 6:15 p.m.

Sincerely,

*Willi M. Thomas*

Willie G. Thomas
Acting Registrar

**A-000109**



# DELAWARE STATE UNIVERSITY

OFFICE OF THE VICE PRESIDENT
FOR ENROLLMENT MANAGEMENT AND STUDENT AFFAIRS

April 4, 2003

Mr. DaShaun Morris
S.S.# 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
116 Varsity Road #1
Newark, NJ 07106

RE:    Possession of a firearm and
       ammunition
       December 9, 2002

Dear Mr. Morris:

After an administrative review of your Zero Tolerance case for the above violations, the sanction of expulsion from the University has been reduced to suspension from the University for the Spring, 2003 semester. You are permitted to return to the University for the Fall 2003 semester on limited disciplinary probation.

While on limited disciplinary probation you are only permitted to participate on the football team. You may not participate in any campus organization or attend any University activity on or off campus. In addition, you may not visit the University Courtyard Apartments.

Should you violate the above stipulations or any other University rule or regulation and you are found responsible, you will automatically be suspended. Should you have any questions, regarding this decision, please contact the Office Judicial Affairs at (302) 857-6470.

Sincerely,

Charles N. Smith
Vice President for Enrollment
Management and Student Affairs

xc:    Mrs. Lowan Pitt          Dr. Doris Wooledge
       Mrs. Kay Moses           Mr. Glen Parker
       Mr. Keith Coleman        Ms. Claudette Gates
       Mrs. Carilyn Brinkley    Chief Carl Wyche
       Mr. Darrell Dudley       Mrs. Wanda Curry-Brown

**EXHIBIT**

Morris 9
COa 9/9/03

**A-000110**

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

DSU-07181



# DELAWARE STATE UNIVERSITY

### OFFICE OF THE VICE PRESIDENT
### FOR ENROLLMENT MANAGEMENT AND STUDENT AFFAIRS

July 8, 2003

Dr. Hallie Gregory
Director of Athletics
Delaware State University
Campus

RE:    DaShaun Morris
S.S.# 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

Dear Dr. Gregory:

This letter is to certify that DaShaun Morris was not eligible to return to the University during the Spring 2003 semester because, in fact, he was suspended for that semester.

Should you have any questions, please contact the Office of Judicial Affairs at (302) 857-6470.

Sincerely,

Charles N. Smith
Vice President for Enrollment
Management and Student Affairs

c:    Mrs. Lowan Pitt
      Mrs. Kay Moses
      Mrs. Kim Walker
      Mr. Dwayne Henry

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6300 • FAX (302) 857-6302

Delaware State University is an equal opportunity employer; and does not discriminate because of race, creed, national or ethnic origin, sex or disability

A-000111

DSU-07346

LAW OFFICES
## SCHMITTINGER AND RODRIGUEZ, P.A.
414 SOUTH STATE STREET
POST OFFICE BOX 497
DOVER, DELAWARE  19901
TELEPHONE 302-674-0140
FAX 302-674-1830

NICHOLAS H. RODRIGUEZ
PAUL H. BOSWELL
JOHN J. SCHMITTINGER
DOUGLAS B. CATTS
WILLIAM D. FLETCHER, JR.
CATHERINE T. HICKEY
CRAIG T. ELIASSEN
WILLIAM W. PEPPER SR.
CRYSTAL L. CAREY*
SCOTT E. CHAMBERS*
FRED A. TOWNSEND III
NOEL E. PRIMOS
DAVID A. BOSWELL
WALT F. SCHMITTINGER
R. SCOTT KAPPES
JEFFREY J. CLARK
BETH B. MILLER
KYLE KEMMER
MARY F. HIGGINS

*ALSO ADMITTED IN MARYLAND

HAROLD SCHMITTINGER
OF COUNSEL

WILMINGTON OFFICE
BRANDYWINE GATEWAY PLAZA
1300 NORTH MARKET STREET
WILMINGTON, DELAWARE 19801
TELEPHONE 302-652-3676
FAX 302-652-8788

REHOBOTH BEACH OFFICE
FIRST UNION BANK BUILDING
4602 HIGHWAY ONE
REHOBOTH BEACH, DELAWARE 19971
TELEPHONE 302-227-1400
FAX 302-645-1843

ODESSA OFFICE
ODESSA PROFESSIONAL PARK
POST OFFICE BOX 626
ODESSA, DELAWARE 19730
TELEPHONE 302-378-1697
FAX 302-378-1659

August 1, 2003

David A. Arndt, Esquire
Jacobs & Crumplar, P.A.
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899

RE: Your Client: Deshaun Morris

Dear Mr. Arndt:

As you are aware, I represent Delaware State University on a regular basis.  The University has requested that I respond to your July 24, 2003 letter regarding Deshaun Morris.

After reviewing this matter with various University personnel, I believe that there are several inaccurate statements in your July 24, 2003 letter.  In addition, I have not been able to identify anyone from the President's office who advised Mr. Morris he was not to return to the University to attend fall classes.

At the current time, therefore, there is no prohibition against Mr. Morris returning to the University to attend fall classes.  At the current time, the April 4, 2003 letter to Mr. Morris from Charles N. Smith, Vice President for Enrollment Management and Student Affairs at Delaware State University, controls and sets forth the parameters of Mr. Morris' return to the University for the fall 2003 semester.  Should you be in need of a copy of that April 4, 2003 letter, please do not hesitate to contact me.

Very truly yours,

CATHERINE T. HICKEY
CTH/mmm
cc: Dr. Allen Sessoms
    Dr. Charles N. Smith

A-000112

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

DASHAUN MORRIS                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      Civil Action No. 1571K
                                        )
DELAWARE STATE UNIVERSITY               )      TRO
                                        )
            Defendant.                  )

## VERIFIED COMPLAINT

Plaintiff, Dashaun Morris, by and through his attorneys Jacobs & Crumplar, P.A., bring this action to obtain injunctive and other relief against Defendant Delaware State University, alleges as follows:

1.    Plaintiff is currently a student at Delaware State University and has participated in the University's football program since his freshman year at Delaware State University.

2.    Upon information and belief, Delaware State University is an institution of higher learning created under the laws of the State of Delaware, 14 Del.C. §6501.

## BACKGROUND

3.    Plaintiff Dashaun Morris attended Delaware State University from his freshman year to the present and participated on the University's football team during those same applicable periods of time.  Dashaun Morris excelled in his athletic endeavors at Delaware State University and made All American during the fall 2002 semester.

A-000113

DSU-07320

4.   During Plaintiff's junior year, Plaintiff was recruited by several NFL football franchises as draft-picks for their teams.  After consultation with University staff, Mr. Morris was persuaded to remain at the University and finish his degree.

5.   Plaintiff Dashaun Morris, was a member of a violent street gang at his childhood residence located in New Jersey. When Mr. Morris began attending Delaware State University, he became aware that the street gang environment was not what he wanted for his future and decided to leave that lifestyle forever.  Upon visiting his childhood residence in New Jersey, Mr. Morris confronted his street gang members and advised of his decision to quit that gang and attempt to pursue a successful career with the National Football League.  Upon learning of Mr. Morris' decision, several of the senior gang members threatened Mr. Morris' life should he decide to pursue his termination of the street gang.  At that point in time, Mr. Morris purchased a hand gun for self-protection.  Mr. Morris would take that hand gun back to New Jersey on his visits to his childhood residence.

6.   On December 9, 2002, there was a verbal altercation on the Delaware State University campus between a fraternity and the football team.  As a result of that altercation, Delaware State University Security searched Mr. Morris' dorm room.  During that search, Mr. Morris voluntarily disclosed the location of the hand gun and that hand gun was seized.  Due to the hand gun possession, Mr. Morris was immediately suspended from Delaware State University.  (See Exh. 1).

**A-000114**

DSU-07321



7.   Mr. Morris had a Hearing held at Delaware State University through the office of Judicial Affairs on December 11, 2002.  During that hearing, Mr. Morris entered a plea of "responsible" because he felt that he was in fact in possession of a firearm and his plea reflects his acknowledgement of that fact only.  As a result of that plea, Mr. Morris was expelled from the University on December 16, 2002.  (See Exh. 2).

8.   Following his expulsion, Mr. Morris requested an appeal to be held before the Student Disciplinary Appeals Counsel.  That appeal was scheduled to be heard on February 13, 2003.  (See Exh. 3).

9.   On February 21, 2003, Mr. Morris was notified by Dr. Charles N. Smith, Vice President for Enrollment Management and Student Affairs, that, as a result of the Appeals Hearing, Mr. Morris had been found "responsible" for the violation of possession of a firearm and ammunition.  Dr. Smith advised that the sanction of expulsion had been reduced to a one-year suspension effective immediately.  Mr. Morris was advised by Dr. Smith that he could return to the University for the Spring semester of 2004.  (See Exh. 4).

10.  Upon hearing of Dr. Smith's decision, the Student Disciplinary Appeals Counsel contacted Dr. Smith and advised that Dr. Smith's notification to Mr. Morris did not reflect the decision nor the will of the Appeals Counsel.  The Appeals Counsel advised Dr. Smith that, based on the evidence presented at the hearing, the three member Appeals Counsel found Mr. Morris "not responsible."  The Appeals Counsel advised Dr. Smith that

A-000115

DSU-07322

one member found Mr. Morris responsible, the Chair of the Counsel did not vote, and the three remaining members of the Counsel found Mr. Morris not responsible. As such, the Counsel advised that the vote had to be either responsible or not responsible and Mr. Morris was found, in fact, not responsible. As such, the Counsel requested that Dr. Smith reverse his previous decision and find Mr. Morris not responsible to honestly reflect the will of the counsel. (See Exh. 5).

11. After reviewing the Appeals Counsel's notification to Dr. Smith, Dr. Smith advised Mr. Morris that his sanction had been reduced to a one semester suspension, i.e., the Spring 2003 semester. Dr. Smith advised that Mr. Morris could return to the University for the Fall 2003 semester on a limited disciplinary probation basis. Dr. Smith also advised Mr. Morris that he was permitted to participate on the football team at the start of the Fall 2003 semester. (See Exh. 6).

12. Since this suspension was for one semester and did not effect Mr. Morris' status as a University football player, Mr. Morris acquiesced to the suspension and did not appeal Dr. Smith's last suspension decision regarding the Spring 2003 semester.

13. Upon returning to campus to attend summer classes, Mr. Morris was verbally advised by President Sessoms office, that his suspension was going to continue for an additional year and Mr. Morris was not to remain on campus. Mr. Morris, by and through his counsel David A. Arndt, contacted the University regarding this additional suspension. (See Exh. 7). Once

**A-000116**

Delaware State University had obtained counsel in response to Mr. Morris' counsel's letter, Delaware State University decided that Mr. Morris could in fact return to classes in the fall of 2003.

14.    In Mr. Morris' attempt to return to Delaware State University's football team, he was verbally advised that he could not participate on the football team because he was not eligible to attend classes during the Spring 2003 semester. (See Exh. 8). Under information and belief, Plaintiff has been advised that NCAA regulations require that Mr. Morris be eligible to attend classes at least one day during the Spring 2003 semester in order to participate in the football program during the Fall 2003 semester. Under information and belief, Mr. Morris does not actually have to attend classes for that one day but solely must be eligible for classes for one day.

15.    According to Delaware State University rules and regulations, Mr. Morris was eligible to attend classes during the appeals period of the Spring 2003 semester. (See Exh. 9). As such, Mr. Morris is eligible to participate in the University's football program under the NCAA guidelines.

16.    Since Plaintiff rejected the 2002 NFL draft-pick invitations, NFL franchises will observe his scholastic and football performance with greater scrutiny for consistency and ability. A prohibition on Plaintiff's participation on the University football program will all but eliminate any possibility of NFL employment opportunity.

A-000117

## COUNT I

17. Plaintiff, Dashaun Morris, has been advised verbally that he is ineligible to participate on the University football team. This ineligible status is a result of his suspension and the NCAA rules which require him to be eligible for classes at least one day during the Spring 2003 semester.

18. Since the Spring 2003 suspension is not supported by the Appeals Counsel decision, it is unenforceable under the University's rules, regulations and procedures.

19. The University's appeal hearings rules and regulations permit Dr. Smith, as the Vice President for Enrollment management and Student Affairs to "uphold, modify, or remove a sanction." (See Exh. 10). Nothing in the University's Rules and Regulations permit Dr. Smith to overrule the counsel's findings and independently, arbitrarily, and capriciously impose his own sanctions upon Plaintiff, Dashaun Morris.

20. On August 2, 2003 upon Mr. Morris being permitted to return to the Fall semester classes, Mr. Morris' counsel asked Delaware State University's counsel to determine whether he was still in fact prohibited from participating on the University's football team. As of the filing of this Complaint, Plaintiff has received no response from Delaware State University and is proceeding under the continued impression, as he was advised verbally, that he was not permitted to participate on the football team.

21. In addition to this University procedural/rule and regulation violation, if the University is successful in

**A-000118**

prohibiting Mr. Morris from participating on the football team, he will suffer irreparable damage due to the fact that he will not be eligible for NFL draft choices and will experience astronomical future economic damages as a result.

22.   Plaintiff Dashaun Morris has the legal right to seek injunctive relief to prevent the procedural violation and enforcement of his Spring 2003 suspension as arbitrarily and capriciously enforced by the University.

23.   Plaintiff Dashaun Morris has no adequate remedy at law and greater injury will be inflicted on him by the denial of his ability to participate on the University's football program.   The University's football camp begins on August 12, 2003.

24.   Defendant, Delaware State University, will not be damaged in any manner or form by granting the relief which Plaintiff requests.   In fact, Defendant Delaware State University will actually benefit from Mr. Morris' participation on the University's football program as Mr. Morris is clearly an asset to the team.

### COUNT II

25.   Assuming arguendo that the Spring 2003 suspension is valid under the University's rules and regulations, Plaintiff Dashaun Morris requests that the University be prohibited from designating him as ineligible for classes during the appeals period in the Spring 2003 semester.

26.   Delaware State University Student Judicial System Rule IV, 19 permits a suspended student to return to classes once an appeal has been granted.   (Exh. 9).   As such, Mr. Morris was

**A-000119**

a.    Declaratory judgment that Defendant's action in suspending Dashaun Morris during the Spring 2003 semester is invalid as it violates Delaware State University's rules, regulations and procedures;

b.    Declaratory judgment that Plaintiff Dashaun Morris was eligible to attend classes during his appeals period for the Spring 2003 semester;

c.    The issuance of a temporary restraining order, a preliminary and then permanent injunction restraining and adjoining Defendant from enforcing their suspension during Spring 2003 semester of Dashaun Morris;

d.    Enter an award in favor of Dashaun Morris and against Defendant University of Delaware for the actual and consequential damages suffered by Dashaun Morris including costs and attorney's fees necessitated by the filing of this action;

e.    Award Dashaun Morris such other and further relief as this Court deems just and proper.

JACOBS & CRUMPLAR, P.A.


BY: David A. Arndt
David A. Arndt
2 E. Seventh Street
P.O. Box 1271
Wilmington, DE   19899
(302) 656-5445
Attorney for Plaintiff

Date: 8-12-03

WF70\Cmp\(98088)DashaunMorrisCtofChanceryCmp.daa.doc

A-000120

DSU-07328

UG/ZG/ZGGG 10.JG FAA JGZGGGGGGG    JACOBS & CRUMPLAR    ⊠012

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

DASHAUN MORRIS                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )    Civil Action No. _____
                                  )
DELAWARE STATE UNIVERSITY         )
                                  )
          Defendant.              )

## VERIFICATION

STATE OF DELAWARE    )
                     :    ss.
KENT COUNTY          )

    Dashaun Morris, being duly sworn according to law hereby deposes and says that he is the undersigned; that he is a student at Delaware State University and that he has read the foregoing complaint and all of the statements contained therein are true and correct to the best of his personal knowledge, information and/or belief.


                              _____
                              Dashaun Morris


    SWORN TO AND SUBSCRIBED before me this _10_ day of August, 2003.


DAVID A. ARNDT                _____
Notarial Officer              Notary Public
29 Del.C. 4323


**A-000121**

DSU-07329

LAW OFFICES
## SCHMITTINGER AND RODRIGUEZ, P.A.
414 SOUTH STATE STREET
POST OFFICE BOX 497
DOVER, DELAWARE 19901
TELEPHONE 302-674-0140
FAX 302-674-1830

NICHOLAS H. RODRIGUEZ
PAUL H. BOSWELL
JOHN J. SCHMITTINGER
DOUGLAS B. CATTS
WILLIAM D. FLETCHER, JR.
CATHERINE T. HICKEY
CRAIG T. ELIASSEN
WILLIAM W. PEPPER SR.
CRYSTAL L. CAREY*
SCOTT E. CHAMBERS*
FRED A. TOWNSEND III
NOEL E. PRIMOS
DAVID A. BOSWELL
WALT F. SCHMITTINGER
R. SCOTT KAPPES
JEFFREY J. CLARK
BETH B. MILLER
KYLE KEMMER
MARY F. HIGGINS

*ALSO ADMITTED IN MARYLAND

HAROLD SCHMITTINGER
OF COUNSEL

WILMINGTON OFFICE
BRANDYWINE GATEWAY PLAZA
1300 NORTH MARKET STREET
WILMINGTON, DELAWARE 19801
TELEPHONE 302-652-3676
FAX 302-652-8788

REHOBOTH BEACH OFFICE
FIRST UNION BANK BUILDING
4602 HIGHWAY ONE
REHOBOTH BEACH, DELAWARE 19971
TELEPHONE 302-227-1400
FAX 302-645-1843

ODESSA OFFICE
ODESSA PROFESSIONAL PARK
POST OFFICE BOX 626
ODESSA, DELAWARE 19730
TELEPHONE 302-378-1697
FAX 302-378-1689

October 6, 2003

Dr. Allen Sessoms
President
Dr. Charles N. Smith
Vice President of Enrollment Management & Student Affairs
Delaware State University
1200 N. duPont Highway
Dover, DE 19901

### VIA TELECOPIER

RE:  Dashaun Morris

Dear Dr. Sessoms and Dr. Smith:

As you may be aware, the hearing for the Petition for Preliminary Injunction in the action brought by Dashaun Morris against the University was scheduled to commence in the Court of Chancery on Thursday, October 9, 2003.  In the meantime, the parties have engaged in some discovery, culminating in depositions of several University employees.  These depositions were initially scheduled for September 18, 2003, but had to be rescheduled due to the hurricane and the state of emergency declared on that date. Therefore, the depositions were held on Thursday, October 2, 2003.

In the meantime, on behalf of the University, we planned to submit a request to the Vice Chancellor for permission to submit a Motion for Summary Judgment or some similar application.  Our rationale for doing that was that based on our research of the law, our interviews with the various University personnel, our review of the documents, and the deposition of Mr. Morris that we had previously taken.  All of these lead us to believe that Mr. Morris was not going to be able to meet the legal standard required to secure the type of injunction that he was seeking.

Following the conclusion of the October 2, 2003 depositions, we

A-000122

October 6, 2003
Page 2

submitted a letter to the Vice Chancellor, outlining our position, providing cites to the appropriate cases, and seeking a teleconference to discuss an expedited schedule for the submission of our Motion for Summary Judgment and briefs in support thereof.

On the morning of Friday, October 3, 2003, prior to the scheduled teleconference with the Court, we received a phone call from Mr. Morris' attorney. After that attorney had reviewed with Mr. Morris the testimony presented during the depositions the previous day, as well as the holdings in the cases cited in our letter to the Court of Chancery, he recommended to Mr. Morris that his lawsuit be dismissed, on the basis that the evidence did not support their petition for an injunction. After giving the matter some consideration, Mr. Morris agreed.

This morning, Mr. Morris' attorney stopped by our office and signed the Stipulation of Dismissal with Prejudice that we prepared. That pleading has been filed with the Court of Chancery. Therefore, this case has now been disposed of in favor of the University.

Please do not hesitate to contact me if you have any questions.

Very truly yours,

CATHERINE T. HICKEY
CTH/mmm

A-000123

IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

DASHAUN MORRIS,                    :    C. A. No.: 1571-K

          Plaintiff,           :

         v.                     :

DELAWARE STATE UNIVERSITY,         :

          Defendant.           :

### STIPULATION OF DISMISSAL WITH PREJUDICE

COMES NOW the Plaintiff DaShaun Morris, by and through his attorneys, Jacobs and Crumplar, P.A., and Defendant Delaware State University, by and through their attorneys, Schmittinger and Rodriguez, P.A., and stipulate and agree that the above-captioned action shall be dismissed with prejudice.

JACOBS & CRUMPLAR, P.A.

_____
DAVID A. ARNDT, ESQUIRE
Attorney at Law
2 East 7th Street
P.O. Box 1271
Wilmington, DE 19899
(302) 656-5445
Attorneys for Plaintiff
 DaShaun Morris

DATED: _10-6-03_

SCHMITTINGER AND RODRIGUEZ, P.A.

_____
CATHERINE T. HICKEY, ESQUIRE
NOEL E. PRIMOS ESQUIRE
414 South State Street
P.O. Box 497
Dover DE 19903-0497
(302) 674-0140
Attorneys for Defendant
 Delaware State University

DATED: _10-6-03_

IT IS SO ORDERED THIS _____ day of _____, 2003.

_____
THE HONORABLE JOHN W. NOBLE

A-000124

March 1, 2004
Grade Changes
Fall 2001

On Friday, February 27, 2004, during a fall grade-change audit I discovered the following:

- 161 grade changes had been processed in the Office of Records and Registration (Documentation attached, pp. 1 and 2)
- Joyce Bowers, Assistant Registrar had processed 133 of those changes
- Of those 133 changes, 21 had been submitted by Dr. Wendell Gorum (Documentation attached, p. 3)
- Of those 22:
    - 16 were from a course taught by Gary Dawkins
    - 04 were from a course taught by D. Wickham
    - 01 was taught by W. Gorum
- Dr. Gorum signed his own name on the Instructor's line of all Change of Grade forms (Documentation attached)
- There were neither Chairs nor Deans approvals on any of the forms
- On Friday, February 27, 2004, I spoke with Drs. Dawkins and Wickham by phone: both indicated they had no knowledge of these grade changes and they did not authorize Dr. Gorum to make any changes
- (Grade Change Policy attached, p. 4)

*Learned of the event on Feb. 26.*

A-000125

| | Student | CRN | Instructor | Date | From | To | |
|---|---|---|---|---|---|---|---|
| 1 | Anderson,T | 15328 | Dawkins | 1/8/2004 | C | B | |
| 2 | Gantt,M | 15333 | Dawkins | 1/8/2004 | W | B | |
| 3 | Henry,L | 14900 | Dawkins | 1/8/2004 | C | B | |
| 4 | Matthews,A | 15333 | Dawkins | 1/8/2004 | W | B | Athlete |
| 5 | McClain,K | 14900 | Dawkins | 1/8/2004 | C | A | Athlete |
| 6 | McClain,K | 15509 | Dawkins | 1/8/2004 | F | B | Athlete |
| 7 | Muckelroy,C | 14900 | Dawkins | 1/8/2004 | C | A | |
| 8 | Parker,K | 14900 | Dawkins | 1/8/2004 | C | B | |
| 9 | Parker,M | 15328 | Dawkins | 1/8/2004 | D | C | |
| 10 | Parker,M | 15509 | Dawkins | 1/8/2004 | F | B | |
| 11 | Rose,R | 14900 | Dawkins | 1/8/2004 | C | B | |
| 12 | Sanon,F | 15328 | Dawkins | 1/8/2004 | D | C | |
| 13 | Saunders,B | 14900 | Dawkins | 1/8/2004 | C | A | Athlete |
| 14 | Stevens,C | 14900 | Dawkins | 1/8/2004 | C | B | |
| 15 | Warren,S | 14900 | Dawkins | 1/8/2004 | C | A | Athlete |
| 16 | Young,C | 14900 | Dawkins | 1/8/2004 | C | A | |
| 17 | Taylor,R | 14888 | Gorum | 1/29/2004 | B | A | |
| 18 | Fleming,K | 14899 | Wickham | 1/8/2004 | F | C | |
| 19 | McClain,K | 14899 | Wickham | 1/8/2004 | F | C | Athlete |
| 20 | Mill,J | 14899 | Wickham | 1/8/2004 | D | C | Athlete |
| 21 | Oliphant,S | 14899 | Wickham | 1/8/2004 | D | C | Athlete |

#Students     18
#Instructor    2
#Athletes      6

**Baruti N Kopano**

03/04/2004 11:04 AM

To: Glenn T Parker/adminst/DSU
cc:
Subject: Re: Grades

I absolutely did NOT authorize a grade change for Antonio Alvarez for Sound Production I for Spring 2003. In fact, I submitted a final grade of "F," not "W." Needless to say, then, I had NOTHING to do with the grade change to A." My roll book reflects that Mr. Alvarez submitted NO assignments for the entire semester. I can reproduce this record for you if needed. In addition, I delivered to your office a copy of the final grade sheet for the Sound Production I class in question. The photocopy of the final grade sheet corroborates my statement of giving Mr. Alvarez an F" for the semester. Please call me at X-6587 if there are any questions.

Thank you,
Baruti N. Kopano, Ph.D.

A-000127

**Delaware State University**
**Office of the Vice President for academic Affairs**
**Dover, Delaware, 19901**

## CHANGE OF GRADE REQUEST FORM

TO:  **Appropriate Academic Dean**

FROM:

Permission is herby requested to change the grade of:

*ANTONIO E. ALVAREZ*          *D10 – 08 – 7659*
**(NAME OF STUDENT)**          **(SOCIAL SECURITY NUMBER)**

in _____    *55 - 223  SOUND  PRODUCTION I*
  **CRN NUMBER**          **COURSE TITLE**

For the  *SPRING*  Semester, *2003* from  *W*  to  *A*
                                    **GRADE**      **GRADE**

Statement of reason(s) for requesting change of grade:

DATE:  *9-12-03*      SIGNATURE: *Wendell J Brown*
                                    **(TEACHER)**

APPROVED: _____
          **DEPARTMENTAL CHAIR**

DISAPPROVED: _____
            **DEPARTMENTAL CHAIR**

APPROVED: _____
          **DEAN**

DISAPPROVED: _____
            **DEAN**

APPROVED:* _____
          **Vice President for Academic Affairs**

DISAPPROVED:* _____
             **Vice President for Academic Affairs**

*Indicates request must be sent to Vice President for Academic Affairs if submitted after deadline of academic calendar.

A-000128

DSU-06186





**DELAWARE STATE UNIVERSITY**
**Dover, Delaware 19901**

PRESIDENT

March 5, 2004

Dr. Wendell Gorum — *certified to home address and campus*
Chair, Mass Communications
Delaware State University
1200 North Dupont Highway
Dover, Delaware 19901

Dear Dr. Gorum,

I have been apprised of the allegation that you changed the grades of multiple students (as outlined in the attached Statement of Charges) contrary to the policies outlined in our catalogue and the practices established and reiterated by Dean Thomas Frederick. Further, I am aware that you (with an AAUP representative) met with Dr. Frederick on March 2, 2004 to and with Dr. Kenneth Bell, Provost, on March 5, 2004, to response to these allegations.

I understand that you do not deny changing these grades but assert that Dr. Frederick verbally authorized them. Alternatively, you suggest that past practice provided you the authority to change a grade when the teacher was not returning – at least one of these instructors did return and has informed Dr. Bell that he gave no permission for a grade change. Dr. Frederick denies giving you such authorization and has recommended termination of your employment.

These grade changes have caused immediate and substantial harm to the University, faculty, students, and our athletic program. I expect that further harm will ensue. Your actions have clearly and substantially reduce your ability to discharge your duties. As such, I have elected to terminate your employment. Further information about your grade changes is still coming in but it is clear that we have sufficient basis to assert that there is Cause for termination. At this point, you may elect to resign, accept dismissal, or agree to a hearing before an Ad Hoc Dismissal Committee within ten (10) days.

In the mean time, I am suspending your employment with pay pending your decision as outlined above. Please remove your possessions from the University and do not return to the campus unless invited to do so. This decision must be submitted to me by 4:30 PM on March 15, 2004.

Sincerely,

Allen Sessoms

cc: AAUP President   *certified to campus*
Mark Farley
Dr. Kenneth Bell   *hand delivered*

1200 NORTH DUPONT HIGHWAY
DOVER, DE 19901
(302) 857-6001
(302) 857-6003 (FAX)
WWW.DESU.EDU

A-000129

## Specific Statement of Charges

In accordance with paragraph 10.4.3 of the Agreement, you have:

    a. Failed to perform professional responsibilities either through incompetence, persistent negligence, refusal to carry out reasonable assignments, or disregard for scholarly and professional standards and ethics.

    d. Deliberately and gravely violated the rights and freedom of other members of the University community.

    e. Committed grave personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community.

Page 25 of the University Catalogue states that "Grade changes must be approved by the dean of the college or school in which the student is a major during the semester of instruction immediately following the semester the grade was issued. Grade changes for undecided majors must be approved by the dean of the College of Arts and Sciences." In addition, Dr. Frederick, Dean of Arts and Sciences has given specific direction that all grade changes will be submitted for his approval (with backup justifying the grade change) -- a requirement you have complied with in the past.

Specifically, you changed student letter grades as follows:

Instructor: DeWayne Wickham (who denies that he gave permission for you to change the grade of a student in his class). Grade changes do not reflect approval signatures other than your own.

- K. Fleming, Ethics and the Media, Fall 2003, changed from F to C

- K. McClain, Athlete, Ethics and the Media, Fall 2003, changed from F to C

- J. MiJi, Athlete, Ethics and the Media, Fall 2003, changed from D to C

- S. Oliphant, Athlete, Ethics and the Media, Fall 2003, changed from D to C

Instructor: Gary Dawkins (who denies that he gave permission for you to change the grade of a student in his class). Grade changes do not reflect approval signatures other than your own.

- B. Saunders, Athlete, Broadcast Writing II, Fall 2003, changed from C to A

- K. McClain, Athlete, Broadcast Writing II, Fall 2003, changed from C to A; and, Radio Station Operations, changed from F to B

- S. Warren, Athlete, Broadcast Writing II, Fall 2003, changed from C to A

- A. Matthews, Athlete, Sound Production I, Fall 2003, changed from W to B

A-000130

- M. Gantt, Sound Production I, Fall 2003, changed from W to B; and, sound Production II, changed from D to C.

- M. Parker, Radio Station Operations, Fall 2003, changed from F to B

- C. Young, Broadcast Writing II, Fall 2003, changed from C to A

- C. Muckelroy, Broadcast Writing II, Fall 2003, changed from C to A

- F. Sanon, Sound Production II, Fall 2003, changed from D to C

- C. Stevens, Broadcast Writing II, Fall 2003, changed from C to B

- R. Rose, Broadcast Writing II, Fall 2003, changed from C to B

- T. Anderson, Sound Production II, changed from C to B

- L. Henry, Broadcast Writing II, changed from C to B

- K. Parker, Broadcast Writing II, changed from C to B

Instructor: Gorum, Grade changes do not reflect approval signatures other than your own.



- R. Taylor, TV and Radio Announcing, changed from B to A, 1/29/04

**Further investigation is proceeding.**

A-000131



# DELAWARE STATE UNIVERSITY

OFFICE OF THE ASSISTANT VICE PRESIDENT AND DEAN FOR STUDENT LIFE

March 18, 2004

ID#D10085333
Mr. DaShaun Morris
116 Varsity Road
Apt #1
Dover, DE 19904

RE: "Misconduct occurring off campus and Disorderly
Conduct"
September 27, 2003

Dear Mr. Morris:

As a result of your Student - Faculty Judiciary Council hearing on February 17, 2004, you have been found responsible for the above violations. You are hereby assessed a fine of $ 50.00. Please be advised that this type of behavior is not condoned on the campus of Delaware State University. If charged with future violations, a more serious penalty will be assessed.

If you desire to discuss the findings of your judicial hearing with the Director of Judicial Affairs, you may call the office to schedule an appointment at (302) 857-6470.

If you desire to appeal this decision, it must be made in writing to the Office of Student Judicial Affairs within two (2) days after receipt of this letter. The request must be based on one or more of the following listed:

    (a)    Lack of due process i.e. when a student can show an error in the hearing or arbitrariness in the findings.

    (b)    Lack of substantial evidence.

    (c)    Evidence that was not considered or available that would subsequently change the nature of the case.

The request for appeal must identify the reason(s) relied on for the appeal and must specify the facts and circumstances that you believe support the reason(s).

Sincerely,

Lowan Pitt
Assistant Vice President and
Dean for Student Life

cc:    Dr. Charles Smith
       Mrs. Kay Moses

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6363 • FAX (302) 857-6362

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

A-000132

DSU-06510

## DELAWARE STATE UNIVERSITY

DEPARTMENT OF INTERCOLLEGIATE ATHLETICS

H
O
R
N
E
T
S

April 28, 2004

Dr. Tommy Frederick
FAR
Delaware State University
Campus

Dear Dr. Frederick:

This correspondence is to inform you of the sequence of events as well as the findings with regards to grade changes that occurred, with Delaware State University student-athletes, which were inconsistent with university policy. The students, whose grade changes were in question, when grades were returned to their original state, did not affect their eligibility. Thus, those student-athletes who were competing during the spring semester were eligible. Please note that all documents indicating changed grades were generated by an audit that was done by Mr. Glenn Parker, Registrar.

Thank you for your time and consideration of this matter. If you have any questions or require further information regarding this matter, please do not hesitate to contact me at extension 6038.

Sincerely,

Kim Walker
Associate Director of Athletics for Compliance

Cc:    Dr. Allen Sessoms, President
       Mr. Mark Farley, Vice President for Human Resources and Legislative Affairs

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6030 • FAX (302) 857-6034

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

A-000133

**21 January 2004**

It was discovered during the NCAA Certification process that a grade for Marques Gantt was changed from a "W" to a "B" in CRN: 15333, Sound Production I

**22 January 2004**

I informed Mr. Glenn Parker, Registrar, about this change.

**27 February 2004**

9:00 a.m.   Glenn Parker informed me about a list of names that he compiled where there were inconsistencies in the university's grade change policy.

4:00 p.m.   A meeting transpired with the following individuals to discuss the potential NCAA violations that may have occurred regarding the inconsistent grade changes.  The meeting was held in Mr. Arrington's office.
Dr. Charles Smith, VP of Enrollment Management and Student Affairs,
Dr. Tommy Frederick, Dean of College of Arts and Sciences and Faculty Athletic Representative (FAR)
Mr. Jimmy Arrington, Assistant VP for Enrollment Management/Director of Admissions
Mr. Glenn Parker, Registrar
Ms. Kim Walker, Associate Director of Athletics for Compliance

It had been determined in the Office of the President that all grade changes inconsistent with university policy were to be returned to its original state.

Based on that directive Aaron Matthews, a men's basketball student-athlete, was identified as potentially being ineligible based on NCAA Bylaw 14.4.3.1 that states a student-athlete must satisfactorily complete six semester hours of academic credit the preceding regular academic term in which the student-athlete has been enrolled.  Mr. Matthews was showing that he received only one letter grade in his course work for Fall 2003.  It was determine through conversation with Dr. Frederick and myself that a potential violation may have occurred.  The decision was made to "pull" Mr. Matthews from competing on Saturday, February 28 versus Norfolk State University.

Dr. Tommy Frederick notified Dr. Allen Sessoms, President, of the possibility of NCAA violations as required by Delaware State University's institutional rules.

5:00 p.m.   Placed a call to Dr. Hallie Gregory, Director of Athletics, who was traveling to Norfolk State University, to make him aware of the grade change issue and for him to

A-000134

DSU-00047

inform the DSU Head Men's Basketball Coach, Greg Jackson, to "pull" Aaron Matthews from the line-up versus Norfolk State University.

NOTE: Other active student-athletes who appeared on the list were Mr. JoAo Miji, men's basketball, Mr. Marques Gantt, men's basketball, and Mr. Sharod Oliphant, football. Mr. Miji's eligibility was not affected when his grade reverted back to the original. Mr. Gantt was ineligible to participate during Spring 2004 due to not meeting required NCAA continuing eligibility requirements and Mr. Oliphant was not "in-season" during Spring 2004.

**28 February 2004**

Spoke to Dr. Fredericks by phone. After further review of NCAA rules it was determined that Aaron Matthews was eligible to participate per NCAA Bylaw 14.4.3.4.7 that states that an incomplete grade in a course may be utilized to fulfill minimum progress toward degree requirements as determined by institutional rules regarding incomplete grades. The deadline for resolving/removing "I" grades for Fall 2003 was March 2, 2004.

4:30 p.m. Left a message on Dr. Gregory's cell phone that Mr. Matthews could participate on Monday, March 1, 2004 versus Hampton.

1 March 2004

5:30 p.m. Called coach Jarrell Wilkerson's cell phone and left a voice mail telling him that Mr. Matthews was eligible to compete.

NOTE:    Aaron Matthews did not compete in the game versus Hampton University.

**2 March 2004**

9:00 a.m.    I received an expanded list of grade changes from Glenn Parker. Identified an additional seven athletes who received grade changes. I informed Dr. Tommy Frederick about the new list.

4:00 p.m.    Dr. Frederick and Kim Walker interviewed the following student-athletes regarding their grade changes.

|  |  |
|---|---|
| Ruby Melton | JoAo Miji |
| Aaron Williams | Christophe Slade |
| Nadia Feimster | Marques Gantt |
| Jashau Bluntt | Rasheed Oliver |

NOTE:    When the original grades were reinstated eligibility for these athletes was not affected.

A-000135

DSU-00048

**2 April 2004**

Received a copy of a grade change form from Glenn Parker.  The names of two student-athletes appeared on the form, Cynthia Jones, women's tennis and Sparkle Williams, women's basketball.

NOTE:        When the original grades were reinstated eligibility for these athletes was not affected.

**A-000136**

DSU-00049

  

# DELAWARE STATE UNIVERSITY

OFFICE OF JUDICIAL AFFAIRS

May 4, 2004

ID# D10085333
Mr. DaShaun Morris
116 Varsity Road
Newark, NJ 07106

Dear Mr. Morris:

You have been charged with Zero Tolerance violation(s) under the 2001-2004 Student Handbook's Undergraduate Student Judicial System of Delaware State University.

Charge (s) is as follows:

"The use, possession of a lethal weapon of any kind (including knives) on University premises and Assault and Battery upon another person."

To Wit

See attached violation(s)

Your case will be submitted for a hearing before the Zero Tolerance Subcommittee Judicial Council. During the hearing you may have a student, faculty or staff member of your choice present to serve as your advisor. When presenting your case, you may bring witnesses on your behalf. If you have any questions regarding these charges please contact the Office of Judicial Affairs at (302) 857-6470.

Sincerely,

Kay S. Moses

Kay S. Moses
Director, Judicial Affairs

xc:     Dr. Charles Smith
        Ms. Lowan Pitt
        Officer Marcus Williams
        Ms. Claudette Gates (Parent)

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6470 • FAX (302) 857-6472

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national origin, ethnic origin, sex or disability.

A-000137

DSU-06469





# DELAWARE STATE UNIVERSITY

OFFICE OF THE VICE PRESIDENT FOR HUMAN RESOURCES AND LEGISLATIVE AFFAIRS

August 25, 2004

Dr. Wendell Gorum
55 Freedom Drive
Dover, DE 19904

Dear Dr. Gorum: .

In Dr. Sessoms letter of March 5, 2004, the President advised you that, pursuant to Section 10.4.7 of the Collective Bargaining Agreement he was exercising the right to temporarily suspend you after making a determination that failure to do so would cause immediate and substantial harm to the University, students or other employees. In addition, the President exercised his discretion under Section 10.4.7 to direct that you remove yourself from University property. As you may recall, in a prior meeting with Dr. Bell during the investigation of these allegations, you had expressed your plans and willingness to retire at the end of the 2003-2004 contract year.

At the time you were suspended and given notice of the President's intent to terminate you, the President concluded that it was appropriate to suspend you with pay pending your decision whether to resign, accept dismissal, or request a hearing before the Ad Hoc Dismissal Committee. Once you elected to contest those charges, the University chose to continue to pay your salary during your suspension in the expectation that the procedures under Section 10.4 of the CBA would be completed in a reasonable and timely fashion. Much to our dismay, that has not occurred. Section 10.4 of the CBA envisions that from the time a unit member requests a hearing before an Ad Hoc Dismissal Committee until the submission of a decision to the Board should take no more than two to three months. The parties to the CBA never envisioned the type of drawn-out negotiation over the composition of the Committee, for extensive pre-hearing investigation, or for delays because potential witnesses would not be on campus during the summer term. It has now been almost seven months since notice was first provided, and we have passed the end of the contract year in which you had previously indicated that you would retire. Based upon the results of the meeting held with the Committee, it is the University's understanding that the Committee may not submit its recommendation until sometime in late October, and then there are further possible appeals.

After careful consideration, the President and the University have decided that effective September 1, 2004, your employment status will be changed to suspension and administrative leave without pay, pending the outcome of all termination proceedings and possible appeals. Although not required to do so, you will continue to receive all benefits

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6261 • FAX (302) 857-6264

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

**A-000138**

DSU-05861

during this period. The University recognizes that if as a result of the termination proceedings and any appeals there is subsequent a decision made that neither termination nor suspension without pay is an appropriate sanction for your actions, you would be entitled to back pay.

It is the University's conclusion that the procedures in Section 10.4, including the Ad Hoc Dismissal Committee, do not preclude temporary suspensions without pay pending the procedures, where such action can be remedied through this post-discipline process. Section 10.4.7 has two separate provisions, only one of which mentions suspensions. No other provision of the CBA expressly addresses suspensions (except in the case of abandonment). Accordingly, consistent with Section 10.4.7 and the Management Rights clause (Section 6.17), the University retains the authority to impose a suspension without pay.

In addition, interpreting the CBA as requiring that all suspensions be with pay until all dismissal proceedings have been exhausted and appeals to the Board completed, would create a perverse disincentive for every unit member to request a hearing and seek to drag out the process as long as possible. This also has the irrational effect of requiring expenditure of public funds to pay individuals who are not providing services based upon the President's determination that their continued teaching or presence on campus would result in substantial harm, and whom may never return to the University. Such an irrational outcome should not be inferred unless such intention is clearly expressed in the CBA, which it is not.

We find further support for this position in the fact that the procedures in section 10.4 are also applicable to the imposition of any type of sanction, including conduct that does not rise to the level of adequate cause for dismissal. When the conduct at issue warrants a substantial penalty, but something less than termination, any interpretation of the CBA that precludes a suspension without pay until all procedures have been exhausted would have the effect of eliminating an entire class of possible penalties, thus removing the ability of the President to take the types of appropriate actions needed to demonstrate that University rules will be enforced. This would unduly limit the President's ability to ensure that suspensions without pay are imposed at the time least disruptive to students. Such powers are traditional management rights that should not be considered abrogated without clear language in the CBA.

Even though DSU interprets the CBA as permitting disciplinary suspensions without pay pending termination procedures, the University and the President agree that in many cases a President may choose to suspend with pay when the issues appear to be relatively simple, and the process is expected to be completed within a relatively short period of time (e.g. 60 days). In your case, the process has already gone substantially longer. The cumulative delay in the process is having a detrimental effect on the administration of the disciplinary system and imposes unnecessary and uncontemplated financial burdens on the University.

DSU-05862

The President has also considered the nature and severity of the allegations against you; the fact that further investigation have uncovered additional examples where you submitted paperwork regarding students without the knowledge or consent of the instructors involved; that you have already been paid through the contract year, and had previously indicated your intent not to return after that contract year; and the fiduciary obligation to protect public funds.

Since this decision is being taken within the confines of the rights vested in the President under Section 10.4 of the CBA, it is the University's position that it is not subject to the grievance procedure, and can be addressed only in the context of the current process.

Please contact me if you have any further questions regarding your employment status or benefits during your continued suspension.

Sincerely,

Mark Farley

Cc: Dr. Allen Sessoms
    Dr. Kenneth Bell
    Dr. Raj Parikh
    President, DSU Chapter of AAUP
    Mr. Zeff

**A-000140**

DSU-05863

**Delaware State News**
**January 7, 2005**

# Warrant issued for former DSU football star

By Drew Volturo
Delaware State News

DOVER — Kent County Superior Court has issued a warrant for former Delaware State University football star DaShaun Morris, who missed a trial appearance last month for assault charges.

Mr. Morris, 23, of Camden, also faces attempted murder charges in a separate incident—a June 8 shooting near University Courtyard Apartments in Dover.



DaShaun Morris

His attorney for the attempted murder case said Mr. Morris missed the assault trial because his other lawyer did not return telephone calls.

According to court records, Mr. Morris did not appear at his final case review Dec. 15 and trial Dec. 21 for second-degree assault and carrying a concealed deadly instrument.

Kent County Superior Court President Judge James T. Vaughn Jr. issued a $2,500 capias for Mr. Morris.

According to New Jersey prison records, Mr. Morris was arrested in Burlington County for being a fugitive of justice Dec. 20, but was released after posting bail.

Mr. Morris originally is from Newark, N.J.

Deputy Attorney General Dennis Kelleher, who is prosecuting Mr. Morris in both cases, said he found it unusual that New Jersey authorities released the former DSU star, but said he expects Mr. Morris to appear at his attempted murder trial later this month.

"His lawyer thinks he's going to show for the trial," Mr. Kelleher said Wednesday.

Reached in Florida by telephone Wednesday, Wilmington attorney Joseph Hurley said Mr. Morris intends to surrender to Delaware authorities Monday — with his phone records.

"He had tried to reach his attorney on numerous occasions as the assault case neared but didn't get a return call," said Mr. Hurley, who represents Mr. Morris in the attempted murder case.

"He didn't know he had to appear."

Mr. Hurley said he talked to Mr. Morris Sunday and advised him to get his phone records to prove he called defense attorney Paul S. Swierzbinski, a public defender in Dover.

Mr. Swierzbinski did not return several phone calls Thursday seeking comment.

Asked if he knew of Mr. Morris' whereabouts, Mr. Hurley said he "wouldn't tell you if I knew. It's not like he's on the run."

According to court records, Mr. Morris allegedly cut a man April 29 with a box cutter or knife after a verbal altercation on the DSU campus escalated.

Mr. Morris was released on $10,000 secured bond.

In June, he was arrested for his alleged involvement in the June 4 shooting of a DSU football player near University Courtyard Apartments on College Road in Dover.

The victim said he looked up and saw Mr. Morris ordering another person "to bust him," court records state. The suspect shot him eight times in his hand, buttocks and legs.

Police charged Mr. Morris with first-degree attempted murder, possession of a firearm during the commission of a felony, inciting a riot, first-degree conspiracy and second-degree conspiracy.

He was released on $165,000 secured bond.

Mr. Hurley said he expects Mr. Morris to stand trial, which is scheduled for Jan. 31.

He was expelled from DSU in June for the April incident, his second expulsion.

Staff writer Drew Volturo can be reached at 741-8296 or dvolturo@newszap.com.

A-000141

News Journal
February 12, 2005

# Man pleads no contest in DSU assault

By JAMES MERRIWEATHER
The News Journal

DOVER — DaShaun Morris, a former football star at Delaware State University, has pleaded no contest to two counts of third-degree assault stemming from the June shooting of a fellow student.

Dover police said Morris, 24, was the leader of a group of 15 to 20 Delaware State students who confronted a group of football players twice on the night of June 4, 2004. One of the players – William Jones, a defensive back who was 22 at the time – was shot eight times by an as-yet-unidentified gunman allegedly following orders from Morris. The victim recovered after spending almost two weeks in a Dover hospital.

Morris originally was charged with first-degree attempted murder, but the charge was reduced to third-degree assault in a plea bargain with prosecutors. In a Jan. 31 appearance in Kent County Superior Court, Morris also pleaded no contest to charges of riot and second-degree conspiracy. Sentencing is set for April 12, and he will face up to seven years in prison.

In the plea bargain, prosecutors agreed to drop a weapons charge and an assault count filed after Morris allegedly slashed another student with a box cutter in April 2004. Delaware State spokesman Carlos Holmes said Morris was expelled in proceedings that began after that incident.

According to police documents, Jones was shot as he tried to run to the university's rear gate after being confronted by the mob, but slipped on the grass and fell. He was shot in the hands, buttocks and legs in woods near College Road, he told investigators.

Earlier, three football players were approached by 15 to 20 people, including one who started a fight, pulled a knife and threatened one of the players. According to police records, the three ran to a friend's off-campus residence. From there, they called more football players that swelled to a group that, on return to campus, was intercepted by the people who had threatened the players earlier.

Morris was named to the Associated Press NCAA Division I-A All-America football team after leading the nation with three kickoff returns for touchdowns. In December 2002, university police officers found a firearm in his room and he was expelled for the following semester because of missed class time. He returned to class in May 2003, but was not allowed to play football.

Contact James Merriweather at 678-4273 or jmerriweather@delawareonline.com.



**DELAWARE STATE UNIVERSITY**
**Dover, Delaware 19901**

# CONFIDENTIAL

**PRESIDENT**

Date: 4/14/05

To:    Members of the Board of Trustees

From: Allen Sessoms

Re:    Gorum, Ad Hoc Dismissal Committee Recommendation

Pursuant to section 10.4.14 of the Collective Bargaining Agreement between DSU and the AAUP, I am transmitting to the Board the recommendations I have received from the Ad Hoc Dismissal Committee regarding Dr. Wendell Gorum, a tenured faculty member who was formally Chair of the Department of Mass Communications. On March 5, 2004, I informed Dr. Gorum that he was being suspended and that I was recommending his termination. (Attached). Dr. Gorum elected to proceed with the Ad Hoc Dismissal Committee. Because of the extended period of this process, I changed the suspension to one without pay effective September 1, 2004. (Attached). My recommendation for termination is unchanged.

The issue before the Committee was whether or not there is "adequate cause" for dismissal under CBA § 10.4.2 and 10.4.3. Findings of Fact and recommended sanctions could be made by any three of the five members of the Ad Hoc Dismissal Committee.
The Ad Hoc Dismissal Committee conducted days of hearings between August and November 2004. The Committee then requested that a written transcript be prepared (at the University's expense), which consisted of more than 1800 pages of testimony. Dr. Gorum's counsel had requested the right to file post-hearing briefs, and the Committee agreed. These were received by the Committee February 2 and 4, 2005. The Committee completed its work and recommendations over Spring Break. The Administration has objected to the extended time this process has taken, and plans to review this process with the AAUP. However, the Administration recognizes that the Committee members have invested substantial time in this process, acting in good faith to ensure that the rights of Dr. Gorum and the University have been protected.

Under CBA § 10.4.14, the Board has the ultimate authority to terminate or otherwise discipline a unit member, and is to render its decision within 30 days of receipt of the Committee's recommendation. The CBA does not otherwise specify what information is to be transmitted to the Board, or the Board's standard of review. Copies of the post hearing briefs, from both parties, together with the findings and recommendations of the Committee are available for your review. In addition, the rest of the record (including the transcript and the exhibits) is available to review at the request of any Board Member. Please contact Mark

**1200 NORTH DUPONT HIGHWAY**
**DOVER, DE 19901**
**(302) 857-6001**
**(302) 857-6003 (FAX)**
**WWW.DESU.EDU**

**A-000143**

DSU-05852

Farley, Vice President for Human Resources, if you would like to review or receive a copy of any portion of the record.

Under the CBA the Board is to make an initial determination, based upon the findings and recommendations of the Committee and the record, whether or not dismissal is appropriate. Nothing in the CBA compels the Board to accept or defer to the findings or recommendations of the Ad Hoc Dismissal Committee. If the Board makes an initial decision in favor of dismissal, the Unit Member then has a right to a "hearing" in front of the Board. Under CBA § 10.4.14, which incorporates CBA § 9.2, such a hearing is merely oral argument by the Unit Member or his counsel, with no live testimony unless the Board chooses to hear it. If the Board's initial decision is to impose no sanction, or any sanction less than dismissal, there is no further hearing.

It was my personal opinion, upon learning of Dr. Gorum's alleged conduct, that the only appropriate sanction was dismissal. I feel even more strongly about that recommendation after reviewing the brief prepared by DSU's attorneys summarizing the evidence and testimony before the Committee. The Committee's findings of facts and conclusions are a strong indictment of Dr. Gorum's unprofessional conduct, which the Committee characterizes as "highly reprehensible." (Report, p. 18). The Committee found that the University more than met its burden of proof under the CBA that there is adequate cause for dismissal, because Dr. Gorum violated sections 10.4.3(a), (d) and (e) of the Collective Bargaining Agreement. Among the Committee's many findings were that Dr. Gorum knowingly misrepresented information on Change of Grade Forms, Removal of Incomplete forms and missing grade forms for 48 students; did so with the intent of misleading the Registrar's Office; did not obtain or attempt to obtain the permission of other faculty members or the Dean prior to changing grades in courses taught by other instructors; awarded grades to students in classes they had never attended; and violated the rights of other faculty. The Committee found no evidence to support Dr. Gorum's claim that he was acting only in the interests of students to respond to problems such as financial purges. Rather, the Committee concluded that "Dr. Gorum's true motive was to selectively help student-athletes to inappropriately meet NCAA requirements. This is highly unprofessional and unethical." (Report, p. 10 and p. 17, finding m). The Committee agreed with the University that "Dr. Gorum's actions undermine the very tenets of the educational profession and rise to a level deserving condemnation by the academic community." (Report, p. 17).

The Committee supports my decision to remove Dr. Gorum as Chair. The Committee also agrees with the University's legal position that Dr. Gorum can be disciplined or terminated as a Unit Member for actions he took as a Chair. The Committee concurs that a minimum sanction should be forfeiture of all back pay from September 1, 2004. Despite all of its findings and conclusions, the Committee is recommending to the Board that Dr. Gorum be reinstated to a teaching position with various restrictions, including a two-year probationary period. The apparent basis for this recommendation is the Committee's view that prior administrations may have engaged in practices and procedures that promoted inappropriate manipulation of student grades, and that Dr. Gorum should not be made a scapegoat.

**A-000144**

DSU-05853

The assessment of an appropriate sanction is a decision for the Board. While I respect the diligent work of the Committee, I strongly oppose the recommendation for reinstatement. The Brief of the University's attorney addresses the evidence of past practice. I believe the Committee has somewhat selectively cited evidence that is not reflective of the policies of DSU under past administrations. If there are other professors who have engaged in similar conduct, those cases will be addressed. But nothing in the allegations of past practice comes anywhere close to the reprehensible actions of Dr. Gorum. Dismissal is the only appropriate sanction for such conduct.

3

*A-000145*

DSU-05854

10

DELAWARE STATE UNIVERSITY
DOVER, DELAWARE
ADDENDUM OF MOTIONS
MINUTES OF THE MEETING OF THE BOARD OF TRUSTEES
APRIL 14, 2005

1.   Adopted and accepted the minutes of the regular meeting of March 10, 2005.

2.   Accepted the report from the Student Affairs Committee as presented.

3.   Approved the list of prospective graduates for May 15, 2005 (Commencement Ceremony) subject to completion of course work, additions and deletions.

4.   Granted tenure and/or promotion to nine faculty members as indicated in the following list:

   Dr. Dae Ryong Kim, Associate Professor of Management, tenure awarded, effective August 25, 2005.

   Dr. Mazen Shahin, Professor of Mathematics, tenure awarded, effective August 25, 2005.

   Dr. Young S. Kwak, Associate Professor of Accounting and Finance, promotion to Professor, effective August 25, 2005.

   Dr. Richard McCallister, Assistant Professor of English and Foreign Languages, promotion to Associate Professor, effective August 25, 2005.

   Dr. Melissa Harrington, Assistant Professor of Biological Sciences, promotion to Associate Professor, effective August 25, 2005.

   Dr. Marwan F. Rasamny, Associate Professor of Computer and Information Sciences, tenure awarded, effective August 25, 2005.

   Dr. Michael A. Reiter, Associate Professor of Agriculture and Natural Resources, tenure awarded, effective August 25, 2005.

   Dr. Andrew J. Goudy, Professor of Chemistry, tenure awarded, effective August 25, 2005.

   Dr. Billie L. Friedland, Assistant Professor of Education, promotion to Associate Professor, effective August 25, 2005.

5.   Adopted and upheld decision by the President to recommend disciplinary action against a faculty member.

A-000146



**DELAWARE STATE UNIVERSITY**
**Dover, Delaware 19901**

PRESIDENT

April 21, 2005

Dr. Wendell Gorum
55 Freedom Drive
Dover, DE 19902

Dear Dr. Gorum:

This letter is to inform you that the recommendation of the Ad Hoc Dismissal Committee was transmitted to the Board. We have considered the Committee's conclusions and recommendations and have determined that your employment with the University should be terminated for adequate cause.

Please note that under Section 10.4.14 of the Collective Bargaining Agreement with the AAUP, and the procedures in Section 8.9.2 that are incorporated, you may request an opportunity to make oral arguments before the Board, if you wish, by writing to the Board in care of the Office of the President within ten (10) working days of receiving this notice. In appealing to the Board, you must state in writing whether you wish to present the case personally to the Board on a date to be designated by the Board. You may elect to be represented by legal counsel and/or an AAUP representative at the meeting. The Board or its designee shall meet with you as soon as possible after receipt of the written appeal. You (or your counsel, if you choose to have one make your argument) shall not be permitted to submit any evidence in support of your appeal, unless such evidence was presented to the Ad Hoc Dismissal Committee or involves matters occurring subsequent to the rendering of the decision by the Ad Hoc Dismissal Committee. Under the procedures, you are not permitted to present oral evidence of other persons. The Board reserves the right to request additional oral evidence at its discretion. Copies of the Board's decision shall be forwarded to you, the President of the University, the AAUP, the appropriate Academic Dean, and the appropriate Vice President within ten (10) working days of the Board's decision.

Sincerely,

Dr. Claibourne D. Smith, Chairman
DSU Board of Trustees

cc:     Allen Sessoms, President
        AAUP President
        Rajeev Parikh, Provost
        Mark Farley, V.P. Human Resources
        Bradley Skelcher, Dean
        Yaw Ackah, Chair, Ad Hoc Committee
        Gregory Zeff, Esq.
        Robert L. Duston, Esq.

A-000147

DSU-05837

# DELAWARE STATE UNIVERSITY
## DOVER, DELAWARE

### BOARD OF TRUSTEES ROLL CALL
### 2004-2005

| NAME | AUG 26 | OCT 14 | NOV 11 | JAN 13 | FEB 10 | MAR 10 | APR 14 | MAY 12 | JUN 9 |
|---|---|---|---|---|---|---|---|---|---|
| SMITH, CLAIBOURNE D. CHAIRMAN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| LAND, JOHN VICE CHAIRMAN | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ |
| SELBY, CORA NORWOOD SECRETARY | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| PARKOWSKI, F. MICHAEL TREASURER | ✓ | | ✓ | ✓ | ✓ | | | | |
| BARROS, A. RICHARD | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| CORRADO, JOSEPH J. | ✓ | ✓ | | ✓ | ✓ | ✓ | | ✓ | |
| OLIVER, NORMAN M. | ✓ | ✓ | ✓ | ✓ | | | | ✓ | ✓ |
| DERRICKSON, NORMA LEE BURTON | ✓ | ✓ | — | | ✓ | ✓ | | ✓ | |
| WILLIAMSON, JESSE R. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ |
| LAWRENCE, MARVIN E. | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| *Wesley Perkins eff 5/05* | | | | | | | | ✓ | ✓ |
| **EX-OFFICIO MEMBERS:** The Honorable Ruth A. Minner, Governor of the State of Delaware | | | | | | | | | |
| Dr. Allen L. Sessoms, President Delaware State University | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

C:BOT ROLL CALL FORM 04 AUG 04

*Note: Six (6) Board Members Present Constitute a Quorum.*

A-000148



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Gorum

## v.

# Sessoms and Board of Trustees of Delaware State University

### C.A. # 06-565-GMS

---

### Transcript of:

### Claiborne Smith, Ph.D.

### June 26, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A-000149

Gorum v. Sessoms and Board of Trustees of Delaware State University

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,          )
                               )
          Plaintiff,           )
                               )
v.                             )    Civil Action No.
                               )     06-565-GMS
ALLEN L. SESSOMS, Ph.D.,       )
     and                       )
BOARD OF TRUSTEES OF DELAWARE  )
STATE UNIVERSITY,              )
                               )
          Defendants.          )

          Deposition of CLAIBORNE SMITH, Ph.D., taken
pursuant to notice at the offices of Saul Ewing, 222
Delaware Avenue, Suite 1200, Wilmington, Delaware,
beginning at 10:30 a.m. on Tuesday, June 26, 2007,
before Anne L. Adams, Registered Professional Reporter
and Notary Public.

APPEARANCES:

          GREGG L. ZEFF, ESQ.
          FROST & ZEFF
             Pier 5 at Penns Landing
             7 North Columbus Boulevard
             Philadelphia, Pennsylvania  19106-1492
             for the Plaintiff,

          ROBERT DUSTON, ESQ.
          SAUL EWING LLP
             2600 Virginia Avenue, N.W.
             The Watergate - Suite 1000
             Washington, D.C.  20037-1922
             for the Defendants.

ALSO PRESENT:  Wendell Gorum, Ph.D.

     ------------------------------------------------
                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

                                        **A-000150**

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

2

1         CLAIBORNE SMITH, Ph.D.,
2         the witness herein, having first been
3         duly sworn on oath, was examined and
4         testified as follows:
5              EXAMINATION
6    BY MR. ZEFF:
7         Q.  Good morning, Dr. Smith. My name is Gregg Zeff.
8    I represent Wendell Gorum in a lawsuit that's been
9    brought against a number of individuals and parties
10   related to Delaware State University. We are here today
11   for your deposition. Have you ever been deposed before?
12        A.  Yes.
13        Q.  You've probably heard instructions. Let me give
14   them to you on the record. Everything we say today is
15   going to be taken down by a court reporter sitting to
16   your right and my left. It's important that you give
17   verbal responses to my questions. Shakes of the head,
18   hand gestures don't make it onto the record. If you
19   need a break at any time, we will be glad to accommodate
20   you.
21             If you hear a question and you don't
22   understand it or you didn't hear part of it, please,
23   don't answer it. Let me know and I will be glad to
24   rephrase it or repeat it so you do understand it.

3

1    Because ultimately what's going to be happen is that
2    there will be a transcript made of today's proceeding.
3    And it will be presented, possibly, to a jury in this
4    case if necessary. Do you understand those
5    instructions?
6         A.  Uh-huh.
7         Q.  Everything you say here is under oath and will
8    be recorded and may be used before a jury. Do you
9    understand that?
10        A.  Yes.
11        Q.  Is there any reason you couldn't understand and
12   answer my questions in a truthful manner? Are you on
13   any kind of medication, any kind of illness, anything
14   that would prevent you from answering?
15        A.  No.
16        Q.  Can you tell me what your association with
17   Delaware State University is?
18        A.  I'm a member of the Board of Trustees and I'm
19   chair of the Board of Trustees.
20        Q.  How long have you been a member of the Board of
21   Trustees?
22        A.  I believe since 1987.
23        Q.  How did you become a member of the Board of
24   Trustees?

4

1         A.  I was appointed by then Governor Mike Castle.
2         Q.  How long have you been chairman of the board?
3         A.  I don't know exactly. But I believe I was, I
4    became chair of the board two to three years after
5    joining the board.
6         Q.  Can you tell me a little bit about your
7    educational background?
8         A.  I have a high school diploma, Bachelor's of
9    Science Degree, Master of Science Degree in Chemistry
10   and a Ph.D. Degree from the University of Oregon in
11   Chemistry.
12        Q.  Did you ever attend Delaware State University?
13        A.  No.
14        Q.  What do you do for a living?
15        A.  I'm retired.
16        Q.  Before you were retired, what did you do?
17        A.  I worked for the DuPont Company.
18        Q.  In what capacity?
19        A.  Various capacities over a period of 35 years. I
20   retired as Vice President For Technical and Professional
21   Development.
22        Q.  How is it that you got to be appointed to -- I
23   understand the governor appointed you, but was this a
24   position that you sought out or were you sought out for?

5

1         A.  No.
2         Q.  How did it come about?
3         A.  No, I did not seek out the position. I had had,
4    at the time that I started to work for DuPont, an
5    association with Delaware State that was initiated by
6    one of my mentors at DuPont, who then had an association
7    with Delaware State. It was then Delaware State
8    College.
9              And since I was a young scientist with a
10   degree in chemistry, I wanted to have me learn a bit
11   about the college and to get to know the chair of the
12   department of chemistry and forge an association with
13   students who might be majoring in chemistry.
14        Q.  And how did that come about? What did you do?
15        A.  I made many visits to the campus, had a number
16   of discussions, both with faculty and students, to learn
17   a bit more about what was going on there and to provide
18   any assistance that I might be able to provide as a
19   scientist.
20        Q.  So you are more of a mentor or advisor to
21   students there?
22        A.  Yes.
23        Q.  Did you ever teach at Delaware State?
24        A.  No.

A-000151

2  (Pages 2 to 5)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

6

1    Q. Before you became a board member, did you ever
2    have any employment with Delaware State?
3    A. No.
4    Q. And can you tell me, since 1987, have the duties
5    of a board member changed?
6    A. No.
7    Q. What are the duties of a board member?
8    A. Fundamentally, the board is a governing body of
9    the university. We have the broad responsibility to
10   make sure that the institution is a viable institution
11   that will support the mission and objectives of the
12   institution, to enhance its visibility, its image, to
13   hire the president of the institution, to maintain or to
14   work at maintaining its viability for the current and
15   the future.
16   Q. And how does the board govern? What rules or
17   internal rules are there?
18   A. The board works diligently to ensure that the
19   policies and procedures that are used to govern the
20   institution, to run the institution are there and in
21   place. The thing that we, perhaps easier for me to
22   describe, is that we don't manage the institution. That
23   is a job of the president. Typically, we work with the
24   president in conjunction with setting broad goals and

7

1    objectives and strategies for the institution to carry
2    out its mission.
3    Q. Now, what role, if any, does the board have in
4    hiring faculty?
5    A. We don't have any role in hiring faculty.
6    Q. How about in the discipline of faculty?
7    A. We don't have any role in the direct discipline
8    of faculty. What we have is a policy and a procedure by
9    which we are asked to be the final arbitrator of
10   decisions made at the lower level both through the
11   Collective Bargaining Agreement that deals with faculty
12   and other non-faculty entities at the institution.
13   Q. And maybe you can explain that in a little more
14   detail for me with regard to discipline of faculty
15   members. Would it be fair to say that an appeal from a
16   decision by the president would be handled by the board
17   relating to that?
18   A. There are procedures and policies, namely in
19   terms of the faculty, the Collective Bargaining
20   Agreement, that spells out what that is, what the role
21   of the board is relative to faculty and through the
22   disciplinary process.
23   Q. Are you familiar with those rules?
24   A. I'm not familiar with the details of the rules.

8

1    I am familiar that those are part of the —
2    Q. Well, since you have been on the board, have
3    you, as a board member or chairman of the board, had to
4    make any kind of decisions relating to the faculty
5    discipline?
6    A. The only time that the board is invited or
7    engaged in disciplinary action is when there is an
8    appeal brought to the board under the terms of the
9    Collective Bargaining Agreement. And I have -- my
10   memory does not allow me to remember all over the X
11   number of years -- specific instances in which
12   disciplinary processes had been appealed to the board or
13   brought to the board as a final decision maker.
14   Q. But there have been some?
15   A. I can only guess. I can't tell you specific
16   because I just don't recall at the moment.
17   Q. My question isn't who or what. My question is
18   broader than that. Have you heard or been involved in
19   appeals to the board of disciplinary decisions related
20   to faculty?
21   A. I don't recall.
22   Q. Do you recall ever being involved in any type of
23   proceeding related to termination of a faculty member?
24   A. I don't recall.

9

1    Q. How about as to Dr. Gorum, were you involved at
2    all in that process?
3    A. Yes.
4    Q. Tell me what involvement did you, as a chairman
5    of the board, have related to Dr. Gorum's termination?
6    A. What role did I —
7    Q. Yes.
8    A. We were asked to affirm the decision of the
9    president according to the procedures spelled out in the
10   Collective Bargaining Agreement.
11   Q. Had you, prior to Dr. Gorum, ever, as chairman
12   of the board or as a board member, been involved in a
13   request to affirm a decision of the president related to
14   disciplining a faculty member?
15   A. I don't recall.
16   Q. How about as to terminating a faculty member?
17   A. I don't recall.
18   Q. Do you recall Margaret McKay?
19   A. The name sounds familiar.
20   Q. Do you know whether or not you were involved in
21   any decisions to terminate Margaret McKay?
22   A. I can't be sure. So I simply answer I don't
23   recall.
24   Q. Are there times when the board disagrees with a

3 (Pages 6 to 9)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

10

1  decision of the president since you have been on the
2  board?
3      A.  We have disagreements all the time.
4      Q.  And are there times when the president has
5  requested that you affirm his decision as a board and
6  you have not done so?
7      A.  Not in a public setting.  There have been
8  executive sessions and individual conversations.
9  Typically, the president will not bring a request to us
10  if we haven't had a chance to discuss ahead of time so
11  that he knows what individual board members' views are.
12  So if he feels like the board isn't going to affirm
13  something, he's not, I don't think, so unwise that he
14  would bring that to the board to have him, you know,
15  opposed.
16      Q.  Has that been true with President Sessoms since
17  he's been in office?
18      A.  That he's brought something to the attention of
19  the board that we said no?
20      Q.  In a public manner.
21      A.  I can't recall an instance in which there has
22  been a public reversal of a decision by the president.
23      Q.  Is there any type of policy or unwritten rule
24  with the board regarding discussing matters with the

11

1  board before you seek affirmance?
2      A.  No.
3      Q.  Is that typically what is done though?
4      A.  Well, I think a wise president would want to
5  hear individual and collective views of issues and items
6  that might be of interest in terms of support from the
7  board.  I think that's a proper approach a president
8  would take.
9      Q.  How many members of the board are there?
10      A.  Currently 15 spots on the board.  There are 14
11  that are occupied.  There is one vacancy for the board
12  right now.
13      Q.  How long has there been a vacancy?
14      A.  I think over two years.
15      Q.  And back in 2004 and 2005, were there 15 members
16  or 14?
17      A.  No.  There were 11 members of the board at the
18  time.
19      Q.  And why were there 11 then and 15 spots now?
20      A.  The government of legislature passed legislation
21  that increased the number of seats on the board.
22      Q.  When was that?
23      A.  I don't recall the date.
24      Q.  How long have you been chair?

12

1      A.  As I answered before, I think if I joined the
2  board in '87, I think it was two to three years that I
3  served before becoming chair, whatever that number.
4      Q.  What duties are there of the chair that are
5  different than those of a board member?
6      A.  Well, the chair's responsibility is to work with
7  individual board members to, number one, ensure that the
8  board's role and responsibility and duties are
9  reasonably proportioned so that all of the board members
10  will have some type of engagement with various
11  activities of the board.  I chair and lead the meetings
12  of the board.  I am an ex-officio member of all
13  committees.  And I am the direct supervisor for the
14  president.
15      Q.  Can you tell me a little bit about -- and,
16  please, tell me if it's changed over the years -- what
17  your day-to-day or week-to-week or month-to-month duties
18  are relating to Delaware State?
19      A.  They run the gamut of PR, of community
20  connections, community discussions with various
21  constituents of the institution, working with chairs of
22  committees and with the president and his senior staff
23  on critical issues that impact the operations of the
24  institution, to support public relations and financial

13

1  development, seeking funds externally for the
2  institution as well as providing both financial and
3  personal support for the institution.
4      Q.  What type of hours do you put in to this
5  position?
6      A.  Some would say too many.  But mostly depending
7  on what is happening at the time.  As I said, I am an
8  ex-officio member of all the committees, standing
9  committees of the board.  And, in which case, I try
10  diligently to be a part of each of those committee
11  meetings in addition to the board meeting, well, the
12  regular trustee meetings.  And having to spend time for
13  preparation for all those meetings consumes a fair
14  amount of time.  I can't give you a number of hours per
15  day.  It depends on the level of activity at any one
16  time.
17      Q.  Is it a daily event for you to be working?
18      A.  Almost a daily event.
19      Q.  How often are there full board member meetings?
20      A.  Currently there are four meetings of the board.
21      Q.  Four per year?
22      A.  Yeah.
23      Q.  And as to the committees, do they meet in
24  between those sessions?

4  (Pages 10 to 13)

A-000153

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

---

**14**

1    A. Oh, yeah.

2    Q. How often is there some committee or another

3  meeting?

4    A. Almost monthly and sometimes twice a month.

5    Q. Are there any approvals or documents that you,

6  as chairman of the board, need to sign off on between

7  the meetings?

8    A. Documents other than minutes of the board

9  meetings, I don't sign off on anything. The chairs of

10  the committees are responsible for their minutes, et

11  cetera. And I don't sign off on those. The only thing

12  I sign off on is the draft of the minutes of the regular

13  full board.

14    Q. Would it be fair to say that the Board of

15  Trustees does not get involved in the disciplinary

16  process related to faculty members until the president

17  brings it to the board's attention?

18    A. That's correct.

19    Q. And that those type of disciplinary matters of

20  faculty are handled internally below the level of the

21  board until such time as the president or, I presume, a

22  faculty member brings it to your attention?

23    A. Correct. We try to adhere to the tenets of the

24  Collective Bargaining Agreement.

---

**15**

1    Q. Can you tell me, before this process, that is

2  the disciplinary process against Wendell Gorum began,

3  did you know him?

4    A. Yes.

5    Q. How did you know him?

6    A. As a chair and a faculty member I had the

7  opportunity, on a number of occasions, to meet and greet

8  him at various functions at the institution,

9  particularly those functions that deal with an

10  invitation to faculty and staff that typically we have

11  once a year in which the board invites the faculty in to

12  a reception in which we have a chance the meet and greet

13  and say hello and typically express our profound

14  appreciation for what they do. They are hardworking

15  people who are kind of the heart of the institution.

16    Q. Do you ever have any different relationship with

17  Dr. Wendell Gorum than you have with any other faculty

18  member?

19    A. I don't believe so.

20    Q. Dr. Sessoms, what role did you have in bringing

21  him to Delaware State?

22    A. As chair of the board, I had a really

23  significant role. I appointed a search committee with

24  the concurrence of the board. And when the search

---

**16**

1  committee had concluded its work and it brought

2  candidates to the attention of the board, I and other

3  members of the board had an opportunity to meet those

4  candidates and be a part of the ultimate selection.

5    Q. Were there other candidates besides Dr. Sessoms?

6    A. Sure, yes.

7    Q. Was the faculty involved in the decision?

8    A. Yes.

9    Q. What was the faculty's role?

10    A. The faculty had -- well, faculty had

11  representation on the search committee. The faculty, as

12  a group, had an opportunity to meet each of the

13  candidates, the finalists for the job of president. And

14  their input was duly noted by Board of Trustees before

15  the decision was made.

16    Q. Were you involved at all in making a

17  recommendation to the rest of the board as to who the

18  next president should be?

19    A. I brought to the board the finalist for the job.

20  And as chair of the board, I asked the board to affirm

21  who they wished to be president. And I had a vote.

22    Q. Who did you vote for?

23    A. Dr. Sessoms.

24    Q. Was there anybody that voted for any other

---

**17**

1  candidate?

2    A. Well, let me put it this way. Yeah, there were

3  people who, on the board, who had preferences for other

4  candidates, yes.

5    Q. Were you aware, at any time during the search

6  process, that there were faculty involved in the search

7  process that wanted to reopen the search at some point?

8    A. No.

9    Q. Were you aware that there was a debate in the

10  faculty senate about recommending to reopen the search?

11    A. No.

12    Q. Now, Dr. Sessoms replaced Dr. DeLauder?

13    A. Yes.

14    Q. Why did Dr. DeLauder leave?

15    A. He retired.

16    Q. At any time was Dr. DeLauder asked to retire?

17    A. No.

18    Q. And was there a transition period or a

19  transition team of some kind involved?

20    A. No.

21    Q. Do you know whether or not President DeLauder

22  met with President Sessoms to get him up to speed or get

23  him running at some point?

24    A. Yes.

---

5  (Pages 14 to 17)

Case 1:06-cv-00565-GMS    Document 40-5    Filed 08/31/2007    Page 7 of 40

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

18

1  Q. Was there some period of time when they were
2  both on campus working together?
3  A. Yes. There were several visits to the campus by
4  Dr. Sessoms before Dr. DeLauder's last day in office.
5  Q. And I want to bring up another area before I get
6  into a little more detail. Disciplining students, what
7  role, if any, does the board have with regard to
8  discipline of the students?
9  A. None that I'm aware of.
10  Q. Does the student have the same right to appeal
11  to the board that a faculty member does relating to
12  disciplinary process?
13  A. As far as I can recall or remember, I don't
14  think there ever has been an instance in which a student
15  has requested an appeal to the board. Whether or not a
16  student has ever asked to do so, I really can't say. I
17  don't recall an instance where a student has ever asked.
18  Q. So if a president expels a student from the
19  university or suspends a students from the university,
20  that's the president's prerogative without the board's
21  approval or ability to appeal that decision?
22  A. I'm not aware of a policy that gives a student
23  that right to appeal the president's decision to the
24  board.

19

1  Q. So would it be fair to say that the board does
2  not involve itself in matters of student discipline?
3  A. No. As an official policy of the board, we
4  strive not to get involved in the disciplinary actions
5  of the students.
6  Q. Are you familiar with a student by the name of
7  DeShawn Morris?
8  A. I've heard the name.
9  Q. Where have you heard the name?
10  A. I think it was in the newspaper and also in some
11  conversations. I believe he was a football player. And
12  that there was a -- I got to tell you I believe this was
13  the case because I don't remember all the details --
14  that he was accused of having a weapon on campus. And
15  that is the extent that I'm aware of all of the issues
16  that surrounded, you know.
17  Q. Did the board ever request or receive any
18  information related to DeShawn Morris for the
19  allegations against him?
20  A. No.
21  Q. Is there any procedure by which the board
22  receives information like that?
23  A. When we have a serious breach of security or a
24  threat to the safety and well-being of the campus by a

20

1  student, yes, that is brought to the attention of the
2  board.
3  Q. Who brings that to attention of the board?
4  A. It can be the president or his designee.
5  Q. How is that brought to the attention of the
6  board?
7  A. It is either by phone call or an E-mail to the
8  members of the board that such an incident has occurred
9  and we want them to be aware because we done want them
10  to read it in the newspaper first.
11  Q. It's more of a notification process than a
12  request for any action by the board?
13  A. Absolutely.
14  Q. Do you know whether such an notification
15  occurred relating to DeShawn Morris?
16  A. I don't recall the details of how that was
17  communicated.
18  Q. Did you have any discussions with Dr. DeLauder
19  about DeShawn Morris?
20  A. I don't recall a conversation I had with
21  Dr. DeLauder on that basis.
22  Q. Do you know whether or not Dr. DeLauder had any
23  discussions with the Board about DeShawn Morris?
24  A. Not that I'm aware.

21

1  Q. Or his designee had any discussions?
2  A. Not that I'm aware.
3  Q. I presume you attend all the board meetings.
4  A. I try to as chair of the board. I don't always
5  make them, but I do.
6  Q. Let me turn your attention to Dr. Gorum. When
7  was the first time that you learned that there was a
8  disciplinary process underway against Dr. Gorum?
9  A. I don't recall the exact day. But I am aware
10  that it was brought to my attention that this issue had
11  been uncovered and that the president informed me that
12  an investigation was being put in place and that it was
13  his intent to proceed with the appropriate disciplinary
14  process in regard to this allegation of grade changes.
15  Q. How was that brought to your attention?
16  A. Verbally.
17  Q. Would that have been in person, in a meeting, by
18  phone?
19  A. It could have been by phone. It could have been
20  by person. I don't recall the exact date and the
21  circumstance, but I recall the president bringing that
22  to my attention.
23  Q. Other than what you have just told me, do you
24  recall anything else about that conversation?

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

---

22

1    A. Nothing other than it was a very serious issue
2    because it had implications of a number of students
3    involved in this, the allegation of these grade changes.
4    Q. Now, when this was brought to your attention, do
5    you know whether or not it was brought to the attention
6    of the other board members as well?
7    A. Not at the same time, no.
8    Q. Do you know when it was first brought to the
9    attention of the entire board?
10    A. I don't. I think that many of the members of
11    the board probably heard it from either the president or
12    Mark Farley to alert them to the fact that this was an
13    issue that was being investigated and that we had
14    nothing to talk about at the moment until an
15    investigation had been completed.
16    Q. And that notification to the board members, was
17    it simply a notification or was there a request that the
18    board do something?
19    A. No, no request that we do anything.
20    Q. And at the time that investigation was going on,
21    did you have an understanding of what was being
22    investigated other than what you've already told me?
23    A. That allegations of grade changes, inappropriate
24    grade changes had taken place and they were pursuing it

---

23

1    to determine the extent of the changes and under what
2    circumstances these were made, and that the allegation
3    of inappropriateness was part of what was being
4    investigated.
5    Q. When you learned of this, what knowledge did you
6    have of the procedures in place at the university
7    related to changing grades and putting grades in?
8    A. First I had no firsthand knowledge of the
9    details of the policy, that is under what circumstances
10    grades could be changed and by whom and what were the
11    procedures by which they occurred. I had no direct
12    knowledge of the details.
13    Q. Had you ever had any –
14    A. No.
15    Q. – such background knowledge?
16    A. No.
17    Q. When was the next time you received any
18    information about the Gorum investigation?
19    A. I don't recall the specific time and date other
20    than periodically the board will ask the president or
21    the vice president of human resources to keep us abreast
22    of the status of any impending issues of magnitude that
23    we would have an interest in. Certainly, the
24    implications of inappropriate grade changes was one that

---

24

1    rose to that level. So that and any other legal or
2    highly significant personnel issue would be summarized,
3    the status would be summarized for the board.
4    Q. How would it be summarized? Would it be
5    presented at a board meeting or some other place?
6    A. Typically at a board meeting in which we would
7    go to executive session to talk about legal and
8    personnel issues and we would ask for status of this or
9    that.
10    Q. Do you have any recall of who or if, even if the
11    Dr. Gorum investigation was presented in executive
12    session to the board?
13    A. Other than it was still under investigation and
14    we hoped to find a conclusion. To that extent, that was
15    about it.
16    Q. Was anything else presented to the board in any
17    executive session or any other session about the
18    details –
19    A. No.
20    Q. – of the investigation?
21    A. No. Not other than the fact that there was a
22    process defined by the collective bargaining agreement
23    that was to be put in place and an ad hoc committee, I
24    suppose is the correct name for it, would be

---

25

1    investigating and that the findings of that ad hoc
2    committee would be shared with the board.
3    Q. Did you ever learn, at some point, that there
4    was an ad hoc committee formed and there was a process
5    going on?
6    A. Uh-huh.
7    Q. Yes?
8    A. Yes. I'm sorry.
9    Q. Did you have any discussions during that process
10    before the committee made their decision as to what
11    those findings were or what the hearing was presenting
12    or any details at all?
13    A. No.
14    Q. When was the next involvement of the board other
15    than just hearing notices of what the procedure was and
16    how it was going forward?
17    A. When the president issued the letter to
18    Dr. Gorum that we shared with me and the board. In
19    terms of the workings of the ad hoc committee, we had no
20    knowledge of that and nor did we seek to have knowledge
21    of that.
22    Q. The letter you are referring to is the one
23    terminating Dr. Gorum?
24    A. Yes.

---

7 (Pages 22 to 25)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

26

1    Q.  And was there any discussion, debate, or any
2  other conversation with the president or his designee
3  about that letter at that time when you received it?
4    A.  I think that —
5        MR. DUSTON:  Which letter?
6        MR. ZEFF:  The letter from Dr. Sessoms
7  terminating Dr. Gorum.
8        THE WITNESS:  What was the date on that
9  letter?
10        MR. ZEFF:  I believe it was March or April
11  of '05.  But that's the letter we are talking about.
12        MR. DUSTON:  I want to make sure we are
13  talking about the right letter.
14        MR. ZEFF:  I'm not sure either.  We'll mark
15  this as Smith 1.
16        (Discussion off the record.)
17        (Smith Exhibit No. 1, Letter to Dr. Gorum
18  Dated 4/14/05, was marked for identification.)
19  BY MR. ZEFF:
20    Q.  I've handed you a document we've marked as Smith
21  1, which is series of documents.  The first one is dated
22  4/4/05 to the members of the Board of Trustees.  It's
23  three pages with some attachments.  The first attachment
24  is some conclusions by the ad hoc committee.  The next

27

1  attachment is a letter from Dr. Sessoms to Dr. Gorum
2  dated March 5th, '04.  After that letter is a letter
3  from Mark Farley to Dr. Gorum dated August 25th, '04.
4        We had a short off the record discussion.
5  I'm trying to understand from this — and we've also
6  shown you an April 21st, '05, letter written by
7  yourself.  I'm trying to understand from these
8  documents, you mentioned that your next involvement was
9  a letter dismissing Dr. Gorum.  Which letter, if any of
10  these, are you referring to?
11    A.  This later which is dated 4/14.  And that was at
12  the conclusion of the working of the Ad Hoc Dismissal
13  Committee.
14    Q.  And that would be the next involvement of the
15  board?
16    A.  Yes.
17    Q.  So would it be fair to say that before receiving
18  this letter of 4/14/05, the board was not informed of
19  the details of the allegations made against Dr. Gorum?
20    A.  Yes.
21    Q.  And you personally had no knowledge of the facts
22  relating to the allegations until 4/14/05?
23    A.  Correct, the facts, yes.
24    Q.  Did you personally receive a copy of this

28

1  4/14/05 memorandum on 4/14/05 or some other date?
2    A.  No, I don't recall seeing this before it was —
3  it was issued — let me back up and say that I don't
4  recall whether or not I had a copy of this before 4/14.
5    Q.  Was 4/14 the date of some meeting?
6    A.  If it's a second Thursday in April, it would
7  have been the date of the board meeting.
8    Q.  And let me suggest to you that 4/14 was a board
9  meeting date.
10        MR. ZEFF:  Can we agree that was a board
11  meeting?
12        MR. DUSTON:  Yes.
13  BY MR. ZEFF:
14    Q.  So you have no recollection then of receiving
15  this memorandum before 4/14/05?
16    A.  I could have seen a draft of it or I could have
17  had it before then.  I just don't recall.
18    Q.  Do you know whether or not any action was taken
19  on 4/14/05 against Dr. Gorum?
20    A.  It would have been the procedure of the board to
21  go into executive session to review the details of this
22  letter to the board and to discuss the findings of the
23  Ad Hoc Dismissal Committee.
24        MR. DUSTON:  Hold on just a second

29

1  Dr. Smith.  Gregg, I think we had discussions off the
2  record that the DSU limited waiver of either executive
3  privilege or of attorney/client privilege as to any
4  issues related to Dr. Gorum, that's true for all the
5  sessions no matter what hat Mark Farley was wearing, is
6  not a general waiver as to any other topic other than
7  Dr. Gorum.  But all issues related to Dr. Gorum's
8  decision and, for that matter, to the extent that Morris
9  or the related issues are ones that are relevant, we'll
10  cover those case by case.  This executive session did
11  cover at least one other personnel issue.  And we are
12  not making a general waiver as to that.
13        MR. ZEFF:  That's fair.  I understand that.
14  And, please, let me know — I'm sure you will — but if
15  I try to overstep my boundaries there —
16        MR. DUSTON:  And that was a standing
17  objection that we had raised ahead of time in the
18  confidentiality and the waiver, I believe, and you have
19  not overstepped that so far.
20        MR. ZEFF:  I believe you are telling me that
21  I can ask these question on a question by question
22  basis, waive them or not.
23        MR. DUSTON:  The failure to object on a
24  question by question is not a waiver, in any way, and is

8 (Pages 26 to 29)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

30

1 a standing objection for the case and a standing limited
2 waiver.
3         MR. ZEFF: Understood. You are not going to
4 bother me while I'm questioning.
5         MR. DUSTON: I'm not going to bother you. I
6 wanted to get that on the table once.
7 BY MR. ZEFF:
8    Q. Was this 4/14/05 memo presented to you in
9 executive session or open session?
10    A. Executive session.
11    Q. Does the board have an attorney or counsel that
12 is regularly present with them when they meet?
13    A. Mark Farley is.
14    Q. He is the board's counsel?
15    A. He is vice president for human resources and
16 legislative affairs. He has a legal background. He is
17 not the board's counsel.
18    Q. Who is, if anyone, the board's counsel?
19    A. When we need counsel, we will designate counsel.
20    Q. Is there a specific firm or group of lawyers
21 that are designated to be counsel to the board?
22    A. Depending on what issues.
23    Q. So they are a group?
24    A. Yes.

31

1    Q. Or different lawyers for different issues?
2    A. Correct.
3    Q. But is there someone that is present at board
4 meetings, including executive sessions, that is counsel
5 to the board?
6    A. No.
7         MR. DUSTON: Gregg, it is the university's
8 position that Mark Farley serves that role on some
9 issues and on others he is wearing his hat as vice
10 president of human resources. And to the extent that
11 there is any dual role in this situation, the waiver
12 extends to his comments.
13 BY MR. ZEFF:
14    Q. So let me ask this. Tell me everything you can
15 recall about that executive session as it relates to
16 Wendell Gorum.
17    A. When we were presented with this document, and
18 as chair of the board, I asked the board to take
19 whatever amount of time they felt necessary to become
20 comfortable with the allegations, the findings of the Ad
21 Hoc Dismissal Committee, their recommendation and the
22 recommendation of the president. They took that time.
23 They were given the opportunity to ask questions of any
24 and all aspects that they felt uncomfortable with or didn't

32

1 understand.
2         The findings were, I would say, pretty -- I
3 don't want to put words in the mouths of the other board
4 members, but we all felt that this was an extremely,
5 extremely serious issue. And the board's conclusions,
6 at the time of this and after it completed its
7 conversations with each other and with the president,
8 was prepared to support and affirm the recommendation of
9 the president to dismiss Dr. Gorum.
10         MR. DUSTON: Gregg, so there is no
11 confusion, it has been represented me that, in advance
12 of Dr. Smith, that a full copy of the findings and
13 conclusions were in some type of binder and given as
14 well as this letter. I have not seen that copy of it.
15 I am looking for a copy of it as it was given to the
16 board. That's not in documents. My understanding, it's
17 the same version we gave to the president.
18         MR. ZEFF: I will get there. But thank you.
19 BY MR. ZEFF:
20    Q. Can you tell me how long it was that the board
21 members were reviewing documents related to this matter
22 before --
23    A. It could have been 35, 45 minutes. It was an
24 extended period of time.

33

1    Q. Were there any questions before the documents
2 were reviewed?
3    A. I don't recall.
4    Q. Who was it that was present to answer questions
5 about this matter?
6    A. Dr. Sessoms and Mark Farley.
7    Q. Do you remember any of the questions?
8    A. Did they have any disagreements with the
9 findings of fact by the Ad Hoc Dismissal Committee? To
10 what extent did we believe these allegations and
11 findings were likely to bring home to the institution?
12 Those were some of the questions that were raised. And
13 I think most people were so incredulous that they were
14 asking how could this, how could someone do this and
15 place the institution in jeopardy as a consequence of
16 it?
17    Q. Did you have any questions yourself?
18    A. Were we satisfied that the ad hoc committee had
19 done a, what we call a, the appropriate diligence in
20 carrying out their investigation. We were not privy to
21 the proceedings of the Ad Hoc Dismissal Committee. So
22 we had to make some assumptions. And we all felt or
23 were comfortable that the members of the ad hoc
24 committee appropriately represented the interests of the

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

---

34

1　institution as defined by the Collective Bargaining
2　Agreement.
3　　Q. You mentioned that you were not privy to the ad
4　hoc committee proceedings. What did you mean by that?
5　　A. What they did, how they did it, who spoke to the
6　ad hoc committee, how many meetings they had, how long
7　they ran, what were the conversations with witnesses, et
8　cetera, we didn't get into all that. We didn't think it
9　was appropriate for us to do so, particularly when
10　Dr. Gorum had the right to appeal the decision of the
11　president to the board. So we certainly did not want to
12　have, you know, got to engaged in a lot of stuff before
13　and if that situation arose.
14　　Q. When you say you weren't privy to it, what do
15　you mean by that?
16　　A. We didn't ask for it nor did we get those
17　details.
18　　Q. Were you aware at the time, that is on 4/14/05,
19　that there was a transcript made of the ad hoc committee
20　hearings?
21　　A. I think that was implicit in the documents that
22　there were transcripts.
23　　Q. When you say implicit, what do you mean?
24　　A. Well, that if in fact the ad hoc committee

---

35

1　conducted hearings and had testimony, that some level of
2　records were being kept of that.
3　　Q. Were you provided a copy of the transcript?
4　　A. No. We didn't ask for them.
5　　Q. Were you provided anything other than this memo
6　dated 4/14/05 with its attachments on that date?
7　　A. Other than that, what Mr. DUSTON just indicated,
8　that there was a report, a binder of the ad hoc
9　committee's work. And that was, I believe, available to
10　the members of the board. At least I saw that document.
11　　Q. Did you read it?
12　　A. Oh, yeah, sure. Yes.
13　　Q. The entire part of the ad hoc committee?
14　　A. Yes.
15　　Q. And did you read it while you were sitting there
16　before you made any decisions or asked any questions?
17　　A. Yes, to the extent that we had time to go
18　through the various important details. I didn't read
19　everything line by line, no. But I did read the
20　findings of the Ad Hoc Dismissal Committee.
21　　Q. Did you read the recommendations of the Ad Hoc
22　Dismissal Committee?
23　　A. Yes.
24　　Q. And do you have a recall of any of the

---

36

1　recommendations of the document that you read that was
2　prepared by the ad hoc committee?
3　　A. Yes. That they indicated this was a serious
4　issue and that it was an important -- let me put it this
5　way. I don't recall the exact language. But the ad hoc
6　committee indicated that Dr. Gorum did not deny the
7　allegations that inappropriate grade changes had been
8　made, and that they were asked that the finding or the
9　recommendation of the provost be taken into
10　consideration. And part of their recommendations or
11　their recommendation was that Dr. Gorum be reduced from
12　chair of the board and reinstated as professor and be
13　placed on two years probation. It was part of their
14　findings.
15　　Q. Did you have any discussions -- when I say you,
16　the board -- about whether or not the committee's
17　recommendations should be followed rather than the
18　president's?
19　　A. Oh, yeah. I think the members of the board
20　talked about those recommendations. And I think, to the
21　person, felt that the findings and the consequences of
22　those findings were of such a grave nature that their
23　recommendations didn't rise to the level of what was
24　appropriate under the circumstances.

---

37

1　　Q. Were there any board members that were in favor
2　of keeping Dr. Gorum as a faculty member?
3　　A. No, none.
4　　　MR. ZEFF: Let me just mark Smith 2, the
5　report of the ad hoc committee hearing. It is a 20-page
6　document with a four-page attachment to the end of it
7　which is the amended charges.
8　　　(Smith Exhibit No. 2, Report of the Ad Hoc
9　Committee Hearing, was marked for identification.)
10　　　MR. ZEFF: If you want to take a few minutes
11　to look at it or not.
12　　　(Discussion off the record.)
13　　　(Thereupon, a brief recess was had.)
14　BY MR. ZEFF:
15　　Q. I've shown you a copy of the report of the ad
16　hoc committee, Exhibit 2. Have you had a chance to
17　review that?
18　　A. Yes.
19　　Q. Have you ever seen that document before?
20　　A. Yes.
21　　Q. When did you first see that document?
22　　A. I believe I might have seen it before the board
23　meeting. I can't recall exactly. But certainly at the
24　board meeting this was available.

---

Wilcox and Fetzer, Ltd.　　Registered Professional Reporters

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

38

1  Q. Going back to the first exhibit, the other
2  document that you have, the bottom of the page it says,
3  second to the last line, "In addition to the rest of the
4  record, including the transcript and the exhibits, is
5  now available to review at the request of any board
6  member." Do you see that?
7  A. Uh-huh.
8  Q. Do you know whether or not there was any request
9  by any board member to review any of the other
10  documents?
11  A. May have been. I'm not aware.
12  Q. And to your knowledge, do you know what it was
13  that the rest of the record meant?
14  A. Transcripts and the exhibits.
15  Q. Can you tell me, at the meeting of 4/14/05, what
16  documents were presented to the board related to
17  Dr. Gorum?
18  A. The findings of the Ad Hoc Dismissal Committee
19  and the recommendations of the president.
20  Q. That would be the 4/14/05 letter?
21  A. Uh-huh.
22  Q. Anything else?
23  A. I'm not aware of anything else.
24  Q. Do you recall seeing anything else at any other

39

1  time relating to Dr. Gorum?
2  A. No.
3  Q. And can you tell me how many copies of the
4  report of the ad hoc committee were presented to the
5  board on that date?
6  A. I don't recall.
7  Q. Did everybody get a copy?
8  A. I believe so.
9  Q. What did you read first?
10  A. I don't recall. But I certainly picked this up
11  to read it and review the findings and then proceeded
12  with the document that Dr. Sessoms had written to the
13  board.
14  Q. You are indicating Exhibits 1 and 2. So you
15  don't know whether you read Exhibit 1 or Exhibit 2
16  first?
17  A. No, I don't.
18  Q. Taking a look at Exhibit 1 again, a couple
19  questions about it. There is a discussion on the second
20  page. "The committee found no evidence to support
21  Dr. Gorum's claim that he was acting only in the
22  interest of students to respond to problems such as
23  financial purges." Do you see that?
24  A. Yes.

40

1  Q. Do you know what is referred to there as
2  financial purges, what that means?
3  A. To the best of my knowledge, a financial purge
4  is to clear the records of students who had not paid
5  their tuition and fees.
6  Q. And next it says, "Rather the committee
7  concluded that Dr. Gorum's true motive was to
8  selectively help student athletes to inappropriately
9  meet NCAA requirements." Do you see that?
10  A. Yes.
11  Q. At the time that you first read that, did you
12  have any concerns about whether or not any NCAA
13  infractions had been committed by the university as a
14  result of Dr. Gorum's behavior?
15  A. Yes.
16  Q. What, if anything, did you do about it?
17  A. Certainly, we asked the administration to find
18  out whether or not any of the athletes who were involved
19  had been adversely impacted by it and would the
20  institution and the athletic programs would be adversely
21  impacted by it. And that we had to take steps to notify
22  the NCAA of these findings because we had to make sure
23  that we were conducting an investigation and to make
24  sure that the NCAA was aware.

41

1  Q. Since you have been a member of the board at
2  Delaware State, have you been aware of any NCAA
3  investigations into Delaware State?
4  A. Title 9 issues have been investigated by NCAA.
5  Q. What role, if any, does the board have in
6  relation to NCAA investigation requirements, that sort
7  of thing?
8  A. To the extent that policy, procedures and/or
9  funding and reputation of the institution might be
10  adversely impacted by us not either confirming or not
11  carrying out our duties as required by the NCAA would be
12  impacted, we would get involved. We want to know what
13  the status was.
14  Q. Other than receiving a notice of some kind from
15  the president or his designee, would there be any other
16  involvement of the board?
17  A. Yes.
18  Q. What?
19  A. We ask the athletic director to meet with
20  committees of the board to help us understand and to
21  determine what activities are likely to need board
22  attention, either from a funding perspective or policy
23  perspective.
24  Q. So would it be fair to say that the board is

11  (Pages 38 to 41)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

50

1    A.  No.
2    Q.  Are you aware that there was a contention in the
3    ad hoc committee hearing that there was no written
4    policy regarding grade changes?
5    A.  That there was an allegation?
6    Q.  Yes.  Are you aware of that?
7    A.  Of an allegation?
8    Q.  Yes.
9    A.  No.
10   Q.  Was the president able to articulate for you in
11   the executive session what the policy regarding grade
12   changes was for DSU at the time that Dr. Gorum was
13   changing those grades?
14   A.  In a broad fashion, yes.  It was not discussed
15   in any great detail.
16   Q.  Was it important for you in making your decision
17   on whether or not to terminate Dr. Gorum to understand
18   what policy or policies he had violated?
19   A.  To the extent that the Ad Hoc Dismissal
20   Committee carried out their roles and responsibility
21   under the Collective Bargaining Agreement, including
22   review of the policy and made their findings of fact,
23   that's what we focused our attention on.
24   Q.  Well, were you relying on the ad hoc committee

51

1    to determine what those facts were?
2    A.  We were relying on the finding of the ad hoc
3    committee and the information that the president and
4    Mark Farley, who had access to pertinent documents, to
5    do so.  We asked the persons we felt appropriate at the
6    time to understand that there was a policy.
7    Q.  And other than what you've told me, can you
8    recall any other questions or any other responses by
9    Farley or Sessoms related to what that policy was?
10   A.  Yes, that the faculty had a procedure to follow
11   in making grade changes that engaged the chairman, the
12   dean, and the provost as to when and under what
13   circumstances grade changes could be made.
14   Q.  Was there any discussion about professors being
15   able to change grades during the first two weeks of a
16   semester without getting the approvals of other people
17   on the administration?
18   A.  I believe we heard that.
19   Q.  From whom?
20   A.  From the president and/or Mark Farley.
21   Q.  What did they say about it?
22   A.  I don't recall the specifics.
23   Q.  Do you recall anything?
24   A.  Other than that, there was a procedure for grade

52

1    changes that occurred early on, particularly when
2    students wanted to withdraw from a class, and there was
3    circumstances and a procedure by which they could do so.
4    Q.  Did the president or Mr. Farley discuss with the
5    committee anything about the registrar's office allowing
6    professors without other signatures to change grades?
7    A.  I don't recall the president specifically citing
8    that as one of the issues or items brought to the
9    attention of the board at the time.  I just don't
10   recall.
11   Q.  Was there any discussion at all about how
12   Dr. Gorum was able to accomplish changing grades?
13   A.  How?
14   Q.  Yes.  How was he able to do it?
15   A.  Well, I think that the allegations and the
16   findings of the Ad Hoc Dismissal Committee pretty well
17   spelled that out.
18   Q.  Well, sitting here today, do you have an
19   understanding of how Dr. Gorum was able to change
20   student's grades?
21   A.  That as chair, he took the initiative to sign
22   the professor's, where the professor's name should have
23   been, and to take those to the registrar's office and
24   get the changes made.

53

1    Q.  Do you know whether or not that followed the
2    procedure of Delaware State University, that is –
3    A.  Without the professor's permission, that was not
4    permissible.
5    Q.  Do you have an understanding of whether or not
6    with the professor's permission Dr. Gorum, as chair of
7    his department, could change someone's grade without any
8    further signatures?
9    A.  I don't recall the specific details of the exact
10   procedure.  But I think there was a provision or there
11   were provisions by which the dean of the school would
12   have to either approve or disapprove.
13   Q.  Did Mr. Farley or Dr. Sessoms tell the committee
14   that the dean's signature was required before a grade
15   could be changed?
16   A.  On all circumstances?
17   Q.  Yes.
18   A.  I don't recall.
19   Q.  Did Dr. Sessoms or Mr. Farley tell the committee
20   that the vice president's or provost's signature was
21   required before any grades could be changed?
22   A.  I don't recall.
23   Q.  Did the committee ask or were they told, in this
24   executive session, how it was that the register accepted

14  (Pages 50 to 53)

A-000161

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

---

62

1  of the president.
2      Q.  The sentence refers to even members of his
3  office.
4          MR. DUSTON:  Does his refer to the
5  administration or Mr. Parker?
6          MR. ZEFF:  Mr. Parker.  That would be a fair
7  interpretation.  I apologize.
8  BY MR. ZEFF:
9      Q.  Did you ask Dr. Sessoms or Mr. Farley whether or
10  not Glenn Parker was subject to discipline or
11  investigation relating to grade changes?
12     A.  To the extent that any allegations were made
13  concerning members of the administration and faculty
14  were part of what would be an ongoing investigation.
15     Q.  And have you received any word, any notice of
16  any continuing investigation or outcome of any
17  investigation into grade changes since April of '05?
18     A.  There have been, as far as I can tell, no formal
19  report.
20     Q.  And that would be something that the board would
21  expect to be reported to about if there was, in fact,
22  there was such a report; wouldn't it?
23     A.  Certainly, if there were findings of anyone else
24  still at the institution who were engaged in

---

63

1  inappropriate practices.
2      Q.  Was there any discussion with President Sessoms
3  and Mr. Farley about whether or not the punishment to
4  Dr. Gorum should be mitigated by past practice?
5      A.  That the president's recommendation should be
6  mitigated?
7      Q.  Yes.
8      A.  Yes.
9      Q.  Tell me everything you recall about that.
10     A.  I don't know that I recall all the details of
11  that discussion.  I think it's fair to say that the
12  consensus of the members of the board, that this was
13  such an egregious breach of competence and confidence,
14  and it went so far as to place the university in real
15  jeopardy that it rose to the level that whatever past or
16  whatever mitigating circumstances were not, did not rise
17  to the level of diminishing the president's
18  recommendation.
19     Q.  Were there any documents or notes that were
20  generated during this executive session?
21     A.  None that I'm aware of.
22     Q.  Are there generally any minutes or notes or
23  documents that are produced from executive?
24     A.  Typically the minutes of executive session

---

64

1  states the topic of our discussion but not the details
2  of those discussions.
3      Q.  Earlier on we were going through what the
4  questions were that you asked for Dr. Sessoms and
5  Mr. Farley at the executive session.  I wanted to know,
6  have we covered all of the questions and answers that
7  you can recall?
8      A.  To the best of my knowledge, yes.
9      Q.  So there aren't any questions or answers that I
10  haven't asked you about and you haven't told me about
11  that you can recall sitting here today?
12     A.  (Witness indicating.)
13     Q.  There was one area that you did talk about that
14  you recalled questioning the president and Mr. Farley
15  about the due diligence or appropriate amount of
16  diligence that the ad hoc committee used in preparing
17  their report.  Can you tell me what you can recall about
18  that?
19     A.  That they were appropriately constituted
20  according to the CBA and that the appropriate time and
21  support was extended to them to conduct their
22  investigation and come to their findings.
23         MR. DUSTON:  I need a minute or two with my
24  client.

---

65

1         (Discussion off the record.)
2  BY MR. ZEFF:
3      Q.  After April 14, 2005, did you have any other
4  discussions or interaction relating to Dr. Gorum's
5  termination?
6      A.  None that I recall.
7         MR. DUSTON:  Prior to this lawsuit you mean?
8         MR. ZEFF:  No, involving counsel, of course.
9  BY MR. ZEFF:
10     Q.  And are there any other discussions or documents
11  related to Dr. Gorum that you are aware of that we
12  haven't already covered?
13     A.  No.
14         MR. ZEFF:  I don't have anything else.
15  Thank you.
16         MR. DUSTON:  I've got no further questions.
17  We will stipulate, for the record, that although we had
18  not gotten the formal notice out, Dr. Smith is being
19  produced pursuant to the Rule 30(b)6.  So the Federal
20  Rules of Civil Procedure as a representative of the
21  board and his comments and discussions can be taken as
22  his role of chair as a representative of the Board of
23  Trustees under Rule 30(b)6.  Certainly as to those
24  issues where he says he does not have personal knowledge

---

17  (Pages 62 to 65)

Gorum v. Sessoms and Board of Trustees of Delaware State University

```
                                    66
1   of other members of the board – he can't speak for what
2   he doesn't know – within those parameters, he's a
3   30(b)6 witness.
4           MR. ZEFF:  Thank you.
5           (Thereupon, the deposition concluded at
6   12:30 p.m.)
7           INDEX TO TESTIMONY
8
    CLAIBORNE SMITH                    PAGE
9
    Examination by Mr. Zeff           2
10
           - - - - -
11
           INDEX TO EXHIBITS
12
    SMITH DEPOSITION EXHIBIT NO.       PAGE
13
14  Smith Exhibit No. 1, Letter to Dr. Gorum   26
    Dated 4/14/05,
15  Smith Exhibit No. 2, Report of the Ad Hoc  37
    Committee Hearing
16
17
18
19
20
21
22
23
24
```

```
                                    68
State of Delaware )
               )
New Castle County )
         CERTIFICATE OF REPORTER
    I, Anne L. Adams, Registered Professional
Reporter and Notary Public, do hereby certify that there
came before me on the 26th day of June, 2007, the
deponent herein, CLAIBORNE SMITH, who was duly sworn by
me and thereafter examined by counsel for the respective
parties; that the questions asked of said deponent and
the answers given were taken down by me in Stenotype
notes and thereafter transcribed into typewriting under
my direction.

    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                        Anne L Adams

                Anne L. Adams
                Certification No. 105-RPR
                (Expires January 31, 2008)
```

```
                                    67
1
2
3
4
5
6
7
8           REPLACE THIS PAGE
9
10          WITH THE ERRATA SHEET
11
12          AFTER IT HAS BEEN
13
14          COMPLETED AND SIGNED
15
16          BY THE DEPONENT.
17
18
19
20
21
22
23
24
```

18  (Pages 66 to 68)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Gorum

## v.

# Sessoms and Board of Trustees of Delaware State University

## C.A. # 06-565-GMS

---

## Transcript of:

## Allen L. Sessoms, Ph.D.

## June 28, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A-000164

Gorum v. Sessoms and Board of Trustees of Delaware State University

1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,                )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )       Civil Action No.
                                      )         06-565-GMS
ALLEN L. SESSOMS, Ph.D.,              )
     and                              )
BOARD OF TRUSTEES OF DELAWARE         )
STATE UNIVERSITY,                     )
                                      )
          Defendants.                 )

          Deposition of ALLEN L. SESSOMS, Ph.D.,
taken pursuant to notice at the Delaware State
University, Administration Building, 1200 N. DuPont
Highway, Dover, Delaware, beginning at 10:00 a.m. on
Thursday, June 28, 2007, before Anne L. Adams,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          GREGG L. ZEFF, ESQ.
          FROST & ZEFF
            Pier 5 at Penns Landing
            7 North Columbus Boulevard
            Philadelphia, Pennsylvania  19106-1492
            for the Plaintiff,

          ROBERT DURSTON, ESQ.
          SAUL EWING LLP
            2600 Virginia Avenue, N.W.
            The Watergate - Suite 1000
            Washington, D.C.  20037-1922
            for the Defendants.

ALSO PRESENT:  Wendell Gorum, Ph.D.

-----------------------------------------------------
                    WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477
                     www.wilfet.com

                                      A-000165

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

| | 2 |
|---|---|
| 1 | ALLEN SESSOMS, Ph.D., |
| 2 | the witness herein, having first been |
| 3 | duly sworn on oath, was examined and |
| 4 | testified as follows: |
| 5 | EXAMINATION |
| 6 | BY MR. ZEFF: |
| 7 | Q. Good morning, Dr. Sessoms. We've met |
| 8 | previously. But today we are here for your deposition |
| 9 | in lawsuit that has been brought again you by Dr. Gorum. |
| 10 | Have you had your deposition taken before? |
| 11 | A. Yes. |
| 12 | Q. I will give you instructions. As you know from |
| 13 | your other depositions, verbal responses to my questions |
| 14 | are necessary. Shakes of the head, hand gestures cannot |
| 15 | be taken by the court reporter seated to my left and to |
| 16 | your right. At the end of this deposition, the court |
| 17 | reporter is going to prepare a transcript of these |
| 18 | proceedings that may very well be used at the time of |
| 19 | trial in front of a jury in this matter. And you are |
| 20 | sworn to tell the truth here today just as if you were |
| 21 | in a court of law. Do you understand those |
| 22 | instructions? |
| 23 | A. Yes. |
| 24 | Q. If you don't understand my question, I will be |

| | 3 |
|---|---|
| 1 | glad to repeat it or rephrase it until you do |
| 2 | understand. Don't answer my question unless you do |
| 3 | understand. It will be presumed if you answer it that |
| 4 | you understood the question. Do you understand that |
| 5 | instruction? |
| 6 | A. Yes. |
| 7 | Q. Can you tell me currently by whom you are |
| 8 | employed and in what capacity? |
| 9 | A. Delaware State University as President. |
| 10 | Q. How did you get to Delaware State? |
| 11 | A. I was recruited to Delaware State. |
| 12 | Q. By whom? |
| 13 | A. Board of Trustees. |
| 14 | Q. How did that take place? When you say you were |
| 15 | recruited, did somebody call you on the phone? Was |
| 16 | there a recruiter of some kind? |
| 17 | A. Yes. And I was nominated. There was a process |
| 18 | and I was selected. |
| 19 | Q. Where were you employed previous to coming to |
| 20 | Delaware State? |
| 21 | A. Harvard University. |
| 22 | Q. In what capacity? |
| 23 | A. Lecturer and senior researcher. |
| 24 | Q. What department? |

| | 4 |
|---|---|
| 1 | A. Kennedy School of Government. |
| 2 | Q. How long were you with Harvard? |
| 3 | A. Three years. |
| 4 | Q. Prior to working at Harvard, what did you do? |
| 5 | A. I was President of Queens College in New York. |
| 6 | Q. How long were you President at Queens College? |
| 7 | A. Five years. |
| 8 | Q. I would like to go over the recruiting process a |
| 9 | little bit more. Do you recall who it was that |
| 10 | contacted you about the Delaware State position? |
| 11 | A. A search firm, Holland and Associates I think. |
| 12 | Q. A search firm rather someone from the |
| 13 | university? |
| 14 | A. A search firm. |
| 15 | Q. When you first made contact with persons at |
| 16 | Delaware State, was it the board or someone on there |
| 17 | behalf? |
| 18 | A. The search firm. |
| 19 | Q. How many times did you interview here at |
| 20 | Delaware State? |
| 21 | A. Once. |
| 22 | Q. And who was that before? |
| 23 | A. There were a number of people actually, faculty, |
| 24 | students, staff, the board. |

| | 5 |
|---|---|
| 1 | Q. Prior to being recruited for Delaware State, did |
| 2 | you know anyone on the faculty or staff or |
| 3 | administration at Delaware State? |
| 4 | A. I never heard — no one on the board, no one on |
| 5 | the faculty, no one on the staff. |
| 6 | Q. What was the length of the process from the time |
| 7 | you were first contacted until the time you accepted the |
| 8 | position? |
| 9 | A. Perhaps six months. |
| 10 | Q. Were you actively looking for a position while |
| 11 | you were at Harvard? |
| 12 | A. No. |
| 13 | Q. And were you aware, once you began interviewing, |
| 14 | who any of the other candidates were for the position? |
| 15 | A. No. |
| 16 | Q. When you came for the interview, how long a |
| 17 | process was that? |
| 18 | A. I don't recall. Couple of days. |
| 19 | Q. It was several days worth of interviews? |
| 20 | A. Couple days, two days perhaps. |
| 21 | Q. With different groups of people? |
| 22 | A. Yes. |
| 23 | Q. Did you meet with any faculty groups? |
| 24 | A. I met with the faculty group. I don't recall |

2  (Pages 2 to 5)

A-000166

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

|  | 6 |
|---|---|
| 1 | the details. |
| 2 | Q. Did anyone state to you that there were |
| 3 | different factions within the university as to who they |
| 4 | wanted to be hired as the next president? |
| 5 | A. No. |
| 6 | Q. Did you have any discussions with Dr. DeLauder |
| 7 | at that time when you were here for those two days? |
| 8 | A. No. |
| 9 | Q. Did you, at some point, meet Dr. DeLauder before |
| 10 | you were actually hired? |
| 11 | A. No. |
| 12 | Q. And were you aware of what the role of the |
| 13 | faculty was in your selection prior to coming to the |
| 14 | school? |
| 15 | A. Faculty were part of the search committee. |
| 16 | Q. And after you received the job, were you aware |
| 17 | of the role of the faculty and what the faculty's role |
| 18 | was? |
| 19 | A. The faculty was part of the search committee. |
| 20 | That was the only awareness I had. |
| 21 | Q. Did you learn from any source that there was a |
| 22 | split among the faculty as to whether or not the search |
| 23 | should be reopened? |
| 24 | A. No. |

|  | 8 |
|---|---|
| 1 | A. In November, 2003. |
| 2 | Q. Did you live somewhere else before? |
| 3 | A. Hotels. |
| 4 | Q. While the house was being renovated? |
| 5 | A. Correct. |
| 6 | Q. So other than dealing with, I guess, the |
| 7 | logistics of you moving here to Dover and moving into |
| 8 | the house, did you have any other dealings with Delaware |
| 9 | State in terms of a transition and what was to be |
| 10 | expected or any type of orientation before July 1, 2003? |
| 11 | A. No. |
| 12 | Q. Tell me about what happened on July 1, 2003, in |
| 13 | the first few weeks in terms of what you did to acquaint |
| 14 | yourself with the new potion. |
| 15 | A. I came in, talked with some members of the |
| 16 | faculty senate, got to know the office, talked with |
| 17 | architects about fixing the house, talked with the |
| 18 | board, the board chair, spent some time talking to |
| 19 | community groups, met with legislators, provost, members |
| 20 | of a few deeds. |
| 21 | Q. And those first -- I don't know how long you |
| 22 | would want characterize your orientation or process |
| 23 | getting acquainted with the university. But that first |
| 24 | period where you were orientating and getting |

|  | 7 |
|---|---|
| 1 | Q. And when you came to the school, was there any |
| 2 | type of transition period for you? That is before |
| 3 | Dr. DeLauder left and you came on, did you work together |
| 4 | in some fashion? |
| 5 | A. No. |
| 6 | Q. So when was your first official day? |
| 7 | A. July 1st, 2003. |
| 8 | Q. And prior to July 1st, 2003, what, if anything, |
| 9 | did you do to prepare yourself for the job? |
| 10 | A. I made a couple of visits to campus just to |
| 11 | primarily decide what to do with the president's house. |
| 12 | Q. Can you explain? |
| 13 | A. It needed renovation. I had to take a look and |
| 14 | discuss with the board the renovations that were needed, |
| 15 | discuss with Dr. DeLauder and his wife their experiences |
| 16 | with the house so they could tell me what renovations |
| 17 | were needed, and get a sense from him, since this was a |
| 18 | new building, were there issues with the building, the |
| 19 | office, the process of moving in, that sort of thing. |
| 20 | Q. Was Dr. DeLauder living in the president's house |
| 21 | at the time? |
| 22 | A. Yes. |
| 23 | Q. When did you, if ever, move into the president's |
| 24 | house? |

|  | 9 |
|---|---|
| 1 | acquainted, who was it you were relying on for the |
| 2 | information that you were garnering about the university |
| 3 | and the issues that were present? |
| 4 | A. Myself. |
| 5 | Q. But who were you talking to, the people you just |
| 6 | mentioned? |
| 7 | A. The people I just mentioned. |
| 8 | Q. Was there anyone in particular? |
| 9 | A. No. |
| 10 | Q. So that would be board members -- |
| 11 | A. Board members, the provost, who is the chief |
| 12 | academic officer of the university, and the deans. |
| 13 | Q. Which provost was that at that time? |
| 14 | A. Kenneth Bell. |
| 15 | Q. And what deans were there that you were talking |
| 16 | to and getting information from? |
| 17 | A. Tommy Frederick and Doris Woolwich. I don't |
| 18 | recall who it was. |
| 19 | Q. When you came to campus on July 1, did you have |
| 20 | any sense of what the key issues or important issues on |
| 21 | campus were for the president at that time? |
| 22 | A. Explain that again. What do you mean? |
| 23 | Q. Sure. When you came to the school, did you know |
| 24 | what the problems with the university were, what |

3 (Pages 6 to 9)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

10

1  direction the university was going in and what your
2  goals and objectives were going to be or was that
3  something that you developed?
4      A.  That developed over time.
5      Q.  So would it be fair to say when you came to
6  campus, you had little to no idea of what direction the
7  school was going in?
8      A.  I didn't say that.
9      Q.  That's what I'm trying to find out.
10     A.  I talked to the people and everyone had a
11  different sense of things.  And I got their different
12  senses.  Some of them made sense and some of them
13  didn't.
14     Q.  When was it that you first started to have an
15  idea of where you wanted to go and where you wanted to
16  take this university?  How long did that take you?
17     A.  About two months.
18     Q.  And what were the goals and issues that after
19  two months you decided you were going to tackle or
20  needed help?
21     A.  There were some clear goals that were defined in
22  there as they were defined in July and codified by the
23  board.  We had to make this an institution to grow and
24  it to develop new resources.  It had to become much more

11

1  embedded in the community.  It had to increase its
2  offerings for graduate students.  It had to increase the
3  quality of its academic offerings.  It had to become
4  more attractive.
5      Q.  And when you met with the board both in
6  interviewing and when you first came onto campus, were
7  those goals they were pushing on you or --
8      A.  The board did not push any goals.
9      Q.  Maybe that's a poor word.  But the board thought
10  there were things you should be working toward?
11     A.  No.  The board asked me what I was thinking
12  about the university and where the university should be
13  from my experience, what I brought to the table at a
14  university like Delaware State.  I had to confess.  I
15  didn't know much about Delaware State, the assets I
16  brought to the table.
17     Q.  You mentioned trying to becoming embedded in the
18  community.  Did you find that there were issues related
19  to that, that the university was not embedded in the
20  community or to your satisfaction embedded in community?
21     A.  One judges embeddedness by support, legislative
22  support and monetary support, private giving or
23  corporations and foundations.  And the university had
24  very little legislative support.  They had very little

12

1  economic support from the state based on the annual
2  allocation.  And they had almost no support from the
3  corporate and foundation communities based on the lack
4  of giving.
5      Q.  Did you develop some type of plan to change
6  that?
7      A.  Yes.
8      Q.  And just give me an overview of what that plan
9  was.
10         MR. DURSTON:  Gregg, at this point, I will
11  lodge my first objection on relevance.  You are getting
12  a little far afield.  General background, but we are
13  getting too far into underlying plans as to Dr. Gorum's
14  situation.
15         (Discussion off the record.)
16         MR. DURSTON:  I will repeat a general
17  objection on the relevance of beyond basic background
18  into plans and issues unrelated to the president and to
19  Dr. Gorum and his specific issues.  I advise the
20  president to, please, respond.  But I think we are
21  getting a little far afield.
22         THE WITNESS:  The plans were to raise a
23  visibility institution, to add value for what the
24  community was interested in.  This is America.  This is

13

1  sports.
2      (Discussion off the record.)
3      THE WITNESS:  What universities do all over
4  the country is to add values to the communities.  That
5  value is measured in lots of different ways.  But
6  whatever is done, it's garnering support in the
7  community, identity with the institution, which includes
8  in America athletics.  Sports team are very important.
9      It includes academic offerings, certainly,
10  at the graduate level that are of interest to the
11  industries and corporations around.  It involves service
12  in the sense of institution, faculty and staff
13  participating in advisory committees in the state and
14  local level.
15      That's, basically, what the institution and
16  all institutions of higher education do to garner
17  support politically or otherwise.  And that's what I
18  suggested and what Delaware State University is, in
19  fact, doing to build that community support.  I think
20  that's probably sufficient.
21  BY MR. ZEFF:
22      Q.  That's fine.  Thank you.  When did you first
23  become acquainted with Wendell Gorum?
24      A.  I first probably met Professor Gorum -- I'm not

4 (Pages 10 to 13)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

14

1    even sure of this -- at a meeting with chairs of the
2    departments. But I don't know when. I don't recall.
3    Didn't make an impression one way or the other.
4        Q. Prior to -- and of course we are here about the
5    termination issues -- but prior to learning about the
6    issues which led to his termination, did you have any
7    contact with him on a one-on-one level?
8        A. Didn't know anything about him.
9        Q. How about his wife, Dean Gorum?
10       A. In nursing?
11       Q. Is she still on campus?
12       A. I don't think so. The nursing department was
13   engaged in some changes because there were issues with
14   staffing. And I had contact with her. But I had no
15   idea that actually she was his wife.
16       Q. There is something called the Martin Luther King
17   Annual Breakfast which is sponsored by the Alpha
18   Fraternity. Are you familiar with that?
19       A. No.
20       Q. Have you ever attended the Martin Luther King
21   breakfast?
22       A. No.
23       Q. Do you recall ever being invited to attend?
24       A. No.

15

1        Q. Have you ever had any contact with the Alpha
2    Fraternity?
3        A. No.
4        Q. Did anyone ever tell you that you had been
5    invited to speak there and that invitation had been
6    withdrawn?
7        A. No.
8        Q. DeShawn Morris, you've heard of DeShawn Morris?
9        A. I'm not familiar -- I never met him. But I'm
10   familiar with the case.
11       Q. You are familiar with some issues related to
12   DeShawn Morris?
13       A. Yes.
14       Q. When did you first learn that there were issues
15   related to DeShawn Morris?
16       A. It was brought to my attention by a coach, Ben
17   Blacknall, and by Kim Walker, who is the compliance
18   officer with the athletic department.
19       Q. What did they tell you?
20       A. That there was a problem with DeShawn Morris,
21   something about eligibility.
22       Q. Did they tell you anything else or any details
23   about what the problem was?
24       A. No.

16

1        Q. When was that?
2        A. July.
3        Q. So --
4        A. Shortly after I arrived.
5        Q. They told there was a problem with his
6    eligibility?
7        A. Yes.
8        Q. How did that occur? Was there some specific
9    meeting about him or --
10       A. Simply brought to my attention as those things
11   tend to be. If there is a problem with the athletics
12   program, they tend to notify the president if there is a
13   problem.
14       Q. Were you notified verbally or in writing?
15       A. Verbally.
16       Q. What, if anything, did you say in response to
17   the notification?
18       A. I didn't respond. I didn't know anything about
19   it.
20       Q. You were just given notice of it and you said
21   thank you for bringing it to my attention?
22       A. That's what I did.
23       Q. When was the next time you were given any
24   information about DeShawn Morris?

17

1        A. When Charles Smith was vice president for
2    student affairs or some other title, he said that there
3    was an issue with DeShawn Morris having had some
4    disciplinary action taken against him. I said fine. I
5    don't engage myself in any student disciplinary action.
6    So whatever it is.
7        Q. When you say you don't engage yourself in
8    disciplinary action, what do you mean?
9        A. I don't engage in student disciplinary action.
10   There is a process and I don't interfere with that
11   process ever.
12       Q. Are you involved in that process?
13       A. No.
14       Q. At any point?
15       A. No.
16       Q. Are you involved in any appeal process?
17       A. No. I do not take any student appeals
18   whatsoever.
19       Q. What is the process relating to student
20   discipline?
21       A. There is a judicial process handled through
22   student affairs where if a student is arrested or has
23   done some other action that requires attention, there is
24   a committee of students and faculty who meet and decide

5  (Pages 14 to 17)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

18

1   some course of action. They have hearings. There is a
2   finding. And the finding -- the student then can, of
3   course, appeal to another body. The ultimate person is
4   the vice president of student affairs.
5       Q. Is the vice president of student affairs'
6   decision final?
7       A. Yes.
8       Q. Is there any appeal of the vice president of
9   student affairs' decision?
10      A. No. There is always an appeal in America. You
11  can go to the court. There is no appeal to me.
12      Q. There is no internal university appeal beyond
13  the vice president?
14      A. No.
15      Q. And your, I guess, only involvement with the
16  disciplinary process would be to receive some notice of
17  what had happened?
18      A. In general, I don't even receive notice.
19      Q. So if a student is expelled or a student is
20  suspended, that would be not something that would be
21  brought to the attention of the president?
22      A. Unless it was criminal activity, no.
23      Q. If there was criminal activity, would it be
24  brought to your attention?

19

1       A. If it was criminal activity and it was a
2   continuing threat to the campus community, yes.
3       Q. How would that be brought to your attention?
4       A. The police would bring it to my attention. It
5   would be a criminal matter.
6       Q. So it would be through security rather than
7   through the academic branch?
8       A. Yes. And there is a reason for that. Students
9   are expelled and suspended often. And the president
10  simply doesn't need to know.
11      Q. Did you become aware, at some point, that
12  President DeLauder had met with DeShawn Morris and had
13  changed or modified the discipline that was handed down
14  to him?
15      A. I'm only aware of what was informed to me by
16  Charles Smith.
17      Q. What did he tell you?
18      A. I don't recall but he said that there had been
19  an appeal. And I don't know whether, in fact, he
20  informed me of any change that DeLauder made or not.
21      Q. Why did Charles Smith inform you of this?
22      A. You have to ask Charles Smith.
23      Q. Typically, that would not be something you would
24  have been informed of, that is there was an appeal and a

20

1   change in discipline?
2       A. Unless there was a larger issue, for example, a
3   criminal finding, or unless there was externalities
4   beyond the purview of the vice president of student
5   affairs that would, for example, end up in the press,
6   let me know, well, there is something that might end up
7   in the press and you should know about it.
8       Q. With the case of DeShawn Morris, did you ask --
9   is it Mr. Smith or Dr. Smith?
10      A. Doctor.
11      Q. -- Dr. Smith whether or not, you know, why are
12  you bringing this to my attention; this is a
13  disciplinary matter and I don't get involved?
14      A. He said it might come out in the press. He said
15  Mr. Morris was an athlete. There were grumblings on the
16  football team about him being eligible, ineligible, and
17  it might show up in the press. It might come to me. It
18  might be an NCAA issue. So he just flagged it for my
19  knowledge in general. So if something shows up in the
20  press, I'm not blind-sided.
21      Q. Was this a verbal or written communication?
22      A. Verbal.
23      Q. Did you have any further discussions with anyone
24  in the athletic department or the coaches or NCAA

21

1   related persons relating to DeShawn Morris?
2       A. Ben Blacknall came to me and asked me, the
3   football coach, whether I would intervene in this case
4   because he thought Mr. Morris should be allowed to play.
5   And I informed him that I don't intervene in these
6   cases, period.
7       Q. Tell me everything you recall about your
8   conversation with Blacknall.
9       A. That's what I recall about my conversation with
10  Blacknall.
11      Q. Why did he want you to intervene?
12      A. You have to ask Coach Blacknall.
13      Q. Do you recall what he told you the reasons were?
14      A. An All-American football player that he wanted
15  to play. Why he wanted me to intervene is another
16  question.
17      Q. Did he explain to you that Dr. DeLauder had
18  cleared him to play?
19      A. He didn't explain to me any of the sort. He
20  just told me he wanted this person to play. The
21  academic people in the athletic department said he
22  appeared to be ineligible. And he was asking me whether
23  I would intervene, and I said no, period.
24      Q. Did you send him anywhere, tell him to go talk

6 (Pages 18 to 21)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

|  | 30 |
|---|---|
| 1 | literally don't recall. |
| 2 | MR. DURSTON: Before my time. |
| 3 | THE WITNESS: Which is probably why we have |
| 4 | Mark Farley now because there wasn't anyone. |
| 5 | BY MR. ZEFF: |
| 6 | Q. So were you made aware of the resolution of the |
| 7 | DeShawn Morris lawsuit? |
| 8 | A. I was made aware of it through some means. I |
| 9 | just don't know what the means was. |
| 10 | Q. Did you have any input or discussion at all |
| 11 | about what that resolution was before it happened? |
| 12 | A. No. |
| 13 | Q. You were simply informed of it? |
| 14 | A. Yeah. |
| 15 | Q. Were you informed, at any time, that Dr. Gorum |
| 16 | was involved with DeShawn Morris in representing him as |
| 17 | any capacity? |
| 18 | A. No. |
| 19 | Q. When, if ever, was the first time you learned |
| 20 | Dr. Gorum was involved in counseling Mr. Morris? |
| 21 | MR. DURSTON: You mean other than |
| 22 | discussions with me in this lawsuit? |
| 23 | MR. ZEFF: Yes. |
| 24 | THE WITNESS: No, never. |

|  | 32 |
|---|---|
| 1 | Q. Now, how did they bring that to your attention? |
| 2 | A. They made an appointment and came up and told |
| 3 | me. |
| 4 | Q. And was this a specific meeting related to that |
| 5 | subject or were there other subjects also discussed? |
| 6 | A. It was an ad hoc meeting. They called and said |
| 7 | we need to talk to you. They came and told me just |
| 8 | that. |
| 9 | Q. Who was present? |
| 10 | A. I was present with Kim Walker and Glenn Parker, |
| 11 | the registrar. |
| 12 | Q. When you heard this information, what did you do |
| 13 | with it? |
| 14 | A. I immediately said you have to investigate and |
| 15 | turned it over to counsel. I think Mark Farley was here |
| 16 | then. |
| 17 | Q. When you said you turned it over to Mark Farley, |
| 18 | did you call Mark Farley to the meeting? |
| 19 | A. No. I told him what I was told. I also asked |
| 20 | the provost to look into it since it's an academic |
| 21 | affairs issue. |
| 22 | Q. That would be Dr. Bell? |
| 23 | A. Yeah. |
| 24 | Q. You mentioned earlier that you were on the NCAA |

|  | 31 |
|---|---|
| 1 | BY MR. ZEFF: |
| 2 | Q. Did anyone ever tell you that Dr. Gorum had paid |
| 3 | part of Mr. Morris' legal fees? |
| 4 | A. No one ever told me anything about any activity |
| 5 | that Dr. Gorum undertook while he was at this |
| 6 | university. |
| 7 | Q. Of any kind? |
| 8 | A. Of any kind. |
| 9 | Q. Did you have any discussions with Dr. DeLauder |
| 10 | in July of 2003 after you took over? |
| 11 | A. No. |
| 12 | Q. So there were no issues or things that needed |
| 13 | cleaning up that you needed to talk to him about? |
| 14 | A. I have not spoken in any substantive way with |
| 15 | Dr. DeLauder since I last saw him in June, 2003, on any |
| 16 | subject. |
| 17 | Q. Let me get right to Dr. Gorum then. How were |
| 18 | you informed that there was an issue relating to grade |
| 19 | changes and Dr. Gorum? |
| 20 | A. Kim Walker was the compliance officer in the |
| 21 | athletic department, and Glenn Parker, who was a |
| 22 | registrar, brought to my attention that there were |
| 23 | apparent unauthorized grade changes for a student, some |
| 24 | of whom were student athletes. |

|  | 33 |
|---|---|
| 1 | Presidents Council when you were at Queens College? |
| 2 | A. Yes. |
| 3 | Q. Can you tell me what that entailed? |
| 4 | A. The Presidents Council is a steering group for |
| 5 | one of the divisions in the NCAA, which there were |
| 6 | three. They were the people who make policy, oversee |
| 7 | the implementation of that policy, generally rules and |
| 8 | regulations, things like that, sit on committees that |
| 9 | look at infractions, that look at scholarship policy, |
| 10 | that look at rewards and decide athletes of the year |
| 11 | sort of things. The presidents run the National |
| 12 | Athletic Association and there is a steering committee |
| 13 | at various levels and there is an annual meeting of all |
| 14 | the people. |
| 15 | Q. How long were you on that committee? |
| 16 | A. Almost five years, almost. |
| 17 | Q. In that five years, did you come to have an |
| 18 | understanding of what the rules and the various |
| 19 | infractions of those rules, the penalties for those |
| 20 | rules were? |
| 21 | A. No. What I know in fact is in policy, the rule |
| 22 | manual is -- |
| 23 | Q. You are indicating a very large manual. I've |
| 24 | seen it. Yeah. |

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

---

38

1   within the university related to these matters?
2   A. No.
3   Q. Do you know if any reports have been generated?
4   A. If I have not received them, I don't know if
5   they have been generated.
6   Q. Somebody may have said we have done a report; do
7   you want to see it?
8   A. No, that's not the way it works.
9   Q. Do you know when it was that you were told that
10  this matter was going to be turned over to NCAA?
11  A. The matter has not been turned over to the NCAA.
12  Q. The notice to the NCAA.
13  A. I don't know. Sometime well after the
14  investigation was underway, it was concluded that there
15  may be sufficient evidence to warrant notification of
16  the NCAA. And where there may be, you notice. You just
17  let them know. You don't doubt. You don't try to hide
18  anything. Any indication there is a problem and there
19  is significant information, you say NCAA, we have a
20  problem. We will investigate it more or you can
21  investigate it yourself. We're just letting you know
22  there is an issue. We are studying it. We will get
23  back to you with more details if we have it. Or the
24  NCAA can say, well, we have problems were your boosters.

---

39

1   We are going to send in our team. It depends on what
2   they decide.
3   Q. Has any student been declared ineligible as a
4   result of what Dr. Gorum did?
5   A. I have no idea.
6   Q. Who would?
7   A. The athletic department.
8   Q. Has anyone notified you that a student has
9   become ineligible?
10  A. I don't receive those notifications.
11  Q. Other than the athletic department, who would
12  receive that notification?
13  A. The athletic department would receive the
14  notification from the NCAA. The president would not.
15  And I'm not aware of anyone else who would because it's
16  a student affairs matter which is dealt with by
17  compliance in the athletic department. It's a student
18  privacy issue. They decide how to dispense that
19  information.
20  Q. If a student is declared ineligible, either
21  through the NCAA or through an internal process, does
22  anyone outside of the athletic department receive notice
23  of that?
24  A. The student receives notice of it.

---

40

1   Q. No one else at the university?
2   A. The registrar, perhaps, receives notice of it.
3   I don't know what the notification system is.
4   Q. Is that notice sent to the Board of Trustees?
5   A. I have no idea. It's not sent through me
6   because it's not the Board of Trustees needs to know.
7   Unless it's going to be a major issue like Clarice,
8   whatever his name is at Ohio State who's your star
9   quarterback, shot somebody in the middle of the street
10  and he's going to be ineligible, you tell the board he
11  got arrested. He's ineligible.
12     But the board only receives that information
13  when it becomes possible that it would be a public issue
14  and they need to know how to respond to a public issue.
15  Yes, somebody told me about this and it's done with
16  procedures. They have no involvement whatsoever other
17  than that.
18  Q. Are the issues related to Wendell Gorum's grade
19  changes public issues?
20  A. When it is clear that the university had been
21  put in jeopardy and we, as a public university, have
22  been put in jeopardy, it is a public issue.
23  Q. So is the answer yes?
24  A. At a certain point when it's clear that there

---

41

1   have been serious breaches, the answer is yes. We are a
2   public institution.
3   Q. We were focusing mostly on the NCAA. And I want
4   to focus more on the grade change issues.
5     After you had the initial meeting with Kim
6   Walker and you talked to Mark Farley and Ken Bell, what
7   was the next contact you had with the issues related to
8   the grade changes with Dr. Gorum?
9   A. I simply don't recall. This discussion about
10  the process and setting up the committees and coming to
11  conclusions were ongoing for well over a year. I have
12  no idea when the series of meetings took place and what
13  discussions happened. It was a discussion that took
14  place over a year. So many discussions took place.
15  Q. Well, can you recall anything specific that was
16  said to you or you said to anyone in that year?
17  A. I recall when it was very clear and there was
18  indisputable evidence and non-contested evidence that
19  grade changes had been made, that it was necessary to
20  take very specific action against the perpetrator of
21  those changes since it was a violation of any kind of
22  ethics. And I sent a notice to Professor Gorum. I
23  believe it was in April, 2004.
24  Q. That's right.

---

11 (Pages 38 to 41)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

42

1    A. And under the circumstances, he was suspended
2    with pay. And he had certain rights and privileges
3    under that suspension. He then chose to invoke his
4    rights to have an Ad Hoc Appeals Committee visit the
5    entire process. And that Ad Hoc Appeals Committee was
6    invoked and met for an enormous amount of time.
7        I believe then six months later, I said this
8    has gone on for a very long period of time. It is
9    anticipated that these issues would be resolved in two
10   or three months. This has gone on for more than six.
11   So your suspension with pay is now changed to a
12   suspension without pay. I think that was six months
13   later, something like that. And then the process drug
14   on for another six months or so and came to its
15   conclusion.
16       Q. Let me show you what we will mark as Sessoms 3.
17   I would like to keep going consecutively with the
18   exhibits. It's Bates stamped 6304 through 6306.
19       (Sessoms Exhibit No. 3, Letter to Wendell
20   Gorum Dated March 5, 2004, was marked for
21   identification.)
22   BY MR. ZEFF:
23       Q. I have handed you what we have marked as Sessoms
24   3. It's dated March 5, 2004. The letter you were

43

1    talking about suspending Dr. Gorum, you said you
2    believed it was April, 2004. Does this refresh your
3    recollection as to when it was?
4        A. Yes. March, 2004.
5        Q. And did you have any discussions with Dr. Bell
6    about what should be done with Dr. Gorum?
7        A. There were recommendations to me. They weren't
8    discussions.
9        Q. Who made recommendations to you?
10       A. Dr. Bell.
11       Q. Anybody else?
12       A. Not that I'm aware.
13       Q. Did Dr. Frederick make any recommendations to
14   you?
15       A. I didn't speak to Dr. Frederick about this
16   matter.
17       Q. Did you speak to Dr. Frederick at any time about
18   Dr. Gorum's grade changes?
19       A. No.
20       Q. If Dr. Frederick said that you did speak to him
21   about —
22       A. His recollection is different than mine. I
23   don't recall.
24       Q. In the process of going through something like

44

1    this, would you, in the normal course, speak to the dean
2    of the professor?
3        A. Not during an investigation. When there is an
4    investigation, I absent myself from the process.
5        Q. And that would be your policy?
6        A. Yes.
7        Q. Why is that?
8        A. Because I'm not going to interfere with anybody
9    else's investigation.
10       Q. So it would be against your policy then to talk
11   to Dean Frederick in regard to this?
12       A. If it came up inadvertently, maybe. But I don't
13   recall any conversation with anyone about this process
14   except occasional discussions with the board and with
15   Mr. Farley and then the initial discussion with the
16   registrar and Kim Walker about what they discovered.
17       Q. And Dr. Bell?
18       A. And Dr. Bell. That was not an initial
19   discussion. Dr. Bell was informed when I was informed.
20       Q. Did Dr. Bell have a recommendation?
21       A. I don't recall. He may have.
22       Q. How many times did you talk to Dr. Bell, if you
23   can recall?
24       A. I talk to Ken about two or three times a week.

45

1    Sometimes once a day. And I do not recall any
2    discussions with Dr. Bell.
3        Q. Or how many times?
4        A. I don't know.
5        Q. How about the board, how many times did you talk
6    to the board about this?
7        A. When we discovered there was an issue, the board
8    was informed that we had this problem. The board was
9    informed of the process that we were going to have to go
10   through. And the board was kept apprised of the
11   process, of the state of the process.
12       Q. By whom?
13       A. By me and by the counsel. Mark Farley and I
14   briefed the Board. And I can't remember who briefed
15   what in executive session. Probably mostly Mark Farley
16   did the briefing because it's a legal matter.
17       Q. The information to the board was simply an
18   investigation was going forward?
19       A. The nature of the investigation, that there were
20   these grade changes, that there might be implications
21   beyond just the grade changes. There was this process
22   that we put in place that Dr. Gorum was, in fact,
23   suspended, that due process was being afforded and they
24   would be informed at the end of the process what the

12 (Pages 42 to 45)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

46

1  outcome was.
2      Q.  Did you share with the board Sessoms 3, this
3  letter of March 5, 2004?
4      A.  I didn't share with the board and I don't share
5  with the board legal documents that counsel may have. I
6  don't keep copies of these documents. I have nothing to
7  share.
8      Q.  You think counsel may have -- are you referring
9  the Mark Farley?
10      A.  Mark Farley may have. I don't recall whether he
11  did or not.
12      Q.  Were you involved at all in the selection of the
13  ad hoc committee?
14      A.  No.
15      Q.  Who was?
16      A.  I don't know. There is a process in the CBA,
17  whatever the process was. It might have been the
18  provost and counsel. But I don't know that for sure
19  because I wasn't involved at all.
20      Q.  And were you informed at all during the hearing
21  process of what was going on in the hearing other than
22  through counsel?
23      A.  No.
24      Q.  Prior to appearing at the hearing, did you

47

1  review any documents in preparation for the hearing?
2      A.  I don't recall. I don't recall. I have no
3  idea.
4      Q.  After the hearings, there were a number of
5  documents generated. There was a brief that I prepared,
6  a brief that your counsel prepared. There was extensive
7  notes of testimony, transcripts. And there was a report
8  by the committee itself. Did you review any of that
9  documentation?
10      A.  The only documentation I would have reviewed was
11  the report by the committee, its final report.
12      Q.  Did you do that?
13      A.  I did it, yes. I don't recall when. I
14  certainly did it.
15      Q.  And did you have any discussions with anyone
16  about that committee report other than your counsel?
17  Let me caution you that conversations with your counsel,
18  please, don't tell me. And I'm not going to keep
19  repeating that.
20      A.  Okay. No.
21      Q.  Have you become aware, at any time, that the
22  report by the committee may not have been the consensus
23  of the committee?
24      A.  I only have the report of the committee and

48

1  that's the report of the committee as far as I knew and
2  know.
3      Q.  Have you learned from any source that that may
4  not be the report in consensus of the committee?
5      A.  I have no knowledge of any statement except that
6  is the report of the committee. I have no knowledge of
7  anything beyond that.
8      Q.  So we are clear, let me show you Smith 2. This
9  is the report we are talking about, the report of the ad
10  hoc committee dated --
11      A.  Yes.
12          MR. DURSTON: It's not dated. That's the
13  problem.
14  BY MR. ZEFF:
15      Q.  But marked Smith 2?
16      A.  Yes, this is the report of the ad hoc committee.
17      Q.  Let me turn your attention to Roman Numeral III.
18  It says committee members. I wanted to ask you a couple
19  questions about the committee members.
20          Prior to their participation in this hearing
21  where you appeared, did you have any interaction with
22  any members of this committee other than their normal
23  role as a faculty member?
24      A.  No.

49

1      Q.  Did you know any of them on a personal level
2  before this?
3      A.  I don't know any faculty on a personal level.
4      Q.  Let's go through the report a little bit. When
5  was the last time you looked at this report?
6      A.  A year ago, year-and-a-half ago.
7      Q.  Have you reviewed any documents in preparation
8  for today's deposition?
9          MR. DURSTON: You can answer that.
10          THE WITNESS: Just the letters. I did not
11  review this document.
12  BY MR. ZEFF:
13      Q.  I'm going to ask you some questions about
14  specific areas of this document. If you want to read
15  the whole thing, if you want to read portions of it,
16  feel free to do so as we go along. I don't want to try
17  to take anything out of context or confuse you with
18  that. Please, take your time and read it if you need
19  to.
20      A.  Thank you.
21      Q.  I would first like you to go to Page 15. The
22  top paragraph, it's actually the last sentence. It's a
23  long one. It says, "This committee questions why
24  Mr. Parker or the administration selectively chose to

13  (Pages 46 to 49)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

---

50

1  only pursue the violations by Dr. Gorum while neglecting
2  violations of other chairs and administrators and even
3  members of his office who had, in one way or another,
4  taken part in, condoned or assisted in the devaluation
5  of DSU educational system."
6      When you first red that a year ago or more,
7  did you do anything based on that sentence and that
8  information?
9      A. That sentence is an assertion. It doesn't
10  contain any specific information. I didn't know what
11  they were talking about.
12      Q. Did you feel it was important to find out what
13  they were talking about?
14      A. We had and have an ongoing investigation into
15  allegations of grade changes and fraud in this
16  university. It continues to this day.
17      Q. Who is in charge of that investigation?
18      A. Mr. Farley.
19      Q. And, to your knowledge, who is being
20  investigated?
21      A. I don't know who is being investigated. It's an
22  investigation. If there are allegations that people
23  have made against certain individuals, those allegations
24  are pursued. But I'm not sure who those allegations are

---

52

1  investigations?
2      A. My knowledge is that the investigations are
3  ongoing. If there were determinations that were being
4  made, I presumed they would be brought to my attention.
5  Since they haven't been, the investigations, to my
6  knowledge, are ongoing.
7      Q. So, to your knowledge, this investigation has
8  been going on since March of 2004?
9      A. These investigations have been going on since it
10  was first brought to our attention. And we are looking
11  at every allegation with great seriousness.
12      Q. And let me point out to you, in March, 2004, you
13  suspended Dr. Gorum. And so you had knowledge of these
14  allegations as of March, 2004, correct?
15      A. I beg your pardon?
16      Q. As of at least March --
17      A. No. When Dr. Gorum was suspended, we had
18  evidence. We had indisputable evidence that, in fact,
19  he had changed grades. We have clearly not gotten
20  indisputable evidence that anyone has changed grades or
21  they would have been treated exactly the same way.
22      Q. To your knowledge, what is being investigated?
23      A. I can't tell you more than what I just said.
24      Q. Do you have knowledge of how the registrar's

---

51

1  against. It's not my business.
2      Q. When did that investigation first commence?
3      A. Immediately upon my knowledge from Kim Walker
4  and Glenn Parker that there were grade changes.
5      Q. So at the same time the investigation into
6  Dr. Gorum was commenced, an investigation generally into
7  grade changes --
8      A. Into all grade changes. Because we didn't know
9  when the grade changes originated, who made the grade
10  changes. We had no idea. So we investigated grade
11  changes.
12      Q. Has Mr. Farley reported to you on the progress
13  of his investigations?
14      A. Yes.
15      Q. How often does he do that?
16      A. When he has something to say.
17      Q. What is the current status of that
18  investigation?
19      A. Those investigations are ongoing.
20      Q. Do you know what the current status is, how
21  close to completion of the investigation they are?
22      A. I know that the investigation is ongoing.
23      Q. Has anything been brought to your attention as
24  to any facts or information related to those

---

53

1  office operates?
2      A. The registrar's office operates in very
3  complicated ways. And I do not have detailed knowledge
4  about the registrar's office. They report to the
5  provost. We have made improvements in the reporting.
6  We have made improvements in software. So, no, I do not
7  have detailed knowledge of how the registrar's office
8  operates.
9      Q. When did this investigation into other persons
10  besides Dr. Gorum changing grades begin?
11      A. When the investigation into Dr. Gorum changing
12  grades began.
13      Q. So that would be sometime on or around March of
14  2004?
15      A. That letter was written well into the
16  investigation when there was sufficient evidence to
17  demonstrate that Dr. Gorum had, in fact, changed grades.
18  That doesn't happen overnight. The investigation had
19  been taking place for some time. This was the first
20  concrete evidence that the grades had been changed by a
21  faculty member. All the other evidence is not concrete
22  except in this case so far. If we find other evidence
23  that is concrete, we will act exactly the same way.
24      Q. Have you been made aware of any evidence

---

14  (Pages 50 to 53)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

**54**

1 relating to any other grade changes that were less than
2 appropriate other than Dr. Gorum?
3    A. I do not market in rumor or innuendo. I only
4 market in fact. And there have been no facts brought to
5 my attention that there have been grade changes of other
6 faculty members of this nature.
7    Q. So would it be fair to say then that the
8 investigation into faculty members, staff,
9 administration condoning or assisting in the changing of
10 grades outside of the standard policy and procedure has
11 been something that's been going on since before
12 March 5th of 2004?
13    A. It's been going on since the issue was brought
14 to my attention by Miss Walker and the registrar
15 sometime prior to the time that letter was written.
16    Q. The letter of March 5, 2004?
17    A. Correct.
18    Q. And what is taking so long?
19    A. What took so long in Dr. Gorum's case? One has
20 to be very careful to get the facts right because we're
21 dealing with reputations. We are dealing with degrees.
22 We are dealing with certainties and uncertainties. We
23 are dealing with a process which is transparent, which
24 is deliberate, which is defined in the Collective

**56**

1 the grade changes unless it's done correctly. We
2 discussed this and other academic issues to try to
3 improve business processes. This is a business process
4 improvement just like buying paper. It's a business
5 process improvement just like ensuring that students can
6 get bills on time. There is a business process. This
7 is a business. That's one of the aspects of business.
8    And we are improving the business process.
9 We have experts helping us improve the business process
10 across the board. And this is just one of the business
11 processes that needs improvement. We have to go from a
12 purely paper system to an electronic system. There is a
13 reason for that. You don't lose electronic files.
14 Sometimes you lose paper. Inadvertence happens. And we
15 are making sure inadvertence is not the norm.
16    Q. Has someone involved with this investigation
17 come to you and said that there are forms that weren't
18 filled out properly and that have been lost?
19    A. No, no one has said specifically here's some
20 forms that have been filled out improperly or here's
21 papers that have been lost. They said there are some
22 issues down there. We are cleaning them up. Students
23 have lost grades. We are cleaning them up. I said,
24 okay, fine, fix it.

**55**

1 Bargaining Agreement and in Professional Ethics and you
2 take your time. Because once you come to a conclusion,
3 it's got to be definitive.
4    Q. This investigation has been ongoing for over
5 three years?
6    A. Yes. It's a continuing investigation.
7    Q. To your knowledge, has the investigation — and
8 the investigation I'm talking about is into others
9 rather than Dr. Gorum. Has the investigation yielded
10 any irregularities of any kind in the registrar's
11 office?
12    A. I just gave you my answer. Irregularities have
13 to be defined. We have seen papers lost. We have seen
14 forms not filled out completely, properly that had to go
15 back and be filled out properly. We have not seen any
16 indications of fraud except in this case.
17    Q. You just described some forms and papers that
18 were lost.
19    A. Displaced. We lose papers all the time.
20    Q. How was that reported to you?
21    A. It wasn't reported to me. I was informed that
22 there are problems with some of the forms, that the
23 provost caught some of them that weren't signed
24 properly, sent them back to the dean. You don't approve

**57**

1    Q. Getting back to this Page 15, this statement,
2 and correct me if I'm wrong, you have not spoken to
3 anyone about this particular investigation made in this
4 report?
5    A. That's not even an allegation. It says there
6 are other bad people around here. Well, so. Who am I
7 going to talk to about that?
8    Q. Well, you could talk to the committee.
9    A. I don't talk to the committee. The committee
10 proves its report, period. The committee has spoken.
11    Q. You could ask Mr. Farley what was meant by this.
12    A. Mr. Farley is not a member of the committee.
13    Q. You could look at the transcript.
14    A. I'm not interested in looking at the transcript.
15 The only thing I care about is the final report of the
16 committee. I'm not interested in my interpretation of
17 what they said. I'm interested in their interpretation.
18 In their interpretation, and I said, okay, we got to
19 follow up on all the allegations that were made. But
20 those allegations were made well before a
21 year-and-a-half after the investigation was started. We
22 started when we found out that there was a problem. And
23 we are investigating those problems thoroughly. This
24 assertion is a statement by whoever based on whatever

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

---

**62**

1  the rules. If you are caught, you are punished, period.
2  Q. Did you find -- and let me go on to Q, which is
3  the next one. It says, "Although DSU has established
4  policies regarding student grade change, practices and
5  procedures were in such significant conflict with those
6  policies as to render them ineffective."
7  Did you look at P and Q and consider those
8  in making your determination, recommendation --
9  A. Yes.
10  Q. -- that Dr. Gorum should be terminated?
11  A. Absolutely.
12  Q. Did you find those to be mitigating factors of
13  any kind?
14  A. No.
15  Q. Why not?
16  A. You commit fraud, you commit fraud.
17  Q. Well, what led you to the conclusion that
18  Dr. Gorum committed fraud?
19  A. He admitted to committing fraud.
20  Q. Then in what way did he admit to committing
21  fraud?
22  A. He changed grades without authorization.
23  Q. When did he admit to that?
24  A. He said he didn't contest the fact that he

---

**63**

1  changed grades and he didn't have authorization.
2  Q. Without whose authorization?
3  A. Without the appropriate authorization in the
4  chain of command, without the dean's office, for
5  example. And Tommy Frederick said he did not have my
6  authorization.
7  Q. Did you talk to Tommy Frederick --
8  A. I did not talk to Tommy Frederick. I have his
9  statement.
10  Q. Are you aware that Dr. Gorum contests that, that
11  is that he says he talked to Dr. Frederick?
12  A. I also heard from the registrar the forms were
13  not executed appropriately.
14  Q. When did you hear that?
15  A. In the report.
16  Q. So was it your opinion, at the time that you
17  made this decision, that Dr. Frederick was telling the
18  truth and Dr. Gorum was lying?
19  A. It is my opinion and it remains my opinion that
20  any faculty member that changes grades inappropriately
21  does not belong at the university for whatever reason.
22  Q. Inappropriate meaning what?
23  A. Changing other people's grades without
24  consulting with them, in other words, calling their

---

**64**

1  faculty colleagues incompetent because why should you
2  believe that you gave a grade that's any good. I'm not
3  going to ask you. I'm going to change it. That's
4  fraud. Because there may be other inducements. I don't
5  know. But it's fraud.
6  Q. Sitting here today, do you have a recall of any
7  of the reasons why Dr. Gorum stated that he changed any
8  of these grades?
9  A. No. And it doesn't matter to me.
10  Q. Why not?
11  A. Because it's fraud. I murdered my wife because
12  she made me angry. I don't care. You murdered your
13  wife. What difference does it make? There are no
14  mitigating factors.
15  Q. If Dr. Gorum was told to do it this way, that's
16  not a mitigating factor?
17  A. If you are told to murder somebody and you kill
18  them, is that a mitigating factor?
19  Q. And that's what you equate what Dr. Gorum did,
20  to that type of situation?
21  A. It undermines entirety the integrity of the
22  institution.
23  Q. Don't you think if the dean told him to do that
24  that the dean was doing something wrong too?

---

**65**

1  A. The dean was doing something wrong too, but it
2  does not recuse Dr. Gorum from doing it.
3  Q. Were you on notice, at any time, that there was
4  an allegation against the dean that he told Dr. Gorum to
5  do this and he told students that Dr. Gorum was going to
6  handle the grade change situation?
7  A. All such allegations have been investigated and
8  proven not true.
9  Q. Who investigated that allegation?
10  A. All investigations have been investigated by the
11  office of counsel.
12  Q. Which counsel, Mr. Farley?
13  A. Yes.
14  Q. Mr. Farley investigated whether or not --
15  A. Mr. Farley investigated whatever there was to be
16  investigated. I didn't investigate anything.
17  Q. Do you know whether Mr. Farley investigated
18  whether or not Dean Frederick did anything wrong with
19  regard to grade changes?
20  A. Mr. Farley investigated all the circumstances
21  surrounding these events.
22  Q. Did you ever talk to Mr. Farley?
23  A. I did not talk to Mr. Farley. My conclusion is
24  if Mr. Farley were to have found a wrongdoing,

---

17 (Pages 62 to 65)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

---

**66**

1  Mr. Farley would have told me. Mr. Farley having not
2  told me did not find wrongdoing. But you can consult
3  with Mr. Farley to determine the statement of mine is
4  correct.
5      Q. To your knowledge, Mr. Farley may or may not
6  have investigated anyone?
7      A. I didn't say that. Mr. Farley investigated all
8  the events surrounding this.
9      Q. And has he completed that investigation?
10     A. I am not aware of whether he has completed it in
11  its entirety. But I am aware that he completed it to
12  the extent that he made his determination.
13     Q. Did you ever talk to Mr. Farley about whether or
14  not Dean Frederick did anything wrong as it related to
15  these changes?
16     A. I asked Mr. Farley to investigate all
17  allegations.
18     Q. Did you ever discuss with Mr. Farley or anyone
19  else, other than counsel, these findings P and Q of the
20  ad hoc committee?
21     A. In specific terms, no.
22     Q. In general?
23     A. In general terms, I spoke about the university
24  not being as good as it should be, not having business

**67**

1  processes in place that it needs across the boards, not
2  just in these areas but in general. And we have spent
3  several millions of dollars improving our business
4  process as soon as I arrived because of that.
5      Q. In what way did you spend millions of dollars?
6      A. In business process improvements.
7      Q. What type of improvements?
8      A. Across the board.
9      Q. Any of those related to the registrar's office?
10     A. They are related to everything in the
11  university, including enrollment, which relates to the
12  registrar's office, including transmission of financial
13  aid packages to students, including the financial aid
14  office, including making sure that students get their
15  transcripts on time involves the registrar's office.
16  There are all sorts of things.
17     Q. Turning to the same page, 18, there is a
18  statement in the committee's recommendation. Is it
19  says, "We strongly feel that Dr. Gorum's case is the tip
20  of the iceberg. And he is, in fact, a scapegoat, albeit
21  a blamable scapegoat, whose investigation we hope has
22  uprooted the roots of the poisonous tree and brought
23  down all the poisonous fruit. We hope so."
24     Did you ever investigate that statement?

**68**

1      A. I can't investigate a statement.
2      Q. Well, you can investigate a statement if someone
3  tells you that someone is being scapegoated. You can
4  look into that.
5      A. No one is being scapegoated in any of this. I
6  came here -- the university was not going to be
7  continuing to perform the way it was. We have rules.
8  We are enforcing the rules, period. He's the first one
9  that got caught. I'm waiting for the second. I'm
10  waiting for the third. He got caught. He's being
11  punished. The excuse that we have been speeding down
12  the highway for years and nobody enforced the law is not
13  an excuse. He's not a scapegoat. We got him first.
14  Fine. There will be second. There will be third.
15     Q. Just so we are clear, no one else has been
16  brought up on any charges relating to changing grades
17  since Dr. Gorum?
18     A. Because there has been no evidence provided that
19  those grade changes had been of this nature.
20     Q. But it's true, no one else has been brought up
21  on charges of any kind related to changing grades?
22     A. For the reasons that I just stated. I'm not
23  aware of certainly any faculty member. I don't know if
24  staff members were discharged because of complicity in

**69**

1  this. I don't know.
2      Q. I'm asking has anyone other than Dr. Gorum --
3      A. I just gave you my answer.
4      Q. Staying on this page, when you discharged
5  Dr. Gorum and went to the board -- let me show you what
6  has been previously marked as Smith 1 -- you presented
7  that to the board?
8      A. Yes.
9      Q. It's dated 4/14/05. When you presented this to
10  the board, there was an executive session in which you
11  were questioned about your recommendations?
12     A. Yes.
13     Q. Do you recall that?
14     A. Yes.
15     Q. That happened April 14th, '05?
16     A. Correct.
17     Q. Did the board ask you any questions about P and
18  Q on the report of the Ad Hoc Dismissal Committee?
19     A. Not that I recall specifically.
20     Q. Did they ask you anything about the scapegoat
21  issue, that is the scapegoat comment on Page 18?
22     A. I don't recall that specifically either.
23     Q. And did you attend the entire executive session
24  where the discussions were held about the

---

18  (Pages 66 to 69)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

**70**

1  recommendation?

2  A. Yes.

3  Q. Was there anyone else present other than

4  yourself and the board?

5  A. Mark Farley.

6  Q. Who answered the board's questions?

7  A. We both did.

8  Q. Do you recall Mark Farley addressing any issues

9  related to P, Q or the scapegoat topic?

10  A. I don't recall those issues being addressed

11  specifically.

12  Q. Do you recall any issues that were discussed in

13  the executive session?

14  A. Yes.

15  Q. Tell me what you can recall.

16  A. Are we sure the grades were changed? Did

17  Dr. Gorum admit to grade changes? Why did he make the

18  changes? No one has any answer why Dr. Gorum did the

19  grade change because no one was told why he did the

20  grade changes. Is this action appropriate? What would

21  happen at other universities had someone done this?

22  What are other universities' experiences in this regard,

23  those type.

24  Q. How long were the questions and answers going on

**71**

1  for?

2  A. Maybe half an hour, 45 minutes.

3  Q. You mentioned the question was asked of you why

4  did Dr. Gorum make these changes.

5  A. Uh-huh.

6  Q. Did you respond to that question?

7  A. Yeah. I said I have no idea.

8  Q. Prior to going in front of the board to discuss

9  that issue, did you ever ask anyone why Dr. Gorum or

10  what Dr. Gorum's reasons were?

11  A. You know, the only person who could answer the

12  question is Dr. Gorum. I didn't talk to him.

13  Q. Why not?

14  A. Because I didn't talk to him. He was suspended.

15  Q. Did you feel that as president of the

16  university, one who was making a recommendation, that it

17  would be appropriate to talk to him to find his version

18  of the story?

19  A. If Dr. Gorum wished to present his version of

20  the story, he could have asked for an appointment with

21  me.

22  Q. So it was up to Dr. Gorum to come to you to give

23  you his side of the story?

24  A. If Dr. Gorum is being sanctioned and he thinks

**72**

1  it's unfair, the answer is absolutely, yes.

2  Q. You don't feel it's appropriate for you to talk

3  to Dr. Gorum without him asking you first; he has to

4  come to you?

5  A. I came with the evidence. I sent Dr. Gorum a

6  not, you are suspended. If he thought it was unfair, he

7  should have said that's unfair. I want to talk to you

8  about it. So I assume he thought it was fair.

9  Q. In presenting this matter to the board, what

10  documents did you present to the board on April 14,

11  2005?

12  A. The board had the report and I think access, if

13  they desired, to the whole transcript stuff and

14  everything else.

15  Q. Do you know whether or not the whole transcript

16  and stuff was provided or whether they were just offered

17  access to it?

18  A. Well, this is voluminous. You are not going to

19  present a thousand pages to each board member. They

20  were made aware they were there and they could have

21  access.

22  Q. Did anyone ask for it?

23  A. I'm not aware that if anybody asked for it.

24  Q. If somebody asked for it, would that be

**73**

1  something you would remember?

2  A. I don't know whether I would remember or not.

3  Q. So the board was presented with your letter of

4  April 14, 2005, and the report of the ad hoc committee?

5  A. Yes.

6  Q. And, to your knowledge, nothing else?

7  A. I didn't say that. I said that's what they were

8  given and provided access, if they wanted, to the other

9  documentation.

10  Q. I understand that. But the documents they were

11  given were these two documents?

12  A. Correct.

13  Q. They were told if they wanted access to other

14  documents they could have them?

15  A. Yes. The other documents may have, in fact,

16  been in the room. I don't know.

17  Q. When you went to the board on April 14, 2005,

18  did you have an understanding of what Dr. Gorum's

19  reasons were for why he changed those grades?

20  A. I answered that question before. I have no idea

21  why Dr. Gorum changed the grades.

22  Q. Did you have access to the same documents that

23  the board did?

24  A. The only documents I chose to read, this one.

19 (Pages 70 to 73)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

74

1   Q. Indicating the report?
2   A. I didn't look at anything else.
3   Q. Why not?
4   A. Because I didn't want to look at anything else.
5   Q. Why not?
6   A. Because this is the final report of the
7   committee and it took a year-and-a-half and half a
8   million dollars. That's the best they could do? That's
9   what I read.
10  Q. You say it cost half a million dollars?
11  A. Yes.
12  Q. What is the basis for that?
13  A. It took them out of the classroom, the time it
14  took for counsel and the expense of counsel. That's a
15  lot of money.
16  Q. In your letter of 4/14/05, you mentioned that
17  the rest of the record, including the transcript and
18  exhibits is available, and you also mention that copies
19  of the briefs from Dr. Gorum and counsel were available.
20  A. Yeah.
21  Q. Why did you make the copies of the briefs
22  available?
23  A. We do not keep anything from the board. They
24  are available if the board wants them.

75

1   Q. Were you concerned that the board was going to
2   be getting information and reviewing information that
3   you hadn't reviewed before you went in front of them?
4   A. I wasn't concerned at all.
5   Q. Why not?
6   A. Because I had the final report. That's what I
7   based my judgment on.
8   Q. Had you ever had any discussions with Dr. Ackah
9   about this report?
10  A. I haven't had discussions with Dr. Ackah about
11  anything.
12  Q. How about Dr. Toscano?
13  A. Nothing except Italian wines.
14  Q. Dr. Gwamesia?
15  A. I don't even know who he is.
16  Q. Dr. Davis?
17  A. Don't know who is he is.
18  Q. Dr. Edward Jackson?
19  A. Don't know who he is.
20  Q. Let me turn your attention to the last page of
21  your memo, which is Page 3. By the way, did you prepare
22  this memo?
23  A. I beg your pardon? I signed this memo.
24  Q. Did you prepare it, write it?

76

1   A. I signed the memo. It was reviewed by counsel.
2   I don't know. I write a lot of things. I review a lot
3   of things. This is a legal memo. It's reviewed by
4   counsel.
5       MR. DURSTON: Objection to any further line
6   of questions besides what he answered.
7   BY MR. ZEFF:
8   Q. I would like to know whether or not —
9   A. I can't tell you.
10  Q. Let me finish the question before you can't tell
11  me. Is it true that you cannot tell me whether or not
12  you drafted this memo or someone else drafted it for
13  you?
14  A. I can guarantee you that I don't recall who
15  drafted this memo. If I'm reading this memo, it's full
16  of legal language. It's unlikely that I started it
17  myself.
18  Q. But it did come from you?
19  A. Correct. I signed it.
20  Q. You did sign it, okay. It says, "The brief of
21  the university's attorney — do you see where it says
22  that?
23  A. Of course.
24  Q. — addresses the evidence of past practice. I

77

1   believe the committee has somewhat selectively cited
2   evidence that is not reflective of the policies of DSU
3   under past administrations." What did you mean by that?
4   A. I meant that there is a lot of innuendo in this
5   place and lot of rumor about favors. When I arrived,
6   the only indications I got from faculty was that
7   Dr. DeLauder had favors. He did favors for people, not
8   to mention people were treated unfairly. And if
9   somebody did something wrong and they were a friend of
10  Dr. DeLauder's they got away it. If they were his
11  enemies, they got punished. That's what people were
12  saying. They gave no evidence, no specifics, never
13  named a name. So that's what I meant. Rumor, innuendo,
14  it's something that happens in academics all the time.
15  Q. Had you read the brief of the university's
16  attorney as it related to evidence of past practice?
17  A. I looked at it, yeah.
18  Q. And what was your understanding of what the
19  allegations relating to past practice were and what the
20  university's position was?
21  A. The allegations were that the university didn't
22  follow its own rules and the answer of the university,
23  in general, did follow its rules.
24  Q. Were you aware, based on that allegation, of

20  (Pages 74 to 77)

A-000180

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

### 78

1  what testimony or evidence was supposed to demonstrate
2  that the university was not following its own rules?
3      A. I have no idea.
4      Q. Were you aware that the former Provost Tolliver
5  stated the rules were not being followed?
6          MR. DURSTON: Objection to form. Objection
7  to the characterization of the testimony. You can
8  answer.
9          THE WITNESS: I don't know anything about
10  former Provost Tolliver. I never met him. I don't know
11  anything about him.
12          (Sessoms Exhibit No. 4, Post Hearing Brief,
13  was marked for identification.)
14          (Thereupon, a brief recess was had.)
15  BY MR. ZEFF:
16      Q. I have handed you Sessoms 4 Bates stamped 3690
17  through 3711. And it is Wendell Gorum's post hearing
18  brief. Have you ever seen this document before?
19      A. I don't recall this document.
20      Q. I wanted to ask you a few questions about some
21  of the information contained in here. And it's cited to
22  the transcript. If you would like, I have the
23  transcript as well here. Starting with Page 4, Number
24  4, it discusses some of Joyce Bowers' testimony. Joyce

### 79

1  Bowers is the assistant to the registrar's office.
2          MR. DURSTON: Before you start the question,
3  I will lodge a general objection to relevance, any
4  questions concerning material or testimony that was not
5  known to the president at the time. The president
6  already said he did not look at the briefs or the
7  testimony. And I will lodge a general objection. I
8  will not repeat but object to the entire line of
9  questioning. He didn't look at it. He didn't know
10  about it. It's not relevant to his motives in this case
11  for termination.
12  BY MR. ZEFF:
13      Q. I recognize the objection and I will ask the
14  question anyway.
15          Were you aware, sir, that Joyce Bowers
16  testified that it's never been a problem for a chair to
17  sign for an instructor regarding grade changes?
18      A. I don't know who Joyce Bowers is.
19      Q. Were you aware that anyone testified that way
20  from the registrar's office?
21      A. No.
22      Q. Were you aware that, in the fall of 2003,
23  Mr. Parker reviewed all the grade change forms and
24  didn't take any action against anyone?

### 80

1      A. No.
2      Q. Were you aware that there were problems with
3  purges and registration that were going on in 2003?
4      A. Yes.
5      Q. Did you know what it was that the deans and the
6  chairs of departments were doing to rectify the purge
7  problem?
8      A. No.
9      Q. Were you aware that Dr. King stated that the
10  Dean Frederick knew that chairs were signing grade
11  change forms without his —
12          MR. DURSTON: Objection. Finish.
13  BY MR. ZEFF:
14      Q. — without his signature?
15          MR. DURSTON: Objection to the form and
16  mischaracterizes the testimony.
17          THE WITNESS: I'm not aware of anything that
18  Dr. King said.
19  BY MR. ZEFF:
20      Q. Are you aware of anything that Dr. Tolliver
21  said?
22      A. No.
23      Q. Are you aware of anything that Dr. Frederick
24  said?

### 81

1      A. No.
2      Q. Are you aware of anything that Dr. Gorum said?
3      A. No.
4      Q. I may have gone through this before, but as to
5  Mr. Morris, correct me if I'm wrong, you had no
6  involvement regarding his discipline or whether or not
7  he came back to campus, was expelled, suspended or
8  anything like that?
9      A. No.
10      Q. The answer is, no, you did not?
11      A. No, I did not.
12      Q. Thank you.
13          MR. ZEFF: I don't have anything else.
14  Thank you.
15          MR. DURSTON: No further questions. Read
16  and sign.
17          (Thereupon, the deposition concluded at
18  12:00 p.m.)
19          - - - - -
20          INDEX TO TESTIMONY
    ALLEN SESSMS, Ph.D                PAGE
        Examination by Mr. Zeff        2
21          - - - - -
          INDEX TO EXHIBITS
22  SESSOMS DEPOSITION EXHIBIT NO.         PAGE
23  Sessoms Exhibit No. 3, Letter to Wendell    42
    Gorum Dated March 5, 2004
24  Sessoms Exhibit No. 4, Post Hearing Brief    78

21  (Pages 78 to 81)

Gorum v. Sessoms and Board of Trustees of Delaware State University

82

1
2
3
4
5
6
7
8          REPLACE THIS PAGE
9
10         WITH THE ERRATA SHEET
11
12         AFTER IT HAS BEEN
13
14         COMPLETED AND SIGNED
15
16         BY THE DEPONENT.
17
18
19
20
21
22
23
24

83

State of Delaware )
            )
New Castle County )
          CERTIFICATE OF REPORTER
     I, Anne L. Adams, Registered Professional
Reporter and Notary Public, do hereby certify that there
came before me on the 28th day of June, 2007, the
deponent herein, ALLEN SESSOMS, Ph.D, who was duly sworn
by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed into
typewriting under my direction.

     I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

     I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                    Anne L Adams

          Anne L. Adams
          Certification No. 105-RPR
          (Expires January 31, 2008)

22 (Pages 82 to 83)



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Gorum

## v.

# Sessoms and Board of Trustees of Delaware State University

### C.A. # 06-565-GMS

---

## Transcript of:

## Akwasi Osei, Ph.D.

## June 28, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A-000183

Gorum v. Sessoms and Board of Trustees of Delaware State University

1

IN THE UNITED STATES DISTRICT COURT.
FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,            )
                                 )
          Plaintiff,             )
                                 )
v.                               )    Civil Action No.
                                 )    06-565-GMS
ALLEN L. SESSOMS, Ph.D.,         )
     and                         )
BOARD OF TRUSTEES OF DELAWARE )
STATE UNIVERSITY,                )
                                 )
          Defendants.            )

          Deposition of AKWASI OSEI, Ph.D., taken
pursuant to notice at the Delaware State University,
Administration Building, 1200 N. DuPont Highway, Dover,
Delaware, beginning at 1:00 p.m. on Thursday, June 28,
2007, before Anne L. Adams, Registered Professional
Reporter and Notary Public.

APPEARANCES:

          GREGG L. ZEFF, ESQ.
          FROST & ZEFF
            Pier 5 at Penns Landing
            7 North Columbus Boulevard
            Philadelphia, Pennsylvania  19106-1492
            for the Plaintiff,

          ROBERT DURSTON, ESQ.
          SAUL EWING LLP
            2600 Virginia Avenue, N.W.
            The Watergate - Suite 1000
            Washington, D.C.  20037-1922
            for the Defendants.

ALSO PRESENT:  Wendell Gorum, Ph.D.
               Kenneth Bell

----------------------------------------------------
              WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                 (302) 655-0477
                 www.wilfet.com

A-000184

Gorum v. Sessoms and Board of Trustees of Delaware State University
Akwasi Osei, Ph.D

2

1    AKWASI OSEI, Ph.D.,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    EXAMINATION
6    BY MR. ZEFF:
7    Q. Good afternoon, doctor. My name is Gregg Zeff.
8    I represent Wendell Gorum in a lawsuit that's been
9    brought against the president of this university. We
10   are here today for your deposition. Have you ever had a
11   deposition before?
12   A. Yes, unfortunately.
13   Q. Just some quick instructions. Everything I say
14   is being taken down by the court reporter. There is a
15   transcript that's made of these proceedings that may be
16   used at the time of trial. So it's very important to
17   give verbal responses.
18   A. Yes, yes.
19   Q. In addition to that, I may not ask you a great
20   question. So if you don't understand my question, don't
21   answer it. If you didn't hear it, you didn't understand
22   it, ask me and I will be glad to correct any questions
23   that you don't quite comprehend. If you do answer a
24   question, I will presume you understood it.

4

1    of the faculty senate, elected position.
2    Q. What is the faculty senate?
3    A. The faculty senate is the faculty body that has
4    a purview on academic programs, academic offerings,
5    student affairs, I believe. I haven't had to answer
6    that question in a while. But the faculty senate is
7    responsible for the university's academic programs.
8    Q. You are no longer the chair of that?
9    A. No, I'm not.
10   Q. When did you last have that position?
11   A. I last served as chair in 2004. I believe I
12   stepped aside on May, 2004.
13   Q. Now, what does the chair of the faculty senate
14   mean?
15   A. The chair of the faculty senate is the, I guess,
16   the convene of the senate. You are responsible for
17   organizing the affairs of the senate. There is a
18   constitution that spells all that out. And I will refer
19   you to that for the actual duties.
20   Q. Is it fair to say the chair would be the leader
21   or the president of the senate?
22   A. Yes, yes, spokesperson also, a representative of
23   the senate, of faculty.
24   Q. Your role as chair of the senate, did you have

3

1    A. Yes.
2    Q. Are you represented by an attorney here today?
3    A. As far as I know, no. I have not had any
4    discussion about that.
5    Q. Are you employed at this time?
6    A. At Delaware State? Yes, I am.
7    Q. For how long have you been employed there?
8    A. At Delaware State, since August, 1993.
9    Q. What do you do?
10   A. I teach and I administer.
11   Q. What is your official title?
12   A. Associate professor and chair of the department
13   of history, political science and philosophy.
14   Q. How long have you been chair?
15   A. I have been performing chair duties, I believe,
16   since 2003, September, 2003. And I have been associate
17   professor since 1996. Prior to then, from '93 to '96, I
18   was assistant professor of history/political science.
19   Q. At Delaware State?
20   A. At Delaware State.
21   Q. In addition to performing those duties, do you
22   perform any other duties for the university?
23   A. I used to be for about -- and I'm not sure about
24   the years -- but about eight years or so I was the chair

5

1    any contact with Dr. Sessoms?
2    A. Yes. Well, yes.
3    Q. In what capacity or what --
4    A. In the beginning, as the faculty representative
5    to the search committee, so not just Dr. Sessoms but all
6    the other applicants. And subsequently when a decision
7    was made, as a member of his cabinet representing
8    faculty.
9    Q. Were you a member of his cabinet as the chair of
10   the faculty senate or was that a different post?
11   A. No. The chair of the senate, by definition,
12   represents faculty of the administrative counsel.
13   Q. With regard to the search involving Dr. Sessoms,
14   were there any problems relating to the presidential
15   search at that time relating to the senate itself?
16   A. Problems?
17   Q. Yeah.
18   A. I don't know.
19   Q. Let me rephrase that. Was there any debate as
20   to whether or not the search was proper?
21   A. I believe after the decision was made, I
22   believe -- my memory may not serve me -- we did have --
23   as is normal, all faculty issues, all university issues
24   are relevant for discussion of the senate. And there

2 (Pages 2 to 5)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Akwasi Osei, Ph.D

---

**6**

1   was a discussion of the senate about the search. I did
2   report to the senate during the search process. I
3   believe every month from October, '02, through May, '04,
4   I believe every month when the senate met, I reported on
5   the search process.
6       Q. And what was that discussion about?
7       A. There was a discussion about who the people are
8   that are coming in. And one of the discussions had to
9   do -- I believe there was a proposal, a motion to vote
10  for a reopening of the, among other things, a reopening
11  of the search.
12      Q. Was Dr. Gorum involved in that motion?
13      A. As I recall, I think it may have been moved by
14  somebody else. But I do believe that Wendell was one of
15  the ones who may have spoken for that. I can't recall.
16  But we do have minutes of the senate. You are talking
17  about four years ago.
18      Q. Did you have a position, that is a position on
19  the issue of whether to reopen, you personally?
20      A. No. I personally thought that that was cast. I
21  don't believe I ever had a position that it should be
22  reopened, no. But I allowed that discussion to go
23  forward.
24      Q. Was there much opposition to that motion?

---

**7**

1       A. Well, I think the result would be in the vote
2   that the senate took. And I do believe that the senate
3   voted not to go forward with that request.
4       Q. Do you know how close the vote was?
5       A. No, I don't.
6       Q. Were you ever in Dr. Sessoms' presence when any
7   discussion regarding that vote took place?
8       A. Never.
9       Q. Do you know whether Dr. Sessoms ever had any
10  knowledge of the fact that there was a vote to reopen
11  the search?
12      A. I would not have known that, no. What we did
13  was public. So I don't know for sure. But I presume
14  everybody would know.
15      Q. You presume everybody, including the president,
16  would know that?
17      A. Well, if you are on campus and -- I don't know.
18  We never discussed it. But if he knew, I wouldn't be
19  surprised because it was an open meeting.
20      Q. I want to talk to you about student affairs for
21  a moment. As both chairman of the department and
22  chairman of the senate, were you involved at all in
23  disciplining students or the process in anyway.
24      A. Just general discipline issues?

---

**8**

1       Q. Yes.
2       A. Well, as a chair, if academic issues came my
3   way, I usually referred faculty who had those issues
4   with the students to the university handbook. But as
5   chair of the senate, the student affairs committee was
6   under my purview, yes.
7       Q. And can you describe for me then, based on your
8   knowledge, what was the procedure that was employed by
9   the university when you were the chair of the faculty
10  regarding student discipline and the steps that were
11  taken before someone could be disciplined and if there
12  is any appeal process?
13      A. That's all spelled out in the handbook. The
14  senate never interfered in that. We had a student
15  affairs committee that handled all those things.
16      Q. And what was your purview of that committee?
17  What was your job?
18      A. As chair of the senate, I was ex-officio on all
19  those committees. And I was an active chair. So I did
20  go to some of those meetings when I could to make sure
21  things were happening.
22      Q. Have you ever been involved in any disciplinary
23  committee meetings or events relating to a DeShawn
24  Morris?

---

**9**

1       A. No.
2       Q. Did you ever hear anything or have any knowledge
3   of DeShawn Morris going through a disciplinary process?
4       A. The name rings a bell.
5       Q. Football player.
6       A. Yes, I recall a football player. But that's
7   about as much as I know. But individually I never had
8   any role in that disciplinary process.
9       Q. Do you have an understanding of what the process
10  itself was, that is there is a hearing before a
11  disciplinary committee --
12      A. I have an idea what the process is.
13      Q. Can you tell me what that is? When someone is
14  brought up on charges, what happens after that?
15      A. I have to consult the process. But just based
16  on knowledge, when I was chair, I think whoever is the
17  complainant goes to the student affairs, the director,
18  the judicial office to write a complaint, and then they
19  let the respondent know that this has been preferred
20  against you. And there are several bodies of student
21  affairs, judiciary committee, the faculty of student
22  affairs and then there was an appeals committee.
23      Q. Do you know ultimately, at this university, who
24  made the final decision as to whether or not someone

---

3 (Pages 6 to 9)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Akwasi Osei, Ph.D

14

1  Q. When were those changes instituted?
2  A. I don't quite recall.
3  Q. Since you have been chair though?
4  A. Yes.
5  Q. How did you find out about those changes?
6  A. From the registrars are where the changes
7  disseminated. The senate, I know that a no show policy
8  was debated at the senate and the senate agreed not to
9  go along with it and dropped it. So that's where that
10  particular one initiated, yes, at the senate.
11  Q. It's my understanding that at certain times of
12  the year after registration, students are purged
13  incorrectly, that is that they can't register for
14  courses or they are not permitted to register for
15  courses but they should be allowed to. Have you had
16  that experience?
17  A. I'm not sure exactly what --
18  Q. Where history majors would go to register for
19  courses and they would be shut out; they wouldn't be
20  allowed to register for one reason or another.
21      MR. DURSTON: Part of your question was that
22  they were correctly or incorrectly?
23  BY MR. ZEFF:
24  Q. I changed it just to make a general question

15

1  rather than a specific one.
2  A. Is the question that there were issues with the
3  purge process?
4  Q. Yes.
5  A. If that's the question, the answer is question.
6  Q. Is that something that happens at the beginning
7  of each semester?
8  A. It happens when the purge happens. I know for
9  different reasons there may have been a purge.
10  Q. And you as chair, is that part of your job
11  duties is to deal with those students that have
12  registration issues like that?
13  A. Yes. I would say yes. As a department chair,
14  part of my job is to make sure that all students who
15  have issues in my department, we handled them right.
16  Q. Back in 2003 when you became chair, were those
17  issues handled any differently than they are handled
18  today?
19  A. I wouldn't say they're handled differently. I
20  would say that I've always, when I've had an issue,
21  bring it to the attention of people who should know and
22  we move on to tackle them. So I wouldn't say there has
23  been a change in how people respond to my request.
24  Q. If a student comes to you and says I've been

16

1  improperly purged and I can't get into my history
2  classes, my major courses, what is the action that you
3  would take?
4  A. I usually would call either the registrars or
5  student accounts. Because usually it's one or the
6  other, whether they paid their money, and if they have,
7  why are they purged. Yes.
8  Q. Has there ever been a case where someone has
9  been improperly purged and should not have been purged?
10  A. I can't tell you that there was a specific
11  incident that I recall.
12  Q. Have you ever had a situation where a major in
13  your unit cannot get into a class they need to graduate?
14  A. Not in my department.
15  Q. Were you aware during the time that Dr. Gorum
16  was being disciplined that there were issues related to
17  Dr. Gorum and grade changes?
18  A. I wasn't aware of the specific issues. But I
19  was aware of disciplinary issue about grades.
20  Q. What was your understanding of what was going on
21  with him?
22  A. That there was an issue about grade changes.
23  And, again, that's not based on a discussion with
24  Wendell, just what I heard.

17

1  Q. Were you present at any cabinet meetings with
2  the president where Dr. Gorum or this issue of grade
3  changes was raised?
4  A. I do not remember. I don't remember because I
5  don't believe that ever happened. At cabinet meetings,
6  they were very worried about discussing personnel issues
7  at cabinet. In all the years I sat, the only issue I
8  may have been involved in is my own personal issues but
9  not other folks. We never discuss personnel issues.
10  Q. Did you ever have any discussions with Dr. Bell
11  about Dr. Gorum's issues?
12  A. I don't recall. I don't recall ever asking
13  Dr. Bell in his position as the dean or VP about that
14  specific issue.
15  Q. Did you ever have any discussions with
16  Dr. Sessoms about Dr. Gorum --
17  A. Never.
18  Q. -- about any issue related to Dr. Gorum?
19  A. Never.
20  Q. Did you ever discuss Dr. Gorum with
21  Dr. Frederick?
22  A. I discussed -- there was a personal -- not
23  personnel -- personal situation between Dr. Gorum and I
24  did ask Dr. Frederick about it. It was the three of us.

5  (Pages 14 to 17)

Gorum v. Sessoms and Board of Trustees of Delaware State University

18

1   Some issue that I didn't understand and I did ask
2   Dr. Frederick.
3       Q.  Tell me what you can recall about that.
4       A.  Nothing at all. I can't tell you what the issue
5   was.
6           MR. ZEFF:  I don't have anything else.
7           MR. DURSTON:  No further questions. Doctor,
8   you have the right -- she's going to write up a
9   transcript. You have the right to either read it to
10  make sure it's accurate or to not, but that's your right
11  and it will be available here if you would like to do
12  that. Let us know.
13          THE WITNESS:  Yeah, I would like to.
14      (Thereupon, the deposition concluded at 1:25
15  p.m.)
16          - - - - -
17      INDEX TO TESTIMONY
18

    AKWASI OSEI, Ph.D.              PAGE
19
    Examination by Mr. Zeff          2
20
21
22
23
24

20

State of Delaware )
                  )
New Castle County )
        CERTIFICATE OF REPORTER
    I, Anne L. Adams, Registered Professional
Reporter and Notary Public, do hereby certify that there
came before me on the 28th day of June, 2007, the
deponent herein, AKWASI OSEI, Ph.D., who was duly sworn
by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed into
typewriting under my direction.

    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                    Anne L Adams

                Anne L. Adams
                Certification No. 105-RPR
                (Expires January 31, 2008)

19

1
2
3
4
5
6
7
8       REPLACE THIS PAGE
9
10      WITH THE ERRATA SHEET
11
12      AFTER IT HAS BEEN
13
14      COMPLETED AND SIGNED
15
16      BY THE DEPONENT.
17
18
19
20
21
22
23
24



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Gorum

# v.

# Sessoms and Board of Trustees of Delaware State University

## C.A. # 06-565-GMS

---

## Transcript of:

# Wendell Gorum, Ph.D.

### Volume # 1

### June 6, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A-000189

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., | ) VOLUME ONE |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action |
| v. | ) No. 06-565-GMS |
| | ) |
| ALLEN L. SESSOMS, Ph.D., | ) |
| | ) |
| and | ) |
| | ) |
| BOARD OF TRUSTEES OF | ) |
| DELAWARE STATE UNIVERSITY, | ) |
| | ) |
| Defendants. | ) |

        Deposition of WENDELL GORUM, Ph.D. taken pursuant to notice at the law offices of Saul Ewing LLP, 222 Delaware Avenue, Suite 1200, Wilmington, Delaware, beginning at 10:10 a.m., on Wednesday, June 6, 2007, before Kurt A. Fetzer, Registered Diplomate Reporter and Notary Public.

APPEARANCES:

        GREGG L. ZEFF, ESQ.
        FROST & ZEFF
          Pier 5 at Penns Landing
          7 North Columbus Boulevard
          Philadelphia, Pennsylvania  19106-1492
          For the Plaintiff

        ROBERT L. DURSTON, ESQ.
        SAUL EWING LLP
          2600 Virginia Avenue, N.W.
          The Watergate - Suite 1000
          Washington, D.C.  20037-1922
             - and -

              WILCOX & FETZER
   1330 King Street -  Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com

**A-000190**

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 6 | Page 8 |
|---|---|
| 1  be -- there may be additions and supplementations, but | 1  work on a Ph.D. |
| 2  the testimony itself is admissible, correct? | 2  Q. And that was started roughly when? |
| 3  MR. ZEFF: I'm not going to stipulate to | 3  A. Oh, boy. '67, '68. |
| 4  anything on the record, but I would state that that | 4  Q. That's why I was hoping there was a C.V. |
| 5  appears to be true. | 5  somewhere. |
| 6  MR. DUSTON: All right. | 6  A. Yes. Well, I have an old one, but I don't have |
| 7  MR. ZEFF: I just have a policy of not | 7  it with me. |
| 8  stipulating to things in the middle of a deposition -- | 8  Q. We will make it quick. |
| 9  MR. DUSTON: All right. | 9  So after Penn State, after you got your |
| 10  MR. ZEFF: -- that relate to things | 10  Ph.D., what was next? |
| 11  that -- | 11  A. I didn't finish my Ph.D. I started working on |
| 12  MR. DUSTON: Well, during the day, Gregg, | 12  it. I did everything but the dissertation at Penn |
| 13  I may ask for some things that we try to work out | 13  State. |
| 14  later that are going to minimize some problems later. | 14  I left Penn State, went to Minnesota and |
| 15  MR. ZEFF: That's fine. | 15  taught, actually chaired an institute for minority |
| 16  MR. DUSTON: That's one of them. | 16  studies for two years. I received a post-doc. to |
| 17  BY MR. DUSTON: | 17  Stanford. |
| 18  Q. Dr. Gorum, in some cases I am not going to try | 18  Q. To Stanford. |
| 19  to repeat questions and areas that we covered in the | 19  A. I forgot the name of the organization. |
| 20  ad hoc dismissal process just because I don't think | 20  Q. That's all right. Post-doc. at Sanford for |
| 21  it's beneficial to any of our time on certain kinds of | 21  what? Two years? |
| 22  issues. | 22  A. One year. |
| 23  But work history, you quickly summarized | 23  Q. One year. Then where? |
| 24  it in your prior testimony. If you would just run | 24  A. I left Stanford and went to Dartmouth College |

| Page 7 | Page 9 |
|---|---|
| 1  through that with me quickly so I can get an idea of | 1  as a professor and director of their transitional |
| 2  dates of your career track leading up to Del State. | 2  program for four years. |
| 3  A. Wow. I started -- my work history? | 3  Q. Now we would be up to what? |
| 4  Q. Yes, your work history. Just tell me where you | 4  A. The end of '73, '74. |
| 5  were in those different positions after graduate | 5  Q. '73-74 range? |
| 6  school. | 6  A. Yes. |
| 7  A. After graduate school? | 7  Q. Okay. |
| 8  Q. I mean after your master's. | 8  A. I left Dartmouth and went to Jackson State as |
| 9  A. Okay. Well, when I finished undergraduate I | 9  director of instructional technology for four years. |
| 10  went into the Peace Corps for two years in Chile. | 10  Q. Which four years were those now? |
| 11  After the Peace Corps, I went to Syracuse | 11  A. '73 to... |
| 12  University to work on a master's in television and | 12  Q. '77-78? |
| 13  radio. | 13  A. Yes. |
| 14  Q. Right. | 14  Q. All right. |
| 15  A. I worked for AT&T in Denver as -- | 15  A. I might be -- |
| 16  Q. For roughly how many years? | 16  Q. You might be off a year or two. I understand. |
| 17  A. Two. | 17  A. Yes. |
| 18  Q. Okay. | 18  Q. We'll worry about that when this gets closer. |
| 19  A. As an economic forecaster and a systems analyst | 19  A. From Jackson State I went to the University of |
| 20  and I was also editor of the employees' newspaper, | 20  Maryland at College Park for five years. |
| 21  industrial newspaper. | 21  Q. Okay. |
| 22  From from AT&T, I went -- I worked for IBM | 22  A. I think that was 1980 |
| 23  as a writer in San Jose, California. | 23  Q. 1980 to '85? |
| 24  From San Jose, I went to Penn State to | 24  A. Yes. |

**A-000191**

3 (Pages 6 to 9)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

Page 10

1    Q. And which positions did you have in College
2    Park?
3    A. I was a director and assistant director of
4    minority -- multiethnic -- what do you call that?
5    Q. Diversity?
6    A. Studies.
7    Q. Multiethnic studies?
8    A. Yeah. What did they call that? Office of
9    minority student education or multiethnic student
10   education.
11        From the University of Maryland, I went to
12   Morgan as a professor of telecommunications.
13   Q. That was 1985, approximately?
14   A. I have to start with going to Delaware State
15   and work back.
16   Q. Fine. When did you first go to DSU?
17   A. '89.
18   Q. All right.
19   A. And before Delaware State it was Norfolk State
20   for one year, director of instructional technology.
21        And before Norfolk State, it was Morgan
22   State as a professor for four years and before Morgan
23   it was five years at the University of Maryland,
24   College Park.

Page 11

1    Q. So at DSU you started as a professor of mass
2    communication?
3    A. Professor of mass communications.
4    Q. Now, at some point you testified you took a
5    sabbatical from DSU and went down to Clafin and then
6    returned. Is that correct?
7    A. Yeah. So it was '97.
8    Q. Was that an entire academic --
9    A. One semester.
10   Q. Oh, it was one semester.
11   A. Spring semester.
12   Q. Now, from 1989 until 1997, just to sum up, you
13   were professor of mass communication and that was the
14   time that the mass communication department was first
15   formed, correct?
16   A. During that period?
17   Q. During that time period.
18   A. Yes.
19   Q. And during that time period there was at least
20   one switch, maybe more between being part of the
21   English department and being a separate department.
22   Is that correct?
23   A. Yes.
24   Q. If I recall your prior -- why don't you go into

Page 12

1    a little more detail?
2        How many times did that change between the
3    time you started and the time you took that first
4    semester sabbatical?
5    A. I cannot remember specifics. While I was in
6    the English department, I was director of mass
7    communications. And at some point -- I cannot recall
8    the exact year -- the English and mass communications
9    were separated.
10   Q. Did there come a point at which after it was
11   separated it was recombined for a period of time or
12   did it only separate once?
13   A. It only separated once.
14   Q. So up until the time it separated, you were
15   director of a program within the English department
16   which was director of mass communication?
17   A. That's correct.
18   Q. Do you recall whether that separated before or
19   after you returned from your sabbatical?
20   A. I really do not remember.
21   Q. Dr. Henry Tisdale was provost at DSU before he
22   left. Is that correct?
23   A. He was vice president and dean of academic
24   affairs. That was the system at that time.

Page 13

1    Q. Do you recall when Dr. Tisdale left DSU,
2    roughly?
3    A. I do not recall specifically. I think it was
4    1995 or something.
5    Q. So it was a couple of years before you took
6    your sabbatical and went down to work with him. Is
7    that correct?
8    A. That's correct.
9    Q. And if I understand your prior testimony, you
10   took that semester to go down and assist Dr. Tisdale
11   in setting up a mass communication department at
12   Clafin University?
13   A. Yes. I was asked to establish a department of
14   mass communication at Clafin.
15   Q. And you did that during that semester?
16   A. Yes.
17   Q. Did he offer you a chance to stay and chair
18   that department?
19   A. Yes.
20   Q. Why did you decline?
21   A. I had tenure and I was a full professor and I
22   did not want to relocate my family. I like Delaware
23   and I was involved in the community and the state.
24   Q. So when you returned to DSU in 1997 after your

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 14 | Page 16 |
|---|---|
| 1 sabbatical, do you recall when you took over as chair? | 1 a long list of persons with knowledge. I don't know |
| 2     MR. ZEFF: Maybe we should clarify what | 2 whether you want to refer to your witness list or the |
| 3 the department was. | 3 one from the interrogatories. |
| 4     MR. DUSTON: I think you're right. | 4     MR. ZEFF: They're the same. |
| 5 BY MR. DUSTON: | 5     MR. DUSTON: Let's just mark it as the |
| 6   Q. When you returned to DSU after your sabbatical, | 6 interrogatory responses. |
| 7 was the mass communications department still part of | 7     MR. ZEFF: And why don't we use this one? |
| 8 English or was it a separate department? | 8 It's probably more accurate than the other one. |
| 9   A. To be honest, I really do not remember. But as | 9     MR. DUSTON: We'll just mark and I.D. as |
| 10 director I took care of all of the mass | 10 Defendant's 1 plaintiff's responses to defendants' |
| 11 communications. It was very similar to it being | 11 first set of interrogatories. |
| 12 separate even as director. | 12     (Defendant's Deposition Exhibit No. 1 was |
| 13   Q. Now, you testified previously that you gave up | 13 marked for identification.) |
| 14 that director position or chair position, whatever you | 14 BY MR. DUSTON: |
| 15 want to call it, for a period of years. | 15   Q. Dr. Gorum, this is a long list of individuals |
| 16     There was sometime when you stepped away | 16 and I don't see any way of -- it's much longer than |
| 17 from it due to, among other things, conflicts with the | 17 the one in your initial list of disclosures and we |
| 18 president? | 18 need to go through all of them and find out what you |
| 19   A. I don't remember why, but I gave it up. | 19 think they know that's relevant to the case, but in |
| 20   Q. Where did that time period fit in? Was it | 20 many of these responses the general description is |
| 21 before or after the sabbatical? | 21 knowledge or information regarding the DSU grade |
| 22   A. Boy, I really do not remember, but I did give | 22 change policy. Okay? |
| 23 it up for a couple of years because I really felt that | 23     I don't know if there's a way to |
| 24 it was easier to teach than to deal with all of the | 24 streamline this, but if what your position is on those |

| Page 15 | Page 17 |
|---|---|
| 1 administrative hassles. | 1 witnesses is that they have general knowledge of the |
| 2   Q. Who ran the department during those years? | 2 same policies and practices that you think you engaged |
| 3   A. They tried Dr. Hagos and it just didn't work | 3 in and that's their generalized area of knowledge, |
| 4 out. | 4 tell me that. But I'm going to ask further questions |
| 5   Q. Did anybody else have that position? | 5 about whether or not they have specific knowledge of |
| 6   A. I don't remember anyone else. And after a year | 6 the kinds of actions that you engaged in. |
| 7 or two I was asked to take it again. | 7     When I refer today to actions that you |
| 8   Q. And you remained as either director or chair | 8 engaged in, I'm going to try to limit it to the |
| 9 from the time you took that back over until your | 9 findings of the ad hoc dismissal committee, the |
| 10 suspension or termination? | 10 practices that they found that you did that were a |
| 11   A. Chair and professor, yes. | 11 violation of the collective bargaining agreement. |
| 12   Q. Other than Delaware State, have you ever been | 12 Okay? |
| 13 asked to leave any position? | 13   A. Mm-hmm. |
| 14   A. No. | 14   Q. I want to narrow our discussion today on grade |
| 15   Q. At any of these other prior employers, have you | 15 changes to those issues and if you have people with |
| 16 ever been told that your contract was not being | 16 knowledge of generally how you DSU worked or other |
| 17 renewed? | 17 issues, I want to try to distinguish those too. |
| 18   A. No. | 18     Let's start with, well, let's start with |
| 19   Q. Have you ever resigned from a position in lieu | 19 Sandra Arnell, the former executive secretary to the |
| 20 of termination or -- | 20 president. |
| 21   A. No. | 21     Who is Ms. Arnell? |
| 22   Q. -- under a cloud? | 22   A. She was the president -- I mean secretary to |
| 23   A. No. | 23 the president. |
| 24   Q. Dr. Gorum, you have a long witness list and/or | 24   Q. She's no longer at DSU, correct? |

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 18 | Page 20 |
|---|---|
| 1  A. That's correct. | 1  Q. Did she tell you anything else in that |
| 2  Q. When was the last time you spoke to her? | 2  telephone call? |
| 3  A. About a month ago. | 3  A. No. My response to her was that I was not |
| 4  Q. How many times have you spoken with her since | 4  going to do it; she would have to do it herself and I |
| 5  you left DSU? | 5  gave her his telephone number. And she telephoned |
| 6  A. We're friends, family friends. She's friends | 6  Morris, who just happened to be in my office at the |
| 7  with my wife. | 7  time, and told him. |
| 8  Q. How long have you known her? | 8  Q. She telephoned him on his cell phone? |
| 9  A. Since moving to Delaware basically. | 9  A. Yes. |
| 10  Q. So -- | 10  Q. And so he was sitting in the office. Was the |
| 11  A. '89. | 11  phone on speaker phone? Did he put it on speaker |
| 12  Q. In addition to being social friends with your | 12  where you could hear? |
| 13  wife, are you part of common organizations or attend | 13  A. No. |
| 14  the same church? | 14  Q. So he telephoned her. How did you know that |
| 15  A. Democratic Party. | 15  she spoke to Mr. Morris? |
| 16  MR. DUSTON: Off the record. | 16  A. The telephone rang and there was a |
| 17  (Discussion off the record.) | 17  conversation. |
| 18  BY MR. DUSTON: | 18  Q. And you heard Mr. Morris's side of the |
| 19  Q. Ms. Arnell still resides in Dover? | 19  conversation? |
| 20  A. Yes. | 20  A. That's correct. |
| 21  Q. Do you know where she's working now or if she | 21  Q. And then he told you who it was and what had |
| 22  is? | 22  been discussed? |
| 23  A. I don't know and I don't know whether she is | 23  A. Yes. |
| 24  working. She's in her seventies, so... | 24  Q. What did Mr. Morris tell you at that point he |

| Page 19 | Page 21 |
|---|---|
| 1  Q. According to your answer, she has information | 1  had been told by Ms. Arnell? |
| 2  regarding DeShawn Morris. | 2  A. I can't remember specifics, but essentially it |
| 3  Tell me what information you believe | 3  was that instead of being suspended for one semester, |
| 4  Ms. Arnell has that's relevant to this case. | 4  which he had already served, that his suspension was |
| 5  A. Mrs. Arnell telephoned me around the 7th or 9th | 5  reinstated for one year. |
| 6  of July when the president came, when the president | 6  Q. All right. Does Ms. Arnell have any other |
| 7  came on -- Sessoms came on board July 1st. And on the | 7  knowledge regarding DeShawn Morris? |
| 8  7th or 9th, I don't remember specifically which date, | 8  A. I don't know. |
| 9  Mrs. Arnell telephoned me and told me that President | 9  Q. Other than this one telephone conversation, has |
| 10  Sessoms told her to tell me to tell Morris that his | 10  she ever had any other conversations with you |
| 11  suspension was reinstated for one year. | 11  concerning President Sessoms and DeShawn Morris? |
| 12  Now, should I go into details of all of | 12  A. No. |
| 13  that? | 13  Q. Has Ms. Arnell ever told you anything about or |
| 14  Q. Actually, I want to know everything she told | 14  spoken to you about your termination or suspension? |
| 15  you. We're going to come back to Mr. Morris and his | 15  A. No. |
| 16  case and your involvement in it. I want to limit | 16  Q. Has she shared any other information with you |
| 17  these questions to what Ms. Arnell knows or can | 17  concerning President Sessoms and his treatment of you |
| 18  testify about. | 18  or his attitudes towards you? |
| 19  So she made that phone call to you. | 19  A. No, not that I can recall. |
| 20  A. Yes. | 20  Q. So the only little piece here that Ms. Arnell |
| 21  Q. And she said the president told her to tell you | 21  has that's relevant to your case as far as you know is |
| 22  to tell Mr. Morris that his suspension was reinstated | 22  this one conversation to you and the follow-up |
| 23  for one year? | 23  conversation to Mr. Morris, correct? |
| 24  A. Yes. | 24  A. Correct. |

A-000194

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 26 | Page 28 |
|---|---|
| 1  A. The time that he was at Delaware State. | 1  Q. I expect they're all on the list. Can you tell |
| 2  Q. So he claims that his telephone was being | 2  me which seven those are that you were referring to at |
| 3  tapped? | 3  that time? |
| 4  A. Yes. | 4  A. Dr. Berhalter, Ernestine Brown, Maggie |
| 5  Q. Did he say by whom? | 5  Claussel, William Flayhart, Alera Hannah, Dr. King, |
| 6  A. No. | 6  Dr. Nwosu, I think Dr. Petrosky, but I just do not |
| 7  Q. Does he have an opinion, does he say who was | 7  remember specifically; Dr. Watkins. |
| 8  engaging in intimidation? | 8       I don't know how many that is, but yeah. |
| 9  A. To be honest, I didn't even inquire like that. | 9  Q. Well, all of those chairs had reached out to |
| 10  I was sort of shocked because he called me out of the | 10  you or communicated with you at some point at the ad |
| 11  blue and he volunteered that information. | 11  hoc dismissal process, right? |
| 12  Q. So he didn't tell you who he felt was | 12  A. Well, before that. |
| 13  threatening him or how he was threatened? | 13  Q. Or before that? |
| 14  A. If he did, I just don't remember. | 14  A. Yes. |
| 15  Q. Had Dr. Aubrey been assisting you with your | 15  Q. Back to Dr. Austin, Dr. John Austin, former |
| 16  defense during the ad hoc dismissal proceeding while | 16  chair of social work. Where is Dr. Austin now |
| 17  you were at Delaware State? | 17  located? |
| 18  A. Not really. The only thing he provided was the | 18  A. He is still at Delaware State University. |
| 19  teacher evaluations. | 19  Q. So he's a professor, but he's no longer chair? |
| 20  Q. Explain what you asked Dr. Aubrey to do and | 20  A. He's assistant vice president and he's no |
| 21  what he did during the ad hoc dismissal process. | 21  longer chair. |
| 22  A. Just provide a copy of the teacher evaluation | 22  Q. What knowledge does Dr. Austin -- have you had |
| 23  of Dr. Osei-Mensah, student evaluation of professors. | 23  any conversations with Dr. Austin about your case? |
| 24  Q. During the ad hoc proceedings, ad hoc dismissal | 24  A. No. |

| Page 27 | Page 29 |
|---|---|
| 1  proceedings, did you ask Dr. Aubrey if he could find | 1  Q. When was the last time you spoke to Dr. Austin? |
| 2  these, find copies of these? | 2  A. I really don't know. It's been some time. |
| 3  A. Yes. | 3  Q. What information do you think Dr. Austin has |
| 4  Q. And he pulled them out and provided them to | 4  that's relevant to your claims? |
| 5  you, correct? | 5  A. There were some grade changes that occurred and |
| 6  A. It was after the hearing was over actually. | 6  he was involved in a similar situation as I was. |
| 7  Q. So you now have copies of the documents that | 7  Q. When you say, "involved in a similar |
| 8  Dr. Aubrey provided? | 8  situation," was he -- |
| 9  A. Somewhere, yes. | 9  A. Well, yeah, he changed grades and he was not |
| 10       MR. DUSTON: Off the record. | 10  challenged. |
| 11       (Discussion off the record.) | 11  Q. What was the nature of the grade changes that |
| 12  BY MR. DUSTON: | 12  you think is similar to your conduct? |
| 13  Q. Any other information that Dr. Aubrey has other | 13  A. As a chair he changed grades of other |
| 14  than the fact that he gave you these evaluations and | 14  professors in the department. |
| 15  whatever prompted him to make this phone call last | 15  Q. During what time period? |
| 16  December and testimony regarding those areas? | 16  A. I couldn't tell you specifics. |
| 17  A. Boy, I just cannot recall anything else at this | 17  Q. Do you know if it was before or after President |
| 18  point. | 18  Sessoms took over? |
| 19  Q. In your prior testimony you mentioned at least | 19  A. Before. |
| 20  seven chairs who had reached out to you during those | 20  Q. Do you know how long before? |
| 21  dismissal proceedings with information to provide or | 21  A. No. |
| 22  offers of support because at least in your mind they | 22  Q. Do you know anything about the circumstances |
| 23  had engaged in similar kinds of issues as chairs. | 23  under which he changed grades of other professors, in |
| 24  A. Mm-hmm. | 24  other words, whether it was a formal grade challenge? |

8 (Pages 26 to 29)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 30 | Page 32 |
|---|---|
| 1    A. I don't know. | 1    A. Just that and the outcome of the lawsuit. I'm |
| 2    Q. You don't know whether it might have been a | 2   trying to remember the name of the professor in his |
| 3   professor who was no longer at Delaware State? | 3   department and I can't remember. |
| 4    A. I don't remember. | 4      Ray Grandfield. And I think he took it to |
| 5    Q. What do you know about the nature of the grade | 5   court and he lost and at that time the ruling was that |
| 6   changes by Dr. Austin? | 6   the chair had a right to change the grade. |
| 7    A. He simply told me that he had changed grades of | 7    Q. So this was the Ray Grandfield case that |
| 8   some of his professors. | 8   Dr. Awadzi was involved in? |
| 9    Q. And when did he tell you that? | 9    A. I believe so. Yeah. |
| 10    A. Before the hearing. | 10    Q. Drexel Ball, when was the last time you spoke |
| 11    Q. Other than that piece of information that at | 11   with Mr. Ball? |
| 12   some point in the past he had before President Sessoms | 12    A. Maybe two weeks ago. |
| 13   changed grades of other professors, you don't know | 13    Q. Where is Mr. Ball now located? |
| 14   anything else about the nature of those changes? | 14    A. He lives in Dover, but he's working at either |
| 15    A. No. | 15   Cheyney or the other school near Cheyney. It's not |
| 16    Q. Have you spoken to Dr. Austin about serving as | 16   Cheyney. It's the other one and I can't remember -- |
| 17   a witness in this case? | 17      MR. ZEFF: Lincoln. |
| 18    A. No. | 18    A. Lincoln, yes. |
| 19    Q. Dr. Awadzi, what knowledge -- is Dr. Awadzi | 19    Q. What's your relationship with Mr. Ball? |
| 20   still at DSU? | 20    A. I just know him from Delaware State. |
| 21    A. I believe so. I really don't know. | 21    Q. Have you spoken to him about being a witness in |
| 22      Dr. Awadzi was the dean of the school of | 22   the case? |
| 23   management or business and he had several issues with | 23    A. Yes. |
| 24   changing grades of professors. One of the | 24    Q. What did he say? |

| Page 31 | Page 33 |
|---|---|
| 1   professors -- I can't remember his name -- sued, took | 1    A. He said yes. |
| 2   it to court. | 2    Q. What information does Mr. Ball have that's |
| 3    Q. And were these changes that were made in his | 3   relevant to your claims? |
| 4   position as dean or as chair? | 4    A. When the ad hoc dismissal committee first sent |
| 5    A. I don't remember because Delaware State only | 5   the report it was in my favor and the chair was told |
| 6   had one dean. It was the vice president and dean of | 6   by Sessoms to take it back and change it. |
| 7   academic affairs. The chairs sort of served -- | 7    Q. Okay. When was it that Dr. Bell or Mr. Bell |
| 8    Q. You said he was the former dean of the school | 8   told you about this the first time? |
| 9   of business. | 9    A. Ball? |
| 10    A. Well, he was acting. That came, yes, that | 10    Q. Yes, Mr. Ball. |
| 11   came, yes, later. And I do not know when the grade | 11      MR. ZEFF: Let's get that straight because |
| 12   changes occurred. I just know that there were legal | 12   there is a Bell. |
| 13   proceedings regarding that. | 13      THE WITNESS: Yes. |
| 14    Q. So you haven't had any conversation with | 14      MR. DUSTON: I know. |
| 15   Dr. Awadzi about the specifics of these situations? | 15    A. When did he tell me? I think it could have |
| 16    A. That was before the hearing and I haven't seen | 16   been last summer. I was driving down the street and |
| 17   or talked to him since. | 17   someone was just flashing headlights and tooting a |
| 18    Q. Did you have a conversation with Dr. Awadzi | 18   horn and I pulled over and it turned out to be Drexel |
| 19   prior to the hearing about grade changes in his | 19   Ball. |
| 20   department? | 20    Q. And he had left the university by that point? |
| 21    A. Yes. | 21    A. Yes. And he told me that the NCAA report had |
| 22    Q. Other than the fact that there were changes | 22   come in and that they could find no evidence of |
| 23   that were challenged, what information did Dr. Awadzi | 23   wrongdoing and also -- and I'm sure I asked questions, |
| 24   share with you? | 24   specific questions. I don't remember. |

9 (Pages 30 to 33)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

---

Page 34

1    But he told me about the report and he
2    just thought I had a good case. And at that time he
3    indicated that when the first report came in, the
4    president told the chair to take it back and change
5    it.
6    Q.  Did he explain to you any further how this
7    draft report supposedly came in or who reviewed it or
8    anything else?
9    A.  No. Again, I was caught offguard. I was, you
10   know, I was surprised that he pulled me over.
11   Q.  Did he tell you how he knew all of this?
12   A.  No. I knew he was the assistant to the
13   president.
14   Q.  Did he describe any specific conversations
15   between the chair of the committee and President
16   Sessoms?
17   A.  No. I didn't ask.
18   Q.  Did he say that he was present at any such
19   discussions?
20   A.  I didn't even ask. He gave me that
21   information.
22   Q.  So what he knows is what he conveyed to you in
23   this conversation?
24        MR. ZEFF: Objection.

---

Page 35

1    Q.  Sorry. As far as you know, the extent of his
2    knowledge is what he's communicated to you right now?
3        MR. ZEFF: Objection.
4    Q.  Dr. Gorum, do you know what else Mr. Ball may
5    know other than what you just conveyed?
6    A.  No, I don't know what else he may know.
7        MR. ZEFF: Thank you.
8    Q.  Dr. Bell, Dr. Kenneth Bell, former provost, did
9    testify before the ad hoc dismissal committee,
10   correct?
11   A.  Yes.
12   Q.  Other than the issues that were discussed with
13   Dr. Bell during the ad hoc dismissal committee and
14   other than his role in various meetings with you which
15   he testified to and was examined on in the hearing,
16   does Dr. Bell have any other knowledge that you think
17   is relevant to your claims?
18   A.  Do I think he has other knowledge? Yes. But
19   he's never shared it with me.
20   Q.  So you have had no conversations with Dr. Bell
21   about his, about whether he's willing to testify in
22   this case?
23   A.  No.
24   Q.  You haven't had any conversations about your

---

Page 36

1    claims against DSU?
2    A.  No. I do not bring it up.
3    Q.  And what are the other subjects on which you
4    believe that Dr. Bell has knowledge besides what has
5    been testified in the earlier proceeding?
6    A.  Dr. Bell had discussed with Dr. King and me
7    information he sent to the president. He showed us a
8    copy of his letter recommending no termination,
9    nothing be done and he showed us that letter.
10        He also talked about his response
11   regarding the Osei-Mensah incident and said that it
12   was not only a right but it was a responsibility as
13   chair to intervene because there was a complaint
14   because it had come to him.
15   Q.  Any other information that you think
16   Dr. Ball -- Dr. Bell may have knowledge of?
17   A.  Oh, I think he has knowledge of basically
18   everything. That's what I think.
19        Why? Because I talked to the other vice
20   presidents and they told me Dr. Bell filled them in
21   and that I should talk to Dr. Bell, but I did not.
22   Q.  When you said they filled them in on what?
23   A.  On everything that was going on relative to my
24   case. Mr. Parr and Dr. Smith both indicated that they

---

Page 37

1    were told basically you didn't have any information
2    and that they should settle soon and they told me to
3    talk to Bell and I did not.
4    Q.  Mr. Parr and Dr. Smith told you what?
5    A.  That they were told that the university did not
6    have any information and that they thought the case
7    had been settled. And both --
8    Q.  Information about what?
9    A.  I was told, and they were somewhat guarded,
10   that all the information they received or knew about
11   my case came from Dr. Bell and that I should talk to
12   Dr. Bell.
13   Q.  So that they didn't have any information about,
14   they didn't have any independent information about
15   your claims or about any of the issues between you and
16   DSU?
17   A.  (Pause).
18   Q.  I'm a little confused here, Dr. Gorum.
19        When did these conversations occur with
20   Mr. Parr and Dr. Smith?
21   A.  Within the last month.
22   Q.  And they somehow thought this case either,
23   either the university --
24   A.  It had already been settled.

---

10 (Pages 34 to 37)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 38 | Page 40 |
|---|---|
| 1     Q.  It had been settled or the university should | 1    grades that I had submitted. |
| 2   settle it? | 2     Q.  That was your understanding or her |
| 3     A.  They thought it had already been settled. | 3    understanding of her -- |
| 4     Q.  That's news to me. | 4     A.  That was my understanding.  I could be wrong. |
| 5        Dr. Berhalter, you have had conversations | 5   I don't know where I got it from. |
| 6   with Dr. Katherine Berhalter. | 6     Q.  What else did you discuss with Ms. Bowers? |
| 7     A.  That was before the hearing. | 7     A.  It was really whether she was willing to |
| 8     Q.  Where is Dr. Berhalter now located? | 8   testify. |
| 9     A.  I don't know, but I believe she might be living | 9     Q.  What did she say? |
| 10   in Dover.  She has since married and I really don't | 10     A.  And she said yes. |
| 11   know. | 11     Q.  Other than the issues that Ms. Bowers testified |
| 12     Q.  Do you know if she's now under a different | 12   to at the ad hoc dismissal hearing, do you believe she |
| 13   name? | 13   has any other knowledge relevant to your claims? |
| 14     A.  That's what I think. | 14     A.  Yes.  She was the assistant registrar and a |
| 15     Q.  What was the nature of your conversation with | 15   different registrar and she knew the practices and |
| 16   Dr. Berhalter? | 16   what went on. |
| 17     A.  It was very simple.  She just indicated that | 17     Q.  Ernestine Brown, former chair of social work, |
| 18   she had similar incidents and I'm sure at that time | 18   when is the last time you spoke to Mr. Brown? |
| 19   they could have given me specifics, but I just don't | 19     A.  It's been a year or two.  It's been a long |
| 20   remember them, about changing grades of other | 20   time. |
| 21   professors in the department, in her department. | 21     Q.  Have you asked Mr. Brown whether he would be |
| 22     Q.  Dr. Kofi Blay, chair of sociology.  Dr. Blay is | 22   willing to testify? |
| 23   still at DSU? | 23     A.  Ernestine Brown? |
| 24     A.  Yes.  I really can't remember specifically what | 24     Q.  Yes. |

| Page 39 | Page 41 |
|---|---|
| 1   he said, but it had to deal with similar incidents, | 1     A.  No.  But at the time, before the hearing she |
| 2   grade changes. | 2   indicated that she had changed grades of professors. |
| 3     Q.  Did you reach out to Dr. Blay or did he talk to | 3   That's why her name is there. |
| 4   you or contact you? | 4     Q.  It's Ms. Brown or Mrs. Brown? |
| 5     A.  He just volunteered.  I don't know who -- I | 5     A.  Yes.  Ms., Mrs. |
| 6   didn't really -- most of the professors contacted me | 6     Q.  Mrs. |
| 7   or saw me and mentioned it in passing. | 7        Did she share with you any of the details |
| 8     Q.  And if Dr. Blay gave you any details about his | 8   regarding the grade changes that she had done? |
| 9   own conduct, you don't remember them right now, | 9     A.  No.  I didn't, I didn't even ask. |
| 10   correct? | 10     Q.  Do you know if those were prior to or after |
| 11     A.  I don't remember specifics, yeah. | 11   President Sessoms took over? |
| 12     Q.  Joyce Bowers, the former registrar, testified | 12     A.  Prior to. |
| 13   extensively at the hearing? | 13     Q.  Do you have any examples on this list of |
| 14     A.  Yes. | 14   professors who have told you that they have changed |
| 15     Q.  Have you spoken with Ms. Bowers since the | 15   grades of students since President Sessoms took over, |
| 16   hearing? | 16   changed grades of other professors? |
| 17     A.  Within the last month. | 17     A.  I do not remember the dates of all of them, so |
| 18     Q.  Did you reach out to her? | 18   I really couldn't answer that with certainty. |
| 19     A.  Did I call her? | 19     Q.  Are there any that you believe were making |
| 20     Q.  Yes. | 20   changes in the same time period that you were in the |
| 21     A.  Yes.  I wanted to know what had happened in her | 21   same manner that you were? |
| 22   case.  Her case went to arbitration and she won.  At | 22        MR. ZEFF:  I'm going to object to form. |
| 23   least they found that she had not done anything wrong. | 23     Q.  Let me change that. |
| 24   She was accused of changing, making the changes of the | 24        Do you know any of the professors on the |

11  (Pages 38 to 41)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 42 | Page 44 |
|---|---|
| 1   list that you believe were making grade changes in | 1     MR. ZEFF: It's with a K, isn't it? |
| 2   classes in which someone else was the instructor of | 2     MR. DUSTON: Yes. |
| 3   record after President Sessoms took over? | 3   A. Yes. |
| 4    A. I really can't -- I can't remember when the | 4   Q. K-o-p-a-n-o. |
| 5   grade changes that the different professors talked | 5     MR. ZEFF: He's on there. |
| 6   about occurred, so I really cannot answer it. | 6   A. Yes, he's on there. |
| 7    Q. Dr. Claussel, Maggie Claussel, when is the last | 7   Q. Dr. Kopano. What conversations have you had |
| 8   time you communicated with Dr. Claussel? | 8   with Dr. Kopano about conversations he's had with |
| 9    A. Within the last month. | 9   President Sessoms? |
| 10   Q. Has she agreed to serve as a witness for you? | 10   A. Within the last month I talked to him and I |
| 11   A. Yes and no. I didn't ask her, but I felt that | 11   specifically asked him about that incident. |
| 12   she would. She's an attorney, practicing attorney. | 12   Q. The incident that Dr. Claussel had told you |
| 13   Q. Where is Dr. Claussel located? | 13   about? |
| 14   A. In Dover. She's still a professor at the | 14   A. Yes. And he said no. |
| 15   university and she has a law office in Dover. | 15   Q. He said what? |
| 16   Q. Tell me about your last discussion. | 16   A. He didn't say it. |
| 17   A. She indicated that Dr. Kopano had told her that | 17   Q. Have you had any other conversations with |
| 18   Dr. Sessoms tried to get Kopano to give him any | 18   Dr. Kopano concerning your claims? |
| 19   information that would give him, Sessoms, my head on a | 19   A. Yeah. He indicated he was willing to come back |
| 20   platter. | 20   and testify, but -- |
| 21     And I was told by three professors the | 21   Q. Has he indicated that he would change his |
| 22   same similar circumstance. | 22   testimony from the ad hoc dismissal committee process? |
| 23   Q. Okay. Who were those other three professors, | 23   A. I didn't even ask. I mean, he volunteered that |
| 24   while we're at it? | 24   he would return to testify. |

| Page 43 | Page 45 |
|---|---|
| 1   A. Osei and Eric Dodson. | 1   Q. Where is Dr. Kopano now? |
| 2   Q. Dr. Osei? | 2   A. He is chair of communications studies at Morgan |
| 3   A. Dr. Osei, O-s-e-i, Akwasi Osei, A-k-w-a-s-i. | 3   State University in Baltimore. |
| 4   Q. Not Dr. Osei-Mensah but Dr. Osei? | 4   Q. Other than Dr. Kopano's knowledge concerning |
| 5   A. Dr. Osei. | 5   the specific grades that he testified about at the |
| 6   Q. So Dr. Osei and Dr. -- | 6   hearing, what other knowledge do you think Dr. Kopano |
| 7   A. Eric Dodson. Eric Dodson. It was all over. | 7   has? |
| 8   These are the people I really communicated with and so | 8   A. He knows that Dr. Frederick put him up to run |
| 9   it could have been others, but yes, Claussel, yes, | 9   against me as chair of the department. Let me back |
| 10   definitely. | 10   up. |
| 11   Q. Let's start with Dr. Claussel does not claim | 11     Chairs at Delaware State are elected by |
| 12   that Dr. Sessoms spoke to her about you, correct? | 12   the faculty and Dr. Frederick asked him to run against |
| 13   A. No. | 13   me twice one year and he lost. |
| 14   Q. Her knowledge is a conversation she had with | 14   Q. And this was -- |
| 15   Dr. Kopano, who supposedly had one with President | 15   A. He lost both times. |
| 16   Sessoms, correct? | 16   Q. And this was prior to President Sessoms being |
| 17   A. Yes. | 17   there? |
| 18   Q. Have you spoken to Dr. Kopano? | 18   A. No. One was when he was there. |
| 19   A. Yes. | 19   Q. What relevance is that to your claims against |
| 20   Q. All right. Jumping ahead to Dr. Kopano -- | 20   President Sessoms? |
| 21   well, you haven't listed Dr. Kopano. | 21   A. What I was told is that Sessoms promised to |
| 22   A. I did not? | 22   make him chair and to give him a raise for any dirt |
| 23   Q. No. | 23   that he could deliver on me and he tried to deliver |
| 24     Oh, there we go. Dr. Kopano. | 24   dirt. And I hope you understand what I mean. |

12 (Pages 42 to 45)

A-000199

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

Page 46

1    Q. Okay.
2    A. Now, once I left they refused to give him a
3    raise and they refused to make him chair, so he left
4    angry.
5    Q. Now, who told you that that was what the deal
6    was that was offered to Dr. Kopano?
7    A. Oh, gee. There were several people. I know
8    Eric Dodson told me. I don't know whether I ever
9    discussed it with Kopano or not. I don't know whether
10   I discussed that with Dr. Kopano. I don't think I
11   did, so other people told me that.
12   Q. So besides Mr. Dodson repeating something else
13   he may have heard -- well, let me rephrase that.
14        You don't believe you ever talked to
15   Dr. Kopano directly about this so-called deal or offer
16   to him by President Sessoms, correct?
17   A. Correct.
18   Q. So at this point you can't say that Dr. Kopano
19   has ever admitted to you that he was approached by
20   President Sessoms or that he was made such an offer,
21   correct?
22   A. No. Dr. Kopano, however, told this to
23   Dr. Claussel. And, see, I don't remember everybody
24   and everything that happened because he did write

Page 47

1    something for the president, and I can't tell you
2    exactly what it was.
3    Q. When did he write something for the president
4    and about what?
5    A. I can't even remember, but he did do something
6    for the president.
7    Q. Who told you that?
8    A. He did.
9    Q. What did he say he wrote for the president?
10   A. There was some document that was written and he
11   just indicated he and one other professor had drafted
12   it.
13   Q. What was it about?
14   A. To be honest, I don't even know.
15   Q. Do you know if it had anything to do with you?
16   A. I don't even know. I don't remember.
17        Kopano, information was given to me by
18   several faculty members that he was out to get
19   anything on me to give to the president.
20   Q. Besides Mr. Dodson and Dr. Claussel, what other
21   professors told you that Dr. Kopano was out to get
22   information on you?
23   A. I don't remember, but there were others.
24   Q. Let's go back to keep these in alphabetical

Page 48

1    order.
2        Anything else that -- I think we finished
3    Dr. Claussel. And her knowledge is based upon this
4    conversation with Dr. Kopano?
5    A. I think so, yeah. The other thing involved
6    Claussel. When Dr. Sessoms was a candidate for the
7    position, he was one of the three finalists who were
8    interviewed. And I don't even remember my position on
9    the faculty. I could have been parliamentarian or
10   something. I don't remember. And I used to be chair
11   of the promotion and tenure committee and then a
12   member, I was definitely a member at that time and the
13   student affairs committee.
14        Most of the university is run by
15   committees, faculty committees. The faculty members
16   make all decisions regarding students. And I
17   interviewed -- you know, I was part of the
18   interviewing process of all of the candidates and my
19   recommendation at the faculty senate was that the
20   search be reopened.
21        And what I received was that the
22   information got back to Sessoms and he was upset about
23   it.
24   Q. Who provided you that information? Was it

Page 49

1    Dr. Claussel that provided that information?
2    A. Yeah, she was one. But it really came out in
3    the faculty senate because the vote was very close.
4    The faculty voted not to reopen it and it was only by
5    like two votes.
6    Q. So prior to the time President Sessoms was here
7    during the search process the faculty senate did have
8    a role and gave their input and by a very narrow vote
9    after open debate decided not to reopen the search,
10   correct?
11   A. Correct.
12   Q. So obviously there were a number of faculty who
13   during the senate supported reopening the search,
14   correct?
15   A. Yes.
16   Q. You were one of them and you had made that
17   recommendation to the senate in some capacity that you
18   had at that time?
19   A. Correct.
20   Q. Were there other professors who made similar
21   recommendations?
22   A. Yes.
23   Q. Who were they?
24   A. Sam Hough --

**A-000200**

13  (Pages 46 to 49)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 50 | Page 52 |
|---|---|
| 1  Q. Who else? | 1      Why? Because I had met with Dr. Osei and |
| 2  A. -- was the leading advocate, Dr. Hough. | 2  the strategy was to get them to reopen the search and |
| 3  Q. Who else? | 3  when we got into the faculty senate, he took a totally |
| 4  A. I don't remember. I just remember Sam, but | 4  different viewpoint. |
| 5  there were a number of faculty members that spoke | 5  Q. So prior to this he had been supportive of |
| 6  regarding it. And I don't know how much of that | 6  reopening and then you believe that there was a quiet |
| 7  information would be in the minutes, but it probably | 7  deal and then he changed his position before the |
| 8  will be. | 8  faculty senate? |
| 9  Q. Now, who was it that informed you that | 9  A. Yes. |
| 10  Dr. Sessoms was upset at you for your role in that? | 10  Q. Clifton Coleman, former director of human |
| 11  A. I think I got it from Dr. Claussel. At this | 11  resources, when is the last time you talked to |
| 12  point I really -- you know, I got it from so many | 12  Mr. Coleman? |
| 13  corners. | 13  A. Six months ago, within the last year. It's |
| 14  Q. Do you know whether any of those individuals | 14  been a long time. |
| 15  had gotten it directly from President Sessoms, had | 15  Q. How long ago was Mr. Coleman director of human |
| 16  spoken to him, had talked to him, had heard him say | 16  resources? |
| 17  it? | 17  A. I don't know. But when Dr. Sessoms came on |
| 18  A. No. Supposedly Dr. Akwasi Osei is the one who | 18  board, he was the director. |
| 19  told Dr. Sessoms and that's where he had gotten the | 19  Q. Have you talked to him about being a witness in |
| 20  information. | 20  the case? |
| 21  Q. So have you talked to Dr. Akwasi Osei about | 21  A. Yes. |
| 22  what he knows about conversations with President | 22  Q. What did he say? |
| 23  Sessoms concerning you? | 23  A. Yes. |
| 24  A. No. | 24  Q. Where is he now located? |

| Page 51 | Page 53 |
|---|---|
| 1  Q. Is it your belief, however, that one of the | 1  A. In Dover. |
| 2  issues on which Dr. Sessoms may have been upset at you | 2  Q. Where is he working? |
| 3  or motivated to retaliate go back to this decision? | 3  A. He's not working. |
| 4  A. That's one. And Dr. Osei really played a role | 4  Q. What subjects have you discussed with |
| 5  in communicating with Dr. Sessoms. He was promised | 5  Mr. Coleman? |
| 6  the deanship of I believe arts and sciences. | 6  A. General information and procedures. |
| 7      How do I know? My wife was a dean and I | 7  Q. Be more specific. |
| 8  escorted her to a Christmas dinner the president had | 8      What knowledge do you think Mr. Coleman |
| 9  and everyone was congratulating him for being the new | 9  has that is relevant to your claims? |
| 10  dean. | 10  A. As director of human resources, he was aware of |
| 11      And he did not get it, so he became | 11  how anyone -- the procedures for hearings, hiring and |
| 12  embittered and withdrew from all of the committees and | 12  firing should transpire. |
| 13  everything else. | 13  Q. And you claim he's an expert on the collective |
| 14  Q. Now, was the promised deanship somehow a deal | 14  bargaining agreement? |
| 15  with President Sessoms? | 15  A. Whether he is or is not, that was part of his |
| 16  A. That's the way I interpreted it. I don't know. | 16  job. |
| 17  Q. Your understanding was that if he supported him | 17  Q. Have you discussed specifically areas of |
| 18  to be president, he would get the deanship? | 18  policies and procedures that you think were violated |
| 19  A. (The witness nodded.) | 19  in your termination? |
| 20  Q. I just want to make sure I understand your | 20  A. Mr. Coleman specifically can talk about how I |
| 21  belief of what the deal was. | 21  had applied for retirement. That he can attest to. |
| 22  A. Is that my belief? | 22  Q. All right. I was going to ask you about that |
| 23  Q. Is that your belief? | 23  anyway. So why don't you tell me about your |
| 24  A. Yes. | 24  application for retirement? |

14  (Pages 50 to 53)

A-000201

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 66 | Page 68 |
|---|---|
| 1  Dr. Toscano gave her an F and Dr. Frederick changed it | 1  Q.  Were those her exact words? |
| 2  to a C or a B. | 2  A.  Yeah. |
| 3  Q.  That was an incident that was in the record? | 3  Q.  Be careful, they are out to get me? |
| 4  A.  Yes. | 4  A.  Yeah. |
| 5  Q.  Dr. Toscano I know also has information about | 5  Q.  Or they are out to get you? |
| 6  DeShawn Morris and we will have a chance to talk about | 6  A.  Yeah. I mean, I don't know about the precise |
| 7  that -- | 7  words, but that's the essence of what she said, yeah. |
| 8  A.  Oh, yeah. Yes. | 8  Q.  Where were you in the Morris process? |
| 9  Q.  -- and that whole issue and we can talk about | 9  A.  Where was I? |
| 10  that later. | 10  Q.  When in the process with Mr. Morris did this |
| 11  A.  Okay. | 11  occur? |
| 12  Q.  And is there any other area that Dr. Davis, | 12  A.  (Pause.) |
| 13  Dr. Jackson or Dr. Toscano have information of? Let's | 13  Q.  To help you out, the lawsuit was filed in |
| 14  take them separately. | 14  August of '04, his lawsuit. The determination was |
| 15  Dr. Davis, any other information about | 15  made that he would not be eligible to play football. |
| 16  grade changing or policies or practices? | 16  There were communications about whether or not he |
| 17  A.  I don't remember whether he was involved in | 17  would be allowed back into class. He retained a |
| 18  grade changes as a department chair. I just don't | 18  lawyer in August. The lawyer filed suit in August of |
| 19  remember, but certainly it was a widespread practice. | 19  '04. That suit was dismissed in October of '04. |
| 20  The chair at that time had the authority, maybe before | 20  Where in that process did this |
| 21  he came, because we really didn't have the dean system | 21  conversation occur? |
| 22  set up until the late nineties, but the practices | 22  A.  It was during that incident, during that |
| 23  didn't stop. | 23  incident. |
| 24  Q.  Does Dr. Jackson have any knowledge of grade | 24  Q.  Was it after Mr. Morris had filed his lawsuit |

| Page 67 | Page 69 |
|---|---|
| 1  changes that he's made of other professors? | 1  against the university or was it while he was still in |
| 2  A.  Not that I know of. I don't know. | 2  the appeals process? |
| 3  Q.  Sheila Davis, you mentioned Ms. Davis several | 3  A.  I think it was after he had -- I don't know |
| 4  times in different responses. | 4  whether it was after he had filed his lawsuit or |
| 5  When is the last time you spoke to | 5  during that time. |
| 6  Ms. Davis? | 6  It was during that time. |
| 7  A.  About a week ago. | 7  Q.  Was it earlier, could it have been earlier |
| 8  Q.  Where is she now located? | 8  while he was still appealing his suspension? |
| 9  A.  She's still in Dover. | 9  A.  I don't think so, no. |
| 10  Q.  Tell me about your discussion last week. | 10  Q.  Sometime in the summer or fall? |
| 11  A.  I wanted to know if she would testify for me | 11  A.  Mm-hmm. |
| 12  and she said yes. | 12  Q.  How did this conversation come about? What |
| 13  Q.  What issues did you ask her to testify about? | 13  were the circumstances? |
| 14  A.  That somebody was out to get me. | 14  A.  I don't remember because certain people I tried |
| 15  Q.  Tell me exactly the conversations you claim | 15  to avoid because I didn't know where they stood or |
| 16  that you've had with Ms. Davis about that issue. | 16  whether I could trust them. Sometime I had some |
| 17  A.  I simply asked who. | 17  interaction with Sheila and she made that statement. |
| 18  Q.  Go back. When was the first time you ever had | 18  Q.  Did she tell you anything else? |
| 19  a communication with Ms. Davis concerning somebody | 19  A.  No. |
| 20  being out to get you? | 20  Q.  Did she tell you who the "they" was? |
| 21  A.  It was early -- oh, gee. | 21  A.  No. And definitely I asked her and she was vague. |
| 22  I was working with DeShawn Morris | 22  Q.  Did she tell you what they were out to get you |
| 23  representing him and she had indicated that I need to | 23  for? |
| 24  be careful because they were out to get him. | 24  A.  No. |

18  (Pages 66 to 69)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

Page 70

1    Q. This is a one-line comment in a context when
2 you were having some other interaction where she said,
3 "Be careful, they are out to get you"?
4    A. (The witness nodded.)
5    Q. What other information does Ms. Davis have
6 that's relevant to your claims?
7    A. Sheila knew that I had represented DeShawn
8 Morris and, to be honest, I can't even say. She was
9 aware that I represented DeShawn Morris. I'm sure she
10 knew Morris because she served as an advisor, as an
11 advisor to maybe Ms. Delaware State University and I
12 served as advisor at some point to the student
13 government association or some student organization.
14    So even on a couple of occasions we had
15 traveled to different events together, but we really
16 never did discuss, we never discussed my case.
17    Q. So you've never discussed any of your claims
18 against the university?
19    A. No.
20    Q. You've never discussed, other than that one
21 comment, this alleged retaliation, correct?
22    A. (The witness nodded.)
23    Q. And other than her knowledge that you had some
24 role in Mr. Morris's appeals, you don't think she has

Page 71

1 any other knowledge?
2    A. I think she has other knowledge. I just don't
3 know what it is.
4    Q. Dr. DeLauder, have you had any conversations
5 with Dr. DeLauder?
6    A. Yes. It's been more than a year.
7    Q. Tell me about your last conversation with
8 Dr. DeLauder.
9    A. I talked to Dr. DeLauder about the DeShawn
10 Morris case. When that incident occurred, Morris went
11 through the faculty-student judiciary committee and
12 was found guilty.
13    Q. We can agree that Dr. DeLauder has lots of
14 knowledge regarding what he did and what Dr. Smith did
15 in the DeShawn Morris case. Dr. DeLauder will have
16 knowledge about his interactions with you.
17    Dr. DeLauder will know whatever he knew
18 about your role in that appeal process?
19    A. Mm-hmm.
20    Q. Dr. DeLauder left in July 1 of 2004?
21    A. Mm-hmm.
22    Q. Does Dr. DeLauder have any actual knowledge
23 regarding anything that happened after he left DSU
24 concerning Mr. Morris?

Page 72

1    A. Yeah. He knew that the charges -- the
2 suspension for one year was reinstated.
3    Q. Let me rephrase that.
4    Was Dr. DeLauder consulted on that or does
5 he just know from what he was told by others?
6    A. I consulted him because I wanted to know --
7 actually, I knew the outcome because he had told me.
8 Morris -- let me back up.
9    Well, we went through the appeals. We
10 based --
11    Q. Dr. Gorum, I don't mean to stop you, but I want
12 to come back to Mr. Morris in chronological order and
13 your role a little bit later on.
14    I just want to know whether Dr. DeLauder
15 has any information relevant to your case other than
16 Dr. DeLauder's own role in the DeShawn Morris issues.
17 Do you think he has any other knowledge relevant to
18 this case?
19    A. He was aware of the procedures and practices in
20 terms of grade changes.
21    Q. Have you discussed with him the ad hoc
22 committee report or its findings?
23    A. No. But he had indicated to me when I saw him
24 in a public hearing that basically he thought it was a

Page 73

1 shame.
2    Q. Do you know if he's had a chance to read the
3 committee report?
4    A. I don't know.
5    Q. Mr. Dodson, Eric Dodson, where is he now
6 located?
7    A. Baltimore.
8    Q. Do you know where he's working?
9    A. Morgan State University.
10    Q. How many times have you communicated -- when is
11 the last time you spoke with him?
12    A. Maybe a month ago.
13    MR. DUSTON: By the way, Gregg, I will ask
14 you to supplement on phone numbers. I won't ask for
15 all of the addresses and contact that he's gone over
16 like jobs, but if he has telephone numbers I want
17 them.
18    MR. ZEFF: That's fair.
19 BY MR. DUSTON:
20    Q. How many times have you spoken with Mr. Dodson
21 since you were terminated by Delaware State?
22    A. Since I was?
23    Q. Since you were terminated.
24    A. Maybe ten or more times.

**A-000203**

19 (Pages 70 to 73)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 74 | Page 76 |
|---|---|
| 1  Q. Has he offered to serve as a witness for you? | 1  Q. When is the last time you spoke with Dr. Hagos? |
| 2  A. Yes. | 2  A. Maybe six months ago. |
| 3  Q. What topics have you discussed with Mr. Dodson | 3  Q. And he's still at Del State? |
| 4  that you might want him to testify on? | 4  A. Yes. |
| 5  A. The grade change that I made for certain | 5  Q. When is the last time you spoke with |
| 6  students that he supervised. | 6  Dr. Flayhart? |
| 7  Q. So his entire area of practicum and internship, | 7  A. I haven't. |
| 8  experience and those grade changes he has knowledge | 8  Q. Not since the hearing? |
| 9  of. He has knowledge of practices within the | 9  A. Not since before the hearing. |
| 10  department and, as you mentioned earlier, | 10  Q. Dr. Hannah is another former chair who you said |
| 11  conversations he supposedly had with Dr. Kopano? | 11  spoke to you about grade changes that she made of |
| 12  A. Mm-hmm. | 12  other professors? |
| 13  Q. Are there any other general areas on which Eric | 13  A. That's correct. |
| 14  Dodson has information that you think are relevant? | 14  Q. And she told you that at some point she has |
| 15  A. Yeah. Every time people went into my office, | 15  made grade changes of other professors? |
| 16  he let me know. | 16  A. Correct. |
| 17  Q. What else? | 17  Q. Do you recall any of the details? |
| 18  A. You covered everything in your summary, yes. | 18  A. I know that she changed grades of about two or |
| 19  Q. Dr. Flayhart you had mentioned earlier as one | 19  three students, two or three professors, and she was |
| 20  of the chairs who had contacted you. | 20  the chair of the department of education which really |
| 21      It's your understanding that Dr. Flayhart | 21  came under my wife, so that incident transpired. |
| 22  made grade changes on other professors? | 22  Q. Do you know any other details of those changes |
| 23  A. Yes. | 23  or recall them? |
| 24  Q. Do you know any of the details of what those | 24  A. No. |

| Page 75 | Page 77 |
|---|---|
| 1  grade changes might have been? | 1  Q. Have you spoken to Dr. Hannah about whether she |
| 2  A. No. | 2  would testify for you? |
| 3  Q. Other than that issue, do you believe that | 3  A. No. |
| 4  Dr. Flayhart has any other information that's relevant | 4  Q. Where is Dr. Hannah now located? |
| 5  to your claims? | 5  A. She's still in Dover. |
| 6  A. Not that I know of. | 6  Q. Dr. Helmy, chair of the department of physics, |
| 7  Q. But he would have knowledge of grade changes | 7  when is the last time you spoke with Dr. Helmy? |
| 8  that he made of other professors in his department? | 8  A. Before the hearing. |
| 9  A. Correct. | 9  Q. Is Dr. Helmy still at DSU? |
| 10  Q. Dr. Hagos testified extensively at the hearing. | 10  A. I assume so. I really don't know. |
| 11  Dr. Hagos has knowledge concerning the grade changes | 11  Q. What information does Dr. Helmy have |
| 12  that are at issue in this case? | 12  regarding — |
| 13  A. Mm-hmm. | 13  A. She was aware of grade changes also. |
| 14  Q. What other information do you think that | 14  Q. Is he aware of grade changes that he made — |
| 15  Dr. Hagos has relevant to this case? | 15  A. She made, yes. |
| 16  A. Dr. Hagos was aware of the politicking that | 16  Q. — she made of other professors in her |
| 17  Dr. Kopano did to try to unseat me and to come up with | 17  department? |
| 18  dirt or incriminating evidence. He brought out the | 18  A. Yes. |
| 19  fact that even though he was working with some of the | 19  Q. But you don't know any of the details? |
| 20  internships, I was still the teacher of record and I | 20  A. No. |
| 21  was the one who would sign all the grade sheets. | 21  Q. When is the last time you spoke with Dr. Helmy |
| 22      He had a class that didn't go and he did | 22  about her knowledge? |
| 23  not feel comfortable in not having the required four | 23  A. Before the hearing. |
| 24  classes, so I sort of gave him that class in name. | 24  Q. Dr. Ikien, when is the last time you spoke with |

20  (Pages 74 to 77)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 78 | Page 80 |
|---|---|
| 1   Dr. Ikien? | 1   president? |
| 2   A.  Dr. Ikein? | 2   A.  There's a date in which the chair must be |
| 3   Q.  Ikein. | 3   reelected and I thought it was the end of October and |
| 4   A.  Maybe six months ago or more. | 4   it occurred during that period of time. |
| 5   Q.  What was your last conversation with Dr. Ikien? | 5      According to Dr. Kopano, Dr. Frederick |
| 6   A.  It was not related to grade changes. | 6   asked him to run against me. And Don told me what he |
| 7   Q.  When was the last time you spoke with Dr. Ikien | 7   was doing, trying to convince people to support him |
| 8   about grade change issues? | 8   and come up with any information that they had. |
| 9   A.  That was before the hearing also. He was a | 9   Q.  So this is in October of 2003? |
| 10   department chair. | 10   A.  Before the end of October, yes. |
| 11   Q.  Did Dr. Ikien tell you that he had made grade | 11   Q.  Before the end of October 2003 there is an |
| 12   changes of other professors? | 12   effort to your understanding -- |
| 13   A.  Yes. | 13   A.  To unseat me. |
| 14   Q.  Did he describe for you any of the | 14   Q.  -- to unseat you as chair and in support of |
| 15   circumstances? | 15   that a specific request on Dr. Kopano to dig up dirt |
| 16   A.  No. | 16   on you? |
| 17   Q.  So you don't have any knowledge of -- | 17   A.  Mm-hmm. |
| 18   A.  I just don't remember, you know, what people | 18   Q.  And so all of the rumors and discussions about |
| 19   said. I just know they did it and I have their names. | 19   Dr. Sessoms wanting Dr. Kopano to dig up dirt on you |
| 20   Q.  We already talked about Dr. Jackson. | 20   date back to October 2003 or earlier in connection |
| 21   A.  Mm-hmm. | 21   with that campaign for chair, correct? |
| 22   Q.  Dawn Jones has knowledge concerning those | 22   A.  Right. |
| 23   classes in which there were grade changes that were at | 23   Q.  So what is it about that early in Dr. Sessoms' |
| 24   issue in the ad hoc dismissal process, correct? | 24   career that you think led him to want to unseat you as |

| Page 79 | Page 81 |
|---|---|
| 1   A.  Correct. | 1   chair and dig up dirt on you? |
| 2   Q.  And the operation of the practicum and how the | 2   A.  Specifically, I don't know. I suspect or draw |
| 3   practicum was run, correct? | 3   conclusions it had to do with three issues. One was |
| 4   A.  That's correct. | 4   the Morris case; second was the opposition to him as |
| 5   Q.  Are there any other areas that you think are | 5   president and, third, it was the rejection of him as a |
| 6   relevant that Ms. Jones has knowledge of? | 6   speaker. |
| 7   A.  The plotting and politics that Dr. Kopano was | 7   Q.  What was the timing of the Martin Luther King |
| 8   involved in in trying to drum up information about me, | 8   Day Breakfast? When is that held each year? I know |
| 9   negative information about me. | 9   it's Martin Luther King Day. |
| 10   Q.  When was this plotting and politics? Give me a | 10   A.  Around January 15th. It's always on the Martin |
| 11   time frame. | 11   Luther King holiday. |
| 12   A.  2003-2004. | 12   Q.  So that would be approximately January 15th of |
| 13   Q.  Let's be more specific. 2003-04. So all of | 13   '04 was the incident that you testified about before? |
| 14   this was the year before Dr. Sessoms came on board? | 14   A.  Correct. |
| 15   A.  No. It was the year he came on board. I | 15   Q.  When did that disinvitation come? When were |
| 16   thought he came in two thousand -- when did he come on | 16   the -- |
| 17   board? | 17   A.  In December. |
| 18   Q.  Am I off on my years? | 18   Q.  So Dawn Jones has knowledge of the plotting and |
| 19   MR. ZEFF: Off the record. | 19   politics in the fall of 2004 within the department? |
| 20   (Discussion off the record.) | 20   A.  Yes. |
| 21   BY MR. DUSTON: | 21   Q.  Dr. Kabria. Dr. Kabria is a former chair. |
| 22   Q.  President Sessoms starts in July 2003. What | 22   Have you had conversations with Dr. Kabria about the |
| 23   was the earliest notice you had of Dr. Kopano | 23   grade changes? |
| 24   supposedly trying to get dirt on you on behalf of the | 24   A.  Yeah. Dr. Kabria was also the dean of the |

21 (Pages 78 to 81)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 86 | Page 88 |
|---|---|
| 1    A. About a year ago. She called and asked for a<br>2  letter of recommendation.<br>3    Q.  What information does Morneau have relevant to<br>4  your claims?<br>5    A.  Any grade changes, anything that I did, she<br>6  kept a copy.<br>7    Q.  Dr. Nwosu, one of the other chairs that you<br>8  said contacted you before the hearing.<br>9        Have you spoken with Dr. Nwosu since the<br>10  hearing about being a witness?<br>11    A.  It's probably more than a year ago.  In fact,<br>12  the last time that I saw her was at my wife's<br>13  retirement, so that's a long time.  But she had<br>14  indicated that she had changed grades of professors<br>15  and I'm almost certain that Dr. Toscano was one of the<br>16  persons that she had changed grades without<br>17  consulting.<br>18    Q.  Dr. Ofosu, what knowledge does Dr. Ofosu have?<br>19    A.  The same had occurred in his department, and I<br>20  don't know whether he was the chair or whether he was<br>21  the professor.<br>22        Dr. Petrosky was the chair for the<br>23  longest...<br>24    Q.  When was the last time you discussed that issue | 1    A.  No.<br>2    Q.  Mr. Parr, what knowledge does Mr. Parr have<br>3  that's relevant?<br>4    A.  There were many issues that I guess Mr. Parr<br>5  had knowledge about.  He told me to contact Dr. Bell<br>6  because Dr. Bell had filled him in on everything.<br>7        So rather than getting it from him, I<br>8  should talk to Dr. Bell.<br>9    Q.  Now, how many conversations have you had with<br>10  Mr. Parr since your termination?<br>11    A.  One, within the last week.<br>12    Q.  Are there issues on which Mr. Parr has direct<br>13  knowledge concerning your termination or the ad hoc<br>14  dismissal committee procedures?<br>15    A.  Well, he knows that I had applied for<br>16  retirement.<br>17    Q.  What role did the fact that you were applying<br>18  for retirement have in your termination?<br>19    A.  Dr. Bell as the provost had recommended that<br>20  they just drop the case because it was in April that<br>21  these matters came up and I had planned to retire May<br>22  15th.<br>23    Q.  And after the initial or during the initial<br>24  investigation there was a meeting and discussion and I |

| Page 87 | Page 89 |
|---|---|
| 1  with Dr. Ofosu?<br>2    A.  It was before the hearing.<br>3    Q.  Dr. Panda, the same thing?<br>4    A.  Yeah.  He was of chair of marketing and he was<br>5  aware of issues with grades of Dr. Ikien that were<br>6  changed.<br>7    Q.  And you spoke to Dr. Panda prior to the<br>8  hearing?<br>9    A.  Yeah.  I spoke with him within the last week.<br>10    Q.  Have you spoken with him about this case?<br>11    A.  Yeah.  Basically, I told him it was coming up.<br>12  He had a case and I really called him because it's on<br>13  the docket and I just wanted to know what it was<br>14  about.<br>15    Q.  So he told you about his case?<br>16    A.  No.  I saw it on the docket and I asked him<br>17  about it and he said it was coming up.<br>18    Q.  Did he tell you anything about it?<br>19    A.  His case?<br>20    Q.  Yes.<br>21    A.  Some student, female student, some white female<br>22  student is charging him with sexual harassment.<br>23    Q.  Did you talk to him about the grade change<br>24  issues and whether he would testify in this case? | 1  believe Dr. Bell testified that his personal<br>2  recommendation at that time was to simply allow you to<br>3  take early retirement and leave in May of 2004,<br>4  correct?<br>5    A.  Correct.<br>6    Q.  And that was Dr. Bell's opinion regarding what<br>7  should happen at that point and his recommendation?<br>8    A.  Well, he was the academic officer and that was<br>9  his recommendation.<br>10    Q.  Right. That was his recommendation.  And<br>11  that's the scope of his knowledge concerning your<br>12  retirement, correct?<br>13    A.  Yeah.  But he has knowledge about all aspects<br>14  of the case.<br>15    Q.  Mr. Parr's knowledge is either information he's<br>16  heard from Dr. Bell or the knowledge about your<br>17  application for retirement, correct?<br>18    A.  Yeah. That's correct.  That's what he<br>19  indicated.<br>20    Q.  Dr. Petrosky, have you spoken with Dr. Petrosky<br>21  since the hearing?<br>22    A.  No.<br>23    Q.  Did Dr. Petrosky say anything to you about<br>24  changes? |

A-000206

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

|  | Page 98 |
|---|---|
| 1 | Have you spoken to each of these students |
| 2 | in the last six months or year about their willingness |
| 3 | to testify? |
| 4 | A. Actually, only one. |
| 5 | Q. So of the eight students on here, you've spoken |
| 6 | to one of them? |
| 7 | A. Mm-hmm. |
| 8 | Q. Who? |
| 9 | A. McClain. Veronica Brinney e-mailed me. |
| 10 | I'm sorry. I talked to Shannon Bellamy. |
| 11 | Q. Okay. And have you had e-mail — |
| 12 | A. I talked to Morgan Parker but more than a year |
| 13 | ago. |
| 14 | Q. But since the hearing have you spoken to, |
| 15 | spoken or e-mailed or contacted all of these students |
| 16 | or just -- |
| 17 | A. No. |
| 18 | Q. -- some of them? |
| 19 | Do any of them have any knowledge other |
| 20 | than about their own grade changes? Some of these |
| 21 | were ones that were testified about at the hearing. |
| 22 | A. Yeah. Some of these students just represented |
| 23 | the entire class and in that connection, yes. |
| 24 | Q. All right. |

|  | Page 99 |
|---|---|
| 1 | MR. DUSTON: Gregg, this is a perfect |
| 2 | breaking point for lunch. |
| 3 | MR. ZEFF: Good. |
| 4 | MR. DUSTON: Then I will move into other |
| 5 | substance afterwards. |
| 6 | (Recessed for lunch at 12:50 p.m.) |
| 7 | - - - - - |
| 8 | AFTERNOON SESSION |
| 9 | 1:35 p.m. |
| 10 | BY MR. DUSTON: |
| 11 | Q. Dr. Gorum, you can set the interrogatories |
| 12 | aside. |
| 13 | Other than the people on that list, is |
| 14 | there anyone else other than your attorney that you |
| 15 | have talked to about your termination? |
| 16 | A. There is a name I did not put on here. I have |
| 17 | to look up her number off the cell phone. |
| 18 | This person was the assistant compliance |
| 19 | officer and she knows that people were threatened and |
| 20 | told that if they worked with us, they would lose |
| 21 | their jobs. |
| 22 | Q. The assistant compliance officer. Are we |
| 23 | talking about the NCAA compliance officer or somebody |
| 24 | else? |

|  | Page 100 |
|---|---|
| 1 | A. I guess it would be the NCAA person. |
| 2 | Q. Are you referring to Kim Walker, who testified, |
| 3 | or to somebody else? |
| 4 | A. Kim's assistant. |
| 5 | Q. So Kim Walker's assistant? |
| 6 | A. Mm-hmm. |
| 7 | Q. And this is somebody you had spoken to? |
| 8 | A. Yes. |
| 9 | Q. You don't recall her name but you're looking |
| 10 | her up? |
| 11 | A. Yeah. I mean, I know who she is and what she |
| 12 | looks like, but I can't remember names. |
| 13 | It will come to me. |
| 14 | Q. While you're looking up that name, what was the |
| 15 | nature of the conversation you had with her? |
| 16 | A. Several persons, including Kim Walker, Ben |
| 17 | Blacknall, the football coach, and Coach Blackiston, |
| 18 | he was the assistant coach, Assistant Coach |
| 19 | Blackiston, had been helping us with the DeShawn |
| 20 | Morris case, providing information and everything. |
| 21 | And then the next day they said, "I can't talk to you |
| 22 | anymore." And that's basically all they said, except |
| 23 | that — what's this girl's name? |
| 24 | Told us that they were told that if they |

|  | Page 101 |
|---|---|
| 1 | helped us or gave us any information, they would be |
| 2 | fired. |
| 3 | Q. Now, at what stage of the Morris case did this |
| 4 | conversation occur? |
| 5 | A. I think it was during the time he had filed |
| 6 | suit. |
| 7 | Q. So sometime in the period between August and |
| 8 | October? |
| 9 | A. Yes. |
| 10 | Q. Where did this conversation occur? |
| 11 | A. With Kim? |
| 12 | Q. With any of these people who talked to you. |
| 13 | A. It was actually in my office at Delaware State. |
| 14 | Q. Okay. Was it that all these people were in the |
| 15 | room at once or -- |
| 16 | A. No. Just one. It was the assistant compliance |
| 17 | officer who told us that these people – all the |
| 18 | people I named stopped talking to us because their |
| 19 | jobs were threatened. |
| 20 | Q. No, that's a conclusion. I want to first ask |
| 21 | you: Did you ever have a conversation with Ben |
| 22 | Blacknall concerning why he stopped providing |
| 23 | information to you? |
| 24 | A. No. |

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 102 | Page 104 |
|---|---|
| 1  Q. Did Blacknall ever have a conversation with you<br>2  saying that he felt he had been threatened or had been<br>3  threatened?<br>4  A. With me, no.<br>5      With DeShawn Morris, yes.<br>6  Q. What conversations are you aware of that<br>7  involved Coach Blacknall being threatened or feeling<br>8  threatened?<br>9  A. Technically, none. We were in contact after he<br>10  was fired and, you know, we still maintain contact to<br>11  this day.<br>12  Q. Has Coach Blacknall ever told you directly that<br>13  at any point during the Morris case he either was<br>14  threatened or had felt threatened?<br>15  A. No. I never asked. And the reason is he had<br>16  told DeShawn Morris and that's why.<br>17  Q. What did Coach Blacknall allegedly tell<br>18  Mr. Morris about threats?<br>19  A. That if they continued to help him, they would<br>20  lose their jobs, basically.<br>21  Q. And when did Mr. Morris repeat this to you?<br>22  A. As soon as he found out.<br>23  Q. And Mr. Morris claimed that he was told this<br>24  directly by Coach Blacknall? | 1      THE WITNESS: I found her name.<br>2  A. It's Nicole Gould, G-o-u-l-d.<br>3  Q. Thank you.<br>4      And when was the last time you spoke to<br>5  Ms. Gould?<br>6  A. The last two weeks.<br>7  Q. Where is she now living?<br>8  A. She's in Baltimore. She's a compliance officer<br>9  at Morgan State University.<br>10      MR. ZEFF: We'll amend our interrogatory<br>11  answers and discovery to include her name.<br>12      MR. DUSTON: Thank you.<br>13  BY MR. DUSTON:<br>14  Q. What was the nature of your conversation with<br>15  Ms. Gould?<br>16  A. I was really trying to reach Kim Walker and I<br>17  didn't have her number, so DeShawn suggested I call<br>18  Nicole and that's when she told me all about it.<br>19  Q. Now, had Nicole had a conversation with you at<br>20  the time concerning threats or was this the first one<br>21  two weeks ago?<br>22  A. Yeah. She had mentioned it before in my<br>23  office.<br>24  Q. So she had at the time she had been in your |

| Page 103 | Page 105 |
|---|---|
| 1  A. Yes. And by Coach Blackiston, Kim Walker.<br>2  Okay?<br>3  Q. So Mr. Morris claims he told you or Mr. Morris<br>4  told you that at least three people had spoken to him<br>5  directly saying that they could not help him or else<br>6  they would lose their jobs?<br>7  A. Yes.<br>8  Q. So Mr. Morris would testify that all three of<br>9  these DSU people had conversations with him expressing<br>10  that they had been, they felt they were threatened or<br>11  felt threatened if they cooperated with him?<br>12  A. Yes.<br>13      And there's another person, a professor in<br>14  there.<br>15  Q. Who is that?<br>16  A. I can't remember her name.<br>17  Q. What was her role?<br>18  A. She was a professor in physical education and<br>19  she had been working with him.<br>20      MR. ZEFF: Let me just interrupt for a<br>21  minute.<br>22      I note you're still looking at your cell<br>23  phone. Why don't we finish that activity so you're<br>24  not doing two things at once? | 1  office -- was anyone else present?<br>2  A. DeShawn.<br>3  Q. What specifically did Nicole Gould tell you at<br>4  that time?<br>5  A. That someone, I thought that someone was<br>6  Dr. Charles Smith but I'm not sure, had told them that<br>7  if they continued to help or provide information to<br>8  DeShawn they would be, they would lose their jobs.<br>9  Q. Standing here today, you can't recall whether<br>10  she specifically named Dr. Smith as the person who<br>11  told them that?<br>12  A. No. I just -- I don't know specifically what<br>13  she said. But -- I don't know.<br>14  Q. Did Ms. Gould indicate then or in your last<br>15  conversation who specifically was told that?<br>16  A. No. I didn't even ask. What happened was that<br>17  we were trying to get information from Kim. Kim had<br>18  been very helpful in terms of making sure we met NCAA<br>19  rules and requirements.<br>20      And then the next day we went back for<br>21  something and she refused to talk to us. She just<br>22  said stay away. It was the same thing with Coach<br>23  Blackiston. He had been a personal trainer.<br>24  Q. Do you know what triggered that change? Let me |

27 (Pages 102 to 105)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 106 | Page 108 |
|---|---|
| 1  rephrase. | 1  made by you or anybody else? |
| 2      Did they tell you what triggered the | 2  A.  The students made a tape of the professor. |
| 3  change, like the filing of the lawsuit, or did they | 3  Q.  Right. |
| 4  just say, "I can't talk to you anymore"? | 4  A.  That one.  Other than that, no. |
| 5  A.  They just said that and that was it. | 5  Q.  There's the tape that came out in the ad hoc |
| 6      MR. ZEFF:  Just said what? | 6  hearing of the one incident with Dr. Osei-Mensah? |
| 7      THE WITNESS:  That "I can't talk to you | 7  A.  Yes. |
| 8  anymore.  Stay away." | 8  Q.  Other than that, as far as you know none of the |
| 9      But what's significant is they said, "I | 9  conversations that anybody had with anybody have been |
| 10  can't talk to you anymore." | 10  tape-recorded knowingly or not? |
| 11  BY MR. DUSTON: | 11  A.  Not that I know of. |
| 12  Q.  Why is that significant? | 12  Q.  Okay.  Dr. Gorum, you've described earlier |
| 13  A.  Because it suggests that they had talked to us | 13  today in general terms three incidents that you think |
| 14  previously, and they had. | 14  are behind President Sessoms' alleged retaliation of |
| 15  Q.  Have you ever had a direct conversation with | 15  you that you think influenced, are the real reasons |
| 16  Coach Blackiston concerning whether he ever felt | 16  why he recommended your termination. |
| 17  threatened? | 17      And those three reasons are your role |
| 18  A.  No.  And we talked many times, but I never | 18  prior to the time he was hired in recommending that |
| 19  discussed it because DeShawn told me and I guess at | 19  the search be reopened and he not be named as |
| 20  that point he had too much to lose so I accepted what | 20  president, the disinvitation to the Martin Luther King |
| 21  he had to say.  He was very close to the coach because | 21  Breakfast and, in general, in broad terms your |
| 22  he was an All American and at a school like Delaware | 22  involvement with DeShawn Morris and his appeal and |
| 23  State you don't produce an All American. | 23  lawsuit, right? |
| 24  Q.  So when you said you responded to him, he | 24  A.  Yes. |

| Page 107 | Page 109 |
|---|---|
| 1  didn't want you contacting them again or he wanted you | 1  Q.  Are there any other incidents before we go into |
| 2  to respect -- what did Mr. Morris tell you? | 2  the details of those, any other things that you have |
| 3  A.  They would not provide any information or help | 3  done that you think were known by President Sessoms |
| 4  anymore, to really to stay away from them. | 4  and that you think were part of his motive for why he |
| 5  Q.  But since that time you've never had | 5  recommended your termination? |
| 6  conversations with any of these people other than | 6  A.  I can't think of anything else at this time. |
| 7  Ms. Gould about whether they had been threatened or by | 7  Q.  So there are no specific actions that you took |
| 8  whom? | 8  on behalf of any other students other than DeShawn |
| 9  A.  I had conversation with Blacknall, but I didn't | 9  Morris that you think played a role in Dr. Sessoms' |
| 10  ask him that question.  He told me that his case had | 10  motivation for recommending your termination? |
| 11  been settled; that he had filed a lawsuit.  And he | 11  A.  I can't think of any.  I represented most |
| 12  didn't give any details.  He could not discuss it. | 12  students who had difficult cases and I can't remember |
| 13  Q.  You didn't list Ms. Walker as a person with | 13  what they were. |
| 14  knowledge.  Does she have anything -- | 14  Q.  Dr. Gorum, during the ad hoc dismissal |
| 15  A.  That was an omission. | 15  committee you discussed to some extent your role over |
| 16  Q.  -- other than what you testified to -- | 16  the years representing different students.  You |
| 17  A.  That's true.  She had a report, yes. | 17  discussed your sort of advocacy on behalf of all of |
| 18  Q.  Other than what she testified to in the hearing | 18  the professors and you actually described that you |
| 19  and her knowledge about Mr. Morris's situation in her | 19  thought that some of those activities had played a |
| 20  role as compliance officer, do you know if she has any | 20  role in your relationship with President DeLauder, |
| 21  other information that's relevant to your claims? | 21  right? |
| 22  A.  No, I do not know. | 22  A.  Mm-hmm. |
| 23  Q.  Are you aware of any tape recordings or voice | 23  Q.  This case you understand is just about your |
| 24  mail messages that have any relevance to your case | 24  termination or suspension and just about the reason |

28  (Pages 106 to 109)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 110 | Page 112 |
|---|---|
| 1  why President Sessoms recommended that you be fired,<br>2  right?<br>3  A. Mm-hmm.<br>4  Q. That's the main thing you're suing over.<br>5  So the main question in this case is<br>6  whether President Sessoms is lying about the reasons<br>7  he's given for recommending your termination, right?<br>8  MR. ZEFF: Objection.<br>9  You can answer if you understand.<br>10  Q. You understand that the central issue here is<br>11  whether or not President Sessoms is lying and that the<br>12  real reason is something other than what he says?<br>13  MR. ZEFF: Same objection.<br>14  Go ahead.<br>15  A. I'm not sure I really understand the question<br>16  because the reasons that, the reasons that I<br>17  enumerated were based on what people had told me and I<br>18  can't remember specifically who, but even people in<br>19  his office had told me, for example, that he was upset<br>20  and angry about the Martin Luther King disinvitation.<br>21  Q. Right.<br>22  A. And then I'm sure, which was known all over<br>23  campus, that I objected to the president, the<br>24  president coming and wanted to reopen the search and I | 1  bargaining agreement the way that he wanted to and in<br>2  many instances I, along with many of the other faculty<br>3  members in the union felt that he violated the<br>4  collective bargaining agreement. And I am a<br>5  spokesperson and I say what I believe and feel.<br>6  Q. So do you believe that one of Dr. Sessoms'<br>7  motives was because of things that you had said or<br>8  done about the collective bargaining agreement?<br>9  A. Yes. That's part of it, yes.<br>10  And I also believe that he was fed<br>11  information about my activities prior to his coming.<br>12  I questioned Dr. DeLauder also.<br>13  Q. What other things, what things did you do, if<br>14  any, after President Sessoms came that you think are<br>15  examples of conduct or behavior that President Sessoms<br>16  didn't like and wanted to retaliate against?<br>17  A. At a faculty reception that was sponsored by<br>18  the board of trustees, I was chaired -- I mean I was<br>19  cornered by the chair of the board and the assistant<br>20  chair of the board. They asked me a question: What<br>21  did I think of them and everything? And of course I<br>22  was somewhat guarded.<br>23  But the impression I came away with was<br>24  that, well, it was just not a favorable impression. I |

| Page 111 | Page 113 |
|---|---|
| 1  was told that he was upset about that.<br>2  Q. Right.<br>3  A. So this information was fed to me by someone.<br>4  Q. Sure. Now, Dr. Gorum, my understanding of the<br>5  claim -- what's your understanding of the claim that<br>6  you're making in this case?<br>7  What are you claiming that Dr. Sessoms did<br>8  that was illegal?<br>9  A. Well, he's really trying to shut me up and show<br>10  that by controlling a full professor, someone who is<br>11  known on campus, popular and if he could succeed in<br>12  shutting me up, then he could control the others.<br>13  And that's my interpretation.<br>14  Q. All right.<br>15  MR. DUSTON: Would you repeat that answer<br>16  for me?<br>17  (The reporter read back the last answer.)<br>18  BY MR. DUSTON:<br>19  Q. So you believe that most important is that<br>20  President Sessoms was trying to make an example out of<br>21  you?<br>22  A. Yes.<br>23  Q. Now, make an example for what?<br>24  A. Dr. Sessoms interpreted the collective | 1  had to be guarded in what I had to say to them and I<br>2  thought I was marked and this is what I had been told<br>3  by others.<br>4  Q. And this was how early in the process?<br>5  September? August?<br>6  A. September.<br>7  Q. September. It would be September 2003, shortly<br>8  after the president came on board?<br>9  A. That's correct.<br>10  Q. And you felt that you had been marked at that<br>11  point by either the fact that they were talking to you<br>12  at this reception --<br>13  A. Well, the manner in which they talked to me and<br>14  they also knew I was behind trying to get them to<br>15  reopen the search.<br>16  Q. Did they talk --<br>17  A. I was told that they did not like having<br>18  faculty question their judgment in the selection<br>19  process. Dr. Osei said that and he was a member of<br>20  the search committee.<br>21  Q. In your opinion, has Dr. Hough been retaliated<br>22  against?<br>23  A. I really don't know. I mean, I don't --<br>24  Q. He was the leader of that, he was one of the |

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    A-000210

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 114 | Page 116 |
|---|---|
| 1 spokespeople in favor of reopening the search, | 1 So -- and I'm sure that it emanated from the climate. |
| 2 correct? | 2   Q. In fact, there were a lot of professors who |
| 3   A. Mm-hmm. | 3 were troubled by some of the changes that President |
| 4   Q. To your knowledge, has Dr. Hough been | 4 Sessoms was implementing, correct? |
| 5 subjected to -- | 5   A. Yes. |
| 6   A. I don't know. I have not had any contact with | 6   Q. And there was a lot of public discussion and |
| 7 him. | 7 criticism, correct? |
| 8   Q. Can you give me any specific examples between | 8   A. Yes and no. When I say yes and no, many people |
| 9 the time that President Sessoms started and your | 9 privately would complain but publicly would not. |
| 10 termination where you opposed certain interpretations | 10   Q. Can you give me any examples of where you |
| 11 of the collective bargaining agreement? | 11 publicly took positions in your own name or on behalf |
| 12   A. I would have to go back and look at notes | 12 of the union concerning actions by President Sessoms? |
| 13 because there were many and I just cannot. I can't | 13   A. I cannot recall right now. That I have to |
| 14 even think of one right now. I'm sorry. | 14 think about. It really has been a long time. I would |
| 15   Q. So it's your position that you took positions | 15 have to go back and look at notes and issues. |
| 16 regarding interpretations of the collective bargaining | 16   Q. What notes would you be able to look at to |
| 17 agreement, right? | 17 refresh your recollection on whether or not there were |
| 18   A. You know, it was, it was the position of the | 18 things that you publicly did critical of President |
| 19 union itself. It wasn't so much it was a personal | 19 Sessoms? |
| 20 position, yeah. | 20   A. The minutes of the collective bargaining |
| 21   Q. Now, you viewed yourself as a spokesperson for | 21 agreement. |
| 22 the union in its dealings -- | 22   Q. The minutes of the union meetings? |
| 23   A. I was a unit member, yes. | 23   A. Yes. That would refresh my memory. |
| 24   Q. Did you have a position with the union, with | 24   Q. Let's assume that the minutes of the union |

| Page 115 | Page 117 |
|---|---|
| 1 the unit at the time? | 1 meeting -- did the union keep regular minutes? |
| 2   A. I don't think so. I don't think so, not at | 2   A. Yes. |
| 3 that time. | 3   Q. And Dr. King would be the keeper of those? |
| 4   Q. Did you ever have direct conversations with | 4   A. I'm sure he gave up his position as president, |
| 5 President Sessoms over union-related issues? | 5 but he was emeritus or -- |
| 6   A. No. | 6   Q. But the president of the union would -- |
| 7   Q. Did anyone ever inform you that President | 7   A. But somebody would, yeah, somebody would have |
| 8 Sessoms perceived you as being a spokesperson for the | 8 them. |
| 9 union? | 9   Q. Now, assuming the minutes show that on |
| 10   A. Someone told me that they saw me as either a | 10 such-and-such a date you spoke critically about |
| 11 rebel rouser or a leader, yes, that was told to me. | 11 something that was going on with the interpretation by |
| 12   Q. Well, someone said they, some unknown they | 12 the administration, do you have any information that |
| 13 viewed you as a rebel rouser? | 13 President Sessoms was aware of any of those incidents |
| 14   A. Yes. | 14 or that conduct? |
| 15   Q. Was it specifically referred to President | 15   A. No, not directly. |
| 16 Sessoms or was it to the administration in general? | 16   Q. Other than this person who said, someone who |
| 17   A. To Sessoms. | 17 said that you were viewed as a rebel rouser, do you |
| 18   Q. You don't know who it was? | 18 have any other information to believe that your role |
| 19   A. No, I really do not. | 19 as a union spokesperson, any other evidence to support |
| 20   Q. You don't know the basis for that perception? | 20 the idea that your role as a union spokesperson might |
| 21 You don't know what they were basing their statement | 21 have been known by and influenced President Sessoms in |
| 22 on? | 22 his later termination recommendation? |
| 23   A. At that time there was a lot of conflict in | 23   A. I believe that Dr. Frederick made it clear that |
| 24 interpretations and in the way people were treated. | 24 he had reported everything to Dr. Sessoms that |

30  (Pages 114 to 117)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

Page 118

1  transpired.
2    Q. When you say, "everything," reported everything
3  what?
4    A. Any interaction, any incidents, actions going
5  on with the faculty.
6    Q. Is it your contention that Dr. Frederick
7  basically drew up a name or a list of faculty and
8  informed the president here are all of the people who
9  are against you?
10    A. No, I didn't say that.
11    Q. So other than the fact that Dr. Frederick wrote
12  a regular report on faculty issues to the president,
13  you don't have any knowledge that Dr. Frederick or
14  anyone else told President Sessoms "Professor Gorum is
15  one of your opponents"?
16    A. I cannot remember now specific details, but I
17  just know that that's the impression I was given. He
18  was the one behind everything.
19    Q. Who?
20    A. Dr. Frederick.
21    Q. Dr. Frederick was behind it?
22    A. Yes.
23    Q. You also said you believe that President
24  Sessoms was fed information about your past actions.

Page 119

1  Which specific -- first of all, what's the basis for
2  that?
3        What's the basis for your claim that
4  Dr. Sessoms was given information by others concerning
5  your role on campus before he arrived?
6    A. When I arrived on campus I guess in '89, every
7  chair of the faculty senate and everything else, in
8  other words, there were no blacks in any position, and
9  I met with 20 black faculties, faculty members in my
10  home to organize, to deal with issues on campus.
11    Q. Dr. Gorum, my question -- and I want to stay
12  focused right now on President Sessoms.
13        My question was: How do you know whether
14  or not President Sessoms was given information after
15  he arrived about your activities and role prior to the
16  time that he was president?
17    A. I don't know that someone gave it to him.
18    Q. You don't know?
19    A. Yeah.
20    Q. So although you have actions that you took,
21  maybe many actions over the years that were advocacy
22  or in opposition to the administration -- let's
23  stipulate.
24        You believe that prior to President

Page 120

1  Sessoms you took actions that were opposed to the
2  administration, right?
3    A. Mm-hmm.
4    Q. And you were engaged on advocacy on behalf of
5  other faculty?
6    A. And students.
7    Q. And students. And that that had been a role
8  that you had believed that you had done for many
9  years, correct?
10    A. Yes.
11    Q. Now, are you claiming that those actions that
12  you had done through the years before President
13  Sessoms arrived were factors in President Sessoms'
14  decision to recommend your termination?
15    A. I was trying to respond to your question in
16  terms of how did he know about my activities, right?
17    Q. And you said you don't know if he did.
18    A. Well, subsequently, yes. But historically I
19  would think anybody on campus would know about those
20  activities, including Dr. Frederick, who was part of
21  that group that we organized.
22    Q. But I'm now talking about are you claiming
23  today that among the reasons that President Sessoms
24  really used in deciding to recommend your termination

Page 121

1  was activities that you had taken before he arrived?
2  Let's call them advocacy activities on campus.
3    A. In terms of your question, activities, no.
4        It was the reputation that he was probably
5  aware of. Specific activities?
6    Q. So as far as you know, President Sessoms was
7  not motivated because of any specific incident or
8  specific student grievance, but you believe he was
9  motivated by your reputation as an advocate and a
10  spokesperson?
11        MR. ZEFF: Objection.
12    A. I didn't see it that way.
13    Q. Okay. I'm trying to understand what you meant.
14        You said he may have been motivated -- do
15  you believe he was motivated to fire you by your
16  reputation?
17    A. In part.
18    Q. Then describe --
19    A. I think I listed them. I said that he reacted
20  to the handling or help that I gave to DeShawn Morris.
21  I think he reacted to the fact that I tried to have
22  the search reopened during the interview process.
23  Everybody thought we sort of had an exchange and they
24  thought well, how do you know him and all this? That

31 (Pages 118 to 121)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 122 | Page 124 |
|---|---|

**Page 122**

1  wasn't it. He just wasn't answering the questions.
2     Q. And you said he was motivated, in part, by the
3  disinvitation on the breakfast?
4     A. That's correct.
5     Q. You have also now said he was motivated, in
6  part, by your reputation on campus?
7     A. Well, what I meant by that is I had always
8  worked with faculty and with students and everybody
9  knew it and I can't tell you about specific activities
10  that I did. It was just the reputation that I was a
11  leader in that area is what I'm trying to get across.
12     Q. But do you believe that one of the factors that
13  Dr. Sessoms used in recommending your termination was
14  your reputation as a leader or as a spokesperson?
15     A. Yes.
16     Q. Do you have any direct or indirect information
17  other than the rebel rouser comment about what
18  Dr. Sessoms may have perceived as your reputation?
19     A. Dr. Sessoms made several references to getting
20  rid of a full professor even at the news conference
21  and they were derogatory. There was a news conference
22  I think in November 2006, yeah, 2006.
23     Q. So I understand what you perceive the
24  reputation was, would you describe for me again your

**Page 123**

1  own view of your reputation that you think negatively
2  affected Dr. Sessoms or affected Dr. Sessoms'
3  decision? You have used the term leader. You have
4  used the term spokesperson.
5     Is there any other aspect of your
6  reputation that you think influenced President
7  Sessoms?
8     A. I would have to go back to the articles that
9  were in the newspaper and the comments that
10  Dr. Sessoms made at the press conference.
11     Q. We're talking about the articles after the NCAA
12  investigation?
13     A. No. No. No. No. Dr. Sessoms called a press
14  conference and accused someone of changing grades, a
15  full professor, and doing all of these things and
16  hacking into the computer to change grades.
17     Q. Okay.
18     A. And eventually of course the press wanted to
19  know who this person was, yeah.
20     Q. Dr. Gorum --
21     A. And I'm saying that to me --
22     Q. So those are those quotes.
23     A. Right.
24     Q. But other than those quotes, I just want to

**Page 124**

1  make certain I understand your perception of your
2  reputation as a leader of the faculty and as a
3  spokesperson for the faculty. Is that correct?
4     A. Yes.
5     Q. Are there any other aspects of your reputation
6  at DSU that you think affected President Sessoms'
7  decision?
8     A. I can't think of anything right now.
9     Q. Let's focus on the Alpha breakfast.
10     If I can summarize, this is an annual
11  Martin Luther King, Jr. Prayer Breakfast that was
12  sponsored by as I recall the Alpha fraternity alumni?
13     A. Yes.
14     Q. And what was your role in organizing that
15  annual breakfast?
16     A. I was responsible for selecting the speaker.
17     Q. So this was the alumni association or the Alpha
18  alumni that sponsored this every year?
19     A. Yes. It's a fraternity and there is an
20  undergraduate chapter and there is a graduate chapter
21  and I was a member of the graduate chapter.
22     Q. You were a member of the graduate chapter and
23  you were also the advisor to the undergraduate
24  chapter. Is that correct?

**Page 125**

1     A. That's correct.
2     Q. So this was an event by the graduate chapter
3  and your role on that was simply as a member or were
4  you a committee member for the breakfast?
5     A. I was chair of the committee that was
6  responsible for selecting the speaker.
7     Q. And somebody else set up details about the
8  breakfast and did everything else, right? You were on
9  the speaker committee?
10     A. I was on the program committee, which -- yes.
11  Yes.
12     Q. Program committee?
13     A. Yes, which was responsible for putting together
14  the program.
15     Q. Who else was on the program committee?
16     A. Oh, my.
17     Q. Roughly how many alumni were on the program
18  committee?
19     A. Eight to ten. I can remember faces. I would
20  have to go back and look at a list for names.
21     Q. Eight to ten were on the alumni committee. How
22  many of them were DSU employees?
23     A. None, per se. One person, Cecil Wilson, was
24  the former president of the Delaware NAACP. He was

32 (Pages 122 to 125)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 126 | Page 128 |
|---|---|
| 1   hired to assist the president in acclimating to the | 1   A. Yes. Yes. |
| 2   community, so in that sense he was a representative. | 2   Q. Tell me what there was. What discussions were |
| 3   Q. And he was on the program committee? | 3   there about this mix-up in invitations? |
| 4   A. Yes. | 4   A. I can't remember the name of the person, but I |
| 5   Q. Now, do you recall who was involved in the | 5   know who he is. That's why I say I would have to see |
| 6   various invitations as in who invited whom first? | 6   a list. He was simply appalled at what was done and |
| 7   A. Okay. I had invited Kwiesi Mfume and he had | 7   the point he made was how could you invite Dr. Sessoms |
| 8   agreed to come. Subsequently to that invitation he | 8   to be the speaker when he no one had ever invited |
| 9   was involved in an auto accident, so he withdrew. | 9   Dr. DeLauder and DeLauder was a member of the |
| 10       I then invited the dean of the school of | 10   fraternity. |
| 11   dentistry at Howard as a backup and I had committed to | 11       So his whole thing is Cecil Wilson took |
| 12   him. Cecil Wilson on his own, without consulting | 12   action on his own and that they thought that he was |
| 13   anybody else on the committee, invited Sessoms. And | 13   wrong in doing it and he should be forced to rescind |
| 14   when we found out what he did, we simply told him he | 14   it. |
| 15   had to rescind that invitation. | 15   Q. So he was wrong in doing it without the consent |
| 16   Q. Now, you had described this as a fairly | 16   of the program committee? |
| 17   significant event every year. Is that accurate? | 17   A. That's correct. |
| 18   A. Yeah. It turned into that, yes. | 18   Q. And he was wrong given the past history with |
| 19   Q. A lot of people attending this event? | 19   President DeLauder in that you had never done it with |
| 20   A. (The witness nodded.) | 20   a president before? |
| 21   Q. Does President Sessoms routinely attend prayer | 21   A. Mm-hmm. |
| 22   breakfasts when they are held? | 22   Q. And was he wrong because there had been another |
| 23   A. That was his first year. | 23   invitation? |
| 24   Q. That was his first year. Do you know if he's | 24   A. I'm not... |

| Page 127 | Page 129 |
|---|---|
| 1   attended subsequent ones? | 1   Q. Let me rephrase it. |
| 2   A. I doubt it, but I don't know. | 2       The committee thought he was wrong just |
| 3   Q. Are there other major occasions at which prayer | 3   because you hadn't invited the president in the past, |
| 4   breakfasts are scheduled on campus? | 4   correct? |
| 5   A. No. It's only once a year. | 5   A. The main reason is he did it on his own without |
| 6   Q. Do you recall what kind of time gap there may | 6   the committee's knowledge or consent. |
| 7   have been between the time Cecil Wilson extended the | 7   Q. All right. Do you know whether Cecil Wilson |
| 8   invitation and then he had to withdraw it? | 8   communicated your role in this to President Sessoms? |
| 9   A. No. We don't know when he did it. When we | 9   A. I don't know, but he almost had to because I |
| 10   found out it was really within the last week, a week | 10   had to deal with him. |
| 11   or so before the event was to take place. | 11   Q. You had to deal with whom? |
| 12   Q. So it had been in early January then? | 12   A. To tell him to rescind the offer. |
| 13   A. It was probably in December. | 13   Q. As the head of the program committee? |
| 14   Q. Do you know where Mr. Wilson is now located? | 14   A. Yes. |
| 15   A. Dover. | 15   Q. Now, I assume that there wasn't any |
| 16   Q. Do you know where he's working or where he is? | 16   compensation for your role on the program committee? |
| 17   A. He retired. He was a principal. | 17   A. No. |
| 18   Q. Other than Mr. Wilson and President Sessoms, is | 18   Q. It was just a volunteer position? |
| 19   there anybody else who would really have knowledge | 19   A. It was volunteer. |
| 20   concerning this incident, how the programming was set | 20   Q. And this was completely unrelated to your job |
| 21   up and the invitations? | 21   duties at Delaware State? |
| 22   A. Yes. Other members of the committee. | 22   A. That's correct. That's correct. |
| 23   Q. Was there any e-mail exchange or discussion | 23   Q. It was just an alumni activity? |
| 24   about this? | 24   A. Yeah. Public service. |

33 (Pages 126 to 129)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 134 | Page 136 |
|---|---|
| 1    Q. That's your belief? | 1    A. For all administrative positions the faculty |
| 2    A. Yeah. | 2    had a right to interview the candidates and that's |
| 3    Q. Going back to your role prior to President | 3    basically what happened. |
| 4    Sessoms coming on board, all of your actions were | 4    Q. So they had a right to interview and then they |
| 5    taken in your role as a unit member and whatever | 5    had a right to express their position? |
| 6    position you had at that time, correct? | 6    A. That's correct. |
| 7    A. Mm-hmm. | 7    Q. Now, in between the interviews, did the |
| 8    Q. And these were all, all of your actions in | 8    administration come back or the board come back with a |
| 9    connection with the search process were based upon | 9    recommendation that said we are recommending or are |
| 10    committee roles or whatever positions you had, formal | 10    initially thinking of Dr. Sessoms? How did that work? |
| 11    positions you had in the search process, correct? | 11    A. All members who attended completed a form on |
| 12    A. I didn't really have a formal position. Just | 12    each candidate. |
| 13    as a unit member. | 13    Q. So you interviewed. How many candidates did |
| 14    Q. You said you held a number of positions in the | 14    you interview during the search process? |
| 15    union and had been involved on various committees. | 15    A. Three. |
| 16    A. In the unit. | 16    Q. Who were the other two? |
| 17    (Discussion off the record.) | 17    A. Let's see. I do not remember the candidates' |
| 18    BY MR. DUSTON: | 18    names, but I knew two of them. I did not know |
| 19    Q. During the entire search process did you have a | 19    Sessoms. |
| 20    role within the faculty senate or under the collective | 20    Q. So three candidates were brought in and the |
| 21    bargaining agreement in connection with the search? | 21    faculty as a group interviewed them, all three of |
| 22    A. No. | 22    them. Each faculty member filled out evaluations. |
| 23    Q. So your activities were in connection with your | 23    What happened to those evaluations? |
| 24    duties, your role as a unit member and the ability to | 24    A. They went to the board. |

| Page 135 | Page 137 |
|---|---|
| 1    speak out like any unit member on how the search was | 1    Q. So all the faculty evaluations were then |
| 2    going and what should happen with the presidential | 2    transmitted to the board. What was the next step of |
| 3    search? | 3    the process? |
| 4    A. I would say yes to it, except it was just how | 4    A. That was it. |
| 5    the search was going. It was just about the process, | 5    Q. Well, where in the process came the faculty's |
| 6    yes. | 6    recommendation, faculty senate's recommendation as to |
| 7    Q. Let me rephrase it. | 7    whether or not the search be reopened or not? |
| 8    There were formal, there were formal | 8    A. That came at the faculty senate meeting. The |
| 9    occasions at which the faculty senate commented on the | 9    president of the faculty senate was also a member of |
| 10    search process, correct? | 10    the search committee. And typically that's the way it |
| 11    A. Yes. | 11    is. |
| 12    Q. Were there specific committees of the faculty | 12    Q. Do you recall who that was at the time? |
| 13    senate that were involved more extensively than others | 13    A. Dr. Akwasi Osei. |
| 14    in the search process? | 14    Q. It was Dr. Osei? |
| 15    A. No. | 15    A. Yes. |
| 16    Q. Were members of the faculty involved in direct | 16    Q. So at that point he was a member of the search |
| 17    interviews at any time with prospective candidates? | 17    committee, but he was, but he was bringing before the |
| 18    A. Yes. The faculty interviewed all candidates. | 18    faculty senate whether or not to make a recommendation |
| 19    Q. What was the forum in which that happened? Was | 19    or whether or not to search, so he had the support of |
| 20    it by committee or was it faculty as a whole? | 20    the senate for his position on the search committee, |
| 21    A. Faculty as a whole. | 21    correct? |
| 22    Q. So there had been -- maybe it will help if you | 22    A. Yes. |
| 23    walk me through simply the steps of the search process | 23    Q. So in that context Dr. Osei brings to the |
| 24    as it involved input by the faculty. | 24    faculty senate, here's where we are, we have got the |

35 (Pages 134 to 137)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 138 | Page 140 |
|---|---|
| 1  three candidates, what should we do, and at the end of | 1        You had a meeting with Dr. Osei and |
| 2  that senate meeting, the faculty senate very narrowly | 2  Dr. Tolliver.  You made an arrangement or thought you |
| 3  voted to recommend President Sessoms and not reopen | 3  had, correct? |
| 4  the search? | 4        A.  (The witness nodded.) |
| 5        A.  No.  No, not to reopen the search committee. | 5        Q.  Then in the meeting itself after Dr. Hough took |
| 6        Q.  Just, just voted not to reopen the search? | 6  the lead, you said you didn't need to say much, |
| 7        A.  Mm-hmm. | 7  correct? |
| 8        Q.  Did the faculty senate ever make a | 8        A.  Correct. |
| 9  recommendation as a whole concerning which candidate | 9        Q.  And did you take any other action, publicly or |
| 10  to recommend? | 10  privately, that you think motivated President Sessoms |
| 11        A.  I don't remember.  And I don't even know | 11  to retaliate against you? |
| 12  whether it was solicited. | 12        A.  What I was told at the time was that Dr. Osei |
| 13        Q.  So your -- | 13  went back to Dr. Sessoms and said that I sort of |
| 14        A.  If I recall correctly, it's stipulated in the | 14  instituted the opposition to his becoming president. |
| 15  collective bargaining agreement that the faculty | 15  And as a consequence of that, Dr. Osei and I are no |
| 16  should participate, but the decision still remained | 16  longer friends. |
| 17  the board of trustees. | 17        Q.  Dr. Gorum, that's a slightly different way than |
| 18        Q.  Now, in that process I think you said this | 18  you described things this morning. |
| 19  morning one thing that you did is you spoke up in the | 19        A.  In what way? |
| 20  faculty meeting, correct, and urged the search be | 20        Q.  So I just want to clarify. |
| 21  reopened? | 21        A.  I didn't give you -- go ahead. |
| 22        A.  Yes. | 22        Q.  It's your understanding from somebody that |
| 23        Q.  And you had private conversations with some | 23  Dr. Osei communicated to President Sessoms that you |
| 24  faculty members urging them to reopen the search? | 24  were the one who was instituting the opposition |

| Page 139 | Page 141 |
|---|---|
| 1        A.  No, I didn't have private conversations with | 1  against him, correct? |
| 2  them.  It came up in a meeting, yeah. | 2        A.  Yes. |
| 3        Q.  So the only activity that you did in that whole | 3        Q.  And who is it who has told you that Dr. Osei |
| 4  process was whatever you said in front of the faculty | 4  communicated that to President Sessoms? |
| 5  senate when you publicly advocated reopening the | 5        A.  I do not remember all of them, but I know my |
| 6  search? | 6  wife was one. |
| 7        A.  No. | 7        Q.  Now, is your wife getting that directly from |
| 8        Q.  Okay.  What had -- | 8  either Dr. Osei or Dr. Sessoms or from -- |
| 9        A.  I had met with Dr. Osei and we had agreed that | 9        A.  I don't know.  I don't know. |
| 10  the search needed to be reopened.  That is the | 10        Q.  But the rumor has it that Dr. Osei went and |
| 11  position that I advocated and was to advocate. | 11  communicated that to Dr. Sessoms, correct? |
| 12        Dr. Hough stood up and took the | 12        A.  Yes.  And I pointed out that supposedly for the |
| 13  initiative, unbeknownst to me and I really didn't have | 13  information that was given to Dr. Sessoms, Dr. Osei |
| 14  to say that much, because he was pointing out facts | 14  was promised the deanship and at the Christmas party |
| 15  and loopholes in all of the candidates. | 15  everybody, including me, congratulated him.  But when |
| 16        Now, when Dr. Osei was in the meeting, | 16  it was announced, Dr. Osei did not get it. |
| 17  even though he had pushed me and urged me to get the | 17        Q.  Have you ever had a conversation with Dr. Osei |
| 18  search reopened, he took the opposite stance.  And | 18  in which he has said what he told Dr. Sessoms? |
| 19  actually it was Dr. Osei and Dr. Tolliver and I who | 19        A.  Yes. |
| 20  met and talked about the candidates. | 20        Q.  What has Dr. Osei told you? |
| 21        And so Dr. Tolliver can... | 21        A.  To be honest, I can't remember.  What happened |
| 22        Q.  I'm trying to be very specific about which | 22  is he, he was in the process of leaving campus and he |
| 23  actions you took that you think later motivated | 23  made a statement that only I and I think Dean |
| 24  Dr. Sessoms to retaliate against you. | 24  Frederick should have known, and which let me know |

36 (Pages 138 to 141)

A-000216

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 142 | Page 144 |
|---|---|
| 1   that he had been involved in that process. It has<br>2   been that long and it's getting late.<br>3       I actually confronted Dr. Osei and I can't<br>4   remember what his reaction was but, as I said, I just<br>5   stopped confiding in him and I mean I wouldn't speak<br>6   to anybody. I don't care who it is, but I knew I<br>7   could not trust him.<br>8   Q. Dr. Gorum, I'm going to change subjects for<br>9   now. We're going to take a break. Let's take a<br>10   five-minute break.<br>11       When we come back, I want to talk before<br>12   you get -- I know it's been a long day. I want to<br>13   talk about the medical issues so I can get the doctors<br>14   down so we can sign that and then try to finish with<br>15   just the Morris details and walk through that.<br>16       MR. DUSTON: And that's all I want to<br>17   accomplish today, Gregg. If we get through persons<br>18   and protected activity, we've gotten a long way.<br>19       MR. ZEFF: Sure. Obviously you need a<br>20   break right now, but if you get too tired, let us<br>21   know.<br>22       THE WITNESS: I'm getting that way because<br>23   I got in at 4:00 o'clock this morning.<br>24       MR. ZEFF: Let's go off the record. | 1   issues.<br>2   A. Oh, those are economic?<br>3   Q. Those are economic.<br>4   A. Okay.<br>5   Q. Money losses.<br>6   A. You're talking about medical?<br>7   Q. Yes.<br>8       MR. ZEFF: Yes.<br>9   Q. I want to focus on medical, on the emotional or<br>10   medical problems that you claim that you have suffered<br>11   and then talk about which doctors might have<br>12   information about that.<br>13   A. I went through a period of uncontrollable high<br>14   blood pressure and my cardiologist was Dr. Harpal,<br>15   H-a-r-p-a-l, Grewal, G-r-e-w-a-l.<br>16   Q. In Dover?<br>17   A. Yes. Cardiology Consultants is his firm.<br>18       I went through a heart catheterization, a<br>19   couple of stress tests in trying to pinpoint the<br>20   problem and it just took a long time to discover.<br>21   Q. When did that start approximately?<br>22   A. 2004. I had high blood pressure before that,<br>23   but it became uncontrollable.<br>24   Q. Before that you were on medication and it had |

| Page 143 | Page 145 |
|---|---|
| 1       (Discussion off the record.)<br>2       (A brief recess was taken.)<br>3   BY MR. DUSTON:<br>4   Q. Dr. Gorum, we're going to switch subjects<br>5   completely to talk about one portion of your claimed<br>6   damages. When we come back, we're going to talk in<br>7   more detail about economic damages and wages and those<br>8   things that you think you've lost as a result of the<br>9   termination or suspension.<br>10       I want to focus first on non-economic<br>11   medical damages. Why don't you describe for me just<br>12   in your own terms what damages you think you've<br>13   suffered other than loss of pay as a result of the<br>14   termination? Just list them for me.<br>15   A. I had done consulting in telecommunications<br>16   with the governments of Liberia, Nigeria, the Virgin<br>17   Islands. I can't remember what else. And, you know,<br>18   I sort of lost those. That's one.<br>19   Q. I know you have listed that before. I don't<br>20   want to -- I know you're tired today. You've got loss<br>21   of pay. You've got the loss of the retirement<br>22   package. You now have added the loss of other<br>23   consulting contracts or other opportunities that you<br>24   had for consulting contracts. Those are all economic | 1   been under control?<br>2   A. Yes.<br>3   Q. And ultimately is it now under control?<br>4   A. I hope so.<br>5   Q. You hope so?<br>6   A. I have to go back, yes.<br>7   Q. The last time you had an appointment it was<br>8   under control?<br>9   A. It was under control, yes.<br>10   Q. How long was it until, roughly until Dr. Grewal<br>11   got things under control?<br>12   A. It took about four to six months.<br>13   Q. Now, did this start, was this going on during<br>14   the ad hoc committee process or did it start later?<br>15   A. I think it was after that. It was after that.<br>16   Q. The hearing, the suspension started in April of<br>17   '04. The committee finished its work in October of<br>18   '04. The report was issued in the termination in<br>19   roughly April of '05.<br>20   A. Mm-hmm.<br>21   Q. When was this four, five, six-month period?<br>22   A. To be honest, I cannot give you specific dates.<br>23   That would have to come from the doctor.<br>24   Q. So you have a four-to-six-month period |

37 (Pages 142 to 145)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

Page 154

1        I N D E X
2    DEPONENT: WENDELL GORUM, Ph.D.        PAGE
3    Examination by Mr. Duston        2
4        E X H I B I T S
5    DEFENDANT'S DEPOSITION EXHIBIT        MARKED
6    1 Plaintiff's Response To Defendant's
     First Set Of Interrogatories        16
7
8    ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 155
9    CERTIFICATE OF REPORTER        PAGE 156
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 156

1    State of Delaware  )
                        )
2    New Castle County  )
3
4            CERTIFICATE OF REPORTER
5
     I, Kurt A. Fetzer, Registered Diplomate
6    Reporter and Notary Public, do hereby certify that
     there came before me on Wednesday, June 6, 2007, the
7    deponent herein, WENDELL GORUM, Ph.D., who was duly
     sworn by me and thereafter examined by counsel for the
8    respective parties; that the questions asked of said
     deponent and the answers given were taken down by me
9    in Stenotype notes and thereafter transcribed by use
     of computer-aided transcription and computer printer
10   under my direction.
11       I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13       I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17           Kurt A. Fetzer, RDR, CRR
             Certification No. 100-RPR
18           (Expires January 31, 2008)
19
     DATED:
20
21
22
23
24

Page 155

1
2
3        REPLACE THIS PAGE
4        WITH THE ERRATA SHEET
5        AFTER IT HAS BEEN
6        COMPLETED AND SIGNED
7        BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Wilcox and Fetzer, Ltd.    Registered Professional Reporters

A-000218



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Gorum

# v.

# Sessoms and Board of Trustees of Delaware State University

## C.A. # 06-565-GMS

---

## Transcript of:

# Wendell Gorum, Ph.D.
## Volume # 2
## June 26, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,      )
                                  )
          Plaintiff,      )
                                  )
v.                           )   Civil Action No.
                                  )   06-565-GMS
ALLEN L. SESSOMS, Ph.D.,     )
    and                  )
BOARD OF TRUSTEES OF DELAWARE )
STATE UNIVERSITY,             )
                                  )
          Defendants.     )

VOLUME 2

          Continued deposition of WENDELL GORUM, Ph.D., taken pursuant to notice at the offices of Saul Ewing, 222 Delaware Avenue, Suite 1200, Wilmington, Delaware, beginning at 1:10 p.m. on Tuesday, June 26, 2007, before Anne L. Adams, Registered Professional Reporter and Notary Public.

APPEARANCES:

        GREGG L. ZEFF, ESQ.
        FROST & ZEFF
          Pier 5 at Penns Landing
          7 North Columbus Boulevard
          Philadelphia, Pennsylvania  19106-1492
          for the Plaintiff,

        ROBERT DURSTON, ESQ.
        SAUL EWING LLP
          2600 Virginia Avenue, N.W.
          The Watergate - Suite 1000
          Washington, D.C.  20037-1922
          for the Defendants.

---

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

**A-000220**

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

|  | Page 158 |  | Page 160 |
|---|---|---|---|

**Page 158**

1       WENDELL GORUM,
2   having been previously sworn as a witness,
3   was resumed on examination and testified
4   further as follows:
5  BY MR. DURSTON:
6   Q. Mr. Gorum, we are continuing your deposition.
7  You understand that you are still under oath, correct?
8   A. Yes.
9   Q. My understanding of your claim is that you are
10  suing on the grounds that your termination was because
11  of protected activities under the first amendment; is
12  that correct?
13   A. That's correct.
14   Q. And your contention is that none of the issues
15  from the ad hoc committee had anything to do with the
16  reason for your termination?
17     MR. ZEFF: Objection to form.
18  BY MR. DURSTON:
19   Q. Do you have any reason to believe that the
20  conclusions of the ad hoc committee and those findings
21  were not part of the motive behind why you were
22  terminated?
23   A. I really don't know.
24   Q. So it's possible there could have been mixed

**Page 159**

1  motives and that was one of the motivations?
2   A. Yes.
3   Q. But it's your claim that you would not have been
4  terminated if it weren't for your activities under the
5  first amendment?
6   A. That is correct.
7   Q. And during your prior testimony, you identified
8  three specific issues, which was your involvement in
9  DeShawn Morris' lawsuit and generally his activities.
10   A. Yes.
11   Q. The issue with the Alpha breakfast invitation
12  and your involvement in opposing the president's hiring
13  and urging that the search be reopened. And you
14  generally described a fourth factor, which was your role
15  as a spokesperson or a representative of students and
16  the faculty; is that correct?
17   A. That's correct.
18   Q. I don't want to put words in your mouth. I'm
19  trying to get a sense that sort of characterizes that
20  last role and how you saw your role on campus. And you
21  used a couple different terms. What phrase do you think
22  best fits that activity?
23   A. I can't think of a phrase per se. I can maybe
24  pinpoint an activity. I had represented the faculty to

**Page 160**

1  the board who had appealed a ruling as an example.
2  Maybe it was to the board, a committee of the board.
3   Q. In general, whether it's as a spokesperson or as
4  an advocate, maybe advocate, your advocacy work on
5  behalf of faculty and students sort of sums up some of
6  the activities?
7   A. It does. But I did it because -- not because I
8  was seeking work.
9   Q. Okay. We fairly exhaustively covered the
10  details of the Alpha breakfast issue. You gave me the
11  facts of what happened and who and why. My
12  understanding was that that was not part of your official job
13  responsibilities as a professor or chair. Your role in
14  the Alpha fraternity was separate from your role as
15  professor and chair?
16   A. That's correct.
17   Q. And that particular activity was something that
18  could be performed by any member of the alumni and
19  didn't have to be on the faculty of DSU? Let me
20  rephrase that.
21     You were on the speakers committee or on
22  the -- you were basically helping chair the committee to
23  set up the breakfast, correct?
24   A. I chaired it.

**Page 161**

1   Q. You chaired it?
2   A. Yeah.
3   Q. And were you chairing it because, in part, you
4  were on the faculty at DSU that is where it's held?
5   A. No. I met with the fraternity.
6   Q. If something had happened, a lawsuit arising out
7  of the breakfast itself, do you know or believe whether
8  DSU's insurance would have covered you for that
9  activity?
10   A. Yes. Not DSU. The fraternity has its own
11  insurance.
12   Q. Do you know or have an opinion whether DSU's
13  insurance would have --
14   A. I doubt it. Because it was not even at DSU.
15   Q. Where was it held?
16   A. Modern Maturity Center.
17   Q. In preparing in connection with that activity,
18  did you use any resources of DSU, copiers, mailing,
19  postage, anything?
20   A. No.
21   Q. Now, without getting into the legal details of
22  what constitutes speech or action protected by the first
23  amendment, I want to make certain I know what part of
24  what happened you think motivated the president. What

2 (Pages 158 to 161)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

<table>
<tr><td>

Page 162

1  did you personally do that you think motivated the
2  president compared to what somebody else did?
3      MR. ZEFF: Objection to the form.
4  BY MR. DURSTON:
5      Q. Let me rephrase the question. Your activity on
6  the Alpha breakfast was in telling the person who had
7  invited the president that they had to revoke the
8  invitation, correct?
9      A. Yes.
10     Q. And that is the only part of your activity in
11  connection with that breakfast that you think was one of
12  the president's motives, correct?
13     A. No, I can't say that was the only.
14     Q. What else did you say or do in connection with
15  that activity that you think played a role in the
16  president's motives to terminate you?
17     A. I was -- I don't even know how to begin to
18  answer that because I'm not clear what you're asking me.
19     Q. I'm going to go through all the other things
20  that you claim that you said or did that might have
21  played a role in the president. One of them was the
22  Alpha breakfast. And in connection with that activity,
23  I want to be clear on what you said or what you did in
24  your role in chairing that committee that you think

</td><td>

Page 164

1  believe got the president upset or angry at you?
2      A. I can explain certain parts of the breakfast and
3  you can draw your own conclusions.
4      Q. Dr. Gorum, you went through with me the process
5  of setting up the breakfast and why there was a debate.
6  I understand that. I need to know what aspect of your
7  activity you think upset the president. Because we need
8  to look at whether or not that's an act of free speech
9  and whether or not he took that into account. You don't
10  claim that he retaliated against you just because you
11  were chair of the breakfast committee, correct?
12     A. Let me explain. The prayer breakfast is usually
13  attended by all of the politicians from the State of
14  Delaware, national as well as state and local
15  levels. Senator Biden, Senator Carper, Congressman
16  Castle, the governor, all of the local representatives.
17  And I was told sometime during the ordeal that by having
18  Sessoms speak at the breakfast, he would have had an
19  opportunity to meet significant people in the State of
20  Delaware and be introduced to the community.
21     Q. Now, was that something that another member of
22  the committee said was a reason for doing it or
23  something that Dr. Sessoms supposedly wanted?
24     A. That's what someone gave as a reason for

</td></tr>
<tr><td>

Page 163

1  played a role in the president's decision other than
2  telling the person that invited the president that he
3  had to revoke the invitation. Is there anything else
4  you did or said regarding the Alpha breakfast?
5      A. The invitation to Sessoms engendered much debate
6  within the fraternity, E-mails and telephone calls. And
7  I had to handle and I had to deal with it to the best of
8  my knowledge. Now, I like to deal with issues and move
9  on. What I did and everything I could not recall. But
10  certainly there were issues. And I heard from many
11  different members of the fraternity regarding that. And
12  I heard from a couple people, and I really cannot
13  remember who. At least I have gone back to people to
14  ask them and they have denied. But I was told that the
15  president was upset with me about the cancelation. And
16  I was also told by someone that he was out to get me.
17     Q. We talked about what Miss Walker supposedly told
18  you about him being out to get you.
19     A. Not Mrs. Walker. What is her name? It wasn't
20  Walker. I'm thinking of her name.
21     Q. Other than being told that the president was
22  upset at you because of the cancelation, was there
23  anything else in the debate, the discussion, what went
24  on within that breakfast in the planning of it that you

</td><td>

Page 165

1  scheduling the meeting.
2      Q. Did you ever speak to Dr. Sessoms about whether
3  he wanted to attend or cared to attend this breakfast?
4      A. No.
5      Q. You never had any direct conversations with him
6  concerning this breakfast, correct?
7      A. No.
8      Q. And the action that you took in addition to
9  monitoring the debate and dealing with the debate over
10  the invitation was to ultimately make the decision that
11  his invitation had to be revoked and then telling
12  someone else to communicate that to the president; is
13  that correct?
14     A. Yes.
15     Q. And the sole basis for why you think Dr. Sessoms
16  not only knew about your role but was upset about it was
17  what somebody supposedly told you, that he was upset
18  about this, about the fact that it had been revoked,
19  correct?
20     A. Yes, but the somebody, I was told, and I don't
21  know, was supposedly hired to work as an attache or
22  whatever you want to call the person who helps introduce
23  him to the Dover and Delaware communities.
24     Q. And you say you since have spoken to that person

</td></tr>
</table>

3 (Pages 162 to 165)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

Page 166

1 and others and they have denied saying it?
2   A. No, no, no. I never spoke to the person who
3 mentioned it. But there were other people who had
4 mentioned comments that they had heard.
5   Q. And you have now gone back to them and they've
6 denied it?
7   A. Yeah, a couple of them.
8   Q. Who has changed their statements, at this point,
9 to your recollection?
10   A. It's not a matter of changing the statements. I
11 did not recall exactly who had said it. So I asked
12 different people and everyone, each one denied that they
13 knew anything about it.
14   Q. So at this point you can't remember who told you
15 that this attache said the president was upset?
16   A. No. There are a couple -- okay. My
17 understanding is that the president hired Cecil Wilson,
18 who was a retired principal, to introduce --
19   Q. And you discussed his role in the last
20 deposition. And Mr. Wilson supposedly made this
21 statement to whom, someone else?
22   A. Yeah, he was a member of the committee. So I
23 heard of a lot of what he said. But in addition to
24 Wilson, other people had told me some of the same

Page 167

1 information. So I don't know who said it or how it came
2 about. But it dealt directly with Wilson because he was
3 the one --
4   Q. Did Cecil Wilson ever tell you directly the
5 president was upset at you?
6   A. No.
7   Q. And has anyone else that you can recall directly
8 told you, somebody who would know, that the president
9 was upset at you?
10   A. Yes.
11   Q. Can you identify them?
12   A. I don't remember who it was. That's the
13 difference.
14   Q. That's where we are.
15   A. May I add to that?
16   Q. If you wish.
17   A. I suspected that Dr. Osei might have been one of
18 those persons. And I went back to talk to him and he
19 said he would not discuss anything unless he was
20 subpoenaed.
21   Q. We will see him on Thursday. Now I want to turn
22 to Mr. Morris, DeShawn Morris. Prior to Mr. Morris'
23 arrest or prior to the incident with the handgun, what
24 was your past knowledge in relationship with DeShawn

Page 168

1 Morris?
2   A. To be honest, I didn't know who he was.
3   Q. Mr. Morris said, at one point, that he was a
4 sports management major. Did you have any role in the
5 sports management program?
6   A. No.
7   Q. Had he been enrolled in courses in the mass
8 communications department?
9   A. Never.
10   Q. He said in one piece of testimony, in his other
11 case, that you were chair of his department. That
12 wasn't correct; was it?
13   A. No, that's not correct.
14   Q. Do you know who was the chair, at the time, of
15 sports management or where that department would have
16 been?
17   A. I don't remember. But it was health and
18 physical education.
19   Q. So sports management would have been a program
20 in health and PE?
21   A. Yes.
22   Q. Do you recall how Mr. Morris first came to your
23 attention or how he got your name?
24   A. Yes. He had gone through the faculty student

Page 169

1 hearing on the possession of the gun. And I think he
2 was found guilty and had given some sentence. And a
3 member of the football team, who was a mass
4 communications major, suggested that he come to me and
5 serve as his advisor. The rules at Delaware State, the
6 rule is that the advisor must be a faculty staff or
7 student.
8   Q. And this is the advisor who is permitted to
9 appear at any other formal proceedings, including
10 appeals, correct?
11   A. That's correct.
12   Q. And advisor is a term that is used under the
13 student handbook to reflect that person, correct?
14   A. Yes.
15   Q. Now, if you can summarize your prior testimony,
16 what I know, you served as an advisor and were present
17 at at least one hearing, correct?
18   A. Yes.
19   Q. You assisted Mr. Morris in drafting at least one
20 letter that was sent as an appeal to Miss Moses,
21 correct?
22   A. Yes.
23   Q. That was the initial appeal of his suspension?
24   A. Yes.

4 (Pages 166 to 169)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

| Page 170 | Page 172 |
|---|---|

**Page 170**

1     Q. Or of the action of the initial committee,
2 correct?
3     A. Correct.
4     Q. And then you appeared at that hearing. Did you
5 appear at any other hearing prior to the time that
6 President DeLauder made the final decision?
7     A. I didn't appear. But the president called me
8 directly.
9     Q. Late in the process or early?
10     A. No. Before he made a decision.
11     Q. I'll get to that in a second. So advisor, you
12 wrote one letter. Then after Dr. Smith made his
13 determination -- I'm sorry, Dr. Smith, the head of
14 student affairs?
15     A. Yeah, that was Charles Smith.
16     Q. After Dr. Charles Smith made the initial finding
17 of a one-year suspension and an issue arose with
18 Dr. Toscano involving whether or not that accurately
19 reflected the finding of the appeals committee, correct?
20     A. Yes.
21     Q. And Dr. Toscano testified in the earlier case
22 that he brought that to your attention and that you and
23 he actually drafted a letter that he sent to, questioned
24 whether or not Dr. Smith's conclusion accurately

**Page 171**

1 reflected the committee; is that accurate?
2     A. I will explain it again.
3     Q. I don't know that you've testified here about
4 that. Why don't you explain to me -- I understand what
5 happened, that there was an issue in the committee's
6 finding about whether or not he was responsible or not
7 responsible. There was an initial meeting involving
8 Mr. Morris, correct, at which they found him -- it's
9 unclear. But the bottom line is they were recommending
10 a suspension rather than expulsion. And then an issue
11 arose about whether or not the committee could have
12 found him not responsible and still recommend a
13 sanction. Why don't you walk me through your knowledge
14 of what happened and your role in that process?
15     A. Okay. Initially, Morris was found guilty with
16 possession of a handgun on campus. I think the sanction
17 is expulsion, which is three years. After three years
18 you can petition to return.
19     Q. That's under the zero tolerance policy is the
20 sanction?
21     A. Yes. Within expulsion, students can appeal
22 automatically. And that's when a friend, I guess, of
23 Morris recommended that he contact me to serve as his
24 advisor. And that's when I was really introduced to

**Page 172**

1 him. I knew something about him on the football field
2 but I didn't know who he was.
3     I had him draft the appeal letter and
4 attended the hearing with him. The hearings at Delaware
5 State are kind of odd because only the student can
6 speak. No one else can speak. So, you know, he sort of
7 had to speak or fend for himself. I could write him
8 notes and that sort of thing.
9     At the end of the hearing -- and some time
10 passed. I don't know how long. There are a number of
11 days in which he should receive the outcome. And I was
12 walking across campus with him and he had just received
13 a letter and we just happened to run across Dr. Toscano.
14 I think he was on route to class or something. And I
15 just, in passing, said so you guys found my -- I don't
16 know what word I used -- person guilty. He said, oh,
17 no, he was innocent on all charges. And I just showed
18 him the letter. And he was upset by the letter because
19 the committee had voted to, had found him not guilty.
20     And, yes, he came to my office, dictated a
21 letter. Yes, I edited it. And he took the letter and
22 got the other members of the committee who had voted
23 with him to sign the letter saying that the chair of the
24 appeals committee did not forward the recommendation of

**Page 173**

1 the committee. And I don't know. I don't know who it
2 went to.
3     Q. You weren't present during the committee's
4 deliberations after the hearing, correct?
5     A. Oh, no.
6     Q. That was the appeals committee.
7     A. Uh-huh.
8     Q. Then after Dr. Toscano edited this letter, you
9 weren't present when he went and talked to the other
10 members of the committee.
11     A. No.
12     Q. Correct?
13     What was your next involvement in that
14 process?
15     A. After the letter -- the letter could have gone
16 to the president. I don't know how much time elapsed or
17 anything else. But the president called me about this
18 student. And I'm certain that I'm not the only one he
19 had called because I had the impression from the
20 president that he understood this student was a leader
21 of a gang, the Bloods in Jersey City, and he was trying
22 to get out and that his life had been threatened. He
23 had talked to his coaches so that Morris did not return
24 to -- he did not go to Jersey City during the breaks.

5 (Pages 170 to 173)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

Page 174

1   He stayed in town and the coaches knew it.
2       Q. So what did the president ask you?
3       A. He wanted me to give him some, as far as I can
4   remember, something about Morris. And so my suggestion
5   to him was, why don't you just talk to him directly and
6   form your own opinions? And that's what he did.
7       Q. Were you present when Mr. Morris talked to
8   President DeLauder?
9       A. No, I was not. But the president did call me
10  back. The president did call me back after he had
11  talked with him and said he was impressed with him and
12  he was a impressionable person.
13      Q. Now, ultimately, President DeLauder made his
14  decision and memorialized in a letter from Dr. Smith.
15  And I don't think there is any memorializing of any
16  letter to Mr. Morris making it clear that he had a
17  one-semester suspension. He could return in the fall
18  after probation. He would be allowed to play football,
19  correct, that was the bottom line?
20      A. It was a one-semester suspension. He could
21  return during the summer sessions to make up work he had
22  missed, yes.
23      Q. And then he could return in the fall. He was
24  under suspension —

Page 175

1       A. But his only activity could be football.
2       Q. Correct. That was the arrangement that
3   President DeLauder and Dr. Smith --
4       A. No. It wasn't Smith. It was Dr. DeLauder.
5       Q. Dr. DeLauder made that judgment and directed
6   Dr. Smith to do so, correct?
7       A. No. Smith wrote the letter from the appeals
8   committee. Then with suspensions or expulsions, student
9   can automatically appeal to the president.
10      Q. So it's the president's ultimate decision,
11  President DeLauder?
12      A. Yes.
13      Q. Now, moving forward, what was the next role that
14  you had with Mr. Morris? This would have been roughly
15  July when the issue came up about NCAA eligibility?
16      A. Uh-huh. Morris remained out the one semester
17  and during the first summer session went to school so
18  that he would have enough credits to play football. And
19  he had completed the first summer session. Around about
20  the 7th or the 9th of July when Dr. Sessoms came aboard
21  on July 1st, I received a telephone call from Mrs.
22  Sandra Arnell, the secretary to the president, telling
23  me that the president said to tell Mr. Morris that his
24  suspension was extended to one year and that he could

Page 176

1   not step foot on campus.
2       Q. You told us about that statement the last
3   deposition. Are you absolutely certain that there were
4   two telephone calls that morning that day in your
5   office, the first one coming into your line and the next
6   one coming into Mr. Morris' cell phone?
7       A. Yes.
8       Q. You are absolutely certain that's the way it
9   happened?
10      A. Yes.
11      Q. Prior to that time, prior to that phone call,
12  were you aware of any issue involving Mr. Morris'
13  eligibility in the fall or his status at the school?
14      A. No.
15      Q. After those two phone calls you've previously
16  described in general terms, your role in Mr. Morris'
17  defense was urging him to get an attorney, correct?
18      A. Uh-huh.
19      Q. Did you pick the attorney that he was going to
20  go see?
21      A. Yes.
22      Q. And you paid for the attorney?
23      A. Yes.
24      Q. How much did you pay on behalf of Mr. Morris for

Page 177

1   his defense?
2       A. About 600 bucks. It was on pro bono. The
3   attorney was a former student who went to Delaware
4   State.
5       Q. And from some of your references of other
6   witnesses, I know that you were assisting Mr. Morris in
7   his defense, correct?
8       A. Yes.
9       Q. And you previously testified about comments
10  that, at certain point, some of the coaches who had been
11  assisting or providing information were told that they
12  can no longer cooperate, correct?
13      A. Correct, yes.
14      Q. What exact role did you play in assisting
15  Mr. Morris in his lawsuit other than hiring the
16  attorney, paying the $600? What was your role?
17      A. That was basically it. Usually when he met with
18  the attorney I was there. But I did not attend the
19  hearings.
20      Q. Now, other than the coaches that you spoke to
21  and told them about it, who else in the administration
22  do you believe knew that you were assisting Mr. Morris
23  in his lawsuit against DSU?
24      A. They all knew.

6 (Pages 174 to 177)

A-000225

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

| Page 178 | Page 180 |
|---|---|

Page 178

1    Q. It's your contention that every single person in
2  the DSU administration knew at that time that you were
3  involved?
4    A. (Witness indicating.)
5    Q. What is the basis for that claim?
6    A. I heard Sheila Davis say it.
7    Q. You heard Sheila Davis say they are out to get
8  you, correct?
9    A. Yes.
10    Q. Did she say the president and the provost and
11  the vice president and everybody else knows that you are
12  representing him?
13    A. No. The typical, the administration is out to
14  get you.
15    Q. Let's just focus on the president. Has anybody
16  told you the president knows that you were involved in
17  Mr. Morris' lawsuit?
18    A. Has anyone told me?
19    Q. Has anyone told you?
20    A. Not that I can remember, no.
21    Q. Have you ever spoken to the president, President
22  Sessoms, about Mr. Morris?
23    A. No.
24    Q. Have you seen anything in writing suggesting

Page 179

1  that the president knew of your involvement in
2  Mr. Morris' lawsuit?
3    A. In writing?
4    Q. In writing.
5    A. No.
6    Q. Was your name ever publicly connected with
7  Mr. Morris' lawsuit; Mr. Morris and his advisor and
8  advocate, Wendell Gorum?
9    A. No, not directly. The connection came. And it
10  seemed apparent to me that when Mrs. Arnell called me
11  and told me that the president said or asked me to tell
12  something to him that he had to know.
13    Q. Well, he had to know what? That was prior to
14  the lawsuit, correct?
15    A. That I was the person representing him on
16  campus.
17    Q. That you had been involved in representing him
18  as his advisor before the appeals committee, correct?
19    A. Yes, and before DeLauder.
20    Q. But as far as your role in the lawsuit, do you
21  have any reason to believe or contend that President
22  Sessoms knew you were involved in Mr. Morris' lawsuit?
23    MR. ZEFF: Objection to the form. You asked
24  him two different questions.

Page 180

1  BY MR. DURSTON:
2    Q. Do you contend that President Sessoms had actual
3  knowledge that you were supporting Mr. Morris in his
4  lawsuit financially and otherwise?
5    A. My position is that he knew. Primarily
6  through -- and I would have to go back to verify --
7  Morris' attorney talking to Mrs. Hickey, the
8  university's attorney. And they made an agreement that
9  if something didn't happen, he would drop the lawsuit.
10  For example, when they called Mrs. Arnell, she said that
11  she never called. We can check telephone logs, both
12  cell phone and university.
13    Q. Dr. Gorum, I'm not following that line. The
14  first part of the question was your basis for believing
15  that President Sessoms knew that you were involved in
16  Morris' lawsuit was conversations between Mr. Morris'
17  attorney and Delaware State's attorney, Miss Hickey?
18    A. No. What I was saying is, for Mrs. Arnell to
19  call me and tell me to tell, give a message to, indicate
20  that he had to know.
21    MR. ZEFF: That's a different question.
22  BY MR. DURSTON:
23    Q. I can understand that you claim that that
24  indicates that he knew that you were Mr. Morris' advisor

Page 181

1  during the student proceedings. Now I'm going to a
2  separate question, which is whether you contend that
3  President Sessoms had actual knowledge that you were
4  advising and supporting Mr. Morris in his lawsuit.
5  That's a yes or no question.
6    MR. ZEFF: I believe he answered that part
7  of the question.
8  BY MR. DURSTON:
9    Q. That he believes the president knew of the
10  involvement in the lawsuit, correct?
11    A. I would say yes.
12    Q. You believe the president knew about your
13  lawsuit. Now, what is the basis for your belief that
14  the president knew about the lawsuit and your role in
15  it?
16    MR. ZEFF: He's given a partial answer to
17  that. And I think he did go off on a tangent.
18  BY MR. DURSTON:
19    Q. I'm not sure I know what the partial answer is.
20  Maybe I missed it. What is the basis for your belief
21  the president knew that you were involved in a lawsuit?
22    A. I believe that the attorney made an agreement
23  with Mrs. Hickey that if something didn't transpire that
24  he would drop the suit.

7  (Pages 178 to 181)

A-000226

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

Page 182

1   Q. Well, we know that he dropped the suit in
2   October after taking a whole lot of depositions of
3   different people. Were you involved in the decision to
4   drop the lawsuit?
5   A. Yes.
6   Q. And you and Mr. Morris' attorney and Mr. Morris
7   had discussions about what had come out during the
8   depositions and whether or not to pursue the lawsuit,
9   correct?
10  A. Yes.
11  Q. Now, at any point during those discussions, did
12  Mr. Morris' attorney say anything about President
13  Sessoms' knowledge?
14  A. Specifically, all I can recall is the talk with
15  the attorney.
16  Q. Do you know what Miss Hickey knew about your
17  role?
18  A. Oh, she knew.
19  Q. Were you ever in a meeting with Catherine
20  Hickey?
21  A. No. But the records indicated that I was the
22  advisor.
23  Q. We understand that. I'm talking about your role
24  in the lawsuit, your role in hiring the attorney, paying

Page 183

1   the attorney, assisting in meetings.
2   A. No.
3   Q. You don't know what Miss Hickey might have known
4   about your role in that, correct?
5   A. I'm sure the attorney conveyed that to us, that
6   she knew --
7   Q. But Mr. Morris' attorney never told you he had
8   conveyed your role to Miss Hickey; did he?
9   A. At some point I'm sure he did. And we were
10  disappointed that he even made an agreement without our
11  knowledge.
12  Q. I'm not referring to the settlement agreement.
13  A. Well, I'm saying he had discussed it with her.
14  Q. Had discussed you or discussed --
15  A. Yeah, I'm sure I was discussed during that time.
16  Q. Well, this agreement that you are referring to
17  is the agreement that if certain things didn't happen or
18  information didn't happen that they would settle the
19  case, correct?
20  A. Yes.
21  Q. That agreement didn't have anything to do with
22  you personally; did it?
23  A. Yes and no. And I say that because it meant
24  that I had to invest more money if I really wanted to

Page 184

1   continue.
2   Q. Meaning that this lawyer was willing to drop the
3   case and if you wanted to continue you would have to
4   hire new counsel?
5   A. I had to pay more money, yes, lots more money.
6   Q. Your role as an advisor, was that part of your
7   official responsibility as a professor or chair, your
8   role as an advisor in the appeals process?
9   A. No.
10  Q. But it was something, it was part of your role
11  as a member of the academic community, correct?
12  A. I could opt not to take cases if I wanted to.
13  But I always helped anyone who asked for help.
14  Q. Why did you choose to do that?
15  A. I have always done that. Students with
16  difficult cases always came to me for assistance.
17  Q. Is that something that you felt important to do
18  as a chair and tenured professor?
19  A. Yeah, I chaired the Student Affairs Committee,
20  which was responsible for the drafting, the judiciary
21  procedures. And from that perspective, I did it because
22  I had been chair of the committee that drafted it and I
23  knew it. And if I didn't assist students, then how
24  could I encourage other faculty members to do the same?

Page 185

1   Q. In your roles as an advisor both with Mr. Morris
2   and otherwise, you would have been covered by DSU's
3   insurance, correct?
4   A. I assume so, yes. But I'm not sure about that.
5   Q. And it's appropriate when preparing for student
6   disciplinary proceedings to use DSU resources in
7   conjunction with those roles, correct?
8   A. What are you calling resources?
9   Q. Copiers, computers, sending E-mails, just
10  whatever you are doing in connection with appeal.
11  A. I assume it's appropriate. We never did any of
12  that though. I never E-mailed them.
13  Q. You didn't send E-mails, didn't use interoffice
14  mail for correspondence, never did any of that?
15  A. (Witness indicating.)
16  Q. Are you referring to the lawsuit or the appeals
17  process or both?
18  A. I thought I was responding to what you asked.
19  Q. Of course, during the appeals process when you
20  helped Mr. Morris write his letter, when you helped
21  Dr. Toscano, you were using university computers and
22  doing this sort of during the working day, correct?
23  A. Yes, correct.
24  Q. And I'm not suggesting there was anything wrong

8 (Pages 182 to 185)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

| Page 186 |
| --- |

1 with that. It was part of the role in the student
2 disciplinary process, correct?
3    A. Correct.
4    Q. You've listed a number of things that you did on
5 behalf of Mr. Morris. Is there any specific one of them
6 that you contend motivated the president to fire you or
7 are you grouping all of them together?
8    A. Collectively I will say.
9    Q. Is it your contention that President Sessoms
10 would have looked for a reason to retaliate against you
11 solely by the fact that you had been Mr. Morris' student
12 advisor prior to the time he came to the school?
13      MR. ZEFF: Objection to the form.
14 BY MR. DURSTON:
15    Q. Let me rephrase this. This may sound like a bit
16 of a hypothetical. I'm trying not to. If you had never
17 been involved in the lawsuit with Mr. Morris, if that
18 part had never happened, do you think President Sessoms
19 would have been motivated to fire you solely because you
20 had been DeShawn Morris' advisor on an appeals
21 proceeding before he even came to campus?
22      MR. ZEFF: Objection. If you understand the
23 question, you can answer it.
24 BY MR. DURSTON:

| Page 187 |
| --- |

1    Q. Do you understand my question, Dr. Gorum?
2    A. Not really because I still say that is
3 hypothetical.
4    Q. Well, it may be. But if DeShawn Morris had
5 never sued and just whatever had happened had happened
6 with President Sessoms, do you believe that President
7 Sessoms was going to retaliate against you because you
8 had been a student advisor to DeShawn Morris?
9      MR. ZEFF: Same objection.
10 BY MR. DURSTON:
11    Q. Answer it if you can.
12    A. It wasn't just that one incident. It was also
13 the rumors or information that I heard that the
14 president was out to get me and that he was looking for
15 anything he could to get back at me. So it's not just
16 that one. That was just another item.
17    Q. I'm trying to get at your belief. Get at you
18 for what? One of the things that you had said he was
19 out to get you for, which we haven't gone back to yet,
20 is your role in him not being hired. One of the things
21 you say he was out to get you for was the Alpha
22 breakfast, revoking that?
23    A. Yes.
24    Q. What I'm trying to get at here is whether you

| Page 188 |
| --- |

1 believe the president was out to get you because you had
2 served as a student advisor during an appeals proceeding
3 or was it because you were helping Mr. Morris in a
4 lawsuit against the university?
5      MR. ZEFF: Same objection. Go ahead.
6      THE WITNESS: That lawsuit was on the verge
7 of being very negative publicity. And so, in that
8 sense, he could not have done it if I had not backed him
9 financially.
10 BY MR. DURSTON:
11    Q. So the lawsuit I understand. Do you contend
12 that one of the other reasons the president was out to
13 get you was solely because or was because you had been a
14 student advisor to Mr. Morris in the past?
15    A. And I said not solely. That was one of several.
16    Q. You do think that just acting as a student
17 advisor was one of the president's motives why he wanted
18 to retaliate against you?
19    A. You are saying just.
20    Q. Was it one of the factors?
21    A. One, yes. In that particular incident, yeah.
22    Q. Now, Mr. Morris served out his suspension in the
23 spring, correct?
24    A. Yes.

| Page 189 |
| --- |

1    Q. He was allowed to take summer classes, correct?
2    A. Yes.
3    Q. And after there may have been discussion, but he
4 was ultimately allowed to take classes in the fall,
5 correct?
6    A. No.
7    Q. You are certain about that?
8    A. Yes.
9    Q. I'm not talking about the initial phone call,
10 but at the end of the day, he did register and take
11 classes in the fall of 2004?
12    A. He hasn't attended since that time.
13    Q. My recollection, he was in classes during the
14 fall during the football season. Didn't you show up at
15 another hearing for him that fall?
16    A. I don't remember.
17    Q. Wasn't there another suspension at which,
18 another incident involving disorderly conducted where he
19 was brought up on disciplinary charges?
20    A. I don't think he was in school.
21    Q. Are you certain about that, that his academic
22 record shows he was registered for classes the entire
23 fall and ended up being expelled in the spring after
24 another box cutter incident, that he was in school the

9 (Pages 186 to 189)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

| Page 190 | Page 192 |
|---|---|
| 1 entire academic year? | 1 sure he could see dollars. And by extending the |
| 2    A. I don't know anything about that. | 2 suspension and not being able to play, it meant that he |
| 3    Q. Did you have any involvement with Mr. Morris | 3 would not be seen by scouts, he would not be picked up. |
| 4 once the lawsuit was dropped? | 4 And that's really what happened. So the impact on him |
| 5    A. Yes, but only as an editor — and that was much | 5 was such that he did become suicidal. He tried to |
| 6 later — of a book. | 6 commit suicide twice by jumping in front of a |
| 7    Q. What book? | 7 tractor-trailer truck. So I had to get people to work |
| 8    A. He wrote a book about his life as a gang. | 8 with him and watch him. So I don't see him being in |
| 9    Q. So you don't recall Mr. Morris being allowed to | 9 school because it had that kind of an impact on him. |
| 10 attend classes in the fall? | 10    Q. And if he was, you simply don't recall? |
| 11    A. No. And to my knowledge he did not. I don't | 11    A. I did not know it. |
| 12 know anything about it. I was wondering if I were still | 12    Q. So the case was really about getting DeShawn |
| 13 there myself. | 13 Morris back on the football field for fall? |
| 14    Q. We are talking about the fall before you were | 14    A. Yeah. It was about his future as a professional |
| 15 suspended. We are talking about the fall of 2004. | 15 athlete. |
| 16    A. I don't think he was there. To my knowledge, he | 16    Q. And it would have made a big difference to the |
| 17 was not. I could definitely check to verify. | 17 alumni and the fans to get him back on the field? |
| 18    Q. You were just starting to explain why you think | 18    A. That's correct. |
| 19 the lawsuit involved a significant issue, was important | 19    Q. You are a big football fan; aren't you, or were? |
| 20 to the university. | 20    A. Yeah. I've always attended and supported the |
| 21    A. PR, negative publicity. And it was, as far as I | 21 university's activities. |
| 22 was concerned, it was really challenging someone's | 22    Q. And you really enjoyed the football games? |
| 23 decision. | 23    A. Football and basketball. |
| 24    Q. And whose decision was it you were challenging | 24    Q. But having a lawsuit going forward, it did have |

| Page 191 | Page 193 |
|---|---|
| 1 at this point? | 1 some risk of being a major media event, correct? |
| 2    A. The president's. | 2    A. Yeah. Actually it was, whether you know, it was |
| 3    Q. What is the decision that President Sessoms made | 3 sort of out of our control. |
| 4 involving Mr. Morris in your opinion? | 4    Q. The media attention was fairly substantial on |
| 5    A. Was to revisit the case and extend the | 5 this case? |
| 6 suspension from one semester to one year. | 6    A. Yes. |
| 7    Q. Now, in fact, didn't it come out during the case | 7    Q. And neither side could control it at that point, |
| 8 that Mr. Morris was in classes and that the suspension | 8 correct? Let me withdraw that question. |
| 9 had been upheld as just one semester? | 9    Did it have the ability to place Delaware |
| 10    A. I had nothing to do with that. | 10 State in a poor light regarding alumni in the community? |
| 11    Q. Wasn't the entire case, at the end of the day, | 11    MR. ZEFF: What, the media attention? |
| 12 about whether or not he was eligible to attend classes | 12    MR. DURSTON: The lawsuit. |
| 13 during the prior spring while he was pending his appeal? | 13    THE WITNESS: Yes, potential, yes. |
| 14 Do you remember that? | 14 BY MR. DURSTON: |
| 15    A. No. He wasn't in school. | 15    Q. I guess it's your claim that your involvement |
| 16    Q. I know he wasn't in school. Didn't the case | 16 with Mr. Morris' lawsuit is something that's protected |
| 17 come down to an interpretation of an NCAA rule over | 17 by the first amendment? |
| 18 whether or not he could, was eligible while he was | 18    A. Yes. |
| 19 appealing his suspension? | 19    Q. What is your understanding of what rights you |
| 20    A. No. | 20 have and where are the lines of your rights as a |
| 21    Q. You don't remember any of that? | 21 professor, what kind of conduct you are protected under? |
| 22    A. No. I dealt with him on a different level. I | 22    A. Freedom of expression. |
| 23 do not — this person was selected as an all American | 23    Q. Let me withdraw that line of questioning. |
| 24 from a small school. That's Delaware State. And so I'm | 24    The other issue that you raised, in general |

10 (Pages 190 to 193)

A-000229

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

Page 194

1  terms, was your role as a spokesperson and advocate in
2  the past, sort of your reputation in a role similar to
3  that you performed with Mr. Morris but also representing
4  other students and faculty, correct?
5      A.  Yes.
6      Q.  And you say at various times in the past you
7  have appeared before the board on different matters?
8      A.  Yes.
9      Q.  Give me an example of a couple of them.
10     A.  Boards?
11     Q.  Boards.
12     A.  I represented faculty members who had about 100
13  publications and could not be promoted to a full
14  professor who had received a Fulbright and a Nissan
15  fellowship.
16     Q.  So appearing before the tenure and promotion
17  committee, did you ever have appearances before the full
18  board?
19     A.  Yes.
20         MR. ZEFF:  That's what he was talking about.
21  BY MR. DURSTON:
22     Q.  Which case was this?
23     A.  Ikein.  Dr. Augustine Ikein.
24     Q.  How long ago was that, five years, maybe longer?

Page 195

1      A.  I don't know.  It was during that period, yes.
2      Q.  Prior to President Sessoms?
3      A.  I'm almost sure it was during also.  I don't
4  remember.  I just know I represented him before the
5  board.
6      Q.  Now, what is the basis for your claim that
7  Dr. Sessoms was aware of your role and reputation as an
8  advocate and spokesperson?
9      A.  What?
10     Q.  You claim that Dr. Sessoms knew that you were an
11  advocate and spokesperson and that was one of the
12  reasons he was out to get you, correct?
13     A.  Everything is what people told me.  For example,
14  they want to know why, who made me the spokesperson for
15  the Africans, statements such as that.  Now I didn't
16  hear him say it, but this is what came to me from
17  others.
18     Q.  Now the quote who made him the spokesperson for
19  the Africans, as I recall, dates back to President
20  DeLauder, correct?
21     A.  Yes.
22     Q.  I'm referring to Dr. Sessoms' knowledge, whether
23  he shared that view or whether he was aware of that
24  reputation.

Page 196

1      A.  I think that will best come from Dr. Osei.  I
2  think he may or may not be able to give an indication.
3      Q.  So --
4      A.  He gave an assessment.
5      Q.  Other than Dr. Osei and what he might say, is
6  there anything else that you have orally, in writing,
7  whatever anybody has told you, to indicate that
8  President Sessoms knew that you were considered a
9  spokesperson and advocate within the community?
10     A.  I can't think of it at this time.
11     Q.  Are you seeking reinstatement to the position as
12  chair of the department or just as a faculty member?
13     A.  Neither.
14     Q.  Neither?  You are not looking to return to
15  Delaware State University at this point?
16     A.  No.
17         MR. DURSTON:  Off the record.
18         (Discussion off the record.)
19  BY MR. DURSTON:
20     Q.  Dr. Gorum, why aren't you seeking reinstatement
21  or why don't you desire it?
22     A.  I may come around to it.  But right now I am
23  angry.  I am hurt.  I feel I gave my all to the
24  university.  I believe that I did nothing that anyone

Page 197

1  else would not have done.  What I did I did with the
2  encouragement and knowledge of the dean who encouraged
3  me to do it.  So I did nothing for self gain.  So, in
4  that sense, it would take some thinking and some for me
5  to come around.
6      Q.  Dr. Gorum.  I'm not offering you the position.
7  Nobody is offering you the position.
8      A.  No.  But I thought I explained.
9      Q.  I think you did.  So if next week the judge were
10  to rule in your favor that your rights had been violated
11  and orders remedy that Delaware State University return
12  you to the position as a faculty member, as of right
13  now, that is not something you would accept?
14     A.  If it's the judge's order, I could accept it for
15  a day and retire.
16     Q.  If the judge says that your only remedy other
17  than back-pay and attorneys' fees was to be reinstated
18  to your job, is that something that you would want to
19  return to do?
20         MR. ZEFF:  I'm going to object.  Not to the
21  extent that it's a poor question, but that's an
22  open-ended situation.  Hypothetically for what period of
23  time, under what circumstance?  If the judge orders it
24  without retaliation --

11 (Pages 194 to 197)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

|  | Page 198 |
|---|---|
| 1 | BY MR. DURSTON: |
| 2 | Q. If a remedy, in this case, is to return to |
| 3 | Delaware State University as an option, how long would |
| 4 | you want to return for and how long would you want to |
| 5 | continue to teach there, if at all? |
| 6 | A. Technically, I wouldn't want to return. But I |
| 7 | probably would return one day and then retire. |
| 8 | Q. And what would be the benefit of regular |
| 9 | retirement under those circumstances versus what |
| 10 | actually happened in this case? |
| 11 | A. What would be the — |
| 12 | Q. I want to understand. You would return and then |
| 13 | want to retire. |
| 14 | A. Because it's an order and I would not want to — |
| 15 | Q. That's an issue of not wanting to violate the |
| 16 | court's order. But you would not want to go back and |
| 17 | teach for any extended period of time right now? |
| 18 | A. No. |
| 19 | MR. DURSTON: A separate issue for later — |
| 20 | and I will put this on the record. I'm going to ask |
| 21 | whether he's seeking either reinstatement or damages for |
| 22 | the loss of the chair position as distinct from the |
| 23 | professor's salary. Has a decision been made on that? |
| 24 | MR. ZEFF: No, no decision has been made on |

|  | Page 199 |
|---|---|
| 1 | that. But I can represent to you that I think it's of |
| 2 | diminished value, the chair position. He's not seeking |
| 3 | reinstatement as chair. I don't know that a court can |
| 4 | do that. |
| 5 | BY MR. DURSTON: |
| 6 | Q. I don't know that a court can do that anyway. |
| 7 | But, Dr. Gorum, the Ad Hoc Dismissal |
| 8 | Committee made some recommendations. You have been over |
| 9 | that report a number of times. |
| 10 | A. Uh-huh. |
| 11 | Q. Among those recommendations was that you be |
| 12 | reinstated the position as a faculty member without |
| 13 | back-pay, at least that was the final, that was what the |
| 14 | report said. The report said the committee had |
| 15 | recommended — and I know there's a dispute about |
| 16 | whether the members supported that — reinstatement to |
| 17 | the position of faculty member, not the position of |
| 18 | chair, two years suspension, correct? |
| 19 | A. Two years probation. |
| 20 | Q. Correct. Two years probation. If the board had |
| 21 | accepted that recommendation, would you have challenged |
| 22 | this decision? |
| 23 | MR. ZEFF: Objection to the form. You can |
| 24 | answer. |

|  | Page 200 |
|---|---|
| 1 | THE WITNESS: Probably. Do you want to know |
| 2 | why? |
| 3 | BY MR. DURSTON: |
| 4 | Q. Yes. |
| 5 | A. I thought that the board ignored important |
| 6 | testimony. I think they believed Dr. Frederick. And |
| 7 | Dr. Frederick is notorious — I hate to be so strong — |
| 8 | as a pathological liar. And if I submitted grades and |
| 9 | then if, I think if you go back and look at the report, |
| 10 | probably 95 or 98 percent of the grades they accused me |
| 11 | of changing I was the teacher of record. But if I |
| 12 | couldn't do it, then I don't think the registrar's |
| 13 | office should have done it. I don't know whether I |
| 14 | answered your question. |
| 15 | Q. Who do you contend made the final decision to |
| 16 | terminate you? |
| 17 | A. I don't even try to guess. I go by the letter. |
| 18 | The letter came from — |
| 19 | Q. Dr. Smith? |
| 20 | A. Smith. |
| 21 | Q. As chair of the board? |
| 22 | A. Yes. |
| 23 | Q. You know that under the Collective Bargaining |
| 24 | Agreement, at least, that the board has the ultimate |

|  | Page 201 |
|---|---|
| 1 | authority to make the decision to terminate, correct? |
| 2 | A. Yes. |
| 3 | Q. Now, in your opinion, what role did the |
| 4 | president's recommendation play in that decision? |
| 5 | A. It was his recommendation. |
| 6 | Q. You heard Dr. Smith testify this morning |
| 7 | regarding role of the discussion of the board. Do you |
| 8 | have any reason to believe that Dr. Clay Smith was not |
| 9 | being truthful this morning to the best of his ability? |
| 10 | A. No. I think it was truthful. But I think — I |
| 11 | mean, it depends how you want to define truth. There |
| 12 | was so much information that was missing or they did not |
| 13 | question or look into. |
| 14 | Q. I will get to that in a second. Dr. Smith |
| 15 | testified this morning that the board had access to a |
| 16 | copy of the report of the committee, that document, the |
| 17 | president's letter and certain information provided by |
| 18 | Mr. Farley and President Sessoms during the board's |
| 19 | deliberations, and that is what the board had in front |
| 20 | of them when they made their decision. Does that |
| 21 | accurately sum up the pieces of information? |
| 22 | A. They had the report. |
| 23 | MR. ZEFF: Unless there is a question — |
| 24 | BY MR. DURSTON: |

12 (Pages 198 to 201)

A-000231

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

**Page 202**

1   Q. The question, do you have any reason to believe
2   that Dr. Smith or any other members of the board had
3   other information in front of them in making the
4   decision other than what they testified to this morning?
5   A. I don't even go that way. I don't try to out
6   guess them.
7   Q. So you don't have, at this point, you don't have
8   any reason to believe that they had other information in
9   deciding whether or not to terminate you?
10  A. I don't have an answer to that one. I don't
11  believe that they had other information. Yeah, I agree
12  with what you are saying, the question.
13  Q. You think there is other things they should have
14  looked at?
15  A. You got it.
16  Q. I understand that. It's your contention that
17  the board should have looked more closely at the actual
18  testimony and other issues that were before the
19  committee?
20  A. Yes.
21  Q. And you have no direct knowledge of the board's
22  deliberations other than what Dr. Smith testified to
23  this morning, correct?
24  A. Correct.

**Page 203**

1   Q. And no one else ever shared with you about the
2   board's deliberations?
3   A. Correct.
4   Q. Do you recall that under the Collective
5   Bargaining Agreement, once the board makes an initial
6   decision on dismissal as an appropriate sanction that
7   you have a right to request to appear before the board?
8   A. Yes.
9   Q. And that right was actually explained in Dr.
10  Smith's letter to you, correct?
11  A. Yes.
12  Q. You chose not to make that request; didn't you?
13  A. Yeah. I have a right to request and a right not
14  to request.
15  Q. And you chose not to make that request, correct?
16  A. Yes.
17  Q. Why not?
18  A. On advice of counsel.
19  Q. You were aware that if you appeared before the
20  board you could have requested the right to present
21  witnesses?
22  A. Yes and no. I just don't remember exactly how
23  it reads, but I thought it had to be relative to what
24  was presented.

**Page 204**

1   Q. But you are aware that if you appeared before
2   the board you could have told the board, for example,
3   have you looked at this testimony or this part of the
4   record or looked at these issues, correct?
5   A. Yes.
6   Q. And so if the board had not had enough
7   information in your opinion beforehand, you or your
8   lawyer could have appeared before the board and at least
9   said we think you should take a look at this or hear
10  these witnesses?
11  A. Yes.
12  Q. And you voluntarily gave up that right after
13  consultation with counsel, correct?
14  A. Yes and no. The board could have also sought
15  additional information and did not choose to do so. So,
16  therefore, I did not.
17  Q. Now, at one point in the ad hoc dismissal
18  process you made a statement in front of the committee
19  that you thought one of the reasons why President
20  Sessoms was recommending dismissal was because of your
21  involvement with Mr. Morris?
22  A. Yes.
23  Q. That was actually one of the first things that
24  you said on the first day that you testified, correct?

**Page 205**

1   A. Uh-huh.
2   Q. You chose not to include that argument in your
3   brief presented to the board or in your brief to the
4   committee, correct?
5   A. I don't recall.
6   Q. You don't recall that brief?
7   A. No.
8   Q. You also did not raise that issue to the Board
9   of Trustees directly; did you?
10  A. Uh-huh. But I didn't present anything to the
11  board.
12  Q. You chose not to present anything to the board?
13  A. Uh-huh.
14  Q. Why did you initially elect to go before the Ad
15  Hoc Dismissal Committee?
16  A. Because I understood that as being the next
17  step --
18  Q. You had the right --
19  A. -- under the CBA.
20  Q. You had the right, at that point, to resign,
21  correct?
22  A. I didn't understand it that way.
23  Q. You didn't understand from President Sessoms'
24  initial communication that you could accept his decision

13 (Pages 202 to 205)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

Page 206

1  and/or resign in lieu of pursuing the Ad Hoc Dismissal
2  Committee?
3      A. I really do not know what was in the letter at
4  this point. I would have to look at it.
5      Q. Were you aware at the time that you started the
6  procedure that the committee's findings were advisory;
7  they weren't binding on the board?
8      A. Not really.
9      Q. To the best of your knowledge, did the Ad Hoc
10 Dismissal Committee, up until the drafting of the
11 report, follow the procedures in the Collective
12 Bargaining Agreement?
13     A. Yes.
14     Q. And you or the through the union were involved
15 in picking the members of the committee, correct?
16     A. I had no hand in picking members of the
17 committee.
18     Q. That was purely an AAUP decision at that time?
19     A. Yes.
20     Q. You didn't have any discussions with the union
21 president?
22         MR. ZEFF: That's a different question.
23 BY MR. DURSTON:
24     Q. Before Gregg and I were involved -- I think this

Page 207

1  was before you were involved -- did you have involvement
2  with the AAUP representative in picking members of the
3  committee?
4      A. Not that I know anything about, no.
5      Q. Did you have any discussions with any union
6  official about the membership of the committee?
7      A. The discussion of the committee came after the
8  committee was selected. And my understanding is that
9  several names were submitted and the president had the
10 right to choose the ones he wanted to choose.
11     Q. Who told you that?
12     A. Dr. King.
13     Q. Were you aware that a number of people were
14 asked to serve on the committee who declined?
15     A. And also who were rejected.
16     Q. And who was it who told you that the
17 university --
18     A. Dr. King.
19     Q. Dr. Scott King?
20     A. Yeah. At that time he was the president.
21     Q. And didn't the union also reject certain
22 individuals?
23     A. I don't know.
24     Q. Do you contend that any members of that

Page 208

1  committee harbored any sort of bias or animus against
2  you before this process started?
3      A. No.
4      Q. You were represented by counsel of your choice
5  during the proceedings, correct?
6      A. Yes.
7      Q. You had the right to call witnesses subject to
8  the limits on subpoena power, correct?
9      A. Yes.
10     Q. You certainly had the right to introduce
11 evidence, correct?
12     A. Yes.
13     Q. And as far as I recall, the committee accepted
14 just anything anybody wanted to present and put it in
15 the record, correct?
16     A. Yes.
17     Q. We had a 1,700-page transcript prepared or
18 thereabouts, correct?
19     A. Yeah.
20     Q. And that was at DSU's expense, as I recall, at
21 the end of the day, correct?
22     A. Yes.
23     Q. Now, in one of your interrogatory answers or one
24 of your requests for admissions, you indicated there was

Page 209

1  evidence that you had, at the time of that process, that
2  you wanted to introduce and were unable to. Was there
3  evidence concerning the issues before the committee that
4  you wanted to introduce at that time and were unable to?
5          MR. ZEFF: That's two different questions
6  you just asked. One has to do with interrogatories.
7  One is a direct question. If there is a question about
8  the interrogatory, can you show it to him?
9  BY MR. DURSTON:
10     Q. I will ask the direct question. I had asked in
11 the request for admissions many of these same questions.
12 And one of the answers, when I asked was there any
13 evidence that you wanted to present, the response was
14 yes. So tell me, is there any evidence that you had at
15 the time of the committee that you wanted to introduce
16 and were not allowed to or could not?
17         MR. ZEFF: Can you show him the question and
18 answer?
19 BY MR. DURSTON:
20     Q. Let me rephrase it your way.
21         Dr. Gorum, is there any evidence that you
22 had during the hearing that you didn't get a chance to
23 introduce that you wanted to?
24     A. That I had, which changes the question. I

14  (Pages 206 to 209)

A-000233

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

| Page 210 | Page 212 |
|---|---|
| 1 wanted the telephone logs introduced because everyone | 1 president. Do you recall signing that or making that |
| 2 indicated that he was not contacted by me. And, of | 2 statement in responses? |
| 3 course, we never could get ahold of the logs. | 3 A. I don't recall. |
| 4 Q. You are referring to all of the telephone logs | 4 Q. In your prior testimony when I asked something |
| 5 from the registrar's office that day? | 5 like that, you pointed to Drexel Ball's statement at the |
| 6 A. Not really all. There is one line that went to | 6 time that you thought that, something to the effect that |
| 7 that particular desk. | 7 there was a draft seen by the president's office that |
| 8 Q. And what about cell phone records? | 8 was sent back. |
| 9 A. I didn't use a cell phone because it was cheaper | 9 A. Uh-huh. |
| 10 to use – | 10 Q. And to the best of my recollection, you didn't |
| 11 Q. The registrar's phone. | 11 have any other information about the president directly |
| 12 A. Yes. | 12 interfering with the decision or findings of the Ad Hoc |
| 13 Q. You did not use your own cell phone? | 13 Dismissal Committee; is that accurate? |
| 14 A. And it was school business. | 14 A. Correct. |
| 15 Q. Was there any other testimony or evidence that | 15 Q. Have you spoken to Mr. Ball since? Have you |
| 16 you wanted to introduce at the time of the process that | 16 spoken to Mr. Ball yourself since the last time you |
| 17 you didn't get a chance to introduce for whatever | 17 testified? |
| 18 reason? | 18 A. Yes. |
| 19 A. I can't think of anything now. | 19 Q. What did Mr. Ball tell you in your most recent |
| 20 Q. Are there any new documents concerning any of | 20 conversation? |
| 21 those issues that you did not have available then but | 21 A. That he had that information from members of the |
| 22 have now? | 22 committee. |
| 23 A. I don't know what you mean by new. I know the | 23 Q. And to be correct, did Mr. Ball claim that |
| 24 outcome of the Shannon Bellamy versus DSU and the report | 24 members of the committee told him the president had |

| Page 211 | Page 213 |
|---|---|
| 1 from the NCAA Committee. Because they flew all over the | 1 changed the report or simply that the final report was |
| 2 country and interviewed all of the athletes involved and | 2 different than the ones that they had seen? |
| 3 said they found no evidence of wrongdoing. | 3 A. He said that the members -- not -- maybe the |
| 4 Q. What is your basis for that belief? What is | 4 chair of the committee was asked to change. |
| 5 your basis for the belief that the NCAA Committee found | 5 Q. Okay. So it's still your understanding that |
| 6 no evidence of wrongdoing? | 6 Mr. Ball says that one or more members of the committee |
| 7 A. Because there really wasn't. | 7 says that the chair was asked to change the report, |
| 8 Q. No. What knowledge do you have of what the NCAA | 8 correct? |
| 9 has or has not concluded? | 9 A. Yes. |
| 10 A. It was in the paper. | 10 Q. And that's the sole evidence you have right now |
| 11 Q. Whatever you know about what has been reported | 11 on which you contend that the president in some way |
| 12 is whatever was in the paper? | 12 influenced this report? |
| 13 A. It was in the paper and also Drexel Ball told | 13 A. Correct. |
| 14 me. But I think he got it from the newspaper too. He | 14 Q. Other than your common hearing on Mr. Morris, do |
| 15 wasn't there at the time. | 15 you know if other members of the Ad Hoc Dismissal |
| 16 MR. DURSTON: Let's take a brief break. | 16 Committee were aware of your protected speech |
| 17 (Thereupon, a brief recess was had.) | 17 activities, the Alpha breakfast, other issues? |
| 18 BY MR. DURSTON: | 18 A. No. |
| 19 Q. Dr. Gorum, in one of your interrogatory | 19 Q. Do you contend that any of the members of the |
| 20 answers -- and I've got it right here. It's simple | 20 committee were influenced by your first amendment |
| 21 sentence -- you made the following statement. | 21 activities in any of the deliberations or |
| 22 "Plaintiff believes and claims in this action that the | 22 recommendations that they made? |
| 23 Ad Hoc Dismissal Committee members and their findings | 23 A. That is difficult to answer because a couple |
| 24 were influenced by the defendant," meaning the | 24 members or maybe three members of the committee went to |

15 (Pages 210 to 213)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

| Page 226 | Page 228 |
|---|---|
| 1     A. I never did that.<br>2     Q. J you deny based on the fact of Frederick's<br>3  statements to you?<br>4     A. Yeah. He lied. And the other thing, I had to<br>5  type a letter to him, if I remember correctly, and I<br>6  used the computer in his office, in the secretary's<br>7  office. Whether the same one is there, I don't know.<br>8  But if they have that date --<br>9     Q. Dr. Gorum, obviously you disagree with many of<br>10  the findings of the committee. Was there some evidence<br>11  in the testimony of other people or in the record from<br>12  which the committee could have found these conclusions<br>13  even though there was other evidence presented that you<br>14  think was different?<br>15     A. Was there some evidence --<br>16     Q. Would you agree that, given the amount of<br>17  evidence in the record and the testimony on both sides,<br>18  that there was a basis for each of the conclusions made<br>19  by the committee?<br>20         MR. ZEFF: Without going through them one at<br>21  a time?<br>22  BY MR. DURSTON:<br>23     Q. We can talk about them. For each conclusion of<br>24  the committee, I know there is evidence that you can | 1  Dr. Davis was the chair. And it certainly happened to<br>2  him. That much I know. Dr. Toscano, certainly happened<br>3  to him. In terms of changing grades, his grades were<br>4  changed without his knowledge or consent. And they will<br>5  testify to that. So you can understand why some of them<br>6  were somewhat surprising because some of them are<br>7  strongly worded. Without being specific, I was<br>8  disappointed at some of the conclusions.<br>9  BY MR. DURSTON:<br>10     Q. So, essentially, you dispute all or most of the<br>11  conclusions reached by the committee?<br>12     A. I didn't say that because I don't know. I have<br>13  to read them.<br>14     Q. Please, finish reading them.<br>15     A. I disagree with most of them. Because I think<br>16  there was evidence given to contradict each point.<br>17     Q. I understand that it is your position that there<br>18  is evidence that you think is persuasive and<br>19  contradicted each point in the conclusions. Would you<br>20  agree that there was at least some evidence before the<br>21  committee to support each of those conclusions?<br>22     A. To me it becomes obvious because they made the<br>23  conclusions. From their perspective, I can't even say<br>24  all members of the committee because there are some of |

| Page 227 | Page 229 |
|---|---|
| 1  point out that you think contradicts it and that you<br>2  believe justifies it. And for each one I could point to<br>3  exhibits or records or testimony.<br>4     My question is: Would you agree that for<br>5  each of the findings that the committee made there was<br>6  at least some basis in the record on which the committee<br>7  operating in good faith could have reached that<br>8  conclusion?<br>9     A. The question is obviously reached that<br>10  conclusion.<br>11     Q. And the question is they obviously reached that<br>12  conclusion and you consider them, you believed that they<br>13  reached those conclusions arbitrarily or do you admit<br>14  that there was at least something in the record that led<br>15  them to reach that conclusion?<br>16         MR. ZEFF: Objection. You can answer it.<br>17  BY MR. DURSTON:<br>18     Q. Let me rephrase the question. Do you consider<br>19  any of these conclusions to have been made by the<br>20  committee without any reasonable basis in fact?<br>21         MR. ZEFF: Same objection. You may answer<br>22  it.<br>23         THE WITNESS: I can't even answer it. I was<br>24  surprised with some of these, on many of these because | 1  the points that people have already pointed out to me<br>2  that they did not agree with and they had nothing to do<br>3  with.<br>4     Q. And there may have been a split on the committee<br>5  between which ones who thought they were supported or<br>6  not. But there was evidence, you think, on both sides<br>7  on every single one of those points, correct?<br>8     A. Evidence?<br>9     Q. That there was evidence supporting and not<br>10  supporting.<br>11     A. Yes.<br>12     Q. Set that aside, Dr. Gorum. Setting aside the<br>13  findings of the committee, would it have violated the<br>14  right of -- let me rephrase that.<br>15     You are familiar with the standard in the<br>16  Collective Bargaining Agreement for termination? Let me<br>17  refer to it. 10.4.3(d), one of the grounds for<br>18  dismissal of a tenured professor is deliberate and grave<br>19  violation of the rights and freedom of other members of<br>20  the university community, correct?<br>21     A. Uh-huh.<br>22     Q. If a person, without authorization, signs a<br>23  grade related adjustment form for another instructor<br>24  without the authorization of that person, is that |

19 (Pages 226 to 229)

A-000235

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

| Page 234 | Page 236 |
|---|---|
| 1 instructor? | 1     MR. ZEFF: Objection. What report are we |
| 2   A. Yes. | 2 talking about? |
| 3   Q. And would the violation of that right rise to | 3 BY MR. DURSTON: |
| 4 the level of a terminable offense within the meaning of | 4   Q. The Ad Hoc Dismissal Committee report as it was |
| 5 this Collective Bargaining Agreement as a deliberate and | 5 received by the board. |
| 6 grave violation of the right of that faculty member? | 6   A. I don't know anything about what the board had |
| 7   A. I'm not certain about that yet. | 7 or did except that there were a couple members of the |
| 8   Q. Then what factors would go into whether or not | 8 board who told my wife to tell me that I had a friend on |
| 9 that would be a deliberate and grave violation of their | 9 the board. |
| 10 rights? | 10   Q. You haven't told me this before. So tell me who |
| 11   A. I would have to know the circumstances. First | 11 told you what, where. |
| 12 of all, you are saying at the request of a student and | 12   A. What board member sent that message? |
| 13 that never happened. Mine was done at the request of | 13   Q. Which board member sent that message to you and |
| 14 the dean. So they are different. | 14 when? |
| 15   Q. Well, so what you are saying is who asked and | 15   A. Cora Selby. And I don't know the person from |
| 16 the motives behind the decision are relevant to whether | 16 Wilmington who -- I don't remember his name. |
| 17 or not it violated the Collective Bargaining Agreement? | 17   Q. What was his role or his job? |
| 18   A. Yeah, there are factors, yeah. | 18   A. Board member. |
| 19   Q. So in the example of students taking internships | 19   Q. Would looking at the roll help you remember? |
| 20 or taking classes over the summer, independent study, | 20   A. Probably if you have a list. |
| 21 and being added back into a class or grade sheets from a | 21   Q. Here is the members of the board of 2004, 2005. |
| 22 prior semester being changed, what is it about those | 22   A. Selby, Oliver. |
| 23 situations that was not a violation of the rights of the | 23   Q. This is Norman Oliver? |
| 24 faculty of record assuming that they were not called? | 24   A. Yes. |

| Page 235 | Page 237 |
|---|---|
| 1     MR. ZEFF: Object. | 1   Q. And when did they contact your wife? Who |
| 2     THE WITNESS: I'm sorry. You say what would | 2 contacted your wife and what did they say? |
| 3 be the violation of the instructor? | 3   A. She attended the board meeting. I don't |
| 4 BY MR. DURSTON: | 4 remember when it was, but that's the message that she |
| 5   Q. Let me withdraw the question. I will move on. | 5 delivered to me. |
| 6     Other than the arguments that were made in | 6   Q. And who was it that said that, Mr. Oliver and |
| 7 your briefs, do you know of any facts that President | 7 Miss Selby or both? |
| 8 Sessoms had that would call into question the findings | 8   A. There was two. |
| 9 and conclusions in the ad hoc committee report? Let me | 9   Q. And the message was you had a friend on the |
| 10 ask this question differently. | 10 board? |
| 11     MR. ZEFF: How is he supposed to know that? | 11   A. Yeah. |
| 12 BY MR. DURSTON: | 12   Q. You are aware now, based on the roll call, that |
| 13   Q. Well, I don't think he does. Do you have any | 13 Miss Selby was present on April 14th when the board |
| 14 facts or information to support a claim that President | 14 affirmed your termination? |
| 15 Sessoms would know that there were errors or omissions | 15   A. Yeah. |
| 16 in this report? | 16   Q. I know you contend there are lots of errors and |
| 17   A. Not really, no. But there is some questions, | 17 omissions in the report, information left out, other |
| 18 positive statements supporting the president I was | 18 evidence. Based on what you know right now, is it your |
| 19 trying to find. The absurd or unnecessary, but they | 19 claim that the president or the board actually knew of |
| 20 were included. Do I know he did or had input? No, I | 20 errors or omissions in the report? |
| 21 don't know. | 21   A. I have no way of knowing. |
| 22   Q. When the board received the report, do you know | 22   Q. Other than the claim that there are things they |
| 23 if the board had any information that would lead them to | 23 could have looked at in the transcripts or in the |
| 24 believe that the report was not accurate and complete? | 24 briefs, is there any other basis why they should have |

21 (Pages 234 to 237)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

|  | Page 238 |
|---|---|
| 1 | known of any errors and omissions? |
| 2 | A. I don't know of any at this time. |
| 3 | Q. Do you contend that Delaware State ever violated |
| 4 | your rights under the Collective Bargaining Agreement in |
| 5 | this termination? |
| 6 | A. Yes. |
| 7 | Q. Which rights do you contend were violated under |
| 8 | the Collective Bargaining Agreement? |
| 9 | A. From the beginning. |
| 10 | Q. Did you discuss with the AAUP your options to |
| 11 | pursue actions under the Collective Bargaining |
| 12 | Agreement? |
| 13 | A. I could have. Dr. King, who was the president |
| 14 | who is the one that served as my advisor, so he was |
| 15 | aware of everything. |
| 16 | Q. After the termination, did you consider taking |
| 17 | action to challenge your dismissal before the Delaware |
| 18 | Employee Relations Board? |
| 19 | A. No. Because I didn't know that was an option. |
| 20 | Q. Other than your conversations with Mr. Zeff, did |
| 21 | you have discussions with Dr. King or anyone else about |
| 22 | your rights under the Collective Bargaining Agreement |
| 23 | itself to pursue your claims? |
| 24 | A. Yes. |

|  | Page 240 |
|---|---|
| 1 | believe that the board was influenced by any of those in |
| 2 | what the board did? |
| 3 | A. The question is tough in that anyone who has |
| 4 | seen Dr. Sessoms operate and his style would know that |
| 5 | he's not putting himself out there and never has, never |
| 6 | does. He has other people doing it for him. He is not |
| 7 | going to present the kind of information -- obviously, |
| 8 | if they just had a summary of the conclusions, he didn't |
| 9 | really present everything to the board. And based on |
| 10 | that, probably if I were a member, I probably would have |
| 11 | concluded the same thing. |
| 12 | Q. And then going back to my question, you had six |
| 13 | members of the board who were present on April 14th, |
| 14 | according to the roll. Dr. Smith, John Land, Cora |
| 15 | Selby, Richard Barros, Jesse Williamson, Marvin |
| 16 | Lawrence, you are familiar with all those members of the |
| 17 | board? |
| 18 | A. I don't know Lawrence. |
| 19 | Q. But you are familiar with the other members of |
| 20 | the board? |
| 21 | A. Yes. |
| 22 | Q. Do you believe that any one of those board |
| 23 | members were motivated or influenced in what they did on |
| 24 | April 14th by your prior first amendment protected |

|  | Page 239 |
|---|---|
| 1 | Q. And what did Dr. King tell you about your rights |
| 2 | to pursue this past the board other than the appeal to |
| 3 | the board? |
| 4 | A. I don't remember the specifics, but he told me |
| 5 | to rely on my attorney. |
| 6 | Q. I'm sorry if I asked this already. Do you know |
| 7 | if any, at the time that the board met, whether any of |
| 8 | the members of the board were aware of your protected |
| 9 | first amended activity, the things that we talked about |
| 10 | earlier, the Morris case, the breakfast, your |
| 11 | involvement in the faculty senate and your role as an |
| 12 | advocate? |
| 13 | A. I knew just about every member of the board very |
| 14 | well. And I don't know what they knew about me. |
| 15 | Q. Do you believe that any members of the board |
| 16 | were influenced, in any way, by those factors in making |
| 17 | the decision to terminate you or in upholding the |
| 18 | president's recommendation? |
| 19 | MR. ZEFF: What factors? |
| 20 | BY MR. DURSTON: |
| 21 | Q. The protected first amendment speech factors. |
| 22 | You claim that there were things that motivated the |
| 23 | president and why he pursued you. That's the basis of |
| 24 | this lawsuit. What I want to know is whether you |

|  | Page 241 |
|---|---|
| 1 | activities? |
| 2 | A. No. In some ways it's not an unfair question. |
| 3 | Because they were reacting to something specific, they |
| 4 | had a proposal presented to them and they had to react |
| 5 | to what they had in front of them. |
| 6 | Q. And I understand that answer, that the board |
| 7 | acted based on this information that was in front of |
| 8 | them presented in the summary and the report and by |
| 9 | Dr. Sessoms and Mark Farley. And sitting today, you |
| 10 | don't have any reason to believe that those board |
| 11 | members were separately motivated by some kind of bias |
| 12 | or animus based upon your first amendment activities, |
| 13 | correct? |
| 14 | A. No. |
| 15 | Q. And for that matter, as far as you know, the |
| 16 | members of the board might not even have known about any |
| 17 | of those issues, the Morris lawsuit or the prayer |
| 18 | breakfast or anything else? |
| 19 | A. No, they knew. |
| 20 | Q. Which of those issues do you contend that |
| 21 | members of the board actually knew about on April 14, |
| 22 | 2005? |
| 23 | A. The Morris case. |
| 24 | Q. Do you believe that some of or all of those |

22 (Pages 238 to 241)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

Page 242

1  seven members knew on that day that you --
2  A. Parkowski knew. Barros knew.
3  Q. Not only knew about the Morris case but knew
4  that you were behind DeShawn Morris' lawsuit?
5  A. I wouldn't say behind. I was the advisor.
6  Q. The advisor during the earlier proceedings.
7  A. Throughout.
8  Q. But not that, you are not claiming that they
9  knew that you were behind Morris' lawsuit?
10  A. They did know. Because I tried to hire some
11  attorneys in Barros' firm and in another firm, and they
12  thought it was a conflict of interest and couldn't take
13  it. So they had to know about the case.
14  Q. Do you believe that Mr. Barros used the fact
15  that you were behind the lawsuit as a factor in going
16  along with the president's recommendation?
17  A. I can't say that.
18  Q. Do you believe that he did?
19  A. I said I can't say that.
20  Q. Do you believe the board members knew about your
21  role in the prayer breakfast --
22  A. Oh, yeah, they knew.
23  Q. -- speech?
24  A. They usually attend it.

Page 243

1  Q. Were they aware that you had revoked the
2  president's speech invitation?
3  A. I really don't know. Now, I don't remember who
4  told me, but I was told when the issue came up on the
5  14th Barros walked out. I'm not sure that he voted.
6  Q. Do you contend that any of those seven board
7  members had any other reason to retaliate against you
8  personally?
9  A. No.
10  Q. You've given, in your testimony two weeks ago, a
11  list of a lot of chairs that you contend engaged in
12  pretty similar situations or similar conduct, correct?
13  A. Yes.
14  Q. Until you gave those names several weeks ago, do
15  you have any basis for believing that President Sessoms
16  or the registrar has been aware of specifics situations
17  of grade changes of other instructors that they could
18  investigate?
19  A. You have to remember that the registrar, who is
20  currently there, was new. And so he didn't have
21  knowledge of much of anything.
22  Q. And I'm referring specifically to the time since
23  President Sessoms came on board and the time since Glenn
24  Parker was hired as registrar. Do you claim that since

Page 244

1  that time an issue of a chair changing the grade of an
2  instructor has arisen that the registrar or the
3  president's office knew about or anybody knew about that
4  has not been pursued?
5  A. I really don't know.
6  MR. DURSTON: Off the record a second.
7  (Thereupon, a brief recess was had.)
8  (Thereupon, the deposition adjourned at
9  4:10 p.m.)
10  - - - - -
11  INDEX TO TESTIMONY
12
WENDELL GORUM                    PAGE
13
Examination by Mr. Durston            158
14
15
16
17
18
19
20
21
22
23
24

Page 245

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

23 (Pages 242 to 245)

Gorum v. Sessoms and Board of Trustees of Delaware State University

Page 246

State of Delaware )
                  )
New Castle County )

CERTIFICATE OF REPORTER

I, Anne L. Adams, Registered Professional
Reporter and Notary Public, do hereby certify that there
came before me on the 26th day of June, 2007, the
deponent herein, WENDELL GORUM, who was duly sworn by me
and thereafter examined by counsel for the respective
parties; that the questions asked of said deponent and
the answers given were taken down by me in Stenotype
notes and thereafter transcribed into typewriting under
my direction.

I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


                    Anne L. Adams
                    Certification No. 105-RPR
                    (Expires January 31, 2008)



**WILCOX & FETZER LTD.**

## In the Matter Of:

## Gorum

### v.

## Sessoms and Board of Trustees of Delaware State University

### C.A. # 06-565-GMS

---

### Transcript of:

### Jacquelyne W. Gorum, Ph.D.

### August 10, 2007

---

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

A-000240

Gorum v. Sessoms and Board of Trustees of Delaware State University

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,                    :

                    Plaintiff,           :

          vs.                            :     Civil Action No.
                                               06-565-GMS
ALLEN L. SESSOMS, Ph.D.,                  :

               and                       :

BOARD OF TRUSTEES OF DELAWARE  :
STATE UNIVERSITY,

                                         :

               Defendants.
                                 - - -

               Deposition of JACQUELYNE W. GORUM,
Ph.D., taken pursuant to notice in the law offices of
Saul Ewing LLP, Suite 1200, 222 Delaware Avenue,
Wilmington, Delaware, on Friday, August 10, 2007, at
10:38 a.m., before Lorraine B. Marino, Registered
Diplomate Reporter and Notary Public.

                                 - - -

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

**A-000241**

Gorum v. Sessoms and Board of Trustees of Delaware State University

**2**

```
1   APPEARANCES:
2           GREGG L. ZEFF, ESQ.
            Frost & Zeff, Esq.
3           Pier 5 at Penn's Landing
            7 North Columbus Boulevard
4           Philadelphia, PA 19106
              for Plaintiff
5
            MICHAEL R. ROBINSON, ESQ.
6           Saul Ewing LLP
            222 Delaware Avenue - Suite 1200
7           Wilmington, DE 19801
              for Defendants
8
    ALSO PRESENT:
9
            WENDELL GORHAM, Ph.D.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
1          JACQUELYNE WALLACE GORUM, Ph.D.,
2   having been first duly sworn, was examined and
3   testified as follows:
4   BY MR. ROBINSON:
5   Q.   Good morning, Mrs. Gorum.
6   A.   Good morning.
7   Q.   This was supposed to start at 10:00, and now
8   it is 10:40, so let's just -- I don't think we are
9   going to be here for more than a couple hours,
10  hopefully.
11         You have already stated your name for the
12  record.  What is your current address?
13  A.   55 Freedom Drive, Dover, Delaware.
14  Q.   And how long have you lived there?
15  A.   Since 1990.
16  Q.   1990.  My name is Michael Robinson.  We just
17  met a few minutes ago, and I represent Delaware State
18  University and the board of trustees and Dr. Allen
19  Sessoms in a lawsuit brought by your husband.  Do you
20  understand that?
21  A.   Yes.
22  Q.   Oh, I am sorry.  I was getting to the ground
23  rules next.  Just going through the ground rules real
24  quick, all your answers -- you understand that all of
```

**4**

```
1   your answers will be recorded by the court reporter --
2   A.   Yes.
3   Q.   -- and that you are under oath?
4   A.   After -- I believe after you have testified
5   today, you will have the opportunity to review your
6   transcript, perhaps with your attorney, and make any,
7   you know, types of changes that you would like to make
8   at that point.  Do you understand that?
9   A.   Yes, I do.
10  Q.   Okay.  Also, because this is being recorded
11  by the court reporter, she can't take down any uh-huhs
12  or mm-hmms or nods of your head, obviously.  I want to
13  keep the record clean for that.
14         I would like to make sure that you
15  understand the question before you answer it, that if
16  you are unclear on what I am asking you or whether you
17  have heard me correctly or not, you will stop me and
18  ask me.  I don't want you to guess.  This isn't a
19  memory test or a trick, game of tricks.  This is about
20  your memory, and we just need to get to the answer as
21  quickly as possible.
22         And if you don't know the answer to a
23  question, go ahead and say so.  Otherwise, I am going
24  to assume that you know the answer.
```

**5**

```
1          And maybe the most important part is if you
2   need a break at any point, just go ahead and let me
3   know.  As long as there isn't a pending question, it
4   shouldn't be a problem to take a break whenever you
5   would like.
6          Do you know of any reason that you are
7   unable to give a deposition today?
8   A.   No, I do not.
9   Q.   Not on any prescription drugs, alcohol, that
10  would prevent you from giving answers?
11  A.   No, there is not.
12  Q.   I have a fairly quiet voice, so make sure
13  you can understand me and hear me.  Tell me if you
14  can't hear me.  Most people have a problem with my
15  voice.
16         Did you review any documents today in
17  preparation for your deposition?
18  A.   Did I do what?
19  Q.   Review any documents.
20  A.   No, I did not.
21  Q.   Did you discuss the matter with anyone in
22  preparation for your deposition?
23  A.   Well, while we were waiting for you, I
24  talked with Zeff.
```

2 (Pages 2 to 5)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

18

1   but --
2   Q.    Okay.  When you first moved to Dover in
3   1989 --
4   A.    Yes.
5   Q.    -- did you become active in a church or
6   social activities?
7   A.    I am now very active in a church.  We
8   visited churches.  We did not find the one that we
9   particularly wanted to have membership in when we
10  first came to Dover.
11  Q.    Okay.
12  A.    But now I serve on the vestry of my church
13  and on the state diocesan council.
14  Q.    And that's at Christ Church?
15  A.    Christ Episcopal Church.
16  Q.    Christ Episcopal; interesting.
17  Q.    How long have you been on the vestry?
18  A.    This is my first year.  So it is a little
19  over a year.  I was elected last -- winter before
20  last, so in '06.  So it is a little over a year I have
21  been on the vestry.
22  Q.    How long have you been members of that
23  church?
24  A.    Maybe five years.

19

1   Q.    I am in my second year of a vestry in my
2   Episcopal church, too.
3   A.    Oh, really?
4   Q.    So I understand.  It is a very interesting
5   experience.
6   A.    Yes.
7   Q.    Do you know Professor Sessoms?
8   A.    Yes, I do.
9   Q.    Or I am sorry.  President --
10  A.    President.
11  Q.    I can't even read my own handwriting.
12  But he is a professor, so either one.
13  You know who I am referring to?
14  A.    Yes.
15  Q.    How long have you known him?
16  A.    Since he came to Delaware State University.
17  Q.    And that was in the summer of '04, I
18  believe.
19  A.    I can't tell you.  I could not tell you the
20  year.
21  Q.    Or actually I think it is '03.
22  A.    '03.  I think it was '03.
23  Q.    Okay.
24  A.    But I couldn't tell you.

20

1   Q.    Did you get to know his family at all?
2   A.    No.  I met his daughters.
3   Q.    Do you believe that President Sessoms acted
4   with retaliation with regard to Dr. Gorum's advocacy
5   activities?
6   A.    Yes, I do.
7        MR. ZEFF:  Objection.
8        MR. ROBINSON:  What basis?
9        MR. ZEFF:  The form.  There is no
10  foundation.
11  BY MR. ROBINSON:
12  Q.    Do you understand what I am referring to
13  when I refer to Dr. Gorum's advocacy activities?
14  A.    Well, I assumed you meant that faculty
15  always and students always went to Dr. Gorum to
16  discuss any problems, issues they were dealing with on
17  campus.  He was seen as a powerbroker on campus.  And
18  I remember Dr. Bell stating how happy he was that we
19  had arrived at this institution because we were both
20  impact players and the difference we made on that
21  campus.
22  Q.    When did Dr. Bell say that?
23  A.    Oh, he said that to me -- we were standing
24  in line at a fall -- in the fall you had a picnic, and

21

1   we were standing in line at the picnic, and he came up
2   and said that to me.
3   Q.    Is that back when you first started in the
4   early '90's?
5   A.    It was in the early '90's.
6   Q.    Did you have a similar reputation?
7   A.    Not to the same extent as Wendell did,
8   because I was in a different role as a senior
9   administrator.
10  Q.    We went through your education history real
11  quick.  I am wondering if we can go through your work
12  history as well.
13  A.    Okay.
14  Q.    Starting from I guess the point after the
15  Peace Corps, you came back and did you go straight
16  into your master's program?
17  A.    Yes, I did.
18  Q.    Were you working at all through your school
19  years?
20  A.    No, I did not.  In social work you have a
21  field experience the entire time you are in school, so
22  I worked, quote, but it was an internship for the two
23  years that it takes to get the master's degree.
24  Q.    Where was that?

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

34

1  with other groups and have a meeting on that open to
2  the public, and various activities such as that.
3  Q.  And that's mostly in the Delaware -- I mean
4  in the Dover -- community. So I could understand it.
5  A.  It was solely in a residence for students for
6  Q.  -- community?
7  A.  It is the -- when I say "solely," others
8  could be invited.  Now, when I talked about those who
9  were the senators, they were running for the State of
10  Delaware.  Since that time you done some work
11  Q.  Sure.  I was having you understand it,
12  A.  But the activity would be in Dover.
13  Q.  Okay.  You talked a little bit about your
14  husband's reputation as an advocate earlier.  I think
15  you said that he was somebody that faculty and
16  students could come to for assistance for various
17  reasons.  Is there anything else that you can think of
18  that your husband was known for at Delaware State
19  University?
20  A.  He was known for being very caring, a hard
21  worker.  He put in hours like you wouldn't believe.
22  Always working to try to enhance the university.  Was
23  known for his creativity, bringing in new projects,
24  new things that the university could do.

35

1        He was the advisor to the undergraduate
2  chapter of his fraternity so was active with that.
3  He had been chair of the tenure committee
4  more than once, so that's again a way he was seen as
5  so powerful, and served on the faculty senate.
6  Q.  Did you ever serve on the faculty senate?
7  A.  As my position, we were members of the
8  faculty senate. We were in too.
9  Q.  You were already -- and that was through the
10  whole time that you were there?
11  A.  The whole time I was dean, yes.
12  Q.  The whole time you were dean and not as
13  A.  I don't think I served on it-- you were
14  elected as faculty, and I do not -- I can't recall if
15  I, I don't think I was elected as a -- no, I was.
16  I was elected to the faculty senate as a faculty
17  member and then served on it as dean.
18  Q.  That was back in 1990?
19  A.  '89, '90.  That's why I am saying, I have
20  to -- you know, these are things I have not thought of
21  about.
22  Q.  Eighteen years ago.
23  A.  Yes.
24  Q.  In your position at the school were you in a

36

1  position to hear rumors or comments about your husband
2  during the years, during the last 15 years?
3  A.  I am certain at times I did.
4  Q.  Were there others that -- were there people
5  who opposed your husband's activities throughout the
6  1990's?
7  A.  Well, on some situations, yes.
8  Q.  Can you describe those situations?
9  A.  Yes.  If somebody did not get tenure and he
10  was the chair of the tenure committee, he was seen as
11  the person who did not give them tenure.  That was not
12  true, but that was a perception that was sometimes
13  there.
14  Q.  Can you give me an example of a person?
15  A.  I don't recall who, but I can remember
16  hearing about it because -- in fact, the reason I know
17  I heard about it is I urged him not to accept it.  I,
18  didn't even want him to serve on the tenure committee
19  when he was nominated again because of that.  So
20  that's how I remember it.  But I don't recall who the
21  faculty member might be.
22  Q.  So the people who were denied tenure were
23  the ones who were complaining?
24  A.  They saw him as the one who denied them

37

1  tenure, not that the committee had done.  Well,
2  actually, the committee didn't deny them.  They made
3  the recommendation, okay?  But if the committee did
4  not recommend them, then it was seen that Wendell was
5  the one who did not recommend them.
6  Q.  He was the one that was instrumental in
7  that?
8  A.  That's correct.
9  Q.  Were there others that were not denied
10  tenure that complained of Dr. Gorum's activities?
11  A.  Well, you know, people don't usually go to
12  the wife with negatives.  That was just something that
13  I heard.  Usually what I heard were the good things.
14  I didn't hear bad things about Wendell.
15  Q.  Did that ever change?
16  A.  Of hearing bad things?
17  Q.  Yes.
18  A.  No.
19  Q.  In 2003, when President Sessoms came on
20  board to the school, did Dr. Gorum's reputation at the
21  school change?
22  A.  I did not hear it change.
23  Q.  When did you first hear about the or did you
24  hear about the grade change -- I think you referred to

10 (Pages 34 to 37)

A-000244

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

38

1    it very early this morning when we first started --
2    the grade change issue?
3    A.    Well, I know that during the time that
4    students, like they had incompletes or they did not
5    have the grade in, Wendell had asked me what was the
6    process, what should he do. And I said you always go
7    and talk to your dean. And so I know that he had gone
8    and talked to Dr. Frederick. I can't tell you names,
9    because I don't know who the students were. But just
10   in general, he did ask the question, and I told him go
11   talk to his dean. I also suggested that he talk to
12   Dr. Bell.
13   Q.    And to your knowledge, he did talk to
14   Dr. Frederick --
15   A.    Yes.
16   Q.    -- or Dr. Bell in every instance?
17   A.    Yes.
18   Q.    Have you discussed this morning or otherwise
19   the reasons why Dr. Gorum is alleging retaliation
20   against him?
21   A.    Have we --
22         MR. ZEFF: Objection to the form.
23   BY MR. ROBINSON:
24   Q.    Do you understand the reasons that Dr. Gorum

39

1    is alleging retaliation in this lawsuit?
2    A.    Well, to me he was seen as a powerbroker,
3    someone who was not in favor of Dr. Sessoms coming to
4    Delaware State University, because at the faculty
5    senate meeting he was the one who suggested that the
6    search be reopened, that we not select from the
7    candidates that we had but open up the search again.
8    Q.    And do you know that Dr. Sessoms was aware
9    of that?
10   A.    I am trying to think if at any of the
11   meetings that followed I know that it was brought up.
12   I am trying to recall what Dr. Osei said, because
13   Dr. Osei was the chair of the faculty senate at that
14   time, and he used to come over to my office on a
15   regular basis then. I cannot recall exactly, because
16   I don't, you know -- so I can't say for certain.
17   Q.    You can't say whether you know that
18   Dr. Sessoms knew about Dr. Gorum's role in trying to
19   open up the --
20   A.    In the faculty senate meeting?
21   Q.    Correct.
22   A.    I said I cannot say for certain. I think
23   that, but I cannot say for certain. And I say I think
24   that because of conversations with Dr. Osei.

40

1    Q.    So is it possible that Dr. Osei told you
2    something about it?
3    A.    That's what I am trying to recall, that or
4    at a meeting. But it is just too long ago. You know,
5    it is not something I was focusing in on.
6    Q.    Were you friends with Dr. Osei?
7    A.    Yes.
8    Q.    And are you still friends with Dr. Osei?
9    A.    Yes.
10   Q.    Do you still talk to him?
11   A.    Yes. Well, at this point in time I don't
12   see hardly anyone from the university. If you have
13   noticed the activities that I mentioned, none of them
14   are connected to Delaware State University, so --
15   Q.    Were there any of your colleagues that
16   attend Christ Church?
17   A.    There was, yes, someone who is retired
18   there. There is the current -- there is a member who
19   is currently on the faculty, someone who was on the
20   faculty, but he and his wife, both of them had worked
21   at Delaware State University. They are now -- they
22   have now moved to Florida. They are the only ones I
23   can think of from Delaware State University.
24         The one who is retired we do discuss the

41

1    university, but the one who works there, we just do
2    not discuss the university. That's --
3    Q.    Before 2004 were you and your husband social
4    friends with people from the university or were you
5    mostly friends with people from outside the
6    university?
7    A.    We were friends with people from the
8    university.
9    Q.    Okay. And you haven't been in touch with
10   many of those people since that time?
11   A.    That is correct.
12   Q.    Do you know of the Martin Luther King
13   Breakfast issue --
14   A.    Yes, I do.
15   Q.    -- that is a part of this case?
16         What do you know about it?
17   A.    Well, I know that I invited -- I personally
18   invited Dr. Sessoms to the Martin Luther King
19   Breakfast at a basketball game, because James Marshall
20   was sitting next to me, and he was the head of The
21   Boosters and also was very active in the fraternity
22   and in the breakfast. And so I introduced Dr. Sessoms
23   to Mr. Marshall and then brought up the breakfast and
24   invited him to attend the breakfast.

11 (Pages 38 to 41)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

**42**

1   Q.   You just -- you invited him to attend?
2   A.   Yes.
3   Q.   You did not invite him to speak?
4   A.   No, I did not. That would not be my role.
5   I just invited him to attend.
6   Q.   Okay. Did you learn that he was invited to
7   speak at some point?
8   A.   I did hear that, yes.
9   Q.   Who did you hear that from?
10   A.   Well, I know I heard it from Wendell. What
11   I don't know, if other people told me that also, like
12   James Marshall, I don't know if other people could
13   have also said it. But I know that he had been
14   invited to speak, but the committee had already
15   contacted somebody else to come and speak.
16   Q.   So is it your understanding that President
17   Sessoms was disinvited --
18   A.   Yes.
19   Q.   if I can use that word?
20     Do you know whether Dr. Sessoms -- I say
21   Dr. Sessoms -- was upset about that, being disinvited?
22   A.   I would imagine, but he and I did not
23   discuss it.
24   Q.   And you did not discuss it with anyone else

**43**

1   that would have knowledge of Dr. Sessoms's feelings on
2   the subject?
3   A.   I am trying to think. See, my recollection
4   is that he was, but I can't tell you on what it is,
5   based, because I know I did not even want to attend
6   the breakfast after that. That's why I think there
7   was feelings around it by Dr. Sessoms.
8   Q.   You did not want to attend the breakfast?
9   A.   That's correct.
10   Q.   Why is that?
11   A.   Because it was -- you know, there was so
12   much negativity about it because of that. And I did
13   go. And you found most of your community leaders
14   there, and I believe Senator Carper was there and the
15   mayor. All of those people were there, and
16   Dr. Sessoms's name was mentioned, and he was the only
17   one not there. So that's why I am saying of what was
18   going on, the appearance was he was upset about it,
19   and he did not attend the breakfast. And all the
20   community leaders and this is his first year at
21   Delaware State University, you would not expect that.
22   Q.   Do you know that he didn't attend because he
23   was upset about being disinvited?
24   A.   I do not know why. I did not ask him why he

**44**

1   did not attend.
2   Q.   Do you know about the issue in this lawsuit
3   regarding DeShawn Morris?
4   A.   I know about DeShawn Morris. I don't know
5   the issue. I mean, when you say, "the issue," I don't
6   know what you are -- We will draw that out a little bit. What do
7   you know about DeShawn Morris? I take it you know who
8   that is?
9   A.   Yes, I do know who that is. I know he was a
10   student who was accused of some illegal activity and
11   that Wendell went to bat for him.
12   Q.   Okay. What do you mean "went to bat"?
13   A.   You know, he would call Wendell, and Wendell
14   stuck by his side. He didn't disown him.
15   Q.   Do you know about what time period that was?
16   A.   I have no idea.
17   Q.   Do you know whether President Sessoms was
18   aware of Dr. Gorum's involvement with DeShawn?
19   A.   I do not know.
20   Q.   Okay. So there is no reason that you would
21   believe that Dr. Sessoms would retaliate against
22   Dr. Gorum for helping DeShawn out?
23     MR. ZEFF: Objection.

**45**

1   BY MR. ROBINSON:
2   Q.   Or do you have any reason to believe that?
3     MR. ZEFF: Same objection.
4     MR. ROBINSON: You can answer.
5     THE WITNESS: Well, I don't know when
6   there is an objection what do I do.
7     MR. ZEFF: Oh, no. You can answer.
8     THE WITNESS: That's why I stopped. I
9   said I have only been deposed one time, so I don't
10   know, you know, what I am supposed to say or do then.
11     MR. ZEFF: I can't stop you from
12   answering a question. I can only object and hope a
13   judge stops you later.
14     THE WITNESS: Okay. I saw it as a
15   cumulative process; that Wendell was seen as a
16   powerbroker on campus, and he is the one who spoke up.
17   I mean, there was a lot of sentiment and feeling on
18   the campus that people did not want Dr. Sessoms,
19   Okay? But Wendell is the one who spoke up. That's
20   the way he is. He doesn't -- you know, he believes in
21   doing what is right and fair, and I think that's why
22   he joined the Peace Corps. He has always wanted to
23   help people and make life better for them. So he has
24   the confidence in himself that he can do that.

12 (Pages 42 to 45)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

46

1    So he is the one who is out there,
2    like the point person. So faculty knew that, students
3    knew that, so when they had issues, he is the one they
4    went to. Didn't have to be in his department, in his
5    school or anything. As I said, my faculty went to
6    him, not because of me, but if there was an issue on
7    campus, even they would go to him. So that's just --
8    that was his reputation on campus.
9        So do I think he was aware of that?
10   Yes, I do. You don't come into an institution. You
11   have to -- remember I told you about all those
12   leadership conferences I went to? You analyze what is
13   going on. You want to know what is happening. If you
14   don't, you are sunk. So he had to know that. But you
15   ask me do I know? I can't -- I have no proof. I
16   can't say it other than what an administrator does is
17   they analyze what is going on. That's the only thing
18   I can say.
19   BY MR. ROBINSON:
20   Q.    Were you aware at some point in 2003 or 2004
21   that there was an investigation into whether or not
22   your husband changed some grades?
23   A.    Now, I know about it in terms of athletics.
24   Is that what you are speaking of? And that the NTAA

47

1    was to be contacted. And when they did the
2    investigation, there was no evidence that he had done
3    anything wrong. And is that what you are referring
4    to?
5    Q.    Well, I am just asking you what your memory
6    is at this time period.
7    A.    Well, I remember that. I can't even tell
8    you if it was 2003. But I do know that that happened.
9    Remember, this is in the peripheral. I am dealing
10   with everything in my school and family. I am not --
11   I mean, as a spouse I am listening to what Wendell is
12   saying to me, but I am not saying, oh, this is 2003
13   that he is telling me this. I know that these things
14   happened, but that's all I can --
15   Q.    Do you know who Kim Walker is?
16   A.    Kim Walker?
17   Q.    Yes.
18   A.    I do not know her.
19   Q.    Was there a point in time that your husband
20   became suspended from his duties?
21   A.    Yes. Yes.
22   Q.    Do you know why that was?
23   A.    All I know is what Dr. -- well, I can't say
24   all I know. But at the time Wendell was in Africa. I

48

1    was on campus, and my administrative assistant told me
2    that I believe there was a sign up and his door was
3    locked and like he could not enter it and it was up
4    for the public, everybody to see. I did not know
5    this. Okay? She told me.
6        Well, I then called Dr. Bell to find out
7    what was going on. So that's when I found out that
8    Wendell had been suspended. As I said, he was in
9    Africa. He wasn't even on campus, because it was
10   spring break time. So that is how I learned about it.
11   Q.    What is your administrative assistant's
12   name?
13   A.    Lynn McGinnis, Mrs.
14   Q.    And what did Dr. Bell say when you called
15   him?
16   A.    He said, "Well, I know I need to talk to
17   you, Jaki." And so I went over to his office, and he
18   talked to me then. Of course, I am upset. All I can
19   recall is he did not understand why Dr. Sessoms had
20   taken the step that he did. He said, "I had advised
21   him not to ban him from campus," that he thought it
22   was overkill. He did not think it was necessary.
23   That I remember.
24       If he went into details, I mean, all I am

49

1    dealing with is he -- you know, well, that he is
2    banned from this place that he has given his life to
3    for all of these years and done when he has not even
4    in the country, when no -- nobody touched base with
5    him ahead of time. And there is always an appeal
6    process. He did not follow any appeal process before
7    he not only suspended him but he banned him from
8    campus. Now, that was what I was so upset about.
9    Q.    Did Dr. Bell tell you why this was done?
10   A.    He probably did. I am certain -- in fact, I
11   know that he did, but I cannot tell you what he said.
12   I was too upset at the time. As I said, this is what
13   I was reacting to. But he did say something, but I
14   cannot recall what it was.
15       And then I remember my youngest son had gone
16   on campus, and he was one of the first ones to see all
17   of that about his father. And he came to me about it,
18   and I had to deal with that that night. So that's
19   what I -- remember, I am a wife and mother as well as
20   an administrator. So that is what I recall, and what
21   I had to deal with with my son about his father, who
22   was someone he adored and respected, looked up to.
23       Everybody -- as I said, this is a person
24   that everybody looked up to. And then for this to

13 (Pages 46 to 49)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

54

1　Q.　Okay. Do you know President Sessoms's
2　secretary, Sandra Arnell?
3　A.　Yes, I do.
4　Q.　Do you know how her health is now? This is
5　kind of off the record. I mean not off the record but
6　a little bit off the reservation from what I am
7　talking about.
8　　　I understand her health is not the best. Is
9　that correct?
10　A.　No. She has had cancer, breast cancer,
11　which was treated, and she had some -- she has had
12　lung difficulties for years, but as far as I know --
13　but that's as far as I know. She is doing okay.
14　Q.　Okay.
15　A.　She is a cancer survivor. When I say "doing
16　okay," she participated in the latest cancer walk.
17　Q.　Oh, great.
18　A.　So that's all I know.
19　Q.　Did you ever speak to her about President
20　Sessoms or Dr. Gorum that you recall?
21　A.　I do not recall.
22　Q.　Were you friends with her?
23　A.　Yes.
24　Q.　So during this time period when your husband

55

1　was being suspended and investigated, you never
2　discussed any of the issues with Ms. Arnell?
3　　　MR. ZEFF: Objection.
4　　　THE WITNESS: I do not recall.
5　BY MR. ROBINSON:
6　Q.　Do you ever -- do you recall ever discussing
7　the DeShawn Morris investigation with her, with
8　Ms. Arnell?
9　A.　I know I did not discuss that with her.
10　Sandy is -- our friendship was based on family
11　matters. Her son was in school with my son when my
12　son Guy that I mentioned, who has all these physical
13　problems, was really deathly ill. We had to go to
14　California to have what we call the lifesaving
15　surgery. She contacted her twin sister, and her twin
16　sister was there with me in the hospital when he was
17　in a coma for ten days and they didn't think he would
18　live. Her sister was there with me during all that.
19　That's the nature of our relationship. But it is not
20　that much with Delaware State University.
21　　　I met her through that and we have been
22　friends. We are on the Democratic -- that's another
23　activity I have, the Democratic Party. She got me
24　involved in that, you know. But we don't really talk

56

1　that much about Delaware State University. That's
2　not --
3　Q.　Did you ever talk to your husband about why
4　he wanted to help DeShawn Morris?
5　A.　It was his nature. That's what he did.
6　Remember what I said. He helped students when he
7　thought --
8　Q.　So he helped any student that asked for his
9　help?
10　A.　That's correct. Now, they always tell you
11　not to add, but I will say this one thing. There was
12　a student who was accused of rape -- don't ask me his
13　name or when it happened -- at Delaware State
14　University. He was found not guilty, but he went to
15　Wendell, and at the time he was charged with this
16　rape. Wendell brought him home. He stayed in our
17　house. And I said, "Wendell, here -- I mean, I don't
18　know the student. He is accused of rape and you are
19　bringing him here. I am in the house with him." But
20　he said, "Jaki, he is not guilty. He didn't do it. I
21　have got to help him."
22　　　I mean, this is the way he was. Faculty
23　came in, they didn't have a place to live; faculty
24　lived in our home until they found housing. That's

57

1　just the way he is. So that's why I say he reached
2　out to help. People knew that. That's just the way
3　he was. I didn't bring faculty to the house to live,
4　but he did more than once. And students, we had
5　students who lived in our home until they could find a
6　place.
7　　　Now you see why I say I am so upset when
8　somebody who has lived their life like this and done
9　all of this, and then that's the way he is treated? I
10　mean, you don't know how upset I have been by the fact
11　that this is what happened.
12　Q.　Do you recall in 2003 -- you know who
13　Dr. Osei is?
14　A.　Yes, I do.
15　Q.　Did you ever come to understand that he was
16　promised a deanship at the school?
17　A.　That was what I was told, yes. Don't ask me
18　who, but, yes, that was the rumor that was dominant on
19　the campus.
20　Q.　That was my next question is why do you
21　think so. You anticipated my next question.
22　　　How long was that a rumor; do you recall?
23　A.　It was over a period of months it was a
24　rumor, but --

15　(Pages 54 to 57)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

58

1  Q.    Do you recall why he was being considered
2  for a deanship or why the rumor stated that he was
3  being considered for a deanship?
4  A.    Yes, because of what he had done to help
5  Dr. Sessoms.
6  Q.    And what was that?
7  A.    Number one, he served on the search
8  committee and had recommended him, was a part of his,
9  quote -- the rumor was Dr. Sessoms had a kitchen
10  cabinet of faculty members who came in and met with
11  him and told him what was going on on the campus and
12  who was doing what. That's why when you say do I
13  think he knew about Wendell, I say yes, because this
14  was the rumor. Okay? He was the one who told him,
15  I mean that he had helped him out. He was the one
16  who, when Wendell proposed that the search be reopened,
17  he -- and I can't tell you what he said now, but he
18  cut that discussion off. And so he was seen as one of
19  Dr. Sessoms's avid supporters, and that was why people
20  thought that he was -- the rumor was that he was to
21  get this deanship.
22  Q.    Did he become a dean?
23  A.    No, he did not.
24  Q.    Why didn't he become a dean?

59

1  A.    I do not know.
2  Q.    Was he upset? Was Dr. Osei upset about not
3  becoming a dean?
4  A.    Appearance-wise, yes. But if you asked him,
5  he said no. Now, he and I talked about it and we
6  joked about it, but, in fact, he gave up, I think,
7  being head of the faculty senate because the
8  expectation was he was to be dean.
9  Q.    Were there any rumors about why he didn't
10  become dean?
11  A.    I never heard a rumor saying why he wasn't --
12  I mean, it was the shock that he was not. That was
13  what you heard, but not as a reason why he did not get
14  it.
15  Q.    So the shock was that he had helped or maybe
16  it was partly that he had helped Dr. Sessoms and now
17  was not being rewarded?
18  A.    That's correct.
19  Q.    Did Dr. Osei ever tell you that he had told
20  President Sessoms that Dr. Gorum had opposed his
21  presidency, his candidacy?
22  A.    That's what I said, I do not recall. He
23  met -- he came over to my office. He used to stop in
24  my office a lot and we talked, but, you know, I can't

60

1  recall the nature of the conversation. So he could
2  have said it or he might not have. I do not recall.
3  Q.    Did these frequent visits or these friendly
4  visits stop at some point?
5  A.    Yes, they did.
6  Q.    When was that?
7  A.    I don't know exactly, but they did stop.
8  Q.    Do you know why they stopped?
9  A.    I do not know why.
10  Q.    Do you have a belief as to why they stopped?
11  A.    I believe it was he had difficulty facing me
12  after Wendell was suspended, because he was known as
13  one of Dr. Sessoms's people, you know.
14  Q.    So do you believe that Dr. Osei had
15  something to do with your husband's suspension?
16  A.    I never thought that.
17  Q.    Who do you believe is responsible for it?
18  A.    Dr. Sessoms.
19  Q.    Just solely Dr. Sessoms?
20  A.    He is the one -- well, no. I would say
21  Dr. Frederick and Dr. Sessoms.
22  Q.    I am sorry I am jumping around a little bit.
23  I guess I am just trying to move forward in a
24  chronological manner that is logical. But I realize I

61

1  am jumping around a little bit, I apologize.
2  Back to the Martin Luther King Breakfast,
3  did you ever discuss -- you said you were thinking
4  about not going to the breakfast?
5  A.    Yes, I was.
6  Q.    Did you ever discuss the whole matter with
7  Cecil Wilson?
8  A.    No. I know Cecil Wilson, but I did not
9  discuss it with him.
10  Q.    You don't recall that?
11  A.    I know I did not discuss it with him.
12  Q.    You know, Okay. Was Cecil Wilson involved?
13  A.    I heard that he was the one who had invited
14  inappropriately Dr. Sessoms to speak.
15  Q.    Okay. And was he the one who was charged
16  with disinviting him?
17  A.    If he issued the invitation, then he had to
18  disinvite him also.
19  Q.    And you never talked to him about it?
20  A.    No. That's an Alpha question. I have
21  nothing to do with Alpha Phi Alpha. I only invited
22  Dr. Sessoms because James Marshall was sitting with me
23  at the basketball game, and James was the president of
24  The Boosters, so that's how I was doing the

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

110

1  not the Wendell that I know and love. That's why all
2  I tell him, I just want this to be over because I want
3  him back. I want the person that I know and love to
4  be there with me at 55 Freedom Drive.
5  Q.     And does that include sexual intimacy?
6  A.     Yes.
7  Q.     And that has also changed in the last five
8  years?
9  A.     That's what I was referring to.
10 Q.     Okay. I wanted to make it clear.
11        Do you know what your husband is seeking in
12 this lawsuit?
13 A.     No, I do not.
14 Q.     Do you think that President Sessoms should
15 be personally liable for like out of his own pocket
16 for the events that have happened over the last five
17 years?
18 A.     I cannot tell you how those things work. Do
19 I hold him accountable is a different question. That
20 I would say yes to. How they do it I don't know.
21        MR. ROBINSON: I don't have any other
22 questions.
23        MR. ZEFF: I have nothing. Reserve
24 reading and signing.

112

1            CERTIFICATE
2         I, LORRAINE B. MARINO, Registered
3  Diplomate Reporter and Notary Public, do hereby
4  certify that the witness, JACQUELYNE W. GORUM, PH.D.,,
5  after being duly sworn by me, was examined by counsel
6  for the respective parties and the questions of said
7  witness and her answers were taken down by me in
8  stenotype notes and thereafter transcribed into
9  typewriting at my direction.
10        I certify that the foregoing is a true
11 and correct transcript of the testimony given at said
12 examination of said witness.
13        I further certify that the deposition
14 was made available to the witness for reading and
15 signing.
16        I further certify that I am not
17 counsel, attorney, or relative of either party, or
18 otherwise interested in the event of this suit.
19
20
21
     Registered Diplomate Reporter and Notary Public
22      Certificate No. 181PS/Exp.: Permanent
23
    Date: 8/20/07
24

111

1        (Deposition concluded at 1:18 p.m.)
2            - - -
3        (There were no exhibits marked.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

29 (Pages 110 to 112)

1 (Pages 1 to 4)

**1**

1    DELAWARE STATE UNIVERSITY
2         GRIEVANCE HEARING
3
4    IN RE: DELAWARE STATE UNIVERSITY
          v.
5    WENDELL GORUM, Ph.D.
6
7         Grievance hearing taken pursuant to
8    notice before Gloria M. D'Amore, Registered Professional
9    Reporter, at Delaware State University, 1200 N. DuPont
10   Highway, MBNA America Building, Dover, Delaware, on
11   Monday, August 30, 2004, beginning at approximately 10:40
12   a.m., there being present:
13   APPEARANCES:
14      BOARD MEMBERS:
           DR. ACKAH, CHAIR
15         FILIPPO TOSCANO
           EDWARD JACKSON
16         LAPOINTE DAVIS
17      FROST & ZEFF
           BY: GREGG L. ZEFF, ESQUIRE
18         Pier Five at Penn's Landing
           Philadelphia, P.A. 19106-1492
19         Attorney for Wendell J. Gorum
20
21
22

**2**

1    APPEARANCES CONTINUED:
2
           SCHMELTZER, APTAKER & SHEPARD, P.C.
3          BY: ROBERT L. DUSTON, ESQUIRE
           The Watergate
4          2600 Virginia Avenue
           N.W., Suite 1000
5          Washington, D.C. 20037-1922
           Attorney for Delaware State University
6
     Also present:
7
           Wendell J. Gorum
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**3**

1         DR. ACKAH:  We are ready to begin,
2    although we are missing one member, Dr. Gwanmesia.
3         As we indicated before we broke for the
4    holidays, we are going to open the floor first to the
5    University to present their case, to be responded to by
6    the Gorum party.
7         MR. DUSTON:  Correct.  The University is
8    prepared to begin today.  We have some procedural issues
9    that Mr. Zeff and I have discussed, and I will put on the
10   record now, if we may.
11        Mr. Zeff has requested that after the
12   University puts on its case, or as much as we can put on
13   within these two days, that there be a continuance that
14   exceeds the normal time period.  He has requested this
15   for a number of reasons, including late arrival of
16   documents, additional time to prepare his witnesses.  He
17   wants to make certain all of his witnesses will be
18   available, conflicting schedules, and the University has
19   not opposed that.
20        At some point at these two days, we
21   would like to sit down with the Committee and find
22   additional dates on everybody's calendar to schedule two

**4**

1    or three days of testimony for Dr. Gorum's case, and the
2    University has no objection to that.
3         We have arranged for the court reporter
4    to be here, who is taking dictation of all testimony and
5    recording it.
6         We may need to take some witnesses out
7    of order these two days.  Mr. Zeff indicated there might
8    be a couple of students he needs to get before they
9    leave.  We have no objection to that.  It is also
10   possible with some of the scheduling breaks, some of the
11   professors and adjuncts that we would like to present,
12   will not be available on campus or by telephone these two
13   days.  We may take those at another point.  But the bulk
14   of our testimony will be able to be presented.
15        Based upon that more limited scope, I
16   had anticipated that the testimony that we have would
17   take much of today and, perhaps, a half day tomorrow.  I
18   understand that there are some conflicts among some
19   Members of the Committee, developmental meetings tomorrow
20   morning.  It will be up to the Chair and the Committee to
21   direct us what time you want to start tomorrow, or if you
22   need to have any recesses for the convenience of the

**A-000251**

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

10 (Pages 37 to 40)

37

1    MR. DAVIS: But I will say, based upon
2  statements given to me from the records's office.
3    MR. ZEFF: That's correct.
4    MR. DAVIS: That is when it was news to
5  me. I think I found that about out about two or three
6  years ago, and I had been here a good 10 or 11 years and
7  was not aware of that.
8    MR. ZEFF: You will also hear that the
9  chair has been doing similar things from various
10  departments for longer than that.
11    MR. DUSTON: If I may, the testimony
12  that we will put on from the registrar, from Dean
13  Frederick, much of what the Committee Members have
14  expressed as being their understanding of practice, or
15  the rules, are things we will go over from the
16  registrar's office, from the new registrar and there may
17  be a difference not only between policy and some
18  practices in the past, but between policy and the
19  direction given by Dean Frederick in the College of Arts
20  and Science and what happened if somebody went to the
21  registrar's office. The registrar is not a position to
22  set policy. So, unless that policy has been blessed by,

38

1  or the practice has been blessed by the dean or the
2  provost, just because it happens, does not necessarily
3  mean it is correct.
4    I have had the registrar waiting. I
5  understand Glenn is still out there. Ms. Walker will be
6  short, but it is an important introduction. So, I don't
7  want to cut off your questions, but I think there will be
8  a good opportunity to discuss all of those issues as we
9  put on the witnesses who actually are involved in
10  administering these policies.
11    DR. ACKAH: Okay.
12    MR. DAVIS: Can I say this? Isn't it
13  the obligation or the responsibility of the registrar or
14  assistant registrar to provide a chair or regular faculty
15  member with the information that this cannot be done.
16  This is a violation of the policy.
17    MR. ZEFF: You will hear testimony that
18  on numerous occasions, the registrar's office has,
19  specifically to Dr. Gorum said, you can't do this. You
20  need another signature. I am not going to accept this
21  one, or not going to accept this. Over the years this
22  has happened. And that it is Dr. Gorum's position that

39

1  he has never changed a grade, ever. And that none of you
2  faculty members or chairs of departments have ever
3  changed a grade. It is the registrar's obligation and
4  duty to change grades. And if they have a problem with a
5  grade change form, they are not to change the grade.
6    DR. ACKAH: May I make a slight
7  correction here. It is not the registrar who changes the
8  grade. It is the registrar who accepts or rejects the
9  signatures of the grade change.
10    MR. ZEFF: I think that is a very good
11  distinction. What we are talking about here is inputting
12  grades based on policies or practice.
13    MR. DAVIS: And what we are doing,
14  faculty members, you are submitting a request for a grade
15  change. Nothing has been changed by virtue of the fact
16  that the request has been submitted.
17    MR. ZEFF: Am I correct in stating that
18  the University is not claiming that Dr. Gorum went into
19  any computer and actually physically changed any grades?
20    MR. DUSTON: No.
21    DR. ACKAH: Proceed.
22    MR. DUSTON: I would like to call

40

1  Ms. Walker.
2    KIM WALKER, having first been duly sworn
3  according to law, was examined and testified as follows:
4    (DIRECT EXAMINATION)
5  BY MR. DUSTON:
6    Q. Ms. Walker, what is your job title here at
7  Delaware State University?
8    A. My job title currently is associate director
9  of athletics for operations/compliance.
10    Q. How long have you been employed by Delaware
11  State University?
12    A. I have been here four years this August. In
13  the compliance position two.
14    Q. Would you describe for me, briefly, your job
15  duties in the compliance position?
16    A. What I do is, yearly, I have to certify
17  athletes for NCAA eligibility rules and make sure that
18  the athletic programs are followed in direct compliance
19  with the eligibility rules and the University.
20    DR. ACKAH: Certify them for what?
21    MS. WALKER: Competition.
22  BY MR. DUSTON:

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

11 (Pages 41 to 44)

41

1    Q.  Give us some idea of the kinds of issues you
2  have to certify.  What does that involve?
3    A.  It involves every single athlete.  We are
4  under two certification rules now because of the NCAA has
5  changed the way we certify our athletes.  Starting with
6  the fall of 2003 that class is under new form of
7  certification.
8        Up until that point, we certified hours
9  per year.  They are supposed to pass 24 hours per year.
10 This is up until last fall of 2003.  We have to certify
11 grade point average.  We have to certify progress towards
12 degree on each athlete.  If they fail to meet any of
13 those areas, they become ineligible.
14   Q.  So, for example, if a student does not have
15 enough hours or fails a course that is necessary towards
16 a degree, that can affect eligibility?
17   A.  Correct.
18        DR. ACKAH:  What happens to the student?
19 Does he lose his scholarship, or...
20        MS. WALKER:  When a student becomes
21 academically ineligible renders himself academically
22 ineligible.  That is an option.  He can remain on

42

1  scholarship being academically ineligible.  That is
2  entirely up to the coach.
3        In the contract that they sign, the
4  grant and aid contract, it says, if I become academically
5  ineligible, I may lose my grant and aid.
6  BY MR. DUSTON:
7    Q.  And if you play an academically ineligible
8  student, what are the implications of that?
9    A.  If you play an academically ineligible
10 student, usually you end up forfeiting the contest that
11 the athlete played in.  That is one.  Sanctions that may
12 come towards playing academic ineligible students is --
13 possible termination of coaches is one aspect of it.
14        MR. JACKSON:  Isn't that the extreme?
15        MS. WALKER:  Not now.
16        MR. JACKSON:  What do you mean by "not
17 now?"
18        MS. WALKER:  Well, if you look at the
19 papers, a lot of coaches are being terminated because of
20 academic fraud.  Ultimately, the coach is held
21 responsible for what happens in that program.
22        MR. JACKSON:  It depends upon the

43

1  University, doesn't it?
2        MS. WALKER:  It depends upon the
3  University, yes.
4        MR. JACKSON:  I went to Syracuse.  They
5  have all kinds of violations.  And a coach has never been
6  fired.
7        MS. WALKER:  I went to Clemson.  I
8  understand that.  It does depend upon the University and
9  what the University does.
10 BY MR. DUSTON:
11   Q.  Who is your direct report?
12   A.  My direct report is the athletic director.
13 Also, anything that has to do with athletes, I have to
14 report any kind of alleged violation to the faculty
15 athletic representative which is Tommy Frederick.
16   Q.  So, Dean Frederick is the faculty liaison with
17 the department?
18   A.  Yes.  And the University.  Basically,
19 athletics and academics.
20   Q.  What does that position involve from that
21 standpoint?  Is that in addition to his role in the
22 College of Arts and Sciences?

44

1    A.  Yes.
2    Q.  What do those set of duties entail?
3    A.  Well, again, he acts as a liaison for athletes
4  and academics.  Again, when an alleged violation occurs,
5  my chain is I inform the director of athletics.  And as
6  you can see in the first letter, I report directly to
7  Thomas Frederick.  He reviews it.  If he believes it
8  should be taken to the president, he will take that
9  violation forward or alleged violation forward.  If he
10 believes it is a procedural error or that type of thing,
11 he will kick it back down to me or say that there is
12 nothing warranted, and that does happen with alleged
13 violations that have occurred.
14   Q.  How often does the NCAA conduct audits of one
15 kind or another of athletic ineligibility?
16   A.  Conduct audits?
17   Q.  Yes.  Or do some kind of audit or review?
18   A.  That's departmental.  That's conference.  Yes.
19 Conference is every four years.  They also, when I send
20 certification forms down, I gather the information in the
21 computer.  There are four signatures that go on that form
22 for certification of athletes.  First goes to the

45

1  registrar. They look in and make sure what I have
2  determined is in their permanent academic record. I have
3  not transposed numbers, or that type of thing. That goes
4  from the registrar and goes to Dr. Frederick. My AD
5  signs off on it, minus my signature, and then it goes
6  down to the conference office. What they do once the
7  certification forms for athletes are down there, they
8  review the forms. If they have any discrepancies from
9  last year's certification to this year's certification,
10 they notify me, and I have to audit that athlete to make
11 sure everything is correct.
12    Q. You refer to possible violations. What type
13 of possible violations do you have of NCAA rules
14 involving changes of grades and incomplete grades or
15 other additions of course issues?
16    A. What happens is, it could affect the
17 eligibility as far as progress toward a degree, grade
18 point average. All of the things I to have look at to
19 certify athletes. Again, if one of those areas are
20 incomplete, or it is affected, that athlete may or may
21 not become eligible, or may or may not be eligible.
22    Q. Now, as long as the grade change or the

46

1  resolution is consistent with University policy, meaning
2  it has followed whatever the procedures are, is that
3  something that you can accept? A grade has been added, a
4  student now is registered for a class or an incomplete
5  has been resolved. When does it become a possible
6  concern for you?
7    A. I go by the permanent record of the
8  University, which is the registrar's office. That is the
9  only thing I can do. Say you change grade forms. I
10 can't have an athlete walk in my office and say, Here is
11 a change of grade, it is not in the system yet. I can't
12 accept that in my office for certification reasons. I
13 have to go by the permanent record from the University,
14 which is the registrar's office.
15    Q. Would you also get involved in investigations
16 if there are alleged problems with the changes of grade
17 for athletes?
18    A. No. Again, that is the policy of the
19 University, and that's the registrar's audit. After the
20 registrar audits, and there may be problems with grades,
21 they are going to have to come back to me and say, this
22 permanent record is going to be changed. Once the

47

1  University tells me this permanent record may or may not
2  be changed, then I go in and start my investigation.
3    Q. If you can identify for the Committee Exhibit
4  No. 1, the whole thing, and tell us what that document
5  is?
6    A. Delaware State actually is a little different
7  than most universities up until this past year. We
8  certify both semesters. There's a statement in the
9  student handbook that says if you're not in good academic
10 standing, you cannot represent the University in public
11 activities. So, that affects athletics because athletics
12 is a public activity. I have to certify both semesters.
13       What this is, during the certification
14 of spring of 2004, that we have spoken about, an athletes
15 grade went from a W to a B. I questioned that due to the
16 fact that I went to school, and usually grades don't go
17 from W's to B's. I actually went to the registrar and
18 informed the registrar -- the conversation went, how does
19 a grade go from a W to a B? And he asked me what? And I
20 gave him the athletes name. And that's how his
21 investigation really started with this process. And that
22 was, basically, our conversation with what happened.

48

1       If it had gone from an I to a B. I know
2  that's legitimate -- more than likely something
3  legitimate. W to a B was kind of a red flag to me.
4       DR. ACKAH: I have a question.
5       Isn't it possible, hypothetically, that
6  this man withdrew. He or she came back to the class
7  later on and the W was not deleted from his records?
8       MS. WALKER: It could have been. Again,
9  I go by the permanent record. I saw a W to a B. That is
10 what made me question it. It could have. But that was
11 something that, again, was a red flag to me. I deal with
12 athletes. I have to make sure that that is legitimate.
13 I went to the proper channels in going to the registrar,
14 and he could have said it was not deleted from the
15 permanent record, fine. It would have stopped right
16 there, as far as my office is concerned. What the
17 registrar chose to do after that --
18       DR. ACKAH: Given that student standard
19 academically and athletically, it impacts the coaches on
20 standing in this school, is it possible that a coach can
21 also attempt to influence grade change or infer a
22 professor to positively look at student's work? Is that

49

1  possible?
2          MS. WALKER: No. That is in Section 10
3  of the NCAA manual.
4          DR. ACKAH: Two answers. No, it is not
5  possible, and it shouldn't be?
6          MS. WALKER: It should not be. We
7  shouldn't be doing that. That practice should not be
8  involved with any of our coaches. Period.
9          DR. ACKAH: I am saying off record. Off
10 record in the past, I had coaches call me and try to
11 influence me to have students who have failed the class
12 or were not in a class, and it went on until a point in
13 time I told the coaches to stop calling me.
14         MS. WALKER: Then I need to know that in
15 my office because I need to -- and my athletic director
16 -- we need to let these coaches know that that is not
17 practice here because those are the type of things that
18 will get you fired. Those are grounds for termination.
19         I know you went to Syracuse, and I went
20 to Clemson, I respect that.
21         MR. DAVIS: What is the grade point
22 average players have to be?

50

1          MS. WALKER: Two point zero. The
2  institutional grade point average supersedes the NCAA.
3  At the institution, cumulatively after four semesters,
4  you have to have a two point zero grade point average.
5  BY MR. DUSTON:
6      Q. Ms. Walker, Exhibit No. 1 starting with the
7  first page is a summary that you did for Dean Frederick
8  transmitted on April 28, 2004.
9          Is that correct?
10     A. Yes.
11     Q. And you prepared this entire document?
12     A. Yes.
13     Q. Is it fair to say that the rest of this is
14 just a summary of the investigation starting with that
15 first W to a B change, and what steps you took with the
16 registrar and the different communications during that
17 time?
18     A. Yes.
19     Q. Can you just quickly walk through the
20 committee during the steps of the investigation that you
21 were involved with and then we will have Mr. Parker fill
22 in after that?

51

1          DR. ACKAH: Ms. Walker, excuse me for
2  jumping in here. Let's go back to Page 1. Letter to
3  Dean Frederick. Go to the line three.
4          MS. WALKER: Yes.
5          DR. ACKAH: The sentence beginning with
6  the students whose grade changes were changed, did not
7  affect their eligibility.
8          What do you mean?
9          MS. WALKER: For the certification for
10 the spring semester, you will notice, as we go in the
11 document --
12         DR. ACKAH: Are you saying even though
13 the grades were changed, they were still not eligible?
14         MS. WALKER: They were still eligible.
15         DR. ACKAH: So, they were eligible
16 before the grade change?
17         MS. WALKER: The one W to a B was not.
18 And there was another athlete in here in the body of this
19 letter that it did affect, but if I go through my --
20         DR. ACKAH: I'm confused here.
21         It becomes an issue if they were not
22 eligible before the grade change and they became eligible

52

1  after the grade change, then there is an issue here.
2          MS. WALKER: Yes. Yes.
3          January 21st, again, through the
4  certification process, I question W to a B grade change.
5          On January 22nd, I took it to Mr.
6  Parker.
7          From January 22nd to February 27th, that
8  was the registrar's audit, I guess, he was performing on
9  these grades.
10         Again, on January 27th, he informed me
11 about a list of names that he compiled that were
12 inconsistent with University grade change policy.
13 Apparently, it had been taken to Dr. Sessoms, and he said
14 all inconsistent grades were to be changed back to their
15 original state.
16         Based on that directive, Aaron Matthews
17 did not meet satisfactory progress with regard to the six
18 hour academic rule. The six hour academic rule says, All
19 athletes have to pass six hours the previous semester in
20 order to be eligible the semester afterwards. It was
21 showing he received only one letter grade in his course
22 work in the fall of 2003.

A-000255

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

14 (Pages 53 to 56)

53

1    After talking with Dr. Frederick, we
2  decided to -- it says pull Mr. Matthews from competing on
3  a Norfolk State game.
4    The next is conversation with the AD,
5  athletic director, who is Dr. Hallie Gregory at the time,
6  as he was driving down to Norfolk State.
7    Again, I don't have Mr. Matthews record
8  in front of me.
9    On February 28th, we spoke by telephone.
10  We reviewed by law that says the I can be used as a
11  determining grade for the six hour rule if it is under --
12  I'm sorry -- the institutional guidelines. So, at that
13  point, Mr. Matthews was eligible. We called on the phone
14  -- the coach's Cell phone. He did not compete at
15  Hampton. We did not get through to the coaches.
16    He did get his incomplete resolved. I
17  have documentation, I guess, in the office, or, actually,
18  Glenn has documentation that I was extended, so he could
19  become state and remain eligible for the rest of the
20  semester.
21    March 2nd, I received an amended list of
22  the athletes that you see there. And, from my records or

54

1  review of records, these athletes, even though the grades
2  were changed, did not affect their eligibility.
3  BY MR. DUSTON:
4    Q. Ms. Walker, what is the importance to Delaware
5  State University today of trying to stay in compliance
6  with NCAA violations? Is this a serious issue or not?
7    **A. Very serious issue. When you are talking**
8  **about academic integrity of your institution, and I just**
9  **deal with athletes, they call it a primary violation to**
10  **tamper with or allegedly tamper with the academic record**
11  **of student athletes in order to make them eligible.**
12    DR. ACKAH: At the bottom of this page
13  there is a note, the original grades were reinstated and
14  eligibility was not affected.
15    Who authorized reinstatement?
16    MS. WALKER: I believe Dr. Sessions
17  authorized that.
18    DR. ACKAH: Was it after conversations
19  with the professor or the chair?
20    MS. WALKER: I don't know.
21    DR. ACKAH: I don't know the
22  investigation policy regarding that.

55

1    MR. DUSTON: Mr. Parker can answer that
2  question about which grades have been changed back and
3  who authorized those.
4    MS. WALKER: I don't know that. I go by
5  what is in the computer, which is the primary record.
6  Once the registrar makes his determination, I go in and
7  review what he has placed in the system, or that office
8  has placed in the system.
9    MR. DUSTON: I have nothing further for
10  Ms. Walker.
11    (CROSS EXAMINATION)
12  BY MR. ZEFF:
13    Q. Good morning, Ms. Walker. My name is Greg
14  Zeff. I represent Dr. Gorum. I have a few questions for
15  you.
16    What is your background that makes you
17  eligible for the job that you have?
18    **A. Well, my background was based in coaching and**
19  **marketing prior to this position.**
20    Q. The only reason I ask is, you have the most
21  complex job of anybody in this room. As we all know,
22  NCAA rules are very complicated.

56

1    I guess the first thing I want to
2  understand is, once the registrar makes a decision and he
3  puts a grade, you have to live or die with that decision
4  in terms of whether or not the person is eligible.
5    Is that correct?
6    **A. That's correct.**
7    Q. So, it made no sense for you, once the
8  registrar did what was done in this case for you to go
9  back and talk to Dr. Gorum, correct, because it did not
10  matter?
11    **A. No. I go by the --**
12    Q. So, whether Dr. Gorum was right or wrong in
13  changing those grades, made no difference to you?
14    **A. To me. No.**
15    Q. Because it is what the registrar did, not what
16  Dr. Gorum did?
17    **A. I suppose, yes.**
18    Q. And when the bottom line all came about,
19  whatever changes were made did not affect anybody's
20  eligibility; did it?
21    **A. No.**
22    Q. In your chronology, second page of it,

125
1  brought you here. We thought it would be nicer to hear
2  your observations of the events to give us some knowledge
3  on some issues.
4        So, you will be questioned by the
5  attorney.
6        (Mr. Davis has left for the afternoon
7  session.)
8        MR. DUSTON: Glenn, so you understand, I
9  will be walking through the direct, but the Committee may
10 be interrupting with questions at any time.
11       I just left another message for
12 Ms. Davis regarding your missing committee member.
13       DR. ACKAH: Gwanmesia.
14       MR. DUSTON: I left her a voice mail.
15       GLENN PARKER, having first been duly
16 sworn according to law, was examined and testified as
17 follows:
18 BY MR. DUSTON:
19 Q.  Mr. Parker, how long have you been employed by
20 Delaware State University?
21 A.  Year and a half.
22 Q.  You started here when?

126
1  A.  March 10, 2003.
2  Q.  Would you give us a brief summary of your
3  background in academia and your qualifications for your
4  current position?
5  A.  I have a Master's degree in educational policy
6  and management from the University of Oregon. I have
7  been in higher education for 15 years. The last, I
8  believe, six years, I have been a registrar. Prior to
9  that, I was an associate registrar. I have an academic
10 advisor. And just prior to working here, I was at Johns
11 Hopkins University as a registrar for their engineering
12 school.
13 Q.  I want to go through a series of policies or
14 issues on the campus and ask you a series of questions
15 about each of those, and I know there is some overlap,
16 but fill in where we can.
17       I want to start with the process for
18 registration of classes, and particular issues like
19 deadlines, add drop, and why don't you start by
20 summarizing what formal policy and procedure there is, at
21 the University at the time that you started, for the
22 registration process. How did that work and the

127
1  deadlines to add drop?
2  A.  Deadlines for adding and dropping -- well,
3  actually, the entire academic calendar is established
4  between the provost and the registrar's office. And the
5  dates are set based on a number of weeks between each of
6  those activities.
7        Registration occurs beginning in the
8  semester prior to that semester, or to the current
9  semester. Late registration starts the first day of
10 classes. The last date to add classes is one week,
11 exactly one week after the first day of classes. Last
12 day to drop classes, I believe it is six weeks, I can't
13 remember if it is six or eight weeks.
14       Are there other dates you need?
15 Q.  No. The process for withdrawing from a class,
16 once you are in a class, how does that work?
17 A.  Well, it is according to the drop deadline.
18 And a student makes a decision to drop the class and can
19 do it either by going to the web or going to an advisor.
20 And the advisor can also do a drop, as long as it is
21 within the add drop deadline or within that period that
22 drops are permitted.

128
1        And the student, as long as the student
2  is seeing an advisor, they are given what is called an
3  alternate pin, and they can have access to their records
4  via the web. And they can go in and do their add and
5  drops on the web without an advisor.
6  Q.  Now, as far as adding individuals after the
7  add period, is there a way for students to do that beyond
8  going to the registration office after the add period?
9  A.  After the add period, they need to get a
10 signature of a dean.
11 Q.  And what form is used for that? Or is there?
12 A.  We have add drop forms that are triplicate
13 forms. The instructor gets a copy, the student gets a
14 copy and my office gets a copy. And on that is a place
15 for three signatures. One is for instructor. One is for
16 advisor. And one is for a dean.
17 Q.  Now, take me through the process, as you
18 understood it when you started here, for submission of
19 grades, when and how that process works for an instructor
20 to turn in his grades?
21 A.  The grading period begins -- I believe it is
22 one or two days after the last day of final exams. And

141

1  on the roster, faculty would turn in the roster and have
2  a name at the bottom of it with a grade. It was assumed
3  that my staff would automatically put those names and
4  grades in. And at that time, the end of December, I
5  issued this to my staff saying we will no longer be doing
6  this. The student must go and follow this new procedure.
7  They have to actually go in and add the class. There are
8  several issues. Inherent in adding students to classes
9  after the semester is over, one of which is that it
10  creates a bill. And, so, student accounts then become
11  involved in the sense that the student may or may not add
12  more charges to his or her bill. And, then, they need
13  to, as a result, need to make arrangements to pay for
14  that.
15    Q. So, the procedure implemented as of last fall
16  was if a student is not already registered for class,
17  they must go through the add process and go through
18  student accounts with the dean's approval, in order to
19  formally add the class after the add period and then can
20  have a grade assigned?
21    A. Correct.
22    Q. Once they have been added in?

142

1    A. Correct. If I can make one more remark about
2  this.
3        I issued this, also, based on our new
4  president had said, our deadlines are to be adhered to.
5  I had been saying all along, if we have an add deadline,
6  if we have a drop deadline, we should be sticking with
7  those deadlines. And in the past, a lot of deadlines had
8  been forgiven when students registered. I issued this
9  statement based on deadlines that we were going to stick
10  to.
11    Q. Now, do you know if that policy had also been
12  communicated to chairs, or deans, or at any other level
13  to the faculty?
14    A. To the best of my knowledge, it was. But I
15  received the information from, once again, the
16  vice-president in my division.
17    Q. The second memo is referring to Supplemental
18  Grade Reports.
19    A. This is a reiteration of the same memo. If we
20  receive add ons or Missing Grade Reports that just list
21  students with the expectation that my staff would
22  register those students and give them a grade, that we

143

1  would not process them in that way.
2    Q. You specifically refer to Missing Grade
3  Reports, indicating that you're receiving Missing Grade
4  Reports for someone who was not on the original roster,
5  was not registered, that it should not be processed?
6    A. Correct.
7    Q. A Missing Grade Report was then to be used for
8  somebody who was registered, but for some reason, the
9  grade never got submitted and processed for that class?
10    A. Can you restate that again?
11    Q. That was not a good question.
12        The next memo dated January 6, 2004.
13  This is directed to All Faculty?
14    A. Yes. This is to All Faculty. It is a set of
15  instructions for grade rosters and the dates that grade
16  rosters would be distributed. And, also, instructions as
17  to how the add drop policy works and also no shows should
18  be in here, I believe.
19    Q. Does this memo reflect a change in policy?
20    A. No.
21    Q. Going forward to the next memo, can you
22  describe this for me?

144

1    A. This is another reiteration of the
2  University's policy that I sent to my staff saying that
3  these are how grade changes are to be processed. I sent
4  this on March 2nd. Simply all I did was take it right
5  out of the catalog, reminding the staff this is how grade
6  changes are to be processed.
7    Q. How was any issue regarding Dr. Gorum and
8  grade changes first brought to your attention?
9        DR. ACKAH: Can you rephrase that?
10        MR. DUSTON: Yes.
11        DR. ACKAH: It is loaded.
12        MR. DUSTON: I'm sorry.
13  BY MR. DUSTON:
14    Q. Mr. Parker, at some point this spring, did you
15  conduct an audit of grades that involved Dr. Gorum?
16    A. Yes.
17    Q. What first triggered that audit?
18    A. Well, it was my intention when I came to work
19  here, that I would audit everything in the office. And I
20  started in March, and I believe I did the audit in
21  January, late January or February, and it had been nearly
22  a year and I knew I needed to do it. Previously, I had

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

37 (Pages 145 to 148)

145

1  heen approached by Kim Walker who is the -- I'm not sure
2  of her title -- whether she is director associate of
3  eligibility for athletics. And she had come to me,
4  questioning a grade that had been changed for an athlete.
5      Q.  Now, at that time, had you already conducted
6  some type of audit regarding grade changes?
7      A.  No. I had not.
8      Q.  Look at the documents behind Tabs 8 and 9. I
9  may have some of these in the wrong order. Take a look
10  at both of those. Then I want you to take the Committee
11  through those documents, what they showed, both 8 and 9.
12      A.  These are my own notes. And these are notes
13  that I made based on an audit I did of grades.
14      Q.  Well, the first page is your notes that you
15  prepared by an audit of grade changes.
16          Correct?
17      A.  Correct.
18      Q.  Look at the last document of Exhibit 9.
19          Is that the audit results you are
20  referring to?
21      A.  Yes.
22      Q.  The last page of Exhibit 9 dated March 1st

146

1  really should go with that first summary.
2      A.  Yes. That's where I put my figures. Yes.
3  Correct. Can I see that last page of Exhibit 9?
4      Q.  So, after Ms. Walker brought this question to
5  your attention, tell us about your audit. What did you
6  do? What did you look at?
7      A.  I'm going to have to think back on how I got
8  this data. I got this data, I'm pretty sure, from
9  requesting a report from institutional research. They
10  sent me the grade changes and I put them in an Excel
11  document. That's what you're looking at. And then did a
12  count on those grades of what grades had been done and by
13  whom. The results of which show, just as it says here,
14  161 grade changes had been processed for the fall 2003.
15  Joyce Bowers, assistant registrar had processed 133 of
16  those changes. And that Dr. Gorum -- 21 had been
17  submitted by him. And then of those 21 or 22, 16 were
18  courses taught by Dawkins. Four were taught by Wickham.
19  And one was taught by Gorum.
20          DR. ACKAH: So, which of the figures is
21  correct, 22 or 21?
22          MR. PARKER: I would have to go back and

147

1  check. I don't know.
2  BY MR. DUSTON:
3      Q.  Now, the grade change result, it was the data
4  that you were provided that showed it was Dr. Gorum who
5  had submitted those?
6      A.  No. That did not show those. The form I had
7  that showed Dr. Gorum submitted those were the Change of
8  Grade Form, or, yes, the change of grade form.
9      Q.  You physically went through the Change of
10  Grade Form in the registrar's office?
11      A.  And matched them to the grades that were
12  submitted.
13      Q.  When you say submitted by Dr. Gorum, these are
14  ones that had Dr. Gorum's signature on them?
15      A.  Correct.
16      Q.  And what information did you use to determine
17  which instructor had taught the course?
18      A.  I looked in the Banner system. And in Banner
19  we record who the instructor of the course is. And that
20  is how I found it.
21      Q.  Now, if you would go through the rest of your
22  notes here and take me through the process.

148

1      A.  The next bullet is that Dr. Gorum signed his
2  name on the instructor's line of all of the grade change
3  forms. And I am assuming there is documentation for
4  that. There were neither chair or dean approvals. And
5  then on Friday, the 27th of February, I spoke with Drs.
6  Dawkins and Wickham by telephone. They indicated they
7  had no knowledge of the grade changes, and they did not
8  authorize Dr. Gorum to make changes for them.
9          Do you want me to continue?
10      Q.  Yes. Continue.
11      A.  The next page is just a list of those grade
12  changes and who taught the course, according to who we
13  had noted in Banner as teaching that course. And the
14  grade change from the previous grade that was originally
15  submitted to the grade that was changed.
16      Q.  And each of those on this list are actual
17  Change of Grade Forms of ones that had been put in the
18  system in one grade and turned in and this was a physical
19  Change of Grade Form.
20          Correct?
21      A.  Correct.
22      Q.  After preparing that summary, did you continue

A-000259

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

38 (Pages 149 to 152)

149

1  your investigation?
2      A.  Yes.
3      Q.  And what else did you find in the course of
4  your investigation?
5      A.  Well, referring to this Exhibit 9, or Section
6  9, these are the students whose grades were changed. And
7  what I did was, I calculated the GPA before the grade
8  change and a GPA after the grade change. And their
9  cumulative GPA before and cumulative GPA after. Then I
10  looked at what would have changed in their academic
11  record as a result of changing a grade for them and then
12  also list their major.
13      Q.  So, for example, the C. Young on the bottom --
14  and this is without regard to NCAA eligibility. In that
15  case, the change from a C to an A would result in
16  C. Young being taken off the dean's list?
17      A.  A C to an A would result in him being put on
18  the dean's list.
19      Q.  And if you reverse that grade back, that would
20  have taken that person off the dean's list in that class?
21      A.  Correct.
22      Q.  In the case of R. Taylor, if you reverse that

150

1  A, and take it back to a B, it would result in academic
2  probation for Mr. Taylor?
3      A.  Correct.
4      Q.  Same thing for Mr. Parker, No. 10, reversing
5  that, one letter grade change would result in probation?
6      A.  Yes.
7      Q.  Same with M. Gantt, who was the W to a B?
8      A.  Correct.
9      Q.  Would have put him on academic probation?
10      A.  Yes.
11      Q.  In the others that are referenced, course
12  won't count for major, is that relevant to anybody
13  besides athletes?
14      A.  It is relevant to everyone. All students are
15  subject to courses either counting or not counting on
16  their major based on their grade.
17      Q.  After preparing that summary, did you ever
18  have an opportunity to -- well, let me ask you more
19  broadly.
20          When you did this audit, how far back
21  can you go looking at Change of Grade Forms and other
22  forms?

151

1      A.  At this time, I was looking at the fall
2  because that is where I had the largest number of grade
3  changes, but I did look at a few grade changes from the
4  previous spring. And I think I also looked at a few from
5  the summer, but I think it was mostly fall.
6      Q.  At any point, did you start going beyond
7  change of grades to other changes, including the
8  incompletes and missing grade forms?
9      A.  All of the forms were lumped together. So, I
10  looked at everything at one time.
11      Q.  Are they physically kept in files?
12      A.  They were all kept in one file.
13      Q.  So, that file would have Missing Grade Forms,
14  Incomplete Forms and Change of Grade Forms?
15      A.  Yes. At the time they were separated.
16      Q.  Turn now to Exhibit 10. Tell me what this
17  summary is.
18      A.  I don't have a date on this. I can't. These
19  are incomplete grades that were resolved and the
20  instructor did not match the person who submitted the
21  resolution.
22      Q.  Do you recall when this one came or was

152

1  developed?
2      A.  I don't know.
3      Q.  I want to start going through the next set of
4  exhibits, which we have organized by instructor with
5  forms and then E-mail correspondence. And I want to go
6  through each set just to identify what we have and where
7  these documents came from. We started with Exhibit 11.
8  And there was, actually, a question earlier about the
9  little box on the right-hand side on a number of these
10  copies.
11          Can you tell the Committee what this is?
12      A.  I put a small, little sticky note on the
13  bottom of these to indicate who the instructor for that
14  course was.
15      Q.  That's your handwriting?
16      A.  Yes.
17      Q.  That was not on the original form?
18      A.  No. I stuck a sticky note on there. Somehow
19  it got photocopied along with this.
20      Q.  So, this set of forms, as an example, can you
21  tell us what the checkmark means?
22      A.  Checkmark means it is processed.

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

39 (Pages 153 to 156)

153

1    Q.  That would have been done by whom?
2    A.  B is Bowers.
3    Q.  So, this form indicates it came out of the
4  records of the registrar's office.  It was processed by
5  Joyce Bowers.  That's her B.  And that change was
6  actually implemented?
7    A.  Correct.
8    Q.  Those four are for ethics in the media.
9         Can you identify what is No. 12?
10   A.  This is an E-mail response from Dr. Wickham to
11  me saying he did not make those grade changes.  He did
12  not authorize them.
13   Q.  Now, in this case, the grade changes were
14  processed on January 8, 2004.  If you will go back to
15  Exhibit 11.
16        When did the registrar's office come
17  back in January?
18   A.  We never are off.  Well, actually, I guess,
19  the day after New Year's.  We are off for a week or so.
20   Q.  You are back January 2nd?
21   A.  Yes.
22   Q.  Under the academic calendar, the professors

154

1  would have been back several weeks later, around the
2  20th?
3    A.  That, I don't know.  I don't know that.
4    Q.  So, Exhibit No. 12 is your E-mail to Professor
5  Wickham and his response?
6    A.  Correct.
7    Q.  The next group relates to several courses
8  where you have Dawkins written on the bottom?
9    A.  Yes.
10   Q.  Who is Mr. Dawkins?  Do you know?
11   A.  I believe he is an adjunct faculty member.
12   Q.  Your E-mails, would you identify those and go
13  through them on Exhibit 14?
14   A.  Let's see.  This is an E-mail to Mr. Dawkins
15  asking him to confirm that he did not make these grade
16  changes.  And he wrote back to me saying that he did not
17  teach that course that semester.  He taught these three
18  other courses.  The original grades are correct.  He did
19  not change them.
20   Q.  So, you had given a list of courses from that
21  other spreadsheet that are listed as Dawkins.
22        On the next page of the E-mail, you have

155

1  that listed as Gorum/Dawkins.
2         Do you recall why?
3    A.  I don't recall why.  No.  No.  I don't know
4  why.  I am not sure why that is listed that way.  I would
5  have to go back and look.
6    Q.  In each of those classes, that actually
7  reflects several different classes there that you asked
8  Mr. Dawkins about.
9         Correct?
10   A.  Correct.
11   Q.  And he indicated he did not teach course
12  14900?
13   A.  Yes.
14   Q.  Did you subsequently determine who taught that
15  course?
16   A.  At that time, I checked with my secretary to
17  ask her if she had any notification that the instructor
18  had changed or somehow that there had been an adjustment
19  to the schedule, and she had not received any.  So, I
20  then asked the department — I went to the secretary of
21  the department and asked if she knew who taught the
22  courses.  And she sent me an Excel spreadsheet with a

156

1  list of who taught courses that semester.  And that's how
2  I determined it was Osei Mensah.
3    Q.  CRN, that is central records number?
4    A.  Course reference number.
5    Q.  So, in this case, the ones we have on the
6  statement of charges for Mr. Dawkins is seven grade
7  changes in three classes that Mr. Dawkins says he did not
8  approve.
9         Correct?
10   A.  Correct.
11   Q.  Did he ever talk to Mr. Dawkins about this?
12   A.  I believe I called him at some point, and then
13  I asked him if he had made these changes.
14   Q.  The next grade change form is Antonio Alvarez.
15  That is Exhibit 15.  Exhibit 15 and 16.  Tell me what you
16  recall about Mr. Alvarez.
17   A.  First of all, seeing that a student changed
18  from a W to an A alerted me to an irregularity because if
19  a student is withdrawn, then they would not have been
20  registered in that class and they would not receive a
21  grade from that class.  How this happened, I was
22  interested in finding out.

157

1    Q.  Did you determine who the instructor for that
2  class was?
3    A.  I looked it up, and I determined that it was
4  Dr. Kopano teaching the course.
5    Q.  Did you communicate with Dr. Kopano about that
6  change?
7    A.  Yes. The E-mail here in No. 16 indicates that
8  I had sent him a message. I don't have the first part of
9  that. But I sent him a message asking if he had made a
10  grade change for Mr. Alvarez.
11    Q.  This is Dr. Kopano's response in Exhibit 16?
12    A.  Correct.
13    Q.  Did you ever discuss this situation with
14  Dr. Kopano?
15    A.  I believe I called him. I believe I called
16  him prior to sending him an E-mail.
17    Q.  Did he have any further response?
18    A.  He was pretty emphatic that he did not make
19  that change.
20    Q.  Can you identify the next exhibit, Exhibit 17?
21    A.  This is a photocopy of a ScanTron grade sheet
22  that I mentioned earlier, the way we used to process

158

1  grades. This is a copy of the original that resides in
2  my permanent records, my office's permanent records of
3  grades. And if you look at Antonio Alvarez, the second
4  student listed, the instructor assigned him an F and W is
5  bubbled in. On the original that I did not bring with
6  me, on the original, the F is erased. Then I asked
7  Kopano to send me a copy of his grade change or his
8  original grades, and his photocopy showed the F with the
9  F bubbled in. So, there had been some alteration of that
10  roster.
11    Q.  When you say the F was erased, these were
12  erased in pencil?
13    A.  Correct.
14    Q.  On the original form, the F has been erased,
15  and the bubble that had the F was erased and it is
16  bubbled in as a W?
17    A.  I don't know if the F exists or not. The
18  pencil bubble is erased.
19    MR. ZEFF:  What do you mean by bubble?
20    MR. PARKER:  No. 2 pencil that fills in
21  the ScanTon.
22    MR. DUSTON:  Each of these little

159

1  squares is a bubble. The F bubble has been erased and W
2  bubble has been put in.
3    MR. PARKER:  Correct. Once again, this
4  is a little sticky note that I put on there. I said this
5  was Kopano's copy that he sent to me.
6  BY MR. DUSTON:
7    Q.  Now, can you take us through what these
8  additional pages behind Exhibit 17 are and what they
9  show?
10    A.  This is a snapshot of one of the screens in
11  Banner, which are student registration software. The
12  first, where I have a checkmark that I made a mark on the
13  right-hand side, this means, in the CRN 14500, and the
14  course is 55223 section for three credit hours and three
15  billing hours, WR means registered on the web. And this
16  is the date that the registration took place, the status
17  date and the add date, and the activity date is the same.
18  This all happened at the same time. I was auditing
19  Course No. 14500, which is this course and the grade for
20  Antonio Alvarez.
21    The second page, the next activity on
22  14500 was that that record was deleted. When it shows

160

1  that the record is deleted on January 10th, by Jim Davis.
2  Jim Davis is our — I don't know his title exactly -- but
3  he coordinates what we call purge. When students have
4  not paid for their account, or paid for their classes by
5  a certain date, their registrations are purged from the
6  system. So, this is an automatic purge with Jim Davis's
7  name. He didn't literally go in and do that for each
8  student that was purged. But this is an automatic
9  function.
10    The next page, activity on CRN 14500.
11  The activity date is January 24, 2003, which is after the
12  semester is over. And the user is Joyce Bowers. This is
13  where she, under course status, you will see an RE. RE
14  means registered. The difference between the RE and the
15  WR is that registered, when a student is RE status, that
16  means they have been registered at a specific terminal by
17  a user, which is, in this case, Joyce Bowers.
18    Q.  So, Ms. Bowers re-registered this student
19  after the semester was over for that class?
20    A.  Correct.
21    Q.  What is the next activity?
22    A.  Next activity in CRN 14500 is on May 15, 2003,

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

41 (Pages 161 to 164)

161

1  that student was given a final grade or was withdrawn
2  from the system. 14500 is she re-registered him. Then
3  the system withdrew him. He was assigned a W in the
4  system from the ScanTron bubble sheet that had a W on it.
5      On the next page on 14500 CRN, he was
6  re-registered for that course after he had been withdrawn
7  from that, or given a W in that course. You can see in
8  the upper right-hand corner there is an E with a little
9  box under it, and that O means it was an override. Ms.
10  Bowers had to override the system in order to register
11  him in that class. And she did have the authority to do
12  that.
13      Q. So, the first set of changes are happening in
14  January 2003, for the fall 2002 fall semester?
15      A. Fall 2003.
16      Q. Fall 2003?
17      A. Correct. But the grade change is the spring
18  of 2003. That's correct.
19      Q. So, you have a spring 2003 course, where
20  initially, he was kicked out of the system for
21  non-payment at the time it started?
22      A. Correct.

162

1      Q. Then was changed in the system to a withdrawn
2  from the course?
3      A. Correct.
4      Q. The instructor submitted his grade not as a W,
5  but as an F. Somebody erased that and put in a W?
6      A. Correct.
7      Q. Consistent with the fact that if he had been
8  withdrawn from the course, he shouldn't have been
9  assigned an F. He should have been withdrawn from the
10  course at all times?
11      A. Correct.
12      Q. And, then, after processing the grade change
13  request from Dr. Gorum, or signed by Dr. Gorum, that
14  withdrawn or F became an A. It was inputted into the
15  system?
16      A. Correct.
17      Q. So, we actually have two different issues.
18      Which was appropriate under all of this?
19  Being kicked out of the system and then withdrawn. What
20  should the grade have been that was in the system at that
21  time?
22      A. Well, if he was kicked out of the system, he

163

1  should have received no grade whatsoever.
2      Q. It shouldn't have shown up as a W?
3      A. He would have been removed from the system
4  completely. If he had been purged from the system, the
5  purge removes the registration records.
6      Q. The next set of forms, we are now to a
7  different set of issues, Exhibit 18.
8      A. Okay.
9      Q. Look at your E-mail to Dr. Kopano that are No.
10  19. It involves two students, Chris Asare and Mr. Aaron
11  Matthews.
12      What can you tell me about those
13  changes?
14      A. These were a second set of grade changes that
15  I discovered from the spring 2003 semester. They were
16  signed by Dr. Gorum in the Missing Grade Form. But these
17  students had not been registered for this class. They
18  were put back in the system after the semester was over
19  and assigned a grade.
20      Q. So, they were not originally registered.
21      Correct?
22      A. Correct. But I apologize. I don't have the

164

1  Banner screens printed for you for this.
2      Q. Dr. Kopano's response, Page 19, is that he did
3  not submit a grade for either Mr. Asare or for Mr. Eric
4  Matthews for that course?
5      A. Correct.
6      Q. There were no grades submitted in the system.
7      Correct?
8      A. Correct.
9      Q. And the Missing Grade Form was not put in by
10  Dr. Gorum, assigning grades to those students?
11      A. Right.
12      Q. In this case, it was for the spring 2003
13  semester for Mr. Asare, and it was put in in July. And
14  for Mr. Matthews, it was a 2002 grade that was put in in
15  May of 2003?
16      A. Right. Fall of 2002.
17      Q. The next set of grade request forms are the
18  ones for -- the Broadcast Writing II course was taught by
19  Dr. Osei Mensah.
20      Correct?
21      A. Dawkins name appears.
22      Q. I want to clarify.

165

1    Behind Exhibit 20 are all of the forms
2    that you originally thought were Mr. Dawkins, that class,
3    14900, and you subsequently determined were Dr. Osei
4    Mensah?
5        A. Correct.
6        Q. These are from Broadcast Writing II from the
7    fall of 2003. Again, changes all submitted on January 8,
8    2004?
9        A. Correct.
10       Q. The first batch are all actual grade change
11   forms for students who had had grades submitted by
12   Dr. Osei Mensah.
13       Correct?
14       A. Correct.
15       Q. All of those grades you see were changed to
16   either A's or B's?
17       A. Right.
18       Q. Then the second set of forms that are behind
19   Tab 21, am I correct that first batch, Course 55409, is
20   all for the same course, Broadcast Writing I?
21       A. 55409. That's correct.
22       Q. The names that are on the top of this form,

166

1    this is Exhibit 21, the first batch are all from Dr. Osei
2    Mensah's course. The second four grades, for Rizer,
3    Williams, Jennings and Alvarez again, do you recognize
4    which course that is?
5        A. That's course number 15,000. That would be
6    55-425, which, I am not sure what that course is.
7        Q. Exhibit No. 22 is the E-mail that you sent to
8    Dr. Osei Mensah. Can you take us through your
9    conversation with him?
10       A. I had contacted him by telephone and asked him
11   if he submitted these grade changes. And he said he did
12   not. And I wrote him an E-mail, and he responded that he
13   did not make any grade changes that were noted in the
14   E-mail.
15       Q. Have you had any other conversations with
16   Dr. Osei Mensah regarding the grade changes?
17       A. He did come to my office one day and asked me
18   if I had changed the grades back to what they originally
19   were.
20       Q. What was your response?
21       A. My response was, yes, I did.
22       Q. What direction had you been given, or what

167

1    grades of all of these have been changed back?
2        A. I would have to go back through my notes to
3    look and see exactly which ones were changed back. But I
4    had asked my immediate supervisor whether he approved of
5    my changing the grades back. And he said as long as I
6    had documentation from the instructors who originally
7    taught the courses, we should change the grades back. I,
8    actually, found an E-mail from him, giving me approval to
9    do that.
10       Q. If you would turn to Exhibit 24. Would you
11   identify that?
12       A. This is an E-mail to Dawn Jones asking her if
13   she changed the following grades for the fall 2003
14   semester. That was CRN 15,000. Reginald Rizer, Sparkle
15   Williams, Shannon Jennings, Antonio Alvarez. Her
16   response was, she did not change those grades.
17       Q. Who is Mrs. Jones?
18       A. She is an adjunct faculty member.
19       Q. Would you go through your E-mail and explain
20   to me, and to the Committee your notes there on what
21   those changes were. We are referring here to the four
22   individuals who are at the bottom of Exhibit 23, Rizer,

168

1    Williams, Jennings and Alvarez, all of whom show either a
2    removal of incomplete grade or a missing grade of A?
3        A. In Reginald Rizer's case, he had been given an
4    incomplete, but that had not been resolved. And it was
5    resolved in this removal of incomplete grade form signed
6    by Dr. Gorum.
7        Q. Now, the three missing grades that were all
8    assigned an A?
9        A. Those students had not been registered for the
10   semester. The course was added to the schedule after the
11   semester was over on January 13th and also given an A at
12   the same time.
13       Q. Now, January 13th, the start of the new
14   semester, all three of these students are being
15   registered in the semester that they had never been
16   registered for?
17       A. Correct.
18       Q. What was the policy at that point?
19       A. The policy at that point, if they had not been
20   registered, that they needed -- based on my E-mail --
21   that they needed to have the dean or vice-president
22   approval adding them to the class after this semester was

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410 (800) 292-4789 (301) 762-8282 (703) 288-0026 (410) 539-3.

A-000264

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

43 (Pages 169 to 172)

169

1    over.
2        Q.  Now, those instructions had gone out to your
3    staff and your faculty.
4            Correct?
5        A.  I send chairs E-mails regularly.  And I
6    believe I sent that to chair, as well.
7        Q.  So, Ms. Bowers knew, at that point, you should
8    not be registering students after the start of the second
9    semester, unless they have an approved add form signed by
10   the dean.
11           Correct?
12       A.  Correct.
13       Q.  Did you determine whether there were any add
14   forms for Sparkle Williams, Shannon Jennings or Antonio
15   Alvarez?
16       A.  I did look that up and could not find add
17   forms for them.
18       Q.  The only thing that was done was, a missing
19   grade form, and in the computer, Ms. Bowers had
20   re-registered them after the end of the semester?
21       A.  Yes.
22       Q.  By not going through the add form, do you know

170

1    whether or not, by re-registering them, it went through
2    the process of paying for that course or not?
3        A.  What I do know is that the act of registration
4    creates a bill.  And that's how our system works.  There
5    were two scenarios.  One is, if that student were already
6    a full-time student, then it would not add to their bill.
7    If that student is not full time, then the courses would
8    be charged course by course or credit by credit.  I think
9    it is credit hour by credit hour is the way they were
10   charging.  If they are not charged full-time status.
11   This may or may not have changed the amount of money they
12   owed to the institution.
13           MR. ZEFF:  Could we take a five-minute
14   break?
15           DR. ACKAH:  Yes.
16           (Off the record at, approximately, 3:30
17   p.m.)
18           (Back on the record at, approximately,
19   3:40 p.m.)
20           DR. ACKAH:  Please proceed.
21   BY MR. DUSTON:
22       Q.  Would you turn to Exhibit No. 26, please.

171

1    Tell the Committee, Mr. Parker, what Exhibit No. 26 is.
2        A.  This is the E-mail message and response from
3    me to Dr. Hagos, and his response.  And this is my
4    question to him whether he had given grades to these
5    students.  And his response was, no, he had not.
6        Q.  And these are a series of students that you
7    E-mailed him about in the practicum --
8        A.  Yes.
9        Q.  -- course?
10       A.  Yes.
11       Q.  That is the series of students that are in the
12   documents attached to Exhibit No. 25?
13       A.  Correct.
14       Q.  Mr. Parker, during your investigation and
15   audit, in going through the documents that your office
16   had processed for the fall of 2003, did you find any
17   other change of grade forms that you could tell had been
18   submitted by somebody other than the instructor for the
19   course?
20       A.  I did find one grade change submitted by
21   another chair.
22       Q.  And what action did you take regarding that

172

1    other grade change?
2        A.  I called the instructor and asked her whether
3    she had, indeed, made the grade change, and she indicated
4    she would check her records and get back to me.  At first
5    she said, no.  She is pretty sure she did not make the
6    change.  But she would check her records to make sure,
7    but she never responded.
8        Q.  Was that for a full-time instructor or an
9    adjunct instructor?
10       A.  Full time.
11       Q.  So, is that investigation still open?
12       A.  Yes.
13       Q.  Other than that one, were there any other
14   forms that were submitted either as change of grade
15   forms, during the fall of 2003, without all of the
16   appropriate signatures, either the deans or the provosts?
17       A.  I don't know that I can answer that question
18   without looking at all of the forms.
19       Q.  Do you recall any others that you took out and
20   rejected or reconsidered, based upon insufficient
21   signatures, for the prior semester?
22       A.  I looked at all of the grade changes for the

217

1    You also indicated that you discovered
2  some irregularities in your investigation. The
3  investigation is still ongoing. Six months from now. It
4  is ongoing for more than six months now?
5        MR. PARKER: Yes.
6        DR. ACKAH: I am wondering why this has
7  taken so long, when, in Dr. Gorum's case, the
8  investigation started almost immediately? How come?
9        MR. PARKER: You are referring to the
10  one other grade change I am investigating. I am still
11  waiting for the instructor to review his or her records
12  to see whether she or he made this grade change.
13        DR. ACKAH: So, this is different than
14  Dr. Gorum's case? The modalities?
15        MR. PARKER: The modalities?
16        DR. ACKAH: The facts involved. Are
17  they different, the facts involved?
18        MR. PARKER: No. Not really.
19        DR. ACKAH: Then, then I will go about
20  my question. Why is that taking a longer period to
21  investigate than the present case?
22        MR. PARKER: Because I have not heard

218

1  back from the faculty member. I have contacted that
2  person three times. And I am waiting to hear back
3  whether that person, in his or her records, actually made
4  the grade change.
5        DR. ACKAH: No instructions in place
6  right now to expedite action on such a case?
7        MR. PARKER: Not that I know of.
8        DR. ACKAH: Thank you, Mr. Parker.
9        I just want to say, if we need you in
10  the future, we will have to recall you.
11        MR. PARKER: That's fine.
12        DR. ACKAH: We will reconvene at ten
13  o'clock tomorrow.
14        (Hearing was adjourned at,
15  approximately, 4:40 p.m.)
16
17
18
19
20
21
22

219

1            INDEX
2
3  WITNESS: KIM WALKER
4
5  EXAMINATION                    PAGE
6
7    Direct Examination by Mr. Duston    40
8    Cross Examination by Mr. Zeff       55
9
10  WITNESS: DEWAYNE WICKHAM
11
12    Direct Examination by Mr. Duston    65
13    Cross Examination by Mr. Zeff       81
14
15  WITNESS: GLENN PARKER
16
17    Direct Examination by Mr. Duston    125
18    Cross Examination by Mr. Zeff       189
19
20
21
22

220

1        C E R T I F I C A T E
2  STATE OF DELAWARE:
                    :
3  NEW CASTLE COUNTY:
4        I, Gloria M. D'Amore, a Registered
5  Professional Reporter, within and for the County and
6  State aforesaid, do hereby certify that the foregoing
7  arbitration hearing was taken before me, pursuant to
8  notice, at the time and place indicated; that said
9  witnesses were by me duly sworn to tell the truth, the
10  whole truth, and nothing but the truth; that the
11  testimony of said witnesses was correctly recorded in
12  machine shorthand by me and thereafter transcribed under
13  my supervision with computer-aided transcription; that
14  the arbitration hearing is a true record of the testimony
15  given by the witnesses; and that I am neither of counsel
16  nor kin to any party in said action, nor interested in
17  the outcome thereof.
18        WITNESS my hand and official seal this
19  29th day of November A.D. 2004.
20
21
        GLORIA M. D'AMORE
22  REGISTERED PROFESSIONAL REPORTER

Case 1:06-cv-00565-GMS    Document 40-7    Filed 08/31/2007    Page 28 of 43
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

1 (Pages 1 to 4)

**1**

1 IN RE: DELAWARE STATE UNIVERSITY
2        V.
3    WENDELL GORUM, Ph.D.
4        A grievance hearing taken pursuant to
5 notice before Tanya M. Congo, a Notary Public and
6 Certified Professional Reporter, at Delaware State
7 University, MBNA Building, Conference Room 309, 1200
8 North DuPont Highway, Dover, Delaware, on Tuesday,
9 August 31, 2004, beginning at approximately 10:15
10 a.m., there being present:
11        APPEARANCES:
12        SCHMELTZER, APTAKER & SHEPARD, P.C.
13        The Watergate Suite 1000
14        2600 Virginia Avenue N.W.
15        Washington, DC 20037-1922
16        BY: ROBERT DUSTON, ESQUIRE
17        Attorney for Delaware State University
18        FROST & ZEFF
19        430 Route 70 West
20        Cherry Hill, NJ 08002
21        BY: GREGG L. ZEFF, ESQUIRE
22        Attorney for Dr. Wendell Gorum

**2**

1    Also present panel members:
2    Dr. FILIPPO TOSCANO
3    Dr. EDWARD JACKSON
4    Dr. LAPOINTE DAVIS
5    Dr. GABRIEL GWANMESIA
6    Dr. YAW ACKAH, (Panel Chairman)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**3**

1        Dean TOMMY L. FREDERICK, having first
2 been duly sworn according to law, was examined and
3 testified as follows:
4        DR. ACKAH: Good morning, ladies and
5 gentlemen. I guess you remember why we're here.
6 It's a continuation of our meeting from yesterday,
7 and today, according to the University's attorney,
8 Dean Frederick and others will be giving their
9 testimony.
10        We're going to begin with Dean
11 Frederick, and as usual I'll allow you to lead him in
12 his testimony.
13        MR. DUSTON: Thank you very much.
14        DR. GWANMESIA: I just want to first
15 apologize for my absence yesterday. I had a family
16 crisis so I missed the first session. So I just
17 wanted to state my apology for not being here.
18        DR. ACKAH: Before we begin, the
19 stenographer made an appeal that she will want to
20 have each one of us introduce ourselves before we
21 begin the deliberations.
22        I am Ackah, Dr. Ackah, and I'm the

**4**

1 Chair of the Committee hearing this issue.
2        DR. GWANMESIA: My name is Gabriel
3 Gwanmesia, member.
4        DR. DAVIS: My name is Lapointe Davis.
5 I'm a professor of music in the Department of Visual
6 and Performing Arts.
7        DR. JACKSON: Edward Jackson, I'm a
8 Professor of English.
9        DR. TOSCANO: Fil Toscano. I used to
10 be Foreign Languages. Now, I don't know, I think I'm
11 in English.
12        DR. ACKAH: English and Foreign
13 Languages.
14        DR. GORUM: Wendell Gorum.
15        MR. ZEFF: Gregg Zeff.
16        DEAN FREDERICK: Tommy Frederick.
17        MR. DUSTON: And Robert Duston.
18        DIRECT EXAMINATION
19 BY MR. DUSTON:
20        Q. Dean Frederick, can you start by just
21 telling the committee your background in academia
22 before coming to Delaware State just briefly.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

2 (Pages 5 to 8)

5

1    A.  Okay.  Before coming to Delaware State I
2  worked in the public schools in the State of Alabama.
3  Went to the University of Indiana, Bloomington
4  campus.  Completed the masters, directorate and
5  doctorate in health sciences.
6         Came from there to Delaware State in
7  1972 -- '73, March of '73, stayed one year, went back
8  to Alabama State.
9         Worked at Alabama State for seventeen
10  years, retired.  Came back to Delaware State in '91.
11  Been at Delaware State since.
12    Q.  And what positions have you held at
13  Delaware State during that time?
14    A.  Chairperson of the Department of Health
15  and Physical Education, faculty athletic
16  representative, Dean of Arts and Sciences and Dean of
17  Mathematics, Natural Sciences and Technology.
18    Q.  And you were Dean of the Department of
19  Arts and Sciences during which period of time?
20    A.  1998 through last year.
21    Q.  Under accepted professional standards what
22  rights do professors have regarding control of grades

6

1  assigned in their classes?
2    A.  Professors have the right to make changes
3  with regard to grades, assign grades and, actually,
4  basically, you know, handle the dispensation of the
5  various grades within their department.
6    Q.  And are those rights just a matter of
7  courtesy or are there professional standards or are
8  they actually embodied in accreditation and other
9  standards?
10    A.  They are embodied in accreditation and
11  other standards, but they are also a matter of the
12  professional academic rights of the professor.
13    Q.  Are the rights of part-time adjunct
14  visiting professors any different in that area than
15  the rights of other professors?
16    A.  No, once a professor's assigned an
17  assignment that professor's responsible for that
18  class; that professor's paid for that class, and that
19  professor has the responsibility and the rights to
20  manage the grades and so forth with regard to that
21  class.
22    Q.  Based upon your experience in academia and

7

1  here at Delaware State, are there any circumstances
2  when it is acceptable to change a grade given by an
3  instructor without that instructor's knowledge or
4  consent?
5    A.  Only in the case where the professor
6  cannot be located at the end of a semester or
7  process, and the dean's office and the other channels
8  through whom that grade should be assigned is
9  contacted or notified and approved.
10    Q.  Have you had those situations arise while
11  you were dean?
12    A.  Sure.
13    Q.  Describe what -- describe any one of the
14  situations and what process you went through when
15  that issue arose?
16    A.  In the case where a professor cannot be
17  located after the process has ended, you know, the
18  semester's ended, the professor is -- normally takes
19  his information to the Chair.  The Chair then will
20  take the information and try and contact the
21  professor, or the professor will try -- I'm sorry --
22  the student usually comes to the professor -- to the

8

1  Chair.  The Chair will then contact -- try and
2  contact the Professor.
3         If the Chair cannot get in touch with
4  the professor to assign a grade, the professor then
5  -- the Chair, then, contacts the Dean's office.  The
6  Dean's office usually will try and contact the
7  professor him or herself.
8         In such cases where that cannot be
9  done, then a committee is set up by the Department,
10  within the Department where this process has
11  occurred, and the committee then will look at the
12  situation and assign a grade.  The grade is then
13  signed off on by the Chair, the Dean and it is moved
14  forward.
15    Q.  And which schools or departments have you
16  had those issues arise where you can recall such a
17  committee being set up to actually determine the
18  appropriate grade for the student?
19    A.  It has occurred in English, Mass
20  Communication -- I'm sorry, foreign languages.  Those
21  are two that come to my mind.
22    Q.  Now, in those cases did the process

Case 1:06-cv-00565-GMS    Document 40-7    Filed 08/31/2007    Page 30 of 43
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

22 (Pages 85 to 88)

85

1    sent it to me.
2        Q.   And this is Dr. Kopano?
3        A.   Yes, Dr. Kopano.
4        Q.   Prior to the issues arising -- well, prior
5    to Mr. Parker and Ms. Walker raising issues regarding
6    grades this Spring, were you aware at any time as
7    Dean that the Registrar's Office had ever processed a
8    Change of Grade Form without appropriate
9    authorizations, without having all the signatures on
10   the form?
11       A.   No.
12       Q.   Had you ever had an opportunity to discuss
13   with the former Registrar, former Assistant
14   Registrar, your expectations that they should not be
15   processing forms that you hadn't approved?
16       A.   No. I didn't have any reason to even
17   think that he was doing something like that, because
18   the process we followed -- if you look at the stack
19   of materials in my office I sent -- you know, I mean,
20   we had just a volume of materials where the Chair
21   would send it to me. I would sign it and we would
22   submit it.

86

1        So there was no reason for me to think
2    that anyone was doing anything different than that.
3        Q.   And did you have any knowledge of Change
4    of Grade Forms being submitted outside of that
5    process?
6        A.   Nope. I wasn't aware of it.
7        Q.   Describe for the Committee how the issues
8    involving Dr. Gorum's changing of grades first came
9    to your attention?
10       A.   I was called by Ms. Walker, Kim Walker,
11   the Compliance Director, as the Faculty Athletics
12   Rep, concerning a student. I believe he was a
13   basketball player. She called me about him to
14   inquire about the situation because the basketball
15   team was in the playoffs at the time.
16       And she indicated to me that it looked
17   as though we had a problem. Any time there is a
18   potential or possible violation of the NCAA rules I'm
19   contacted. Within twenty-four hours I'm supposed to
20   contact the President. I'm supposed to write a
21   letter to the President indicating the nature of the
22   violation and, then, what is being done to resolve

87

1    the issue.
2        So she had to contact me, and she
3    contacted me and asked my opinion on what was
4    happening.
5        I told her that we would -- you know,
6    we would have to look into it and that at that
7    particular time what I needed to do is see the
8    information first.
9        She and I reviewed the information. I
10   called the basketball coach. In fact, I called the
11   Athletic Director at the tournament site, and told
12   him to pull this kid from the playoffs because if we
13   had been in violation, you already -- we'd already
14   lost all of the games that he participated in.
15       And if he had not, I didn't want it to
16   go any further down that road because once the NCAA
17   gets a situation of this nature, if you continue that
18   process then you really are perceived as wanting --
19   or deliberately violating the rules.
20       So we wanted to stop it immediately,
21   so that we have a record that we did stop the process
22   at that particular time.

88

1        The next day I was called by Mr.
2    Parker's office, I believe, or -- I can't verify
3    which office, but some office, and there was a Dr.
4    Smith. And there was a meeting between Dr. Smith,
5    Dr. Gregory, Ms. Walker, myself, Dr. Arrington,
6    regarding the change of grade in the Department, the
7    Department's change of grade process.
8        And so I went to the meeting. We
9    looked at the grades and so forth, and he indicated
10   at that time that there were other athletes involved.
11       So I said, what we need to do then is
12   go back and look at every athlete to make sure that
13   there were no violations because I have to report the
14   violations effective immediately if, in case, there
15   is a violation.
16       So they then proceeded to look at
17   other athletes to see if, in fact, we had -- you
18   know, grades had been changed on athletes that we
19   didn't know about.
20       If an athlete had twelve credit hours
21   -- if, in fact, the student athlete received a grade
22   and was only -- and had only completed nine credit

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

23 (Pages 89 to 92)

89

1  hours and, then, participated the next semester, then
2  you're obviously in violation. Every contest that
3  we're involved in we lose. It's a public affair, and
4  it's not pleasant.
5         So we -- that was the process in which
6  this took place.
7     Q.  So up to -- through this point the focus
8  was just on possible NCAA violations and, you know,
9  the athletes involved, correct?
10    A.  Yes.
11    Q.  And this was in your roll as a liaison to
12  the Athletic Department?
13    A.  Sure. Exactly.
14    Q.  Now, at the conclusion of that process --
15  of that initial process in early March, when was the
16  first time you met with Dr. Gorum over these issues
17  and those changes?
18    A.  I met with Dr. Gorum after they -- the
19  process had gone, I guess, through -- we had looked
20  at some records. We looked at the information
21  regarding the changes of grades and so forth, and I
22  wanted to meet with Dr. Gorum to ask Dr. Gorum,

90

1  specifically, if, in fact, you know, these were
2  errors or how it took place, so that I would have
3  some backup or something for the NCAA meeting, you
4  know, so that we could move forward.
5         And in that meeting, I just asked
6  point blank questions regarding the change of grades
7  and how it had occurred, and why and for whom.
8         I also talked to the student athletes
9  prior to this because I had to talk to the athletes
10 as well. So I made an athletic investigation of a
11 sort. It was more of a query, question, you know,
12 and asked the process with the athletes in the
13 presence of Ms. Walker, which is part of the
14 compliance process, to see if they had grades, if
15 they actually took the classes or what took place.
16 If they were just being given grades, you know,
17 because, again, that's serious business.
18    Q.  Do you recall the results of those
19 interviews with athletes that you conducted?
20    A.  Sure. Some of them. I -- Ms. Walker has
21 the actual accounts because she was in the Compliance
22 Office at the time, and she can give you specific

91

1  accounts of the testimony of each of the athletes,
2  because I don't -- you know, I didn't keep them
3  myself.
4         But, basically, some of the athletes
5  indicated that they were in the classes. Some of
6  them indicated that they did not attend class. They
7  didn't know anything about the grade change. They
8  didn't know that the grade had been changed in a
9  couple of cases. They didn't realize they had an A,
10 you know, even though they had taken the class. That
11 was a couple of cases. So --
12    Q.  On how many occasions did you meet with
13 Dr. Gorum over these issues?
14    A.  One.
15    Q.  I'm going to ask you give me your
16 recollection of that meeting.
17         MR. DUSTON: But for the Committee's
18 benefit, at Tab 36, are notes prepared by -- I
19 believe by Mark Farley, of that meeting.
20         MR. ZEFF: Tab which?
21         MR. DUSTON: Thirty-six.
22         THE WITNESS: Basically, I met with

92

1  Dr. Gorum, and I asked, you know, him about the grade
2  changes, why he made the grade changes.
3         He gave me his account of why he made
4  the grade changes and everything that went on.
5         MR. ZEFF: These are not his notes.
6         MR. DUSTON: Whose notes?
7         MR. DUSTON: These are Mark Farley's
8  notes.
9         DR. ACKAH: Okay.
10        MR. DUSTON: Of this meeting. Dr.
11 King was also present as a Faculty Representative,
12 Dr. Frederick was there, Dr. Gorum. Mark Farley is
13 Vice President Human Resources, because at that point
14 he was being investigated.
15        THE WITNESS: And I asked Mark Farley
16 to take the notes of the meeting.
17        DR. GWANMESIA: Was this after the
18 meeting with the athletes?
19        MR. DUSTON: This is approximately a
20 month later.
21        DR. GWANMESIA: Okay.
22        MR. DUSTON: Well, it may not be right

Case 1:06-cv-00565-GMS     Document 40-7     Filed 08/31/2007     Page 32 of 43
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

24 (Pages 93 to 96)

93

1 after the interviews of the athletes. Let's see,
2 it's March 2nd.
3          DR. DAVIS: I think it's really
4 important for you to note that is Mr. Parker's
5 statement that he had the right to change one grade
6 within the first three weeks of next -- the next
7 semester.
8          MR. DUSTON: No, that's not Mr.
9 Parker, by the way, that's Dr. Gorum, I believe.
10 Now, I -- Mr. Parker was not in that meeting.
11          DR. DAVIS: Oh, so Mr. Parker did not
12 --
13          MR. ZEFF: Mr. Farley did it.
14          MR. DUSTON: Mr. Farley, the Vice --
15          THE WITNESS: Farley was there --
16          MR. DUSTON: -- President of Human
17 Resources.
18          THE WITNESS: -- Dr. Gorum was there,
19 I was there, Scott King was there. Those were the
20 four people that were there.
21          MR. ZEFF: My issue now, I don't know
22 what he's planning on doing with these notes with

94

1 this witness.
2          MR. DUSTON: I was going to use them
3 to see if they refresh recollection, but I'm happy to
4 have Dean Frederick testify as to his recollection,
5 and if need be, bring in Mr. Farley at another time
6 to testify as to his recollection of these meetings.
7          MR. ZEFF: We're certainly going to
8 give -- have given you leeway as to leading
9 questions, so I don't know why he would need someone
10 else's notes. But he may be getting established
11 whether or not he's ever seen these notes, or whether
12 he looked at them previously or reviewed them or
13 anything like that. So we don't know that his
14 recollection has anything to do with these notes.
15          DR. ACKAH: Now, Mr. Farley took these
16 notes in what capacity?
17          MR. DUSTON: As Vice President of
18 Human Resources, as part of his -- he was involved at
19 that point because it was a possible disciplinary
20 matter, and a possible disciplinary meeting. And
21 this was the initial opportunity for Dean Frederick
22 to discuss with Dr. Gorum what his reasons and

95

1 explanations were.
2          DR. ACKAH: Are these notes then able
3 to further -- have you ever seen these notes?
4          THE WITNESS: No.
5          MR. DUSTON: All right.
6          THE WITNESS: I can testify as to
7 what --
8          MR. DUSTON: Dean Frederick --
9          THE WITNESS: -- took place at the
10 meeting.
11          MR. DUSTON: -- please. Please.
12 Please don't --
13          DR. ACKAH: Okay. That's fine.
14          THE WITNESS: Yes. We -- I called the
15 meeting. Dr. Gorum was present. Dr. King was
16 present. I was present. Farley was there.
17          And I asked Dr. Gorum why did he
18 change the grades -- you know, why were the grades
19 changed, and he said -- he indicated that he felt he
20 had a right to do so.
21          And I asked him, under -- the
22 circumstances under which he did it. He gave me his

96

1 account of the circumstances under which he, you
2 know, felt he had the right to do it.
3          And we discussed the right to do the
4 changes or not to do the changes, and I indicated at
5 that time that, you know, that, in fact, these
6 procedures were not proper or appropriate.
7          Dr. Gorum felt that they were. And I
8 asked him if he really felt that that process was
9 totally out of line, and that it was a violation of
10 the rights of professors under whom these changes
11 were made.
12          I concluded in the discussions with
13 Dr. Gorum, that he had no intention -- or felt that
14 he really had a right to make changes of other
15 professors. That was the thing that really was most
16 prevalent in my mind, that he had the right to make
17 changes of the other professors' grades without their
18 authorization.
19          And he indicated that he couldn't get
20 in touch with them, and I indicated that Doctor --
21 several of them were here on the campus. They were
22 still working for the University. There was no

Case 1:06-cv-00565-GMS    Document 40-7    Filed 08/31/2007    Page 33 of 43
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

25 (Pages 97 to 100)

97

1  logical reason why he couldn't get in touch with
2  them. They'd been in and out of the offices all week
3  all during that time frame.
4       And he intimated that he just couldn't
5  find them, or something of that nature.
6       But, basically, that's what took
7  place. I could find them, they were there, Professor
8  Kopano, Wickham. These guys were still working for
9  the University, were under contract.
10      He indicated he couldn't find one
11  professor, and the professor had been over in his
12  office on that -- in his -- within that unit five or
13  six times during the week that they were discussing
14  about it, because they were talking about writing
15  some type of grant. And I indicated that he's been
16  on campus all semester trying to write a grant with
17  Ms. Wright, Renee Wright. So there was no reason why
18  he couldn't find these people. Certainly, Wickham,
19  Kopano were there.
20      So that was the gist, basically, of
21  what took place overall. There were some other
22  accusations or statements made regarding, you know,

98

1  the process and the change of grade, but basically
2  that was the overall discussion that took place.
3  BY MR. DUSTON:
4  Q.  During that meeting did Dr. Gorum claim or
5  say that he had gotten consent of any of the four
6  instructors that we're talking about at that point,
7  which was Wickham, Kopano, Dawkins and Osei-Mensah?
8  A.  I believe he said he had Wickham's
9  consent. I don't know if he had the other -- the
10  consent of the others. He said he couldn't find
11  Mensah, and he couldn't find Dawkins because Dawkins
12  was not here.
13      And I indicated that Dawkins actually
14  came and taught the class, so was in the class and
15  here during that week. And he said that Dawkins was
16  here but Dawkins left because he didn't have a
17  contract.
18      And that's -- you know, it's going to
19  specifics as to that.
20  Q.  Now, at any point did you directly talk to
21  DeWayne Wickham?
22  A.  Yes, I talked to DeWayne Wickham, and

99

1  DeWayne Wickham indicated that he had not talked to
2  Dr. Gorum. He indicated that he would not give
3  authorization for Dr. Gorum to change the grades, and
4  that he didn't know anything about it actually.
5  Q.  And you also --
6  A.  He called me. Actually, he called me at
7  my office.
8  Q.  Have you talked to Gary Dawkins directly?
9  A.  Yes, I talked to Gary Dawkins.
10  Q.  And what did Mr. Dawkins say?
11  A.  Gary Dawkins stated that he didn't know
12  anything about it. He didn't know that there were
13  any grade changes and he didn't know that they had
14  been changed or why they had been changed.
15  Q.  Now, at that point, Mr. Wickham was under
16  an annual contract?
17  A.  Yes.
18  Q.  Was Mr. Dawkins also under an annual
19  contract?
20  A.  At the time I talked to him he was, but
21  during the time Dr. Gorum was referring to, he --
22  we'd submitted the paperwork for him. There was a

100

1  question of where the funds were going to come from
2  to hire him.
3       Dr. Gorum was supposed to check on
4  some funds with -- from Dr. Smith's office, I
5  believe, and have the funds assigned to Mr. Dawkins.
6       So he was -- theoretically, he was not
7  under contract, but he was here but we were preparing
8  the contract. He came and taught the first class, or
9  he came into the first class of the semester to teach
10  the class.
11      And, then, he was asked by Dr. Gorum
12  to leave the class because of Dr. Gorum's meeting.
13  He was asked to leave the class because he was not
14  under contract. So --.
15  Q.  We're actually talking about now in the
16  Spring, 2004, correct?
17  A.  Correct.
18  Q.  And this is a meeting you were having on
19  March 2nd?
20  A.  Right.
21  Q.  Mr. Dawkins had been under a Letter of
22  Appointment in the Fall.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

27 (Pages 105 to 108)

105

1  between the professor and one student in the class
2  regarding a test the student was supposed to have
3  taken.
4       The students indicated that they had a
5  problem with Osei in that he couldn't, you know, he
6  couldn't teach and -- I mean, there were a number of
7  accusations made about the professor at the time, and
8  I listened to the tape.
9       They left. I met with Dr. Gorum just
10  before the semester ended, as I recall in talking
11  about that situation, and in meeting with him he and
12  I talked about, you know, the situation with
13  Osei-Mensah, the class and so forth.
14       I can't recall all of the information
15  -- you know, all of the information that was
16  discussed during the course of that discussion, but
17  basically it was just a matter of Osei-Mensah -- you
18  know, the students complained about him. They may
19  have a problem.
20       I said, well, they don't have a
21  problem now. The grade -- I mean the semester's not
22  up, grades have not been submitted. And this was

106

1  prior to the end of the semester.
2       When the semester is up and grades are
3  submitted for the students and the students receive
4  their grades, if they come -- you know, if they have
5  a problem, we know the procedure, you file a
6  complaint form, just like all other students do if
7  there's a question about any grade in the course.
8       And that, basically, is the gist of
9  what took place in that meeting.
10  Q.  So during that conversation prior to the
11  Fall, 2003 semester, you specifically said, if
12  there's a problem, you know the procedure, the
13  grade-dispute procedure that they can fill out to
14  complain about those grades?
15  A.  Sure. Always we talk about the complaint
16  process. Any time a student or professor, or anyone,
17  comes to my office to discuss a grade that may or may
18  not be available, or should be available and isn't
19  available, we talk about the complaint form.
20       There's a complaint form that our
21  students fill out and follow that procedure. That's
22  what we talked about. It's standard procedure.

107

1  Everybody knows it.
2  Q.  Now, after grades were submitted by Dr.
3  Osei-Mensah, and prior to the start of Christmas
4  break, did you have any other conversations with Dr.
5  Gorum regarding that class?
6  A.  No, I don't recall having any more, not
7  any conversation about that class.
8  Q.  Now, coming back to January, when were you
9  back on campus in January?
10  A.  When was I?
11  Q.  Yes.
12  A.  I don't know if I ever left.
13  Q.  You would have been back the day after
14  Christmas, or shortly after that?
15  A.  I'm sure I was.
16  Q.  Between that time, in that first week of
17  January, did you have telephone conversations or any
18  personal conversations with Dr. Gorum --
19  A.  No.
20  Q.  -- discussing or regarding any of these
21  classes?
22  A.  Not that I'm aware of.

108

1  Q.  Now, Dr. Gorum is apparently going to say
2  that he had conversations with you either prior to or
3  after the end of the semester where you authorized
4  him, if there were problems with the class, he could
5  simply go ahead and change the grades; is that true?
6  A.  No.
7  Q.  Did he come back to you once the grades
8  were submitted and say, at any time in January prior
9  to the time the grade changes were put in on January
10  8th, I have all these students complaining, here are
11  the problems, the faculty member walked out in the
12  middle of the final exam. We have lots of problems
13  with him. We need to deal with this?
14  A.  No.
15  Q.  There were no discussions regarding --
16       DR. GWANMESIA: When the students left
17  -- Dean Frederick, when they left your office, did
18  you instruct them that if they had any problem they
19  should come to you or they should go to the
20  Chairperson, Dr. Gorum?
21       What was the --
22       THE WITNESS: I always instruct them

Case 1:06-cv-00565-GMS   Document 40-7   Filed 08/31/2007   Page 35 of 43
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

28 (Pages 109 to 112)

109

1   to go to the Chair.
2          DR. GWANMESIA: Okay.
3          THE WITNESS: Because they shouldn't
4   have been in my office in the first place.
5          And, secondly, they -- they indicated
6   to me that they were going to get the tape and make a
7   copy of the tape and give me a copy of the tape. And
8   they never did. So they never came back.
9          DR. GWANMESIA: Okay.
10  BY MR. DUSTON:
11      Q. Did you have any other discussions with
12  Dr. Gorum about Dr. Osei-Mensah and the issues
13  involving his class or the grade changes, until this
14  meeting on March 2nd?
15      A. No. The only discussion I had with Dr.
16  Gorum was in that meeting, initial meeting -- you
17  know, it was somewhere near the end of the semester
18  and he came in, as I indicated, to talk to me about
19  the class and Dr. Osei-Mensah.
20      Q. Now, at the conclusion of that meeting,
21  was there any discussion for all these grade changes
22  of whether or not there was backup documentation to

110

1   justify the reason Dr. Gorum gave the grade?
2       A. You mean -- what do you mean?
3       Q. I'm sorry. I'm talking -- in the meeting
4   of March 2nd, you've gone over all these grade
5   changes. He said he thought he was authorized to
6   make them --
7       A. You mean in the meeting with Mark Farley?
8       Q. With Mark Farley, yes. After all this had
9   come up.
10      A. Okay.
11      Q. Was Dr. Gorum given an opportunity at that
12  time to provide backup documentation for any of these
13  grade changes?
14          Why he made them?
15      A. Yes.
16      Q. What the students had earned? What the
17  basis was for the change?
18      A. Yes.
19      Q. Tell me about --
20      A. We asked him --
21      Q. -- those discussions?
22      A. We asked him to give -- if he had any

111

1   information to substantiate the grade changes that
2   were made, we asked him to submit that to us within a
3   time frame, and I can't recall what the time frame
4   was.
5          And he indicated that he would go and
6   he would do that. In fact, I think he volunteered
7   this himself, if I'm not mistaken. He said, well, I
8   have the grade change -- you know, reasons where I
9   can show you why.
10          So he agreed to voluntarily, if I'm
11  not mistaken, to submit that information to us. But
12  I know it was requested, and he said, he would do it.
13      Q. And have you ever received any
14  documentation from Dr. Gorum regarding these changes?
15      A. No.
16      Q. At no time since then?
17      A. No.
18      Q. After that meeting were you involved in
19  any further discussions regarding -- with either the
20  Provost or -- the Provost, Human Resources or the
21  President regarding what steps should be taken
22  regarding Dr. Gorum?

112

1       A. I'm not sure. I can't remember who I
2   talked to after the meeting, but I know I didn't talk
3   to the President, and I know I didn't talk to the
4   Provost about steps to be taken regarding Dr. Gorum.
5       Q. So your involvement in this process ended
6   after this meeting, to the best of your recollection?
7       A. As Dean I think I -- I know I wrote a
8   letter regarding that process and what should be done
9   with regard to Dr. Gorum at that particular time. I
10  submitted it to the Provost's Office, yes.
11          DR. JACKSON: Could you tell us what
12  you recommended?
13          Is that a proper question to ask?
14          MR. DUSTON: It is a proper question.
15  I actually thought I had that document in my file and
16  I didn't. So -- Dean Frederick gave me the
17  information last week, so I will try to track that
18  down.
19          And I have no objection to -- you can
20  communicate your opinion.
21          MR. ZEFF: And I'd appreciate getting
22  a copy of that.

A-000274

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539 .

Case 1:06-cv-00565-GMS    Document 40-7    Filed 08/31/2007    Page 36 of 43
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

29 (Pages 113 to 116)

113

1    MR. DUSTON: Yes, as soon as I can
2    track it down.
3        THE WITNESS: I indicated that -- as I
4    recall, I indicated that -- I know I indicated that
5    he should be removed from this process effective
6    immediately because we were in violation of NCAA
7    rules. The University was in jeopardy in my opinion,
8    and it still is with regard to these letter grade
9    changes.
10        DR. JACKSON: You said process, what
11   do you mean by process?
12        You said he should be removed from the
13   process?
14        THE WITNESS: From the University,
15   from his respon -- from his duties, you know, he
16   should be, you know, summarily removed from the
17   duties.
18        MR. ZEFF: Fired.
19        THE WITNESS: Am I --
20        DR. ACKAH: You can't --
21        DR. JACKSON: You're not exactly
22   clear. You said, removed from the process, removed

114

1    from the University.
2    BY MR. DUSTON:
3        Q. Dean Frederick, did you recommend in
4    substance that --
5        DR. GWANMESIA: That he be terminated.
6    BY MR. DUSTON:
7        Q. -- that he be terminated?
8        A. Terminated.
9        DR. GWANMESIA: And with regard to the
10   -- I just heard that he -- Dr. Gorum was supposed to
11   submit some documentation justifying why. Was there
12   a time line that he had to --
13        THE WITNESS: Yes, there was a time
14   line.
15        DR. GWANMESIA: So did he miss that
16   time before that letter was written?
17        THE WITNESS: He didn't -- he didn't
18   submit anything at any time. No, he didn't.
19        MR. ZEFF: I think he's asking what
20   the time line was?
21        THE WITNESS: The Monday after the
22   meeting, as I recall it. It was the Monday after

115

1    this meeting to submit anything.
2        DR. DAVIS: Is this the first case of
3    this sort, Dr. Frederick, that you've been involved
4    in with a Chair changing of grades in the ways that
5    have been described thus far?
6        THE WITNESS: Yes.
7        DR. DAVIS: So this is really setting
8    a precedent as far as how Chairs like this will be
9    dealt with if they change grades in these various
10   ways.
11        THE WITNESS: I don't think just
12   necessarily, Dr. Davis, a Chair. I think anyone who
13   goes in, changes the grade of another professor, even
14   if they can do it, I don't --
15        DR. DAVIS: Well, I just said Chair
16   since he is --
17        THE WITNESS: I understand that.
18        DR. DAVIS: -- the Chair. But I
19   understand --
20        THE WITNESS: If any professor --
21        DR. DAVIS: -- it would apply across
22   the board.

116

1        THE WITNESS: If anyone changes the
2    grade of another professor, or violates the process
3    as it relates to something that egregious, I would
4    say you -- you follow the precedents, yes, but I
5    think it's an appropriate procedure.
6        DR. DAVIS: So you saw that there was
7    no reason for issuing some type of a -- some type of
8    a reprimand. That the charges -- the offenses were
9    so great that they should -- that they justified --
10        THE WITNESS: Yes, after talking --
11        DR. DAVIS: -- immediate termination?
12        THE WITNESS: -- Dr. Gorum in the
13   meeting with Mark Farley, he indicated that he felt
14   that he had the right to do what he did and he would
15   do it again. Essentially that's what he conveyed to
16   me. And he felt that he could continue to do this
17   type of thing.
18        So that being the case, knowing what I
19   know about the NCAA process and the thing that we
20   were dealing with, I said this -- you know, we need
21   to stop this now. We need to -- because who is to
22   say that this won't continue, you know. We were

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, AUGUST 31, 2004

76 (Page 301)

301

1           CERTIFICATION
2               I, TANYA M. CONGO, Certified
3     Professional Reporter, certify that the foregoing is
4     a true and accurate transcript of the foregoing
5     deposition, that the witness as first sworn by me at
6     the time, place and on the date herein before set
7     forth.
8               I further certify that I am neither
9     attorney nor counsel for, not related to nor employed
10    by any of the parties to the action in which this
11    deposition was taken; further, that I am not a
12    relative or employee of any attorney or counsel
13    employed in this case, nor am I financially
14    interested in this action.
15    _____
16    Tanya M. Congo
17    Certified Professional Reporter and Notary Public of
18    the State of Delaware, #189-PS
19
20
21
22

A-000276

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, SEPTEMBER 28, 2004

1 (Pages 1 to 4)

**1**

1  IN RE: DELAWARE STATE UNIVERSITY
2                    V.
3      WENDELL GORUM, Ph.D.
4      Continuation of the grievance hearing taken
5  pursuant to notice before Tanya M. Congo, a Notary
6  Public and Certified Professional Reporter, at
7  Delaware State University, MBNA Building, Conference
8  Room 310, 1200 North DuPont Highway, Dover, Delaware,
9  on Tuesday, September 28, 2004, beginning at
10 approximately 10:00 a.m., there being present:
11        APPEARANCES:
12     SCHMELTZER, APTAKER & SHEPARD, P.C.
13     The Watergate, Suite 1000
14     2600 Virginia Avenue N.W.
15     Washington, DC 20037-1922
16     BY: ROBERT DUSTON, ESQUIRE
17     Attorney for Delaware State University
18     FROST & ZEFF
19     430 Route 70 West
20     Cherry Hill, NJ 08002
21     BY: Gregg L. ZEFF, ESQUIRE
22     Attorney for Dr. Gorum

**2**

1          Also present panel members:
2          Dr. FILIPPO TOSCANO
3          Dr. LAPOINTE DAVIS
4          Dr. GABRIEL GWANMESIA
5          Dr. YAW ACKAH, (Panel Chairman)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**3**

1          DR. ACKAH:  What we're going to do is
2  to start at 10:00, 10:10, have a break at 12:00 and
3  then resume at 1:00 and then we'll break about 4:00.
4          MR. DUSTON:  Okay.
5          MR. ZEFF:  Yes.
6          DR. ACKAH:  So, 10:00 to 12:00 and
7  then 1:00 to 4:00.
8          MR. DUSTON:  Dr. Ackah, we had
9  anticipated that that would be your schedule.  Well,
10 I almost anticipated.  We have two instructors this
11 morning, Dr. Kopano and Dr. Osei-Mensah.
12         DR. ACKAH:  Who?
13         MR. DUSTON:  Osei-Mensah.
14         DR. ACKAH:  Osei-Mensah, okay.
15         MR. DUSTON:  Both who will be here and
16 are here on campus to testify this morning.  I
17 anticipate that we will no more than an hour a piece
18 on those two instructors.
19         I had intended that Professor Gary
20 Dawkins would be calling in after lunch, but was
21 unable to confirm with him his availability today.
22 Dr. Bell is cleared on his schedule from 2:00 to 4:00

**4**

1  this afternoon.  I have made a request that --
2  because Mr. Dawkins is unavailable today, if he can
3  move back up to 1 o'clock, that he do so.
4          The only person we are waiting on to
5  confirm his schedule today is the President.  And we
6  had difficulties confirming the President's time.  So
7  whenever he's available for an hour these two days,
8  we'll request that we can just take him out of order.
9  But if I could move Dr. Bell up, then we should be
10 out of here before 4 o'clock today.
11         And then there are three instructors
12 -- there are two instructors who I am not going to
13 call, but if the committee chooses later to call them
14 or they may be relevant on rebuttal and that's Ms.
15 Jones and Professor Hagos, but we're not going to
16 call them as part of our case right now.
17         DR. ACKAH:  Well, we'll begin today
18 where we left off the last time.  You're going to
19 complete your --
20         MR. DUSTON:  We are going to complete
21 our case today with those three professors -- with
22 those two professors and Dr. Bell.  And then Dr.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, SEPTEMBER 28, 2004

44 (Pages 173 to 176)

173

1  with the secretary, wasn't the reason for that
2  something to do with the evaluation?
3          MR. DUSTON: Objection to relevance of
4  the confrontation. It's outside --
5          MR. ZEFF: Well, certainly the
6  confrontation has to do with all the knowledge that
7  my client had regarding issues with students that
8  came to him.
9          DR. ACKAH: I think the confrontation
10  was based on the car sale.
11         MR. ZEFF: Okay.
12  BY MR. ZEFF:
13     Q. Let me ask you, did Veronica Brinney
14  submit a tape to you?
15     A. I have it with me.
16     Q. So she did?
17     A. Yeah. I have it with me.
18     Q. How was her tape?
19     A. What tape?
20     Q. Veronica Brinney's tape. Did you evaluate
21  it?
22     A. Yes.

174

1      Q. How was the quality of that; A, B, C, D,
2  F?
3      A. She had some points already, so I added to
4  the points she had already.
5          DR. ACKAH: Dr. Osei-Mensah, please
6  answer the question.
7          THE WITNESS: Okay.
8          DR. ACKAH: A, B, C, D or F?
9          THE WITNESS: B.
10         MR. ZEFF: I don't have anything
11  further.
12         DR. ACKAH: Anyone have any questions?
13         MR. DUSTON: I have no further
14  questions.
15         DR. ACKAH: Do you have any more
16  witnesses?
17         MR. DUSTON: Dr. Bell is waiting
18  outside.
19         DR. ACKAH: Okay. We will take a
20  break.
21         (Whereupon, a brief recess was taken.)
22  Whereupon,

175

1          KENNETH BELL, having been first duly
2  sworn, was examined and testified as follows:
3          DIRECT EXAMINATION
4  BY MR. DUSTON:
5      Q. Dr. Bell, can you briefly describe for the
6  committee your background in academia before coming
7  to Delaware State?
8      A. Before coming to Delaware State, I was a
9  graduate student at Tennessee State University. I
10  came here straight from graduate school.
11     Q. And how long have you been here?
12     A. Thirty-five years.
13     Q. Is there any position here, other than
14  President you haven't held?
15     A. Yes.
16     Q. Dr. Bell, at the time that these issues
17  arose with Dr. Gorum's grades in the Spring 2004, you
18  were Provost at that time?
19     A. I was Acting Provost.
20     Q. And you've been Acting Provost and Vice
21  President for how long at that point?
22     A. When did this occur?

176

1      Q. March/April of 2004.
2      A. I — since July of 2003, I've been Acting
3  Provost.
4      Q. Describe for me how these allegations
5  first came to your attention?
6      A. It was first called to my attention by the
7  Vice President for Human Resources.
8      Q. Mr. Farley.
9      A. Yes.
10     Q. What information did you first have
11  brought to your attention by Mr. Farley?
12     A. Mr. Farley told me that they it had been
13  called to his attention, I believe by the Records
14  Office, that there were some irregularities in grade
15  changes that had taken place by Dr. Gorum.
16     Q. What was your first action or involvement
17  in that, other than discussions with Mr. Farley?
18     A. There was a meeting — I had a meeting
19  with Dr. Gorum and Dr. King after some discussion
20  with Mr. Farley, and I think the CDA called for me to
21  meet with Dr. Gorum and so I had a meeting with Dr.
22  Gorum and Dr. King.

A-000278

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, SEPTEMBER 28, 2004

45 (Pages 177 to 180)

177

1  Q.  At that point, what was your understanding
2  of the issues or the evidence that was available at
3  that point regarding any grade changes?
4     A.  At that point, Dr. Gorum explained to me
5  that he had made some grade changes because he was
6  not able to contact the professor who had taught the
7  course and that the students had been, in his opinion
8  wronged.
9     Q.  And do you recall which professor was
10  involved in it at that time?
11    A.  Dr. -- I guess it's Mr. Osei.
12    Q.  Professor Osei-Mensah?
13    A.  Mensah.
14    Q.  Now, at the time that you had your meeting
15  with Dr. King and Dr. Gorum, was there a discussion
16  of whether there were any grade changes in any other
17  courses at that time?
18    A.  I believe there was and it was indicated
19  that -- we didn't talk about any other grade changes,
20  except Dr. Mensah.
21    Q.  Did Dr. Gorum admit or deny changing
22  grades in any other course other than that involving

178

1  Professor Osei- Mensah?
2     A.  I really did not question him if there had
3  been any others and that was the only one that we
4  discussed.
5     Q.  The only one that you raised in that
6  context was the grades for Professor Osei-Mensah?
7     A.  Yes.
8     Q.  Did you have any materials that you
9  reviewed with he and Dr. King at that time?
10    A.  Copies of Dr. Osei-Mensah's course, I
11  believe.
12    Q.  Do you recall discussions of any other
13  grade change forms at that time?
14    A.  No.
15    Q.  What else went on during that meeting with
16  Dr. Gorum?
17    A.  Dr. Gorum -- we talked about any possible
18  solutions to the situation. Dr. Gorum told me that
19  he would accept, because when I talked with Dr.
20  Farley, he told me to talk with Dr. Gorum and see if
21  there was any resolution that might be taken -- that
22  we could reach.

179

1        And Dr. Gorum told me that he would
2  agree to be removed as Chair and that he would resign
3  at the end -- retire at the end of May.
4        DR. ACKAH:  May of 2004?
5        THE WITNESS:  Beg your pardon?
6        DR. ACKAH:  This May?
7        THE WITNESS:  Yes.
8        MR. ZEFF:  Objection. I don't know
9  what the relevance of whatever settlement
10  negotiations that took place has to do with anything.
11       DR. ACKAH:  That's overruled. I think
12  it's relevant.
13  BY MR. DUSTON:
14    Q.  Dr. Bell, in those discussions did you
15  question Dr. Gorum on the basis or the reasons or did
16  he offer any explanations on the basis or reasons for
17  the grade changes that he had made to Professor
18  Osei-Mensah's class?
19    A.  Well, he told me that he -- there were
20  some problems with Dr. Osei-Mensah attending class
21  and that he did not feel that the students had just
22  evaluations.

180

1     Q.  And did he explain to you the basis on
2  which he evaluated those students?
3     A.  No.
4     Q.  In that meeting, was there any discussion
5  of whether or not he could provide justification for
6  grade changes for those students?
7     A.  No.
8     Q.  Did Dr. Gorum defend his ability or
9  discuss his ability as a Chair to make those kinds of
10  grade changes to another professor's class?
11    A.  In the discussion we talked about the fact
12  that he could not have reached the professor and that
13  he felt that there had been some grades that had been
14  wrongly assigned.
15    Q.  Did Dr. Gorum represent that he attempted
16  to reach the professor?
17    A.  He said he had, yes.
18    Q.  Did he explain what those efforts were?
19    A.  I can't recall.
20    Q.  Was there any discussion of whether Dr.
21  Gorum consulted or not with Dean Frederick before
22  making those grade changes?

A-000279

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3...

181

1    A. We did not talk at that point as to
2    whether he had consulted Dean Frederick.
3    Q. Other than saying that he had done this
4    after trying to reach the professor and he felt that
5    they were unjust, was there any other discussion
6    about the nature of the procedural violations or
7    whether Dr. Gorum had or had not the authority to do
8    that as a Chair of the Department?
9    A. No.
10   Q. Is there anything else about your
11   conversation, that conversation with Dr. Gorum, that
12   you can recall?
13   A. No. I told him that I would carry forth
14   his proposed agreement and make that recommendation
15   to the President.
16   Q. And did you have any subsequent
17   involvement directly with Dr. Gorum -- I'm sorry, let
18   me rephrase that.
19       Did you have any other meetings with
20   Dr. Gorum after that one meeting at which Dr. King
21   was present?
22   A. No.

182

1    Q. Did you at any point have any discussions
2    with Dean Frederick about these grade changes or the
3    procedures that had or had not been followed?
4    A. Not after that meeting.
5    Q. Now, prior to that time, what information
6    had you acquired from either Mr. Parker, or Dean
7    Frederick or anyone regarding the nature of these
8    grade changes and the procedures?
9    A. I did review the documents, the grade
10   changes and eventually got a full copy of all the
11   grade changes and I was told that there were some
12   other courses that were involved, other than Dr.
13   Osei-Mensah.
14   Q. So you were told that there were other
15   courses involved other than Dr. Osei-Mensah's and had
16   you been told in each case whether or not the
17   professors involved said they had been contacted or
18   not?
19   A. I -- Mr. Farley did tell me the professors
20   he had spoken to, one of the professors and said he
21   had not been contacted.
22   Q. Under accepted professional standards,

183

1    what rights do professors have regarding control of
2    grade assignments in their classes?
3    A. The professors -- it's outlined in the --
4    in the agreement, I believe. The professors have so
5    many weeks into the next semester to change their
6    grades. After that there must be -- there is a sheet
7    that must be filled out that requires certain
8    signators including the instructor, the professor and
9    the Dean.
10   Q. But aside from that procedure, who else
11   can change a professor's grades, other than that
12   professor at DSU?
13   A. There is no other procedure outlined for
14   the change of a grade.
15   Q. At any point in your 35 years at Delaware
16   State, has it ever been stated to your knowledge that
17   a Chair of a Department, on his or her own signature,
18   can submit a change of grade of a professor without
19   consulting that professor?
20   A. No.
21   Q. Have you ever heard any Provost, President
22   or even a Chair claim to have the authority to change

184

1    grades in a professor's class without prior
2    consultation with that professor?
3    A. No.
4    Q. Now if there is a -- have you ever heard
5    it claimed or ever heard of Chairs being given
6    authority, that if there is a disagreement where a
7    student complains or raises an issue and the
8    professor will not change the grade, that the Chair
9    can simply overrule the professor and without any
10   further process, change a grade in a class in a
11   department?
12   A. No.
13   Q. That's never been asserted as the power of
14   a Chair anywhere without consulting with the Dean?
15   A. Not to my knowledge, no.
16   Q. Is the need to involve professors, just as
17   a matter of professional courtesy, or is tied in with
18   accreditation or other standards?
19   A. Well, I -- it's a procedure and it's the
20   procedure because there are a number of things.
21   Academic professionalism, as well as trying to get
22   the just and appropriate grade for a student.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, SEPTEMBER 28, 2004

47 (Pages 185 to 188)

185

1    Q.  Do you know, at least during the time that
2    you were Provost, whether there was any other Chair
3    or instructor, who has changed grades for another
4    instructor's class, both grades or even resolving
5    incompletes, without the involvement and approval of
6    that instructor?
7    A.  I don't know of any, no.
8    Q.  Didn't happen to your knowledge while you
9    were Provost?
10   A.  No.
11   Q.  Is the change of grade procedures process
12   and form an important procedure or is it just another
13   procedure?
14   A.  I would think it's important.
15   Q.  Why is it important?
16   A.  Well, because professors do make mistakes
17   and things happen.  Professors sometimes lose
18   student's work and they find it and when they find it
19   find out that --
20   Q.  They have procedures to correct mistakes
21   when professors make them?
22   A.  Yes, sir.

186

1    Q.  Is the review by the Dean important or
2    unimportant in that process, after the semester or
3    whatever point a professor ends his own ability to
4    change a grade, is it important?
5    A.  It's important.  If the Dean's signator is
6    not on there, I send it back.
7    Q.  So you have seen Change of Grade Forms
8    that come up to you -- now if -- as I recall the
9    procedure, you would not submit a Change of Grade
10   Form as Provost, unless it happened more than a
11   semester after the one that was just past, during a
12   certain period only the Dean's signature is required,
13   correct?  And then they come up to you --
14   A.  After a certain period.  After a certain
15   number of weeks.
16   Q.  After a certain number of time --
17   A.  It wasn't a full semester, but, yes.
18   Q.  After a certain period in the semester,
19   you must sign off as well as the Dean, correct?
20   A.  Right.
21   Q.  And if the Dean's signature wasn't on
22   there, you sent them back?

187

1    A.  Yes.
2    Q.  Did you ever approve anything just over a
3    Chair's signature?
4    A.  No.
5    Q.  And you never approved anything just over
6    an instructor's signature?
7    A.  No.
8    Q.  Do you know if the signature of the Chair
9    is even required for a change of grade?  Do you
10   recall?
11   A.  For the change of grade before --
12   Q.  Correct.  Before it reaches you?
13   A.  Yes.
14        DR. ACKAH:  Before the end of the
15   semester or after the end of the semester, which one?
16        MR. DUSTON:  Before the end of the
17   semester.  Taking a look at the change of grade
18   request form which is Exhibit Number 5, there is a --
19        DR. GWANMESIA:  About five weeks
20   after.
21        THE WITNESS:  Five weeks after.
22        DR. GWANMESIA:  That the professor can

188

1    change the grade.
2         MR. DUSTON:  It's already been
3    stipulated, that notwithstanding what the contract
4    said -- what the catalog says and what policy is,
5    there was an informal practice that professors
6    themselves can change grades for a certain number of
7    weeks at the start of the next semester.
8    BY MR. DUSTON:
9    Q.  Dr. Bell, you're familiar with that?
10   A.  Yes.
11   Q.  That's been past practice that an
12   instructor, himself, could do it into the next
13   semester, even though it's not in the catalogue,
14   correct?
15   A.  Yes.
16   Q.  Can you tell the panel anything more about
17   that practice or whether you have any information as
18   to how it developed as a practice that if the
19   catalogue wasn't followed, the professors could still
20   change grades?
21   A.  That policy was in place when I got here.
22   So --

A-000281

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON TUESDAY, SEPTEMBER 28, 2004

63 (Pages 249 to 250)

249

I N D E X

1
2    WITNESS:                          PAGE
3    DR. BARUTI KOPANO
4    Direct by Mr. Duston            4
5    Cross by Mr. Zeff               44
6    Redirect by Mr. Duston         62
7    Recross by Mr. Zeff            67
8    DR. MICHAEL OSEI-MENSAH
9    Direct by Mr. Duston           72
10   Cross by Mr. Zeff             129
11   DR. KENNETH BELL
12   Direct by Mr. Duston         175
13   Cross by Mr. Zeff            204
14   Redirect by Mr. Duston       237
15          E X H I B I T S
16   Exhibit No. 39 (document)     26
17   Exhibit No. 40 (grade rosters)  72
18   Exhibit No. 41 (CV)           72
19
20
21
22

250

1          C E R T I F I C A T I O N
2          I, TANYA M. CONGO, Certified
3    Professional Reporter, certify that the foregoing is
4    a true and accurate transcript of the foregoing
5    deposition, that the witness as first sworn by me at
6    the time, place and on the date herein before set
7    forth.
8          I further certify that I am neither
9    attorney nor counsel for, not related to nor employed
10   by any of the parties to the action in which this
11   deposition was taken; further, that I am not a
12   relative or employee of any attorney or counsel
13   employed in this case, nor am I financially
14   interested in this action.
15   _____
16   Tanya M. Congo
17   Certified Professional Reporter and Notary Public of
18   the State of Delaware, #189-PS
19
20
21
22

**A-000282**

**1**

1  IN RE: DELAWARE STATE UNIVERSITY
2       V.
3    WENDELL GORUM, Ph.D.
4        Continuation of the grievance hearing,
5  taken pursuant to notice before Tanya M. Congo, a
6  Notary Public and Certified Professional Reporter, at
7  Delaware State University, MBNA Building, Conference
8  Room 309, 1200 North DuPont Highway, Dover, Delaware,
9  on Wednesday, October 27, 2004, beginning at
10 approximately 10:10 a.m., there being present:
11        APPEARANCES:
12        SCHMELTZER, APTAKER & SHEPARD, P.C.
13        The Watergate Suite 1000
14        2600 Virginia Avenue N.W.
15        Washington, DC 20037-1922
16        BY: ROBERT DUSTON, ESQUIRE
17        Attorney for Delaware State University
18        FROST & ZEFF
19        430 Route 70
20        West Cherry Hill, NJ 08002
21        BY: GREGG L. ZEFF, ESQUIRE
22        Attorney for Dr. Gorum

**2**

1        Also present panel members:
2        Dr. FILIPPO TOSCANO
3        Dr. LAPOINTE DAVIS
4        Dr. GABRIEL GWANMESIA
5        Dr. EDWARD JACKSON
6        Dr. YAW ACKAH, (Panel Chairman)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**3**

1            PROCEEDINGS
2        DR. ACKAH: Good morning. And I'm
3  sure you're all disappointed that we are not holding
4  the proceeding in our beautiful, scheduled room, but
5  we are going to go back there tomorrow, anyway.
6        Mr. Zeff is going first.
7        MR. ZEFF: Yes. And at this time
8  we're going to call Dr. Gorum out of turn because we
9  don't have telephone facilities in this room.
10        As we mentioned, we were going to call
11 Dr. Tolliver first, but the telephone system won't be
12 arriving till the afternoon. We'll have everybody
13 available after lunch.
14        With that --
15 Whereupon,
16        WENDELL GORUM, Ph.D., having first
17 been duly sworn according to law, was examined and
18 testified as follows:
19        DIRECT EXAMINATION
20 BY MR. ZEFF:
21    Q. Dr. Gorum, can you tell the panel a little
22 bit about your educational background.

**4**

1    A. I grew up in the Norfolk, Virginia area
2  and went to undergraduate college at Norfolk State
3  University in business. While I was in Norfolk State
4  I worked as a dee jay with a radio station.
5        As soon as I graduated from Norfolk
6  State, I joined the Peace Corps, and served two years
7  in Chile.
8        After the Peace Corps I had a job with
9  a marketing research firm on Madison Avenue in New
10 York City. I was also enrolled at Columbia
11 University MBA program.
12        I decided that my first love was
13 broadcasting, so I applied to the Newhouse School of
14 Communications at Syracuse University and was
15 admitted. And, hence, I went to Syracuse as a grad
16 assistant as a fellow. And I worked with the State
17 Department in their International Broadcasting
18 Seminar. And the actual purpose of that seminar was
19 to bring in international broadcasters so that they
20 could gain some -- gain firsthand knowledge and
21 experience in the American system of broadcasting.
22        After Syracuse I took a job as

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

**5**

1  assistant analyst and editor of an employee newspaper
2  with AT&T in Denver, Colorado.
3          My wife was in graduate school at the
4  University of Denver.
5          So after a couple of years with AT&T,
6  we left and I took a job with IBM as a writer in
7  California -- San Jose, California.
8          While at IBM I decided that my first
9  love was really teaching. So I decided to return to
10  school. So I went to -- I started out to work in
11  broadcasting at Penn State.
12          While at Penn State I worked for the
13  local TV station there as Director of Technical
14  Directing.
15          After Penn State, I took a job as
16  Chair of the Department at Boys(ph.) State University
17  of Minnesota.
18          After a couple years left Minnesota,
19  went to Stanford as a post doc. From Stanford, took
20  a job as a professor at Dartmouth College, New
21  Hampshire.
22          I was at Dartmouth for, what, four

**6**

1  years. Left Dartmouth, went to Jackson State in
2  Mississippi as the Director of Instructional
3  Technology and Professor of Mass Communications.
4          Left Jackson State. Went to the
5  University of Maryland at College Park for five
6  years. I was the Director of the Student Affairs
7  Program at the University of Maryland.
8          From Maryland I was recruited to go to
9  Morgan State University in their broadcasting
10  program, and while I was there, I actually authored
11  the program and saw the program through approval
12  through the State Board of Education, a different
13  system.
14          I was at Morgan for five years, as I
15  said. And left Morgan and went to Norfolk State. I
16  was recruited to Norfolk State to serve as Director
17  of Instructional Technology and Professor of Mass
18  Communications.
19          While I was at Morgan, I was a
20  Fulbright Fellow, and I'd also been a Ford Fellow and
21  NEH fellow at other institutions.
22          I was recruited by Dr. Tisdale to come

**7**

1  to Delaware State to establish a Department of Mass
2  Communications.
3          It was sort of a symbiotic
4  relationship because my wife was a professor at the
5  State University of Stony Brook, and it meant that I
6  was commuting every weekend and, you know, that --
7  that can wear on you. So coming to Delaware State
8  was a symbiotic relationship.
9          I came to Delaware State in 1989. I
10  presented a proposal for a Department of Mass
11  Communications in December of '89, and was told that
12  there was no money. And at that time, the President
13  had a list of twenty-five priority items, and
14  communications was not among the priority items.
15          So what I did was to ask if I could
16  come up with my own source of funding for the
17  program, and was told, yes. And it was put in the
18  Minutes of the Administrative Council.
19          To fund the program I designed a
20  questionnaire, and had Residence Life administer the
21  questionnaire to all of the students on campus, to
22  see if they would support a cable television service.

**8**

1          At that time, students could only
2  receive two channels. That was Channel 17 -- 27 and
3  Channel 12, Public -- PBS. So students did not watch
4  television very much during those days.
5          Students responded that they would be
6  willing to pay for cable service 100 percent, not one
7  dissenting vote. So we charged students a cable fee.
8          And, of course, it was more than what
9  it cost us, but that enabled us to fund the
10  Department of Mass Communications. We were able to
11  build it and it was completed and operational by
12  January, 1991.
13          Initially, Mass Communications was a
14  program in the Department of English, and there were
15  a couple of other programs. I know Black Sight was
16  one. I forgot what the other one was. Which meant
17  that Dr. King was the Chair and I was the Director,
18  and directed the pre-alleged Chairs.
19          And I did that for about five years.
20  It meant recruiting students, as well as faculty, and
21  Dr. Kopano, Dr. Hagos, Eric Dodson, Dr. Taylor, were
22  all among the people I recruited.

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 3 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

3 (Pages 9 to 12)

9

1    We grew from really nothing to close
2  to a hundred students. I took a sabbatical, went to
3  South Carolina, worked with Dr. Tisdale, to establish
4  a program there. And when I returned, I resigned as
5  Chair for about three or four years.
6    Q. Was that Chair or Director?
7    A. Director. I'm sorry. Director. During
8  that period, Delaware State changed from being a
9  college to a university, and as part of that
10  undertaking, new direction, the University
11  established a committee to review all programs and
12  departments. And emanating from that committee, was
13  a recommendation to separate English from Mass
14  Communications. And that occurred.
15    I was asked by Dean Frederick and Dr.
16  Tolliver, if I would chair it again because they were
17  unhappy with the pre -- the other Chair. And I
18  agreed, and that was actually 2001/2002, my first
19  year.
20    While I was Chair the Department grew
21  from about one hundred, fewer than one hundred six,
22  seven, to more than three hundred students. The

10

1  large numbers, of course, presented problems, all
2  kinds of problems. And I'll talk about some of those
3  problems, but -- well, maybe I should mention
4  something --
5    Q. Yeah. Well, let me go back a little bit
6  and ask you some more background questions for the
7  Panel.
8    A. Um-hum.
9    Q. During the time you've been at Delaware
10  State, how many times has Mass Communications been
11  made into a department versus a program?
12    A. Mass Communications separated from English
13  during some period, and I had difficulty with the
14  President, Dr. DeLauder, and he combined English and
15  Mass Communications. It was the Department of
16  English and Mass Communications. He did it sort of
17  to get back at me.
18    Q. What do you mean by that?
19    A. Well, because I used to represent many of
20  the faculty and students in any kinds of problems. I
21  mean, people sought me out, and the President even
22  made a comment, who made you the leader of the

11

1  Africans, because I supported or represented the
2  students in their quest for tenure or whatever,
3  appeals for tenure, or any issues that faculty --
4    MR. ZEFF: Our last member's on his
5  way in right now, Doctor.
6    DR. GWANMESIA: Good morning.
7  BY MR. ZEFF:
8    Q. Doctor, by saying you represented faculty,
9  over the years how many faculty members have you
10  represented in various disputes with the
11  Administration?
12    A. There have been many, and I suppose that
13  representing them may have come from my having been
14  Chair of the Promotion and Tenure Committee for six
15  years. And, also, Chair of the Student Affairs
16  Committee, which oversaw the Judiciary Codes. So I
17  was familiar with the rules and regulations.
18    Q. Now, with regard to Student Affairs and
19  Judiciary Codes, do you have anything to do with
20  either writing them or --
21    A. I chaired -- chaired the committee that
22  authored the Student Judiciary Code. It was revised.

12

1    Q. In addition to representing faculty
2  members, have you represented students in various
3  matters?
4    A. Yes. I probably -- I mean, some people
5  who have been on the Student Affairs -- I probably
6  represent students more than any other faculty.
7    Q. Why is that?
8    A. They seek me out. I don't go asking for
9  work because I'm bombarded, but usually -- I usually
10  know the rules and I can advise them.
11    DR. GWANMESIA: Were these students
12  especially coming from your Mass Communication area,
13  or --
14    THE WITNESS: Oh, no.
15    DR. GWANMESIA: -- are you talking
16  about --
17    THE WITNESS: They are students --
18    DR. GWANMESIA: -- students as --
19    THE WITNESS: -- that are campus-wide.
20  Most are not Mass Communications students.
21  BY MR. ZEFF:
22    Q. What sort of things have you represented

13

1  students in?
2      A.  I represented --
3      Q.  And when I say, represented, counseling or
4  representing or a combination?
5      A.  Well, you're deemed -- you're called an
6  advisor, and I just serve as an advisor to -- to many
7  students.
8          DR. ACKAH:  When you say, advisor, do
9  you mean official advising or unofficial, 'cause I do
10  a lot of unofficial advising of students.
11          THE WITNESS:  No, this was official,
12  which meant that I attended the hearing with the
13  student and advised the student during the hearing
14  process.
15  BY MR. ZEFF:
16      Q.  This is not academic advising, then --
17      A.  No, this is a different type of advising,
18  not academic.
19      Q.  What type of advising is this?  What would
20  you represent them in?
21      A.  Well, it's sort of like it would be
22  comparable to a counsel.  But what I did not like

14

1      about that Code is that the advisor could not say
2      anything.  Only the student -- the student really had
3      to talk for him or herself.
4      Q.  But what type of events would these
5  students need you for?
6          DR. ACKAH:  What problems, like what
7  type of problems?
8          THE WITNESS:  Many, ranging from
9  having firecrackers, having guns, fights, alcohol,
10  drugs.  I guess -- I represented Deshon Morris, who
11  was a student; football player.  He was, I think, the
12  second student from Delaware -- second or third
13  student from Delaware State to make All-American.  He
14  was a punt return specialist.  He was ranked Number 1
15  in the nation.
16  BY MR. ZEFF:
17      Q.  Before we get to Deshon, let me just go
18  through this with you.  How many times a year would
19  you be representing students in these judiciary
20  proceedings?
21      A.  About ten.
22      Q.  Ten times a year?

15

1      A.  At least, yes.
2      Q.  And how many students in a year would be
3  brought up before the Judiciary Board?
4      A.  It was every week.
5      Q.  Okay.
6      A.  Yes.
7      Q.  So somebody was brought up every week?
8      A.  Yeah.
9      Q.  And you would -- you would actually advise
10  about ten of them, go to hearings with them every
11  year.
12      A.  Yes.
13      Q.  How many years were you doing that?
14      A.  Since I've been here.
15      Q.  And did that involve conflictS with the
16  University's position?
17      A.  Often, yes.
18      Q.  And in advising all of the -- and
19  counseling all of the faculty members that you
20  counsel, would that also involve conflicts with the
21  University?
22      A.  Yes.  And faculty members usually wound up

16

1  going before the Board of Trustees.  Students did not
2  have that right, but the faculty members did.
3      Q.  Did you accompany faculty members to the
4  Board of Trustees?
5      A.  I went with some, but usually at that
6  level I like for them to hire outside legal
7  attorneys, but I certainly accompanied some.
8      Q.  Now, you mentioned earlier that you had
9  prior problems with President DeLauder, and what do
10  you attribute those problems to?
11          MR. DUSTON:  Objection to questions
12  relating to any prior Presidents on the grounds of
13  relevance.  I've allowed this to go on but history
14  prior to Dr. Sessoms I don't think is relevant to
15  this proceeding.
16          DR. ACKAH:  Well, it is because you
17  didn't raise an objection when he mentioned this
18  matter with Dr. DeLauder initially, because he
19  mentioned that through is the event that led to his
20  resignation as Chair.  You did not raise that.
21          So go on.
22          THE WITNESS:  You know, you never

17

1  really know the true reason, but because I
2  represented some of the faculty, either in their
3  quest for promotion and tenure, and really argued and
4  fought for them, I guess, Dr. DeLauder became angry
5  once and made the comment that, who made me the
6  leader of the Africans.
7  BY MR. ZEFF:
8     Q.  Now --
9        DR. GWANMESIA:  Now, while we're
10 talking about that, how many Africans did you
11 represent to make Dr. DeLauder come to that
12 conclusion?
13       THE WITNESS:  Four that I can think
14 of.  I don't know why he came to that conclusion, but
15 he did say that, that comment.
16 BY MR. ZEFF:
17    Q.  Now, I wanted to talk to you a little bit
18 more about the department that you founded and, also,
19 I guess, the program that you founded.  Have any of
20 your students won any awards?
21    A.  Within -- as of 2003/2004 my students have
22 won five Emmys, all were in the television area,

18

1  which is my area of specialty.
2        DR. GWANMESIA:  From when to when?
3        THE WITNESS:  From 2 -- between 2001
4  and 2004.
5  BY MR. ZEFF:
6     Q.  Now, do you get a lot of athletes in your
7  program?
8     A.  We had quite a few, and we have volleyball
9  players, football -- volleyball players are females,
10 football players.  We had basketball players, male
11 and female, wrestlers, some -- yes, we had quite a
12 few athletes, actually.
13    Q.  One of those was Deshon Morris, who you
14 referred to earlier?
15    A.  Deshon Morris is one, yes.
16    Q.  Did you advise him in some capacity?
17    A.  Yes.  Deshon was a member of the football
18 team, and the football team had a fight with Sigma --
19 Phi Beta Sigma Fraternity.  And a member of Phi Beta
20 Sigma accused Deshon Morris of having his hand in his
21 pocket as if he had a gun.
22       And as it turned out, he wasn't even

19

1  at the fight.  But during that period, Security
2  searched his room.  And Security went in with a
3  search warrant, went in about 1:00 a.m. and they put
4  him out of the room and they searched his room.
5        And, then, they went out and talked to
6  him.  And, then, they told him what they were looking
7  for, a gun.  And so he went in and showed them where
8  the gun was, because they had not found it.
9        And, I guess, under Delaware law
10 you're not supposed to put anyone out.  The person's
11 supposed to be there because without them being
12 present, items could be planted.
13       And I represented him on that, and I
14 think, actually, the Committee found him not
15 responsible or not guilty.
16    Q.  You represented him on campus then?
17    A.  Yes, on campus.  Yes.
18    Q.  Okay.  And what committee found him not
19 guilty?
20    A.  The Initial Committee, if I remember
21 correctly.  And there was a lot of controversy
22 because the committee voted not responsible or not

20

1  guilty, but the chair of the committee did not send
2  forth the recommendation of the committee.
3        DR. TOSCANO:  Excuse me.
4        THE WITNESS:  Yes.
5        DR. TOSCANO:  At the first hearing he
6  was found guilty.
7        THE WITNESS:  Okay.
8        DR. TOSCANO:  Then, he appealed.
9        THE WITNESS:  The Appeal Committee, I
10 guess.
11       DR. TOSCANO:  And the appeal found him
12 not responsible.
13       THE WITNESS:  Okay.  Thank you.
14       DR. TOSCANO:  You're welcome.
15       THE WITNESS:  Yes, there's so many I
16 do well to remember.  But that is correct.  He was
17 found guilty, and I only -- I was only -- I entered
18 the case during the appeal process, and that's what
19 happened.
20       And what happened is that it led to
21 difficulty in that he was found not guilty, but, yet,
22 the chair of the committee did not send forth the

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 6 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

6 (Pages 21 to 24)

**21**

1  recommendation of the Appeals Committee.
2  In the end, Shon was suspended for a
3  year, and he appealed to the President, DeLauder at
4  that time, and the President reduced his suspension
5  to one semester and told him that he could return
6  during the summer to take classes, and he could --
7  the only thing he could do was play football.
8  And he did that. He entered summer
9  school to catch up. He did not attend school during
10  the Spring semester.
11  When Dr. Sessoms came on on July 9th,
12  I received a call from someone in his office telling
13  me to tell Morris that he could not play football,
14  and he could not return for a year.
15  And they asked me to tell him, and I
16  said, no. I'm not going to tell him. That's up to
17  you guys to tell him. And I gave them -- I gave that
18  person his cell phone number. And they called and
19  told him that.
20  And, of course, my position on that
21  was that it was double jeopardy. He had ruled and
22  actually served his time, and it was again rehashed.

**22**

1  So the case was taken to Court outside of school.
2  BY MR. ZEFF:
3  Q. Okay. And who set that up?
4  A. We had no alternative. I set it up.
5  DR. ACKAH: You set what up?
6  MR. ZEFF: Set up taking the case to
7  Court, taking Shon Morris' case to Court.
8  DR. ACKAH: On his behalf?
9  MR. ZEFF: Yes.
10  THE WITNESS: Yes.
11  DR. ACKAH: Do you have any reason why
12  -- you are a faculty member, why did you get involved
13  to that extent?
14  Why did you think it necessary to as a
15  faculty member?
16  THE WITNESS: I became involved during
17  the appeal process, and I represented Morris and,
18  like I said, everyone knew it.
19  And get involved to that extent, well,
20  if you're given a one-semester suspension, and you
21  serve it, I don't think, after the fact, after you
22  have served it, you know, your sanction should be

**23**

1  increased or changed.
2  And when Dr. Sessoms came, he did just
3  that. The entire football team went -- met with Dr.
4  Sessoms and, basically, what he said, he was not the
5  one, it was being done by Dr. Smith.
6  Nevertheless, it happened. And the
7  only alternative that we had, because there was no
8  listening to reasoning, was to take the case to
9  Court, or take it off campus.
10  DR. GWANMESIA: When did this happen?
11  When did this happen?
12  THE WITNESS: I think it was 2002,
13  2003. I don't remember the exact date.
14  BY MR. ZEFF:
15  Q. Now, Dr. Ackah asked a very pointed
16  question. Why did you do this?
17  What -- why'd you get yourself so
18  involved in this?
19  A. I have always been an advocate for the
20  students, and I was asked to work with a student. I
21  talked to the student, listened to the student, and
22  determine whether or not I believed what the student

**24**

1  was saying.
2  And it sort of mushroomed. It was
3  just the way I worked. I work with the students.
4  And I think Security will tell you that I probably
5  spent more time chaperoning functions or whatever
6  with students, than any other faculty member on this
7  campus.
8  Q. Now, was this the first time that you had
9  taken a student and advised them to go to Court
10  against the University?
11  A. No. Even today I think there are four
12  cases out there.
13  Q. And --
14  DR. GWANMESIA: In Court?
15  THE WITNESS: Yeah.
16  BY MR. ZEFF:
17  Q. And have you in the past given some of
18  your own money to help some of these students?
19  A. Yes.
20  Q. With regard to Deshon Morris, who paid for
21  his lawyer?
22  A. I did.

A-000288

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 7 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

7 (Pages 25 to 28)

25

1    Q. Why'd you do that?
2    A. I have donated much of my money to
3  students. I try not to spread, or let it be known,
4  but I do it often. It's something I do.
5    Q. Now, with regard to all these students
6  that you've represented, have they all been right, or
7  do you represent students who have actually done
8  something you thought was wrong?
9    A. No, they have not been all right. But I
10  still feel that, right or wrong, they still should
11  have their representation.
12    Q. So did Dr. Sessoms know that you were the
13  one behind Mr. Morris going to Court?
14    A. Yes.
15    Q. How do you know that?
16    A. Because he told some of the professors and
17  football players that if they didn't the right thing,
18  that they would be fired --
19    DR. ACKAH: He meaning --
20    THE WITNESS: The President, as well
21  as the Vice President of Student Affairs.
22  BY MR. ZEFF:

26

1    Q. Who was that?
2    A. Smith.
3    Q. Now --
4    DR. ACKAH: Let's go back. How do you
5  really substantially know whether the President was
6  aware?
7    THE WITNESS: Because it was primarily
8  with the former football staff. They actually told
9  me during the time that they were told not to have
10  anything to do with Morris, and to stay out of it.
11    DR. GWANMESIA: That they were told by
12  the President?
13    THE WITNESS: Some -- yes, there were
14  some were told by the President, and some were told
15  by Smith.
16  BY MR. ZEFF:
17    Q. Now, at around the time this was all going
18  on, did you believe that Dr. Sessoms did anything to
19  retaliate against you?
20    DR. ACKAH: I'm a little --
21    MR. ZEFF: It goes to --
22    DR. ACKAH: -- disturbed by that

27

1  question.
2    MR. ZEFF: Okay. Well, then, let me
3  rephrase the question.
4    DR. ACKAH: Yes, please.
5  BY MR. ZEFF:
6    Q. At about the time that you were taking Mr.
7  Morris to Court or assisting Mr. Morris with the
8  Court, did anything happen with the Alphas that you
9  believe was related?
10    A. Yes.
11    Q. First, who are the Alphas?
12    A. Okay. Alphas are a fraternity on campus,
13  and the Alphas --
14    Q. What's your role with them?
15    A. I was the advisor. And the Alphas came up
16  with the idea of using the University parking areas
17  to accommodate some of the traffic from the NASCAR
18  races. There is a Spring race, there's a Fall race,
19  June and September. And presently income from those
20  races amount to about $150,000.00. And --
21    Q. Income to the University for the parking?
22    A. Yes. That's part of it. And I also

28

1  belong to the Alphas -- the graduate chapter, which
2  has nothing to do with the University. And each year
3  the Alphas has a Martin Luther King, Jr. prayer
4  breakfast, and it's an event which will accommodate
5  from 700 to 900 persons a year.
6    Most dignitaries are there, Carper,
7  Biden, the Governor, local -- all the politicians are
8  there. And what happened, I was responsible for
9  inviting -- for finding the speaker, and I did.
10    But there was a member of the
11  fraternity on the Committee who invited Sessoms, and
12  somebody else invited someone else, and I had already
13  invited a speaker. When I found out, since it was my
14  responsibility, I told them they had to rescind the
15  offer.
16    Dr. Sessoms had been invited and it
17  was rescinded. And it did not go well according to
18  someone in his office.
19    Q. Now, what happened with your relationship
20  with the Alphas and President Sessoms after that?
21    Was there an accusation?
22    A. Oh, yeah. I mean, in some ways I thought

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 8 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

8 (Pages 29 to 32)

29

1  they were -- they came after me. I was accused of
2  taking the Alphas' money.
3      Q. How did that happen? Who accused you?
4      A. Someone in the School of Business. I was
5  never told directly, but students and the Alpha
6  leaders were told, and they are the ones who told me.
7      Q. That you were accused of taking their
8  money?
9      A. Yes.
10          DR. ACKAH: Has there been officially
11 any documentation of that --
12          THE WITNESS: No. It could not be
13 documented, but they were told that.
14          Now, the Alphas worked the June race
15 that normally brings in about $70,000.00. And every
16 -- when I left -- when I was suspended in March, the
17 fraternity had about $5,000.00 left in its account.
18 Now there is a deficit of $3,000.00, including all of
19 the money that was brought in during the Spring. So
20 the students actually got nothing from it, 'cause the
21 money was taken away and spent.
22 BY MR. ZEFF:

30

1      Q. Now, let me -- with all that background,
2  let me bring you now to -- back to your department a
3  little bit, and have you talk about some of the
4  issues you had as Department Chair and, also, as
5  Director with registration and with purging
6  internships, practicums, that sort of thing.
7          So let me go back to a time when you
8  just a Director, and as a Director, who do you report
9  to as Director of Mass Communications?
10     A. Dr. King, who was the Chair.
11     Q. Scott King?
12     A. Yes.
13     Q. He was the Chair of English?
14     A. English and Mass Communications.
15     Q. So he was your Department Chair at that
16 time?
17     A. That's correct.
18     Q. Okay. Were there problems back when you
19 were just a Director and working for Dr. King with
20 purges?
21     A. Yes.
22     Q. What kind of problems were there?

31

1          MR. DUSTON: Objection as to relevance
2  going this far back in the registration process.
3          MR. ZEFF: I'm going to be -- well, I
4  need to establish the practice and the procedure that
5  was used by his department that was taught to him.
6  And why he did what he did based on practice and
7  procedure that was taught to him by the Chair of his
8  department known by the Administration and the
9  Registrar's Office as to what was done.
10         DR. ACKAH: Okay. I'll allow it.
11         THE WITNESS: Each semester students
12 supposedly who owed $1,000.00 or more --
13 BY MR. ZEFF:
14     Q. And this is when you were a director?
15     A. That's correct. Students were purged or
16 taken out of their classes. Because we had such a
17 large number of students, and even at 100, that's
18 still a large number. We had many students who were
19 purged.
20         Now, purging is not a good process
21 even though we were told that students were purged if
22 they owed $1,000.00 or more, many students were

32

1  purged who owed --
2          UNIDENTIFIED MALE: Excuse me, the
3  gentleman is here with the conference phone.
4          DR. ACKAH: Off the record.
5          (Recess)
6          MR. ZEFF: Let's go on the record, if
7  we may and we'll tell you what we're discussing.
8          MR. DUSTON: Two issues discussed off
9  the record are to be, the first related to privacy
10 issues for students and further protections, and it's
11 just the understanding of the Committee that the
12 records that we have received are confidential
13 student records, not to be disclosed beyond the
14 Committee, or those within the proceeding, to know
15 pursuant to FIRPO(ph.), and if there's anyone who
16 wishes to attend this public hearing who is not
17 directly involved in the Administration or faculty
18 members, we will address that when if we wish to at
19 that point in time.
20         The -- Mr. Zeff has asked, and certain
21 Committee members have that we summarize what has
22 happened in the litigation reported in the paper this

A-000290

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-.

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 9 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

10 (Pages 37 to 40)

37

1  and depending on what they say regarding their grades
2  and what work they did, the Committee, consisting of
3  Dean Skelcher, Dr. Marcia Taylor and Dr. Stephen
4  Taylor, will determine what to do, case by case, with
5  the students' actual grades.
6      And this is because the change of
7  grade appeal process really did not fit this
8  situation where the students were claiming that they
9  thought they were taking classes with Dr. Gorum, or
10  relied on Dr. Gorum's position.
11      So it was really sort of an ad hoc
12  process to directly address this unique situation
13  where the Chair was acting and took these particular
14  actions.
15      So that's where we stand today.
16      DR. ACKAH: With reference to
17  restoring some of the -- the University has started
18  to do that?
19      MR. DUSTON: Oh, yes. It was done as
20  of -- the Registrar changed them back either Friday
21  or Monday for those students whose grades were
22  removed. There's roughly fifteen or twenty.

38

1      DR. ACKAH: They're already restored?
2      MR. DUSTON: Already restored pending
3  these due process proceedings.
4      For students whose grades had been
5  changed by Dr. Gorum from those issued by the initial
6  instructor of record, they're -- those grades will
7  reverse back to what the original instructor gave
8  last Spring. And there is -- those students are
9  being renotified of their right to have those
10  reviewed by the same committee.
11      But those have not been changed at
12  all. We believe that the original grades issued by
13  the instructor of record should stay unless there's
14  grounds for reversal.
15      So that's -- that's where things stand
16  today. We don't believe that any of this is relevant
17  to this process or the issue of termination, not
18  directly relevant. The University's position, in
19  regard to these issues, is completely apart from
20  whatever this committee chooses to do or not do.
21      DR. JACKSON: This is part of the
22  appeal?

39

1      MR. DUSTON: There is no appeal right
2  now.
3      DR. JACKSON: That's what it said in
4  the paper.
5      MR. DUSTON: There's no appeal.
6      MR. JACKSON: No, okay.
7      MR. DUSTON: There's no -- there was
8  ten days to appeal the preliminary injunction. The
9  University has voluntarily decided to implement this
10  for everybody, and it is not filing an appeal of the
11  preliminary injunction. Because we have provided the
12  same relief, that Court case should be over.
13      DR. ACKAH: Okay. It is of interest
14  to the Committee, but we're going to not be bound or
15  influenced in any way by the Court's decision. That
16  is not of interest to us as far as I'm concerned.
17      Welcome, Dr. Sessoms. We're the
18  Committee you set up to investigate the incident with
19  Dr. Gorum.
20      I'm Dr. Ackah, the Chair of the
21  Committee. On my right is Dr. Gwanmesia, and on my
22  left, Dr. Jackson, Dr. Toscano and Dr. Davis. And

40

1  this is the lady who is graciously helping us since
2  the second day of these proceedings.
3      MR. DUSTON: Dr. Sessoms, thank you.
4  Would you please describe for the Committee --
5      DR. ACKAH: Would you want to swear
6  him in.
7      MR. DUSTON: I'm sorry.
8  Whereupon,
9      ALLEN SESSOMS, Ph.D., having first
10  been duly sworn according to law, was examined and
11  testified as follows:
12      DIRECT EXAMINATION
13  BY MR. DUSTON:
14      Q. Dr. Sessoms, would you briefly describe
15  for the Committee your background in academia before
16  coming to Delaware State University?
17      A. Before coming to Delaware State University
18  I was on the faculty at Harvard University. Prior to
19  that I was President of Queens College in New York.
20      Prior to the presidency of Queens
21  College, I was Executive Vice President at the
22  University of Massachusetts System.

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 10 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

11 (Pages 41 to 44)

41

1    I was out of academia prior to that.
2  Before that I was on the faculty of Harvard
3  University.
4    Q.  How many years in academia in your career?
5    A.  Half my life. I won't tell you how many
6  years that is.
7    Q.  And you've been President of Delaware
8  State since --
9    A.  Since July 1st, 2003.
10   Q.  The focus of this proceeding is on the
11 grades submitted by Dr. Gorum, both changed grades
12 and Missing Grade Forms for instructors.
13        Under accepted professional standards,
14 what rights do professors have regarding control of
15 grades that are assigned to them?
16   A.  Faculty members have an obligation when
17 they teach a course to provide grades accurately
18 reflecting performance of the students, not only
19 relative to other students in that course, but
20 relative to the standards of the University.
21        The University's certification is the
22 single stake it has that defines its purpose. It's

42

1  educating students. That education is, in the minds
2  of most, completely codified in the credentials of
3  the University, and that credential is, in fact, the
4  reason for the University's existence, in addition to
5  the extension services and educational opportunities
6  in general. Without that certification, there is no
7  university.
8    Q.  Now, what about the faculty members'
9  rights to control his or her own grades?
10       If a professor does not comply with
11 accepted University standards, can members of the
12 Administration simply change the grade issued by a
13 professor?
14   A.  No, in fact there's lots of legal and
15 other precedents to suggest that the faculty member
16 is, in fact, the arbiter. And unless there is an
17 extraordinary circumstance where a student protests
18 and can demonstrate the fact that the student has
19 been treated unfairly in the course, or the reason of
20 racial, gender or whatever, the faculty member is, in
21 fact, the final arbiter. There is no other arbiter.
22   Q.  So are there any circumstances, you

43

1  mentioned some extraordinary ones, where it's
2  acceptable for someone other than the instructor who
3  taught the course, to change a grade without that
4  instructor's knowledge or consent?
5    A.  No, the consent is another issue. But
6  knowledge is certainly -- for example, a student is
7  clearly doing work in the course, and the faculty
8  member chooses to remove all the papers, the student
9  can demonstrate that, in fact, the faculty member is
10 clearly prejudiced against the student and the
11 student can demonstrate that prejudice, then, there
12 is an appeal process. Very clear appeals process, so
13 the student, in fact, can be treated fairly through a
14 process that goes through the Chair and through the
15 -- ultimately through the Provost.
16       But it is such an elaborate process
17 because the faculty member is, in fact, in charge.
18 And there is no other recourse except under
19 acceptable terms.
20       An example, the President of St.
21 Bonaventure University, a few years ago, felt
22 compelled to change the grade of a student athlete on

44

1  the basketball team, and when it came out the
2  President, on one grade, was forced to resign.
3        MR. ZEFF: I'm going to object to that
4  testimony as being irrelevant to these proceedings.
5        DR. ACKAH: That is sustained. It is
6  not really relevant to our case, but very
7  interesting.
8        MR. DUSTON: Well --
9        THE WITNESS: He asked under what
10 circumstances. I just gave an example of what
11 happened at St. Bonaventure.
12       MR. DUSTON: Well, under accepted
13 professional standards.
14 BY MR. DUSTON:
15   Q.  Is this a matter purely of administration
16 policy, or what role does academic freedom play in
17 this?
18   A.  Academic freedom plays absolutely no role
19 in this. It is a faculty member's obligation to be
20 academically honest, and it is the faculty member's
21 obligation to be fair, because it's not just one
22 student's record, it's the other students in the

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 11 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

12 (Pages 45 to 48)

45

1  eourse. It's beyond the simple rules and
2  regulations, it's established procedure.
3      Q. But when -- if some other individual were
4  to change that grade, higher in the administration,
5  without following established procedures, does that
6  infringe on the rights of the faculty member, and in
7  what way?
8          MR. ZEFF: Objection. Whose
9  established procedures?
10         DR. ACKAH: Overruled. We assume that
11 is the University's established precedent.
12         MR. ZEFF: This University?
13         DR. ACKAH: Yes. That is what we are
14 here for.
15         MR. ZEFF: Thank you.
16         DR. ACKAH: Overruled. Go ahead.
17 We're ready.
18         THE WITNESS: There is no right for
19 any one without going through established University
20 procedures to change a grade.
21 BY MR. DUSTON:
22     Q. Now are the rights of part-time or adjunct

46

1  instructors any different regarding their control
2  over their own grades?
3      A. It's identical. There is no difference.
4      Q. To your knowledge since you have been
5  President, and other than the situation involving Dr.
6  Gorum, is there any other Chair or instructor who has
7  changed grades for another instructor's class without
8  the involved knowledge and consent of the instructor?
9      A. To my current knowledge, no.
10     Q. Under the current Delaware State policy
11 and practice, if an issue comes to a Department Chair
12 regarding grades of an adjunct faculty member, a
13 student dispute or problem, what is the Chair's
14 responsibility?
15     A. He can settle it with the instructor.
16     Q. And if the instructor does not agree or
17 the instructor cannot be reached, what is the Chair's
18 rights and obligations?
19     A. The Chair's obligation, then, is to refer
20 the issue to the Dean.
21     Q. Can chairs take action over grades within
22 their department, or over instructors, if they have

47

1  not consulted with the instructor and obtained
2  consent or the Dean's approval?
3      A. No.
4      Q. Now, going directly to decisions regarding
5  Dr. Gorum, describe for the Committee how those
6  issues first came to your attention?
7      A. The issue came to my attention because of
8  an issue related to the eligibility of a basketball
9  player, the student's grade in the Spring semester,
10 and confusion about a grade being given, a grade
11 change, and eligibility with continued performance in
12 his athletic capacity as a student.
13         Investigation ensued, and it was
14 determined after some significant effort, that the
15 student was not permitted to participate in athletic
16 events until it was resolved. The student, in the
17 end, was, in fact, eligible.
18         That led to a much further
19 investigation of issnes relating to grades in the
20 Mass Communications Department, which developed
21 evidence of significant disparities and
22 irregularities in the grading of many students in

48

1  this Department.
2          DR. ACKAH: Excuse me. By whom?
3          THE WITNESS: I beg your pardon.
4          DR. ACKAH: By whom? You said --
5          DR. GWANMESIA: The grading.
6          DR. ACKAH: The grading. You said --
7          THE WITNESS: It came through the
8  process -- through the Registrar's checking the
9  records.
10         DR. ACKAH: No, you said there was a
11 gross --
12         DR. GWANMESIA: Disparities.
13         DR. ACKAH: -- disparities.
14         THE WITNESS: Yes, through the
15 Registrar's --
16         DR. ACKAH: Yes, but --
17         MR. DUSTON: If I may.
18 BY MR. DUSTON:
19     Q. Specifically to Dr. Gorum, what do you
20 recall, or what information do you recall being
21 available to you prior to the time that you made your
22 recommendation regarding termination?

A-000293

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-�....

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 12 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

13 (Pages 49 to 52)

49

1    A.  It was brought to my attention that a
2  number of grades had been changed by Dr. Gorum
3  without appropriate consultation, without going
4  through the due process rigors that the University
5  has established for maintaining the integrity of its
6  grading system, and, therefore, the certification
7  process.
8        And it was a number of these
9  disparities that came to light at once that focused
10  attention -- my attention on the situation.
11        DR. ACKAH:  So when you said there
12  were disparities, you were referring to Dr. Gorum?
13        THE WITNESS:  Yes.  Specifically Dr.
14  Gorum.  Only Dr. Gorum.
15  BY MR. DUSTON:
16    Q.  When you said that Dr. Gorum had changed
17  grades without going through the established
18  procedures, which procedures were you referring to?
19    A.  Lack of consultation with the instructor.
20  Lack of consultation with the Dean.
21    Q.  What was your reaction to those
22  allegations when you heard them?

50

1    A.  I found them sufficiently extraordinary
2  that I didn't believe them at first, and requested
3  that they be verified.
4    Q.  And what verification came back to you?
5    A.  That, indeed, that was the case.  And, in
6  fact, it wasn't just an isolated incident; that there
7  were many instances, verified by the Registrar, where
8  grades had been changed without the appropriate
9  signatures.
10    Q.  Who did you consult with, or discuss these
11  issues with prior to making the decision that
12  termination was the appropriate response?
13    A.  With the Provost, with the Dean, with
14  counsel.
15    Q.  And which dean are you referring to?
16    A.  I spoke with Dean Frederick, who was there
17  at the time, and -- I can't recall.
18    Q.  Why did you conclude that termination was
19  the appropriate sanction for this conduct unrelated
20  to the terms of the Collective Bargaining Agreement?
21    A.  To me this was one of the highest levels
22  of violation of the ethics -- certainly the highest

51

1  that I'd ever seen under any circumstances.
2        It was something that undermined the
3  very fabric and purpose of the institution, and under
4  no circumstances was it permitted.  And the person
5  who perpetrated such acts had no place in the
6  University setting under any circumstances.
7        DR. GWANMESIA:  Was this the
8  recommendation of the Dean and the Provost --
9        THE WITNESS:  Yes.
10        DR. GWANMESIA:  -- of the University?
11  BY MR. DUSTON:
12    Q.  To your recollection both Dean Frederick
13  and Dean Bell --
14    A.  Yes, the Provost.
15    Q.  -- recommended termination?
16    A.  Yes.
17        DR. ACKAH:  I want the Committee
18  members to note that on the record, the President
19  said that the Provost recommended termination of Dr.
20  Gorum --
21        DR. JACKSON:  Can I ask a question.  I
22  was not here when the Provost testified.  Can I ask a

52

1  question about his testimony?
2        DR. ACKAH:  Sure.  Go ahead.
3        DR. JACKSON:  As I understood it, the
4  Provost said he did not recommend termination.
5        MR. ZEFF:  Yes, that's what he
6  informed us.
7        DR. ACKAH:  That's what the Provost
8  did say.  So that's why I asked you --
9        THE WITNESS:  I'm just telling you
10  what I recall.  There was some discussion about this.
11  BY MR. DUSTON:
12    Q.  Was there also discussion about whether
13  Dr. Gorum should be simply allowed to -- should he be
14  removed as Chair and allowed to take early retirement
15  during that semester?
16    A.  It was mentioned as one of the options.
17        DR. ACKAH:  Okay.  Dr. Sessoms, if the
18  Provost were to be called here, or recalled, and he
19  were to come in and deny it, what would your reaction
20  be?
21        THE WITNESS:  I don't have a reaction
22  to hypotheticals.  It's what I recall.

A-000294

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3⌐ .

Case 1:06-cv-00565-GMS    Document 40-8    Filed 08/31/2007    Page 13 of 34
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

17 (Pages 65 to 68)

65

1    DR. ACKAH: Robert, please let me make
2  this statement. Remember, Mr. Farley wrote a letter
3  to the Committee at the beginning of our
4  deliberations, and in my response I told him we are
5  not your enemies. We are not your opponents. We are
6  all working together to try to resolve this very
7  difficult situation.
8        I think, Dr. Sessoms, you have to
9  understand, too. We are not your opponents. We are
10  not your enemies. You gave us this responsibility,
11  you and the AAUP. We cannot do our job if we don't
12  get cooperation from the Administration.
13        THE WITNESS: I think I was being
14  cooperative. I was answering his question. He asked
15  me what I thought. I'm telling you what I thought.
16        DR. ACKAH: Yes, but Dr. Gorum's
17  client raised an objection.
18        THE WITNESS: Yes, but he can't tell
19  me what I thought.
20        MR. ZEFF: If the --
21        DR. ACKAH: This is like a Courtroom
22  situation. He can object to something that you say.

66

1        MR. DUSTON: Dr. Ackah, there was a
2  raised and sustained objection. We can move on with
3  more questions.
4  BY MR. DUSTON:
5    Q.  Dr. Sessoms, the -- would it have made a
6  difference to you in what sanction you felt was
7  appropriate if this had only involved one change of
8  Mr. Wickham's or Dr. Kopano's grades?
9        If there had just been one or two
10  cases of a change of grade without consultation with
11  the instructor of record by the Chair?
12    A.  No.
13    Q.  Is it that level of severity that if there
14  were only one change of a grade without the knowledge
15  and consent of the instructor of record, that would
16  suggest you move outside of the Collective Bargaining
17  Agreement for termination?
18    A.  Yes.
19        DR. GWANMESIA: Can I -- I still go
20  back to this Exhibit 11. Does it mean that this
21  Registrar is going to be sanctioned for this grade
22  that was changed without going through the due

67

1  process?
2        Is that Registrar going to be
3  sanctioned?
4        MR. DUSTON: Well, this Assistant
5  Registrar --
6        MR. ZEFF: Can the President answer
7  the question.
8        DR. GWANMESIA: No, I need the
9  President to answer this question, because it is
10  important. We are trying to --
11        THE WITNESS: I defer to counsel
12  because I don't know the circumstances of this, and I
13  will not impute to someone the lack of integrity
14  because we don't know --
15        MR. ZEFF: Except for Dr. Gorum.
16        THE WITNESS: -- whether the system
17  was corrupted or not.
18        DR. GWANMESIA: This is a -- what you
19  are saying is that as long as any change of grade
20  does not go through the due process, it's punishable
21  by dismissal. And I'm asking --
22        THE WITNESS: For a faculty member,

68

1  yes.
2        DR. GWANMESIA: -- are we going to
3  dismiss this --
4        DR. ACKAH: He's qualifying only for
5  purpose of --
6        THE WITNESS: I'm talking about a
7  faculty member.
8        DR. GWANMESIA: But if anybody -- why?
9        THE WITNESS: Because a faculty member
10  controls the grades. A faculty member is the final
11  arbiter of grades.
12        DR. GWANMESIA: Let me --
13        THE WITNESS: The faculty member is
14  the person who provides the credential of the
15  university --
16        DR. GWANMESIA: But Dr. Gorum --
17        THE WITNESS: Not someone who
18  processes forms --
19        DR. GWANMESIA: Dr. Gorum was --
20        THE WITNESS: -- according to certain
21  procedures.
22        DR. ACKAH: Let him go. Let him go.

117

1   deal.
2          DR. ACKAH:  Based on your statement
3   the Dean should be sanctioned, what type of sanction,
4   that is not why we are here.
5          THE WITNESS:  The Dean -- if the Dean
6   didn't do their job, clearly -- I mean --
7          DR. ACKAH:  So I think we should lay
8   it to rest.
9          MR. ZEFF:  Thank you.  Let me just go
10  back --
11         DR. ACKAH:  Let's move on, please.
12  BY MR. ZEFF:
13      Q.  If Dean Frederick told Dr. Gorum to change
14  Dr. Osei-Mensah's grades, what consequences would
15  there be for Dr. Gorum if he didn't obey the
16  instruction of the Dean?
17      A.  Nothing.  What's the Dean going to do?  He
18  can't instruct somebody to change somebody else's
19  grade.  The Dean, then, is responsible for doing it,
20  if he initiated the change.  But, I mean, if you say,
21  okay, go and do something which you know is
22  incorrect, you know what, I don't do it, you don't do

118

1   it.  What's going to happen, nothing.
2      Q.  Is there insubordination that a Dean
3   charges --
4      A.  Faculty -- Deans can do all sort of
5   things, but they can't -- I don't think they're going
6   to be able to sanction a faculty member for
7   disobeying a ridiculous directive.
8          DR. ACKAH:  So far from the -- let me
9   get in here.  I don't recall anyone giving the idea
10  that the Dean told somebody, but rather he
11  authorized.  To authorize someone to do something --
12         MR. DUSTON:  Actually, Dr. Ackah, at
13  this point I don't think there's been any testimony.
14  What there's been is a bunch of question from Mr.
15  Zeff.
16         Dean Frederick did not testify to
17  that, and Dr. Gorum hasn't testified to it yet,
18  either.
19  BY MR. ZEFF:
20      Q.  Well, let me -- let me turn to the black
21  binder, if you would, Dr. Sessoms, the eleventh
22  document in that notebook.

119

1          They're actually -- it's page 11.
2   They're date stamped.
3          DR. ACKAH:  When are we going to?
4          MR. ZEFF:  Two o'clock.
5          DR. ACKAH:  Two o'clock.  Would it be
6   possible for you to run it off with about ten minutes
7   so that we can have the break?  Is that possible?
8          MR. ZEFF:  I can certainly try.
9          DR. ACKAH:  So ten minutes.
10         MR. ZEFF:  Let me see where I get.  I
11  don't know if I've got more than that left anyway.
12  BY MR. ZEFF:
13      Q.  Let me just direct your attention to the
14  second paragraph --
15         DR. GWANMESIA:  Where are we?
16         MR. ZEFF:  Number 11 in the black
17  binder.
18  BY MR. ZEFF:
19      Q.  Is this the letter that you authored?
20      A.  It's a very strong statement.  It's a
21  letter that I signed.
22      Q.  Okay.  Did you author this letter?

120

1      A.  It's a letter that I signed.
2      Q.  Who wrote it?
3      A.  Counsel.
4      Q.  Did you review the letter before you
5   signed it?
6      A.  Of course.
7      Q.  Did you make any changes to the letter
8   before you signed it?
9      A.  No, not that I'm aware of.  I don't
10  remember.  This is a long time ago.
11      Q.  Okay.  Then, it's counsel's language and
12  not yours?
13      A.  I signed the letter.
14      Q.  Okay.
15      A.  I did not author the letter.
16      Q.  The second paragraph says, I understand
17  that you do not deny changing these grades, but
18  assert that Dr. Frederick verbally authorized those.
19  Do you see that?
20      A.  Yes.
21      Q.  Okay.  And at the time you signed this
22  letter, you had read that?

A-000296

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

31 (Pages 121 to 124)

121

1    A.  Yes.

2    Q.  Was that also your understanding?

3    A.  I understand -- I understood then and do

4    understand now from what I've heard that Dr. Gorum

5    asserts that.

6    Q.  Okay.  Other than Dr. Frederick saying

7    that he denied that that conversation took place,

8    what proof do you have that Dr. Gorum did not speak

9    with Dr. Frederick?

10   A.  I don't have any proof that anyone didn't

11   speak to anyone.  I have proof that the signed -- the

12   form was not signed.

13        Now, if I am trying to get someone to

14   approve something, and there's a form to be signed, I

15   don't listen to what they say.  I get their signature

16   on the form.  Common sense.

17   Q.  If --

18   A.  It's a legal document.  If you're

19   requiring a process to change something that was not

20   originated by the person seeking the change.

21   Q.  But Dr. Frederick has been -- if the

22   students testified that Dr. Frederick told them,

122

1    don't talk to me about this grade change, go talk to

2    Dr. Gorum, do you think that would be some proof that

3    he had a conversation with Dr. Gorum about Dr.

4    Osei-Mensah's grades?

5    A.  I cannot prove anything about

6    conversations that I was not privy to.

7    Q.  Well, don't you think that would be an

8    important thing for you to know before making a

9    decision as to whether to terminate someone?

10   A.  It makes no difference what I knew about

11   other people's conversations.

12   Q.  So even if --

13   A.  Dr. Gorum admitted that he made these

14   changes.  Dr. Frederick clearly denied that he even

15   gave verbal authorization.  But, in any case, there

16   was no signed authorization.  So the form was not

17   valid.

18   Q.  So let me just get this straight.  Even if

19   Dr. Frederick -- Dean Frederick said to Dr. Gorum, go

20   make these changes, you would still recommend that

21   Dr. Gorum be terminated for making those changes

22   without the Dean's signature?

123

1    A.  There is no proof whatsoever, no proof,

2    that Dr. Frederick made that statement.

3    Q.  Not my question.

4    A.  There is no signature on a document,

5    therefore it is my assumption that independent of

6    what others assert, there is no evidence that that,

7    in fact, occurred.  None.

8    Q.  And if students testified that they were

9    told otherwise, that would be evidence, wouldn't it?

10   A.  No, if students are told by the Dean, I

11   don't deal with this level of grades.  I don't know

12   enough about it, go talk to the Chair, that is the

13   appropriate response from the Chair.

14   Q.  And if students --

15   A.  From the Dean.

16   Q.  -- testified that they met with Dean Gorum

17   about this situation --

18        DR. GWANMESIA:  Dean --

19   BY MR. ZEFF:

20   Q.  -- Dean Frederick about the situation, and

21   that they're aware that Dr. Gorum met with Dean

22   Frederick about the situation, would that change your

124

1    opinion at all?

2    A.  No, because I meet with students all the

3    time about various things and give them no opinion,

4    but tell them, this is the chain of command, go

5    through it, always.

6        I meet with everybody.  I don't make

7    decisions.  In fact, I'm insisting that people assume

8    their authority.

9        Meeting with someone, talking to

10   someone about something, does not mean you approve

11   any of it.

12   Q.  Are you aware --

13   A.  It means you're doing your job.

14   Q.  Are you aware that Dr. Gorum made at least

15   three appointments to see Dean Frederick about

16   changing grades?

17   A.  I'm not aware of anything.  I -- why would

18   I be aware.

19   Q.  Are you aware that Dr. Gorum claims to

20   have made phone calls from the Registrar's Office to

21   Mr. Wickham?

22   A.  I am not aware of any of those.  Why would

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-.

A-000297

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

62 (Page 245)

245

1              C E R T I F I C A T I O N
2              I, TANYA M. CONGO, Certified
3    Professional Reporter, certify that the foregoing is
4    a true and accurate transcript of the foregoing
5    deposition, that the witness as first sworn by me at
6    the time, place and on the date herein before set
7    forth.
8              I further certify that I am neither
9    attorney nor counsel for, not related to nor employed
10   by any of the parties to the action in which this
11   deposition was taken; further, that I am not a
12   relative or employee of any attorney or counsel
13   employed in this case, nor am I financially
14   interested in this action.
15   _____
16   Tanya M. Congo
17   Certified Professional Reporter and Notary Public of
18   the State of Delaware, #189-PS
19
20
21
22

A-000298

**1**

1  IN RE: DELAWARE STATE UNIVERSITY
2       V.
3  WENDELL GORUM, Ph.D.
4       Continuation of the grievance hearing,
5  taken pursuant to notice before Tanya M. Congo, a
6  Notary Public and Certified Professional Reporter, at
7  Delaware State University, MBNA Building, Conference
8  Room 309, 1200 North DuPont Highway, Dover, Delaware,
9  on Friday, October 29, 2004, beginning at
10 approximately 10:05 a.m., there being present:
11      APPEARANCES:
12      SCHMELTZER, APTAKER & SHEPARD, P.C.
13      The Watergate, Suite 1000
14      2600 Virginia Avenue N.W.
15      Washington, DC 20037-1922
16      BY: ROBERT DUSTON, ESQUIRE
17      Attorney for Delaware State University
18      FROST & ZEFF
19      430 Route 70 West
20      Cherry Hill, NJ 08002
21      BY: GREGG L. ZEFF, ESQUIRE
22      Attorney for Dr. Gorum

**2**

1       Also present panel members:
2       Dr. FILIPPO TOSCANO
3       Dr. LAPOINTE DAVIS
4       Dr. GABRIEL GWANMESIA
5       Dr. EDWARD JACKSON
6       Dr. YAW ACKAH, (Panel Chairman)
7
8
9
10      REPLACEMENT COPY
11
12
13
14
15
16
17
18
19
20
21
22

**3**

1              P R O C E E D I N G S
2       MR. ZEFF: Okay. We can start.
3  Whereupon,
4       ANTONIO ALVEREZ,
5  having previously been duly sworn according to law,
6  was examined and testified as follows:
7       MR. DUSTON: Mr. Alverez, this is Rob
8  Duston again.
9       I just have a few more questions.
10      CROSS-EXAMINATION (Cont'd)
11 BY MR. DUSTON:
12      Q.  We pulled your transcript and it's in
13 front of the Committee members right now.
14      It does not show you having actually
15 registered for Radio Station Operations in the spring
16 in which you were originally purged from Sound
17 Production I.
18      Is it your recollection that you
19 actually registered for that class, or was it done
20 privately?
21      A.  It was done privately. I think I had a
22 slip for it.

**4**

1       Q.  You filled out a slip for --
2       A.  Yeah.
3       Q.  -- for Radio Station -- to add Radio
4  Stations Operations?
5       Do you know who taught Radio Station
6  Operations that spring?
7       A.  Well, I was taught under Eric Dodson.
8       Q.  Were you aware that there was a section of
9  Radio Station Operations that was taught by Dr.
10 Kopano that spring, and it had room in it?
11      A.  No.
12      MR. DUSTON: Now, we are talking in
13 the Spring of 2003, where Mr. Alverez testified
14 yesterday that he originally signed up for Sound
15 Production I, was purged. The Records Office shows
16 that he was reinstated a week later.
17      He says he was told by Dr. Gorum that
18 he would be placed in Radio Station Operations as an
19 equivalent. And, then, the grade was given in Sound
20 Production I.
21 BY MR. DUSTON:
22      Q.  So when you were taught by Mr. Dodson

101

1  met with the Provost, he indicated that you cannot
2  contact the -- you should not contact the adjunct for
3  any -- what was the reason again?
4       Why?
5       THE WITNESS: I contacted the
6  Provost's office first, and was told that. And I
7  specifically -- well, I started off trying to see if
8  contracts had been renewed. They said, no, that you
9  can't.
10      I said -- and I gave the names of the
11 professor and asked if I could call to deal with the
12 grade. They said, no, you could not do it.
13      When I met with the Provost, he
14 reaffirmed that position. He said, no, the policy is
15 you cannot contact them --
16      DR. GWANMESIA: Was one of the reasons
17 --
18      THE WITNESS: -- or talk about it with
19 them because they can't charge us.
20      DR. GWANMESIA: Okay. But was one of
21 the reasons you wanted to contact any of them have to
22 do with grades?

102

1       THE WITNESS: Yeah. That's what it
2  was about.
3       DR. GWANMESIA: And you were
4  specifically told that you should not contact them?
5       THE WITNESS: That's correct.
6       DR. GWANMESIA: I just wanted to
7  clarify.
8       DR. ACKAH: If there are no more
9  questions for Dr. Gorum, I suggest we take our break
10 now and come back at 1 o'clock.
11      DR. DAVIS: May I ask just one brief
12 question.
13      Dr. Gorum, to your knowledge, were
14 there other Chairs on campus doing the same kind of
15 things with respect to changing other instructors'
16 grades?
17      THE WITNESS: Yes.
18      DR. DAVIS: And I know we've all said
19 -- and I mean it's been the consensus that it's a
20 common practice, but do you know of specific
21 situations in which Chairs were changing other
22 instructors' grades or instructors' grades in the

103

1  same fashion?
2       MR. DUSTON: Without consultation, I
3  assume?
4       DR. DAVIS: Yes.
5       THE WITNESS: Yes. I had seven Chairs
6  call me and tell me they did the same things in the
7  same semesters that I did. And I actually --
8       MR. DUSTON: And I'd like them all
9  identified for the record.
10      THE WITNESS: Because of reprisals I
11 would be reluctant to identify them.
12      MR. ZEFF: And just so we're clear --
13      DR. ACKAH: No, I want to know --
14      THE WITNESS: And put them in harm to
15 subpoena them.
16      DR. ACKAH: -- why would they call
17 you? What --
18      THE WITNESS: Because it was sympathy.
19 They were being sympathetic.
20      MR. ZEFF: Right.
21      DR. DAVIS: They'd say, well, you
22 know, you're being charged with this, and I've been

104

1  doing the same kind of thing --
2       THE WITNESS: That's correct.
3       MR. ZEFF: You know, if --
4       DR. GWANMESIA: Dr. Davis, did you do
5  that when you were a Chair?
6       MR. DUSTON: Dr. Ackah, I would
7  strongly object and move that that testimony be
8  stricken and excluded.
9       Either this Committee should figure
10 out from those professors whether the situations were
11 identical to what is here, or you should not consider
12 at all the allegation of common practice. Because we
13 have fifty different students with different kinds of
14 situations, and unless you prove that they were done
15 in the same way without consultation, the Committee
16 should not consider the allegation that it's a common
17 practice.
18      MR. ZEFF: Mr. Chair --
19      DR. ACKAH: If you think about it, if
20 we try to include this in our deliberation, we may be
21 compelled to bring in different persons to testify
22 and, then, thereby incriminate them, so we will not

105
1  consider this.
2      MR. ZEFF: And I'd just like to point
3  out that earlier in the proceedings, Dean Frederick,
4  in his first testimony, said there was -- or Bell, I
5  don't know who it was, said there was an ongoing
6  investigation into another professor and you would
7  not allow that professor to be named.
8      MR. ACKAH: Exactly. That's why we
9  won't go into that.
10      MR. ZEFF: And so if you're going to
11  do one, I would ask for the other.
12      DR. ACKAH: No, no names. No names.
13  We don't have that power.
14      Okay. Let's come back at 1 o'clock
15  and, hopefully, we should be able to wrap up
16  everything today.
17      (Recess)
18      DR. ACKAH: We're going to start with
19  Robert cross-examining Dr. Gorum.
20      MR. ZEFF: Yes.
21      CROSS-EXAMINATION
22  BY MR. DUSTON:

106
1      Q. Dr. Gorum, you admit that all of these
2  grade change forms that have been introduced, are
3  ones that you signed, correct?
4      A. Well, yeah, but there are some that I did
5  not sign.
6      Q. I'm sorry. All the ones that have Wendell
7  J. Gorum on them and that are stated in the Amended
8  Statement of Charges are ones that you signed as
9  either a grade change form or removal of incomplete?
10      A. For the most part, but there are a couple
11  that I did not sign with my name on them.
12      Q. Then, we'll go through them section by
13  section. I want to start with the four grade changes
14  for Dr. Wickham's Ethics in the Media class, that's
15  behind Tab 11 in the white book.
16      All four of those are grade changes
17  that you signed in Professor Wickham's Ethics in the
18  Media class January 8th, 2004, correct?
19      A. Correct.
20      Q. And you signed those and hand carried
21  those down to the Registrar's Office, correct?
22      A. Correct.

107
1      Q. Isn't it also correct that no one was
2  there on that day?
3      A. I think Ms. Bowers' testimony was that
4  she was not there and that these were just dropped
5  off at the Registrar's Office on January 8th?
6      A. That is correct.
7      Q. Right? All right. Now, Dr. Wickham --
8  Professor Wickham previously went through his
9  materials --
10      MR. DUSTON: This, just for the
11  Committee's reference, is the materials that he had
12  referred to, including his final grade roster, a
13  syllabus for Ethics in the Media, and his examples
14  that he talked about on his midterm -- on his final.
15  BY MR. DUSTON:
16      Q. Now, Professor Wickham turned in his
17  grades on December 16th, 2003, according to the final
18  grade roster; is that correct?
19      A. He never turned them in to me.
20      Q. You didn't see -- he didn't them into the
21  Chair prior to turning these into the Registrar's
22  Office?

108
1      A. Not to me, no.
2      Q. All right. What was the first
3  communication you had with Mr. Fleming, Mr. McClain,
4  Mr. Domichi's(ph.) and Mr. Olifant(ph.) regarding Dr.
5  Wickham -- Professor Wickham's grades?
6      A. What was the first --
7      Q. All right. Let me rephrase that. Did any
8  of these students come to you between the time that
9  these grades were given, December 16th, and January
10  8th, 2004, when the grade changes were submitted?
11      A. Yes.
12      Q. Which students came and talked to you?
13      A. I talked to McClain, Olifant and Domichi.
14      Q. Okay. You didn't talk to Howard Fleming?
15      A. I don't remember, but I'm sure I did.
16      Q. Okay. What was the nature of your
17  conversation with Mr. McClain?
18      A. Basically -- I don't remember the details,
19  but that was the -- one of the quizzes in which he
20  and others tried to take during the summer. The
21  class did not meet because there were not enough
22  students.

221

1    Q.  And in those cases where you didn't have
2    either, what did you do?
3        A.  There were some students' grades I did not
4    change.
5        Q.  The roster that we're looking at for the
6    final grade roster is at Tab 40.
7            Dr. Gorum, without going through them,
8    every grade -- there were six Bs and As that were
9    unchanged, and every other grade got raised, either
10   incomplete or a C or lower.
11       A.  I'm sorry.  What's your -- what's your --
12       Q.  My question is, isn't it true that every
13   grade other than a B or an A got raised for thirteen
14   of the nineteen students?
15           MR. ZEFF:  It is what it is.
16           THE WITNESS:  Yeah.
17   BY MR. DUSTON:
18       Q.  Very well.  Dr. Gorum, you raised the
19   issue yesterday, possibly the day before -- change of
20   subject.  Is it your claim that the President is
21   retaliating against you for actions taken on behalf
22   of students?

222

1            DR. ACKAH:  Dr. Gorum, if you do not
2    answer, it's up to you to decide.
3            MR. DUSTON:  Well, Dr. Gorum testified
4    about it two days ago, about all the acts of
5    retaliation.  So I guess if he's not raising that
6    claim now --
7            DR. ACKAH:  Yes, that's what I'm
8    saying, it's up to you.
9            THE WITNESS:  Okay.  I had someone --
10           MR. ZEFF:  It's a yes or no question.
11           THE WITNESS:  Yes.
12           DR. ACKAH:  Yes, that it's retaliation
13   against you?
14           THE WITNESS:  What?
15           DR. ACKAH:  You maintain that is
16   retaliation against you?
17   BY MR. DUSTON:
18       Q.  And it's your claim that it's retaliation
19   for the actions that you've taken on behalf of
20   students and faculty, correct?
21       A.  Yes.
22       Q.  Of the four students who are currently

223

1    suing the University, other than -- or have been,
2    other than Deshon Morris, are you financing any of
3    the other litigation?
4        A.  No.
5        Q.  You're not contributing money to Mr.
6    Bellamy or to anybody else towards their litigation?
7        A.  No.
8        Q.  What students have you financed in the
9    past?
10       A.  Morris, definitely, and the others I
11   cannot recall names.
12           DR. DAVIS:  What's the relevance of
13   that to this particular situation?
14           MR. DUSTON:  Well, it happened around
15   two days ago.
16           DR. DAVIS:  Yes, I know that, that he
17   testified that he helped finance students.
18           MR. DUSTON:  Then, let me ask this,
19   Dr. Davis.
20   BY MR. DUSTON:
21       Q.  Dr. Gorum, do you have any direct or
22   circumstantial evidence that the President is

224

1    retaliating against you?
2        A.  I was told this by someone in his office.
3        Q.  All right.  So we have hearsay.  Who told
4    you in his office that this was an act of
5    retaliation?
6        A.  That's something I don't really think I
7    should divulge.
8            DR. ACKAH:  Yeah, you need to be
9    careful about how you answer.
10           THE WITNESS:  I know, but that was --
11   that was --
12           DR. ACKAH:  Okay.  Be careful.
13           THE WITNESS:  Yes.
14           DR. ACKAH:  You can ask a follow-up
15   question if you want to.
16           MR. ZEFF:  Ask a follow-up question.
17           MR. DUSTON:  Are you allowing him to
18   refuse to answer that question?
19           DR. ACKAH:  No, but I'm telling him to
20   be careful.
21   BY MR. DUSTON:
22       Q.  All right.  What were you told

225

1  specifically by this person in the President's
2  office?
3       MR. ZEFF:  Without using the name.
4       THE WITNESS:  That -- basically that
5  he was upset about being removed as speaker.
6       And I should also say that he -- when
7  I say, he, the President had issued a threat to the
8  football coaches, and -- the President and the Vice
9  President, but I can say unfortunate, fortunate,
10 whatever, of course the coaches eventually were
11 fired, and will testify to that.
12 BY MR. DUSTON:
13      Q.  But did this person connect those two
14 issues, the President saying something about the
15 speaker or the threat to his decision to suspend and
16 initiate these proceedings?
17      A.  No, I would -- I was trying to give you
18 more than one instance or reason.
19      DR. ACKAH:  I understand what he is
20 saying.  If it wasn't related to this issue, then,
21 you cannot use it to support your claim that the
22 President was trying to get back at you.

226

1       MR. ZEFF:  The question was -- the
2  original question was, what circumstantial or other
3  evidence do you have that he was retaliating.  And he
4  was specifically giving you facts.
5       DR. ACKAH:  Against him?  Against him?
6       MR. ZEFF:  Yes.  And he was stating
7  those facts.  And, then, the follow-up question was,
8  did anybody specifically link the events together,
9  and the answer is no.
10      DR. DAVIS:  Now, when you say he was
11 removed, he being the President was removed as a
12 speaker; is that what you're saying?
13      THE WITNESS:  Yeah.
14      DR. ACKAH:  The President was removed
15 as a speaker.
16      MR. DUSTON:  At the Martin Luther King
17 Breakfast.  This was discussed two days ago.
18      MR. ZEFF:  Yes.
19      MR. DUSTON:  He was signed up to be a
20 speaker and, then, got bounced by Dr. Gorum in favor
21 of another speaker.
22      MR. ZEFF:  I don't know if that

227

1  characterization is perfect, but --
2       DR. DAVIS:  So you're saying that Dr.
3  Sessoms was invited or was being considered to be the
4  keynote speaker, something like that?
5       MR. ZEFF:  Just the other way around.
6  He was non-invited.  There were other speakers lined
7  up, and someone invited him accidentally not knowing
8  that other speakers were lined up, and he was taken
9  off.
10      THE WITNESS:  It was accidental.
11      DR. DAVIS:  So he perceived it as --
12      THE WITNESS:  He was invited but we
13 had already committed to someone.  So the offer had
14 to be rescinded.
15      DR. DAVIS:  Oh, I see.
16 BY MR. DUSTON:
17      Q.  Dr. Gorum, let me just finish with this
18 line of questions.
19      If a problem comes up with a student's
20 grades or their record, or any issue arises involving
21 students' grades, who is the person to whom the
22 University should go or the outside world should go

228

1  to determine whether or not it's a legitimate issue?
2       MR. ZEFF:  Objection.
3  BY MR. DUSTON:
4       Q.  Let me rephrase that.  What does it mean
5  when a professor's name is listed on the record as
6  having been professor of a particular course?
7       MR. ZEFF:  What's it mean?
8  BY MR. DUSTON:
9       Q.  What's it mean?  What's it mean to the
10 wider world?
11      MR. ZEFF:  I'm not sure I understand,
12 but you can --
13      DR. ACKAH:  Can you rephrase the
14 question.
15 BY MR. DUSTON:
16      Q.  Is there any -- I want to get into your
17 view of the --
18      DR. ACKAH:  You mean the significance
19 or --
20 BY MR. DUSTON:
21      Q.  The significance.  What rights does an
22 instructor of record have to control his or her own

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004 .

64 (Pages 253 to 254)

253

1         INDEX
2    Grievance hearing of Dr. Wendell Gorum
3          Friday, October 29, 2004
4
5   Examination of:              PAGE
6   Antonio Alverez
7   (By Mr. Duston)             3, 24
8   (By Mr. Zeff)              17
9   Dean Tommy Frederick
10  (By Dr. Ackah)             28
11  (By Dr. Gwanmesia)         35, 46
12  (By Mr. Duston)            37
13  (By Dr. Davis)             40
14  (By Dr. Toscano)           53
15  (By Mr. Zeff)              54
16  Dr. Wendell Gorum
17  (By Mr. Zeff)              90, 232
18  (By Mr. Duston)           105
19        EXHIBITS
20  NAME          DESCRIPTION          PAGE
21  (None)
22

254

1        C E R T I F I C A T I O N
2          I, TANYA M. CONGO, Certified
3   Professional Reporter, certify that the foregoing is
4   a true and accurate transcript of the foregoing
5   deposition, that the witness as first sworn by me at
6   the time, place and on the date herein before set
7   forth.
8          I further certify that I am neither
9   attorney nor counsel for, not related to nor employed
10  by any of the parties to the action in which this
11  deposition was taken; further, that I am not a
12  relative or employee of any attorney or counsel
13  employed in this case, nor am I financially
14  interested in this action.
15  _____
16  Tanya M. Congo
17  Certified Professional Reporter and Notary Public of
18  the State of Delaware, #189-PS
19
20
21
22                                              A-000304

# ORIGINAL 1

IN THE CHANCERY COURT OF THE STATE OF DELAWARE
IN AND FOR KENT COUNTY

DASHAUN MORRIS,                    )
    Petitioner,        )
           )
    v.                       )  C.A. Number
           )  1571-K
DELAWARE STATE UNIVERSITY,         )
    Respondent.        )

    Deposition of **DASHAUN MORRIS**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 410 South State
Street, Dover, Delaware, on Tuesday, September 9, 2003,
beginning at 10:00 a.m.

APPEARANCES:

   SCHMITTINGER & RODRIGUEZ
   BY:  CATHERINE T. HICKEY, ESQUIRE
   and NOEL E. PRIMOS, ESQUIRE
   410 South State Street
   Dover, Delaware  19901
   Attorney for Petitioner.

   JACOBS & CRUMPLAR
   BY:  DAVID A. ARNDT, ESQUIRE
   PO Box 1271
   Wilmington, Delaware  19801
   Attorney for Defendants.

  **ORIGINAL RETAINED BY CATHERINE T. HICKEY, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

2

1                      DESHAUN MORRIS,

2           the witness herein, having first been

3           duly sworn on oath, was examined and

4           testified as follows:

5    BY MS. HICKEY:

6           Q.    Good morning, Mr. Morris.

7           A.    Good morning.

8           Q.    My name is Catherine Hickey.  I represent

9    Delaware State University on a regular basis and, in

10   particular, in connection with this action that you have

11   filed against it.

12                I'm going to ask you some questions today.

13   I would ask that you respond verbally and not say uh-huh

14   or unh-unh or shake your head, because the court

15   reporter is taking down what we say and she will have

16   difficulty interpreting any nonverbal answers.

17                If you don't understand the question, please

18   feel free to let me know that.  If you provide me with

19   an answer, I will know that you have understood the

20   question and that your answer is to the question that I

21   have asked.  All right?

22          A.    All right.

23                (Following a discussion off the record:)

24

33

1          Q.    What was your purpose in talking to

2     Dr. Gorum?

3          A.    Initially?

4          Q.    All right, initially.

5          A.    I was referred to Dr. Gorum.

6          Q.    Who referred you to Dr. Gorum?

7          A.    I was referred to Dr. Gorum.  I am not sure.

8     I think it was an Alpha, but I'm not sure.

9          Q.    I'm sorry.  Who?

10         A.    Alpha, a member.

11         Q.    A member of Dr. Gorum's fraternity?

12         A.    Yes.

13         Q.    Are you a member of that fraternity?

14         A.    No, I'm not.

15         Q.    Was it a student member of the fraternity?

16         A.    Yes, I think so.  I was in his -- It was the

17    ETV Building.  At least someone told me to speak to him

18    about the situation, and I did.

19         Q.    What situation were you going to speak to

20    him about?

21         A.    About my school situation.

22         Q.    Where in the process of your school

23    situation were you talking to Dr. Gorum?

24         A.    Do you mean at what point when I decided to

A-000307    DSU-07059

34

```
 1   speak to him?

 2        Q.   Yes.

 3        A.   I believe this was at the beginning.

 4        Q.   At the beginning?

 5        A.   Uh-huh.

 6        Q.   Before the zero tolerance subcommittee

 7   hearing?

 8        A.   You said before --

 9             MR. ARNDT:  That is the December 11th

10   hearing or --

11             MS. HICKEY:  Yes.

12             THE WITNESS:  That is the December?  It was

13   afterwards.

14   BY MS. HICKEY:

15        Q.   It was after the December 11th hearing?

16        A.   Yes.

17        Q.   Was it after the December 16, '02 letter

18   from Dr. Smith?

19        A.   It was before that.

20        Q.   So it was between the 11th and the 16th of

21   December?

22        A.   Yes.  It was right after I found that I was

23   being expelled.

24        Q.   Did you find out you were immediately
```

35

1    expelled before you received Dr. Smith's December 16,

2    '02 letter?

3         A.    The December 16, '02 letter?  I believe when

4    I received the letter is when I found out everything.

5         Q.    So it was after you received that letter

6    from Dr. Smith that you went to talk to Dr. Gorum?

7         A.    Yes, stating that I was expelled.

8         Q.    And you were in the ETV Building, and

9    someone suggested that you go talk to Dr. Gorum?

10         A.    Again, I was being advised by different

11    people on help to get out of this situation, and I was

12    advised to go see Dr. Gorum.

13         Q.    And that was a student that advised you to

14    do that?

15         A.    Yes.

16         Q.    And what did you want Dr. Gorum to do?

17         A.    Well, at that point I just wanted to let him

18    know of my situation, to see if there was anything I

19    could do.

20         Q.    What did you tell Dr. Gorum?

21         A.    I explained to him what happened, the

22    whole -- when he came to my room, I explained to him the

23    personal letter, everything.

24         Q.    Well, can you tell me, to the best of your

36

1    recollection, exactly what you told him?

2         A.    That Sergeant Crippen and some members came

3    to my room and searched my room for the possession of a

4    handgun, the first appeal that I -- the first hearing

5    that I went to, why I had it, and what was my status

6    now.

7         Q.    And what did Dr. Gorum tell you?

8         A.    What did he tell me?  What did he say?  Now,

9    after we spoke and I let him know of everything that was

10   going on, we really didn't speak too much.  He told me

11   to come back and see him in a couple of days.

12        Q.    Did you go back and see him in a couple of

13   days?

14        A.    Yes, I did.

15        Q.    And what did you talk about then?

16        A.    Where we left off at and where I was at in

17   my situation, my hearings and things.

18        Q.    And did Dr. Gorum give you any advice?

19        A.    Yes, he spoke.

20        Q.    What did Dr. Gorum tell you?

21        A.    Basically, to appeal it and basically to

22   talk about everything that happened to me from the

23   beginning, when he came to my room.

24        Q.    And Dr. Gorum suggested that you appeal it?

37

```
 1          A.    Well, it.wasn't just him, but yes, he did.

 2          Q.    Well, let's just remain focused on Dr. Gorum

 3    for a few minutes, because that is what I thought we

 4    were talking about.

 5                Okay.  Did Dr. Gorum recommend that you

 6    appeal it?

 7          A.    Yes, he did.

 8          Q.    Did he help you write the letter that is in

 9    front of you?

10          A.    Yes.

11          Q.    How much input did he have in this letter?

12          A.    Percentage-wise, I couldn't --

13          Q.    Who typed the letter?

14          A.    I typed my letter.  Well, I was in his

15    office, so I typed it.

16          Q.    You typed it in his office?

17          A.    Uh-huh.

18          Q.    All right.  Did he tell you what to put in

19    the letter?

20          A.    He commented on a few things.  I wrote the

21    letter.  He helped me, though.

22          Q.    Okay.  Now, when you went to the zero

23    tolerance subcommittee hearing in December of '02,

24    December 11th of '02, did you plead responsible to the
```

38

```
1    charge?

2         A.    Yes, I did.

3         Q.    And then after they imposed the discipline

4    on you, then you decided to appeal it?

5         A.    Yes.

6         Q.    And that was after you talked to Dr. Gorum,

7    among others?

8         A.    Yes.

9         Q.    Who else did you talk to?

10        A.    As far as appealing it?

11        Q.    Yes.

12        A.    My mother, my coach, my family.

13        Q.    By your coach, do you mean Coach Blacknall?

14        A.    Yes.

15        Q.    And what did Coach Blacknall recommend?

16        A.    If I had reason to appeal, I should do it.

17        Q.    And did you feel you had reason to appeal?

18        A.    Yes.

19        Q.    And what did you think the reason was?

20        A.    There was many reasons.  One, in my letters,

21   it was lack of due process.  And also, the reason why I

22   had the possession of the handgun, which was in my

23   personal letter, those were the reasons why I wanted to

24   appeal.
```

53

1   that you would take the handgun back to New Jersey, to

2   your childhood residence.

3              Now, is that correct?  Is it correct that

4   your handgun never came out of your dormitory?

5        A.    Is that correct in the --

6        Q.    No.  It is in your Complaint.  Do you need a

7   copy of your Complaint?

8              MR. ARNDT:  What page?

9              MS. HICKEY:  My copy doesn't have page

10  numbers.  It is paragraph five.

11             THE WITNESS:  And where is it?

12  BY MS. HICKEY:

13       Q.    It is at the end of the last sentence in the

14  paragraph.

15       A.    I don't recall taking my hand -- That

16  handgun, I don't recall it.

17       Q.    So you didn't take it back to New Jersey?

18       A.    No.

19       Q.    Let me show you another letter dated

20  February 6th.

21             MS. HICKEY:  That will be marked as

22  Morris 6.

23

24             (Morris Exhibit Number 6 was marked for

54

1    identification and attached to the record.)

2    BY MS. HICKEY:

3        Q.    Do you recognize that letter?

4        A.    Yes.

5        Q.    It is a letter to you, telling when your

6    Student Disciplinary Appeals Council hearing will be?

7        A.    Yes.

8        Q.    Was it your understanding that this is in

9    response to Morris 4, which is your letter to Ms. Pitts?

10        A.    I believe so, I think, yes.

11        Q.    Did you attend this hearing?

12        A.    Yes.

13        Q.    Did you have anybody with you to serve as an

14    advisor?

15        A.    Well, I had -- when you say serve as an

16    advisor, inside the hearing, while I was in there?

17        Q.    Yes.

18        A.    Yes, Dr. Gorum.

19        Q.    Dr. Wendell Gorum was there with you?

20        A.    Yes.

21        Q.    Did you present any witnesses?

22        A.    Well, I had a witness there, but they didn't

23    get to speak.

24        Q.    Who was the witness?

64

1    of -- I mean appealing this, the one-year suspension.

2         Q.    Okay.  Let me show you this letter and see

3    if this is what you are talking about.

4              (Morris Exhibit Number 8 was marked for

5    identification and attached to the record.)

6    BY MS. HICKEY:

7         Q.    Is that the letter that you were speaking

8.   of --

9         A.    Uh-huh, yes.

10        Q.    -- dated March 20th?  And we have now marked

11   that as Morris 8.  Did you receive any assistance in

12   writing this letter?

13        A.    Yes, I did.

14        Q.    And who was it that you received assistance

15   from?

16        A.    Dr. Gorum.

17        Q.    Wendell Gorum?

18        A.    Yes.

19        Q.    There is a handwritten telephone number and

20   name or word at the top of that page.  Do you recognize

21   that writing?

22        A.    Yes.

23        Q.    Whose writing is that?

24        A.    Mine.

141

1    State of Delaware    )
                          )
2    Kent County          )

3

4                CERTIFICATE OF REPORTER

5         I, Cheryl A. Anthony, Delaware Certified Shorthand
     Reporter, Cert No. 107-PS, certify that there came
6    before me on the 9th day of September, 2003, the
     deponent herein, DASHAUN MORRIS, who was duly sworn by
7    me and thereafter examined by counsel for the respective
     parties; that the questions asked of said deponent and
8    the answers given were taken down by me in Stenotype
     notes and thereafter transcribed into typewriting under
9    my direction.

10        I further certify that the foregoing is a true and
     correct transcript of the testimony given at said
11   examination of said witness.

12        I further certify that I am not counsel, attorney,
     employee, or relative of either party, or otherwise
13   interested in the event of this suit.

14

15        _____
                Cheryl A. Anthony
16              Delaware Certified
                Shorthand Reporter
17              Cert. No. 107-PS

18

19   DATED:    9/17/03

20

21

22

23

24



IN THE CHANCERY COURT OF THE STATE OF DELAWARE
IN AND FOR KENT COUNTY

DASHAUN MORRIS,                          )
            Petitioner,                  )
                                         )
            v.                           )  C.A. Number
                                         )  1571-K
DELAWARE STATE UNIVERSITY,               )
            Respondent.                  )

            Deposition of **DR. CHARLES SMITH**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Schmittinger & Rodriguez, 52 The Green, Dover,
Delaware, on Thursday, October 2, 2003, beginning at
11:30 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  CATHERINE T. HICKEY, ESQUIRE
        and NOEL E. PRIMOS, ESQUIRE
        410 South State Street
        Dover, Delaware  19901
        Attorney for Petitioner.

        JACOBS & CRUMPLAR
        BY:  DAVID A. ARNDT, ESQUIRE
        PO Box 1271
        Wilmington, Delaware  19801
        Attorney for Defendants.

        ORIGINAL RETAINED BY DAVID A. ARNDT, ESQUIRE

        ANTHONY REPORTING
        PO Box 234
        Dover, Delaware  19903
        (302) 674-8884

A-000317

DSU-07447

5

1    in charge of enrollment, I talk with the compliance

2    officer basically to make sure that the athletes are

3    cleared for registration.

4        Q.    If you could, explain what the compliance

5    office does? What is their function at the university?

6        A.    The compliance officer is the regulatory

7    person for athletics, for NCAA regulations, making sure

8    they are adhered to, policies and procedures.

9        Q.    Are you familiar with the NCAA regulations?

10        A.    For the most part; they change. There may

11    be new regulations that are added each year, yeah.

12        Q.    And in Mr. Morris's current situation, you

13    are aware of the compliance issue regarding his

14    eligibility to attend classes during the spring of 2003;

15    is that correct?

16        A.    That was brought to my attention, as I

17    recall, maybe June, July, somewhere during that time.

18        Q.    And what is your understanding of those

19    regulations and how his eligibility to be enrolled in

20    classes are affected by those regulation?

21        A.    Based on my conversation with Kim Walker,

22    who is the compliance officer with the university, and

23    the athletic director, Dr. Hallie Gregory, and my

24    reading of the regulations, it would mean that

6

1    Mr. Morris would have had to have been eligible to

2    attend school in the spring in order to be eligible to

3    play football in the fall.

4              MR. ARNDT:  I would like to have this marked

5    as Smith 1, please.

6              (Smith Exhibit Number 1 was marked for

7    identification and attached to the record.)

8              MR. ARNDT:  I would like to hand Dr. Smith a

9    letter dated July 8, 2003 that he wrote.  Do you want to

10   see it first?

11             MR. PRIMOS:  No.  I believe we have that.

12   BY MR. ARNDT:

13        Q.   Dr. Smith, I am handing you what we have

14   marked as Smith Exhibit Number 1, dated July 8, 2003

15   from you to Dr. Hallie Gregory.  If you could, take a

16   moment and just read that letter, please.

17             Is that your signature at the bottom of the

18   letter?

19        A.   Yes, it is.

20        Q.   Did you draft that letter?

21        A.   Yes, I did.

22        Q.   Now, if you could explain, what was the

23   purpose of this letter?

24        A.   I was asked by the athletic director,

7

1    Dr. Hallie Gregory and Ms. Kim Walker, who is the

2    compliance officer, whether or not Mr. Morris was

3    eligible to return to school during the spring of the

4    year. And they asked me to send in writing my decision.

5        Q.    Now, when you did this letter, were you

6    aware of the NCAA regulation that would prohibit him

7    from participating on the football team if he was not

8    eligible?

9        A.    I had been made aware of that, as I recall,

10   sometime in the middle of June to closer to the

11   beginning of the July.

12       Q.    Were you aware of that when you wrote this

13   letter?

14       A.    On July 8th?

15       Q.    Yes.

16       A.    Yes.

17       Q.    And you were aware that as a consequence of

18   this letter, he would be prohibited from participating

19   on the football team?

20       A.    I was not asked to determine that. I was

21   simply asked to verify whether or not he was eligible to

22   return to school.

23       Q.    Okay. That wasn't what I asked, though.

24   Were you aware that when you wrote this letter, that

A-000320

DSU-07453

8

1    that would prohibit him under the NCAA regulations from

2    participating on the football team?

3         A.    No.

4         Q.    No?  Even though you are aware of that

5    regulation?

6         A.    Because at that time Ms. Walker and

7    Dr. Gregory, they were still talking with the NCAA

8    because they said that there may be a possibility that

9    they could work or do something else with the NCAA.  The

10    NCAA may give them what they usually call some leeway to

11    function, deal with that.

12         Q.    Okay.  Now, this determination that he was

13    not eligible to return to the university during the

14    spring 2003 semester, did you discuss that determination

15    with President Sessoms?

16         A.    Not to my knowledge.

17         Q.    Okay.  This determination, was that up to

18    your discretion?

19         A.    Which determination?

20         Q.    This determination that you made --

21         A.    Based on the letter?

22         Q.    Yes.

23         A.    This determination was based on the record.

24         Q.    And what record is that?

A-000321        DSU-07454

14

1          A.      Yes.

2          Q.      Okay.  And again, the reasoning and the

3     justification would have been because of the zero

4     tolerance policy?

5          A.      Yes.

6          Q.      Okay.  Have you discussed that issue about

7     the attending classes during the appeals period with

8     anyone other than the coach, I think, that you had

9     mentioned?

10         A.      I didn't discuss this with the coach during

11    the appeals period.  When I discussed this with the

12    coach, it was in July.  It was probably about two days

13    or three days before this letter.

14         Q.      Did you discuss that issue with President

15    Sessoms?

16         A.      President Sessoms, we did not discuss

17    Mr. Morris's eligibility for attending class at all.

18         Q.      Okay.  And you mentioned --

19         A.      Correction.  We did have a discussion.  But

20    the discussion was I was asked whether Mr. Morris was

21    eligible to attend class for the fall of the year 2003.

22    And my answer was yes, because he had permission to go

23    to summer school and to attend classes in the fall of

24    2003.

**A-000322**                              DSU-07460

15

1       Q.    But not the spring?

2       A.    Not the spring.

3       Q.    Whose discretion was it or who was

4  responsible at the university for determining whether or

5  not Dashaun could attend classes during his appeals

6  period? Who would that rest with?

7       A.    That would rest with me.

8       Q.    And you mentioned previously that if that

9  had been requested, that you would have denied it

10  because of the zero tolerance policy.

11       A.    Yes.

12       Q.    Could you describe the zero tolerance policy

13  and how that would affect your decision?

14       A.    We had zero tolerance on what we call major

15  violations. We consider major violations, assault and

16  battery is one; possession of a weapon on campus, two;

17  and possession and intent to distribute drugs, any kind

18  of drugs; and we have a zero tolerance policy on

19  underage drinking.

20            In terms of that, a decision is made when a

21  student is suspended pending a hearing or expelled

22  pending a hearing. We do not bring those students who

23  fall in those violations back into the population until

24  we are certain there is no clear and present danger

20

1             (Smith Exhibit Number 2 was marked for

2       identification and attached to the record.)

3       BY MR. ARNDT:

4             Q.    If you could, take a minute and take a look

5       at that for me, please.

6             A.    Yes.

7             Q.    Is that your signature?

8             A.    Yes, it is.

9             Q.    And this is a letter to Mr. Morris stating

10      that his sanction of expulsion had been reduced to a

11      suspension from the university for the spring semester.

12      Is this letter in response to what President DeLauder

13      had directed you, as far as reducing the suspension from

14      a year to one semester?

15            A.    Yes.

16            Q.    Backing up to the first paragraph, the last

17      sentence says:  You are permitted to return to the

18      university for the fall 2003 semester on a limited

19      disciplinary probation.  And then the next paragraph:

20      While on limited disciplinary probation, you are only

21      permitted to participate on the football team.

22            Did you get direction regarding Mr. Morris's

23      participation on the football team from Dr. DeLauder?

24            A.    The then-President DeLauder conversation was

A-000324        DSU-07466

21

1    he did not want us to do anything to prohibit Mr. Morris

2    from playing football.  As you are aware, according to

3    our student handbook, if you are on probation, you can't

4    participate in a varsity sport.

5         Q.    So in effect, Dr. DeLauder was asking you to

6    have an exception to that --

7         A.    Yes.

8         Q.    -- and permitting him to do that?

9         A.    Yes.

10        Q.    And the NCAA rules obviously prohibit his

11   participation if he wasn't eligible to attend classes.

12   That is correct, isn't it?

13        A.    According to what we found out in July.

14        Q.    Okay.  And what prohibits you in your

15   discretion from advising the compliance office that in

16   Dashaun's case, he would have been eligible to attend

17   classes during his appeals period and thereby allow him

18   to participate on the football team?

19             MR. PRIMOS:  I have the same objection to

20   the phrase would have been.  I don't know what you mean

21   by that.

22             MR. ARNDT:  Under the same circumstances

23   that we have jumped through this hoop before.

24             MR. PRIMOS:  Under exactly what

A-000325     DSU-07467

33

1    attending summer school.  And if I recall correctly,

2    either the President called me or he had someone in his

3    office to call me and tell me that he wanted Mr. Morris

4    to be able to go to summer school.

5            And that is when I drafted the letter that

6    indicated he could attend summer school.  In our

7    previous conversation, when the President indicated he

8    wanted to place him on a one-semester suspension, the

9    conversation of summer school was never discussed.

10        Q.    Now, you refer to President.  Are we talking

11   about Dr. DeLauder?

12        A.    Dr. DeLauder, the former President.

13        Q.    When did Dr. Sessoms become President?

14        A.    July 1st.

15        Q.    It's my understanding and Mr. Morris has

16   testified that when he returned to the fall of 2003

17   semester, that he was advised by the President's Office

18   that his suspension was now for one year again.

19           Have you had any conversations with

20   President Sessoms about extending his suspension for

21   another semester?

22        A.    The President never said anything to me

23   about extending his suspension to another semester.  In

24   our conversation, he simply stated that that decision

A-000326          DSU-07479

34

1    was a bad decision, that he shouldn't have been in

2    school.  And I shared with him that the policy indicated

3    that he had been placed on a one-semester suspension and

4    he was trying to attend school in the fall, and we left

5    it at that.

6              (Following a discussion off the record:)

7    BY MR. ARNDT:

8         Q.    Now, I would like to hand you an exhibit

9    that we had marked in Dr. Toscano's deposition.  This is

10   Toscano 2, a letter from you to Dr. Toscano, Ms. Batson,

11   and Ms. Addo.

12        A.    Uh-huh.

13        Q.    You have seen that letter before; is that

14   correct?

15        A.    Yes.

16        Q.    Did that letter prompt the meeting on

17   March 7th, I believe it was?  I believe you have heard

18   testimony, and we have discussed that meeting.

19        A.    Yes.

20        Q.    You have heard testimony today from

21   Dr. Toscano, stating that his impression was that there

22   was a vote finding Dashaun not responsible.  And you are

23   aware of Dr. Toscano's position; is that correct?

24        A.    Yes.

A-000327

DSU-07480

45

1    State of Delaware      )
                            )
2    Kent County            )

3

4                    CERTIFICATE OF REPORTER

5         I, Cheryl A. Anthony, Delaware Certified Shorthand
     Reporter, Cert No. 107-PS, certify that there came
6    before me on the 2nd day of October, 2003, the deponent
     herein, DR. CHARLES N. SMITH, who was duly sworn by me
7    and thereafter examined by counsel for the respective
     parties; that the questions asked of said deponent and
8    the answers given were taken down by me in Stenotype
     notes and thereafter transcribed into typewriting under
9    my direction.

10        I further certify that the foregoing is a true and
     correct transcript of the testimony given at said
11   examination of said witness.

12        I further certify that I am not counsel, attorney,
     employee, or relative of either party, or otherwise
13   interested in the event of this suit.

14

15   _____

16                              Cheryl A. Anthony
                                Delaware Certified
17                              Shorthand Reporter
                                Cert. No. 107-PS

18

19   DATED: _____

20

21

22

23

24

                    Anthony Reporting
                     (302) 674-8884

**A-000328**

DSU-07491

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,                     )
                                          )
          Plaintiff,                   )
                                          )          Civil Action No. 06-565-GMS
     v.                                 )
                                          )
ALLEN L. SESSOMS, Ph.D.,                  )
                                          )
        and                          )
                                          )
BOARD OF TRUSTEES OF                      )
DELAWARE STATE UNIVERSITY,                )
                                          )
        Defendants.                  )

### DECLARATION OF MARK FARLEY
### IN SUPPORT OF DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

I, Mark Farley, hereby declare as follows:

    1. I am over the age of 18. I am making this declaration based upon my personal knowledge. If called upon to testify at trial, I could and would competently testify to the following.

    2. I am currently employed as Vice President for Human Resources and Legislative Affairs for Delaware State University, a position that I have held since February 2004. My prior positions include acting as Associate Vice President of Human Resources at Frederick Community College and various Human Resources and Labor Relations positions in the public and private sector. While I have a J.D. degree, I am not and do not hold out to be practicing as an attorney at law. However, one of my duties at DSU includes retaining outside counsel to represent the Board of Trustees on various matters, and communicating between the University Administration and outside counsel.

    3. Within the first weeks after I started at DSU, I was advised by Registrar Glen Parker of the investigation he had undertaken into grade adjustments and changes by Dr. Wendell Gorum. I reviewed the relevant provisions of the Collective Bargaining Agreement (CBA) and all materials that had been gathered by Registrar Parker. I also advised Registrar Parker and Dean Frederick regarding additional information that was needed.

4. After reviewing the evidence, I reached the conclusion that the evidence and the alleged conduct was such that dismissal might be a possible sanction. I then briefed President Sessoms on the information available and the next steps under the CBA.

5. I was present during the initial meeting between Dean Frederick and Dr. Gorum, which was pursuant to CBA §10.4.4. Dr. Scott King, who was then head of the AAUP unit, was also present. I took notes. Dean Frederick's description of this meeting during his testimony before the Ad Hoc Dismissal Committee is consistent with my notes and recollection.

6. Relatively early in the process I first consulted with outside counsel Robert Duston, whose practice concentrates on employment law and higher education law, for advice regarding the Gorum matter.

7. Based upon my review of the evidence and Dr. Gorum's statements, I believed that it was appropriate to move towards dismissal proceedings, and I recommended this to President Sessoms. I was subsequently advised to proceed with the CBA procedures, and I did so. I worked with the American Association of University Professors (AAUP) on the selection of the members of the Ad Hoc Dismissal Proceeding, and then turned the matter over to outside counsel to develop and present the University's case to the Committee.

8. I was unaware, until I was advised that Dr. Gorum had mentioned it in the Ad Hoc Dismissal Committee proceedings, that Dr. Gorum had any involvement in the lawsuit that had been filed by DeShaun Morris in the Fall of 2003.

9. I was involved in periodic discussions with President Sessoms from the time I first raised the grade change investigation through the Board's decision. At no time did I hear President Sessoms make any reference to any conduct of Dr. Gorum other than the grade adjustments, or reference to any of the prior activities that Dr. Gorum has claimed in this lawsuit are protected.

10. I was present at the April 14, 2005 meeting of the Board of Trustees where the Ad Hoc Dismiss Committee Report was discussed. To the best of my recollection the Briefs of the parties had been provided to the Board the prior month, before the Committee Report was received. The Report was provided to the Board on the day of the meeting to ensure the discuss was kept confidential.

11. I handled the majority of the questions posed by the members of the Board. The remarks of President Sessoms were basically the same as the opinions he had expressed in his April 14, 2005 transmittal to the Board, and focused on why he felt that termination was the correct sanction for Dr. Gorum's conduct.

12. From the first meeting with Dr. Gorum in March 2004, I have been aware of his claim that other Department Chairs have in the past engaged in grade adjustments. Registrar Parker's initial investigation did look at all grade adjustments that he could locate the prior semester, and some earlier semesters, and did not see any others where a Chair signed for an

-2-

A-000330

instructor. Dr. Gorum refused to provide any specific examples or names during the Ad Hoc Dismissal Committee hearings. Several witnesses testified to examples that were consistent with DSU policies or procedures, i.e. involved the Dean or the Provost, or were pursuant to the procedures student can use to challenge grades. Since April 2004 there has been only one grade change identified, by a former Chair, that may have been a violation of DSU policy. The incident occurred prior to the time that President Sessoms arrived, and by the time the incident was identified, the individual left DSU.

13. During his deposition in this case Dr. Gorum has identified a number of current or former Chairs who allegedly engaged in or are aware of grade adjustments that he thinks may have violated DSU policies. Approximately half of these individuals are no longer employed by DSU. My office is proceeding to interview the current employees who have been on campus during the summer, and will interview the rest on their return. At this point, none of the individuals have admitted to engaging in or having knowledge of conduct similar to that described in the Ad Hoc Dismissal Committee Report.

I declare under the penalty for perjury that the forgoing is true and correct.

Executed this 27 day of August, 2007 at Dover, Delaware.

Mark Farley

A-000331

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   C.A. No 06-565 |
| | ) |
| ALLEN SESSOMS, Ph.D. | ) |
| | ) |
| | ) |
| Defendants. | ) |

DECLARATION OF
CECIL WILSON

I, Cecil Wilson, declare as follows:

1. I am over the age of 18. I am making this declaration based upon my personal knowledge. If called up to testify, I could and would testify to the following.

2. I am a resident of Dover Delaware. My current address is 130 Brandy Wine Dr. Dover, DE 19904-2287.

3. I have reviewed portions of the deposition of Dr. Wendall Gorum in which Dr. Gorum identifies me as a person with knowledge potentially relevant to his claims against Delaware State University.

4. I am a 1963 graduate of DSU and hold a Masters Degree in Elementary Education from Salisbury State University and a Principal Certification from the University of Delaware. I was employed for 23 years by the Cesar Rodney School District and the Capitol School District for 12 years until I retired in 2000 as a secondary school principal. I have also been active in

**A-000332**

community service, including 8 years as President of the Central Delaware Branch 2028 of the NAACP.

5. I know Dr. Gorum through our mutual involvement in the DSU Alumni Chapter of the Alpha Phi Alpha fraternity. Dr. Gorum has also served for a number of years as the official Advisor to the DSU undergraduate chapter of the Alpha fraternity. Former DSU President DeLauder was an Alpha Phi Alpha alumni, and had a good relationship with the DSU Alumni chapter.

6. I am aware that there were DSU Alumni, including members of the Alpha fraternity, who had reservations about the hiring of Dr. Allen Sessoms as President of DSU, and the degree of change he might bring to the campus. I supported President Sessoms' hiring.

7. The allegation made by Dr. Gorum that I had some type of position with DSU during President Sessoms' transition is not true. I did not hold any position, paid or unpaid, during that transition, and have not been employed by DSU other than as an adjunct faculty member in 2002. I first met President Sessoms at luncheon hosted by the DSU Alumni Association sometime in the summer of 2003.

8. I subsequently met with President Sessoms, and suggested to him the idea that as part of his outreach to the community, he should consider visiting the 19 school districts in Delaware, meeting with Superintendents and Boards. President Sessoms liked this idea and asked for my assistance in facilitating these meetings. I used my contacts throughout the state to help arrange for these meetings, and traveled with President Sessoms to many of them. I worked closely with the President's secretary, Sandra Arnell, on this scheduling.

9. The DSU Alpha Alumni Chapter does sponsor an annual Prayer Breakfast in Dover each January on Martin Luther King Day. It is my understanding that copies f the January 2004

**A-000333**

Prayer Breakfast brochures were copied at Delaware State University. I was part of the Committee that help plan the January 2004 Prayer Breakfast. The planning committee, made up of officers and members of the fraternity, is responsible for securing the site and recommending speakers. The program, including the speakers, is approved by the entire membership of the Alumni Chapter.

10. At no time did I extend an invitation to President Sessoms to be a speaker at the January 2004 Prayer Breakfast, or at any other Prayer Breakfast. I understood that decision on speakers were made by the entire Alumni members based on recommendations from the Committee, not one member.

11. Although I have no specific recollection of doing so, it is possible that at some point while President Sessoms and I were involved in visiting school districts that I may have mentioned this event to him, and suggested that he might wish to attend. To the best of my knowledge and recollection no formal invitation to attend this Prayer Breakfast was ever extended by the Alumni Chapter.

12. At no time did I ever mention Dr. Wendall Gorum to President Sessoms, or discuss in any way Dr. Gorum's involvement in the undergraduate or alumni chapters of the Alpha fraternity, or the Prayer Breakfast. President Sessoms never mentioned Dr. Gorum to me, in any context.

I declare under the penalty of perjury that the forgoing is true and correct.

Executed this 20 day of August, 2007 at Dover Delaware.

Cecil Wilson

-3-

**A-000334**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ALLEN L. SESSOMS, Ph.D., | ) |
| | ) |
| and | ) |
| | ) |
| BOARD OF TRUSTEES OF | ) |
| DELAWARE STATE UNIVERSITY, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 06-565-GMS

## DECLARATION OF GLENN PARKER
## IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

I, Glenn T. Parker, hereby declare as follows:

1. I am over the age of 18. I am making this declaration based upon my personal knowledge. If called upon to testify at trial, I could and would competently testify to the following.

2. I am currently employed as Registrar at Delaware State University, a position that I have held since March, 2003.

3. I previously testified under oath before an Ad Hoc Dismissal Committee in the matter of Dr. Wendell Gorum. I have reviewed the transcript of my prior testimony, and affirm that it is truthful and accurate to the best of my recollection.

4. In my prior testimony I described the circumstances under which a questionable grade change was brought to my attention by Ms. Kim Walker, the steps I took to investigate and my conclusions. At no time during that process did President Sessoms say or do anything to influence or limit my review or conclusions. I began looking at a broader range of grade changes. My investigation focused on Dr. Gorum because that was where there were clear issues. President Sessoms' direction to me was to do a comprehensive investigation and to report my findings to the Vice President for Human Resources.

5. I was not aware in the Spring of 2004 of Dr. Gorum's involvement in those activities that he now claims are "protected," including his assistance to DeShaun Morris and his

opposition to the hiring of President Sessoms, both of which largely pre-dated my arrival at DSU, or anything concerning a Prayer Breakfast invitation. President Sessoms did not mention any of these subjects.

6. During my initial investigation, and continuing to date, I have only identified one grade adjustment that may have been in the same category as the acts of Dr. Gorum. The professor involved is no longer employed by DSU, and the incident occurred prior to July 2003.

I declare under the penalty for perjury that the forgoing is true and correct.

Executed this 27day of August, 2007 at Dover, Delaware.

Glenn T. Parker

-2-

A-000336

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,     )
     )
    Plaintiff,     )
     )    Civil Action No. 06-565-GMS
   v.     )
     )
ALLEN L. SESSOMS, Ph.D.,     )
     )
   and     )
     )
BOARD OF TRUSTEES OF     )
DELAWARE STATE UNIVERSITY,     )
     )
    Defendants.     )

## DECLARATION OF PRESIDENT SESSOMS
## IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

I, Allen Sessoms, hereby declare as follows:

1.    I am over the age of 18. I am making this declaration based upon my personal knowledge. If called upon to testify at trial, I could and would competently testify to the following.

2.    I am currently employed as the President of Delaware State University, a position that I have held since July 3, 2004.

3.    I previously testified under oath before an Ad Hoc Dismissal Committee in the matter of Wendall Gorum. I have reviewed the transcript of my prior testimony and affirm that it is truthful and accurate to the best of my recollection.

4.    I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 30 day of August, 2007 at Dover, Delaware.

President Allen Sessoms

925813.1 8/27/07

A-000337

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-565-GMS |
| v. | ) | |
| | ) | |
| ALLEN L. SESSOMS, Ph.D., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOARD OF TRUSTEES OF | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I, Michael R. Robinson, hereby certify that on August 31, 2007 I caused a true and

correct copy of the foregoing **APPENDIX IN SUPPORT OF DEFENDANTS' MOTION**

**FOR SUMMARY JUDGMENT** to be served electronically via CM/ECF system and first class,

U.S. Mail, postage prepaid, upon the following:

| | |
|---|---|
| Gilbert Shelsby, Esq. | Gregg L. Zeff, Esq. |
| Michael J. Logullo, Esq. | FROST & ZEFF |
| SHELSBY & LEONI | Pier 5 at Penn's Landing |
| 221 Main Street | 7 North Columbus Boulevard |
| Stanton, DE 19804 | Philadelphia, PA 19106 |

/s/ Michael R. Robinson
Michael R. Robinson (#4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
mrobinson@saul.com