IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| WENDELL GORUM, Ph.D., | : | **CIVIL ACTION** |
| Plaintiff, | : | |
| | : | NO.   06-565-GMS |
| v. | : | |
| ALLEN L. SESSOMS, Ph.D. | : | **JURY TRIAL DEMANDED** |
| and | : | |
| BOARD OF TRUSTEES OF | : | |
| DELAWARE STATE UNIVERSITY, | : | |
| Defendants. | : | |

**PLAINTIFFS' ANSWERING MEMORANDUM OF LAW IN OPPOSITION
TO SUMMARY JUDGMENT**

**SHELBY & LEONI**

BY:   MICHAEL LOGULLO, ESQUIRE
221 Main Street
Stanton, DE 19804
(302) 995-6210 Ext. #108
(302) 995-6121 (fax)
mlogullo@mslde.com

*Counsel for Plaintiff*

**FROST & ZEFF**

BY:   GREGG L. ZEFF, ESQUIRE
Pier 5 at Penn's Landing
7 N. Columbus Boulevard
Philadelphia, PA 19106
(215) 351-3333
(215) 351-3332
gzeff@frostzeff.com

*Counsel for Plaintiff*

DATED:    September 24, 2007

## TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT...................................................................2
NATURE AND STAGE OF THE PROCEEDINGS.......................................2

STATEMENT OF FACTS................................................................................3

    A. DR GORUM'S PROTECTED SPEECH........................................3

        1. Faculty Search ...............................................................3

        2. DaShaun Morris............................................................4

        3. Martin Luther King, Jr. Prayer Breakfast.................6

    B. PROBLEMS WITHIN THE MASS COMMUNICATIONS DEPARTMENT............6

        1. Problems With the Registration System.....................6

        2. Professor Osei-Mensah..................................................7

        3. Grade Change Problems.................................................9

    C. POLICIES AND CUSTOMS AT DSU REGARDING GRADE CHANGES............9

    D. GRADES CHANGED BY DR. GORUM.....................................10

    E. DR. FREDERICK'S CONFLICTING TESTIMONY..................12

    F. INVESTIGATION INTO DR. GORUM'S GRADE CHANGES............14

    G. AD HOC DISCIPLINARY COMMITTEE REPORT................15

    H. PRESIDENT'S FINAL RECOMMENDATION............................17

    I. THE BOARD OF TRUSTEES.......................................................18

    J. POST-TERMINATION INVESTIGATION..................................19

ARGUMENT...................................................................................................20

1. DR. GORUM'S SPEECH AND CONDUCT QUALIFIES AS FIRST AMENDMENT

PROTECTED ACTIVITY.................................................................................21

    1.    Dr. Gorum's Speech Was a Matter of Public Concern.............................................21

    2.    Dr. Gorum's Assistance to DaShaun Morris Was a Matter of Public Concern........23

    3.    Dr. Gorum's Revocation of Dr. Sessom's Invitation to the MLK Jr. Breakfast Was Speech and Conduct Related to A Matter of Public Concern...........................24

    4.    Dr. Gorum's Withdrawal of Support for Defendant Sessoms' Candidacy For President Of the University Was Speech on a Matter of Public Concern...........25

B.    DR. GORUM'S PROTECTED ACTIVITY WAS NOT OUTWEIGHED BY HIS EMPLOYERS INTEREST IN EFFICIENCY.................................................................26

C.    A REASONABLE INFERENCE EXISTS THAT DEFENDANT SESSOMS WAS AWARE OF DR. GORUM'S PROTECTED ACTIVITY.............................................26

D.    DEFENDANT SESSOMS IS NOT ENTITLED TO QUALIFIED IMMUNITY............30

E.    A REASONABLE INFERENCE EXISTS THAT DEFENDANT SESSOMS WAS MOTIVATED BY RETALIATORY ANIMUS......................................................30

F.    DEFENDANTS' STATED REASON FOR PLAINTIFF'S DISCHARGE IS PRETEXTUAL...............................................................................................................33

G.    DR. GORUM'S ACTION IS NOT PRECLUDED BY THE STATUTE OF LIMITATIONS.................................................................................................................38

H.    THE BOARD OF TRUSTEES SHOULD NOT BE DISMISSED BECAUSE DR. GORUM IS SEEKING INJUNCTIVE RELIEF.................................................................39

I.    PRESIDENT SESSOMS IS SUBJECT TO PUNITIVE DAMAGES.............................39

CONCLUSION...........................................................................................................................39

# TABLE OF AUTHORITIES

Page

## Federal Cases

Abramson v. Wm. Patterson College, 260 F. 3d 265 (3d Cir. 2001)..............................................35

Ambrose v. Twp of Robinson, 303 F.3d 488 (3d Cir 2002)...........................................................31

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).........................................................22

Anderson v. Creighton, 483 U.S. 635, 640 (1987)......................................................................32

Baldassare v. New Jersey, 250 F.3d 188, 194(3d Cir. 2001).........................................................23

Bradshaw v. Township of Middletown, 296 F.Supp.2d 526, 542 (D.N.J. 2003)...........................23

Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986)................................................................22

Connick v. Myers, 461 U.S. 138, 147, 75 L.Ed. 2d 708(1983).................................................23, 28

Copp v. Unified Sch. Dist. No. 501, 882 F.2d 1547 (10th Cir. 1989)............................................26

Desert Palace, Inc. v. Costa, 539 U.S. 90, 94 (2003)...............................................................22, 29

Enzo Life Scis. Inc. v. Digene Corp., 305 F.Supp. 2d 406 (D.Del. 2004)....................................22

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000)......................................34, 36

Friedman v. Beame, 558 F.2d 1107 (2d Cir.1977)........................................................................24

Fultz v. Dunn, 165 F.3d 215, 218 (3d Cir 1998)...........................................................................23

Gans v. Mundy, 762 F.2d 338, 341 (3rd Cir. 1985) cert. denied 474 U.S. 1010 (1985)...............22

Gregory v. Chehi, 843 F.2d 111 (3d Cir. 1988)............................................................................40

Hydrick v. Hunter, 466 F. 3d 676, 692 (9th Cir. 2006)................................................................25

Igwe v. E.I. DuPont De Nemours & Co., 180 Fed. Appx. 353 (3d Cir. 2006)..............................36

iii

Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173 (3d Cir. 1997)................................................34

Kosta v. Connolly, 709 F.Supp. 592 (E.D. Pa 1989)....................................................................22

Moore v. Susquehanna, 2005 US DIST LEXIS 4503 (M.D.Pa., Sept. 30, 2005)..........................31

Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S 274 (1977)....................................23, 35

NAACP v. Button, 371 U.S. 415 (1963)......................................................................................26

Rennie v. Klein, 653 F. 2d 836 (3d Cir. 1981)............................................................................26

Roberts v. Jaycees, 468 U.S. 609, 617 (1984)...........................................................................26

Roebuck v. Drexel University, 825 F.2d 715 (3d Cir. 1988)........................................................35

Ruhlman v. Hankinson, 461 F.Supp. 145 (W.D. Pa. 1978)........................................................28

Shelton v. Tucker, 364 U.S. 479 (1960)....................................................................................26

Stiner v. Univ. of Delaware, 243 F. Supp. 2d 106 (D.Del.2003).................................................23

Swartzwelder v. McNeilly, 297 F.3d 228, 235 (3d Cir. 2002).....................................................23

Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957)...............................................................24

Thomas v. Town of Hammonton, 351 F.3d 108 (3d Cir. 2003)...................................................35

Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1960).................24

Trotman v. Board of Trustees of Lincoln University, 635 F.2d 216 (3d Cir. 1980)..............24, 28

United States v. Diebold, Inc., 369 U.S. 654 (1962)..................................................................22

Watters v. City of Philadelphia, 55 F.3d 886, 892 n. 3 (3d Cir. 1995).......................................36

Williams v. Phila. Hous.Auth., 380 F.3d 751, 780 (3d Cir. 2004).............................................35

## Rules and Statutes

Fed. R. Civ. P. 56(c)..................................................................................................................22

28 U.S.C. § 1983........................................................................................................................23

## SUMMARY OF ARGUMENT

1.  Dr. Gorum's speech and conduct is First Amendment protected activity because his speech and association were related to matters of public concern, including his assistance to a student, his revocation of the Defendant's invitation to a high profile event on campus, and his withdrawal of support for Defendant's candidacy for university president.

2.  Dr. Gorum's protected conduct was not outweighed by his employer's interest in efficiency, and in fact did not have any disruptive effect on the business of the University.

3.  A reasonable inference exists that Defendant Sessoms was aware of Dr. Gorum's conduct, as much of it was directed against Defendant, and otherwise related to high-profile events on campus.

4.  Qualified immunity is not an appropriate defense to this suit.

5.  A reasonable inference exists that Defendant Sessoms was motivated by retaliatory animus, as other faculty members engaged in the conduct for which Dr. Gorum was terminated were not investigated or disciplined.

6.  Defendants' stated reason for Plaintiff's discharge is pretextual.

7.  Dr. Gorum's action is not precluded by the statute of limitations.

8.  The Board of Trustees should not be dismissed because Dr. Gorum is seeking injunctive relief.

## NATURE AND STAGE OF THE PROCEEDINGS

Dr. Wendell Gorum ("Dr. Gorum" or "Gorum") was a full professor at Delaware State University ("DSU"). He was terminated by DSU, through its President, Dr. Allen L. Sessoms ("President Sessoms" or "Sessoms"), for allegedly changing grades improperly. Dr. Gorum has brought this lawsuit to prove that his termination was a pretext in order to punish him for his

protected First Amendment rights.

Dr. Gorum was involved in several matters of public concern early on in President Sessoms administration. These included Dr. Gorum's speech related to flaws in the search committee that ultimately recommended Dr. Sessoms, a political/religious event including Delaware's major elected officials at which Dr. Gorum prevented President Sessoms from speaking and a student advisory role by Dr. Gorum that led to a lawsuit funded by Dr. Gorum.

This Brief shall focus on the constitutionally protected nature of Dr. Gorum's speech as well as the pretext for the termination. That pretext is compelling. Dr. Gorum admits, as Chairman of the Communications Department, to changing students' grades. The evidence demonstrates that Dr. Gorum had the authority of the past administration and Registrar's Office to change all of the student grades in question. Testimony from the former Vice-President of Academic Affairs and Provost, Assistant Registrar, former Chairman of his department and students support this claim. The President of the University ignored this evidence and other testimony that should have cleared Dr. Gorum of any wrongdoing or at least mitigated the discipline of termination. Furthermore, an Ad Hoc Dismissal Hearing Committee made up of faculty members declared that Dr. Gorum was a "scapegoat" and that the activities Dr. Gorum was accused of were the "tip of the iceberg," "known to the administration, condoned by the past administration, in that [plaintiff] was selectively prosecuted." That committee recommended that Dr. Gorum be disciplined, not terminated for his grade changing activities.

When the matter was placed before the Board of Trustees of DSU, the President ignored the compelling mitigating factors regarding Dr. Gorum and recommended the termination. Furthermore, they did not present any of the mitigating factors to the Board of Directors in making

their decision and gave the Board incomplete and inaccurate information about the case. As a result of the selective prosecution of Dr. Gorum and his role as a scapegoat, it is submitted to this Court that a reasonable jury could find that the President's role in Plaintiff's discharge was retaliation for Plaintiff's First Amendment protected rights.

**STATEMENT OF FACTS**

Plaintiff, Dr. Wendell Gorum, Professor and Chair of Mass Communications at DSU, was active at DSU as a policy maker, faculty leader and student advocate. He was seen as a "powerbroker" on campus, whom faculty and students often turned to for help. (J. Gorum Dep. at 20) (B0001). He soon gained a reputation as a student advocate and often assisted students with their academic or administrative problems. Dr. Gorum also garnered a reputation as a "rabble rouser," and Defendant Dr. Sessoms was aware that Plaintiff spoke out and associated with individuals on matters of public concern related to Delaware State on a continuing and regular basis. (J. Gorum Dep. at 25) (B0002). Dr. Gorum was also instrumental in shaping some of the school's disciplinary procedures. Because of this role, students often sought his help when they encountered disciplinary problems. (Morris Dep. at 36) (B0007).

The following shall describe the protected activities of Dr. Gorum, a brief history of problems in his Department that lead to his termination and the termination process.[1]

**A.    DR. GORUM'S PROTECTED ACTIVITIES**

   **1.    Faculty Search**

In 2002, Former DSU President DeLauder announced his retirement. By March 3, 2003,

---

[1]Much of the testimony cited herein is derived from the Ad Hoc Disciplinary Hearing which was held in the matter before Dr. Gorum's discharge.

the faculty senate had narrowed their search to three candidates for his replacement. (Osei Dep. at 4-7) (B0012-0015). Before the vote, Dr. Gorum voiced his opposition, and suggested the search be reopened. (J. Gorum Dep. at 39) (B0003). The search was not reopened and Defendant Dr. Allen L. Sessoms was appointed President of DSU. Shortly after Defendant Sessoms took office, Gorum was questioned by the Chair and Assistant Chair of the Board of Trustees. (W. Gorum Dep. at 112) (B0016). Gorum felt that he was "marked" and being watched because of his speech during the faculty search. Id. Dr. Osei told Gorum that the Board of Trustees did not like having their judgment questioned concerning their selection for President. (W. Gorum Dep. at 113) (B0016). Dr. Osei was close to Defendant Sessoms, and Dr. Wendell Gorum and his wife, Dean Jacquelyne Gorum, both believe that Dr. Osei was informing Sessoms of Gorum's opinions and speech about him. (J. Gorum Dep. at 45) (B0006).

## 2. DaShaun Morris

In December 2002, an altercation ensued between students and some members of the DSU football team. As a result, campus security searched the dorm room of student DaShaun Morris, who admitted to keeping a firearm in his room. (Morris Complaint at 2) (B0019). Morris, a star football player, was immediately suspended per the University's no tolerance policy on weapon possession on campus. (C.Smith letter 12/16/02) (B0020). After administrative review, Morris' punishment was reduced to a suspension for the Spring 2003 semester. (C.Smith letter 4/4/03) (B0021). However, in July 2003, shortly after Defendant Sessoms assumed the University presidency, he changed Morris' punishment to a year long suspension, which, under NCAA rules, made him ineligible for the football team. (Morris Complaint at 4) (B0022). Coach Blacknall asked Sessoms to intervene, but Sessoms declined to reinstate Morris' original, less severe

4

punishment. (Sessoms Dep. at 21) (B0023).

Gorum had become the de facto advisor to all DSU students with disciplinary problems as a result of his authorship of the DSU disciplinary code and procedures. On the recommendation of students familiar with Dr. Gorum's reputation,    Morris sought Dr. Gorum's advice. Gorum first met with Morris in December 2002, and advised him during his disciplinary hearings. When President Sessoms decided to impose additional discipline against Morris, the President's secretary, Sandra Arnell, called Dr. Gorum - not Morris on the telephone, to inform both Gorum and Morris of the decision. (W. Gorum Dep. at 174-176) (B0024).    Gorum, who was in his office with Morris at the time of the call, refused to accept this notice and requested Ms. Arnell to call Morris directly. (Morris Dep. at 37, 54) (B008, B0011). Dr. Gorum retained an attorney for Morris. Gorum paid his $600.00 retainer. A lawsuit was filed against Dr. Sessoms and DSU by Morris. (Sessoms Dep. at 30) (B0025). At deposition in his lawsuit, Morris acknowledged to DSU's attorney Dr. Gorum's role in his internal proceeding and litigation (Morris Dep. at 43, 54, 64) (B0017, B0011, B0140) and was extensively questioned about Dr. Gorum's role:

> "Q.   What did Dr. Gorum tell you?
> A.   Basically, to appeal it and basically to talk about everything that happened to me."
> (36)
>
> Q.   You also told me that Dr. Gorum assisted you in doing this, writing the letter?
> A.   The appeal letter?
> Q.   Yes.
> A.   Yes. (43)
>
> Q.   Did you attend this hearing? Did you have anyone with you to serve as an advisor?
> A.   Yes, Dr. Gorum." (54)

### 3.    Martin Luther King, Jr. Prayer Breakfast

Dr. Gorum was a member of the Alpha Phi Alpha Fraternity, an organization that hosted

5

an annual Martin Luther King, Jr. Prayer Breakfast (the "MLK Breakfast"). The event was well known on and off campus as a gathering of prominent politicians and community leaders. Invitees in 2004 included Governor Ruth Ann Minner, Mayor James Hutchinson, U.S. Senators Joseph Biden and Thomas Carper, Representative Michael Castle and several State and Federal Judges. (Wm. Torian letters 12/12/03) (B0029-0039). Dr. Gorum was the Chair of the speakers committee, responsible for selecting and inviting community leaders to speak at the event. (W. Gorum Dep. at 125) (B0040) In or around December 2003, Dean Jacquelyne Gorum (Gorum's wife and former DSU Dean) invited Defendant Sessoms to attend the MLK Breakfast, and Cecil Wilson later invited him to speak at the event.(J.Gorum Dep. at 60) (B0042). Unfortunately, unbeknownst to Wilson, a speaker had already been selected. Dr. Gorum, as Chair of the committee to select a speaker, had chosen Dr. Ryle Bell, Dean of the Howard University School of Dentistry. (W. Gorum Dep. at 126) (B0041). Dr. Gorum had to direct Wilson to revoke Dr. Sessoms' invitation to speak. Gorum heard from several people that Dr. Sessoms was upset about the cancellation. (W. Gorum Dep. at 163) (B0018). President Sessoms did not attend the breakfast at all, and his absence was notable amongst many of the politicians and dignitaries present, especially in Dr. Sessoms' inaugural year on campus. (W. Gorum Dep. at 64) (B0018). President Sessoms has denied any knowledge of the MLK Breakfast or receipt of an invitation. (Sessoms Dep. at p. 14) (B0025).

**B.    PROBLEMS WITHIN THE MASS COMMUNICATIONS DEPARTMENT**

**1.    Problems With the Registration System**

Before becoming Chair of the Mass Communications Department, Gorum acted as its Director and reported to Dr. Scott King, Chair of the Department of English and Mass

6

Communications. (10/27/04 AHDC Tr. at 30) (B0044) As Director, Gorum became familiar with grade problems in Mass Communications that affected students who had been purged by the system. (Id. 31) (B0044). A student was "purged" from the registration system when the computer refused to allow the student to register. Once Dr. Gorum became Chair, he became more exposed to these problems. "We had a problem every semester with athletes who were on scholarships. ...The scholarships were never entered, never. And they were always purged. So we had to again put them in classes, so that they would be eligible and so that they would have a full-time load ... The problem with the purging was a major one, and it was every semester ... it impacted Mass Comm more because we had more than three hundred majors, and usually almost a third of them would wind up getting purged." (10/28/04 AHDC Tr. at 109-111) (B0066). Dr. Tommy Frederick, Dean of Arts and Sciences since 1998 ("Dean Frederick"), was well aware of the problems that purging caused in the Mass Communications Department, as Dr. Gorum addressed the issue with him numerous times, sometimes with students and parents (10/28/04 AHDC Transcript at 112, 119) (B0066, 0067).

### 2.   Professor Osei-Mensah

In the fall of 2003, students began approaching Dr. Gorum to complain about Dr. Osei-Mensah, an adjunct Mass Comm professor who was teaching Broadcast Writing II. Specifically, students including Veronica Brinney and April Pierce complained that Dr. Osei-Mensah was teaching Broadcast Writing I course materials to their class and that he never returned completed assignments. (9/29/04 AHDC Tr. at 132, 152) (B0074). After Brinney, a junior, had an altercation with Dr. Osei-Mensah, she met with Dean Frederick to discuss the situation and "Dean Frederick told me to go back to Dr. Gorum because Dr. Gorum has the right to handle any grade situation

7

within his department", recalled Brinney. "He told me I shouldn't worry ... I would be graded according to the work I submit and that Dr. Gorum can take care of it ... he told me ... go back and let Dr. Gorum do his job ... go follow the chain of command. Do not come back over here, let Dr. Gorum handle it." (9/29/04 AHDC Tr. at 36-37) (B0068-0069).

Dean Frederick assuaged Brinney's fear that she would receive an unfair grade from Dr. Osei-Mensah by telling her that whatever grade she received, "if I felt it was unfair ... I needed to go talk to Dr. Gorum, because he can adjust my grade according to the work that I submit." (9/29/04 AHDC Tr. at 38) (B0069). Subsequently, Brinney followed Dean Frederick's advice and met with Dr. Gorum (9/29/04 AHDC Tr. at 40) (B0069). Dr. Gorum advised her to complete the remainder of the assignments from Dr. Osei-Mensah's class and submit a copy to him, Dr. Osei-Mensah and Dean Frederick for a final grade. (9/29/04 AHDC Transcript at 40) (B0069). Brinney stated, "[Dean Frederick] specifically said, 'I'm tired of secretaries doing Chairs' jobs, Chairs doing Deans' jobs. And everybody doing everyone else's job. Go back to Dr. Gorum, he can take care of this.' That was the impression he gave me, that Dr. Gorum would take care of the grades ... He was going to change whatever grades needed to be changed ... he told me, as long as you do your part, we'll do our part. Submit your work, you shouldn't have a problem getting a grade. (9/29/04 AHDC Tr. at 54, 58) (B0071, B0072). As a result, Brinney submitted a copy of her work to Dr. Osei-Mensah, Dr. Gorum and Dr. Frederick on December 11, 2003 and Dr. Gorum assigned her a grade (9/29/04 AHDC Tr. at 42-43, 54) (B0070, B0072).

###   3.    Grade Change Problems

Dr. Gorum was confronted with several other grade problems in the fall of 2003, including

two that involved student Kenneth McClain, a football player. After he received an "F" in Professor Wickham's class, despite not having failed any exams, McClain approached Wickham, who gave McClain a final assignment which would change his grade. (9/29/04 AHDC Tr. at 195) (B0078). After unsuccessfully trying to contact Wickham four to five times a day for three weeks, McClain approached Dr. Gorum to inquire whether there was anything he could do to improve his grade in Wickham's course. (9/29/04 AHDC Tr. at 188-189) (B0076-B0077). McClain relayed to Gorum, Professor Wickham's instruction to make up the last assignment for the course to receive an improved grade. (9/29/04 AHDC Tr. at 196) (B0078). Gorum and McClain came to an arrangement whereby McClain would complete the assignment and give it to Gorum. (Id. at 197) (B0079) Gorum later notified Wickham that a few of Wickham's students were taking his course as an independent study under Gorum's supervision and "that I would be assigning grades". (10/29/04 AHDC Tr. at 120) (B0073).

McClain also sought Dr. Gorum's assistance with a problem he had in Professor Gary Dawkins' Radio Station Operations class. McClain notified Gorum of the situation and asked him if he would speak to Professor Dawkins about receiving credit for a CD he produced. (9/29/04 AHDC Tr. at 211) (B0081). After contacting Dawkins, Gorum reviewed the CD and assigned McClain a grade. Confronted with this and other student grade issues, Dr. Gorum followed custom and practice at DSU in addressing these problems.

## C.   POLICIES AND CUSTOMS AT DSU REGARDING GRADE CHANGES

DSU has a history of scheduling, registration and grade change issues. Joyce Bowers worked in the Registrar's office for 29 years until the Spring of 2004. (9/29/04 AHDC Tr. at 233) (B0082). Bowers worked as a secretary, senior secretary and records systems officer and

assistant registrar. (9/29/04 AHDC Tr. at 233).  Bowers was involved in processing grade changes at DSU in her last 10 years as Assistant Registrar. (9/29/04 AHDC Tr. at 234-235) (B0082).

One of Bowers' primary responsibilities as Assistant Registrar was to accept or reject grade change forms submitted by instructors. (9/29/04 AHDC Tr. at 262) (B0086).  According to Bowers, Department Chairs such as Dr. Gorum have frequently signed grade forms in lieu of an instructor since the time she was a student at DSU, thirty-three years ago. "the Chair has signed more than once for the instructor," she stated.  "That's never been a problem." (9/29/04 AHDC Tr. at 244) (B0083).  Bowers further remarked that the practice of Chairs changing student grades is "pretty darn widespread" at DSU.  (9/29/04 AHDC Tr. at 267) (B0087). When professors could not be reached to discuss changing their students' grades, Chairs also signed grade change forms when student were purged from course rosters for owing money to DSU. (9/29/04 ADHC Tr. at 250) (B0084).  Since purging was extremely problematic and widespread at the University, a Chair would provide a grade under these circumstances, and the Registrar's office would officially register the student in the class upon receipt of payments owed so that a student could receive a grade. (9/29/04 AHDC Tr. at 250) (B0084).

Bowers noted that Chairs also signed grade change forms for students who participated in summer internships and practicums at DSU.  These instances occurred when students enrolled in summer courses that were cancelled. Since students frequently needed to take a summer class required for graduation, Chairs remedied the situation by allowing them to complete a summer internship or practicum for academic credit instead.  A student's name would then be added to the roster of a fall course that resembled his or her summer internship, although he or she would not actually attend the fall course. At the end of the fall semester, ths student would receive a grade

10

for the internship or practicum that he or she had completed. (9/29/04 AHDC Tr. at 257-8) (B0085). This enrollment practice was widespread among departments that offered practicums and internships. "[I]t's never been a problem where the Chair submits the grade change for the instructor," explained Bowers. "[This has been occurring for] as long as I've been here, for twenty-nine years and two months." (9/29/04 AHDC Tr. at 271) (B0088). Nevertheless, this practice caused much confusion among professors who didn't understand why students were on their course roster who had never attended their class. (9/29/04 AHDC Tr. at 259) (B0085).

Dr. James Scott King, a former Chair of the English Department for thirty-two years, had knowledge of the policies and practices relating to Chairs changing grades at DSU. "As a department we served about 1400 students per semester." (10/27/04 AHDC Tr. at 151) (B0089) King was extremely familiar with the problems that purging caused at DSU, and particularly in the English Department. " ... school's purge ran anywhere from semester to semester, anywhere from 20% to 30, 33, 35%," he explained. (10/27/04 AHDC Tr. at 142) (B0052). King reiterated Bower' testimony that when Mass Communications students were purged from their courses, they would be enrolled in internships and practicums. "[I]t varied who would actually instruct or supervise the students," he explained. "But all the grades would be ... turned into me because I was the teacher of record ... And this was done throughout the history basically of the Mass Comm program." (10/27/04 AHDC Tr. at 146) (B0053).

In addition, there were prior instances when King, as Chair, changed another professor's grade because he or she could not be reached. (10/27/04 AHDC Tr. at 149-150) (B0089). "[T]his commonly happened because as a Department we served about 1400 students per semester, and there are going to be errors. So we handle them". (10/27/04 AHDC Tr. at 150) (B0089). King

11

never requested a grade change from the Dean in processing these forms. In fact, prior to March 3, 2004, no grade change request forms that King completed as Chair were ever returned to him for lacking the Dean's signature. (10/27/04 AHDC Tr. at 186) (B0056).

Dean Frederick was well aware of this practice at DSU, because he had specifically requested that King assign students grades on several occasions in the past. (10/27/04 AHDC Tr. at 154) (B0054). King further recalled, "[F]or instance if we have an adjunct teacher, and that adjunct gives grades and the adjunct is no longer here, no longer comes back, and there are discrepancies with the grades between the student's records and the grade that the teacher gave him, the Dean requested that the Chair handle that matter ... all the Deans, not only Dean Frederick. He was following a common practice." (10/27/04 ADHC Tr. at 156) (B0054).

Chairs were authorized to change student grades because administrative problems including purging and cancelled summer classes often interfered with accurate grade processing. "If the student could prove to my satisfaction that the grade was an error, I would change it ... the point is that you try not to let a student suffer or cause damage to a student because of an instructor's error," King stated. (10/28/04 AHDC Tr. at 26) (B0061).

Dr. Johnny Tolliver testified to his experiences as the Dean of Arts and Sciences, Acting Vice President of Academic Affairs and Provost and Vice President of Academic Affairs. (10/27/04 AHDC Tr. at 190) (B0050). During his tenure at DSU, Tolliver experienced many of the same problems with grade processing, particularly with adjunct professors who leave campus before the administration discovered problems with the grades they assigned. "[I]n those cases we ... gave latitude to the Department Chairs to try to rectify those situations ... in many cases where students were purged improperly, we gave wide latitude to the Department Chairs to make sure

12

that those students were restored. In some cases students had not - who had scholarships, for instance, and those scholarships had not been posted to their accounts and were purged, and those faculty members took it upon themselves, with our blessings, of course, to get those students restored as quickly as possible." (10/27/04 AHDC Tr. at 191-192) (B0050). On other occasions, resolution of student grades involved a Chair evaluating a student's course work and assigning him or her a grade, which was also common practice at DSU. (10/27/04 AHDC Tr. at 202) (B0057).

When asked if Dean Frederick was aware that Chairs were authorized to correct students' grades, Tolliver replied, "Absolutely ... as far as I knew, he was allowing - this is when I was Provost - he was allowing Chairs in the College of Arts and Sciences to do the same." (10/27/04 AHDC Tr. at 194) (B0051). Depending on a particular Chair's relationship with the staff of the Office of Records, in some instances he or she would go directly to the Records Office and make grade changes without signatures from the Dean or the Vice President (10/27/04 AHDC Tr. at 199) (B0058). Dr. Frederick has stated under oath that Provost and Vice President Tolliver lied about these customs and practices and his knowledge of them. (10/27/04 AHDC Tr. at 46-47) (B0139).

## D.  GRADES CHANGED BY DR. GORUM

Dr. Gorum contacted or attempted to contact all of the professors whose grades he ultimately changed. With regard to Professor Wickham, "I called him ... about the students who were taking the class - we had a number of students who were seniors. They only needed the fall semester to finish, and they needed a course. And so I let them do the course independent study ... that's what was recommended to me and that's what we've done for a number of years."

13

(10/28/04 AHDC Tr. at 205) (B0065).   With regard to other professors whose grades Gorum changed, Gorum stated that he consulted with King about the situation. "I talked to Scott and he told me to call [the professors], and that's exactly what I did." (10/28/04 AHDC Tr. at 207) (B0065).  Gorum further recalled that when he spoke to each of the professors, he relayed that he would be assigning their students grades and they did not object. (10/28/04 AHDC Tr. at 209) (B0064).

In addition to speaking to the professors, Gorum met with Dean Frederick and discussed grade problems he had in Dawkins, Wickham and Kopano's classes.  Gorum informed the Dean that some students had been purged and others had tried to attend summer courses required for graduation that were cancelled.  Gorum also notified Frederick that he had some exams from Dr. Osei-Mensah's class that had not been graded.  The Dean's response to these problems was that Gorum should handle them himself.  "I'm almost sure he told me to change the grade," Gorum testified, "whatever he said, I interpreted as change the grades.  And what I did was look at the exams, and I had work from most - many of the students... and the students I didn't have anything from, I didn't change the grades.  So I changed the grades because that was what I was told to do." (10/28/04 AHDC Tr. at 159) (B0063).  Dr. Frederick stated under oath that Dr. Gorum lied about this.  (8/31/04 AHDC Tr. at 149-50) (B0102).

## E.  DR. FREDERICK'S CONFLICTING TESTIMONY

Dr. Tommy Frederick served as the Dean of the Department of Arts and Sciences at DSU from 1998-2003. (8/31/04 AHDC Tr. at 5) (B0090).  While testifying, Frederick offered several descriptions of DSU's procedure for changing grades that conflicted with the testimony and remarks of other faculty.  According to Dean Frederick, "There are procedures in the catalog and

14

in the University's process that exist" and "the complaint form process has never been confusing." (8/31/04 AHDC Tr. at 165, 180) (B0099). Frederick stated that all Chairs understand the grade change procedure and received a form "to be utilized in the process for change of grades in cases where ... professors left." (8/31/04 AHDC Tr. at 64) (B0095). However, Ad Hoc Disciplinary Committee Chair Dr. Ackah and Committee Member Dr. Gwanmesia remarked during Frederick's testimony that they had never seen the form before (8/31/04 AHDC Tr. at 67) (B0096). Frederick also asserted that if an instructor submits a form to remove an incomplete grade after the six-week deadline, the Dean must sign it. (8/31/04 AHDC Tr. at 46) (B0093). Yet, this procedure was unknown to Committee Member Jackson, who indicated that he has submitted forms removing grades of incomplete without the Dean's signature at the instruction of his Chair. Jackson's Chair told him, "All I had to do was sign it, send it to the Registrar's office," which accepted the form. (8/31/04 AHDC Tr. at 48-49) (B0093-0094).

Notwithstanding the testimony of Dr. Gorum, Dr. King, Ms. Bowers and Dr. Tolliver, Dean Frederick claimed to have no knowledge of past practices of the Chair signing grade forms in certain instances. "I don't know what the testimony will be regarding the Registrar's Office or the Assistant Registrar accepting other people's signatures, Chairs' signatures but not instructors. The University's position is that if they did that that was never authorized and it has never been accepted that any one other than an instructor can change his or her own grade." (8/31/04 AHDC Tr. at 186) (B0100). Dean Frederick also stated, "things that don't - that are not my business, I don't deal with. So if it is a procedure that a Chair is supposed to be doing, and he or she is supposed to go to the Records Office without my intervention, I have too many - too much work to do to be running to see if Chairs are doing, you know, those types of things when that's their

15

job." (10/29/04 AHDC Transcript at 45) (B0093). This testimony is nearly identical to Veronica Brinney's account of her conversation with Dean Frederick, in which he explicitly told her that Dr. Gorum would adjust her grade.

## F.  INVESTIGATION INTO DR. GORUM'S GRADE CHANGES

In the Spring of 2004, the new Registrar at DSU, Glen Parker, discovered that Dr. Gorum had changed the grades of students without a Dean or Vice-President's signature during a routine verification of eligibility requirements for NCAA compliance. (AHDC Report at 1) (B0103). Ultimately, no NCAA eligibility violations were found. Even if grades were returned to their original state, all student athletes retained their eligibility to play NCAA sports. (AHDC Report at 1 and K.Walker Letter 4/28/2004) (B0103 and B0141).

According to President Sessoms first testimony, he spoke to Dean Frederick and Provost Bell about the grade changes before deciding to recommend Dr. Gorum for termination. (10/27/04 AHDC Tr. at 105-6; see also Letter of 3/5/04 attached to Deposition of Sessoms as Exhibit "3") (B0048; B0107) At deposition, Dr. Sessoms denied speaking to Dean Frederick (Sessoms Dep. at 43) (B0108). Sessoms' decision to terminate Gorum was made without regard to past practice at DSU. "Past practice doesn't matter to me." (10/27/04 AHDC Tr. at 81) (B0043). Furthermore, Sessoms did not speak to Dr. Gorum nor did he speak to Dean Frederick to determine whether Frederick told Gorum to change grades in Dr. Osei-Mensah's class or if any changes were authorized. (10/27/04 AHDC Tr. at 106) (B0048). Provost Kenneth Bell, who served as Acting Provost from July 2003 until June 20, 2004, indicated that if Dean Frederick had given Dr. Gorum permission to change Professor Osei-Mensah's grade after the professor could not be reached, "that would have been acceptable to me." (9/28/04 AHDC Tr. at 212) (B0109).

16

## G.   AD HOC DISMISSAL COMMITTEE REPORT

Upon receipt of President Sessoms' notice of suspension, Dr. Gorum elected to have a hearing before a selected group of faculty.  The AHDC convened a public hearing in seven sittings, meeting on August 30 -31, September 28-29, and October 27-29, 2004. (AHDC Report at 4) (B0104).   After hearing extensive testimony from seventeen witnesses and reviewing extensive documentary evidence, the committee produced a twenty page report.  The report concluded that there existed a chaotic state of practices and procedures for changing student grades at DSU (AHDC Report at 14) (B0105).  Dr. Johnny Tolliver, former Provost and VP of Academic Affairs, testified that when students were wrongly erased or "purged" from the system, Chairs were allowed to evaluate their course work and assign grades.  The report based this finding on Provost Tolliver's testimony that Dean Tommy Frederick allowed this practice in the College of Arts and Sciences, in which Dr. Gorum taught Mass Communications. (AHDC Report at 14) (B0105).

Contrary to Dean Frederick and Defendant Sessoms' positions, Dr. Tolliver acknowledged the significance of a Chair's motivation in changing student grades, particularly in light of common practice at DSU.  "It's important to know that he or she is being motivated for good reason," Tolliver stated.  "And all the good reason is for the benefit of the student.  That is not to say you want to give students grades, but if students truly earn grades that are better than what a faculty member may award, then, you do want to take steps to try to make sure that the student gets the grade that he or she earns." (10/27/04 AHDC Tr. at 232-233) (B0059-0060).

If a Chair changed students' grades based on good intentions, as described above, Dr. Tolliver does not consider such actions to constitute a dismissible offense.  "People violate

17

procedures all the time," he remarked. "I've been in this business long enough to know that people violate procedures even as simple as missing a step in the line of authority to try to get some things done. Sometimes you have to do that in order to get things done. So, no, I wouldn't consider that a dismissible offense. It may require the removal of that person as a Department Chair, but depending on the violation of procedure, how serious the breach is, that would be the extend of the sanctions for that." (10/27/04 AHDC Tr. at 233) (B0059).

Dr. Tolliver's focus on a Chair's motivation in changing grades stemmed, in part, from his experience as DSU Provost. "[T]he whole aim was to get students qualified for graduation," he stated. "And in some cases where there was some controversy over some courses, we gave very wide latitude in substituting courses so that students could meet graduation requirements." (10/27/04 AHDC Tr. at 193) (B0051).

The Committee found that the prior administration had a different understanding of the rules regarding grade changes. It created an atmosphere of "lack of rule enforcement ... that perpetuated and encouraged random and uncontrolled manipulation of student grades." (AHDC Report at 14) (B0105).

"We strongly feel that Dr. Gorum's case is the tip of the iceberg, and he is in fact the scapegoat ... whose investigation we hope has uprooted the roots of the poisonous tree and brought down all the poisonous fruit. We believe he deserves a severe sanction but short of dismissal." (AHDC Report at 18) (B0106). The report continued, "this Committee is convinced that DSU university administration engaged in practices and procedures that encouraged and promoted inappropriate manipulation of student grades." (AHDC Report at 18) (B0106). "Although DSU has established policies regarding student grade change, practices and procedure

18

were in such significant conflict with those policies as to render them ineffective."(AHDC Report at 18) (B0106).

## H.   PRESIDENT'S FINAL RECOMMENDATION

The President read the AHDC Report and recommended termination to the Board. Sessoms did not attend the AHDC Hearings (though he did testify).  (Sessoms Dep. at 46) (B0027).  He did not read the transcript of the hearing or the post-trial briefs.  Id at 47 (B0028).  He was not aware at the time of his decision that his dean, Dean Frederick, gave testimony contradictory to that of the Vice-President Provost Tolliver, Former Chair Dr. King and Dr. Gorum.  Id at 80-81 (B0112-B0013).[2]  He has and had no idea what evidence or testimony was presented that demonstrated that DSU did not follow its own rules or that Provost Tolliver admitted this at the Hearing.  Id. at p. 77-8 (B0110-0111).[3]  President Sessoms did not and does not know what department chairs were told to do about student purges.  Id. at 80-81 (B0112-B0113).  Sessoms never spoke to Gorum about this matter.  Id. at p. 43 (B0114).  Despite the above, Dr. Sessoms chose to ignore the AHDC's recommendation that Dr. Gorum be reinstated.

## I.   THE BOARD OF TRUSTEES

Dr. Sessoms signed a letter dated 4/14/05 (Exhibit B0116-B0118), recommending the Board terminate Dr. Gorum.  The Board met on April 14, 2005 to review the recommendation. On that date, Dr. Sessoms and Mark Farley, DSU counsel, provided the Board with an AHDC

---

[2]By inference, it should also be assumed then that President Sessoms had no knowledge that Dean Frederick called Dr. Gorum and Dr. Tolliver liars or that students and Dr. King agreed with Gorum and Tolliver's version of events.

[3]Mark Farley, Vice-President of Human Resources, has admitted that Dr. Tolliver's comments about grade changing practices reflect what the practice was at the time.  (Farley Dep. at 4 and 79)

Report and answered questions from the Board.

The Board was not privy to the proceedings of the Ad Hoc Dismissal Hearings, so they had to make certain assumptions. (Claiborne Smith Dep. at 33) (B0115). They were not provided with a copy of the transcript of the Hearing. Id at p. 34-5 (B0120). The Board considered and questioned Dr. Sessoms about page 18 of the Ad Hoc Dismissal Committee Report which provides in part that "although DSU has established policies regarding student grade change, practices and procedures were in significant conflict with those policies as to render them ineffective" and that Gorum was a "scapegoat." (Sessoms Dep. at. 62; see also p. 18 of the AHDC's Report) (B0123; B0106).

The Chairman of the Board of Trustees of DSU, Claiborne Smith, thought the page eighteen (18) findings of the AHDC were serious and something that he expected the President of the University to look into and keep the Board informed of. (Smith Dep. 56) (B0119). The President told the Board during questioning that there was an ongoing investigation into the matters discussed in the AHDC Report. (Smith Dep. at 47; see also Sessoms Dep. p. 50) (B0121; B0124). According to Dr. Sessoms, this investigation has now been ongoing since March of 2004. (Sessoms Dep. p. 52-3) (B0124). Thus, according to Dr. Sessoms there has been an investigation into these matters for over three years that is continuing. Id. at p. 55 (B0125).

The Board also asked President Sessoms why Dr. Gorum had made the grade changes. In response, Sessoms replied that he had no idea. (Sessoms Dep. at 71) (B0142). At no time did the President explain to the board that Dr. Gorum, Dr. King and Vice-President and Provost Tolliver all stated that there was a past practice or custom of allowing chairs to change grades. (Smith Dep. at 46-8) (B0121). No one told the Board that Dean Frederick called Vice-President Tolliver

20

and Dr. King liars when they said that Dean Frederick knew about this policy or custom. Id. at 49-50 (B0121). Nor was the board made aware that there was an allegation by the AHDC that there was no effective written policy regarding grade changes. Id. at 50 (B0121). The President, however, articulated to the board in a broad sense what the policy was but did not discuss it in detail. Id. at 50 (B0121). He also claimed that the AHDC "selectively cited evidence ... not reflective of [DSU policies]." (B0118).

As a result of the recommendation of President Sessoms, the Board terminated Dr. Gorum on April 21, 2005.

## J.   POST TERMINATION INVESTIGATION

The Board of Trustees has not been provided with any formal or informal report regarding any ongoing investigation into grade changes, manipulation of grade changes or any other irregularities in the Registrar's Office other than related to Dr. Gorum. (Smith Dep. at 57-62) (B0122-B0123). If such an investigation has been ongoing, Dr. Smith, as Board Chairman, would have expected to have heard some type of status report related to it. Id. at 62 (B0123).

Moreover, Dr. Kenneth Bell, the Provost and Vice-President of Academic Affairs and Chief Academic Officer during much of the time since Dr. Gorum's termination has no knowledge of any investigation into Dean Frederick, improper grade changes or failure to follow grade change policies. (Bell Dep. at 2-5, 12-13) (B0126-B0129). If such an investigation occurred or was ongoing, Dr. Bell would expect to be notified of it. Id.

## ARGUMENT

The standards to be observed in evaluating a motion for summary judgment are clear. Fed.R.Civ.P. 56(c) instructs a court to enter summary judgment only when the record reveals that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed.R.Civ.P. 56(c).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986), Kosta v. Connolly, 709 F.Supp. 592 (E.D. Pa 1989), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), Enzo Life Scis. Inc. v. Digene Corp., 305 F.Supp. 2d 406 (D.Del. 2004).  At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  477 US 242 (1986).

In making its determination on a summary judgment motion, the Court must view all the inferences in a light most favorable to the non-moving party, United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); must resolve all doubts against the moving party, Gans v. Mundy, 762 F.2d 338, 341 (3rd Cir. 1985) cert. denied 474 U.S. 1010 (1985), and must take as true all allegations of the non-moving party that conflict with those of the movant.  Id.  In addition, the Court must treat direct and circumstantial evidence alike.  See Desert Palace. Inc. v. Costa, 539 U.S. 90, 94 (2003) (reasoning that "circumstantial evidence is not only sufficient but may also be more certain, satisfying and persuasive than direct evidence").  In the instant case, there is ample evidence from which a reasonable jury may find in Plaintiff's favor and, therefore, summary judgment should be denied.

## A.  DR. GORUM'S SPEECH AND CONDUCT QUALIFIES AS FIRST AMENDMENT PROTECTED ACTIVITY

To advance a claim of retaliation under § 1983 and the First Amendment, Plaintiff must prove (1) that he engaged in protected conduct; (2) that he was retaliated against; and (3) that the protected conduct was a substantial or motivating factor in the retaliation. 42 U.S.C. § 1983.  See Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S 274 (1977); Baldassare v. New Jersey,

250 F.3d 188, 194(3d Cir. 2001); Fultz v. Dunn, 165 F.3d 215, 218 (3d Cir 1998); Rodriguez v.

Torres, 60 F.Supp.2d 334 (D.N.J. 1999); Bradshaw v. Township of Middletown, 296 F.Supp.2d

526, 542 (D.N.J. 2003).

### 1. Dr. Gorum's Speech Was a Matter of Public Concern

Dr. Gorum's speech was a matter of public concern. It related to matters of political and

social concern to the community. In analyzing whether an employee's speech addresses public

concern, a court must determine whether it can be "fairly considered as relating to any matter of

political, social or other concern to the community Swartzwelder v. McNeilly, 297 F.3d 228, 235

(3d Cir. 2002); Connick v. Myers, 461 U.S. 138, 147, 75 L.Ed. 2d 708(1983). The inquiry is a

legal one, to be analyzed in the context of a given statement, as revealed by the whole record.

Stiner v. University of Delaware, 243 F. Supp. 2d 106, 111, (D.Del.2003). Dr. Gorum's protected

activities must be viewed together, in the context of all the circumstances surrounding his

termination, including the findings of the Disciplinary Committee and the tolerance of similar

actions by other faculty. The Court must also analyze the public impact and perception of Dr.

Gorum's speech and actions. The selection of a state university president, the expulsion of its

football star, and the attendance at a prestigious political event all had considerable public impact

and received substantial public attention.

The Third Circuit has noted that "it is particularly important that in cases dealing with

academia, the standard applied ... should be the one applicable to the rights of teachers and

students 'in light of the special characteristics of the school environment'" Trotman v. Board of

Trustees of Lincoln University, 635 F.2d 216 (3d Cir. 1980), quoting Tinker v. Des Moines

Independent Community School District, 393 U.S. 503, S.Ct. 733 (1960). In Trotman, several

professors and the president were engaged in a protracted dispute about a number of university policies. In response, the president sent telegrams to the faculty, threatening their jobs. The court was concerned about the chilling effect the President's retaliatory actions had on free speech in a university context. In Tinker, the Supreme Court urged that neither "students nor teachers shed their Constitutional rights at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years." 393 U.S. 503, 506. The Court again stressed the importance of freedom of speech in academia in Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957), "the essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." Friedman v. Beame, 558 F.2d 1107 (2d Cir.1977).

The following pages will review Dr. Gorum's individual exercises of First Amendment activity.

### 2.    Dr. Gorum's Assistance to DeShaun Morris Was Protected Conduct.

Dr. Gorum's association with and defense of a student expelled from the University and its football team received considerable public attention. A professor's ability to associate with and support his students without fear of retaliation is a matter of public concern. In December, 2002, student DeShaun Morris admitted having a firearm in his dorm room. Morris sought out Dr. Gorum to assist him in his defense because Gorum had become the *de facto* student discipline advisor as a result of his efforts to draft a student disciplinary code and process for DSU.

Dr. Gorum served as Morris' advisor during the university's internal judicial proceedings. Morris was suspended for the Spring 2003 semester, allowed to take summer classes and resume

24

his classes and membership on the football team in Fall 2003. However, in July 2003, shortly after Defendant Sessoms assumed the presidency, he changed Morris' punishment to a year's suspension and complete expulsion from the football team. Defendant Sessoms announced this modification to Morris' disciplinary sentence by having his secretary call Dr. Gorum. (Morris Dep. at 87) (B0130). Morris requested Gorum assist him with this new punishment. Gorum hired and paid a $600 retainer to an attorney to represent Morris. (Gorum Dep. at 175-176) (B0024). Gorum spent his own time and money with Morris and his lawyer, lending substantial assistance and support in Morris' lawsuit against the University. He assisted Morris and his lawyer in developing his case and soliciting witnesses. Punishment in retaliation for exercising one's right to access the court may constitute a First Amendment violation. Hydrick v. Hunter, 466 F. 3d 676, 692 (9th Cir. 2006).

Even if Dr. Gorum's conduct is not considered "speech", it is conduct covered by the First Amendment's protection of free association. Shelton v. Tucker, 364 U.S. 479 (1960), Rennie v. Klein, 653 F.2d 836 (3d Cir. 1981). The Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, *petition for the redress of grievances*, and the exercise of religion. Roberts v. Jaycees, 468 U.S. 609, 617 (1984) (emph. added).

Dr. Gorum's involvement with DaShaun Morris qualifies as a protected free association. "Attending meetings on necessary legal steps and associating for the purpose of assisting persons seeking legal redress are modes of expression and association protected by the First Amendment" Copp v. Unified Sch. Dist. No. 501, 882 F.2d 1547 (10th Cir. 1989) (allowing a police officer to pursue a First Amendment claim where he alleged that he was fired for assisting his wife in filing

a sex discrimination claim against his employer); <u>NAACP v. Button</u>, 371 U.S. 415(1963) (finding

a regulation prohibiting NAACP members from assisting political parties to litigation violative of

First Amendment).   The Supreme Court has held that nowhere is the protection of First

Amendment freedoms more important than in American schools. <u>Shelton v. Tucker</u>, 364 U.S. 479

(1960).  Further, the Supreme Court has held that nowhere is the protection of First Amendment

freedoms more important than in American schools. <u>Shelton v. Tucker</u>, 364 U.S. 479 (1960).

**3.    Dr. Gorum's Revocation of Dr. Sessoms' Invitation to the Martin Luther King Prayer Breakfast Was Speech and Conduct on a Matter of Public Concern**

Another instance of protected activity was Dr. Gorum's cancellation of Defendant

Sessoms' speech at the 2004 Martin Luther King Alumni Prayer Breakfast.  The MLK Breakfast,

hosted by the Delaware State chapter of Alpha Phi Alpha, is a recognized public event of political

significance in the State of Delaware.  Invitees in 2004 included Governor Ruth Ann Minner,

Mayor James Hutchinson, U.S. Senators Joseph Biden and Thomas Carper,  Representative

Michael Castle and several State and Federal Judges.  (Wm. Torian letters 12/12/03) (B0029-

B0039).

The 2004 Breakfast was the organization's 20th anniversary event, and promised to be an

assemblage of influential members of the University community as well as local and national

politicians and dignitaries.   When Dr. Gorum arranged for the Dean of Howard University to

speak at the Breakfast instead of Defendant Sessoms, he engaged in conduct relating to a matter of

social and political importance.  Not only was Dr. Sessoms disinvited from a prominent event, the

cancellation served as a public notice of the new President's lack of support on campus. (J.

Gorum Dep. at 44) (B0006).  Instead of canceling the appearance of Howard University's Dean of the School of Dentistry, Dr. Gorum disinvited his own President.   Defendant Sessoms had only been in office for one semester and was already being shunned and upstaged by one of the University's most popular professors.

Dr. Gorum exercised his First Amendment right to choose the speaker at this political and religious public event.  The Constitution protects this activity.

**4.     Dr. Gorum's Withdrawal of Support for Defendant Sessom's Candidacy for President of the University Was Speech on a Matter of Public Concern.**

Dr. Gorum was part of the interviewing committee during the search for a new University President following former president DeLauder's retirement.  At the faculty senate, Dr. Gorum recommended a continuation of the search for a new president rather than a vote for Defendant Sessoms. (W. Gorum Dep. at 48) (B0132).  The faculty voted not to reopen the search, but the vote was very close. This speech as well was protected. See, Trotman v. Board of Trustees of Lincoln U., supra.

**B.     DR. GORUM'S PROTECTED ACTIVITY WAS NOT OUTWEIGHED BY HIS EMPLOYER'S INTEREST IN EFFICIENCY**

An employer has an interest in avoiding disruptions to the workplace.  The burden is on the employer to demonstrate that protected speech substantially interferes with the operation of the business or undermine the authority of the employer. Connick, 461 U.S. 138(1983).  It has been held that otherwise protected speech must "materially and substantially" disrupt the operation of the enterprise before it can be said to have relinquished First Amendment protection. Ruhlman v. Hankinson, 461 F.Supp. 145 (W.D. Pa. 1978).  While Defendant Sessoms had an interest in maintaining the efficiency of his office, the record does not suggest that any of Dr.

27

Gorum's actions caused any disruption on campus. The President's Office did not suffer any stoppage of its operations, nor did the staff's working relationships disintegrate. President Sessoms has denied ever having knowledge of Gorum's activities.

## C.    A REASONABLE INFERENCE EXISTS THAT DEFENDANT SESSOMS WAS AWARE OF DR. GORUM'S PROTECTED ACTIVITY

Defendant Sessoms claims to have no knowledge whatsoever about any of Dr. Gorum's protected actions and speech. (Sessoms Dep. at 34) (B0143). However, circumstantial evidence and direct witness testimony contradict this assertion. Dr. Gorum's actions were of such a high profile nature, that it is difficult to believe Dr. Sessoms was oblivious, especially when much of Gorum's speech concerned Sessoms directly. Further, in light of the selective discipline taken against Dr. Gorum, against the AHDC's studied recommendations, Defendant Sessoms fired Gorum precisely because he was angered by Gorum's protected actions. See, Desert Palace, supra.

For each of Gorum's protected activities, there is a reasonable inference that Sessoms was aware of and was upset by the Professor's speech. Several of Dr. Gorum's colleagues alerted him that Gorum's vote to reopen the presidential search had "gotten back to Sessoms and he was upset about it" (W. Gorum Dep. at 48) (B0132). The committee meetings regarding the presidential search were open meetings, with recorded minutes, and anyone with an interest in the proceedings would be able to attend or otherwise discover what was discussed. (Osei Dep. at 7) (B0015).

Dr. Osei was allegedly promised a deanship at the University in return for his assistance to Defendant Sessoms (J. Gorum Dep. at 58) (B0005). Dr. Osei was one of several of Sessoms' supporters on the search committee, who later reported to the new President which of the faculty had been in support of his candidacy. (J. Gorum Dep. at 58) (B0005). Another of Sessoms'

supporters was Dean Tommy Frederick, who allegedly gave the President a regular report on faculty issues and discussions. (W. Gorum Dep. at 118) (B0073).

Sessoms claims not to have any contact with retired President DeLauder since June 2003, but according to Dr. Smith, Chairman of the Board of Trustees, DeLauder frequently returned to campus to help with Sessoms' transition. (Sessoms Dep. at 31) (B0144). Before Dr. DeLauder's retirement, he remained on campus during Dr. Sessom's transition into the President's office. (Smith Dep. at 18) (B0145). A reasonable inference may be drawn that a succeeding President would draw upon the wisdom and knowledge of the retiring President during the transition. Sessoms denies having any substantive conversations with his predecessor. (Sessoms Dep. at 31) (A-0144). The Board Chairman's contradicting statement raise serious factual questions about what the President knew about the campus and its leaders when he took over.

Dr. Sessoms claims to have no knowledge of his invitation to the 2004 Martin Luther King Jr. Prayer Breakfast, nor of the event at all. (Sessoms Dep. at 14) (B0025). The testimonies of several individuals contradict Defendant Sessoms' claim of total ignorance of the Breakfast. (J. Gorum Dep., affd of Torian and Shelton) (B0131). It is difficult to believe that the University President has no knowledge of a distinguished, annual event on his campus, one that draws some of the state's preeminent citizens. Further, Dr. Sessoms was invited to attend by Jacquelyne Gorum and invited to speak by Cecil Wilson, who later had to rescind the invitation. Cecil Wilson, former president of the Delaware NAACP, was hired to assist Dr. Sessoms acclimate to the university. (W. Gorum Dep. at 125-126) (B0040-B0041). Because Gorum, as head of the search committee, spoke directly to Wilson in ordering the revocation of Sessoms' invitation, it is highly likely that Wilson told Sessoms of Gorum's role in the decision. (W. Gorum Dep. at 129)

29

(B0146). Further, Wilson told Gorum that Sessoms had already agreed to come. (W. Gorum Dep. at 130) (B0148).

Dr. Sessoms did not attend the event, not because he was unaware of it, but most likely because he was upset about the revocation of his invitation to speak. As the new president of the University, his absence was conspicuous, and many in attendance gathered that he was upset. (J. Gorum Dep. at 43) (B0006). A reasonable inference may therefore be drawn that Defendant Sessoms was upset at Dr. Gorum, who was responsible for inviting a different speaker and directing the revocation of Dr. Sessoms' invitation.

Despite his denial, a question of fact remains whether Dr. Sessoms was aware of Dr. Gorum's assistance to DeShaun Morris in his lawsuit against DSU. A reasonable jury may find Sessoms was well aware of the controversy, as his own secretary, Sandra Arnell, called Dr. Gorum to inform him that Morris' punishment had been increased and that he had to leave campus immediately (Morris Complaint at 4). Additionally, the filing of the lawsuit raised the issue to the forefront for the University President (Sessoms Dep. at 25). The role of Dr. Gorum was explored extensively in Morris' Deposition on September 9, 2003. Morris' discipline even received newspaper coverage (News-Journal, Aug 24, 28, Dec 25, 2003) (B0154-B0158). During the preparation for the suit, football coaches were ordered to cease cooperation with Morris and his attorney, an order that in all likelihood would not have been given without the knowledge or permission of the President. (Gorum Dep. at 177) (B0024).

Along with Mrs. Arnell, other members of Sesssoms' office knew that Gorum had conflict with the new President. Sheila Davis, a staff member of Sessoms' office, warned Dr. Gorum that Sessoms and other administrators were aware of his involvement with Morris' lawsuit. Davis told

Gorum that "the administration is out to get you" (Gorum dep 178:7-14) (B0024).

Defendant relies on <u>Ambrose v. Twp of Robinson</u>, 303 F 3d 488, (3d Cir. 202) to establish that Dr. Gorum does not have the requisite amount of proof of Dr.Sessoms' knowledge of Gorum's speech. However, the plaintiff in <u>Ambrose</u> could only offer the close temporal proximity between the plaintiff's speech and his adverse employment action. <u>Ambrose</u>, The Court ruled that closeness in time is relevant, but alone is not sufficient to establish the defendant's knowledge. <u>Moore v. Susquehanna</u>, 2005 US DIS LEXIS 4503 (M.D.Pa., Sept. 30, 2005). In the present case, Plaintiff has much more than temporal proximity to establish the Defendant's awareness of his protected activities. Gorum challenged Sessoms' candidacy for President, one of his first disciplinary decisions, and revoked his speaking engagement at the University's most prominent event. His speech and actions were of a nature that would be difficult for Sessoms to overlook.

**D.    DEFENDANT SESSOMS IS NOT ENTITLED TO QUALIFIED IMMUNITY**

Defendant asserts that he is entitled to qualified immunity. A state official is immune from a § 1983 claim if a reasonable person in her position could have believed that her actions were proper in light of existing law. Such immunity is not available, however, where, in light of the existing law, the unlawfulness should have been apparent. <u>Id</u>. <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987).

**E.    A REASONABLE INFERENCE EXISTS THAT DEFENDANT SESSOMS WAS MOTIVATED BY RETALIATORY ANIMUS**

Defendants argue that no causal connection between Dr. Gorum's protected activity and the alleged adverse employment action exists. (Defendant's Brief at 29). A review of the record demonstrates that a reasonable jury could find that Defendant Sessoms was motivated by

retaliatory animus when he recommended Dr. Gorum's termination to the Board.

Defendant Sessoms' knowledge of Dr. Gorum's protected activities, together with the recommendation and misinformation he gave the Board of Trustees concerning Gorum's termination create a strong inference that Sessoms acted in retaliation. Sessoms was aware of Gorum's actions, especially those that adversely affected him. It is reasonable to infer that Sessoms would have been upset at Gorum, who openly did not support his candidacy and took other actions that undermined Sessoms' authority. Gorum challenged Sessoms' disciplinary actions, supported a student in his lawsuit against the University, and publicly humiliated the new President by ordering the revocation of his invitation to the Martin Luther King Jr. Prayer Breakfast. All of these actions had a considerable negative impact on Defendant Sessoms

The President's dismissal of the Report of the AHDC demonstrates pretextual conduct and improper motivation. The AHDC found that inappropriate grade changes were being made by other faculty and even members of the registrar's office. (Smith Dep. at 62) (B0134). At least seven chairs of different departments told Dr. Gorum that they had engaged in similar conduct, and offered their support to him. (W. Gorum Dep. at 27) (B0137). Many professors changed grades in a similar manner as Gorum but were never challenged or censured. (W. Gorum Dep. at 29) (B0138). The AHDC report indicated that further investigation into allegations of other violations should follow. However, despite the serious nature of the University's widespread grade change violations, no report of any kind has been issued regarding further investigations into the problem. (Smith Dep. at 57) (B0139). The President told the Board of Trustees that an investigation was ongoing. Yet, no interim or oral report has been made to the Board in three years. If such an investigation were ongoing, Board Chairman Smith believes he would have

32

received some indication. Provost Bell has also testified that he has no knowledge of any investigation. As Chief Academic Officer, Provost Bell would be expected to know or be informed of an investigation into grade changes and irregularities was ongoing. A jury could reasonable conclude that no investigation into any other faculty member or grade change has ever occurred. If no one else has been subjected to investigation, why was Dr. Gorum? A jury could find, as the AHDC found, that Dr. Gorum was singled out to be a scapegoat and selectively prosecuted. Despite Sessoms' knowledge of the mitigating factors regarding no viable grade change procedures and widespread administrative knowledge, he recommended termination for Dr. Gorum to remove a person who had spoken out against him.

Other faculty at DSU have feared retaliation from Defendant Sessoms. (W. Gorum Dep. at 25) (B0136). Dr. Aubrey, former director of the testing center, related to Dr. Gorum information regarding student and faculty evaluations in connection with the University's investigation of grade changes. (W. Gorum Dep. at. 22) (0135). Dr. Aubrey said that he felt threatened and intimidated because of his assistance to Dr. Gorum. He was in fear for his job, and believed his telephone was being tapped. (W. Gorum Dep. at 25) (B0136). Dr. Gorum was warned by several colleagues that Defendant Sessoms had directed other faculty members to gather incriminating information on Dr. Gorum (W. Gorum Dep. at 48) (B0149).

The timing of the investigation is also relevant to Sessoms' motivation and intent. In Farrell v. Planters Lifesavers Co., the Court discussed whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of causal connection for the purpose of a prima facie case of retaliation. 206 F.3d 271, 278 (3d Cir. 2000). In Farrell, Id. the Court explained "[the] analysis is essentially fact based." The Court

stated that they had ruled differently on the issue in their case law depending on how proximate the events actually were and the context in which the case came before them. Id. The Court cautioned that each case must be considered with a careful eye to the specific facts and circumstances encountered. Id. at n. 5 (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)).

Defendant claims there is no temporal proximity because his recommendation to the Board was submitted in April 2005, and the DeShaun Morris case ended in October 2003. (Defendant's Brief at 28) Defendant ignores some key facts in selecting those dates as guideposts. The controversy surrounding Mr. Morris was not the last event that Dr. Gorum spoke about. The MLK Breakfast was slated for January 19, 2004 (letter of Wm Torian, 12/12/2003) (B0029). The first action the administration took against Dr. Gorum concerning grade changes occurred on March 5, 2004, only 1 ½ months after the Prayer Breakfast. Situations involving a lapse of up to two months have been found to exhibit enough temporal proximity that, along with other evidence, are sufficient to establish causation. Williams v. Phila. Hous.Auth., 380 F.3d 751, 780 (3d Cir. 2004), Thomas v. Town of Hammonton, 351 F.3d 108, 114(3d Cir. 2003). Plaintiffs have made a prima facie case of retaliation, and consequently, Defendant's Motion should be denied.

**F.  DEFENDANTS' STATED REASON FOR PLAINTIFF'S DISCHARGE IS PRETEXTUAL**

The retaliatory animus and the pretext in this matter work hand-in-hand. It is well established that a Plaintiff has the burden of demonstrating a prima facie case of retaliation. Once this is established, the Defendant must demonstrate a non-discriminating reason(s) for its action. The burden then shifts to the Plaintiff to demonstrate that this action was pretextual. Mt. Healthy City Sch. Dist. Bd. of Ed., supra.

34

Here, it is submitted that President Sessoms improperly influenced the Board of Trustees because of his retaliatory animus towards Dr. Gorum. "It is plainly permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decision making process and thus allowed discrimination to infect the ultimate decision." Roebuck v. Drexel University, 852 F. 2d 715, 727 (3d Cir. 1988), quoting Abramson v. William Patterson College, 260 F.3d 265, 283 (3d Cir., 2001). Generally, whether the proffered reasons for termination are pretextual is left to the jury. Watters v. City of Philadelphia, 55 F.3d 886, 892 n. 3 (3d Cir. 1995). Revealing discrepancies in the proffered reasons can also constitute evidence of the causal link. See Farrell v. Planter's Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000). Plaintiffs need not cast doubt on each proffered reason in a vacuum. If Defendants proffer several legitimate reasons, and Plaintiffs manage to cast substantial doubt on a fair number of them, Plaintiffs may not need to discredit the remainder. That is because the fact finder's rejection of some of Defendants' proffered reasons may impede the employer's credibility seriously enough so that a fact finder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available. Abramson, 260 F.3d at 283, Igwe v. E.I. DuPont De Nemours & Co., 180 Fed. Appx. 353 (3d Cir. 2006).

Dr. Gorum has ample support for his contention that Defendants reason for his dismissal was pretextual. Although Dr. Sessoms' suspension of Dr. Gorum pending the AHDC Hearing may have been severe, it was initially done with pay and is not contested. The pretextual action in this matter is Dr. Sessoms' recommendation of termination and discussion with the Board. At the time of these actions, Sessoms had in his possession the AHDC Report, transcripts of those proceedings, the Post-Hearing Briefs of the parties and access to all of the witnesses and AHDC

35

members. He chose to ignore issues of conflict in the grade changing process raised by the AHDC which cast great doubt on whether Dr. Gorum had committed a violation worthy of termination.

The AHDC uncovered a long history of gaping disparities between official grade change policy and actual practice at DSU. (Ackah Dep. at 20) (B0150). The Committee noted that many faculty and members of the Registrars and President's Office either committed or condoned the unofficial practices. Committee member Ackah noted, "the administration was also responsible ... it had been endemic for a long time and no one did anything. (Ackah Dep. at 20) (B0150) (AHDC Report at 18) (B0106). Furthermore, the AHDC report did not reveal the rationale behind much of the grade change procedures. (J. Gorum Dep. at 45) (B0151). For example, students whose summer courses were cancelled were frequently allowed to take those classes as an independent study. For crediting purposes, their names were listed in the following semester's roster for that course. Thus, instructors in the fall or spring semester who were unfamiliar with the practice claimed that Dr. Gorum was giving grades to no-show students. (B.Skelcher letter to Dr. Tolliver, 12/2000, Gorum 0087) (B00152).

Because the grade change policy violations were commonplace in an "atmosphere of subtle encouragement to violate procedures"and because the changes were made in an attempt to fix mistakes in the registration system, the AHDC strongly recommended Dr. Gorum be retained. (AHDC Report at 16, 18) (B0133, B0106). The committee cautioned that Dr. Gorum should not be treated as a scapegoat (AHDC Report at 16) (B0106). However, when Defendant Sessoms made his recommendation to the Board of Trustees, marginalized these key findings of the AHDC. The Board knew only that Gorum had violated policy; they did not understand that it had

36

long been a common, condoned practice throughout the university, nor did they know of the reasons these practices had become necessary. Defendant Sessoms presented Dr. Gorum's case in a false light. He did not alert the Board of Trustees to any of the background facts because he intended to have Dr. Gorum fired. Defendant Sessoms seized the opportunity presented by the Registrar's discovery of the grade change violations to remove a disfavored employee.

Defendant Sessoms characterized Dr. Gorum's conduct as causing "immediate and substantial harm to the University" (Sessoms letter to Gorum, 3/5/04) (B0107). He told the Board of Trustees that Dr. Gorum violated a written grade change policy despite the AHDC's insistence that no clear and effective policy existed (See Claiborne Smith dep at 50) (B0153). Dr. Akah's Chair of the AHDC called President Sessoms' actions "draconian." (Ackah Dep. at 42-43) (B0161-B0162).

A reasonable jury may also find that the President's assertion that an ongoing investigation into other grade changes and grade change procedural problems was a sham. The Board was told that an investigation was ongoing in 2004. No writing or oral update has been provided to the Board. Id. p. 56-62 (B0122). The Chief Academic Officer of DSU, Dr. Kenneth Bell, has no knowledge of any investigation. Both the Board and Chief Academic Officer would expect some notice in three years if such an investigation were being conducted.

A jury could also reasonably infer that President Sessoms' claim that he has no knowledge of Dr. Gorum's protected activities is a pretext. Sessoms claims he never met with his predecessor President DeLauder to discuss DSU business. Yet, Board Chair Smith has stated he did. Soon after succeeding DeLauder, Sessoms modified DeLauder's disciplinary sentence for Morris, making him ineligible to play football. A reasonable inference may be drawn that

37

Sessoms talked to DeLauder about Morris. Sessoms denies that he knew Gorum was involved with Morris. A jury could easily find this false.

Why would Sessoms' secretary, Sandra Arnell, call Dr. Gorum to announce the President's decision to ban Morris from the football team if the President didn't know Gorum was involved? Why would the President give false or misleading information to the Board about Gorum? Why would the President say an investigation was ongoing when none was? Why did the President not consider or present to the Board the mitigating factors related to past procedures and purging problems? Why didn't the President tell the Board that Provost Tolliver, President Sessons or Bowers, Dr. Gorum and students contradicted Dr. Frederick's version of the grade changes? Why did the President disregard the recommendation of the AHDC that Dr. Gorum be reinstated after he AHDC spent seven days, over a thousand pages in hearing transcripts and prepared a 20 page report? A reasonable jury could answer these questions by concluding that President Sessoms was acting with prextext in an effort to discharge Gorum.

## G.    DR. GORUM'S ACTION IS NOT PRECLUDED BY THE STATUTE OF LIMITATIONS

Defendants claim that all actions of retaliation occurred prior to September 2004, and since Dr. Gorum filed this suit on September 12, 2006, his action falls outside of the statute of limitations and should be dismissed. Defendants have misapplied the facts and calculated the wrong dates to determine the tolling of the Statute of limitations. The Statute of limitations runs from the first act of retaliation known to the plaintiff. Here, the investigation and AHDC hearing, which began in August 2004, were not acts of retaliation. Dr. Gorum does not allege that the investigation into policy violations was either unwarranted or retaliatory. Dr. Gorum admits to making grade changes against official policy. He was placed on paid leave during the

investigation. The first retaliatory action did not occur until Dr. Sessoms recommended Gorum's outright termination, contrary to the recommendation of the AHDC. Dr. Sessoms wrote a letter to the Board of Trustees recommending Gorum's termination on April 14, 2005. (B0116-B0118). Dr. Gorum received a letter notifying him of Sessoms' and the Boards decision to terminate dated April 21, 2005. Therefore, Gorum first learned of Defendant's retaliation on or soon after April 21, 2005. He then filed this lawsuit on September 12, 2006, well within the 2 year statute of limitations that expired on September 12, 2007.

## H.   THE BOARD OF TRUSTEES SHOULD NOT BE DISMISSED BECAUSE DR. GORUM IS SEEKING INJUNCTIVE RELIEF

Injunctive relief is available because Dr. Gorum seeks reinstatement to his position as Professor and Chair of the Department of Mass Communications. Any comments Dr. Gorum made stating he has no desire to return to DSU for a lengthy period stemmed out of feelings of indignation or resentment surrounding his termination. Dr. Gorum has not relinquished his right to return to DSU if this Court so orders, and therefore the injunctive relief requested against the Board of Trustees should not be dismissed, and the Board should remain a party to this litigation.

## I.   PRESIDENT SESSOMS IS SUBJECT TO PUNITIVE DAMAGES

Defendants argue that President Sessoms is not subject to punitive damages. To the contrary, the law permits a jury to find President Sessoms, sued in his individual capacity liable for punitive damages. Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988).

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be

DENIED.

Respectfully submitted,

**SHELSBY AND LEONI**

**FROST & ZEFF**

BY: _s/ Michael J. Logullo_
    Michael J. Logullo, Esquire
    221 Main Street
    Stanton, DE 19804
    mlogullo@mslde.com


Counsel for Plaintiff

BY: _s/ Gregg L. Zeff_
    Gregg L. Zeff, Esquire
    Pro Hac Vice
    Pier 5 at Penn's Landing, 2nd Floor
    Philadelphia, PA 19106
    gzeff@frostzeff.com


Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-565 (GMS) |
| | : | |
| v. | : | |
| | : | |
| ALLEN L. SESSOMS, Ph.D., | : | |
| And BOARD OF TRUSTEES OF DSU | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

### CERTIFICATE OF SERVICE

      I Michael J. Logullo, Esquire, hereby certify that on September 25, 2007 I caused a true and correct copy o the foregoing PLAINTIFF'S ANSWERING MEMORANDUM OF LAW IN OPPOSITION TO SUMMARY JUDGMENT to be served electronically via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Robert L. Duston, Esquire
Saul Ewing, LLP
2600 Virginia Avenue, NW
The Watergate, Suite 1000
Washington, DC 20037
(202) 333-8800
rduston@saul.com

Kimberly L. Gattuso, Esquire
Michael R. Robinson, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
(302) 421-6800
kgattuso@saul.com
mrobinson@saul.com

**SHELSBY & LEONI**

  /s/ Michael J. Logullo
MICHAEL J. LOGULLO, ESQUIRE
Mlogullo@mslde.com
221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| WENDELL GORUM, Ph.D., | : | CIVIL ACTION |
|  | : | NO. 06-565 |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| ALLEN L. SESSOMS, Ph.D., | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| BOARD OF TRUSTEES OF | : |  |
| DELAWARE STATE UNIVERSITY, | : |  |
|  | : |  |
| Defendant. | : |  |

APPENDIX
IN SUPPORT OF PLAINTIFF'S
MOTION IN OPPOSITION TO SUMMARY JUDGMENT

Michael Logullo
SHELSBY & LEONI
221 Main Street
Stanton, DE 19804
(302) 995-6210 Ext. #108
(302) 995-6121 (fax)
mlogullo@mlsde.com

*Counsel for Plaintiff*

Gregg L. Zeff
FROST & ZEFF
Pier 5 at Penn's Landing
7 N. Columbus Blvd.
(215) 351-3333
(215) 351-3332
gzeff@frostzeff.com

*Counsel for Plaintiff*

DATED:   September 25, 2007

# TABLE OF CONTENTS

**Relevant Pleadings and Discovery:**

Amended Complaint.................................................................................B0154

Defendants' Brief in Support of Motion for Summary Judgment.....................B0155

AHDC Report.......................................................................................B0162

**Documents:**

Excerpts from Deposition Transcript of Jacquelyne Gorum, Ph.D...................B001-B006, B0151

Excerpts from Deposition Transcript of DaShaun Morris................................B007-0011, B0130

Excertps from Desposition Transcript of Osei-Mensah.....................................B0012-B0015

Excerpts from Deposition Transcript of Wendell Gorum, Ph.D.........................B0016-B0018,
    A0024, A0040-A0042, A0132,  A0135-0138, A0146-A0149

Letter from Charles N. Smith to DaShaun Morris.............................................B0020

Excerpts from Deposition Transcript of Allen Sessoms, Ph.D...........................B0023, B0108,
    A0025-A0028, A0110-A0114, A0123-A0125, A0142-A0144

Invitation letters from William Torian................................................................B0029-B0039

Excerpts from Transcript of AHDC Hearing 10/27/04.....................................B0043-B0060,
    A0089

Excerpts from Transcript of AHDC Hearing 10/28/04.....................................B0061-B0067

Excerpts from Transcript of AHDC Hearing 9/29/04.......................................B0068-B0088

Excerpts from Transcript of AHDC Hearing 8/31/04.......................................B0090-B0102

Excerpts from Report of AHDC.........................................................................B0103-B0106,
    A0133

Letter from Dr. Sessoms to Dr. Gorum, 3/5/2004.............................................B0107

Excerpts from Transcript of Hearing 9/28/04.....................................................B0109

Excerpts from Deposition Transcript of Claiborne Smith, Ph.D...........................B0115, B0119-0122, A0134, A0145, A0153

Letter from Dr. Sessoms to Board of Trustees, 4/14/05.......................................B0116-B0118

Excerpts from Deposition Transcript of Kenneth Bell, Ph.D.................................B0126-B0129

Declaration of William Torian.......................................................................B0131

Excerpt from Report of AHDC........................................................................B0133

Excerpt from Transcript of AHDC Hearing 10/29/04...........................................B0139

Excerpts from Deposition Transcript of Yaw Ackah, Ph.D...................................B0150, B0160

Letter from Dr. Bradley Skelcher to Dr. Johnny Tolliver.....................................B0152

News-Journal August 24, 2003, "Hornets' top player ruled ineligible.................B0154-B0155

News-Journal August 28, 2003, "DSU's Morris expelled"..................................B0156-B0157

News-Journal December 25, 20003, "Morris tries to make up for a lost season"...B0158-B0160

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

G

**18**

1  but --
2  Q.    Okay. When you first moved to Dover in
3  1989 --
4  A.    Yes.
5  Q.    -- did you become active in a church or
6  social activities?
7  A.    I am now very active in a church. We
8  visited churches. We did not find the one that we
9  particularly wanted to have membership in when we
10  first came to Dover.
11  Q.    Okay.
12  A.    But now I serve on the vestry of my church
13  and on the state diocesan council.
14  Q.    And that's at Christ Church?
15  A.    Christ Episcopal Church.
16  Q.    Christ Episcopal; interesting.
17      How long have you been on the vestry?
18  A.    This is my first year. So it is a little
19  over a year. I was elected last -- winter before
20  last, so in '06. So it is a little over a year I have
21  been on the vestry.
22  Q.    How long have you been members of that
23  church?
24  A.    Maybe five years.

**19**

1  Q.    I am in my second year of a vestry in my
2  Episcopal church, too.
3  A.    Oh, really?
4  Q.    So I understand. It is a very interesting
5  experience.
6  A.    Yes.
7  Q.    Do you know Professor Sessoms?
8  A.    Yes, I do.
9  Q.    Or I am sorry. President.
10  A.    President.
11  Q.    I can't even read my own handwriting.
12  A.    But he is a professor, so either one.
13  Q.    You know who I am referring to?
14  A.    Yes.
15  Q.    How long have you known him?
16  A.    Since he came to Delaware State University.
17  Q.    And that was in the summer of '04, I
18  believe.
19  A.    I can't tell you. I could not tell you the
20  year.
21  Q.    Or actually I think it is '03.
22  A.    '03. I think it was '03.
23  Q.    Okay.
24  A.    But I couldn't tell you.

**20**

1  Q.    Did you get to know his family at all?
2  A.    No. I met his daughters.
3  Q.    Do you believe that President Sessoms acted
4  with retaliation with regard to Dr. Gorum's advocacy
5  activities?
6  A.    Yes, I do.
7      MR. ZEFF: Objection.
8      MR. ROBINSON: What basis?
9      MR. ZEFF: The form. There is no
10  foundation.
11  BY MR. ROBINSON:
12  Q.    Do you understand what I am referring to
13  when I refer to Dr. Gorum's advocacy activities?
14  A.    Well, I assumed you meant that faculty
15  always and students always went to Dr. Gorum to
16  discuss any problems, issues they were dealing with on
17  campus. He was seen as a powerbroker on campus. And
18  I remember Dr. Bell stating how happy he was that we
19  had arrived at this institution because we were both
20  impact players and the difference we made on that
21  campus.
22  Q.    When did Dr. Bell say that?
23  A.    Oh, he said that to me -- we were standing
24  in line at a fall -- in the fall you had a picnic, and

**21**

1  we were standing in line at the picnic, and he came up
2  and said that to me.
3  Q.    Is that back when you first started in the
4  early '90's?
5  A.    It was in the early '90's.
6  Q.    Did you have a similar reputation?
7  A.    Not to the same extent as Wendell did,
8  because I was in a different role as a senior
9  administrator.
10  Q.    We went through your education history real
11  quick. I am wondering if we can go through your work
12  history as well.
13  A.    Okay.
14  Q.    Starting from I guess the point after the
15  Peace Corps, you came back and did you go straight
16  into your master's program?
17  A.    Yes, I did.
18  Q.    Were you working at all through your school
19  years?
20  A.    No, I did not. In social work you have a
21  field experience the entire time you are in school, so
22  I worked, quote, but it was an internship for the two
23  years that it takes to get the master's degree.
24  Q.    Where was that?

6 (Pages 18 to 21)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

---

22

1  A.    Pardon?
2  Q.    And that was --
3  A.    An MSW, a master's in social work.
4  Q.    No.
5  A.    Oh.
6  Q.    Where were you working in your internship?
7  A.    The second year I worked in a high school
8  and an elementary school, and in the first year I
9  worked in welfare, public welfare.
10 Q.    Okay. And then after --
11 A.    After I graduated with my master's, I was
12 then hired by the Public Welfare Department to work in
13 child welfare as a senior child welfare worker.
14 Q.    Where was that?
15 A.    In Denver.
16 Q.    In Denver again. How long did you do that?
17 A.    Let's see. It was about two years or three
18 years. It was until we left to go to San Jose.
19 Q.    That's okay. Just approximately is fine.
20 A.    Okay.
21 Q.    So you left that job because you moved to
22 San Jose?
23 A.    That's correct.
24 Q.    Did you work when you were in California?

---

24

1  academic teaching career was at Penn State. Then from
2  Penn State we went to Minnesota. I am sorry.
3  Q.    What were you teaching?
4  A.    Social work. First I was teaching social
5  science, and then students asked for me as a
6  professor, so then that makes them notice you at such
7  a large institution. And they said when students
8  start asking for you, then they came to me and asked
9  me to teach other things, and that's when I then was
10 teaching in the social work program.
11 Q.    And then you all moved to Minnesota?
12 A.    Then we went to Minnesota.
13 Q.    And you started teaching again?
14 A.    Yes, at Morehead State.
15 Q.    At Morehead. What were you teaching there?
16 A.    Social work.
17 Q.    Social work as well?
18 A.    Yes.
19 Q.    And then did you move to Stanford?
20 A.    Yes.
21 Q.    So back to California?
22 A.    Yes, we moved back to California, and I did
23 not work that year. And then from Stanford we went to
24 Dartmouth, and I taught in the medical school and

---

23

1  A.    I did. I worked in Santa Clara County Child
2  Welfare Department.
3  Q.    How long did you do that?
4  A.    Oh, about a year.
5  Q.    And then after that?
6  A.    Then we moved to Minnesota, and I stayed
7  home the first year, and then I worked in the social
8  work department after that.
9        Our son guy, the one who lives with us, is
10 physically handicapped, and he was having a lot of
11 medical issues, life-and-death medical issues, and I
12 was home taking care of him. And then the university
13 came to me and asked me I please come in and
14 work and that they would be flexible in terms of when
15 I needed to be with him. And so I then started
16 teaching again -- wait a minute. We left Penn
17 State -- wait a minute. We went to -- see, you are
18 taking me back so many years, I have got to stop and
19 think where we went from there.
20 Q.    That's okay.
21 A.    From Denver to San Jose. From San Jose we
22 then went to Penn State. Okay. I left out a place.
23 That's where guy was born was Penn State. So we went
24 to Penn State, and then that's when I started my

---

25

1  practiced as a psychotherapist and an administrator of
2  a children's mental health program.
3  Q.    Did you have training to work as a
4  psychotherapist?
5  A.    Yes. That's what my master's is in --
6  Q.    Oh, okay.
7  A.    -- psychiatric social work, so --
8  Q.    Besides your master's and doctorate, which
9  are quite substantial achievements, did you do any
10 other types of certification or training?
11 A.    I did a lot of training --
12 Q.    Okay.
13 A.    -- a lot of leadership training. I was
14 selected for a lot of honorary programs that I
15 participated in.
16 Q.    Can you tell me about some of those?
17 A.    Goodness. One of them that I went to, we
18 had one that was called the Brain Trust, where we were
19 trying to work to improve leadership; also dealt with
20 diversity. That was held at Stony Brook.
21        I went to -- I was a CSWE, Council on Social
22 Work Education, fellow when I was getting my doctorate
23 at Howard University, so I had to attend leadership
24 development, and also -- and I was -- mental health

---

7  (Pages 22 to 25)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

38

1 it very early this morning when we first started --
2 the grade change issue?
3   A.    Well, I know that during the time that
4 students, like they had incompletes or they did not
5 have the grade in, Wendell had asked me what was the
6 process, what should he do. And I said you always go
7 and talk to your dean. And so I know that he had gone
8 and talked to Dr. Frederick. I can't tell you names,
9 because I don't know who the students were. But just
10 in general, he did ask the question, and I told him go
11 talk to his dean. I also suggested that he talk to
12 Dr. Bell.
13   Q.    And to your knowledge, he did talk to
14 Dr. Frederick --
15   A.    Yes.
16   Q.    -- or Dr. Bell in every instance?
17   A.    Yes.
18   Q.    Have you discussed this morning or otherwise
19 the reasons why Dr. Gorum is alleging retaliation
20 against him?
21   A.    Have we --
22         MR. ZEFF: Objection to the form.
23 BY MR. ROBINSON:
24   Q.    Do you understand the reasons that Dr. Gorum

39

1 is alleging retaliation in this lawsuit?
2   A.    Well, to me he was seen as a powerbroker,
3 someone who was not in favor of Dr. Sessoms coming to
4 Delaware State University, because at the faculty
5 senate meeting he was the one who suggested that the
6 search be reopened, that we not select from the
7 candidates that we had but open up the search again.
8   Q.    And do you know that Dr. Sessoms was aware
9 of that?
10   A.    I am trying to think if at any of the
11 meetings that followed I know that it was brought up.
12 I am trying to recall what Dr. Osei said, because
13 Dr. Osei was the chair of the faculty senate at that
14 time, and he used to come over to my office on a
15 regular basis then. I cannot recall exactly, because
16 I don't, you know -- so I can't say for certain.
17   Q.    You can't say whether you know that
18 Dr. Sessoms knew about Dr. Gorum's role in trying to
19 open up the --
20   A.    In the faculty senate meeting?
21   Q.    Correct.
22   A.    I said I cannot say for certain. I think
23 that, but I cannot say for certain. And I say I think
24 that because of conversations with Dr. Osei.

40

1   Q.    So is it possible that Dr. Osei told you
2 something about it?
3   A.    That's what I am trying to recall, that or
4 at a meeting. And it is just too long ago. You know,
5 it is not something I was focusing in on.
6   Q.    Were you friends with Dr. Osei?
7   A.    Yes.
8   Q.    And are you still friends with Dr. Osei?
9   A.    Yes.
10   Q.    Do you still talk to him?
11   A.    Yes. Well, at this point in time I don't
12 see hardly anyone from the university. If you have
13 noticed the activities that I mentioned, none of them
14 are connected to Delaware State University, so --
15   Q.    Were there any of your colleagues that
16 attend Christ Church?
17   A.    There was, yes, someone who is retired
18 there. There is the current -- there is a member who
19 is currently on the faculty, someone who was on the
20 faculty, but he and his wife, both of them had worked
21 at Delaware State University. They are now -- they
22 have now moved to Florida. They are the only ones I
23 can think of from Delaware State University.
24         The one who is retired we do discuss the

41

1 university, but the one who works there, we just do
2 not discuss the university. That's --
3   Q.    Before 2004 were you and your husband social
4 friends with people from the university or were you
5 mostly friends with people from outside the
6 university?
7   A.    We were friends with people from the
8 university.
9   Q.    Okay. And you haven't been in touch with
10 many of those people since that time?
11   A.    That is correct.
12   Q.    Do you know of the Martin Luther King
13 Breakfast issue --
14   A.    Yes, I do.
15   Q.    -- that is a part of this case?
16         What do you know about it?
17   A.    Well, I know that I invited -- I personally
18 invited Dr. Sessoms to the Martin Luther King
19 Breakfast at a basketball game, because James Marshall
20 was sitting next to me, and he was the head of The
21 Boosters and also was very active in the fraternity
22 and in the breakfast. And so I introduced Dr. Sessoms
23 to Mr. Marshall and then brought up the breakfast and
24 invited him to attend the breakfast.

11 (Pages 38 to 41)

Gorum v. Sessoms and Board of Trustees of Delaware State University    Gor
J. W. Gorum, Ph.D.

66

1　Q.　Going back to the ad hoc committee that we
2　talked about a little earlier, I am just going to run
3　through the five names of the committee members and
4　you can tell me if you know them and how you know
5　them. Dr. Davis?
6　A.　Dr. LaPointe Davis, I knew him. He used to
7　be chair, I think, when it was music. It changed its
8　name.
9　Q.　Were you friends with him?
10　A.　Well, when you say friends, I mean, even
11　when you mention Osei, these are people that you work
12　with. They are colleagues is really a more
13　appropriate term, I think, for all of them. They are
14　colleagues. We didn't do anything socially.
15　Q.　Okay. I guess that's really what I want to
16　know is --
17　A.　That's what I --
18　Q.　-- whether you are more friendly than just
19　colleagues.
20　A.　No.
21　Q.　Okay. Dr. Jackson?
22　A.　No. Colleague.
23　Q.　How long did you know him?
24　A.　I believe he was a newer member of the

67

1　faculty. I did not know him well.
2　Q.　Dr. Toscano?
3　A.　Toscano I knew. Again, not socially. As a
4　colleague.
5　Q.　Dr. Gwamesia?
6　A.　Gwamesia? I knew him as a colleague, but he
7　also had gotten his doctorate in physics at Stony
8　Brook, and we knew some of the same people at Stony
9　Brook. And he went back every summer and took
10　students, so we used to talk about Stony Brook
11　sometimes. And he gave me his phone book on Stony
12　Brook so I could call people back there. So we did
13　things that were outside of the realm of our work at
14　Del State.
15　Q.　And how about Dr. Ackah?
16　A.　I knew Dr. Ackah. I had placed his son in
17　Leadership Alliance, who then got into medical school
18　and had done well, and he and I would periodically
19　discuss his son. I also placed his daughter in
20　Leadership Alliance. But that's how I knew him.
21　Q.　Do you recall Dr. Davis and Dr. Jackson ever
22　coming to your house to discuss the ad hoc committee
23　process?
24　A.　I do not recall.

68

1　Q.　Do you recall them ever being in your house?
2　A.　Dr. Davis and Dr. Jackson. I know
3　Dr. Jackson. Dr. Davis -- they could have. I just do
4　not recall.
5　Q.　You don't recall? At some point did the ad
6　hoc committee make a recommendation?
7　A.　Yes, they did.
8　Q.　What did they decide?
9　A.　I never saw the recommendation, but I know
10　that Dr. Toscano called and said he will be very
11　pleased with the recommendation of the committee;
12　have him come pick it up.
13　Q.　Did he say that to you?
14　A.　Yes, he did, because I answered the
15　telephone. That's how I know that one.
16　Q.　Did you ask him what he meant by --
17　A.　No, I just did. I just told Wendell go get
18　it and he said you will be very pleased, and he went
19　to get it.
20　Q.　Was he very pleased?
21　A.　No, he was not.
22　Q.　Did he call Dr. Toscano to ask him what he
23　meant about being very pleased?
24　A.　I can't answer that. I don't know.

69

1　Q.　Did you discuss it with your husband?
2　A.　No. I mean, what he did, what he said to
3　Dr. Toscano, we did not -- I don't recall what he
4　said. He probably did, but I do not recall.
5　Q.　Did you discuss the report with your
6　husband?
7　A.　He talked to me about the report. I know he
8　was shocked by that, because I know that as Toscano
9　said he would be very pleased, they were indicating
10　support for Dr. -- it is so hard to call him
11　Dr. Gorum. For Dr. Gorum.
12　Q.　You can say Wendell or your husband. I will
13　know who you are talking about.
14　A.　So he was so shocked by it. And I was, too.
15　And I can remember even running into them in the
16　community and coming up to me saying it wasn't right.
17　It wasn't fair. That is not what we did. They did
18　not -- the report that was submitted was not
19　what they had done. So I had them come up to me and
20　say that. That part I do know.
21　Q.　So who said that to you? I am sorry.
22　A.　Members of the ad hoc committee.
23　Q.　Who were they?
24　A.　Well, I do know that Dr. Davis was one of

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

---

**58**

1  Q.  Do you recall why he was being considered
2  for a deanship or why the rumor stated that he was
3  being considered for a deanship?
4  A.  Yes, because of what he had done to help
5  Dr. Sessoms.
6  Q.  And what was that?
7  A.  Number one, he served on the search
8  committee and had recommended him, was a part of his,
9  quote -- the rumor was Dr. Sessoms had a kitchen
10  cabinet of faculty members who came in and met with
11  him and told him what was going on on the campus and
12  who was doing what. That's why when you say do I
13  think he knew about Wendell, I say yes, because this
14  was the rumor. Okay?
15       That he had helped him out. He was the one
16  who when Wendell proposed that the search be reopened,
17  he -- and I can't tell you what he said now, but he
18  cut that discussion off. And so he was seen as one of
19  Dr. Sessoms's avid supporters, and that was why people
20  thought that he was -- the rumor was that he was to
21  get this deanship.
22  Q.  Did he become a dean?
23  A.  No, he did not.
24  Q.  Why didn't he become a dean?

**59**

1  A.  I do not know.
2  Q.  Was he upset? Was Dr. Osei upset about not
3  becoming a dean?
4  A.  Appearance-wise, yes. But if you asked him,
5  he said no. Now, he and I talked about it and we
6  joked about it, but, in fact, he gave up, I think,
7  being head of the faculty senate because the
8  expectation was he was to be dean.
9  Q.  Were there any rumors about why he didn't
10  become dean?
11  A.  I never heard a rumor about why he wasn't --
12  I mean, it was the shock that he was not. That was
13  what you heard, but not as a reason why he did not get
14  it.
15  Q.  So the shock was that he had helped or maybe
16  it was partly that he had helped Dr. Sessoms and now
17  was not being rewarded?
18  A.  That's correct.
19  Q.  Did Dr. Osei ever tell you that he had told
20  President Sessoms that Dr. Gorum had opposed his
21  presidency, his candidacy?
22  A.  That's what I said, I do not recall. He
23  met -- he came over to my office. He used to stop in
24  my office a lot and we talked, but, you know, I can't

**60**

1  recall the nature of the conversation. So he could
2  have said it or he might not have. I do not recall.
3  Q.  Did these frequent visits or these friendly
4  visits stop at some point?
5  A.  Yes, they did.
6  Q.  When was that?
7  A.  I don't know exactly, but they did stop.
8  Q.  Do you know why they stopped?
9  A.  I do not know why.
10  Q.  Do you have a belief as to why they stopped?
11  A.  I believe it was he had difficulty facing me
12  after Wendell was suspended, because he was known as
13  one of Dr. Sessoms's people, you know.
14  Q.  So do you believe that Dr. Osei had
15  something to do with your husband's suspension?
16  A.  I never thought that.
17  Q.  Who do you believe is responsible for it?
18  A.  Dr. Sessoms.
19  Q.  Just solely Dr. Sessoms?
20  A.  He is the one -- well, no. I would say
21  Dr. Frederick and Dr. Sessoms.
22  Q.  I am sorry I am jumping around a little bit.
23  I guess I am just trying to move forward in a
24  chronological manner that is logical. But I realize I

**61**

1  am jumping around a little bit. I apologize.
2       Back to the Martin Luther King Breakfast,
3  did you ever discuss -- you said you were thinking
4  about not going to the breakfast.
5  A.  Yes, I was.
6  Q.  Did you ever discuss the whole matter with
7  Cecil Wilson?
8  A.  No. I know Cecil Wilson, but I did not
9  discuss it with him.
10  Q.  You don't recall that?
11  A.  I know I did not discuss it with him.
12  Q.  You know. Okay. Was Cecil Wilson involved?
13  A.  I heard that he was the one who had invited
14  inappropriately Dr. Sessoms to speak.
15  Q.  Okay. And was he the one who was charged
16  with disinviting him?
17  A.  If he issued the invitation, then he had to
18  disinvite him also.
19  Q.  And you never talked to him about it?
20  A.  No. That's an Alpha function. I have
21  nothing to do with Alpha Phi Alpha. I only invited
22  Dr. Sessoms because James Marshall was sitting with me
23  at the basketball game, and James was the president of
24  The Boosters, so that's how I was doing the

---

16 (Pages 58 to 61)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

42

1  Q.  You just -- you invited him to attend?
2  A.  Yes.
3  Q.  You did not invite him to speak?
4  A.  No, I did not. That would not be my role.
5  I just invited him to attend.
6  Q.  Okay. Did you learn that he was invited to
7  speak at some point?
8  A.  I did hear that, yes.
9  Q.  Who did you hear that from?
10  A.  Well, I know I heard it from Wendell. What
11  I don't know, if other people told me that also, like
12  James Marshall. I don't know if other people could
13  have also said it. But I know that he had been
14  invited to speak, but the committee had already
15  contacted somebody else to come and speak.
16  Q.  So is it your understanding that President
17  Sessoms was disinvited --
18  A.  Yes.
19  Q.  -- if I can use that word?
20  Do you know whether Dr. Sessoms -- I say
21  Dr. Sessoms -- was upset about that, being disinvited?
22  A.  I would imagine, but he and I did not
23  discuss it.
24  Q.  And you did not discuss it with anyone else

43

1  that would have knowledge of Dr. Sessoms's feelings on
2  the subject?
3  A.  I am trying to think. See, my recollection
4  is that he was, but I can't tell you on what it is
5  based, because I know I did not even want to attend
6  the breakfast after that. That's why I think there
7  was feelings around it by Dr. Sessoms.
8  Q.  You did not want to attend the breakfast?
9  A.  That's correct.
10  Q.  Why is that?
11  A.  Because it was -- you know, there was so
12  much negativity about it because of that. And I did
13  go. And you found most of your community leaders
14  there, and I believe Senator Carper was there and the
15  mayor. All of those people were there, and
16  Dr. Sessoms's name was mentioned, and he was the only
17  one not there. So that's why I am saying of what was
18  going on, the appearance was he was upset about it,
19  and he did not attend the breakfast. And all the
20  community leaders and this is his first year at
21  Delaware State University, you would not expect that.
22  Q.  Do you know that he didn't attend because he
23  was upset about being disinvited?
24  A.  I do not know why. I did not ask him why he

1  did not attend.
2  Q.  Do you know about the issue in this lawsuit
3  regarding DeShawn Morris?
4  A.  I know about DeShawn Morris. I don't know
5  the issue. I mean, when you say "the issue," I don't
6  know what you are --
7  Q.  We will draw that out a little bit. What do
8  you know about DeShawn Morris? I take it you know v
9  that is?
10  A.  Yes, I do know who that is. I know he was a
11  student who was accused of some illegal activity and
12  that Wendell went to bat for him.
13  Q.  Okay. What do you mean "went to bat"?
14  A.  You know, he would call Wendell, and Wendell
15  stuck by his side. He didn't disown him.
16  Q.  Do you know about what time period that was?
17  A.  I have no idea.
18  Q.  Do you know whether President Sessoms was
19  aware of Dr. Gorum's involvement with DeShawn?
20  A.  I do not know.
21  Q.  Okay. So there is no reason that you would
22  believe that Dr. Sessoms would retaliate against
23  Dr. Gorum for helping DeShawn out?
24  MR. ZEFF: Objection.

1  BY MR. ROBINSON:
2  Q.  Or do you have any reason to believe that?
3  MR. ZEFF: Same objection.
4  MR. ROBINSON: You can answer.
5  THE WITNESS: Well, I don't know when
6  there is an objection what do I do.
7  MR. ZEFF: Oh, no. You can answer.
8  THE WITNESS: That's why I stopped. I
9  said I have only been deposed one time, so I don't
10  know, you know, what I am supposed to say or do then
11  MR. ZEFF: I can't stop you from
12  answering a question. I can only object and hope a
13  judge stops you later.
14  THE WITNESS: Okay. I saw it as a
15  cumulative process; that Wendell was seen as a
16  powerbroker on campus, and he is the one who spoke v
17  I mean, there was a lot of sentiment and feeling on
18  the campus that people did not want Dr. Sessoms.
19  Okay? But Wendell is the one who spoke up. That's
20  the way he is. He doesn't -- you know, he believes in
21  doing what is right and fair, and I think that's why
22  he joined the Peace Corps. He has always wanted to
23  help people and make life better for them. So he has
24  the confidence in himself that he can do that.

Wilcox and Fetzer, Ltd.    Registered Professional Reporter  B 0006

36

1   recollection, exactly what you told him?

2        A.    That Sergeant Crippen and some members came

3   to my room and searched my room for the possession of a

4   handgun, the first appeal that I -- the first hearing

5   that I went to, why I had it, and what was my status

6   now.

7        Q.    And what did Dr. Gorum tell you?

8        A.    What did he tell me?  What did he say?  Now,

9   after we spoke and I let him know of everything that was

10  going on, we really didn't speak too much.  He told me

11  to come back and see him in a couple of days.

12       Q.    Did you go back and see him in a couple of

13  days?

14       A.    Yes, I did.

15       Q.    And what did you talk about then?

16       A.    Where we left off at and where I was at in

17  my situation, my hearings and things.

18       Q.    And did Dr. Gorum give you any advice?

19       A.    Yes, he spoke.

20       Q.    What did Dr. Gorum tell you?

21       A.    Basically, to appeal it and basically to

22  talk about everything that happened to me from the

23  beginning, when he came to my room.

24       Q.    And Dr. Gorum suggested that you appeal it?

37

A.    Well, it wasn't just him, but yes, he did.

Q.    Well, let's just remain focused on Dr. Gorum for a few minutes, because that is what I thought we were talking about.

Okay.  Did Dr. Gorum recommend that you appeal it?

A.    Yes, he did.

Q.    Did he help you write the letter that is in front of you?

A.    Yes.

Q.    How much input did he have in this letter?

A.    Percentage-wise, I couldn't --

Q.    Who typed the letter?

A.    I typed my letter.  Well, I was in his office, so I typed it.

Q.    You typed it in his office?

A.    Uh-huh.

Q.    All right.  Did he tell you what to put in the letter?

A.    He commented on a few things.  I wrote the letter.  He helped me, though.

Q.    Okay.  Now, when you went to the zero tolerance subcommittee hearing in December of '02, December 11th of '02, did you plead responsible to the

43

1       Q.    No.  As I understand it, the letter to

2   Ms. Pitt that was marked Morris 4, you now recognize as

3   the appeal --

4       A.    Yes.

5       Q.    '-- from the December 11th hearing?

6       A.    Okay.

7       Q.    All right.  And I think your testimony is

8   that when you wrote that letter, you didn't know where

9   that appeal was going, what body --

10      A.    No.

11      Q.    What body was going to hear it?

12      A.    No.

13      Q.    And I think you also told me that Dr. Gorum

14   assisted you in doing this, writing the letter?

15      A.    The appeal letter?

16      Q.    Yes.

17      A.    Yes.

18      Q.    Okay.  And my question was did you

19   subsequently learn who was going to hear that appeal?

20      A.    No, I don't believe, no.

21      Q.    Did you ever know who was going to hear that

22   appeal?

23      A.    Before?

24      Q.    Before what?

64

1    of -- I mean appealing this, the one-year suspension.

2        Q.    Okay.  Let me show you this letter and see

3    if this is what you are talking about.

4             (Morris Exhibit Number 8 was marked for

5    identification and attached to the record.)

6    BY MS. HICKEY:

7        Q.    Is that the letter that you were speaking

8    of --

9        A.    Uh-huh, yes.

10       Q.    -- dated March 20th?  And we have now marked

11   that as Morris 8.  Did you receive any assistance in

12   writing this letter?

13       A.    Yes, I did.

14       Q.    And who was it that you received assistance

15   from?

16       A.    Dr. Gorum.

17       Q.    Wendell Gorum?

18       A.    Yes.

19       Q.    There is a handwritten telephone number and

20   name or word at the top of that page.  Do you recognize

21   that writing?

22       A.    Yes.

23       Q.    Whose writing is that?

24       A.    Mine.

54

1   identification and attached to the record.)

2   BY MS. HICKEY:

3       Q.    Do you recognize that letter?

4       A.    Yes.

5       Q.    It is a letter to you, telling when your

6   Student Disciplinary Appeals Council hearing will be?

7       A.    Yes.

8       Q.    Was it your understanding that this is in

9   response to Morris 4, which is your letter to Ms. Pitts?

10      A.    I believe so, I think, yes.

11      Q.    Did you attend this hearing?

12      A.    Yes.

13      Q.    Did you have anybody with you to serve as an

14  advisor?

15      A.    Well, I had -- when you say serve as an

16  advisor, inside the hearing, while I was in there?

17      Q.    Yes.

18      A.    Yes, Dr. Gorum.

19      Q.    Dr. Wendell Gorum was there with you?

20      A.    Yes.

21      Q.    Did you present any witnesses?

22      A.    Well, I had a witness there, but they didn't

23  get to speak.

24      Q.    Who was the witness?

Akwasi Osei, Ph.D

4

1   of the faculty senate, elected position.

2      Q.    What is the faculty senate?

3      A.    The faculty senate is the faculty body that has

4   a purview on academic programs, academic offerings,

5   student affairs, I believe.  I haven't had to answer

6   that question in a while.  But the faculty senate is

7   responsible for the university's academic programs.

8      Q.    You are no longer the chair of that?

9      A.    No, I'm not.

10     Q.    When did you last have that position?

11     A.    I last served as chair in 2004.  I believe I

12  stepped aside on May, 2004.

13     Q.    Now, what does the chair of the faculty senate

14  mean?

15     A.    The chair of the faculty senate is the, I guess,

16  the convene of the senate.  You are responsible for

17  organizing the affairs of the senate.  There is a

18  constitution that spells all that out.  And I will refer

19  you to that for the actual duties.

20     Q.    Is it fair to say the chair would be the leader

21  or the president of the senate?

22     A.    Yes, yes, spokesperson also, a representative of

23  the senate, of faculty.

24     Q.    Your role as chair of the senate, did you have

Akwasi Osei, Ph.D

5

1  any contact with Dr. Sessoms?

2      A.    Yes.  Well, yes.

3      Q.    In what capacity or what --

4      A.    In the beginning, as the faculty representative

5  to the search committee, so not just Dr. Sessoms but all

6  the other applicants.  And subsequently when a decision

7  was made, as a member of his cabinet representing

8  faculty.

9      Q.    Were you a member of his cabinet as the chair of

10  the faculty senate or was that a different post?

11      A.    No.  The chair of the senate, by definition,

12  represents faculty of the administrative counsel.

13      Q.    With regard to the search involving Dr. Sessoms,

14  were there any problems relating to the presidential

15  search at that time relating to the senate itself?

16      A.    Problems?

17      Q.    Yeah.

18      A.    I don't know.

19      Q.    Let me rephrase that.  Was there any debate as

20  to whether or not the search was proper?

21      A.    I believe after the decision was made, I

22  believe -- my memory may not serve me -- we did have --

23  as is normal, all faculty issues, all university issues

24  are relevant for discussion of the senate.  And there

Akwasi Osei, Ph.D

6

1   was a discussion of the senate about the search.  I did

2   report to the senate during the search process.  I

3   believe every month from October, '02, through May, '04,

4   I believe every month when the senate met, I reported on

5   the search process.

6       Q.   And what was that discussion about?

7       A.   There was a discussion about who the people are

8   that are coming in.  And one of the discussions had to

9   do -- I believe there was a proposal, a motion to vote

10  for a reopening of the, among other things, a reopening

11  of the search.

12      Q.   Was Dr. Gorum involved in that motion?

13      A.   As I recall, I think it may have been moved by

14  somebody else.  But I do believe that Wendell was one of

15  the ones who may have spoken for that.  I can't recall.

16  But we do have minutes of the senate.  You are talking

17  about four years ago.

18      Q.   Did you have a position, that is a position on

19  the issue of whether to reopen, you personally?

20      A.   No.  I personally thought that that was cast.  I

21  don't believe I ever had a position that it should be

22  reopened, no.  But I allowed that discussion to go

23  forward.

24      Q.   Was there much opposition to that motion?

Akwasi Osei, Ph.D

7

1    A.    Well, I think the result would be in the vote

2    that the senate took.  And I do believe that the senate

3    voted not to go forward with that request.

4    Q.    Do you know how close the vote was?

5    A.    No, I don't.

6    Q.    Were you ever in Dr. Sessoms' presence when any

7    discussion regarding that vote took place?

8    A.    Never.

9    Q.    Do you know whether Dr. Sessoms ever had any

10   knowledge of the fact that there was a vote to reopen

11   the search?

12   A.    I would not have known that, no.  What we did

13   was public.  So I don't know for sure.  But I presume

14   everybody would know.

15   Q.    You presume everybody, including the president,

16   would know that?

17   A.    Well, if you are on campus and -- I don't know.

18   We never discussed it.  But if he knew, I wouldn't be

19   surprised because it was an open meeting.

20   Q.    I want to talk to you about student affairs for

21   a moment.  As both chairman of the department and

22   chairman of the senate, were you involved at all in

23   disciplining students or the process in anyway.

24   A.    Just general discipline issues?

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

Page 110

1  why President Sessoms recommended that you be fired,
2  right?
3      A. Mm-hmm.
4      Q. That's the main thing you're suing over.
5          So the main question in this case is
6  whether President Sessoms is lying about the reasons
7  he's given for recommending your termination, right?
8          MR. ZEFF: Objection.
9          You can answer if you understand.
10     Q. You understand that the central issue here is
11  whether or not President Sessoms is lying and that the
12  real reason is something other than what he says?
13         MR. ZEFF: Same objection.
14         Go ahead.
15     A. I'm not sure I really understand the question
16  because the reasons that, the reasons that I
17  enumerated were based on what people had told me and I
18  can't remember specifically who, but even people in
19  his office had told me, for example, that he was upset
20  and angry about the Martin Luther King disinvitation.
21     Q. Right.
22     A. And then I'm sure, which was known all over
23  campus, that I objected to the president, the
24  president coming and wanted to reopen the search and I

Page 111

1  was told that he was upset about that.
2      Q. Right.
3      A. So this information was fed to me by someone.
4      Q. Sure. Now, Dr. Gorum, my understanding of the
5  claim -- what's your understanding of the claim that
6  you're making in this case?
7          What are you claiming that Dr. Sessoms did
8  that was illegal?
9      A. Well, he's really trying to shut me up and show
10  that by controlling a full professor, someone who is
11  known on campus, popular and if he could succeed in
12  shutting me up, then he could control the others.
13         And that's my interpretation.
14     Q. All right.
15         MR. DUSTON: Would you repeat that answer
16  for me?
17         (The reporter read back the last answer.)
18  BY MR. DUSTON:
19     Q. So you believe that most important is that
20  President Sessoms was trying to make an example out of
21  you?
22     A. Yes.
23     Q. Now, make an example for what?
24     A. Dr. Sessoms interpreted the collective

Page 112

1  bargaining agreement the way that he wanted to and in
2  many instances I, along with many of the other faculty
3  members in the union felt that he violated the
4  collective bargaining agreement. And I am a
5  spokesperson and I say what I believe and feel.
6      Q. So do you believe that one of Dr. Sessoms'
7  motives was because of things that you had said or
8  done about the collective bargaining agreement?
9      A. Yes. That's part of it, yes.
10         And I also believe that he was fed
11  information about my activities prior to his coming.
12  I questioned Dr. DeLauder also.
13     Q. What other things, what things did you do, if
14  any, after President Sessoms came that you think are
15  examples of conduct or behavior that President Sessoms
16  didn't like and wanted to retaliate against?
17     A. At a faculty reception that was sponsored by
18  the board of trustees, I was chaired -- I mean I was
19  cornered by the chair of the board and the assistant
20  chair of the board. They asked me a question: What
21  did I think of them and everything? And of course I
22  was somewhat guarded.
23         But the impression I came away with was
24  that, well, it was just not a favorable impression. I

Page 113

1  had to be guarded in what I had to say to them and I
2  thought I was marked and this is what I had been told
3  by others.
4      Q. And this was how early in the process?
5  September? August?
6      A. September.
7      Q. September. It would be September 2003, shortly
8  after the president came on board?
9      A. That's correct.
10     Q. And you felt that you had been marked at that
11  point by either the fact that they were talking to you
12  at this reception --
13     A. Well, the manner in which they talked to me and
14  they also knew I was behind trying to get them to
15  reopen the search.
16     Q. Did they talk --
17     A. I was told that they did not like having
18  faculty question their judgment in the selection
19  process. Dr. Osei said that he was a member of
20  the search committee.
21     Q. In your opinion, has Dr. Hough been retaliated
22  against?
23     A. I really don't know. I mean, I don't --
24     Q. He was the leader of that, he was one of the

29 (Pages 110 to 113)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 42 | Page |
|---|---|
| 1   list that you believe were making grade changes in<br>2   classes in which someone else was the instructor of<br>3   record after President Sessoms took over?<br>4    A. I really can't -- I can't remember when the<br>5   grade changes that the different professors talked<br>6   about occurred, so I really cannot answer it.<br>7    Q. Dr. Claussel, Maggie Claussel, when is the last<br>8   time you communicated with Dr. Claussel?<br>9    A. Within the last month.<br>10    Q. Has she agreed to serve as a witness for you?<br>11    A. Yes and no. I didn't ask her, but I felt that<br>12   she would. She's an attorney, practicing attorney.<br>13    Q. Where is Dr. Claussel located?<br>14    A. In Dover. She's still a professor at the<br>15   university and she has a law office in Dover.<br>16    Q. Tell me about your last discussion.<br>17    A. She indicated that Dr. Kopano had told her that<br>18   Dr. Sessoms tried to get Kopano to give him any<br>19   information that would give him, Sessoms, my head on a<br>20   platter.<br>21     And I was told by three professors the<br>22   same similar circumstance.<br>23    Q. Okay. Who were those other three professors,<br>24   while we're at it? | 1    MR. ZEFF: It's with a K, isn't it?<br>2    MR. DUSTON: Yes.<br>3    A. Yes.<br>4    Q. K-o-p-a-n-o.<br>5    MR. ZEFF: He's on there.<br>6    A. Yes, he's on there.<br>7    Q. Dr. Kopano. What conversations have you had<br>8   with Dr. Kopano about conversations he's had with<br>9   President Sessoms?<br>10    A. Within the last month I talked to him and I<br>11   specifically asked him about that incident.<br>12    Q. The incident that Dr. Claussel had told you<br>13   about?<br>14    A. Yes. And he said no.<br>15    Q. He said what?<br>16    A. He didn't say it.<br>17    Q. Have you had any other conversations with<br>18   Dr. Kopano concerning your claims?<br>19    A. Yeah. He indicated he was willing to come back<br>20   and testify, but --<br>21    Q. Has he indicated that he would change his<br>22   testimony from the ad hoc dismissal committee proces.<br>23    A. I didn't even ask. I mean, he volunteered that<br>24   he would return to testify. |
| **Page 43** | **Page** |
| 1    A. Osei and Eric Dodson.<br>2    Q. Dr. Osei?<br>3    A. Dr. Osei, O-s-e-i, Akwasi Osei, A-k-w-a-s-i.<br>4    Q. Not Dr. Osei-Mensah but Dr. Osei?<br>5    A. Dr. Osei.<br>6    Q. So Dr. Osei and Dr. --<br>7    A. Eric Dodson. Eric Dodson. It was all over.<br>8   These are the people I really communicated with and so<br>9   it could have been others, but yes, Claussel, yes,<br>10   definitely.<br>11    Q. Let's start with Dr. Claussel does not claim<br>12   that Dr. Sessoms spoke to her about you, correct?<br>13    A. No.<br>14    Q. Her knowledge is a conversation she had with<br>15   Dr. Kopano, who supposedly had one with President<br>16   Sessoms, correct?<br>17    A. Yes.<br>18    Q. Have you spoken to Dr. Kopano?<br>19    A. Yes.<br>20    Q. All right. Jumping ahead to Dr. Kopano --<br>21   well, you haven't listed Dr. Kopano.<br>22    A. I did not?<br>23    Q. No.<br>24     Oh, there we go. Dr. Kopano. | 1    Q. Where is Dr. Kopano now?<br>2    A. He is chair of communications studies at Morga<br>3   State University in Baltimore.<br>4    Q. Other than Dr. Kopano's knowledge concerning<br>5   the specific grades that he testified about at the<br>6   hearing, what other knowledge do you think Dr. Kop.<br>7   has?<br>8    A. He knows that Dr. Frederick put him up to run<br>9   against me as chair of the department. Let me back<br>10   up.<br>11     Chairs at Delaware State are elected by<br>12   the faculty and Dr. Frederick asked him to run agains<br>13   me twice one year and he lost.<br>14    Q. And this was --<br>15    A. He lost both times.<br>16    Q. And this was prior to President Sessoms being<br>17   there?<br>18    A. No. One was when he was there.<br>19    Q. What relevance is that to your claims against<br>20   President Sessoms?<br>21    A. What I was told is that Sessoms promised to<br>22   make him chair and to give him a raise for any dirt<br>23   that he could deliver on me and he tried to deliver<br>24   dirt. And I hope you understand what I mean. |

12 (Pages 42 to 45)

B 0017

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

**Page 162**

1  did you personally do that you think motivated the
2  president compared to what somebody else did?
3       MR. ZEFF: Objection to the form.
4  BY MR. DUSTON:
5       Q. Let me rephrase the question. Your activity on
6  the Alpha breakfast was in telling the person who had
7  invited the president that they had to revoke the
8  invitation, correct?
9       A. Yes.
10      Q. And that is the only part of your activity in
11  connection with that breakfast that you think was one of
12  the president's motives, correct?
13      A. No, I can't say that was the only.
14      Q. What else did you say or do in connection with
15  that activity that you think played a role in the
16  president's motives to terminate you?
17      A. I was — I don't even know how to begin to
18  answer that because I'm not clear what you're asking me.
19      Q. I'm going to go through all the other things
20  that you claim that you said or did that might have
21  played a role in the president. One of them was the
22  Alpha breakfast. And in connection with that activity,
23  I want to be clear on what you said or what you did in
24  your role in chairing that committee that you think

**Page 163**

1  played a role in the president's decision other than
2  telling the person that invited the president that he
3  had to revoke the invitation. Is there anything else
4  you did or said regarding the Alpha breakfast?
5       A. The invitation to Sessoms engendered much debate
6  within the fraternity, E-mails and telephone calls. And
7  I had to handle and I had to deal with it to the best of
8  my knowledge. Now, I like to deal with issues and move
9  on. What I did and everything I could not recall. But
10  certainly there were issues. And I heard from many
11  different members of the fraternity regarding that. And
12  I heard from a couple people, and I really cannot
13  remember who. At least I have gone back to people to
14  ask them and they have denied. But I was told that the
15  president was upset with me about the cancelation. And
16  I was also told by someone that he was out to get me.
17      Q. We talked about what Miss Walker supposedly told
18  you about him being out to get you.
19      A. Not Mrs. Walker. What is her name? It wasn't
20  Walker. I'm thinking of her name.
21      Q. Other than being told that the president was
22  upset at you because of the cancelation, was there
23  anything else in the debate, the discussion, what went
24  on within that breakfast in the planning of it that you

**Page 164**

1  believe got the president upset or angry at you?
2       A. I can explain certain parts of the breakfast and
3  you can draw your own conclusions.
4       Q. Dr. Gorum, you went through with me the process
5  of setting up the breakfast and why there was a debate.
6  I understand that. I need to know what aspect of your
7  activity you think upset the president. Because we need
8  to look at whether or not that's an act of free speech
9  and whether or not he took that into account. You don't
10  claim that he retaliated against you just because you
11  were chair of the breakfast committee, correct?
12      A. Let me explain. The prayer breakfast is usually
13  attended by all of the politicians from the State of
14  Delaware, national as well as state and local
15  levels. Senator Biden, Senator Carper, Congressman
16  Castle, the governor, all of the local representatives.
17  And I was told sometime during the ordeal that by having
18  Sessoms speak at the breakfast, he would have had an
19  opportunity to meet significant people in the State of
20  Delaware and be introduced to the community.
21      Q. Now, was that something that another member of
22  the committee said was a reason for doing it or
23  something that Dr. Sessoms supposedly wanted?
24      A. That's what someone gave as a reason for

**Page 165**

1  scheduling the meeting.
2       Q. Did you ever speak to Dr. Sessoms about whether
3  he wanted to attend or cared to attend this breakfast?
4       A. No.
5       Q. You never had any direct conversations with him
6  concerning this breakfast, correct?
7       A. No.
8       Q. And the action that you took in addition to
9  monitoring the debate and dealing with the debate over
10  the invitation was to ultimately make the decision that
11  his invitation had to be revoked and then telling
12  someone else to communicate that to the president; is
13  that correct?
14      A. Yes.
15      Q. And the sole basis for why you think Dr. Sessoms
16  not only knew about your role but was upset about it was
17  what somebody supposedly told you, that he was upset
18  about this, about the fact that it had been revoked,
19  correct?
20      A. Yes, but the somebody, I was told, and I don't
21  know, was supposedly hired to work as an attache or
22  whatever you want to call the person who helps introduce
23  him to the Dover and Delaware communities.
24      Q. And you say you since have spoken to that person

3  (Pages 162 to 165)

4.   During Plaintiff's junior year, Plaintiff was recruited by several NFL football franchises as draft-picks for their teams. After consultation with University staff, Mr. Morris was persuaded to remain at the University and finish his degree.

5.   Plaintiff Dashaun Morris, was a member of a violent street gang at his childhood residence located in New Jersey. When Mr. Morris began attending Delaware State University, he became aware that the street gang environment was not what he wanted for his future and decided to leave that lifestyle forever. Upon visiting his childhood residence in New Jersey, Mr. Morris confronted his street gang members and advised of his decision to quit that gang and attempt to pursue a successful career with the National Football League. Upon learning of Mr. Morris' decision, several of the senior gang members threatened Mr. Morris' life should he decide to pursue his termination of the street gang. At that point in time, Mr. Morris purchased a hand gun for self-protection. Mr. Morris would take that hand gun back to New Jersey on his visits to his childhood residence.

6.   On December 9, 2002, there was a verbal altercation on the Delaware State University campus between a fraternity and the football team. As a result of that altercation, Delaware State University Security searched Mr. Morris' dorm room. During that search, Mr. Morris voluntarily disclosed the location of the hand gun and that hand gun was seized. Due to the hand gun possession, Mr. Morris was immediately suspended from Delaware State University.  (See Exh. I).

B 0019



# DELAWARE STATE UNIVERSITY

OFFICE OF THE VICE PRESIDENT
FOR ENROLLMENT MANAGEMENT AND STUDENT AFFAIRS

December 16, 2002

Mr. DaShaun Morris                    RE:    Possession of a firearm and
116 Varsity Rd. #1                            ammunition
Newark, NJ 07106                              December 9, 2002

Dear Mr. Morris:

As a result of the Zero Tolerance Subcommittee hearing on December 11, 2002, the Council has found you responsible for the above actions. Therefore, per the zero tolerance policy, you are hereby expelled from the University, effective immediately. During your expulsion, you are not permitted on the campus of Delaware State University, or the University Courtyard Apartments. If found on campus or the University Courtyard Apartments, you will be cited for trespassing.

If you desire to appeal this decision, it must be made in writing to the Office of the Assistant Vice President for Student Affairs within two (2) days after receipt of this letter. The request must be based on reasons listed below:

    (a)    Lack of due process, i.e. when a student can show an error in the hearing, or arbitrariness in the finding.
    (b)    Lack of substantial evidence.
    (c)    Evidence that was not considered or available that would subsequently change the nature of the case.

If you have questions regarding the request of an appeal, you may contact the Office of Judicial Affairs at (302) 857-6470.

Sincerely,

Charles N. Smith
Vice President for Enrollment
Management and Student Affairs

C:    Mrs. Lowan Pitt            Dr. Doris Wooledge
      Mrs. Kay Moses             Mr. Willie Thomas
      Dr. Christopher Curry      Ms. Claudette Gates
      Mrs. Carilyn Brinkley      Chief Carl Wyche

A-000103

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6300 • FAX (302) 857-6302

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

B 0020



# DELAWARE STATE UNIVERSITY

OFFICE OF THE VICE PRESIDENT
FOR ENROLLMENT MANAGEMENT AND STUDENT AFFAIRS

April 4, 2003

Mr. DaShaun Morris                    RE:    Possession of a firearm and
S.S.# 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                            ammunition
116 Varsity Road #1                          December 9, 2002
Newark, NJ 07106

Dear Mr. Morris:

After an administrative review of your Zero Tolerance case for the above violations, the sanction of expulsion from the University has been reduced to suspension from the University for the Spring, 2003 semester. You are permitted to return to the University for the Fall 2003 semester on limited disciplinary probation.

While on limited disciplinary probation you are only permitted to participate on the football team. You may not participate in any campus organization or attend any University activity on or off campus. In addition, you may not visit the University Courtyard Apartments.

Should you violate the above stipulations or any other University rule or regulation and you are found responsible, you will automatically be suspended. Should you have any questions, regarding this decision, please contact the Office Judicial Affairs at (302) 857-6470.

Sincerely,

Charles N. Smith
Vice President for Enrollment
Management and Student Affairs

xc:    Mrs. Lowan Pitt            Dr. Doris Wooledge
       Mrs. Kay Moses             Mr. Glen Parker
       Mr. Keith Coleman          Ms. Claudette Gates
       Mrs. Carilyn Brinkley      Chief Carl Wyche
       Mr. Darrell Dudley         Mrs. Wanda Curry-Brown

EXHIBIT

Morris 9
coa 9/9/03

A-000110

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6300 • FAX (302) 857-6302

Delaware State University is an equal opportunity employer and does not discriminate because of race, color, national origin, sex, age, or disability

B 0021

Delaware State University had obtained counsel in response to Mr. Morris' counsel's letter, Delaware State University decided that Mr. Morris could in fact return to classes in the fall of 2003.

14. In Mr. Morris' attempt to return to Delaware State University's football team, he was verbally advised that he could not participate on the football team because he was not eligible to attend classes during the Spring 2003 semester. (See Exh. 8). Under information and belief, Plaintiff has been advised that NCAA regulations require that Mr. Morris be eligible to attend classes at least one day during the Spring 2003 semester in order to participate in the football program during the Fall 2003 semester. Under information and belief, Mr. Morris does not actually have to attend classes for that one day but solely must be eligible for classes for one day.

15. According to Delaware State University rules and regulations, Mr. Morris was eligible to attend classes during the appeals period of the Spring 2003 semester. (See Exh. 9). As such, Mr. Morris is eligible to participate in the University's football program under the NCAA guidelines.

16. Since Plaintiff rejected the 2002 NFL draft-pick invitations, NFL franchises will observe his scholastic and football performance with greater scrutiny for consistency and ability. A prohibition on Plaintiff's participation on the University football program will all but eliminate any possibility of NFL employment opportunity.

B 0022

Allen Sessoms, Ph.D.

21

1    related persons relating to DeShawn Morris?

2        A.    Ben Blacknall came to me and asked me, the

3    football coach, whether I would intervene in this case

4    because he thought Mr. Morris should be allowed to play.

5    And I informed him that I don't intervene in these

6    cases, period.

7        Q.    Tell me everything you recall about your

8    conversation with Blacknall.

9        A.    That's what I recall about my conversation with

10   Blacknall.

11       Q.    Why did he want you to intervene?

12       A.    You have to ask Coach Blacknall.

13       Q.    Do you recall what he told you the reasons were?

14       A.    An All-American football player that he wanted

15   to play.  Why he wanted me to intervene is another

16   question.

17       Q.    Did he explain to you that Dr. DeLauder had

18   cleared him to play?

19       A.    He didn't explain to me any of the sort.  He

20   just told me he wanted this person to play.  The

21   academic people in the athletic department said he

22   appeared to be ineligible.  And he was asking me whether

23   I would intervene, and I said no, period.

24       Q.    Did you send him anywhere, tell him to go talk

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

Page 174

1   He stayed in town and the coaches knew it.
2     Q.  So what did the president ask you?
3     A.  He wanted me to give him some, as far as I can
4   remember, something about Morris.  And so my suggestion
5   to him was, why don't you just talk to him directly and
6   form your own opinions?  And that's what he did,
7     Q.  Were you present when Mr. Morris talked to
8   President DeLauder?
9     A.  No, I was not.  But the president did call me
10  back.  The president did call me back after he had
11  talked with him and said he was impressed with him and
12  he was a impressionable person.
13    Q.  Now, ultimately, President DeLauder made his
14  decision and memorialized in a letter from Dr. Smith.
15  And I don't think there is any memorializing of any
16  letter to Mr. Morris making it clear that he had a
17  one-semester suspension.  He could return in the fall
18  after probation.  He would be allowed to play football,
19  correct, that was the bottom line?
20    A.  It was a one-semester suspension.  He could
21  return during the summer sessions to make up work he had
22  missed, yes.
23    Q.  And then he could return in the fall.  He was
24  under suspension --

Page 175

1     A.  But his only activity could be football.
2     Q.  Correct.  That was the arrangement that
3   President DeLauder and Dr. Smith --
4     A.  No.  It wasn't Smith.  It was Dr. DeLauder.
5     Q.  Dr. DeLauder made that judgment and directed
6   Dr. Smith to do so, correct?
7     A.  No.  Smith wrote the letter from the appeals
8   committee.  Then with suspensions or expulsions, student
9   can automatically appeal to the president.
10    Q.  So it's the president's ultimate decision,
11  President DeLauder?
12    A.  Yes.
13    Q.  Now, moving forward, what was the next role that
14  you had with Mr. Morris?  This would have been roughly
15  July when the issue came up about NCAA eligibility?
16    A.  Uh-huh.  Morris remained out the one semester
17  and during the first summer session went to school so
18  that he would have enough credits to play football.  And
19  he had completed the first summer session.  Around about
20  the 7th or the 9th of July when Dr. Sessoms came aboard
21  on July 1st, I received a telephone call from Mrs.
22  Sandra Arnell, the secretary to the president, telling
23  me that the president said to tell Mr. Morris that his
24  suspension was extended to one year and that he could

Page 176

1   not step foot on campus.
2     Q.  You told us about that statement the last
3   deposition.  Are you absolutely certain that there were
4   two telephone calls that morning that day in your
5   office, the first one coming into your line and the next
6   one coming into Mr. Morris' cell phone?
7     A.  Yes.
8     Q.  You are absolutely certain that's the way it
9   happened?
10    A.  Yes.
11    Q.  Prior to that time, prior to that phone call,
12  were you aware of any issue involving Mr. Morris'
13  eligibility in the fall or his status at the school?
14    A.  No.
15    Q.  After those two phone calls you've previously
16  described in general terms, your role in Mr. Morris'
17  defense was urging him to get an attorney, correct?
18    A.  Uh-huh.
19    Q.  Did you pick the attorney that he was going to
20  go see?
21    A.  Yes.
22    Q.  And you paid for the attorney?
23    A.  Yes.
24    Q.  How much did you pay on behalf of Mr. Morris for

Page 177

1   his defense?
2     A.  About 600 bucks.  It was on pro bono.  The
3   attorney was a former student who went to Delaware
4   State.
5     Q.  And from some of your references of other
6   witnesses, I know that you were assisting Mr. Morris in
7   his defense, correct?
8     A.  Yes.
9     Q.  And you previously testified about comments
10  that, at certain point, some of the coaches who had been
11  assisting or providing information were told that they
12  can no longer cooperate, correct?
13    A.  Correct, yes.
14    Q.  What exact role did you play in assisting
15  Mr. Morris in his lawsuit other than hiring the
16  attorney, paying the $600?  What was your role?
17    A.  That was basically it.  Usually when he met with
18  the attorney I was there.  But I did not attend the
19  hearings.
20    Q.  Now, other than the coaches that you spoke to
21  and told them about it, who else in the administration
22  do you believe knew that you were assisting Mr. Morris
23  in his lawsuit against DSU?
24    A.  They all knew.

6 (Pages 174 to 177)

B 0024

Allen Sessoms, Ph.D.

13                                                                                    14

ll over

That

ncludes

tant.

ainly,

service

and

ion and

.t I

in

hink

.rst

:'m not

1  even sure of this -- at a meeting with chairs of the

2  departments.  But I don't know when.  I don't recall.

3  Didn't make an impression one way or the other.

4      Q.    Prior to -- and of course we are here about the

5  termination issues -- but prior to learning about the

6  issues which led to his termination, did you have any

7  contact with him on a one-on-one level?

8      A.    Didn't know anything about him.

9      Q.    How about his wife, Dean Gorum?

10     A.    In nursing?

11     Q.    Is she still on campus?

12     A.    I don't think so.  The nursing department was

13  engaged in some changes because there were issues with

14  staffing.  And I had contact with her.  But I had no

15  idea that actually she was his wife.

16     Q.    There is something called the Martin Luther King

17  Annual Breakfast which is sponsored by the Alpha

18  Fraternity.  Are you familiar with that?

19     A.    No.

20     Q.    Have you ever attended the Martin Luther King

21  breakfast?

22     A.    No.

23     Q.    Do you recall ever being invited to attend?

24     A.    No.

Allen Sessoms, Ph.D.

29

some

arley?

what

ou to

w or he

lve

nput?

sition,

, at

30

1   literally don't recall.

2          MR. DUSTON:  Before my time.

3          THE WITNESS:  Which is probably why we have

4   Mark Farley now because there wasn't anyone.

5   BY MR. ZEFF:

6      Q.   So were you made aware of the resolution of the

7   DeShawn Morris lawsuit?

8      A.   I was made aware of it through some means.  I

9   just don't know what the means was.

10     Q.   Did you have any input or discussion at all

11  about what that resolution was before it happened?

12     A.   No.

13     Q.   You were simply informed of it?

14     A.   Yeah.

15     Q.   Were you informed, at any time, that Dr. Gorum

16  was involved with DeShawn Morris in representing him as

17  any capacity?

18     A.   No.

19     Q.   When, if ever, was the first time you learned

20  Dr. Gorum was involved in counseling Mr. Morris?

21         MR. DUSTON:  You mean other than discussions

22  with me in this lawsuit?

23         MR. ZEFF:  Yes.

24         THE WITNESS:  No, never.

Allen Sessoms, Ph.D.

45

46

1    outcome was.

2    Q.    Did you share with the board Sessoms 3, this

3    letter of March 5, 2004?

4    A.    I didn't share with the board and I don't share

5    with the board legal documents that counsel may have.  I

6    don't keep copies of these documents.  I have nothing to

7    share.

8    Q.    You think counsel may have -- are you referring

9    the Mark Farley?

10    A.    Mark Farley may have.  I don't recall whether he

11    did or not.

12    Q.    Were you involved at all in the selection of the

13    ad hoc committee?

14    A.    No.

15    Q.    Who was?

16    A.    I don't know.  There is a process in the CBA,

17    whatever the process was.  It might have been the

18    provost and counsel.  But I don't know that for sure

19    because I wasn't involved at all.

20    Q.    And were you informed at all during the hearing

21    process of what was going on in the hearing other than

22    through counsel?

23    A.    No.

24    Q.    Prior to appearing at the hearing, did you

Allen Sessoms, Ph.D.

47

1  review any documents in preparation for the hearing?

2    A.    I don't recall.  I don't recall.  I have no

3  idea.

4    Q.    After the hearings, there were a number of

5  documents generated.  There was a brief that I prepared,

6  a brief that your counsel prepared.  There was extensive

7  notes of testimony, transcripts.  And there was a report

8  by the committee itself.  Did you review any of that

9  documentation?

10    A.    The only documentation I would have reviewed was

11  the report by the committee, its final report.

12    Q.    Did you do that?

13    A.    I did it, yes.  I don't recall when.  I

14  certainly did it.

15    Q.    And did you have any discussions with anyone

16  about that committee report other than your counsel?

17  Let me caution you that conversations with your counsel,

18  please, don't tell me.  And I'm not going to keep

19  repeating that.

20    A.    Okay.  No.

21    Q.    Have you become aware, at any time, that the

22  report by the committee may not have been the consensus

23  of the committee?

24    A.    I only have the report of the committee and



## A❖A
### ALPHA PHI ALPHA FRATERNITY, INC.
Zeta Rho Lambda Chapter
P. O. Box 1302
Dover, Delaware 19903

December 12, 2003

The Honorable Ruth Ann Minner
Governor of Delaware
Tatnall Building
William Penn Street, 2nd Fl
Dover, DE 19901

Dear Governor Minner:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast,** which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center**, located at 1121 Forrest Avenue.  The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms.**  Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.**  We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond.   We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity.  We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets.  We would appreciate receiving confirmation of your attendance.  **Please reply to 302-677-3532 (or e-mail: _William.Torian1@dover.af.mil)_ by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0029



ΑΦΑ

**ALPHA PHI ALPHA FRATERNITY, INC.**
**Zeta Rho Lambda Chapter**
**P. O. Box 1302**
**Dover, Delaware 19903**

December 12, 2003

The Honorable James L. Hutchinson
Mayor of Dover
P. O. Box 475
Dover, DE 19903-0475

Dear Mayor Hutchinson:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast**, which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center**, located at 1121 Forrest Avenue. The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms**. Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.** We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event has grown significantly and, now, boasts an attendance of over 700 people** from the Greater Dover Community and beyond. We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity. We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets. We would appreciate receiving confirmation of your attendance. **Please reply to 302-677-3532 (or e-mail: *William.Torian1@dover.af.mil*) by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0030



## AΦA

### ALPHA PHI ALPHA FRATERNITY, INC.
**Zeta Rho Lambda Chapter
P. O. Box 1302
Dover, Delaware 19903**

December 12, 2003

The Honorable Joseph R. Biden, Jr.
United States Senator
24 NW Front Street
Milford DE 19963

Dear Senator Biden:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast**, which will be held on **Monday, January 19, 2004** at the Dover Modern Maturity Center, located at 1121 Forrest Avenue. The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms**. Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.** We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond. We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity. We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets. We would appreciate receiving confirmation of your attendance. **Please reply to 302-677-3532 (or e-mail:** *William.Torian1@dover.af.mil*) by Monday, January 12, 2004.

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0031



## AΦA
### ALPHA PHI ALPHA FRATERNITY, INC.
#### Zeta Rho Lambda Chapter
#### P. O. Box 1302
#### Dover, Delaware 19903

December 12, 2003

The Honorable Michael N. Castle
Representative in Congress
Frear Federal Building
300 S. New Street
Dover, DE 19904

Dear Mr. Castle:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast**, which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center**, located at 1121 Forrest Avenue. The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms**. Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.** We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond. We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity. We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets. We would appreciate receiving confirmation of your attendance. **Please reply to 302-677-3532 (or e-mail: *William.Torian1@dover.af.mil*) by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0032



## AΦA
### ALPHA PHI ALPHA FRATERNITY, INC.
### Zeta Rho Lambda Chapter
### P. O. Box 1302
### Dover, Delaware 19903

December 12, 2003

The Honorable Thomas R. Carper
United States Senator
Frear Federal Building
300 S. New Street
Dover, DE 19904

Dear Senator Carper:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast,** which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center**, located at 1121 Forrest Avenue. The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms.** Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.** We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond. We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity. We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets. We would appreciate receiving confirmation of your attendance. **Please reply to 302-677-3532 (or e-mail:** *William.Torian1@dover.af.mil)* **by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,


William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0033



# ΑΦΑ

### ALPHA PHI ALPHA FRATERNITY, INC.
#### Zeta Rho Lambda Chapter
#### P. O. Box 1302
#### Dover, Delaware 19903

December 12, 2003

The Honorable Nancy H. Wagner
283 Troon Road
Dover, DE 19904

Dear Mrs. Wagner:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity,** Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast,** which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center,** located at 1121 Forrest Avenue.  The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms.**  Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.**  We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond.   We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity.  We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets.  We would appreciate receiving confirmation of your attendance.  **Please reply to 302-677-3532 (or e-mail: *William.Torian1@dover.af.mil*) by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*



**AΦA**

### ALPHA PHI ALPHA FRATERNITY, INC.
**Zeta Rho Lambda Chapter**
**P. O. Box 1302**
**Dover, Delaware 19903**

December 12, 2003

Dr. Allen L. Sessoms
President
Delaware State University
1200 N. Dupont Highway
Dover, DE 19901

Dear Dr. Sessoms:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast,** which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center**, located at 1121 Forrest Avenue. The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms**. Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.** We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond. We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity. We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets. We would appreciate receiving confirmation of your attendance. **Please reply to 302-677-3532 (or e-mail: *William.Torian1@dover.af.mil*) by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0035



## A◉A
### ALPHA PHI ALPHA FRATERNITY, INC.
### Zeta Rho Lambda Chapter
### P. O. Box 1302
### Dover, Delaware 19903

December 12, 2003

Dr. Claiborne D. Smith
Chairman of the Board of Trustees
Delaware State University
317 Pentland Drive/ Box 2
Centerville, DE  19807

Dear Dr. Claiborne D. Smith:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast,** which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center**, located at 1121 Forrest Avenue. The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms.** Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.** We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond.   We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity.  We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets. We would appreciate receiving confirmation of your attendance. **Please reply to 302-677-3532 (or e-mail: *William.Torian1@dover.af.mil*) by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,


William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0036



## AΦA
### ALPHA PHI ALPHA FRATERNITY, INC.
**Zeta Rho Lambda Chapter**
**P. O. Box 1302**
**Dover, Delaware 19903**

December 12, 2003

The Honorable John C. Still, III
P. O. Box 311
Dover, DE  19903

Dear Mr. Still:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast,** which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center,** located at 1121 Forrest Avenue.  The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms.**  Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.**  We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond.    We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity.  We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets.  We would appreciate receiving confirmation of your attendance. **Please reply to 302-677-3532 (or e-mail:** *William.Torian1@dover.af.mil)* **by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0037



## A⚜A
### ALPHA PHI ALPHA FRATERNITY, INC.
**Zeta Rho Lambda Chapter**
**P. O. Box 1302**
**Dover, Delaware 19903**

December 12, 2003

The Honorable Donna D. Stone
1155 Woodsedge Street
Dover, DE  19904

Dear Mrs. Stone:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast,** which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center**, located at 1121 Forrest Avenue.  The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms**.  Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.**  We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond.   We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity.  We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets.  We would appreciate receiving confirmation of your attendance.  **Please reply to 302-677-3532 (or e-mail:** *William.Torian1@dover.af.mil)* **by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

B 0038



A Φ A

## ALPHA PHI ALPHA FRATERNITY, INC.
### Zeta Rho Lambda Chapter
P. O. Box 1302
Dover, Delaware 19903

December 12, 2003

The Honorable Donna D. Stone
1155 Woodsedge Street
Dover, DE 19904

Dear Mrs. Stone:

Greetings!

The Officers and Members of **Alpha Phi Alpha Fraternity**, Incorporated, Zeta Rho Lambda Chapter of Dover, cordially invite you and your guest to join us for our **20th Annual Rev. Dr. Martin Luther King, Jr. Prayer Breakfast**, which will be held on **Monday, January 19, 2004** at the **Dover Modern Maturity Center**, located at 1121 Forrest Avenue. The program will begin promptly at **8:00 a.m.** in the **East Wing Ballrooms**. Breakfast will be served at 8:15.

Our **Keynote Speaker** will be **Ryle A. Bell, D. D. S., Professor and Associate Dean Howard University School of Dentistry, Washington, D.C.** We are confident that this distinguished Alpha Man will bring an inspiring and uplifting message.

Each year since its inception, **this cornerstone event** has grown significantly and, now, **boasts an attendance of over 700 people** from the Greater Dover Community and beyond. We would be honored to have you in our midst, as we celebrate and commemorate the life and contributions of the late Civil Rights Leader, who was also a member of the fraternity. We sincerely hope that your schedule will permit your participation.

Enclosed are two complimentary tickets. We would appreciate receiving confirmation of your attendance. **Please reply to 302-677-3532 (or e-mail: *William.Torian1@dover.af.mil*) by Monday, January 12, 2004.**

In closing, let me also take this opportunity to wish you and yours all the best this holiday season.

Very truly yours,

William E. Torian, Chairman
*MLK Prayer Breakfast Committee*

1    A.    That's correct.

2    Q.    So this was an event by the graduate chapter

3    and your role on that was simply as a member or were

4    you a committee member for the breakfast?

5    A.    I was chair of the committee that was

6    responsible for selecting the speaker.

7    Q.    And somebody else set up details about the

8    breakfast and did everything else, right?  You were on

9    the speaker committee?

10    A.    I was on the program committee, which -- yes.

11    Yes.

12    Q.    Program committee?

13    A.    Yes, which was responsible for putting together

14    the program.

15    Q.    Who else was on the program committee?

16    A.    Oh, my.

17    Q.    Roughly how many alumni were on the program

18    committee?

19    A.    Eight to ten.  I can remember faces.  I would

20    have to go back and look at a list for names.

21    Q.    Eight to ten were on the alumni committee.  How

22    many of them were DSU employees?

23    A.    None, per se.  One person, Cecil Wilson, was

24    the former president of the Delaware NAACP.  He was

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Wendell Gorum, Ph.D.

125

126

1   hired to assist the president in acclimating to the

2   community, so in that sense he was a representative.

3       Q.   And he was on the program committee?

4       A.   Yes.

5       Q.   Now, do you recall who was involved in the

6   various invitations as in who invited whom first?

7       A.   Okay.  I had invited Kwiesi Mfume and he had

8   agreed to come.  Subsequently to that invitation he

9   was involved in an auto accident, so he withdrew.

10          I then invited the dean of the school of

11  dentistry at Howard as a backup and I had committed to

12  him.  Cecil Wilson on his own, without consulting

13  anybody else on the committee, invited Sessoms.  And

14  when we found out what he did, we simply told him he

15  had to rescind that invitation.

16      Q.   Now, you had described this as a fairly

17  significant event every year.  Is that accurate?

18      A.   Yeah.  It turned into that, yes.

19      Q.   A lot of people attending this event?

20      A.   (The witness nodded.)

21      Q.   Does President Sessoms routinely attend prayer

22  breakfasts when they are held?

23      A.   That was his first year.

24      Q.   That was his first year.  Do you know if he's

W&F

WILCOX & FETZER LTD.
Registered Professional

B0041

Wendell Gorum, Ph.D.

60

1    not approve or discuss.

2      Q.    Was this before or after you had received

3    notice of termination from the board?

4      A.    I don't remember.  I don't remember.  Shortly

5    after the report was issued, they showed up at my

6    house.  And they were not friends.  They had never

7    been to my house before like that.

8      Q.    So all three of them showed up.  Did they tell

9    you specifically which things were in the report that

10   they had not seen before?

11     A.    They actually did.  I would have to look at the

12   report to refer to it and I really cannot remember the

13   specifics.

14     Q.    We'll go back to that later.

15           MR. ZEFF:  Can we take a five-minute

16   break?

17           MR. DUSTON:  Sure.

18           (A brief recess was taken.)

19   BY MR. DUSTON:

20     Q.    Other than information of things in the report,

21   that they saw that they did not think they had agreed

22   to, have Dr. Davis, Jackson or Toscano shared other

23   information with you about how the committee did its

24   work or problems that they had with the process?

Case 1:06-cv-00565-GMS    Document 43-4    Filed 09/25/2007    Page 1 of 47
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

21 (Pages 81 to 84)

**81**

1 　　　MR. DUSTON: I have no further
2 questions.
3 　　　DR. DAVIS: I have two questions.
4 　　　DR. ACKAH: Go ahead.
5 　　　DR. DAVIS: Dr. Sessoms, in view of
6 the fact that these past practices of Chairs and
7 instructors and sometimes even Deans changing grades
8 inappropriately and so forth, and we can go back and
9 discuss some of these issues -- all of these -- well,
10 not all of them, some of them with the individuals
11 who have testified, in view of all that taking place,
12 you felt that there was no justification for issuing
13 Dr. Gorum some type of a warning or a reprimand as
14 far as his, in your judgment, inappropriate,
15 unethical, unprofessional activities in light of all
16 these past practices that took place, not only with
17 Dr. Gorum, but other individuals on this campus.
18 　　　You saw no need to submit or issue a
19 warning of some type to him?
20 　　　THE WITNESS: When I took over this
21 University, I took over the University. Past
22 practice doesn't matter to me.

**82**

1 　　　DR. DAVIS: Well, would you admit that
2 there is still, to this day, a lot of confusion
3 pertaining to grade changes and so forth. You know,
4 one could argue very well that in many instances he
5 submitted Request for Grade Change Forms, and
6 someone, knowingly or unknowingly, had to approve it
7 because the grades had been changed -- were changed.
8 　　　And so there is a lot of confusion, I
9 think. I know what is acceptable and what's not, but
10 in light of all this confusion and controversy that's
11 taken place, and Dr. Gorum doesn't have a history of
12 being reprimanded, as far as I know, for such
13 academic conduct prior to these allegations.
14 　　　You didn't see any need to issue any
15 warning or --
16 　　　THE WITNESS: I see no reason --
17 　　　DR. DAVIS: -- reprimand.
18 　　　THE WITNESS: I see no basis for any
19 confusion.
20 　　　DR. DAVIS: Well, I don't see -- well,
21 I agree that there shouldn't be any --
22 　　　THE WITNESS: I agree. There should

**83**

1 be no basis for any confusion.
2 　　　MR. DUSTON: I have no further
3 questions for Dr. Sessoms.
4 　　　DR. JACKSON: But there is confusion
5 because I have a student who has an incomplete. But
6 I can't find when the student took the final with me.
7 So I have to go back and search the records.
8 　　　The student -- the incomplete -- she
9 gave an incomplete. I don't remember who she was.
10 She says she tried to send it through E-mail. She
11 didn't get the E-mail. The incomplete date has
12 passed. I'm waiting for her to turn in her work.
13 　　　Now, when I get ready to change her
14 grade, what's clear about that?
15 　　　THE WITNESS: There's a process that
16 you go through.
17 　　　DR. JACKSON: But she's already missed
18 the grade date.
19 　　　THE WITNESS: The process says that if
20 you miss the grade change time, the incomplete turns
21 into an F. That is what you should do. It's
22 unambiguous.

**84**

1 　　　DR. DAVIS: No. Mr. Parker did send
2 out a notice saying that -- indicating that if an
3 extension is needed to submit something in writing
4 for him to grant --
5 　　　THE WITNESS: There's a process for
6 extensions, but it's not -- it's not -- there's no
7 confusion. There's a process.
8 　　　MR. ZEFF: My witness, 'cause I'll
9 pick up right where we left off.
10 　　　CROSS-EXAMINATION
11 BY MR. ZEFF:
12 　　Q. Dr. Sessoms, my name is Greg Zeff. I
13 represent Dr. Gorum.
14 　　　Let's start off with that process.
15 Where's that written down?
16 　　**A. It's written down in the catalog.**
17 　　Q. In the catalog.
18 　　　MR. ZEFF: Do we have a copy of the
19 catalog here?
20 　　　DR. GWANMESIA: Is the catalog --
21 　　　THE WITNESS: Whatever has these --
22 　　　MR. ZEFF: I'm talking about -- he

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
Case 1:06-cv-00565-GMS    Document 43-4    Filed 09/25/2007    Page 2 of 47
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

8 (Pages 29 to 32)

**29**

1 they were -- they came after me. I was accused of
2 taking the Alphas' money.
3     Q. How did that happen? Who accused you?
4     A. Someone in the School of Business. I was
5 never told directly, but students and the Alpha
6 leaders were told, and they are the ones who told me.
7     Q. That you were accused of taking their
8 money?
9     A. Yes.
10     DR. ACKAH: Has there been officially
11 any documentation of that --
12     THE WITNESS: No. It could not be
13 documented, but they were told that.
14     Now, the Alphas worked the June race
15 that normally brings in about $70,000.00. And every
16 -- when I left -- when I was suspended in March, the
17 fraternity had about $5,000.00 left in its account.
18 Now there is a deficit of $3,000.00, including all of
19 the money that was brought in during the Spring. So
20 the students actually got nothing from it, 'cause the
21 money was taken away and spent.
22 BY MR. ZEFF:

**30**

1     Q. Now, let me -- with all that background,
2 let me bring you now to -- back to your department a
3 little bit, and have you talk about some of the
4 issues you had as Department Chair and, also, as
5 Director with registration and with purging
6 internships, practicums, that sort of thing.
7     So let me go back to a time when you
8 just a Director, and as a Director, who do you report
9 to as Director of Mass Communications?
10     A. Dr. King, who was the Chair.
11     Q. Scott King?
12     A. Yes.
13     Q. He was the Chair of English?
14     A. English and Mass Communications.
15     Q. So he was your Department Chair at that
16 time?
17     A. That's correct.
18     Q. Okay. Were there problems back when you
19 were just a Director and working for Dr. King with
20 purges?
21     A. Yes.
22     Q. What kind of problems were there?

**31**

1     MR. DUSTON: Objection as to relevance
2 going this far back in the registration process.
3     MR. ZEFF: I'm going to be -- well, I
4 need to establish the practice and the procedure that
5 was used by his department that was taught to him.
6 And why he did what he did based on practice and
7 procedure that was taught to him by the Chair of his
8 department known by the Administration and the
9 Registrar's Office as to what was done.
10     DR. ACKAH: Okay. I'll allow it.
11     THE WITNESS: Each semester students
12 supposedly who owed $1,000.00 or more --
13 BY MR. ZEFF:
14     Q. And this is when you were a director?
15     A. That's correct. Students were purged or
16 taken out of their classes. Because we had such a
17 large number of students, and even at 100, that's
18 still a large number. We had many students who were
19 purged.
20     Now, purging is not a good process
21 even though we were told that students were purged if
22 they owed $1,000.00 or more, many students were

**32**

1 purged who owed --
2     UNIDENTIFIED MALE: Excuse me, the
3 gentleman is here with the conference phone.
4     DR. ACKAH: Off the record.
5     (Recess)
6     MR. ZEFF: Let's go on the record, if
7 we may and we'll tell you what we're discussing.
8     MR. DUSTON: Two issues discussed off
9 the record are to be, the first related to privacy
10 issues for students and further protections, and it's
11 just the understanding of the Committee that the
12 records that we have received are confidential
13 student records, not to be disclosed beyond the
14 Committee, or those within the proceeding, to know
15 pursuant to FIRPO(ph.), and if there's anyone who
16 wishes to attend this public hearing who is not
17 directly involved in the Administration or faculty
18 members, we will address that when if we wish to at
19 that point in time.
20     The -- Mr. Zeff has asked, and certain
21 Committee members have that we summarize what has
22 happened in the litigation reported in the paper this

---

**85**

1 said the catalog. I don't know what -- what catalog
2 are we talking about?
3         DR. JACKSON: It's printed somewhere.
4         THE WITNESS: The faculty members know
5 what the process is through some mechanism. I don't
6 spend time in classes, so I'm not going to get into
7 the details.
8 BY MR. ZEFF:
9     Q. I see, but it's written down and it's firm
10 and it's exact and it's not unclear in any way, but
11 you don't know what it is, sir?
12     A. I don't have to know what it is.
13     Q. Well, who does?
14     A. The Registrar knows what it is.
15     Q. The Registrar. Mr. Parker knows what it
16 is?
17     A. Yes.
18     Q. He knows exactly --
19     A. And the Chairs.
20     Q. Okay.
21     A. And the Deans.
22     Q. Let's talk --

---

**86**

1     A. They know what they are.
2     Q. Let's talk about Mr. Parker for a minute.
3     A. No, I won't talk about Mr. Parker.
4         DR. GWANMESIA: Can --
5         THE WITNESS: I have no interest in
6 talking about Mr. Parker. This is about Mr. Gorum.
7         MR. ZEFF: Okay.
8         DR. ACKAH: No, Dr. Sessoms, that is
9 where you are wrong. If it is relevant that you talk
10 about Mr. Parker --
11         THE WITNESS: I don't know about Mr.
12 Parker, so I will not comment on Mr. Parker.
13         DR. ACKAH: No, what I'm saying is, if
14 it becomes necessary that we say something about Mr.
15 Parker --
16         THE WITNESS: Yes, but don't ask me
17 about Mr. Parker.
18         DR. ACKAH: Yeah, okay.
19 BY MR. ZEFF:
20     Q. Well, did you know Mr. Parker?
21     A. I know who Mr. Parker is, yes.
22     Q. Did you talk to Mr. Parker about Dr.

---

**87**

1 Gorum?
2     A. No.
3     Q. Did you think it was important to find out
4 before you terminated Dr. Gorum --
5     A. I found out through an appropriate
6 channel.
7     Q. May I finish, please. Do you think it's
8 appropriate before you fired Dr. Gorum to talk to the
9 Registrar to see why those grade change request forms
10 were accepted?
11     A. No, there is a process.
12     Q. Okay. Where's that process written down
13 that says what Dr. Gorum was supposed to do for a
14 student that comes to him and has no registration,
15 and he has to find classes for that student?
16         MR. DUSTON: Objection. Hypothetical.
17         MR. ZEFF: No, it's not a hypothetical
18 in any way, shape or form.
19         DR. ACKAH: Overruled. Overruled.
20 BY MR. ZEFF:
21     Q. Where's that written down, sir?
22     A. I think Dr. Gorum should know where it's

---

**88**

1 written down. I'm not --
2     Q. I'm asking you.
3     A. I don't have an answer. I don't know.
4     Q. You don't know?
5     A. That's correct.
6     Q. If it's not written down anywhere, would
7 you say that there would be room for confusion as to
8 how Dr. Gorum should proceed?
9     A. I didn't say it wasn't written down.
10     Q. I'm asking you --
11     A. No, I'm not going to answer a
12 hypothetical. It is written down. The procedures
13 for changing of grades are written down.
14     Q. Okay. Sir --
15         DR. ACKAH: Robert, I think we have a
16 hostile witness.
17         MR. DUSTON: I think we have a hostile
18 opposing counsel as well.
19         MR. ZEFF: I will be glad to back off
20 my tone at this point.
21         DR. ACKAH: Okay. Please, and I was
22 going to say that. Please, you raise your voice --

---

HEARING IN RE DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

23 (Pages 89 to 92)

89

1    MR. ZEFF: I tend to do that.
2    DR. ACKAH: Yeah, don't do that.
3    MR. ZEFF: -- and I won't do that.
4    DR. ACKAH: Don't do that. He is the
5  President of our University.
6    MR. ZEFF: Dr. Sessoms, I apologize.
7    DR. ACKAH: At the same time, Dr.
8  Sessoms, please, we want you to be friendly with us.
9    THE WITNESS: I'm friendly with you.
10  I'm talking to his question.
11    MR. ZEFF: I apologize for my tone.
12    DR. ACKAH: Okay.
13    MR. ZEFF: I will try to keep it down.
14  I do get a little excited sometimes, and I usually am
15  in a courtroom and start throwing things. So I'll
16  try not to do that here.
17    DR. ACKAH: Don't do that.
18    MR. ZEFF: If I do, just tell me and
19  I'll stop.
20  BY MR. ZEFF:
21    Q. Can we turn to Document Number 11 in the
22  University's book here, which is the Change of Grade

90

1  Request Forms. Are you familiar with this form?
2    A. No.
3    Q. You're not familiar with this form?
4    A. I don't use these forms. I don't deal
5  with these forms, no.
6    Q. So you've never seen this form?
7    A. I've seen this form before. I'm not
8  familiar with this form.
9    Q. Okay. Is there another document that has
10  been prepared by your administration that tells
11  faculty members how to go about changing a grade
12  other than this form?
13    A. This form doesn't tell the faculty member
14  how to change a grade.
15    Q. Okay. Is there another document that
16  does?
17    A. My administration did not prepare
18  documents that had been in practice at the University
19  --
20    Q. Okay.
21    A. -- published in the catalog that described
22  exactly how grades are to be handled.

91

1    Q. But past practice doesn't matter under
2  your administration, does it?
3    A. Past practice in violation of rules
4  doesn't matter.
5    Q. Does not matter?
6    A. Well, let me give you an example of how
7  past practice, in general, doesn't matter.
8    If there's a lawless regime and people
9  are murdered on the streets, and it's replaced by a
10  regime that's lawful, that murder that you can get
11  away is not relevant.
12    What I'm trying to say is, we are an
13  institution of rules and regulations. The only thing
14  that matters to this institution is its credibility.
15    If we are not clear with our students
16  and to our external constituencies, and with our
17  funders, that we, in fact, have rules and we obey
18  those rules, then we have no credibility.
19    DR. GWANMESIA: Can I ask -- can I --
20    DR. ACKAH: Yes, go ahead.
21    MR. ZEFF: Sure, because if I say
22  something, he's going to get mad again.

92

1    DR. GWANMESIA: Do you believe that in
2  order to have people behave in a certain way, we need
3  to have those rules and regulations clearly spelled
4  out so that people know what they have to do?
5    If you come to an institution and you
6  start out with a lawless society, how do you get that
7  society to start behaving in a lawful way if they
8  don't have any rules?
9    THE WITNESS: A lawless society is not
10  necessarily one that has no rules. It's one that
11  generally violates its own rules.
12    DR. GWANMESIA: But since --
13    THE WITNESS: That's what you have --
14  we had, in many instances at this institution, and
15  the most important that I was confronted with when I
16  arrived, is this circumstance. When I arrived, okay.
17    The problem is that there are rules
18  and they were being ignored. That's what I mean.
19    DR. GWANMESIA: I guess that's what
20  Zeff is asking, are these rules there and you know
21  what to do, and you say, it doesn't matter. And --
22    THE WITNESS: No. No. I didn't say.

Case 1:06-cv-00565-GMS   Document 43-4   Filed 09/25/2007   Page 5 of 47
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

24 (Pages 93 to 96)

93

1  Mr. Gorum --
2       DR. GWANMESIA: Maybe I'm --
3       THE WITNESS: -- was on this faculty
4  for a couple of decades. Mr. Gorum, as a member --
5       MR. ZEFF: Dr. Gorum.
6       THE WITNESS: Mr. Gorum, as a member
7  of this faculty --
8       DR. ACKAH: Dr. Gorum.
9       THE WITNESS: Excuse me. I can -- he
10  is Mr. Gorum. My sister's a doctor, she's a
11  gynecologist. I'm Mr. Sessoms.
12       I can refer to him as Mr. Gorum, it's
13  --
14       DR. ACKAH: But it's up to Dr. Gorum
15  to be whatever he wants to be addressed, as Mr. or --
16       THE WITNESS: He didn't say anything.
17       MR. ZEFF: I did.
18       DR. ACKAH: He explained -- his
19  attorney has indicated he prefers to be addressed as
20  Doctor. When my students call me Mr. Ackah, I tell
21  them no, you can't do that.
22       THE WITNESS: That's your preference,

94

1  okay.
2       DR. ACKAH: Dr. Gorum, do you mind he
3  addresses you as Mister? Do you mind?
4       DR. GORUM: Yes.
5       DR. ACKAH: So you want to be
6  addressed as Doctor.
7       MR. ZEFF: Please.
8       DR. ACKAH: Okay.
9       THE WITNESS: Dr. Gorum, having been
10  on the faculty for well over a couple of decades and
11  knowing the responsibility that goes with it, and
12  being a Chair, can be expected to know the rules.
13  BY MR. ZEFF:
14       Q. Now, the rule that he should know about
15  being on this faculty for so many years, that should
16  be written down somewhere, shouldn't it?
17       Something so important that someone
18  can be fired for failing to abide by that rule, it
19  should be written down somewhere, shouldn't it?
20       A. If Dr. Gorum knew how to use this form,
21  then, he must have known what the rules are. So I
22  assume the rules are written down somewhere.

95

1       Q. And it would be a failing of the
2  Administrations before yours if it wasn't written
3  down somewhere, wouldn't it?
4       A. It would be a failure of the institution
5  to have not clarified what the rules are. And it
6  would be a failure of the faculty member to use the
7  system to not know what the rules were.
8       Q. And you've mentioned a lot of terms here,
9  and I'm going to try to say this calmly, but the last
10  one was murder. Do you attribute what Dr. Gorum has
11  done here to, in the outside world, to something as
12  heinous as a murder?
13       A. Let me say this: The academic integrity
14  of this institution is all it has. If actions are
15  taken that undermine the academic integrity of the
16  institution, it is -- it can be, and in many
17  instances, has been a fatal blow to the institution.
18       Q. And you are asking this Committee here
19  today to consider that what Dr. Gorum did to be a
20  corruption, to be akin to a murder, then?
21       A. No --
22       DR. ACKAH: No. No. No.

96

1       THE WITNESS: I'll answer your
2  question.
3       DR. ACKAH: You're using it in a
4  symbolic --
5       MR. ZEFF: It's a metaphor.
6       DR. ACKAH: Yes.
7  BY MR. ZEFF:
8       Q. Okay. Then let me just get right to it.
9  It's your opinion, sir, looking at this form that
10  this form is not a sufficient document to tell a
11  faculty member what all the procedures are --
12       A. It is not, in my opinion, about the form.
13  I do not know what the ensuing documentation --
14       Q. Well, let me --
15       A. Let me finish my answer.
16       Q. I didn't finish my question.
17       A. You asked whether I found this form
18  insufficient. This form is not an instruction. It
19  is a piece of paper with lines on it. It doesn't
20  tell you even how to use it.
21       Q. Okay. Therefore, it would be insufficient
22  as the instruction for how to change grades at

**105**

1  students, and to protect the integrity of the

2  process.

3      Q. Mr. Sessoms --

4      A. Call me Doctor.

5      Q. Whatever you want me to call you -- I'll

6  call you something.

7          Dr. Sessoms -- Dr. Sessoms, I have no

8  idea where I was.

9          Okay. In coming to the decision that

10  Dr. Gorum's actions were so unethical that he should

11  be terminated -- that was the decision you made,

12  isn't it?

13      A. Correct.

14      Q. You talked to Dean Frederick?

15      A. Yes.

16      Q. You talked to Dr. Bell?

17      A. Yes.

18      Q. You didn't -- we already established you

19  didn't talk to Dr. Parker -- Mr. Carper, excuse me,

20  correct?

21      A. Correct.

22      Q. You didn't talk to Dr. Gorum, did you?

**106**

1      A. No.

2      Q. You didn't talk to any of the students?

3      A. No.

4      Q. The only two people you talked to were

5  Dean Frederick and Dr. Bell, correct?

6      A. Correct.

7      Q. And they told you -- at least Dr. Bell

8  told you --

9      A. How do you know what Dr. Bell -- you only

10  know what he said.

11      Q. Well, did he tell you that Dr. Gorum said

12  he got permission from Dean Frederick to change

13  grades in Dr. Osei-Mensah's class?

14      A. I don't recall.

15      Q. Did you ask Dean Frederick whether or not

16  that was true?

17      A. I didn't talk to Dean Frederick

18  specifically about that.

19      Q. What did you talk to Dean Frederick about?

20      A. What the circumstances were, and whether

21  he knew what was going on, and what the reactions of

22  the students were.

**107**

1      Q. And what did Dean Frederick tell you?

2      A. He told me that he found what was going on

3  to be a very difficult situation.

4      Q. What else did he -- tell me every --

5      A. I don't remember everything he told me. I

6  don't recall. I told you what I remember. This was

7  a long time ago.

8      Q. Do you remember anything else at all about

9  any conversations you had with Dean Frederick about

10  Dr. Gorum?

11      A. Not specifically, no.

12      Q. Anything at all?

13      A. I don't recall, because I don't take

14  notes. I don't write memos. I know that when I make

15  an announcement, I discuss it thoroughly and, then,

16  take action.

17      Q. Can you recall anything, other than what

18  you've told us, about what you and Dr. Bell talked

19  about regarding Dr. Gorum?

20      A. No, because I had, as Provost,

21  conversations with Dr. Bell two or three times a day

22  about lots of things. I simply don't recall.

**108**

1          If I were to give you an answer it

2  might be misleading. I just don't remember.

3      Q. If Dr. Gorum had the permission of the

4  Dean, his Dean, to change Dr. Osei-Mensah's grades,

5  would he have been in violation of DSU policy at that

6  time by going in and changing those grades?

7      A. You said -- ask the question again,

8  please. I didn't hear the issue to begin with.

9          MR. ZEFF: Read it back, please.

10          (Whereupon, the Reporter read from the

11  record as requested.)

12          THE WITNESS: Yes, he would have been

13  in violation of DSU policy because it required the

14  signature also of the Provost.

15  BY MR. ZEFF:

16      Q. So if Dean Frederick told Dr. Gorum to

17  change the grades, Dean Frederick would also be in

18  violation?

19      A. Dean Frederick can't tell Dr. Gorum to

20  change grades. Dean Frederick cannot change the

21  grades. Dr. Gorum cannot change the grades. The

22  forms are submitted through the Registrar's Office.

**117**

1  deal.

2  　　　　DR. ACKAH: Based on your statement

3  the Dean should be sanctioned, what type of sanction,

4  that is not why we are here.

5  　　　　THE WITNESS: The Dean -- if the Dean

6  didn't do their job, clearly -- I mean --

7  　　　　DR. ACKAH: So I think we should lay

8  it to rest.

9  　　　　MR. ZEFF: Thank you. Let me just go

10  back --

11  　　　　DR. ACKAH: Let's move on, please.

12  BY MR. ZEFF:

13  　　Q. If Dean Frederick told Dr. Gorum to change

14  Dr. Osei-Mensah's grades, what consequences would

15  there be for Dr. Gorum if he didn't obey the

16  instruction of the Dean?

17  　　**A. Nothing. What's the Dean going to do? He**

18  **can't instruct somebody to change somebody else's**

19  **grade. The Dean, then, is responsible for doing it,**

20  **if he initiated the change. But, I mean, if you say,**

21  **okay, go and do something which you know is**

22  **incorrect, you know what, I don't do it, you don't do**

**118**

1  **it. What's going to happen, nothing.**

2  　　Q. Is there insubordination that a Dean

3  charges --

4  　　**A. Faculty -- Deans can do all sort of**

5  **things, but they can't -- I don't think they're going**

6  **to be able to sanction a faculty member for**

7  **disobeying a ridiculous directive.**

8  　　　　DR. ACKAH: So far from the -- let me

9  get in here. I don't recall anyone giving the idea

10  that the Dean told somebody, but rather he

11  authorized. To authorize someone to do something --

12  　　　　MR. DUSTON: Actually, Dr. Ackah, at

13  this point I don't think there's been any testimony.

14  What there's been is a bunch of question from Mr.

15  Zeff.

16  　　　　Dean Frederick did not testify to

17  that, and Dr. Gorum hasn't testified to it yet,

18  either.

19  BY MR. ZEFF:

20  　　Q. Well, let me -- let me turn to the black

21  binder, if you would, Dr. Sessoms, the eleventh

22  document in that notebook.

**119**

1  　　　　They're actually -- it's page 11.

2  They're date stamped.

3  　　　　DR. ACKAH: When are we going to?

4  　　　　MR. ZEFF: Two o'clock.

5  　　　　DR. ACKAH: Two o'clock. Would it be

6  possible for you to run it off with about ten minutes

7  so that we can have the break? Is that possible?

8  　　　　MR. ZEFF: I can certainly try.

9  　　　　DR. ACKAH: So ten minutes.

10  　　　　MR. ZEFF: Let me see where I get. I

11  don't know if I've got more than that left anyway.

12  BY MR. ZEFF:

13  　　Q. Let me just direct your attention to the

14  second paragraph --

15  　　　　DR. GWANMESIA: Where are we?

16  　　　　MR. ZEFF: Number 11 in the black

17  binder.

18  BY MR. ZEFF:

19  　　Q. Is this the letter that you authored?

20  　　**A. It's a very strong statement. It's a**

21  **letter that I signed.**

22  　　Q. Okay. Did you author this letter?

**120**

1  　　**A. It's a letter that I signed.**

2  　　Q. Who wrote it?

3  　　**A. Counsel.**

4  　　Q. Did you review the letter before you

5  signed it?

6  　　**A. Of course.**

7  　　Q. Did you make any changes to the letter

8  before you signed it?

9  　　**A. No, not that I'm aware of. I don't**

10  **remember. This is a long time ago.**

11  　　Q. Okay. Then, it's counsel's language and

12  not yours?

13  　　**A. I signed the letter.**

14  　　Q. Okay.

15  　　**A. I did not author the letter.**

16  　　Q. The second paragraph says, I understand

17  that you do not deny changing these grades, but

18  assert that Dr. Frederick verbally authorized those.

19  Do you see that?

20  　　**A. Yes.**

21  　　Q. Okay. And at the time you signed this

22  letter, you had read that?

Case 1:06-cv-00565-GMS Delaware University GOP J. M. Ph.D. Document 43-4 Filed 09/25/2007 Page 8 of 47
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

48 (Pages 189 to 192)

**189**

1  to you, Dr. Tolliver.
2        DR. TOLLIVER: Nice talking to you.
3        DR. ACKAH: And we have a lady here
4  who's helping us.
5        DR. TOLLIVER: Okay.
6        MR. ZEFF: And can we -- just for the
7  record can we verify that the panel recognizes Dr.
8  Tolliver's voice.
9        DR. ACKAH: Oh, yeah. We know his
10  voice.
11        MR. ZEFF: Okay.
12  Whereupon,
13        JOHNNY TOLLIVER, Ph.D., having first
14  been duly sworn according to law, was examined and
15  testified as follows:
16        DIRECT EXAMINATION
17  BY MR. ZEFF:
18    Q. Dr. Tolliver, can you just very briefly
19  tell the Panel here what your experience at Delaware
20  State was.
21    A. Well, at Delaware State I came in in 1993
22  as Dean of the -- at that time, School of Arts and

**190**

1  Sciences. And in 1997 I assumed the position of
2  Acting Vice President of Academic Affairs. And in
3  the Spring of '98 I was appointed Provost and Vice
4  President of Academic Affairs.
5    Q. And in those various capacities, did you
6  have the opportunity to deal with submitting grades
7  and grade change issues related to students?
8    A. Yes. When I first came to Delaware State,
9  the practice was that during that period of time
10  after the regular submission of grades, that faculty
11  members could go to the Registrar's Office and change
12  grades themselves.
13        There was a general practice of
14  Chairs, especially, making grade changes without
15  signatures from Deans or the Provost, but going
16  directly to the Registrar's Office and making those
17  changes themselves.
18        We tried to bring some control to that
19  while I was there, and we did to the extent where
20  certain grade changes did require the signature of a
21  Dean -- signatures of the Dean and the Provost in
22  order for the Records Office to accept them.

**191**

1    Q. Which changes required those signatures?
2    A. Letter grade changes from like C to A or D
3  to B, or something like that.
4        But even in cases like -- those were
5  routine cases where a faculty member may have been
6  changing the grade of one student, or requesting a
7  grade change for one student.
8        But in some cases we had some serious
9  problems with adjuncts, especially, who might come to
10  Delaware State and teach for a semester and, then,
11  create some real problems with the grades that he or
12  she may have submitted.
13        And in those cases we used the -- gave
14  latitude to Department Chairs to try to rectify those
15  situations. And I'm aware of several cases that were
16  like that.
17    Q. Are you also aware of giving Department
18  Chairs latitude with regard to purges?
19    A. There -- with respect to purging, those
20  were done through the enrollment and financial
21  offices for students who had not paid by a certain
22  date.

**192**

1        But in many cases where students were
2  purged improperly, we gave wide latitude to the
3  Department Chairs to make sure that those students
4  were restored.
5        In some cases students had not -- who
6  had scholarships, for instance, and those
7  scholarships had not been posted to their accounts
8  and were purged, and those faculty members took it
9  upon themselves, with our blessings, of course, to
10  get those students restored as quickly as possible.
11    Q. And did that wide authority include
12  allowing Chairs to register students for other
13  courses, or give them grades -- place grades in other
14  courses that weren't necessarily the course that they
15  had taken?
16    A. I don't know if we had instances where a
17  Chair would put grades -- give students grades in
18  courses they had not taken. Now, I don't recall
19  that.
20        I do know that in some cases there may
21  have been some instances where students had taken
22  courses and did not receive grades, or those grades

193

1  were not posted on the transcript, and we had to find
2  evidence that the students had, indeed, taken the
3  course. And if there was no grade, we had to try to
4  develop a grade as best as we could.
5      Q.  And, then, were there also occasions where
6  you had to find either a new course or a different
7  course to enroll them in?
8      A.  Yes. Yes. And to try to substitute some
9  courses for other courses.
10     Q.  That's what I'm talking about.
11     A.  Yeah, the whole aim was to get students
12  qualified for graduation. And in some cases where
13  there was some controversy over some courses, we gave
14  very wide latitude in substituting courses so that
15  students could meet graduation requirements.
16     Q.  Would that same latitude apply for
17  students who were on scholarship or needed a certain
18  number of credits and they had been purged?
19     A.  Right. Absolutely.
20     Q.  Okay. And did -- was it required that the
21  Chairs of Departments get all the signatures of the
22  Deans and the Vice Presidents or the Provost in order

194

1  to accomplish these goals?
2      A.  No. No, not in those kinds of situations.
3      Q.  Okay. Now, did you have discussions at
4  Deans' meetings or cabinet meetings about these
5  purging issues and the latitude you gave to Chairs?
6      A.  In Deans' meetings -- in Chairs' meetings
7  when I was Dean, yes. And in meetings with the Deans
8  when I was Provost.
9      Q.  Was Dean Frederick a part of any of these
10  meetings?
11     A.  Yes.
12     Q.  Was he aware that you had given Chairs the
13  approval to do whatever -- or wide latitude, as you
14  said, to correct the students' rights?
15     A.  Absolutely. And as far as I knew, he was
16  allowing -- this is when I was Provost -- he was
17  allowing Chairs in the College of Arts and Sciences
18  to do the same.
19     Q.  Do you know whether or not -- go ahead,
20  I'm sorry.
21     DR. ACKAH:  Dr. Tolliver --
22     THE WITNESS:  Yes.

195

1      DR. ACKAH:  -- I'm sorry to worry you,
2  but can you repeat that. That's a very key --
3      THE WITNESS:  Say again.
4      DR. ACKAH:  -- statement that you
5  made. Can you repeat what you just said.
6      THE WITNESS:  Oh, yes. I'm saying
7  that there were rare cases when we were pretty sure
8  that students' grades did not reflect what they
9  should have been. And so what I would do is appoint
10  a committee of faculty members to take a look at it,
11  to see if -- if that were indeed the case.
12     But in Deans' meetings when I was
13  Provost, we talked about situations like that, and
14  how Chairs needed to have our support in trying to
15  get these things straightened out, so that students
16  would not be hurt.
17     I have always -- my philosophy has
18  always been, if we're going to err, let's err on the
19  side of the student, especially when the institution
20  has been responsible for the error.
21     DR. ACKAH:  Okay. Now, can you repeat
22  what you said about the School of Arts and Sciences

196

1  and Dr. Frederick.
2      THE WITNESS:  Yes. What I said about
3  that is, Dr Frederick was aware that we would give
4  latitude to Chairs to make grade changes if they
5  warranted such changes. And in some cases, they did.
6      DR. ACKAH:  You are aware that this
7  was going on in --
8      THE WITNESS:  In his school.
9      DR. ACKAH:  -- in his school, Arts and
10  Science?
11     You said you were aware that he was
12  doing that the same in his school, right?
13     THE WITNESS:  Right. Right. You
14  know, when I was Dean of Arts and Sciences, Dr.
15  Frederick was a Chair in the School and, then, later
16  the College of Arts and Sciences.
17     And, then, when I became Provost, he
18  became Dean of Arts and Sciences. And we did, in
19  fact, in several cases -- we're not talking about a
20  whole lot of cases, but in a few cases we had to deal
21  with grades that were improperly assigned by faculty
22  members.

Case 1:06-cv-00565-GMS-DEL ACKAH STATE UNIVERSITY WENDELL GORUM, Ph.D.
Document 143-4 Filed 09/25/2007 Page 10 of 47
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

36 (Pages 141 to 144)

141

1  purged either because they had pre-registered and
2  were not coming back, and had somehow informed the
3  school of such, or they owed some money.
4       The problem with that is that somehow
5  the Business Office made no distinction between, and
6  this was until later years, and probably even last
7  year, owing $1.00 or owing $10,000.00. It was, if
8  there were anything owed, you were purged.
9       And, then, the student would have to,
10  somehow, go around, get everything straight and be
11  readmitted to the class.
12       The problem with that is that once a
13  student is purged, that class is open and Chairs and
14  teachers usually put other students in those slots.
15       So a student had to literally go
16  around and go from instructor to instructor and try
17  to get back in that class, or get in another class if
18  a teacher were to accept him or her.
19       Q.  How long was this purge process going on?
20       A.  In terms of years?
21       Q.  Yes.
22       A.  Basically, I would say, at least twenty

142

1  years.
2       Q.  And was it going on up to and including
3  2003/2004?
4       A.  Yes, it was.
5       Q.  And for a period of time, Dr. Gorum was
6  Director of Mass Comm under your auspices as Chair?
7       A.  Yes, English and Mass Communications
8  Departments were combined.
9       Q.  Were there problems or issues related to
10  purges while Mass Comm was with English?
11       A.  Yes.
12       Q.  What types of problems were there, and
13  what did you do about them?
14       A.  Well, we had a lot of Mass Comm and
15  English majors -- I guess the school's purge ran
16  anywhere from semester to semester, anywhere from 20
17  to 30, 33, 35 percent.
18       Q.  Thirty-five percent of the students in the
19  school, in DSU, would be purged on occasion?
20       A.  Yes. And I said, for a number of reasons.
21  A lot of times a student's check, say if you were
22  getting some money from a church, might be sitting in

143

1  student accounts, and not put on the account bill
2  yet. So that student would automatically be purged.
3       Financial aid might be here, but it
4  has not been posted yet. So that student would still
5  be purged. So you had any number of reasons. And a
6  student, legitimately, may not have had the money,
7  especially during those times when there was no
8  deferred payment, and that type of thing.
9       MR. DUSTON: Dr. Ackah, before Dr.
10  King goes any further, I'm just going to
11  conditionally object to the line of testimony unless
12  it's linked up later that some or more of these fifty
13  students actually were purged from the system,
14  because all this is very interesting, but unless the
15  evidence is there that some of the fifty students
16  whose grade changes are at issue, were, in fact,
17  purged and that was the link, then it's not relevant.
18       DR. ACKAH: I think I'm going to have
19  to overrule that, but I can see where he's coming
20  from. I think he's trying to get your point and link
21  it with --
22       MR. ZEFF: We will both link it and

144

1  use this as background.
2       MR. DUSTON: As long as it is later
3  linked up to actual evidence the students were purged
4  --
5       DR. ACKAH: We need evidence or --
6       MR. ZEFF: It will be relevant.
7       DR. ACKAH: Yes.
8  BY MR. ZEFF:
9       Q.  Okay. If you could explain what -- so
10  would all of these students who were purged, be
11  purged at the same time in a semester?
12       A.  I don't know about -- I'll say during the
13  same time period, yes.
14       Q.  Okay. What would you do about it as
15  Chair?
16       A.  As Chair when the student corrected
17  whatever problem existed, we had to try to get that
18  student back in class, or if not those specific
19  classes, enough classes to make him a full-time
20  student.
21       Q.  What would you do in order to do that?
22       A.  Any number of things. We would call and

Case 1:06-cv-00565-GMS Document 43-4 Filed 09/26/2007 Page 11 of 47
HOWARD UNIVERSITY v. ROBERTS-WILLIAMS GORHAM Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

37 (Pages 145 to 148)

**145**

1 ask the teacher, would the teacher accept him. If
2 the teacher did not accept them, we tried to put them
3 in another class. If it were classes within the
4 English Department, we might put them in another
5 teacher's class, if a particular teacher were not
6 willing to take that student and help them.
7 And for Mass Comm majors, when they
8 couldn't get another class, we'd sometimes put them
9 in an internship, sometimes in practicum.
10 Q. Under whose name would the students
11 ultimately get a grade, under these circumstances?
12 A. Whoever was listed for teaching
13 internships. Say if I were listed for teaching
14 internships and the student would be put into an
15 internship, I would have one for fifty.
16 But if the student were a public
17 relations student, they student might be put under
18 Marcia Taylor.
19 If the student were a radio student,
20 the student would be put under Kopano or Gorum.
21 If the student were a television
22 student, he might be put under Gorum or Kopano or

**146**

1 Eric Dodson.
2 So it varied who would actually
3 instruct or supervise the students. But all the
4 grades would be put -- turned into me because I was
5 the teacher of record.
6 Q. Now, were there times when the teacher of
7 record would not even know the name of the student on
8 their roster?
9 A. Yes.
10 Q. How would that come about?
11 A. Because someone else was actually
12 supervising the student. You were just recordkeeping
13 and turning in the grade and the course was under
14 you. And this was done throughout the history
15 basically of the Mass Comm program.
16 Q. You were the Chair of that program?
17 A. Yes.
18 Q. And was this done under your supervision?
19 A. Yes.
20 Q. And with your permission?
21 A. Yes.
22 Q. And did Dr. Gorum -- was Dr. Gorum aware

**147**

1 of these practices?
2 A. Yes.
3 Q. Okay. Were your Deans aware of these
4 practices?
5 A. Yes.
6 Q. Dean Frederick?
7 A. Yes.
8 Q. How do you know Dean Frederick was aware?
9 A. Because I told him. And he knew how it
10 was set up from the very beginning.
11 Q. Did you go to Dean Frederick to get his
12 signature each time you made one of these changes?
13 A. No, because the changes were made within
14 the first three weeks of the semester. And it has
15 always been the policy that if a teacher changes the
16 grade within the first three weeks of the semester,
17 and it were an error in recording or an error in
18 calculation, it was always done within the
19 Department.
20 Q. Did Dean Frederick know this?
21 A. Yes.
22 Q. Was this a practice that Dean Frederick

**148**

1 was aware of?
2 A. Yes.
3 MR. DUSTON: Which practice?
4 MR. ZEFF: The practice of the first
5 three weeks.
6 BY MR. ZEFF:
7 Q. How do you know that?
8 A. How do I know?
9 Q. Yes.
10 A. Because it was a common practice.
11 Everybody did it, okay.
12 DR. JACKSON: I have a question. We
13 have a catalog saying something different, and, then,
14 they started enforcing the catalog about two years
15 ago.
16 THE WITNESS: No, not two years ago,
17 last year. Now, I'll ask you a question. As a
18 faculty member, in the first three weeks of the
19 semester, who signed your grade changes?
20 DR. JACKSON: Wasn't it the Department
21 Chair?
22 THE WITNESS: Yes. And did you ever

153

1   would --
2          DR. GWANMESIA: Be valid.
3          THE WITNESS: Um-hum. Right.
4   BY MR. ZEFF:
5      Q.  Now, in addition to what you've testified
6   to, you've mentioned the Dean. Does that Dean
7   include Dean Frederick or someone else?
8      A.  It includes Dean Frederick. It includes
9   Dean Tolliver. It includes Dean Tisdale. It
10  includes Dean Caldwell. Virtually all of the Deans.
11     Q.  Do you have any specific recall of Dean
12  Frederick telling you to handle changing another
13  professor's grade?
14         I'm not asking for the example, but do
15  you have any recall of actually having a conversation
16  with him where he said, handle this matter?
17     A.  Not exactly the way you're saying it. I
18  have had -- I have had occasion where students -- a
19  student, a particular student, have wanted to drop a
20  teacher's class after that time period because of
21  conflict with the teacher.
22         I have dropped that student from a

154

1   class and enrolled him in another teacher's class,
2   and either that teacher has taught him or I have
3   taught that student as an independent study, and
4   given that teacher the grade. And that has been
5   numerous times.
6      Q.  And has Dean Frederick been aware of you
7   doing that?
8      A.  Yes.
9      Q.  How has he been aware of this?
10     A.  Because he has requested that I do that on
11  several occasions.
12     Q.  And did you require his signature on
13  anything to do that?
14     A.  No. But the only time that ever, that his
15  signature has come into play was last semester; that
16  was with a student in a particular teacher's class,
17  and the student and the teacher filed grievances
18  against each other.
19         And our solution, that's Dean
20  Frederick's and mine, was to drop that student from
21  the teacher's class, and I take the student as an
22  independent study. And this was the first time ever

155

1   an independent study number was created in the
2   English Department. That student was put in that
3   course and I gave the grade.
4          Before when situations happened like
5   that, we simply put the student in another teacher's
6   class. I would either take the student or that
7   teacher would agree to take the student, and if I
8   took the student, I gave that teacher the grade and
9   that teacher turned the grade in.
10         DR. ACKAH: You used the word
11  requested. You said the Dean requested you to change
12  it. What do you mean, requested?
13         You used the word requested.
14         THE WITNESS: I'm sorry.
15         DR. ACKAH: Can you go back and read
16  that.
17         (Whereupon the Reporter read from the
18  record as requested.)
19         DR. ACKAH: I think that's very
20  important.
21  BY MR. ZEFF:
22     Q.  Let me ask a question about that. In the

156

1   past has the Dean requested you change a student's
2   grade? As Chair, has he requested you to change a
3   student's grade from another professor?
4      A.  Yes. Say for instance if we have an
5   adjunct teacher, and that adjunct gives grades and
6   the adjunct is no longer here, no longer comes back,
7   and there are discrepancies with the grades between
8   the student's records and the grade that that teacher
9   gave him, the Dean requested that the Chair handle
10  that matter.
11         Not only grades where there were
12  discrepancies, but also incompletes.
13     Q.  And this is Dean Frederick?
14     A.  Yes. All the Deans, not only Dean
15  Frederick. He was following a common practice.
16     Q.  Now, if the Dean makes such a request of a
17  Chair, can the Chair refuse the Dean's request
18  without being subject to discipline?
19     A.  The Dean --
20     Q.  Let me give you a specific example. The
21  Dean says, handle this grade change or this
22  incomplete. Can you refuse to do that?

Case 1:06-cv-00565-GMS DEL: Document 43-4 UNIVERSITY FILED 09/25/2007 GOP/LEN PH3 of 47
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

38 (Pages 149 to 152)

149

1    have any problem?
2        Were they ever sent back to you?
3        DR. JACKSON: No.
4        THE WITNESS: That was the practice.
5    BY MR. ZEFF:
6        Q.  Now, had you ever been involved in a
7    situation as Chair where you have changed another
8    professor's grade?
9        A.  Yes.
10       Q.  How did you handle those situations?
11       A.  I've had, say, a teacher on vacation and a
12   student comes in and says -- and I'll give you one
13   example specifically.
14       Ms. Lawson had gone to California.  A
15   student came in and said, I thought I was getting an
16   A.  And I can't remember whether he got a B or a C.
17   But I said, well -- we tried to reach Ms. Lawson and
18   we could not reach her.  And his mother was with him,
19   and he says, well, he has to keep a three point, his
20   scholarship is depending upon this.
21       I said, well, we'll go in Ms. Lawson's
22   office.  Her grades are always by the numbers.

150

1        We went through, and she -- clearly,
2    she had made an error in calculation.  Instead of
3    7.5, she did .75.  So I changed the grade.
4        Another instance with Ms. Reynolds
5    when she says, with the term paper I'm being rough on
6    this thing, misspellings, because you're word
7    processing them, you can always put spell check on.
8    So if you have three misspelled words, I'm not even
9    going to read anymore of the paper, that's it.
10       The student misused their, T-H-E-I-R,
11   and T-H-E-R-E.  So we call -- well, is it a
12   misspelled word or is it the wrong use of the word.
13   And a word processor will not make the distinction
14   between those two.
15       And we kind of laughed about it.  And
16   we went on -- I went on because she was in D.C. at
17   that time, and changed the grade.
18       I mean, sometimes a teacher will call
19   and say, I made an error, will you do this.  The
20   teacher might be in Wilmington.
21       I did put on the form, requested by
22   telephone, and signed that name and put my name

151

1    behind it and, then, signed it again.
2        So this happens commonly because as a
3    Department we served about 1400 students per
4    semester.  And there are going to be errors.  So we
5    handle them.
6        DR. GWANMESIA:  Were these grade
7    changes ever -- did you ever go through the Dean?
8        Did you ever request the permission of
9    the Dean before changing, or could you do that --
10       THE WITNESS:  I have never requested a
11   grade change from the Dean.
12       DR. GWANMESIA:  Regardless of how long
13   it has been since the grade was awarded?
14       Because in the case of change of a
15   grade by faculty three weeks after the grade has been
16   assigned you could -- the faculty could just change
17   it with the signature of the Chair, right?
18       THE WITNESS:  Right.
19       DR. GWANMESIA:  But in the case where
20   you could verify that the students were right, you
21   didn't need to have authorization from the Dean, did
22   you?

152

1        THE WITNESS:  No.  And even after.
2    Say a student had been away a year, and not enrolled
3    in school, all we had to do was call the Dean and
4    tell him, and he would say, handle it.
5        DR. GWANMESIA:  But no formal
6    application, no forms were completed as long as --
7        THE WITNESS:  If there was a form, and
8    I can't remember these cases specifically 'cause we
9    have not had that many of them, my student worker
10   would walk it over to the Dean and he would sign it
11   and forward it to the Records Office.
12       And I do remember a couple of cases
13   like that.
14       DR. DAVIS:  When the Dean said -- made
15   that statement, did you understand that you had the
16   authority to change a grade?
17       When he said, you know, you called the
18   Dean?
19       THE WITNESS:  Right.  When he says,
20   handle it?
21       DR. DAVIS:  Handle it, yes.
22       THE WITNESS:  Yes, that my signature

Case 1:06-cv-00565-CMS ELAWARE STATE UNIVERSITY 09/25/2007 GORUM, Ph.D. Page 14 of 47
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

47 (Pages 185 to 188)

185

1 Are they aware of this kind of
2 situation?
3 THE WITNESS: Yes, 'cause sometimes
4 they call the Dean, and the Dean refers them to you.
5 DR. DAVIS: Well, according to Dr.
6 Frederick's testimony, you submitted a number of
7 grade changes towards the end of the semester, Spring
8 semester, and he sent them back.
9 THE WITNESS: I did?
10 DR. DAVIS: No, Dr. Frederick did.
11 THE WITNESS: That I submitted a
12 number of grade changes to him?
13 DR. GWANMESIA: And he sent it back.
14 THE WITNESS: Yeah, that was the first
15 time he ever sent any back, and that was simply
16 because of Dr. Gorum's case.
17 BY MR. ZEFF:
18 Q. Let me direct your attention, actually, to
19 the black binder, page number 35. I believe that's
20 what's being referred to.
21 DR. JACKSON: The black binder in
22 front of you.

186

1 BY MR. ZEFF:
2 Q. The black binder, page 35.
3 A. Page --
4 Q. Thirty-five.
5 A. Okay.
6 DR. GWANMESIA: This did not actually
7 come from Dean Frederick. It came from the
8 Registrar.
9 THE WITNESS: Are these the forms?
10 MR. ZEFF: No, they're not.
11 BY MR. ZEFF:
12 Q. But did you ever receive a copy of this
13 correspondence, which is from Len Parker?
14 A. I don't recall receiving it, but I won't
15 say that I didn't receive this, but if I did, it was
16 the first time that I've ever received one from him
17 in this time frame.
18 Q. So previous to March 3, 2004 had you ever
19 had your grade change request forms returned to you
20 for the Dean's signature?
21 A. No.
22 MR. ZEFF: I don't have anything

187

1 further.
2 MR. DUSTON: Actually, could I request
3 a two-minute break before we start with Dr. King.
4 (Recess)
5 MR. ZEFF: While we're taking our
6 break, we keep pushing Dr. Tolliver off, who we now
7 told 3:15.
8 MR. DUSTON: Well, sorry. You spent
9 an hour with Dr. King --
10 MR. ZEFF: Yeah, I don't know how we
11 want to do this. Dr. King is easily available.
12 MR. DUSTON: If you want to call Dr.
13 King back to be available for redirect by me tomorrow
14 morning at 10:00 a.m., that's fine. We can take Dr.
15 Tolliver right now, and I'm happy to do my
16 cross-examination of Dr. King in the morning.
17 MR. ZEFF: Thank you. I think we
18 would like to do -- just so we're clear, I guess
19 Tolliver would, then, be the last witness today?
20 DR. ACKAH: Probably, because it's
21 almost 3:15.
22 MR. ZEFF: Okay. As long as Dr.

188

1 King's available in the morning for that.
2 (Discussion off the record)
3 MR. ZEFF: Hello. Can you hear me?
4 DR. TOLLIVER: Yes, I can.
5 MR. ZEFF: Let me see. We're in the
6 hearing, so let's just test out and see how well you
7 hear everybody.
8 DR. ACKAH: Dr. Tolliver, good
9 afternoon. This is Dr. Ackah.
10 DR. TOLLIVER: Okay. Yes --
11 DR. GWANMESIA: And this is Gabriel
12 Gwanmesia here.
13 DR. JACKSON: Dr. Jackson.
14 DR. TOSCANO: Fil Toscano.
15 DR. TOLLIVER: Okay.
16 DR. DAVIS: Lapointe Davis.
17 DR. TOLLIVER: Okay.
18 DR. ACKAH: Do you remember all of us?
19 DR. TOLLIVER: Yes.
20 DR. ACKAH: Thank you. And the
21 University's attorney is --
22 MR. DUSTON: Rob Duston. Nice to talk

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
Case 1:06-cv-00565-GMS   Document 43-4   Filed 09/25/2004   Page 15 of 47
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

51 (Pages 201 to 204)

201

1        DR. ACKAH:  -- as a faculty, are you
2   talking about Federal punishment or -- what is --
3        THE WITNESS:  No, I mean whatever that
4   person may have done as Chair, we did not consider in
5   dealing with that person as a faculty member.
6        DR. GWANMESIA:  Oh, okay.
7        THE WITNESS:  Okay.  And I'm saying
8   that the only -- unless a person did some --
9   committed some criminal act as Chair, then, of
10  course, we would still have to strip him of the Chair
11  and, then, deal with the person as a faculty member,
12  okay.
13        And that's the way it was because of
14  the Collective Bargaining Agreement.  You had to deal
15  with the person as the Chair.
16        And even where I am now, if we're
17  going to do -- if a faculty member -- I'm sorry, if a
18  Chair commits something that is considered unethical
19  or criminal, then what we do is, strip that person of
20  the Chair.
21        MR. DUSTON:  Objection.  Relevance.
22        THE WITNESS:  And, then deal with that

202

1   person as a faculty member, especially if what he or
2   she did was criminal.
3        DR. ACKAH:  Okay.
4        DR. DAVIS:  Dr. Tolliver --
5        THE WITNESS:  Yes.
6        DR. DAVIS:  -- did the resolution of
7   these grade issues sometimes include Chairs taking
8   students' course work, evaluating the course work
9   and, then, assigning a grade to the course for the
10  student?
11        THE WITNESS:  Yes, it did.
12  BY MR. ZEFF:
13     Q.  Did Dr. Frederick, either as a Chair or
14  Dean, know about these practices that you've been
15  describing?
16     A.  He should have.
17     Q.  When you say, he should have, what do you
18  mean?
19     A.  Well, in some cases we -- even when he was
20  a Department Chair, as I recall, we had to deal with
21  some instances where his students may have received
22  an unfair grade.  And when I was Provost, we dealt

203

1   with a few cases where we had to deal with that, and
2   Tommy was right there.  He knew about it.
3        I never did anything that did not
4   include the Deans knowing about it.
5     Q.  Did -- you mentioned earlier that there
6   were instances where you were aware Chairs were going
7   in and changing grades, and you said that you could
8   have disciplined them by firing them as Chair.  Why
9   --
10     A.  No, I didn't --
11        DR. ACKAH:  He didn't say that.
12        THE WITNESS:  You're right, we could
13  have.
14  BY MR. ZEFF:
15     Q.  Okay.  Could have, that's what I said.
16     A.  But we didn't.
17     Q.  But you didn't.  Why didn't you?
18     A.  Well, in one case I know the President
19  felt that it would be less bothersome to just let it
20  go and try to deal with it, because then we would
21  have had to deal with a backlash from alumnae, and he
22  did not want to deal with that.

204

1     Q.  Okay.  And in the other cases?
2     A.  That is the one particular case that I --
3   that is vivid in my mind.  I can't really recall the
4   others.
5     Q.  Okay.  But you know there were others?
6     A.  Yeah, I know there were others.
7     Q.  And none of those Chairs were disciplined?
8     A.  I may not have even known about them.  We
9   knew the practice was going on, but -- you see, the
10  Registrar's Office was not under my control.
11        Because of the new organization that
12  went into effect in 1998 when I became Provost, the
13  Registrar's Office was moved from Academic Affairs to
14  Enrollment Management, and so I knew -- I knew less
15  and less about what was going on between faculty and
16  Chairs and the Registrar's Office at that point, than
17  when it was under Academic Affairs.
18     Q.  Okay.  By the way, I don't think I
19  established, where are you now?
20        Where are you employed?
21     A.  I'm employed at Southern University, Baton
22  Rouge.

Case 1:06-cv-00565-GMS   Document 43-4   Filed 09/25/2007   Page 16 of 47
HEARING OF DELAWARE STATE UNIVERSITY by WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

50 (Pages 197 to 200)

197

1    DR. ACKAH: When you said, we had to
2  deal with, what do you mean by that?
3    THE WITNESS: Say again.
4    DR. ACKAH: You said, we had to deal
5  with grades that were improperly assigned.
6    THE WITNESS: Improperly assigned --
7    DR. ACKAH: Yeah. Now, I wanted to --
8    THE WITNESS: -- according to -- if a
9  faculty member would assign all Fs to a class of
10 students, and if students were complaining about that
11 faculty member, then -- and the Chair may have been
12 aware of some things that were going on with that
13 faculty member, we couldn't let those grades stand
14 and hurt those students' records.
15   DR. GWANMESIA: But was the rest --
16   THE WITNESS: In some case -- in some
17 cases we would try to get those grades changed,
18 either through some retesting or something, in order
19 to try to get the grades as accurate as we could,
20 especially in some -- in cases when these faculty
21 members would not even try to help us to rectify it.
22   There's one case I remember in

198

1  particular, a lady who was at Delaware State and,
2  then, went to Del Tech, and she had been horrible in
3  the way that she had treated students during the
4  course of a semester, and in the final grades that
5  she had assigned.
6    And we did not feel that those grades
7  were the proper grades that she should have assigned,
8  and so we changed them.
9    DR. GWANMESIA: Dr. Tolliver, in
10 addressing this issue, all the responsibilities
11 rested on who; is it the Chair, the Dean, or --
12   THE WITNESS: I can't hear you.
13   DR. GWANMESIA: Who was directly
14 responsible for resolving such issues; is it the
15 Chair?
16   Did you give the responsibility to the
17 Chair to carry out --
18   THE WITNESS: It varied. Sometimes it
19 was a committee that I appointed at either the school
20 level or at the -- at the Division of Academic
21 Affairs' level, or it may have been in conversation
22 with a Dean and a Chair about what had happened with

199

1  a particular faculty member and grades. And we
2  decided to -- to try to get them changed.
3    I'll also note that in a few cases
4  some Chairs would go directly to the Records Office
5  and make those changes without signatures from Deans
6  or the Vice President. And it had to do more with
7  the relationship between that Chair and people in the
8  Office of Records than anything else.
9    DR. GWANMESIA: But was that allowed?
10 Was that something that --
11   THE WITNESS: No, it wasn't allowed.
12 It wasn't something that was allowed. We didn't --
13 in many cases we didn't even know about it, but we
14 became aware in some cases that this was taking
15 place.
16   DR. JACKSON: Did you -- did anybody
17 change it, or did it just remain the same?
18   THE WITNESS: No, nobody changed it.
19   DR. ACKAH: Now, were the Chairs
20 sanctioned in any way?
21   THE WITNESS: Were the Chairs what?
22   DR. ACKAH: Sanctioned. Were they

200

1  punished?
2    THE WITNESS: No.
3  BY MR. ZEFF:
4    Q. Why not?
5    A. Because the only way we could punish a
6  Chair would be to remove that person as Chair. And
7  as I recall when I was Dean, we did remove several
8  Chairs, but not for that reason.
9    And when we start talking about
10 punishing or punishment, punishment would be meted
11 out to a faculty member based on what procedures
12 there were established in the Collective Bargaining
13 Agreement for dealing with faculty members, and a
14 Chair is considered a faculty member in the
15 Collective Bargaining Agreement at Delaware State.
16 And so what the Administration would do is to relieve
17 the person as Chair and, then, deal with him or her
18 as a faculty member.
19   DR. ACKAH: Can I ask one question.
20 When you say, deal with him as a Chair, are you
21 talking --
22   DR. GWANMESIA: As a faculty.

Case 1:06-cv-00365-GMS DELAWARE STATE UNIVERSITY GORUM, Ph.D Document 134 Filed 09/25/2007 Page 17 of 47
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

59 (Pages 233 to 236)

233

1 the grade that he or she earns.

2     Q. So if the Chair violates procedure, but is

3 motivated by what you've just described, good

4 intentions, would you consider that to be a violation

5 for the terminating of a faculty member?

6     **A. No.**

7     Q. Why not?

8     **A. People violate procedures all the time. I**

9 **know that. I've been in this business long enough to**

10 **know that people violate procedures even as simple as**

11 **missing a step in the line of authority to try to get**

12 **some things done. Sometimes you have to do that in**

13 **order to get things done.**

14     **So, no, I wouldn't consider that a**

15 **dismissable offense. It may require the removal of**

16 **that person as a department Chair, but depending on**

17 **the violation of procedure, how serious the breach**

18 **is, that would be the extent of the sanctions for**

19 **that.**

20     Q. And the basis for your opinion that that

21 would be the sanction, does that have anything to do

22 with any precedent at Delaware State?

234

1     **A. No, my precedent as a professional both as**

2 **in the military and higher education, and even in the**

3 **military there's violations of procedures in order to**

4 **get things done.**

5     MR. ZEFF: I don't have anything

6 further.

7     DR. DAVIS: I have one. Yes, I would

8 like to know, Dr. Tolliver, during the time at which

9 you were Dean and Provost at Delaware State

10 University, did Dr. Gorum, to your knowledge, ever

11 engage in any type of academic misconduct?

12     THE WITNESS: Not to my knowledge.

13     DR. JACKSON: Dr. Tolliver --

14     THE WITNESS: Yes.

15     DR. JACKSON: -- sometimes we violate

16 procedures and we don't know we're violating them.

17 That's possible, isn't it?

18     THE WITNESS: Right, that is.

19     DR. JACKSON: And sometimes they told

20 me things that are in the catalog I was not aware of,

21 and the Chairman did not make me aware of it. So the

22 onus should not be on the faculty member; is that

235

1 correct?

2     THE WITNESS: The onus should not be

3 on the faculty member?

4     DR. JACKSON: If the Department Chair

5 does not tell me that there's a policy in the catalog

6 or in the contract, where does the onus belong?

7     THE WITNESS: You know, in terms of

8 leadership, the person who is in charge of the unit

9 has to accept responsibility for everything that

10 happens or does not happen in that unit, even if a

11 person in that unit does not know something. So I

12 would place the onus on the Chair.

13     DR. JACKSON: Thank you.

14     DR. ACKAH: All right. Dr. Tolliver,

15 though we miss you and we want to go on, we will let

16 you go.

17     THE WITNESS: Okay.

18     DR. ACKAH: Thank you very much for --

19     THE WITNESS: Thank you.

20     DR. ACKAH: -- making time to meet us.

21 Dr. Tolliver, let me warn you, if it's possible -- if

22 it's necessary, we might recall you. I'm hoping that

236

1 we won't have to go to that extent.

2     THE WITNESS: Okay.

3     DR. ACKAH: Thank you very much and

4 good night.

5     THE WITNESS: All right. Good night

6 and take care.

7     (Witness excused)

8     DR. ACKAH: Oh, boy. Thank you

9 everybody. It's a tiring day.

10     Tomorrow, what do we have first thing?

11     MR. ZEFF: I have to be in Court at

12 exactly 9 o'clock for something that should take

13 fifteen minutes. I would hope to be here by 11:00.

14     DR. GWANMESIA: Tomorrow?

15     MR. ZEFF: Tomorrow. Is that --

16     DR. ACKAH: How many witnesses do you

17 have for us?

18     MR. ZEFF: We have Dr. King --

19     MR. DUSTON: Do you want to put on

20 your other two before you do Dr. Gorum?

21     MR. ZEFF: Depending on what time you

22 finish, we can use Dr. Gorum to fill in any time. We

229
1 people would be suspended pending a hearing before an
2 ad hoc dismissal committee.
3      MR. ZEFF: Were any of them a Chair?
4      THE WITNESS: As I recall -- just wait
5 a minute. No.
6      MR. ZEFF: I'm sorry. I just wanted
7 to clarify that.
8      THE WITNESS: No, neither one of them
9 was a Chair.
10      DR. GWANMESIA: Did the action that
11 you take to suspend the individual, is it based on
12 your judgment of the severity of the crime, or is it
13 based on the Collective Bargaining Agreement?
14      THE WITNESS: Oh, it's based on the
15 severity of what I consider to be the violation and,
16 also, what is in the Collective Bargaining Agreement.
17 BY MR. DUSTON:
18      Q.   And just so that the Committee can compare
19 your views to the others in the Administration, how
20 severe or not do you view a Chair changing the grades
21 of an instructor of record without consultation with
22 that instructor, and without --

230
1      A.   I don't think it would -- I don't think it
2 warrants dismissal.
3      DR. ACKAH: Robert, how much time --
4 how much more time do you have?
5      MR. DUSTON: I have no further
6 questions for Dr. Tolliver.
7      DR. ACKAH: Any rebuttal?
8      MR. ZEFF: I do have just a couple.
9 It's not going to take very long.
10      DR. ACKAH: Just a couple, please.
11      REDIRECT EXAMINATION
12 BY MR. ZEFF:
13      Q.   Dr. Tolliver, is it -- just so we're
14 clear, is it your testimony that a Chair of a
15 department may be terminated as a faculty member for
16 actions they take as a Chair?
17      A.   It may be if those actions are criminal.
18      Q.   Other than criminal action, may they be
19 terminated for actions they take as a Chair?
20      A.   If they are severe enough that I would
21 consider recommending that they be dismissed for
22 cause.

231
1      Q.   Okay. You mentioned that there were some
2 problems with a Delaware Tech adjunct, do you recall?
3      A.   Correct.
4      Q.   And those problems involve -- it sounded
5 like improper grades being submitted, the grades just
6 didn't make sense?
7      A.   Well, it went beyond that. I understand
8 she was not teaching the students well. She was very
9 disrespectful to the students. She was not teaching
10 the students well. She was disrespectful to the
11 students, and her grades we thought were very severe
12 based on what we knew about what she was doing with
13 the students.
14      Q.   Were you the Dean or the Provost at that
15 time?
16      A.   I don't remember.
17      Q.   Did you ask Dr. Gorum to handle that
18 situation?
19      A.   I don't remember if I asked Dr. Gorum to
20 handle that situation because I can't remember
21 whether I was Dean or Provost.
22      Q.   Let me move on and just kind of wrap up.

232
1 There were -- you've talked about a lot of practices
2 and a lot of policies. Were the two the same at
3 Delaware State with regard to grades?
4      A.   No.
5      Q.   Were there a lot of practices that were
6 being followed that were contrary to the policies?
7      A.   Absolutely. That was always a big problem
8 at Delaware State.
9      Q.   And was it important to you whether you
10 were the Dean or the Provost to determine what the
11 Chair's motivation was --
12      A.   Yes.
13      Q.   -- behind changing a grade?
14      A.   Yes, it was.
15      Q.   Why's that important?
16      A.   Well, it's important to know that he or
17 she is being motivated for good reason. And all the
18 good reason is for the benefit of the student. That
19 is not to say you want to give students grades, but
20 if students truly earn grades that are better than
21 what a faculty member may award, then, you do want to
22 take steps to try to make sure that that student gets

Case 1:06-cv-00565-GMS   Document 48-4   Filed 09/25/2007   Page 19 of 47
DEPOSITION OF DELAWARE STATE UNIVERSITY by WENDELL GORUM, PhD.
CONDUCTED ON THURSDAY, OCTOBER 28, 2004

7 (Pages 25 to 28)

25

BY MR. DUSTON:

Q.   If you had a student -- or had a professor -- you mentioned two professors that you would never have changed a grade without talking to them, Dr. Davis was one of them --

DR. DAVIS:  I don't know if he said that.

DR. GWANMESIA:  He didn't say Davis.

MR. DUSTON:  I'm sorry.

MR. ZEFF:  He said Jackson.

BY MR. DUSTON:

Q.   Let me rephrase that.  Dr. Jackson --

A.   Yes.

Q.   -- if you had a student complaining over mid-term break about a grade in Dr. Jackson's class, and said, I think I got the wrong grade.  And as a result of this lower grade I'm not going to get my scholarship for next year.  I dispute this grade, and I need it now, it's January 5th.  And you can't reach Dr. Jackson for some reason.

As Chair, did you have authority to simply change that letter grade, and if so, under

26

what circumstances?

A.   If the student could prove to my satisfaction that the grade was an error, I would change it.  Otherwise, I would not.

In fact, I might even change it to an I pending Dr. Jackson's return, if an I would suffice.

It depends on the circumstances.  You can't give me a specific set of circumstances.  If an I would make it possible for him to receive the scholarship rather than the grade he had received, I would change it to an I and the teacher could simply change it back.

If necessary, if it were going to cause the student to lose a scholarship and I was reasonably certain that the student could correct -- could approve it, I could change it to a W, withdrawn from that course, or any number of things.

The point is that you try not to let a student suffer or cause damage to a student because of an instructor's error.

Q.   Now, when you say, as a result of error,

27

let me assume that it is not a calculation error, but a subjective disagreement over the quality of work.

The grades that were given justified a D.  The student would be rendered ineligible to play sports based on a D, not a C?

A.   Well, no.  I don't willy nilly change grades to -- to satisfy coaches or students' eligibility or pledging, or any of these other things.  It has to be a clear cut case where the student's grade is an error, a miscalculation or a error in recording.

Q.   So it has to be either error in recording, that the instructor actually tried to put a D, and somehow it ended up as an F, or a clear case of miscalculation where you can look at the syllabus and the percentage is given, and the grade book, have all of those in front of you and conclude, unambiguously, it was a miscalculation?

A.   Right.  Or that that student was taught by someone else, and that other teacher was supposed to give the instructor the grade.

Q.   Now, in that situation, this whole

28

situation of students being taught by someone else, you testified about when students were purged or when they were removed for financial reasons or disciplinary reasons and, then, were reinstated, that you would try to become re-enrolled in some other class.

Now, I want to limit your testimony right now, if you can, to the time period in which Dr. Frederick was Dean.

A.   Um-hum.

Q.   Over just the last several years in which Dr. Frederick was in that role.

A.   Okay.

Q.   One option you had was to re-enroll them in another class, and that's -- and they would be -- when you say put them in another class, you meant register them in some other class, correct?

A.   Yes.

Q.   And that might mean registering them after the drop/add period in some cases, but you would get them in some other class, correct?

A.   Yes.  Um-hum.

Case 1:06-cv-00565-GMS    Document 43-4    Filed 09/25/2007    Page 20 of 47
DEPOSITION OF DELAWARE STATE UNIVERSITY OF WENDELL GORUM, Ph.D.
CONDUCTED ON THURSDAY, OCTOBER 28, 2004

17 (Pages 65 to 68)

**Page 65**

1     in his dealings or performance of his duties as
2     Chair, can he be terminated as a Unit member, as long
3     as it otherwise meets the just cause standard?
4     **A. I don't know what the just cause standard**
5     **is, and I don't --**
6     Q. Dr. King, you're --
7     **A. I don't know what the just cause standard**
8     **is.**
9     Q. As long as it meets the standard for
10    termination for tenured faculty members under the
11    Collective Bargaining Agreement?
12    **A. Not in his performance of his duties as a**
13    **Chair.**
14    Q. So it does not matter how -- if he commits
15    fraud, intentional knowing fraud, but it's in the
16    performance of his duties as Chair, rather than in
17    connection with a course he was teaching --
18    **A. Okay.**
19    Q. -- it is your understanding that that
20    cannot be grounds for termination as a Unit member?
21    **A. Yes.**
22    Q. Okay. Where's that spelled out in the

**Page 66**

1     Collective Bargaining Agreement?
2     **A. Where's it not spelled out?**
3     Q. Where's it spelled out that there's a
4     difference between what you can do -- between acts of
5     dishonesty performed or fraud as a Chair versus as a
6     Unit member; that somehow that protects you --
7     **A. Because the duties of a Chair are strictly**
8     **administrative duties. It has nothing to do with his**
9     **performance as a --**
10    DR. ACKAH: Unit member.
11    THE WITNESS: Yeah.
12    BY MR. DUSTON:
13    Q. So what is the difference then -- so the
14    line you're drawing is as long as it's in the
15    performance of the duties as a Unit member?
16    **A. He could be terminated in -- a teacher can**
17    **be terminated -- let's put this in some perspective.**
18    Q. So he could engage in -- in theory, a
19    Chair could engage in defamation, fraud, dishonesty
20    in the documents or ministerial duties that they
21    carry out as Chair, and yet that cannot be sanctioned
22    or terminated as a Unit member under your opinion?

**Page 67**

1     **A. Right.**
2     MR. DUSTON: I have no further
3     questions of Dr. King.
4     DR. JACKSON: Can I ask a question
5     now.
6     THE WITNESS: Um-hum.
7     DR. JACKSON: Isn't this Committee --
8     shouldn't this Committee be prior the termination as
9     opposed to after termination?
10    THE WITNESS: What? Yes.
11    DR. JACKSON: Isn't the Committee
12    supposed to be prior to the termination --
13    THE WITNESS: Yes.
14    DR. JACKSON: -- as opposed to after
15    termination?
16    THE WITNESS: Yes, it is clearly
17    spelled out that way.
18    DR. DAVIS: Dr. King, did Dr.
19    Frederick discuss grade changes with the Chairs prior
20    to the charges made by the University with respect to
21    Dr. Gorum's case?
22    THE WITNESS: Not to my recollection.

**Page 68**

1     MR. ZEFF: I do have a couple of quick
2     follow ups.
3     DR. ACKAH: Except your couple is not
4     really a couple.
5     MR. ZEFF: I'll try.
6     DR. ACKAH: Okay.
7     MR. ZEFF: I'll try.
8     REDIRECT EXAMINATION
9     BY MR. ZEFF:
10    Q. If the Unit member is Chair of a
11    Department and up for tenure, and the Chair's service
12    was poor, is that to be -- is that to be considered
13    in their tenure application?
14    **A. No.**
15    Q. Why not?
16    **A. Because a tenure application is for**
17    **teaching. It's for four months as a Unit member as a**
18    **teacher.**
19    Q. So if a non-tenured faculty member is
20    actually discharged from the duties of Chair because
21    of poor performance, fraud, whatever it may be, would
22    that be something that would be considered in their

157

1  You don't even know whether you returned homeworks to
2  people.
3         I don't think -- I think he actually
4  embarrassed us when he made his presentation.
5         MR. ZEFF: Just so we're clear, he did
6  say he would be back to produce those documents, and
7  I know --
8         DR. ACKAH: No, from his testimony I
9  don't think he will do that.
10        MR. ZEFF: I know I don't have
11 anything. I don't know if he's producing anything to
12 the University.
13        DR. ACKAH: I don't know. Robert has
14 he presented anything to you?
15        MR. DUSTON: I have not received it
16 yet. I have left messages and --
17        DR. GWANMESIA: Yes, it's an
18 understatement because I felt kind of --
19 BY MR. ZEFF:
20    Q. So you went back to Dean Frederick?
21    A. Yes, I did. I went to Dean Frederick, and
22 I had to sit out there for half-hour or so. And I

158

1  can remember the Chair of Computer Science coming in.
2  Rasamny, he's Computer Science, Dr. Rasamny, coming
3  in and I was ahead of him but I let him go since he
4  only needed signatures.
5         And when I got in he was, you know,
6  very pleasant. He just, deal with it. I had -- he
7  had already told students that I had the authority to
8  do it, and he just told me to deal with it.
9         And I explained Dawkins, I explained
10 the Kopano -- Wickham, and he just -- now, I
11 explained the situation because students were purged
12 who we had to put in the classes. Some of the
13 students tried to attend summer school, and all of
14 the classes were canceled.
15    Q. Well, in this meeting with Dr. Frederick
16 you talked about more than Dr. Osei-Mensah?
17    A. That's correct.
18    Q. But we haven't gotten to the other issue
19 yet. But at this meeting with Dr. Frederick, you
20 told him that there were problems and that there --
21 did you also tell him that you had some of the exams
22 and you knew they weren't graded?

159

1    A. Yes.
2    Q. Okay. And his instruction to you was to
3  deal with it?
4    A. Yes.
5    Q. Okay. And you interpreted that to mean
6  that you were to take care of the grade issue?
7    A. Well, if I remember correctly, he -- I'm
8  almost sure he told me to change the grade.
9    Q. But you're not going to sit here and swear
10 that you remember that word for word that he --
11    A. No, whatever he said, I interpreted as
12 change the grades.
13    Q. Okay.
14    A. And what I did was look at the exams, and
15 I had work from most -- many of the students, and I
16 also gave that to the paralegal so that you could see
17 copies. And I looked at the work, and the students I
18 didn't have anything from, I didn't change the
19 grades.
20        So I changed the grades because that's
21 what I was told to do.
22        DR. GWANMESIA: But was it based on

160

1  the final exams --
2         THE WITNESS: The entirety that the
3  students submitted.
4         DR. GWANMESIA: Okay.
5         THE WITNESS: And many students
6  submitted everything they had turned in, copies of
7  everything. It was done on computers and they had it
8  disks.
9  BY MR. ZEFF:
10    Q. If a student didn't come to you and say, I
11 have a problem with this grade, did you do anything?
12    A. No.
13    Q. So only the students that actually --
14    A. Unfortunately, yes.
15    Q. -- called or physically came to you and
16 said, I'm challenging this grade of Dr. Osei-Mensah?
17    A. That's correct.
18    Q. Okay.
19        DR. ACKAH: And they gave you a
20 package.
21        DR. GWANMESIA: Their package --
22        THE WITNESS: Yes.

Case 1:06-cv-00565-GMS    Document 43-4    Filed 09/25/2007    Page 22 of 47
HEARING/DELAWARE STATE UNIVERSITY/WENDELL GORUM, Ph.D.
CONDUCTED ON THURSDAY, OCTOBER 28, 2004

53 (Pages 209 to 212)

**209**

1  individual responses?
2  THE WITNESS: No one -- no one said
3  anything.
4  BY MR. ZEFF:
5  Q. Did that involve the other situation where
6  you changed grades as well?
7  Did you speak to them about changing
8  students' grades as well?
9  **A. I don't remember specific -- unless it was**
10  **specifics, I don't --**
11  Q. Well, will that --
12  DR. ACKAH: When you say, no one said
13  anything, what were the reactions --
14  THE WITNESS: Oh, they didn't -- they
15  did not object.
16  DR. ACKAH: They did not object, okay.
17  THE WITNESS: Yes.
18  BY MR. ZEFF:
19  Q. And you believe that the phone records
20  from the Registrar's Office will show that you made
21  phone calls to various members of the Department?
22  **A. The phone records from the Registrar's**

**210**

1  **Office, and I have records from my cell phone.**
2  MR. DUSTON: Why haven't those been
3  produced?
4  THE WITNESS: Because the ones that
5  were sent was for the wrong date, and they did send
6  them today. They E-mailed them in.
7  MR. ZEFF: Hopefully, we'll have --
8  THE WITNESS: And I'll have them
9  tomorrow.
10  BY MR. ZEFF:
11  Q. Now, have you seen these records?
12  **A. No.**
13  Q. So you could be wrong?
14  **A. No, I remember doing it. I called and**
15  **talked to them.**
16  Q. That's my point here today. You're going
17  out -- you've not seen the records from the
18  Registrar's Office?
19  **A. No, I have not.**
20  Q. Okay. So if the telephone records from
21  the Registrar's Office and the cell phone records
22  that you're going to get, hopefully, they were

**211**

1  E-mailed to your house today, don't show that you
2  made these phone calls, what are you going to say?
3  **A. What can I say.**
4  Q. You're that sure that these --
5  **A. I made the calls.**
6  Q. Okay. Now, some of these calls may have
7  been local calls. They may not show up on the
8  Registrar's Office.
9  **A. Everything should show.**
10  Q. Well, we don't know -- but some of the
11  calls may be long distance, weren't they?
12  **A. Yeah, most of them are long distance, but**
13  **--**
14  Q. Okay. Let's go through them.
15  MR. DUSTON: Mr. Chair, based on this,
16  'cause I know the time is short, I'm going to -- I am
17  going to request that we can call Professor Hagos,
18  Dr. Taylor and Ms. Jones, at least to verify whether
19  or not they discussed, because they have previously
20  told Mr. Parker that, no, they did not.
21  And I think it's important that those
22  are the three professors we have not heard from, and

**212**

1  this is now an issue of credibility for Dr. Gorum,
2  and I'll attempt to reach them right afterwards and
3  find out if they are available.
4  THE WITNESS: Okay.
5  DR. ACKAH: I think that is fair.
6  THE WITNESS: What is significant is
7  we should really have a grade sheet because you'll
8  see that we were coinstructors.
9  DR. GWANMESIA: Coinstructors?
10  THE WITNESS: Yes. I'm the one who
11  signed the grade sheet.
12  DR. ACKAH: Don't we have the
13  originals?
14  THE WITNESS: Well, you had some with
15  my signature on it. And there are others, I was the
16  teacher of record.
17  MR. DUSTON: May I. I raise this, Dr.
18  Ackah, because if Dr. Gorum wishes to reconsider his
19  testimony whether he actually talked to these people
20  and obtained their consent, we don't -- I don't need
21  to bring them in for other purposes.
22  We have their statements and we have

Case 1:06-cv-00565-GMS    Document 43-4    Filed 09/25/2007    Page 23 of 47
HEARINGS IN RE DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON THURSDAY, OCTOBER 28, 2004

52 (Pages 205 to 208)

205

1  Wickham testify, and you've also had students testify
2  regarding Dr. Wickham's class. What problems did you
3  have with Dr. Wickham and grade changes?
4      A.  I called him, and we -- I mean, I remember
5  other things that we chatted about, and he didn't
6  remember, but I do.
7      Q.  When you say you called, what did you call
8  him about?
9      A.  About the students who were taking the
10  class -- we had a number of students who were
11  seniors. They only needed the fall semester to
12  finish, and they needed a course.
13      And so I let them do the course
14  independent study. Now, that's what -- I mean,
15  that's what was recommended to me and that's what
16  we've done for a number of years.
17      I can recall submitting the paperwork
18  to receive 167 pay, but it was denied.
19      Q.  How about as to changing some of Dr.
20  Wickham's grades?
21      A.  They were only students I had dealt with.
22      Q.  Well, did you talk to Dr. Wickham about

206

1  changing those grades?
2      A.  Yes, I did.
3      Q.  And where did you call him from?
4      A.  I called him from the Registrar's Office.
5      Q.  On what date?
6      A.  On January 8th.
7      Q.  How do you know it was January 8th?
8      A.  Because that was the day that I submitted
9  the changes.
10      Q.  Now, on many occasions the Committee has
11  heard me asking for the telephone records for the
12  Registrar's Office on January 8th. Why do we want
13  those records?
14      A.  Because the records show that I called not
15  only Wickham -- my policy usually is, in terms of
16  calling faculty members at home, if it is not life
17  and death I don't bother them.
18      And I have been told on a number of
19  occasions that I should just feel free to call them,
20  but I just don't do it.
21      But on that particular day I called
22  everyone in the Department.

207

1      Q.  Well, everyone in the Department whose
2  grades you felt you --
3      A.  I called everybody from within the
4  Department.
5      DR. GWANMESIA:  That's generally it.
6      THE WITNESS:  Yes.
7  BY MR. ZEFF:
8      Q.  Why?
9      A.  I talked to Scott and he told me to call
10  them, and that's exactly what I did.
11      DR. GWANMESIA:  You mean you talked to
12  Scott about what?
13      THE WITNESS:  About the grade changes
14  and the students and the problems.
15      DR. GWANMESIA:  That you were going to
16  make some changes?
17      THE WITNESS:  Yes.
18      DR. GWANMESIA:  Okay.
19      THE WITNESS:  And he told me to call
20  them. And there are some grades that are not listed
21  because I actually signed the other professor's name
22  and initialed it.

208

1      DR. GWANMESIA:  Who is Scott?
2      THE WITNESS:  Dr. King.
3      DR. GWANMESIA:  Oh, Scott, yeah.
4  BY MR. ZEFF:
5      Q.  So did there --
6      DR. ACKAH:  Were you able to get in
7  touch with all of them?
8      THE WITNESS:  I'm sure I talked to
9  every last one.
10      DR. ACKAH:  How many is this?
11      THE WITNESS:  Kopano, Wickham --
12      DR. ACKAH:  Hagos?
13      THE WITNESS:  Yes. Taylor and Don
14  Jones.
15      DR. JACKSON:  Did they give you a
16  consent to change grades or modify the grades?
17      THE WITNESS:  Basically what I told
18  them is that the student had taken the class. It's
19  something that we did all the time. And that they
20  were in the class and I was going to give them their
21  grade.
22      DR. ACKAH:  And what was their

Case 1:06-cv-00565-GMS   Document 43-4   Filed 09/25/2007   Page 24 of 47
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON THURSDAY, OCTOBER 28, 2004

28 (Pages 109 to 112)

109

1 deal with these students who were purged?
2     A. We were told. They were sent to the Chair
3 by the Records Office. Once students check on their
4 bills, they were sent to the Records -- by the
5 Records Office to be re-registered, and we had a
6 problem every semester with athletes who were on
7 scholarships. The scholarships were never entered,
8 never. And they were always purged.
9         So we had to again put them in
10 classes, so that they would be eligible and so that
11 they would have a full-time load. We had a problem
12 with many students who would not receive a loan, and
13 sometimes it wasn't a case that the loans were not
14 in. They could have been sitting in Financial Aid
15 and not given to Student Accounts and were not
16 entered.
17         So the problem with the purging was a
18 major one, and it was every semester, and I think
19 people in here really know and understand that
20 problem.
21         It impacted Mass Communications more
22 because we had more than three hundred majors, and

110

1 usually almost a third of them would get wind up
2 getting purged.
3     Q. You say almost a third, that's ninety
4 students?
5     A. Usually around seventy-six.
6     Q. Why do you say --
7     A. Sixty to seventy.
8     Q. Oh, sixty to seventy. Now, would they all
9 get purged at the same time?
10     A. Yes.
11     Q. So what would happen to you as the Chair?
12     A. I had to find classes for them.
13     Q. Would they all show up at the same time?
14     A. I had long lines outside of my office. I
15 had to miss class. I stayed after hours. It was a
16 problem. It was a problem that I did not like and
17 didn't appreciate, but it was something I had to deal
18 with.
19     Q. Did Dean Frederick know about this
20 problem?
21     A. Yes, because I had parents to come here
22 with students, and I had to go to the Dean's office

111

1 with the parent and student, and I listened --
2 because they were upset because I had not helped
3 them.
4         And I listened and I said, were you
5 purged, and the students said, yes. I didn't need to
6 say anything else. It wasn't my fault that the
7 student was purged and couldn't get into classes.
8         It becomes a serious problem also for
9 upper classmen if they're trying to graduate. They
10 need specific courses. If you are a freshman or
11 sophomore, we can probably put them in just about any
12 class. But, you know, as they become juniors and
13 seniors, they have specific requirements that they
14 have to meet.
15     DR. ACKAH: Can I ask you something?
16     THE WITNESS: Yes.
17     DR. ACKAH: When you said Dr.
18 Frederick was aware of this problem, can you be more
19 explicit about aware?
20     THE WITNESS: Let me tell you. We
21 talked about it in the Chairs meeting, and I brought
22 up the problem with Wellness.

112

1     DR. DAVIS: You mean the course about
2 Fitness and Wellness?
3     THE WITNESS: Yeah, remember that.
4 The problem was there were only three hundred spots.
5 We bring in nine hundred to 1,000 freshmen each year.
6         The General Education Director was
7 saying that we had to remember that students are
8 required to take certain courses during the first
9 thirty credits.
10         It's impossible for them to take
11 Wellness if you don't have a section. Or a foreign
12 language if you don't have the sections to
13 accommodate nine hundred students.
14     DR. GWANMESIA: And you brought this
15 up during a Chair meeting when Dr. Frederick was
16 there?
17     THE WITNESS: Yes. He -- it became
18 really problematic because his wife was in charge of
19 the Wellness, and we didn't get very much
20 accomplished that day because he was very defensive.
21         But that was just one example. I said
22 -- I gave foreign language as another example. And

117

1 reinstated. The Chair has to respond by finding
2 classes. That's been said by several different Deans
3 that this is an issue each semester. The question
4 is, what did Dr. Gorum do and how did he go ahead and
5 respond to that. And the example of Mr. Alverez or
6 any of the other fifty students is all that's
7 relevant.
8      DR. DAVIS: Well, the reason that I
9 asked these questions, I want to see if there were a
10 connection between what ultimately happened and Dr.
11 Frederick's involvement when he stated that the
12 parents and students went to see him, Dr. Frederick.
13      I'm interested in what kind of
14 participation did Dr. Frederick give.
15      MR. DUSTON: And, Dr. Ackah, I would
16 argue that it's relevant only to the extent it
17 involved these fifty students, and any other examples
18 or discussions should be limited to the ones that are
19 before this Committee.
20      MR. ZEFF: Rather than -- why is that
21 fair if we show that Dr. Frederick had knowledge --
22      DR. DAVIS: Yes, I think --

118

1      MR. ZEFF: -- of the situation, and
2 that he instructed my client to deal with it, not on
3 a case by case basis, but globally.
4      DR. ACKAH: I'll allow you to go on
5 because you did mention that you had the Council of
6 the President and you made this known to him.
7      THE WITNESS: Yes.
8      DR. ACKAH: Okay. You mentioned it --
9      THE WITNESS: It was known to the
10 President and the Provost and all of the other
11 Chairs, and I think Dr. Bell acknowledged that.
12      MR. ZEFF: And you heard Dr. Tolliver
13 discuss that it was a major problem at the
14 University.
15      DR. DAVIS: And the students and
16 parents knew that they were purged before they met
17 with Dr. Frederick?
18      THE WITNESS: They were purged, but
19 they were purged for -- erroneously.
20      DR. DAVIS: Right. I'm saying --
21      THE WITNESS: Yes.
22      DR. DAVIS: But they knew that they

119

1 were purged --
2      MR. ZEFF: Right.
3      DR. DAVIS: -- prior to the meeting.
4 So --
5      MR. ZEFF: Yes.
6      DR. DAVIS: -- I'm interested in what
7 happened --
8 BY MR. ZEFF:
9      Q. Can we go back. You talked about having a
10 meeting with Dr. Frederick and the students. Why
11 were those -- why were you in that meeting?
12      **A. I was called to the Dean's office because**
13 **the student and the parent were there. And I -- and**
14 **I sat there for about ten, fifteen minutes and**
15 **listened to the complaint --**
16      Q. What were they complaining --
17      **A. The complaint was, you know, I did not**
18 **help the student get registered.**
19      Q. Re-registered?
20      **A. Re-registered, yes. And --**
21      DR. ACKAH: Who did that complaining,
22 the parents or --

120

1      THE WITNESS: The student.
2 BY MR. ZEFF:
3      Q. With the parents?
4      **A. With the parents.**
5      Q. With the Dean?
6      MR. DUSTON: Which student?
7      THE WITNESS: I'd have to go back and
8 look on the list, but she's in here.
9      DR. DAVIS: Is it one student and one
10 parent we're talking about, or several?
11      DR. GWANMESIA: Were there several
12 students or just --
13      MR. ZEFF: Maybe I can clarify. It's
14 that he would have students and parents come to his
15 office on a regular basis --
16      MR. DUSTON: You know, Gregg, could
17 you stop testifying for your client at a certain
18 point and let the client testify.
19      MR. ZEFF: Wait a minute here.
20 Members of the Committee, this has been going on for
21 days now with Mr. Duston speaking on behalf of his
22 client --

Case 1:06-cv-00565-GMS    Document 43-4    Filed 09/25/2007    Page 26 of 47
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

9 (Pages 33 to 36)

---

**33**

1   were giving midterms all around the campus.
2   THE WITNESS: All --
3   DR. ACKAH: Why would he be different?
4   THE WITNESS: Because -- but, also,
5   the other professors that I had classes with, also
6   stated there would be a midterm on the syllabus.
7   DR. ACKAH: But you are aware --
8   THE WITNESS: Right.
9   DR. ACKAH: -- that we do give
10  midterms and then finals?
11  THE WITNESS: Definitely, but, also,
12  when you're given a midterm, you're also given a
13  review as to what you need to study.
14  DR. ACKAH: Not necessarily. I don't
15  give a review for midterms.
16  THE WITNESS: Okay. Well, in that
17  case, okay, even if he didn't have to give us a
18  review for the midterm, at least let me know what it
19  is I'm supposed to study. Because I have no idea
20  because you've been teaching Broadcast Writing I.
21  How am I to know what I am supposed to study for a
22  midterm?

---

**34**

1   DR. DAVIS: Could we move on to --
2   MR. ZEFF: Sure.
3   BY MR. ZEFF:
4   Q.  I just want to clarify one point with you.
5   Who told you to bring the tape recorder into class?
6   **A.  No one. I brought it on my own.**
7   Q.  Did you talk to Dr. Gorum about tape
8   recording Dr. Osei-Mensah?
9   **A.  No, I did not. No.**
10  DR. ACKAH: Did you let the teacher
11  know that you were tape recording?
12  THE WITNESS: I wasn't actually taping
13  his class. It was for another class. I had Ethics
14  and Media after Osei-Mensah's class, but when he
15  started to yell at the student, I started taping the
16  conversation, because I had to show that this was
17  ridiculous, the things that were going on in that
18  class.
19  DR. ACKAH: But you didn't actually
20  tell him you were tape recording?
21  THE WITNESS: Well, he was in the
22  midst of arguing with a student. I didn't think, you

---

**35**

1   know, it would be appropriate for me to say, excuse
2   me, can I tape this conversation.
3   BY MR. ZEFF:
4   Q.  And when you brought it to Dr. Frederick,
5   what -- were you able to talk to Dr. Frederick?
6   **A.  I talked to Dr. Frederick that day and he
7   told me that it was inappropriate and that he was
8   going to speak Dr. Osei-Mensah and Dr. Gorum, because
9   he felt that Dr. Gorum should take care of the
10  situation.
11  At that time when I spoke with him, I
12  told him my main concern was my grade, because I
13  wanted to make sure that I got a grade for the class.
14  Because I couldn't afford to drop the class.**
15  Q.  Okay. And was anybody with you when you
16  talked to Dr. Frederick?
17  **A.  Courtney Brown (ph), she's now -- she's
18  since graduated. She's a Spanish major. She was in
19  the class, as well.**
20  Q.  When you talked to Dr. Frederick about
21  your grade, what did he say?
22  **A.  He told me to go back to Dr. Gorum,**

---

**36**

1   because that was Dr. Gorum's area and Dr. Gorum can
2   decide what grade I should get dealing with Dr.
3   Osei-Mensah. He told me not to worry, to go back,
4   Dr. Gorum has the right to deal with any grade
5   situations with any professor in his department.
6   DR. GWANMESIA: You'll have to repeat
7   that.
8   DR. ACKAH: Slowly.
9   THE WITNESS: Okay. Dean Frederick
10  told me to go back to Dr. Gorum because Dr. Gorum has
11  the right to handle any grade situation within his
12  department.
13  MR. JACKSON:: Did he mean that Dr.
14  Gorum had the right to change grades?
15  THE WITNESS: He told me that I
16  shouldn't worry. As long I submit my work I
17  shouldn't worry about getting a failing grade or
18  anything like that. I would be graded according to
19  the work I submit and that Dr. Gorum can take care of
20  it.
21  MR. JACKSON:: Did he say that Dr.
22  Gorum had the right to change a grade or submit

---

37

1  grades?
2        THE WITNESS: To some degree he did
3  say that Dr. Gorum has the choice of either disputing
4  a grade a teacher gives, according to if there is a
5  complaint filed against the instructor for the grade.
6        And he told me, he said; go back to
7  Dr. Gorum and let Dr. Gorum do his job. He said wait
8  until it gets to the point. Go follow the chain of
9  command. Do not come back over here, let Dr. Gorum
10  handle it. And that's what I did, I went back to Dr.
11  Gorum.
12        DR. ACKAH: As much as possible, as
13  much as you remember, can you tell us exactly what he
14  said.
15        THE WITNESS: Exactly what he said.
16        DR. ACKAH: Don't paraphrase.
17        DR. GWANMESIA: Don't -- if you can
18  remember.
19  BY MR. ZEFF:
20     Q.  Starting from the first time you walked
21  into his office or wherever you met with him. Was it
22  in his office, first of all?

38

1     A.  What was in his office?
2     Q.  No, was it in his office?
3     A.  Yes, it was.
4     Q.  So from the first time you spoke to him
5  that day, and if you can remember when it was, that
6  would be good, too, but from the first time you did
7  that until the time you and he stopped talking that
8  day, tell us everything that you remember.
9        DR. ACKAH: Take your time.
10        THE WITNESS: I walked into his
11  office. I told him I had an issue with one of the
12  professors in the department. I went into explaining
13  the issue I had with the professor and I told him
14  that my main concern was that I did not want to get a
15  failing grade because this teacher and I didn't get
16  along.
17        He in turn told me to go back to Dr.
18  Gorum, because Dr. Gorum can take care of my grade.
19  Whatever grade that I get from Dr. Osei-Mensah, if I
20  felt it was unfair, that I needed to go talk to Dr.
21  Gorum, because he can adjust my grade according to
22  the work that I submit.

39

1        DR. ACKAH: You use the word "adjust"?
2        THE WITNESS: Adjust.
3        DR. ACKAH: I want the Committee and
4  the stenographer to take note of that word, in
5  capital letters.
6        MR. ZEFF: Mark it is what he is
7  asking you to do, I believe, as well.
8        DR. ACKAH: Veronica, if we were to
9  bring Dr. Frederick here and he were to deny that --
10        THE WITNESS: Then he's lying. He is
11  lying. I have -- there's no benefit for me to say --
12  to say these things, because as of right now I still
13  have an Incomplete in his class, which turned into an
14  F, which is affecting my GPA. Which I can't afford
15  because I just won a scholarship for this year. I
16  can't -- no. He's -- he would be lying if he denied
17  it.
18        DR. GWANMESIA: You said there was
19  another student with you that day?
20        THE WITNESS: Her name is Courtney
21  Brown.
22        DR. GWANMESIA: Okay. Both of you

40

1  were present when --
2        THE WITNESS: We were present. Yes.
3        MR. ZEFF: Do you know where Courtney
4  Brown is today?
5        THE WITNESS: I believe Courtney Brown
6  is out of the country because she was a Spanish major
7  and she was studying it in New Mexico. That was the
8  last I heard from her.
9  BY MR. ZEFF:
10     Q.  Now after this meeting with Dean
11  Frederick, what did you do?
12     A.  I went back over to Dr. Gorum's office and
13  I had a meeting with him, a closed door meeting with
14  him. And during that closed door meeting, he told
15  me, finish the class as an independent study, since I
16  already had the material. Submit my work, a copy to
17  him as well as to Osei-Mensah and Dean Frederick to
18  get my final grade.
19        That way I covered every base.
20  There's no way that Osei-Mensah could say that I
21  didn't turn in my work. And that's what I did. At
22  that point he told me, don't go back to Osei-Mensah's

Case 1:06-cv-00565-GMS Document 48-4 University of New Mexico GORUM, PhD Filed 09/25/2007 Page 28 of 47
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

11 (Pages 41 to 44)

41

1    class, because he couldn't take the disruptions
2    anymore that he was bringing to him.
3          DR. ACKAH: Who was going to teach it?
4          DR. GWANMESIA: Who was going to --
5          THE WITNESS: No, he told me to do an
6    independent study.
7          DR. ACKAH: But who, which professor?
8          THE WITNESS: He didn't give me a
9    professor to actually report to. He told me to
10   complete the work --
11         DR. ACKAH: Independent study, you
12   need a professor.
13         THE WITNESS: Right. But he told me
14   to complete the work that was on the syllabus and
15   that's what I did. Because I already knew the work
16   that was on the syllabus because I had it. And
17   Broadcast Writing 1, I took it the previous semester.
18         DR. GWANMESIA: Were you happy --
19         DR. DAVIS: As to what he was saying,
20   it sounds like you were to finish the course in an
21   independent fashion?
22         THE WITNESS: Right. Exactly.

42

1          DR. DAVIS: Register for independent
2    class study.
3          THE WITNESS: Exactly. Exactly.
4          DR. DAVIS: And finish it
5    independently.
6          DR. GWANMESIA: Now, how do you
7    reconcile the fact that you had already taken this
8    course?
9          THE WITNESS: I was angry about it.
10         DR. GWANMESIA: Okay.
11         THE WITNESS: But at that point, what
12   else could I do. I was carrying a full load, I work
13   full-time and I have three children and I'm married.
14   There was no other way that I could handle it at that
15   time and I trusted that Dr. Gorum was going to take
16   care of the grade.
17   BY MR. ZEFF:
18       Q.  And did you do the work?
19       A.  I submitted the work on December 11th.
20       Q.  Who did you submit it to?
21       A.  I submitted a copy to Dr. Osei-Mensah, Dr.
22   Gorum and I e-mailed a copy to Dr. Osei-Mensah, Dr.

43

1    Gorum and Dean Frederick.
2        Q.  And is this a copy of that work?
3        A.  That's a copy of the work along with the
4    complaint I filed after the fact, in April, with Dean
5    Frederick when I realized my grade was still an
6    Incomplete. As well as the letters I had to follow
7    up with the two acting Chairs, Dr. Panda (ph), as
8    well as Dr. Skeltcher (ph).
9        Q.  Now, were there any assignments in this
10   class that related to a tape or tape recording?
11       A.  No. No.
12       Q.  Can you explain what the interviews were
13   that you did?
14       A.  Interviews were brief interviews we had to
15   take with another student that he assigned us. We
16   had to write it in, obviously in like a story-style.
17   Like as if I was reading an interview on air. That
18   was the form that we had to write it in and we had to
19   put it in a sealed envelope and give it to him. And
20   that's what I did, but I never received that
21   assignment back.
22       Q.  Did you ever receive any assignments back

44

1    with grades?
2        A.  No.
3        Q.  Were there other students in the class
4    that had complaints about Osei-Mensah?
5        A.  Quite a few students; Serena Warren (ph),
6    Cathy Ray Johnson, April Pierce, Courtney Brown,
7    Kelly Alston. There was quite a few.
8        Q.  What were their complaints?
9        A.  Basically on the same lines as my
10   complaints. That they had already had Broadcast
11   Writing 2 and they -- I mean, Broadcast Writing 1 and
12   they didn't want to take it again.
13       Q.  And do you know whether or not any of them
14   ever received any of their homework assignments back?
15       A.  Not to my knowledge. I still speak with
16   April Pierce frequently. We both are Mass Com majors
17   and she's still complaining that she hasn't received
18   a grade that she was supposed to receive either.
19   That she's still fighting for her grade, as well.
20       Q.  Do you know whether or not she ever
21   received any assignments back or any kind of --
22       A.  Not that I know of. Not that I know of.

Case 1:06-cv-00565-GMS Document 434 Filed 09/25/2007 Page 29 of 47
DELAWARE STATE UNIVERSITY, WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

14 (Pages 53 to 56)

**53**

1 listed on the syllabus.
2     DR. GWANMESIA: She just completed --
3     DR. DAVIS: She completed the work on
4 her own.
5     DR. ACKAH: The syllabus had
6 assignments.
7     THE WITNESS: I completed the
8 assignments that was on the syllabus.
9     DR. ACKAH: He graded you and gave you
10 --
11     THE WITNESS: He didn't give me a
12 grade at all.
13     MR. JACKSON:: So why didn't he give
14 you a grade?
15     THE WITNESS: Well, every time I tried
16 to speak with him, he wouldn't respond to me. So at
17 that point I just wouldn't even talk to him anymore.
18 Because I was getting angry at that point and that's
19 when I started dealing with Dr. Gorum and Dean
20 Frederick, because it was pointless to keep trying to
21 speak with this man and he wouldn't even acknowledge
22 me.

**54**

1     DR. ACKAH: Okay. Give me the
2 sequence again. So, first -- there was a change of
3 grade?
4     THE WITNESS: I submitted my work. I
5 had an Incomplete. I went back to Dr. Gorum and
6 questioned the Incomplete, because I told him I
7 submitted my work. I gave him another copy at that
8 time. Dr. Gorum said, I've already spoke with the
9 Dean, I'll take care of it. It was turned into an A.
10     MR. JACKSON:: Do you know for a fact
11 that Dr. Gorum spoke with the Dean?
12     THE WITNESS: Yes. Because I went
13 back and checked with Dean Frederick. He told me, he
14 said, don't worry about it. Dr. Gorum's -- he
15 specifically said, I'm tired of secretaries doing
16 Chairs' jobs, Chairs doing Deans' jobs. And
17 everybody doing everyone else's job. Go back to Dr.
18 Gorum, he can take care of this and that's what he
19 told me.
20 BY MR. ZEFF:
21     Q. So how many times did you talk to Dr.
22 Frederick?

**55**

1     A. I would say at least three to four times.
2 Because the final meeting when I met with Dean
3 Frederick, Dr. Gorum was gone at that point, and he
4 told me to meet with Dr. Panda, because he was the
5 Acting Chair and talk to him about attending the
6 class, as an audit (sic), so I can get the education
7 from Broadcast Writing 2 and have the teacher that
8 taught that class to give me a grade, so I can have a
9 grade submitted for that class.
10     Because I told him I couldn't drop it.
11 I couldn't accept an F, because it would just throw
12 my financial aid off, as well as my GPA and I wasn't
13 accepting that.
14     DR. ACKAH: Did you say someone was
15 Acting Chair at that time?
16     THE WITNESS: Dr. Panda. The final
17 time I spoke with Dean Frederick about my grade
18 issue, when it went back to an I, when Dr. Gorum was
19 no longer on campus, he sent me to Dr. Panda. And
20 that's when I submitted the packet to Dr. Panda, as
21 well.
22     DR. ACKAH: That was the Spring of --

**56**

1     THE WITNESS: I want to say this past
2 semester.
3     DR. ACKAH: Spring of 2004.
4     THE WITNESS: 2004, exactly.
5     DR. ACKAH: By that time Panda was not
6 teaching?
7     THE WITNESS: Exactly.
8     MR. JACKSON:: Are you aware --
9 BY MR. ZEFF:
10     Q. Did he send you back to Dr. Osei-Mensah at
11 that point?
12     A. No, Dr. Panda informed me that he would
13 talk to Dr. Osei-Mensah, because I explained to him
14 the issues I had with conversating with Dr.
15 Osei-Mensah.
16     Q. No, no, did Dean Frederick tell you to go
17 to Dr. Osei-Mensah?
18     A. No.
19     Q. He told you to go to the Chair?
20     A. He told me to go to the Chair.
21     DR. ACKAH: That was Dr. Panda at that
22 time?

Case 1:06-cv-00565-GMS Document 43-4 Filed 09/25/2007 Page 30 of 47
HEARING OF DELAWARE STATE UNIVERSITY - WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

15 (Pages 57 to 60)

**57**

1    THE WITNESS: Yes.
2    DR. ACKAH: So when did he tell you to
3 go to Dr. Gorum, this semester?
4    THE WITNESS: Dean Frederick, he's
5 been -- he was telling me to go to Dr. Panda -- Dr.
6 Gorum, when I was actually in that fall semester,
7 when all the problems started to arise.
8    DR. ACKAH: But Dr. Gorum wasn't the
9 Chair. So why --
10    THE WITNESS: In the Fall of 2003,
11 yes, he was there.
12    DR. ACKAH: Oh, I'm confused.
13    THE WITNESS: I'm sorry.
14    DR. ACKAH: The sequence -- I'm
15 talking about the sequence.
16    DR. DAVIS: The Fall of 2003. All
17 this started Fall of 2003.
18    MR. ZEFF: Dr. Osei-Mensah's class was
19 Fall 2003.
20    DR. ACKAH: And then he came in and --
21    MR. ZEFF: Exactly.
22    DR. JACKSON: Are you aware that Dr.

**58**

1 Frederick was aware that Dr. Gorum had changed
2 grades?
3    THE WITNESS: Yes. That was the
4 impression he gave me, that Dr. Gorum would take care
5 of the grades. Don't worry about it. He was going
6 to change whatever grades needed to be changed.
7 According to -- as long as I submitted my work -- he
8 told me, as long as you do your part, we'll do our
9 part. Submit your work, you shouldn't have a problem
10 getting a grade.
11    DR. ACKAH: And that Dr. Gorum can
12 adjust --
13    THE WITNESS: Adjust my grade
14 according to my work that I submit.
15 BY MR. ZEFF:
16    Q. Let me just draw your attention to the
17 first letter on the top here. The first letter in
18 your -- were you actually in a Broadcast Writing 2
19 class in the Spring Semester of 2004, after this?
20    A. No.
21    Q. Can you explain to me what this letter of
22 Dr. Skeltcher refers to?

**59**

1    A. This is trying to give Dr. Skeltcher a
2 road map as to all of the things that took place from
3 2003 up until present. Because he didn't know
4 anything that was going on and I was asking for his
5 assistance at this point.
6    When I spoke with him, you know, about
7 the issue at first he told me, he said, register for
8 the class and we'll take care of it, but you need to
9 give me some idea what happened in the past.
10    That's when I wrote the letter, but
11 then when I went back and I looked, I didn't have the
12 money to pay for another class, because as I said,
13 I'm on scholarship this year and I told him, I said,
14 I don't think it's fair because that Incomplete is
15 going to turn into an F.
16    MR. DUSTON: Mr. Chair, I object on
17 relevance to all of this, right or wrong, the college
18 to deal with these grade changes --
19    MR. ZEFF: I don't know that it's --
20    MR. DUSTON: -- if it's false or
21 otherwise.
22    MR. ZEFF: I don't know that it's

**60**

1 relevant.
2    DR. ACKAH: Stick to --
3    MR. ZEFF: I just wanted to go through
4 the documents, that's all. But I'll be glad to try
5 to wrap up.
6    I don't have anything further. I'm
7 sure the University's got something to say.
8    DR. ACKAH: Okay, Robert.
9    MR. DUSTON: Actually, Mr. Chair, I'm
10 still a little confused on the chronology and I want
11 to make sure that I understand Ms. Brinney's
12 testimony.
13    CROSS-EXAMINATION
14 BY MR. DUSTON:
15    Q. I want to start with your first meeting
16 with Dean Frederick. Now, you said you went over
17 there as soon as the taping was done?
18    A. Right after the class.
19    Q. Now how long did you and Ms. Brown spend
20 with Dean Frederick that first time?
21    A. It was maybe 10, 15 minutes. It wasn't
22 that long.

Case 1:06-cv-00565-GMS   Document 43-4   Filed 09/25/2007   Page 31 of 47

HEARING IN RE: DELAWARE STATE UNIVERSITY vs. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

30 (Pages 117 to 120)

**117**

1    DR. DAVIS: Did you receive that for
2    the first time when Dr. Osei-Mensah --
3    THE WITNESS: That's when we received
4    this.
5    DR. DAVIS: That's when you received
6    it. You didn't receive anything at the very first
7    beginning of the class?
8    THE WITNESS: We didn't receive
9    anything at the very beginning. We received this
10   when Osei-Mensah arrived.
11   DR. DAVIS: When he started?
12   THE WITNESS: Uh-huh.
13   DR. GWANMESIA: When he arrived.
14   Before that, who was there, who was in the class with
15   you, with the students? You said before he arrived.
16   THE WITNESS: Uh-huh.
17   DR. GWANMESIA: Who gave you the
18   syllabus before he arrived?
19   THE WITNESS: We didn't get a
20   syllabus. We got a syllabus when the teacher
21   arrived, the professor.
22   DR. ACKAH: Can I --

**118**

1    MR. ZEFF: Please.
2    DR. ACKAH: We have two conflicting
3    statements here. One student said that Dr. Osei came
4    in later. Chris is telling us that Dr. Osei was
5    there right from the beginning.
6    DR. DAVIS: No, he's saying he came at
7    the third week, they didn't have class for the first
8    two weeks.
9    DR. ACKAH: So who was the teacher for
10   the first two weeks? That's what he needs to tell us
11   about. What can you tell us about that, Dr. Gorum?
12   DR. GORUM: I really cannot remember.
13   What happened is, I was the professor listed to teach
14   the class. Dr. Osei-Mensah went to teach as an
15   adjunct, so I refused to take the overload and gave
16   it to him.
17   I took him to lunch and I showed him
18   the syllabus. The syllabus is a departmental
19   syllabus, because more than one teacher teaches it.
20   DR. DAVIS: It's a common syllabus.
21   DR. GORUM: Yes. And --
22   DR. ACKAH: For which one? For 1 or

**119**

1    2?
2    DR. GORUM: 1 and 2.
3    DR. ACKAH: 1 and 2?
4    DR. GORUM: Yes. I usually taught 2.
5    Dawkins taught 2. And so we had a departmental
6    syllabus. So I gave him copies of the syllabus, both
7    1 and 2.
8    MR. ZEFF: There's a separate syllabus
9    for 2?
10   DR. GORUM: That's correct.
11   DR. GWANMESIA: Can we have copies of
12   those syllabus, the originals?
13   DR. GORUM: They're probably in the
14   office.
15   DR. GWANMESIA: If we could have it.
16   DR. GORUM: They're probably in the
17   secretary's -- I know they're in the secretary's
18   office.
19   DR. GWANMESIA: Okay.
20   DR. ACKAH: So the syllabus that you
21   gave to Dr. Osei was the syllabus for 1 and 2?
22   DR. GORUM: That's correct.

**120**

1    DR. ACKAH: The one he gave to us is
2    different from this?
3    DR. GORUM: He took 1 and changed --
4    well, I don't know why he used this. It really
5    doesn't matter because I explained how I taught the
6    class and everyone else. The objective of 2 is to
7    have students write drama, situation comedies,
8    documentaries, plays.
9    Broadcast Writing 1 is primarily news
10   writing. Commercials.
11   DR. ACKAH: Okay. So it doesn't
12   matter, the teacher can still be using this and still
13   be teaching 1 or 2, depending on the type of syllabus
14   he gives to the class.
15   DR. GORUM: No, no, no. He --
16   DR. ACKAH: No, he said it doesn't
17   matter. Didn't he use the word "it doesn't matter."
18   MR. ZEFF: Yes, he did. He used the
19   words --
20   DR. GORUM: Yes.
21   DR. ACKAH: Okay. Let me go back
22   again.

129

1    actually arguing about.
2           DR. ACKAH: Chris, be careful of your
3    choice of words. In the beginning you said they were
4    yelling and then you said "each other." Those are
5    two different -- be very careful choosing your words.
6    BY MR. ZEFF:
7       Q. Were you present also for the midterm exam
8    in class?
9       A. Yes.
10      Q. And what happened that day?
11      A. He gave us the midterm and he left.
12      Q. What do you mean?
13      A. He handed the midterm, the test, out to
14   the class and then after he finished handing out the
15   midterm, he left.
16      Q. Was there any --
17      A. And he told us to give our midterms --
18   well, we didn't know who to give the midterms to. We
19   gave our midterms to Ms. Patty.
20      Q. Was there any conflict that day? Do you
21   remember Veronica Brinney arguing with him that day?
22   Do you remember anybody refusing to take the midterm?

130

1       A. I remember people refusing, but I don't
2    remember Veronica arguing with Dr. Osei-Mensah.
3    People was refusing to take it because we didn't know
4    what was on it. He didn't tell us what was going to
5    be on the test. He didn't -- he didn't tell us
6    nothing. He just gave us the midterm and he just
7    left.
8       Q. Did you ever --
9           DR. GWANMESIA: Can I?
10          MR. ZEFF: Sure.
11          DR. GWANMESIA: When the students
12   refused to take the exam, do you remember if some of
13   them just stayed there and refused to take it or did
14   some of them walk out?
15          THE WITNESS: Some of us took it, but
16   some of us left.
17          DR. GWANMESIA: They walked out?
18          THE WITNESS: Uh-huh.
19          DR. GWANMESIA: How many students
20   left?
21          THE WITNESS: I don't remember.
22          DR. ACKAH: Why did you take the exam?

131

1    If it is true that he hadn't taught what was in the
2    syllabus, why didn't you walk out like the other
3    students?
4           THE WITNESS: I took it. I mean, I
5    didn't have no choice. I mean, I had a choice, but I
6    just took it.
7           DR. ACKAH: No, that's not my
8    question. Why?
9           THE WITNESS: Because I just did.
10          DR. ACKAH: No, no, no, why did you
11   take it?
12          THE WITNESS: Because I needed the
13   class to pass. Why would I want to skip out on a
14   midterm exam?
15          DR. GWANMESIA: One of the things that
16   you said here was that the course outline was for
17   Broadcast Writing 1, which you had already taken. So
18   I assume that you knew the material, right?
19          THE WITNESS: Yeah.
20          DR. GWANMESIA: Why didn't you
21   complain that he was giving a midterm on something
22   that you didn't know? What does that mean?

132

1           MR. ZEFF: He didn't say --
2           THE WITNESS: I didn't complain about
3    the midterm period. I took it. I didn't complain
4    about it. I complained about the way he was teaching
5    the class, the structure of the class. The same
6    stuff I learned when I first took Broadcast Writing
7    1. That's what I was complaining about. I didn't
8    care about -- it was an easy class for me.
9    BY MR. ZEFF:
10      Q. Did you complete the assignments?
11      A. Yep. I completed all my assignments.
12      Q. Did you hand them in?
13      A. I sure did.
14      Q. Did you ever get any of them back?
15      A. Nope.
16      Q. Did you ever get the midterm back?
17      A. No.
18      Q. Did you ever get your final back?
19      A. No.
20      Q. Did Dr. Osei-Mensah stay for the entire
21   time the final was being given?
22      A. No.

Case 1:06-cv-00565-GMS   Document 43-4   Filed 09/25/2007   Page 33 of 47
HEARINGS OF DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

38 (Pages 149 to 152)

149

1   Journalism for the National Association of Black
2   Journalists. I'm the president of the Mass
3   Communications Society of Delaware State University.
4       Q.   Any other things you're active in on the
5   campus?
6       A.   Yes. I'm a mentor for incoming freshman
7   girls.
8       Q.   Now in the Fall of 2003, did you have a
9   class with Dr. Osei-Mensah?
10      A.   Yes, I did.
11      Q.   What class was it?
12      A.   Broadcast Writing 2.
13      Q.   Previous to Broadcast Writing 2, had you
14  taken Broadcast Writing 1?
15      A.   Yes, I did.
16      Q.   Who did you take that with?
17      A.   Baruti Kopano.
18      Q.   Can you tell the Panel Members, did you
19  have any problems with Dr. Osei-Mensah?
20      A.   I had a number of problems with Dr.
21  Osei-Mensah. He was very disrespectful to me. He --
22  I had a problem with the class altogether, because

150

1   the things he was teaching, I learned already in
2   Broadcast Writing 1. He just was like a very nasty
3   person.
4       DR. GWANMESIA:   What do you mean
5   "nasty"?
6       THE WITNESS:   His attitude.
7   Attitude-wise. Attitude-wise. His attitude was
8   horrible.
9       DR. GWANMESIA:   When he comes to
10  class, does he say things to you or -- when you say
11  he was very nasty, what are those specific
12  substances?
13      THE WITNESS:   Okay. His attitude
14  towards me was horrible. He actually told me at one
15  time that he would get his daughter to like, beat me
16  up or something. What else --
17      DR. ACKAH:   He just came out of the
18  blue --
19      THE WITNESS:   No. We got into a
20  confrontation.
21      MR. ZEFF:   You interrupted and --
22      DR. GWANMESIA:   Okay.

151

1       THE WITNESS:   Yeah, we got into like
2   an argument and during the argument, that's when he
3   said those things to me.
4       DR. GWANMESIA:   What -- how did the
5   argument start? What happened?
6       THE WITNESS:   I handed him some work
7   and he did not want to take the work from me in his
8   hand. He told me to put it down. He didn't want to
9   -- like hand it to me. I handed him the work like
10  this (indicating).
11      DR. GWANMESIA:   Yeah.
12      THE WITNESS:   And he "Put it down.
13  Put it down. Just put it down." So, I got offensive
14  because -- defensive, excuse me, because he was being
15  nasty to me. I'm handing him work and you don't even
16  want to -- you're telling me to put it on the table
17  and the work that I did give to him, he never even
18  gave it back graded.
19  BY MR. ZEFF:
20      Q.   So would it be fair to say that you were
21  not very nice to him either?
22      A.   Yeah.

152

1       Q.   Did you say things to him?
2       A.   Yes. After he -- you know.
3       DR. ACKAH:   For example?
4       THE WITNESS:   I told him he was a
5   horrible teacher. I -- let me think. And I remind
6   you this was a year and a half ago, so my memory is
7   not like --
8       DR. GWANMESIA:   Okay.
9       THE WITNESS:   Okay. I did tell him he
10  was a horrible teacher on a couple of different
11  occasions. I told him that he was teaching us the
12  same stuff that I already learned. Things of that
13  nature.
14      DR. ACKAH:   Did you call him stupid?
15      THE WITNESS:   Sure did.
16  BY MR. ZEFF:
17      Q.   And did you complain to anyone about Dr.
18  Osei-Mensah?
19      A.   Yes, I did. I complained to Dr. Gorum and
20  I also complained to Dean Frederick.
21      Q.   Okay.
22      DR. ACKAH:   About who?

HEARINGS IN RE DELAWARE STATE UNIVERSITY v. WENDELL GOBUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

47 (Pages 185 to 188)

---

185

THE WITNESS: The students got fed up with the fact that they were paying money and we weren't doing anything. We weren't really learning anything in the class.

DR. ACKAH: You said he would put you on the computer and do some things.

THE WITNESS: He would put it on the computer, but it wasn't something that we was learning. It was just put us on the computer and he would say, "Fix this paragraph." And we'd do the same thing every class period. We weren't learning. We weren't progressing.

And then the students would get frustrated. And he would get frustrated and then -- it took a while for the students to actually state their problem or get mad at him. Like he would just do little things, little things that would build up, build up, build up and build up and then a student would complain. And then he would basically say, "I don't care," or he would just neglect the fact that students had problems and then the students would get even more madder and then arguments would occur.

---

186

DR. ACKAH: You said all the students in the class had this exception or most of the students?

THE WITNESS: I would say most of the students. I can't speak for everybody. I don't know.

BY MR. ZEFF:

Q. One last thing about Dr. Osei-Mensah. Did you take the final?

A. Yes.

Q. Okay. Was Dr. Osei-Mensah there the entire time the final was being given?

A. No.

Q. Okay. Did he leave at some point?

A. Yeah. He left a little bit before halfway through. He left maybe 20 minutes into the test.

DR. GWANMESIA: Did he come back?

THE WITNESS: No, because I didn't hand him my paper.

DR. GWANMESIA: Who took your paper at the end?

THE WITNESS: The secretary, Mrs.

---

187

Stevens, Pat.

DR. DAVIS: Did you have to leave the room to give it to her?

THE WITNESS: I had to leave the room. Yeah, I had to leave the room to give it to her.

DR. ACKAH: Did he give any reason why he left in the middle of an exam?

THE WITNESS: I really couldn't -- I don't know. He left and everybody was looking around, like what's going on. And everybody was just talking saying, Where's he at? Where did he go?

BY MR. ZEFF:

Q. Did any students, and I don't want you to name anybody by name, but were students talking about what was on the test, while he was out of the room?

A. To be honest, there were some students who said, Hey, what's this or what's that? You know, they'd do that.

Q. I'm surprised. Now, let me get back to Dr. Wickham for a moment. Did you receive a grade from Dr. Wickham?

A. Yes.

---

188

Q. What was the grade initially?

A. It was an F.

Q. What did you do when you received the F?

A. I went to -- first of all I went to Wickham and I asked him if there was anything I could do, you know, to make up the grade and then he told me to get with his secretary.

I got with his secretary maybe about three or four times. I was trying to call the secretary and get in touch with him. I didn't get in touch with him, but she said she would get back to me and it took me about two weeks. After that I had to go to Doc and see if there was anything that he could do to help me.

Q. How many times did you try to contact Dr. Wickham?

A. It was probably about four or five times a day.

Q. For how long?

A. For three weeks, two or three weeks.

Q. Now, how many phone numbers did Dr. Wickham give you to contact him at?

---

48 (Pages 189 to 192)

189

1       A.  Only the office number, to his office.
2       Q.  To his office here on campus?
3       A.  No.
4       Q.  Did he give you his cell phone number?
5       A.  No.
6       Q.  Did he give you any office in Baltimore
7   that he might have?
8       A.  No.
9       Q.  Did he give you any email address other
10  than the campus address?
11      A.  Just the campus email address.
12      Q.  And how many -- you said for two weeks?
13      A.  For two or three weeks.
14      Q.  You contacted his office?
15      A.  Yes.
16      Q.  And he was willing -- you did have one
17  conversation with him where he said he was willing to
18  give you some work to make it up so that you could
19  get a better grade?
20      A.  That was -- I had to catch him like in the
21  parking lot for that.
22      Q.  Okay.  But he did say he would do that?

190

1       A.  Yes.
2       Q.  So after a few weeks of trying to get a
3   hold of Dr. Wickham, you went to see Dr. Gorum about
4   the situation?
5       A.  Yes.
6       Q.  Tell us about that conversation.
7       A.  Well, the thing with Dr. Gorum -- before
8   all of this, I had previously taken that class in the
9   Spring of 2003.  And, also, I also got evaluated in
10  that class, but that was at a time when I was like
11  not in school at all, because I was traveling and I
12  was going through the draft and everything like that,
13  you know, NFL.
14          That summer I had spoken to Doc and --
15          MR. DUSTON:  Which class are we
16  talking about?
17          MR. ZEFF:  The Ethics class.
18          THE WITNESS:  Yeah, Media and Ethics.
19          DR. GWANMESIA:  With Dr. Wickham?
20          MR. ZEFF:  Yes.
21          THE WITNESS:  Yes.  And I asked Doc
22  was there anything that I could do to get this grade

191

1   changed.  So what we did was all the work -- I did
2   all the work all over again and I did my final over.
3   The idea was for me to do the work in the summer,
4   because they were supposed to offer it in the summer,
5   but they didn't because they didn't get enough
6   students for the class.
7           Then I would sit in on a class and
8   then we would try to find a way to get my grades from
9   sitting in the class and actually doing the work
10  previously.
11  BY MR. ZEFF:
12      Q.  So you sat in on Dr. Wickham's class and
13  you missed a lot of the classes?
14      A.  Yes.
15      Q.  Okay.  But you did take all of Dr.
16  Wickham's exams?
17      A.  Yes.  Never failed a test.
18      Q.  And you failed and he gave you an F grade?
19      A.  Yes.
20          DR. ACKAH:  I'm sorry.  Let me take
21  you back.  And Kenneth, remember you are under oath.
22          THE WITNESS:  Yes.

192

1           DR. ACKAH:  You said that Dr. Osei
2   didn't give you an exam --
3           MR. ZEFF:  This is Dr. Wickham.
4           THE WITNESS:  Dr. Wickham.
5           MR. DUSTON:  I thought it was Dr.
6   Gorum.
7           DR. ACKAH:  No, he said --
8           MR. DUSTON:  When he said Doctor,
9   referring to Dr. Gorum.
10          DR. ACKAH:  I'm just taking him back.
11          THE WITNESS:  Yes.
12          DR. ACKAH:  I'm taking him back for a
13  brief moment.
14          THE WITNESS:  Okay.
15          DR. ACKAH:  You said that Osei didn't
16  give you his email address?
17          THE WITNESS:  I was never asked that.
18          MR. ZEFF:  Dr. Wickham.
19          THE WITNESS:  We were talking about
20  Dr. Wickham.
21          DR. GWANMESIA:  Wickham.
22          MR. ZEFF:  Dr. Wickham didn't give him

193

1    anybody on campus email address. He had trouble
2    getting a hold of Dr. Wickham, not Dr. Osei.
3         DR. GWANMESIA: You said you took all
4    the exams in that class even though you were absent
5    about 40 percent of the time, right?
6         THE WITNESS: Yes.
7         DR. GWANMESIA: And you passed all of
8    it?
9         THE WITNESS: Yes.
10        DR. GWANMESIA: Do you have some of
11   those exams? Did he ever return the exams to you?
12        THE WITNESS: I received -- I have two
13   of those tests.
14        DR. GWANMESIA: You have them?
15        THE WITNESS: Yeah. One was a 71 and
16   one was a 72.
17        DR. GWANMESIA: And how many tests did
18   you take?
19        THE WITNESS: It was four.
20        DR. GWANMESIA: Four of them.
21        THE WITNESS: Yes.
22        DR. GWANMESIA: And you have two of

194

1    them; 71 --
2         THE WITNESS: Yeah, 72, 71, 75. But
3    his big thing -- when he spoke -- he said his big
4    thing was attendance. It was a big part of it also.
5    But that's the thing that got me, because we spoke
6    about it before.
7         DR. GWANMESIA: In the course outline
8    is there any grade --
9         DR. DAVIS: We need the syllabus for
10   that.
11        DR. GWANMESIA: We need to know what
12   was assigned for attendance.
13        MR. ZEFF: Dr. Wickham testified about
14   that. I believe there was back and forth testimony
15   and it wasn't very clear.
16        DR. ACKAH: Recommended failure.
17        DR. GWANMESIA: There were four tests.
18   You just have the three about 75. Do you recall what
19   you might have had in the last one, the last one, do
20   you know if you passed that one?
21        THE WITNESS: I don't know if I
22   passed. I never went back to him.

195

1         DR. GWANMESIA: Okay. Was it like the
2    finals or --
3         THE WITNESS: Excuse me?
4         DR. GWANMESIA: The last one, was it a
5    final or --
6         THE WITNESS: No, it was four, just
7    regular broad tests, not including the final.
8         DR. GWANMESIA: Okay.
9         THE WITNESS: Now, another thing,
10   there were some assignments that he said that I
11   missed out on, but he said that the final assignment
12   that he gave me to make up for it, he said that would
13   wipe all of that out.
14   BY MR. ZEFF:
15        Q. And you were talking in the parking lot or
16   somewhere and --
17        A. Yes.
18        Q. -- he told you that you could do some
19   extra work to make it up?
20        A. Yes.
21        Q. Because you wanted to pass the course.
22   And that was the last time you were able to reach

196

1    him?
2         A. Right.
3         Q. Okay. So then you went to see Dr. Gorum?
4         A. Right.
5         Q. And what did you and Dr. Gorum discuss?
6         A. I just had to make up that last assignment
7    that Wickham told me to do, which I did, and I gave
8    them to Doc, Dr. Gorum and, you know, see what he can
9    do about it.
10        DR. ACKAH: Okay. I'm going to help
11   you here. I'm going to help you here. I got Dr.
12   Wickham's percentage for class participation for you.
13   It is 40 percent.
14        MR. ZEFF: 40?
15        DR. DAVIS: He made a statement that
16   he gave a lot of weight to participation.
17        MR. ZEFF: Yes.
18        DR. ACKAH: Not extraordinary,
19   although he wasn't able to explain.
20        MR. ZEFF: Okay.
21   BY MR. ZEFF:
22        Q. So then you were not able to get a hold of

HEARING RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

50 (Pages 197 to 200)

197

1    Dr. Wickham and you went to Dr. Gorum. You handed
2    him that last assignment?
3        A.   That last assignment, right.
4        Q.   Okay. And the next thing you know, was
5    the grade changed or do you know anything else?
6        A.   Next thing I know, the grade was changed.
7        Q.   Also, were you involved in producing a CD
8    of some type?
9        A.   The CD was for Gary Dawkins' class, Radio
10   Station Operations. Everything was fine with Gary
11   Dawkins except I didn't turn in my last CD. And I
12   had to -- basically, he just told me to turn in the
13   last CD and my grade would be fine.
14       The thing was, his student teacher --
15   am I allowed to say her name?
16       Q.   Sure.
17       A.   Armon Martin (ph), the student teacher, he
18   told me to, you know, you're going to go in the
19   studio and we was going to produce a CD and he'll
20   help me on it. You know.
21       Q.   This is a Radio Production course?
22       A.   Yes.

198

1        Q.   Okay.
2        A.   And Armon Martin and I went into the
3    studio. We was in the studio every Saturday for a
4    month and a half, you know, producing the CD. Now on
5    the CD it contained a 60 second PSA, Public Service
6    Announcement; a 60 second commercial; a 5 second PSA;
7    a 10 second PSA; a 10 second commercial; a 5 second
8    station identification; two 30ths of a second
9    commercials; and we had to come up with our own song.
10   Or anything like a song or a story, something that we
11   can introduce on the radio.
12       Armon helped me do that. We produced
13   a CD. We printed out two copies. Armon supposedly
14   gave it to Professor Dawkins or, you know, Gary
15   Dawkins states that he never got the CD.
16   But, Armon Martin, his student teacher kept telling
17   me the grade is going to be changed. You know, we
18   have your grade number changed. We have it. And I
19   went to Gary Dawkins and he said he couldn't
20   recollect receiving the CD.
21       Q.   Did you have the other copy?
22       A.   I had the other copy and then I gave it to

199

1    Dr. Gorum.
2        Q.   And you gave it to Dr. Gorum after you
3    couldn't get the grade changed?
4        A.   Right.
5        Q.   Okay. Do you know if Dr. Gorum ever
6    reviewed the CD?
7        A.   I couldn't tell, I don't know.
8        Q.   Did your grade get changed at some point
9    after you turned in the CD to Dr. Gorum?
10       A.   Yes.
11           MR. ZEFF: I have nothing further.
12           DR. ACKAH: Mr. Duston.
13           CROSS-EXAMINATION
14   BY MR. DUSTON:
15       Q.   Kenneth, my name is Robert Duston. I'm
16   the attorney for Delaware State. Let me start with
17   Mr. Dawkins.
18       Now, had you taken Radio Station
19   Operations prior to the Fall of 2003 before?
20       A.   No.
21       Q.   So it was the first time you took that
22   course. You knew that a CD was one of the

200

1    requirements for the course, correct?
2        A.   We didn't know that until midterm, mid way
3    into the semester.
4        Q.   So midway that was given as an assignment
5    and you then began producing that CD, correct?
6        A.   Excuse me?
7        Q.   You started that CD some time after you
8    learned that it was to be done, somewhere in the
9    middle of the semester, right?
10       A.   I didn't start until later on in the
11   semester.
12       Q.   Okay. When in the semester did you and
13   Armon begin working on the CD for Radio Station
14   Operations?
15       A.   We were in there for one week and we were
16   in there three weeks before the semester ended.
17       Q.   So you finished that some time in the end
18   of November?
19       A.   No, it wasn't finished.
20       Q.   When did you finish that CD?
21       A.   We finished that CD -- we finished that
22   CD, I think, two or three weeks after it was due.

205

1    it. And then Armon had spoke to Gary Dawkins like
2    over the Christmas break and he let me know what my
3    grade was going to be.
4        Q.  So it's your claim that Armon spoke to Mr.
5    Dawkins some time over the break and he learned that
6    you were getting an F in the course and that -- and
7    that's what he communicated to you?
8        A.  Excuse me? Repeat that one more time.
9        Q.  What did Armon tell you your grade was
10   going to be for Radio Station Operations?
11       A.  Armon told me that if I turned in the CD I
12   could get a B in the course.
13       Q.  Armon told you that?
14       A.  Yes. Because he said that he had spoken
15   to Gary Dawkins about my grade.
16       Q.  Now are you aware -- but did Armon tell
17   you exactly what grade Mr. Dawkins --
18       A.  He said it was going to be a B and Gary
19   Dawkins also told me it was going to be a B.
20       Q.  When did Mr. Dawkins tell you your grade
21   was going to be a B?
22       A.  When I phoned him up. I was away in

206

1    Pennsylvania at a training camp and I called him on
2    the phone.
3        Q.  You were at a training camp?
4        A.  Yes.
5        Q.  For --
6        DR. DAVIS:  Can you explain to us
7    where you're going with this? I'm trying to figure
8    out how does this come in.
9        MR. DUSTON:  Frankly, the grade
10   changed from -- the testimony is all over the map and
11   I've got these on five different courses. The grade
12   change was turned in by Dr. Gorum on January 8th.
13   And Dr. Gorum claims -- both this witness and Dr.
14   Gorum are claiming that Dr. Wickham -- I'm sorry, Dr.
15   Dawkins had approved that or seen the CD or had it
16   and were involved and had discussions with each
17   other.
18       MR. ZEFF:  No, no, that's not the
19   testimony at all.
20       MR. DUSTON:  I can't get the story
21   straight of when he talks to Mr. Dawkins and when he
22   talked to Dr. Gorum and exactly the chronology,

207

1    whether this was before or after Dr. Gorum turned in
2    the grade change for this class. And that's what I'm
3    trying to figure out.
4        MR. ZEFF:  That's not the testimony.
5        MR. DUSTON:  I'm a little lost, too,
6    as far as exactly what happened on the grade change.
7        DR. ACKAH:  We need to have a time
8    frame.
9        MR. DUSTON:  I'm trying --
10       MR. ZEFF:  The testimony is that he
11   turned it in to Armon, Dawkins never got it. And
12   then he went into Gorum.
13       MR. DUSTON:  So that's the next
14   question.
15       MR. ZEFF:  That's what his testimony
16   is.
17       MR. DUSTON:  But even before that, he
18   says he had conversations with Mr. Dawkins and with
19   Armon about a B grade. And I'm trying to figure out
20   the timing of that conversation.
21       THE WITNESS:  As I said, I can't
22   pinpoint when was the exact conversations because we

208

1    talked all throughout the semester.
2        MR. DUSTON:  I'm talking about over
3    the Christmas break. His grades get turned in, in
4    mid December, and I want to find out when he talked
5    to Mr. Dawkins after the end of the semester.
6        THE WITNESS:  I talked to Mr. Dawkins
7    during finals week, before finals week. It was too
8    many conversations that we had. Too many meetings.
9    BY MR. DUSTON:
10       Q.  As of the last conversation that you had
11   with him, before finals week, did he have a CD; yes
12   or no?
13       A.  I don't know.
14       Q.  You don't know.
15       A.  During -- you asked me if he had it during
16   finals week?
17       Q.  Yes.
18       A.  He didn't have it during finals week.
19       Q.  So the CD was not done yet?
20       A.  It wasn't done yet in finals week.
21       Q.  So during finals week it wasn't done.
22   What was the next conversation you had with Mr.

Case 1:06-cv-00565-GMS    Document 434    Filed 09/28/2007    Page 39 of 47
HEARING IN RE DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

53 (Pages 209 to 212)

209

1  Dawkins after finals week?
2      A.  It was just to give him the CD and I told
3  him that Armon had the CD and he told me to get in
4  contact with Armon and get the CD.
5      Q.  All right.  And when was that
6  conversation?
7      A.  That was two or three days after the final
8  that we took.
9      Q.  Okay.  After that you had a conversation
10  with Armon and gave him the CD.
11      A.  Uh-hum.
12      Q.  Now when did Armon first tell you anything
13  about your grade?
14      A.  He was telling me that -- he was just
15  telling me, you know, I'll put the CD in for you,
16  you're going to have a B.  You're going to have a B.
17  You'll have a B.  He was telling me -- I was talking
18  to Armon like every day.
19      Q.  That's fine.  When did you find out that
20  you had gotten an F in that class?
21      A.  Armon had got the grades.  I'm not sure
22  when Armon got the grade.  He said he got the grades

210

1  from Gary Dawkins because he had to turn them in, but
2  I know it was after -- it was after we left.
3      Q.  After you left campus, you found out that
4  you got an F in that grade.  What did you do next?
5      A.  I just kept asking Armon, when's my grade
6  going to be changed, because I had my CD.  I had made
7  a CD.
8      Q.  All right.  When is the next time you
9  talked to Mr. Dawkins or did you?
10      A.  I think I ran -- it was off campus.  I ran
11  into him, but we didn't speak because I was in a
12  hurry.  I was getting somewhere.
13      Q.  So the next person you talked to after
14  your grade got turned in with an F was Dr. Gorum,
15  correct?
16      A.  Right.
17      Q.  And you went in to Dr. Gorum when?  When
18  did you talk to him?
19      A.  I was talking to Dr. Gorum all throughout
20  the semester, too, and I was asking him -- after I
21  produced a CD and Armon had told me that I received,
22  you know, my grade was an F or whatever, but it was

211

1  going to be changed as soon as Gary gets the CD and I
2  was like, Doc, is there any way you could talk to --
3  Dr. Gorum, is there any way you could talk to, you
4  know, Gary, I have my work right here, whatever,
5  whatever.  And that's when I gave him the CD.
6      Q.  So at some point after you learned that it
7  was an F, you went in to Dr. Gorum, you gave him the
8  copy of the CD and you asked him to talk to Dr.
9  Wickham, correct?
10      A.  It wasn't Dr. Wickham, it was Gary
11  Dawkins.
12      Q.  I'm sorry, Mr. Dawkins.  Did you speak to
13  Mr. Wickham again prior to the time your grade was
14  changed to a B?
15      A.  I haven't talked -- after that Christmas
16  break, when I said I saw him, that was it.  I haven't
17  spoken to him again.
18      Q.  All right.  So the last conversation you
19  had with Mr. Dawkins was when he said -- when you
20  told him the CD was coming and you were going to turn
21  it in, correct?
22      A.  Yeah.

212

1      Q.  Now after going to Dr. Gorum and saying,
2  here's my CD, I haven't been able to reach Mr.
3  Dawkins, here's what he told me beforehand, is there
4  any way you can reach him, did you have another
5  conversation with Dr. Gorum over your grades?
6      A.  I just -- no.  Actually, I asked Dr.
7  Gorum, hadn't he spoken to Gary about my grade.  I
8  asked Dr. Gorum, have you spoke to Gary Dawkins?  And
9  I asked him if he needed proof, you know, that Armon
10  helped me to do the CD.
11      Q.  Now I want to turn to Dr. Wickham.  You
12  indicated that you, in this semester, the Fall of
13  2003, you took Ethics and Media with Mr. Wickham.
14  You took Radio Station Operations with Mr. Dawkins
15  and you took Broadcast Writing 2 with Dr.
16  Osei-Mensah; is that correct?
17      A.  Yes.
18      Q.  That was your schedule for that semester?
19      A.  As far as Fall 2003.
20      Q.  And that was your schedule for that Fall?
21      A.  Yes.
22      Q.  What was your schedule for the Spring of

**233**

1 worker in the Records Office when I was
2 matriculating, from '69 through '73.
3    Q.   And in what capacity have you worked those
4 29 years, what have you done?
5    A.   You mean positions?
6    Q.   Yeah, you can just do it briefly.
7    A.   I'm going to make it brief, trust me.
8 Secretary, Senior Secretary, Records Systems Officer,
9 Assistant Registrar.
10    Q.   For what period of time did you work for
11 the Registrar's Office?
12    A.   Twenty-nine years and two months.
13    Q.   So all of your positions were within the
14 Registrar's Office?
15    A.   That's correct.
16    Q.   Including the secretary position?
17    A.   Yes.
18    Q.   Are you familiar with the system through
19 which grades are changed or supplemental grades are
20 added in and grades are changed to grades?
21        MR. DUSTON:   During which period of
22 time?

**234**

1        MR. ZEFF:   I'm about to get to that.
2 And if the panel will allow me to lead, a lot of this
3 has already been testified to, so I'm going to skip
4 around and if the panel has any questions about
5 procedures, please --
6    DR. ACKAH:   Go ahead.
7        MR. ZEFF:   We've already had a lot of
8 testimony about it.  She's our expert on it though.
9 BY MR. ZEFF:
10    Q.   Now, can you tell me for what period of
11 time have you been doing grade changes and that sort
12 of thing?
13    A.   Over the 29 years, during various -- oh,
14 I'm sorry.
15    Q.   That's okay.
16    A.   I'm sorry.  Over the 29 years during
17 various years it's been maybe five to seven years and
18 then maybe I did not do them for maybe three to five
19 years, then I'm right back doing them.  So I would
20 say over the 29 year period, for at least 20 years,
21 maybe a little better than 20 years.
22    Q.   In the past 10 years have you had any

**235**

1 dealings with grade changes and the like?
2    A.   Since '94, that's about all that I've
3 done.
4    Q.   And what percentage, if you know of the
5 grade changes and the Incomplete changes and the
6 supplemental grades, have you, yourself processed
7 versus someone else in the Registrar's Office?
8    A.   Until you said supplemental grades,
9 because those are grades that come out during final
10 grades.  Other than supplemental grades, I would say
11 90, at least 95 percent of the grades I do.
12    Q.   So you do 95 percent of the grade changes
13 and changes of Incompletes?
14    A.   Yes.
15    Q.   For the last ten years?
16    A.   That's correct.
17    Q.   Up until when?
18    A.   Up until I was terminated in March of
19 2004.
20    Q.   Okay.  Now can you tell the Panel Members
21 who, over the last ten years, has had the authority
22 based on your practices --

**236**

1        MR. DUSTON:   Objection to the use of
2 the word "authority."
3        MR. ZEFF:   All right.
4        DR. ACKAH:   Overruled.
5 BY MR. ZEFF:
6    Q.   Who has had the authority based on your
7 practices to make a grade change?
8    A.   You mean other than myself?
9    Q.   Okay.
10    A.   I mean, the authority lies with the
11 Registrar at first.  Then with myself, Mrs. -- do you
12 want names or titles?
13    Q.   Just titles is fine.
14    A.   Okay, I'm sorry.  The Registrar, the
15 Assistant Registrar, which would be yours truly.  The
16 -- I'm trying to think of her title -- Associate
17 Registrar and then -- I'm trying to think of Mrs.
18 Jones' title.  I have to give a name, I'm sorry.
19    Q.   That's okay.  People in the Registrar's
20 Office.
21    A.   Four people in the Records Office.
22    Q.   Are the only ones allowed to do that?

Case 1:06-cv-00565-GMS   Document 43-4   Filed 09/25/2007   Page 41 of 47
HEARINGS OF DELAWARE STATE UNIVERSITY RE: WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

61 (Pages 241 to 244)

241

1    Q. Sure, go ahead. Use any names you want.
2    A. At the time Jean Wilson retired, who was
3  the former Registrar in 1991, Mrs. Wilson was a
4  stickler for detail and following policy. She
5  required all the signatures any time of the semester.
6  It didn't matter when it was.
7    Q. So how long was that?
8    A. She retired, if I'm not mistaken, in 1991.
9  I think it was. The very first year that early
10  retirement package was offered. I think it was '91.
11       DR. DAVIS: That was 1990.
12       THE WITNESS: Hum?
13       DR. DAVIS: I said that was 1990.
14       THE WITNESS: Then that would be the
15  year she retired. Thank you.
16  BY MR. ZEFF:
17    Q. For what period of time were all
18  signatures requires at all times, when she was in
19  charge?
20    A. Yes.
21    Q. How long was she in charge?
22    A. Oh, Jesus. I'm sorry.

242

1    Q. That's okay.
2       DR. ACKAH: We didn't hear that.
3       THE WITNESS: She was here when I was
4  I student.
5  BY MR. ZEFF:
6    Q. Okay.
7    A. I'm sorry. I don't know, the former
8  Registrar when I came in as a student was Fred
9  Franklin. He's now deceased and I don't know when
10  Mrs. Wilson became Registrar.
11       DR. ACKAH: Is there a point to going
12  all the way back?
13       MR. ZEFF: I'm just trying to get some
14  background here. I'll be glad to move on.
15  BY MR. ZEFF:
16    Q. Well, since 1991, the only signature that
17  was required to change a grade would be the
18  professor's signature involved?
19    A. That's the way it started being done, that
20  is correct. After her retirement.
21       DR. ACKAH: Up to 2004?
22  BY MR. ZEFF:

243

1    Q. Up to 2004?
2    A. Yes.
3    Q. Okay. So that's more than 10 years?
4    A. Yes.
5    Q. That's the way it was?
6    A. Yes. Yes.
7    Q. After that three week period what
8  signatures would be required?
9    A. If I was looking at the form --
10    Q. Let me show you the form, which is Exhibit
11  5, would that be the form?
12    A. That's correct, that would be it.
13    Q. Okay.
14    A. After the three week period it would be
15  the Instructor, the Chair and the Dean.
16    Q. Now --
17       DR. ACKAH: Which page is that,
18  please?
19       MR. ZEFF: Five in the black -- in the
20  white notebook.
21       DR. GWANMESIA: White.
22       DR. TOSCANO: White notebook.

244

1  BY MR. ZEFF:
2    Q. If after three weeks the Change of Grade
3  Request Form came in without the Chair -- without the
4  Instructor, Chair and Dean's signature, what would
5  you do?
6    A. I mean, whose signature would be on -- I'm
7  sorry, to answer the question.
8    Q. If all of these signatures were not on
9  there after the three week period --
10    A. I wouldn't put it in until I had received
11  all the signatures. I'd send it back to either the
12  Chair and/or the Dean for the signatures and then I
13  would enter them.
14    Q. Was it also a practice at Delaware State
15  University in the last ten years relating to whether
16  a Chair could sign in lieu of an Instructor signing?
17    A. That could go back to when I was a
18  student. The Chair has signed more than once for the
19  instructor. That's never been a problem.
20    Q. And without --
21       DR. ACKAH: Since when did this form
22  come into use? Because I've not seen it between 1991

Case 1:06-cv-00565-GMS   Document 43-4   Filed 09/25/2007   Page 42 of 47
HEARING OF DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

63 (Pages 249 to 252)

249

1  graduate?
2      A.  Sure.  Every year.
3      Q.  And what happens?
4      A.  We contact the Chair.
5      Q.  And what happens?
6      A.  I'm not quite sure honestly.
7      Q.  What do the Chairs do when you contact
8  them and say a student is short a few credits to
9  graduate?
10     A.  I mean, I can only speculate, because I've
11  never been a --
12     Q.  I don't want you to speculate, but do they
13  come to your office?
14     A.  Sure, they come to our office and they
15  submit a grade.
16     Q.  They submit a grade?
17     A.  For that student.
18     Q.  Would that student have been registered
19  previously for any particular course?
20     A.  Sometimes they were.  Sometimes they
21  weren't.
22     Q.  Can you explain that?

250

1      A.  Yeah.  It may be a case where the student
2  had financial problems.  Where he or she had been
3  purged from the system and maybe that student didn't
4  get his money together until the end of the semester,
5  which is not uncommon at Delaware State.  So we
6  couldn't receive the grade until the student had been
7  officially registered, which means payment had been
8  made.  That's registration; payment.
9      Q.  And a Chair would come and give a grade
10  under those circumstances?
11     A.  Sure.
12     DR. ACKAH:  Is it the responsibility
13  of your office to chase a faculty member for his or
14  her grade?
15     THE WITNESS:  We contact the Chair and
16  we ask the Chair to contact his or her faculty
17  member.
18     DR. ACKAH:  Great.  So assuming a
19  Chair comes in and tells you, I have not been
20  successful in reaching my faculty member and the
21  Chair gives the grade, then the grade needs to be
22  changed.  Now would you accept that from the Chair?

251

1      THE WITNESS:  No.  Not if they were to
2  come in and say that.  Absolutely not.  You're saying
3  if the Chair came in saying they could not reach
4  their -- no, if they're going to come in and say
5  that, no.  We will not accept it.
6      DR. ACKAH:  If they were to come in
7  and say that, would you accept it?
8      THE WITNESS:  No, we would not.
9      DR. ACKAH:  But you just said you
10  trust their integrity.  It's the Chair.
11     THE WITNESS:  Because when the Chair
12  comes in, we're assuming the Chair has already talked
13  with his or her faculty member.  Now if the Chair is
14  dumb enough to come in and -- I'm sorry, if the Chair
15  comes in and says, I tried to reach the faculty
16  member, but I couldn't I'd have to tell him, I'm
17  sorry, I can't accept this.  You're telling me you've
18  not been authorized to put in this change.  So I
19  cannot accept it.
20     DR. ACKAH:  Okay.  But assuming this
21  student needs to graduate.  The faculty member cannot
22  be reached.  What do you do?

252

1      THE WITNESS:  How do I -- okay, I'm
2  sorry.  I would not know that the faculty member
3  could not be reached unless the Chair physically came
4  into the office and said to me, I could not reach
5  this faculty member.  It's only then we would know.
6      DR. ACKAH:  That's what I'm saying.
7      THE WITNESS:  Then we would not accept
8  the grade.  But if they come in and bring a grade, we
9  can only assume they have reached that faculty
10  member.  But if they come in and admittedly said,
11  look, I couldn't reach him, but I'm going to put in a
12  grade, we would not accept it.  We can't accept that.
13     DR. DAVIS:  Would you accept it if the
14  Dean's Office after having tried to contact the
15  faculty member in question, issued a grade because of
16  his inability to reach this person?
17     THE WITNESS:  We've done that in the
18  past.  Yeah, we have.  From a Dean, not from a Chair.
19  From a Dean, not from a Chair.
20     DR. JACKSON:  Are you saying that a
21  Dean has the power of changing grades?
22     DR. DAVIS:  Or to issue a grade --

Case 1:06-cv-00565-GMS    Document 43-4    Filed 09/25/2007    Page 43 of 47
HEARINGS IN RE DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

65 (Pages 257 to 260)

257

1    THE WITNESS: Yeah, I mean, it would
2  be in agreement. I can honestly say that it would be
3  in agreement between the two, but they knew we
4  couldn't add and drop, but they'd say, I'm going to
5  let this kid stay in my class. But don't -- and
6  sometimes it worked out fine, it wasn't a problem.
7  Sometimes that other faculty member forgot that
8  student was going to the other class and give him an
9  F. So we would have to switch that around, where the
10  student would receive the grade from the instructor
11  whose course he actually attended.
12    DR. ACKAH: So on paper it would not
13  look improper.
14    THE WITNESS: Well, it would be
15  improper in that they didn't add or drop before the
16  deadline. That would be the only improper part of
17  it. And then we also have students who -- and
18  there's certainly practice where this happens, we
19  take like an internship during the summer --
20    MR. ZEFF: Or a practicum.
21    THE WITNESS: Or a practicum,
22  whichever you want to call it and like I said, it

258

1  only affects maybe about -- I would say five -- maybe
2  five to seven departments. And summer school, and I
3  don't know if it still works this way, I wasn't here
4  this past summer, you have to have a minimal number
5  of students in order for the course to go.
6    So they would let the student take or
7  be like a corroborating teacher for the student
8  during the summer, even though the course wasn't
9  being offered, the student would do his or her
10  internship, particularly those students who -- in
11  history and political science, I am going to say that
12  department, because they would work during the
13  summer.
14    DR. ACKAH: My department, too.
15    THE WITNESS: Your department. Well,
16  good, great, your department as well. Then that
17  course would be offered maybe in the fall and at that
18  time, that's when the student would be added to that
19  roster to receive his or her grade that they had
20  earned during the summer.
21  BY MR. ZEFF:
22    Q. And would that instructor in the fall

259

1  necessarily be the same instructor that it was in the
2  summer?
3    **A. Not necessarily, but the course would be
4  the same.**
5    Q. Okay. So there would be occasions where
6  an instructor would have a student on their roster,
7  who they didn't know and never showed up for their
8  class?
9    **A. That's correct.**
10    Q. Who they may give an F to who deserves a
11  grade because they completed the course over the
12  summer?
13    **A. That's correct. That's something the
14  faculty members would have to work out.**
15    DR. ACKAH: And in that case, it is
16  the student's responsibility to explain this to the
17  professor?
18    THE WITNESS: I would agree with you
19  on that. But they didn't always do that and that's
20  why we sometimes had problems.
21  BY MR. ZEFF:
22    Q. In the course of your career, are the

260

1  Chairs of the departments involved in straightening
2  out these types of situations?
3    **A. Sure. That's their jobs. Yes.**
4    Q. Okay. And have their been situations
5  where persons have received failing grades for work
6  that they completed over the summer even though they
7  weren't in the class and the Chair had to come and
8  straighten it out?
9    **A. Yes.**
10    Q. And was Mass Communications one of the
11  departments where that sort of thing happened?
12    **A. Yes, amongst others.**
13    Q. Okay. And by the way, what's the largest
14  department on campus, if you know? At the time you
15  left.
16    **A. It would be management.**
17    DR. GWANMESIA: That's the school.
18    THE WITNESS: School, I'm sorry.
19  BY MR. ZEFF:
20    Q. Largest department.
21    **A. Well, what is the name, the new name of
22  the Business Department? I used to call it Business.**

261

1 What is it called now? Excuse me? It's what used to
2 be Business Administration. Let's say it that way.
3    Q. Do you know how many Mass Communications
4 majors there were January, 2004?
5    A. Well, my answer would be a guess. I know
6 it was --
7    Q. I don't want you to get a guess.
8    A. Well, there -- no, I do not.
9    Q. Okay. Were you involved at all in
10 processing any of the Change of Grade Forms for
11 Wendell Gorum in the January, 2004 time frame?
12    A. Yes.
13    Q. Do you remember receiving a stack of forms
14 from him?
15    A. I most certainly do.
16    Q. Were you actually present when he dropped
17 those off at your office?
18    A. Yes. And he came by like at about 4:29.
19 Yes. Yeah, I remember very specifically.
20    Q. And what did you do?
21    A. I took them and told him they would be
22 going in tomorrow morning because I got off at 4:30.

262

1    Q. And you would put them in the next day?
2    A. I certainly did.
3    Q. Did you review them all before you put
4 them in?
5    A. I certainly did.
6    Q. At that time did you have the discretion
7 to reject any of those requested changes if you felt
8 they were improper?
9    A. Yes, I did.
10    Q. And did you reject any of them?
11    A. I think I have rejected one or two, at
12 which time he submitted the copies of the drop slips.
13 Unfortunately, ours are not in alphabetical order
14 anymore in Records.
15    Q. So there were several of them that were
16 changed from F to W based on receiving drop slips?
17    A. That's correct.
18    Q. And do you know what's happened to any of
19 those drop slips that were submitted? In other
20 words, are they kept on file somewhere? Would there
21 be a record of those drop slips somewhere?
22    A. Yeah, they're on file, just not in

263

1 alphabetical order.
2    Q. Okay. So it would be very difficult to
3 find them?
4    A. Yes, very difficult.
5    Q. How difficult? Why would it be difficult?
6    A. We're talking about going through like
7 five to ten thousand sheets of paper.
8    Q. Oh, God. Okay.
9    A. Because some students may come in and make
10 10 or 15 changes and they need an add slip for each
11 one they drop.
12    Q. And those are not in alphabetical order?
13    A. No, they are not.
14    Q. So when Dr. Gorum gave you these change of
15 grade forms, some of them included changing F's to
16 W's or changing F's to I's or whatever it was, if you
17 needed further documentation, you had -- you got it
18 from him?
19    A. I would ask him for that documentation.
20    Q. And you received that documentation?
21    A. If I put the change in, I received it. If
22 I didn't put the change in, I did not receive it.

264

1    DR. DAVIS: Was it the University's
2 practice or policy, you can tell me if it was both,
3 for instructors to be able to issue a withdrawal or
4 is it the Records Office's responsibility to issue a
5 withdrawal.
6    THE WITNESS: I wish I could really
7 answer simply, Dr. Davis, but over the years the
8 responsibility has fluctuated from the Provost down
9 to the instructor.
10    DR. DAVIS: And the reason I ask is
11 that I always thought it was the Records Office's
12 responsibility, because faculty for the most part
13 would not know that a student has withdrawn from
14 their course. Unless he comes in and says, I've
15 withdrawn.
16    THE WITNESS: Let me give you an
17 instance that's going to jog your memory.
18    DR. DAVIS: Okay.
19    THE WITNESS: A Dean can write the
20 Records Office and say withdraw this student from
21 this or these courses. At which time we would have
22 to do it. The Provost can write a letter to the

Case 1:06-cv-00565-GMS DANIEL SAM NIGDEL DOCUMENT 43-4 UNIVERSITY FILED 09/25/2007 GORUM Page 25 of 47
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

67 (Pages 265 to 268)

265

1  Records Office that says the same thing. And the
2  Records Office does what the Provost or the Dean
3  says. And I'm sure you're familiar with that.
4        DR. DAVIS: I thought -- it was my
5  assumption that when your office saw that a student
6  -- well, isn't there a withdrawal slip that the
7  student must complete or form in the Records Office,
8  which would give you official information that, yes,
9  the student has indeed withdrawn from a class?
10       THE WITNESS: Sure there's a form.
11       DR. DAVIS: In most cases, students
12  will do this so they won't lose money --
13       THE WITNESS: Sure there is. But I'm
14  saying when there isn't -- when that form is not
15  there, then if a Dean writes and says withdrawn or
16  the Provost, then it doesn't matter if the form is
17  there or not.
18       DR. DAVIS: But on the grade roster,
19  an instructor should not pencil in a W; is that
20  correct?
21       THE WITNESS: Yeah, you're absolutely
22  -- unless they have the official withdrawal for the

266

1  student. They shouldn't, but they certainly do it,
2  as you're well aware. Yeah.
3        DR. JACKSON: This is a wide-spread
4  practice?
5        THE WITNESS: Uh-hum.
6        DR. JACKSON: It's a wide-spread
7  practice. Why do you think the President would
8  terminate someone on something that is wide-spread?
9        THE WITNESS: Do you really want me to
10  answer that?
11       DR. ACKAH: She really can't answer
12  for --
13       THE WITNESS: I can speculate. It's
14  probably because he doesn't know how wide-spread a
15  practice it really is. I can only assume he doesn't
16  know.
17  BY MR. ZEFF:
18     Q. Can you tell us how wide-spread it is.
19       MR. DUSTON: Can I ask which
20  wide-spread practice you're referring to?
21       DR. JACKSON: Changing of grades.
22       MR. DUSTON: Well, no. The question

267

1  is changing grades with or without the instructor's
2  consent. And that's what --
3        THE WITNESS: That's pretty darn
4  wide-spread -- I mean, that's pretty wide-spread as
5  well.
6        MR. DUSTON: I'll hold my questions.
7        MR. ZEFF: Let me break that -- go
8  ahead.
9        DR. DAVIS: Do you consider, and this
10  is a matter of how you perceive -- the request for a
11  grade change, is that the same as an instructor
12  making a grade change?
13       MR. ZEFF: In other words, this form
14  says "request"?
15       THE WITNESS: Yeah, that's the same
16  thing. They're one and the same.
17       DR. DAVIS: Would that be looked upon
18  in the same fashion if an instructor had the ability
19  to go into the system and change students' grades?
20       THE WITNESS: I can't answer that.
21       DR. DAVIS: Earlier you said --
22       THE WITNESS: I don't think the day is

268

1  going to ever come when we're going to let you-all go
2  into the system and change grades.
3        DR. DAVIS: No, no --
4        THE WITNESS: I mean, I could be
5  wrong, but --
6        MR. ZEFF: Do you mean Dr. Davis or
7  everybody?
8        THE WITNESS: I'm sorry. I don't mean
9  Dr. Davis, personally. I don't think that day is
10  going to come.
11       DR. DAVIS: The point I'm getting at
12  is that Dr. Gorum submitted requests for grade
13  changes that had to be approved by you, so that they
14  could be physically entered into the system, that's
15  when the grade changes took place.
16       MR. ZEFF: That was my point earlier
17  at one of the other hearing dates, yes.
18       THE WITNESS: I thought we had cleared
19  that up. His change came in, if I recall -- I don't
20  remember the exact date, but I know it was right
21  after we had gotten back from the Christmas holiday.
22       MR. ZEFF: But the point is Dr. Gorum

269

1 didn't change the grades, you did?
2        THE WITNESS: Yeah. Dr. Gorum can't
3 change the grade physically in the computer. I do
4 that.
5        DR. ACKAH: That's --
6        THE WITNESS: No instructor can.
7        DR. ACKAH: Yeah, but --
8        THE WITNESS: You can't.
9        DR. ACKAH: -- she -- sorry, he does
10 this on paper?
11        THE WITNESS: Yes. This form.
12        DR. ACKAH: The form?
13        THE WITNESS: Yes.
14        DR. ACKAH: But it doesn't take effect
15 until you enter it into the system?
16        THE WITNESS: That's correct.
17 BY MR. ZEFF:
18    Q.  And you're not a rubber stamp --
19    A.  No.
20    Q.  -- you have some discretion as to whether
21 --
22    A.  Yes, I do.

270

1        DR. JACKSON: Once I put a grade into
2 that system, that grade is there. If I go back and
3 try to change that grade, I can't.
4        THE WITNESS: You can't. You can't.
5        DR. JACKSON: You can change a grade
6 on this new system, but you can't change it on the
7 old system, unless it's been approved.
8        THE WITNESS: You're right. You
9 cannot change it. And when I say you, I mean a
10 faculty member.
11        DR. JACKSON: I know sometimes you go
12 there and look at the grade and want to change it and
13 then they say we have a new system --
14        THE WITNESS: No, I don't think you're
15 ever going to be able to change it, but you can come
16 to the Records Office and submit this form and we
17 will change it for you.
18 BY MR. ZEFF:
19    Q.  A couple of questions I want to follow up
20 on. We were talking about some wide-spread
21 practices, one of which -- let me ask you this: Has
22 it been a wide-spread practice at Delaware State that

271

1 the Chair with the consent of a faulty member would
2 sign a Change of Grade Request Form in lieu of the
3 faculty member who actually taught the course?
4    A.  When you say wide-spread, because I can
5 almost think of who the Chairs are, some Chairs just
6 do not do it.
7    Q.  Okay.
8    A.  For whatever reason, they say, no, I'm not
9 doing it.
10    Q.  Okay.
11    A.  But I know -- I know maybe about five
12 departments where the Chair, it's never been a
13 problem where the Chair submits the grade change for
14 the instructor.
15    Q.  For what period of time?
16    A.  As long as I've been here, for twenty-nine
17 years and two months.
18    Q.  Is that what you meant earlier by
19 wide-spread? You used the term, that's why I wanted
20 to --
21    A.  Yeah, maybe that's what I meant.
22    Q.  Okay. Has there also been a practice of

272

1 Chairs changing students' grades in lieu of the
2 instructor changing it without the instructor's
3 consent.
4        MR. DUSTON: How would she know that
5 unless they had --
6        THE WITNESS: Oh, I know of one case.
7 Trust me, I do.
8        MR. DUSTON: So you do know of one
9 case --
10        THE WITNESS: Yes, I do. And I can --
11 as a matter of fact, my God, that was a Dean. I
12 think she was Dean at the time.
13        MR. DUSTON: And that example, if she
14 knows of one instance --
15        THE WITNESS: And I know the faculty
16 member whose grade it was that she changed.
17        MR. DUSTON: Please tell us about it.
18        THE WITNESS: Do you want the names?
19        MR. DUSTON: Yes.
20        THE WITNESS: The Dean I do believe
21 was Cynthia Hammond. The instructor was Alida Hanna
22 and Dr. Tolliver got all stuck in the middle of it,

Case 1:06-cv-00565-GMS    Document 43-4    Filed 09/25/2007    Page 47 of 47
HEARING IN RE: DELAWARE STATE UNIVERSITY V. WENDELL GORUM, PH.D
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

38 (Pages 149 to 152)

**149**

1 have any problem?

2        Were they ever sent back to you?

3        DR. JACKSON: No.

4        THE WITNESS: That was the practice.

5 BY MR. ZEFF:

6    Q.  Now, had you ever been involved in a

7 situation as Chair where you have changed another

8 professor's grade?

9    A.  Yes.

10    Q.  How did you handle those situations?

11    A.  I've had, say, a teacher on vacation and a

12 student comes in and says -- and I'll give you one

13 example specifically.

14        Ms. Lawson had gone to California. A

15 student came in and said, I thought I was getting an

16 A. And I can't remember whether he got a B or a C.

17 But I said, well -- we tried to reach Ms. Lawson and

18 we could not reach her. And his mother was with him,

19 and he says, well, he has to keep a three point, his

20 scholarship is depending upon this.

21        I said, well, we'll go in Ms. Lawson's

22 office. Her grades are always by the numbers.

**150**

1        We went through, and she -- clearly,

2 she had made an error in calculation. Instead of

3 7.5, she did .75. So I changed the grade.

4        Another instance with Ms. Reynolds

5 when she says, with the term paper I'm being rough on

6 this thing, misspellings, because you're word

7 processing them, you can always put spell check on.

8 So if you have three misspelled words, I'm not even

9 going to read anymore of the paper, that's it.

10        The student misused their, T-H-E-I-R,

11 and T-H-E-R-E. So we call -- well, is it a

12 misspelled word or is it the wrong use of the word.

13 And a word processor will not make the distinction

14 between those two.

15        And we kind of laughed about it. And

16 we went on -- I went on because she was in D.C. at

17 that time, and changed the grade.

18        I mean, sometimes a teacher will call

19 and say, I made an error, will you do this. The

20 teacher might be in Wilmington.

21        I did put on the form, requested by

22 telephone, and signed that name and put my name

**151**

1 behind it and, then, signed it again.

2        So this happens commonly because as a

3 Department we served about 1400 students per

4 semester. And there are going to be errors. So we

5 handle them.

6        DR. GWANMESIA: Were these grade

7 changes ever -- did you ever go through the Dean?

8        Did you ever request the permission of

9 the Dean before changing, or could you do that --

10        THE WITNESS: I have never requested a

11 grade change from the Dean.

12        DR. GWANMESIA: Regardless of how long

13 it has been since the grade was awarded?

14        Because in the case of change of a

15 grade by faculty three weeks after the grade has been

16 assigned you could -- the faculty could just change

17 it with the signature of the Chair, right?

18        THE WITNESS: Right.

19        DR. GWANMESIA: But in the case where

20 you could verify that the students were right, you

21 didn't need to have authorization from the Dean, did

22 you?

**152**

1        THE WITNESS: No. And even after.

2 Say a student had been away a year, and not enrolled

3 in school, all we had to do was call the Dean and

4 tell him, and he would say, handle it.

5        DR. GWANMESIA: But no formal

6 application, no forms were completed as long as --

7        THE WITNESS: If there was a form, and

8 I can't remember these cases specifically 'cause we

9 have not had that many of them, my student worker

10 would walk it over to the Dean and he would sign it

11 and forward it to the Records Office.

12        And I do remember a couple of cases

13 like that.

14        DR. DAVIS: When the Dean said -- made

15 that statement, did you understand that you had the

16 authority to change a grade?

17        When he said, you know, you called the

18 Dean?

19        THE WITNESS: Right. When he says,

20 handle it?

21        DR. DAVIS: Handle it, yes.

22        THE WITNESS: Yes, that my signature

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.

Case 1:06-cv-00565-GMS  Document 143-5  Filed 09/25/2007  Page 1 of 59

2 (Pages 5 to 8)

**5**

1    A.  Okay.  Before coming to Delaware State I
2  worked in the public schools in the State of Alabama.
3  Went to the University of Indiana, Bloomington
4  campus.  Completed the masters, directorate and
5  doctorate in health sciences.
6        Came from there to Delaware State in
7  1972 -- '73, March of '73, stayed one year, went back
8  to Alabama State.
9        Worked at Alabama State for seventeen
10  years, retired.  Came back to Delaware State in '91.
11  Been at Delaware State since.
12    Q.  And what positions have you held at
13  Delaware State during that time?
14    A.  Chairperson of the Department of Health
15  and Physical Education, faculty athletic
16  representative, Dean of Arts and Sciences and Dean of
17  Mathematics, Natural Sciences and Technology.
18    Q.  And you were Dean of the Department of
19  Arts and Sciences during which period of time?
20    A.  1998 through last year.
21    Q.  Under accepted professional standards what
22  rights do professors have regarding control of grades

**6**

1  assigned in their classes?
2    A.  Professors have the right to make changes
3  with regard to grades, assign grades and, actually,
4  basically, you know, handle the dispensation of the
5  various grades within their department.
6    Q.  And are those rights just a matter of
7  courtesy or are there professional standards or are
8  they actually embodied in accreditation and other
9  standards?
10    A.  They are embodied in accreditation and
11  other standards, but they are also a matter of the
12  professional academic rights of the professor.
13    Q.  Are the rights of part-time adjunct
14  visiting professors any different in that area than
15  the rights of other professors?
16    A.  No, once a professor's assigned an
17  assignment that professor's responsible for that
18  class; that professor's paid for that class, and that
19  professor has the responsibility and the rights to
20  manage the grades and so forth with regard to that
21  class.
22    Q.  Based upon your experience in academia and

**7**

1  here at Delaware State, are there any circumstances
2  when it is acceptable to change a grade given by an
3  instructor without that instructor's knowledge or
4  consent?
5    A.  Only in the case where the professor
6  cannot be located at the end of a semester or
7  process, and the dean's office and the other channels
8  through whom that grade should be assigned is
9  contacted or notified and approved.
10    Q.  Have you had those situations arise while
11  you were dean?
12    A.  Sure.
13    Q.  Describe what -- describe any one of the
14  situations and what process you went through when
15  that issue arose?
16    A.  In the case where a professor cannot be
17  located after the process has ended, you know, the
18  semester's ended, the professor is -- normally takes
19  his information to the Chair.  The Chair then will
20  take the information and try and contact the
21  professor, or the professor will try -- I'm sorry --
22  the student usually comes to the professor -- to the

**8**

1  Chair.  The Chair will then contact -- try and
2  contact the Professor.
3        If the Chair cannot get in touch with
4  the professor to assign a grade, the professor then
5  -- the Chair, then, contacts the Dean's office.  The
6  Dean's office usually will try and contact the
7  professor him or herself.
8        In such cases where that cannot be
9  done, then a committee is set up by the Department,
10  within the Department where this process has
11  occurred, and the committee then will look at the
12  situation and assign a grade.  The grade is then
13  signed off on by the Chair, the Dean and it is moved
14  forward.
15    Q.  And which schools or departments have you
16  had those issues arise where you can recall such a
17  committee being set up to actually determine the
18  appropriate grade for the student?
19    A.  It has occurred in English, Mass
20  Communication -- I'm sorry, foreign languages.  Those
21  are two that come to my mind.
22    Q.  Now, in those cases did the process

**29**

1  letter grade changes.
2          And that stemmed -- you know, as I
3  said, this is nothing new for me because we have
4  discussed this prior to this every year from '98
5  through. And so had Johnny Tolliver, because I was
6  in meetings as a Chair when he did it -- you know,
7  about change -- authorization, change of letter
8  grades.
9          Now, this situation's taught me to,
10  you know, to notify all of my Chairs that if, in
11  fact, a letter grade was changed for a student, there
12  should be some backup, some authorization for doing
13  so.
14          And I wanted to make it very clear
15  because this is a serious issue and it's not going
16  away and it's not going to go away, you know, it's a
17  prevalent issue.
18          So that's what stemmed that particular
19  statement -- this particular statement with regard to
20  --
21          DR. GWANMESIA: Just as a follow up --
22          MR. ZEFF: Excuse me, I just want to

**30**

1  close the door. It's very --
2          DR. ACKAH: Yes. Yes.
3          DR. GWANMESIA: I guess my question --
4  the next question I really have has to deal with what
5  -- Dr. Blade's concern, too, because it says here, he
6  interjected and asked who was the faculty member who
7  was accused of changing grade. And there is no
8  follow up. I mean, the Minutes does not actually
9  tell us what happened.
10          THE WITNESS: Dr. Blade asked the
11  question?
12          DR. GWANMESIA: Yes. I'm trying to
13  find out if --
14          THE WITNESS: Dr. Blade asked the
15  question who was the faculty member, you know, who --
16  we said there is no faculty member. There is -- it's
17  a process and we need to be careful about how we do
18  these things.
19          There was no accusation made, in my
20  opinion, not at that time, with regards to any
21  particular individual.
22          All that was said was that we should

**31**

1  be very careful at Delaware State University, and, in
2  fact, Greg Jackson, in our meeting, called for an
3  audit.
4          He wanted to -- he made us go back and
5  check all of the grades for all of the departments
6  and all of the colleges to audit -- or at least
7  locate and audit those grades to be sure that, in
8  fact, everything's above board. So that when the
9  NCAA comes in November of this year, and call for
10  those audits, and call for those records, and he's
11  changed the grades on a lot of these athletes, we
12  will be in a position to justify or substantiate.
13  Otherwise we would be closed down.
14  BY MR. DUSTON:
15      Q. So the NCAA is coming in in November of --
16      A. Oh, yes. Oh, I'm sorry, February, they'll
17  be here. The actual team will be here some time in
18  February. And we have to submit our self-study
19  report for certification.
20      Q. Of '05?
21      A. November of this year. We've got to
22  submit the report this year, '05 -- I'm sorry -- this

**32**

1  coming November the NCAA report will go out,
2  self-study report.
3      Q. Now, in addition to grades, whether grades
4  have been changed after the fact for athletes, one
5  issue, will the NCAA also be auditing things like
6  independent study and practicum grades for athletes
7  and whether they were unsupported?
8      A. They normally do. I've served on the NCAA
9  Committee -- Review Committee myself for five years,
10  and I was in the original self-study process. We
11  were the guinea pig. I was at Alabama, so A came
12  first. The first HBCU was Alabama State, the second
13  was Auburn State and we were the only two in that
14  process.
15          So we were in at the beginning when it
16  started in '89, I believe, and since that time I have
17  served in either that capacity or some other capacity
18  related to this.
19          I've served on a national committee
20  when I reviewed schools myself. And I've chaired the
21  National Committee on Academic Integrity at Toledo,
22  the University of Toledo, and I believe when I was on

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
Case 1:06-cv-00565-GMS   Document 43-5   SECOND WEDNESDAY Filed 09/25/2007   Page 3 of 59

9 (Pages 33 to 36)

33

1 the Gender Equity Committee at Martin -- Tennessee
2 Martin.
3       But the last one I served on was
4 Toledo. I've chaired that committee and the first
5 thing we do is check -- spot check the grades and the
6 process that you have in place, check the catalog,
7 check your records, to see if you're following your
8 own rules.
9       And if we find anything, we, then, do
10 a complete audit, and we go through every record and
11 look at every grade that was changed for every
12 athlete. If it's an independent study, a practicum
13 grade, there must be substantiation. If there was a
14 letter grade for an athlete, there must be
15 substantiation as to why it was changed and so forth.
16       If it is found that it is fraudulent
17 or if there's some process that's involved that
18 should have taken place, you're usually targeted and
19 you are usually -- well, you've read the newspapers.
20 Georgia, last month -- three months ago, the
21 University of Georgia where there's a lot -- where,
22 you know.

34

1    Q.  Let me give another example. If a student
2 is not registered during a particular semester for a
3 course, and subsequent to that semester a -- either a
4 supplemental grade form or a missing grade form is
5 put in and the student is, at the same time,
6 retroactively registered with a grade in a practicum
7 course or independent study course or internship, is
8 that the type of thing that will get a red flag and a
9 look at if an athlete's involved?
10   A.  Sure it is. And what you must have is
11 some show of work that that student did and some
12 verification or substantiation that, in fact, the
13 student did do the work, if something happened, you
14 know, for the grade to have been assigned.
15   Q.  And if there are procedures within the
16 department for what kind of documentation you need on
17 that, logs that have to be kept of internship, notes,
18 paperwork assigned, whatever that backup would
19 normally be to assign a grade and, then, a credit,
20 you would expect that documentation -- you would need
21 to show the same documentation for that person?
22   A.  You would have to.

35

1       DR. ACKAH:  May I come in here?
2       MR. DUSTON:  Yes.
3       DR. ACKAH:  The situation you are
4 referring to, this example, it's more appropriate for
5 incomplete grades, but not necessarily grade change.
6       MR. DUSTON:  Well --
7       DR. ACKAH:  Incomplete means the
8 student did not complete my assignment and,
9 therefore, subsequently if he completes the
10 assignment, then the instructor can go in and assign
11 the grade using the documentation. I've done so
12 before.
13       If I remember, one of my best students
14 -- I was upset when you ask me to show documentation.
15 I said, don't you trust me. I have an idea that that
16 was the normal thing to do. So I did bring the
17 documentation. So you have two things.
18       MR. DUSTON:  Yeah, I understand. And
19 I want to repeat the same thing I said yesterday
20 morning. We have three situations described in the
21 Amended Statement of Charges, and they are distinct
22 procedures and there are distinct issues.

36

1       The most important and obvious is four
2 courses in which there were change of grade forms
3 submitted and they were not courses in which Dr.
4 Gorum was the instructor. And those are the first
5 four items in the Statement of Charges.
6       There's also a fairly long list that
7 was added on of missing grade forms or incomplete
8 forms. An incomplete form would be used, as Mr.
9 Parker said, if a student was actually registered for
10 the course and actually took an I at the end of the
11 semester and someone submitted subsequent a
12 resolution of that independent study.
13       You would think, under those
14 circumstances the key thing for the NCAA is that
15 whoever put in that I grade form, had the
16 documentation that the student had completed the work
17 assigned.
18       Whether the Chair had a right to do
19 that, I haven't asked that question yet. I'm going
20 to get to that, the Chair versus the instructor.
21       A third situation is the supplemental
22 grade form that used to be used, or using the missing

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.

Case 1:06-cv-00565-GMS  Document 143-5  SECOND DAY - TUESDAY  Filed 09/25/2007  Page 4 of 59

12 (Pages 45 to 48)

**45**

1    unusual document. You mean --

2    Q. Why your signature is on this particular

3    form, do you recall?

4    **A. I don't recall why it's on there.**

5    DR. GWANMESIA: What form is that,

6    please?

7    MR. DUSTON: It's 41.

8    DR. GWANMESIA: The 41 that we are

9    looking at?

10    MR. DUSTON: Yes, 41 is a removal of

11    an incomplete grade form submitted for the Fall by a

12    course that I believe Dr. Gorum taught, submitted, I

13    guess, a little bit after the six-week deadline.

14    THE WITNESS: Right. That's what I

15    was going to say.

16    DR. GWANMESIA: Whose signature is

17    that?

18    THE WITNESS: Mine.

19    MR. DUSTON: That's -- that's Dr.

20    Frederick's. It's Dr. Gorum's -- Dr. Frederick's

21    signature underneath Dr. Gorum's.

22    THE WITNESS: That probably -- it was

**46**

1    after the six-week deadline and the Dean, you know,

2    as practice signs.

3    MR. ZEFF: Objection. We're getting

4    two or three different stories now. First he says he

5    doesn't know, he can't remember.

6    THE WITNESS: I couldn't remember, but

7    as a practice -- as a practice if it's after the

8    deadline, the Dean signs it. And that's all you're

9    going to get.

10    DR. JACKSON: But is that in every

11    instance?

12    THE WITNESS: Every instance that

13    comes up to me.

14    DR. JACKSON: Because I have had

15    incompletes that you didn't sign.

16    THE WITNESS: But if it comes to me.

17    DR. JACKSON: I mean, it didn't come

18    to you though.

19    THE WITNESS: Then, I don't know

20    anything about that.

21    DR. JACKSON: But you just said that

22    practice --

**47**

1    THE WITNESS: How would I know what

2    you did or didn't come to me.

3    DR. JACKSON: Yeah, but I'm saying,

4    you just said --

5    THE WITNESS: As a practice -- as a

6    practice of the university after the deadline, the

7    Dean's signature is required. We sign it.

8    DR. JACKSON: On an incomplete?

9    THE WITNESS: Yes, after the deadline.

10    MR. DUSTON: We're referring to after

11    the deadline for -- after the six weeks have past.

12    THE WITNESS: Past.

13    MR. DUSTON: And the new semester is

14    where --

15    DR. JACKSON: But yesterday I gave you

16    an example of a student I gave an incomplete. She

17    failed the class. It was an F. I changed the grade,

18    took it to the department Chair, and I said I have to

19    -- do I have to have documents for this. He said,

20    no, it's an incomplete.

21    MR. DUSTON: And the question is, did

22    that occur within --

**48**

1    DR. JACKSON: He did not sign it.

2    MR. DUSTON: Did it come within the

3    six weeks after the start of a new semester when a

4    professor has a right to change his own incompletes?

5    DR. JACKSON: This is almost a year

6    later.

7    MR. DUSTON: It's a year after the

8    incident?

9    DR. JACKSON: Yeah, this student was

10    getting ready to graduate. I had flunked her in --

11    what was it, the Fall semester and she came to me in

12    the Spring semester getting ready to graduate with an

13    incomplete that had turned to an F.

14    MR. DUSTON: And this is -- and it had

15    turned to an F --

16    DR. JACKSON: Right.

17    MR. DUSTON: -- and you went to your

18    Chair --

19    DR. JACKSON: Right.

20    MR. DUSTON: -- who instructed you

21    that --

22    DR. JACKSON: All I had to do was sign

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.

Case 1:06-cv-00565-GMS WEDNESDAY, Filed 09/25/2007    Page 5 of 59

13 (Pages 49 to 52)

49

1    it, send it to the Registrar's Office.
2           THE WITNESS: And what your Chair did
3    is fraudulent.
4           DR. ACKAH: Yeah, but it was accepted
5    by the Registrar's Office, right?
6           DR. JACKSON: Right.
7           THE WITNESS: But it's still
8    fraudulent.
9           DR. GWANMESIA: But the key here is,
10   once you give a student a grade, it's no longer an
11   incomplete. If you change it from an incomplete to
12   an F, it's no longer an incomplete. You've given
13   that student a grade. Then it becomes a change of
14   grade. And if you --
15          DR. JACKSON: But that did not happen.
16          THE WITNESS: But I'm submitting to
17   you then that was illegal.
18          DR. JACKSON: But the problem is you
19   have more than one person doing it, more than -- Dr.
20   Gorum is doing something that other people did.
21          THE WITNESS: But you know, this being
22   said, and I'm not an attorney or anything, but if

50

1    someone murders someone in a town and they catch
2    them, they put them in prison --
3           DR. JACKSON: That's an extreme
4    example.
5           THE WITNESS: No, it's not extreme.
6    They put him in prison. If someone --
7           MR. DUSTON: Dean Frederick, may I
8    comment. One of the reasons why we took -- one of
9    the reasons why we've limited the Statement of
10   Charges to those courses in which Dr. Gorum was not
11   the instructor, there are many, many examples by Dr.
12   Gorum and by other professors of both, of submitting
13   I grade changes directly to the Registrar's Office
14   even after the period of submitting missing grades in
15   the instructor's own course after the semester, of
16   supplemental grades.
17          There are a lot of procedures that are
18   not in the catalog and that Dean Frederick will say
19   have not been university policy that are not at issue
20   in this Statement of Charges, because there obviously
21   have been things that the Registrar's Office has
22   done, and there've been things that other Chairs have

51

1    said could be permitted to be done.
2           And there is no accusation being made
3    that those actions being taken by an instructor for
4    his own class were so egregious as to warrant
5    termination. That's why this Statement of Charges is
6    limited to those courses in which Dr. Gorum was not
7    the instructor of record.
8           DR. ACKAH: And I think I would
9    support that by advising members of the Committee and
10   both parties that we limit ourselves to what is
11   germane to this issue.
12          And we will write up our
13   recommendations and if there are other issues that we
14   need to discuss, we'll do so, because there are so
15   many issues that are coming in that we don't have the
16   power to bring them up from here for discussion.
17          But in the end, we will have to when
18   we have to make our recommendations.
19          MR. ZEFF: Certainly --
20          DR. ACKAH: But that is up to us at
21   the end.
22          MR. ZEFF: Certainly you're expected

52

1    to bring your life experiences --
2           DR. ACKAH: Sure. Exactly.
3           MR. ZEFF: -- and your experiences at
4    the University is why you've been selected.
5    BY MR. DUSTON:
6       Q.  Now, as --
7           DR. GWANMESIA: I'd like to ask a
8    question on this Exhibit 23 that you --
9           MR. DUSTON: Yes.
10          DR. GWANMESIA: I'd like to know --
11   there is a -- there are some asterisks on one of the
12   -- says, not registered --
13          MR. DUSTON: Correct.
14          DR. GWANMESIA: What does that --
15          MR. DUSTON: Mr. -- Mr. Parker could
16   be called back to clarify. I will represent for the
17   Committee, the check and the B on top --
18          DR. GWANMESIA: Okay.
19          MR. DUSTON: -- he testified
20   yesterday. He indicated that Joyce Bowers, the
21   Assistant Registrar, processed these and implemented
22   these changes.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
Case 1:06-cv-00565-GMS   Document 43-5   Filed 09/25/2007   Page 6 of 59
CONDUCTED ON TUESDAY, AUGUST 21, 2007

16 (Pages 61 to 64)

61

1    Q.  Dean Frederick, I, now, want to go back to
2  something that's a little more general.  I'm not
3  talking about the procedures for filling out
4  incompletes with the -- with the Registrar's office,
5  but I do want you to touch on the discussions within
6  the College of Arts and Sciences among your Chairs
7  regarding incompletes and the development of the
8  protocol on incompletes, as I think it's important to
9  the discussions that have been going on over the last
10  couple of years about incompletes?
11       Tell me how the issue came up and what
12  issues have been addressed within the Chairs of your
13  Department?
14    A.  The incomplete change of grade and
15  incomplete form process, as I said earlier, has
16  always been a concern of mine.  And in dealing with
17  the change of grade incomplete form process, we -- I
18  discussed it at four or five meetings as I indicated
19  earlier; that I always -- we always start off and
20  talk about these things.
21       In discussing the incomplete grade
22  process, some of the professors were concerned about

62

1  professors working at the University as adjuncts,
2  leaving the University, and leaving without assigning
3  a particular grade to a student.
4       The Chair then has to try and figure
5  out what grade should be assigned, and in doing so we
6  decided that -- the college Chairs and I decided that
7  we needed a specific process that we would implement
8  in the College of Arts and Sciences whereby a grade
9  will be decided by the adjunct professor before he or
10  she left, or in cases where a professor was fired or
11  quit or left the University, in those cases as well.
12       So we would implement a process where
13  we would -- we would institute a process that would
14  take care of the situation where we had the change of
15  grade and, of course, necessary change of grade when
16  there was material, backup material to change the
17  grade.
18       So in doing so we decided that we
19  would set up another process.  Sam Huff agreed to
20  chair a subcommittee to develop a process for
21  implementing the change of grade form process.  And
22  he did so.

63

1    Q.  If you would look at Exhibit Number 30,
2  the second document are meeting notes from November
3  14th, 2002, just noting, Dean Frederick stated we
4  will establish a protocol for faculty and staff to
5  request incompletes.
6       The following procedures will be
7  required, faculty member must submit the necessary
8  paperwork, conditions and have the student sign for
9  all documents and conditions prior to removing the
10  incomplete.
11       So this was to design a new protocol
12  that hadn't been used before to have the student and
13  professor agree prior to the end of the semester what
14  work should be done to resolve the incompletes.
15       And, then, if the professor was
16  leaving the University, they would have the
17  appropriate document -- the Chair should have in
18  their position that documentation.
19       DR. JACKSON:  This is a policy -- this
20  is a policy of --
21       THE WITNESS:  Of the College of Arts
22  and Sciences.

64

1       DR. JACKSON:  This is a policy?
2       THE WITNESS:  Yes.
3       MR. DUSTON:  Well --
4       THE WITNESS:  This is a process that
5  we implement in the College of Arts and Sciences.
6  BY MR. DUSTON:
7    Q.  Let me continue, if I can.  If that was in
8  November, was the discussion --
9    A.  The discussion.
10    Q.  -- in -- there are references two pages
11  later to the meeting agenda for the August 26, 2003
12  meeting, at which point the incomplete grade process
13  was further discussed.
14    A.  Right.
15    Q.  And, then, the page after that there's a
16  form.  Was that form reviewed by the Chairs of the
17  college at that meeting?
18    A.  Yes.  It was submitted at that meeting and
19  reviewed by the Chairs, and it was voted upon, as I
20  recall, to be utilized in the process for change of
21  grades in cases where students, you know, professors
22  left.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
Case 1:06-cv-00565-GMS Document 43-5 Filed 09/25/2007 Page 7 of 59
SECOND DAY, WEDNESDAY, FEBRUARY 15, 2006

17 (Pages 65 to 68)

**65**

1    Q.  Do you know whether the Chairs were
2  actually sent out -- I mean, directed that they were
3  to adopt this within their departments, this
4  protocol?
5    A.  Yes.  We voted upon it at that meeting.
6  We -- we had already established that we would adopt
7  it.  It was a question then of the form, itself, the
8  completion of the form.
9      I believe Dr. Huff and some of his
10  committee members developed the form at that time.
11  And, then, we submitted the form to all the Chairs.
12  All the Chairs received it.  All the Chairs
13  understood it.  All of the ones who were there
14  present.
15    Q.  Now, let me make it clear.  I'm not --
16  there's no suggestion, there's nothing in the
17  Statement of Charges, about failure to follow these
18  processes?
19    A.  Right.
20    Q.  At -- at most, this was a protocol that
21  was being discussed in the Fall of 2003, and going
22  into the Spring of 2004?

**66**

1    A.  Exactly.
2    Q.  My only two points are that the Chairs did
3  discuss that process and the importance, particularly
4  with adjunct faculty, of having such a process to
5  avoid problems when they left the university.  And I
6  think that had been under discussion for more than a
7  year among the Chairs of the department, too,
8  correct?
9    A.  Yes.
10    Q.  And that by that point the Committee had
11  developed a form?
12    A.  Right.
13    Q.  That the Chairs had seen that was
14  available for any Chair to use?
15    A.  That's what it got developed for.
16    Q.  And that was all in place going into the
17  Fall of 2003 semester?
18    A.  Right.
19    Q.  So any Chair in your school -- in your
20  college, had -- understood the issue and had a form
21  available to use whether or not you made it policy
22  and required them to do it at that time?

**67**

1    A.  Sure.  They were in on the discussions.
2  They were -- there were discussions regarding it
3  initially, as to the need for it and why, you know, a
4  number of issues.
5      And, then, there were other subsequent
6  discussions regarding that process.
7    DR. ACKAH:  I think we ought to
8  discuss the level of the Chairs.  This is the first
9  time I'm seeing this.
10    MR. DUSTON:  And the reason why I
11  prefaced that is because I know that this -- I have
12  no idea how many of you had ever seen this or had it
13  discussed with your Chairs.
14    DR. GWANMESIA:  I've never seen this
15  before.
16    MR. DUSTON:  And with the, you know,
17  split between the two departments last year, I don't
18  want to make that the issue, whether or not this
19  actually got implemented down to the instructor
20  level, or went past the Chairs.
21    Dr. Gorum is defending his conduct as
22  a Chair, and the powers of the Chairs, and I think

**68**

1  that the relevance of the discussion of the
2  importance of resolving this to avoid problems with
3  adjuncts leaving this college, is a Chair
4  responsibility to, you know, to anticipate and deal
5  with those issues.
6      And I wanted that background as part
7  of Dean Frederick's background in dealing with the
8  goal of the Chairs.
9    MR. ZEFF:  We're in agreement that
10  what you just described is not the policy?
11    MR. DUSTON:  I --
12    MR. ZEFF:  And it's not the procedure?
13    MR. DUSTON:  No.  As far as -- this
14  procedure actually would -- if it was implemented and
15  required in the College of Arts and Sciences, would
16  have required the Chairs to in turn insure the
17  professors do this.  And this was discussed and
18  agreed upon as a form in August of 2003.
19      I have not seen a directive and have
20  not produced one that says, Chairs shall do this as a
21  matter of College Arts and Science policy.
22  BY MR. DUSTON:

165

1    Q.  Yeah, let's know what they are.  Can you
2  describe them for me?
3        What are they?
4    A.  For letter grade change?
5    Q.  Letter grade changes.
6    A.  There's a missing grade form -- change
7  form, that exists.  There are procedures in the
8  catalog and in the University's process that exist.
9  Change of Grade Request form to change a letter
10  grade.  And there's a Supplemental Grade Change form
11  that's available.
12        Those are the ones that I'm familiar
13  with right now.
14    Q.  Have you seen any others?
15    A.  There might be others, but I can't tell
16  you sitting right here now every Grade Change Form in
17  the University process.  When it occurs I look it up,
18  I review it and I go to it and systematically review
19  it on the basis of what it says there.
20    Q.  Just so we're clear, I'm not asking about
21  that.  I want to know every document that describes
22  the policy and procedure, and that's what you've just

166

1  given me?
2    A.  Every document?
3    Q.  Yes.
4    A.  I can't give you every document on this
5  campus or any campus, every document.
6    Q.  Are there any other documents that we --
7  that you haven't talked about?
8        I've asked --
9    A.  No.
10    Q.  I've asked the university for every
11  document that exists that describes the policies.
12    A.  Right.
13    Q.  And the documents that you've just
14  described are the ones they've given me.
15    A.  Those are the ones that I'm familiar with.
16  I didn't talk about any others.
17    Q.  And you would know?  As the Dean, you
18  would know what those documents are?  If there are
19  others that existed, you would know about them?
20    A.  I know that these exist, and those are the
21  ones that I follow.
22    Q.  You mentioned that at Council Chair

167

1  meetings --
2    A.  Yes.
3    Q.  -- you always mentioned grade changes.  At
4  every meeting?
5    A.  At a meeting of the deans, that's a common
6  theme.  That's what I said, and I maintain that.
7    Q.  So we'd expect to see in the notes from
8  those meetings --
9    A.  Not necessarily because sometimes
10  secretaries get the notes and sometimes they miss
11  some notes.  They wouldn't necessarily put every
12  grade -- every statement that I make in the notes.
13    Q.  It's an important statement, though, isn't
14  it?
15    A.  It's important but it's said so much that
16  every Chair on the campus in Arts and Sciences is
17  fully aware of it and they all know that it exists,
18  and they know that it's a common practice and it's a
19  common theme within the College of Arts and Sciences
20  and has been.
21    Q.  Do you think you'd agree with -- are there
22  any documents that exist that show that --

168

1    A.  The Minutes you have.
2    Q.  -- any documents that exist to show that
3  Dr. Gorum has seen any of the Minutes or documents
4  that you have propagated that relates to changes?
5    A.  Why would there be any notes to show that
6  Dr. Gorum saw the Minutes when he was a Chair?
7        He was supposed to be --
8    Q.  Was he at the meeting?
9    A.  He should have been at the meeting.  It's
10  his job.  That's what he gets paid for.  There are
11  six credit hours worth of time.  It's his
12  responsibility.
13    Q.  You don't know why he wasn't there.  So if
14  he had been at the meeting, he would have known that
15  there were changes and he'd still have his job?
16    A.  If he were at the meeting, he would know.
17    Q.  If he had gone to this meeting and heard
18  about these changes --
19    A.  No, not this meeting.  At ten or fifteen
20  meetings.
21    Q.  Okay.
22    A.  Every meeting just about in the College of

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
Case 1:06-cv-00565-GMS Document 43-5 SECOND DAY Filed 09/25/2007 Page 9 of 59

32 (Pages 125 to 128)

125

1    DR. ACKAH: We are ready, yes.
2    MR. ZEFF: Thank you.
3         CROSS-EXAMINATION
4    BY MR. ZEFF:
5    Q. Good afternoon.
6    **A. Good afternoon.**
7    Q. My name is Gregg Zeff. We've met before.
8    I'm here on behalf of Dr. Gorum. I have some
9    questions for you.
10        Are you aware that the University has
11   stipulated that Dr. Gorum's motives behind what he
12   did here is irrelevant to this matter?
13   **A. They're not relevant?**
14   Q. Yes.
15        DR. ACKAH: Can you repeat that,
16   please.
17   BY MR. ZEFF:
18   Q. Are you aware that the University has
19   asked that there be a stipulation that Dr. Gorum's
20   motivation behind his activities that we're here
21   about is irrelevant to this matter?
22   **A. No, I'm not aware of it.**

126

1         MR. DUSTON: I don't believe that
2    that's the accuracy of the Stipulation, Gregg, but go
3    ahead.
4         MR. ZEFF: Well, perhaps -- let me ask
5    that it be corrected, then. What -- in the beginning
6    -- in the opening statement it was stated --
7         MR. DUSTON: It was stated that we
8    have no intention of offering evidence on motives,
9    and do not think it is necessary that the Committee
10   examine Dr. Gorum's motives.
11        And we've said that if Dr. Gorum
12   chooses to put in evidence of his rationale or
13   defense or his motives behind these grade changes,
14   then, we would reserve our right to come back and
15   look at those issues, but our focus is on the
16   decision to change another instructor's grades
17   without consultation with that instructor regardless
18   of whether it was a good or a bad motive.
19        So from that standpoint, we don't
20   think it's relevant to and necessary for the
21   Committee to decide that.
22        DR. ACKAH: Okay. So in simpler

127

1    terms, what Zeff is saying is exactly what your --
2    it's the sum of what you say. So what he said is
3    true.
4         THE WITNESS: And you asked if I was
5    aware or not?
6    BY MR. ZEFF:
7    Q. Yes. Do you believe that Dr. Gorum's
8    motivation for what he did play any part in these
9    proceedings?
10   **A. I don't care really or desire or have any**
11   **intention of trying to decide on what Dr. Gorum's**
12   **motivation is or was or wasn't.**
13   Q. And is it your position that in making
14   your determination that he should be terminated, that
15   his motivation behind making these grade changes
16   played no part in your decision?
17   **A. You saw what I wrote.**
18   Q. Answer my question.
19   **A. His motivation.**
20   Q. Yes, his motivation. Why he did what he
21   did, what he was thinking, why he was doing it, did
22   that play any part at all in your decision to

128

1    terminate -- or recommend termination?
2    **A. The question -- I can't answer that it**
3    **made any difference. What he did and the magnitude**
4    **of what he did did play a part in my decision to**
5    **write the letter.**
6    Q. You're saying his actions played a part?
7    **A. Exactly.**
8    Q. I want to know whether or not his state of
9    mind, what he was thinking, why he changed these
10   grades, why he submitted these forms --
11   **A. Because I asked him that question and he**
12   **refused to answer me.**
13   Q. He refused to answer?
14   **A. Right. In the proceedings he did not**
15   **answer that.**
16   Q. So is it your testimony that there should
17   be notes or testimony from another individual that
18   you asked him what his motivation was for taking the
19   actions he did?
20   **A. If you read the notes from Mark Farley,**
21   **you will find that I did ask that question, why did**
22   **he change the grades. In fact, that was the first**

**129**

1  question I asked, why did he change -- what basis did
2  he have for changing those grades.
3     Q.  And didn't Dr. Gorum tell you that he had
4  a right to change them?
5     A.  That's his opinion.
6     Q.  And that was his opinion.  But did you ask
7  him why he changed the grades, not whether he had a
8  right to --
9     A.  Sure I asked him why he changed the
10  grades.
11     Q.  And he never gave you an explanation?
12     A.  Not based on -- not to my satisfaction.
13     Q.  What was his explanation?
14     A.  I don't have that information in front of
15  me.
16     Q.  No.  No.  I'm not asking you what someone
17  else wrote down.  I'm asking what you remember what
18  his explanation was, why he did it?
19     A.  Why he changed grades?
20     Q.  Yes.
21     A.  He said -- he told -- based on my
22  understanding, based on the information that I

**130**

1  received when I asked the question, he indicated that
2  he changed the grades because he felt that he had a
3  right to do so, and that this was common practice at
4  the University.  That's what he said.
5     Q.  That was his answer as to why procedurally
6  he changed the grades.  Did he or you at any time
7  have any substantive conversation -- do you know what
8  I mean by substantive, what reason did you change
9  this student's grade or that student's grade?
10     Did you ever ask him that?
11     A.  I asked him that in that hearing.
12     Q.  Okay.  And tell me -- can you tell me what
13  his answer was as to any student?
14     A.  The answer that I just gave you.
15     Q.  He had a right.  So he just said, I have a
16  right.
17     A.  He said, I had the right to change the
18  grade and that's the procedure that he's always
19  followed.
20     Q.  He never told you why he changed any
21  particular student's grade?
22     A.  I don't recall him telling me why.  If he

**131**

1  did tell me why, I have no idea as to why he -- you
2  know, in various comments related to the proceedings,
3  he said that the professor was not here.  He could
4  not get in touch with the professor.
5     Q.  Again, that's procedure.
6     A.  Well, that's what --
7     Q.  Did he, then, tell you anything about why
8  he changed any specific student's grade?
9     A.  I don't recall him telling me anything
10  other than what I just told you.
11     Q.  And that wouldn't matter to you, would it,
12  what his motivation or why he changed the grade?
13     What you were concerned about was the
14  fact that he had violated procedure; is that true?
15     A.  That's true.
16     Q.  Okay.  And if it's irrelevant to you as to
17  what Dr. Gorum's intent behind what he was doing is,
18  you believe that regardless of his motivation,
19  whether he was right or wrong, the procedure he
20  employed in doing so violated policy of this
21  University to such a degree that he deserves to be
22  terminated?

**132**

1     MR. ACKAH:  Dean Frederick, don't
2  answer that now.
3     Can you reframe that, it's not clear.
4     MR. ZEFF:  Sure.  I would be glad to.
5     MR. ACKAH:  Make it very clear.
6  BY MR. ZEFF:
7     Q.  That regardless of Dr. Gorum's intent, why
8  he was doing this, whether he was motivated by good
9  reasons or bad reasons, the fact that he violated
10  these procedures is the reason he's being terminated?
11     A.  Systematically violated.
12     Q.  Systematically violated.
13     A.  Over and over and over.
14     Q.  Even if --
15     A.  Professor after professor.
16     Q.  Even if he was doing so because he had
17  good intentions, he should still be terminated?
18     A.  Yes.
19     Q.  So you're telling me and this Committee
20  that even if he was acting because the students had
21  been violated, had their academic rights violated, if
22  the grades should have been changed, if they deserve

185

1  Office will accept signatures of instructors, or
2  signatures of Deans without the signature --
3  instructors or Chairs without the signature of a dean
4  where a grade change was made within a certain
5  deadline before the next semester. And that violates
6  policy.
7      MR. DUSTON: We have -- yes, we are
8  stipulating, and we said this morning that based upon
9  comments made by various people that there has been a
10  longstanding practice which several members of the
11  Committee said was a longstanding understanding, it
12  was still in effect last January, that for up to
13  three weeks after the end of a semester -- I mean
14  after the start of the second semester, and for that
15  entire period, an instructor could go to the
16  Registrar's Office and correct or change his own
17  letter grades that had been submitted that prior
18  Fall.
19      DR. GWANMESIA: Okay. But after that
20  --
21      MR. DUSTON: And, then, that's -- and
22  that practice is contrary to what the catalog

186

1  suggests -- says, which is, that once you are into
2  the next semester, you must use the form and you must
3  get the Dean's signature.
4      So that is where practice and
5  understanding of the instructors and professors and
6  the practice of the Registrar's Office in accepting
7  those is contrary to catalog. It's a longstanding
8  practice for the instructors on grades. After that
9  point, there will be two things that we do we
10  disagree with.
11      I don't know what the testimony will
12  be regarding the Registrar's Office or the Assistant
13  Registrar accepting other people's signatures,
14  Chairs' signatures but not instructors.
15      The University's position is that if
16  they did that, that was never authorized and it has
17  never been accepted that any one other than an
18  instructor can change his or her own grade. And the
19  Dean's position is that beyond that three-week period
20  actually, always urged Dean approval, and that it is
21  absolutely required even for an instructor's own
22  grade change after that three-week period and

187

1  required the new procedure.
2      DR. DAVIS: Well, I think after the
3  three-week period the same process would apply, even
4  if you need all the signatures, Chairs, Deans and the
5  Provost.
6      MR. DUSTON: Provost is only when you
7  get beyond that semester.
8      DR. DAVIS: Right.
9      MR. DUSTON: Provost -- if you get
10  beyond --
11      DR. DAVIS: After the three weeks.
12      MR. DUSTON: No, actually, if you're
13  dealing with Fall, 2003 grade change, or Spring, 2004
14  it's only a Dean's signature, Chair and Dean, under
15  the procedure.
16      Once you get beyond that semester,
17  then, the Provost is required.
18      DR. DAVIS: Oh, okay.
19      MR. DUSTON: So in the period we're
20  talking about, Spring, 2004, it would be Chair, Dean,
21  unless by past practice it was the instructor himself
22  changing in between semesters for those first three

188

1  weeks.
2      MR. ZEFF: And it's our position, and
3  there will be testimony that the Assistant Registrar
4  would accept a Chair's signature in lieu of the
5  instructor's signature in that first three weeks.
6      MR. DUSTON: And assuming that
7  happened, and if there is testimony that the
8  Assistant Registrar did that, and certainly it is
9  clear in this case that the Assistant Registrar did
10  accept those papers from Dr. Gorum, did input those
11  changes, did not send those back. There's no
12  question that happened.
13      She made lots of changes. She
14  retroactively registered people. She did lots of
15  things that Mr. Parker says were unacceptable in
16  light of the policy.
17      But in those situations, we will
18  challenge whether there's ever any evidence that any
19  Dean or Vice President or Provost or President
20  authorized the Registrar to do that, or authorized
21  the Chairs to do that without Dean approval.
22      DR. GWANMESIA: Has the Assistant

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.

Case 1:06-cv-00565-GMS    Document 49-5    Filed 09/26/2007    Page 12 of 59

55 (Pages 217 to 220)

217

1    A. -- he already had a C in the course. The
2    student has an accident, breaks his neck --
3        Q. Right.
4        A. -- the professor doesn't know when that
5    accident has happened. The professor doesn't know
6    the student is coming. He feels that the student has
7    just missed the final exam. And the student later
8    shows up with evidence that, you know, in this time
9    frame his neck was broken, he was in the hospital,
10   the medical records.
11       He'll bring that into the professor.
12   Some students have been allowed to retake the final
13   exam and a grade be submitted for the student by the
14   professor. In those cases it's approved, yes.
15       Q. And that's an exception?
16       A. Yes, and that's the only exception that we
17   -- would be followed. I mean, that's the only one I
18   know of.
19       Q. And that's because it wouldn't be fair to
20   the other students to allow someone to come back
21   after the fact and make up work, right?
22       A. Yes.

218

1        Q. Okay.
2        DR. ACKAH: And that just happened.
3    It just happened. I've had one, this one was
4    surgery.
5        DR. GWANMESIA: I think it's also a
6    matter of fairness to the other students, that no
7    student can come after assigned grades and say, can I
8    do extra work. It must be something that justifies
9    that.
10       We all -- I mean, something happens.
11   If you are coming to school and you have an accident,
12   that's a good reason for a professor to make that
13   particular exception.
14       But without that, to be fair to the
15   other students you cannot come after the exam and
16   say, well, can I do some extra work so I upgrade.
17   You can't do that.
18       MR. ZEFF: Can you turn in your black
19   binder to Gorum 55.
20   BY MR. ZEFF:
21       Q. Is that your signature?
22       A. Yes, it is.

219

1        Q. Did you approve of Sherod Oliphant coming
2    back and completing a special assignment to change
3    his grade from a D to a C after the fact?
4        A. I signed this document, yes.
5        Q. And he wasn't injured or ill in any way at
6    the time -- in the Fall of 2003 when he received the
7    D, was he?
8        A. As I recall there was a special
9    circumstance with this particular student. I don't
10   know all of the information on it right now, but when
11   it was presented to me, it was of that category and
12   of that nature that we just discussed.
13       Q. That he was injured or hurt --
14       A. No. No. Not necessarily injured --
15       Q. -- sick?
16       A. -- or hurt, but with a special
17   circumstance in regard to that particular student.
18       Q. What special circumstance?
19       A. As I said, I don't -- I can't recall
20   exactly what it was right at this moment. But I do
21   recall it was a situation that occurred with this
22   student. This student may have been on a --

220

1        MR. DUSTON: Dean Frederick, this is
2    --
3        MR. ZEFF: You can help him then.
4        MR. DUSTON: Is this the one DeWayne
5    Wickham testified about yesterday?
6        MR. ZEFF: Yes.
7        DR. GWANMESIA: Okay. What did he
8    say.
9        MR. ZEFF: DeWayne Wickham.
10       MR. DUSTON: Okay. Remember this is
11   -- DeWayne Wickham yesterday testified --
12       DR. GWANMESIA: About this?
13       MR. DUSTON: About this --
14       MR. ZEFF: About this.
15       MR. DUSTON: About this situation, and
16   he testified -- and he claimed yesterday it was Mr.
17   Ameche, and the document is that it's Mr. Oliphant --
18       MR. ZEFF: You asked him if it might
19   be Mr. Ameche and he said, no, I thought it was Mr.
20   Oliphant.
21       MR. DUSTON: Yes. That there were --
22   for those who weren't present, there were two

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
Case 1:06-cv-00565-GMS Document 46-35 Filed 09/25/2007 Page 13 of 59

38 (Pages 149 to 152)

**149**

1  in the meeting he had with you that he did talk to
2  you about these grade changes?
3  　　A.  I'm not aware of it, but if he stated it,
4  he stated it.
5  　　Q.  Do you remember at the meeting you had
6  with him on March 2nd, that Dr. Gorum did say, what's
7  this all about, I talked to you about these changes.
8  　　A.  No, I don't --
9  　　Q.  You told me to make the changes.
10  　　A.  He may have said that, but he lied.
11  　　Q.  He lied.  I see.  And you will state here
12  unequivocally --
13  　　A.  Yes.
14  　　Q.  -- that Dr. Gorum is a liar?
15  　　A.  I will state that I did not talk to Dr.
16  Gorum about the grade changes.  If he said that, yes,
17  he's a liar.
18  　　Q.  I see.  And --
19  　　DR. ACKAH:  What does it mean, he's a
20  liar if he said it --
21  　　THE WITNESS:  If he said it --
22  　　DR. ACKAH:  -- and especially if he

**150**

1  didn't say it.
2  　　THE WITNESS:  I'm not saying he's --
3  BY MR. ZEFF:
4  　　Q.  Your testimony --
5  　　A.  I'm just saying he lied if he said I said
6  that.  I'm sorry.
7  　　DR. ACKAH:  If he said it.
8  BY MR. ZEFF:
9  　　Q.  Did Dr. Gorum talk to you about changing
10  Dr. Dawkins' grades?
11  　　A.  Dr. -- no.
12  　　Q.  Mr. Dawkins, I'm sorry.
13  　　A.  No.
14  　　Q.  Did Dr. Gorum talk to you about the fact
15  that Dr. -- that Mr. Dawkins didn't have a contract?
16  　　A.  Yes.
17  　　Q.  Something had to be done about changing
18  his grades 'cause he was not under contract?
19  　　A.  He talked to me about Dawkins' contract.
20  　　Q.  Didn't he talk to you about changing
21  grades in the same conversation?
22  　　A.  Of course not.

**151**

1  　　Q.  Did he talk to you about the fact that --
2  　　A.  That's ridiculous because Dawkins was on
3  the campus.
4  　　Q.  Not under contract though, was he?
5  　　A.  Dawkins was in the classroom teaching a
6  class, under contract or not under contract, he was
7  here.
8  　　Q.  If Mr. Dawkins testified that he came the
9  first day of class --
10  　　A.  Right.
11  　　Q.  -- and was dismissed because he didn't
12  have a contract --
13  　　A.  He was dismissed by Dr. Gorum.  He came to
14  the campus.  He went into the classroom to teach the
15  course.  Dawkins had authorization from me to go into
16  the classroom and to teach that course.  Gorum knew
17  that.  He's well aware of that.
18  　　And the only thing that had occurred
19  was, prior to that process Dr. Gorum was supposed to
20  clear the contract for the man and he hadn't cleared
21  it.
22  　　So Dawkins was in the classroom.  I

**152**

1  was under the assumption that Dawkins' contract had
2  been cleared.  I found out later that it hadn't been.
3  Gorum asked him to leave, and he left.  But he was
4  here.  He was on the campus.  There was no reason
5  that Doctor -- for Dr. Gorum to change Dawkins'
6  grades because Dawkins could have changed them
7  himself.
8  　　So you can't tell me that a guy is
9  standing there and you're telling him to go back
10  home, but I can't find you to find out what grades
11  you gave to the students the semester before.  That's
12  ridiculous.
13  　　Q.  You just said something and I want to make
14  sure I understood it right, okay?
15  　　A.  Yeah.  Okay.
16  　　Q.  You said you were under the assumption
17  that Mr. Dawkins' contract situation had been cleared
18  up.
19  　　A.  When we started the paperwork for faculty
20  members, it's no different than what we are doing
21  right now.  The adjunct faculty contracts --
22  　　Q.  I'm not asking you for procedure.  I'm

## INTRODUCTION

This is a report of the Ad Hoc Committee (Gorum Ad Hoc Dismissal Committee) which was formed jointly by Delaware State University (DSU) and the DSU Chapter of the Association of University Professors (AAUP) in accordance with Article 10.4.6a to hold hearing in the matter of Dr. Wendell Gorum, former Chair of the Mass Communications Department, who has been charged with violating section 10.4.3. a, d, e (see details below) of the Collective Bargaining Agreement (CBA). According to the DSU allegation, these charges ensued from violation of university policies by Dr. Gorum, in submitting change of grades, removal of incomplete and missing grade forms for forty-eight (48) Mass Communications students between the period 5/19/03 and 1/08/04 (see attached statement of charges). The University alleges that Dr. Gorum changed the grades of students in courses taught by seven (7) faculty of the Department of Mass Communications without their permission or approval.

## BACK GROUND OF VIOLATIONS

The background of the alleged violations by Dr. Gorum is systematically outlined in the brief prepared by Mr. Robert Dutson, the DSU counsel, which to a large extent has been paraphrased in this section. Delaware State University alleges that following a routine verification of eligibility requirements for NCAA Certification or compliance of Delaware State University (DSU) athletes, in early January, 2003, Ms. Kim Walker, Associate Director of Athletics for Compliance discovered that Mr. Marques Grant, a Mass Communication student's grade had been changed from a "W" to a "B" in CRN:15333, *Sound Production I*. Ms. Walker reported the matter to Mr. Glenn Parker, the DSU Registrar, who initiated an audit of all grade changes submitted in Fall semester, 2003. Mr. Parker found that Dr. Gorum had submitted 21 grade changes for the fall 2003 semester for courses in which he was not the instructor-of-record, and that many of the changes affected the student's academic, or graduation standing. Upon contact, the six (6) instructors-of-record denied knowledge of the grade changes and also denied giving Dr. Gorum permission to make the changes in their classes. Further audit by Mr. Parker, uncovered additional grade changes by Dr. Gorum for prior semesters. According to DSU, the investigation which included interviews with nine of the students whose grades had been changed, revealed that change of grades, removal of incomplete and missing

1

DSU-02456

Filippo Toscano Ph.D. (Associate Professor, English Foreign Languages; *Associate Chair*)

Gabriel D. Gwanmesia Ph.D (Professor, Physics & Pre-Engineering)

Lapointe Davis Ph.D. (Professor, Music and Visual and Performing Arts)

Edward Jackson Ph.D. (Professor, English Foreign Languages)

## HEARING

The hearing, including presentation of all witnesses by the University and Dr. Gorum was completed in seven sittings:

- August 30, 2004
- August 31, 2004
- September 28, 2004
- September 29, 2004
- October 27, 2004
- October 28, 2004
- October 29, 2004

All hearings took place in the MBNA building at DSU. Each session lasted from about 8 a.m to 4:30 pm with a one hour break at about noon. Dr. Wendell Gorum was represented by Mr. Gregg L. Zeff, attorney with Greg and Zeff in Philadelphia, while Mr. Robert Duston, of Schmeltzer, Aptaker & Shepard, and PC in Washington DC was counsel for Delaware State University. In accordance with the CBA, "verbatim recording of all testimonies" was taken by Ms. Tanya M. Congo, a Notary and Certified Professional Reporter. Although Dr. Gorum opted for a public hearing, apart from those listed above and the committee members, no outside person attended any of the hearings.

## DOCUMENTARY EVIDENCE AND WITNESSES

Both DSU and Dr. Wendell Gorum presented an extensive assortment of documentary evidence to the committee in support of their positions. In addition to Dr. Gorum's personal testimony, the committee heard testimony from a total of seventeen (17) witnesses – eight (8) for the university and nine (9) for Dr. Gorum, as outlined below.

4

B0104

DSU-02459

## DID DSU POLICIES DIFFER FROM PRACTICES AND PROCEDURES FOR STUDENT GRADE ADJUSTMENTS?

Notwithstanding the reprehensible actions of Dr. Gorum as outlined above, the committee was quite troubled and disappointed by the indirect role of former DSU administration in creating an atmosphere of pervasive laxity, lack of rule enforcement, and the absence of accountability at all levels that perpetuated and encouraged random and uncontrolled manipulations of student grades.

The chaotic state of practices and procedures for changing student grades at DSU was clearly summed up by Mr. Glenn Parker, DSU registrar who testified that on a scale of one to ten regarding procedures and practices at the Registrar's office, he would rank DSU as a five, based on his prior experience at other academic institutions (Trans 8/30/04, pg 139). According to Dr. Johnny Tolliver, former Provost and Vice President of Academic Affairs, when for example students were inappropriately purged from the system, chairs were allowed to evaluate their course work and assign grades. He emphatically stated in reference to Dr. Tommy Frederick, "... *as far as I know was allowing – this when I was Provost- he was allowing chairs in the College of Arts and sciences to do the same.*" (Trans 10/27/04). Depending on a particular Chair's relationship with the staff in the Office of Records, in some instances he or she would go directly to the Record's Office and make grade changes without signatures from the Dean or the Vice President (Trans 10/27/04 pg 199).

There are several examples of inconsistencies in the administration's response to student academic problems and issues. For example, although not the covert "official policy", the administration often gave permission to some students to be given "special" assignments to improve their grades. Upon cross examination by counsel Zeff, Dr. Kenneth Bell, Former Acting Provost indicated that "*that would have been acceptable to me*" if Dr. Frederick had given Dr. Gorum permission to change Dr Osei-Mensah's grades. On the contrary, Dr. Sessoms in response to the same question said "Dean's *can't instruct somebody to change somebody else's grade*". It is quite obvious to this committee that there is a pervasive lack of consensus on how to react to any given situation regarding student grade problems.

14

DSU-02469

o. Dr. Gorum's actions violated the rights of students to a fair and impartial evaluation in the educational process.

p. This Committee is convinced that DSU university administration engaged in practices and procedures that encouraged and promoted inappropriate manipulation of student grades.

q. Although DSU has established policies regarding student grade change, practices and procedures were in such significant conflict with these policies as to render them ineffective.

## COMMITTEE'S RECOMMENDATIONS

1. The committee resolves that although Dr Gorum's unprofessional behavior is highly reprehensible, we do not recommend outright dismissal. We base our decision on the premise that the administration at Delaware State University, prior to Dr Sessoms term, had failed to stringently enforce accountability and violations of professional conduct, and thus created a climate within which several unit members violated university professional ethics. But for the grave, *outright misrepresentation on signatures* on forms submitted to the Registrar's office, some of the charges against Dr Gorum were endemic at DSU, and some sectors of the administration either by commission or omission participated in it. We strongly feel that Dr Gorum's case is the tip of the iceberg, and he is, in fact, the scapegoat (albeit a blamable scapegoat) whose investigation we hope has uprooted the roots of the poisonous tree and brought down all the poisonous fruits. We hope so!

   We must emphasize that this is not to condone Dr Gorum's conduct. We believe he deserves a severe sanction but short of dismissal.

2. The committee joins the University's decision to relieve Dr Gorum of his position as chair. We join in this decision because we do not agree with Dr Gorum that he acted

18

B0106

DSU-02473



**DELAWARE STATE UNIVERSITY**
**Dover, Delaware 19901**

PRESIDENT

COPY
CONFIDENTIAL

March 5, 2004

Dr. Wendell Gorum — *certified to home address and campus*
Chair, Mass Communications
Delaware State University
1200 North Dupont Highway
Dover, Delaware 19901

Dear Dr. Gorum,

I have been apprised of the allegation that you changed the grades of multiple students (as outlined in the attached Statement of Charges) contrary to the policies outlined in our catalogue and the practices established and reiterated by Dean Thomas Frederick. Further, I am aware that you (with an AAUP representative) met with Dr. Frederick on March 2, 2004 to and with Dr. Kenneth Bell, Provost, on March 5, 2004, to response to these allegations.

I understand that you do not deny changing these grades but assert that Dr. Frederick verbally authorized them. Alternatively, you suggest that past practice provided you the authority to change a grade when the teacher was not returning – at least one of these instructors did return and has informed Dr. Bell that he gave no permission for a grade change. Dr. Frederick denies giving you such authorization and has recommended termination of your employment.

These grade changes have caused immediate and substantial harm to the University, faculty, students, and our athletic program. I expect that further harm will ensue. Your actions have clearly and substantially reduce your ability to discharge your duties. As such, I have elected to terminate your employment. Further information about your grade changes is still coming in but it is clear that we have sufficient basis to assert that there is Cause for termination. At this point, you may elect to resign, accept dismissal, or agree to a hearing before an Ad Hoc Dismissal Committee within ten (10) days.

In the mean time, I am suspending your employment with pay pending your decision as outlined above. Please remove your possessions from the University and do not return to the campus unless invited to do so. This decision must be submitted to me by 4:30 PM on March 15, 2004.

Sincerely,

Allen Sessoms

cc: AAUP President  *certified to campus*
    Mark Farley
    Dr. Kenneth Bell  *hand delivered*

DEPOSITION
EXHIBIT
Sessoms
6/28/07
PENGAD 800-631-6989

Allen Sessoms, Ph.D.

43

1    talking about suspending Dr. Gorum, you said you

2    believed it was April, 2004.  Does this refresh your

3    recollection as to when it was?

4        A.    Yes.  March, 2004.

5        Q.    And did you have any discussions with Dr. Bell

6    about what should be done with Dr. Gorum?

7        A.    There were recommendations to me.  They weren't

8    discussions.

9        Q.    Who made recommendations to you?

10       A.    Dr. Bell.

11       Q.    Anybody else?

12       A.    Not that I'm aware.

13       Q.    Did Dr. Frederick make any recommendations to

14   you?

15       A.    I didn't speak to Dr. Frederick about this

16   matter.

17       Q.    Did you speak to Dr. Frederick at any time about

18   Dr. Gorum's grade changes?

19       A.    No.

20       Q.    If Dr. Frederick said that you did speak to him

21   about --

22       A.    His recollection is different than mine.  I

23   don't recall.

24       Q.    In the process of going through something like

HEARING IN RE: DELAWARE STATE UNIVERSITY V. WENDELL GORUM, PH.D.
CONDUCTED ON TUESDAY, SEPTEMBER 28, 2004

53 (Pages 209 to 212)

209

1  classes. Yeah, he told me about that.
2      Q.  And did he ever discuss with you that he
3  wanted to discipline Osei-Mensah, get him out of the
4  classroom?
5      **A.  He did talk about, I think, wanting to get**
6  **him out of the classroom, to the best of my**
7  **recollection.**
8      Q.  And was it your recommendation that he
9  just wait until the end of the semester and just not
10  re-hire him?
11      **A.  I don't specifically recall that, but I**
12  **certainly, if he was having problems with him, I**
13  **would certainly recommend that he not re-hire him as**
14  **an adjunct.**
15      Q.  Now, there was some discussion about what
16  you would do if an instructor, an adjunct was not
17  available to change a grade during that semester.  If
18  an adjunct is not re-hired and has no contract for
19  the next semester, are they allowed to teach or be in
20  a classroom at Delaware State without a contract?
21      **A.  They should not be.**
22      Q.  Are they allowed to take any official

210

1  action as instructor or teacher that next semester,
2  if they don't have a contract?
3      **A.  Any official action?**
4      Q.  Any official action.
5      **A.  No.**
6      Q.  Are they allowed to go in and change
7  grades if they don't have a contract?
8      **A.  No.**
9          DR. GWANMESIA:  Clarify that.  If --
10          DR. ACKAH:  If he taught the class?
11          DR. GWANMESIA:  If they taught the
12  class --
13          THE WITNESS:  If they taught the class
14  they can, of course, change the grade.
15  BY MR. ZEFF:
16      Q.  The next semester, when they don't have a
17  contract?
18          DR. GWANMESIA:  If somebody leaves the
19  school, the student doesn't lose the grade because
20  they don't have a contract, if they don't have a
21  contract.
22  BY MR. ZEFF:

211

1      Q.  Are you aware of any situations where
2  instructors have been teaching courses without a
3  contract?
4      **A.  I've heard of situations.  I'm not**
5  **familiar with any, no.**
6      Q.  That's not common though, is it?
7      **A.  No.**
8          DR. ACKAH:  It happens.  I taught a
9  course --
10          MR. ZEFF:  You're a full-time faculty
11  member though.  I'm talking about adjuncts now.
12          DR. ACKAH:  Okay.
13  BY MR. ZEFF:
14      Q.  Are you aware of a current situation where
15  a Chair was or may be disciplined as a result of
16  allowing an adjunct to teach without a contract?
17      **A.  No.**
18      Q.  If Dean Frederick orally gave Dr. Gorum
19  permission to change Osei-Mensah's grades, would that
20  have been a violation of -- by Dr. Gorum?
21      **A.  If Dean Frederick and Dr. Gorum reached an**
22  **agreement to change the grade --**

212

1      Q.  Yes.
2      **A.  -- and they could not reach Dr.**
3  **Osei-Mensah, that would have been acceptable by me.**
4      Q.  If Dean Frederick --
5          DR. GWANMESIA:  Could I just --
6          MR. ZEFF:  Sure.
7          DR. GWANMESIA:  Could they do that
8  without any official document that has, you know,
9  justification?  Could they just verbally agree on the
10  change of grade?  I think that's what --
11          MR. ZEFF:  That was my next follow-up.
12          THE WITNESS:  Oh, they would have to
13  work out a procedure by which they would arrive at a
14  grade.  Which may mean that they need to review some
15  documents or whatever they need to do.
16          DR. GWANMESIA:  But would there be an
17  official Change of Grade Form that each of them would
18  sign that's in the file or can they verbally agree
19  that we can change the grade?  We found, you know,
20  reasonable reason to --
21          THE WITNESS:  No.  I'd look for
22  documentation, be it a letter explaining how they did

Allen Sessoms, Ph.D.

77

1   believe the committee has somewhat selectively cited

2   evidence that is not reflective of the policies of DSU

3   under past administrations."  What did you mean by that?

4       A.   I meant that there is a lot of innuendo in this

5   place and lot of rumor about favors.  When I arrived,

6   the only indications I got from faculty was that

7   Dr. DeLauder had favors.  He did favors for people, not

8   to mention people were treated unfairly.  And if

9   somebody did something wrong and they were a friend of

10  Dr. DeLauder's they got away it.  If they were his

11  enemies, they got punished.  That's what people were

12  saying.  They gave no evidence, no specifics, never

13  named a name.  So that's what I meant.  Rumor, innuendo,

14  it's something that happens in academics all the time.

15      Q.   Had you read the brief of the university's

16  attorney as it related to evidence of past practice?

17      A.   I looked at it, yeah.

18      Q.   And what was your understanding of what the

19  allegations relating to past practice were and what the

20  university's position was?

21      A.   The allegations were that the university didn't

22  follow its own rules and the answer of the university,

23  in general, did follow its rules.

24      Q.   Were you aware, based on that allegation, of

Allen Sessoms, Ph.D.

77

78

1    what testimony or evidence was supported to demonstrate

2    that the university was not following its own rules?

3       A.    I have no idea.

4       Q.    Were you aware that the former Provost Tolliver

5    stated the rules were not being followed?

6               MR. DUSTON:  Objection to form.  Objection

7    to the characterization of the testimony.  You can

8    answer.

9               THE WITNESS:  I don't know anything about

10   former Provost Tolliver.  I never met him.  I don't know

11   anything about him.

12              (Sessoms Exhibit No. 4, Post Hearing Brief,

13   was marked for identification.)

14              (Thereupon, a brief recess was had.)

15   BY MR. ZEFF:

16      Q.    I have handed you Sessoms 4 Bates stamped 3690

17   through 3711.  And it is Wendell Gorum's post hearing

18   brief.  Have you ever seen this document before?

19      A.    I don't recall this document.

20      Q.    I wanted to ask you a few questions about some

21   of the information contained in here.  And it's cited to

22   the transcript.  If you would like, I have the

23   transcript as well here.  Starting with Page 4, Number

24   4, it discusses some of Joyce Bowers' testimony.  Joyce

Allen Sessoms, Ph.D.

80

1    A.   No.

2    Q.   Were you aware that there were problems with

3   purges and registration that were going on in 2003?

4    A.   Yes.

5    Q.   Did you know what it was that the deans and the

6   chairs of departments were doing to rectify the purge

7   problem?

8    A.   No.

9    Q.   Were you aware that Dr. King stated that the

10  Dean Frederick knew that chairs were signing grade

11  change forms without his --

12          MR. DUSTON:  Objection.  Finish.

13  BY MR. ZEFF:

14    Q.   --  without his signature?

15          MR. DUSTON:  Objection to the form and

16  mischaracterizes the testimony.

17          THE WITNESS:  I'm not aware of anything that

18  Dr. King said.

19  BY MR. ZEFF:

20    Q.   Are you aware of anything that Dr. Tolliver

21  said?

22    A.   No.

23    Q.   Are you aware of anything that Dr. Frederick

24  said?

1 A. No.

2 Q. Are you aware of anything that Dr. Gorum said?

3 A. No.

4 Q. I may have gone through this before, but as to

5 Mr. Morris, correct me if I'm wrong, you had no

6 involvement regarding his discipline or whether or not

7 he came back to campus, was expelled, suspended or

8 anything like that?

9 A. No.

10 Q. The answer is, no, you did not?

11 A. No, I did not.

12 Q. Thank you.

13  MR. ZEFF:  I don't have anything else.

14 Thank you.

15  MR. DUSTON:  No further questions.  Read and

16 sign.

17  (Thereupon, the deposition concluded at

18 12:00 p.m.)

19   - - - -

INDEX TO TESTIMONY  PAGE

20 ALLEN SESSMS, Ph.D  2
  Examination by Mr. Zeff
   - - - -

21  INDEX TO EXHIBITS  PAGE

22 SESSOMS DEPOSITION EXHIBIT NO.

23 Sessoms Exhibit No. 3, Letter to Wendell  42
Gorum Dated March 5, 2004

24 Sessoms Exhibit No. 4, Post Hearing Brief  78

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

42

1    A.  And under the circumstances, he was suspended
2  with pay.  And he had certain rights and privileges
3  under that suspension.  He then chose to invoke his
4  rights to have an Ad Hoc Appeals Committee visit the
5  entire process.  And that Ad Hoc Appeals Committee was
6  invoked and met for an enormous amount of time.
7        I believe then six months later, I said this
8  has gone on for a very long period of time.  It is
9  anticipated that these issues would be resolved in two
10  or three months.  This has gone on for more than six.
11  So your suspension with pay is now changed to a
12  suspension without pay.  I think that was six months
13  later, something like that.  And then the process drug
14  on for another six months or so and came to its
15  conclusion.
16    Q.  Let me show you what we will mark as Sessoms 3.
17  I would like to keep going consecutively with the
18  exhibits.  It's Bates stamped 6304 through 6306.
19        (Sessoms Exhibit No. 3, Letter to Wendell
20  Gorum Dated March 5, 2004, was marked for
21  identification.)
22  BY MR. ZEFF:
23    Q.  I have handed you what we have marked as Sessoms
24  3.  It's dated March 5, 2004.  The letter you were

43

1  talking about suspending Dr. Gorum, you said you
2  believed it was April, 2004.  Does this refresh your
3  recollection as to when it was?
4    A.  Yes.  March, 2004.
5    Q.  And did you have any discussions with Dr. Bell
6  about what should be done with Dr. Gorum?
7    A.  There were recommendations to me.  They weren't
8  discussions.
9    Q.  Who made recommendations to you?
10    A.  Dr. Bell.
11    Q.  Anybody else?
12    A.  Not that I'm aware.
13    Q.  Did Dr. Frederick make any recommendations to
14  you?
15    A.  I didn't speak to Dr. Frederick about this
16  matter.
17    Q.  Did you speak to Dr. Frederick at any time about
18  Dr. Gorum's grade changes?
19    A.  No.
20    Q.  If Dr. Frederick said that you did speak to him
21  about --
22    A.  His recollection is different than mine.  I
23  don't recall.
24    Q.  In the process of going through something like

44

1  this, would you, in the normal course, speak to the dean
2  of the professor?
3    A.  Not during an investigation.  When there is an
4  investigation, I absent myself from the process.
5    Q.  And that would be your policy?
6    A.  Yes.
7    Q.  Why is that?
8    A.  Because I'm not going to interfere with anybody
9  else's investigation.
10    Q.  So it would be against your policy then to talk
11  to Dean Frederick in regard to this?
12    A.  If it came up inadvertently, maybe.  But I don't
13  recall any conversation with anyone about this process
14  except occasional discussions with the board and with
15  Mr. Farley and then the initial discussion with the
16  registrar and Kim Walker about what they discovered.
17    Q.  And Dr. Bell?
18    A.  And Dr. Bell.  That was not an initial
19  discussion.  Dr. Bell was informed when I was informed.
20    Q.  Did Dr. Bell have a recommendation?
21    A.  I don't recall.  He may have.
22    Q.  How many times did you talk to Dr. Bell, if you
23  can recall?
24    A.  I talk to Ken about two or three times a week.

45

1  Sometimes once a day.  And I do not recall any
2  discussions with Dr. Bell.
3    Q.  Or how many times?
4    A.  I don't know.
5    Q.  How about the board, how many times did you talk
6  to the board about this?
7    A.  When we discovered there was an issue, the board
8  was informed that we had this problem.  The board was
9  informed of the process that we were going to have to go
10  through.  And the board was kept apprised of the
11  process, of the state of the process.
12    Q.  By whom?
13    A.  By me and by the counsel.  Mark Farley and I
14  briefed the Board.  And I can't remember who briefed
15  what in executive session.  Probably mostly Mark Farley
16  did the briefing because it's a legal matter.
17    Q.  The information to the board was simply an
18  investigation was going forward?
19    A.  The nature of the investigation, that there were
20  these grade changes, that there might be implications
21  beyond just the grade changes.  There was this process
22  that we put in place that Dr. Gorum was, in fact,
23  suspended, that due process was being afforded and they
24  would be informed at the end of the process what the

12 (Pages 42 to 45)

B0114

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

---

30

1 a standing objection for the case and a standing limited
2 waiver.
3        MR. ZEFF: Understood. You are not going to
4 bother me while I'm questioning.
5        MR. DUSTON: I'm not going to bother you. I
6 wanted to get that on the table once.
7 BY MR. ZEFF:
8    Q. Was this 4/14/05 memo presented to you in
9 executive session or open session?
10   A. Executive session.
11   Q. Does the board have an attorney or counsel that
12 is regularly present with them when they meet?
13   A. Mark Farley is.
14   Q. He is the board's counsel?
15   A. He is vice president for human resources and
16 legislative affairs. He has a legal background. He is
17 not the board's counsel.
18   Q. Who is, if anyone, the board's counsel?
19   A. When we need counsel, we will designate counsel.
20   Q. Is there a specific firm or group of lawyers
21 that are designated to be counsel to the board?
22   A. Depending on what issues.
23   Q. So they are a group?
24   A. Yes.

---

31

1    Q. Or different lawyers for different issues?
2    A. Correct.
3    Q. But is there someone that is present at board
4 meetings, including executive sessions, that is counsel
5 to the board?
6    A. No.
7        MR. DUSTON: Gregg, it is the university's
8 position that Mark Farley serves that role on some
9 issues and on others he is wearing his hat as vice
10 president of human resources. And to the extent that
11 there is any dual role in this situation, the waiver
12 extends to his comments.
13 BY MR. ZEFF:
14   Q. So let me ask this. Tell me everything you can
15 recall about that executive session as it relates to
16 Wendell Gorum.
17   A. When we were presented with this document, and
18 as chair of the board, I asked the board to take
19 whatever amount of time they felt necessary to become
20 comfortable with the allegations, the findings of the Ad
21 Hoc Dismissal Committee, their recommendation and the
22 recommendation of the president. They took that time.
23 They were given the opportunity to ask questions of any
24 and all aspects that they felt uncomfortable or didn't

---

32

1 understand.
2        The findings were, I would say, pretty -- I
3 don't want to put words in the mouths of the other board
4 members, but we all felt that this was an extremely,
5 extremely serious issue. And the board's conclusions,
6 at the time of this and after it completed its
7 conversations with each other and with the president,
8 was prepared to support and affirm the recommendation of
9 the president to dismiss Dr. Gorum.
10        MR. DUSTON: Gregg, so there is no
11 confusion, it has been represented me that, in advance
12 of Dr. Smith, that a full copy of the findings and
13 conclusions were in some type of binder and given as
14 well as this letter. I have not seen that copy of it.
15 I am looking for a copy of it as it was given to the
16 board. That's not in documents. My understanding, it's
17 the same version we gave to the president.
18        MR. ZEFF: I will get there. But thank you.
19 BY MR. ZEFF:
20   Q. Can you tell me how long it was that the board
21 members were reviewing documents related to this matter
22 before --
23   A. It could have been 35, 45 minutes. It was an
24 extended period of time.

---

33

1    Q. Were there any questions before the documents
2 were reviewed?
3    A. I don't recall.
4    Q. Who was it that was present to answer questions
5 about this matter?
6    A. Dr. Sessoms and Mark Farley.
7    Q. Do you remember any of the questions?
8    A. Did they have any disagreements with the
9 findings of fact by the Ad Hoc Dismissal Committee? To
10 what extent did we believe these allegations and
11 findings were likely to bring home to the institution?
12 Those were some of the questions that were raised. And
13 I think most people were so incredulous that they were
14 asking how could this, how could someone do this and
15 place the institution in jeopardy as a consequence of
16 it?
17   Q. Did you have any questions yourself?
18   A. Were we satisfied that the ad hoc committee had
19 done a, what we call a, the appropriate diligence in
20 carrying out their investigation. We were not privy to
21 the proceedings of the Ad Hoc Dismissal Committee. So
22 we had to make some assumptions. And we all felt or
23 were comfortable that the members of the ad hoc
24 committee appropriately represented the interests of the

---

9  (Pa       B0115



**DELAWARE STATE UNIVERSITY**
**Dover, Delaware 19901**

PRESIDENT

CONFIDENTIAL

Date: 4/14/05

To:   Members of the Board of Trustees

From: Allen Sessoms _ALS_

Re:   Gorum, Ad Hoc Dismissal Committee Recommendation

Pursuant to section 10.4.14 of the Collective Bargaining Agreement between DSU and the AAUP, I am transmitting to the Board the recommendations I have received from the Ad Hoc Dismissal Committee regarding Dr. Wendell Gorum, a tenured faculty member who was formally Chair of the Department of Mass Communications. On March 5, 2004, I informed Dr. Gorum that he was being suspended and that I was recommending his termination. (Attached). Dr. Gorum elected to proceed with the Ad Hoc Dismissal Committee. Because of the extended period of this process, I changed the suspension to one without pay effective September 1, 2004. (Attached). My recommendation for termination is unchanged.

The issue before the Committee was whether or not there is "adequate cause" for dismissal under CBA § 10.4.2 and 10.4.3. Findings of Fact and recommended sanctions could be made by any three of the five members of the Ad Hoc Dismissal Committee.
The Ad Hoc Dismissal Committee conducted days of hearings between August and November 2004. The Committee then requested that a written transcript be prepared (at the University's expense), which consisted of more than 1800 pages of testimony. Dr. Gorum's counsel had requested the right to file post-hearing briefs, and the Committee agreed. These were received by the Committee February 2 and 4, 2005. The Committee completed its work and recommendations over Spring Break. The Administration has objected to the extended time this process has taken, and plans to review this process with the AAUP. However, the Administration recognizes that the Committee members have invested substantial time in this process, acting in good faith to ensure that the rights of Dr. Gorum and the University have been protected.

Under CBA § 10.4.14, the Board has the ultimate authority to terminate or otherwise discipline a unit member, and is to render its decision within 30 days of receipt of the Committee's recommendation. The CBA does not otherwise specify what information is to be transmitted to the Board, or the Board's standard of review. Copies of the post hearing briefs, from both parties, together with the findings and recommendations of the Committee are available for your review. In addition, the rest of the record (including the transcript and the exhibits) is available to review at the request of any Board Member. Please contact Mark

1200 NORTH DUPONT HIGHWAY
DOVER, DE 19901
(302) 857-6001
(302) 857-6003 (FAX)
WWW.DESU.EDU                                B0116

U-05852

Farley, Vice President for Human Resources, if you would like to review or receive a copy of any portion of the record.

Under the CBA the Board is to make an initial determination, based upon the findings and recommendations of the Committee and the record, whether or not dismissal is appropriate. Nothing in the CBA compels the Board to accept or defer to the findings or recommendations of the Ad Hoc Dismissal Committee. If the Board makes an initial decision in favor of dismissal, the Unit Member then has a right to a "hearing" in front of the Board. Under CBA § 10.4.14, which incorporates CBA § 9.2, such a hearing is merely oral argument by the Unit Member or his counsel, with no live testimony unless the Board chooses to hear it. If the Board's initial decision is to impose no sanction, or any sanction less than dismissal, there is no further hearing.

It was my personal opinion, upon learning of Dr. Gorum's alleged conduct, that the only appropriate sanction was dismissal. I feel even more strongly about that recommendation after reviewing the brief prepared by DSU's attorneys summarizing the evidence and testimony before the Committee. The Committee's findings of facts and conclusions are a strong indictment of Dr. Gorum's unprofessional conduct, which the Committee characterizes as "highly reprehensible." (Report, p. 18). The Committee found that the University more than met its burden of proof under the CBA that there is adequate cause for dismissal, because Dr. Gorum violated sections 10.4.3(a), (d) and (e) of the Collective Bargaining Agreement. Among the Committee's many findings were that Dr. Gorum knowingly misrepresented information on Change of Grade Forms, Removal of Incomplete forms and missing grade forms for 48 students; did so with the intent of misleading the Registrar's Office; did not obtain or attempt to obtain the permission of other faculty members or the Dean prior to changing grades in courses taught by other instructors; awarded grades to students in classes they had never attended; and violated the rights of other faculty. The Committee found no evidence to support Dr. Gorum's claim that he was acting only in the interests of students to respond to problems such as financial purges. Rather, the Committee concluded that "Dr. Gorum's true motive was to selectively help student-athletes to inappropriately meet NCAA requirements. This is highly unprofessional and unethical." (Report, p. 10 and p. 17, finding m). The Committee agreed with the University that "Dr. Gorum's actions undermine the very tenets of the educational profession and rise to a level deserving condemnation by the academic community." (Report, p. 17).

The Committee supports my decision to remove Dr. Gorum as Chair. The Committee also agrees with the University's legal position that Dr. Gorum can be disciplined or terminated as a Unit Member for actions he took as a Chair. The Committee concurs that a minimum sanction should be forfeiture of all back pay from September 1, 2004. Despite all of its findings and conclusions, the Committee is recommending to the Board that Dr. Gorum be reinstated to a teaching position with various restrictions, including a two-year probationary period. The apparent basis for this recommendation is the Committee's view that prior administrations may have engaged in practices and procedures that promoted inappropriate manipulation of student grades, and that Dr. Gorum should not be made a scapegoat.

B0117

DSU-05853

The assessment of an appropriate sanction is a decision for the Board.  While I respect the diligent work of the Committee, I strongly oppose the recommendation for reinstatement. The Brief of the University's attorney addresses the evidence of past practice.  I believe the Committee has somewhat selectively cited evidence that is not reflective of the policies of DSU under past administrations. If there are other professors who have engaged in similar conduct, those cases will be addressed.  But nothing in the allegations of past practice comes anywhere close to the reprehensible actions of Dr. Gorum.  Dismissal is the only appropriate sanction for such conduct.

B0118

DSU-05854

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

2

1    CLAIBORNE SMITH, Ph.D.,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    EXAMINATION
6    BY MR. ZEFF:
7    Q.  Good morning, Dr. Smith.  My name is Gregg Zeff.
8    I represent Wendell Gorum in a lawsuit that's been
9    brought against a number of individuals and parties
10   related to Delaware State University.  We are here today
11   for your deposition.  Have you ever been deposed before?
12   A.  Yes.
13   Q.  You've probably heard instructions.  Let me give
14   them to you on the record.  Everything we say today is
15   going to be taken down by a court reporter sitting to
16   your right and my left.  It's important that you give
17   verbal responses to my questions.  Shakes of the head,
18   hand gestures don't make it onto the record.  If you
19   need a break at any time, we will be glad to accommodate
20   you.
21       If you hear a question and you don't
22   understand it or you didn't hear part of it, please,
23   don't answer it.  Let me know and I will be glad to
24   rephrase it or repeat it so you do understand it.

3

1    Because ultimately what's going to be happen is that
2    there will be a transcript made of today's proceeding.
3    And it will be presented, possibly, to a jury in this
4    case if necessary.  Do you understand those
5    instructions?
6    A.  Uh-huh.
7    Q.  Everything you say here is under oath and will
8    be recorded and may be used before a jury.  Do you
9    understand that?
10   A.  Yes.
11   Q.  Is there any reason you couldn't understand and
12   answer my questions in a truthful manner?  Are you on
13   any kind of medication, any kind of illness, anything
14   that would prevent you from answering?
15   A.  No.
16   Q.  Can you tell me what your association with
17   Delaware State University is?
18   A.  I'm a member of the Board of Trustees and I'm
19   chair of the Board of Trustees.
20   Q.  How long have you been a member of the Board of
21   Trustees?
22   A.  I believe since 1987.
23   Q.  How did you become a member of the Board of
24   Trustees?

4

1    A.  I was appointed by then Governor Mike Castle.
2    Q.  How long have you been chairman of the board?
3    A.  I don't know exactly.  But I believe I was, I
4    became chair of the board two to three years after
5    joining the board.
6    Q.  Can you tell me a little bit about your
7    educational background?
8    A.  I have a high school diploma, Bachelor's of
9    Science Degree, Master of Science Degree in Chemistry
10   and a Ph.D. Degree from the University of Oregon in
11   Chemistry.
12   Q.  Did you ever attend Delaware State University?
13   A.  No.
14   Q.  What do you do for a living?
15   A.  I'm retired.
16   Q.  Before you were retired, what did you do?
17   A.  I worked for the DuPont Company.
18   Q.  In what capacity?
19   A.  Various capacities over a period of 35 years.  I
20   retired as Vice President For Technical and Professional
21   Development.
22   Q.  How is it that you got to be appointed to -- I
23   understand the governor appointed you, but was this a
24   position that you sought out or were you sought out for?

5

1    A.  No.
2    Q.  How did it come about?
3    A.  No, I did not seek out the position.  I had had,
4    at the time that I started to work for DuPont, an
5    association with Delaware State that was initiated by
6    one of my mentors at DuPont, who then had an association
7    with Delaware State.  It was then Delaware State
8    College.
9        And since I was a young scientist with a
10   degree in chemistry, he wanted to have me learn a bit
11   about the college and to get to know the chair of the
12   department of chemistry and forge an association with
13   students who might be majoring in chemistry.
14   Q.  And how did that come about?  What did you do?
15   A.  I made many visits to the campus, had a number
16   of discussions, both with faculty and students, to learn
17   a bit more about what was going on there and to provide
18   any assistance that I might be able to provide as a
19   scientist.
20   Q.  So you are more of a mentor or advisor to
21   students there?
22   A.  Yes.
23   Q.  Did you ever teach at Delaware State?
24   A.  No.

2 (Pages 2 to 5)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

34

1  institution as defined by the Collective Bargaining
2  Agreement.
3  Q.  You mentioned that you were not privy to the ad
4  hoc committee proceedings.  What did you mean by that?
5  A.  What they did, how they did it, who spoke to the
6  ad hoc committee, how many meetings they had, how long
7  they ran, what were the conversations with witnesses, et
8  cetera, we didn't get into all that.  We didn't think it
9  was appropriate for us to do so, particularly when
10  Dr. Gorum had the right to appeal the decision of the
11  president to the board.  So we certainly did not want to
12  have, you know, got to engaged in a lot of stuff before
13  and if that situation arose.
14  Q.  When you say you weren't privy to it, what do
15  you mean by that?
16  A.  We didn't ask for it nor did we get those
17  details.
18  Q.  Were you aware at the time, that is on 4/14/05,
19  that there was a transcript made of the ad hoc committee
20  hearings?
21  A.  I think that was implicit in the documents that
22  there were transcripts.
23  Q.  When you say implicit, what do you mean?
24  A.  Well, that if in fact the ad hoc committee

35

1  conducted hearings and had testimony, that some level of
2  records were being kept of that.
3  Q.  Were you provided a copy of the transcript?
4  A.  No.  We didn't ask for them.
5  Q.  Were you provided anything other than this memo
6  dated 4/14/05 with its attachments on that date?
7  A.  Other than that, what Mr. DUSTON just indicated,
8  that there was a report, a binder of the ad hoc
9  committee's work.  And that was, I believe, available to
10  the members of the board.  At least I saw that document.
11  Q.  Did you read it?
12  A.  Oh, yeah, sure.  Yes.
13  Q.  The entire part of the ad hoc committee?
14  A.  Yes.
15  Q.  And did you read it while you were sitting there
16  before you made any decisions or asked any questions?
17  A.  Yes, to the extent that we had time to go
18  through the various important details.  I didn't read
19  everything line by line, no.  But I did read the
20  findings of the Ad Hoc Dismissal Committee.
21  Q.  Did you read the recommendations of the Ad Hoc
22  Dismissal Committee?
23  A.  Yes.
24  Q.  And do you have a recall of any of the

36

1  recommendations of the document that you read that was
2  prepared by the ad hoc committee?
3  A.  Yes.  That they indicated this was a serious
4  issue and that it was an important -- let me put it this
5  way.  I don't recall the exact language.  But the ad hoc
6  committee indicated that Dr. Gorum did not deny the
7  allegations that inappropriate grade changes had been
8  made, and that they were asked that the finding or the
9  recommendation of the provost be taken into
10  consideration.  And part of their recommendations or
11  their recommendation was that Dr. Gorum be reduced from
12  chair of the board and reinstated as professor and be
13  placed on two years probation.  It was part of their
14  findings.
15  Q.  Did you have any discussions -- when I say you,
16  the board -- about whether or not the committee's
17  recommendations should be followed rather than the
18  president's?
19  A.  Oh, yeah.  I think the members of the board
20  talked about those recommendations.  And I think, to the
21  person, felt that the findings and the consequences of
22  those findings were of such a grave nature that their
23  recommendations didn't rise to the level of what was
24  appropriate under the circumstances.

37

1  Q.  Were there any board members that were in favor
2  of keeping Dr. Gorum as a faculty member?
3  A.  No, none.
4  MR. ZEFF:  Let me just mark Smith 2, the
5  report of the ad hoc committee hearing.  It is a 20-page
6  document with a four-page attachment to the end of it
7  which is the amended charges.
8  (Smith Exhibit No. 2, Report of the Ad Hoc
9  Committee Hearing, was marked for identification.)
10  MR. ZEFF:  If you want to take a few minutes
11  to look at it or not.
12  (Discussion off the record.)
13  (Thereupon, a brief recess was had.)
14  BY MR. ZEFF:
15  Q.  I've shown you a copy of the report of the ad
16  hoc committee, Exhibit 2.  Have you had a chance to
17  review that?
18  A.  Yes.
19  Q.  Have you ever seen that document before?
20  A.  Yes.
21  Q.  When did you first see that document?
22  A.  I believe I might have seen it before the board
23  meeting.  I can't recall exactly.  But certainly at the
24  board meeting this was available.

10  (Pages 34 to 37)

B0120

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

46

1    never raised as to what is the meaning of a scapegoat.
2        Q.   Did anyone at the board meeting with the
3    president in executive session ask the president whether
4    or not Dr. Gorum was being made a scapegoat?
5        A.   It may have been asked. I don't recall.
6        Q.   Do you recall whether there was any discussion
7    about Dr. Gorum being a scapegoat and what anyone said?
8        A.   The focus of the board, at that time, was on the
9    allegations and findings of the ad hoc committee. And
10   there was clearly, and as I recall, no appreciation of
11   any other tangential issues that would lead one to
12   embrace the terms "scapegoat."
13       Q.   Did you have an understanding at that executive
14   session of what the practices and procedures regarding
15   student grades and student grade changes were?
16       A.   Certainly we asked what the policy was. And we
17   were given a review of those policies. And it was in
18   conjunction with whether or not Dr. Gorum followed those
19   policies.
20       Q.   Who gave you that review of the policies? Who
21   told you what they were?
22       A.   The president and/or Mark Farley.
23       Q.   And what is your recall and understanding of
24   what those policies were?

47

1        A.   That there was a procedure by which a grade
2    could be changed with the appropriate engagement of the
3    faculty, the chair, the dean and the provost, and that
4    that was a policy that had long been in place.
5        Q.   Who told you that?
6        A.   Mark Farley and/or the president.
7        Q.   Did Mark Farley and/or the president tell the
8    board that there was a past practice of not following
9    that procedure?
10       A.   There were allegations that, in the past, some
11   of the procedures may not have been followed. And as
12   far as we could tell, they were only allegations.
13       Q.   And can you tell me what, if any, detail you
14   were given regarding those allegations, who made the
15   allegations, what facts there were to support the
16   allegations, if any?
17       A.   Those were part of an ongoing investigation.
18   And that was the extent of it.
19       Q.   Did the president or Mark Farley tell the board
20   that former Vice President Tolliver said that there was
21   a past practice of not following this policy?
22            MR. DUSTON: Objection to the form. But
23   answer if you know whether that was said to you.
24            THE WITNESS: It was not said to me, no.

48

1    BY MR. ZEFF:
2        Q.   Did anyone in this executive session, the
3    president or Mr. Farley, say that Dr. King had said that
4    there was a practice of not following the policy?
5        A.   I don't recall Dr. King's name being brought up
6    at all.
7        Q.   Did the president or Mr. Farley, in this
8    executive session, tell the board that persons from the
9    registrar's office had said there was a practice of
10   not following the policy?
11       A.   No one said that to me or to the board.
12       Q.   So was it your understanding, based on what the
13   president or Mr. Farley said to you, was that there was
14   an allegation that there was a custom or practice of not
15   following the policy but there was no proof presented to
16   you that there was any truth to that?
17       A.   That's correct.
18       Q.   Did the president or Mr. Farley inform you that
19   Dean Frederick called both Vice President Tolliver and
20   Dr. King liars related to that process?
21       A.   Never heard that.
22       Q.   Would that have been information that you would
23   have wanted to know at the time?
24       A.   That they were called a liar?

49

1        Q.   That Dean Frederick said that Dr. Tolliver and
2    Dr. King were lying relating to their contention that
3    there was a past practice at Delaware State of not
4    following the grade change policy as written.
5        A.   Would we have an interest in knowing that?
6        Q.   Yes.
7        A.   I don't know whether that would have been an
8    interest at the time or not. We were comfortable that
9    the present administration was committed to conducting
10   whatever investigation that was appropriate and to put
11   in place whatever was necessary to prevent or obviate
12   any future issues surrounding grade changes, whatever
13   weaknesses may have been in the policy and the
14   conformity to the policy would be, changes would be made
15   to ensure that this was not the case.
16       Q.   Were there any questions or comments, either
17   from the board or to the board in that executive
18   session, regarding what the policy was and that there
19   was anything wrong with the policy?
20       A.   What we were told is that a policy existed and
21   that it was the responsibility of the chairs and the
22   deans and the provost to carry out those policies.
23       Q.   Did anybody show you a copy of any written
24   policy?

13

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

54

1 Dr. Gorum's signature without anyone else's signature in
2 changing grades?
3    A. I don't recall the specific description or
4 findings associated with that.
5    Q. Was there any discussion about the ad hoc
6 committee's recommendations regarding changes in the
7 policies?
8    A. Say that again, please.
9    Q. Were there any discussions by either of the
10 board with Mr. Farley and/or the president regarding the
11 committee's, that is the ad hoc committee's
12 recommendations relating to grade policies and
13 practices?
14    A. I don't recall.
15    Q. Let me direct your attention to Page 18 of
16 Exhibit 2, the Letter Q. Actually, Letter P. It says,
17 "This committee is convinced that DSU University
18 administration engaged in practices and procedures that
19 encourage and promote inappropriate manipulation of
20 grades." Do you see that?
21    A. Yes.
22    Q. Was that discussed at all by the executive
23 committee with the president or Mr. Farley?
24    A. Certainly the question came up as to what this

56

1 appropriate checks and balances.
2    Q. And was that the subject of any questions?
3    A. Yes. What steps are being taken to remedy this
4 if, in fact, that was the case?
5    Q. What do you recall Mr. Farley or President
6 Sessoms saying in response to that?
7    A. That this is part of the ongoing investigation,
8 and changes, appropriate changes would be made if, in
9 fact, their findings were that there were problems with
10 either the understanding or the adherence of the policy
11 and procedures.
12    Q. Did you consider these, the findings by the ad
13 hoc committee, P and Q, to be serious matters?
14    A. Sure.
15    Q. Was this something that you would expect to be
16 kept informed of by the president of the university?
17    A. Yes.
18    Q. And it was your understanding, based on your
19 discussions with him at this executive committee meeting
20 in April '05, that there was further investigation going
21 into the grade policy, grade change policies and
22 practices of the university?
23    A. Yes.
24    Q. And since April of '05, have you received any

55

1 meant and what was the thrust of this comment about by
2 the ad hoc committee. And I don't recall the exact
3 response that we got to that other than to say that
4 whatever procedures or practices that may have been
5 subject to inappropriate interpretation was being
6 changed to ensure that everyone knew their roles and
7 responsibilities.
8    Q. Was it your understanding, based on what the
9 president and/or Mr. Farley told you at the executive
10 committee meeting, that there was something that was
11 going to be done to change the practice and procedures
12 related to how professors could or couldn't change
13 grades?
14    A. I don't recall.
15    Q. Let me turn your attention to the Letter Q,
16 which is the next one down. "Although DSU has
17 established policies regarding student grade changes,
18 practices and procedures were in such significant
19 conflict with these policies as to render them
20 ineffective." What is your understanding of what that
21 means?
22    A. That there were implications that there were
23 opportunities for people to do things by which there
24 were, there could be changes in grades made without the

57

1 reports of any kind from the president or his designee
2 relating to any of the practices or procedures or
3 investigation that was ongoing at that time?
4    A. That appropriate procedures and -- that
5 appropriate procedures are in place.
6    Q. Okay. Let me back up. It was your
7 understanding as of April of '05 that there was another
8 investigation going on into the practices and procedures
9 related to grade changes. Is that what the president or
10 Mr. Farley told you was going on?
11    A. That a continuing investigation was ongoing in
12 terms of --
13    Q. Has the president or his designee reported back
14 to you the results of that investigation?
15    A. I don't believe so.
16    Q. Since April, '05, has there been any report of
17 any kind from the president or his designee related to
18 any investigation into the practices and procedures
19 related to grade changes?
20    A. I don't believe there has been a formal report
21 of any type.
22    Q. Has there been any informal report?
23    A. I don't recall.
24    Q. If there was such an informal or formal report,

15 (Pages 54 to 57)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

62

1    the rules. If you are caught, you are punished, period.
2    Q.    Did you find -- and let me go on to Q, which is
3    the next one. It says, "Although DSU has established
4    policies regarding student grade change, practices and
5    procedures were in such significant conflict with those
6    policies as to render them ineffective."
7          Did you look at P and Q and consider those
8    in making your determination, recommendation --
9    A.    Yes.
10   Q.    -- that Dr. Gorum should be terminated?
11   A.    Absolutely.
12   Q.    Did you find those to be mitigating factors of
13   any kind?
14   A.    No.
15   Q.    Why not?
16   A.    You commit fraud, you commit fraud.
17   Q.    Well, what led you to the conclusion that
18   Dr. Gorum committed fraud?
19   A.    He admitted to committing fraud.
20   Q.    Then in what way did he admit to committing
21   fraud?
22   A.    He changed grades without authorization.
23   Q.    When did he admit to that?
24   A.    He said he didn't contest the fact that he

63

1    changed grades and he didn't have authorization.
2    Q.    Without whose authorization?
3    A.    Without the appropriate authorization in the
4    chain of command, without the dean's office, for
5    example. And Tommy Frederick said he did not have my
6    authorization.
7    Q.    Did you talk to Tommy Frederick --
8    A.    I did not talk to Tommy Frederick. I have his
9    statement.
10   Q.    Are you aware that Dr. Gorum contests that, that
11   is that he says he talked to Dr. Frederick?
12   A.    I also heard from the registrar the forms were
13   not executed appropriately.
14   Q.    When did you hear that?
15   A.    In the report.
16   Q.    So was it your opinion, at the time that you
17   made this decision, that Dr. Frederick was telling the
18   truth and Dr. Gorum was lying?
19   A.    It is my opinion and it remains my opinion that
20   any faculty member that changes grades inappropriately
21   does not belong at the university for whatever reason.
22   Q.    Inappropriate meaning what?
23   A.    Changing other people's grades without
24   consulting with them, in other words, calling their

64

1    faculty colleagues incompetent because why should you
2    believe that you gave a grade that's any good. I'm not
3    going to ask you. I'm going to change it. That's
4    fraud. Because there may be other inducements. I don't
5    know. But it's fraud.
6    Q.    Sitting here today, do you have a recall of any
7    of the reasons why Dr. Gorum stated that he changed any
8    of these grades?
9    A.    No. And it doesn't matter to me.
10   Q.    Why not?
11   A.    Because it's fraud. I murdered my wife because
12   she made me angry. I don't care. You murdered your
13   wife. What difference does it make? There are no
14   mitigating factors.
15   Q.    If Dr. Gorum was told to do it this way, that's
16   not a mitigating factor?
17   A.    If you are told to murder somebody and you kill
18   them, is that a mitigating factor?
19   Q.    And that's what you equate what Dr. Gorum did,
20   to that type of situation?
21   A.    It undermines entirety the integrity of the
22   institution.
23   Q.    Don't you think if the dean told him to do that
24   that the dean was doing something wrong too?

65

1    A.    The dean was doing something wrong too, but it
2    does not recuse Dr. Gorum from doing it.
3    Q.    Were you on notice, at any time, that there was
4    an allegation against he dean that he told Dr. Gorum to
5    do this and he told students that Dr. Gorum was going to
6    handle the grade change situation?
7    A.    All such allegations have been investigated and
8    proven not true.
9    Q.    Who investigated that allegation?
10   A.    All investigations have been investigated by the
11   office of counsel.
12   Q.    Which counsel, Mr. Farley?
13   A.    Yes.
14   Q.    Mr. Farley investigated whether or not --
15   A.    Mr. Farley investigated whatever there was to be
16   investigated. I didn't investigate anything.
17   Q.    Do you know whether Mr. Farley investigated
18   whether or not Dean Frederick did anything wrong with
19   regard to grade changes?
20   A.    Mr. Farley investigated all the circumstances
21   surrounding these events.
22   Q.    Did you ever talk to Mr. Farley?
23   A.    I did not talk to Mr. Farley. My conclusion is
24   if Mr. Farley were to have found a wrongdoing,

17 (Pages 62 to 65)

50

1  only pursue the violations by Dr. Gorum while neglecting
2  violations of other chairs and administrators and even
3  members of his office who had, in one way or another,
4  taken part in, condoned or assisted in the devaluation
5  of DSU educational system."
6      When you first red that a year ago or more,
7  did you do anything based on that sentence and that
8  information?
9      A.  That sentence is an assertion.  It doesn't
10  contain any specific information.  I didn't know what
11  they were talking about.
12      Q.  Did you feel it was important to find out what
13  they were talking about?
14      A.  We had and have an ongoing investigation into
15  allegations of grade changes and fraud in this
16  university.  It continues to this day.
17      Q.  Who is in charge of that investigation?
18      A.  Mr. Farley.
19      Q.  And, to your knowledge, who is being
20  investigated?
21      A.  I don't know who is being investigated.  It's an
22  investigation.  If there are allegations that people
23  have made against certain individuals, those allegations
24  are pursued.  But I'm not sure who those allegations are

1  investigations?
2      A.  My knowledge is that the investigations are
3  ongoing.  If there were determinations that were being
4  made, I presumed they would be brought to my attention.
5  Since they haven't been, the investigations, to my
6  knowledge, are ongoing.
7      Q.  So, to your knowledge, this investigation has
8  been going on since March of 2004?
9      A.  These investigations have been going on since it
10  was first brought to our attention.  And we are looking
11  at every allegation with great seriousness.
12      Q.  And let me point out to you, in March, 2004, you
13  suspended Dr. Gorum.  And so you had knowledge of the
14  allegations as of March, 2004, correct?
15      A.  I beg your pardon?
16      Q.  As of at least March --
17      A.  No.  When Dr. Gorum was suspended, we had
18  evidence.  We had indisputable evidence that, in fact,
19  he had changed grades.  We have clearly not gotten
20  indisputable evidence that anyone has changed grades or
21  they would have been treated exactly the same way.
22      Q.  To your knowledge, what is being investigated?
23      A.  I can't tell you more than what I just said.
24      Q.  Do you have knowledge of how the registrar's

51

1  against.  It's not my business.
2      Q.  When did that investigation first commence?
3      A.  Immediately upon my knowledge from Kim Walker
4  and Glenn Parker that there were grade changes.
5      Q.  So at the same time the investigation into
6  Dr. Gorum was commenced, an investigation generally into
7  grade changes --
8      A.  Into all grade changes.  Because we didn't know
9  when the grade changes originated, who made the grade
10  changes.  We had no idea.  So we investigated grade
11  changes.
12      Q.  Has Mr. Farley reported to you on the progress
13  of his investigations?
14      A.  Yes.
15      Q.  How often does he do that?
16      A.  When he has something to say.
17      Q.  What is the current status of that
18  investigation?
19      A.  Those investigations are ongoing.
20      Q.  Do you know what the current status is, how
21  close to completion of the investigation they are?
22      A.  I know that the investigation is ongoing.
23      Q.  Has anything been brought to your attention as
24  to any facts or information related to those

52

1  office operates?
2      A.  The registrar's office operates in very
3  complicated ways.  And I do not have detailed knowledge
4  about the registrar's office.  They report to the
5  provost.  We have made improvements in the reporting.
6  We have made improvements in software.  So, no, I do not
7  have detailed knowledge of how the registrar's office
8  operates.
9      Q.  When did this investigation into other persons
10  besides Dr. Gorum changing grades begin?
11      A.  When the investigation into Dr. Gorum changing
12  grades began.
13      Q.  So that would be sometime on or around March of
14  2004?
15      A.  That letter was written well into the
16  investigation when there was sufficient evidence to
17  demonstrate that Dr. Gorum had, in fact, changed grades.
18  That doesn't happen overnight.  The investigation had
19  been taking place for some time.  This was the first
20  concrete evidence that the grades had been changed by a
21  faculty member.  All the other evidence is not concrete
22  except in this case so far.  If we find other evidence
23  that is concrete, we will act exactly the same way.
24      Q.  Have you been made aware of any evidence

14  (Pages 50 to 53)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

54

1  relating to any other grade changes that were less than
2  appropriate other than Dr. Gorum?
3      A.  I do not market in rumor or innuendo.  I only
4  market in fact.  And there have been no facts brought to
5  my attention that there have been grade changes of other
6  faculty members of this nature.
7      Q.  So would it be fair to say then that the
8  investigation into faculty members, staff,
9  administration condoning or assisting in the changing of
10 grades outside of the standard policy and procedure has
11 been something that's been going on since before
12 March 5th of 2004?
13     A.  It's been going on since the issue was brought
14 to my attention by Miss Walker and the registrar
15 sometime prior to the time that letter was written.
16     Q.  The letter of March 5, 2004?
17     A.  Correct.
18     Q.  And what is taking so long?
19     A.  What took so long in Dr. Gorum's case?  One has
20 to be very careful to get the facts right because we're
21 dealing with reputations.  We are dealing with degrees.
22 We are dealing with certainties and uncertainties.  We
23 are dealing with a process which is transparent, which
24 is deliberate, which is defined in the Collective

55

1  Bargaining Agreement and in Professional Ethics and you
2  take your time.  Because once you come to a conclusion,
3  it's got to be definitive.
4      Q.  This investigation has been ongoing for over
5  three years?
6      A.  Yes.  It's a continuing investigation.
7      Q.  To your knowledge, has the investigation -- and
8  the investigation I'm talking about is into others
9  rather than Dr. Gorum.  Has the investigation yielded
10 any irregularities of any kind in the registrar's
11 office?
12     A.  I just gave you my answer.  Irregularities have
13 to be defined.  We have seen papers lost.  We have seen
14 forms not filled out completely, properly that had to go
15 back and be filled out properly.  We have not seen any
16 indications of fraud except in this case.
17     Q.  You just described some forms and papers that
18 were lost.
19     A.  Displaced.  We lose papers all the time.
20     Q.  How was that reported to you?
21     A.  It wasn't reported to me.  I was informed that
22 there are problems with some of the forms, that the
23 provost caught some of them that weren't signed
24 properly, sent them back to the dean.  You don't approve

56

1  the grade changes unless it's done correctly.  We
2  discussed this and other academic issues to try to
3  improve business processes.  This is a business process
4  improvement just like buying paper.  It's a business
5  process improvement just like ensuring that students can
6  get bills on time.  There is a business process.  This
7  is a business.  That's one of the aspects of business.
8          And we are improving the business process.
9  We have experts helping us improve the business process
10 across the board.  And this is just one of the business
11 processes that needs improvement.  We have to go from a
12 purely paper system to an electronic system.  There is a
13 reason for that.  You don't lose electronic files.
14 Sometimes you lose paper.  Inadvertence happens.  And we
15 are making sure inadvertence is not the norm.
16     Q.  Has someone involved with this investigation
17 come to you and said that there are forms that weren't
18 filled out properly and papers that have been lost?
19     A.  No, no one has said specifically here's some
20 forms that have been filled out improperly or here's
21 papers that have been lost.  They said there are some
22 issues down there.  We are cleaning them up.  Students
23 have lost grades.  We are cleaning them up.  I said,
24 okay, fine, fix it.

57

1      Q.  Getting back to this Page 15, this statement,
2  and correct me if I'm wrong, you have not spoken to
3  anyone about this particular investigation made in this
4  report?
5      A.  That's not even an allegation.  It says there
6  are other bad people around here.  Well, so.  Who am I
7  going to talk to about that?
8      Q.  Well, you could talk to the committee.
9      A.  I don't talk to the committee.  The committee
10 proves its report, period.  The committee has spoken.
11     Q.  You could ask Mr. Farley what was meant by this.
12     A.  Mr. Farley is not a member of the committee.
13     Q.  You could look at the transcript.
14     A.  I'm not interested in looking at the transcript.
15 The only thing I care about is the final report of the
16 committee.  I'm not interested in my interpretation of
17 what they said.  I'm interested in their interpretation.
18 In their interpretation, and I said, okay, we got to
19 follow up on all the allegations that were made.  But
20 those allegations were made well before a
21 year-and-a-half after the investigation was started.  We
22 started when we found out that there was a problem.  And
23 we are investigating those problems thoroughly.  This
24 assertion is a statement by whoever based on whatever

15 (Pages 54 to 57)

Kenneth Bell, Ph.D

3

1    you understand the instructions?

2        A.    Yes.

3        Q.    Can you tell me what your current position is?

4        A.    Interim provost and Vice President of Academic

5    Affairs at Delaware State University.

6        Q.    How long have you held those job titles?

7        A.    This time since April of '06.

8        Q.    What did you do before April of '06?

9        A.    I was Dean and Vice President For Agriculture

10    and Agricultural Research.

11        Q.    For what period of time?

12        A.    That time from August of '04, I believe.   I

13    believe.

14        Q.    Until April, '06?

15        A.    Right.

16        Q.    And before August, '04?

17        A.    I was Dean of the College of Agriculture and

18    Related Sciences.

19        Q.    For what period of time?

20        A.    That I can't tell you.   I know -- I don't know

21    how long that was.

22        Q.    Were you also either an interim or permanent

23    provost or dean sometime in the '03 time frame?

24        A.    Yes.   Yes.   From '02, right.

Kenneth Bell, Ph.D

4

1    Q.    From '02 to --

2    A.    '04 I was interim provost.

3    Q.    You were internum provost and vice president of

4    academic affairs?

5    A.    Yes.

6    Q.    And does the interim provost and vice president

7    do the same thing as a permanent vice president and

8    provost would do?

9    A.    You mean the same duties?

10    Q.    Same duties.

11    A.    Yes.

12    Q.    What are and were those duties?

13    A.    The provost and vice president of academic

14    affairs is the chief academic officer to oversee the

15    academic programs.

16    Q.    And as the chief academic officer, were part of

17    your job duties to supervise and deal with disciplinary

18    issues related to students?

19    A.    No.  That was the duties of the vice president

20    of student affairs.

21    Q.    Who was the vice president of student affairs in

22    2003, 2004?

23    A.    I believe that was Charles Smith.

24    Q.    And did Charles Smith report to the president or

Kenneth Bell, Ph.D

11

1    Frederick.  But I didn't ask him about that.

2        Q.    How did you know he had been in conversations

3    with Dean Frederick?

4        A.    Because he had told me that he had talked to

5    Dean Frederick.  And I knew that -- well, most of the

6    faculty talked to the dean.  But, at some point, I

7    remember him telling me that he talked to Dr. Frederick.

8        Q.    At some point you recall that Dr. Gorum told you

9    that he talked to Dean Frederick about the grade

10   changes?

11       A.    Yes.

12       Q.    And was this before Dr. Gorum had been

13   terminated, this conversation?

14       A.    Yes.

15       Q.    Did you tell anyone that Dr. Gorum believed he

16   had the authority to make the grade changes and that

17   Dr. Gorum had talked to Dean Frederick about them?

18       A.    I do not recall if I told Mr. Farley that he had

19   talked with him.  I did, as I said, tell Mr. Farley that

20   he had agreed to retire.

21       Q.    Did you tell anybody that it was Dr. Gorum's

22   position that he had talked to Dr. Frederick and

23   believed he had authority to make these grade changes?

24       A.    I don't recall if I did or not.

Kenneth Bell, Ph.D

12

1    Q.    Do you believe that that was an important

2    factor, that is that Dr. Gorum had talked to

3    Dr. Frederick about this?

4    A.    Certainly, as I indicated a while ago, that is a

5    part of the procedure.

6    Q.    And, to your knowledge, has Dr. Frederick ever

7    been investigated to determine whether or not he has

8    improperly used the grade change procedure?

9    A.    Oh, not that I'm aware of.

10   Q.    Would that be something that you would be made

11   aware of if it was going on?

12   A.    Might be, might not.

13   Q.    Since the investigation into Dr. Gorum, have you

14   participated in cabinet meetings with the president?

15   A.    With the present president?

16   Q.    Yes.

17   A.    Yes.

18   Q.    And have you heard in any discussions at any

19   cabinet meetings with the president anything about an

20   ongoing investigation into grade changes and the grade

21   change policy?

22   A.    Ask me the question again.

23   Q.    Okay.  In all of the cabinet meetings with the

24   president you have attended, have you ever heard any

87

1  after speaking with Ms. Arnell?

2      A.    I was in his office.  We called together.

3  He was calling to find out when could I have my

4  appointment with the president.

5      Q.    Was it on the speaker phone?

6      A.    No.  He was on the phone.

7      Q.    Okay.  So he told you what Ms. Arnell said?

8      A.    Yes.

9      Q.    All right.  And what was your purpose in

10  making an appointment or wanting to see Dr. Sessoms?

11      A.    To explain why I was being told I couldn't

12  return back to school in the fall when I was ordered by

13  Dr. DeLauder that I could.

14      Q.    Well, who told you before you went to make

15  an appointment with Dr. Sessoms that you couldn't return

16  to school in the fall?

17      A.    Okay.  Before I tried to make the

18  appointment with Dr. Sessoms, who told me that?

19      Q.    Yes.

20      A.    Okay.  I spoke to Coach Blacknall about

21  that, and that is when I found out I couldn't return to

22  school.

23      Q.    So Coach Blacknall is the first one that

24  told you?

## Declaration of William Torian

I, William Torian, being of age, do hereby affirm that I am a member of Zeta Rho Lambda Chapter of Alpha Phi Alpha Fraternity, Inc. I was the Chair of the 2004 Martin Luther King, Jr. Prayer Breakfast Committee with the responsibility of organizing the 20th Anniversary event. I recall that a mix up occurred in which Cecil Wilson said he had asked Dr. Allen Sessoms, President of Delaware State University, to speak at the Prayer Breakfast after Dr. Wendell Gorum, the Editor of the Program Booklet and the person responsible for booking the speaker for the breakfast, had already committed the fraternity to Dr. Ryle Bell, Associate Dean of Clinical Affairs at Howard University College of Dentistry. I was present when Cecil Wilson acknowledged the error and stated that he would rescind the offer to Dr. Sessoms. Dr. Gorum was also most responsible for requiring the rescinding of the invitation to Dr. Sessoms as a result of the error and by virtue of having the responsibility of selecting the speaker delegated to him.

_____        5 Sept 07
Signature                                              Date

B0131

Wendell Gorum, Ph.D.

48

1  order.

2          Anything else that -- I think we finished

3  Dr. Claussel.  And her knowledge is based upon this

4  conversation with Dr. Kopano?

5    A.    I think so, yeah.  The other thing involved

6  Claussel.  When Dr. Sessoms was a candidate for the

7  position, he was one of the three finalists who were

8  interviewed.  And I don't even remember my position on

9  the faculty.  I could have been parliamentarian or

10 something.  I don't remember.  And I used to be chair

11 of the promotion and tenure committee and then a

12 member, I was definitely a member at that time and the

13 student affairs committee.

14         Most of the university is run by

15 committees, faculty committees.  The faculty members

16 make all decisions regarding students.  And I

17 interviewed -- you know, I was part of the

18 interviewing process of all of the candidates and my

19 recommendation at the faculty senate was that the

20 search be reopened.

21         And what I received was that the

22 information got back to Sessoms and he was upset about

23 it.

24   Q.    Who provided you that information?  Was it

demand, but rather than deal with the truth, the office turned a blind eye. Dr. Johnny Tolliver also confirmed this practice. He testified that: *"The whole aim was to get students qualified for graduation"* (Trans. of 10/27/04 page 193) He further added, *"And in some cases where there was some controversy over some courses, we gave wide latitude in substituting courses so that students could meet graduation requirements"* (Trans. of 10/27/04)

In such an atmosphere of "subtle encouragement" to violate DSU procedures to meet graduation target or increase retention rate, it is not surprising that several individuals engaged in blatant, unprofessional and unethical conduct. As the committee has indicated, Dr. Gorum's case is only the "tip of the iceberg". This committee shudders to imagine the full extent of the iceberg that lies "submerged" or hidden!

## CONCLUSIONS:

a. DSU has proven by clear and convincing evidence that Dr. Wendell Gorum violated section 10.4.3 (a), (d) and (e) of the Collective Bargaining Agreement (CBA) between the board of Trustees of Delaware State University and the Delaware State University Chapter of the American Association of University Professors (AAUP).

b. Dr. Gorum submitted Change of Grade forms, Removal of Incomplete forms, and Missing Grade forms to all forty-eight (48) Mass communications students.

c. In all cases, Dr. Gorum misrepresented information on the form by signing as instructor for courses that he did not actually teach.

d. Dr. Gorum was aware that the Registrar's office would refuse any grade changes if he expressly stated that he was not the instructor-of-record or disclosed to the Registrar's office that he did not have the permission of the instructor-of record to change his or her grade.

16

B0133

DSU-02471

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

62

1  of the president.
2      Q.  The sentence refers to even members of his
3  office.
4          MR. DUSTON:  Does his refer to the
5  administration or Mr. Parker?
6          MR. ZEFF:  Mr. Parker.  That would be a fair
7  interpretation.  I apologize.
8  BY MR. ZEFF:
9      Q.  Did you ask Dr. Sessoms or Mr. Farley whether or
10  not Glenn Parker was subject to discipline or
11  investigation relating to grade changes?
12      A.  To the extent that any allegations were made
13  concerning members of the administration and faculty
14  were part of what would be an ongoing investigation.
15      Q.  And have you received any word, any notice of
16  any continuing investigation or outcome of any
17  investigation into grade changes since April of '05?
18      A.  There have been, as far as I can tell, no formal
19  report.
20      Q.  And that would be something that the board would
21  expect to be reported to about if there was, in fact,
22  there was such a report; wouldn't it?
23      A.  Certainly, if there were findings of anyone else
24  still at the institution who were engaged in

63

1  inappropriate practices.
2      Q.  Was there any discussion with President Sessoms
3  and Mr. Farley about whether or not the punishment to
4  Dr. Gorum should be mitigated by past practice?
5      A.  That the president's recommendation should be
6  mitigated?
7      Q.  Yes.
8      A.  Yes.
9      Q.  Tell me everything you recall about that.
10      A.  I don't know that I recall all the details of
11  that discussion.  I think it's fair to say that the
12  consensus of the members of the board, that this was
13  such an egregious breach of competence and confidence,
14  and it went so far as to place the university in real
15  jeopardy that it rose to the level that whatever past or
16  whatever mitigating circumstances were not, did not rise
17  to the level of diminishing the president's
18  recommendation.
19      Q.  Are there any documents or notes that were
20  generated during this executive session?
21      A.  None that I'm aware of.
22      Q.  Are there generally any minutes or notes or
23  documents that are produced from executive?
24      A.  Typically the minutes of executive session

64

1  states the topic of our discussion but not the details
2  of those discussions.
3      Q.  Earlier on we were going through what the
4  questions were that you asked for Dr. Sessoms and
5  Mr. Farley at the executive session.  I wanted to know,
6  have we covered all of the questions and answers that
7  you can recall?
8      A.  To the best of my knowledge, yes.
9      Q.  So there aren't any questions or answers that I
10  haven't asked you about and you haven't told me about
11  that you can recall sitting here today?
12      A.  (Witness indicating.)
13      Q.  There was one area that you did talk about that
14  you recalled questioning the president and Mr. Farley
15  about the due diligence or appropriate amount of
16  diligence that the ad hoc committee used in preparing
17  their report.  Can you tell me what you can recall about
18  that?
19      A.  That they were appropriately constituted
20  according to the CBA and that the appropriate time and
21  support was extended to them to conduct their
22  investigation and come to their findings.
23          MR. DUSTON:  I need a minute or two with my
24  client.

65

1          (Discussion off the record.)
2  BY MR. ZEFF:
3      Q.  After April 14, 2005, did you have any other
4  discussions or interaction relating to Dr. Gorum's
5  termination?
6      A.  None that I recall.
7          MR. DUSTON:  Prior to this lawsuit you mean?
8          MR. ZEFF:  No, involving counsel, of course.
9  BY MR. ZEFF:
10      Q.  And are there any other discussions or documents
11  related to Dr. Gorum that you are aware of that we
12  haven't already covered?
13      A.  No.
14          MR. ZEFF:  I don't have anything else.
15  Thank you.
16          MR. DUSTON:  I've got no further questions.
17  We will stipulate, for the record, that although we had
18  not gotten the formal notice out, Dr. Smith is being
19  produced pursuant to the Rule 30(b)6.  So the Federal
20  Rules of Civil Procedure as a representative of the
21  board and his comments and discussions can be taken as
22  his role of chair as a representative of the Board of
23  Trustees under Rule 30(b)6.  Certainly as to those
24  issues where he says he does not have personal knowledge

17  (Pages 62 to 65)
B0134

Wendell Gorum, Ph.D.

21

22

1    Q.    Dr. Aubrey, Dr. Harold Aubrey is former

2    director of the testing center.

3            Do you know where Dr. Aubrey is now

4    located?

5    A.    Bowie State University.

6    Q.    When was the last time you spoke to Dr. Aubrey?

7    A.    Christmas break, perhaps.

8    Q.    Have you spoken to him periodically since your

9    departure?

10   A.    No, not really.

11   Q.    What's your relationship with Dr. Aubrey?

12   A.    We were just colleagues.

13   Q.    You list Dr. Aubrey as having knowledge

14   regarding student and faculty evaluations.  Tell me

15   what you mean by that.

16   A.    Dr. Aubrey was the director of testing and he

17   was responsible for student evaluation of faculty

18   teaching and he has student evaluations of

19   Dr. Osei-Mensah's classroom teaching.

20   Q.    You say, "he has."  Does he still have those in

21   his possession?

22   A.    He has or had.

23   Q.    He had in his possession evaluations --

24   A.    I don't know whether he still has them or not.

y it

ter,

was

, has

t or

n?

you

 you

ell

ow is

Wendell Gorum, Ph.D.

2

1    A.    He thought, he felt there was intimidation and

2    that he was threatened.  He thought that his telephone

3    was tapped and it was all about assisting me in any

4    way.

5    Q.    All about assisting you?

6    A.    Providing information to me.

7    Q.    To you.  All right.  So let's go back to the

8    timing.

9              When did he have these conversations with

10   you?

11   A.    That was around Christmas, Christmastime when

12   he called.

13   Q.    Where is Dr. Aubrey residing?

14   A.    What?

15   Q.    Where does he live?

16   A.    In Maryland.  I don't know where, but he has

17   always maintained the same residence even when he was

18   teaching at Delaware State.

19   Q.    So Dr. Aubrey told you -- when did Dr. Aubrey

20   leave Delaware State and go to Bowie State?

21   A.    I don't know.  It was after I was gone.

22   Q.    So is he referring to currently or is he

23   referring to the time when he was at Delaware State

24   when he says he felt threatened and intimidation?

1   proceedings, did you ask Dr. Aubrey if he could find

2   these, find copies of these?

3       A.   Yes.

4       Q.   And he pulled them out and provided them to

5   you, correct?

6       A.   It was after the hearing was over actually.

7       Q.   So you now have copies of the documents that

8   Dr. Aubrey provided?

9       A.   Somewhere, yes.

10              MR. DUSTON:  Off the record.

11              (Discussion off the record.)

12  BY MR. DUSTON:

13      Q.   Any other information that Dr. Aubrey has other

14  than the fact that he gave you these evaluations and

15  whatever prompted him to make this phone call last

16  December and testimony regarding those areas?

17      A.   Boy, I just cannot recall anything else at thi

18  point.

19      Q.   In your prior testimony you mentioned at least

20  seven chairs who had reached out to you during those

21  dismissal proceedings with information to provide or

22  offers of support because at least in your mind they

23  had engaged in similar kinds of issues as chairs.

24      A.   Mm-hmm.



Wendell Gorum, Ph.D.

29

1    Q.   When was the last time you spoke to Dr. Austin?

2    A.   I really don't know.  It's been some time.

3    Q.   What information do you think Dr. Austin has

4 that's relevant to your claims?

5    A.   There were some grade changes that occurred and

6 he was involved in a similar situation as I was.

7    Q.   When you say, "involved in a similar

8 situation," was he --

9    A.   Well, yeah, he changed grades and he was not

10 challenged.

11    Q.   What was the nature of the grade changes that

12 you think is similar to your conduct?

13    A.   As a chair he changed grades of other

14 professors in the department.

15    Q.   During what time period?

16    A.   I couldn't tell you specifics.

17    Q.   Do you know if it was before or after President

18 Sessoms took over?

19    A.   Before.

20    Q.   Do you know how long before?

21    A.   No.

22    Q.   Do you know anything about the circumstances

23 under which he changed grades of other professors, in

24 other words, whether it was a formal grade challenge?

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

12 (Pages 45 to 48)

---

**45**

1  office, there are grades after grades after grades
2  where I sign them.
3      Q.   Were you aware --
4      A.   No.
5      Q.   -- that during the time period between the
6  time the grades were submitted in the previous -- in
7  the Fall semester, that there were Chairs signing the
8  instructor line and taking those directly to the
9  Registrar's Office and those being processed?
10     A.   No.  Things that don't -- that are not my
11  business, I don't deal with.  So if it is a procedure
12  that a Chair is supposed to be doing, and he or she
13  is supposed to go to the Records Office without my
14  intervention, I have too many -- too much work to do
15  to be running to see if Chairs are doing, you know,
16  those types of things when that's their job.
17         I don't know.  I don't.  I'm not aware
18  of that.  I don't --
19     Q.   Now, Dr. Frederick, were you aware that
20  Chairs, at least Dr. King and Dr. Gorum, if not
21  others, were signing --
22     A.   No.

---

**46**

1      Q.   -- signing Change of Grade Forms or other
2  forms on the instructor line of the form, without
3  indicating that it's on behalf of or for another
4  instructor, and submitting those to the Records
5  Office within the time period in which the Registrar
6  accepted change of grades from instructors?
7      A.   No.
8      Q.   Did you ever give Dr. King any verbal
9  authorization to just process grade changes, removal
10  of incompletes as Chair without signing off on them?
11     A.   No.
12     Q.   Are you aware of any discussion at any
13  meetings that you held as Dean with Dr. King or Dr.
14  Gorum at which that was ever considered to be an
15  approved practice?
16     A.   No.
17     Q.   Did you ever give Dr. King or Dr. Gorum
18  carte blanche to just resolve student problems and
19  with faculty members and just fill in the appropriate
20  paperwork?
21     A.   No.
22         DR. GWANMESIA:  Dr. Frederick, during

---

**47**

1  the testimony we received from Dr. Tolliver --
2         THE WITNESS:  Yes.
3         DR. GWANMESIA:  -- I'll paraphrase
4  some of it.  I just wrote down a number of things.  I
5  tried to write as much as I could.
6         He made a statement like latitude was
7  given to Chairs to change grades for students, and he
8  gave an example.  For example, adjuncts who might
9  have left with problem grades, for example.
10         He said -- he made another statement
11  that it was never required of Chairs to acquire
12  signature of Deans, et cetera.
13         He made the statement, Dean Frederick
14  was aware that we give latitude to Chairs, and said,
15  Dr. Frederick dealt with such cases when he was
16  Chair.
17         This is a statement that he made.
18  That you were aware that latitude was given to --
19  yeah, I wanted to see your reaction to that.
20         MR. ZEFF:  I'm sorry.  I didn't hear
21  your answer.
22         THE WITNESS:  I said, he lied.

---

**48**

1         DR. ACKAH:  Because I have the same --
2         DR. GWANMESIA:  Yeah, he --
3         DR. ACKAH:  -- he did say, Dr.
4  Frederick was aware of the latitude --
5         DR. GWANMESIA:  Given to the Chairs,
6  and he dealt with such cases when he was Chair,
7  himself.  These were the statements that he made to
8  us.  So I just wanted to ask what you have to say to
9  that?
10         DR. DAVIS:  He also said, if he didn't
11  know, he should have known.
12         MR. DUSTON:  I don't have my notes of
13  what he said when I cross-examined him 'cause I don't
14  --
15         DR. GWANMESIA:  I do have one of the
16  statements.  You asked him sometime -- he said --
17  what did he say -- letter grade changes require
18  Dean's and Provost's signature.
19         MR. DUSTON:  Right.  And I don't --
20  since I don't have those notes in front of me, I know
21  that Dr. Tolliver said all of that in his direct
22  testimony.  And, then, there were various statements

---

Allen Sessoms, Ph.D.

64

1  faculty colleagues incompetent because why should you

2  believe that you gave a grade that's any good.  I'm not

3  going to ask you.  I'm going to change it.  That's

4  fraud.  Because there may be other inducements.  I don't

5  know.  But it's fraud.

6    Q.    Sitting here today, do you have a recall of any

7  of the reasons why Dr. Gorum stated that he changed any

8  of these grades?

9    A.    No.  And it doesn't matter to me.

10   Q.    Why not?

11   A.    Because it's fraud.  I murdered my wife because

12  she made me angry.  I don't care.  You murdered your

13  wife.  What difference does it make?  There are no

14  mitigating factors.

15   Q.    If Dr. Gorum was told to do it this way, that's

16  not a mitigating factor?

17   A.    If you are told to murder somebody and you kill

18  them, is that a mitigating factor?

19   Q.    And that's what you equate what Dr. Gorum did,

20  to that type of situation?

21   A.    It undermines entirely the integrity of the

22  institution.

23   Q.    Don't you think if the dean told him to do that

24  that the dean was doing something wrong too?



# DELAWARE STATE UNIVERSITY

DEPARTMENT OF INTERCOLLEGIATE ATHLETICS

H
O
R
N
E
T
S

April 28, 2004

Dr. Tommy Frederick
FAR
Delaware State University
Campus

Dear Dr. Frederick:

This correspondence is to inform you of the sequence of events as well as the findings with regards to grade changes that occurred, with Delaware State University student-athletes, which were inconsistent with university policy. The students, whose grade changes were in question, when grades were returned to their original state, did not affect their eligibility. Thus, those student-athletes who were competing during the spring semester were eligible. Please note that all documents indicating changed grades were generated by an audit that was done by Mr. Glenn Parker, Registrar.

Thank you for your time and consideration of this matter. If you have any questions or require further information regarding this matter, please do not hesitate to contact me at extension 6038.

Sincerely,

Kim Walker
Associate Director of Athletics for Compliance

Cc:    Dr. Allen Sessoms, President
       Mr. Mark Farley, Vice President for Human Resources and Legislative Affairs

B0141

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6030 • FAX (302) 857-6034

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

70

1  recommendation?
2      A.  Yes.
3      Q.  Was there anyone else present other than
4  yourself and the board?
5      A.  Mark Farley.
6      Q.  Who answered the board's questions?
7      A.  We both did.
8      Q.  Do you recall Mark Farley addressing any issues
9  related to P, Q or the scapegoat topic?
10     A.  I don't recall those issues being addressed
11  specifically.
12     Q.  Do you recall any issues that were discussed in
13  the executive session?
14     A.  Yes.
15     Q.  Tell me what you can recall.
16     A.  Are we sure the grades were changed?  Did
17  Dr. Gorum admit to grade changes?  Why did he make the
18  changes?  No one has any answer why Dr. Gorum did the
19  grade change because no one was told why he did the
20  grade changes.  Is this action appropriate?  What would
21  happen at other universities had someone done this?
22  What are other universities' experiences in this regard,
23  those type.
24     Q.  How long were the questions and answers going on

71

1  for?
2      A.  Maybe half an hour, 45 minutes.
3      Q.  You mentioned the question was asked of you why
4  did Dr. Gorum make these changes.
5      A.  Uh-huh.
6      Q.  Did you respond to that question?
7      A.  Yeah.  I said I have no idea.
8      Q.  Prior to going in front of the board to discuss
9  that issue, did you ever ask anyone why Dr. Gorum or
10  what Dr. Gorum's reasons were?
11     A.  You know, the only person who could answer the
12  question is Dr. Gorum.  I didn't talk to him.
13     Q.  Why not?
14     A.  Because I didn't talk to him.  He was suspended.
15     Q.  Did you feel that as president of the
16  university, one who was making a recommendation, that it
17  would be appropriate to talk to him to find his version
18  of the story?
19     A.  If Dr. Gorum wished to present his version of
20  the story, he could have asked for an appointment with
21  me.
22     Q.  So it was up to Dr. Gorum to come to you to give
23  you his side of the story?
24     A.  If Dr. Gorum is being sanctioned and he thinks

72

1  it's unfair, the answer is absolutely, yes.
2      Q.  You don't feel it's appropriate for you to talk
3  to Dr. Gorum without him asking you first; he has to
4  come to you?
5      A.  I came with the evidence.  I sent Dr. Gorum a
6  not, you are suspended.  If he thought it was unfair, he
7  should have said that's unfair.  I want to talk to you
8  about it.  So I assume he thought it was fair.
9      Q.  In presenting this matter to the board, what
10  documents did you present to the board on April 14,
11  2005?
12     A.  The board had the report and I think access, if
13  they desired, to the whole transcript stuff and
14  everything else.
15     Q.  Do you know whether or not the whole transcript
16  and stuff was provided or whether they were just offered
17  access to it?
18     A.  Well, this is voluminous.  You are not going to
19  present a thousand pages to each board member.  They
20  were made aware they were there and they could have
21  access.
22     Q.  Did anyone ask for it?
23     A.  I'm not aware that if anybody asked for it.
24     Q.  If somebody asked for it, would that be

73

1  something you would remember?
2      A.  I don't know whether I would remember or not.
3      Q.  So the board was presented with your letter of
4  April 14, 2005, and the report of the ad hoc committee?
5      A.  Yes.
6      Q.  And, to your knowledge, nothing else?
7      A.  I didn't say that.  I said that's what they were
8  given and provided access, if they wanted, to the other
9  documentation.
10     Q.  I understand that.  But the documents they were
11  given were these two documents?
12     A.  Correct.
13     Q.  They were told if they wanted access to other
14  documents they could have them?
15     A.  Yes.  The other documents may have, in fact,
16  been in the room.  I don't know.
17     Q.  When you went to the board on April 14, 2005,
18  did you have an understanding of what Dr. Gorum's
19  reasons were for why he changed those grades?
20     A.  I answered that question before.  I have no idea
21  why Dr. Gorum changed the grades.
22     Q.  Did you have access to the same documents that
23  the board did?
24     A.  The only documents I chose to read, this one.

19 (Pages 70 to 73)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

34

1  A. And it's different for different divisions. I
2  was on Presidents Council for Division 2. The details
3  for Division 1 are different than the details for
4  Division 2, are different for details for Division 3,
5  and each of those divisions have 500-page books with the
6  details of those things spelled out.
7  So the presidents don't get involved in the
8  details. Those are for athletic directors and
9  compliance officers and lawyers and others. The
10  presidents just set the general tone.
11  Q. The Queens College -- and your service on that
12  committee were for what division?
13  A. 2.
14  Q. Delaware State is what division?
15  A. 1.
16  Q. Do you know whether there are different
17  reporting rules related to Division 1, 2 and 3?
18  A. Reporting rules are different. But they are
19  similar for 1 and 2 because of the scholarship issue.
20  If you are a non scholarship institution like Division
21  3, then the reporting requirements are very different.
22  Most of the issues related to scholarships and
23  recruiting. And that's why the book is so thick.
24  Q. Well, with regards to the reporting issues, I

35

1  guess my question is, when you heard -- by they way,
2  have you told me everything that Kim Walker and Glenn
3  Parker told you in that first meeting you had with them
4  about these issues?
5  A. Yes.
6  Q. At that time, did you have a concern that there
7  might be an NCAA infraction?
8  A. There is always a concern that there might be an
9  infraction when I'm told by the compliance officer that
10  there might be an infraction.
11  Q. My question is: At that time, at the time of
12  this first meeting, did you feel there was a duty on
13  behalf of Delaware State University to report that there
14  might be an infraction to the NCAA?
15  A. That is a requirement. You have to investigate
16  and say this is what happened. You don't say there
17  might be an infraction because they'll say go
18  investigate and tell me what you are talking about. So
19  what you do is you say I'm looking into it and see what
20  really happened. Then if there is some indication of
21  infraction, you report it.
22  Q. At what point, to your knowledge, did Delaware
23  State University have a duty to report to the NCAA that
24  there either was an infraction or there might be an

36

1  infraction?
2  A. When there is sufficient evidence that there
3  might be an infraction. An that's determined by the
4  compliance officer, not by the president.
5  Q. Kim Walker was the compliance officer?
6  A. Yes.
7  Q. Did Kim Walker ever tell you she believed there
8  is sufficient evidence that there is an infraction?
9  A. She told me that she felt it necessary to report
10  something to the NCAA. I can't remember when. I said
11  do what you have to do.
12  Q. Did she tell you that she believed that there
13  was an infraction?
14  A. She told me she had a reportable event to the
15  NCAA. The infractions are determined by a process which
16  is very much compliant with rules. She's got to go and
17  check. She's got to send it to the NCAA. She can say I
18  think there is a problem here. You have to let me know.
19  The NCAA will says yes or we don't know enough. Go back
20  and tell us more. Or they will initiate their own
21  investigation if it's serious enough.
22  Q. And, at some point, the matters related to
23  Dr. Gorum's grade changes were turned over to the NCAA?
24  A. I don't know what you mean turned over.

37

1  Q. There was a notice given to the NCAA of a
2  possible infraction related to Dr. Gorum's grade
3  changes?
4  A. Yes.
5  Q. Was there an investigation?
6  A. There is an investigation ongoing.
7  Q. Has there been any notice to the university that
8  there has been an infraction related --
9  A. There has been no notice to the university that
10  the investigation is concluded.
11  Q. There has been no finding of any kind?
12  A. We have not received any indication that there
13  has been a finding or has not been a finding. We have
14  received no indication, period.
15  Q. Have you been given any notice of the, either
16  the details of the investigation or what the university
17  has done to comply with it?
18  MR. DUSTON: To extent it has not come from
19  outside counsel or communications with counsel.
20  BY MR. ZEFF:
21  Q. Yes.
22  A. The answer is no.
23  Q. Have you received any reports, other than from
24  counsel, from Kim Walker or any other compliance officer

10 (Pages 34 to 37)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

30

1    literally don't recall.
2        MR. DUSTON: Before my time.
3        THE WITNESS: Which is probably why we have
4    Mark Farley now because there wasn't anyone.
5    BY MR. ZEFF:
6        Q.  So were you made aware of the resolution of the
7    DeShawn Morris lawsuit?
8        A.  I was made aware of it through some means. I
9    just don't know what that means was.
10       Q.  Did you have any input or discussion at all
11   about what that resolution was before it happened?
12       A.  No.
13       Q.  You were simply informed of it?
14       A.  Yeah.
15       Q.  Were you informed, at any time, that Dr. Gorum
16   was involved with DeShawn Morris in representing him as
17   any capacity?
18       A.  No.
19       Q.  When, if ever, was the first time you learned
20   Dr. Gorum was involved in counseling Mr. Morris?
21       MR. DUSTON: You mean other than discussions
22   with me in this lawsuit?
23       MR. ZEFF: Yes.
24       THE WITNESS: No, never.

31

1    BY MR. ZEFF:
2        Q.  Did anyone ever tell you that Dr. Gorum had paid
3    part of Mr. Morris' legal fees?
4        A.  No one ever told me anything about any activity
5    that Dr. Gorum undertook while he was at this
6    university.
7        Q.  Of any kind?
8        A.  Of any kind.
9        Q.  Did you have any discussions with Dr. DeLauder
10   in July of 2003 after you took over?
11       A.  No.
12       Q.  So there were no issues or things that needed
13   cleaning up that you needed to talk to him about?
14       A.  I have not spoken in any substantive way with
15   Dr. DeLauder since I last saw him in June, 2003, on any
16   subject.
17       Q.  Let me get right to Dr. Gorum then. How were
18   you informed that there was an issue relating to grade
19   changes and Dr. Gorum?
20       A.  Kim Walker was the compliance officer in the
21   athletic department, and Glenn Parker, who was a
22   registrar, brought to my attention that there were
23   apparent unauthorized grade changes for a student, some
24   of whom were student athletes.

32

1        Q.  Now, how did they bring that to your attention?
2        A.  They made an appointment and came up and told
3    me.
4        Q.  And was this a specific meeting related to that
5    subject or were there other subjects also discussed?
6        A.  It was an ad hoc meeting. They called and said
7    we need to talk to you. They came and told me just
8    that.
9        Q.  Who was present?
10       A.  I was present with Kim Walker and Glenn Parker,
11   the registrar.
12       Q.  When you heard this information, what did you do
13   with it?
14       A.  I immediately said you have to investigate and
15   turned it over to counsel. I think Mark Farley was here
16   then.
17       Q.  When you said you turned it over to Mark Farley,
18   did you call Mark Farley to the meeting?
19       A.  No. I told him what I was told. I also asked
20   the provost to look into it since it's an academic
21   affairs issue.
22       Q.  That would be Dr. Bell?
23       A.  Yeah.
24       Q.  You mentioned earlier that you were on the NCAA

33

1    Presidents Council when you were at Queens College?
2        A.  Yes.
3        Q.  Can you tell me what that entailed?
4        A.  The Presidents Council is a steering group for
5    one of the divisions in the NCAA, which there were
6    three. They were the people who make policy, oversee
7    the implementation of that policy, generally rules and
8    regulations, things like that, sit on committees that
9    look at infractions, that look at scholarship policy,
10   that look at rewards and decide athletes of the year
11   sort of things. The presidents run the National
12   Athletic Association and there is a steering committee
13   at various levels and there is an annual meeting of all
14   the people.
15       Q.  How long were you on that committee?
16       A.  Almost five years, almost.
17       Q.  In that five years, did you come to have an
18   understanding of what the rules and the various
19   infractions of those rules, the penalties for those
20   rules were?
21       A.  No. What I know in fact is in policy, the rule
22   manual is --
23       Q.  You are indicating a very large manual. I've
24   seen it. Yeah.

9  (Pa'

B0144

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

18

1    Q.  Was there some period of time when they were
2    both on campus working together?
3        A.  Yes.  There were several visits to the campus by
4    Dr. Sessoms before Dr. DeLauder's last day in office.
5        Q.  And I want to bring up another area before I get
6    into a little more detail.  Disciplining students, what
7    role, if any, does the board have with regard to
8    discipline of the students?
9        A.  None that I'm aware of.
10       Q.  Does the student have the same right to appeal
11   to the board that a faculty member does relating to
12   disciplinary process?
13       A.  As far as I can recall or remember, I don't
14   think there ever has been an instance in which a student
15   has requested an appeal to the board.  Whether or not a
16   student has ever asked to do so, I really can't say.  I
17   don't recall an instance where a student has ever asked.
18       Q.  So if a president expels a student from the
19   university or suspends a students from the university,
20   that's the president's prerogative without the board's
21   approval or ability to appeal that decision?
22       A.  I'm not aware of a policy that gives a student
23   that right to appeal the president's decision to the
24   board.

19

1    Q.  So would it be fair to say that the board does
2    not involve itself in matters of student discipline?
3        A.  No.  As an official policy of the board, we
4    strive not to get involved in the disciplinary actions
5    of the students.
6        Q.  Are you familiar with a student by the name of
7    DeShawn Morris?
8        A.  I've heard the name.
9        Q.  Where have you heard the name?
10       A.  I think it was in the newspaper and also in some
11   conversations.  I believe he was a football player.  And
12   that there was a -- I got to tell you I believe this was
13   the case because I don't remember all the details --
14   that he was accused of having a weapon on campus.  And
15   that is the extent that I'm aware of all of the issues
16   that surrounded, you know.
17       Q.  Did the board ever request or receive any
18   information related to DeShawn Morris for the
19   allegations against him?
20       A.  No.
21       Q.  Is there any procedure by which the board
22   receives information like that?
23       A.  When we have a serious breach of security or a
24   threat to the safety and well-being of the campus by a

20

1    student, yes, that is brought to the attention of the
2    board.
3        Q.  Who brings that to attention of the board?
4        A.  It can be the president or his designee.
5        Q.  How is that brought to the attention of the
6    board?
7        A.  It is either by phone call or an E-mail to the
8    members of the board that such an incident has occurred
9    and we want them to be aware because we done want them
10   to read it in the newspaper first.
11       Q.  It's more of a notification process than a
12   request for any action by the board?
13       A.  Absolutely.
14       Q.  Do you know whether such an notification
15   occurred relating to DeShawn Morris?
16       A.  I don't recall the details of how that was
17   communicated.
18       Q.  Did you have any discussions with Dr. DeLauder
19   about DeShawn Morris?
20       A.  I don't recall a conversation I had with
21   Dr. DeLauder on that basis.
22       Q.  Do you know whether or not Dr. DeLauder had any
23   discussions with the Board about DeShawn Morris?
24       A.  Not that I'm aware.

21

1    Q.  Or his designee had any discussions?
2        A.  Not that I'm aware.
3        Q.  I presume you attend all the board meetings.
4        A.  I try to as chair of the board.  I don't always
5    make them, but I do.
6        Q.  Let me turn your attention to Dr. Gorum.  When
7    was the first time that you learned that there was a
8    disciplinary process underway against Dr. Gorum?
9        A.  I don't recall the exact day.  But I am aware
10   that it was brought to my attention that this issue had
11   been uncovered and that the president informed me that
12   an investigation was being put in place and that it was
13   his intent to proceed with the appropriate disciplinary
14   process in regard to this allegation of grade changes.
15       Q.  How was that brought to your attention?
16       A.  Verbally.
17       Q.  Would that have been in person, in a meeting, by
18   phone?
19       A.  It could have been by phone.  It could have been
20   by person.  I don't recall the exact date and the
21   circumstance, but I recall the president bringing that
22   to my attention.
23       Q.  Other than what you have just told me, do you
24   recall anything else about that conversation?

Wendell Gorum, Ph.D.

128

1    A.    Yes.  Yes.

2    Q.    Tell me what there was.  What discussions were

3  there about this mix-up in invitations?

4    A.    I can't remember the name of the person, but I

5  know who he is.  That's why I say I would have to see

6  a list.  He was simply appalled at what was done and

7  the point he made was how could you invite Dr. Sessoms

8  to be the speaker when no one had ever invited

9  Dr. DeLauder and DeLauder was a member of the

10  fraternity.

11         So his whole thing is Cecil Wilson took

12  action on his own and that they thought that he was

13  wrong in doing it and he should be forced to rescind

14  it.

15    Q.    So he was wrong in doing it without the consent

16  of the program committee?

17    A.    That's correct.

18    Q.    And he was wrong given the past history with

19  President DeLauder in that you had never done it with

20  a president before?

21    A.    Mm-hmm.

22    Q.    And was he wrong because there had been another

23  invitation?

24    A.    I'm not...



Wendell Gorum, Ph.D.

129

1    Q.    Let me rephrase it.

2            The committee thought he was wrong just

3    because you hadn't invited the president in the past,

4    correct?

5    A.    The main reason is he did it on his own without

6    the committee's knowledge or consent.

7    Q.    All right.  Do you know whether Cecil Wilson

8    communicated your role in this to President Sessoms?

9    A.    I don't know, but he almost had to because I

10   had to deal with him.

11   Q.    You had to deal with whom?

12   A.    To tell him to rescind the offer.

13   Q.    As the head of the program committee?

14   A.    Yes.

15   Q.    Now, I assume that there wasn't any

16   compensation for your role on the program committee?

17   A.    No.

18   Q.    It was just a volunteer position?

19   A.    It was volunteer.

20   Q.    And this was completely unrelated to your job

21   duties at Delaware State?

22   A.    That's correct.  That's correct.

23   Q.    It was just an alumni activity?

24   A.    Yeah.  Public service.

Wendell Gorum, Ph.D.

1    Q.    And the only action that you took in connection

2    with this was telling Cecil Wilson after the committee

3    talked about it that he had to decline the invitation

4    to President Sessoms, correct?

5    A.    Yes.

6    Q.    Was this a controversial decision?

7    A.    (Pause).

8    Q.    Let me rephrase that.

9         This was a simple situation of somebody

10   extending an invitation that they didn't have

11   authority to extend, right?

12   A.    Yes.  And we had already contracted with

13   someone else to do it.

14   Q.    And the only people affected by this were

15   whether President Sessoms was going to attend or not.

16   Is that correct?

17   A.    That's correct.

18   Q.    Do you know whether President Sessoms had

19   already agreed to come?

20   A.    That's what was reported to us by Wilson.

21   Q.    By Wilson.  Other than the one piece of

22   information that you received secondhand that he was

23   upset by this, did President Sessoms ever communicate

24   to you or any other members of the committee about

Wendell Gorum, Ph.D.

48

1    order.

2            Anything else that -- I think we finished

3    Dr. Claussel.  And her knowledge is based upon this

4    conversation with Dr. Kopano?

5    A.    I think so, yeah.  The other thing involved

6    Claussel.  When Dr. Sessoms was a candidate for the

7    position, he was one of the three finalists who were

8    interviewed.  And I don't even remember my position on

9    the faculty.  I could have been parliamentarian or

10   something.  I don't remember.  And I used to be chair

11   of the promotion and tenure committee and then a

12   member, I was definitely a member at that time and the

13   student affairs committee.

14           Most of the university is run by

15   committees, faculty committees.  The faculty members

16   make all decisions regarding students.  And I

17   interviewed -- you know, I was part of the

18   interviewing process of all of the candidates and my

19   recommendation at the faculty senate was that the

20   search be reopened.

21           And what I received was that the

22   information got back to Sessoms and he was upset about

23   it.

24   Q.    Who provided you that information?  Was it

YAW ACKAH, Ph.D.

18

1  be read by every member. And if they objected -- and
2  that's what I told them: If they objected, they
3  could do so. They read, as university professors,
4  and they signed. Nobody forced them to sign.
5      Q. Now, one of the things you said was that
6  three of the committee members were going to do
7  something you didn't feel was very professional in
8  terms of how they were going to submit something
9  regarding the disposition of this matter. What was
10 it that those three members wanted to do?
11     A. Not what they wanted to; what they did.
12     Q. Okay.
13     A. They brought their reports. One of --
14 don't remember the exact individual. But one brought
15 his report on one page.
16     Q. Uh-huh.
17     A. Another one had two pages. And we told
18 them this is highly unacceptable.
19     Q. Uh-huh.
20     A. It should be detailed.
21     Q. Uh-huh.
22     A. So that if anybody, ten years from now,
23 reads their report, that person can conclude that,
24 okay, their conclusion was based on this. We

19

1  couldn't do that on a one-page report when we had
2  spent almost a year doing the investigation.
3      Q. Right.
4      A. That was disgraceful.
5      Q. Uh-huh. Who was it that submitted a
6  one-page or a two-page report to you?
7      A. I don't remember, but I think either
8  Dr. Toscano or Dr. Jackson; because when he said,
9  Well, we -- it's foregone conclusion. We know what
10 is happening, blah, blah, blah.
11         I said, No, no, no. We don't do that.
12 It's an investigation. Everything should be on
13 record. It should be methodical. We have to show
14 why we -- how we came -- why and how we came to this
15 conclusion.
16     Q. Uh-huh.
17     A. What I'm trying to emphasize is this: We
18 weren't going to allow them to embarrass us. No. I
19 wouldn't put my signature on any report that is
20 shameful.
21     Q. Uh-huh.
22     A. We wanted to show the whole world why we
23 did what we did. And that's what we did.
24     Q. Uh-huh. Did Lapointe Davis submit

20

1  anything in writing to you?
2      A. That's what I'm saying; I don't remember.
3  But either one of them -- either he or someone else.
4  But I think -- and I remember Toscano did. And I
5  think Jackson too did. I think it was Lapointe.
6          But that doesn't mean anything;
7  because he agreed -- we all agreed on what we were
8  going to do.
9      Q. Okay. Now, did you have an understanding
10 when you were preparing this document of what type of
11 message you wanted to send to the administration?
12     A. Yeah. It was clear. This is the
13 report --
14     Q. Okay.
15     A. -- that administration was, was -- we're
16 saying they were also responsible for whatever
17 happened.
18     Q. Uh-huh.
19     A. Because it had been something that was
20 endemic in the university and nobody did anything.
21         Now, let me note this: Not during
22 Dr. Sessoms' time, no; so you cannot blame him. But
23 it is something that had been happening in the past.
24     Q. Okay. Since you prepared this report,

21

1  have you had any contact with anyone from the
2  administration to follow up on the matters about the
3  administration that you were critical of?
4      A. No. Now, let me, let me show you
5  something here. Here. Here. After we submitted our
6  report, Dr. Claiborne Smith, who is the chair of the
7  board of trustees, called me on the phone, that they
8  have received our report and they appreciate our
9  work.
10     Q. Uh-huh.
11     A. I wasn't happy with that because I think
12 that was disrespectful. So I told him I would not
13 accept a verbal acknowledgment of the report and that
14 he should write something down so that I can keep it
15 on record. I like keeping records.
16         He never called me again. And I have
17 never had any contact with him. Even the president
18 never acknowledged receipt of the report. Here's a
19 letter I was going to send him.
20     Q. The letter -- you've just handed
21 Mr. Duston and I a letter --
22     A. No, no. I discussed that with the other
23 committee members and --
24     Q. Let me just interrupt you a second,

6 (Pages 18 to 21)

Gorum v. Sessoms and Board of Trustees of Delaware State University
J. W. Gorum, Ph.D.

42

1    Q.    You just -- you invited him to attend?
2    A.    Yes.
3    Q.    You did not invite him to speak?
4    A.    No, I did not. That would not be my role.
5    I just invited him to attend.
6    Q.    Okay. Did you learn that he was invited to
7    speak at some point?
8    A.    I did hear that, yes.
9    Q.    Who did you hear that from?
10   A.    Well, I know I heard it from Wendell. What
11   I don't know, if other people told me that also, like
12   James Marshall. I don't know if other people could
13   have also said it. But I know that he had been
14   invited to speak, but the committee had already
15   contacted somebody else to come and speak.
16   Q.    So is it your understanding that President
17   Sessoms was disinvited --
18   A.    Yes.
19   Q.    -- if I can use that word?
20         Do you know whether Dr. Sessoms -- I say
21   Dr. Sessoms -- was upset about that, being disinvited?
22   A.    I would imagine, but he and I did not
23   discuss it.
24   Q.    And you did not discuss it with anyone else

43

1    that would have knowledge of Dr. Sessoms's feelings on
2    the subject?
3    A.    I am trying to think. See, my recollection
4    is that he was, but I can't tell you on what it is
5    based, because I know I did not even want to attend
6    the breakfast after that. That's why I think there
7    was feelings around it by Dr. Sessoms.
8    Q.    You did not want to attend the breakfast?
9    A.    That's correct.
10   Q.    Why is that?
11   A.    Because it was -- you know, there was so
12   much negativity about it because of that. And I did
13   go. And you found most of your community leaders
14   there, and I believe Senator Carper was there and the
15   mayor. All of those people were there, and
16   Dr. Sessoms's name was mentioned, and he was the only
17   one not there. So that's why I am saying of what was
18   going on, the appearance was he was upset about it,
19   and he did not attend the breakfast. And all the
20   community leaders and this is his first year at
21   Delaware State University, you would not expect that.
22   Q.    Do you know that he didn't attend because he
23   was upset about being disinvited?
24   A.    I do not know why. I did not ask him why he

44

1    did not attend.
2    Q.    Do you know about the issue in this lawsuit
3    regarding DeShawn Morris?
4    A.    I know about DeShawn Morris. I don't know
5    the issue. I mean, when you say "the issue," I don't
6    know what you are --
7    Q.    We will draw that out a little bit. What do
8    you know about DeShawn Morris? I take it you know who
9    that is?
10   A.    Yes, I do know who that is. I know he was a
11   student who was accused of some illegal activity and
12   that Wendell went to bat for him.
13   Q.    Okay. What do you mean "went to bat"?
14   A.    You know, he would call Wendell, and Wendell
15   stuck by his side. He didn't disown him.
16   Q.    Do you know about what time period that was?
17   A.    I have no idea.
18   Q.    Do you know whether President Sessoms was
19   aware of Dr. Gorum's involvement with DeShawn?
20   A.    I do not know.
21   Q.    Okay. So there is no reason that you would
22   believe that Dr. Sessoms would retaliate against
23   Dr. Gorum for helping DeShawn out?
24         MR. ZEFF: Objection.

45

1    BY MR. ROBINSON:
2    Q.    Or do you have any reason to believe that?
3         MR. ZEFF: Same objection.
4         MR. ROBINSON: You can answer.
5         THE WITNESS: Well, I don't know when
6    there is an objection what do I do.
7         MR. ZEFF: Oh, no. You can answer.
8         THE WITNESS: That's why I stopped. I
9    said I have only been deposed one time, so I don't
10   know, you know, what I am supposed to say or do then.
11        MR. ZEFF: I can't stop you from
12   answering a question. I can only object and hope a
13   judge stops you later.
14        THE WITNESS: Okay. I saw it as a
15   cumulative process; that Wendell was seen as a
16   powerbroker on campus, and he is the one who spoke up.
17   I mean, there was a lot of sentiment and feeling on
18   the campus that people did not want Dr. Sessoms.
19   Okay? But Wendell is the one who spoke up. That's
20   the way he is. He doesn't -- you know, he believes in
21   doing what is right and fair, and I think that's why
22   he joined the Peace Corps. He has always wanted to
23   help people and make life better for them. So he has
24   the confidence in himself that he can do that.

12 (Pages 42 to 45)



# DELAWARE STATE UNIVERSITY

DEPARTMENT OF HISTORY, POLITICAL SCIENCE AND PHILOSOPHY

Dr. Bradley Skelcher

December 14, 2000

Dr. Johnny Tolliver
Provost and Vice President of Academic Affairs
Delaware State University
Dover, Delaware 19901

Dear Dr. Tolliver:

This letter is to inform you that Mr. Roderic Farmer did not attend my course, African American Experience from 1865 during the Spring Semester 1997. Please remove the F from his record.

Thank you,

Bradley Skelcher



GORUM 0087

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6621 • FAX (302) 857-6623

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

B0152

Gorum v. Sessoms and Board of Trustees of Delaware State University
Claiborne Smith, Ph.D.

50

1    A.  No.
2    Q.  Are you aware that there was a contention in the
3  ad hoc committee hearing that there was no written
4  policy regarding grade changes?
5    A.  That there was an allegation?
6    Q.  Yes.  Are you aware of that?
7    A.  Of an allegation?
8    Q.  Yes.
9    A.  No.
10    Q.  Was the president able to articulate for you in
11  the executive session what the policy regarding grade
12  changes was for DSU at the time that Dr. Gorum was
13  changing those grades?
14    A.  In a broad fashion, yes.  It was not discussed
15  in any great detail.
16    Q.  Was it important for you in making your decision
17  on whether or not to terminate Dr. Gorum to understand
18  what policy or policies he had violated?
19    A.  To the extent that the Ad Hoc Dismissal
20  Committee carried out their roles and responsibility
21  under the Collective Bargaining Agreement, including
22  review of the policy and made their findings of fact,
23  that's what we focused our attention on.
24    Q.  Well, were you relying on the ad hoc committee

5.

1  changes that occurred early on, particularly when
2  students wanted to withdraw from a class, and there was
3  circumstances and a procedure by which they could do so
4    Q.  Did the president or Mr. Farley discuss with the
5  committee anything about the registrar's office allowing
6  professors without other signatures to change grades?
7    A.  I don't recall the president specifically citing
8  that as one of the issues or items brought to the
9  attention of the board at the time.  I just don't
10  recall.
11    Q.  Was there any discussion at all about how
12  Dr. Gorum was able to accomplish changing grades?
13    A.  How?
14    Q.  Yes.  How was he able to do it?
15    A.  Well, I think that the allegations and the
16  findings of the Ad Hoc Dismissal Committee pretty well
17  spelled that out.
18    Q.  Well, sitting here today, do you have an
19  understanding of how Dr. Gorum was able to change
20  student's grades?
21    A.  That as chair, he took the initiative to sign
22  the professor's, where the professor's name should have
23  been, and to take those to the registrar's office and
24  get the changes made.

51

1  to determine what those facts were?
2    A.  We were relying on the finding of the ad hoc
3  committee and the information that the president and
4  Mark Farley, who had access to pertinent documents, to
5  do so.  We asked the persons we felt appropriate at the
6  time to understand that there was a policy.
7    Q.  And other than what you've told me, can you
8  recall any other questions or any other responses by
9  Farley or Sessoms related to what that policy was?
10    A.  Yes, that the faculty had a procedure to follow
11  in making grade changes that engaged the chairman, the
12  dean, and the provost as to when and under what
13  circumstances grade changes could be made.
14    Q.  Was there any discussion about professors being
15  able to change grades during the first two weeks of a
16  semester without getting the approvals of other people
17  on the administration?
18    A.  I believe we heard that.
19    Q.  From whom?
20    A.  From the president and/or Mark Farley.
21    Q.  What did they say about it?
22    A.  I don't recall the specifics.
23    Q.  Do you recall anything?
24    A.  Other than that, there was a procedure for grade

53

1    Q.  Do you know whether or not that followed the
2  procedure of Delaware State University, that is --
3    A.  Without the professor's permission, that was not
4  permissible.
5    Q.  Do you have an understanding of whether or not
6  with the professor's permission Dr. Gorum, as chair of
7  his department, could change someone's grade without any
8  further signatures?
9    A.  I don't recall the specific details of the exact
10  procedure.  But I think there was a provision or there
11  were provisions by which the dean of the school would
12  have to either approve or disapprove.
13    Q.  Did Mr. Farley or Dr. Sessoms tell the committee
14  that the dean's signature was required before a grade
15  could be changed?
16    A.  On all circumstances?
17    Q.  Yes.
18    A.  I don't recall.
19    Q.  Did Dr. Sessoms or Mr. Farley tell the committee
20  that the vice president's or provost's signature was
21  required before any grades could be changed?
22    A.  I don't recall.
23    Q.  Did the committee ask or were they told, in this
24  executive session, how it was that the register accepted

14  (Pages 50 to 53)

2 of 50 DOCUMENTS

Copyright 2003 The News Journal (Wilmington, DE)
All Rights Reserved
The News Journal (Wilmington, DE)

August 24, 2003 Sunday

**SECTION:** SPORTS; Pg. 6D

**LENGTH:** 514 words

**HEADLINE:** Hornets' top player ruled ineligible

**BYLINE:** KRISTIAN POPE, Staff

**BODY:**

Morris fails to meet academic standards after 2002 suspension

By KRISTIAN POPE, Staff reporter

DOVER - DaShaun Morris, a preseason All-American and Delaware State's best football player, is academically ineligible for the upcoming season, school officials said Saturday.

Morris was suspended near the end of the 2002 fall term for an undisclosed "non-academic" incident in violation of school policy, DSU athletic director Hallie Gregory said. Morris appealed the suspension through the student affairs office, Gregory said.

The appeal was denied and Morris was prevented from attending classes during the spring semester, Gregory said. The missed academic work kept Morris from meeting NCAA and school requirements for eligibility, even though he attended summer school.

Morris, one of the nation's best NCAA Division I-AA kick return specialists, declined to say Saturday why he had been penalized in fall 2002. He is a senior.

"I was told not to say anything," Morris said late Saturday. He has not practiced with the team this season.

Hornets coach Ben Blacknall had told The News Journal in a story published Aug. 8 that Morris would be eligible this season.

"He was under the gun," Blacknall said. "He got it taken care of."

Blacknall said Saturday: "We thought he was going to be ready to go."

Gregory said he could not comment on what Morris did to receive the suspension, but did say there was little chance Morris could regain his eligibility this season.

"It was an administrative decision to render him ineligible, because of breaking institutional rules," Gregory said of the fall 2002 suspension.

Morris said he plans to attend classes in the fall semester at DSU.

Hornets' top player ruled ineligible The News Journal (Wilmington, DE) August 24, 2003 Sunday

Morris said he initially assumed he was eligible to play this season because he took a summer course to make up for missed classwork. He said he learned in a letter he received last week that the school ruled him ineligible to play this season.

On Saturday, during the Hornets' first scrimmage, Blacknall said Morris was no longer with the team. Blacknall said he learned of Morris' ineligibility only last week.

"The football program was hoping [an appeal] would go through," Gregory said. "It got stretched out and the appeal was not granted. The coaches were hoping it would get overturned."

Morris, selected as a Division I-AA preseason All-American by The Sports Network and the Associated Press, has been the Hornets' top receiver the past two seasons.

Morris led the Hornets in 2002 with eight touchdowns, three on kickoff returns, and 1,440 all-purpose yards.

A transfer from Jersey City State College, Morris was a Division III All-American in 2000.

Hornets notes

DSU held its first scrimmage Saturday at Alumni Stadium. The first-team offense ran selected full-contact plays against the second-team defense. The second-team offense faced the first-team defense.

Senior quarterback Keon Frazier played most of the first and second halves on the first team while backup Andrew Blackston ran the reserves.

Reach Kristian Pope at 734-7946 or kpope@delawareonline.com.

**LOAD-DATE:** August 26, 2003

3 of 50 DOCUMENTS

Copyright 2003 The News Journal (Wilmington, DE)
All Rights Reserved
The News Journal (Wilmington, DE)

August 28, 2003 Thursday

**SECTION:** SPORTS; Pg. 6C

**LENGTH:** 443 words

**HEADLINE:** DSU's Morris expelled for 'rearm violation

**BYLINE:** KRISTIAN POPE, Staff

**BODY:**

Football standout dismissed in Dec., yet still at school

DSU FOOTBALL

By KRISTIAN POPE, Staff reporter

DOVER - Former Delaware State football player DaShaun Morris was expelled from the school in December 2002 because he was found to be in possession of a firearm in his campus dorm room, school officials said Wednesday.

According to school spokesman Carlos Holmes, the DSU Police Department received information from an undisclosed source and police were dispatched to Morris' room at the Warren-Franklin dorm Dec. 9. When police conducted a search of the room, they found a firearm, which is a violation of DSU policy.

Holmes said he did not have information on what kind of firearm Morris had or if it was loaded.

Morris, a senior NCAA Division I-AA All-American kick returner, was immediately suspended from the school and the football team, Holmes said. After a hearing before the school's Department of Judicial Affairs two days later, Morris was expelled from school Dec. 16, Holmes said.

Morris appealed the expulsion. In February, the expulsion was upheld. Morris said he attended summer school at DSU and is enrolled for the fall semester, which starts Tuesday.

Morris, who lives in Dover, did not answer calls seeking comment Wednesday night. Morris said last week he had been declared academically ineligible to play this season, which resulted from him not being allowed to attend classes in the 2003 spring semester. He said he was told to not comment about why he was held out of classes.

Morris, who transferred from Division III Jersey City (N.J.) State College in 2000, sat out that season due to NCAA transfer rules.

He played in the 2001 and 2002 seasons and was a standout on the field for the Hornets. He was chosen first team All-American last season as a kick returner after returning three kickoffs for touchdowns and was expected to be one of the nation's best Division I-AA players this year.

Morris has not participated with the football team since the December expulsion.

DSU's Morris expelled for 'rearm violation The News Journal (Wilmington, DE) August 28, 2003 Thursday

"I wish it could have been taken care of a long time ago," DSU coach Ben Blacknall said Wednesday. "The kids understand what is expected of them."

Quarterbacks decided

The Hornets held their second scrimmage Wednesday at Alumni Stadium and Blacknall said senior Keon Frazier and junior Andrew Blackston will share playing time at quarterback this season.

Junior college transfer Andre Smith also competed for the starting quarterback position but Blacknall said Smith doesn't know the offense well enough. The season begins Sept. 6 against Bucknell at Alumni Stadium.

Reach Kristian Pope at 734-7946 or kpope@delawareonline.com.

**LOAD-DATE:** August 29, 2003

1 of 50 DOCUMENTS

Copyright 2003 The News Journal (Wilmington, DE)
All Rights Reserved
The News Journal

December 25, 2003 Thursday

**SECTION:** SPORTS; Pg. 16C

**LENGTH:** 1142 words

**HEADLINE:** Morris tries to make up for a lost season

**BYLINE:** KRISTIAN POPE

**BODY:**

One-time Delaware State standout works toward getting a shot at pro football

By KRISTIAN POPE Staff reporter

DOVER -Sitting on the front steps leading to his Dover apartment complex, former Delaware State football player DaShaun Morris holds a piece of paper he believes will be his ticket to the National Football League.

It's an invitation to the Las Vegas All-American Classic on Jan. 17, where he will get a chance to showcase his skills for NFL coaches and scouts.

Morris needs every chance he can get after sitting out this season. He was an NCAA Division I-AA All-American in 2002, but did not play this season after an expulsion from DSU in the 2003 spring semester caused him to fail to meet academic eligibility requirements.

Some observers believe Morris could be among the top kick returners available in next year's NFL draft. He is doing what he can to make that happen, working out five days a week with DSU offensive coordinator Jeff Braxton and running backs coach Curtis Thomas.

The 5-foot-11, 180-pound Morris remains on the minds of NFL teams. The Seattle Seahawks sent a scout to DSU on Nov. 20 to put him through speed and agility drills. The Seahawks declined to discuss their interest in Morris.

The all-star game in Las Vegas involves 80 NCAA Division I-A players and 30 Division I-AA players. Morris' kick-return skills were evident in 2002, when he averaged 28.3 yards per return and had three touchdowns.

"I'm still going to get good looks from teams," Morris said. "It worked out better than I could have imagined."

His Hornets football career ended after Morris, according to Delaware State officials, was expelled for violating the university's zero-tolerance policy for possession of a firearm in his dorm room following an on-campus incident in December 2002.

He was allowed to return to classes in May under an arrangement with former DSU president William DeLauder, who, Morris said, wanted to give him a chance to continue his education.

Morris said he believed he would be eligible to play this season until days before the Sept. 6 opener, when he

Morris tries to make up for a lost season The News Journal December 25, 2003 Thursday

learned the missed class time because of his expulsion made him ineligible under NCAA rules.

So Morris watched from afar as the Hornets endured a 1-10 season that led to the midseason firing of coach Ben Blacknall.

"To be honest, after fighting with the school, hassling with them, looking at it now, I'm glad I'm not playing," Morris said. "But I'm not disappointed now, knowing all that's gone on."

Morris remains bitter about being ineligible, but he has tried to channel his anger toward preparing for a shot at the NFL.

Several days a week, Morris trains with Braxton and Thomas on campus. Morris arrived at DSU in 2000 after transferring from Jersey City State College. He has always worked closely with Braxton, who said he has tried to help Morris get his life together.

"Knowing him and what his situation was, I'm a forgiving man," Braxton said. "I wanted to help him fulfill his dreams of playing in the NFL. We just wanted to make sure he knew someone was looking out for him."

Braxton, Thomas and Morris do running and catching drills, some of which have been suggested by Washington Redskins receiver Darnerien McCants, a former DSU player, to simulate NFL situations. McCants has become a mentor to Morris, who was a Hornets redshirt in McCants' senior year.

"More or less, my relationship with him got tight when I got in the league," McCants said.

Morris also lifts weights on campus with Braxton, and has added 10 pounds since starting the regimen.

Morris was out of sight on the playing field this season, but he is not out of the minds of NFL scouts. The National Football Scouting service in Tulsa, Okla., which is used by all 32 NFL teams, graded Morris a 5.0 (on a 9.0 scale) in its spring report of prospects. Texas receiver Roy Williams, regarded as the top college prospect, was graded 7.9. Morris also was observed by the other major NFL scouting service, Pittsburgh-based BLESTO.

The evaluations of those services are used to determine the 300 or so prospects invited to the NFL combine each February in Indianapolis. Invitations are issued after the college football season. Being chosen for the combine is significant, as the vast majority of each year's NFL draft choices and players signed as free agents participate.

Darry Alton, director of the Las Vegas All-American Classic, said Morris has a legitimate chance to play pro football.

"NFL scouts think highly of him," Alton said. "We hear he may be the best in the nation [as a kick returner], and he deserves to be seen."

Morris said he bought the firearm after arriving at DSU because of concerns for his safety. He said that while living in Newark, N.J., one of his best friends was shot to death. While he was at DSU, another friend was killed in New Jersey.

"I don't regret doing it," Morris said. "I have reasons why I did it. My safety comes first. It's to that degree."

Morris' case was heard by the Student Judicial Appeals Council, a panel made up of faculty members and students, on Dec. 16, 2002. Based on information presented to the council, Morris was expelled, said Delaware State vice president for student affairs Charles Smith.

In February, Morris' expulsion was upheld by DSU's Office of Judicial Affairs.

Morris tries to make up for a lost season The News Journal December 25, 2003 Thursday

"They're not just going to throw me out," Morris said. "I was a student and I was here to learn from my mistakes. So I took it to the president."

Morris said he met in April with DeLauder, who arranged to have Morris reinstated to school for the summer session. At the time, athletic department officials spoke on Morris' behalf.

The decision did not mean Morris' football career would automatically resume. Morris was eventually declared ineligible because his expulsion prevented him from meeting NCAA requirements of completing 12 credit hours of coursework, said Kim Walker, DSU's assistant athletic director for compliance.

Morris said he was stunned to learn in August that he was ineligible. He said he presumed he would qualify to play after attending one summer class.

"I resented that," Morris said. "I'll take that to my grave."

Said Smith: "I think, if anything, Morris should be one of the happiest students around. He still has an opportunity to continue his education. The heavens smiled on him."

Morris chose to attend Delaware State over Syracuse, Rutgers and Hofstra. He said that while things did not turn out the way he envisioned, he believes he made the right decision.

"When I came to Delaware State, I had a chip on my shoulder," Morris said. "That's how I was trained. But coach Blacknall stayed firm on me. I hated school then, but I learned to appreciate it."

Now, Morris hopes, DSU has helped open the door to the NFL.

Reach Kristian Pope at 734-7946 or kpope@delawareonline.com.

**GRAPHIC:** Special to The News Journal, SUCHAT PEDERSON; DaShaun Morris, who sat out this season after being expelled by Delaware State, is trying to attract the attention of NFL teams. News Journal file, GARY EMEIGH; As a kick returner, DSU's DaShaun Morris averaged 28.3 yards per return and had three touchdowns in 2002.

**LOAD-DATE:** April 7, 2005

YAW ACKAH, Ph.D.

42

1  everybody.
2      So if you single out someone, then the
3  person becomes a scapegoat.
4      Q.  When you say "everybody," who did you mean
5  everybody should be punished?
6      A.  It's in the report.  I'm sure you have
7  read the report.
8      Q.  Oh, of course.
9      A.  The deans.  And, and Dr. Gorum made that
10  assumption.  And from their, their testimony it was
11  clear that it was going on.  But I can't give you
12  names.
13      Q.  By "going on," you meant chairs changing
14  grades without proper procedures being followed?
15      A.  Something to that effect.
16      Q.  Okay.  When you learned that Dr. Gorum had
17  been terminated, were you surprised?
18      A.  My feelings were more than surprised.  My
19  feelings were anger, disappointment, frustration.
20      Q.  Why?
21      A.  Because we felt that the university would
22  respect our recommendation, even though the last
23  decision lies with the board.
24      Q.  Uh-huh.

43

1      A.  And we -- to us, the punishment was
2  draconian.
3      Q.  Uh-huh.
4      A.  We really punished him.
5      Q.  Uh-huh.
6      A.  So we thought that the punishment would be
7  enough.
8      Q.  Let me ask you to turn to page 1 as well.
9  And you may not need to, but I do want to reference
10  it with you.  The very first paragraph...
11      A.  Uh-huh.
12      Q.  This committee questions why Mr. Parker --
13  do you see that, in the very first paragraph?
14      A.  Yeah.
15      Q.  -- or the administration selectively chose
16  to only pursue the violations of Dr. Gorum while
17  neglecting violations of other chairs and
18  administrators, and even members in the office, who
19  in one way or another have taken part, condoned, or
20  assisted in the devaluation of the DSU education
21  system.
22          Was that a finding of fact by the
23  committee?
24      A.  Yeah, being it's on the report.

44

1      Q.  Was that consensus of all five members of
2  the committee, that there was a selective enforcement
3  of the policy as to Dr. Gorum?
4      A.  Yeah.  That's why -- see, this keeps
5  resonating throughout, throughout our report.
6      Q.  Uh-huh.
7      A.  That's what -- and that's the main reason
8  that we didn't recommend dismissal.
9      Q.  Okay.
10      A.  So our, our recommendation, our final
11  recommendation, was predicated on that --
12      Q.  Okay.
13      A.  -- that he wasn't the only one.
14      Q.  And --
15      A.  No matter how despicable what he did.
16      Q.  Would it be fair to say that the
17  committee, and through its report, tried to
18  communicate that to the president and the board --
19  that is, that Dr. Gorum was being selectively chosen
20  for discipline, whereas it could have been any of the
21  chairs or any of the people that may have been
22  involved?
23      A.  Yeah.  That's there, right there.
24      Q.  Okay.  Do you have any idea, sitting here

45

1  today, why Dr. Gorum was selectively chosen?
2      A.  No.
3      Q.  Before you were involved in the process,
4  did you know Dr. Gorum?
5      A.  I knew his wife.  I was close to the wife.
6      Q.  Did you know, before this process, about
7  Dr. Wendell Gorum's activities on campus, in the
8  Senate and with student disciplinary processes and
9  that sort of thing?
10      A.  Honestly, no.  I didn't really know a lot
11  about Dr. Gorum.
12      Q.  Okay.
13      A.  As I said, I knew the wife.
14      Q.  Did you know anything about Dr. Wendell
15  Gorum's reputation --
16      A.  No.
17      Q.  -- on campus?
18      A.  No.
19      Q.  Okay.
20      A.  And let me add something.
21      Q.  Sure.
22      A.  Just because of my relation of the wife,
23  that initially I didn't want to be part of this
24  committee.

12  (Pages 42 to 45)

# Delaware State University

## *Versus*

# Wendell Gorum Ph.D.

## Report of the Ad Hoc Committee Hearing

Conducted on

August (30, 31); September (28, 29); October (27, 28, 29) 2004

i

B0162

DSU-02453

# TABLE OF CONTENTS

INTRODUCTION ............................................................... 1

BACK GROUND OF VIOLATIONS ................................................ 1

CONSTITUTION OF AD HOC COMMITTEE......................................... 3

Committee Members........................................................... 3

HEARING..................................................................... 4

DOCUMENTARY EVIDENCE AND WITNESSES ...................................... 4

a. Witnesses for Dr. Wendell Gorum........................................ 4

b. Witnesses for Delaware State University................................ 5

c. Assessment of Documentary Evidence and witnesses testimony.............. 5

DID DR. WENDELL GORUM ADJUST (CHANGE GRADES,
SUBMIT MISSING GRADES, REMOVED INCOMPLETE)
THE GRADES OF FORTY-EIGHT (48) STUDENTS? ................................ 6

DID DR. WENDELL GORUM COMMIT ANY VIOLATIONS
IN THE PROCESS OF THE GRADE ADJUSTMENTS? .............................. 10
1. Removal of Incomplete.................................................. 11

2. Missing Grades ....................................................... 11

3. Withdrawal .......................................................... 12

4. Retroactive Addition of Students to Courses ........................... 12

DID DSU POLICIES DIFFER FROM PRACTICES AND
PROCEDURES FOR STUDENT GRADE ADJUSTMENTS? ......................... 13

CONCLUSIONS .......................................................... 16

COMMITTEE'S RECOMMENDATIONS ...................................... 18

FINAL NOTE .......................................................... 20

ii

B0163

DSU-02454

# COMMITTEE MEMBERS

Yaw Ackah Ph.D.
*(Professor, Sociology; Chair)*

Filippo Toscano Ph.D.
*(Associate Professor, Foreign Languages; Associate Chair)*

Gabriel D. Gwanmesia Ph.D.
*(Professor, Physics & Pre-Engineering)*

Lapointe Davis Ph.D.
*(Professor, Music and Visual Performing Arts)*

Edward Jackson Ph.D.
*(Professor, English)*

B0164

DSU-02455

grade forms for forty-eight (48) Mass Communication students, submitted by Dr. Gorum were inconsistent with DSU policies, as outlined in the DSU catalog.

Following a preliminary investigation into the allegation by the registrar of DSU, Dr. Gorum was invited to meet with Dr. Tommy Frederick, Dean of College of Mathematics, Natural Sciences and Technology on March 3, 2004 and subsequently with Dr. Bell, Acting Provost and Dean of Academic affairs on March 5, 2004, to discuss the issue. Representatives of both the AAUP and the Office of Human Resources were present at these meetings. Not being able to arrive at a mutual resolution on the issue at these meetings, at the recommendation of Dr. Tommy Frederick, Dr. Allen Sessoms, president of DSU issued a letter on March 5, 2004 to temporarily suspend Dr. Gorum from the university and to notify Dr. Gorum of his intent to commence dismissal proceedings. In the letter of suspension, DSU specifically alleged that Dr. Gorum:

    a. Failed to perform professional responsibilities either through incompetence, persistent negligence, refusal to carry out reasonable assignments, or disregard for scholarly and professional standards and ethics.

    d. Deliberately and gravely violated the rights and freedom of other members of the University community.

    e. Committed grave personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community.
    (CBA: 10.4.3 a, d, e)

We have attached the original copy of the specific charges by DSU which include details (specific title and course numbers, names of students involved, the nature of grade changes, dates when changes were made, names of instructors who taught courses in which grades were changed) of alleged violations. The detailed report of these violations fall into three main categories:

    1. Violation of policy regarding registration and awarding of grades

2

B0165

DSU-02457

2. Violation of policy regarding *Change of Grade*

3. Violation of policy regarding *Removal of Incompletes* and submission of *Missing* grades

In this report, we use the term *Grade adjustment* or *modification* to refer to the collective violations listed above to avoid confusion with *Change of Grade* which is a specific category of the violations above.

Upon receipt of Dr. Sessoms' notification of termination, and in accordance with section 10.4.4 of the CBA, Dr. Wendell Gorum indicated his intention to exercise his right to a hearing by an Ad Hoc Committee of his peers.

## CONSTITUTION OF AD HOC COMMITTEE

The Gorum Ad Hoc Dismissal Committee was formed on April 19, 2004, and consisted of five members and four alternates. However, most of the primary or initial members either declined the appointment or resigned for personal reasons, and it was only in late June, 2004, that a stable or steady committee consisting of the current members was established. According to the CBA section 10.4.11, the committee was charged with holding hearings to *make the findings of fact in the case by evaluating all documentary evidence, as well as witness testimonies from both parties, stating its conclusions and reasons therefore and making its recommendation* through the president of Delaware State University to the Board of Trustees, as to whether Dr. Gorum should be dismissed or not. The CBA further stipulates that the "burden of proof that *adequate cause exists* rests on the University and shall be satisfied by clear and convincing evidence in the record considered as a whole" (10.4.11.f). The Committee is satisfied that it performed its function in strict adherence to the CBA provisions.

## Committee Members

Yaw Ackah Ph.D. (Professor, Sociology; *Chair*)

3

B0166

DSU-02458

### a. Witnesses for Dr. Wendell Gorum
Dr. Johnny Tolliver, former DSU Provost and Dean of Academic Affairs

Dr. Scott King, (Former Chair of English Department, now Retired)

Ms. Joyce Bowers (Former DSU Assistant Registrar, now retired)

6 students (all associated with the alleged grade changes)

### B. Witness for Delaware State University
Dr. Allen Sessoms (President, DSU)

Dr. Kenneth Bell, (former Acting Provost and Vice President for Academic Affairs)

Dr. Tommy L. Frederick (Dean of College of Mathematics, Natural Sciences and Technology)

Mr. Glenn Parker, (Registrar of DSU)

Ms. Kim Walker (Associate Director of Athletics for Compliance President)

Dr. Michael Osei-Mensah (A faculty whose grades were changed)

Dr. Baruti Kopano (A faculty whose grades were changed)

Dr. DeWayne Wickham (A faculty whose grades were changed)

The committee's general assessment of the hearing is that it was effective and fair. Both parties were granted adequate time to exchange documents and information in the stipulation of facts in the case. Whenever necessary, the committee granted reasonable adjournments to enable both parties prepare material or to locate and make arrangements for the appearance of witnesses (CBA 10.4.4d) Furthermore, whenever necessary, the committee recalled certain witnesses for further interrogations to clarify any issues pertaining to the finding of facts.

### Assessment of Documentary Evidence and Witness Testimony
The case against Dr. Gorum is about the "adjustment" of grades for forty eight (48) Mass Communications students. The committee's task was to determine whether or not in the process, Dr. Gorum followed DSU established policies. Secondly, to determine whether or not Dr. Gorum's actions were in conformity with the general DSU practices and procedures (if identified), which may have been different from the policies. We list below some critical questions that need to be reconciled through systematic evaluation of all

5

B0167

DSU-02460

evidence and the review and assessment of all testimony, in order to facilitate the process of finding the facts.

1. Did Dr. Gorum *adjust* the grades of some or all the 48 Mass Communications students?

2. If yes, did he violate university policy in the process of the grade *adjustment?*

3. How did DSU practices and procedures for student grades adjustment differ from policies? (i.e. if there are policies on grade adjustment)

4. What are the Findings of Facts in this matter?

5. If it is determined that Dr. Gorum violated university policy, should any disciplinary action against him be taken under the *Unit* member status or in his capacity as chair of Mass Communications Department?

## DID DR. WENDELL GORUM ADJUST (CHANGE GRADES, SUBMIT MISSING GRADES, REMOVE INCOMPLETE) THE GRADES OF FORTY-EIGHT (48) STUDENTS?

In his post-hearing brief, Dr. Wendell Gorum's legal counsel, Mr. Gregg L. Zeff, argues that from a technical view point, Dr. Gorum can not and has not changed grades or improperly manipulated grades since he did not physically change the grades in the system. According to Dr. Gorum, the Registrar or his/her representative should be accountable for any violation of DSU policy resulting from the grade change which he submitted because, the office had the prerogative to accept or reject any grade adjustment forms that he submitted to the Registrar's office.

The committee finds this argument greatly flawed and unconvincing. First, the Registrar has no discretionary rights or power to effect grade changes. The registrar only enters grade changes into the system when submitted by an instructor or chair and only when

6

submitted in conformity with university policies. Secondly, documentary evidence clearly shows that in all cases, Dr. Gorum signed in the space provided for the instructor-of-record, instead of in the space designated for the chair. He did not even add an annotation that he was signing for the instructor, but represented himself as having taught the course or courses in which he was *modifying* grades. The committee strongly believes that Dr. Gorum purposefully and consciously misrepresented key information in the grade *adjustment* forms in order to mislead the Registrar, because he knew that the registrar would not have accepted any of the grade *adjustment* request forms if the Registrar was aware that Dr. Gorum substituted them without the permission or approval of the instructors-of-record. Mrs. Joyce Bower emphatically stated that she would never have accepted any adjustment of grade forms from Dr. Gorum had he indicated verbally or in writing that he had not obtained the permission of the instructor who taught the course to make such grade adjustment (Trans Sept. 29).

Throughout her testimony, Mrs. Bowers never claimed that she did not require the signature or approval of the instructor-of-record as condition for a grade adjustment. According to Mrs. Bowers she relied on "*...the integrity of them. Of all of them*". She was referring to the chairs (see Trans September 29 Pages 251). She would not have accepted any grade change requests had any chair been "*dumb enough*" to inform her that he or she did not obtain the permission of the instructor-of-record. Mrs. Bowers adds "*...if the chair comes in and says, I tried to reach the faculty member, but couldn't I'd have to tell him. I'm sorry. I can't accept this. You are telling me you've not been authorized to put in this change. So I can not accept*" (Trans Sept., 29; pp 251).

Of critical importance in the fact finding in this case, is whether or not Dr. Gorum made any serious or significant effort to contact or obtain approval of the instructors-of-record before submitting grade modification forms for their classes. Dr. Gorum has stated that for most of the grade *adjustments* he obtained the approval of the instructors. For example, on January 8, 2004, Dr. Gorum submitted grade changes for twenty seven (27) students in courses taught by Dr. Dawkins, Dr. Osei-Mensah, Ms. Jones and Dr. Wickham. Dr. Gorum testified that he made several attempts to reach all of these

7

B0169

DSU-02462

professors, and even had telephone conversations with them and obtained their approval to submit the grade changes. All the instructors have denied receiving any calls from Dr. Gorum or giving him permission to change grades in their courses. In all, Dr. Gorum effected grade adjustments in courses taught by seven Mass Communications instructors without their approval or without even consulting them.

More importantly, Dr. Gorum has not been able to provide any documents to support his claim that he received approval of the instructors to make any grade adjustments in the courses they taught. Although in his testimony, Dr. Gorum promised submitting phone logs from the Registrar's office and from his cell phone as proof that he made the calls to all the instructors on January 8, 2008, he never submitted them. The only logical conclusion we can draw is that Dr. Gorum did not make any attempt to contact the instructors as he claims, and that all seven Mass Communications instructors are telling the truth. Secondly, we can not find any motive for these professors to lie about these calls.

Nineteen (19) of the 27 grade changes effected by Dr. Gorum on January 8, 2004 were for *Broadcast Writing II* taught by Dr. Osei-Mensah in Fall 2003. Dr. Gorum increased the grades of nine of these students, removed incompletes and awarded grades to 4 students. He awarded grades to two students who where not on the roster and never attended the class. In the hearing, one of the students testified that several students had problems with Dr. Osei-Mensah because of his teaching style and his attitude towards students. Most of the students also complained that he had been using *Broadcast Writing I* syllabus to teach *Broadcast Writing II*. Dr. Gorum arranged for this particular student who had refused to take Dr. Osei-Mensah test, to complete only the projects outlined in the syllabus, and without taking the mid-term and final examination, Dr. Gorum issued an "A" grade to the student for the course. Upon cross-examination this student acknowledged that compared to other students who had completed the entire course content, she did not deserve the grade awarded to her by Dr. Gorum. She said" *I wouldn't say that I feel I should have received "A". No, I don't. Because as you say, I didn't take the midterm or the finals for the class. It was solely on the assignments in the syllabus"*

8

B0170

DSU-02463

Trans. Of Sept. 29, 2004; PG 75-76). The committee believes that part of Dr. Osei-Mensah's problem in the Mass Communications department could be attributed to personal conflict with Dr. Gorum. It is also conceivable that most of the students became rebellious because of Dr. Osei-Mensah's performance expectation compared to what they were accustomed to under Dr. Gorum.

None of the witnesses ever specifically stated that Dr. Tommy Frederick gave direct instructions to Dr. Gorum to make any form of grade adjustment without following due procedures. The general word used by most witnesses was that Dr. Frederick said that Dr. Gorum would *adjust* their grade. Given that there was evidence that Dr. Frederick had indeed returned some change of grade forms because they did not have the instructor's signature or did not have supporting documents, the committee concludes that Dr. Frederick did not instruct Dr. Gorum to effect grade changes for students without following due procedures.

Even after trying to convince the committee that Dr. Frederick specifically instructed him to change grade for students who had taken Dr. Osei-Mensah's course, Dr Gorum also claims that according to DSU practices a chair could change another professor's grade without requiring the Dean's signature. He cited the testimony of Dr. King who had testified that Dean Frederick specifically requested him (Dr. King) to assign grades to students on several occasions, to justify why he did not request Dr. Frederick's approval for the grade changes that he submitted. However, Dr. King cited an example of an adjunct teacher who had left the school without giving a grade to students and the discrepancies in the student's record and adjunct's record. It is in such a situation that the Dean will ask the chair to *"handle the matter"*. Dr. Gorum's case does not fit into any category that permitted him to change grades in courses taught by other instructors. Besides, several if not all, these professors could be reached by phone. Secondly, in most of the cases, the committee could not find any urgent reason for Dr. Gorum to change the grades without waiting for the return of the instructor, assuming that they could not be reached by phone.

9

B0171

DSU-02464

In summary, the committee has determined and is convinced that Dr. Wendell Gorum effected grade adjustments by submitting *Change of Grade* forms, *Missing Grade* forms, *and Removal of Incomplete* forms for 48 Mass Communications students, as alleged by DSU. Secondly, that he effected these changes without the approval or permission of the instructors who taught the courses and without the signature of the appropriate dean, which is Dr. Frederick as contained in the University Catalog (Catalog 2001-2003, pg. 25).

## DID DR. WENDELL GORUM COMMIT ANY VIOLATIONS IN THE PROCESS OF THE GRADE ADJUSTMENTS?

Dr. Gorum's defense on the issue of violating university policies some how contradicts his argument that he did not *adjust* students' grades as charged by the university. Dr. Gorum argues that the motives for his actions are relevant to the finding of facts, because all his actions were taken in the best interest of the students and in accordance with past practices and goals of DSU which were *designed to encourage and promote graduation rates and maintain scholarship*. Secondly, Dr. Gorum asserts that some his actions were taken to resolve grade issues for students who were wrongfully purged from the system by DSU. Yet, the committee can not identify a single student out of the 48, whose grade was *modified* to accommodate financial purge. The committee agrees that motives are relevant and necessary, and especially if they provide the bases for assessing the guilt, as well as the magnitude or severity, of the violations, for example as presented by the university.

The committee disagrees with Dr. Gorum's argument that his "motive in changing students grades was predicated on his desire to help students and DSU, or that his modification of grades were in the best interest of the students. This committee finds it difficult to understand why Dr. Gorum can not comprehend the long term devastating impact and ramifications of his randomly and indiscriminately assigning grades to students who clearly have not acquired the subject matter in the course. The committee has assessed that Dr. Gorum's true motive was to selectively help student-athletes to inappropriately meet NCAA requirements. This is highly unprofessional and unethical.

10

B0172

DSU-02465

The committee carefully examined documentary evidence submitted by both parties, and especially those submitted by Dr. Gorum on the *practices* and *Procedures* of DSU faculty and chairs regarding all categories of grade modifications at DSU, in order to clearly assess how these *practices and procedures* might differ from established DSU policies. The committee has carefully examined a random sampling of grade *adjustment* request forms that chairs and faculty of various departments have been submitting to the Registrar's office at DSU. We find that there is not a single grade modification form (removal of incomplete, supply of missing grades, change of grades) that was not correctly *signed* by the instructor-of-record, or the Dean, where applicable. In contrast, Dr. Gorum signed in the space allocated for the instructor in all the grade *modification* forms that he submitted to the Registrar's office. Although, there are rare cases where the chair signed change of grade forms for the instructor, Mrs. Bowers said that the Registrar's office would accept such requests "*as long as he had authorization from that faculty*).

Rather than give a list of all violations, and the names of all affected *students* and instructors, the committee has elected to summarize each category of grade modification violation and cite examples. We have also agreed to exclude student's names from this report, in order to protect their privacy.

## 1. Removal of Incomplete

Under DSU policy (*see DSU Catalog 2001-2003, Pg. 25 and Removal of Incomplete form*), the only authorized signature on a "*Removal of Incomplete*" form is that of the instructor who teaches a course and gives the initial incomplete. "*Signature of Instructor required*) is clearly written at the bottom of the *Removal of Incomplete* form, and not even the chair or Dean's signature is required. Yet, evidence submitted to this committee by DSU, indicates that Dr. Gorum signed *Removal of Incomplete* forms for several students in classes that he did not teach. For example, in December 2003 Dr. Gorum signed and submitted *Removal of Incomplete* forms for two (2) students to the Registrar's office in violation of DSU policy. The incomplete was initially given by Dr. Oei-Mensah. On January 8 and 27, 2004, Dr. Gorum removed Incomplete for two students in a course that was originally taught by Ms. Jones. In January 2004, Dr. Gorum again removed an

11

B0173

incomplete for two students who were registered in Practicum taught by Ms. Jones in fall semester, 2003.

## 2. Missing Grades

In the documentary evidence submitted to the committee by DSU, there are several illustrations of Dr. Gorum submitting *missing* grades for students in violation of university policy. For example, on July 17, 2003, Dr. Gorum submitted *missing* grade of "B" for a student in *Radio Stations Operations* (No. 55-362) taught by Dr. Kopano. According to Dr. Kopano there were only 15 students registered for this class and he could not recall this particular student having registered for the course.

## 3. Withdrawal (*DSU Catalog 2001-2003, Pg. 28-29*)

"W" or Withdrawal is a situation whereby a student officially withdraws from a course in order to avoid receiving a grade that might adversely affect his/her GPA. In principle, a "W" can not be changed, "except under some compelling reasons" (*DSU Catalog 2001-2003, Pg. 28*) or Administrative Withdrawal, and consequently there is no DSU form for removing a "W". However, a student received an "F" for Radio Station Operations: 55-362 (spring 2003) taken with Dr. Kapano (9/28, pp. 25-29). Dr. Gorum changed the grade from "F" to "W" and then from "W" to "A".

## 4. Retroactive Addition of Students to Courses

Dr. Wendell Gorum retroactively added and assigned grades to several students in courses in which these students were not officially registered and often without the knowledge or approval of the faculty teaching these courses. Dr. Gorum testified that such grades were awarded to students based on their participation in Practicum and Internship Programs organized by the Mass Communications Department. However *Practicum* and *Internship* were under the supervision or coordination of Ms. Dawn Jones and Professor Hagos. On May 8, 2003, Dr. Hagos submitted grades for 39 students in his capacity as coordinator of the Practicum, but between May 30, 2003 and September 12, 2003, Dr. Gorum, without consultation with Professor Hagos, submitted *missing* grades for an additional nine students, none of whom had been registered in this class. In addition Dr. Gorum gave all nine students "A" grade. In January 2004, Dr. Gorum also

12

B0174

DSU-02467

removed an incomplete for two students, and submitted missing grade of "A" for three students who were not registered in Practicum taught by Ms. Jones in fall semester, 2003.

Documentary evidence presented by DSU is replete with several examples of arbitrary or indiscriminate grade changes by Dr. Gorum, and in almost all these cases Dr. Gorum has not satisfactorily explained to this committee the bases (material covered, time spent, grading system etc) that he utilized to fairly grade these students. Some students did not remember ever attending a course for which they were assigned grades by Dr. Gorum. This committee concludes that the unchecked gratuitous award of grades to students, the inappropriate and unjustified removal of incomplete and submission of missing grades, the selective retroactive registration of students by Dr. Gorum into courses taught by other instructors gravely violated the rights of the affected instructors and students of the Mass Communications department. He has violated the rights of other students to a fair and impartial evaluation in the educational process. Therefore, the actions of Dr. Gorum are highly reprehensible, and warrant the condemnation of the academic community at large.

Regarding sanctions for his actions, Dr. Wendell Gorum has argued that he should not be subject to termination for activities or actions which he performed in his administrative capacity as chair of Mass Communications department and not as a DSU faculty. The committee strongly disagrees with this line of argument. According to section 2.1.2 of the CBA Dr. Gorum is a unit member, even while performing the role of chair. As a unit member, he is bound by all rules and regulations applicable to that role. On the other hand, he is also entitled to the protection provided in the tenets of the CBA. We do not believe that faculty can at one level utilize the CBA as a shield for protection from CBA violators, while at another level use their own interpretation of sections of the same CBA as a sword to cut a road through which to escape their own violations of the CBA.

13

Quite disturbing to the committee, is Mr. Glenn Parker's admission that he looked at grade changes processed in the fall of 2003, but did not take any action regarding grade change forms that lacked the appropriate signatures (Trans of 8/30/04). This committee questions why Mr. Parker or the administration selectively chose to only pursue the violations by Dr. Gorum, while neglecting violations of other chairs and administrators, and even members of his office, who in one way or another have taken part in, condoned or assisted in the devaluation of DSU educational system.

There is a conspicuous lack of consensus in the administration as to the appropriate sanction for Dr. Gorum perhaps as a result of their varied knowledge of prior DSU practices and procedures. Dr. Kenneth Boll accepted Dr. Gorum's proposal to step down as chair of Mass Communications department and to retire at the end of 2003-2004 academic year and passed on this recommendation to the President, Dr. Allen Sessoms. On the other hand, Dr. Tommy Frederick recommended to Dr. Allen Sessoms that Dr. Gorum be terminated. However, upon cross examination, Dr. Frederick stated that he would have only recommended Dr. Gorum's removal as chair of the department, and not outright dismissal had he shown remorse for his conduct. Considering the "gravity" of the allegations against Dr. Gorum as DSU claims, it is unclear to this committee how serious violations of academic standards and the integrity of the education system could easily be mitigated by a simple remorse statement. We are also disturbed by the lack of unanimity in the administration concerning the most appropriate sanction for Dr. Gorum's conduct.

Throughout her testimony Ms. Bowers recounted several instances during which pressure imposed on the Registrar's office by the strong drive of the administration to increase graduation rates. Ms. Bowers explained that even up to the Friday before commencement, the Registrar's office would often call chairs to submit Missing grades. In fact, in one instance, the Registrar's office sent a DSU security officer to a chair's home to secure grades to complete requirements for graduation. It was implicit in her testimony that the Registrar's office was sometimes aware that the chairs could not have obtained the approval of the instructor-of-record, especially given the urgency of

15

B0176

demand, but rather than deal with the truth, the office turned a blind eye. Dr. Johnny Tolliver also confirmed this practice. He testified that: *"The whole aim was to get students qualified for graduation"* (Trans. of 10/27/04 page 193) He further added, *"And in some cases where there was some controversy over some courses, we gave wide latitude in substituting courses so that students could meet graduation requirements"* (Trans. of 10/27/04)

In such an atmosphere of "subtle encouragement" to violate DSU procedures to meet graduation target or increase retention rate, it is not surprising that several individuals engaged in blatant, unprofessional and unethical conduct. As the committee has indicated, Dr. Gorum's case is only the "tip of the iceberg". This committee shudders to imagine the full extent of the iceberg that lies "submerged" or hidden!

## CONCLUSIONS:

a. DSU has proven by clear and convincing evidence that Dr. Wendell Gorum violated section 10.4.3 (a), (d) and (e) of the Collective Bargaining Agreement (CBA) between the board of Trustees of Delaware State University and the Delaware State University Chapter of the American Association of University Professors (AAUP).

b. Dr. Gorum submitted Change of Grade forms, Removal of Incomplete forms, and Missing Grade forms to all forty-eight (48) Mass communications students.

c. In all cases, Dr. Gorum misrepresented information on the form by signing as instructor for courses that he did not actually teach.

d. Dr. Gorum was aware that the Registrar's office would refuse any grade changes if he expressly stated that he was not the instructor-of-record or disclosed to the Registrar's office that he did not have the permission of the instructor-of record to change his or her grade.

16

B0177

DSU-02471

e. Dr. Gorum did not obtain the permission or approval of the instructor-of-record to execute modification of grade.

f. Dr. Gorum knew that DSU practices and procedures did not include signing of an instructor-of-record without indicating this fact on the form.

g. Dr. Gorum arbitrarily assigned grades to students for courses they were not registered in, and without any clear bases for evaluating the students.

h. Dr. Gorum retroactively registered and assigned grades to students for classes taught by other instructors, without consultation with these instructors.

i. Dr. Gorum awarded grades to some students in classes that the students had never attended.

j. There is no direct or convincing evidence that Dr. Frederick gave specific instructions to Dr. Gorum to change grades for any student.

k. Dr. Gorum is a Unit member of the CBA, and may be terminated for acts committed while discharging his professional responsibilities as chair.

l. The actions by Dr. Gorum violate the academic rights of faculty to solely control any grades they issue to students in classes they (the professors) taught.

m. Dr. Gorum's actions undermine the very tenets of the educational profession and rise to a level deserving condemnation by the academic community.

n. Dr. Gorum practiced favoritism, whereby selected students, especially athletes obtained grades in core courses in their major, without necessarily completing required course material.

17

B0178

DSU-02472

## INTRODUCTION

This is a report of the Ad Hoc Committee (Gorum Ad Hoc Dismissal Committee) which was formed jointly by Delaware State University (DSU) and the DSU Chapter of the Association of University Professors (AAUP) in accordance with Article 10.4.6a to hold hearing in the matter of Dr. Wendell Gorum, former Chair of the Mass Communications Department, who has been charged with violating section 10.4.3. a, d, e (see details below) of the Collective Bargaining Agreement (CBA). According to the DSU allegation, these charges ensued from violation of university policies by Dr. Gorum, in submitting change of grades, removal of incomplete and missing grade forms for forty-eight (48) Mass Communications students between the period 5/19/03 and 1/08/04 (see attached statement of charges). The University alleges that Dr. Gorum changed the grades of students in courses taught by seven (7) faculty of the Department of Mass Communications without their permission or approval.

## BACK GROUND OF VIOLATIONS

The background of the alleged violations by Dr. Gorum is systematically outlined in the brief prepared by Mr. Robert Dutson, the DSU counsel, which to a large extent has been paraphrased in this section. Delaware State University alleges that following a routine verification of eligibility requirements for NCAA Certification or compliance of Delaware State University (DSU) athletes, in early January, 2003, Ms. Kim Walker, Associate Director of Athletics for Compliance discovered that Mr. Marques Grant, a Mass Communication student's grade had been changed from a "W" to a "B" in CRN:15333, *Sound Production I*. Ms. Walker reported the matter to Mr. Glenn Parker, the DSU Registrar, who initiated an audit of all grade changes submitted in Fall semester, 2003. Mr. Parker found that Dr. Gorum had submitted 21 grade changes for the fall 2003 semester for courses in which he was not the instructor-of-record, and that many of the changes affected the student's academic, or graduation standing. Upon contact, the six (6) instructors-of-record denied knowledge of the grade changes and also denied giving Dr. Gorum permission to make the changes in their classes. Further audit by Mr. Parker, uncovered additional grade changes by Dr. Gorum for prior semesters. According to DSU, the investigation which included interviews with nine of the students whose grades had been changed, revealed that change of grades, removal of incomplete and missing

1

B0179

DSU-02456

Filippo Toscano Ph.D. (Associate Professor, English Foreign Languages; *Associate Chair*)

Gabriel D. Gwanmesia Ph.D (Professor, Physics & Pre-Engineering)

Lapointe Davis Ph.D. (Professor, Music and Visual and Performing Arts)

Edward Jackson Ph.D. (Professor, English Foreign Languages)

## HEARING

The hearing, including presentation of all witnesses by the University and Dr. Gorum was completed in seven sittings:

- August 30, 2004
- August 31, 2004
- September 28, 2004
- September 29, 2004
- October 27, 2004
- October 28, 2004
- October 29, 2004

All hearings took place in the MBNA building at DSU. Each session lasted from about 8 a.m to 4:30 pm with a one hour break at about noon. Dr. Wendell Gorum was represented by Mr. Gregg L. Zeff, attorney with Greg and Zeff in Philadelphia, while Mr. Robert Duston, of Schmeltzer, Aptaker & Shepard, and PC in Washington DC was counsel for Delaware State University. In accordance with the CBA, "verbatim recording of all testimonies" was taken by Ms. Tanya M. Congo, a Notary and Certified Professional Reporter. Although Dr. Gorum opted for a public hearing, apart from those listed above and the committee members, no outside person attended any of the hearings.

## DOCUMENTARY EVIDENCE AND WITNESSES

Both DSU and Dr. Wendell Gorum presented an extensive assortment of documentary evidence to the committee in support of their positions. In addition to Dr. Gorum's personal testimony, the committee heard testimony from a total of seventeen (17) witnesses – eight (8) for the university and nine (9) for Dr. Gorum, as outlined below.

4

B0180

DSU-02459

## DID DSU POLICIES DIFFER FROM PRACTICES AND PROCEDURES FOR STUDENT GRADE ADJUSTMENTS?

Notwithstanding the reprehensible actions of Dr. Gorum as outlined above, the committee was quite troubled and disappointed by the indirect role of former DSU administration in creating an atmosphere of pervasive laxity, lack of rule enforcement, and the absence of accountability at all levels that perpetuated and encouraged random and uncontrolled manipulations of student grades.

The chaotic state of practices and procedures for changing student grades at DSU was clearly summed up by Mr. Glenn Parker, DSU registrar who testified that on a scale of one to ten regarding procedures and practices at the Registrar's office, he would rank DSU as a five, based on his prior experience at other academic institutions (Trans 8/30/04, pg 139). According to Dr. Johnny Tolliver, former Provost and Vice President of Academic Affairs, when for example students were inappropriately purged from the system, chairs were allowed to evaluate their course work and assign grades. He emphatically stated in reference to Dr. Tommy Frederick, "... *as far as I know was allowing – this when I was Provost- he was allowing chairs in the College of Arts and sciences to do the same*." (Trans 10/27/04). Depending on a particular Chair's relationship with the staff in the Office of Records, in some instances he or she would go directly to the Record's Office and make grade changes without signatures from the Dean or the Vice President (Trans 10/27/04 pg 199).

There are several examples of inconsistencies in the administration's response to student academic problems and issues. For example, although not the covert "official policy", the administration often gave permission to some students to be given "special" assignments to improve their grades. Upon cross examination by counsel Zeff, Dr. Kenneth Bell, Former Acting Provost indicated that "*that would have been acceptable to me*" if Dr. Frederick had given Dr. Gorum permission to change Dr Osei-Mensah's grades. On the contrary, Dr. Sessoms in response to the same question said "Dean's *can't instruct somebody to change somebody else's grade*". It is quite obvious to this committee that there is a pervasive lack of consensus on how to react to any given situation regarding student grade problems.

14

B0181

DSU-02469

o. Dr. Gorum's actions violated the rights of students to a fair and impartial evaluation in the educational process.

p. This Committee is convinced that DSU university administration engaged in practices and procedures that encouraged and promoted inappropriate manipulation of student grades.

q. Although DSU has established policies regarding student grade change, practices and procedures were in such significant conflict with these policies as to render them ineffective.

## COMMITTEE'S RECOMMENDATIONS

1. The committee resolves that although Dr Gorum's unprofessional behavior is highly reprehensible, we do not recommend outright dismissal. We base our decision on the premise that the administration at Delaware State University, prior to Dr Sessoms term, had failed to stringently enforce accountability and violations of professional conduct, and thus created a climate within which several unit members violated university professional ethics. But for the grave, *outright misrepresentation on signatures* on forms submitted to the Registrar's office, some of the charges against Dr Gorum were endemic at DSU, and some sectors of the administration either by commission or omission participated in it. We strongly feel that Dr Gorum's case is the tip of the iceberg, and he is, in fact, the scapegoat (albeit a blamable scapegoat) whose investigation we hope has uprooted the roots of the poisonous tree and brought down all the poisonous fruits. We hope so!

We must emphasize that this is not to condone Dr Gorum's conduct. We believe he deserves a severe sanction but short of dismissal.

2. The committee joins the University's decision to relieve Dr Gorum of his position as chair. We join in this decision because we do not agree with Dr Gorum that he acted

18

B0182

DSU-02473

in the capacity as chair and therefore cannot be sanctioned as a unit member. As a chair, Dr Gorum continues to be a unit member, and therefore bound by, and entitled to, the protections provided in the tenets of the CBA. We do not believe that faculty can at one level utilize the CBA as a shield to protect themselves from violators of the CBA, and at another level use their own interpretation of sections of the same CBA as a sword to cut a road through it to escape from their own violations of the CBA.

3. Dr. Gorum should be reinstated effective May 01, 2005, as a full professor and assigned his full teaching responsibilities

4. Dr, Gorum should not be allowed to derive any financial compensation for assumed or real hardships suffered as a consequence of the dismissal proceedings for the period September 01, 2004 through April 30, 2005.

5. Dr Gorum should not be allowed to hold any position of authority/responsibility at DSU because he flagrantly abused this position.

6. Syllabi for courses to be taught by Dr. Gorum and all grades assigned by him must be approved (have the Dean's signature) by the Dean before submission to Records office.

7. Dr. Gorum should be placed on a 2-year probation during which he must be of good professional behavior, a violation of which should result in summary dismissal.

8. The University should not engage in any action following this investigation that can be objectively inferred as a vindictive retribution, or a way to get back at Dr Gorum.

9. DSU should draft a clear comprehensive policy regarding Grade changes, Incompletes, Withdrawals and submission of Missing Grades. Corresponding sanctions must be spelt out clearly.

19

B0183

DSU-02474

10. This Committee strongly recommends that any future violator (whether faculty, Registrar, Deans or Administrators) of DSU policies regarding grade changes be severely sanctioned.

FINAL NOTE:

This Committee highly commends Dr. Allen Sessoms, President of Delaware State University for taking a bold step towards stamping out a tradition of unethical and unprofessional conduct that have gravely undermined and devaluated the DSU educational system. It is regrettable that because of the covert and overt contributions of his former administration to the present violations by Dr. Gorum, we could not recommend a dismissal sanction. However, there is no iota of doubt in our collective conscience that Dr. Sessoms has chosen the right path, and deserves our high commendation.

20

B0184

DSU 02475

12/3/04

## Amended Specific Statement of Charges
## Against Dr. Wendell Gorum

In accordance with paragraph 10.4.3 of the Collective Bargaining Agreement, you have, through the conduct outlined below:

a.   Failed to perform professional responsibilities either through incompetence, persistent negligence, refusal to carry out reasonable assignments, or disregard for scholarly and professional standards and ethics.

d.   Deliberately and gravely violated the rights and freedom of other members of the University community.

e.   Committed grave personal misconduct of such a nature as to warrant and evoke the condemnation of the academic community.

Page 25 of the University Catalogue states that "Grade changes must be approved by the dean of the college or school in which the student is a major during the semester of instruction immediately following the semester the grade was issues. Grade changes for undecided majors must be approved by the dean of the College of Arts and Sciences." In addition, Dr. Frederick, Dean of Arts and Sciences has given specific direction that all grade changes will be submitted for his approval (with backup justifying the grade change) — a requirement you have complied with in the past. There are also established procedures requiring that removal of incompletes must be processed by the Instructor for a course or, in the absence of that Instructor, in consultation with the Dean.

Specifically, you changed student letter grades and/or violated procedures as follows[1]:

Instructor:   Prof. DeWayne Wickham (who denies that he gave permission for you to change the grade of a student in his class).  Grade changes do not reflect approval signatures other than your own for:

*Ethics and the Media*, CRN 14899, Course No. 55-407 (Fall 2003)
   • Khary Fleming, changed from F to C, 1/8/04 [DSU Exh. 11]
   • Kenneth McClain, changed from D to C, 1/8/04 [DSU Exh. 11]
   • JoAo MiJi, changed from D to C, 1/8/04 [DSU Exh. 11]
   • Sharod Oliphant, changed from D to C, 1/8/04 [DSU Exh. 11]

---

[1]    DSU has removed from this Amended Statement of Charges  all  prior claims concerning Eric Dodson (TV Production III, Course No. 55-373, Spring 2003 in which a grade of A was entered on 5/19/03 for a missing grade for Marc Gorum, without the instructor's knowledge or permission, and reflecting only your signature) and one course taught by Dr. Gorum (TV and Radio Announcing, Fall 2003, a grade of B changed to A on 1/29/04 for Richard Taylor that did not reflect approval signatures other than your own). DSU has also removed the allegations regarding the Practicum, Course No. 55-425 (Spring 2002), Mark A. Dungee, entered a grade of A for 6 credits and Jill St. Jean, entered grade of A , where the instructor of record is listed as Dr. Marcia Taylor (nee Benson).

B0185

DSU-02476

Instructor: Dr. Baruti Kopano (who denies that he gave permission for you to enter a student grade in his class). Grades entered as missing (from the Spring 2003 and Fall 2002 semesters) were not with the instructor's knowledge or permission and reflect only your signature:

*Intro to Mass Communications,* Course No. 0055-208 (Fall 2002)
- Aaron Matthews, entered a grade of B on 5/27/03 [DSU Exh. 18]

*Radio Station Operations,* Course No. 0055-362 (Spring 2003)
- C. Asare, entered a grade of B on 7/16/03 [DSU Exh. 18]

*Sound Production I,* Course No. 055-223 (Spring 2003)
- Antonio Alvarez, original grade of F, changed from W to A on 9/12/03 [DSU Exh. 15]

Instructor: Prof. Gary Dawkins (who denies that he gave permission for you to change the grade of a student in his class). Grade changes do not reflect approval signature other than your own for the following courses:

*Sound Production I,* CRN 15333, Course 55-223 (Fall 2003)
- Aaron Matthews, changed from W to B, 1/8/04 [DSU Exh. 13]
- Marques Gantt, changed from W to B, 1/8/04 [DSU Exh. 13]

*Sound Production II,* CRN 15328, Course No. 55-361-90 (Fall 2003)
- Morgan Parker, changed from D to C, 1/8/04 [DSU Exh. 13]
- Fredo Sanon, changed from D to C, 1/8/04 [DSU Exh. 13]
- Tony Anderson, changed from C to B, 1/8/04 [DSU Exh. 13]

*Radio Station Operations,* CRN 15509, Course No. 55-362 (Fall 2003)
- Morgan Parker, changed from F to B, 1/8/04 [DSU Exh. 13]
- Kenneth McClain, changed from F to B, 1/8/04 [DSU Exh. 13]

Instructor: Dr. Osei-Mensah (who denies that he gave permission for you to enter a student grade in his class). Grade changes do not reflect approval of signature other than your own for:

*Broadcast Writing II,* CRN 14900, Course No. 55-409 (Fall 2003)

- Blake Saunders, changed from C to A, 1/8/04 [DSU Exh. 20]
- Kenneth McClain, changed from C to A, 1/8/04 [DSU Exh. 20]
- Serena Warren, changed from C to A, 1/8/04 [DSU Exh. 20]

- Christopher Young, changed from C to A, 1/8/04 [DSU Exh. 20]

2

B0186

DSU-02477

- Carl Muckelroy, changed from C to A, 1/8/04 [DSU Exh. 20]
- Christopher Stevens, changed from C to B, 1/8/04 [DSU Exh. 20]
- LaByron Rose, changed from C to B, 1/8/04 [DSU Exh. 20]
- Laurence Henry, changed from C to B, 1/8/04 [DSU Exh. 20]
- Korey Parker, changed from C to B, 1/8/04 [DSU Exh. 20]

In addition, a Removal of Incomplete Grade Form was submitted by you for this class as the instructor, 1/8/04, with no other signatures, showing the following grades. Several of these students had never registered for the class or have received other grades.

- Kelle Alston          A          [DSU Exh. 21]
- Veronica Brinney      A          [DSU Exh. 21]
- Cynthia Jones         A          [DSU Exh. 21]
- James Mitchell        A          [DSU Exh. 21]
- Lauren Ricks          A          [DSU Exh. 21]
- Kenneth McClain       A          [DSU Exh. 21]
- David Newman          A          [DSU Exh. 21]

These changes collectively reflect the majority of the students in this course.

---

## PRACTICUMS/INTERNSHIPS

**Instructor: Dawn Jones** (who denies that she gave permission for you to enter a student grade in her class). A Removal of Incomplete Grade Form/Missing Grade Form was submitted 1/8/04 by you, with no other signatures:

*Practicum*, CRN 15000, Course No. 55-425 (Fall 2003)
- Reginald Rizer, entered a grade of A     [DSU Exh. 23]
- Sparkle Williams, entered a grade of A   [DSU Exh. 23]
- Shannon Jennings, entered a grade of A   [DSU Exh. 23]
- Antonio Alvarez, entered a grade of A    [DSU Exh. 23]

Three of these students had not previously registered for or had dropped this course.

An additional Removal of Incomplete form for this course was submitted January 27, 2004, for:
- Marcus Lusby, entered a grade of A       [DSU Exh. 23]

---

**Instructor: Prof. Asgede Hagos** (who denies that he gave permission for you to enter a student grade in his class). Grades entered as missing (from the Spring 2003 and Spring/Fall 2002 semesters) were not with the instructor's knowledge or permission and reflect only your signature:

3

DSU-02478

_Practicum_, Course No. 55-425 (Spring 2003)
- Riley Peoples, entered a grade of A on 7/15/03 [DSU Exh. 25]
- Jamie Goodman, entered a grade of A on 7/19/03 [DSU Exh. 25]
- Mandakova Clark, entered a grade of A on 7/28/03 [DSU Exh. 25]
- Anthony Leonard, entered a grade of A on 7/5/03 [DSU Exh. 25]
- Mecca Thomas, entered a grade of A on 9/12/03 [DSU Exh. 25]
- Chris Asare, entered a grade of A on 7/16/03 [DSU Exh. 25]
- Shannon Bellamy, entered a grade of A for 6 credits on 5/30/03 [DSU Exh. 25]
- Vanita Bentley, entered a grade of A on 5/30/03 [DSU Exh. 25]
- Antonio Alvarez, entered a missing grade of A for 6 credits on 5/19/03 [DSU Exh. 25]

_Internship_, Course No. 55-450 (Spring 2002)
- Serena Warren, entered a grade of A for 3 credits on 10/27/03 [DSU Exh. 25]

_Internship_, Course No. 55-450 (Fall 2002)
- Shannon Bellamy, entered grade of A for 3 credits on 5/30/03 [DSU Exh. 25]
- Aaron Matthews, entered a grade of A for 6 credits on 5/21/03 [DSU Exh. 25]

_Internship_, Course No. 55-450 (Spring 2003)
- David Kuti, entered a missing grade of A on 7/5/03 [DSU Exh. 25]

In all specific cases, these changes were processed by you directly with the Registrar's Office, with your representation that you were the Instructor of the course. None of these forms were filed with the Dean's Office or show the signature of the Dean, who denies that he approved them.

You were knowledgeable concerning the applicable policies and procedures. You were given an opportunity to provide the appropriate back-up documentation for grade changes or obtain the approval of the instructors and failed to do so.

H:\LIBRARY\DOCS\2951\29510\CORRB961331.DOC

4

B0188

DSU-02479

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-565 (GMS) |
| | : | |
| v. | : | |
| | : | |
| ALLEN L. SESSOMS, Ph.D., | : | |
| And BOARD OF TRUSTEES OF DSU | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |
| | : | |

### CERTIFICATE OF SERVICE

I Michael J. Logullo, Esquire, hereby certify that on September 25, 2007 I caused a true and correct copy o the foregoing APPENDIX IN SUPPORT OF PLAINTIFF'S MOTION IN OPPOSITION TO SUMMARY JUDGMENT to be served electronically via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Robert L. Duston, Esquire
Saul Ewing, LLP
2600 Virginia Avenue, NW
The Watergate, Suite 1000
Washington, DC 20037
(202) 333-8800
rduston@saul.com

Kimberly L. Gattuso, Esquire
Michael R. Robinson, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
(302) 421-6800
kgattuso@saul.com
mrobinson@saul.com

**SHELSBY & LEONI**


 /s/ Michael J. Logullo
MICHAEL J. LOGULLO, ESQUIRE
Mlogullo@mslde.com
221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*