# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,      )
                              )
        Plaintiff,          )
                              )     Civil Action No. 06-565-GMS
       v.                 )
                              )
ALLEN L. SESSOMS, Ph.D.,     )
                              )
        and            )
                              )
BOARD OF TRUSTEES OF        )
DELAWARE STATE UNIVERSITY,  )
                              )
        Defendants.      )

## REPLY MEMORANDUM IN FURTHER SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Robert L. Duston (Admitted Pro Hac Vice)
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037-1922
(202) 333-8800 (telephone)
(202) 337-6065 (facsimile)
rduston@saul.com

*Counsel for Defendants*

Kimberly L. Gattuso (No. 3733)
Michael R. Robinson (No. 4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19801
(302) 421-6800 (telephone)
(302) 421-5871 (facsimile)
kgattuso@saul.com
mrobinson@saul.com

*Counsel for Defendants*

DATED: October 3, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................iii

INTRODUCTION AND RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS ...................1

ARGUMENT ...................................................................................................2

I.  PLAINTIFF'S NARROWING OF HIS CLAIM TO PRESIDENT
    SESSOMS' APRIL 2005 RECOMMENDATION PRECLUDES
    ANY ARGUMENTS CONCERNING PRIOR ACTIONS........................................2

II.  THE COURT SHOULD REFUSE TO CONSIDER CLAIMS
     AND THEORIES THAT ARE OUTSIDE THE SCOPE OF THE
     PLEADINGS AND HAVE NOT BEEN SUBJECT TO A
     TIMELY MOTION FOR LEAVE TO AMEND..............................................2

III.  THE CLAIMS AGAINST THE BOARD OF TRUSTEES
      SHOULD BE DISMISSED BECAUSE THERE IS AN
      ADEQUATE REMEDY AT LAW. ..........................................................3

IV.  PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF
     PROVING THAT HIS ALLEGED SPEECH WAS MADE AS A
     CITIZEN, NOT AN EMPLOYEE.............................................................3

V.  PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF
    PROVING, AS
    A MATTER OF LAW, THAT HE ENGAGED IN ANY
    PROTECTED ACTIVITY.....................................................................7

    A.  None of the Alleged Protected Conduct Was Speech "On A
        Matter of Public Concern."........................................................7

    B.  Plaintiff Has Failed to Meet His Burden of Proving That
        His Alleged Conduct Is Protected under other Aspects of
        the First Amendment................................................................9

    C.  Plaintiff Has Failed to Meet His Burden under the
        *Connick/Pickering* Balancing Test. ...........................................10

VI.  PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF PROOF
     TO OVERCOME PRESIDENT SESSOMS' QUALIFIED
     IMMUNITY TO SUIT. .....................................................................11

VII.    PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF
        PROVING, THROUGH ADMISSIBLE EVIDENCE, THAT
        PRESIDENT SESSOMS KNEW OF OR CARED ABOUT THE
        ALLEGED PROTECTED CONDUCT..................................................................12

VIII.   PLAINTIFF HAS NOT MET HIS BURDEN OF CREATING A
        TRIABLE ISSUE OVER WHETHER PROTECTED ACTIVITY
        WAS A MOTIVATING FACTOR IN PRESIDENT SESSOMS'
        RECOMMENDATION. ......................................................................................16

        A.    The Conclusions of the AHDC as a Whole, and the Entire
              Record on Which They Were Based, Provided a
              Reasonable Basis for the President's Recommendation and
              Does Not Support an Inference of Pretext. ....................................................17

        B.    President Sessoms' Rejection of the AHDC's
              Recommendation of a Mitigated Sanction Does Not Permit
              a Reasonable Jury Could Infer that His Reasons Are a
              Pretext for Retaliation. .............................................................................19

IX.     PRESIDENT SESSOMS HAS MET HIS BURDEN OF
        SHOWING THAT HE WOULD HAVE MADE THE SAME
        RECOMMENDATION ABSENT THE ALLEGED PROTECTED
        ACTIVITIES....................................................................................................20

CONCLUSION....................................................................................................................20

# TABLE OF AUTHORITIES

Page

CASES

Blackburn v. United Parcel Service, 179 F.3d 81 (3d Cir. 1999) .................................................12

Brown v. Armenti, 247 F.3d 69 (3d Cir. 2001) ....................................................................7

Carter v. Delaware State University, 2002 U.S. Dist. LEXIS 4721
    (D. Del. March 21, 2002).................................................................20

Cobb v. Pozzi, 363 F.3d 89 (2d Cir. 2004)...........................................................9, 10

Connick v. Myers, 461 U.S. 138, 75 L. Ed. 2d 708 (1983) ..................................................7, 9, 10

Copp v. Unified Schl. Dist., 882 F.2d 1547 (10th Cir. 1989).........................................................9

Ferace v. Hawley, 2007 U.S. Dist. LEXIS 71437 (W.D. Pa., Sept. 26, 2007)................................9

Foraker v. Chaffinch, 2007 U.S. App. LEXIS 20739 (3d Cir. Aug. 30, 2007) ...........................4, 9

Garcetti v. Ceballos, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) ........................................1, 3, 4, 7

Greene v. Philadelphia Housing Auth., 105 F.3d 882 (3d Cir. 1997) ..........................................10

Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005)...................................................................16

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) ..........................................................7

Houlihan v. Sussex Technical Schl. Dist., 461 F. Supp. 2d 252 (D. Del. 2006) ...........................4

In re Integrated Health Services, Inc., 2007 U.S. Dist. LEXIS 67406
    (D. Del. Sept. 12, 2007) ......................................................................3

Johnson v. George, 2007 U.S. Dist. LEXIS 42465 (D. Del. June 11, 2007)..............................4, 7

McKee v. Hart, 436 F.3d 165 (3d Cir. 2006)...........................................................................2, 11

NAACP v. Button, 371 U.S. 415, 9 L. Ed. 405 (1963) ................................................................10

Owens v. Rush, 654 F.2d 1370, 1379 (10th Cir. 1981) ...............................................................10

Price v. Macleish, 2006 U.S. Dist. LEXIS 57026 (D. Del. Aug. 14, 2006) ...................................4

Rennie v. Klein, 653 F.2d 836 (3d Cir. 1981) .............................................................................10

Ruhlman v. Hankinson, 461 F. Supp. 145 (W.D. Pa. 1978).........................................................10

Sanguigni v. Pittsburgh Bd. of Pub. Ed., 968 F.2d 393 (3d Cir. 1992) ........................................7, 9

Stiner v. University of Delaware, 243 F. Supp. 2d 106 (D. Del. 2003)............................................7

Swartzwelder v. McNeilly, 297 F.3d 228 (3d Cir. 2002) ................................................................7

Trotman v. Board of Trustees, 635 F.2d 216 (3rd. Cir. 1980)........................................................7

Yon v. SEPTA, 2003 U.S. Dist. LEXIS 20189 (E.D. Pa. Nov. 4, 2003) ......................................12

## RULES

Fed. R. Civ. P. 15(a) ...........................................................................................................3

Fed. R. Civ. P. 56...............................................................................................................1

Fed. R. Civ. P. 56(e) ...........................................................................................................12

## INTRODUCTION AND RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

Plaintiff's Answering Memorandum tells a compelling story but omits large portions of the record before and the conclusions of the Ad Hoc Dismissal Committee (AHDC), is based on inadmissible testimony, and misrepresents or omits critical legal standards. DSU's President, Allen Sessoms, a senior state governmental official, has qualified immunity from suit; Plaintiff's response treats this case like a garden variety Title VII case. In 2006, however, the U.S. Supreme Court declared in <u>Garcetti</u> that all speech or conduct a public employee makes within the scope of his employment is not protected under the First Amendment; Plaintiff's response simply ignores that decision. Fed. R. Civ. P. 56 clearly requires parties to rely on admissible evidence; Plaintiff's response ignores Defendants' hearsay objections and treats faculty gossip as "fact." The AHDC heard and rejected all of the arguments and justifications Dr. Gorum is now repeating; found Dr. Gorum not credible; and concluded that his actions were adequate cause for termination and "undermine[d] the very tenets of the educational profession and [rose] to a level deserving condemnation." Plaintiff's response simply ignores the parts of the AHDC report he does not like, while according other conclusions as entitled to great deference. The errors and material omissions in Plaintiff's Statement of Facts are so numerous they cannot all be detailed in this Reply, but key issues are addressed in the arguments where they are relevant.

There are multiple, independent grounds for Summary Judgment set out in Defendants' Opening Memorandum in Support of its Motion for Summary Judgment, most of them issues of law for the Court. In response, Plaintiff's Opposition fails to meet his burden of demonstrating that there are material issues warranting a 7-day jury trial on any of them.[1]

---

[1]    Defendants' supplemental Appendix is cited as "C____." It includes excerpts of several depositions taken by Plaintiff on August 29, 2007. The transcripts were received later, and are cited in Plaintiff's Opposition.

**ARGUMENT**

I.   **PLAINTIFF'S NARROWING OF HIS CLAIM TO PRESIDENT SESSOMS' APRIL 2005 RECOMMENDATION PRECLUDES ANY ARGUMENTS CONCERNING PRIOR ACTIONS.**

Defendants never contended that claims related to Dr. Gorum's termination were untimely.  In response to Defendant's Motion that prior acts were outside the statute of limitations, Plaintiff went even further, and concedes that the initial investigation into grade changes and the AHDC hearing were *not* acts of retaliation; the only alleged acts of retaliation are Dr. Sessoms' April 14, 2005 letter to the Board and his comments during the Board's April 14 meeting. (Pltf. Mem. at 38-39).  This admission has evidentiary significance, and precludes any claim by Plaintiff, such as the one he makes regarding temporal proximity (Pltf. Mem. at 33-34), that prior acts by President Sessoms were motivated by retaliatory animus.  It is also a concession that the Board did not act with any retaliatory motive.

II.  **THE COURT SHOULD REFUSE TO CONSIDER CLAIMS AND THEORIES THAT ARE OUTSIDE THE SCOPE OF THE PLEADINGS AND HAVE NOT BEEN SUBJECT TO A TIMELY MOTION FOR LEAVE TO AMEND.**

In Section 1983 cases, principles of notice pleading and liberality of amendment must be balanced against the right of public officials not to be burdened with defending against frivolous lawsuits.  See, e.g., McKee v. Hart, 436 F.3d 165, 169 (3d Cir. 2006).  Defendants have objected to Dr. Gorum's expansion of his case from one "protected activity" in his Amended Complaint (alleged support of DeShaun Morris) to four allegations in his deposition.  (Def. Mem. at 10). The Amended Complaint was specific on the *theory* of the case—that Dr. Sessoms violated Dr. Gorum's "right to hold employment without infringement of his First Amendment right to *freedom of speech.*"  (D.I. 14 at ¶ 31-32).  Dr. Gorum is now attempting to add freedom of association and petition claims, without bothering to seek leave to amend.  (Pltf. Mem. at 24-26).

The Amended Complaint also specified that the alleged violation by President Sessoms was that he terminated Plaintiff's employment, but has now shifted to his recommendation.

President Sessoms and the DSU Board are responding to these new theories below—but they should not have to. Defendants have not consented to amendment under Fed. R. Civ. P. 15(a) to try these additional theories, and no such consent should be inferred from addressing them here as well as in later procedural motions. In fact, the Court should not consider any theories not specifically pled in the Amended Complaint. See, e.g., In re Integrated Health Services, Inc., 2007 U.S. Dist. LEXIS 67406, at *15 (D. Del. Sept. 12, 2007) (attached hereto as Exhibit A) (citing Aldinger v. Spectrum Control, Inc., 207 F. App'x 177, 180 n.1, 181 (3d Cir. 2006)) (affirming the district court's dismissal of a claim on the grounds that the party had not raised the issue in its pleadings, but instead first raised the issue in a brief filed in opposition to a motion for summary judgment).

## III. THE CLAIMS AGAINST THE BOARD OF TRUSTEES SHOULD BE DISMISSED BECAUSE THERE IS AN ADEQUATE REMEDY AT LAW.

The only reason the Board is a party in this action is to effectuate one type of injunctive relief—reinstatement of Dr. Gorum as a tenured professor. (D.I. 14 at ¶8; D.I. 15). Unlike Title VII, where reinstatement is the presumed remedy, under Section 1983 there is *no* injunctive relief if there is an adequate remedy at law. (Def. Mem at 15, citing Kerns v. Dukes, 153 F.3d 96, 111 n.6 (3d Cir. 1998). The Court lacks authority to award reinstatement, regardless of what Dr. Gorum wants. Plaintiff does not contest this principle, or request any other form of injunctive relief. (Pltf. Mem. at 39). Thus, there is no basis to keep the Board as a party.

## IV. PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF PROVING THAT HIS ALLEGED SPEECH WAS MADE AS A CITIZEN, NOT AN EMPLOYEE.

The entire approach to Section 1983 changed when the Supreme Court held in Garcetti v. Ceballos, that "when public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes." Garcetti v. Ceballos,

126 S. Ct. 1951, 1960, 164 L. Ed. 2d 689 (2006).  The Court concluded that "Ceballos did not act

as a citizen when he went about his daily professional activities.... When he went to work and

performed the tasks he was paid to perform, Ceballos acted as a government employee." Id. The

Court reserved comment on how its decision might apply to classroom instruction or academic

scholarship, id. at 1962, but the decision has been routinely applied to other situations involving

colleges and schools, calling into question many of the older precedents relied upon by Plaintiff.

See, e.g., Johnson v. George, 2007 U.S. Dist. LEXIS 42465 (D. Del. June 11, 2007) (attached

hereto as Exhibit B); Houlihan v. Sussex Technical Schl. Dist., 461 F. Supp. 2d 252 (D. Del.

2006).  The citizen/employee issue must be addressed before reaching whether an employee's

speech is of public concern.  See Foraker v. Chaffinch, 2007 U.S. App. LEXIS 20739, at *33 (3d

Cir. Aug. 30, 2007) (attached hereto as Exhibit C), affirming Price v. Macleish, 2006 U.S. Dist.

LEXIS 57026 (D. Del. Aug. 14, 2006) (attached hereto as Exhibit D).  Unlike the public concern

and the Pickering balancing test, which are questions of law, "the question of whether a

particular incident of speech is made within a particular plaintiff's job duties is a mixed question

of fact and law." Foraker, 2007 U.S. App. LEXIS 20739, at *25.

　　　　Plaintiff elected not to address the Garcetti arguments.  Tenured professors at DSU do not

have official job descriptions, but the scope of their varied rights and responsibilities can be

inferred from the Collective Bargaining Agreement ("CBA"), the Bylaws of the Board and the

Faculty Senate (posted on DSU's website) and Plaintiff's own perception of his actual or

perceived role.  The record shows that all three of Dr. Gorum's alleged protected actions fell

within a practical definition of his duties.

   a. <u>Support for Re-opening the Presidential Search</u>.  Dr. Gorum claims to have been

"part of the interviewing committee during the search for a new University President" in 2003.

(Pltf. Mem. at 27).  While that over-states his role, Dr. Gorum was elected to the Faculty Senate,

which is the primary governing body of the faculty.  (Faculty Senate Bylaws Art. I, §2; Art. II,

§§ 3-4) (C013; C014).  The Faculty Senate is given authority by the Board over academic

programs and student affairs.  (Osei Dep. at 4) (A000185).  The CBA refers to this as a shared

governance system, with the "the Faculty Senate as the primary body for insuring effective

Faculty participation in the governance of the institution...." (CBA Art. XIX, §§19.1(e); 19.4)

(C003; C007).  Faculty are obligated, as part of their workloads, to serve on their fair share of

committees, including the Faculty Senate.  (CBA Art. XII, §§12.3(l), 12.6.  (C002-2.1).

   Plaintiff's alleged protected activity occurred prior to and during a March 2003 Faculty

Senate meeting.  (Pltf. Mem. at 3-4; Def. Mem. at 11).  Dr. Osei, who chaired the Senate, was the

faculty representative on the Presidential Search Committee.  One agenda item was for Dr. Osei

to obtain and then transmit the Faculty Senate's input on this important hiring personnel

decision.  (Osei Dep. at 5-6) (A000185-186); (Fac. Sen. Mtg. Min.) (A00107).  In the context of

DSU's joint governance system, Dr. Gorum's alleged activities were pursuant to his official

duties as a DSU faculty member, not as a "private citizen."

   b. <u>Assistance to Student DeShaun Morris</u>.  Plaintiff's second alleged protected

activity is his help to the student caught with a loaded gun and gang paraphernalia in his dorm

room.  Dr. Gorum worked to get this student's sanction reduced from expulsion, then back on the

football field.  Plaintiff draws no legal distinction between the stages of his assistance, viewing it

as one activity.  (Pltf. Mem. at 4-5).  Dr. Gorum claims that he "had become the de facto advisor

to all DSU students with disciplinary problems as a result of his authorship of the DSU

disciplinary code and procedures" and emphasizes the importance of "a professor's ability to associate with and support his students." (Pltf. Mem. at 5, 24). While this description (without citation to the record) again exaggerates Dr. Gorum's role on campus, it does characterize his perception of his role in the DSU community. DSU Faculty, through the Faculty Senate, have a role in developing rules, regulations and discipline for the student body. (Fac. Sen. Bylaws Art. I, § 3(B) (C013). Only faculty, staff and students can serve as judicial "advisors." (A00096). Many of Dr. Gorum's actions occurred on-campus, or used DSU resources. (Def. Mem. at 19, citing Gorum Dep.). These facts, and Dr. Gorum's own perception of his role, demonstrate that his assistance to Morris arose from his duties as a DSU professor, not as a private citizen.

   c.   The Prayer Breakfast Invitation. Dr. Gorum's role as an undergraduate fraternity advisor was within his job duties. (See, e.g., Fac. Sen. Bylaws at 14) (C026). Dr. Gorum does not dispute the testimony that he used DSU facilities when planning the Alumni Chapter Prayer Breakfast. (Wilson Decl. ¶ 5) (A000333). Dr. Gorum refers to this event as "an assemblage of influential members of the University community as well as local and national politicians and dignitaries." (Pltf. Mem. at 26). Dr. Gorum could have argued that his work on the Prayer Breakfast committee was separate from his role as an employee, but chose to argue that "the cancellation served as a public notice of the new President's lack of support on campus." Id. Plaintiff cannot have it both ways. If this alleged "disinvitation" was intended as opposition by "one of the University's most popular professors" to the new President, as Plaintiff argues, then it was clearly done in his role as a faculty member, not as a private citizen.

## V. PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF PROVING, AS A MATTER OF LAW, THAT HE ENGAGED IN ANY PROTECTED ACTIVITY.

### A. None of the Alleged Protected Conduct Was Speech "On A Matter of Public Concern."

The basic standards for the "public concern" inquiry are set forth in Connick v. Myers, 461 U.S. 138, 75 L. Ed. 2d 708 (1983), but the application is fact specific. Two of the cases Plaintiff cites are easily distinguished. Swartzwelder v. McNeilly, 297 F.3d 228, 238 (3d Cir. 2002) involved a police rule restricting court testimony, which is always speech of public concern. In Trotman v. Board of Trustees, 635 F.2d 216 (3rd. Cir. 1980), the faculty launched widespread protests against their president's decisions to reduce the size of the faculty. The holding is of little value in light of recent precedents. If any of the professors' speech survived the Garcetti analysis, courts would focus on whether there were broader policy issues, or merely "internal personnel and operations matters" not protected by the First Amendment. See, e.g., Johnson v. George, 2007 U.S. Dist. LEXIS 42465, at *20. Stiner v. University of Delaware, 243 F. Supp. 2d 106 (D. Del. 2003), supports Defendants' Motion. The District Court granted Summary Judgment for the University because the professor's speech was not of concern to anyone except faculty members; was not in a public forum; and did not involve allegations of serious wrongdoing or illegality. The Court relied on Sanguigni v. Pittsburgh Bd. of Pub. Ed., 968 F.2d 393, 397-99 (3d Cir. 1992), which had affirmed dismissal of a school teacher's case involving a letter written in the school newspaper attacking the school's principal, where there was no broad social policy at issue or alleged violations of law. Accord Brown v. Armenti, 247 F.3d 69, 76 (3d Cir. 2001) and Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993). Plaintiff has not met his burden of getting over this high hurdle as to his alleged activities.

1. Support for Re-opening the Presidential Search. Plaintiff does not dispute that his "speech" involved either closed-door meetings, or possibly a brief comment at the Faculty

Senate meeting. (Def. Mem. at 17-18). The Meeting Minutes do not reflect any comment by

Dr. Gorum, but show that Dr. Hoff's motion to reopen the search was defeated 19-6, with 6

abstentions. (3/0/03 Fac. Sen. Min.) (A00105-107). Plaintiff has never explained *why* he

opposed hiring Dr. Sessoms or the other two candidates. There is no basis for concluding that

this was anything other than an internal personnel matter.

   2. <u>Assistance to Student DeShaun Morris</u>. Plaintiff chooses to focus on new theories

instead of responding to Defendants' arguments that one student's internal grievance to his

expulsion for having a loaded handgun in his room, or his efforts to become eligible to play

football, were not matters of public concern. (Def. Mem. at 19-20). Dr. Gorum admitted that the

lawsuit was all about football. (Gorum Dep. at 192) (A000229). While sports writers or avid

DSU football fans might feel otherwise, under First Amendment jurisprudence the fact that

Morris was an All-American does not convert his professional goals into a "public concern."

   3. <u>The Prayer Breakfast Invitation</u>. Dr. Gorum has produced evidence regarding

invitees, not attendees, but DSU will assume *arguendo* this was a popular event. There is no

admissible evidence that anyone outside the Alumni organizing committee and Dr. Gorum's wife

were aware of the alleged invitation by Cecil Wilson to President Sessoms, or the alleged

withdrawal of that invitation. (Gorum Dep. at 126-129) (A000214). The official invitations,

dated December 12, give the name of Keynote Speaker Ryle Bell; they do not mention President

Sessoms. (B0029). Plaintiff's argument that this was intended as and/or widely perceived as a

public challenge by Dr. Gorum to President Sessoms is a creation of counsel. Dr. Gorum

testified that he allegedly corrected a mistake by Mr. Wilson, and the revocation was handled

privately, not publicly. (W. Gorum Dep. at 126-29, 166-167) (A00124, A00223). The public

nature of the event does not change the private concern of the alleged speech, which was merely

to instruct a fellow alumni who had allegedly over-stepped authority to correct his mistake.

**B.    Plaintiff Has Failed to Meet His Burden of Proving That His Alleged
Conduct Is Protected under other Aspects of the First Amendment.**

Dr. Gorum's Opposition raises several new theories as to why his assistance of DeShaun

Morris was a protected activity.  (Pltf. Mem. at 25-26).  The first is "freedom of association."

The Third Circuit has previously declined to address whether the Connick "public concern" test

applies to claims involving the freedom of association.  See, e.g., Sanguigni v. Pittsburgh Bd. of

Public Educ., 968 F.2d 393, 400 (3d Cir. 1992); see also Ferace v. Hawley, 2007 U.S. Dist.

LEXIS 71437, at *23 (W.D. Pa., Sept. 26, 2007) (attached hereto as Exhibit E).  The majority of

Circuit Courts to address the issue have held that to be protected under the First Amendment, the

"association" must be on a matter of public concern.  See Cobb v. Pozzi, 363 F.3d 89, 102-105

(2d Cir. 2004).  As detailed above, DeShaun Morris' discipline and lawsuit were private

concerns.

Plaintiff's Opposition also mentions the "petition" clause, which protects individuals who

take advantage of formal mechanisms established by the government for redress of grievances.

Foraker, 2007 U.S. App. LEXIS 20739, at *7-8.  The cases cited by Plaintiff involve individuals

attempting to address their *own* grievances, not the grievances of others.  (Def. Mem. at 20).

Plaintiff does not claim, and there is no evidence, that *Dr. Gorum* engaged in petitioning activity

on his own grievances.

This leaves Plaintiff's final new theory, that Dr. Gorum is protected by the First

Amendment because he *assisted* in Morris' petition activities.  Plaintiff's primary authority,

Copp v. Unified Schl. Dist., 882 F.2d 1547 (10th Cir. 1989), is not described accurately; Copp

involved a janitor who promised to testify in a later case.  Plaintiff probably intended to cite

Owens v. Rush, 654 F.2d 1370, 1379 (10th Cir. 1981). Contrary to Plaintiff's implication, Owens does *not* support the idea that anyone "assisting" in any type of litigation is protected under the First Amendment. Owens merely construed the Supreme Court's decision in NAACP v. Button, 371 U.S. 415, 9 L. Ed. 405 (1963), as protecting association activities involving the assistance of litigation *vindicating civil rights*. Owens, 654 F.2d at 1379. In Button, the Supreme Court emphasized the "broad public significance" of "obtaining vindication of fundamental rights" through litigation, particularly "in the sensitive area of racial relationships." Button, 371 U.S. 453. Plaintiff's other authorities are based upon association for otherwise protected purposes except for Rennie v. Klein, 653 F.2d 836 (3d Cir. 1981), which has *nothing* to do with the First Amendment. Under Cobb v. Pozzi, association with persons filing a lawsuit or "petition" are only protected if the suit involves a matter of public concern. 363 F.3d at 102-105.

### C.  Plaintiff Has Failed to Meet His Burden under the *Connick/Pickering* Balancing Test.

Contrary to Plaintiff's assertion (Pltf. Mem. at 27), the Connick/Pickering balancing test is not an affirmative defense. The employer must raise and identify the potential disruption of the speech, but the issue is one of law that must be weighed by the Court in determining whether *Plaintiff* has met *his* burden of proof that he engaged in protected speech. (Def. Mem. at 20). The standard does not require proof of actual disruption, only be a substantial *risk* of disruption, dissension among co-workers, interference with management, etc. Greene v. Philadelphia Housing Auth., 105 F.3d 882, 888 (3d Cir. 1997). The only case cited by Plaintiff, Ruhlman v. Hankinson, 461 F. Supp. 145 (W.D. Pa. 1978), pre-dates Connick and has been superseded. Defendants detailed how Dr. Gorum's financial and other assistance to help Morris sue DSU, including soliciting witnesses, was potentially disruptive. (Def. Mem. at 20-21). Plaintiff simply

ignores these arguments, suggesting that the only relevant factor under the Connick/Pickering

test was whether there was disruption of President Sessoms' office. (Pltf. Mem. at 27-28).

## VI.    PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF PROOF TO OVERCOME PRESIDENT SESSOMS' QUALIFIED IMMUNITY TO SUIT.

Defendants' Memorandum, citing and applying recent Supreme Court and Third Circuit

law, sets out two additional, independent grounds for summary judgment that are questions of

law: (1) whether a Constitutional right would have been violated on the facts alleged and, if so,

(2) whether the right was clearly established at the time of the action. These also need to be

addressed before reaching questions of causation or pretext. (Def. Mem. at 24-27). Plaintiff

briefly cites one older case on the second issue, and offers no counter argument or discussion on

either point, preferring to discuss pretext. (Pltf. Mem. at 31).

Under Plaintiff's newest theory, the only alleged Constitutional violation is President

Sessoms' April 14, 2005 recommendations of a stronger sanction than was recommended by the

AHDC. (Pltf. Mem. at 39). Plaintiff offers no rebuttal to the testimony of the Board that it made

its own independent evaluation of the AHDC Report and the appropriate consequences.

(C. Smith Dep. at 36-37, 50-51, 63) (A00159-62). Plaintiff ignores the related argument seeking

partial summary judgment on damages arising from Dr. Gorum's termination. (Def. Mem. at

37). Plaintiff also ignores the fundamental Constitutional question—whether a public official

without authority to fire can be sued by a subordinate under Section 1983 for confidential

communications made to his supervisors (i.e., the Board), reflecting his personal opinions and

recommendations regarding the appropriate level of discipline for serious violations.

Defendants' analysis on this point, applying McKee v. Hart, 436 F.3d 165, 170-71 (3d Cir.

2006), stands unrebutted. These actions by President Sessoms, not known to Dr. Gorum, do not

rise to the level of a Constitutional violation, regardless of the motive. (Def. Mem. at 25-26).

**VII.    PLAINTIFF HAS FAILED TO MEET HIS BURDEN OF PROVING, THROUGH ADMISSIBLE EVIDENCE, THAT PRESIDENT SESSOMS KNEW OF OR CARED ABOUT THE ALLEGED PROTECTED CONDUCT.**

Unless Plaintiff has been able to overcome all hurdles in the prior five arguments, the Court need not evaluate the evidence concerning Dr. Sessoms' alleged knowledge or motives. If the Court reaches this issue, Defendants urge close examination of the testimony cited in Plaintiff's Opposition. Defendants' Memorandum detailed that key allegations were based on hearsay, rumor from unidentified sources, or raw speculation. Plaintiff's Opposition cites this same testimony as "fact," simply ignoring the hearsay objections. Where a non-proving party simply fails to address evidentiary objections, the Court need not parse the rules to see if some exception might apply; the Court can simply disregard the evidence, finding that Plaintiff has failed to meet his burden under Fed. R. Civ. P. 56(e). <u>Blackburn v. United Parcel Service</u>, 179 F.3d 81, 95 (3d Cir. 1999) (hearsay statements inadmissible at trial should not be considered when determine whether a plaintiff has established a triable issue of fact); <u>accord</u> <u>Yon v. SEPTA</u>, 2003 U.S. Dist. LEXIS 20189, at *28-29, *34 (E.D. Pa. Nov. 4, 2003) (attached hereto as Exhibit F). A few examples, focusing on President Sessoms' alleged knowledge of Plaintiffs' protected activity, should suffice.

a.    <u>Support for Re-opening the Presidential Search</u>. Dr. Sessoms unequivocally denied any knowledge of faculty efforts to re-open the search, or of Dr. Gorum's alleged involvement. (Sessoms Dep. at 6-7) (A000169). Dr. Osei denies saying anything about that issue, or about Dr. Gorum, to President Sessoms. (Osei Dep. at 17) (A000187). Plaintiff points to the public nature of the Faculty Senate meetings (Pltf. Mem. at 28), neglecting to mention that Dr. Sessoms was not even on campus, the Minutes do not mention Dr. Gorum, and individual votes were not reported. Plaintiff then cites hearsay or speculation from unidentified sources and the testimony of his own wife, who was repeating gossip about Dr. Osei. (Pltf. Mem. at 28,

citing W. Gorum Dep. at 48-49 and J. Gorum Dep. at 58) (A000200; A000249).  Defendants

previously detailed the further cross-examination pinning down that Plaintiff's knowledge was

all gossip and hearsay, and Jacquelyne Gorum's admission that she has no first hand knowledge

of any person who spoke to President Sessoms about this issue.  (Def. Mem. at 23, citing W.

Gorum Dep. at 50-51, 140-41, J. Gorum Dep. at 39-46) (A000201, A000216, A000245-47).[2]

Plaintiff's only "evidence" is inadmissible and cannot be considered.

      b.      The Prayer Breakfast Invitation.  It is Dr. Gorum's burden to produce admissible

evidence that (1) Cecil Wilson did invite and later disinvite President Sessoms to be a speaker;

(2) President Sessoms knew about both *and* knew that Dr. Gorum was responsible; and (3) that

President Sessoms cared.  The testimony that Jacquelyn Gorum (and possibly Mr. Wilson) might

have mentioned this social event in passing and encouraged Dr. Sessoms to attend, coupled with

the President's lack of recollection of the event four years later, is not relevant or probative.

      There is a dispute of fact over what Mr. Wilson might have said to his fellow Alumni.

Dr. Gorum and one other Alumnus (Mr. Torian) claim that Mr. Wilson told them he had

extended an invitation to President Sessoms.  These statements might be admissible for the fact

that the Alumni heard that statement—but are not for the truth of that statement.  President

Sessoms testified that he does not recall being invited to speak at that breakfast, and has never

attended it.  (Sessoms Dep. at 14-15) (A000169).  Mr. Wilson testified that he never extended an

invitation to speak, *and that he never talked to President Sessoms about Dr. Gorum.*  (Wilson

Decl. ¶¶10-12) (A000334).  Plaintiff offers no admissible evidence that Mr. Wilson subsequently

spoke to President Sessoms, or that he mentioned Dr. Gorum, or that President Sessoms cared.

---

[2]     Since Plaintiff has now abandoned his other new theory that his alleged "reputation" on campus
was protected activity, his speculation about whether anyone (including former President DeLauder) may
have communicated about Dr. Gorum is not relevant to President Sessoms' knowledge of these three
specific activities.

His beliefs are built on speculation and gossip. (Def. Mem. at 23, citing W. Gorum Dep. at 129-130, 140-141 and J. Gorum Dep. at 41-43) (A000214-16, A000245-46). The testimony of President Sessoms and Mr. Wilson on this issue stands unrebutted.

        c.     <u>Assistance in DeShaun Morris' Lawsuit</u>. Dr. Sessoms testified that when DeShaun Morris sued DSU over his football eligibility, the matter was turned over to outside counsel and that prior to this suit he was never told that Dr. Gorum was involved in Morris' lawsuit. (Sessoms Dep. at 26-27, 30-31) (C032, A000171). Dr. Gorum, in fact, admits that his involvement was behind the scenes. (Gorum Dep. at 176-77) (A000225). Immediately following the testimony Plaintiff cites, Dr. Gorum admitted that, in fact, *no one* has told him that President Sessoms knew he was involved in Morris' lawsuit. (Gorum Dep. at 178) (A000226). Dr. Gorum goes on to state that he simply *assumes* that Mr. Morris' attorney may have communicated his role to DSU's outside counsel, and further *assumes* that outside counsel communicated that to President Sessoms. (Gorum Dep. at 179-184) (A000226-27).

      Plaintiff's only other response rests on a single hearsay statement by Sheila Davis. (Pltf. Mem. at 30). Plaintiff chose not to depose Ms. Davis, and offers no declaration. Ms. Davis was not "a staff member of Sessoms' office" but a former Assistant Director of Human Resources. (Gorum Dep. at 52, 56) (A000201, C065). Dr. Gorum testified that sometime in the Summer or Fall of 2003, he had some interaction with Ms. Davis, and while Dr. Gorum doesn't "know about [her] precise words," the "essence" was that "I need to be careful because they were out to get me." (Gorum Dep. at 67-70) (A000202-03). Dr. Gorum further testified that Ms. Davis did not tell him who "they" were or for what "they were out to get" him. (Gorum Dep. at 69) (A000202).

Plaintiff's supposed "proof" concerning his assistance to Morris during the judiciary proceeding, and to the unfounded allegation that President Sessoms changed Mr. Morris' sanction, similarly have no basis in fact. (See Def. Mem. at 12-13, 23-24). Plaintiff's Opposition rests on citation of the Morris Complaint as if it were fact (Pltf. Mem. at 4), and double or triple hearsay conversations Morris allegedly had with the President's former secretary and with football coaches. (Pltf. Mem. 5, 30).[3]

Dr. Gorum's belief that President Sessoms was out to get him is bound up with his belief that he was an important person on campus. The only evidence on this alleged reputation comes from Dr. Gorum and his wife, and his alleged popularity among students he helped get out of trouble or get easy grades. Dr. Ackah, the AHDC Chair, who has been at DSU since 1992, testified that he knew Dr. Gorum's wife, but nothing of Dr. Gorum's reputation on campus. (Ackah Dep. at 6-7, 45) (C035.1-36, C037). President Sessoms said something similar. (Sessoms Dep. at 10-11) (A000168). Further evidence that Dr. Gorum may not have been accurately perceiving the motives of others can be found in comparing Board Chair Claibourne Smith's description of his occasional meetings with Dr. Gorum at the Board's annual faculty reception (C. Smith Dep. at 15) (A000154), with Dr. Gorum's belief that casual questions during one reception led Dr. Gorum to believe he had been "marked." (Pltf. Mem. at 4; Gorum Dep. at 112-113) (A000210).

When the inadmissible hearsay and speculation is stripped away, there is no evidence from which a reasonable jury could conclude that President Sessoms is lying, and both knew of *and* cared about Dr. Gorum's alleged protected activities.

---

[3]    It is important to note that this "evidence" comes from a student who admitted having a loaded gun in his dorm room to protect himself from his fellow former gang members from New Jersey and who, just a few months after his suit was dismissed, was expelled from DSU for possession of another weapon (a box cutter) and later convicted of attempted murder. (A000137, A000141-142, C008-11).

## VIII. PLAINTIFF HAS NOT MET HIS BURDEN OF CREATING A TRIABLE ISSUE OVER WHETHER PROTECTED ACTIVITY WAS A MOTIVATING FACTOR IN PRESIDENT SESSOMS' RECOMMENDATION.

Plaintiff's Opposition "pretext" discussion misstates the burdens in a Section 1983 case, and cites only Title VII cases involving the inapplicable McDonnell-Douglas burden-shifting formula. (Pltf. Mem. at 34-35). What some opinions confusingly call the Section 1983 "prima facie case" is a plaintiff's burden of production *and* proof that there is protected speech (an issue of law) as well as the existence of sufficient admissible evidence from which a reasonable jury could find that protected speech was a substantial or motivating factor behind the alleged retaliation. Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).

The testimony of Board Chair Claibourne Smith and President Sessoms has now been supplemented by the deposition of Vice President of Human Resources Mark Farley. President Sessoms relies heavily on Mr. Farley's advice in significant personnel matters. (Sessoms Dep. at 28-29, 32, 45-46, 65-66, 75-76)) (C032; A000171, A000173-174, A000177-178, A000180). Mr. Farley heard Dr. Gorum's defenses, yet still concluded early in the investigation that Dr. Gorum's conduct might warrant significant disciplinary action under the CBA.. (Farley Dep. at 11-17, 49-52, 54, 56) (C046-47, C055-56, C057). He was informed of all developments in the hearing, read both parties' briefs and understood Dr. Gorum's arguments. He gave copies of the briefs to the Board and the President, and discussed them in a Board meeting before April 14, 2005. (Farley Dep. at 23-26, 68-71) (C049-50, C060-61). Upon receiving the AHDC Report on April 12, President Sessoms asked Mr. Farley to draft a transmittal to the Board. Mr. Farley, with outside counsel, included a recommendation that termination was appropriate on the facts and consistent with the CBA.. President Sessoms agreed, and signed the letter. (Farley Dep. at 51-57) (C056-57). At the April 14 Board meeting, both President Sessoms and Mr. Farley gave their opinion that, notwithstanding the AHDC's recommendation, they believed termination was

appropriate, and the importance of holding people accountable for their actions.  (Farley Dep. at 71-74) (C061-62).

**A.   The Conclusions of the AHDC as a Whole, and the Entire Record on Which They Were Based, Provided a Reasonable Basis for the President's Recommendation and Does Not Support an Inference of Pretext.**

Plaintiff does not challenge the extensive precedent that evidence not actually known by President Sessoms is irrelevant and inadmissible on the issue of President Sessoms' motives (Def. Mem. at 21-24), but simply proceeds to cite highly selective portions of the AHDC record and conclusions.  Plaintiff argues that the President and the Board somehow erred by not considering that testimony (a procedural due process claim) while ignoring the fact that he waived his right to oral argument before the Board.

The AHDC Report must be read as a whole.  It is undisputable that the Committee carefully considered the arguments Dr. Gorum repeats in his Opposition, made credibility judgments, and found that DSU had met its burden of showing that there was "adequate cause" for dismissal.  The AHDC concluded that Dr. Gorum had misrepresented information on *48* grade adjustment forms by signing as instructor, not department chair; that he knew that it was against DSU policy to do so unless he had the permission of the instructor *or* either the Dean or Provost; and that Dr. Gorum "purposefully and consciously misrepresented key information in the grade adjustment forms in order to mislead the Registrar."  (AHDC Rep. at 7, 16-17, Concl. (b)-(f)) (A000029, A000038-39).  The AHDC also concluded that Dr. Gorum had engaged in favoritism to some students over others, and "undermined the very tenets of the educational profession."  (AHDC Rep. at 17, Concl. (m), (n)) (A000039).  Dr. Gorum "arbitrarily assigned grades to students for courses they were not registered in, and without any clear bases for evaluating students; retroactively registered and assigned grades to students for classes taught by other instructors, without consultation with these instructors," and "awarded grades to some

students in classes that the students had never attended." (AHDC Rep. at 11-12; 17, Concl. (g)-(i)) (A000033-34, A000039).

Dr. Gorum repeats arguments and stray pieces of testimony the AHDC considered and rejected, such as his claim that he had verbal permission from some instructors for grade changes he submitted on January 8, 2004. (Pltf. Mem. at 14). The AHDC had testimony and statements from these professors, phone records, and Plaintiff's shifting testimony, before concluding that Dr. Gorum was lying. (AHDC. Rep. at 8, 17) (A000030, A000039). Dr. Gorum rehashes the claim that he had Dean Frederick's approval to make grade changes in a class taught by Dr. Osei-Mensah. (Pltf. Mem. at 7-8). The President, the Board and Mr. Farley were aware of Dr. Gorum's claims, and they were summarized and rejected in the AHDC Report. (AHDC Rep. at 7-11, 13) (A000029-33, A000035); (Farley Dep at 17-21) (C047-48).

Two examples illustrate the highly selective way in which Plaintiff cites snippets of AHDC testimony from the volumes considered by the AHDC. Plaintiff includes a few quotes from former Registrar Joyce Bowers (Pltf. Mem. at 10), but omits the critical page, relied upon and cited by the AHDC, where Ms. Bowers stated that she would not have accepted any grade changes from a Department Chair "dumb enough" to inform her that they did not have permission from the instructor of record. (Bowers AHDC 9/29/04 Tr. at 251) (C076; AHDC Rep. at 7). Plaintiff also relies on portions of the testimony of former Provost Toliver (Pltf. Mem. at 12), ignoring Dr. Toliver's testimony that he implemented procedures to stop the unacceptable practice of Department Chairs making grade changes before taking every effort to consult with the instructor of record and, when that was not possible, getting the Dean's approval. (Toliver, AHDC 10/27 Tr. at 209-210; 213-16) (C078-79; C080-83).

One example out of many should illustrates the record underlying the AHDC's findings that Dr. Gorum engaged in academic fraud. Four of the grade changes involved a required class taught by Professor Dwayne Wickham. Dr. Gorum claimed that he had arranged for four student-athletes to take the class "independent study" in the Summer of 2003. He told them to register for Professor Wickham's class, but that they did not need to attend classes. Dr. Gorum admitted that these were special arrangements he made for athletes, and sometimes other students. After Professor Wickham had turned in his grades, Plaintiff submitted letter grade changes that he signed as the "instructor." Dr. Gorum claims he may have spoke to Professor Wickham, but argued the he did not ask for or need consent. The AHDC found Professor Wickham's testimony more credible. (Gorum AHDC, 10/29 Tr. at 108-116, 125-131, 150-151, 205-06) (C085-93, C094-100, C101-102, C103-104); (Wickham, AHDC 8/30 Tr. at 78-84) (C068-74). While the issue in this case in not the sufficiency of the record before the AHDC, but whether President Sessoms is lying about why he felt termination was the appropriate sanction, the extensive record upon which the AHDC made its findings amply support that result.

**B.      President Sessoms' Rejection of the AHDC's Recommendation of a Mitigated Sanction Does Not Permit a Reasonable Jury Could Infer that His Reasons Are a Pretext for Retaliation.**

President Sessoms has provided a reasonable, non-retaliatory explanation, detailed in both his April 14, 2005 letter and testimony, why he felt termination was the only appropriate sanction and why he rejected the AHDC's rationale for mitigating the sanction permitted by the CBA. The Board reviewed the AHDC Report and unanimously reached the same conclusion. So did Mr. Farley. (Farley Dep. at 71-74) (C061-62). With all due respect for the AHDC's efforts, there is nothing sacrosanct about their recommendation. Just because reasonable people with different roles at DSU differ over what is appropriate discipline for serious wrongdoing does not permit an inference that President Sessoms' is lying about his motives.

Plaintiff's argument that President Sessoms is not serious about enforcing the rules, was addressed previously in the detailed discussions as to why there is no *admissible* evidence of similarly situated employees. (Def. Mem. at 33-34). Plaintiff's Opposition does not include any admissible evidence of any single professor, who committed conduct similar to that cited in the AHDC Report, known by President Sessoms, who received a lesser sanction. Instead, Dr. Gorum repeats his AHDC testimony regarding hearsay statements with no details or names, and the more recent hearsay testimony with names but no details. (Pltf. Mem. at 18, 32). When DSU has had specifics, it has looked into them, but has yet to find any evidence on which to take disciplinary action against a current employee. (Farley Dep. at 34-37, 60-63) (C052; C058-59).

## IX.   PRESIDENT SESSOMS HAS MET HIS BURDEN OF SHOWING THAT HE WOULD HAVE MADE THE SAME RECOMMENDATION ABSENT THE ALLEGED PROTECTED ACTIVITIES.

If Plaintiff has met all other burdens, President Sessoms can still prevail on Summary Judgment by showing that he would have made the same decision absent protected activities. Carter v. Delaware State University, 2002 U.S. Dist. LEXIS 4721, at *5 (D. Del. March 21, 2002) (attached hereto as Exhibit G). Plaintiff offers no response to the oft-repeated testimony of Dr. Sessoms on the seriousness of academic fraud and the integrity of grades. (Def. Mem. at 36). Given the extensive violations found by the AHDC, and the strong views of President Sessoms and Mr. Farley, no reasonable jury could find that President Sessoms would have reached any different conclusion if Dr. Gorum had not played a role in a failed Faculty Senate motion in 2003, revoked a mistaken invitation, and/or assisted DeShaun Morris.

## CONCLUSION

For the forgoing reasons, and those set forth in Defendants' Opening Memorandum and the supporting record, Defendants' Motion for Summary Judgment should be granted.

**OF COUNSEL**
Robert L. Duston
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037-1922
(202) 333-8800
rduston@saul.com

DATED:  October 3, 2007

Kimberly L. Gattuso (No. 3733)
Michael R. Robinson (No. 4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19899-1266
(302) 421-6800
kgattuso@saul.com
mrobinson@saul.com

# EXHIBIT A

LEXSEE 2007 U.S. DIST. LEXIS 67406

In re: Integrated Health Services, Inc., et al., Debtors. Indemnity Insurance Company of North America, Plaintiff, v. Integrated Health Services, Inc., and ABE Briarwood Corp., Defendants. IHS Liquidating LLC, Plaintiff, v. Ace Indemnity Insurance Company, Defendants.

Bankruptcy Case No. 00-389 (MFW) (Chapter 11), C.A. No. 04-1262 (GMS), C.A. No. 05-376 (GMS)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2007 U.S. Dist. LEXIS 67406*

September 12, 2007, Decided
September 12, 2007, Filed

COUNSEL: [*1] For IHS Liguidating LLC, Plaintiff: Garvan F. McDaniel, LEAD ATTORNEY, Bifferato Gentilotti LLC, Wilmington, DE.

For Ace Indemnity Insurance Company, formerly known as Indemnity Insurance Company of North, Defendant: Benjamin C. Wetzel, III, LEAD ATTORNEY, Wetzel & Associates, P.A., Wilmington, DE; Natalie Marie Ippolito, Wetzel & Associates, P.A., Wilmington, DE.

For National Union Fire Insurance Company of Pittsburgh, PA, ThirdParty Defendant: Christopher Page Simon, LEAD ATTORNEY, Cross & Simon, LLC, Wilmington, DE; George G. Campion, Pro Hac Vice.

JUDGES: Gregory M. Sleet, CHIEF, UNITED STATES DISTRICT JUDGE.

OPINION BY: Gregory M. Sleet

OPINION

MEMORANDUM

I. INTRODUCTION

On May 6, 2005, IHS Liquidating, LLC (the "Liquidating LLC") commenced an adversary proceeding in the United States Bankruptcy Court for the District of Delaware against Indemnity Insurance Company of North America ("IICNA") seeking a determination of whether

coverage provided to Integrated Health Services ("IHS," of which the Liquidating LLC is a successor) by IICNA under an excess catastrophe liability policy had been triggered. (See D.I. 6 at 2.) IICNA filed a Motion to Withdraw Reference on June 8, 2005 (D.I. 1), and filed an Answer and Counterclaim [*2] to the Liquidating LLC's complaint on July 26, 2005. (See D.I. 6 at 2.) The Liquidating LLC filed a Reply to the counterclaim and a Third Party Complaint against National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and General Star Indemnity Company ("GenStar") seeking a declaration of coverage under policies issued by National Union and GenStar, and also seeking injunctive relief against IICNA. (See id.) IICNA answered the Liquidating LLC's Third Party Complaint and filed a cross-claim complaint against National Union and GenStar on September 19, 2005. (See id.) IICNA moved to amend its cross-claim complaint on October 31, 2006. (D.I. 29.) The court granted the motion by oral order on February 21, 2007, and IICNA filed its amended answer and cross-claim complaint with the court on February 28, 2007. (D.I. 57).

Presently before the court are four motions. The first is the Liquidating LLC's Motion for Partial Summary Judgment seeking summary judgment as to Count I of its complaint (D.I. 21). The second is IICNA's motion for summary judgment (D.I. 94). The third is National Union's cross-motion for summary judgment (D.I. 97). The fourth is IICNA's motion to amend [*3] its answer and cross-claim complaint (D.I. 102). Because the

2007 U.S. Dist. LEXIS 67406, *3

later-filed motions resolve issues relevant to the earlier motions, the court will address the motions in reverse chronological order. For the reasons that follow, the Liquidating LLC's motion for partial summary judgment and National Union's motion for summary judgment will both be granted, and both of IICNA's motions will be denied.

## II. BACKGROUND

This dispute involves the various coverages provided to IHS for the 1999 and 2000 policy years. Reliance National Indemnity Company ("Reliance") provided IHS's primary coverage with a matching deductible policy that provided coverage of either $ 4,500,000 or $ 9,000,000 aggregate (the "Reliance Policy"). (D.I. 21 at 7.) National Union provided IHS's next layer of coverage with a policy with a coverage limit of $ 25,000,000 per occurrence and aggregate in excess of the underlying coverage. (Id. at 9.) GenStar provided the third layer of coverage with a policy with a coverage limit of $ 25,000,000 per occurrence and aggregate in excess of the underlying coverage. (Id. at 10.) IICNA provided the fourth and final layer of coverage (the "IICNA Policy"). The IICNA Policy had a coverage [*4] limit of $ 50,000,000 per occurrence and aggregate in excess of the underlying coverage. (Id. at 11.)

Coverage under the IICNA Policy is afforded as follows under Section I(A) of the policy:

> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE (2) *only after all UNDERLYING INSURANCE has been exhausted by payment* of the limits of such insurance for losses arising out of OCCURRENCES that take place during Our policy period and are insured by all of the policies designated in the declarations

> as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than exhaustion of an aggregate limit of insurance, then We shall not pay *such* loss.

(D.I. 7-5 at 12.) (emphasis added). Section IV(I) of the policy provides:

> if any limits of liability of UNDERLYING INSURANCE . . . are unavailable due to bankruptcy or insolvency of an underlying insurer . . . then the insurance afforded by this policy *shall apply in the same manner as if such underlying insurance and limits of liability had been in effect, available, so maintained and unchanged.*

(Id. at 15.) (emphasis added).

National Union issued two policies to IHS for the 1999 and 2000 policy [*5] years. The first (the "Main Policy") was issued to IHS, and contained limits of $ 25 million per occurrence and aggregate. (D.I. 97 at 5.) The second (the "Lester Policy") was issued to IHS of Lester, Inc., a subsidiary of IHS, with a $ 2 million limit. (Id.) The 2000 Main Policy contained the following endorsement:

### Non-Pyramiding of Limits Endorsement

If damages covered by this policy are also covered in whole or in part by Policy Numbers 357-43-86 [the 2000 Lester Policy] and 357-43-88, our total Limits of Insurance under all policies combined shall be:

| $ 25,000,000 | Each Occurrence Limit |
| $ 25,000,000 | Each Medical Incident Limit |
| $ 25,000,000 | Products Completed Operations |
| | Aggregate Limit |
| $ 25,000,000 | Medical Professional Aggregate |
| | Limit |

2007 U.S. Dist. LEXIS 67406, *5

| $ 25,000,000 | General Aggregate Limit |
| --- | --- |

(Id. at 5-6.) The 2000 Lester Policy contains an identical anti-pyramiding endorsement, except that it refers to the IHS 2000 Main Policy number rather than the Lester Policy number. (Id. at 6.) These provisions (the "Non-Pyramiding endorsements") expressly limit the combined coverage for all IHS entities to $ 25 million for the 2000 policy period. The Non-Pyramiding endorsements did not appear in the 1999 National Union policies, [*6] but appeared in both of the 2000 policies.

In its motion for partial summary judgment, the Liquidating LLC seeks a determination that IICNA's policy obligates IICNA to pay professional liability and general liability claims that have been liquidated to the extent that such liquidated claims are in excess of the applicable per occurrence or aggregate limits of the underlying insurance coverage of IHS for the 1999 policy year. (D.I. 21 at 24.) IICNA opposes the motion by arguing that the IICNA Policy has not been triggered, because the coverage limits of the Reliance Policy were not exhausted by actual payment, and because the limits of the underlying coverage were improperly exhausted. (D.I. 6 at 4.)

IICNA has also filed a cross-claim complaint against National Union, and the remaining three motions relate to that cross-claim complaint. IICNA argues in its own motion for summary judgment that the Non-Pyramiding endorsements are not applicable to National Union's 2000 Main Policy and requests that the court declare that "IICNA is entitled to the limits of the 2000 Lester Policy." (D.I. 94, Wherefore clause.) In practical terms, IICNA is asserting that the limits of National Union's coverage [*7] for the 2000 policy year should be $ 27,000,000 (the sum of the limits of the 2000 Main Policy and the 2000 Lester Policy) instead of $ 25,000,000 (the limits of the 2000 Main Policy), and is asking the court to order National Union to reimburse IICNA for the $ 2,000,000 differential created by the Non-Pyramiding endorsements.

National Union opposed IICNA's motion for summary judgment and filed its own cross-motion for summary judgment on the grounds that IICNA's claim relating to the Non-Pyramiding endorsements was not pled in IICNA's amended cross-claim complaint. (D.I.

100 at 11-12; D.I. 97 at 10.) National Union further contends that because IICNA's counsel stated on the record that all of IICNA's claims against National Union except the claim relating to the Non-Pyramiding endorsements were being withdrawn, National Union is entitled to summary judgment on the entirety of IICNA's cross-claim complaint. (D.I. 97 at 7-8.) Shortly after National Union filed its motion for summary judgment, IICNA filed a motion to amend in which it asked for leave to replace all of the claims in the existing cross-claim complaint with a claim challenging the validity of the Non-Pyramiding endorsements. [*8] (D.I. 102.)

## III. STANDARD OF REVIEW

### A. Motion to Amend

Motions to amend under *Rule 15(b) of the Federal Rules of Civil Procedure* are made "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties." The issue of the Non-Pyramiding endorsements has not been tried by the parties, nor has National Union given its express or implied consent to try these issues. Consequently, the court reads IICNA's motion as a motion to amend under *Rule 15(a)* rather than a motion to amend to conform to evidence under *Rule 15(b)*. [1]

> 1   IICNA now appears to concur with this reading of its motion, since IICNA suggests in its reply brief that the provisions of 15(a) should apply to its motion to amend. (See D.I. 110 at 10.)

Under *Rule 15(a)*, permission to amend a pleading "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a). See also Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)* (same). Nevertheless, a court can deny a motion to amend if the motion is motivated by bad faith or if granting the motion will result in undue delay or prejudice to the opposing party. *See Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001)* (citations omitted). [*9] Furthermore, the doctrine of futility allows the court to refuse any amendment that fails to state a cause of action. *See Foman, 371 U.S. at 182.*

### B. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c); see also Boyle v. County of Allegheny Pa., 139 F.3d 386, 392 (3d Cir. 1998).* Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle, 139 F.3d at 393.* A fact is material if it might affect the outcome of the suit. *Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).* An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields, 178 F.3d 170, 173-74 (3d Cir. 1999).* [*10] If the moving party has demonstrated an absence of material fact, the non-moving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)).* The mere existence of some evidence in support of the non-moving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the non-moving party on that issue. *Anderson, 477 U.S. at 249.*

## IV. DISCUSSION

### A. Motion to Amend

A court may deny a motion to amend where the movant has unduly delayed in bringing the motion. *See Cureton v. Nat'l Collegiate Athletic Ass'n, 252 F.3d 267, 273 (3d Cir. 2001).* While delay alone is usually "an insufficient ground to deny leave to amend . . . at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* The plaintiff's delay may become undue after a motion for summary judgment is filed where the movant has had previous opportunities to amend a complaint, but chose [*11] not to do so. *See Bethany Pharmacal Co. v. QVC, Inc., 241 F.3d 854, 861 (7th Cir. 2001)* (denying leave to amend where the plaintiff "offered no

explanation for waiting until it was faced with a summary judgment motion before attempting to add its promissory estoppel claim" although claim was previously available). In particular, if the requested amendment is based upon facts known to the plaintiff at the time the previous complaint was amended, the amendment is disfavored. *See M/V Am. Queen v. San Diego Marine Constr. Corp., 708 F.2d 1483, 1492 (9th Cir. 1983)* (denying leave to amend where summary judgment was pending and amendment was not the product of newly discovery facts, but facts known at the time of the previous complaint).

Count II of the existing cross-claim complaint requests that the court require National Union to replenish the underlying policies in amounts equal to:

> (a) all amounts spent by National Union in connection with the defense of lawsuits and claims asserted against IHS of Lester and allocated toward the exhaustion of the 2000 IHS Main Policy's Limits of Liability . . .

> (c) all amounts spent by National Union . . . for Hamlin & Burton's administration of the 2000 [*12] IHS Main Policy . . .; and

> (d) all amounts spent by National Union . . . in payment of Chapter 400 fees. 2

(D.I. 57 at 30-31.)

> 2   Part (b) of the prayer for relief pertained only to GenStar, and all charges against GenStar have been dismissed by stipulation of the parties. (See D.I. 87.)

IICNA knew or should have known of the existence of the Non-Pyramiding endorsements at the time it filed its cross-claim complaint. In fact, as recently as February 28, 2007, IICNA filed a copy of its amended answer with the court that quoted numerous other provisions of the 2000 policy, but never made any mention of the Non-Pyramiding endorsements that it now seeks to invalidate. (See D.I. 57 at 16-17.)

In Count II of the existing cross-claim complaint, IICNA bases its claim that National Union improperly exhausted its 2000 policies solely on the allegation that

the 2000 Main Policy expressly excludes coverage for IHS of Lester. (Id. PP 101-104.) National Union therefore had no notice from the cross-claim complaint that IICNA might challenge the validity of the Non-Pyramiding endorsements, nor that it would be required to litigate on any specific provision of the 2000 policies other than the express exclusion [*13] clause.

IICNA asserts in its reply brief that National Union did not allow discovery to proceed on the 2000 policies until February 20, 2007. (D.I. 110 at 5.) If IICNA believed, however, that the Non-Pyramiding endorsements could become relevant to its claim, it could have mentioned the endorsements in its cross-claim complaint or phrased its claims in broader terms so that the claims might encompass the endorsements. Instead, IICNA made no mention of the Non-Pyramiding endorsements in its cross-claim complaint, and Count II of the cross-claim complaint was phrased very narrowly so that only the exclusion provision was implicated. (See D.I. 57 at 30-31.) IICNA must bear the consequences of its choice to phrase its cross-claim complaint in such narrow terms. IICNA did not allege the invalidity of the Non-Pyramiding endorsements in any pleading or motion filed with this court in connection with its cross-claim against National Union until IICNA filed its motion for summary judgment on June 25, 2007, after the discovery period had ended. The motion to amend was filed only after National Union filed its own motion for summary judgment and asserted that the existing cross-claim complaint [*14] did not raise the issue of the validity of the Non-Pyramiding endorsements. (See D.I. 97 at 10.)

Given these facts, the delay in filing the motion to amend is inexcusable. The proposed amended cross-claim complaint would effectively replace all of the existing claims in the existing cross-claim complaint with a new claim that was not raised until after the conclusion of the discovery period. The court finds that granting the motion to amend under these circumstances would be unduly prejudicial to National Union, and would not serve the interests of justice. The motion to amend is therefore denied.

**B. IICNA's Motion for Summary Judgment**

In its motion for summary judgment, IICNA does not ask the court to grant relief for any of the three remaining categories of expenditures articulated in its existing cross-claim. Instead, IICNA requests in its motion for summary judgment that the court declare that the

Non-Pyramiding endorsements are "not applicable as they are not part of the policies" and that "IICNA is entitled to the limits of the 2000 Lester Policy." (D.I. 94, Wherefore Clause.) In effect, IICNA contends that the Non-Pyramiding endorsements are invalid and should not be considered [*15] a part of National Union's 2000 policies.

National Union argues that no challenge to the Non-Pyramiding endorsement has been pled in the existing cross-claim, and that the relief requested by IICNA in its motion for summary judgment is not the same as that requested in its cross-claim complaint. (D.I. 100 at 11.) The court agrees. As discussed above, the claim challenging the validity of the Non-Pyramiding endorsement was not present in the copy of the cross-claim complaint that IICNA filed with the court on February 27, 2007, and the claim was not present in any pleading or motion filed with the court until IICNA filed its motion for summary judgment on June 25, 2007.

The claim relating to the invalidity of the Non-Pyramiding endorsements has not been pled, and summary judgment cannot be granted for unpled claims. *See Aldinger v. Spectrum Control, Inc., 207 F. App'x 177, 180 n.1, 181 (3d Cir. 2006)* (affirming the district court's dismissal of a claim on the grounds that the party had not raised the issue in its pleadings, but instead first raised the issue in a brief filed in opposition to a motion for summary judgment); *cf. White v. Anchor Motor Freight, Inc., 899 F.2d 555, 559 (6th Cir. 1990)* [*16] (holding that a party could not pursue an employment discrimination claim under one article of a labor agreement when the complaint was framed exclusively in terms of another article of the same agreement). Consequently, IICNA's motion for summary judgment is denied.

**C. National Union's Motion for Summary Judgment**

National Union moves to dismiss IICNA's entire cross-claim complaint on the grounds that all claims in the existing cross-claim complaint have been withdrawn, and that the claim based on the Non-Pyramiding endorsements has not been pled. IICNA contends that summary judgment would be premature given IICNA's motion to amend, and since the claim based on the Non-Pyramiding endorsements has, in any case, been sufficiently pled in its existing cross-claim complaint. (D.I. 105 at 14-15.)

For the reasons explained above, the court rejects IICNA's contention that its existing cross-claim complaint pleads its claim based on the Non-Pyramiding endorsements, and denies IICNA's motion to amend. The court also finds that the existing claims stated in IICNA's cross-claim complaint have been withdrawn, since IICNA's counsel stated on the record that "[e]very claim has been withdrawn except [*17] the claim with respect to the non pyramiding endorsement." (Deposition of Dennis Hecht, D.I. 98-2 at 10.) Furthermore, in its answering brief to National Union's motion for summary judgment, IICNA does not dispute that these claims had all been withdrawn. For these reasons, the court finds that all of IICNA's remaining claims against National Union in IICNA's amended cross-claim complaint have been withdrawn. The court therefore will grant National Union's motion for summary judgment.

**D. The Liquidating LLC's Motion for Partial Summary Judgment**

In its brief in opposition to the Liquidating LLC's motion, IICNA contends that the language of Section I(A) makes exhaustion of all underlying coverage through actual cash payments an absolute condition precedent to the attachment of IICNA's policy. IICNA then asserts that since Reliance's coverage was not exhausted due to Reliance's insolvency, and since the coverage limits of the National Union and GenStar policies were allegedly "improperly exhausted," IICNA has no obligation to make any payments to the plaintiff under the terms of the IICNA Policy.

The Liquidating LLC admitted in the brief accompanying its motion that Section I(A) relieves [*18] IICNA from any obligation to "drop down" to cover unpaid claims within the underlying layers of coverage. (D.I. 21 P 59.) The Liquidating LLC also argues, however, that when Section I(A) is read together with Section IV(I), the policy must be interpreted such that Reliance's insolvency does not affect IICNA's obligation to pay claims within IICNA's *own* layer of coverage. The court agrees with the Liquidating LLC's interpretation of the policy.

In attempting to resolve a dispute between parties regarding the proper interpretation of the language of an insurance policy, a court should first seek to determine the parties' intent from the language of the insurance contract itself. *Alstrin v. St. Paul Mercury Ins. Co.*, 179 F. Supp. 2d 376, 388 (D. Del. 2002) (internal citations omitted). In so doing, the court must construe the policy "as a whole." *Id.* All provisions should be given meaning and the policy should not be interpreted to render any part superfluous. *Id.*

In this case, accepting IICNA's interpretation of Section I(A) would require reading Section IV(I) out of the policy. The meaning of Section IV(I) is plain and unambiguous: the bankruptcy or insolvency of an underlying insurer, [*19] such as Reliance, does not affect IICNA's obligations with respect to claims within its own layer of coverage. Reading the policy so that Reliance's insolvency relieves IICNA of its obligation to pay out any claims thus would be wholly inconsistent with Section IV(I). Consequently, to the extent that Reliance was unable to pay out its claims as a result of its insolvency, the failure of Reliance to exhaust its claims through actual payments does not affect IICNA's obligations to IHS for claims within IICNA's own layer of coverage.

IICNA's claim that the underlying policies have been improperly exhausted does not affect the determination of the Liquidating LLC's motion. Even if claims against National Union or GenStar remained, IICNA's contention that the coverage limits of the underlying policies were improperly exhausted would not affect the determination of the narrow declaratory judgment that the Liquidating LLC seeks. The only issues before the court on the present motion relate to IICNA's policy with IHS, and under that policy, IICNA is obligated to pay claims if the coverage limits of all underlying insurance have been exhausted by payment or, as in the case of Reliance, could [*20] not be exhausted by payment due to bankruptcy or insolvency. (See D.I. 7-5 at 12.) It is undisputed that the coverage limits of the National Union and GenStar policies have been exhausted by actual payment, and the terms of the policy do not require an inquiry whether the payments were proper. Furthermore, all of IICNA's claims against GenStar have been dismissed and, as discussed above, IICNA's claims against National Union asserting that its policies were improperly exhausted have either been withdrawn or were not pled. As a result, IICNA's allegation that the underlying insurance was improperly exhausted does not alter the determination of IHS's motion.

The court also notes that IICNA spent several pages in its brief characterizing the plaintiff's motion for partial summary judgment as an attempt to force IICNA to "drop

down" and cover unpaid portions of the underlying insurance coverage, and arguing that IICNA has no such duty to drop down. Even a cursory review of the plaintiff's motion, however, reveals that the plaintiff is not requesting that IICNA drop down to provide coverage within a lower level of insurance. On the contrary, the Liquidating LLC merely asks IICNA to pay the [*21] portions of outstanding claims that *exceed* the coverage limits of all underlying insurance -- in other words, those portions of the claims that would be within IICNA's own layer of coverage. That request is wholly consistent with the terms of the IICNA Policy.

For these reasons, to the extent that Reliance was unable to pay out its claims as a result of its insolvency or bankruptcy, the court declares that the IICNA Policy obligates IICNA to pay claims that have been liquidated by judgment or settlement to the extent that such claims exceed the per occurrence and aggregate limits of liability set forth in the Reliance, National Union, and GenStar policies, regardless of whether the Reliance coverage has been exhausted by actual cash payments of claims and defense costs.

**V. CONCLUSION**

For the reasons stated above, the court denies IICNA's Motion to Amend (D.I. 102) and IICNA's Motion for Summary Judgment (D.I. 94), and grants National Union's motion for Summary Judgment (D.I. 96) and the Liquidating LLC's Motion for Partial

Summary Judgment (D.I. 21).

Dated: September 12, 2007

/s/ Gregory M. Sleet

CHIEF, UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's memorandum of [*22] this same date, IT IS HEREBY ORDERED that:

1. The Liquidating LLC's Motion for Partial Summary Judgment (D.I. 21) is GRANTED;

2. IICNA 's Motion for Summary Judgment (D.I. 94) is DENIED;

3. National Union's Motion for Summary Judgment (D.I. 96) is GRANTED;

4. IICNA's Motion to Amend (D.I. 102) is DENIED.

Dated: September 12, 2007

/s/ Gregory M. Sleet

CHIEF, UNITED STATES DISTRICT JUDGE

# **<u>EXHIBIT B</u>**

LEXSEE 2007 U.S. DIST. LEXIS 42465

**MARGUERITE A. JOHNSON, Plaintiff, v. ORLANDO J. GEORGE, JR., and DELAWARE TECHNICAL AND COMMUNITY COLLEGE, Defendants.**

**Civil Action No. 05-157-MPT**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2007 U.S. Dist. LEXIS 42465*

**June 11, 2007, Decided**

**PRIOR HISTORY:** *Johnson v. George, 2007 U.S. Dist. LEXIS 35344 (D. Del., May 15, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendants, her former employer and a supervisor, alleging a free speech violation, retaliation and wrongful termination, that she was wrongfully deprived of a property interest by being placed on administrative leave without a grievance procedure, and that she was denied procedural due process with respect to a pretermination hearing. Defendants moved for summary judgment. The employee contested the motion.

**OVERVIEW:** The employee was a campus director of a community college. After she made especially antagonistic comments during a departmental meeting regarding a new campus policy, she was placed on paid administrative leave pending an investigation. A grievance was denied on the basis that such leave was not grievable. An investigation revealed that the employee abused her position by using personnel and materials for personal reasons, misused a college credit card, and was abusive toward employees. After a pretermination hearing, wherein the employee was permitted to present evidence to an independent impartial hearing officer, she was terminated. The court granted summary judgment for defendants. The employee's comments at the meeting were not protected speech because it did not target matters of public concern. The employee received due process because she had six months notice of the charges and an opportunity to present evidence at a hearing. There was no substantive due process violation because the termination decision was not malicious, arbitrary, or

irrational. Defendants were entitled to qualified immunity since there was no violation of clearly established constitutional rights.

**OUTCOME:** The court granted defendants' summary judgment motion.

**COUNSEL:** [*1] Gary W. Aber, Esquire, Aber, Goldlust, Baker and Over, Wilmington, Delaware, Attorney for Plaintiff.

David H. Williams, Esquire, Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, Attorney for Defendants.

**JUDGES:** Mary Pat Thynge, U.S. Magistrate Judge.

**OPINION BY:** Mary Pat Thynge

**OPINION**

**AMENDED MEMORANDUM OPINION**

June 11, 2007

**Mary Pat Thynge, U.S. Magistrate Judge**

**I. INTRODUCTION**

This is an employment discrimination case. On March 15, 2005, Marguerite A. Johnson ("Johnson") filed a complaint [1] against Orlando J. George, Jr., ("George") and the Delaware Technical and Community College (the "College" or collectively, "Defendants") alleging violation of her right of free speech under the *First*

2007 U.S. Dist. LEXIS 42465, *1

*Amendment* and *42 U.S.C. § 1983*. Johnson claims that her comments led to retaliatory action resulting in her wrongful termination. Johnson alleges that she was wrongfully deprived of a property interest by being placed on administrative leave from the College without a grievance procedure, and was denied her procedural due process rights in the events prior to and during a termination hearing.

    1  D.I. 1.

    [*2] In support of their motion for summary judgment, Defendants argue that Johnson's statements are not protected under the *First Amendment*, that paid administrative leave does not deprive her of property rights, and procedural due process was more than adequate. This is the court's determination of that motion.

## II. BACKGROUND

    Delaware Technical and Community College is a state-wide institution of higher education with campuses in Wilmington, Stanton, Dover (the Terry Campus) and Georgetown. Johnson began her employment 1970 as a GED Instructor and ultimately rose to one of the top leadership positions at the College in 1994. Johnson's success over the years was attributed to her being "a tough cookie who didn't pull punches." [2] Detracting from her successful record were reports of a change in Johnson's behavior. [3] In a November 26, 2002 letter to Johnson, [4] George expressed concern that her behavior was "all too frequently out of control," and asked that she either take remedial steps to correct her behavior or submit to a thorough investigation of the allegations. Ultimately, Johnson agreed to engage an outside consulting firm for counseling and behavior modification. [*3] Allegations of Johnson's abusive, contrary and disrespectful behavior to both colleagues and subordinates continued through 2004. [5]

    2  D.I. 115 at 5.
    3  D.I. 108 at 3 (George first started hearing complaints about Johnson's behavior in 2002).
    4  D.I. 109 at 128 (That letter also states that George was "deeply concerned because the unacceptable behavior described is strikingly similar to many anecdotal reports I have received concerning your behavior").
    5  D.I. 108 at 6.

The complaints surfaced a final time in a report to

George of Johnson's antagonistic comments during a departmental meeting. The meeting took place, in part, to introduce a new campus-wide technology policy. Prior to the meeting, and in an effort to consolidate business practices, the President's Council [6] decided to reorganize the Campus Information Technology ("IT") Division. With his Vice-Presidents' advice and agreement, George established the new IT strategy and leadership program, which included a directive to strictly support [*4] and follow the new IT director and his agenda. [7] During the November 19, 2004 meeting of the Terry Campus Department Chairs, Johnson's comments "left many with the sense that [she] was unaware of the changes brought about by the reorganization." [8] It was reported to George that Johnson's questions were antagonistic and inconsistent with those of a Campus Director, and expressed a negative attitude toward the new IT policy and disdain for Mr. Shoudy. [9]

    6    The President's Counsel constituents were George and the six Vice-Presidents (including Johnson). During the latter half of 2005, George was the President of the College and Johnson was a Vice-President and Director of the Terry Campus.
    7  D.I. 108 at 4 (Mr. Peter Shoudy, the school's Chief Technology Officer).
    8  D.I. 109 at 33.
    9  *Id.*

    George, once again, suggested that an investigation be made into the allegations of improper conduct by Johnson to "get to the bottom and determine whether or not [the] incidents have any substance to [*5] them." [10] He suggested that Johnson either take an administrative leave while the investigation was ongoing, or alternately, accept an early retirement from her position. Johnson replied that neither option was acceptable. [11] On January 3, 2005, George placed Johnson on administrative leave with full pay and benefits, pending an investigation which focused on the allegations about her behavior. In a confidential memorandum, George asked that Johnson gather her personal belongings and leave at the end of that day. The memo stipulated that she neither talk to College employees to discuss the investigation, nor visit College facilities without prior permission. [12] A general announcement was issued stating that Johnson was on administrative leave and that Daniel Simpson would be acting director of the Terry Campus. Johnson subsequently filed a grievance with Human Resources,

which was denied on the basis that paid administrative leave is contractually a non-disciplinary and non-grievable action, [13] because Johnson was not adversely affected by the leave. [14] On March 15, 2005, Johnson filed the present matter.

[*6]

10  D.I. 108 at 6.

11  D.I. 116 at 49.

12  *Id.* at 50.

13  D.I. 119 at 3.

14  D.I. 109 at 87.

An investigation was undertaken by the College's attorney, David Williams, Esq., and an accountant from the Santora Baffone CPA Group. The investigation uncovered that Johnson abused her position at the Terry Campus by using personnel and materials for personal reasons, misused a College issued credit card, and was abusive toward employees. The CPA Group produced a report (the "Santora Report") outlining the abuses and sent it to Johnson on April 15, 2005. As a result of the investigation, George determined that a pre-termination hearing was in order. On April 26, 2005, upon the recommendation of counsel, the College's Board of Trustees adopted new rules of procedure for conducting termination proceedings to protect Johnson's due process rights, [15] which afforded rights that were not included in the College's Personnel Policy Manual. [16] Specifically, the new rules provided:

    1. Notice of the reasons for termination.

    2. A hearing before an independent, impartial Hearing Officer.

    3. The right [*7] to confront and cross-examine witnesses testifying under oath.

    4. The creation of a stenographic record.

    5. The burden of the College to establish one or more reasons for termination by a preponderance of the evidence.

    6. The preparation of a written decision by the Hearing Officer.

    7. A binding and final decision by the Hearing Officer. [17]

On the following day, Johnson was sent notification of the College's intention to terminate her employment which included the grounds for termination and the new hearing procedures.

15  D.I. 109 at 30 (George Deposition, November 30, 2005).

16  D.I. 108 at 9 (The College's Personnel Manual afforded notice of the reasons for termination, affidavits from persons supporting termination, a hearing presided over by the College's chief legal counsel, no right to address or cross-examine witnesses at the hearing, and a final recommendation by counsel to the Vice-President).

17  D.I. 109 at 43 (The new rules for a pre-termination hearing were to assure that a Vice-President would receive a hearing before an independent and impartial decision maker).

[*8] On May 11, 2005, retired Delaware Superior Court Judge Vincent Bifferato was appointed as the hearing officer in the matter. [18] On June 17, 2005, the College identified its witnesses and on June 28, 2005, Johnson received the College's hearing exhibits, and affidavits from witnesses. On the following day in a two-day hearing, the College presented 13 witnesses and 30 exhibits. Through counsel, Johnson cross-examined the College's witnesses. Johnson testified on her own behalf and presented 6 witnesses and 47 exhibits. Judge Bifferato reviewed the eight page report from the Santora Baffone Group to determine if Johnson's actions were consistent with College policy. The audit conducted by Santora Baffone was in accordance with standards established by the American Institute of Certified Public Accountants. [19] On July 19, 2005, after reviewing the evidence presented at the hearing, including the exhibits, Judge Bifferato issued a decision that Johnson be terminated for cause. He found that the College met its burden of proof by a preponderance of the evidence that "Johnson inappropriately used College personnel and materials for personal matters" and that "Johnson did not fully and [*9] equitably replay [sic] the College for such labor and materials." [20] In addition, he commented that Johnson followed a "pattern of abuse in the use of [her] College [issued] credit card." [21] Finally, he concluded that Johnson's actions clearly met the requirements for

2007 U.S. Dist. LEXIS 42465, *9

termination outlined in her employment contract. [22] Consistent with the findings of Judge Bifferato, Johnson's employment was terminated on July 19, 2005.

> 18    Bifferato was recommended by Hope Murray, head of Human Relations, and selected by George.
> 19    D.I. 109 at 46 (The report was reviewed by the State of Delaware Office of Auditor of Accounts. In the report, dated November 10, 2005, the Auditor concurred with the findings of the CPA Group and referred the case to the Office of Attorney General for the State of Delaware for review and any further action). D.I. 109 at 212.
> 20    D.I. 116 at 109.
> 21    *Id.* at 110.
> 22    *Id.* at 111.

## III. LEGAL STANDARD

Summary Judgment

A grant of summary judgment [*10] pursuant to *Fed. R. Civ. P. 56(c)* is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [23] A *Rule 56(c)* movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case." [24] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." [25] To avoid summary judgment, a plaintiff must offer "concrete evidence from which a reasonable [trier of fact] could return a verdict in his favor" and may not rely on unsupported assertions or conclusory allegations. [26] Even so, the nonmovant must be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the nonmovant. [27]

> 23    *Lujan v. National Wildlife Federation, 497 U.S. 871, 884, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).*

[*11]

> 24    *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*
> 25    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.*

> *Ed. 2d 538 (1986).*
> 26    *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*
> 27    *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992).*

*First Amendment* Protection

The United States Supreme Court's decision in *Garcetti v. Ceballos* [28] addresses whether a public employee's speech is protected under the *First Amendment*. In prior opinions, the Court "identified two inquires to guide interpretation of the constitutional protections accorded to public employee speech." [29] The first requires determining if the employee was speaking "as a citizen on a matter of public concern." [30] If not, there is no motivation for retaliatory action and therefore, no cause of action. [31] The second question is whether the employer had adequate justification to restrict the speech, relating the content of the speech to the employer's interest in promoting efficiency for the public [*12] service it performs. [32] Ultimately, the burden of showing that the speech is protected rests with the employee. [33] In *Garcetti*, the Court maintains the delicate balance of interests between when an employee speaks as a citizen addressing a matter of public concern, and when an employee is "simply performing [her] job duties, [where] there is no warrant for a similar degree of scrutiny." [34] It reasons that public employees occupy trusted positions in society, and therefore, when they speak out against government policy, the speech can impair the proper performance of government functions. [35] It found that "the *First Amendment* does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." [36] While the dissent in *Garcetti* argued that the need for balance does not disappear "when an employee speaks on matters his job requires him to address," [37] an employee "should not prevail on balance unless he speaks on a matter of unusual importance and satisfies high standards of responsibility in the way he does it." [38] Eligible subject matter for comment would include: "official dishonesty, deliberately unconstitutional [*13] action, other serious wrongdoing, or threats to health and safety." [39]

> 28    *Garcetti v. Ceballos, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).*
> 29    *Id. at 1958* (citing *Pickering v. Bd. of Educ.,*

*391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).*

30  *Id.*

31  *See Mt. Healy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).*

32  *See Garcetti, 126 S. Ct. at 1957.*

33  *See Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995).*

34  *Garcetti, 126 S. Ct. at 1961.*

35  *See Id. at 1958.*

36  *Id. at 1954.*

37  *Id. at 1961.*

38  *Id. at 1967.*

39  *Id.*

Procedural Due Process

A government employee may be deprived of a property interest if not afforded due process in termination proceedings. The State cannot deny an expectation of continued employment without due process of law. [40] The *Fourteenth Amendment* [*14] does not, itself, create property rights, but rather, protects rights granted employees. [41] Property rights are determined from sources independent of the Constitution, such as, a state law or employee contract. [42] Prior to termination, a government employee is generally entitled to "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." [43] Notice is sufficient if "1) it apprises the vulnerable party of the nature of the charges and general evidence against him, and 2) if it is timely under the particular circumstances of the case." [44] A simple statement providing notice of the charges and nature of the evidence is enough. [45] The specificity required should provide the "opportunity to determine what facts, if any, within [the plaintiff's] knowledge might be presented in mitigation of or in denial of the charges." [46] While advance notice is not required, "the timing and content of notice . . . will depend on appropriate accommodation of the competing interests involved." [47]

40  *See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*

[*15]

41  *Id.*

42  *See Board of Regents v. Roth, 408 U.S. 564,* *577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).*

43  *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*

44  *Gniotek v. City of Philadelphia, 808 F.2d 241, 244 (3d Cir. 1986).*

45  *See Id.*

46  *Id.*

47  *Goss v. Lopez, 419 U.S. 565, 579, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975).*

IV.  POSITIONS  OF  THE  PARTIES  AND ANALYSIS

The College defends its conduct by arguing that Johnson's statements were made pursuant to her official duties, and she was not speaking as a citizen on a matter of concern for *First Amendment* purposes. It maintains that Johnson was not denied due process in the investigation and subsequent termination hearing and was not subject to adverse action as a result of having to choose between early retirement and paid administrative leave. Johnson disagrees. She contends that she was denied due process throughout her administrative leave and in her pre-termination hearing.

Johnson's Speech as Government Employee

The College explains that Johnson was a high ranking [*16] official with a leadership position during the Terry Campus meeting for Department Chairs. It asserts that Johnson's speech projected a lack of support for the new IT director and his policies, an area within her authority as Director of the Terry Campus. It states that personnel matters and department reorganizations are areas of concern for a campus Director, and not the general citizenry.

Johnson argues it was not her job to manage, direct or control the IT department, and therefore, her comments were outside of her job responsibilities. She argues that as a Vice President, she was not required to attend every meeting on campus, nor supervise the IT department. She adds that she was not a regular attendee of Department Chair meetings and therefore, attendance was not part of her daily professional activities as Director. Johnson contends that she acted appropriately in discussing public concerns for the IT system at the meeting and was not subversive or insubordinate. In the alternative, she argues that if her comments are characterized as subversive and insubordinate, the

characterization supports that she must have "acted outside of her job duties in raising those issues." [48] [*17]

    48  D.I. 115 at 35.

In *Garcetti*, the Court concludes that when government employees speak in an official capacity and are "simply performing their job duties," [49] they have no *First Amendment* right, and the court need not balance that right and an employer's prerogative to restrict it. Johnson rationalizes the *Garcetti* opinion as "narrow," of "limited scope" and "inapplicable," explaining that a government employee's speech is always protected from discipline, except, when acting within the defined limits of her job description or as part of her specific, daily professional activities. Johnson's characterization is unpersuasive. *Garcetti* explains that the *"First Amendment* protects a public employee's right, in *certain* circumstances, to speak as a citizen addressing matters of public concern." [50] Johnson was acting in her capacity as the Campus Director, with overall responsibility for the needs of the students and faculty of the campus when attending and participating in the Department Chair [*18] meetings, the purpose of such included review of the College IT program, as well, as other campus related matters. Johnson argues that because she did not regularly attend these meetings, that they do not fall within her employment responsibilities. Johnson's logic of how attending a faculty meeting could be described as outside of her official capacity is unpersuasive. There is no indication that the public was invited to attend or participate in such meetings and there is no evidence that the meeting in question addressed matters unrelated to College issues. Following Johnson's argument to its logical conclusion means that *all* College matters are public issues. That argument eviscerates the principles of *Garcetti* because Johnson would always be addressing public concerns just by her position as a government employee.

    49  *Garcetti v. Ceballos, 126 S. Ct. 1951, 1961, 164 L. Ed. 2d 689 (2006).*
    50  *Id. at 1957* (emphasis added).

Johnson contends that since she was not responsible for [*19] managing the IT department, her attendance was not required, nor within her employment duties. [51] Her argument is nonsensical, and contradicts Johnson's own admission of concern over the new IT strategy and its impact on campus services. In *Garcetti,* "[r]estricting speech that owes its existence to a public employee's

professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." [52] Johnson was responsible for the Terry Campus, and her attendance at the Chairpersons meeting is consistent with that role. Therefore, the College did not infringe Johnson's liberties by subjecting her to any resultant discipline for her conduct.

    51  D.I. 115 at 34.
    52  *Garcetti, 126 S. Ct. at 1960.*

Johnson's Speech as a Matter of Public Concern

The College maintains that Johnson's statements do not address any misuse of College funds [*20] or allegations of wrong-doing, and therefore were not a matter of public concern. It contends that Johnson's statements regarded personnel and operational matters or "personnel squabbles," are not matters of public interest and do not meet the definition of speech protected by the *First Amendment*. It submits that a dispute over departmental reorganization is, in essence, a power struggle between departments. Assuming such speech is protected, it argues that Johnson's speech was not a basis of Judge Bifferato's decision and not a motivating factor in the decision to terminate her employment.

Johnson argues that the subject matter of the meeting was one of public concern. She states that the IT department affected how the administrators, students and the outside public would interact with the school, and therefore automatically is a matter of public concern. Johnson admits that she had previous issues with the IT department and that her statements were relevant to how that department offered service to the Terry Campus. [53] Finally, in an affidavit dated July 17, 2006, Johnson suggests that the College offered off-campus interactive computerized classes through the IT department and [*21] as a result, her comments dealt with issues related to the public. [54]

    53  D.I. 115 at 8.
    54  D.I. 116 at 334.

Criticism of the College's IT strategy and leadership is not the type of speech protected by the *First Amendment* according to *Garcetti* and its progeny. The structure and function of the IT department are issues for the College faculty, staff and students, but such

communications are not matters of *public* concern. *Garcetti* explains that "[o]fficial communications have official consequences, creating a need for substantive consistency and clarity" and a supervisor's communications must be "accurate, demonstrate sound judgment, and promote the employer's mission." [55] Johnson's comments at the Directors meeting did not "promote the employer's mission" because they questioned an agreed upon policy set forth by the College. If Johnson's superiors thought her comments were "inflammatory or misguided, they had the authority to take proper corrective action." [56] In his role as president of [*22] the College and Johnson's superior, George generated consensus regarding the new IT strategy, hired a program manager, and specifically called for the Vice Presidents to support the new policies. Johnson's comments were critical of the program, failed to promote the College's mission, and were subject to corrective measures. Even if the court balances Johnson's right to express her opinions with the College's needs, her comments are not protected speech. Her criticisms did not address nor were directed to "official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety." [57] Simply, Johnson's statements expressed her disapproval for George's choice of an IT director and his programs. Speech directed to internal personnel and operational matters is not protected by the *First Amendment*.

55  *Garcetti, 126 S. Ct. at 1960.*
56  *Id.*
57  *Id.*

In conclusion, Johnson acted in her role as director of the Terry Campus by her attendance [*23] and participation in the meeting of faculty chairpersons. She spoke on certain issues as director of the Campus. Her comments projected her dissatisfaction with the College's choice in leadership and the IT strategy. Her speech did not target matters of public concern. Therefore, no genuine issue of material fact exists. Johnson's comments during the Campus Chairperson's meeting do not fall within any *First Amendment* protection.

Procedural Due Process

The College contends that the hearing procedures afforded Johnson exceeded the minimal due process required by the *Due Process Clause of the 14th Amendment* and under her employment contract. First, it explains that since Johnson was suspended with pay, she

was not being disciplined, nor was she denied a property or liberty interest and therefore, no process was mandated before placing her on leave. It also states that she received advance notice of the charges against her in the Santora Report. [58] Witnesses were identified by the College on June 17, 2005, eleven days before the hearing. Johnson was provided with over one thousand pages of documents, in addition to the exhibits the College planned to rely on at the hearing. [*24] The College maintains that the process was both fair and adequate because Judge Bifferato was appointed as the hearing officer, and the College Trustees agreed to be bound by his decision.

58    The Santora Report included a detailed explanation of the allegations of improper conduct and misuse of College funds.

Johnson proposes that she has a constitutionally protected property interest in her employment and that the unfair nature of the proceedings denied her due process. [59] She contends that the College denied her due process rights by placing her on administrative leave without the right to a grievance procedure, and that the College's actions stigmatized her and damaged her professional reputation. She argues that her paid administrative leave was a disciplinary action, and a grievance procedure was guaranteed by her employment contract. Johnson complains that she was also denied the right to speak to College employees while the investigation was underway, and therefore, the investigation was generally unfair [*25] to her. She contends that the investigation and the Santora Report was "riddled with errors, omissions and contradictory facts" implying that the College manipulated the decision making process, resulting in a decision that was "intrinsically flawed." [60] Johnson alleges that she was unable to refute the testimony against her because the College refused to "provide specifics concerning such testimony." [61] She also reasons that changes made by Defendants to the pre-termination hearing process did not eliminate the College's prior contractual obligation to provide her with affidavits from witnesses. Finally, she claims her procedural due process rights were violated because she did not receive a description of the evidence to be used to prove her abuse of employees.

59  D.I. 115 at 41.
60  D.I. 115 at 42.
61  *Id.* at 44.

Johnson's contention, that she was deprived of a property interest as a result of the College's termination procedure, is unsubstantiated. The court recognizes that Johnson has a [*26] property interest in her continued employment and turns to the issue of what process Johnson is due. The United States Supreme Court in *Cleveland Bd. of Educ. v. Loudermill*, states that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." [62] While the hearing "need not be elaborate," it must provide the "determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." [63] The adequacy of the hearing is dependant on the importance of the property interest being denied and the property right to one's livelihood is extremely important. [64] If post-termination proceedings are non-existent, then a more elaborate pre-termination hearing is required. [65]

62  *470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*
63  *Id. at 545.*
64  See *Hameli v. Nazario, 1994 U.S. Dist. LEXIS 20523, 1994 WL 827787, *4 (D. Del. Sept. 2, 1994).*
65  *Id.*

[*27] Although "advance notice is not a per se requirement of due process," [66] Johnson received ample notice of the charges and had a reasonable opportunity to prepare a response. Johnson was aware that her activities were under investigation more than six months prior to the hearing. Two and a half months prior to the hearing, Johnson received the Santora Report which outlined the allegations of financial abuse which were the basis for her dismissal. Two weeks before the hearing, the College provided notice of the witnesses it was going to call, and days before, the College offered all of the materials and demonstratives used at the hearing. Therefore, notice was sufficient as it provided the nature of the charges and the evidence against her, and was timely under the circumstances of the case.

66  *Morton v. Beyer, 822 F.2d 364, 369 (3d Cir. 1987).*

Prior to April 2005, the College did not have guidelines for conducting a pre-termination hearing for a Campus Vice-President. The College's Board of [*28]

Trustees approved the new guidelines to insure that both parties would be represented fairly and due process procedures were followed. During the two day hearing, Johnson was provided an opportunity to respond to the charges against her. The Constitution requires a proceeding to be "appropriate under the circumstances; [but] it does not require confrontation and cross examination in every proceeding." [67] The purpose of such a proceeding is to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." [68] At the pre-termination hearing Johnson could call and cross-examine witnesses and present evidence. Johnson was represented by counsel, and she was able to test the truthfulness of the accusations against her. Johnson testified on her own behalf and proffered 6 witnesses and 47 exhibits. Retired Superior Court Judge Bifferato, whose decision in the matter was final, reviewed all of the material presented. He found that there were reasonable grounds to believe that the charges against Johnson were true and supported her dismissal. In his report, the Judge determined that the College met its burden of [*29] proof by a preponderance of the evidence that "Johnson inappropriately used College personnel and materials for personal matters" and portrayed a "pattern of abuse in the use of [her] College [issued] credit card." [69] He concluded that Johnson's actions clearly met the requirements for termination outlined in her employment contract. [70] In conclusion, the hearing procedures afforded Johnson the due process provided by her employment contract and under the *14th Amendment*.

67  *Hameli v. Nazario, 1994 U.S. Dist. LEXIS 20523, 1994 WL 827787, *6 (D. Del. Sept. 2, 1994).*
68  *Doherty v. Delaware, 424 F. Supp. 2d 729, 734 (D. Del. 2006).*
69  D.I. 116 at 213.
70  *Id.* at 214.

Substantive Due Process

Johnson claims that her substantive process rights were denied because the termination hearing did not "meet the basic requirements of speaking the truth." [71] She primarily focuses on the Santora Report, claiming that because it is "riddled with errors" and "not designed to seek the truth, [*30] " Judge Bifferato's decision is intrinsically flawed and unfair. [72] Johnson links her

substantive due process argument to a violation of procedural due process by claiming that she was stigmatized by negative newspaper articles about the investigation and dismissal. [73] Johnson also suggests that Judge Bifferato may have been biased because of an alleged conflict of interest. [74]

> 71    Johnson argues, essentially for the first time in a lengthy *surreply* brief of thirty-four pages that the evidence at the pre-termination hearing was false and incomplete. In her fifty page answering brief (in excess of the page limitation authorized under the court's local rules), she alludes to a possible substantive due process claim. No where in her original or amended complaints is a substantive due process claim raised. Further, those complaints are absent of any allegations of fraud, which under the Federal Rules of Civil Procedure ("FRCP"), specifically *Rule 9*, are to be pled with specificity. Therefore, no notice of a substantive due process claim was provided. Johnson points to no discovery directed to such a claim.

> The primary evidence Johnson alleges as false is the Santora Report, a document she possessed for over two and a half months before the pre-termination hearing. Johnson cross-examined the investigator and author, David Dwyer, during that hearing.

> Johnson knew or should have known of a substantive due process claim *before* this action was filed. Johnson's back door amendment to the pleadings is inconsistent with FRCP and the Local Rules of Civil Practice and Procedure of this court.

[*31]

> 72    D.I. 115 at 42.
> 73    *Id.* at 48.
> 74    The firm with whom Judge Bifferato is associated as senior counsel represented the College in four matters which arose in the 1994-1996 time frame, nine to eleven years before the Johnson pre-termination hearing and four to six years before Judge Bifferato retired from the bench in April 2000. *See* www.courts.delaware.gov. The only reported matter ended in 1999, six years before the pre-termination hearing. Obviously, Judge

Bifferato was not involved with the firm before his retirement. Moreover, a member of the firm served as a mediator in 2004 in a case in which the College was one of four of parties, which suggests that the firm was not representing and had not recently represented the College. Clearly, Judge Bifferato never represented any party in the present matter. Johnson never states that Judge Bifferato was biased: rather, she suggests that the selection process was partial.

To support a violation of substantive due process, government action must be so "ill conceived or malicious that it shocks the conscience" [75] or "arbitrary [*32] or irrational," [76] exceeding negligence and indifference to "reach a level of gross negligence." [77] "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." [78] In a substantive due process matter, a properly supported motion for summary judgment will require the nonmovant to produce some (more than a "scintilla") evidence in support of his position. [79]

> 75    *Miller v. Philadelphia, 174 F.3d 368, 374 (3d Cir. 1999).*
> 76    *Duffy v. Bucks, 7 F. Supp. 2d 569, 576 (E.D. PA 1999).*
> 77    *Miller, 174 F.3d at 376.*
> 78    *Id.*
> 79    *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

The College's decision to terminate Johnson's employment cannot be described as malicious, arbitrary or irrational. Johnson was placed on paid administrative leave. She was not arbitrarily dismissed for her alleged behavior. Johnson was provided with a pre-termination [*33] hearing. The evidence proffered at the hearing supports Judge Bifferato's findings. Johnson argues that the Santora Report was false because it focuses on her abuses of College policy and not her merit-worthy behavior. [80] She claims that the procedure set forth by the College, limited the review, and therefore, rendered the analysis inaccurate. The investigation was to determine whether Johnson had violated College policy. The Santora Report determined that she had by converting College resources for her personal use. Johnson had over two months to prepare to rebut the charges and to counter

the report. She had the opportunity to present facts and evidence at the hearing to address the alleged inaccuracies. An independent hearing officer determined the charges were founded.

80  D.I. 115 at 14.

Finally, Johnson's argument that a denial of procedural due process directly results in a violation of substantive due process is a misinterpretation of case law. 81 Substantive due process violations must be supported [*34] with facts that Defendants acted "arbitrarily or irrationally" in a way that would "shock the conscience" of the court. Implying that Johnson might have been stigmatized by the College's actions does not meet this burden. Nothing Johnson has presented rises to the level of a substantive due process claim.

> 81    Johnson's answer brief states: "In addition, the Court had found that in addition to the termination (on procedural due process) was without basis and fact. Accordingly, a violation of the substantive due process has also been established." *Morris v. Bd. of Edu. Of Laurel Sch. Dist., 401 F. Supp. 188, 211 (D. Del. 1975).* The facts in *Morris* are clearly distinguishable. There, the court held that the defendant breached the plaintiff's contract and violated her *14th Amendment* rights and denied her the opportunity to be heard and failed to advise her of the charges (which the court determined were unfounded). As a result, the plaintiff's procedural and substantive due process rights were determined to be violated.

[*35]  As a result, Johnson fails to state a viable substantive due process claim.

Qualified Immunity

Defendants assert that the doctrine of qualified immunity requires dismissal of the case against George since his conduct in performing his discretionary duties did not violate Johnson's statutory or Constitutional rights. Defendants contend that George is protected from civil liability, as long as, he did not knowingly violate Johnson's Constitutional rights. They note that "Johnson has not sufficiently alleged a violation of even colorable constitutional or statutory rights, much less 'clearly established' ones." 82

82    D.I. 108 at 27 (citing *Kodrea v. City of Kokomo, Indiana, 458 F. Supp. 2d 857, 2006 WL 1750071, at *12 (S.D. Ind. 2006)).*

Johnson concludes that if her "*First Amendment* rights were violated, it follows that those rights were clearly established [and] the defendant does not have qualified immunity." 83 Johnson contends that George would have reasonably known, because he had the advice of [*36] his attorneys, that denying her a grievance procedure and subjecting her to administrative leave would be a violation of the *First Amendment*.

83    D.I. 115 at 48.

Generally, government officials are protected from civil liability when their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." 84 "The question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights." 85 The issue of qualified immunity requires a "careful examination of the record (preferably by the district court) to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)." 86 When public officials, however, "invoke administrative processes for a legitimate purpose, they are acting in conformity with the Constitution and cannot be violating 'clearly established' law (because they are not [*37] violating the law at all)." 87

> 84    *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).*
> 85    *Grant v. City of Pittsburgh, 98 F.3d 116, 121 (3d Cir. 1996)* (emphasis in original)(citing *Anderson v. Creighton, 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).*
> 86    *Id. at 122.*
> 87    *Id. at 125.*

Based upon a careful review of the facts, Defendants have established that George's conduct did not violate Johnson's clearly established rights. First, George acted to preserve Johnson's due process rights during the investigation and pre-termination hearing. George admitted that "it was counsel's advice to me as president that in order to protect Dr. Johnson's due process rights, that I should ask the Board of Trustees to adopt these rules of procedure." 88 Instead of clearly violating

2007 U.S. Dist. LEXIS 42465, *37

Johnson's rights, George sought and applied counsel's recommendations to preserve Johnson's property interest and due process rights. George provided Johnson with notice of the charges against her and [*38] an opportunity to be heard. He supported the College Board's approval of the revised hearing process that focused on providing Johnson with a fair and impartial hearing. George authorized the appointment of an independent hearing officer, whose recommendation would be final. Finally, George had a legitimate purpose in placing Johnson on administrative leave and proceeding with a the pre-termination hearing. Johnson was forewarned that her behavior would lead to an investigation of allegations of abuse. George ordered the investigation which required the temporary removal of Johnson from her position. The resultant report and findings of abuse directed the termination proceeding. These actions were not improper, nor infringe clearly established rights. As a result, the doctrine of qualified immunity applies to George.

88    D.I. 109 at 31.

## V. CONCLUSION

For the reasons stated above, the College's motion for summary judgment is GRANTED. An appropriate order consistent with this memorandum will follow.

[*39] **ORDER**

At Wilmington this 11th day of **June, 2007.**

IT IS ORDERED that the Memorandum Opinion dated May 15, 2007 be corrected to substitute "*42 U.S.C. § 1983*" for the incorrect cite "43 U.S.C. § 1493" in the first sentence of the decision.

IT IS ALSO ORDERED that footnote number 26 be corrected to substitute citation "*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).*" for the incorrect cite "*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 343, 356 (1986) ."

/s/ Mary Pat Thynge

UNITED STATES MAGISTRATE JUDGE

# **<u>EXHIBIT C</u>**

LEXSEE 2007 U.S. APP. LEXIS 20739

**\* SERGEANT CHRISTOPHER D. FORAKER, individually and in his official capacity as Superintendent of the Delaware State Police v. COLONEL L. AARON CHAFFINCH; LIEUTENANT COLONEL THOMAS F. MACLEISH, individually and in his official capacity as Deputy Superintendent of the Delaware State Police; DAVID B. MITCHELL, in his official capacity as Secretary of the Department of Safety and Homeland Security of the State of Delaware; DIVISION OF STATE POLICE DEPARTMENT OF SAFETY AND HOMELAND SECURITY STATE OF DELAWARE (D.C. Civil No. 04-cv-01207) CORPORAL B. KURT PRICE; CORPORAL WAYNE WARREN \* SERGEANT CHRISTOPHER D. FORAKER v. COLONEL L. AARON CHAFFINCH, individually and in his official capacity as Superintendent of the Delaware State Police; LIEUTENANT COLONEL THOMAS F. MACLEISH, individually and in his official capacity as Deputy Superintendent of the Delaware State Police; DAVID B. MITCHELL, in his official capacity as the Secretary of the Department of Safety and Homeland Security of the State of Delaware; DIVISION OF STATE POLICE, DEPARTMENT OF SAFETY AND HOMELAND SECURITY, STATE OF DELAWARE (D.C. Civil No. 04-cv-00956) B. Kurt Price, Wayne Warren, \* Christopher D. Foraker, Appellants**

\*  Dismissed Per the Court's Order of 11/7/06

Case No: 06-4086

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*2007 U.S. App. LEXIS 20739; 26 I.E.R. Cas. (BNA) 863*

June 8, 2007, Argued
August 30, 2007, Filed

**PRIOR HISTORY:** [\*1]
On Appeal from the United States District Court for the District of Delaware. District Court Nos.: 04-cv-1207, 04-cv-0956. District Judge: The Honorable Gregory M. Sleet.
*Price v. MacLeish, 2006 U.S. Dist. LEXIS 57026 (D. Del., Aug. 14, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, former Delaware State Troopers and instructors in the Delaware State Police Firearms Training Unit, appealed from a judgment of the United States District Court for the District of Delaware which granted judgment as a matter of law pursuant to *Fed. R. Civ. P. 50(b)* to defendants, Superintendent and Deputy Superintendent of the Delaware State Police and state officials, on plaintiffs' *First Amendment* claims.

**OVERVIEW:** Plaintiffs asserted that their actions in bringing the problems at the firing range to the attention of the government constituted protected petitioning activity under the *First Amendment* and that they suffered adverse employment action as a result of their petitions. The instant court found that plaintiffs complained internally; they did not petition a state agency qua agency. They appealed to their employer, which also happened to be a state agency, through informal channels. Thus, plaintiffs could not seek solace in the Petition Clause. Plaintiffs also alleged that they were retaliated against for their speech about hazardous conditions at the Firearms Training Unit and governmental corruption, misconduct, and mismanagement. The instant court found that reporting problems at the firing range was among the tasks that plaintiffs were paid to perform. Their positions in the Delaware State Police required them to report up the chain of command, and their positions as instructors who regularly used and performed light maintenance on the equipment at the range on a daily basis put any environmental concerns there within the scope of their routine operations.

2007 U.S. App. LEXIS 20739, *1; 26 I.E.R. Cas. (BNA) 863

**OUTCOME:** The judgment was affirmed.

**COUNSEL:** Martin D. Haverly, Thomas S. Neuberger, Stephen J. Neuberger (argued), The Neuberger Firm, Wilmington, DE, Counsel for Appellants.

Edward T. Ellis (argued), Carmon M. Harvey, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Counsel for Appellees.

**JUDGES:** Before: SMITH and GREENBERG, Circuit Judges, and POLLAK, District Judge *. GREENBERG, Circuit Judge, concurring. POLLAK, District Judge, concurring.

> * The Honorable Louis H. Pollak, Senior District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

**OPINION BY:** SMITH

**OPINION**

OPINION OF THE COURT

SMITH, *Circuit Judge.*

Appellants Corporal B. Kurt Price and Corporal Wayne Warren, both former Delaware State Troopers and instructors in the Delaware State Police Firearms Training Unit, appeal from the District Court's grant of judgment as a matter of law pursuant to *Federal Rule of Civil Procedure 50(b)*. Price and Warren present two principal issues for review: (1) whether the activities they engaged in were protected by the *Petition Clause*, and [*2] (2) whether their speech is protected after the Supreme Court's decision in *Garcetti v. Ceballos,    U.S. , 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)*. We will affirm the judgment of the District Court.

I.

The origins of this case date to September 1998, when the Delaware State Police ("DSP") opened an indoor firing range in Smyrna, Delaware. The range became the locus of operations for the Firearms Training Unit ("FTU"), the unit to which Price and Warren were assigned as instructors during the time period relevant to this case. The range and those who used it encountered a number of difficulties from the outset, including problems with the heating, ventilation, and air conditioning ("HVAC") system.

Price and Warren were long-term members of the DSP at the time of the events giving rise to this case. Price had been part of the FTU since 1996 and Warren had been assigned to the unit in 2001. Sergeant Christopher Foraker was the Section Chief of the FTU from August 1, 2001 through April 8, 2002, at which point he was moved to another unit. Foraker sued Colonel L. Aaron Chaffinch on April 24, 2002 for *First Amendment* retaliation, and won a jury verdict in his favor. The parties later agreed that Foraker [*3] would be reinstated to his position with the FTU and that the monetary judgment against Chaffinch would be vacated. Foraker returned to the firing range on December 1, 2003.

Price, Warren, and Foraker considered the range conditions intolerable, and were specifically concerned with health and safety issues there. The HVAC system did not work properly, the bullet trap was malfunctioning, and officers and students at the range were suffering the physical manifestations of contamination, including elevated levels of heavy metals in their blood. Foraker sent a number of e-mails regarding the deteriorating conditions at the range to his superiors, including Lieutenant Colonel Thomas F. MacLeish, Captain Greg Warren, and Lieutenant Ralph Davis. In an e-mail dated December 19, 2003 he explained that, due to a broken drive chain and damaged sprocket on the conveyor, the dredging system had been brought to a complete stop. He also outlined concerns about Price's and Warren's elevated blood levels.

In early December, Price, Warren, and Foraker decided to suspend certain bullet trap maintenance because they considered carrying it out to be unsafe. At trial, Warren explained that their objective [*4] was to limit their exposure to lead and other unsafe metals. They continued to perform other forms of range maintenance, including removal of spent casings and trash. The three men had meetings to discuss the range with MacLeish, Captain Greg Warren, and the Division of Facilities Management. In March 2004, the DSP closed the range.

Following the closing of the range, the State Auditor reviewed the issues surrounding the closing. Price, Warren, and Foraker met with the Auditor on May 12, 2004. Their attorney later read their statements to the

Auditor, verbatim, to the Delaware State News, a local newspaper. As troopers, Price, Warren, and Foraker were not permitted to speak to the press without the approval of superior officers. On May 13, 2004, they were ordered to submit to a hearing examination to determine whether they were fit for duty. On June 25, 2004, Price and Warren were placed on light duty. On August 19, 2004, Price, Warren, and Foraker filed this action. [1] Price, Warren, and Foraker amended their complaint on October 14, 2005 to include the two counts at issue here. Count One of the amended complaint alleged a violation of the plaintiffs' Free Speech rights, and Count Two [*5] alleged Petition Clause violations. Price and Warren retired from the DSP on April 7, 2006.

> 1 Foraker also filed a separate action on August 30, 2004 under 42 U.S.C. § 1983, which was consolidated with this suit for discovery purposes only on February 1, 2005. Foraker's independent action settled and was dismissed on October 11, 2006.

During discovery, Price, Warren, and Foraker sought to discover e-mail messages stored on Chaffinch's hard drive. Chaffinch retired in May 2005. Pursuant to routine DSP procedure, a technician at the DSP re-imaged the hard drive, destroying any messages saved there. The plaintiffs requested default judgment or an adverse inference instruction on the basis of spoliation of evidence. The District Court denied both motions.

Trial began on May 15, 2006. The District Court charged the jury on May 30, 2006, the same day that the Supreme Court decided Garcetti v. Ceballos. The next day, the jury returned a verdict for Price, Warren, and Foraker.

After the District Court entered judgment on the verdict for Price, Warren, and Foraker, appellees Chaffinch, MacLeish, David Mitchell, and the DSP ("DSP defendants") moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b). [*6] On August 14, 2006, the District Court granted the motion. The Court held that the First Amendment Speech and Petition Clauses did not protect Price and Warren because their reports up the DSP chain of command and statements to the Auditor were part of their official duties as Troopers and they had been ordered to cooperate. The Court denied the motion of Price, Warren, and Foraker to amend the complaint to conform to the evidence at trial under Rule 15(b). Foraker settled with the DSP

defendants shortly after the filing of this appeal, and the District Court entered an order of dismissal of his claims on October 11, 2006.

## II.

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the grant of a Rule 50(b) motion for judgment as a matter of law. DiBella v. Borough of Beachwood, 407 F.3d 599, 601 (3d Cir. 2005). In evaluating the grant of judgment as a matter of law, "we must look at the evidence in the light most favorable to ... the verdict winner[s], and draw all reasonable inferences in [their] favor." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996). [*7] In Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993), we explained that "although the court draws all reasonable and logical inferences in the nonmovant's favor, we must affirm an order granting judgment as a matter of law if, upon review of the record, it is apparent that the verdict is not supported by legally sufficient evidence." Id. at 1166.

## III.

Price and Warren assert that their actions in bringing the problems at the firing range to the attention of the government constitute protected petitioning activity under the First Amendment. In their amended complaint, they alleged that they suffered adverse employment action as a result of their petitions to the government for redress of grievances. The Petition Clause provides that "Congress shall make no law ... abridging ... the right of the people peaceably to assemble, and to petition the government for a redress of grievances." U.S. CONST. amend. I, cl. 6. The first question for our review is whether Price and Warren's expressions are petitions within the meaning of the First Amendment.

The history of the Petition Clause is instructive. Petitions were first utilized in America during the colonial era, when colonists petitioned [*8] the colonial assemblies for resolution of private disputes as well as for legislative action. See Stephen A. Higginson, Note, A Short History of the Right to Petition Government for the Redress of Grievances, 96 YALE L.J. 142, 144-55 (1986). By the time the Framers penned the First Amendment and the states ratified the right of people to petition the government, petitioning was already a firmly

established-and highly valued-right in the common law tradition, and one that included the right to governmental consideration of the petition. *See id. at* 155-56 & n.92 (quoting the Declaration of Independence: "In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury."); *see also* James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government, 91 NW. U. L. REV. 899, 909* & n.36 (1997) ("Early practice on the 'petition of right,' which came to be seen as an important element of the common law, included a variety of features that would later characterize prerogative practice."); Julie M. Spanbauer, *The First Amendment* [*9] *Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth,* 21 HASTINGS CONST. L.Q. 15, 22-34 (1993).

James Madison included the right to assemble and to "apply[] to the Legislature by petitions" in his draft amendments of June 8, 1789, and separated these rights from the freedoms of religion, speech, and the press. *See* 1 *Annals of Cong.* 451 (Joseph Gales, ed. 1789); Spanbauer, *supra* at 39-40. In his endorsement of the amendments before the House, he called upon the representatives to "expressly declare the great rights of mankind secured under this constitution." 1 *Annals of Cong.* 449 (Joseph Gales, ed. 1789). The House of Representatives combined these rights into a single amendment in their modifications, and substituted the word "government" for "legislature." Spanbauer, *supra* at 39-40; 1 *U.S. House Journal* 85 (Aug. 21, 1789). The Senate changed the right of "application" to protect the right to "petition." Spanbauer, *supra* at 42; 1 *U.S. Senate Journal* 70-71 (Sept. 4, 1789). Acknowledging these historical roots, the Supreme Court stated:

> We have recognized this right to petition as one of "the most precious of the liberties safeguarded by the *Bill of Rights,*" [*10] and have explained that the right is implied by "[t]he very idea of a government, republican in form."

*BE&K Constr. Co. v. N.L.R.B., 536 U.S. 516, 524-25, 122 S. Ct. 2390, 153 L. Ed. 2d 499 (2002)* (internal citations omitted); *see also Adderley v. Florida, 385 U.S. 39, 49 n.2, 87 S. Ct. 242, 17 L. Ed. 2d 149 (1966)* (Douglas, J., dissenting) (recounting a brief history of the

right to petition in both Britain and America). However, the right to petition has undergone a significant transformation since its inclusion in the *Bill of Rights. See* Higginson, *supra* at 165 ("Despite the clear colonial practice that linked petitioning to a corollary duty of legislative response, the Southern 'gag' proponents [of states' rights with respect to slavery] successfully challenged this link and subsumed the right [to petition] within free expression."); *McDonald v. Smith, 472 U.S. 479, 482, 105 S. Ct. 2787, 86 L. Ed. 2d 384 (1985)* ("The right to petition is cut from the same cloth as the other guarantees of that Amendment, and is an assurance of a particular freedom of expression."); *id. at 485* (ignoring the varied histories of the right to petition and the freedoms of speech, religion, and the press, and stating that "[t]he *Petition Clause* ... was inspired by the same ideals of liberty and democracy [*11] that gave us the freedoms to speak, publish, and assemble."); *WMX Techs., Inc. v. Miller, 197 F.3d 367, 372 (9th Cir. 1999)* (en banc) ("The protections afforded by the *Petition Clause* have been limited by the Supreme Court to situations where an individual's associational or speech interests are also implicated.").

In *San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994),* we concluded that a public employee who has petitioned the government through a formal mechanism such as the filing of a lawsuit or grievance is protected under the *Petition Clause* from retaliation for that activity, even if the petition concerns a matter of solely private concern. In discussing the distinct origin of the *Petition Clause,* we distinguished the rule laid out in *Connick v. Myers, 461 U.S. 138, 154, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)* with respect to speech [2], and explained that "when one files a 'petition' one is not appealing over government's head to the general citizenry: when one files a 'petition' one is addressing government and asking government to fix what, allegedly, government has broken or has failed in its duty to repair." *Id. at 442.* Moreover, we noted that the argument that

> the scope of the petition right depends upon [*12] the context in which the right is exercised is particularly persuasive because the scope of the free speech right-a right that, like the petition right, is stated in unqualified terms in the *first amendment*-depends on the context in which that right is exercised.

*Id. at 438.*

2  In *San Filippo*, we wrote that

> As applied to communications that are not petitions, the *Connick* rule means that a public employee who goes public--e.g., by writing to *The New York Times*--with an employment dispute that is not of "public concern" runs the risk of being disciplined by her public employer for undertaking to draw public attention to a private dispute.

*Id. at 442.*

Formal petitions are defined by their invocation of a formal mechanism of redress. Thus, "[l]awsuits, grievances, [and] workers compensation claims" are all examples of formal petitions. *Id. at 439 n.18.* Contrary to the requirements for speech protection discussed below, when a formal petition is made, the employee need not show that the subject matter of the petition involved a matter of public concern. *Id. at 442.* This distinction is legitimate because the *Petition Clause* is not merely duplicative of the Free Speech Clause. *Id. at 441-42* ("[W]e [*13] believe that there is an independent reason-a reason of constitutional dimension-to protect an employee lawsuit or grievance if it is of the sort that constitutes a 'petition' within the meaning of the *first amendment*."); *see also Brennan v. Norton, 350 F.3d 399, 417 (3d Cir. 2003)* (contrasting the requirements for proof of retaliation for free expression with those for petitioning activity and noting that "a plaintiff need only show that his/her lawsuit was not frivolous in order to make out a prima facie claim for retaliation under the *Petition Clause*").

The Supreme Court has explained that "the values in the right of petition as an important aspect of self-government are beyond question." *McDonald, 472 U.S. at 483.* Although the *Free Speech Clause* also serves the interests of democracy, it does so in a unique manner. *See, e.g., Buckley v. Valeo, 424 U.S. 1, 93 n.127, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)* ("[T]he central purpose of the *Speech and Press Clauses* was to assure a society in which 'uninhibited, robust, and wide-open' public debate

concerning matters of public interest would thrive, for only in such a society can a healthy representative democracy flourish." (quoting *New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964))).* [*14] Whereas the *Free Speech Clause* protects the right to "wide-open" debate, the *Petition Clause* encompasses only activity directed to a government audience. This distinction correlates to the separate analysis for each clause. Accordingly, the argument of the DSP defendants that because *Garcetti v. Ceballos, U.S.   , 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)* bars plaintiffs' claims as speech, it also bars them as petitions is inaccurate-petitions are not synonymous with speech for purposes of constitutional analysis.

There are less formal mechanisms by which a petition may be made. *San Filippo, 30 F.3d at 439-40.* Informal petitions may include letters such as those at issue in *McDonald and Schalk v. Gallemore, 906 F.2d 491 (10th Cir. 1990)* (per curiam). Petitions made through informal channels may occasion a lesser degree of constitutional protection than their formal counterparts. *See, e.g., San Filippo, 30 F.3d at 439* (paraphrasing the Tenth Circuit's holding in *Schalk* that when "the 'petition' at issue [is] simply a letter imposing on the government no obligation to respond, it [is] properly analyzable under the conventional *Connick* rubric applicable to speech"); *id. at 442; see also Minnesota State Bd. for Community Colleges v. Knight, 465 U.S. 271, 285, 104 S. Ct. 1058, 79 L. Ed. 2d 299 (1984)* [*15] ("Nothing in the *First Amendment* or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues.").

In *Hill v. Borough of Kutztown, 455 F.3d 225 (3d Cir. 2006),* we addressed the *First Amendment* claim of a former borough manager who made reports to the Borough Council that led to retaliation from the mayor, which eventually culminated in Hill's resignation. *Id. at 230-32.* We explained in a footnote that, although "[w]e have never held ... that a report of a superior's misconduct to a legislative body when the legislative body is also the reporter's employer constitutes 'petitioning activity,'" the complaints Hill made to the Pennsylvania Human Relations Commission and the EEOC "might well qualify as 'petitioning.'" *Id. at 242 n.24.* However, we declined to make this determination because Hill had not alleged retaliation based on his complaints to the PHRC or

2007 U.S. App. LEXIS 20739, *15; 26 I.E.R. Cas. (BNA) 863

EEOC.

The distinction drawn in *Hill* between Hill's report to his employer and his complaints to the administrative bodies illustrates why the plaintiffs' complaints up the chain of command did not [*16] constitute petitioning activity. Price and Warren complained internally; they did not petition a state agency qua agency. They appealed to their employer, which also happened to be a state agency, through informal channels. *See generally Herr v. Pequea Twp., 274 F.3d 109, 115 (3d Cir. 2001)* (questioned on other grounds by *Mariana v. Fisher, 338 F.3d 189, 199 (3d Cir. 2003)*; *United Artists Theatre Circuit, Inc. v. Twp. of Warrington, 316 F.3d 392, 400 (3d Cir.2003))*; *see also Hilton v. City of Wheeling, 209 F.3d 1005, 1007 (7th Cir. 2000)* ("[T]he right to petition for redress of grievances [does not] imply a duty of the government to make every government employee [or entity] a petition receiver."). Thus, they cannot seek solace in the *Petition Clause.*

Price and Warren further assert that their speech to the State Auditor qualifies for protection under the *Petition Clause.* However, as the District Court found, although their statements to the State Auditor may be characterized as invoking a formal mechanism, "they were *ordered* to cooperate." Statements made under compulsion do not comport with the basic principle of freedom underlying the *Petition Clause.* Therefore, these statements [*17] do not fall within the constitutional protections for petitions to the government.

IV.

Price and Warren allege that they were retaliated against for their speech about hazardous conditions at the FTU and governmental corruption, misconduct, and mismanagement. In particular, Price and Warren assert that their speech up the chain of command and to the State Auditor was protected by the *First Amendment* because it exposed serious health and safety concerns and exposed government incompetence and wrongdoing. They assert that the holding of *Garcetti v. Ceballos, U.S. , 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)* does not affect their claims because their job duty as expert firearms instructors was to teach students how to fire weapons, and speaking out about health and safety problems at the firing range was not part of their job function. They maintain that the District Court's grant of judgment as a matter of law was in error. [3] The DSP defendants claim that the speech in question is not

protected because Price's and Warren's complaints up the chain of command fell within the scope of their duties as troopers in the FTU, and were thus foreclosed by *Garcetti*. The DSP defendants assert that Price and Warren's [*18] speech to the State Auditor was also within the scope of their job duties.

> 3   Price and Warren also raise an argument as to spoliation of evidence. We have considered this argument, and conclude that it is without merit and compels no separate discussion.

As noted above, the Supreme Court issued its opinion in *Garcetti* on May 30, 2006, the same day that the jury was charged in this case. After hearing argument on the DSP defendants' motion for judgment as a matter of law under *Federal Rule of Civil Procedure 50(b)*, the District Court correctly held that *Garcetti* must be applied in this case. [4]

> 4   In *Garcetti*, the Court applied the rule it enunciated to Ceballos' claims. Thus, the rule announced was not purely prospective, and the District Court properly applied it in this case, which was pending at the time of the *Garcetti* decision. *See, e.g., Linkletter v. Walker, 381 U.S. 618, 622, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965).*

In *Garcetti*, the Supreme Court addressed the question of "whether the *First Amendment* protects a government employee from discipline based on speech made pursuant to the employee's official duties." *Id. at 1955.* Ceballos was a deputy district attorney in Los Angeles. While performing that role, a defense [*19] attorney approached him about inaccuracies in an affidavit that had been used to obtain a critical search warrant. Ceballos investigated and determined that there were inaccuracies that were still unresolved after consultation with the affiant. He informed his supervisors, composed a memo which recommended dismissal of the case, and met with his supervisors and the affiant to discuss the case. The prosecution proceeded, and Ceballos was called as a witness for the defense. Following the trial, Ceballos was reassigned, transferred to another courthouse, and denied a promotion. He filed an unsuccessful employment grievance, and then filed an action in federal court under *42 U.S.C. § 1983*, alleging retaliation in violation of the *First* and *Fourteenth Amendments.*

Focusing on the distinction between

employee-speech and citizen-speech, the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes, and the Constitution does not insulate their communications from employer discipline." *Id. at 1960.* The Court emphasized the importance of allowing government employers "sufficient discretion [*20] to manage their operations." *Id.; see also Waters v. Churchill, 511 U.S. 661, 671-72, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994)* (plurality opinion) ("We have never explicitly answered this question, though we have always assumed that its premise is correct-that the government as employer indeed has far broader powers than does the government as sovereign."). [5] The Court relied on the undisputed fact that Ceballos wrote his memo pursuant to his job responsibilities in explaining that "[w]e ... have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. ... The proper inquiry is a practical one." *Id. at 1961.* Accordingly, Price and Warren argue that they were not functioning within the scope of their employment duties either when they made their statements to the State Auditor or complained up the chain of command.

> [5]  In rejecting "the notion that the *First Amendment* shields from discipline the expressions employees make pursuant to their professional duties," the majority opinion noted that the "powerful [*21] network of legislative enactments--such as whistle-blower protection laws and labor codes--available to those who seek to expose wrongdoing," protects employees. *Id. at 1962.* The Court embraced the notion that-at least in the context of statements made by "a public employee ... in the course of doing his or her job"--protection from retaliation and protection under the *First Amendment* are mutually exclusive considerations.

We briefly addressed the impact of *Garcetti in Hill v. Borough of Kutztown, 455 F.3d 225 (3d Cir. 2006).* Hill, a Borough Manager, allegedly suffered retaliation following his reports of misconduct by the mayor to the Borough Council. He admitted to issuing this report "pursuant to his official duties" to protect Borough employees. *Id. at 242.* Accordingly, we concluded that "he was not speaking 'as a citizen' when he made these reports, and thus, as a matter of law, the reports are not

protected speech [under *Garcetti* ]." *Id.*

However, we reversed the dismissal of Hill's *First Amendment* retaliation claim to the extent that it concerned Hill's advocacy of ideas, principles and projects disfavored by the mayor on the grounds that "w e cannot determine in this procedural [*22] posture whether the speech involved a matter of public concern." *Id.* We explained that "[t]hat determination must be made after an examination of 'the content, form, and context of [the] statement, as revealed by the whole record.'" *Id. at 243* (quoting *Rankin v. McPherson, 483 U.S. 378, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)).* Thus, the *Hill* opinion followed the *Garcetti* approach by remanding to the District Court for an inquiry into whether the employee spoke as a citizen and, if so, "whether the [mayor] had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti, 126 S. Ct. at 1958.* In contrast to *Hill*, Price and Warren's claims were presented in detail at a jury trial, giving both the District Court and this Court comprehensive information from which to answer the question of whether Price and Warren spoke pursuant to their official duties.

Precedent in the Fifth and Ninth Circuit Courts of Appeals also points to the conclusion we reach here. In *Williams v. Dallas Independent School District, 480 F.3d 689 (5th Cir. 2007)* (per curiam), the Fifth Circuit applied *Garcetti* to foreclose the retaliation claim of a high school athletic director who was discharged [*23] after writing a memo to his principal concerning the handling of school athletic funds. Noting *Garcetti's* injunction that *First Amendment* protection "does not invest [employees] with a right to perform their jobs however they see fit," the Court held that it was within Williams' "daily operations" to manage the athletic department, and because he needed information on the athletic accounts in order to be able to do that, his memorandum to his superior concerning accounts was necessary for him to complete his job. *Id. at 694.* The Court noted that this outcome was dictated by the fact that "Williams had *special knowledge* that $ 200 was raised at a basketball tournament," and that he was " *experienced* with standard operating procedures for athletic departments." *Id.* (emphasis added). Applying the Fifth Circuit's understanding, Price and Warren were acting within their job duties when they expressed their concerns up the chain of command because they needed to have a functioning bullet trap to conduct their educational

programs and it was their special knowledge and experience with the bullet trap [6] that demonstrated their responsibility for ensuring its functionality by reporting problems [*24] to their superiors.

> 6 We recognize that Price and Warren did not have the sort of specialized knowledge required to perform certain hazardous maintenance work on the bullet trap. The special knowledge and experience referenced here is their daily interaction with the equipment, which put them in the position to know when problems arose.

Our result is also consistent with *Freitag v. Ayers, 468 F.3d 528 (9th Cir. 2006), cert. denied, 127 S. Ct. 1918, 167 L. Ed. 2d 567 (Apr. 2, 2007)*. In *Freitag*, a female corrections officer was terminated after filing reports documenting sexual harassment by prisoners and inaction on the part of her superiors. Applying *Garcetti* to her *First Amendment* claims, the Ninth Circuit explained that the reports she submitted were pursuant to her official duties. *Id. at 546*. However, the Court declined to hold that a letter she wrote to the Director of the California Department of Corrections and Rehabilitation explaining the hostile work environment she had encountered was within her job duties, and remanded that issue to the District Court. *Id.* Apart from the minor factual distinctions between a prison guard's duty to write internal reports about prisoner misconduct and her supervisors' [*25] dilatory response and Price and Warren's responsibility to report required bullet trap maintenance, *Freitag* helps to illustrate the connection between Price and Warren's speech and their job duties.

The Ninth Circuit's remand of the question whether Freitag's letter of complaint to the Director was within her job duties illustrates the fact-intensive nature of this inquiry. Unlike the question of whether speech is protected by the *First Amendment*, the question of whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law. Thus, as the Ninth Circuit held, the proper resolution of challenges to the designation of such speech is to defer to the district court, because "having presided over this and related litigation for several years, [it] may be in a better position to make the relevant factual determinations...." *Freitag, 468 F.3d at 546*. Accordingly, Price and Warren's claims of retaliation based on the *First Amendment* are foreclosed because, as the District Court found, reporting problems at the FTU

was within their official job duties. [7]

> 7 The Sixth Circuit did not believe that the *Garcetti* inquiry required district [*26] court involvement. In *Haynes v. City of Circleville, 474 F.3d 357 (6th Cir. 2007)*, the Court rejected a K-9 unit police officer's contention that his complaints regarding cuts to the K-9 program w ere protected following *Garcetti*. Characterizing the memo Haynes wrote to the Police Chief as "reflect[ing] nothing more than 'the quintessential employee beef': management has acted incompetently," the Court explained that "[i]n lodging his protests to Chief Gray against the training cutbacks, Haynes was acting as a public employee carrying out his professional responsibilities." *Id. at 364-65* (citation omitted). However, the Sixth Circuit also said that "[t]he fact that Haynes communicated solely to his superior also indicates that he was speaking 'in [his] capacity as a public employee....'" *Id. at 364* (quoting *M ills v. City of Evansville, Ind., 452 F.3d 646, 646 (7th Cir. 2006)*). As *Garcetti* explained, the inquiry is nuanced: the fact that an employee speaks privately is not conclusive as to whether the speech is within the scope of his or her job duties.

In *Mills*, the Seventh Circuit made a similar ruling. *452 F.3d at 648*. The Court explained that:

> Mills was on duty, in uniform, and engaged [*27] in discussion with her superiors, all of whom had just emerged from Chief Gulledge's briefing [on personnel changes]. She spoke in her capacity as a public employee contributing to the formation and execution of official policy. Under *Garcetti* her employer could draw inferences from her statements about whether she would zealously implement the Chief's plans or try to undermine them; when the department drew the latter inference it was free to act accordingly.

*Id.* The Court further held that "[p]ublic employers must be able to change assignments in

response to events (including statements) that reveal whether employees w ill be faithful agents of the decisions made by the politically accountable managers." *Id.*

As the Court explained in *Garcetti*, the facts that "Ceballos expressed his views inside his office, rather than publicly," and that his memo concerned the subject matter of his employment, were non-dispositive. *126 S. Ct. at 1954.* Thus, the controlling fact in the case at bar is that Price and Warren were expected, pursuant to their job duties, to report problems concerning the operations at the range up the chain of command. Price and Warren spoke internally with respect to the [*28] health conditions at their workplace. They were required to speak up the chain of command and were prevented from speaking to the press without prior approval. Price and Warren w ere likewise expected to report truthfully to the State Auditor upon being ordered to do so.

The result required by *Garcetti* illustrates how that opinion narrowed the Court's jurisprudence in the area of employee speech. Although under *Garcetti* an employee's right to protest matters of public concern is not automatically forfeited by his or her choice of a workplace forum, that right is limited. *Compare Connick v. Myers, 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)*, with *Garcetti, 126 S. Ct. at 1959* (identifying the "controlling factor" in removing speech from the *First Amendment* as being that the expressions were made pursuant to employment duties); *Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 413, 99 S. Ct. 693, 58 L. Ed. 2d 619 (1979)*.

Reporting problems at the firing range was among the tasks that Price and Warren were paid to perform. Their positions in the DSP required them to report up the chain of command, and their positions as instructors who regularly used and performed light maintenance on the equipment at the range on a daily basis [*29] put any environmental concerns there within the scope of their routine operations. As the District Court noted, their annual performance reviews suggest that Price and Warren were involved in workplace safety issues-Price's report explains that he "aided his supervisors in identifying safety issues at the facility," and "reached out to experts in the field of ventilation [and] firing range design along with heavy metal exposure and contamination [experts] and established a rapport with these professionals to search out the root cause and

contributing factors surrounding the dangers w e face in exposure to heavy metal contamination." There is some suggestion in the record that Price's search for external assistance may have been motivated by personal concerns, but the fact that Price may have exceeded the expectations of his formal job description as a firearms instructor does not mean that they were not within the scope of his duties. *Garcetti, 126 S. Ct. at 1961-62* ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform...."). Warren admitted at trial that he regularly dealt with the water in the bullet trap, unclogged the pumps, [*30] and replaced the filters.

Although voluntary efforts to engage in public discourse do not automatically remove internal workplace speech from constitutional protection, Price and Warren were required by the terms of their employment to maintain a safe learning environment at the FTU. *See Garcetti, 126 S. Ct. at 1960* ("Refusing to recognize *First Amendment* claims based on government employees' work product does not prevent them from participating in public debate. The employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit."). In his evaluation, Price was "tasked" with "the safe execution of the Academy Patrol Procedures Program" and the creation of "a new and more applicable set of Firing Range Safety Rules." Similarly, one of Warren's "objectives" for the next evaluation period was "conduct[ing] a safe Firearms Training Program" for which the plan of action was identified to include "[e]nsur[ing] all students and instructors practice approved safety procedures." Warren's performance appraisal justification noted that one [*31] of the "accomplishments of the Firearms Training Unit" during the period from October 1, 2002 through September 30, 2003 was that the unit "[c]ompleted the alterations and modifications to the Bullet Recovery system." With respect to work habits, Price and Warren were both given high marks for their care of the equipment related to firearms training. [8] Notably, the plaintiffs did not identify anyone else whose job might have included the sort of maintenance they performed, or who might have had responsibility to ensure the safety of the range.

8    In support of their contention that such reporting was not within the scope of their

employment, Price and Warren direct us to the Eighth Circuit's holding in *Lindsey v. City of Orrick, 491 F.3d 892, 2007 W L 1814943 (8th Cir. 2007)*. Lindsey was the public works director for the City. In that role he maintained the City's parks, water systems, streets, and sewers and reported about public works at City Council meetings. After attending a training session that included information on state sunshine law compliance, Lindsey questioned the Council's compliance with the open meetings requirement at a number of public meetings. He was later [*32] fired. The Court differentiated *Garcetti*, and held that Lindsey's speech was made "both as a citizen and on a matter of public concern." *491 F.3d 892, at *5*. The opinion in *Lindsey*, however, does not suggest that Price and Warren's speech should be protected by the *First Amendment* as the Court explained that "there is no evidence Lindsey's job duties even arguably included sunshine law compliance." *491 F.3d 892, at *3*. As demonstrated above, there is sufficient evidence that Price and Warren's jobs included reporting health and safety problems at the firing range.

We recognize that giving statements to the State Auditor was not part of their everyday duties and that *Garcetti* leaves open the possibility that speech within the workplace relating to non-job issues is protected. However, Price explained that he spoke to the auditors because "[i]t was my duty to speak to the auditors. The order came down from the executive office of the State of Delaware, meaning the Governor's office. I am bound by that order." Although this speech was compelled by their employer, this fact alone does not locate the speech within the realm of Price and Warren's job duties. Rather, what is dispositive is that the prior statements [*33] of Price and Warren within the chain of command prompted the order to speak with the State Auditor. Because the speech that motivated the order was within their job duties, the responsibility to respond to the subsequent order was also within the scope of their duties.

Because we agree with the District Court that Price and Warren were acting pursuant to their job duties when they made their complaints up the chain of command and gave their reports to the State Auditor, we need not examine whether their speech passes the remainder of the test established by *Pickering* and its progeny. *See Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731,*

*20 L. Ed. 2d 811 (1968); Givhan, 439 U.S. at 410; Connick, 461 U.S. at 138; see also Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004)*. As the Seventh Circuit explained, "*Garcetti* requires that before analyzing whether an employee's speech is of public concern, a court must determine whether the employee was speaking 'as a citizen' or, by contrast, pursuant to his duties as a public employee." *Sigsworth v. City of Aurora, 487 F.3d 506, 509-10 (7th Cir. 2007); see also Brammer-Hoelter v. Twin Peaks Charter Academy, 492 F.3d 1192 , 2007 W L 2007546, at *5 (10th Cir. 2007)*. [*34] In making their voices heard up the chain of command and reporting to the State Auditor under order, Price and Warren spoke pursuant to their duties as government employees at the FTU.

Price and Warren also assert that the release of their statements to the Auditor by their attorney was speech that was not pursuant to their job duties, and therefore not foreclosed as a basis for recovery by *Garcetti*. As *Garcetti* explained, "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of *First Amendment* protection because that is the kind of activity engaged in by citizens who do not work for the government." *Id. at 1961* (citing writing a letter to a local newspaper or discussing politics with a co-worker as examples of speech that falls "outside the scope of official duties"). They raised this argument before the District Court in regard to their motion to amend the complaint to conform to the evidence presented at trial. *See FED. R. CIV. P. 15(b)*. Although the release of their statements may have been outside the scope of their duties, and perhaps even in contravention of those duties, we need not reach this question because [*35] the District Court did not abuse its discretion in denying the motion to amend. *See Douglas v. Owens, 50 F.3d 1226, 1235 (3d Cir. 1995)* ("We review for abuse of discretion the district court's granting of leave to amend the complaint."). Moreover, the media speech theory was not presented to the District Court as a defense to the motion for judgment as a matter of law, but only in conjunction with their *Rule 15(b)* motion. *See, e.g., Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir. 1976)* ("We generally refuse to consider issues that are raised for the first time on appeal.").

In their brief to the District Court challenging the motion for judgment, Price and Warren argued that their speech was internal, but still protected after *Garcetti*

because it was not pursuant to their job duties. They also argued that they had not received notice of any defense that their speech to the Auditor was not within their job duties because, if they had, they would have shown that "it was their attorneys, who also spoke out to the press on their behalf after the first Auditor meeting, who arranged the actual meeting with the Auditor on their clients' behalf so their clients could [*36] blow the whistle on DSP wrongdoing." Their brief to the District Court also alleged that their " *speech to the Auditor* was the means of responding to [the] gag order; responding to the defamatory attack on plaintiffs; and of informing the public of governmental mismanagement and corruption through the Auditor and the media." (emphasis added). They concluded that "plaintiffs engaged in protected speech when they raised their health and safety concerns *to the State Auditor.*" (emphasis added).

We recognize that the parties did not have the benefit of the *Garcetti* opinion at the time of trial. *See North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 n.39 (3d Cir. 1995)* ("[W]here a previously ignored legal theory takes on new importance due to an intervening development in the law, it is appropriate to exercise discretion to allow a party to revive that theory." (internal citations omitted)). However, Price and Warren did not ask the District Court for a partial new trial on the ground that *Garcetti* had changed the legal landscape, pursuant to *Rule 59(a). See FED. R. CIV. P. 59(a)* ("A new trial may be granted to all or any of the parties and on all or part of the issues ... for [*37] any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...."); *Pryer v. C.O. 3 Slavic, 251 F.3d 448, 454 (3d Cir. 2001)*. Instead, they requested an amendment to conform the complaint to the evidence. The District Court correctly denied that request.

Price and Warren did not meet the requirements for an amendment pursuant to *Rule 15(b)*, which allows amendment of pleadings if the claim was tried by the express or implied consent of the parties. The record makes clear that the DSP defendants did not give their express consent. In order to ascertain whether they gave implied consent, we look to "whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." *Douglas, 50*

*F.3d at 1236* (quoting *Portis v. First Nat'l Bank, 34 F.3d 325, 332 (5th Cir. 1994)); see also Evans Prods. Co. v. West Am. Ins. Co., 736 F.2d 920, 924 (3d Cir. 1984)* ("The primary consideration in determining whether leave to amend under *Fed.R.Civ.P. 15(b)* [*38] should be granted is prejudice to the opposing party. The principal test for prejudice in such situations is whether the opposing party was denied a fair opportunity to defend and to offer additional evidence on that different theory." (citation omitted)).

Price and Warren identify a May 14, 2004 newspaper article that indicates that their counsel read their statements verbatim to the Delaware State News, and point to trial testimony regarding the article as support for the unpleaded issue. Admitted without objection, the newspaper article was relevant to and admitted for the purpose of proving Price and Warren's theory of retaliation and their defamation claim. Their attorney explained in a proffer to the District Court "why I am offering this," i.e., that the article "goes to the motive of the defendants to retaliate." He did not argue the possibility that the article might show that Price and Warren used their attorney to take their otherwise internal speech public. Indeed, in response to concerns raised by opposing counsel, he disclaimed altogether any connection his clients had with the article. [9]

9  The following sidebar colloquy is illustrative:

> The Court: W hat are you offering?
>
> Mr. [*39] S. Neuberger: The fact that the FTU, that the conditions at the FTU were all over the media in the beginning of 2004.... I am not offering, for example, Captain [Greg] Warren's quote that the FTU was, quote, the absolute epitome of a project from hell since its very inception, end quote--Captain Warren can testify about that in a couple of days when he is in here....
>
> Mr. Ellis: If that is the case, it is really misleading, because the evidence would make it seem like these three people w ere responsible for what's in the paper.

That is really misleading because it's not the case.

The Court: That is a concern, the concern outlined by Mr. Ellis.

Mr. T. Neuberger: I will be happy to have Corporal [Wayne] Warren testify that there is overlap in the subject matter, but *it wasn't him speaking to the media and giving them this information.* [emphasis added]

\* \* \*

Mr. T. Neuberger: I think we are missing something that we are saying on motivation. ... This is a backdrop of pressure and concern about the range, which, even if that pressure is not talking about our clients, it is talking about the fact that the state has a broken-down facility. And we are saying that the motive to retaliate is because [*40] all this is going public. So any news story of any nature about the range contributes ... to a motive to retaliate. It doesn't have to be about our guys. ... Simply the [fact that the] range is now being covered again [by the news media shows the defendants' displeasure about the publicity].

\* \* \*

The Court: Albeit these particular plaintiffs were not the source --

Mr. T. Neuberger: No.

In direct examination of Warren, the plaintiffs introduced the news article in the following manner:

Q. What were you concerned about?

A. Being blamed for the

downfall of the operation [at the FTU].

Q. Do you recall seeing any news media coverage discussing your meetings with the auditors?

A. Yes.

Q. Do you recall what newspapers that coverage was in?

A. I believe it was in both the News Journal and the State News.

Following this exchange, Warren identified the headline of the article in which their lawyer's reading of their statements was reported. Warren did not refer to the article again in his testimony. Several other references w ere made to the article during the plaintiffs' case, all in the context of showing the animosity of the defendants toward Price and Warren.

The sole occasion on which it is even arguable [*41] that Price and Warren introduced unchallenged evidence of their media speech theory was during the direct examination of Major David Baylor, which came after the plaintiffs' explanation that the article was evidence of motivation for retaliation. Plaintiffs' counsel asked Baylor if it was correct "that both Lieutenant Colonel MacLeish and Colonel Chaffinch became angry about the newspaper reporting on statements my office had made on behalf of my clients?" Baylor responded that "[t]here was a level of frustration, yes." The subsequent line of inquiry focused on the frustration of MacLeish and Chaffinch about the news stories and their angry feelings toward Price and Warren. This single question is insufficient to satisfy the requirements of *Rule 15(b)*. *See, e.g., Farfaras v. Citizens Bank and Trust of Chicago, 433 F.3d 558, 568 (7th Cir. 2006)* (holding that the plaintiff's admission on cross-examination in an employment discrimination case that she did not go to work right away was "not sufficient to demonstrate that the defense had raised the issue of failure to mitigate").

As we explained in *Douglas,* "an issue has not been tried by implied consent if evidence relevant to the new claim [*42] is also relevant to the claim originally pled, because the defendant does not have any notice that the implied claim was being tried." *50 F.3d at 1236.* Having

disclaimed any attempt to introduce the article for the purpose of showing that they were responsible for the statements or the release to the press, Price and Warren cannot now assert that they entered the unpleaded issue of media speech into the trial.

Nor did the defendants implicitly agree to the inclusion of the unpleaded issue in their testimony. Chaffinch testified that "I was not upset that your clients were talking to the auditors because, like I said, we w ere going to comply with the Auditor's Office in any way they needed to complete their investigation. I was not upset that they were talking to the auditors, no. I was upset that it was bringing a negative light to the Division of State Police in the media." Although Price and Warren now point to Chaffinch's testimony as evidence that the DSP defendants impliedly agreed that the issue of speech to the media was being tried, Chaffinch did not testify as to how the statements got into the media. Both he and MacLeish expressed their dismay at the negative coverage that [*43] the situation at the FTU had received, but neither stated that they were upset with Price and Warren for going to the media via their attorney and circumventing the universal DSP order prohibiting officers from talking to the media without approval.

The fact that there was no objection to the hearsay contained in the article further indicates that the defendants understood the introduction of the article and testimony regarding it to relate only to the adverse action prong of Price and Warren's retaliation claim. The DSP defendants did not implicitly consent to the trial of a claim that Price and Warren engaged in protected speech to the media. Accordingly, their motion under *Rule 15(b)* fails on the merits. [10]

> 10    We note that, although Price and Warren's *Rule 15(b)* motion fails, they may have had a valid claim under *Rule 59(a)* or *Rule 60(b)(6)* on the basis of the changed legal landscape after *Garcetti*. *See, e.g., Stanton by Brooks v. Astra Pharma. Prods., Inc., 718 F.2d 553, 557, 576 (3d Cir. 1983)* (confirming that a change in the law is an appropriate basis for a partial re-trial); *FED. R. CIV. P. 60(b)(6)* ("On motion and upon such terms as are just, the court may relieve a party or [*44] a party's legal representative from a final judgment, order, or proceeding for ... any other reason justifying relief from the operation of the judgment."); *but see Agostini v. Felton, 521 U.S.*

*203, 239, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997)* ("Intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under *Rule 60(b)(6)*...."). However, Price and Warren did not seek a partial re-trial on the issue of media speech or relief from the judgment under *Rule 60(b)(6)*. They sought only reinstatement of the verdict or default judgment as relief.

Although we are mindful that *Rule 54(c)* requires that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings," we note that the rule "addresses and cures a limited formal problem. It is not designed to allow plaintiffs to recover for claims they never alleged." *USX Corp. v. Barnhart, 395 F.3d 161, 165 (3d Cir. 2004)*. Thus, w e are unable to assist Price and Warren in salvaging their potentially meritorious, but unpleaded and untried, claims.

V.

Price and Warren's *Petition Clause* claim does not withstand scrutiny. [*45] Their complaints within the chain of command were not directed to the DSP as a governmental agency, but rather were directed to the DSP as their employer. Such complaints are not petitioning activity entitled to protection under the *First Amendment*.

The holding in *Garcetti* controls our analysis of the *First Amendment* speech claims. Under the rule established in *Garcetti*, Price and Warren spoke out about the maintenance of the bullet trap "pursuant to their official duties." *First Amendment* protection extends to government employees speaking as citizens, but it does not extend to workers who speak in the course of fulfilling their employment responsibilities. Price and Warren were speaking pursuant to their employment duties when they made their concerns known through the chain of command and when they spoke with the State Auditor. Accordingly, their *First Amendment* claims are foreclosed.

The District Court did not abuse its discretion in denying Price and Warren's motion under *Rule 15(b)*.

We will affirm the judgment of the District Court.

CONCUR BY: GREENBERG; POLLAK

CONCUR

GREENBERG, Circuit Judge, concurring.

Though I agree with the result the majority reaches on Price's and Warren's petition claim, I write [*46] separately to note my hesitation in finding that their e-mail complaints up the chain of command (as distinguished from their communications to the State Auditor), did not constitute petitioning activity. Rather, I would assume, arguendo, that the e-mails were petitioning activity, but conclude that the Supreme Court's opinion in *Garcetti v. Ceballos, 126 S. Ct. 1951, 1960, 164 L. Ed. 2d 689 (2006)*, barred their petitioning claim given that they sent their complaints up the chain of command "pursuant to their official duties." See majority opinion at 25.

The majority finds that because Price's and Warren's

"complaints within the chain of command were not directed to the DSP as a governmental agency, but rather were directed to the DSP as their employer," Price and Warren cannot seek solace now in the *Petition Clause*. Majority opinion at 39; see also id. at 16 (noting Price and Warren "appealed to their employer, which also happened

to be a state agency, through informal channels"). In *San Filippo v. Bongiovanni, 30 F.3d 424, 449 (3d Cir. 1994)*, we held "that a public employee is protected under the *Petition Clause* against retaliation for having filed a petition . . . addressing a matter of purely private [*47] concern." [11] We explained that the reason for our conclusion was "[t]he *first amendment's* petition clause imposes on the United States an obligation to have at least some channel open for those who seek redress for perceived grievances. Through its incorporation the *first amendment*, the *fourteenth amendment's* guarantee of 'liberty' imposes the same obligation on the states." *Id.* at 442. Thus:

> [W]hen government-federal or state-formally adopts a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably

meritorious 'petition' invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

Id. Additionally, we distinguished retaliation claims based on speech, which are subject to the rule announced by the Supreme Court in *Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690, 75 L. Ed. 2d 708 (1983)*, [12] as follows: "[W]hen one files a 'petition' one is not appealing over government's head to the general citizenry: when one [*48] files a 'petition' one is addressing government and asking government to fix what, allegedly, government has broken or has failed in its duty to repair."

*San Filippo, 30 F.3d at 442.*

> 11    We quote this language characterizing the majority opinion in San Filippo from Judge Becker's concurring and dissenting opinion in that case.
> 12    In Connick, the Supreme Court held that a government employee who goes public with an employment dispute that is not a "matter of public concern" does not have *first amendment* immunity against subsequent employer discipline. *Connick, 461 U.S. at 146, 103 S. Ct. at 1690.*

Notwithstanding the above, both San Filippo and the majority concede that there also exist "less formal mechanisms by which a petition may be made," although they "may occasion a lesser degree of constitutional protection than their formal counterparts." Majority opinion at 14; see also *McDonald v. Smith, 472 U.S. 479, 480, 105 S.Ct. 2787, 2788, 86 L. Ed. 2d 384 (1985)* (recognizing letters sent to President of United States by defendant charged with defaming plaintiff as petitions). The majority concludes, however, that because Price and Warren, in their capacity as public employees, "appealed to their employer, [*49] which also happened to be a state agency," their e-mails cannot constitute petitioning activity. Majority opinion typescript at 16. I find the result reached somewhat troubling. Specifically, given our broad characterization of a public employee's right to petition in *San Filippo*, it is unclear to me why Price's and Warren's complaints would constitute petitioning activity if they had contacted "a state agency qua

agency," id., rather than the same agency as their employer. Indeed, if in both cases plaintiffs are asking government to fix what it "has broken or has failed in its duty to repair" through means the government has deemed acceptable, [13] *San Filippo, 30 F.3d at 442,* why should the activity be stripped of its constitutional protection in one instance but not the other? [14]

> 13   This discussion assumes that e-mail was the typical means by which their employer expected Price and Warren--as well as other DSP employees--to communicate their concerns to it.
> 14   Notably, although we observed in *Hill v. Borough of Kutztown, 455 F.3d 225, 242 n.24 (3d Cir. 2006),* that "[w]e have never held . . . a report of a superior's misconduct to a legislative body when the legislative body is also [*50] the reporter's employer constitutes 'petitioning activity,'" so far as I am aware we similarly never have held to the contrary.

We can avoid the need to resolve the difficult question of whether a public employee ever can "petition" the government when the government is also the public employee's employer by looking, instead, to the Supreme Court's opinion in Garcetti v. Ceballos. [15] In Garcetti, the Supreme Court held that when public employees speak "pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes, and the Constitution does not insulate their communications from employer discipline." *126 S. Ct. at 1960.* While the Supreme Court did not address the question of whether the rule it announced in Garcetti applies to *First Amendment* retaliation claims based on a public employee's petitioning activities, as distinguished from his speech, there is good reason to believe that it does.

> 15   Obviously, a public employee can petition his governmental employer regarding a matter completely unrelated to his employment and be in the position of any other petitioner for constitutional purposes. But that situation is not present here.

To be sure, [*51] "[t]he petition clause of the *first amendment* was not intended to be a dead letter-or a graceful but redundant appendage of the clauses guaranteeing freedom of speech and press." *San Filippo, 30 F.3d at 442.* Rather, the right to petition "is an assurance of a particular freedom of expression,"

*McDonald, 472 U.S. at 482, 105 S. Ct. at 2789,* and "has a pedigree independent of-and substantially more ancient-than the freedoms of speech and press." *San Filippo, 30 F.3d at 443.* Nonetheless, "[t]he right to petition is cut from the same cloth as the other guarantees of that Amendment." *McDonald, 472 U.S. at 482, 105 S. Ct. at 2789.* To this end, the Supreme Court has plainly recognized that:

> The *Petition Clause* . . . was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble. . . . These *First Amendment* rights are inseparable . . . and there is no sound basis for granting greater constitutional protection to statements made in a petition . . . than other *First Amendment* expressions.

*Id. at 485, 105 S. Ct. at 2791* (internal citations omitted); see also *San Filippo, 30 F.3d at 450* (Becker, J., concurring and dissenting) (noting "even if [*52] all petitions now constitute speech (given the broad interpretation the Supreme Court has given to speech), I do not see why it matters that the guarantees overlap"). Given the above, it certainly would be plausible for us to believe that, if presented with the question, the Court is likely to find that when public employees petition the government pursuant to their official duties, the Constitution does not insulate such petitions from employer discipline. See *Garcetti, 126 S. Ct. at 1960;* see also *D'Angelo v. School Bd. of Polk County, Fla., No. 06-13582, F.3d, 2007 U.S. App. LEXIS 18235, 2007 WL 2189099, at *7 (11th Cir. Aug. 1, 2007)* (noting that, after Garcetti, the court must ask "whether the public employee made his petition both on a matter of public concern and as a citizen" and "[i]f the petition fails this threshold question, it is not protected under the *First Amendment*").

Assuming, arguendo, that Price and Warren's complaints up the chain of command did constitute petitioning activity, because I believe that Garcetti applies to their claim, I similarly would uphold the district court's order granting judgment against them as a matter of law for this reason. For the reasons the majority thoughtfully [*53] sets forth, it seems plain that Price and Warren acted "pursuant to their official duties," *Garcetti, 126 S. Ct. at 1960,* in voicing their complaints up the chain of command. Accordingly, their complaints

cannot be the basis underlying a *First Amendment* claim against defendants.

POLLAK, District Judge, concurring:

I join the opinion and judgment of the court.

The opinion explains with precision that the free speech aspect (as distinct from the *Petition Clause* aspect) of this case dealing with the rights of public employees is squarely governed by the Supreme Court's recent decision in *Garcetti v. Ceballos,    U.S.  , 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)*: "The result required by *Garcetti* illustrates how that opinion narrowed the Court's jurisprudence in the area of employee speech. Although under *Garcetti* an employee's right to protest matters of public concern is not automatically forfeited by his choice of a workplace forum, that right is limited." As the court further observes, under *Garcetti*, "the 'controlling factor' in removing speech from the *First Amendment* [is] that the expressions were made pursuant to employment duties." In the case at bar, it is not surprising that reports made by Corporal [*54] B. Kurt Price and Corporal Wayne Warren within the chain of command of the Delaware State Police were regarded as "made pursuant to employment duties." Less clear is that

the statements Price and Warren made to the State Auditor--statements ordered to be made to a high state official beyond the chain of state police command--were part of their employment duties. As the court notes, "giving statements to the State Auditor was not part of [appellants'] everyday duties." But, given the statements Price and Warren had made to their senior officers, it was not clear error for the District Court to find that the directive to Price and Warren to aid the State Auditor's inquiry broadened the scope of their employment duties. *See Gustafson v. Jones, 290 F.3d 895, 906 (7th Cir. 2002)*.

It may be expected that *Garcetti* will, to some extent, inhibit federal judicial micromanaging of public employment practices. It also may be expected that *Garcetti* will, to some extent, inhibit dissemination of information of arguable public interest about the operations of government agencies. How the balance will be struck may be expected to depend, to some extent, on the nuanced judgments of public employees [*55] and their superiors, and also of courts, on the scope of a public employee's employment duties. *Compare Garcetti, 126 S. Ct. at 1961-62, with id. at 1963* (Stevens, J., dissenting), *and id. at 1965, 1968* (Souter, J., dissenting).

# **<u>EXHIBIT D</u>**

LEXSEE 2006 U.S. DIST. LEXIS 57026

**B. KURT PRICE, WAYNE WARREN, AND CHRISTOPHER FORAKER, Plaintiffs, v. THOMAS MACLEISH, AND L. AARON CHAFFINCH, et al., Defendants. CHRISTOPHER FORAKER, Plaintiff, v. THOMAS MACLEISH, AND L. AARON CHAFFINCH, et al., Defendants.**

Civil Action No. 04-956 (GMS), Civil Action No. 04-1207 (GMS)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2006 U.S. Dist. LEXIS 57026*

**August 14, 2006, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *Foraker v. Chaffinch, 2007 U.S. App. LEXIS 20739 (3d Cir. Del., Aug. 30, 2007)*

**PRIOR HISTORY:** *Price v. Chaffinch, 2006 U.S. Dist. LEXIS 28974 (D. Del., May 12, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, Delaware State Troopers, filed suit pursuant to *42 U.S.C.S. § 1983* against defendants, a colonel and lieutenant colonel, alleging that they were unlawfully retaliated against in violation of their *First Amendment* rights to free speech and to petition the government for the redress of grievances. Defendants filed a renewed motion for judgment as a matter of law, or in the alternative, motion to amend the judgment or for a new trial.

**OVERVIEW:** The troopers alleged that they were retaliated against after they spoke out about hazardous health conditions at the Division State Police's (DSP) Firearms Training Unit facility in Smyrna, Delaware. The court found that speaking out within the chain of command about any hazardous range conditions was squarely within one trooper's official duties. The court reasoned that the leadership role of which the trooper spoke obviously arose from his employment with the DSP, and therefore, by his own admission, the trooper's speech up the chain of command was done pursuant to his official job duties. Accordingly, that speech was not protected by the *First Amendment*. As to the other two troopers, the court found that they were also expected to

speak out within the chain of command if they noticed any hazardous range conditions. With regard to the troopers' statements to the State Auditor, all three were ordered to aid the investigation. Thus, that speech was also within the scope of their official duties. Finally, regarding the defamation claim, the court found that the evidence did not support the jury's conclusion that the colonel acted with actual malice.

**OUTCOME:** The court granted defendants' *Fed. R. Civ. P. 50(b)* motion as to Counts I & II (Free Speech Clause and Petition Clause) in the first case, and Count III (defamation) in the second case. The court also granted defendants' *Fed. R. Civ. P. 59(a)* motion as to Counts I & II (Free Speech Clause and Petition Clause) in the Foraker case. The remainder of the outstanding motions were denied.

**COUNSEL:** [*1] Thomas Neuberger, Esquire, and Stephen Neuberger, Esquire, of THE NEUBERGER FIRM, Wilmington, Delware, and Martin Haverly, Esquire, Wilmington, Delaware, for Plaintiffs.

Edward Ellis, Esquire, of MONTGOMERY, MCCRACKEN, WALKER & RHOADES, LLP, Cherry Hill, New Jersey, Carmon Harvey, Esquire of MONTGOMERY, MCCRACKEN, WALKER & RHOADES, LLP, Philadelphia, Pennsylvania, and Richard Donaldson, Esquire and Noel Burnham, Esquire of MONTGOMERY, MCCRACKEN, WALKER & RHOADES, LLP, Wilmington, Delaware, for Defendants.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

August 14, 2006

Wilmington, Delaware

**SLEET, District Judge**

**I. INTRODUCTION**

In Civil Action No. 04-956-GMS ("the Price case"), brought pursuant to *42 U.S.C.A. § 1983 (2003)*, three Delaware State Troopers -- Corporal B. Kurt Price, Corporal Wayne Warren, and Sergeant Christopher Foraker -- claim that they were unlawfully retaliated against in violation of their *First Amendment* rights to free speech and to petition the government for the redress of grievances by Colonel L. Aaron Chaffinch and Lieutenant Colonel Thomas MacLeish after the troopers spoke [*2] out about hazardous health conditions at the Division State Police's ("DSP") Firearms Training Unit facility ("FTU") in Smyrna, Delaware. In Civil Action No. 04-1207-GMS ("the Foraker case"), also brought pursuant to *§ 1983*, Foraker individually claims that Chaffinch and MacLeish unlawfully retaliated against him in violation of his *First Amendment* rights to free speech and to petition the government for redress of grievances in response to a previous *First Amendment* retaliation lawsuit he had filed against Chaffinch in 2002. Foraker further claims that Chaffinch and MacLeish defamed him and unlawfully invaded his privacy in violation of state law.

Due to the substantial overlap between these two cases, they were consolidated for purposes of discovery on February 1, 2005, and for trial on April 18, 2006. On May 12, 2006, the court denied the defendants' motion for summary judgment on both counts in the Price case (*Free Speech Clause* retaliation and *Petition Clause* retaliation), and denied the defendants' motion for summary judgment on three counts in the Foraker case (*Free Speech Clause* retaliation, *Petition Clause* retaliation, and defamation). However, the court granted the defendants' [*3] motion for summary judgment on the fourth count in the Foraker case (invasion of privacy).

The court then held an eleven-day jury trial which began on May 15, 2006. At the close of the plaintiffs' case, the defendants moved for judgment as a matter of law on all counts in both cases pursuant to *Fed. R. Civ. P. 50(a)*. That motion was denied. And thus, on May 30, 2006, the court charged the jury and deliberations were scheduled to commence the following morning. Meanwhile on May 30, the Supreme Court of the United States announced its highly-relevant *First Amendment* retaliation decision in *Garcetti v. Ceballos, 547 U.S. , 126 S.Ct. 1951, 164 L. Ed. 2d 689 (2006)*. Although the jury's deliberations began as previously scheduled, the parties were directed to appear before the court on the afternoon of May 31 to discuss the impact of *Garcetti* on the case at bar. Before that discussion began, however, the jury concluded its deliberations. The verdict -- subsequently announced in open court in lieu of the planned *Garcetti* discussion -- was against Chaffinch on all remaining counts in both cases, and against MacLeish on all remaining [*4] counts in both cases except Count III in the Foraker case (defamation).

Presently before the court is the defendants' renewed motion for judgment as a matter of law pursuant to *Fed. R. Civ. P. 50(b)*, or in the alternative, motion to amend the judgment or for a new trial pursuant to *Fed. R. Civ. P. 59*. For the reasons discussed below, the court will grant the defendants' *Rule 50(b)* motion as to Counts I & II in the Price case (*Free Speech Clause* and *Petition Clause*), and Count III in the Foraker case (defamation). The court will also grant the defendants' *Rule 59* motion as to Counts I & II in the Foraker case (*Free Speech Clause* and *Petition Clause*). The remainder of the defendants' motion, as well as all other outstanding motions, will be denied.

**II. JURISDICTION**

The court has subject matter jurisdiction in this matter pursuant to *28 U.S.C.A. §§ 1331* and *1367 (1993)*.

**III. STANDARD OF REVIEW**

"[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the [*5] same.' *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. It therefore follows that, in entertaining a motion for judgment as a matter of

Case 1:06-cv-00565-GMS    Document 44-2    Filed 10/03/2007    Page 41 of 78

Page 3
2006 U.S. Dist. LEXIS 57026, *5

law, the court should review all of the evidence in the record." *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).* "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. [*See* 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299 (2d ed. 1995).] That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' *Id.* at 300." *Reeves, 530 U.S. at 151.*

## IV. BACKGROUND

A safely-constructed firing range must employ some means of stopping discharged ammunition. One such means is known as a wet bullet [*6] trap, which uses a water-coated ramp to direct hydroplaning ammunition into a deceleration chamber. The ammunition then spins around in the deceleration chamber, loses energy, drops to a conveyer belt below, and is carried away to a disposal bin. Indoor ranges also require adequate ventilation to prevent people inside the range from inhaling unsafe toxins, such as lead from the ammunition.

The FTU, which was designed with a wet bullet trap and ventilation system, became operational in September 1998. Not long thereafter, however, an environmental-assessment firm hired in response to concerns expressed about the adequacy of the ventilation system concluded that the lead level in the air significantly exceeded the maximum acceptable level recommended by the Occupational Safety and Health Administration. By at least as early as June 14, 1999, the FTU's air-quality problems became the subject of public scrutiny after *The News Journal* -- a local Delaware newspaper--publicized the firm's conclusions in an article entitled, "Shooting range under fire for lead: State police are exposed to levels of metal in air twice federal standard." By January 2001, the DSP had switched to lead-free [*7] disintegrating, or "frangible," ammunition for handguns used at the FTU.

The switch to frangible ammunition was no panacea because it caused significant problems with the bullet trap. The trap was equipped with several sprayer heads to provide the ramp with a continuous coating of recycled water pumped up from a reservoir tank that collected the

water as it cascaded off the ramp. As with any mechanical pump system, clogs from the collection of debris -- in this case, bullet fragments and shotgun wadding -- could disrupt the water flow and cause dry spots on the ramp. Dry spots were a problem with frangible ammunition because it, unlike regular ammunition, would burst into a cloud of heavy-metal particles on impact with the water-less portion of the ramp. And, because the ventilation system still did not function properly, the air within the range became potentially unsafe to breathe. Moreover, the disintegrated fragments left by the frangible ammunition caused much more frequent clogging, and therefore, the pump system required much more frequent cleaning. Since the cleaning was done by hand, the person performing that chore was exposed to water contaminated by the DSP's spent shotgun [*8] ammunition, which remained lead based even after the switch to the lead-free frangible handgun ammunition. The disintegrated fragments also had a deleterious effect on the conveyor belt because they often adhered themselves into a concrete-like sludge which, if not promptly removed, would cause the belt to seize up. The responsibility for cleaning and maintaining the bullet trap belonged to the FTU staff, which consisted of several full-time troopers with expertise in firearms.

Corporal Price and then-Corporal Foraker were assigned to the FTU in 1996 and 1997, respectively, before the indoor range was operational. Corporal Eddie Cathell, a personal friend of Chaffinch, joined the FTU staff approximately six months after Foraker. Corporal Warren was brought on in 2001. On August 1, 2001, Foraker was simultaneously promoted both to the rank of Sergeant and to the position of non-commissioned officer in charge ("NCOIC") of the FTU. Foraker and Cathell had a rather rocky professional relationship, and on several occasions Foraker spoke out against Cathell within the DSP. Foraker's actions in this regard seem to have "ruffled [Chaffinch's] feathers" because in early 2002 Foraker was [*9] abruptly transferred away from the FTU and into what he considered to be a dead-end position. This transfer prompted Foraker to file a *§ 1983* action against Chaffinch for unlawful *First Amendment* retaliation. After a five-day trial, a jury found that Chaffinch had in fact retaliated against Foraker. The parties later agreed on settlement terms, pursuant to which Foraker was reinstated as the NCOIC of the FTU on December 1, 2003.

After his reinstatement, Foraker held several

2006 U.S. Dist. LEXIS 57026, *9

meetings with the FTU staff and others, including his superiors and the interim NCOIC, to discuss the status of the range. Foraker also initiated a related email correspondence with his superiors. At those meetings and in those emails, Foraker relayed his concerns, and those of Price and Warren, up the chain of command about the ventilation system and bullet trap. Additionally, because Foraker, Price, and Warren shared similar concerns about the health risks posed by their cleaning and maintaining of the bullet trap, they decided to suspend such activities until the necessary repairs had been made to the trap and ventilation system. In March of 2004, the FTU's air quality remained poor and, as a result, the facility [*10] was formally closed.

Due to the public attention the FTU's closing generated, Chaffinch gave a media tour of the facility the following month. Afterwards, the following description of the tour appeared in both the *Delaware State News* and *American Police Beat Magazine*:

> Col. Chaffinch said that he had visited the range for a staff shoot in the fall and things had been a lot better in terms of clean-up and maintenance. Things weren't perfect, but the range wasn't in the state it is now.

> "There was some discoloration in the bullet trap but that was about it," Col. Chaffinch said as the group moved through the facility.

> "It's a lot dirtier now. The previous sergeant in charge did a good job. Things changed in December when another sergeant came in. That's at least a portion of where the ball was dropped," Chaffinch said.

> The previous sergeant was one Sgt. Roger [sic, Richard] Ashley, who was picked by Col. Chaffinch in April of 2002 to replace Sgt. Christopher D. Foraker as range supervisor. Sgt. Foraker sued the Col. successfully in District Court last year and got his position back by court order. At issue in the range's deterioration, according to Col. Chaffinch, was [*11] the difference in the way the two sergeants approached their duties.

> "Because of the frangible ammunition we were using, the bullet trap required hands-on, daily cleaning. Sgt. Ashley was willing to do that," Chaffinch told the Delaware State News in an interview.

> "I cannot say Sgt. Foraker was willing to do that. He was interested in instruction and teaching people how to shoot. He did not feel that cleaning was part of his purview. He felt that was putting him in harm's way."

(D.I. 196 at A292-A297.) Although Foraker was unable to respond to these allegations due to a gag order imposed by Chaffinch, all three plaintiffs gave subsequent statements to Delaware's Auditor of Accounts ("State Auditor" or "Auditor") in cooperation with a governor-ordered investigation of the FTU. The Auditor's investigation concluded that the inadequate ventilation system, the lack of maintenance protocols, and the suspension of cleaning and maintenance under Foraker were the most-identifiable factors contributing to the closing of the range. In the wake of these three events, the defendants retaliated against all three plaintiffs by taking various adverse actions against them.

**V. DISCUSSION**

[*12] **A. *First Amendment* Claims (Counts I & II in Both Cases)**

There is "a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the *First Amendment*." *Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005)*. The employee must show at step one -- which is the only step at issue here -- that the activity in question is protected by the *First Amendment* as a matter of law. *Id., Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004)*. "[T]he *First Amendment* protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti, 126 S. Ct. at 1957.* [1] The contours of that protection are generally defined as follows:

> *Pickering [v. Board of Educ., 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)]* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional

protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. *See id., at 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811.* [*13] If the answer is no, the employee has no *First Amendment* cause of action based on his or her employer's reaction to the speech. *See Connick [v. Myers, 461 U.S. 138, 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)].* If the answer is yes, then the possibility of a *First Amendment* claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. *See Pickering, 391 U.S., at 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811.* This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti, 126 S. Ct. at 1958.*

1    "When [the Supreme Court] applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Va. Dep 't of Taxation, 509 U.S. 86, 97, 113 S. Ct. 2510, 125 L. Ed. 2d 74 (1993).* As such, the court must decide the defendants' motion under the rule announced in *Garcetti.* Additionally, because the court's analysis of the defendants' motion for summary judgment was grounded in pre-*Garcetti* retaliation law, Part IV.A of the written opinion dated May 12, 2006 will be vacated. Furthermore, to the extent the plaintiffs' argue that application of *Garcetti* at this stage of the litigation is a deprivation of their due process rights, counsel for plaintiffs represented to the court that the summary judgment record

was assembled in anticipation of the Supreme Court's decision. (Tr. 2646:11-2647:8.) Therefore, the plaintiffs were not deprived of their due process rights because their post-trial briefs provided them with an opportunity -- of which they did not avail themselves -- to point the court to evidence in the summary judgment record that was not adduced at trial.

[*14] Although the *Pickering/Connick* inquiries are easy to recite, they can be considerably more difficult to answer due to "'the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal,'" or other adverse action. *Garcetti, 126 S. Ct. at 1958* (quoting *Pickering, 391 U.S. at 569*). Perhaps in an effort to ease this difficulty, the Supreme Court in its recent *Garcetti* decision drew a figurative line in the sand by holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for *First Amendment* purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti, 126 S. Ct. at 1960.* Whether the water has been somewhat cleared or further muddied by *Garcetti* remains to be seen. Suffice it to say, many billable hours will likely be spent wrangling over the scope of every employee-plaintiff's "official duties." *See id. at 1962 n.2* (Souter, J., dissenting). The *Garcetti* case itself provides rather vague [*15] guidance in this regard:

[A]s indicated above, the parties in this case do not dispute that [the plaintiff] wrote his disposition memo pursuant to his employment duties. We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate. We reject, however, the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions. . . . The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of

the employee's professional duties for *First Amendment* purposes.

*Id. at 1961-62..*

That the scope of an employee's duties should not be discerned by blind reliance upon mere labels is not surprising. In *Bd. of County Comm'rs v. Umbehr* the Supreme Court rejected "a bright-line rule distinguishing independent contractors from employees" that would have given "the government [*16] *carte blanche* to terminate independent contractors for exercising *First Amendment* rights." *518 U.S. 668, 678, 116 S. Ct. 2342, 135 L. Ed. 2d 843 (1996).* The Court reasoned in part "that [a] bright-line rule would leave *First Amendment* rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake." *Id. at 679. See also Rankin v. McPherson, 483 U.S. 378, 380-81, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)* (holding that the title "deputy constable" was meaningless where all employees were given that title "regardless of job function"). *Cf. O'Hare Truck Serv. v. City of Northlake, 518 U.S. 712, 722, 116 S. Ct. 2353, 135 L. Ed. 2d 874 (1996)* (explaining that, in the context of political patronage systems, a bright-line rule distinguishing employees from independent contractors "would invite manipulation by government, which could avoid constitutional liability simply by attaching different labels to particular jobs"); *Branti v. Finkel, 445 U.S. 507, 518, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980)* (also in the context of political patronage systems, explaining that "the ultimate inquiry [*17] is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved").

Yet, to conclude from the Court's *dicta* in *Garcetti* that job descriptions are irrelevant and that the scope of an employee's official duties is strictly confined to the duties actually performed by that employee would be a mistake. "The proper inquiry is a practical one," and the court must look "to the duties an employee actually is *expected* to perform." *Garcetti, 126 S. Ct. at 1961-62* (emphasis added). In the closely-related political patronage cases, the Third Circuit has explained the proper approach for evaluating whether an employee is a "policymaker":

The character of this inquiry is inherently fact-specific in that it requires a court to examine the nature of the responsibilities of the particular job at issue. *See Zold v. Township of Mantua, 935 F.2d 633, 635 (3d Cir. 1991).* Importantly, this inquiry is focused on "the function of the public office in question [*18] and not the actual past duties of the particular employee involved." *Brown v. Trench, 787 F.2d 167, 168 (3d Cir. 1986); see also Waskovich v. Morgano, 2 F.3d 1292, 1297 (3d Cir. 1993); Burns v. County of Cambria, Pa., 971 F.2d 1015, 1022 (3d Cir. 1993); cf. Furlong v. Gudknecht, 808 F.2d 233, 236 (3d Cir. 1986).* Other circuits have used a similar analysis, as we document in the margin. We have held, however, that evidence of past job duties may in some cases be informative. *See Peters v. Delaware River Port Auth., 16 F.3d 1346, 1353 (3d Cir. 1994); Waskovich, 2 F.3d at 1300.*

*Wetzel v. Tucker, 139 F.3d 380, 383-84 (3d Cir. 1998)* (footnote omitted). Thus, given the guidance provided by the cases above, the scope of an employee's official duties are defined by actions and expectations of the employer and/or supervisors, of others who have held the employee's position, and of the employee himself. While perhaps not tailored to suit every fact pattern that may arise, this list of considerations is more than sufficient for present purposes.

### 1. The Price Case

#### [*19] a. Free Speech Clause (Count I)

At issue in the Price case is the plaintiffs' speech up the chain of command and to the State Auditor's Office regarding the conditions at the FTU. With respect to Foraker's speech up the chain of command, the expectations of his superiors are manifest from the high ratings and generous praise he was given in his performance appraisal:

Upon returning to the DSP FTU, Sgt. Foraker immediately identified safety

2006 U.S. Dist. LEXIS 57026, *19

issues that placed the health of FTU staff in serious jeopardy. *Sgt. Foraker immediately brought this to the attention of the DSP Academy staff and continued to provide the Academy staff, as well as the DSP Executive Staff, with information concerning the conditions at the range.*

(Pls.' Ex. 7 at CF7 (emphasis added).)

On December 1, 2003, Sergeant Foraker was reassigned to the DSP FTU. Sergeant Foraker immediately identified safety issues that placed the health and safety of the FTU staff and officers training at the DSP range in jeopardy. *Sergeant Foraker brought the conditions to the attention of the DSP Academy staff. After notifying the staff, Sergeant Foraker continued to provide updates of the range conditions, [\*20] conducted research to identify the cause of the problems, and attempted to identify potential solutions. Sergeant Foraker made this information available to the DSP Academy and Executive staffs, the Department of Administrative Services, and the Delaware Auditor's Office.*

(Id. at CF9 (emphasis added).) Such expectations are consistent with the actions of every trooper who has ever been in charge of the FTU:

(1) Lieutenant William Bryson, the officer in charge of the FTU in 1998, testified at trial that he had a duty to "[o]versee the operation of the facility, make sure the facility was maintained and running, operational." (Tr. at 2172:19-20.) 2 Bryson further testified that he notified the chain of command of problems with the HVAC system after he discovered that it was not functioning properly. (Id. at 2176:14-20.)

(2) Sergeant Brian Fitzpatrick, the NCOIC from 1998 to 1999, wrote at least three memoranda to his superiors reporting problems with the HVAC system and his concerns about the health of the FTU staff. (Defs.' Exs. 48-50.)

(3) Sergeant Al Parton, the NCOIC from 1999 to 2001, also spoke out to his superiors regarding these same issues. (Pls. [\*21] ' Ex. 114.)

(4) Foraker, during his first term as the NCOIC from 2001 to 2002, reported to his superiors that the FTU staff suffered from elevated levels of lead their blood. (Tr. at 1392:19-1393:1.)

(4) Sergeant Richard Ashley -- the interim NCOIC during Foraker's absence from early 2002 until December 2003 -- also reported the range's problems up the chain of command. (Pls.' Ex. 115.) In fact, Ashley was explicitly instructed by his superiors to "[c]ontinually inspect the facility and *identify deficiencies*" (Defs.' Ex. 56 at 13 (emphasis added).)

(5) Foraker, upon being reinstated as the NCOIC in 2003, "sounded the alarm for. . . the conditions of the range" in an attempt to "push it up the chain of command, to hopefully get the situation rectified." (Tr. at 1405:8-13.)

2  "Tr." refers to the trial transcript.

The inescapable conclusion from all of this evidence is that speaking out within the chain of command about any hazardous range conditions was squarely within Foraker's official [\*22] duties. Lest there be any doubt, it is surely removed by Foraker's testimony regarding his responsibilities as the NCOIC:

Q Now, fast forwarding from your time at the FTU in December of 2003 forward, were you trying to protect your men?

A Absolutely.

Q Why?

A A leader is supposed to put his men above himself. A leader should lead from the front, not from the back. A leader should put his health concerns below the health concerns of. . . the men that he

2006 U.S. Dist. LEXIS 57026, *22

leads. And there is no way that I would want to put my men in harm's way deliberately with the situation back behind that bullet trap. It was obviously dangerous, as you saw when the men had to clean it up, it was a Hazmat site.

(Tr. at 1484:25-1485:12.) This leadership role of which Foraker speaks obviously arose from his employment with the DSP, and therefore, by his own admission, Foraker's speech up the chain of command was done pursuant to his official job duties. *See also Hill v. Marino,* No. 05-1356, *455 F.3d 225, 2006 U.S. App. LEXIS 18708 (3d Cir. 2006)* (holding that a Borough Manager who reported complaints from his employees was not shielded by the *First Amendment* under *Garcetti*); *Mills v. City of Evansville,* No. 05-3207, *452 F.3d 646, 2006 U.S. App. LEXIS 15082 (7th Cir. 2006)* [*23] (holding that a police sergeant was not speaking as a citizen under *Garcetti* by criticizing new police policy up the chain of command). Accordingly, that speech is not protected by the *First Amendment.* [3]

> 3    The defendants also point out that in his previous trial, Foraker testified that he "was in charge of the entire operations of the firearms training," and that he "basically managed the facility." (D.I. 223 at C-26.) Because this evidence is merely cumulative of the evidence cited above, the court does not believe it is necessary to decide whether such testimony is admissible. Nevertheless, his testimony certainly buttresses the court's conclusion vis-a-vis Foraker's official job duties.

As to Price and Warren, they were also expected to speak out within the chain of command if they noticed any hazardous range conditions. Foraker, who was their superior, wrote performance appraisals of both men in which he applauded such speech:

> Cpl/3 Price aided his supervisors in identifying safety issues at [*24] the facility that placed the health and safety of his coworkers, our families, our students and their families at risk. Cpl/3 Price has reached out to experts in the field of ventilation, firing range design along with heavy metal exposure and contamination and established a rapport with these

professionals to search out the root cause and contributing factors surrounding the dangers we face in exposure to heavy metal contamination. Cpl/3 Price contacted and established communication with the experts in those fields to obtain a greater understanding in an effort to help protect and inform all assigned instructors, all of those who train at the facility, the cleaning personnel and all of our family members as well as the Division of State Police.

(D.I. 196 at A-381.)

> Cpl/3 Warren aided his supervisors in identifying safety issues at the facility that placed the health and safety of his coworkers, our families, our students and their families at risk. Cpl/3 Warren has conducted much research in the areas contributing to the cause surrounding the dangers of heavy metal exposure and contamination along with contacting and establishing a rapport with experts in that field [*25] of understanding in an effort to help protect and inform all instructors assigned to the facility, all of those who train at the facility, the civilian cleaning personnel and all of our family members as well as the Division of State police.

(D.I. 196 at A-369.) And, as with Foraker, those expectations are consistent with the actions taken by both men as FTU staff members. The record is also rife with evidence that Price and Warren themselves believed it was their responsibility to speak out within the chain of command about conditions at the range. For example, both men acknowledged that they were expected to maintain the range, and that they met with various high-ranking DSP officials on several occasions for the purpose of discussing the hazardous conditions they discovered in the course of that maintenance. Again, the inescapable conclusion is that their chain-of-command speech was within the scope of their official duties.

With regard to the plaintiffs' statements to the State Auditor, all three were ordered to aid the investigation. Thus, that speech was also within the scope of their official duties. *Cf. Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation, 392 U.S. 280, 285, 88 S. Ct. 1917,*

*20 L. Ed. 2d 1089 (1968)* [*26] (explaining that "public employees. . . subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights"). Accordingly, because none of the speech at issue in the Price case is protected by the *Free Speech Clause* under *Garcetti*, the defendants are entitled to judgment as a matter of law on Count I.

### b. Petition Clause (Count II)

The Supreme Court's articulation of the nature of the relationship between the *Free Speech Clause* and the *Petition Clause* is clear: "*First Amendment* rights are inseparable, *Thomas v. Collins, 323 U.S. 516, 530, 65 S. Ct. 315, 89 L. Ed. 430 (1945)*, and there is no sound basis for granting greater constitutional protection to statements made in a petition. . . than other *First Amendment* expressions." *McDonald v. Smith, 472 U.S. 479, 485, 105 S. Ct. 2787, 86 L. Ed. 2d 384 (1985)*. Thus, under *McDonald*, the plaintiffs' speech up the chain of command and to the State Auditor is not entitled to a higher level of *First Amendment* protection merely because that speech is now labeled as a "petition." Moreover, the plaintiffs' reliance [*27] upon *San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)*, is misplaced. In that case, the Third Circuit held that petitions, unlike speech, need not address a matter of public concern in order to qualify for *First Amendment* protection. *Id. at 440*. However, a crucial component of the court's reasoning distinguishes *San Filippo* from the case at bar:

> [N]either the United States nor the several states are required to recognize as a "petition" whatever particular communication is so characterized by one who chooses to protest governmental acts or omissions. But when government -- federal or state -- *formally adopts* a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious "petition" *invoking that mechanism* may be disciplined for such *invocation* by the very government that in compliance with the petition clause has given *the particular mechanism* its

constitutional imprimatur.

*Id. at 442* (emphasis added). Here, the plaintiffs' "petitions" up [*28] the chain of command were not through a formally-adopted mechanism. To the extent, however, that the plaintiffs' "petitions" to the State Auditor might be characterized as having been done through a formally-adopted mechanism, that mechanism was not *invoked* by the plaintiffs -- they were *ordered* to cooperate. Clearly, the plaintiffs' petitioning activities do not fall under the safe harbor provided by *San Filippo*. Therefore, the court holds that the defendants are entitled to judgment as a matter of law on Count II as well.

### 2. The Foraker Case

At issue in the Foraker case is the alleged retaliation in response to Foraker's 2002 lawsuit against Chaffinch. The defendants do not contend that judgment as a matter of law is appropriate as to these counts. Instead, the defendants argue that a new trial is warranted because the jury verdict is ambiguous in light of the JMOL ruling in the Price case. The court agrees. The verdict form asked the jurors whether the defendants took adverse action against Foraker in retaliation for his protected *First Amendment* activity generally. Thus, there is no way to deduce or infer whether the jury believed that the defendants were motivated [*29] by the speech that is the subject of the Price case, or by the speech that is the subject of the Foraker case. Therefore, a new trial is warranted as to Counts I & II in the Foraker case.

### B. Defamation Claim (Count III in the Foraker Case)

On May 12, 2006, the court denied the defendants' motion for summary judgment as to Foraker's defamation claim, holding that he is a limited purpose public figure who needed to prove actual malice in order to recover. (D.I. 167 at 11.) Out of an abundance of caution and with no accompanying analysis, the court further held that "the record contains sufficient evidence for a reasonable jury to conclude that the defendants' statements were made with actual malice." (D.I. 167 at 11.) Although the evidence of actual malice adduced at trial was the same as the evidence of actual malice contained in the summary judgment record, the court deems it prudent to reconsider the sufficiency of that evidence.

"Where the plaintiff is a public figure, there is an additional constitutional requirement that the defendant have acted with actual malice. *See New York Times Co. v.*

*Sullivan, 376 U.S. 254, 280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964).* [*30] Actual malice exists where the declarant acts with 'knowledge that it was false or with reckless disregard of whether it was false or not.' *Id." Gill v. Del. Park, LLC, 294 F. Supp. 2d 638, 646 (D. Del. Dec. 2, 2003).* Moreover, "a public-figure plaintiff must show the falsity of the statements at issue in order to prevail in a suit for defamation." *Phila. Newspapers v. Hepps, 475 U.S. 767, 775, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986).*

In the present case, after what appears to have been a thorough investigation, the State Auditor concluded as follows:

> On December 1, 2003, a new Sergeant [i.e., Foraker] took over command of the firing range. In an interview he informed us that shortly thereafter he met with the current staff and as a result of that meeting a decision was made not to perform any maintenance at the range. The staff made the decision not to continue performing maintenance and custodial functions due to health related issues and not being qualified to perform those functions.

> We can only surmise that the failing of the conveyor system, no maintenance performed on the bullet recovery system, and no custodian maintenance being performed to clean the firing range, [*31] that these situations contributed to an unhealthy and unclean environment leading to the ultimate closing of the firing range.

(D.I. 196 at A-250.) These conclusions, which mirror Chaffinch's allegedly-defamatory statements reproduced above, demonstrate two things. First, Chaffinch's statements were likely substantially true. Second, even if there is evidence to dispute the accuracy of the State Auditor's conclusions, the investigation was doubtlessly done with care. Consequently, it cannot be said that Chaffinch's nearly-identical statements to the media were made with reckless disregard to falsity. Therefore, the evidence does not support the jury's conclusion that Chaffinch acted with actual malice. Accordingly, Chaffinch is entitled to judgment as a matter of law on Count III.

## VI. OTHER OUTSTANDING MATTERS

There are a few outstanding motions that warrant a brief comment. First, with regard to plaintiffs' motions for attorneys' fees and costs, the court will deny those motions as moot pending the outcome of the re-trial of the Foraker case. Second, with regard to Foraker's motion to find the defendants' in civil contempt for violating The Honorable Joseph J. [*32] Farnan, Jr.'s order in the 2002 case, the court will also deny that motion as moot pending the outcome of the re-trial in the Foraker case. Finally, with regard to the plaintiffs' motion to amend the complaint in order to conform to the evidence adduced at trial pursuant to *Fed. R. Civ. P. 15(b),* the motion must be denied because it is nothing more than an inappropriate attempt by the plaintiffs to mitigate for a failed strategic decision made early on in the litigation. *DRR, L.L.C. v. Sears, Roebuck & Co., 171 F.R.D. 162, 165 (D. Del. Feb. 19, 1997)* ("[A] losing party, by motions to amend and rehear, [cannot] keep a case in court indefinitely, trying one theory of recovery or defense after another, in the hope of finally hitting upon a successful one.") (internal citations omitted).

## VII. CONCLUSION

For the reasons described above, the court will grant the defendants' *Rule 50(b)* motion as to Counts I & II (*Free Speech Clause* and *Petition Clause*) in the Price case, and Count III (defamation) in the Foraker case. The court will also grant the defendants' *Rule 59(a)* motion as to Counts I & II (*Free Speech Clause* [*33] and *Petition Clause*) in the Foraker case. The remainder of the outstanding motions will be denied.

## ORDER

IT IS HEREBY ORDERED THAT:

1. The defendants' renewed motion for judgment as a matter of law pursuant to *Fed. R. Civ. P. 50(b),* or in the alternative, motion to amend the judgment or for a new trial pursuant to *Fed. R. Civ. P. 59* (D.I. 193) be GRANTED in part and DENIED in part as moot;

2. All other outstanding motions (D.I. 179, 187, 189, 192, 197, and 229) be DENIED; and

3. The judgment of June 15, 2006 (D.I. 186), and Part IV.A of the written opinion dated May 12, 2006 (D.I. 167) be VACATED.

2006 U.S. Dist. LEXIS 57026, *33

Dated: August 14, 2006                    UNITED STATES DISTRICT JUDGE

/s/ Gregory M. Sleet

# **EXHIBIT E**

LEXSEE 2007 U.S. DIST. LEXIS 71437

**JAMES E. FERACE, Plaintiff, v. EDMUND S. HAWLEY, ADMINISTRATOR, TRANSPORTATION SECURITY ADMINISTRATION AND DEPARTMENT OF HOMELAND SECURITY, TRANSPORTATION SECURITY ADMINISTRATION, Defendants.**

Civil Action No. 05-1259

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

*2007 U.S. Dist. LEXIS 71437*

September 26, 2007, Decided
September 26, 2007, Filed

**COUNSEL:** [*1] For AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, Plaintiff: Gony Frieder Goldberg, LEAD ATTORNEY, American Federation of Government Employees, AFL-CIO, Washington, DC; Melvin L. Vatz, Grossinger, Gordon & Vatz, Pittsburgh, PA.

For JAMES E. FERACE, Plaintiff: Gony Frieder Goldberg, LEAD ATTORNEY, American Federation of Government Employees, AFL-CIO, Washington, DC.

For JAMES M. LOY, in his official capacity as Administrator, Transportation Security Administration, TRANSPORATION SECURITY ADMINISTRATION, Defendants: Jacqueline E. Coleman Snead, LEAD ATTORNEY, United States Department of Justice, Washington, DC; Paul D. Kovac, United States Attorney's Office, Pittsburgh, PA.

**JUDGES:** Nora Barry Fischer, United States District Judge.

**OPINION BY:** Nora Barry Fischer

**OPINION**

**MEMORANDUM OPINION**

**I. Introduction**

This is an action seeking declaratory and injunctive relief and damages for alleged retaliation in violation of the *First Amendment* rights of free speech and association. Plaintiff James E. Ferace ("Plaintiff") is a former employee of the Transportation Security Administration ("TSA") who claims that he was unlawfully discharged because of his active and open efforts in an attempt to unionize the screening department [*2] of the Pittsburgh International Airport. (Complaint at Docket No. 20 ("Complaint") at PP 4, 17, 26).

Presently before this Court is Defendants' Motion for Summary Judgment ("Defendants' Motion"). [DE 58]. The matter has been fully briefed by the parties. [DE 59, 67, and 69]. Pursuant to *Local Rule of Court ("LR") 56.1(B)(1)*, Defendants set forth a concise statement of material facts. [DE 60]. Plaintiff, however, failed to respond to these statements in accordance with *LR 56.1(C)(1)*, and consequently, the facts set forth in the concise statement of material facts submitted by Defendants are deemed to be admitted by Plaintiff for the purpose of the instant motion, in accordance with *LR 56.1(E)*. [1] *Benko v. Portage Area Sch. Dist., 2006 U.S. Dist. LEXIS 40573, 2006 WL 1698317 (W.D. Pa. 2006); Smith v. Burrows Corp., 2005 WL 2106594 (W.D. Pa. 2005); Loving v. Borough of E. McKeesport, 2005 U.S. Dist. LEXIS 37514, 2005 WL 3560661 (W.D. Pa 2005)* (movant's facts admitted because non-movants failed to respond to movant's statement of material facts, pursuant to *LR 56.1*).

1 Plaintiff was provided further notice of these procedures in the Case Management Order dated

September 25, 2006. Docket No. 46 at P 10 ("The party opposing a motion for summary judgment [*3] must respond to the movant's statement of undisputed facts paragraph by paragraph by either admitting or denying that a proposed fact is undisputed"). Again, Plaintiff was provided with further notice of his failure to comply with the local rule when Defendants filed their Reply in Support of Their Motion for Summary Judgment (Docket No. 69) and Defendants' Response to Court Order Directing Parties to File Joint Statement of Material Facts Not in Dispute (Docket No. 71), both of which raised the issue of Plaintiff's failure to comply with the local rule. Still, Plaintiff failed to file, or even request leave to file, a responsive statement of facts as set forth in *LR 56.1*. Instead, on July 25, 2007, Plaintiff filed a "Statement of Material Fact" (Docket No. 73) in which Plaintiff purports to incorporate by reference the statement of facts contained within its Opposition to Defendants' Motion for Summary Judgment (Docket No. 67) and allege several facts Plaintiff believes are in dispute. As set forth above, this does not comply with the local rule.

For the reasons set forth below, Defendants' Motion [DE 58] is GRANTED.

## II. Factual Background

### A. Plaintiff's Employment with TSA

Plaintiff [*4] is a former employee of TSA, a component of the United States Department of Homeland Security. (Docket No. 60, Defendants' Statement of Undisputed Material Facts in Support of Summary Judgment, ("SOF") at P 1). TSA was established in the aftermath of the September 11, 2001 terrorist attacks and was tasked with the security mission of preventing dangerous passengers and cargo from boarding aircraft. SOF at PP 2, 5. Plaintiff began work with TSA as a federal airport security screener at the Pittsburgh International Airport on August 28, 2002. SOF at P 3. A screener's primary responsibility is to provide front line security and protection for air travelers, airports, and airplanes, by identifying dangerous objects in baggage, cargo, and on passengers and preventing such objects from being transported onto aircraft. SOF at P 5. Plaintiff was primarily a "checkpoint" screener and was responsible for screening individuals as they walked

through metal detectors and for screening carry-on baggage. SOF at P 6. As a federal airport security screener, Plaintiff was required to serve a one-year probationary employment period. SOF at P 69. During this probationary employment period, Plaintiff could [*5] be terminated if his supervisors found that his performance or conduct were deficient. SOF at P 69.

Shortly after he began working for TSA, Plaintiff became affiliated with the American Federation of Government Employees ("AFGE"), a labor union of federal government employees that was active in attempting to unionize the TSA workforce. [2] SOF at PP 17, 20. In the fall of 2002, Plaintiff began serving as AFGE's Pittsburgh Airport point of contact. SOF at P 20. As the Pittsburgh Airport point of contact, Plaintiff was the first to act in furtherance of AFGE's "campaign to organize TSA screeners for the purposes of obtaining recognition as the [sic] their exclusive representative and securing collective bargaining." Complaint at P 3. Specifically, Plaintiff "actively and openly engaged in the effort to organize TSA employees [at the Pittsburgh Airport] for the purpose of securing collective bargaining and other protections," by distributing union materials, organizing meetings, speaking with employees about the union, and administering a website on the union's behalf. Complaint at PP 4, 17; SOF at P 21. Plaintiff claims that all his unionizing activity occurred during "off duty" hours and [*6] in locations outside the workplace such as the airport parking lot and local hotels where the union meetings were held. SOF at P 21.

> 2    The AFGE is a labor organization that represents approximately 700,000 federal government workers by, among other things, negotiating collective bargaining agreements, arbitrating grievances, filing unfair labor practices, lobbying, and litigating various disputes on behalf of its members. Complaint at P 3.

When he began his employment with TSA, Plaintiff acknowledged that he understood the various TSA policies regarding professional conduct in the workplace and his obligation to maintain the security of sensitive information. SOF at PP 7-16. On August 26, 2002, Plaintiff signed a document affirming that he understood Sensitive Security Information ("SSI") and pledged to abide by regulations controlling its unlawful disclosure thereof, including disclosure on a website not approved by TSA. [3] SOF at P7. On January 15, 2003, Plaintiff

Case 1:06-cv-00565-GMS    Document 44-2    Filed 10/03/2007    Page 53 of 78

Page 3
2007 U.S. Dist. LEXIS 71437, *6

signed his "Employee Performance Agreement" and pledged to "work as an effective team member," contribute to the accomplishment of TSA's mission and vision, and "conduct [himself] in a way that supports TSA's values." SOF at [*7] P 8. On February 10, 2003, Plaintiff acknowledged that he received and read a copy of HRM Letter No. 735-1, which establishes standards of behavior and ethical conduct for TSA employees, the breach of which may result in disciplinary or other corrective action. SOF at PP 9-16.

> 3   49 CFR 1520 "governs the maintenance, safeguarding, and disclosure of records and information that TSA has determined to be Sensitive Security Information." Pursuant to 49 CFR 1520, "SSI is information obtained or developed in the conduct of security activities . . . the disclosure of which TSA has determined would. . . [b]e detrimental to the security of transportation." *49 CFR 1520.5(a); (a)(1).* Additionally, TSA's "Interim Sensitive Security Information Policies and Procedures for Safeguarding and Control" explicitly states that "[a]ny information that TSA has determined may reveal a vulnerability of aviation facilities to attack" constitutes SSI. Def. Ex. A at 67-78.

In February 2003, Plaintiff disclosed confidential TSA information regarding a security breach on a website that he maintained for the union. SOF at P 33, 35. As a result of Plaintiff's disclosure, this sensitive information was later publicized [*8] in newspapers, television, and radio. SOF at P 34. Plaintiff's disclosure constituted a breach of TSA policy that mandated the strict adherence to protecting SSI. SOF at P 33. Plaintiff also placed demeaning comments and "character assassinations" regarding his fellow TSA employees' dress, background, and personal appearance on his website. SOF at PP 37-38. Former Federal Security Director Robert Blose ("FSD Blose") testified that Plaintiff's character assassinations included a caricature of one young female employee who was portrayed on Plaintiff's website with huge buckteeth. SOF at P 38.

On February 26, 2003, Plaintiff was counseled by FSD Blose and signed a Memorandum of Counseling relating to Plaintiff's release of SSI on the union website he maintained. SOF at P 36. As the result of this offense, FSD Blose requested Plaintiff's immediate termination because Plaintiff's conduct was detrimental to the good

order and discipline of the TSA workplace. SOF at PP 37, 41. Despite Plaintiff's probationary status, his February 2003 counseling incident, and FSD Blose's push to terminate Plaintiff, TSA Headquarters ("Headquarters") decided to retain Plaintiff. SOF at P 44. FSD Blose testified [*9] that Headquarters was especially cautious about firing Plaintiff in order to prevent the appearance of retaliating against an individual with union affiliation. SOF at P 44.

On May 1, 2003, Plaintiff was given another letter of counseling relating to his failure to follow proper procedures for requesting sick leave. SOF at PP 47, 50. The failure to provide a specific reason for taking sick leave violates FAA Order 3600.4, provisions of HRM Letter 735-1, and TSA Pittsburgh Memorandum 2003-85. SOF at P 50. Plaintiff admitted that he failed to follow appropriate sick leave procedures after he called in sick and refused to state the nature of his illness, but refused to sign the Letter of Counseling because he felt that doing so implicated "medical privacy issues." [4] SOF at P 49.

> 4  The Court notes that this is not Plaintiff's first incident of unauthorized absence, nor is this his first employment discrimination case. Plaintiff was previously employed as an air traffic controller with the Federal Aviation Administration ("FAA"), but was terminated for unauthorized absence. Plaintiff filed a subsequent employment discrimination lawsuit in the United States District Court for the Western District [*10] of Pennsylvania, alleging that such termination was unlawful. That lawsuit was dismissed pursuant to *Federal Rule of Civil Procedure 56* in favor of the FAA. Def. Ex. A at 1-5; Def. Ex. B at 4-5, 13-14, 21; *see also Ferace v. Hon. Rodney Slater, Security of Transportation,* Case No. 99-1610 (W.D. Pa. 2001).

On May 20, 2003, Plaintiff committed another infraction of TSA policy by approaching his supervisor's podium and sorting through daily records of each screener's performance. SOF at P 52. After he obtained the evaluation comments of his team members, Plaintiff approached two screeners and disclosed to them the negative comments that were written about them in their evaluations. SOF at PP 52, 59. Upon receiving the evaluation comments, the screeners became visibly upset; one even began to cry. SOF at P 60. This incident had a significant impact during this time period due to an

ongoing tension among TSA employees over a reduction in force that required Pittsburgh International Airport to reduce its screening force by approximately 40 percent; additionally, during the Spring/Summer of 2003, a nationwide reduction of screeners resulted in TSA slating for termination approximately 6,000 [*11] screeners. SOF at P 61. On June 2, 2003, Human Resources Specialist Donna Hajduk notified Fred Pope, Employee Relations Specialist for Northeast Headquarters of TSA, of the May 20, 2003 incident and Plaintiff's other counseling incidents and recommended that a one day suspension be issued. SOF at P 62. Ms. Hajduk's letter to Mr. Pope stated that "Ferace continues to disregard TSA and local policies and his behavior impairs the efficiency of Pittsburgh International Airport." SOF at P 63. In making this disciplinary recommendation, Ms. Hajduk did not consider Plaintiff's union affiliation. SOF at P 64.

In 2003, all disciplinary decisions were made at Headquarters in Washington, D.C. SOF at P 65. Local managers and officials could only make recommendations regarding termination and disciplinary action; they did not have the authority to authorize termination or disciplinary action of their own employees. SOF at P 65. On July 7, 2003, Assistant FSD ("AFSD") Martelle and Manager Rough signed a document requesting Plaintiff's termination. SOF at P 66. Mr. Pope reviewed Plaintiff's file and recommended that his various infractions supported termination, especially given Plaintiff's status [*12] as a probationary employee. SOF at P 69. On July 10, 2003, Plaintiff signed a "Termination During Probationary Period" letter delivered and signed by AFSD Martelle, dated July 9, 2003. SOF at P 67. The letter notified Plaintiff that he was being terminated due to "misconduct" as a result of his unauthorized access and disclosure of daily logs and his other counseling incidents. SOF at P 67.

Mr. Pope, Former FSD Martelle, Former Manager Rough and FSD Blose all unequivocally agreed that Plaintiff's termination was due to misconduct and had nothing whatsoever to do with Plaintiff's union affiliation. SOF at PP 71-73, 82. In fact, Former FSD Blose testified that Plaintiff's claim that he was terminated due to union affiliation was a "spurious charge" and "absolutely untrue" and further testified, "I feel absolutely positive . . . I will go to my grave saying he was not terminated due to his union activities, he was terminated for character issues and violations of TSA policies." SOF at P 82. Additionally, Plaintiff admitted

that none of his managers ever specifically told him to stop associating with the union, nor did they specifically prohibit him from conducting union activities. SOF [*13] at PP 30-32.

**B. Procedural History**

On January 8, 2003, Former TSA Administrator James Loy ("Loy") issued a memorandum stating that in light of the screeners' "critical national security responsibilities, [they] shall not . . . be entitled to engage in collective bargaining or be represented for the purpose of engaging in such bargaining by any representative or organization" (hereinafter, "the Loy Determination"). SOF at P 25. Loy subsequently issued a second memorandum stating that "employees are still free to engage in employee organization activities as long as they do not do so on work time and it does not interfere with [the TSA's] security work or otherwise undermine aviation security." SOF at P 26. Moreover, TSA continually stressed that TSA management should maintain strict neutrality on the subject of unions. SOF at P 29. Several former TSA managers testified that TSA was extremely cautious when it came to discussions about the union and that they did not perceive any animus toward the union within the TSA organization. SOF at PP 72-74, 80-81.

Starting in November 2002, AFGE filed numerous petitions with the Federal Labor Relations Board ("FLRA") in order to obtain recognition [*14] as the exclusive representative of TSA employees at various airports throughout the country. While the AFGE's petitions were pending before the FLRA, the AFGE filed a complaint in the United States District Court for the District of Columbia on January 10, 2003, alleging that: (1) Loy did not have statutory authority to issue the Loy Determination; (2) the Loy Determination 'deprives plaintiffs of their rights of free speech and association under the *First Amendment*'; (3) the Loy Determination 'deprives plaintiffs of their right to equal protection under the law guaranteed by the *Fifth Amendment to the United States Constitution*'; and (4) the Loy Determination 'is contrary to Pub.L. 107-71, § 101(n) and otherwise is arbitrary and capricious under the standards set forth in *5 U.S.C. § 706.*' *AFGE v. Loy ("Loy II")*, 332 F. Supp. 2d 218, 220 (D.D.C. 2004); *see also AFGE v. Loy ("Loy I")*, 281 F. Supp. 2d 59 (D.D.C. 2003).

On July 8, 2003, AFGE's petitions were dismissed by the Regional Director of the FLRA on jurisdictional

Case 1:06-cv-00565-GMS    Document 44-2    Filed 10/03/2007    Page 55 of 78

Page 5
2007 U.S. Dist. LEXIS 71437, *14

grounds. Complaint at PP 11-13, 18. Accordingly, "[t]he AFGE. . . was permitted to supplement its complaint to allege that 'TSA [*15] has applied the Loy Determination to threaten employees with discipline and/or termination for conducting union organizing activities while not on duty in violation of the *First Amendment* . . . and that Ferace was discharged on the day after' the FLRA issued its decision to dismiss the union's petitions for an election." *Loy II, 332 F. Supp. 2d at 220.*

On September 5, 2003, the United States District Court for the District of Columbia ("D.C. Court") severed Plaintiff's individual First Amendment complaint from the suit, and ordered him to refile the complaint. *Loy I, 281 F. Supp. 2d at 66 n.6.* The D.C. Court also dismissed AFGE's statutory claims "for lack of jurisdiction under *Rule 12(b)(1) of the Federal Rules of Civil Procedure* [and] [t]he constitutional claims . . . for failure to state a claim under *Rule 12(b)(6)*." *Id. at 66.* The United States Court of Appeals for the District of Columbia Circuit subsequently affirmed the dismissal of those claims. *AFGE v. Loy, 361 U.S. App. D.C. 309, 367 F.3d 932 (D.C.Cir. 2004).*

AFGE and Plaintiff subsequently filed this Complaint in the D.C. Court on September 17, 2003, alleging that "Defendants have deprived plaintiffs of their right to engage in [*16] organizational and other expressive activity in violation of the *First Amendment to the United States Constitution*," that "Defendants have deprived plaintiffs of their right to engage in *First Amendment* activity in a manner that also violates the equal protection of law guarantee of the *Fifth Amendment to the United States Constitution*," and that Plaintiff was unlawfully discharged "in retaliation for exercising his rights to freedom of speech and association in violation of the *First Amendment to the U.S. Constitution*." Complaint at PP 22, 24, 26. Counts I and II of the Complaint were dismissed as barred by *res judicata. Loy II, 332 F. Supp. 2d at 226-27.* Additionally, on May 18, 2005, Plaintiff AFGE was dismissed, and this case was transferred to this Court from the D.C. Court.

Defendants filed their motion for summary judgment on March 16, 2007. Thereafter, the Court held a status conference to determine the potential, if any, for alternative dispute resolution, which Defendants denied. Accordingly, the Court addresses the motion at this time.

### III. Standard of Review

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, [*17] together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)).* Pursuant to *Rule 56,* the Court must enter summary judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

In evaluating the evidence, the court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. *Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007).* Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004).* The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005).* While the non-moving party will bear the burden of proof at trial, the party moving for summary [*18] judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex, 477 U.S. at 322.* Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id. at 324.* The nonmoving party "cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325).*

### IV. Discussion

#### A. Plaintiff's Freedom of Expression Claim Fails.

The law of the Third Circuit provides that a "public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003) citing Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001).* However, this right of expression is not absolute in that the public employer has a right to exercise some

control over its work force. *Brennan, 350 F.3d at 412* (citations omitted). [*19] In this Circuit, "a public employee's retaliation claim for engaging in protected activity must be evaluated under a three-step process." *Baldassare, 250 F.3d at 194.*

In order to prevail on a freedom of expression claim such as Plaintiff's claim here, the plaintiff must establish that the speech in question was protected. *Brennan, 350 F.3d at 412.* Plaintiff's speech is protected if: (1) the speech is a matter of public concern; and (2) his interest in the speech outweighs the employer's countervailing interest in promoting the efficiency of the public services it provides through its employees. *Baldassare, 250 F.3d at 195* (citations omitted). Next, the plaintiff must show that the protected speech was a substantial or motivating factor in the alleged retaliatory action. *Brennan, 350 F.3d at 413 (citing Baldassare, 250 F.3d at 195).* Finally, if the plaintiff satisfies each of these steps, the burden shifts to the employer who must then rebut the employee's claim by demonstrating that the employer would have reached the same decision in absence of the protected conduct. [5] *Id.*

> 5   The Court notes for the record that Defendants concede that Plaintiff's speech is a matter of public concern. [*20] The parties disagree as to the weight of the parties' individual interests, however, as set forth herein, this Court need not address this issue.

In the present case, it is not necessary for the Court to engage in a lengthy analysis to determine whether Plaintiff's speech is protected. Nor does the Court need to determine whether issues of fact exist as to whether Plaintiff's protected speech was a substantial or motivating factor in his termination. In fact, whether Plaintiff's speech is protected and whether such speech was the cause of his termination is immaterial because it is clear from the record that Plaintiff was terminated as the result of his own misconduct. Indeed, the record clearly illustrates that Plaintiff committed many violations of TSA policy, any of which would justify his termination. Accordingly, even if Plaintiff is able to establish the three prongs necessary to build his claim, Defendants successfully rebut Plaintiff's claim by demonstrating that Plaintiff would have been terminated even in the absence of the arguably protected conduct. *Baldassare, 250 F.3d at 195; Brennan, 350 F.3d at 413.*

As set forth above, Plaintiff was hired as a

"probationary employee" [*21] and, as such, could be terminated during that probationary period "at any time during . . . the probationary period" SOF at P 69. Plaintiff committed numerous infractions of TSA policy, any of which could have been cause for termination. In fact, Plaintiff could have been terminated even if he had not committed such violations of TSA policy. Indeed, similarly situated employees who had not committed violations of TSA policy were also terminated during the same time frame. During the spring/summer of 2003, the TSA implemented a reduction in force and slated 6,000 screeners nationwide for termination by September 30, 2003. SOF at P 61. All probationary screeners were at risk because Pittsburgh was tasked with reducing its screening force by approximately 40 percent. SOF at P 61. In accordance with this policy, 18 screeners had been terminated in Pittsburgh effective May 30, 2003. SOF at P 79. Some of those terminated had required "no disciplinary actions of any sort." SOF at P 79. More terminations had been forecasted to meet the September 20, 2003 requirement. SOF at P 79. Certainly, Plaintiff, a probationary employee who violated TSA policy on several occasions, could be terminated [*22] when other probationary employees with "no disciplinary actions of any sort" were being terminated in furtherance of TSA's reduction in force. Docket No. 59 at 21. Further, TSA, and other government agencies are "free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy and responsiveness of service to the public." *Board of County Comm'rs v. Umbehr, 518 U.S. 668, 674, 116 S. Ct. 2342, 135 L. Ed. 2d 843 (1996).* Finally, "absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all." *Id.* As set forth above, it is clear from the record that Plaintiff is the instrument of his own undoing and no genuine issue of material fact exists as to whether Plaintiff's termination resulted from anything other than his own misconduct.

**B. Plaintiff's Freedom of Association Claim Also Fails.**

A public employee also has a constitutional right to freely associate with others without the fear of retaliation. *See U.S. Const. Amend. I; Smith v. Ark. State Highway Employees, Local 1315, 441 U.S. 463, 465, 99 S. Ct. 1826, 60 L. Ed. 2d 360 (1979)* ("The public employee surely can associate . . . freely . . . and he is protected by the *First Amendment* [*23] from retaliation for doing so"). While the Third Circuit has not determined whether the "public concern" test and the balancing of interest test

apply in the context of *First Amendment* claims involving the right to associate, it is generally recognized by the courts of the Third Circuit that "efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the *First Amendment* protects from hostile state action." *Schlichter v. Limerick Twp., No. 04-4229, 2006 U.S. Dist. LEXIS 57399, 2006 WL 2381970, *8 (E.D.Pa., Aug. 14, 2006) (citing Labov v. Lalley, 809 F.2d 220, 222-223 (3d Cir. 1987)); see also Hitchens v. County of Montgomery, No. 00-4282, 2002 U.S. Dist. LEXIS 2803, 2002 WL 253939, *3 (E.D.Pa., Feb. 20, 2002)* (noting circuit split as to whether public concern test applies to associational conduct). Accordingly, it would seem that a public employee's attempt to unionize would always be a matter of public concern and would not be outweighed by a countervailing government interest. *Schlichter, 2006 U.S. Dist. LEXIS 57399, 2006 WL 2381970 at *8 (citing Hitchens, 2002 U.S. Dist. LEXIS 2803, 2002 WL 253939 at *3).*

Therefore, whether a plaintiff's *First Amendment* right to freedom of association has been violated in this context depends [*24] upon whether the conduct was a substantial and motivating factor in the government employer's decision. "Employees . . . who claim that adverse employment action was taken against them based upon the exercise of their associational rights must show that they were engaged in constitutionally protected conduct, which conduct was a 'substantial' or 'motivating factor' in the government employer's decision." *Rode v. Dellarciprete, 845 F.2d 1195, 1204 (3d Cir. 1988) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)).* This analysis requires a two step inquiry. *Schlichter, 2006 U.S. Dist. LEXIS 57399, 2006 WL 2381970 at *8.* First, the court must determine whether there was an actionable adverse employment action taken against a public employee. *Id.* Next, the court must determine whether the motivation for such action was retaliation for the protected activity. *Id.*

As set forth above, the Court need not determine whether the motivation for Plaintiff's termination was retaliation for the protected activity. Indeed, Defendants have successfully rebutted Plaintiff's claim by demonstrating that Defendants would have reached the same decision to terminate Plaintiff in absence of the protected [*25] conduct. *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).* Therefore, Plaintiff's freedom of

association claim fails for the same reason that his freedom of speech claim fails; Defendants have shown that Plaintiff would have been terminated even in the absence of the arguably protected conduct. *Baldassare, 250 F.3d at 195; Brennan, 350 F.3d at 413.*

## C. Plaintiff's Additional Argument Regarding Fact Discrepancies Lack Merit.

This Court will address Plaintiff's argument that certain issues of fact exist which preclude the entry of summary judgment at this time. As set forth above, Plaintiff failed to file a responsive statement of material facts in accordance with *Local Rule 56.1.* Accordingly, the facts set forth in Defendants' SOF are deemed admitted for purposes of this motion and the Court accepts the same as true. Even so, Plaintiff attempts to create issues of fact in an effort to avoid a summary judgment determination in Defendants' favor. In that regard, Plaintiff alleges that several factual discrepancies create genuine issues of material fact such that summary judgment is improper. Plaintiff argues that an issue of fact exists as to (1) who recommended Plaintiff's termination; [*26] (2) who authorized Plaintiff's termination; and (3) what was the motivation for Plaintiff's termination. (Docket No. 67 at 7). Additionally, Plaintiff argues that "[t]he factual discrepancy as found in the documentary evidence and depositions of Donna Hajduk, SM Rough, AFSD Martelle, and Mr. Pope suggest that a credibility determination is required in this case." (Docket No. 67 at 7). As set forth below, none of these factual discrepancies constitute a genuine issue of material fact precluding summary judgment. Indeed, factual disputes that are irrelevant will not defeat summary judgment. *Anderson, 477 U.S. at 248.* Accordingly, the Court finds that each of these purported factual disputes either is not disputed or is irrelevant to the issue before this Court, as set forth below.

First, no material issue of fact exists as to who recommended Plaintiff's termination. Plaintiff attempts to create a factual dispute by implying that AFSD Martelle and Manager Rough did not recommended Plaintiff's termination. (Docket No. 67 at 8). However, this is not a genuine issue of material fact because, first and foremost, it is an undisputed fact that on July 7, 2003, William Rough and Craig Martelle [*27] signed a document which states, in pertinent part, "Please process the termination for James Ferace, Transportation Security

Screener, for misconduct." SOF at P 66. Moreover, even if Plaintiff could show that Martelle and Rough hadn't recommended his termination, he has not stated, and this Court cannot determine, why such a factual dispute would be material to the issue before the Court.

Next, the identity of the person who authorized Plaintiff's termination is irrelevant to the issues before the Court. Plaintiff attempts to create a factual dispute regarding who authorized his termination, but has not stated why this factual dispute is material. Docket No. 67 at 8-9. The Court agrees with Defendants' argument that any factual question regarding the identity of the ultimate "decision maker" is irrelevant, because legitimate reasons for Plaintiff's discharge were set forth in his termination letter and were supported by documentary evidence and the testimony of witnesses, as discussed above.

Next, Defendant alleges that an issue of fact exists as to the motivation behind Plaintiff's termination. As set forth above, the motivation behind Defendants' decision to terminate Plaintiff is [*28] not in dispute. Plaintiff was terminated as the result of multiple violations of TSA policy and upon recommendation of his supervisors for that reason. SOF at P 69. Moreover, Plaintiff's union affiliation did not result in his termination. SOF at P 71.

Finally, Plaintiff alleges that a credibility determination is required to interpret the testimony of Donna Hajduk, SM Rough, AFSD Martelle, and Mr. Pope and accordingly, summary judgment is not appropriate in this case. This argument fails because Plaintiff failed to dispute the relevant statements of such witnesses as set forth in Defendants' Statement of Undisputed Material Facts in Support of Summary Judgment. Accordingly, as set forth above, such facts are deemed admitted pursuant to *Local Rule 56.1* without the need for a credibility determination.

**D. Plaintiff is Not Entitled to Back Pay.**

A plaintiff is entitled to back pay where he has suffered economic loss as the result of an employer's wrong. *Hubbard v. EPA, 299 U.S. App. D.C. 143, 982 F.2d 531, 534 (D.C. Cir. 1992)*. Plaintiff is not entitled to back pay because, as set forth above, he has failed to make such a showing.

**V. Conclusion**

Accordingly, this 26<th> day of September, 2007, IT IS HEREBY ORDERED [*29] that Defendants' motion is **GRANTED.** An appropriate order follows.

Dated: September 26, 2007

BY THE COURT:

*s/ Nora Barry Fischer*

United States District Judge

# **EXHIBIT F**

LEXSEE 2003 U.S. DIST. LEXIS 20189

**YVONNE J. YON, Plaintiff v. SEPTA and TRANSPORT WORKER'S UNION LOCAL # 234, Defendants**

**CIVIL ACTION NO. 01-5231, NO. 01-5232**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2003 U.S. Dist. LEXIS 20189; 173 L.R.R.M. 3025*

**October 31, 2003, Decided
November 4, 2003, Filed**

**SUBSEQUENT HISTORY:** Affirmed by *Yon v. Transp. Workers' Union Local # 234, 2004 U.S. App. LEXIS 21212 (3d Cir. Pa., Sept. 27, 2004)*

**DISPOSITION:**    [*1] Defendants' motions for summary judgment granted. Judgment entered in favor of defendants.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendants, a former employer and a union, alleging race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.*, and the Pennsylvania Human Relations Act, *Pa. Stat. Ann. tit. 43, § 955*, against the employer, and alleging breach of the duty of fair representation and discrimination in violation of Title VII.

**OVERVIEW:** The employer claimed that the employee failed to establish a prima facie case of discrimination, and that she was terminated because she threatened supervisors with a deadly weapon. The court initially held that the employee failed to establish any racially discriminatory treatment, or that other similarly situated employees were treated more favorably. The court further held that the employer's reason for the employee's termination for threatening supervisors with an automobile anti-theft device and using hostile language was a legitimate, non-discriminatory reason for her discharge, and that the employee failed to show that the employer's reason was pretextual. The court then held

that the employee failed to establish her retaliation claim as there was no evidence to link her termination to her letters written to the employer's general manager. The court finally held that the employee's breach of the fair duty of representation claim against the union was untimely, that the employee failed to show that the union's conduct was arbitrary, discriminatory, or in bad faith, and that the employee failed to show that the union deliberately delayed in processing her grievance.

**OUTCOME:** Summary judgment was granted for the employer and the union. Judgment was entered in favor of the employer and the union.

**COUNSEL:** For YVONNE J. YON, Plaintiff (2:01-cv-05231-JG, 2:01-cv-05232-JG): KARIN M. GUNTER, LEAD ATTORNEY, LAW OFFICES OF KARIN M. GUNTER, PHILADELPHIA, PA.

YVONNE J. YON, Plaintiff (2:01-cv-05232-JG), Pro se, PHILADELPHIA, PA.

For TRANSPORT WORKER'S UNION LOCAL # 234, Defendant (2:01-cv-05231-JG): JOSHUA P. RUBINSKY, BRODIE & RUBINSKY.

For SEPTA, Defendant (2:01-cv-05232-JG): KRISTINE FREYLEUE COLLINS, SUSAN PACKER, SAUL KRENZEAL & ASSOC., LEAD ATTORNEYS, SAUL H. KRENZEL, LEAD ATTORNEY, SAUL H. KRENZEL & ASSOCIATES, PHILADELPHIA, PA.

**JUDGES:** James T. Giles, C.J.

Page 2

2003 U.S. Dist. LEXIS 20189, *1; 173 L.R.R.M. 3025

**OPINION BY:** James T. Giles

**OPINION**

**MEMORANDUM**

Giles, C.J.

**Introduction**

Yvonne Yon brings this action against Southeastern Pennsylvania Transportation Authority (SEPTA) and Transport Workers' Union Local # 234 (Union), seeking damages pursuant to *42 U.S.C. § 2000e,* [*2] *et seq.*, the Pennsylvania Human Relations Act, *43 P.S. 955,* and the common law of Pennsylvania, to redress injuries suffered from her termination at SEPTA and related events. Now before the court are SEPTA's and the Union's Motions for Summary Judgment, pursuant to the *Federal Rule of Civil Procedure 56(c).* For the reasons that follow, both motions for summary judgment are granted.

**Factual Background**

The facts in the light most favorable to the non-moving party follow.

**SEPTA**

Ms. Yon was hired by SEPTA on June 19, 1991, as a Student Bus Operator, and became a Bus Operator on July 24, 1991. (Pl.'s Resp. in Opp'n to SEPTA's Mot. at 3.) On November 1, 1992, Ms. Yon was transferred into the position of Rail Operator. (Id.) On January 1, 1994, Ms. Yon was transferred to the position of Surface Train Person, until on August 25, 1994, when she was transferred back to her former post as Rail Operator. (Id.) She held this position at the time of her discharge. (Id.)

During her employment tenure at SEPTA Ms. Yon alleges that she experienced numerous incidents of discriminatory treatment. On October 7, 1993, a female [*3] passenger assaulted Ms. Yon while she was operating a trolley. (Id. at 4.) Ms. Yon's supervisor, Frank Hargrove, a white male, arrived on the scene. (Id.) He asked Ms. Yon to complete an accident report, but she refused, preferring to first be treated for her injuries. (Id.) Ms. Yon does not allege that Mr. Hargrove's accident report request was the result of discrimination based upon race or gender. As a result of her injuries, Ms. Yon received workers' compensation from October 8, 1993 to

May 9, 1994. (Id.) During this time, Ms. Yon received psychotherapy treatments and was put on various medications. (Id.) She returned to full duty on July 29, 1994. (Id.)

On November 29, 1994, when she was eight months pregnant, Ms. Yon began experiencing labor-like pains. (Id.) She telephoned the SEPTA office, but her supervisor, Jim Brown, a black male, refused to grant her the day off of work. (Id.) When Ms. Yon saw the doctor on November 30, 1994, she was told to cease working immediately but, even with this diagnosis, she was assessed two "points" [1] for an "Emergency at Home." She alleges this assessment was discriminatory, although she does not allege that [*4] it was contrary to the terms of the Collective Bargaining Agreement. (Id.)

> 1    In the Collective Bargaining Agreement ("CBA") between SEPTA and the Union, an Attendance Point System was created "to provide an objective basis for the imposition of discipline for incidents of non-attendance." (See Pl.'s Ex. 8.)

A few days after Ms. Yon returned to work following her maternity leave, on February 23, 1995, she was required to arrive for a shift beginning at 5:00 a.m. (Id. at 5.) Ms. Yon alleges that she arrived at 4:55, and made her presence known; however, Mr. Brown asserted that she had arrived late, pointed his finger in her face and ordered her to sit down. He assessed her five "points" for "MLF - Missing Less than Four Hours." (Id.)

Later on the same day, Ms. Yon was asked about the incident by SEPTA Instructor Joseph DeBreaux. (Id.) She refused to answer his questions. (Id.) Following her refusal, he told her that she had copied her run route incorrectly and told her to return to the [*5] station. (Id.) When it was discovered that Ms. Yon had correctly copied the route, Mr. DeBreaux admitted his mistake but allegedly told Ms. Yon that he had "covered [her] ass." (Id.) SEPTA records indicate that Mr. DeBreaux filed a Report making negative remarks about Ms. Yon's attitude. (Id.) Following the aforementioned events of February 23, 1995, Ms. Yon wrote a letter to the General Manager complaining about discriminatory treatment. (Id. at 6.)

On March 16, 1995, Ms. Yon alleges another incident occurred when she finished half of her route. (Id.) When she pulled her vehicle into the shop room two white male SEPTA employees, a revenue manager and a

Page 3

2003 U.S. Dist. LEXIS 20189, *5; 173 L.R.R.M. 3025

shop keeper, greeted her. (Id.) While she gathered her belongings, she heard one say to the other, "That's a[] black ugly bitch isn't it?," to which the other replied, "Yes, it is." (Id.) Ms. Yon wrote a second letter to the General Manager regarding this incident. (Id. at 7.)

On March 27, 1995, a meeting was held to discuss the February 23, 1995 incidents. (Id. at 6.) In attendance were Ronnie Nelms and Ronnie Adams (Union representatives), Jim Brown (dispatcher), Joe DeBreaux (instructor), [*6] Harold Perkins (supervisor), and Ms. Yon. (Id.) As a result of the meeting an intra-office memo was sent by Mr. Perkins to the local Superintendent stating that the meeting produced satisfactory results. (Id.) However, Ms. Yon sent a letter in response to the memo denying that the results had been satisfactory and accusing SEPTA management of continued lies and false accusations. (Id.) At some point following that meeting, Ms. Yon claims that she was informed by Union representative, Ronnie Nelms, that SEPTA management was trying to get her fired. (Id.) She asked Mr. Nelms to file a grievance for her, but no such grievance was filed. (Id.) Following the sending of this letter, Ms. Yon alleges that she was assessed five more "points." (Id.) However, review of her SEPTA point record shows that this allegation is not accurate. (SEPTA's Ex. G, Point History Report.) The claimed five additional points were not assessed. (Id.)

On June 5, 1995, Ms. Yon was involved in a vehicular accident. She was injured and filed an Occupational Injury Report (OIR). She was approved for Workers' Compensation benefits effective June 21, 1995. (Id.) Because she did not begin [*7] receiving payments until June 29, 1995, Ms. Yon asserts that SEPTA was in breach of the Collective Bargaining Agreement ("CBA"), which allegedly required benefits determinations to be made within thirteen days of filing. (Id.) However, no provision of the CBA is cited for that proposition and, in any event, Ms. Yon has not alleged that non-timely receipt of benefits was the result of her race or gender.

Following the June 5, 1995 injury, she remained out of work for over a year and collected full Workers' Compensation Benefits during this period. (Id. at 8.) While she was on medical leave, Ms. Yon claims that she experienced incidences of harassment. She alleges that SEPTA or its Workers' Compensation agent hired a private investigator to take pictures of her. (Id. at 8.) Also, Ms. Yon's locker was emptied as part of a general

locker audit, and, although notice was posted on her locker, Ms. Yon alleges this was discriminatory because no notification was sent to the homes of those on extended leave. (Id.)

On July 16, 1996, after receiving medical clearance from SEPTA physicians, Ms. Yon returned to work as a Rail Operator. (Id. at 9.) Ms. Yon alleges that she was [*8] forced to return to work, against her doctor's recommendation. (Id. at 8.) On July 25, 1996, Ms. Yon again filed for Workers' Compensation based on an injury of July 23, 1996. (Id. at 9.) She returned to temporary duty on July 28, 1996. (Id.)

On October 6, 1996, approximately thirty minutes before she was due to report to work, Ms. Yon called the Elmwood depot and asked to be excused for the day. (Id. at 9.) She claims that she was told that she would have to be put in the "sick book" if she failed to come in, which could have subjected her to a two point assessment or she would be marked "AWOL," which would mean a ten point assessment. (Id.) Despite her assertions, SEPTA's records show that Ms. Yon was told that she was excused for that day. (See SEPTA's Ex. G, Point History Report.) However, it is undisputed that Ms. Yon arrived at work on October 6, 1996, and had a verbal altercation with at least two SEPTA supervisors. (Id. at 10.)

Ms. Yon admits that when she arrived at the work place on October 6, 1996, she was carrying in her hand an automobile anti-theft device, the "Club," and was using profanity. (Id.) SEPTA claims that she was waving the [*9] Club at the employees present in the office in a threatening manner. (SEPTA's Mem. of Law in Supp. of Summ. Jud. at 3.) Ms. Yon asserts that she held the Club behind her back throughout the incident. (Pl.'s Resp. in Opp'n to SEPTA's Mot. at 10-11.) Ms. Yon acknowledges that the police were called by SEPTA during the altercation to render assistance. (Id. at 10.) SEPTA police arrived at the depot after Ms. Yon had left the premises. (Id.)

Mr. Thomas, [2] Mr. Balsualdo, [3] and Mr. DeGrasse each completed a Supervisor's Special Report concerning the incident on October 6, 1996. (Id. at 11.) Mr. Thomas and Mr. Balsualdo also completed Occupational Injury Reports related to the incident. (Id.) As a result of this incident, Ms. Yon was suspended from her job on October 7, 1996. (Id.) An informal investigation took place and it was recommended that Ms. Yon be terminated. (Id.)

Page 4

2003 U.S. Dist. LEXIS 20189, *9; 173 L.R.R.M. 3025

2 Mr. Thomas is a white male.

3 Mr. Balsualdo is a hispanic male.

A formal hearing was held on October 29, 1996. ( [*10] Id.) Testimony was presented by Ms. Yon, SEPTA witnesses, and Ms. Yon's Union representatives. (Id.). On November 4, 1996, SEPTA permanently terminated Ms. Yon, retroactive to October 6, 1996, due to "Conduct Unbecoming a SEPTA Employee." (Id. at 12.) She was found to have violated a number of SEPTA's work rules by: 1) Possession of a Deadly Weapon; 2) Verbal Assault of a Supervisor; 3) Conduct Unbecoming of a SEPTA Employee; 4) Carrying a Deadly Weapon; and 5) Threats/Assaults. (SEPTA's Mem. of Law in Supp. of Summ. Jud. at 3.)

On February 6, 1997, a Labor Relations Step (Grievance) Hearing was held to review Ms. Yon's discharge. (Id.) Ms. Yon's discharge was sustained. It was determined that SEPTA management had just cause for the termination. (Id.) On May 27, 1997, Ms. Yon filed a complaint with the City of Philadelphia Commission on Human Relations ("PCHR"). (Id.) In this complaint, she asserted that SEPTA had discriminated against her on account of her race and/or color and/or sex and/or in retaliation for her opposition to SEPTA's unfair employment practices. (Id.) This charge was later also filed with the Equal Employment Opportunity Commission ("EEOC"). [*11] (Id.) SEPTA filed a formal response and, at the request of the PCHR, also provided requested additional information. After completing its investigation, the PCHR determined that Ms. Yon's charges were not substantiated. (Id.) The EEOC adopted this finding. (Id.)

**Union - Local 234**

Ms. Yon also brings suit against the Union under Title VII and for Breach of the Duty of Fair Representation. She claims that before her termination she had encountered difficulties in receiving assistance from the Union. Ms. Yon alleges that Union representatives informed her, following the March 27, 1995 meeting, that SEPTA management wanted her fired. (Pl.'s Resp. in Opp'n to Union's Mot. at 5.) She requested that grievances be filed concerning this allegation and the harassment she alleged that she was experiencing. However, no action was taken by the Union on her behalf. (Id. at 5-6.) Ms. Yon also requested assistance from the Union when her Workers' Compensation checks were delayed, but no direct action was taken on her behalf. (Id.) Additionally, after discovering her belongings had been removed from her locker, Ms. Yon requested that a grievance be filed, but this filing [*12] was delayed for over ten months. (Id. at 7.) Ms. Yon also alleges that her Union representative, Ronnie Nelms, informed Ms. Yon that someone from SEPTA had called the Workers' Compensation carrier, PMA Group, to have plaintiff followed while she was on disability. (Id. at 6-7.) Mr. Nelms of the Union believed that the surveillance action was undertaken to harass plaintiff. (Id. at 7.)

Ms. Yon was entitled, by the CBA between SEPTA and the Union, to be represented in any hearings that occurred as a result of the discipline she received. She was represented at her formal hearing and at her Labor Relations Step hearing by Union representatives. 4 (Id. at 9-10.)

4 At least two of of Ms. Yon's representatives, Willie Brown and Sabin Rich, are black men.

Under the CBA, if the Union is dissatisfied with the resolution of a grievance, it has the right to refer the dispute to a labor arbitration panel. (Id. at 10.) It took the position that Ms. Yon's termination was improper and voted to send her [*13] grievance to arbitration. (Id.) At least twice, arbitration was scheduled, but had to be delayed due to inaction by Ms. Yon. (Union's Mem. of Law in Supp. of Summ. Judg. at 5-6.) In both August and October of 1997, Ms. Yon failed to attend preparatory sessions necessary for her action to proceed to arbitration. Due to this failure, the hearing dates were delayed. (Id.)

On October 8, 1997, Ms. Yon expressed concern to the Union's legal counsel that its representation of her presented a conflict of interest because she had filed a charge of race discrimination against the Union. (Id. at 6.) In response to this concern, Ms. Yon was sent a letter by the Union, stating that they were willing to proceed on her behalf and that she also had the opportunity to be represented by an individual of her choosing, whether or not that person was an attorney. (Id.)

On November 21, 1997, Ms. Yon agreed to attend a preparatory session on December 17, 1997. However, she failed to appear for the meeting and the hearing again had to be postponed. (Id.) Following this, Ms. Yon informed the Union that she did not want Local 234 to represent her at the hearing, and that she was going [*14] to obtain her own advocate. (Id.) On January 5, 1998, the Union, through Mr. Bodner, advised Ms. Yon that the Union

Page 5

2003 U.S. Dist. LEXIS 20189, *14; 173 L.R.R.M. 3025

would reschedule the hearing once she selected an attorney to represent her. (Id. at 7.) Ms. Yon did not respond to this letter. On August 7, 1998, Mr. Bodner wrote Ms. Yon and asked her to advise him of how to proceed. He advised her that her case would be withdrawn from arbitration if she did not respond by December 17, 1998. (Id.) On December 15, 1998, Mr. Bodner spoke to Ms. Yon by telephone and advised her that the hearing was rescheduled for January 8, 1999, and that a preparatory session was scheduled for January 6, 1999. (Id.) Ms. Yon did not appear at the session, and informed the Union that she "decided not to have anything to do with the union" and that she preferred to take her dispute "to the commissions." (Id. at 8.) As a result, Local 234 withdrew from her case, and Ms. Yon was informed of this by a letter dated January 7, 1999. (Id.)

**Legal Standard for Summary Judgment**

Under *Fed. R. Civ. P. 56(c)*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, [*15] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celetox Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Fed. R. Civ. P. 56(c)*. [5]

> 5 Ms. Yon argues that plaintiff should be afforded a less stringent standard because her complaint was drafted when she was a *pro se* litigant. The summary judgement standard is not altered for *pro se* litigants. Regardless, Ms. Yon is currently represented and has been permitted extensive opportunities to amend her complaint, extend discovery, and present any arguments in oral and written form. She has suffered no prejudice as a result of her temporary *pro se* status.

**Analysis**

**SEPTA**

Employer Discrimination

Title VII and the PHRA [6] provide plaintiffs with two theories of liability to seek recovery for discrimination-disparate impact and disparate treatment. [*16] Under a disparate treatment theory, an employer is

required to have the intent to discriminate against a member or members of a protected class. *Massarsky v. General Motors Co., 706 F.2d 111, 117 (3d Cir. 1983)*. Disparate treatment claims can be further subdivided into two categories-facial discrimination and pretextual discrimination. *Healey v. Southwood Psychiatric Hosp., 78 F.3d 128, 131 (3d Cir. 1996)*.

> 6 Discrimination claims brought under the PHRA are analyzed under the same standards as their federal counterparts. *Connors v. Chrysler Fin. Corp., 160 F.3d 971, 972 (3d Cir. 1988)*.

Claims alleging disparate treatment must be analyzed under the burden shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and later crystallized in *Texas Dep't. of Comty. Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*. Under these cases, a Title VII plaintiff initially must establish, by a preponderance [*17] of the evidence, a prima facie case of discrimination. *Texas Dep't of Comty. Affairs, 450 U.S. at 252-53; McDonnell Douglas Corp., 411 U.S. at 802*. Once the plaintiff has made such a showing the burden then shifts to the defendant to demonstrate a "legitimate non-discriminatory reason for the employee's rejection." *McDonnell Douglas Corp., 411 U.S. at 802*. Should the defendant prevail in carrying this burden the plaintiff must then be afforded an opportunity "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Comty. Affairs, 450 U.S. at 253*.

In order to satisfy her initial burden and make out a prima facie case of discrimination Ms. Yon must offer sufficient evidence that she: (1) is a member of a protected class;(2) was qualified for the position that she held; (3) suffered an adverse employment decision; and (4) that she suffered an adverse employment action while persons not in the protected class were treated more favorably or there is some other evidence sufficient to support an inference [*18] of unlawful discrimination. See *Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999); Burch v. WDAS AM/FM, 2002 U.S. Dist. LEXIS 12290, No. 00-4852, 2002 WL 1471703, *6 (E.D. Pa. June 28, 2002)*. The prima facie case can be shown by direct evidence of discrimination, or "by indirect evidence whose cumulative probative force, apart

Case 1:06-cv-00565-GMS    Document 44-2    Filed 10/03/2007    Page 65 of 78

Page 6
2003 U.S. Dist. LEXIS 20189, *18; 173 L.R.R.M. 3025

from the presumption's operation, would suffice under the controlling standard to support as a reasonable probability the inference" of discrimination. *Iadimarco v. Runyon, 190 F.3d 151, 162 (3d Cir. 1999)* (quoting *Holmes v. Bevilacqua, 794 F.2d 142, 146 (4th Cir. 1986)).* The determination of whether a prima facie case has been made is one for the court. *Pivirotto, 191 F.3d at 347 n.1.*

Ms. Yon alleges that she was suspended and then fired because she is black and/or a woman. To create an inference of discrimination, she relies upon numerous alleged instances of discrimination. She also contends that other SEPTA employees that were not members of a protected class in similar situations were administered substantially more lenient sanctions. SEPTA responds that Ms. Yon cannot establish [*19] a prima facie case of discrimination, and even if she could make such an initial inference, she cannot overcome SEPTA's explanation that she was terminated because she threatened supervisors with a deadly weapon, and not because of her race or gender. The court first addresses whether Ms. Yon has established a prima facie case of discrimination.

1. Ms. Yon's Prima Facie Case

To survive a motion for summary judgment the evidence set forth must be "sufficient to convince a reasonable fact finder to find all of the elements of the prima facie case." *Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001).* It is undisputed that Ms. Yon satisfies the first three prongs of the test. As a black woman, Ms. Yon is a member of a protected class. There is also no contention that Ms. Yon was not qualified to perform her job functions. With regard to prong three, Ms. Yon suffered an adverse action when she was terminated by SEPTA. The parties disagree as to whether there is sufficient evidence to support an inference of unlawful discrimination concerning her termination from SEPTA.

Ms. Yon raises a litany of incidences of alleged mistreatment that occurred [*20] during her employment at SEPTA. However, these events fail, individually and collectively, to create any reasonable inference that her termination resulted from discrimination, race or gender.

a. Accident Report Demand

Ms. Yon alleges that, following an assault by a passenger on October 7, 1993, her SEPTA supervisor,

Frank Hargrove, asked plaintiff to complete an accident report before she went to the hospital. Ms. Yon refused and went to the hospital for treatment. She does not allege that she was punished for her actions, and admits that she received full worker's compensation for approximately the next seven months. Ms. Yon fails to allege that the treatment she received was different because of her race or gender. Accordingly, the incident does not create any inference that Ms. Yon was discriminated against in her firing by other SEPTA officials, which occurred years later. At best, it shows a lack of sensitivity by Mr. Hargrove, and is insufficient to support an allegation of discrimination, especially since there is no medical evidence physically that Ms. Yon could not have completed the report when requested.

b. Refusal to Excuse for Labor Pains

Ms. Yon cites the [*21] refusal of her dispatcher to excuse her when she was pregnant as evidence of unlawful sex discrimination. (Pl.'s Resp. in Opp'n to SEPTA at 24.) On November 24, 1994, Ms. Yon called the dispatcher, Jim Brown, and reported that she was experiencing labor pains. Mr. Brown refused to excuse her and Ms. Yon asserts that she was assessed two attendance deviation points, for an "emergency at home." Even after receiving a note from her physician, Ms. Yon alleges that Mr. Brown did not reinstate her points. She argues that the CBA required the points to be reinstated and that his failure to do so demonstrates discrimination.

Other than her own conjecture, Ms. Yon gives no explanation as to how she knows this incident was a result of discrimination by Mr. Brown. It is just as likely that an administrative error occurred, or that Mr. Brown habitually failed to follow this policy. Ms. Yon does not cite any evidence that would indicate that the treatment she received was worse than others who did not belong to a protected class. Further, Ms. Yon fails to demonstrate how Mr. Brown's mental state in November 1994 had any influence or impact upon her termination, as he was not one of the individuals [*22] involved in the termination decision. Isolated incidences of inappropriate or rude behavior that are by non-decision makers or are temporally remote from the adverse action are rarely adequate to make out a claim of discrimination. See *Pivirotto v. Innovative Sys., 191 F.3d 344, 359 (3d Cir. 1999).* To allege a prima facie case of discrimination, Ms. Yon must show by a *preponderance of the evidence* that her supervisors had an intent to discriminate. *McDonnell*

Case 1:06-cv-00565-GMS    Document 44-2    Filed 10/03/2007    Page 66 of 78

Page 7

2003 U.S. Dist. LEXIS 20189, *22; 173 L.R.R.M. 3025

*Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* Ms. Yon's alleged point deduction could have resulted from numerous benign, plausible explanations. Further, no connection is alleged between this incident and Ms. Yon's eventual termination. Thus, this alleged incident fails to create an inference that Ms. Yon's later termination was based upon discriminatory intent.

### c. Point Deduction for Delayed Arrival

Ms. Yon was out on maternity leave from December 3, 1994 to February 21, 1995. On February 25, 1995, Ms. Yon was required to report for duty by 5:00 a.m. Ms. Yon alleges that she arrived at 4:55 a.m., and upon arrival she made her presence known to dispatcher Jim Brown and [*23] others in the depot. Later, Mr. Brown accused Ms. Yon of having reported late, at 6:47 a.m. Ms. Yon claims that when she attempted to explain that she was present, Mr. Brown pointed his finger at her, cursed at her, and told her to sit down if she wanted to work. (Yon Dep., 11/17/02 at 82.) When Ms. Yon reported the incident, Mr. Brown denied the events. He claimed that he did not write up Ms. Yon. However, Ms. Yon's record shows that she lost five points on February 23, 2003, for being "MLF - missing less than four hours." Ms. Yon claims this incident displays the discrimination she experienced at SEPTA.

Again, Ms. Yon fails to provide evidence that Mr. Brown's behavior was the result of race or gender discrimination. While she states that he acted rudely, she does not allege that he made comments about her race or gender, even when he was reprimanding her. Mr. Brown's actions may be explained as those of an abrupt person, or he could have had a personality conflict with Ms. Yon unrelated to race and/or gender. Ms. Yon does not cite instances where individuals who were not part of a protected class were treated more favorably by Mr. Brown. Further, she fails to establish any link [*24] between Mr. Brown's conduct and her subsequent firing from SEPTA. Thus, the event fails to create any inference that her termination was the result of discrimination.

### d. Treatment by Mr. DeBreaux

Ms. Yon alleges that, also on February 23, 1995, a SEPTA instructor boarded her vehicle and asked her about the incident earlier that day with Mr. Brown. Ms. Yon refused to answer. The instructor, Joseph DeBreaux, ordered her to return to the depot, accusing her of having

copied her run incorrectly. Upon returning to the depot, it was clear that Ms. Yon had not made an error. Ms. Yon alleges that later Mr. DeBreaux admitted his mistake, but made a sarcastic remark to her. SEPTA reports indicate that Mr. DeBreaux filed a Light Rail Operation Follow-Up Report on Ms. Yon that made disparaging remarks about Ms. Yon's attitude.

Again, Ms. Yon does not demonstrate that this behavior was the result of discrimination. She admits that she refused to speak to him with regard to the earlier conflict with Mr. Brown when she may have had a duty to do so. Her refusal, therefore, has not been excluded as the reason for his negative remarks in her evaluation. Further, even if she could show discriminatory [*25] intent by Mr. DeBreaux, Ms. Yon fails to demonstrate how this had any impact on her subsequent termination in which Mr. DeBreaux had no role.

Ms. Yon argues that under *Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989),* she is not required to make a showing of discrimination, and that a jury should be allowed to determine if discrimination occurred in any instance when it *might* have motivated an employer. (Pl.'s Resp. in Opp'n to Mot. By SEPTA at 26, quoting *Price Waterhouse, 490 U.S. at 258.*) Ms. Yon misunderstands Price Waterhouse. Plaintiff's burden of proof under McDonnell Douglas has not been removed. Plaintiffs are required by a preponderance of the evidence to show that an employer had a discriminatory intent when the adverse employment action transpired. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* Here, Ms. Yon merely speculates that discrimination *might* have motivated Mr. DeBreaux's behavior, which is insufficient to create such an inference and cannot survive SEPTA's motion for summary judgment.

### d. Racial Comment by SEPTA Employees

Ms. Yon first alleges that on March 16, 1995, after [*26] pulling her vehicle into the shop she saw two white male SEPTA non-supervisory employees. As she gathered her belongings, she heard one say to the other, "That is a[] ugly black bitch, isn't it?," to which the other replied, "Yes, it is." Ms. Yon wrote a letter to the General Manager regarding this incident. She now alleges that this incident is proof that race and/or gender was involved in SEPTA's decision to fire her. SEPTA argues that Ms. Yon offers no evidence that the remark was

Page 8

2003 U.S. Dist. LEXIS 20189, *26; 173 L.R.R.M. 3025

directed at her, she only makes this assumption because there was no other black woman present. SEPTA further argues that, even if the comment referred to Ms. Yon, there is no showing that either individual had control or influence over her job.

The comment alone is insufficient to create a material fact that could lead to a conclusion that Ms. Yon was discriminated against by SEPTA management. First, Ms. Yon cannot demonstrate that the comment referred to her. While she was the only black woman in the room, it could have been made in reference to a picture, in a magazine or newspaper, or it could have been part of a larger conversation that Ms. Yon did not hear. Even if the isolated comment was directed [*27] at her, Ms. Yon fails to present any evidence that indicates her SEPTA managers and supervisors considered race or gender in the termination decision. Ms. Yon has not alleged that either individual she heard on March 23, 1995 was in a superior role to her, or had any influence over those who were responsible for her termination in October 1996. Those in supervisory positions are not assumed to know, much less agree with, the sentiments and attitudes of those below them. To automatically impute those that fired Ms. Yon with the same mental state as the men commenting would be inaccurate and improper.

The third circuit has refused to find a prima facie case was established from stray remarks, even when they are "crude and unprofessional." *Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992).* "Stray remarks by non-decision makers or decision makers that are unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 359 (3d Cir. 1999)* (quoting *Ezold, 983 F.2d at 545*). Because Ms. [*28] Yon cannot connect the event in any way to her termination, she fails to demonstrate an issue of material fact.

e. Delay in Workers' Compensation Payments

In June of 1995, plaintiff was involved in a vehicle accident. Plaintiff filed an Occupational Injury Report on June 5, 1995, however, she did not begin receiving payments until late June. Her payments were not received within the prescribed thirteen days, as required under the Union and SEPTA's CBA. Ms. Yon was obviously frustrated by the delay in receiving payments while she was injured. However, she fails to allege that the delay

resulted from discrimination. Further, Ms. Yon's workers' compensation payments were being processed by PMA Group, an outside agent. She does not allege that any delay caused by PMA relates in any way to her subsequent contested termination. Thus, this incident is irrelevant to the termination, and cannot create any inference of discrimination.

f. Harassment while on Workers' Compensation

Ms. Yon alleges that while she was out on leave as a result of her injuries, a SEPTA or PMA Group agent harassed her by hiring a private investigator to follow her and photograph her. Further, she alleges [*29] that her Elmwood District locker was opened and emptied, without notice to her. Ms. Yon fails to allege that either of these incidents were the result of discrimination.

With regard to the investigator, she fails to present any evidence, except her own allegations, that she was ever followed or photographed. Though she alleges that a Union representative, Mr. Nelms, told her she was followed at the direction of SEPTA, this allegation is inadmissible hearsay and cannot be considered by the court to overcome a summary judgment motion. *Rule 56(e)* states:

> When a motion for summary judgment is made ... an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate shall be entered against the adverse party.

*Fed. R. Civ. P. 56(e)*. Ms. Yon has not presented an affidavit corroborating what she alleges Mr. Nelms said to her. She merely alleges the content of a prior [*30] conversation with him. Allegations that would not be admissible at trial are inadequate to create an issue of material fact. Even if she could demonstrate such treatment, she does not have any evidence to demonstrate that she was specifically targeted because of her race and/or gender.

With regard to her locker, all the lockers in the Elmwood District were auditted while Ms. Yon was on

Page 9

2003 U.S. Dist. LEXIS 20189, *30; 173 L.R.R.M. 3025

medical leave. She was given eight weeks notice of the audit, the same notice given to all employees. While Ms. Yon may not have received this notice at home, she was notified in the same manner as every other employee with a locker at Elmwood. She admits that no notice was given to any of the employees who were out of work due to disability or other reason, thus admitting that the treatment was not a result of discrimination based on race and/or gender.

f. Return to Work

Ms. Yon alleges that she was forced to return to work before her doctor recommended that she was ready. Before she returned she was approved by SEPTA doctors as not needing any accommodation. Approximately a week after she returned, Ms. Yon was re-injured. After receiving this injury she left work early and was assessed two attendance [*31] deviation points by Ed Thomas. While Ms. Yon raises these events, she does not allege that any of the treatment was improper or not part of the standard SEPTA protocol. Further, she fails to allege that any of the actions resulted from discrimination, or that other employees in non-protected classes received better treatment. Thus, these events do not create an inference of discrimination on the part of SEPTA or its employees.

g. October 6, 1996

On October 6, 1996, Ms. Yon called work and asked to be excused due to back pain. What occurred next is disputed. Ms. Yon alleges that Mr. Degrasse and Mr. Thomas refused to excuse her, told her she would be assessed points if she did not arrive for her shift, and threatened that she would be fired if she did not report to work. Mr. Degrasse claims that he told Ms. Yon he would excuse her from work. SEPTA records indicate that Ms. Yon was told she was excused, and did not have to report. Ms. Yon states that she never heard Mr. Degrasse excuse her.

Ms. Yon arrived at the Elmwood Depot at 7:00 p.m., and clocked in. The exact events following her arrival are also disputed. She claims that she went by Mr. Degrasse, heading towards the dispatcher [*32] window to make certain the she was not marked "AWOL." SEPTA supervisors claim that Ms. Yon argued with the dispatcher, used profanity, racial slurs, and insults, and waved around an anti-theft automobile device, the "Club." Ms. Yon admits that there was a verbal altercation, that she used profanity and that she was in

possession of the Club during that time. She denies making racial remarks, and claims that she held the Club behind her back through the entirety of the argument. SEPTA supervisors called the police to render assistance. Before they arrived Ms. Yon left the premises and drove off.

In recounting these events, Ms. Yon alleges that she her SEPTA supervisor's refusal to dismiss her was the result of race and/or gender discrimination. However, SEPTA records show that she *was* actually excused for the night in question and Ms. Yon has no evidence to the contrary. Thus, she cannot demonstrate any discriminatory treatment.

h. Similarly Situated

A plaintiff may demonstrate an inference of racial discrimination by presenting evidence that similarly situated individuals not members of the plaintiff's protected class received more favorable treatment. *Anderson v. Haverford College, 868 F. Supp. 741, 745 (E.D. Pa. 1994)*; [*33] *Robertson v. Ashcroft, 2002 U.S. Dist. LEXIS 1218, No. 00-5728, 2002 WL 109624 (E.D. Pa. Jan. 28, 2002)*. In order to be considered "similarly situated" for the purpose of Title VII cases, "the plaintiff must prove that all of the relevant aspects of [her] employment situation are nearly *identical* to those of the ... employees whom [she] alleges were treated more favorably." *Miller v. Del. Dep't of Probation & Parole, 158 F. Supp. 2d 406 (D. Del. 2001)* (citation omitted); *Anderson, 868 F. Supp. at 745* (plaintiff must show that she and the other individual "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [her] conduct or the employer's treatment of them for it.").

Ms. Yon raises several situations that are sufficiently similar to hers that she can demonstrate discrimination. SEPTA argues that none of plaintiff's comparable cases can be considered similarly situated, and Ms. Yon has not met her burden.

1. Excusal of Worker on October 6, 1996

Ms. Yon claims that another worker was given an excused absence for October 6, 2003, the night Ms. Yon claims that she believed her supervisor [*34] refused to excuse her, but that she received the excusal without argument or resistance from SEPTA. (Yon Dep. 9/30/02 at 147-50.) However, this employee was also a black

Case 1:06-cv-00565-GMS    Document 44-2    Filed 10/03/2007    Page 69 of 78

Page 10

2003 U.S. Dist. LEXIS 20189, *34; 173 L.R.R.M. 3025

woman. Because she is a member of the same protected class as Ms. Yon, her excusal does not raise the inference that the treatment Ms. Yon received was a result of her race and/or gender. Further, SEPTA records show that Ms. Yon actually was excused for her shift on October 6, 1996, thereby rebutting all inference of differential treatment.

2. Robert Justice

Ms. Yon alleges that a white male SEPTA employee, Robert Justice, assaulted a SEPTA supervisor in the subway and was able to continue employment at SEPTA. 7 (Pl.'s Resp. in Opp'n to SEPTA's Mot. at 31.) Ms. Yon admits that her knowledge of these events is hearsay, and would be inadmissible in court. Her allegations alone are insufficient to overcome a motion for summary judgment. See Fed. R. Civ. Proc. 56(c). Discovery was reopened to permit Ms. Yon to gather any evidence to support her allegations concerning Mr. Justice. Despite a lengthy extension of discovery, Ms. Yon has produced no evidence that substantiates [*35] her claims concerning Mr. Justice. As mere hearsay is insufficient to sustain her burden of proof, she has not presented adequate information to create an issue of material fact.

> 7 Ms. Yon also alleges that she witnessed Mr. Justice driving SEPTA vehicles while he was inebriated and that despite this behavior he retained his job. (Pl.'s Resp. in Opp'n to SEPTA's Mot. at 31.) However, as no part of Ms. Yon's situation involved driving while inebriated, her situation is not similar and cannot be relied upon for an inference that her termination was the result of discrimination.

3. George Garner

Ms. Yon claims that she is similarly situated to George Garner, a SEPTA employee that spit on a female passenger. (Pl.'s Resp. in Opp'n to SEPTA's Mot. at 29.) Initially Ms. Yon alleged that Mr. Garner had spit on a passenger and had not been disciplined or barred from work. 8 (Id. at 29.) Mr. Garner's subsequent deposition revealed that he had been severely reprimanded. (Garner Dep. at 35.) He was charged with [*36] "conduct unbecoming a SEPTA employee" and was suspended from work without pay pending investigation and SEPTA ruling on the incident. (Id. at 47-54.) Thus, Ms. Yon's contention that Mr. Garner was treated more favorably is incorrect.

8 Ms. Yon also alleged that Mr. Garner assaulted a passenger. (Pl.'s Resp. in Opp'n to SEPTA's Mot. at 29.) This incident does not give rise to an inference of discrimination, as Mr. Garner was suspended for the alleged conduct. (Garner Dep. at 17-18.) However, when no evidence was presented by the passenger to substantiate the allegation, and no charges were filed against Mr. Garner, he was re-instated and granted back pay. (Id. at 16-29.) To date, there is no evidence confirming that Mr. Garner did assault the passenger, and Mr. Garner has consistently denied engaging in such inappropriate conduct. (Id.)

4. Dirk Shuster

Ms. Yon claims that another white male operator, Dirk Schuster, with the same tenure as she, was allowed to call out from work on short notice. [*37] (Yon Dep. 9/30/02 at 113-15, 119-23.) These unsubstantiated allegations cannot create an inference of discrimination since they do not allege circumstances similar to those surrounding Ms. Yon's discharge. Further, the allegations are based solely on hearsay and were not substantiated by admissible evidence despite a discovery extension.

5. Linda Angotta

Ms. Yon claims that SEPTA treated its white employees better during their pregnancies than its black employees. (Pl.'s Resp. in Opp'n to SEPTA's Mot. at 27-28.) She alleges that Linda Angotta, a white woman, was reassigned to the main office when she was pregnant and allowed to do desk work. (Id.) Ms. Yon claims that other black female operators were required to continue making runs, attending night shifts, and performing physical labor such as repairing trolley poles. (Pl.'s Resp. in Opp'n to SEPTA's Mot. at 28.) Ms. Yon claims that, as a result of this labor, many black female operators miscarried and lost their children. (Id.)

Without addressing the veracity of plaintiff's contentions, this information is deemed irrelevant to Ms. Yon's claims of discrimination. When one attempts to create an inference of discrimination [*38] another "similarly situated" employee who was treated more favorably, the plaintiff must show that the relevant aspects are nearly identical. Miller v. Del. Dep't of Probation & Parole, 158 F. Supp. 2d 406 (D. Del. 2001). Here, Ms. Yon contests her termination, alleging that it was the result of race and/or gender discrimination. If

Case 1:06-cv-00565-GMS    Document 44-2    Filed 10/03/2007    Page 70 of 78

Page 11

2003 U.S. Dist. LEXIS 20189, *38; 173 L.R.R.M. 3025

true, Ms. Angotta's treatment may be relevant to a claim addressing discrimination of placement within the SEPTA system when pregnant. However, it is irrelevant to Ms. Yon's termination. Ms. Yon would need to show a situation where an employee, not a member of a protected class, threatened or attacked a supervisor and was treated more favorably. Information that one pregnant woman was assigned to desk work, does not imply that Ms. Yon was terminated as a result of discrimination after she had threatened supervisors verbally and with a dangerous weapon. Ms. Angotta's treatment is simply unrelated to the situation at hand and, thus, cannot be used by Ms. Yon to establish her prima facie case of discrimination.

2. Legitimate, Non-Discriminatory Reason for Termination

Ms. Yon fails to establish a prima facie case. However, [*39] even if she were able to provide sufficient information for a prima facie case, SEPTA has proffered a legitimate, non-discriminatory reason for her termination. Therefore, a plaintiff bears the burden of showing that the circumstances encountered by the supervisors on the night of the Club incident were a pretext for race or gender discrimination. *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).*

Here, SEPTA states that Ms. Yon was barred from returning to work because she allegedly threatened or assaulted a supervisor. The SEPTA work rules state that an employee shall be barred from reporting to work and/or discharged for "threatening and/or assaulting a supervisory person, passenger, and/or other employee or non-employee ..." (SEPTA's Ex. G, CBA at PH00234.) At her outburst on October 6, 1996, Ms. Yon admits that she used profanity and had in her hands a device that could have been wielded as a dangerous weapon. The three supervisors present-Mr. Thomas, Mr. Balsualdo, and Mr. DeGrasse-filed Supervisor's Special Reports concerning the incident. Mr. Thomas and Mr. Balsudo also filed Occupational Injury Reports. In their Supervisor's reports, Mr. Balsudo [*40] and Mr. Thomas stated that Ms. Yon used foul language, made racial slurs, and threatened each with the Club by waving it at them.

The following day plaintiff learned that she had been barred from reporting to work. On October 8, 1996, Ernie Pronkowitz, the Director of Transportation at the Elmwood District, conducted an informal investigation and recommended that Ms. Yon be discharged. On

October 29, 1996, Kevin O'Brien, the Chief District Officer at the Elmwood District, conducted a formal hearing. At the hearing Ms. Yon was assisted by Union representatives and both Ms. Yon and SEPTA were allowed to present witnesses. As a result of this hearing, Mr. O'Brien, who is not associated with any claims of discrimination, recommended that Ms. Yon be discharged for conduct unbecoming a SEPTA employee on November 3, 1996. On that date plaintiff was discharged and she ceased receiving Workers' Compensation payments.

The undisputed evidence shows that Ms. Yon entered the supervisors' office on October 6, 1996, while angry, that she carried a Club and used inappropriate and hostile language. This evidence provides a legitimate, non-discriminatory reason for Ms. Yon's discharge. By barring [*41] her from work following the submission of the Supervisors' Reports, SEPTA acted in compliance with the CBA. Informal and formal investigations were conducted pursuant to proper procedure. The third circuit has stated that an employer has a "relatively light burden" to produce a legitimate reason for the adverse employment action suffered by an employee. *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).* SEPTA's reliance upon Ms. Yon's outburst, where she threatened SEPTA supervisors by possessing a dangerous instrument, is more than adequate to satisfy their burden of showing the termination was for reasons that were not discriminatory.

Following such a showing, "the burden of production rebounds to the plaintiff, who must show by a preponderance of the evidence that the employer's explanation is pretextual." *Fuentes, 32 F.3d at 763.* A plaintiff may survive summary judgment only by submitting evidence from which a factfinder could reasonably either: 1) disbelieve the employer's articulated legitimate reasons; or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. [*42] *Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).* Thus, to meet this burden, Ms. Yon must proffer sufficient evidence that would allow a fact finder to reasonably believe the nondiscriminatory reasons were either fabricated, implausible, or not the actual motives for the suspension and termination. *Fuentes, 32 F.3d at 764.* Ms. Yon has not met this burden. She is unable to establish an

Page 12

2003 U.S. Dist. LEXIS 20189, *42; 173 L.R.R.M. 3025

inference of discrimination sufficient to support a prima facie case. Even if able to produce such a showing, she has failed to produce any evidence that would discredit SEPTA's reason for suspension and termination, or that would demonstrate that discrimination was more likely than not a determinative factor underlying these actions.

Retaliation

Finally, Ms. Yon alleges that her termination was the result of SEPTA retaliating against her asserting her rights. "To establish a prima facie case of retaliation, a plaintiff must show that he/she is engaged in protected activity, that the employer took an adverse employment action against him/her, and that there is a casual [*43] connection between the protected activity and the adverse employment action." *Goosby v. Johnson & Johnson, 228 F.3d 313, 323 (3d Cir. 2000).* The only arguable protected activity that Ms. Yon was engaged in was writing letters to the SEPTA General Manager. However, there is no evidence to link the writing of these letters to her termination. While Ms. Yon claims that, following the writing of these letters, she was informed by a Union representative that SEPTA management was trying to get her fired there is no corroboration of this claim. Without evidence, properly considerable under summary judgment rules, of a linkage between the letters and her termination, Ms. Yon fails to establish a prima facie case of retaliation.

**Union - Local 234**

Duty of Fair Representation

Under Pennsylvania law governing the duty of fair representation, a public employee claiming that her union has breached its duty of fair representation must show that the Union's processing of a grievance was arbitrary, discriminatory, or based on bad faith. See *Hughes v. Council 13, Am. Fed'n of State, County and Mun. Employees, 157 Pa. Commw. 96, 629 A.2d 194, 195-96 (Pa. Comm. Pl. 1993)* [*44] (citing *Vaca v. Sipes, 386 U.S. 171, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967))*. The union enjoys "broad discretion to receive, pass upon and withdraw grievances." Id. (citing *Falsetti v. Local Union 2026, 400 Pa. 145, 161 A.2d 882 (Pa. 1960))*. Absent evidence of arbitrariness, discrimination, or bad faith, a plaintiff cannot prevail in her claim. Id. A claim does not exist for negligence in processing a grievance. *Findley v. Jones Motor Freight, Division Allegheny, 639 F.2d 953, 960 (3d Cir. 1981)*.

There is a two-year statute of limitations applicable to claims for breach of the fair duty of representation. The Union asserts that Ms. Yon did not file within this time period and, thus, her claim should be dismissed as untimely. The Union asserts that it actively pursued her claims until January 7, 1999, when the Union agent wrote to Ms. Yon and informed her that her grievance was being withdrawn from arbitration. Ms. Yon did not file her claim until October 17, 2001, two and a half years later, and accordingly it must be dismissed.

Even if Ms. Yon's claim is timely, Ms. Yon presents no evidence that the Union's conduct was arbitrary, discriminatory, or in bad faith. Without [*45] evidence in her favor there is no issue of material fact as to whether the Union breached its duty. The Union acted appropriately while assisting Ms. Yon, even going beyond its required actions by allowing her to hire an independent attorney at the Union's expense.

Ms. Yon alleges that her claim of breach of duty of fair representation is a result of treatment not of her discharge, but of events that occurred during her employment-the emptying of her locker, her delayed workers' compensation payments, and her reassignment to light duty. Ms. Yon alleges that her claims were not properly processed due to gender discrimination. [9] In support of her gender discrimination claim, Ms. Yon cites to a note she obtained that was passed between Union representatives during a preparation session for her arbitration claim, which allegedly demonstrates gender discrimination. (Pl.'s Resp. in Opp'n to Union's Mot. at 23; Pl.'s Ex. 7, PH 00333.) Ms. Yon's exhibit contains what is alleged to be a copy of the note. (Pl.'s Ex. 7, PH 00333.) The second page of the note reads: "She just lost her case," "PMS," "defience" (sic), and "harmon embalance" (sic). (Id.) Ms. Yon alleges that the two men who [*46] were writing the note were Rich Sabin and Willie Brown. (Id.)

> [9] Ms. Yon also alleges that failure the file grievances on her behalf was due to race discrimination, as she claims that the Union was hesitant to file claims based upon race discrimination. (Pl.'s Resp. in Opp'n to Union's Mot. at 23.) However, she fails to present any evidence to support this contention. Without evidence, Ms. Yon cannot satisfy her burden of showing that any failure was based upon discrimination and, thus, her allegation is

Page 13

2003 U.S. Dist. LEXIS 20189, *46; 173 L.R.R.M. 3025

insufficient to overcome the Union's Motion for Summary Judgment.

This note was written during a meeting preparing to challenge her termination. The Union diligently pursued claims surrounding Ms. Yon's termination. Ms. Yon does not even claim that any of the Union's conduct regarding her termination proceedings violated her right to fair representation. Despite its timing, she believes that the comments indicate a gender bias, and further such discrimination could have caused the Union to inadequately represent [*47] her on prior occasions. (Pl.'s Resp. in Opp'n to Union's Mot. at 23.)

First, passing references to PMS and hormones, coming after the statement that "She just lost her case" do not create an inference of gender discrimination. The representatives may have been, upon hearing Ms. Yon speak, making determinations of her credibility or how her testimony would be considered by a fact-finder. Whatever the meaning of the note, there is no dispute that the Union diligently pursued Ms. Yon's improper termination claim. Further, the comments have no probative value concerning the Union's prior treatment of Ms. Yon. Ms. Yon alleges that she repeatedly told Mr. Nelms to pursue grievances for her. He is not alleged to be involved in writing the note, and any thoughts of the writers cannot be imputed to him or to the Union decisions generally. As stated, a union enjoys "broad discretion to receive, pass upon and withdraw grievances." *Hughes v. Council 13, Am. Fed'n of State, County and Mun. Employees, 157 Pa. Commw. 96, 629 A.2d 194, 195-96 (Pa. Comm. Pl. 1993).* This note, written significantly after the period of time Ms. Yon alleges that the Union did not properly represent her, [*48] and written by individuals not previously involved in her claims, does not establish any proof of discrimination on the part of the Union.

Title VII Labor Organization Standard

In order to prove a prima facie violation under Title VII against a labor organization, a plaintiff must prove that: 1) the organization committed a violation of the CBA with respect to the plaintiff; 2) that the Union permitted that breach to go unrepaired, thus breaching its own duty of fair representation; and 3) that there was some indication that the Union's actions were motivated by some discriminatory animus. *Bugg v. Int'l Union of Allied Workers of America, 674 F.2d 595, 598 n.5 (7th Cir. 1982)*; Bell v. Glass, Molders, Pottery, Plastics, and Allied Workers Local Union # 246, No. 00-1693, 2002 WL 32107218 (W.D. Pa. Aug. 19, 2002).

Ms. Yon alleges that the Union discriminated against her by failing to properly represent her, mainly that they failed to file grievances on her behalf on numerous occasions. (Pl.'s Resp. in Opp'n to Union's Mot. at 14.) The Union states that they pursued Ms. Yon's grievances for a period in excess of two years, and therefore there is [*49] no dispute regarding its representation of Ms. Yon was adequate. In her deposition, even Ms. Yon could think of no facts that supported that any alleged failings of the Union had been a result of racism/sexism. As stated above, the note Ms. Yon allegedly recovered is not probative of any gender discrimination against Ms. Yon.

Ms. Yon argues that *Goodman v. Lukens Steel Co., 777 F.2d 113, 126 (3d Cir. 1985)*, governs this case. Under Goodman the deliberate failure to process grievances, as Ms. Yon alleges, can constitute a Title VII violation. While Goodman may remain good law, Ms. Yon has failed to present evidence that any delay caused by the Union was deliberate.

An appropriate order follows.

**JUDGMENT ORDER**

AND NOW, this 31st day of October, 2003, upon consideration of defendant SEPTA's Motion for Summary Judgment, defendant Transport Workers Union Local # 234's Motion for Summary Judgment, all responses thereto, and related document, it is hereby ORDERED as follows:

    i. Defendant SEPTA's Motion is GRANTED;

    ii. JUDGMENT is entered in favor of defendant SEPTA and against plaintiff;

    iii. Defendant Transport Workers Union Local [*50] # 234's Motion for Summary Judgment is GRANTED;

    iv. JUDGMENT is entered in favor of Transport Workers Union Local # 234 and against plaintiff;

    v. Any pending motions are DENIED as MOOT.

2003 U.S. Dist. LEXIS 20189, *50; 173 L.R.R.M. 3025

BY THE COURT:                              James T. Giles, C.J.

# **EXHIBIT G**

LEXSEE 2002 U.S. DIST. LEXIS 4721

**DR. KATHLEEN CARTER, Plaintiff, v. DELAWARE STATE UNIVERSITY, DR. WILLIAM B. DELAUDER, PRESIDENT, DR. JOHNNY TOLLIVER, DEAN JACQUELYN W. GORUM, DR. ALETA HANNAH and DELAWARE STATE UNIVERSITY BOARD OF TRUSTEES, Defendants.**

**C.A. No. 99-642 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 4721*

**March 21, 2002, Decided**

**SUBSEQUENT HISTORY:** *Affirmed by Carter v. Del. State Univ., 2003 U.S. App. LEXIS 7219 (3d Cir. Del., Apr. 16, 2003)*

**DISPOSITION:**    [*1] Summary judgment ENTERED in favor of the individual defendants on the § 1981 and § 1983 claims in Counts II and III.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff professor filed a *First Amendment* retaliation claim under *42 U.S.C.S. § 1983*. Defendants university president and board of trustees requested a judgment in their favor, arguing the professor's speech was not protected and it was not a substantial factor in the decision to deny tenure. The defendants also argued that other permissible factors supported their decision. The professor argued questions of fact remained as to motivation.

**OVERVIEW:** The professor's critical remarks about scheduling policies to her class were entitled to *First Amendment* protection. She alleged that the president admitted that her classroom statements were considered in the tenure process. If true, the court found the denial of tenure was at least partially based on the professor's remarks. Thus, the speech was a substantial or motivating factor in the decision. The other factors were her service on a committee and her neutral evaluations, none of which were related to speech. Although the neutral evaluation and her performance on the committee were unrelated to speech, they were directly related to job performance. Her neutral evaluation and allegedly poor

committee service established that her performance was, at times, marginal. Thus, there were sufficient grounds to deny tenure in the absence of her speech. She never provided any facts to rebut the assertions that her evaluations were neutral and that her performance on the committee was allegedly inadequate. If the president's decision would have remained the same in the absence of the professor's comments, it was sufficient. The court found that the decision would have been the same.

**OUTCOME:** The court entered summary judgment in favor of the defendants.

**COUNSEL:** For KATHLEEN CARTER, Dr., plaintiff: Laurence V. Cronin, Smith, Katzenstein, & Furlow, Wilmington, DE.

For WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, ALETA HANNAH, Dr., DELAWARE STATE UNIVERSITY BOARD OF TRUSTEES, defendants: John D. Balaguer, White & Williams, Wilmington, DE.

For WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, defendants: Christian J. Singewald, White & Williams, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

2002 U.S. Dist. LEXIS 4721, *1

## OPINION

## MEMORANDUM AND ORDER

On February 27, 2002, the court issued a memorandum and order disposing of all of the plaintiff's claims in the case except her § 1981 and § 1983 claims against the individual defendants in their official capacities. (D.I. 142 at 19-20.) On February 28, 2002, the court held a teleconference wherein the parties discussed how the remaining claims should proceed. Subsequent to the teleconference, the parties agreed that the § 1981 claim is not viable in light of the court's ruling on the Title VII claim. [*2] (D.I. 143.) However, the parties continue to dispute the validity of the § 1983 claim.

The defendants request an order entering judgment in their favor on the § 1983 claims. (D.I. 143, D.I. 145.) The defendants argue that the plaintiff cannot establish the elements of her *First Amendment* retaliation claim under § 1983 because her speech was not protected and it was not a substantial factor in the tenure decision. The defendants further submit that even if the plaintiff's speech was protected and that speech was a substantial factor in their decision to deny her tenure, other permissible factors support their decision to deny tenure to the plaintiff. The plaintiff argues that the claim is valid because questions of fact remain as to the motivation behind the decision. The court agrees with the defendant that the § 1983 claims should be dismissed. Therefore, the court will enter an order dismissing both the § 1981 and § 1983 claims against the defendants.

## II. STANDARD OF REVIEW [1]

[1]  The facts of this case are fully set forth in the court's previous memorandum and order and will not be repeated here. (*See* D.I. 142 at 4-7.)

[*3] Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999).* The nonmoving party, however, must demonstrate the existence of a material fact -- not mere allegations -- supplying sufficient evidence for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996)* (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not [*4] match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)* (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson, 477 U.S. at 249-50.* [2]

2    Although proper summary judgment briefs have not been filed on the present issues, treating this matter a motion for summary judgment is appropriate for three reasons. First, since summary judgment motions have already been filed in this case, the plaintiff is on notice that her claims may be dismissed in this manner. Second, the defendants' remarks after the summary judgment motion indicate that they seek judgment in their favor on the § 1983 claims. (*See* D.I. 143 at 2 (noting that defendants will "provide a response and application for entry of judgment" after the plaintiff writes to the court)). Finally, the plaintiff argues that the court cannot dismiss her claims because issues of fact remain. (D.I. 144 at 2,4.) (arguing that claims should go to jury). Therefore, summary judgment is appropriate.

[*5] III. DISCUSSION

In order to establish that she was denied tenure in retaliation for exercising her *First Amendment* rights, Carter must first demonstrate that her speech was protected. *See Green v. Philadelphia Housing Authority, 105 F.3d 882, 885 (3d Cir. 1997).* She must then establish that her protected speech was a substantial or motivating factor behind the alleged retaliation. *See id.* Finally, if Carter can establish these two elements, the burden will then shift to the defendants to demonstrate that the same action would have been taken if the speech had not occurred. *See id.*

2002 U.S. Dist. LEXIS 4721, *5

The parties do not dispute that Carter made certain unfavorable remarks about DSU's scheduling policies to her class. Instructors' remarks about university policies, even those critical of the university, are entitled to *First Amendment* protection. *See Eichman v. Indiana State University Bd. of Trustees, 597 F.2d 1104, 1108 (5th Cir. 1979)* (finding that district court erred in holding that professor's statements criticizing university's scheduling and curriculum were outside the scope of *First Amendment* protection). Thus, the court finds that the plaintiff's [*6] speech was protected.

The court further finds that the speech was a substantial or motivating factor in the tenure decision. A substantial or motivating factor need not be the only factor. Rather, a substantial or motivating factor is one that played "some substantial role" in the decision making process. *See Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000)*. In the present case, Carter alleges that DeLauder admitted that her classroom statements were considered in the tenure process. Accepting Carter's allegation as true, the court finds that the denial of tenure was at least partially based on Carter's remarks. Therefore, Carter's speech was a substantial or motivating factor in the defendants' decision to deny her tenure.

Since Carter has demonstrated that her protected speech was a motivating factor in the tenure decision, the defendants must demonstrate by a preponderance of the evidence they would have taken the same action in the absence of the protected conduct. *See id. at 235.* The defendants have carried this burden. The court noted in its previous order that Carter's speech was one of four factors that motivated the tenure decision. (D. [*7] I. 142 at 11.) The other three factors were her service as department chair, her service on the NCATE committee, and her neutral evaluations. (*Id.*) [3] None of these considerations were related to Carter's speech. A university may deny tenure for any non-discriminatory reason. *See Parate v. Isibor, 868 F.2d 821, 827 (6th Cir. 1989)* ("The university may dismiss a non-tenured professor for any reason, or no reason, and the professor has no recourse unless such dismissal abridges his exercise of a constitutionally protected right."). Here, although Carter's neutral evaluation and her performance on the NCATE committee were unrelated to her speech, they were directly related to her job performance. *See Coats v. Pierre, 890 F.2d 728, 733 (5th Cir. 1990)* (noting that the reasons for denial of tenure "[bore] at least some relation to [the professor's] effectiveness as a

faculty member"). *See also Gerhart v. Hayes, 217 F.3d 320, 322 (5th Cir. 2000)* (finding that plaintiff's job performance was inadequate and she would have been denied tenure in the absence of her speech). Carter's neutral evaluation and allegedly poor NCATE service [*8] establish that her performance was, at times, marginal. Thus, the factual record supports a finding that there were sufficient grounds to deny Carter tenure in the absence of her speech.

   3  The court will not consider Carter's service as department chair for the reasons stated in the previous memorandum. (*See* D.I. 142 at 12.)

Carter argues that the court should deny summary judgment because there are issues of fact regarding DSU's motivation for denying tenure. However, Carter never provided any facts to rebut the assertions that her evaluations were neutral and that her performance on the NCATE committee was allegedly inadequate. [4] Thus, Carter has failed to create a genuine issue of material fact on these points as is her burden. Therefore, there is no impediment to granting summary judgment in favor of the defendants on this claim. [5] [6]

   4  Indeed, rather than disputing the fact that her evaluations were neutral, Carter attempted to use this fact as proof of Dr. Hannah's racial bias against her.

[*9]

   5  Carter argues that the defendants cannot claim they would have terminated her on other grounds because DeLauder did not know about her evaluations or her allegedly poor NCATE performance at the time he made his initial negative tenure recommendation. The court rejects this argument. The law on retaliation does not state that the protected speech cannot be considered -- it only requires proof that the defendants' decision would have been the same in the absence of the speech. Thus, if DeLauder's decision would have remained the same in the absence of Carter's comments, it is sufficient. Since the court finds that the decision would have been the same, Carter's argument on this point is rejected.

   6  The court recently held that the final two prongs of a *first amendment* retaliation claim were questions of fact. See *Springer v. Henry, 2002 U.S. Dist. LEXIS 3975*, No. 00-885(GMS), 2002

2002 U.S. Dist. LEXIS 4721, *9

WL 389136 (D. Del. Mar. 11, 2002). This case is distinguishable from *Springer*, however. In *Springer*, there were several areas of contested fact. In the present case, as previously explained, Carter does not dispute the outcome-determinative facts. Therefore, the court finds that although summary judgment was not appropriate in *Springer*, it is appropriate in this case.

[*10] **IV. CONCLUSION**

For all of the foregoing reasons, the court will grant summary judgment in favor of the defendants on the § 1981 and *§ 1983* claims.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. Summary judgment be and hereby is ENTERED in favor of the individual defendants on the § 1981 and *§ 1983* claims in Counts II and III.

2. The clerk shall close this case.

Dated: March 21, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,      )
                                   )
        Plaintiff,          )
                                   )    Civil Action No. 06-565-GMS
        v.                 )
                                   )
ALLEN L. SESSOMS, Ph.D.,     )
                                   )
        and             )
                                   )
BOARD OF TRUSTEES OF       )
DELAWARE STATE UNIVERSITY,   )
                                   )
        Defendants.      )

## CERTIFICATE OF SERVICE

I, Michael R. Robinson, hereby certify that on October 3, 2007 I caused a true and correct

copy of the foregoing REPLY MEMORANDUM IN FURTHER SUPPORT OF

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT to be served electronically via

CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Gilbert Shelsby, Esq.                Gregg L. Zeff, Esq.
Michael J. Logullo, Esq.            FROST & ZEFF
SHELSBY & LEONI                Pier 5 at Penn's Landing
221 Main Street                    7 North Columbus Boulevard
Stanton, DE 19804              Philadelphia, PA 19106

_____
Michael R. Robinson (#4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
mrobinson@saul.com

936771.4 10/3/07