# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,      )
                           )
        Plaintiff,        )
                           )     Civil Action No. 06-565-GMS
        v.              )
                           )
ALLEN L. SESSOMS, Ph.D.,   )
                           )
        and           )
                           )
BOARD OF TRUSTEES OF     )
DELAWARE STATE UNIVERSITY, )
                           )
       Defendants.      )

## SUPPLEMENTAL APPENDIX
## IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Robert L. Duston
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037-1922
(202) 333-8800 (telephone)
(202) 337-6065 (facsimile)
rduston@saul.com

*Counsel for Defendants*

Kimberly L. Gattuso (No. 3733)
Michael R. Robinson (No. 4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19801
(302) 421-6800 (telephone)
(302) 421-5871 (facsimile)
kgattuso@saul.com
mrobinson@saul.com

*Counsel for Defendants*

DATED:  October 3, 2007

# TABLE OF CONTENTS

## Documents

Excerpts from the Collective Bargaining Agreement......................................................C001-C007

6/7/04 Letter from C. Smith to D. Morris...........................................................................C008

DSU Violation/Infraction Report Forms .......................................................................C009-C011

Excerpts from the Faculty Senate Bylaws ..................................................................C012- C030

## Gorum v. DSU Deposition Excerpts

Excerpts from Deposition Transcript of Allen L.
    Sessoms, Ph.D. dated June 28, 2007.......................................................C031- C032

Excerpts from Deposition Transcript of Yaw
    Ackah, Ph.D. dated Aug. 29, 2007 ..................................................C033- C042

Excerpts from Deposition Transcript of Mark
    Farley. dated Aug. 29, 2007..........................................................C043- C063

Excerpts from Deposition Transcript of Wendell
    Gorum, Ph.D., dated June 6, 2007 ................................................C064- C065

## AHDC Hearing Excerpts

Excerpts from AHDC 2004 Hearing – Testimony of
    Dewayne Wickham. dated Aug. 30, 2004 .......................................C066- C074

Excerpts from AHDC 2004 Hearing – Testimony of
    Joyce Bowers dated Sept. 24, 2004 ................................................C075- C076

Excerpts from AHDC 2004 Hearing – Testimony of
    Johnny Toliver, Ph.D. dated Oct. 27, 2004.....................................C077- C083

Excerpts from AHDC 2004 Hearing – Testimony of
    Wendell Gorum, Ph.D. dated Oct. 29, 2004 ...................................C084- C0104



## 2000 - 2009

## COLLECTIVE BARGAINING AGREEMENT

### BETWEEN

## THE BOARD OF TRUSTEES OF DELAWARE STATE UNIVERSITY

### AND

## THE DELAWARE STATE UNIVERSITY CHAPTER OF THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS

C 001

**12.3** <u>Faculty Responsibilities and Obligations</u>

The Association and the University recognize that mutual benefits derive from continual improvement of the University as an institution of higher learning, and that, toward this end, the primary professional responsibility of each member of the faculty is to the University. The Association and the University concur that each member of the faculty should display a high degree of professionalism. To that end, the Association and the University agree that accepting and assuming a faculty position at Delaware State University entails the following professional responsibilities and obligations:

a. To demonstrate and maintain professional competence and knowledge of subject matter and strive to keep informed of contemporary developments in the field of specialization through reading and research, or other means of expression appropriate to the discipline.

b. To meet each class as scheduled.

c. To aspire to excellence in teaching by conducting each class according to the highest professional standards.

d. To distribute policies concerning attendance, course requirements, and criteria for grading to each student at the beginning of each semester.

e. To present to students during the term and within a reasonable time evaluations of their academic performance and progress in the class.

f. To be available to students on a regular basis for advising and counseling on matters regarding their academic performance and progress in class.

g. To treat all students fairly, impartially, and with understanding.

h. To improve, update, enrich, and revise courses periodically to keep them current.

i. To maintain adherence to course descriptions in accordance with the syllabus and the University Catalog.

j. To be available on a regular basis to students who have been identified as advisees on matters pertaining to the students' program of study.

k. To accept willingly a fair share of Departmental and University duties.

l. To accept willingly a fair share of committee assignments and to serve conscientiously as a member of committees appointed or elected to and fulfill the specific duties of any chair or office accepted.

C 002

### 12.5.1 Faculty Attendance

Faculty members are expected to conduct all classes as scheduled. In the event of illness or unavoidable absence, the faculty member shall notify the appropriate Chair or, if unavailable, the appropriate Academic Dean.

Provided that reasonable notice is given, faculty members are also expected to attend all general faculty meetings, Department meetings, and meetings of any standing committee, including the Faculty Senate, to which they have been elected or appointed, unless the faculty member has classes scheduled at that time.

All faculty members, unless excused by the appropriate Academic Dean, shall attend Commencement. Attendance of faculty members at other University sponsored functions is expected and encouraged.

### 12.6 Committee Service

As agreed in Section 3 of this Article, faculty members are obligated and expected as part of the workload to serve on committees; however, the University and the Association agree that faculty members cannot be required to serve on more than two (2) University-wide committees, including the Faculty Senate and committees of the Association. Such limitation is intended to provide all faculty members with an opportunity to serve on various committees and to provide the various committees with diverse viewpoints; it is understood that such a limitation does not preclude faculty members from voluntarily serving on more committees or from accepting a reasonable and fair share of Department or ad hoc committee assignments.

### 12.7 Overload

a. Department Chairpersons shall have the responsibility to schedule overload courses and assign teaching loads above the base teaching load subject to the prior approval of the appropriate Academic Dean.

b. Unit members who have been approved to teach in excess of their basic teaching load will be paid overload in accordance with the payment schedule contained in Article XVII, Salary.

c. In no case will a unit member be permitted to have an overload assignment in excess of one (1) course or a maximum of four (4) credit hours per semester. Overload includes all courses taught in excess of the basic teaching load whenever scheduled and whether taught as part of the regular undergraduate or graduate programs.

d. Non-teaching members of the unit shall not be eligible for overload compensation unless they are assigned teaching responsibilities outside their normal workload.

e. Full-time faculty members shall be given preference over part-time or adjunct faculty for

C 002.1

# ARTICLE XIX

# GOVERNANCE

## 19.1    General Principles

Although the Association, as the elected bargaining agent, retains the exclusive right to negotiate and reach agreement on terms and conditions of employment for members of the bargaining unit, and the Board of Trustees retains its rights, under law, to manage and direct the University, the parties recognize the necessity of a collegial governance system for faculty and other members of the bargaining unit in matters of academic concern. It is mutually desirable that the collegial system of shared governance be maintained and strengthened so that faculty and other members of the bargaining unit shall have a mechanism and procedure, independent of the collective bargaining process, for making recommendations to appropriate administrators and for resolving matters of concern to the faculty through the organizational structures of the Departments, the Faculty Senate, the Administrative Council, and the Board of Trustees. To that end, the parties agree to the following principles:

a. The Faculty of the University shall be able to make its opinion about matters affecting the University known to the Administration.

b. The Faculty of the Department shall be able to make its opinions about matters affecting the Department known to the Chairperson.

c. The Faculty shall have a voice through Faculty representatives elected for that purpose to serve on Department, Senate, or University committees in the formulation of policies and in decisions relating to their implementation.

d. The parties to this Agreement recognize the presently constituted organizations within the University, i.e., the Departments, the Faculty Senate, the full Faculty in session, which are composed, in whole or in part, of the faculty and may exercise all the rights and powers, and prerogatives that they have heretofore possessed, provided that the actions thereof may not directly or indirectly repeal, rescind, or otherwise modify the terms and conditions of this Agreement.

e. Both parties to this Agreement recognize the Faculty Senate as the primary body for insuring effective Faculty participation in the governance of the institution and providing the means for the Faculty to exercise its responsibilities.

## 19.2    Departmental Governance

19.2.1    Departments or academic units shall consist of a Chairperson or Head and Faculty members and other members of the bargaining unit assigned to the Department. Academic Departments shall be established by the University with the advice of the full Faculty or the Faculty Senate. The Library, the Comprehensive Learning Center, and the Counseling

C 003

Center shall be, for the purposes of implementing this Article, treated in the same manner as Academic Departments.

19.2.2    The Department is the structure through which the unit member shall act in academic and personnel matters.  All recommendations of Department committees must be approved by the Department as a whole.  The only exception is that the personnel committee submits its recommendation to the Chair for transmittal to the Promotion and Tenure Committee.

19.2.3    A Department, either as a whole or through committee, shall have primary responsibility for the content and development of courses, curriculum, and programs of study within its discipline; for forming Department policies with respect to majors and the general academic standards of the Department; for recommending class size; for establishing and maintaining standards of teaching, research, and service; for recommending criteria with respect to the appropriateness of degrees to the teaching and research responsibilities of the Department; for establishing Departmental criteria and procedures with respect to recommendations concerning appointment, reappointment, non-reappointment, promotion, tenure, sabbatical leave, peer review, part-time appointments, staff appointments, and other personnel recommendations; and to advise, aid and counsel the Chairperson in administering the Department.  Such action shall not conflict with this Agreement, University policies, procedures, or regulations.

The Chairperson shall serve as Chairperson of the committee of the whole.  Departments shall express their recommendations by majority vote.  Eligibility to vote shall be limited to those full-time and half-time members of the Department who hold the rank of Instructor or above or the equivalent.

19.2.4    The Department may establish whatever committees and procedures it deems appropriate to carry out its internal responsibilities, consistent with University-wide policies and practices and this Agreement.

19.2.5    Each Department shall establish written by-laws, subject to a majority vote of the Department, describing its structure, procedures, and policies.  A copy of such by-laws shall be filed with the appropriate Academic Dean and the AAUP.  Such by-laws shall not conflict with this Agreement, or with University policies, procedures, or regulations.

The purpose of the Department By-laws is to outline the procedures to be followed by the Department in performing their obligations assigned to the Department under this Agreement.

19.2.6    In accordance with the provision of Article VIII of this Agreement, each Department shall establish a Personnel Committee of tenured Faculty members to make recommendations concerning appointment, reappointment, non-reappointment, promotion and tenure of members of the Department.  In the event that a Department has fewer than two (2) tenured faculty members, the Department Personnel Committee shall be composed of other members of the Department in order of seniority (length of service).

C 004

a. When there is only one tenured faculty member- A minimum of one other ranked faculty member shall be selected, based on length of service.

b. When there are no tenured faculty members - A minimum of two (2) ranked faculty members shall be selected, based on lengths of service.

c. When there is one or no tenured faculty members and no other ranked faculty in the department - The appropriate number (one or two) of tenured faculty will be selected from another department.

d. The Counselors and Librarians shall act as a committee-of-the-whole. Department Chairs do not serve on the personnel committees since they provide independent judgments provided for in Articles: 7.4.5 and 8.6.6.

It is understood that a member of the Department whose case is being considered by the Personnel Committee shall not participate in such meetings except at the request of the Committee.

19.2.7 Each Department shall meet as needed at the call of the Chair, but not less than twice a semester. All members of the Department shall receive timely notice of such meetings. The Chair of a Department must call a meeting if requested to do so in writing by at least thirty (30) percent of Department members. Minutes of the meetings shall be kept and distributed to all members of the Department. A copy of the minutes shall be filed with the appropriate Academic Dean. Departmental secretaries may be requested by the Department Chair to keep Department meeting minutes when the meetings are scheduled during their normal workday.

19.2.8 All references in this Article to Department Chairpersons shall also apply to Academic Directors and the Head Librarian.

19.3    Designation of Chairperson

Department Chairperson are ranked faculty members who shall be appointed for a period of one year by the Board of Trustees upon the recommendation of the President. Department Chairpersons are responsible for directing their respective Departments. They have the obligation to build Departments strong in scholarship, teaching capacity and community service.

Appointments to the position of Department Chairperson by the Trustees shall be in accordance with the following procedures, except in emergency circumstances as described in succeeding paragraphs. Except where a Department has recommended that an appointee be automatically reappointed for a period of up to three years, an annual recommendation in regard to its preference for Department Chairperson shall be provided to the appropriate Academic Dean by each academic Department, with appropriate evidence.

Procedures: The recommendation by a Department in regard to its preference for Department

C 005

Chairperson shall be the preference of a majority of Department faculty present and voting by secret ballot at a duly called meeting of the Department faculty. The conduct of the meeting shall be in accord with established parliamentary authority in regard to elections, except the balloting is to designate a nominee for consideration by the appropriate Academic Dean. The meeting shall be presided over by the appropriate Academic Dean. In the event there is a tie and two names are presented to the appropriate Academic Dean, the appropriate Academic Dean shall recommend one of the nominees tied for first place. Only under unusual circumstances will a Chairperson be recommended by the appropriate Academic Dean who does not meet the approval of a majority of the Department Faculty. If this should occur, the Department may present evidence in support of its nominee directly to the appropriate Academic Dean. If the appropriate Academic Dean rejects the evidence of the Department and does not support its recommendations, the Department may appeal to the Vice President of Academic Affairs.

In the absence of a regularly appointed Chairperson, the Department may recommend an Acting Chairperson whose term shall not exceed one (1) year, and recommend said person to the appropriate Academic Dean. The appropriate Academic Dean, in consultation with the Association and members of the Department, reserves the right to recommend a Chairperson to the Vice President of Academic Affairs in order to promote Departmental continuity and efficiency, or in connection with the establishment of a new Department.

In emergency situations, the President shall fill the vacancy on a temporary basis until the normal procedures for Departmental recommendations can be carried out.

19.3.1  Searches for Department Chairperson shall be conducted according to the following procedures:

a. The decision to recruit a Chairperson from within or without the Department or to conduct a "mixed" search shall be the decision of the appropriate Academic Dean in consultation with the members of the Department.

b. If an outside search is conducted, it shall follow the procedures established for initial appointments, subject to the provisions of this Agreement.

c. In the event that a Chairperson is to be designated from within the Department, the affected Department shall follow the procedures for recommending a Chairperson as outlined in Section 19.3.

d. In the event that two-thirds of the membership of a Department petition the appropriate Academic Dean for the removal of a Chairperson, the appropriate Academic Dean shall make his/her recommendation to the Vice President of Academic Affairs. The Vice President shall make his/her recommendation for the removal or non-removal to the President of the University. In the event that the appropriate Academic Dean recommends removal of the Chairperson, this decision may be appealed to the President of the University.

C 006

19.3.2  The Department Chairperson shall be responsible to the appropriate Academic Dean for the day-to-day operation of the Department.

19.3.3  In the event that a Chairperson fails to carry out his/her responsibilities, he/she will be subject to removal from the position of Chairperson by the Board of Trustees upon the recommendation of the President.

19.4    University Governance

To better meet its educational goals, Delaware State University is committed to furthering joint planning and effort by the Board of Trustees, the Administration, the Faculty, the Students, as well as other segments of society.  It is recognized that the interests of all are coordinate and related and that the broadest of possible exchange of information and opinion is necessary for the effective planning and implementation of the University's educational objectives.  It is also recognized, however, that the distinction between the institutional system of communication and the system of responsibility for making the decision needs to be preserved.  This means that while each component of the academic community has different initiating and decision-making responsibilities, all components need to exchange information and opinion before final decisions are reached so that the confusion and/or conflict arising from unilateral effort can be avoided.

The primary responsibilities of the Board of Trustees and the President are outlined in the Charter and By-laws of Delaware State University.  The faculty has primary responsibility for reviewing, discussing, and making policy recommendations in such areas as curriculum, standards, research, faculty status, honorary degrees, and student activities related to the academic life of the University.  The power of review or final decision in these areas is lodged in the Board of Trustees or delegated by it to the President.  Only in exceptional circumstances, however, will nonconcurrence be exercised, and the reasons for the action will be communicated to the faculty in writing.

19.5    Participation on Search Committees

Ranked faculty members shall be included on all search committees for major academic Administrators.

19.6    Administrative Equivalence

For purposes of this Article, the Vice President for Student Affairs shall serve the same function for the Counseling Center that the Provost and Vice President for Academic Affairs serves for the academic units.

C 007

 

# DELAWARE STATE UNIVERSITY

OFFICE OF THE VICE PRESIDENT
FOR ENROLLMENT MANAGEMENT AND STUDENT AFFAIRS

June 7, 2004

Mr. DaShaun Morris                    RE:    Assault and battery, illegal possession of a
I.D.# D10085333                              weapon, any social behavior that might violate
116 Varsity Road #1                          or offend criminal behavior.
Newark, NJ 07106                             Refer to: Pg. 135, D#2, 134, D#7

Dear Mr. Morris:

As a result of of the Zero Tolerance Subcommittee hearing on June 2, 2004, the Council has found you responsible for the above charges. Therefore, per the zero tolerance policy, you are hereby expelled from Delaware State University, effective immediately.

During your expulsion, you are not permitted on the campus of Delaware State University, or the University Courtyard Apartments. If found on campus or the University Courtyard Apartments, you will be cited for trespassing. Before readmission to Delaware State University, you must write a letter for readmission to the Vice President for Enrollment Management and Student Affairs.

If you desire to discuss the findings of your hearing with the Director of Judicial Affairs, you may call and schedule an appointment at (302) 857-6470.

If you desire to appeal this decision, it must be made in writing to the Director of Student Judicial Affairs within two (2) days after receipt of this letter. The request must be based on reasons listed below:

   (a)   Lack of due process i.e., when a student can show an error in the hearing, or
          arbitrariness in the finding.
   (b)   Lack of substantial evidence.
   (c)   Evidence that was not considered or available that would subsequently change the nature
          of the case.

The request for an appeal must identify the reason(s) relied on for the appeal and must specify the facts and circumstances that you believe support the reason(s).

Sincerely,

Charles N. Smith
Vice President for Enrollment
Management and Student Affairs

cc:   Ms. Kay Moses          Ms. Carolyn Brinkley
      Mrs. Lowan Pitt         Mr. Keith Coleman
      Mrs. Wanda Curry-Brown   Mr. Glenn Parker
      Ms. Diane Cooke        Chief Carl Wyche
      Dr. Doris Wooledge     Ms. Claudette Gates

1200 N. DUPONT HIGHWAY • DOVER, DELAWARE 19901-2277 • (302) 857-6300 • FAX (302) 857-6302

Delaware State University is an equal opportunity employer and does not discriminate because of race, creed, national or ethnic origin, sex or disability.

**C 008**

DSU-06464

DELAWARE STATE UNIVERSITY
**STUDENT JUDICIAL SYSTEM**
VIOLATION/INFRACTION REPORT FORM

Name of Violator __Morris__          __Dashaun__
                   Last Name            First Name          Middle

Social Security Number __010085333__

Campus or Local Address __116 Varsity Rd    Newark, NJ 07106__

Date/Time of Violation __4/29/04    2240__
                        Month/Day/Year/Time

Location of Violation __Parking Lot 4__

Please use a separate form for each violation

Type of Violation: (Please cite page number, number of violation, and state violation in
Delaware State University Student Handbook)

__Pg. 135 E(2) Assault and Battery upon another person: Conduct
which endangers the health or safety of any member of the
University community or any person on university owned or controlled property.__

Statement Regarding the Violation: (Your statement should be based solely on fact, no opinion, and contain a
__complete__, detailed account of the incident in order for the judiciary process to be carried out to the fullest extent).

__Dashaun Morris, while in a physical altercation with Charles
McMillan, used a box cutter and caused a deep laceration
on his left tricep which needed 15 stitches.__

NOTE: If additional information is needed, use another sheet of paper and attach to form.

Please indicate if there will be further investigation. __Yes__

Names of all persons observing the Violation __Ptlm Baynard, Ptlm Williams__
__Major Cannon__

Date of this Report: __043004__

Signature of Person Making Report __Ofc. Will__

**Printed Name of Person Making Report** __Officer Williams__

Address of Person Making Report __1200 N. Dupont Hwy__

Please return to the Director of Judicial Affairs
Martin Luther King Student Center, Room 129

**C 009**

DSU-06466

DELAWARE STATE UNIVERSITY
STUDENT JUDICIAL SYSTEM
VIOLATION/INFRACTION REPORT FORM

Name of Violator _Morris_ _Dashaun_
               Last Name         First Name       Middle

Social Security Number _010085333_

Campus or Local Address _116 Varsity Rd_ _Newark, N.J. 07106_

Date/Time of Violation _4/29/04  2240_
                   Month/Day/Year/Time

Location of Violation _Parking Lot 4_

**Please use a separate form for each violation**

Type of Violation: (Please cite page number, number of violation, and state violation in Delaware State University Student Handbook)

_Pg 134 D(7)  The use, possession of lethal weapons of any kind (including knives) on University premises_

Statement Regarding the Violation: (Your statement should be based solely on fact, no opinion, and contain a complete, detailed account of the incident in order for the judiciary process to be carried out to the fullest extent).

_Dashaun Morris had in his possession a boxcutter and use it to seriously injure Charles McMillan by stabbing him in his left tricep._

NOTE: If additional information is needed, use another sheet of paper and attach to form.

Please indicate if there will be further investigation. _Yes_

Names of all persons observing the Violation _Ptlm. Baynard, Ptlm. Williams,_
_Major Cannon_

Date of this Report: _043004_

Signature of Person Making Report _Ofc. Will__

**Printed Name of Person Making Report** _Officer Williams_

Address of Person Making Report _1200 N. Dupont Hwy_

**Please return to the Director of Judicial Affairs
Martin Luther King Student Center, Room 129**

**C 010**

DSU-06467

DELAWARE STATE UNIVERSITY
STUDENT JUDICIAL SYSTEM
VIOLATION/INFRACTION REPORT FORM

Name of Violator  _Morris_____  _Dashaun_____  _____
                    Last Name                        First Name                    Middle

Social Security Number  _D10085333_____

Campus or Local Address  _116 Varsity Rd_____  _Newark, NJ  07106_____

Date/Time of Violation  _4/29/04  2240_____
                              Month/Day/Year/Time

Location of Violation  _Parking Lot 4_____

**Please use a separate form for each violation**

Type of Violation: (Please cite page number, number of violation, and state violation in
               Delaware State University Student Handbook)

_Pg 94-95 4th Paragraph 4th Sentence.  Any social behavior that might offend_
_or violate University policy or criminal law is clearly inappropriate and may_
_subject a student to discipline upto and including expulsion from the University_

Statement Regarding the Violation: (Your statement should be based solely on fact, no opinion, and contain a
**complete**, detailed account of the incident in order for the judiciary process to be carried out to the fullest extent).

_Dashaun Morris was in a Physical altercation with Charles_
_Mcmillan and used a ~~knife~~ penknife to stab Mcmillian in his_
_tricep when he attempted to restrect._

NOTE: If additional information is needed, use another sheet of paper and attach to form.

Please indicate if there will be further investigation.  _Yes_____

Names of all persons observing the Violation  _Ptlm Baynard, Ptlm Williams_
_Major Cannon_____

Date of this Report:  _043004_____

Signature of Person Making Report  _____

Printed Name of Person Making Report  _Officer Williams_____

Address of Person Making Report  _1200 N. Dupont Hwy_____

**Please return to the Director of Judicial Affairs
Martin Luther King Student Center, Room 129**

**C 011**

DSU-06468

Delaware State University

Faculty Senate

Constitution and Bylaws

Proposed Revisions:  June 2005

C 012

## PREAMBLE

The primary purposes of the University are as follows: (1) to provide quality educational programs; (2) to engage in scholarly research; and (3) to provide outreach. In order to fulfill these purposes, the faculty is properly concerned with the review and formulation of the University's educational policies. In order to ensure the continued development of the University, to ensure effective faculty participation in the governance of the institution, and to provide the means for the faculty to exercise its responsibilities, we, the faculty of Delaware State University, do hereby subscribe to this Constitution as the statement of the function and responsibilities of the Faculty Senate.

## ARTICLE I. NAME, FUNCTIONS AND RESPONSIBILITIES

**Section 1.  Name:**  The name of this organization shall be the Faculty Senate of Delaware State University.

**Section 2.  Function:**  The Faculty Senate is the primary governing body of the faculty. It shall serve as a channel of communication between the faculty and the administration and, through the administration, to the Board of Trustees. It shall seek means to raise the level of all aspects of professional performance. It shall be the instrument by which the faculty carries out its responsibilities under the Charter and Bylaws of the Board of Trustees of Delaware State University.

**Section 3.  Responsibilities:**  The Faculty Senate is the chief governing body under the authority of the faculty. It shall possess the primary responsibility and authority to review, discuss, and make policy recommendations in such areas as curriculum, standards, research, faculty status, honorary degrees, and student activities related to the academic life of the University. Specific authority of the Faculty Senate shall include the responsibility to:

**A.**  Establish departmental curricula and courses.

**B.**  Develop rules, regulations and discipline of the student body;

**C.**  Determine ~~educational~~ academic policies with respect to ~~and of~~ admissions.

**D.**  Determine requirements for degrees and recommend candidates for degrees, which shall be conferred by the President of the University under the authority of the Board of Trustees.

**E.**  Recommend to the Board of Trustees the establishment of any degree to be awarded and the disestablishment of any degree.

**F.**  Consider matters of general interest to the university and make recommendations to the President of the University for presentation to the Board of Trustees.

## ARTICLE II. MEMBERSHIP AND ELECTIONS

**Section 1.  Eligibility:**  All permanent (faculty who occupy a budget line, are tenure track, and are not visiting or adjunct) full-time and half-time faculty members whose major responsibility is teaching and/or research, and the professional staff of the library are

1

C 013

eligible for membership in the Faculty Senate through their respective Departments or areas.

**Section 2.**    **Membership:**

**A.** The Faculty Senate shall consist of its elected Officers and Senators, ~~the Chairs of Standing Committees, the President of the University, the Provost and Vice President for Academic Affairs, Academic Deans, Graduate School Dean~~ and such ex-officio members as herein designated.

**B.** Each academic department shall be entitled to one elected faculty member for the first five members of the department or less, and one additional elected member for each additional five members of the department or fractional part thereof.

**C.** Each elected Faculty Senator shall serve for a term of two years, from 1 July to 30 June.

**D.** A faculty member with a joint appointment can be eligible for membership from only one department. Unless otherwise specified, a faculty member shall be eligible for membership from that department of his/her major teaching responsibilities.

**Section 3.  Election of Senators**

**A.** Annual departmental elections by secret ballot shall occur in March of each Academic Year.

**B.** The results of this election shall be forwarded to the Secretary of the Senate.

**C.** Challenges may be made until the end of April to any member-elect whose election was: (1) not by secret ballot; (2) not supervised by an incumbent Senator and one other faculty member; (3) illegal, in terms of having already served two successive terms. Challenged members will not be seated until after the Officers of the Faculty Senate have submitted a written report to the senators disposing of the challenge, which must be completed within 30 working days.

**D.** Vacancies shall be filled by departmental election within 30 days after the vacancy exists; and the representative shall serve the unexpired term without penalty of ineligibility for formal election for two successive terms.

**E.** Each department shall elect one alternate for each Senator.

**Section 4.  Duties and Responsibilities of Faculty Senators**

**A.** Faculty Senators are expected to attend all Faculty Senate meetings.

**B.** Faculty Senators are expected to communicate to their respective departments all actions of the Faculty Senate.

**C.** Faculty Senators are expected to communicate to the full Senate any of their respective departmental concerns.

**D.** Faculty Senators are expected to provide a monthly senator's report for their department. Senator Form 1A

**E.** When voting on senate matters senators are require to complete Senator Form 1B

C 014

F. Senators are required to supervise the election of new senators in their departments in March and to report the election results to the secretary of the senate in April. (Senator Form 1C)

**Section 5. Other Representatives**
    **A.** The Chair of the Faculty Senate may invite University representatives or guests to attend meetings of the Faculty Senate, ~~with the approval of the Faculty Senate~~. These persons may take part in the discussion, upon recognition of the Chair, but shall have no voting privileges. From time to time, the Faculty Senate may request the presence of certain officers of the University at the meeting of the Faculty Senate. Faculty members who are not members of the Senate may attend the meeting of the Faculty Senate, and may participate in the discussion with prior approval and recognition of the Chair, but may not vote.
    **B.** The ex-officio (non-voting) members of the Faculty Senate the President of the University, the Provost and Vice President for Academic Affairs, Academic Deans, Graduate School Dean ~~are~~ the Registrar, the Vice President for Enrollment Management and Student Affairs, the Vice President for Business and Finance, the Vice President for Development and University Relations, the Vice President for Human Resources and Legislative Affairs, and the Assistant Vice Presidents for Academic Affairs.

## ARTICLE III. OFFICERS AND DUTIES
**Section 1.** The elected Officers of the Faculty Senate are Chair and Vice Chair. Appointed Officers are Secretary and Parliamentarian.

**Section 2. Officers:** All permanent faculty (See Article II Section 1) are eligible to be officers of the Senate. The Chair and Vice Chair shall be elected by secret ballot at the May meeting of the general faculty every other academic year for a term of office of two years, extending from July 1 to June 30. A majority of the faculty present and voting shall elect. The Registrar is herein designated as Secretary of the Faculty Senate. The Parliamentarian shall be appointed by the Chair of the Faculty Senate before the first Faculty Senate meeting of each year.

**Section 3. Duties of Officers**
    **A.** The Chair of the Faculty Senate shall preside at all meetings of the Senate.
    **B.** The Vice Chair shall fulfill the duties of the Chair when the Chair is absent and shall and shall chair the Executive Committee.
    **C.** The Secretary shall keep minutes of all regular meetings of the Senate, maintain the important papers of the Senate, and maintain a roster of all elected members. The Secretary shall distribute copies of the minutes to all members of the Senate at least one week before the next meeting. The Secretary shall post the minutes on the web after they have been approved by the Senate. Motions that have been passed by the senate will posted on the web within three days of being passed. ~~Prior to the first faculty~~

3

**C 015**

~~meeting of the academic year, the Secretary shall prepare and distribute to each faculty member summary minutes of the actions taken by the Faculty Senate during the preceding year. The summary minutes shall be reviewed by the full faculty at that meeting.~~

**D.** The Parliamentarian shall rule on matters of parliamentary procedure and ensure that the business of the Faculty Senate is conducted in an orderly and procedurally correct manner.

## ARTICLE IV.  BUSINESS OF FACULTY SENATE

**Section 1.  Meetings:** The Faculty Senate shall meet once a month.  The Chair of the Faculty Senate may call special meetings at anytime with at least forty-eight hours notice. The forty-eight hour requirement is to be waived when the President of the University or Provost and Vice President for Academic Affairs requests the Chair to call a special meeting.

**Section 2.  Quorum:** A simple majority of all members of the Faculty Senate shall constitute a quorum. Once a quorum is established it shall remain established until the end of the meeting provided that more that 50% of the departments are represented.

**Section 3.  Agenda:** The agenda of each meeting shall be prepared by the Chair of the Faculty Senate and circulated to all faculty members prior to each meeting. Committee chairpersons shall submit reports containing items requiring senate deliberation to the Secretary at least ten days in advance of the Senate meeting during which the report is to be considered. Senators must have reports at least five days in advance of the meeting. If the report is not delivered within this schedule, consideration of the issue will require approval by a show of hands of two-thirds of the members present and voting.

**Section 4.  Initiation of Action:** The Faculty Senate may receive items for the agenda from any member of the Faculty, Administration, Staff or Student Government. Such items shall be presented in writing (using the Faculty Senate Request for Action Form) to the Chair of the Faculty Senate for assignment to a committee of the Senate for review and recommendation before presenting them to the Faculty Senate. Emergency situations will be reviewed by the executive committee provided that the request is made to the Chair of the Faculty Senate at least forty-eight hours prior to the meeting. A record of ~~such items~~ all request and their dispositions shall be kept by the Secretary and become a part of the published minutes. The President of the University and the Provost and Vice President for Academic Affairs may present matters directly to the Senate.
~~In emergency situations, any faculty member may have items added to the agenda provided that the request is made to the Chair of the Faculty Senate at least forty-eight hours prior to the meeting. Exceptions to the time limit may be made in extreme cases.~~

4

C 016

**Section 5.  Review:**  Any action of the Faculty Senate may be subject to review of the full faculty on the basis of a written petition signed by not less than ten percent of the faculty representing at least two departments and presented to the Provost and Vice President for Academic Affairs and the Chair of the Faculty Senate within seven days of the publication of the ~~minutes~~ motion on the DSU website. Failure to petition within the specified time constitutes the full approval of the faculty.

**Section 6.  Authority of Faculty:**  The full faculty in session has authority over the Faculty Senate and its committees.  ~~At its end of the year meeting in May, the full faculty shall act on all motions/actions by the Faculty Senate for the end of the academic year.~~  Actions of the Faculty Senate requiring Board review and approval will be transmitted to the Provost and Vice President for Academic Affairs.  The Provost will add a cover letter with comments and recommendations, which s/he will then send to the President.  The Provost's comments and recommendations  will also be sent to the Chair of the Faculty Senate. If the President of the University approves the recommended action, then s/he will add comments and recommendations and send the entire matter to the Chairperson of the Educational Policy Committee of the Board of Trustees. The President then informs the faculty of the Board's disposition.  If, however, the President does not approve the recommended action, then he will so inform the Chair of the Faculty Senate in writing with justification, who may request the President or the Provost to arrange a hearing before the Educational Policy Committee. It is within this Committee that a full hearing of Faculty matters should take place.

The Chair of the Faculty Senate would be responsible for presenting Faculty Senate matters to the committee.  However, s/he may invite other faculty members to appear. After full consideration by the committee, the Educational Policy Committee makes its recommendation to the Board of Trustees. The Chair of the Faculty Senate may request to speak on the matter before the full Board.  The Board of Trustees then takes its action. The action of the Board is final.

In matters that do not require Board approval, all Faculty Senate recommendations are to be transmitted to the President through the Provost and Vice President for Academic Affairs.  In the event of a rejection by the President, the President will inform the Chair of the Senate in writing of his/her reasons for the rejection.  The Senate may appeal to the President to reconsider his decision, at which point the Provost will arrange a meeting between the President and the Chair of the Faculty Senate and his/her representatives.

**Section 7.  Hearings:**  Any committee of the Senate may request persons to appear before it for consultation or advice in the areas of faculty responsibility as specified in the Charter. When appropriate, committees ~~may~~ can and should hold hearings open to the faculty to discuss issues which are of concern to the faculty.

**Section 8.  Other Meetings:**  A meeting of the entire faculty must be called if ten percent of the faculty, representing at least two departments, make a signed written request to the

C 017

Provost and Vice President for Academic Affairs. A copy of the petition must be filed with the Chair of the Faculty Senate.

## ARTICLE V.  COMMITTEES OF THE SENATE

**Section 1.  Selection of Committees:**  The Faculty Senate shall have standing committees to consider the broad problems of faculty concern within its jurisdiction. These committees will review, study, and report their recommendations to the Faculty Senate for action. The Faculty Senate shall have the power to create or dissolve standing committees of the Senate. Ad Hoc committees may be created and appointed by the Chair of the Faculty Senate for the purpose of expediting temporary business.

**Section 2.  General Structure and Operation**

**A.** The Standing Committees of the Faculty Senate are the following: Executive Committee, Academic Affairs, Assessment of Student Learning Committee, Curriculum Committee, ~~Admissions,~~ Faculty Affairs, ~~Faculty Research, Library,~~ Student Affairs, ~~Finance,~~ Budget and Planning, ~~General Education Program, School Curriculum Committees,~~ Council for Professional Education, ~~Teaching Effectiveness, Graduate Council,~~ and the Committee on Committees. In addition, there are six Joint Committees:  the Athletics Council, Excellence Awards Committee, Professional Development Committee, Awards and Honorary Degrees Committee, and the Cultural and Special Events Committee.

**B.** Within these major committees, subcommittees can and should be formed based on guidelines established in Senate Form 1A

**C.** All standing committees shall be chaired by ~~permanent full-time faculty,~~ an elected senator, except in those cases where the senate by-laws specify a particular position as chair.

**D.** No one shall be chair of more than one standing committee; this does not preclude a standing committee chair from serving as chair of a subcommittee or an ad hoc committee.

**E.** The majority of each committee shall consist of faculty members elected or appointed from the full permanent Faculty. Students will serve on the appropriate committees.

**F.** The standing committees shall act on instructions from the Senate ~~or Faculty~~ and initiate proposals for Senate or Faculty action.

**G.** Standing committees shall establish and coordinate meeting dates at the beginning of the academic year and provide such dates to the Chair of the Faculty Senate and with the Secretary of the Senate.

**H.** Any person who fails to carry out the assigned responsibilities can be removed by petition of a majority of the committee members and a two-thirds vote of the Senate.

**I.** All committees shall keep reports and minutes. All committees shall submit reports that they are required to produce as specified in their charge. At the May Faculty Senate Meeting, each standing, joint, and sub-committee shall submit a final written report (including a list of attendees) detailing all major business conducted during that

C 018

academic year. A copy of each committee's report shall be distributed to faculty senators.

**J.** The minutes, official papers, and documents of each standing committee, subcommittee, and the Faculty Senate shall be ~~bound and~~ filed in electronic form and hard copy form in the Office of Records by academic year and in chronological order for easy access.

**K.** Committees requiring budgets shall manage those budgets according to University financial procedures.

**L.** Subcommittee chairs must be members of the standing committee.

**Section 3. Eligibility**

All permanent faculty, students, and those administrative staff deemed necessary by the Senate are eligible to serve on the standing or ad hoc committees of the Faculty Senate. No faculty member shall <u>be required</u> to serve on more than one, nor <u>be allowed</u> to serve on more than two standing committees of the Faculty Senate.

**Section 4. Term of Office**

The term of office of members of Faculty Senate standing committees and the chairs of the committees shall be three years with staggered terms, with the right to be re-elected. Terms will begin 1 July and end 30 June. Student members shall be selected through the Student Government. The secretary of each committee shall be elected by the committee.

**Section 5. Election of the Committee Chairperson:**

Only permanent full time faculty (as explained in Article II , Section 1) who are faculty senators are eligible for election as chairs of standing committees. The chairs shall be elected by the Faculty Senate, except in those cases where the Senate Bylaws specify a particular position as chairperson. The Committee on Committees shall provide at least two nominees for the chairs of each committee. The election of chairs shall be held at the April Faculty Senate meeting.

**Section 6. Vacancies**

Vacancies on standing committees shall be filled by the committee chairperson. Appointments to the vacancies which occur shall be to fill the unexpired term.

**Section 7. Meetings**

Each committee shall meet each semester. Additional meetings may occur at the call of the chairperson, the request of at least three members of the committee, or the request of the Chair of the Faculty Senate.

C 019

**Section 8.  Committees--Membership and Duties**

The standing committees of the Faculty Senate shall be those that are deemed necessary. All members of the permanent faculty and professional library staff are eligible for election and appointment to committees. All committee members are required to make positive contributions toward the goals of the committee. Individual committee members will be asked to lead the committee's efforts to accomplish specific task as described in the committee's functions. Task leaders may use the other members of the committee as resources and may also request the services of faculty and staff that are not on the committee. Committee members have one vote.

**Section 9.  Meetings When the Faculty Senate is not in Session**

When the Faculty is not in session, the Faculty Senate will approve an Ad Hoc Committee at its last meeting consisting of one faculty senator from ~~member~~ each ~~selected by the~~ departments. If no senators from a department are available during the summer then the department will elect an alternate for the summer. The Ad Hoc Committee of the Senate will be available during the months of June, July, and August. This ad-hoc committee shall act only on necessary matters and any actions shall be reviewed and voted on by the full faculty senate at its next regular meeting.

**Section 10.  Faculty Senate Ad Hoc Committee**

~~During the summer session, the functions of the committees will be delegated to the Faculty Senate Ad Hoc Committee. During the month of May each department shall submit the names of the Ad Hoc Faculty Senator and Alternate to the office of the Provost and Vice President for Academic Affairs. This committee shall act only on necessary matters and any actions shall be reviewed and voted on by the full faculty senate at its next regular meeting.~~

~~**Section 11. Authority of Committees:** The Faculty Senate relies on standing committees to facilitate its work. The recommendations developed by these committees are presented first to the Faculty Senate, then the Provost and Vice President for Academic Affairs submits these recommendations to the President of the University, who then may submit them to the Board of Trustees. The recommendations become effective when approved by the Board of Trustees.~~

**Section 12.  Nominations and Elections to Committees**

A. In February, the Committee on Committees will poll in writing the permanent faculty and faculty administrators for nominees to fill the vacancies on the various faculty committees.

B. In March of each year, the Committee on Committees will distribute to the Faculty Senate nominations for the various committees. In April, the Faculty Senate will elect faculty to three-year staggered terms, and these newly elected committee members will

C 020

take office 1 July.  Voting shall be by secret ballot.  A majority of those present and voting shall elect.

**Section 13.  Composition and Function**
**Beginning of new Committee definitions**

# I. Executive Committee

Members:          Chair of the Faculty Senate
                  Vice Chair of the Faculty Senate
                  Chair of the Academic Affairs Committee
                  Chair of the Student Affairs Committee
                  Chair of the Faculty Affairs Committee
                  Chair of the Budget and Planning Committee

Functions: The Executive Committee will meet with the President's Executive Council in August, October, January and May to review emerging issues and to discuss priorities for the year ahead.  The Executive Committee of the Senate or the President's Executive Council may call additional meetings as necessary. The Executive Committee shall represent the Senate and thus the faculty at large as an advisory and consultative body to the President of the University. It shall provide advice and consultation to the President on matters of general concern to the faculty pertaining to the welfare and effectiveness of the University. Topics for discussion may include any matter initiated either by the President or the Executive Committee. The Executive Committee shall report regularly to the Senate.  (

Executive Committee
General Agenda

1.  Report from the President
2.  Report from the Provost
3.  The Senate Chair's Report
       a)  Summary of department concerns based on the senators' reports
4.  Reports from the Academic Affairs Committee on;
       a)  Teaching
       b)  Learning Outcomes
       c)  Academic Support Systems
       d)  Current curriculum projects

5.  Reports from Faculty Affairs
       a)  Faculty Development Activities and Needs
6.  Report from Student Affairs
       a)  Academic Support
       b)  Faculty Student Interaction
       c)  Student disciplinary actions
7.  Report from Budget and Planning
       a)  Budget Report
       b)  Priorities Report
               i.   Program Development
               ii.  Faculty Development
               iii. Student Support
8.  Report from the Vice President for Enrollment

9

C 021

9. Report from the Vice President for Finance
10. Report from the Vice President for Human Resources
11. Report from the Vice President for Marketing and Development

# II. ACADEMIC AFFAIRS COMMITTEE

**Membership:**     Two faculty from each school/college, a representative from the library appointed by the Dean of the library, the Director of Continuing Education, and the Director of International Studies, ex-officio members are the Provost and Vice President for Academic Affairs, Academic Deans, Director of Institutional Research, director of Testing and Evaluation, and the Registrar

**The functions of this committee are:**

1.  To conduct a continuous study of the policies of all phases of academic programs (See the Academic Policies Review Form)
2.  To annually prepare the:
    a. General Education Evaluation and Review (Due November 20th of each year)
       (See the General Education Evaluation Review From)
    b. International Education Review (Due February 15th each year)
       (See the International Education Review From)
    c. Honors Program Review (Due November 20th each year)
       (See the Honors Program Review From)
    d. University Library Acquisitions and Services Review (Due February 15th each year)
       (See the University Library Acquisitions and Services Review Form)
    e. Growth Programs Review (Due November 20th each year)
       (See the Remedial Programs Review Form)
    f. Continuing Education Review (Due February 15th each year)
       (See the Continuing Education Review Form)
    g. Graduate Studies Review (Due November 15th each year)
    h. Undergraduate Program Review (Due  February 15th each year)

3.  To recommend policies and standards for all graduate programs
4.  To seek means of assessment, evaluation and improvement of all academic programs
5.  To assist the Provost and Vice President for Academic Affairs in the preparation of the Faculty Institute.
6.  To study and recommend to the Faculty Senate policies governing  recruitment, selection, admission, and readmission of students; to develop and execute, in conjunction with the Admissions Office, a program for recruitment and retention of students; and to advise and aid the Director of Admissions and the Registrar.
7.  To study and recommend financial aid and scholarship criteria and policy

The Academic Affairs Committee will perform an annual review of the undergraduate and graduate Academic Policies Handbook. The committee will provide a report in October identifying issues and recommended changes. In order to insure consistency and to promote stability except in very special circumstance all changes to the academic policies must be completed during this annual review. (See the Academic Policies Review Form)

One member of the committee should be identified to lead the efforts on each report in number 1&2 above.  The lead person on each report may rely on the other members of the Academic Affairs Committee, department chairs, program directors, administrators, the Office of Assessment, and other faculty and staff for support. These reports will serve as the means for making recommendations in the other areas for which the committee is responsible. The chair of the Academic Affairs Committee will lead the effort to respond to charges three through seven. A full report should be provide to the senate by April 15.

# Curriculum Committee

Membership: The chair of each school/college curriculum committee and one faculty member from each

10

C 022

school/college.

## Purpose

The purpose of the Faculty Senate Curriculum Committee is to ensure the quality and appropriateness of undergraduate and graduate programs offered by academic departments, and schools or colleges of the University. It is the responsibility of the committee to make decisions to accommodate traditional general education needs, expanding knowledge, increasing professional requirements, and the demands of a changing global society.

## Goals of the Curriculum Process

1. To ensure consistency and harmony with educational standards within the department, college/school and University
2. To advance discussion of institution-wide curricular issues
3. To evaluate curricular needs, including articulation agreements
4. To consider capacity, resource and feasibility issues
5. To ensure sound curricular procedures are followed by the Departmental and School Curriculum Committees
6. To evaluate the academic rigor, skills and competencies set forth for the students
7. To empower faculty with respect to the curriculum process
8. To encourage faculty to constantly improve the curriculum;

## Functions of the Curriculum Committee

1. To review all proposals for the establishment, dissolution, division, or consolidation of academic departments or other degree-granting entities;
2. To review all proposals for the establishment, dissolution, or revision of academic degrees, including majors, minors, and certificate programs;
3. To consult with the budget and finance committee and the assessment committee before approving all proposals;
4. To develop policies for maximum and minimum hours required for majors, minors, and certificates and the total number of hours required for graduation;
5. To ensure the integration of general education goals and strands, and globality into all aspects of curriculum;
6. To resolve any curricular conflicts between schools and/or colleges;
7. And other general curricular policies which have total university impact.

After reviewing Curriculum proposals the committee shall submit all such proposals, along with the committee's written recommendations, to the Senate for consideration. The Committee will elect a steering committee that will evaluate and decide minor issues that do not require the full attention of the Committee. (See Senate document 1D-A Policies And Guidelines For Curriculum Changes)

**SCHOOL CURRICULUM COMMITTEES** shall be subcommittees of the Faculty Senate curriculum committee. Functions:

1. To hold hearings on curriculum changes and proposals for the addition and deletion of programs and courses;
2. To recommend all graduate curricular and program changes to the Faculty Senate Curriculum Committee;
3. To recommend to the Faculty Senate changes in the general education curriculum;
4. To deal with any matters referred to it by the Faculty Senate.

## CURRICULUM COMMITTEE DEADLINES

The Curriculum Committee has established two firm deadlines for submission of proposals dealing with new

C 023

degrees, new majors, new emphases, course changes and considerations for curriculum policy. The two deadlines for Fall and Spring considerations are: **October 1 and February 1**
The Curriculum Committee will make every effort to expedite proposals. However, some proposals may not be considered during the semester they are submitted. The Committee will not sacrifice careful decision making in order to meet printing deadlines. Therefore, those submitting proposals are encouraged to bring proposals, especially those proposals dealing with major changes, to the Curriculum Committee by the OCTOBER 1 deadline to ensure adequate time for processing and deliberation.

## Assessment of Student Learning Committee

Membership: Vice Chair of the Faculty Senate, Director of Assessment and Testing, the Chair of each school or college assessment committee, and one member from each school/college.

**Duties and Responsibilities**

The Assessment of Student Learning Committee shall be responsible for but not limited to:

1) Recommending to the Faculty Senate and Provost policy and procedural guidelines for the Campus Student Outcomes Assessment Plan based on the overall goal of the improvement of academic courses, programs and services.

2) Promoting and facilitating faculty and staff responsibility for the design, implementation, data collection, data sharing, and evaluation of the components of the assessment program in their academic units.

3) To insure that academic unit assessment plans address the assessment of general education, the honors program, and remedial programs.

4) Facilitating the development of, providing support to, and coordinating the activities of school and college assessment committees.

5) Insuring that all assessment data (including Courses Assessment Forms) is collected and stored at the university level

5) Assessing the effectiveness of the Campus Student Learning Assessment Plan based on regular reviews of the assessment of student learning in each academic program and based on reports from the Academic Affairs Committee.

6) Ensuring through its reviews of the Campus Student Learning Assessment Plan that neither the Plan nor the use of its results will limit access to academic programs for qualified students.

7) Reporting annually to the Vice President for Academic Affairs and the Faculty Senate on the state of assessment design and implementation.

9) Complete the Assessment Committee report. (See Senate Form 1C)

C 024

### c. School/College Assessment Committees

Each school/college shall be responsible for the establishment of an assessment committee through their own procedures. These school/college assessment committees shall be responsible for leadership and oversight in the development of an assessment process for each academic program in their school/college. The school/college assessment committees will be responsible for the following.

To promote consistency of the same course taught by different instructors and courses taught during different semesters through the creation and dissemination of course curriculum outlines and standard assessments guidelines.

Defining and documenting student learning goals for each academic program and communicating this information to the senate assessment committee

Defining specific learning outcomes (general education outcomes and major outcomes) for each academic program and course based on program goals

3) Developing for each academic program multiple methods of assessing student academic achievement at four specified stages: entry, midway through the major program of study, at graduation, and after graduation.

4) Submitting a report each year to the Assessment of Student Learning Committee that documents the progress made toward developing, implementing, collecting, and utilizing the results of the assessment of student academic achievement in each program in the division

5) Provide assessment data for each course (including the Course Assessment Form) and program in the school or college for each semester offered.

## Budget and Planning Committee

**Membership:**, One member form each school or college and the library, ex-officio members are the Vice president for Business and Finance

**Functions:**

- To assist the Provost and Vice President for Academic Affairs in the preparation of recommendations of priorities for the use of financial resources for the purposes of establishing new courses and programs, the improvement of teaching and learning and in other instructional matters.
- This committee shall monitor the views and concerns of the faculty and Faculty Senate regarding the financial operation and status of the University.
- It shall regularly monitor the formation, presentation, and allocation of the operating and capital budgets of the University.
- Produce the Budget and Finance Committee Report each May.
- In consultation with the Provost and Vice President for Academic Affairs and Vice President for Business and Finance, it will make recommendations to the Faculty Senate concerning financial matters.

## FACULTY AFFAIRS COMMITTEE

13

C 025

The Faculty Affairs Committee is concerned with policies and procedures that influence the personal and professional welfare of the faculty.

Membership:, one faculty member form each school or college and the library staff, ex-officio Vice President for Human Relations.

**Duties and Responsibilities**

- To encourage and maintain working relationships among the faculty;
- To promote and encourage research by members of the faculty.
- To develop and recommend to the Faculty Senate policies governing faculty research.
- To examine all policies and procedures of the University which influence the professional and personal development and welfare of the faculty, and to recommend improvements in the design and implementation of faculty personnel policies, including such matters as tenure and promotion (in conjunction with the Tenure Committee),
- To review the minutes of the Faculty Senate, the Administrative Council and the University Board of Trustees for the purpose of maintaining and updating the Faculty Handbook.
- To recognize and reward international competence and activity in the hiring, tenure, promotion and merit processes.
- Review and selection of proposals for faculty research from faculty, departments and schools for scholarly research grants that result in professional development of the faculty. This committee shall make its recommendations to the Provost for support from Faculty Research Funds.
- To complete the Faculty Affairs Committee report each may (See Senate Form 1E)

# STUDENT AFFAIRS COMMITTEE

Membership: one faculty member from each school, college, and the library staff. Ex-officio Vice President for Enrollment Management and Student Affairs, Director of Counseling, Director of Orientation, Director of Judicial Affairs, Director of Residence Life, Director of Student Health Services, Chief of DSU Police,
Functions:

- The Student Affairs Committee shall have primary responsibility for the development and review of policy regarding student affairs at the university, including
- Recruitment, Reviews and recommends policy in planning the program of activities for new students; considers policy related to introducing students to the intellectual and social climates of the University.
- Academic Advising Academic Advising to bring administrators, student services personnel, instructional support personnel, and faculty together, at department/school/college levels, in a systematic and effective way to improve the academic and social experience of the students
- To monitor ,evaluate, and improve the mentoring and advising processes for undergraduate, graduate, commuter, residential, and international students
- Faculty Student Interaction To facilitate faculty and alumni involvement with student organizations and clubs as mentors and advisors; to serve as the central oversight and advisory body for student life on campus;
- to support international students' and resident scholars' curricular and co-curricular activities on campus
- To advise the Vice President for Enrollment Management and Student Affairs on matters involving the quality of student life on campus;
- To formulate policy and procedures involving orientation, disciplinary problems, student activities, health services, counseling, and student housing.
- To complete the student affairs committee report (See Senate Form 1F)

14

C 026

**Subcommittees:**
**(1)** General Judiciary Council

The General Judiciary Council will adjudicate all Zero Tolerance violations and all other violations that the Dean of Students or designee determines should not be referred to a Hearing Officer or the Residence Hall Judiciary Council. The Council becomes active on the 15th day of August each year.

**Membership**
The General Judiciary Council is composed of a panel of four (4) students, six (6) faculty members (one from each school/college elected by the faculty) and two (2) administrative staff of the University. The Chair shall be a faculty member elected by the subcommittee.

Student members are chosen by the Student Government Association according to its bylaws (see Student Government section) and those of the Faculty Senate. At least two full-time students must be selected to serve on this committee. Students who have been found to have committed any violation within the past year as well as those who are on academic probation are ineligible to serve on this Council. Student members must have been enrolled in the University as full-time students for a minimum of one semester and be in good standing with the University.

Staff members are selected by the Director of Judicial Affairs or the Associate Provost.

**Functions:**  To hear all student disciplinary cases referred to it by the Director of Judicial Affairs in accordance with the procedures for hearings;
to recommend the disciplinary action to be taken on each case;
to serve as an appeals body for the Residence Hall Judiciary Councils.
**(2) Student Disciplinary Appeals**
**Membership**
Four faculty members and three students.
**Functions:** To serve as an appellate body to hear student appeals of disciplinary action and
to submit a report of the hearing and the subcommittee's decision in an appeal case to the Director of Judicial Affairs and the Chair of the Faculty Senate.

# COMMITTEE ON COMMITTEES
**Membership:** Vice Chair of the Faculty Senate, Chair of the Faculty Affairs Committee, three Faculty.

**Functions:**  To provide the Faculty Senate each year with the nominees to fill the vacancies on the various Faculty Senate committees; to provide at least two nominations for the Chair of each standing committee (drawn from the entire permanent faculty); and to match faculty interests as closely as possible with the goals and objectives of the Faculty Senate committees.

**End of New Material No changes have been made beyond this point in the document.**

## ARTICLE VI.  JOINT COMMITTEES
## Section 1.  ATHLETICS COUNCIL
The Athletics Council shall be a standing committee of the University that reports directly to the President.
**Membership:**  One Trustee of the University, five faculty members, one student representative, one alumni representative and two administrative officers of the University. The Vice President for Enrollment Management and Student Affairs and the Athletics Director are ex-officio members of the Council. The President

C 027

of the University shall  appoint the Chairman and members of the Council.

**Functions:** The Council shall consider all matters relating to intercollegiate athletics and shall advise the Athletic Director and the Vice President for Student Affairs on the development of the intercollegiate athletics program within the framework of the athletics policy of the University.  The Faculty may make recommendations to the Council concerning athletic matters through the Faculty Senate.  The council shall make recommendations to the President on policy matters concerning the athletics council.  In order to conduct business, the faculty and administrative members of the Council shall be of at least sufficient number to constitute the majority of members present.

## Section 2. TRUSTEE/FACULTY/STUDENT COMMITTEE

**Membership:** Four Trustees (appointed by the Chair of the Board of Trustees), four faculty members and six students.

**Function:** Serves as a means of communication among the various segments of the University community.

## Section 3. EXCELLENCE AWARDS COMMITTEE

**Membership:** The President of the University and the Chair of the Faculty Senate shall each name four representatives to the committee.  Members shall elect their own Chairperson.

**Function:** Review and recommend recipients for each category.

## Section 4. PROFESSIONAL DEVELOPMENT COMMITTEE

The Committee shall be chaired by a Dean selected by the Provost and Vice President of Academic Affairs.  The composition of the committee shall be as follows: six unit members, at least one from each school, three of whom shall be elected by the Faculty Senate and three of whom shall be appointed by the Provost and Vice President of Academic Affairs.  At least one of the two unit members appointed by the Provost and Vice President of Academic Affairs shall be non-teaching.

**Function:** Review, evaluate and rank recommendations for faculty travel and other professional projects under this Development fund.

Submit the ranked recommendations to the appropriate Vice President no later than December 1 for Spring awards and April 1 for Summer and Fall awards.

## Section 5. AWARDS AND HONORARY DEGREES COMMITTEE

**Membership:** One member from the administration, four faculty members (two named by the President of the University and two named by the Chair of the Faculty Senate), two members of the senior class, and two members of the Board of Trustees.

**Function:**

A.  The committee will oversee all matters pertaining to awards and honorary

C 028

degrees and make recommendations to the Board of Trustees through the Faculty Senate and the President.

**B.** The committee will

(1) solicit and receive nominations for honorary degrees and awards,

(2) evaluate candidates who have been nominated and make appropriate recommendations, and

(3) review policy relating to awards and honorary degrees

and recommend appropriate changes.

### Section 6. CULTURAL AND SPECIAL EVENTS COMMITTEE

This is a standing committee that will report directly to the President of the University.

**Membership:** The President of the University will appoint 10 members of this committee, and the Chair of the Faculty Senate will appoint three faculty members. Other members will consist of two resident and two non-resident students.

**Functions:** To develop and plan academic and cultural programs of interest to the student body and the community; to set up criteria to be used by the University's Scheduling and Activities Committee for scheduling events; to study problems related to publicizing campus activities and to propose possible solutions; to designate other offices or subcommittees to carry out functions such as scheduling and planning special programs (including Parents' Day, Founders' Day, Martin Luther King, Jr. Day, and Commencement); and to coordinate the scheduling of programs through the University's Scheduling and Activities Committee.

### ARTICLE VII. AMENDMENTS

**Section 1. Amendments:** Amendments to the Constitution and Bylaws may be proposed by any faculty member. All proposed amendments to the Constitution and Bylaws shall be submitted in writing to the Chair of the Faculty Senate. The proposed amendments shall be submitted to all members of the Senate at least one month prior to the meeting in which they are to be acted upon. If two-thirds of the Senators present and voting approve the amendments, they shall then be submitted to the full faculty for ratification.

### Section 2. Approval of Amendments:

Amendments shall be ratified by a two-thirds majority of the faculty present and voting at ~~the (May) year-end~~ any official general faculty meeting called by the Provost during the regular academic year. The proposed amendments shall be submitted to all members of the faculty at least one (1) month prior to the meeting in which they are to be acted upon. Amendments approved by the faculty shall be transmitted by the Chairperson of the Faculty Senate via the Provost and Vice President for Academic Affairs and the President to the Board of Trustees. The Board shall vote on the measure at its next official meeting following receipt of the amendment. Upon approval of the ratification by the Board, the amendments shall become effective immediately unless otherwise specified by the language of the amendments.

17

C 029

**ARTICLE VIII.  PARLIAMENTARY AUTHORITY**

**Section 1.  <u>Rules of Procedure:</u>**  <u>Robert's Rules of Order</u> <u>Revised</u> shall be the governing rules of the Faculty Senate.

Revised:    May 2004
            May 2003
            June 2001
            August 1999
            July 1996

18

**C 030**



**WILCOX & FETZER LTD.**

In the Matter Of:

# Gorum

## v.

# Sessoms and Board of Trustees of Delaware State University

### C.A. # 06-565-GMS

Transcript of:

Allen L. Sessoms, Ph.D.

June 28, 2007

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

C 031

Gorum v. Sessoms and Board of Trustees of Delaware State University
Allen Sessoms, Ph.D.

26

1 authority to do so if you chose to?
2 A. I think the question is not relevant.
3 Q. Why not?
4 A. Because it's not germane because I wouldn't and
5 I didn't.
6 MR. DURSTON: Gregg, I think he answered the
7 question three different times.
8 BY MR. ZEFF:
9 Q. I don't know that he has. And I understand that
10 you wouldn't and you couldn't. I'm just trying to
11 understand whether or not you had the power to do that
12 if you wanted to.
13 A. Let me give you an answer which I think will get
14 at it another way. If you take a look at NCAA
15 regulations when it comes to a student athlete, there
16 are very clear rules that prevent interference by
17 institutional authorities. Institutions have been
18 severely penalized for interfering in that process. The
19 answer is, people can have whatever authority they
20 assume. But it doesn't mean that it is in fact legal.
21 Q. Do you have the authority to overrule the vice
22 president of academic affairs on any issue?
23 A. Yes.
24 Q. And as to DeShawn Morris, did you ever receive

27

1 anything in writing related to either his NCAA
2 eligibility or his disciplinary matters related to --
3 A. Not that I recall.
4 Q. Were you kept informed, other than the meetings
5 you have told me about, of the status of his
6 disciplinary process?
7 A. No.
8 Q. At some point, were you made aware that
9 Mr. Morris had sued the university?
10 A. Yes.
11 Q. How did you become aware of that?
12 A. I was advised by counsel.
13 Q. And that conversation would be privileged. But
14 did you receive anything in writing relating to that
15 other than from counsel?
16 A. No.
17 Q. What is your understanding of what Mr. Morris
18 was suing for?
19 A. I think -- and I don't remember in detail -- he
20 was suing because he felt he had been wrongly made
21 ineligible during some part of the season or something
22 like that. I just don't recall. It's not something I
23 focused on.
24 Q. And when a matter such as a student is suing the

28

1 university is brought to your attention, how is that
2 handled within your administration? Is it yourself that
3 deals with the lawyers or is it someone else?
4 MR. DURSTON: Gregg, why don't you focus on
5 this time period? It may have changed.
6 BY MR. ZEFF:
7 Q. I was going to do that next.
8 A. Counsel handled. Counsel has always handled.
9 Q. But counsel has to report to somebody at the
10 university.
11 A. We have a counsel at the university.
12 Q. Would that be Mark Farley today?
13 A. Yes, it is Mark Farley today.
14 Q. Back in 2003?
15 A. I simply don't recall. It may have been an
16 external law firm.
17 Q. And I understand, but the external law firm
18 would have to report to someone at the university who's
19 paying the bill and dealing with the issue.
20 A. I don't recall receiving reports on this case.
21 And I'm not even -- it was disposed of by counsel.
22 Q. Well, that brings me to my next question. When
23 a lawsuit is disposed of -- and let's focus on today and
24 I'll ask you about how it was back then -- is that

29

1 something that you are, A, privy to and, B, have some
2 input into?
3 A. Only at the request of counsel.
4 Q. Counsel, I presume, now reports to Mark Farley?
5 A. Mark Farley is the counsel.
6 Q. If it's outside counsel --
7 A. Outside counsel reports the Mark Farley.
8 Q. And Mark Farley would give you notice of what
9 was going on if he thought it was necessary for you to
10 know?
11 A. If he felt it was necessary for me to know or he
12 wished to ask whether a certain resolution was
13 satisfactory, he would ask me.
14 Q. But Mark Farley had the authority to resolve
15 certain legal matters without your knowledge or input?
16 A. Absolutely.
17 Q. Now, how long has Mark Farley had that position,
18 if you know?
19 A. I don't recall. Two years?
20 MR. DURSTON: Two-and-a-half years.
21 BY MR. ZEFF:
22 Q. Before Mark Farley, who had that job duty at
23 Delaware State?
24 A. I don't recall if there was anybody. I

8 (Pages 26 to 29)

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3   WENDELL GORUM, Ph.D.,          :
                                    :
 4        Plaintiff,                :
                                    :  Civil Action
 5        v.                        :  No. 06-565-GMS
                                    :
 6   ALLEN L. SESSOMS, Ph.D.,       :
                                    :
 7        and                       :  COPY
                                    :
 8   BOARD OF TRUSTEES OF           :
     DELAWARE STATE UNIVERSITY,     :
 9                                  :
          Defendants.               :
10
11              Deposition of YAW ACKAH, Ph.D., taken
12   pursuant to notice before Adam D. Miller, Registered
13   Professional Reporter and Certified Shorthand
14   Reporter, in the offices of Delaware State
15   University, Administration Building, Room 203, 1200
16   North Dupont Highway, Dover, on Wednesday, August 29,
17   2007, beginning at approximately 2:25 p.m., there
18   being present:
19
20
21
22
23
24
```

YAW ACKAH, Ph.D.

1    presumed that you understood the question.

2                Also, try not to answer a question

3    till I've finished asking it.  It's difficult for the

4    court reporter to take down two people talking at the

5    same time.

6                If you need a break at any time, let

7    me know.

8                And, please, I'll be glad to answer --

9    try to clarify anything you need.  So take your time

10   and answer as best as you can.

11               Are you represented by an attorney

12   here today?

13        A.    No.

14        Q.    Okay.  And do you understand all the

15   questions, all the instructions I've given you so

16   far?

17        A.    I do.

18        Q.    Okay.  Great.

19               MR. ZEFF:  Did you want to make some

20   statement for the record?

21               MR. DUSTON:  Yeah.  For the record,

22   Dr. Ackah is not being represented by university

23   counsel today.  He is a professor and employee of

24   Delaware State University.  He was here under --

YAW ACKAH, Ph.D.

1  basically, under subpoena.  He said he would appear

2  and discuss activities of the ad hoc dismissal

3  committee with both counsel under compulsion of the

4  law.

5       Delaware State has no objection to any

6  questions of Dr. Ackah which in any way relate to the

7  activities of President Sessoms that may have

8  affected -- or communications outside the ad hoc

9  dismissal process.  Allegations were made that there

10  had been tainting of the process by the president.

11       We do believe that the internal

12  decision-making of the ad hoc dismissal committee,

13  the processes they used, are irrelevant and

14  inadmissible, unless known by President Sessoms or

15  the board at the time of the decision.

16       And we, frankly, believe that the

17  whole thing is confidential internal decision-making

18  that should not be revealed.  But we've agreed to go

19  forward and allow the deposition to be taken with our

20  right to move to seek to have this excluded or put

21  under seal with an appropriate protective order.

22       MR. ZEFF:  That's very reasonable and

23  fair.  Thank you.  So you're not going to object to

24  the questions here today --

YAW ACKAH, Ph.D.

1          MR. DUSTON:  We are not --

2          MR. ZEFF:  -- but you're going to

3  reserve the right to object later.

4          MR. DUSTON:  We are reserving the

5  right to object to the entire deposition and to all

6  questions that don't go to -- nor am I going to

7  object on every single question -- those questions

8  that are related to communication with the president

9  or members of the board are --

10          (Telephone interruption.)

11          (Discussion held off the record.)

12          MR. DUSTON:  -- are not objectionable.

13  But everything else related to internal

14  decision-making discussions we believe is

15  inadmissible.

16          MR. ZEFF:  And I'll recognize that as

17  a continuing objection.  And thank you for making

18  that instead of interrupting every 30 seconds.

19  BY MR. ZEFF:

20      Q.    Dr. Ackah, can you tell me where you're

21  currently employed?

22      A.    Delaware State.

23      Q.    How long have you been with Delaware

24  State?

C 035.1

YAW ACKAH, Ph.D.

1      A.    Since '92.

2      Q.    In what capacity do you currently serve?

3      A.    I'm a professor.

4      Q.    Full professor?

5      A.    Uh-huh.

6      Q.    In what department?

7      A.    Sociology.

8      Q.    Okay.  Have you had an opportunity before

9  today to have any discussions with any attorneys for

10 Delaware State about what's going on here today?

11     A.    Yes.

12     Q.    Okay.  Tell me about those.

13     A.    He called me and informed me that

14 Dr. Gorum had brought a lawsuit against the school

15 and they would like to discuss some issues with me.

16            And I told him that I will not talk to

17 him or talk to you without a subpoena from the Court.

18     Q.    Okay.

19     A.    Because I did my job with the committee

20 and I didn't see why anyone should bring me here.

21     Q.    So would it be fair to say that that was

22 the sum and substance of what you talked to

23 Mr. Duston about?

24     A.    Yeah.

YAW ACKAH, Ph.D.

1    today, why Dr. Gorum was selectively chosen?

2         A.    No.

3         Q.    Before you were involved in the process,

4    did you know Dr. Gorum?

5         A.    I knew his wife.  I was close to the wife.

6         Q.    Did you know, before this process, about

7    Dr. Wendell Gorum's activities on campus, in the

8    Senate and with student disciplinary processes and

9    that sort of thing?

10        A.    Honestly, no.  I didn't really know a lot

11   about Dr. Gorum.

12        Q.    Okay.

13        A.    As I said, I knew the wife.

14        Q.    Did you know anything about Dr. Wendell

15   Gorum's reputation --

16        A.    No.

17        Q.    -- on campus?

18        A.    No.

19        Q.    Okay.

20        A.    And let me add something.

21        Q.    Sure.

22        A.    Just because of my relation of the wife,

23   that initially I didn't want to be part of this

24   committee.

YAW ACKAH, Ph.D.

1    want -- I'd like to read that card into the record.

2    And then -- because that gives us one of dates we

3    were looking for, which is the date that the

4    president received the report.

5    BY MR. DUSTON:

6        Q.    Dr. Ackah, what was -- would you just read

7    the note?

8        A.    Okay.  4/12/2005, recorded two packages --

9        Q.    Or "received"?

10       A.    Oh.  Received two packages from Dr. Ackah,

11   chair Gorum ad hoc committee DSU -- what's that word?

12   I can't read her handwriting.

13       Q.    Addressed to.

14       A.    Addressed to Dr., Dr. Smith and

15   Dr. Sessoms, president.

16                Please help me out.

17       Q.    Addressed to Dr. Allen L. Sessoms,

18   president, and Dr. Claiborne Smith, chair, DSU board

19   of trustees.  And then it appears to be initials at

20   the bottom.

21       A.    Okay.

22       Q.    And the business card is from Cynthia Y.

23   Williams?

24       A.    Williams, yeah.

YAW ACKAH, Ph.D.

1        Q.    Assistant secretary of the board, office

2    of the president.

3                 So that was April 12th, 2005?

4        A.    Yeah.

5        Q.    You may be able to help us with something

6    we were struggling with earlier.  Mr. Zeff and I have

7    both forgotten or can't find the transmittal letter

8    of when we sent the briefs to you.  We know it was

9    either January or February.

10       A.    I have no -- I can't recall.

11       Q.    You don't happen to have any

12   correspondence somewhere or email --

13       A.    I have your -- I have -- I think I have

14   your briefs.

15       Q.    And --

16       A.    I was searching for them, and I saw them

17   last night.  But I didn't bring them this morning.

18   But I do have them.

19                 MR. DUSTON:  Off the record.

20                 (Discussion held off the record.)

21   BY MR. DUSTON:

22       Q.    So, Dr. Ackah, you printed copies of the

23   report and distributed it to each of the four -- the

24   four other committee members?

YAW ACKAH, Ph.D.

1          A.     Yeah.

2          Q.     Did the report that you distributed to

3     them first include a blank signature page for them?

4     I mean, did it come the same way here with a page

5     that had their signatures?

6          A.     Exactly like that.

7          Q.     Like that?

8          A.     I was the first to sign.  And I

9     think Toscano was the second person to sign.  Then

10    Gwanmesia.  Lapointe was the one I had to chase.

11         Q.     Okay.  So if I -- and each of them were

12    given and kept a copy of their report, presumably?

13         A.     Yeah, presumably.  I think they have

14    copies.

15         Q.     Now, if I found the copy of the report

16    that, say, Dr. Davis had, would he have one with

17    signatures on it, or would he still have the blank

18    page?

19         A.     He should have the signatures.

20         Q.     Okay.  How many times did everybody sign?

21         A.     About as many times as the number of the

22    copies.

23         Q.     Okay.  So this is where Mr. Zeff and I got

24    confused.  You have five copies.  You drop one off to

YAW ACKAH, Ph.D.

1  each person so they can have a chance to read it.

2  You then need to go back later to chase them for

3  signatures; right?

4      A.    Yeah.

5      Q.    And that was a couple days after you

6  dropped them off?

7      A.    I don't know how many but -- the length of

8  time.

9      Q.    Okay.  But you went back later to get

10  signatures --

11      A.    Yeah.

12      Q.    -- after you dropped -- the first time you

13  dropped it off, there were no signatures on the

14  report; right?

15      A.    Except mine.

16      Q.    Except yours?

17      A.    Yeah.  Mine was there.

18      Q.    Okay.  So you dropped off five copies.  So

19  how did you go about getting --

20      A.    I don't really know how I did it.

21      Q.    Okay.

22      A.    But what I -- what happened was I --

23  eventually, each one of them signed all the copies.

24      Q.    Okay.

YAW ACKAH, Ph.D.

1      A.    Yeah.

2      Q.    Eventually.  Now, one of the members of

3  the committee -- and let me -- Dr. Gorum testified

4  that one of the members of the committee told him

5  that what you carried around was just a blank sheet

6  to get all five signatures and that was separate from

7  the report.  Do you recall whether that's true?

8      A.    That would be a lie.

9      Q.    Okay.

10      A.    Because they had to read the report before

11  they signed it.  So I couldn't have sent them only a

12  sheet.

13      Q.    No -- okay.  I guess where we've gotten

14  just -- you said you don't remember the process.  You

15  distribute reports that have a signature page with

16  your signature on all five copies.

17      A.    Yeah.

18      Q.    And it's the same report that we have here

19  today.

20            At some point you got four more

21  signatures on this copy.

22      A.    More than four.

23      Q.    Well, you got the other four.

24      A.    Yeah.

Page 1

```
1                IN THE UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF DELAWARE
3    WENDELL GORUM, Ph.D.,            :
                                      :
4         Plaintiff,                  :
                                      :   Civil Action
5         v.                          :   No. 06-565-GMS
                                      :
6    ALLEN L. SESSOMS, Ph.D.,         :
                                      :
7         and                         :
                                      :
8    BOARD OF TRUSTEES OF             :
     DELAWARE STATE UNIVERSITY,       :
9                                     :
          Defendants.                 :
10
11                Deposition of MARK FARLEY, taken
12   pursuant to notice before Adam D. Miller, Registered
13   Professional Reporter and Certified Shorthand
14   Reporter, in the offices of Delaware State
15   University, Administration Building, Room 203, 1200
16   North Dupont Highway, Dover, on Wednesday, August 29,
17   2007, beginning at approximately 10:10 a.m., there
18   being present:
19
20
21
22
23
24                                              C 043
```

Page 2

```
1   APPEARANCES:
2       FROST & ZEFF
            Pier 5 at Penns Landing
3           7 North Columbus Boulevard
            Philadelphia, Pennsylvania 19106-1492
4       BY: GREGG L. ZEFF, ESQUIRE
            Attorney for Plaintiff
5
        SAUL EWING LLP
6           2600 Virginia Avenue, N.W.
            Suite 1000 - The Watergate
7           Washington, D.C. 20037-1922
        BY: ROBERT L. DUSTON, ESQUIRE
8           Attorney for Defendants
9   ALSO PRESENT: WENDELL GORUM, Ph.D.
10          - - - - -
11            I N D E X
12  BY MR. ZEFF:           3
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
1           MARK FARLEY, having first been duly
2   sworn according to law, was examined and testified as
3   follows:
4           - - - - -
5   BY MR. ZEFF:
6       Q.  Good morning, Mr. Farley.  My name is
7   Gregg Zeff.  I represent Wendell Gorum in a lawsuit
8   that's been brought against President Sessoms and the
9   university.  We're here today for your deposition.
10          As you can see, everything I'm saying
11  is being taken down by the court reporter sitting to
12  my left and your right.  And it's very important that
13  you give verbal responses to the questions.  Shakes
14  of the head, hand gestures, that sort of thing
15  doesn't come out.
16          In addition to that, please try to
17  wait till I finish asking before you begin answering
18  a question.  And, finally, be advised that everything
19  you say here's being taken down by a court reporter
20  and may be used at the time of trial.
21          And you've just been sworn under oath
22  just as if you were in front of a jury here.  So your
23  testimony today would be just as if you were in front
24  of a jury.
```

Page 4

```
1           Do you understand the instructions?
2       A.  I do.
3       Q.  Tell me who you work for at this time.
4       A.  Delaware State University.
5       Q.  How long have you worked for DSU?
6       A.  Since February 23rd, 2004.
7       Q.  Okay.  And it's my understanding that you
8   are an attorney?
9       A.  I am -- I have a law degree, but I don't
10  hold myself out to practice law.
11      Q.  Okay.  And do you hold yourself out as
12  practicing law in any capacity for Delaware State
13  University?
14      A.  No, I do not.
15      Q.  At any time have you done so?
16      A.  No.
17      Q.  That makes it easy.  Can you tell me what
18  your current job duties are?
19      A.  I'm responsible for human resources work.
20  It's full-breadth collective bargaining.  I have the
21  Delaware State University public safety department
22  I oversee contract administration for the university;
23  some IT-related functions relevant to human
24  resources, risk management.
```

Page 5

```
1       Q.  Uh-huh.
2       A.  I coordinate with outside counsel on legal
3   matters.
4       Q.  Have these been your job duties since you
5   started or have they changed at all?
6       A.  They've evolved over time.
7       Q.  Can you tell me what, if anything, was
8   different in 2004?
9       A.  In 2004 I, I didn't have risk management
10  in the same way that came on.  A lot of the
11  IT-related activities, contract administration, those
12  are all things that came on after the fact.
13      Q.  When did contract administration become
14  part of your duties?
15      A.  Probably within the past year and a half.
16      Q.  Okay.  Do you have any job duties related
17  to security on campus?
18      A.  Public safety, yes.
19      Q.  Okay.  And you've had those job duties
20  since you started --
21      A.  No.  Those evolved.
22      Q.  Okay.
23      A.  -- probably eight months or nine months
24  after I got here.  I started working closely and then
```

MARK FARLEY

Page 6

1 picked up responsibility for them.
2    Q.  We're here today in part related to the
3 termination of Dr. Gorum.  Can you tell me, were you
4 on campus at the time that those decisions were being
5 made?
6    A.  I, again, I came here on February 23rd of
7 2004.  Within my first couple of weeks, I heard a
8 report from Glenn Parker that they had identified
9 some grade irregularities.  I asked him for documents
10 in support of that, spent a lot of time reviewing
11 those documents, and conferred with Mr. Duston.
12         At that point as I, as I considered
13 those more and more, it seemed to me as though there
14 may be a possibility that termination would be
15 appropriate.  So that's within my first couple of
16 weeks.
17    Q.  Okay.  Prior to your discussion with,
18 first discussion with Glenn Parker about grade
19 irregularities, did you know Dr. Gorum, Dr. Wendell
20 Gorum?
21    A.  No, I did not.
22    Q.  Had you ever heard his name mentioned
23 before then?
24    A.  No.

Page 7

1    Q.  Tell me about that first conversation.  Or
2 I presume it was a conversation, not a written
3 communication with Glenn Parker about grade
4 irregularities.
5    A.  It was a conversation.
6    Q.  Okay.
7    A.  I don't remember the number, but he said
8 that there, there was a question as to whether or not
9 Dr. Gorum had changed the grades -- the one that
10 really sort of evoked my curiosity was the W to a
11 letter grade.
12         There was some -- and I don't remember
13 the name of the person -- but some -- one had been
14 changed from a withdraw to a letter grade.  And then
15 I asked for -- he said there were others, and I don't
16 remember the exact number.  I asked for the
17 documentation on those so that I might start
18 reviewing it.
19    Q.  Did you ask Mr. Parker to conduct any type
20 of investigation?
21    A.  I believe Mr. Parker had been involved in
22 developing the information from the beginning before
23 he made the, this, you know, made it known to me.  I
24 did also at some time within the first few weeks see

Page 8

1 some emails where instructors had been asked whether
2 they gave permission for a letter grade or for a
3 grade issue.
4         And I know there are a few different
5 kinds of grade issues.  There's the entrance of a
6 missing grade; the change of a grade; and then the
7 granting of a grade when someone had a dispute of
8 some kind.
9    Q.  Did you get any type of written report
10 from Mr. Parker about these grade problems?
11    A.  Not a report per se.  I did see documents.
12 I asked for copies of documents which, I believe,
13 were considered by the ad hoc dismissal committee.
14    Q.  Now, during the course of your discussions
15 with Mr. Parker, did you involve anybody else in the
16 administration?
17    A.  Within the first few weeks of my
18 employment here, I took what I had learned and spent
19 a lot of time, you know, considering it to the
20 president with a recommendation that he consider
21 termination as an alternative, you know, naturally,
22 based on the collective bargaining process that
23 Dr. Gorum was entitled to for ad hoc dismissal
24 consideration.

Page 9

1    Q.  In addition to the president, did you talk
2 to anybody else about it?
3    A.  I spoke with Dr. Frederick.  I was present
4 at a meeting between Dr. Frederick and Dr. Gorum,
5 because the collective bargaining agreement required
6 an invitation to meet in an effort to hopefully
7 settle things amicably.  And then after that,
8 Dr. Gorum met with Dr. Bell.
9         So, yes; I spoke with Dr. Bell,
10 Dr. Sessoms, Dr. Frederick, certainly heard from
11 Dr. Gorum.  Dr. King was present at that meeting, I
12 believe, with Dr. Gorum and Dr. Frederick.  Is
13 that --
14    Q.  Yes.
15    A.  -- responsive?
16    Q.  And what I'd like to do is go
17 chronologically through those meetings with you to
18 find out what happened at those meetings.
19    A.  Okay.
20    Q.  The first person you talked to about this
21 was Glenn Parker; correct?
22    A.  Correct.
23    Q.  Okay.  And can you tell me for what period
24 of time were your discussions only with Glenn Parker?

Page 10

1  that is, when was the first time after talking to
2  Glenn Parker that someone else became involved in
3  your communications?
4      A.  Well, it all happened rather quickly.  I
5  would say I was, I was up until probably 1:00 in the
6  morning for two or three nights working through what
7  I had learned from Mr. Parker initially, before I
8  went to the president.
9      Q.  Okay.
10     A.  The president would have been the next
11 person and, either just before that or just after
12 that, the provost, to seek his input.
13     Q.  That would be Dr. Bell?
14     A.  Yes.
15     Q.  Okay.  Tell me, the first person was
16 Dr. Sessoms you went to see?
17     A.  I beg your pardon?
18     Q.  You saw Dr. Sessoms before you talked to
19 Dr. Bell?
20     A.  I don't remember exactly what the order
21 was.
22     Q.  Okay.  Were they together or were these
23 separate meetings?
24     A.  They were not together.

Page 11

1      Q.  Tell me everything you can recall about
2  the first time you talked to President Sessoms about
3  the grade irregularities.
4      A.  I informed him that the registrar,
5  Mr. Parker, had given me documentation; that I had
6  looked through it and organized it and considered it
7  in light of the collective bargaining agreement,
8  Section 10, which gets into disciplinary action.  And
9  although that's been changed subsequent to then, it
10 was a very prescriptive process.
11         So I looked at whether or not the
12 alleged behaviors were likely basis for suspension
13 disciplinary decisions, up to and including discharge
14 in this case.  After giving that thought, I reported
15 to the president that I believed it was.  And so that
16 was, you know, three days or so after I had gotten
17 initial discussion.
18     Q.  Can you recall any more detail as to what
19 you told the president?
20     A.  Conversation was brief.
21     Q.  Uh-huh.
22     A.  Here's what I've learned; here's where I
23 think we are.
24     Q.  Uh-huh.

Page 12

1      A.  I recommended that we follow the
2  disciplinary process as outlined.  And he said, Go
3  forward with the disciplinary process.
4      Q.  Do you recall what you told him you
5  learned?
6      A.  I learned that there were allegations
7  that, that Dr. Gorum had changed grades without the
8  permission of the instructors.  I told him
9  specifically about the W to letter grade.  I don't
10 really remember much other than that.
11     Q.  How did you learn that there was an
12 allegation that Dr. Gorum had changed grades without
13 the professors' consent?
14     A.  I had seen an email that Glenn Parker --
15 where he had inquired of someone.
16     Q.  Okay.  And do you remember anything other
17 than what you've told me about what Dr. Sessoms said?
18     A.  This was a -- I think I probably went to
19 his office at, like, 9:00 o'clock at night.  I had
20 worked on these things, you know, trying to get them
21 organized and structured.
22         I really, when I first got here, I
23 scanned the collective bargaining agreement.  But
24 this was, like, instant feet to the ground, learn it,

Page 13

1  apply it.  That's why I sought the advice of
2  Mr. Duston early on, because of his employment and
3  higher ed experience.  And I -- it was late and he
4  said, Follow the process; move forward.  It was very
5  brief.
6      Q.  Uh-huh.  Did you tell him that it was
7  Dr. Wendell Gorum that was involved?
8      A.  I told him Dr. Gorum was who the
9  allegation was against; yes.
10     Q.  Did Dr. Sessoms, to your understanding,
11 know who Dr. Wendell Gorum was at that time?
12     A.  He didn't, he didn't say anything about
13 knowing him.  He just said -- you know, I think he
14 expected me to hit the ground running when I got
15 here, and that was his expectation when I walked in
16 his office that night.
17     Q.  Okay.  And you also said you talked to
18 Dr. Bell sometime around that time?
19     A.  Uh-huh.
20     Q.  Okay.  Tell me everything you can recall
21 about your conversation with Dr. Bell.
22     A.  I remember laying out the same essential
23 things that I spoke with Dr. Sessoms about, going
24 through a range of options, you know, about what we

MARK FARLEY

Page 14

1 could do. And, you know, I think it was a few days
2 later that we had to, we had a meeting with
3 Dr. Frederick -- I don't remember exactly -- all
4 these things sort of came in a cluster.
5         So I laid out options. We talked
6 about the collective bargaining agreement. He's
7 been, he'd been here more than 30 years and had good
8 experience with the collective bargaining agreement,
9 so I sought his input. So...
10     Q. What did he tell you? What did he say at
11 the meeting?
12     A. We talked about the need to, you know, to
13 extend the invitation. You know, that's the meeting
14 with Dr. Frederick to extend the invitation to
15 Dr. Gorum.
16     Q. Uh-huh.
17     A. We talked about what might be
18 alternatives, you know, where we might go as it
19 related to Dr. Gorum as things played out.
20 Oftentimes you want to seek, you know, an
21 alternative. So, I mean, we talked about whether
22 there would be alternatives.
23     Q. Uh-huh.
24     A. So...

Page 15

1     Q. What alternatives did you talk about?
2     A. If I'm, if I'm remembering this right and,
3 you know, chronologically, I believe we had a
4 discussion about whether Dr. Gorum would want to
5 retire.
6     Q. Uh-huh. That was your discussion with
7 Dr. Bell?
8     A. Yes.
9     Q. Okay. Anything else you can recall about
10 your discussion with Dr. Bell?
11     A. No.
12     Q. Okay. Did you meet with Dr. Frederick at
13 all before you met with Dr. Frederick, Bell, King,
14 and Gorum?
15     A. No.
16     Q. So the first time you met with
17 Dr. Frederick about the grade-change issues was in
18 front of Dr. Gorum?
19     A. That's correct.
20     Q. Tell me what you can recall about that
21 meeting involving those four individuals.
22     A. Dr. Gorum was there. He had his AAUP
23 representative, Dr. King, with him. Dr. Gorum was
24 presented with a statement of what we thought he did

Page 16

1 wrong.
2         He agreed that he had changed grades.
3 I believe there was a fundamental disagreement about
4 whether or not Dr. Frederick had given -- had
5 authorized those -- he denied -- Dr. Frederick denied
6 that he had.
7         Dr. King asserted that he was aware of
8 others perhaps but nothing specific. Dr. Gorum
9 committed to give us some documents. I don't
10 remember what documents those were, but I never
11 received them. I, I really -- I don't remember
12 anything else.
13     Q. At the meeting you do, however, remember
14 that Dr. Gorum asserted that Dr. Frederick authorized
15 him to change grades?
16     A. I think that's what he asserted, yes.
17     Q. And Dr. Frederick denied that?
18     A. Correct.
19     Q. Okay.
20     A. I don't know whether he denied it at that
21 time. But I believe he did.
22     Q. Okay. Do you know -- do you recall
23 anything more about the documents that Dr. Gorum
24 claimed he had?

Page 17

1     A. I don't.
2     Q. Did Dr. Frederick ever give you any
3 documents related to this dispute?
4     A. I don't believe so.
5     Q. Okay. Did you ever look into or
6 investigate whether or not Dr. Frederick was telling
7 the truth when he said he did not authorize Dr. Gorum
8 to change grades?
9     A. We had an, an initial inquiry into grades.
10 I believe Mr. Parker looked into grades --
11     Q. Uh-huh.
12     A. -- more broadly. The only indication that
13 I've ever had is that there is no other
14 representation by any other faculty member other than
15 the assertion I heard from Dr. King in our meeting
16 and what came out during the course of your ad hoc
17 dismissal process, that other chairs have changed
18 grades as Dr. Gorum did.
19         Dr. Frederick, in looking at other
20 grade changes, there doesn't appear to be anyone else
21 that was an issue at -- and we've, we have followed
22 up with other instructors.
23         I think the only possible one was
24 Dr. King, who, who, I believe it had happened quite a

MARK FARLEY

Page 18

1 bit earlier and, as it turned out, had the okay of
2 the instructor. And he, and he retired, I think,
3 during this process.
4        So it's been kind of a moving target.
5 And, quite frankly, we've learned about other people
6 alleged to have done things, these similar things as
7 much during -- in your Complaint -- Dr. Gorum's
8 Complaint -- and in the ad hoc process. So we have
9 followed through. Kimeu Boynton in my office has
10 interviewed and that's...
11    Q.  What, if anything, did you do to
12 investigate specifically whether or not Dr. Frederick
13 had authorized Dr. Gorum to change grades?
14    A.  There was no indication that, in -- when
15 confronted with Dr. Gorum's assertion and
16 Dr. Frederick's denial, there was no other evidence
17 to suggest that Dr. Frederick had authorized grade
18 changes.
19        The practice was, was clear -- or the,
20 the process, as articulated in the catalog, was
21 clear.  Folks seemed to understand it.  And there was
22 no reason to believe that, in fact, Dr. Frederick did
23 authorize grade changes.
24    Q.  Okay.  Were you aware that Dr. Gorum

Page 19

1 alleged that he went to Dr. Frederick with these
2 problems and Dr. Gorum -- and Dr. Frederick told
3 Gorum to fix them or take care of them?
4    A.  I'm aware as much from --
5    Q.  Uh-huh.
6    A.  -- your post hearing brief and post
7 hearing brief of Mr. Duston and the ad hoc dismissal
8 committee report.
9    Q.  Okay.  Prior to that --
10    A.  Uh-huh.
11    Q.  -- did you have any knowledge at all or do
12 any investigation into whether or not Dr. Frederick
13 told Dr. Gorum to take care of these grade problems?
14    A.  It was never characterized in that way in
15 the meeting that I was in.  Dr. Gorum did assert in
16 the meeting that he was told to do that.
17 Dr. Frederick denied it.
18    Q.  Okay.  And did you at any time, either
19 before any of the hearings or after any of the
20 hearings, take any action to investigate whether or
21 not what Dr. Frederick said about Dr. Frederick was true?
22    A.  I took no further action on that issue.
23    Q.  Okay.
24    A.  I had no reason to believe that there

Page 20

1 was -- that it was, in fact, true.
2    Q.  Okay.  And if anyone at Delaware State
3 University was to take action, would it have been
4 through your office; that is -- strike that.  Let me
5 ask it a different way a little easier.
6        Do you know whether anyone else has
7 investigated whether or not Dr. Frederick told
8 Dr. Gorum to make these changes?
9    A.  I think the ad hoc dismissal process got
10 into that heavily.
11    Q.  Okay.  Other than that process?
12    A.  I don't know that anyone else --
13 Dr. Frederick is the dean -- was the dean.
14    Q.  Uh-huh.
15    A.  It would be his job to investigate whether
16 there was a grade irregularity.  And, in part, the
17 due-process meeting that took place was an inquiry
18 into that.  And whether or not somebody else above
19 Dr. Frederick investigated, I don't -- I'm not aware.
20    Q.  Okay.  If Dr. Frederick had told Dr. Gorum
21 to take care of these grade changes, would that have
22 changed your opinion in recommendations related to
23 discipline for Dr. Gorum?
24    A.  I don't know what "take care of it" means.

Page 21

1    Q.  Okay.
2    A.  In my view, that means handle it in
3 accordance with the procedure that's been
4 articulated.  That was clearly articulated by the
5 registrar.  Dr. Frederick shared how he had made it
6 known to the faculty members and chairs.  So "take
7 care of it," to me, is not inappropriate.  It means
8 follow the procedure.
9    Q.  What procedure was in place at the time,
10 to your knowledge, to take care of these grade-change
11 problems?
12        MR. DUSTON:  Which grade-change
13 problems are we specifying?
14        MR. ZEFF:  The ones that led to the
15 termination.  I'm generalizing them at this point.
16        MR. DUSTON:  Well, you've yet to
17 establish that the meeting focused on the different
18 types of grade adjustments or whether the "take care
19 of it" applies to all grade changes or just those in
20 the one class.  So...
21        MR. ZEFF:  I'll be glad to lay a
22 better foundation if that's what you'd like.
23 BY MR. ZEFF:
24    Q.  To your understanding, the issues related

MARK FARLEY

Page 22

1 to grades and Dr. Gorum, at the time those issues
2 came up, what was your understanding of what internal
3 rules Dr. Gorum violated?
4     A.  The, the catalog talks about the
5 prescribed time in the semester subsequent to that in
6 which a grade is given to enter a grade change.
7 Within that period of time, an instructor can request
8 a grade change.
9             It was my understanding that if a
10 grade change was to take place, it had to be signed
11 by the instructor of record.  Dr. Gorum signed the
12 grade change form as the instructor of record.  Had
13 he not done so, I believe the registrar's office
14 would not have processed it.  Because as Joyce Bowers
15 said, I think at some, in someone's brief -- I don't
16 remember where it was -- they'd be stupid to tell her
17 that they weren't the instructor of record because it
18 wouldn't have gone through.
19             So my understanding is you have to
20 have the permission of the instructor of record;
21 grade changes have to be supported by evidence of
22 achievement of the learning objectives in the
23 class -- now, those are my words.  Those aren't
24 somebody else's words.

Page 23

1             You had to submit it through the dean
2 to justify the basis for a grade change.  And all
3 this is about academic integrity, that it leads to
4 the result of student participation in class and
5 their achievement in life goals.
6             Without -- I understood that there was
7 a concern by the university that we had to follow our
8 protocol.  And I didn't, even today don't understand
9 that it's any different.
10     Q.  You've referred to the briefs and the ad
11 hoc committee and things of that nature.  Let me go
12 back and pick up what documents you have looked at
13 both for this process and for today.
14     A.  Okay.
15     Q.  So let me ask you this:  Have you reviewed
16 any documents in preparation for your deposition
17 today?
18     A.  I, I had organized all the documents to
19 keep a file because I coordinate on legal issues.
20     Q.  Uh-huh.
21     A.  I, I read your brief and Mr. Duston's
22 brief and the ad hoc dismissal committee reports when
23 they came to me.
24     Q.  Uh-huh.

Page 24

1     A.  I reviewed them again a week or so ago; I
2 took a look at them, didn't spend a lot of time on
3 them.
4     Q.  Uh-huh.
5     A.  I haven't reviewed other letters or --
6 but, I mean, I saw things as they, as they went
7 through.
8     Q.  Did you review any of the transcripts from
9 the ad hoc dismissal committee?
10     A.  That was 1800 pages, I think.
11     Q.  Yeah.
12     A.  To be honest with you, Mr. Duston kept me
13 informed of events as they took place during the
14 committee.
15     Q.  Okay.  In your review -- I understand you
16 did one for the deposition.  But in your review of
17 these documents as they came in back at the time of
18 the hearings --
19     A.  Yes.
20     Q.  -- do you recall there being an issue of
21 confusion regarding the procedures related to grade
22 changes?
23     A.  I know that -- now, are we speaking about
24 three -- we're speaking about three documents: your

Page 25

1 brief, Mr. Duston's brief, and the ad hoc dismissal
2 committee?
3     Q.  Yes.
4     A.  I know that your brief suggested that the
5 administration prior to Dr. Sessoms had a different
6 view of grade changes and that the reasons as, as you
7 outlined them was to support students in their
8 academic achievement, et cetera.  I know that
9 Mr. Toliver, Dr. Toliver even said that he would not
10 have disapproved with something.  That doesn't make
11 it right.
12             As I, as I looked at our counsel's
13 brief, as I looked at the ad hoc dismissal committee,
14 they found that, in fact, it -- there was a clear
15 process; that Dr. Gorum did substitute his name for
16 the instructor of record; that, that Dean Frederick
17 had a process; that the registrar was engaged in a,
18 you know, a process of adhering to a reasonable
19 standard of academic integrity.  And I think that --
20 on balance, it was pretty clear.
21     Q.  I'm sorry.  What was pretty clear?
22     A.  That Dr. Gorum had, in fact, offended the
23 rights of other faculty members and the academic
24 process itself -- "the academic community"; I guess

MARK FARLEY

Page 26

1  that's the collective bargaining term.
2     Q.  And did you have an understanding based on
3  everything you read and heard about the issue as to
4  whether or not there was any confusion related to the
5  grading process and the procedures that were in
6  place?
7     A.  I don't know that I would say confusion.
8     Q.  Okay.
9     A.  Certainly it was ques- -- is that it?
10    Q.  That's fine.
11    A.  You want me to stop?
12    Q.  That's fine; because let me ask a
13 follow-up question.
14    A.  Okay.
15    Q.  Do you have an understanding based on what
16 you read and heard as to whether or not there was a
17 custom that was being followed rather than the actual
18 procedures that were written?
19    A.  Prior to Dr. Sessoms' arrival, it is clear
20 that the practices were inconsistent.
21    Q.  Inconsistent with the written policy;
22 would that be true?
23    A.  I don't know what the written policy was
24 at the time --

Page 27

1     Q.  Okay.
2     A.  -- because I wasn't here.  Clearly, they
3  were inconsistent.
4     Q.  Okay.  Has anything been done since you've
5  been here to change the grade-changing policies or
6  procedures?
7     A.  I believe -- since I've been here --
8     Q.  Yeah.
9     A.  -- in February of 2004, we have continued
10 to rely on the same language that's in the catalog.
11 There has been inquiry into grade changes, ongoing,
12 but haven't identified any other, any other person
13 who may have done -- violated those procedures.
14 Dr. -- or Glenn Parker and the provost have
15 emphasized the grade-change procedures.
16    Q.  I understand that there was an
17 investigation done into the Joyce Bowers somehow.
18 Were you involved in that?
19    A.  I was involved in it.  Honestly, I don't
20 remember the particulars of it, other than there were
21 some allegations about her conduct, some of which had
22 nothing to do with Dr. Gorum.
23       I think, you know, the question is
24 whether, at the time whether she had done something

Page 28

1  wrong by entering the grades.  And as -- but I don't
2  remember -- I mean, it's been some time since she was
3  gone.  And I, I haven't looked at those documents in
4  a long time.
5     Q.  Were you responsible for decisions made as
6  to whether or not to discipline or investigate Joyce
7  Bowers?
8     A.  I made recommendations; yes.
9     Q.  Okay.  Who was responsible for making the
10 decision as to whether or not to, A, investigate and
11 then, B, discipline her?
12    A.  I --
13       MR. DUSTON:  Is --
14       MR. ZEFF:  Two questions, I
15 understand.
16       MR. DUSTON:  Is the foundation
17 question investigated for any performance conduct or
18 things related to Dr. Gorum or both?
19       MR. ZEFF:  Both.  I don't know what
20 the investigation is yet, so I'm going to get there.
21       MR. DUSTON:  Okay.
22       THE WITNESS:  I know that Glenn Parker
23 had a problem with Joyce Bowers' work performance.
24 BY MR. ZEFF:

Page 29

1     Q.  Uh-huh.
2     A.  I don't remember much at this point,
3  honestly.
4     Q.  If Glenn Parker has a problem, as a
5  registrar, with someone who works for him, what is
6  his chain of command in doing something about that?
7     A.  His chain of command would be to speak
8  with his supervisor, which has changed several times
9  I believe at that time it was Charles Smith.
10    Q.  Uh-huh.
11    A.  Subsequently, it's Dr. Bell.  He would
12 need to inform them of his concerns, and he would
13 have come to see me.
14    Q.  And you were in charge of HR at that time?
15    A.  Yes.
16    Q.  And what role, if any, would you have in
17 that procedure, then?
18    A.  Determining whether or not there was just
19 cause for a disciplinary action.
20    Q.  Do you have any recall of whether or not
21 you made a determination of whether there was just
22 cause to discipline Joyce Bowers?
23    A.  Honestly, I don't remember the facts very
24 well right now.

MARK FARLEY

Page 30

1  Q.  Okay.
2  A.  I know that subsequent to that there was a
3  mutual agreement.  But I don't remember what the
4  terms of that agreement were.  Eventually, I believe
5  she resigned.  She gave a resignation.
6  Q.  Do you know whether or not there was an
7  arbitration related to Joyce Bowers?
8  A.  There was something.  I don't know that it
9  was an arbitration.
10  Q.  Do you know what the outcome of whatever
11  that was?
12  A.  I think that resulted in our agreement,
13  our mutual agreement.
14  Q.  Was there ever a decision made by an
15  arbitrator or anyone else related to --
16  A.  I don't believe there was a decision.  I
17  think we agreed mutually and, therefore, resolved
18  whatever form it was in.
19  Q.  Do you know whether or not any of the
20  issues related to disciplining Joyce Bowers related
21  to the same grade changes involved in this matter
22  related to Dr. Gorum?
23  A.  I recall that it -- that there may have
24  been grade-change issues, but I don't believe that

Page 31

1  was everything.  And I don't remember what everything
2  was.
3  Q.  Are there documents related to Joyce
4  Bowers' disciplinary process?
5  A.  I'm sure there are.
6  Q.  And could you supply those to me?
7  A.  Sure.
8  Q.  They're still available?
9  A.  To the extent that, I mean, it's, it's in
10  the record, I'm happy to provide that to you.
11  MR. ZEFF:  I would request that at
12  this time, that those documents be provided to the
13  extent that they are in any way remotely relevant to
14  this matter.  And if there's something private or
15  personal in those documents, just give me a heads-up
16  as to a privilege log.
17  MR. DUSTON:  I will represent that
18  there are a number of performance issues completely
19  unrelated.  And my recollection -- but I will go back
20  and double-check -- is that the grade changes
21  involving Dr. Gorum per se were not a part of that.
22  But I will double-check the records.
23  And to the extent that they are relevant in any way
24  to the grade changes or her following grade-change

Page 32

1  procedures as part of that discipline, sure.
2  MR. ZEFF:  Of course any agreement to
3  resign or any arbitration finding or anything like
4  that is included in this request.
5  MR. DUSTON:  Confidential settlement
6  I'm not inclined to give.  But if there's any report
7  of decision, you know -- I'll look at what we have.
8  MR. ZEFF: That's fine.  Let me know
9  what you have.  And I'm including everything in my
10  request, and you redact what you need to and let me
11  know why.
12  BY MR. ZEFF:
13  Q.  In your investigations -- I'm going to
14  call it multiple investigations; I don't know when
15  one ends and one begins.
16  A.  It's on kind of --
17  Q.  You mentioned that there were inquiries
18  into other persons or other faculty members changing
19  grades.  Can you tell me who was in charge of that
20  investigation?
21  A.  I don't know that it was a single
22  investigation.  When we heard things -- and it hasn't
23  been -- it has sort of been sporadic.  Some as an
24  outgrowth of what was learned in the ad hoc dismissal

Page 33

1  committee, some as an outgrowth into the inquiry
2  related to student athletes.
3  Q.  Uh-huh.
4  A.  Some, as most -- as recent as the things
5  that were raised in your Complaint.
6  Q.  Okay.
7  A.  Principally, Kimeu Boynton, who works with
8  me, spoke with --
9  Q.  Is that Kimeu?
10  A.  K-I-M-E-U, B-O-Y-N-T-O-N.
11  Q.  Got it.  I'm sorry.  Go ahead.
12  A.  I certainly had oversight of the progress.
13  I received feedback from counsel, Rick Evrard, who
14  was inquiring into the student-athlete issues.  I
15  expect at some point in the near future to receive a
16  preliminary report on the student-athlete issues.
17  But I've heard verbally that at this
18  point student athletes did not benefit more than
19  others and so that there wouldn't be an adverse
20  action against us, which was a relief for the
21  university.
22  Q.  What has Kimeu Boynton investigated?
23  A.  Kimeu Boynton met with faculty members,
24  chairs, following up on whether or not they were --

MARK FARLEY

Page 34

1  they changed grades or were aware of grade changes.
2      Q.  When did that take place?
3          MR. DUSTON:  After Dr. Gorum's first
4  day of deposition.
5          THE WITNESS:  That's -- it was after
6  the deposition began and we learned other, other
7  people we needed to follow up on.
8  BY MR. ZEFF:
9      Q.  Okay.  Was there ever any investigation
10 into any other faculty member or chair changing
11 grades before Dr. Gorum's deposition in this case?
12     A.  I know that, that Dr. King had brought up
13 in the meeting with Dr. Frederick that he had changed
14 grades.  And, in fact, one of those grade changes had
15 come up.  We, we didn't have reason to believe that
16 it, that it was a violation of a procedure because
17 the instructor did give permission.  And it had
18 happened some time during the prior administration.
19     Q.  Tell me what was done to investigate
20 Dr. King.
21     A.  Well, I know I looked at grade-change
22 forms.  And I also heard from Dr. King, you know,
23 during, when he was present with Dr. Gorum at that
24 meeting, when it was.  It didn't -- it really didn't

Page 35

1  rise to the same level.  I didn't -- there didn't
2  appear to be substantiation, from everything I had
3  heard, that it needed to be pursued further.  And
4  then he retired.
5      Q.  Uh-huh.
6      A.  So further investigation took place
7  during -- when we were looking at all that, you know,
8  the athletic issues as well and now.  So when faculty
9  is gone for the summer, it's a little tough to get
10 with people.  But since the deposition when Dr. Gorum
11 identified other people, we have continued to pursue
12 that.
13     Q.  Other than Dr. King and Dr. Gorum, have
14 there been any other faculty members that been
15 investigated for changing grades?
16     A.  Well, if you're talking about the
17 investigations and inquiry process, yeah.  Certainly
18 we looked at the other people Dr. Gorum raised in his
19 deposition.
20     Q.  And you did that after the deposition?
21     A.  Yes.
22     Q.  Okay.  Can you tell me what was done to
23 investigate?  That is, I understand you met with
24 faculty members.  But can you describe the whole

Page 36

1  process that was used?
2      A.  Kimeu could do that better than I.  He was
3  the person who did it firsthand.
4      Q.  Did he provide you with any documentation
5  or reports about the findings of his investigation?
6      A.  Actually, he gave me something this
7  morning, but it's on my desk somewhere.
8      Q.  And I would like to see a copy of that.
9  Obviously, you have to look at it first and share it
10 with your counsel, but I'd request that as well.
11         MR. ZEFF:  Can you just make a note of
12 what I'm requesting.
13         (Discussion held off the record.)
14 BY MR. ZEFF:
15     Q.  Did Kimeu tell you anything about his
16 findings?
17     A.  Yes.
18     Q.  What --
19     A.  He told me that he didn't, didn't come
20 across anyone else who acknowledged doing or knowing
21 about grade changes, as had been alleged.  He also
22 had followed up, I believe, on the issue of something
23 to do with the ad hoc dismissal committee report.
24 So -- and I, again, I saw it come to my desk this

Page 37

1  morning.  I glanced at, I but I really didn't have
2  time to read it.
3      Q.  What did he do with the follow-up relating
4  to the ad hoc dismissal committee report?
5      A.  I believe that he was inquiring -- and he
6  had communication with Mr. Duston as well, inquiring
7  as to whether the committee report, you know, what
8  these committee members felt about the report.  And I
9  think he, he said something about Dr. -- what's his
10 name?  Italian gentleman -- Toscano.
11     Q.  Toscano.
12     A.  That Dr. Toscano --
13         MR. DUSTON:  Okay.  Mark, I'm going to
14 stop the discussion at that point, and we'll
15 distinguish between the interviews that Kimeu did as
16 investigation of grade changes, for which no
17 privilege is attached because that's part of an
18 ongoing HR process, and any interviews he did at my
19 direction --
20         THE WITNESS:  Okay.
21         MR. DUSTON:  -- in seeking information
22 from potential witnesses.  Obviously, what the
23 witnesses know is not confidential.  But when Kimeu
24 is collecting information on my behalf, it's got a

MARK FARLEY

Page 38

1    work-product intention. And unless you know the
2    difference between those two, I'll draw the line
3    right there.
4            MR. ZEFF: Well, let me try to draw
5    the line.
6    BY MR. ZEFF:
7        Q. Did the -- did you have conversations with
8    Mr. Duston that involved Mr. Boynton; that is, the
9    three of you discussing something together?
10       A. Yes.
11       Q. Okay. I don't want to know about those
12    conversations. Did you have conversations with
13    Mr. Boynton without Mr. Duston being present --
14       A. Just to --
15       Q. -- related to the ad hoc dismissal
16    committee?
17       A. No.
18       Q. You've never discussed the ad hoc
19    dismissal committee with Mr. Boynton?
20       A. He dropped something on my desk this
21    morning. Other than that, when --
22            MR. DUSTON: Gregg, let met just
23    clarify something. Mr. Boynton holds several
24    different titles, working for Mark. But he is Mark's

Page 39

1    assistant. And in that context, he and Mark both
2    work and collect information for me and provide
3    information for assistance in the defense of this
4    case and both have a role, as the client, in
5    overseeing.
6            But they are also collecting
7    information to assist in my providing advice and
8    defense in this case. That is, in some cases they
9    are in that role as the client collecting information
10    for counsel in advising the university.
11            We also have discussions, and in this
12    case they are doing activities for which we're not
13    claiming any work-product protection, all of the
14    things relating to discussion of grade changes.
15            As you know, some of the people whom
16    Dr. Gorum identified on the committee he stated had
17    knowledge of both past grade changes by themselves
18    and others and they sat on the ad hoc dismissal
19    committee process. No privilege is being claimed to
20    any questions asked of any of the members of the
21    committee about their knowledge of grade changes by
22    themselves or others.
23            For anything else that they collected
24    on the internal procedures of the committee, I'm

Page 40

1    doing that the same way you would your discussions
2    with those committee members. Dr. Gorum has them.
3    They may or may not be privileged. If you have them,
4    you'd claim privilege as to your conversations with
5    those witnesses.
6            MR. ZEFF: Are you claiming that
7    Boynton's conversations with these individuals are
8    privileged in some way?
9            MR. DUSTON: That Boynton's
10    conversations as to the internal activities of the
11    ad hoc dismissal committee are merely work product
12    privilege of him collecting information for me to use
13    in the defense of the university.
14            But these are the same witnesses that
15    you can talk to at the same time and you or your
16    client have. So what they told Boynton, you know,
17    I'm claiming a privilege as to what he collected and
18    asked and what information he got. But you're as
19    free to talk to these committee members as I am and
20    as they are.
21            MR. ZEFF: I'm going to object to
22    that, and I'll reserve the right to do something with
23    it.
24        (Discussion held off the record.)

Page 41

1    BY MR. ZEFF:
2        Q. Mr. Farley, have you had any discussions
3    with Mr. Boynton between the two of you without
4    anyone else present -- that is, counsel present --
5    regarding the ad hoc dismissal committee witnesses
6    that he has interviewed?
7        A. No.
8            MR. DUSTON: Objection.
9    BY MR. ZEFF:
10       Q. Okay. Do you know what that document on
11    your desk is about?
12       A. I believe it's about the grade-change
13    issue that he was following up on and the ad hoc
14    dismissal stuff that he was following up on.
15       Q. You haven't read it, though?
16       A. No.
17       Q. Okay.
18       A. I glanced at it. You know, I didn't
19    sit -- I didn't have a moment to sit down and read
20    it.
21       Q. I understand. It's understandable too.
22       A. Okay.
23       Q. That's what it's about; okay. When did
24    Mr. Boynton begin -- strike that.

MARK FARLEY

Page 42

1    Has Mr. Boynton done any investigating
2 on your behalf that isn't at counsel's request
3 related to either the ad hoc dismissal process or
4 committee or grade changes?
5    A.  No.
6    Q.  And when was the first time Mr. Boynton
7 began an investigation into either one of those?
8    A.  I don't remember when the first time would
9 be.
10    Q.  Would it have been this year sometime,
11 2007, or would it be prior to that?
12    A.  He -- I don't remember how long he's been
13 with us.  Maybe a year and a half.  I don't remember
14 whether he was here during the ad hoc dismissal
15 process.
16    But Kimeu's one of those kind of
17 hard-working guys who jumps in and helps, and he's
18 worked with Rob since he got here.  So...
19    Q.  Do you know whether or not you -- by
20 "you," I mean your office through Mr. Boynton or
21 anyone else -- has done any investigating into the
22 ad hoc dismissal committee process prior to
23 Dr. Gorum's deposition?
24    A.  I'm not sure I understand your question.

Page 43

1    Q.  Okay.  I'll withdrawal that one because
2 I'll get into it in a few minutes.  But --
3    MR. DUSTON:  Why don't you ask him the
4 first time he ever heard of any issues with the
5 ad hoc dismissal committee process.
6    MR. ZEFF:  That's where I'll go with
7 this.  That's exactly right.
8 BY MR. ZEFF:
9    Q.  That's fine.  That's a fine question.
10 When was the first time you heard about any issues
11 relating to the ad hoc dismissal committee process?
12    A.  I believe it was in your Complaint.  I was
13 never aware of prior to this or even -- I don't
14 remember, but it was -- it was pretty recently.
15    Q.  Okay.
16    A.  I, you know, I got a document with a
17 signed page and assumed everybody was all, you know,
18 unanimous.
19    Q.  You mentioned the NCAA a couple of times
20 in your testimony.  Can you tell me what involvement
21 you've had with the NCAA in any investigation into
22 the Dr. Gorum grade changes?
23    A.  I worked with outside counsel,
24 specializing in NCAA matters, Rick Evrard --

Page 44

1    Q.  Uh-huh.
2    A.  -- in order to approach the issue,
3 comprehensively, transparently, and cooperatively.
4 And I helped to ensure that people were available and
5 counsel -- when counsel came in for interviews or to
6 assist in mobilizing resources to get documents, that
7 sort of thing.
8    Q.  Were you advising anyone that is within
9 the university?  Were you reporting to the president
10 or the vice president or something on your
11 activities?
12    A.  The -- we made the board aware --
13    Q.  Uh-huh.
14    A.  -- that we were securing outside counsel,
15 in order to look into it; yes.
16    Q.  When did you first retain NCAA counsel?
17    A.  I don't remember.
18    Q.  Were you involved in any discussions or
19 investigations relating to whether or not there were
20 NCAA violations, with anyone other than counsel?
21    A.  Only hearing from Mr. Parker that he had
22 talked to Kim Walker --
23    Q.  Uh-huh.
24    A.  -- about -- apparently that was the

Page 45

1 genesis of a lot of this.
2    Q.  Yes.
3    A.  So, no, not other than that.  Everything
4 on NCAA was discussion with Rick Evrard --
5    Q.  Okay.
6    A.  -- or Rob Duston.
7    Q.  And do you know when that process began --
8 that is, when you started talking to Rick Evrard?
9    A.  I really don't remember, honestly, so...
10    Q.  Okay.  Do you know whether or not that was
11 before or after the ad hoc dismissal committee
12 hearing?
13    A.  No, I don't.
14    Q.  Would there be a document somewhere that
15 would indicate when that process began?  Could you go
16 back somewhere and look?
17    A.  I could look through my legal files in
18 terms of a letter of representation from Rick Evrard.
19    MR. ZEFF:  Okay.  And I am going to
20 request a copy of that letter to the extent that it
21 does not include attorney/client-related matters,
22 even if you give me a copy that's completely redacted
23 except for a date and/or provide me with the date.
24 BY MR. ZEFF:

MARK FARLEY

Page 46

1  Q.  And was it --
2      MR. DUSTON:  I'm -- off the record a
3  second.
4      (Discussion held off the record.)
5      MR. DUSTON:  In response to the
6  request, we do want a representation on the record or
7  a statement on the record of the relevance to the
8  claims in this case of when outside counsel for --
9  was retained on NCAA issues.
10     MR. ZEFF:  Okay.  And the relevance is
11  this:  It was Dr. Gorum's position at the ad hoc
12  dismissal committee hearing and it's his position
13  here today that there was no NCAA investigation going
14  on up until the time he was terminated.
15     And I would like to go backwards and
16  find out when it was this university began some type
17  of investigation or inquiry related to the NCAA
18  violation -- alleged violations -- and the
19  progression of that, the chronology of that.
20     And if there is some document or date
21  that precedes the retaining of an attorney, then I
22  would like to see that.
23     MR. DUSTON:  And, again, given the
24  stated reasons for termination, what is the relevance

Page 47

1  to the retaliation of suspected activity or pretext
2  of when DSU went from its internal discussions of --
3  with athletes and athletes' grades to hiring outside
4  counsel and deciding whether or not, when and how to
5  self-report to the NCAA?
6      MR. ZEFF:  There was significant
7  testimony by Dr. Frederick relating to the NCAA
8  violations and the serious nature of what Dr. Gorum
9  did as it related to athletes and how it exposed the
10  university.  His testimony, further, was that he made
11  those comments to Dr. Bell.  I believe he also
12  testified that he made them in front of Mr. Farley.
13     And he certainly made them in front of
14  the ad hoc dismissal committee hearing, that that was
15  a major consideration in his recommendation to
16  terminate and that there was an ongoing investigation
17  as of August, September, and October of 2004.  And I
18  would like to find out when that investigation was
19  and how it came about.
20     (Interruption at the door.)
21     (Discussion held off the record.)
22     MR. DUSTON:  The -- counsel's position
23  is understood --
24     MR. ZEFF:  I think it is.

Page 48

1      MR. DUSTON:  -- and we'll respond.
2  BY MR. ZEFF:
3      Q.  And, Mr. Farley, you've heard my
4  discussion with Mr. Duston.  I just wanted to try to
5  pinpoint, was there a date or an approximate date
6  that you can give me when this university began an
7  internal investigation related to whether or not they
8  had violated any NCAA rules as it related to
9  Dr. Gorum?
10     A.  I wasn't here at the time.
11     Q.  Okay.
12     A.  I believe Kim Walker identified this
13  problem --
14     Q.  Uh-huh.
15     A.  -- before I got here.  Since she had an
16  athletics department role and Dr. Frederick was the
17  faculty academic -- or faculty athletic rep, I think,
18  FAR, they were involved in compliance issues that
19  didn't have anything to do with the collective
20  bargaining agreement or disciplinary action.  So I
21  wouldn't have known what else was going on.
22     Q.  Okay.  When was the first time you became
23  aware that there were NCAA investigations or issues
24  on campus?

Page 49

1      A.  Well, the fact that Kim Walker was
2  involved, I assumed that there were some athletic
3  issues.  So when I first began, because I heard that
4  Kim Walker was involved.
5      Q.  Okay.  And other than just learning that,
6  you didn't have anything to do with it?
7      A.  I wasn't -- until we were further along
8  and we -- you know, I think there was a question of
9  whether a report had been made to the NCAA.  And I
10  wasn't involved in all that reporting, so I really
11  can't answer.
12     Q.  You weren't really involved?
13     A.  Right.
14     Q.  Okay.  During the course of your
15  investigation into grade irregularities, have you
16  discussed the matter with the president?
17     A.  When I first went up there, I explained to
18  him that there was a W to a grade letter.  We had a
19  brief discussion late one night.  I recommended
20  disciplinary action.  That's about it.
21     The president, I know he has strong
22  feelings about the academic integrity.  I don't
23  remember any particular conversations.  We had the
24  one that night in the first couple weeks of

MARK FARLEY

Page 50

1  employment.
2      Q.  Since that one discussion with
3  Dr. Sessoms, have you had any other discussions with
4  Dr. Sessoms about Dr. Gorum?
5      A.  I relayed information from Mr. Duston --
6      Q.  Uh-huh.
7      A.  -- to Dr. Gorum -- or to Dr. Sessoms,
8  which included the results of the ad hoc dismissal
9  committee.
10     Q.  Uh-huh.
11     A.  Updates, just, you know, as I got updates.
12  That would be about it.
13     Q.  You mean updates from counsel?
14     A.  Yes.
15     Q.  Can you tell me, when you told him about
16  the results of the committee, were you --
17     A.  Okay.  The ad hoc dismissal committee?
18     Q.  Yes.  Tell me everything you can recall
19  about that.  Again, without telling me what your
20  attorney told you.
21     A.  I think he got it at the same time.  I
22  think they delivered it to him and to me the same
23  day.
24     Q.  Uh-huh.

Page 51

1      A.  He said he'd read it -- or had it.  I
2  don't remember -- read it or had it.
3          I think it spoke for itself.  I don't,
4  I don't really remember any -- much as far as
5  conversation.  I think it was something we touched
6  base on right before we went into another meeting.
7      Q.  Uh-huh.
8      A.  So most of my meetings with Dr. Sessoms
9  are pretty short.
10     Q.  Okay.
11     A.  So this would have just been a mention
12  that he got it.  And then we had to discuss the next
13  steps.  And I believe that's when we were preparing
14  to send it to the board.
15     Q.  Uh-huh.  Did you discuss with Dr. Sessoms
16  what your recommendation would be?
17     A.  No; because he knew my recommendation from
18  the very beginning.
19     Q.  Okay.
20     A.  My recommendation was -- and -- that
21  things were consistent with the basis of the
22  collective bargaining agreement, Section 10, for
23  disciplinary action, suspension or termination.
24     Q.  Uh-huh.

Page 52

1      A.  That, that we had to follow the process.
2      Q.  Uh-huh.
3      A.  I was told to follow the process.  And I
4  recommended that we consider the possibility of
5  discharge from the beginning.
6      Q.  Well, in light of the
7  recommendation -- strike that.
8          Do you recall what the recommendation
9  of the ad hoc dismissal committee was?
10     A.  The recommendation of the ad hoc dismissal
11  committee was lengthy.  I think it was like -- I
12  think there were a whole bunch of recommendations.
13     Q.  Uh-huh.
14     A.  But generally speaking, I believe they
15  felt he should not get back pay, that he should be
16  put on a probationary period, that he should not be
17  able to be the chair or in any position of
18  responsibility, but that he not be discharged.
19     Q.  Uh-huh.
20     A.  It found substance and merit in the
21  allegations that had been brought against him, I
22  believe, as it related to the offenses under
23  Section 10 of the collective bargaining agreement;
24  that the academic community was, in fact, harmed, or

Page 53

1  something to that extent.
2      Q.  Did you discuss that with the president --
3      A.  No.  He read it.
4      Q.  -- as the recommendation?
5      A.  He got it.  I mean, he had it.
6      Q.  And he had read it?
7      A.  I don't remember whether he said he read
8  it or had it.
9      Q.  Uh-huh.
10     A.  But -- that we needed to take the next
11  step.
12     Q.  Well, what would that be?  That would
13  be --
14     A.  Forwarding it to the board.
15     Q.  And would that include a recommendation
16  from the president?
17     A.  It -- the transmittal letter was discussed
18  with counsel.
19     Q.  Uh-huh.
20     A.  And so my next step was, follow the
21  president's direction, take the next step.  I called
22  Mr. Duston and --
23     Q.  Okay.  What did the president direct you
24  to do?

MARK FARLEY

Page 54

1    A.  Forward it to the board.
2    Q.  Uh-huh.  With a recommendation?
3    A.  I don't remember a specific
4  recommendation.  This, again, very --
5    Q.  Okay.
6    A.  -- very quick.
7    Q.  Uh-huh.  Did the president recommend to
8  you or say to you that he thought that Dr. Gorum
9  should be terminated?
10    A.  From the very beginning it was me saying
11  whether termination was consistent with the
12  collective bargaining agreement, me trying to, you
13  know, get, get a quick view of what it is we're
14  looking at.  So I don't remember him ever saying this
15  is what I should think, except when there were
16  discussion with the board --
17    Q.  Uh-huh.
18    A.  -- and in his -- I think he sent a letter
19  in about April, something like that, that was
20  developed with the assistance of Mr. Duston.
21    Q.  And did you have any discussions with the
22  president about that letter; that is, whether or not
23  the president was going to recommend termination or
24  recommend what the ad hoc dismissal committee

Page 55

1  recommended or something else?
2    A.  I believe Mr. Duston drafted that letter
3  or I took a first cut at it and then, and then he did
4  it.  The president never said, from the beginning
5  when I was making a recommendation within the first
6  two weeks of my employment in 2004, never said
7  anything different than what I was -- the direction I
8  suggested we follow.
9    Q.  And your direction was --
10    A.  -- was that this may be appropriate for
11  disciplinary action, up to and including discharge.
12    Q.  Okay.  But who made the decision that it
13  was going to be termination rather than some other
14  form of discipline?
15    A.  Dr. Sessoms was waiting for the results of
16  the ad hoc dismissal committee.
17    Q.  Okay.
18    A.  He got it, said -- or -- let's get this
19  forwarded to the board.  Mr. Duston was -- assisted
20  us in drafting that memo.  It contained his
21  recommendation.
22    Q.  Okay.
23    A.  Things -- it wasn't as though we sat down
24  and had a conversation about, gee, let's -- what

Page 56

1  should we do?  It was a part of drafting the letter.
2  Dr. Sessoms reviewed the letter.
3    Q.  Uh-huh.
4    A.  I don't remember whether he had edits or
5  changes.  And the letter went.  So --
6    Q.  Did you have -- well, were you present for
7  any discussions with Dr. Sessoms where he indicated
8  or sought your advice as to what discipline would be
9  appropriate for Dr. Gorum?
10    A.  No.  My advice was within the first couple
11  weeks of my employment.
12    Q.  And that advice was --
13    A.  This may be --
14    Q.  -- that Dr. Gorum may be subject to
15  termination or other discipline?
16    A.  Yes.
17    Q.  Okay.  And at no time after that did
18  Dr. Sessoms say in your presence, I think he should
19  be terminated or I think we should follow the ad hoc
20  dismissal committee's recommendation or anything
21  else?
22    A.  No.  We discussed it during the board,
23  with the board.
24    Q.  I haven't gotten to that yet.  But at some

Page 57

1  point prior to discussing it with the board,
2  Dr. Sessoms made a decision to recommend termination?
3    A.  And he would have put that in his letter.
4    Q.  Yes.
5    A.  It wasn't a discussion we had.  We
6  certainly...
7    Q.  Okay.
8    A.  That's that.
9    Q.  You were aware that that was Dr. Sessoms'
10  recommendation before you went to the board -- that
11  is, to terminate him?
12    A.  Well, I saw the letter.  I was involved in
13  getting the letter out.
14    Q.  Prior to going to the board, were you
15  present when Dr. Sessoms took this to the board?
16    A.  Yes, I was.
17    Q.  Did you have any discussions with
18  Dr. Sessoms in preparation for going to the board?
19    A.  Yes.  We had discussions about the letter.
20    Q.  Okay.
21    A.  The -- I believe we had some -- our
22  discussions at the, at the board were about the --
23    Q.  This is in preparation for going to the
24  board, now, not what you talked about at the board.

MARK FARLEY

Page 58

1    A. I don't, I really don't remember any.
2    Q. Okay. Let me show you a copy of the
3  ad hoc dismissal hearing report. It's been
4  previously marked in the case.
5    A. I don't have my glasses, but I'll -- okay.
6    Q. I wanted to ask you a few questions about
7  it. First of all, let me go back to the NCAA issues.
8  And please tell me if I'm mischaracterizing in any
9  way.
10        It's my understanding from your
11 testimony that the -- you have received a verbal
12 report that there were no NCAA infractions related to
13 Dr. Gorum's grade-changing activities?
14    A. I would say what I understand is --
15    Q. Okay.
16    A. -- that the grade-adjustment behaviors did
17 not result in a disparate benefit to athletes.
18    Q. Okay.
19    A. So I don't know how else to characterize
20 it on that. Apparently under NCAA rules, you can't
21 benefit athletes more than you benefit others.
22    Q. Okay. And that's what you've been told
23 by -- will be the results of the report?
24    A. Yes.

Page 59

1    Q. Okay. Does that mean that the
2  university's been cleared of any wrongdoing by the
3  NCAA?
4    A. I don't know. Again, I don't have a
5  report. I haven't seen a report.
6    Q. Okay. Page 10 of this document. Do you
7  have trouble reading it? We can -- your glasses are
8  close by, aren't they?
9    A. May I?
10        (Discussion held off the record.)
11        RECESS
12 BY MR. ZEFF:
13    Q. I was going to direct your attention to
14 the last paragraph on page 10. And feel free to read
15 anything you need to to understand the context. But
16 just that one paragraph, and I was going to ask you
17 about the last sentence. Take a minute and read it
18 and let me know when you're ready.
19    A. Okay.
20    Q. Okay. The last sentence says, The
21 committee has assessed that Dr. Gorum's true motive
22 was to selectively help student athletes to
23 inappropriately meet NCAA requirements. This is
24 highly unprofessional and unethical.

Page 60

1        Actually, that's the last two
2  sentences. And my question for you is that the
3  investigation that the NCAA just did does not support
4  that particular assessment that was done by the ad
5  hoc dismissal committee?
6    A. I would say that they're different --
7    Q. Okay.
8    A. -- Mr. Zeff. The committee seems to be
9  determining Dr. Gorum's motive, while the NCAA is
10 determining whether or not its rules were broken.
11    Q. Okay. Turning to page 15, first
12 paragraph.
13    A. Okay.
14    Q. Okay. And I'm just going to read part of
15 it. It says, This committee questions why Mr. Parker
16 or the administration selectively chose to only
17 pursue the violations by Dr. Gorum while neglecting
18 violations of other chairs and administrators and
19 even members of his office who, in one way or
20 another, have taken part in, condoned, or assisted in
21 the devaluation of the DSU education system.
22        Did you ever discuss what I've just
23 read with you with Dr. Sessoms?
24    A. I don't recall having a discussion. I

Page 61

1  know that when Mr. Parker gave me the batch of
2  documents related to grade changes, Dr. Gorum's was
3  the only one that came to light. Certainly Dr. King
4  was at issue. But, again, I discussed that earlier.
5        And I'm not aware of anyone else who
6  has changed grades like this. You've raised other
7  allegations during deposition, and each time we've
8  looked into it. And at this point I know of no one
9  else who, who was involved in grade changes like
10 this.
11    Q. So you never had a discussion with
12 Dr. Sessoms about this?
13    A. He -- there was a discussion that he's
14 concerned about grade integrity.
15    Q. Uh-huh.
16    A. But it wasn't this particular thing. I
17 mean, he wants to make sure that, that the grade
18 procedures are followed.
19    Q. Did -- were you present for the
20 discussions about the board --
21    A. Yes, I was.
22    Q. -- related to Dr. Gorum?
23    A. Yes.
24    Q. Did this section on page 15 that I've just

MARK FARLEY

Page 62

1  read to you come up in front of the board -- that is,
2  were there any discussions with the board relating to
3  these particular sections?
4      A.   The board -- I don't remember which board
5  member. But, but one board member wanted to ensure
6  that if there were others --
7      Q.   Uh-huh.
8      A.   -- with similar grading irregularities or
9  adjustments, that, that they would be considered and
10  that we would respond to them appropriately. I'm not
11  aware of any others.
12      Q.   And have you described for me all of the
13  ways you have attempted to investigate whether or not
14  there were others?
15      A.   I don't remember. But if I put all the
16  pieces of our discussions together, Mr. Zeff --
17      Q.   Okay. Well, then why don't you do it
18  again.
19      A.   Sure. Thank you.
20      Q.   Describe for me every way that you have
21  investigated the allegations that are contained on
22  page 15 of the ad hoc dismissal committee report that
23  I just read to you.
24      A.   Initially, Glenn Parker, as the registrar,

Page 63

1  was looking at grade changes. And he identified a
2  number of them, which I studied in preparation for
3  making a recommendation to the president --
4      Q.   Uh-huh.
5      A.   -- related to Dr. Gorum. I know that
6  there was another related to Dr. King, I think, that
7  came up in a meeting with Dr. Frederick.
8      Q.   Uh-huh.
9      A.   There was allegation in the meeting with
10  Dr. Frederick that others had done it. And Dr. Gorum
11  said he was going to supply some additional
12  documentation I didn't get. I was kind of wondering
13  whether that would reflect something about somebody
14  else who did something.
15          I think Dr. -- I think Glenn Parker
16  did further inquiry into grade changes. I became
17  aware during the ad hoc process of some other
18  allegations that I believe have been looked into by
19  Mr. Boynton. There were allegations contained in
20  your Complaint, I believe, and in the most recent
21  deposition, all of which Mr. Boynton has looked into
22  as coordinated with counsel.
23          On the NCAA side, there was a
24  completely separate effort that involved the inquiry

Page 64

1  into lots of -- you know, all of the grade-change
2  issues.
3          Again, Mr. Boynton and, and counsel or
4  someone from counsel's office conducted inquiry. I
5  believe the ad hoc dismissal committee conducted
6  inquiry. There's been discussion with chairs at
7  chairs' meetings about following the process.
8          I'm not aware of any other -- anyone
9  who's been alleged to have violated the process that
10  hasn't been considered, and I'm not aware of any that
11  have been substantiated.
12      Q.   You mentioned that Mr. Parker did further
13  investigation. Do you know what further
14  investigation he did?
15      A.   Not specifically. I mean, this is some
16  years ago, but I know he had access to all the
17  records. And so he was -- in both the NCAA-related
18  stuff and in the general inquiry in preparation
19  probably for the ad hoc committee.
20      Q.   Did Mr. Parker ever give you anything in
21  writing relating to any investigation or inquiry that
22  he conducted?
23      A.   He gave me -- he came to me initially.
24      Q.   Other than as to Dr. Gorum.

Page 65

1      A.   Not that I recall.
2      Q.   Okay. And you said during the ad hoc
3  dismissal committee hearings other allegations came
4  to light that were investigated. What were those?
5      A.   I believe there was something about Dr. --
6  time, you know, it's a little tough to put it in time
7  reference. But I want to say Dr. -- there was
8  something at some point about Dr. Toscano and Brenda
9  Farmer. I don't, I don't remember specifically. But
10  I know that anything that came up we put on our radar
11  and that Mr. Duston discussed that with Mr. Boynton,
12  to pursue it.
13      Q.   Was there anything put in writing relating
14  to any investigation of Dr. Toscano and Brenda
15  Farmer?
16      A.   That may be in the memo from Mr. Boynton;
17  because, remember, the grade change was a part of
18  that.
19      Q.   Yeah.
20      A.   I think the -- I don't remember whether
21  there was anything in the ad hoc dismissal committee
22  work. But I think I heard something. I mean, I
23  don't know whether that's -- I heard something from
24  someone -- that it had come up, probably in one of

MARK FARLEY

Page 66

1  the briefings from Mr. Duston during the course of
2  the hearings.
3          (Discussion held off the record.)
4  BY MR. ZEFF:
5      Q.  You also mentioned that there was some
6  effort to have -- to discuss with chairs following
7  the process.  Can you give me a little more detail on
8  that?
9      A.  Chairs were, were reminded again -- I
10 believe there have been several iterations of this --
11 reminding everyone to follow policy and procedures.
12 So...
13     Q.  Let me ask this:  If a chair admitted that
14 they were not following the policy and procedure
15 relating to grade changes, would they be subject to
16 discipline?
17     A.  Yes.
18     Q.  Okay.
19     A.  Certainly the level of discipline anywhere
20 from, you know, an oral counseling to termination
21 would depend on the circumstances.
22     Q.  And to your knowledge, do all the chairs
23 know what happened to Dr. Gorum, Wendell Gorum?
24     A.  I do not know whether they all know.

Page 67

1      Q.  Did you or anyone, to your knowledge, ever
2  talk to the members of the ad hoc dismissal committee
3  about the allegations that are part of page 15 that
4  we were just discussing, that I read?
5      A.  The first paragraph?
6      Q.  Yeah.
7      A.  No.  Unless members of those committees
8  were interviewed for some other reason.
9      Q.  Let me turn now to the meeting with the
10 board.
11     A.  Yes.
12     Q.  Tell me everything you can recall about
13 it, first.
14     A.  Well, it wasn't a meeting.
15     Q.  Yes.
16     A.  It was -- typically the board is
17 updated --
18     Q.  Uh-huh.
19     A.  -- on personnel matters or legal matters.
20 When the ad hoc dismissal committee was being formed,
21 they were informed that the committee was being
22 formed, that it was going through the process.
23 They're given -- when the two briefs were received --
24 I believe the two briefs were received, oh --

Page 68

1      Q.  Uh-huh.
2      A.  -- I don't remember the exact timing of
3  the meetings, but they were provided with the two
4  briefs in a meeting --
5      Q.  Uh-huh.
6      A.  -- and given an update that we were
7  awaiting the outcome of the ad hoc committee.  And I
8  think then that committee gave us the report.  And I
9  think it was, like, April or something that that
10 report was transmitted to the board.
11         In those meetings the -- because this
12 was a confidential matter --
13     Q.  Uh-huh.
14     A.  -- and it was in the board's executive --
15 closed session, they were provided with the
16 documents, given an update.  They looked through the
17 documents.  They asked any questions.  And, you know,
18 I think at the time we had two members of the board
19 who were attorneys.
20     Q.  Uh-huh.
21     A.  And obviously they spent some time looking
22 through the documents, asking questions.  On the
23 brief, when the briefs were distributed, I believe I
24 was asked a question about, you know, okay, here we

Page 69

1  have -- you know, we're moving forward.  When can we
2  expect the ad hoc dismissal committee report?  At
3  that point I didn't know exactly when we'd received
4  it, but I knew they were working on it.
5          They asked -- one person asked a
6  question about Dr. Gorum's perspective.
7          I explained that Dr. Gorum believed
8  that, through, you know, through the process, that it
9  had been -- there had been a more relaxed process
10 before Dr. Sessoms came and that his submittal of the
11 forms wasn't tantamount to changing the grades.
12         And so I believe, I think I mentioned
13 something about his making mention of trying to
14 contact, the instructors, but that I didn't have
15 any further evidence of that.
16     Q.  Did Dr. Sessoms answer any questions?
17     A.  I think the question -- I think the board
18 was more concerned for him, of what's the, what's the
19 academic integrity stuff here.  What's -- you know,
20 and so he was speaking, I believe, on a broader
21 basis.
22         I'm trying to respond to what's before
23 them.  And he's, you know, I think he said something
24 to the effect of, This offends, you know, our

MARK FARLEY

Page 70

1  academic -- I don't remember his exact words, but
2  something to the effect that it affects our academy
3  integrity.
4      Q.  Do you remember Dr. Sessoms saying
5  anything else at the meeting about Dr. Gorum?
6      A.  No.  And, again, I'm talking about the
7  meeting where the two briefs were supplied.
8      Q.  Okay.
9      A.  Okay.
10     Q.  At that time had Dr. Sessoms read the
11 briefs, to your knowledge?
12     A.  He reads everything.
13     Q.  Okay.
14     A.  I mean, I, I got them to him.  And he --
15 you know, it's not as though we, we spend a lot of
16 time chatting.
17     Q.  All right.  Would it be fair to say that
18 at that meeting you answered the questions about
19 detail relating to the case, and he gave broader
20 answers?
21     A.  I don't know that it was detailed.
22     Q.  Okay.
23     A.  The questions weren't terribly detailed.
24     Q.  All right.

Page 71

1      A.  But he did give broader answers.
2      Q.  And then once the recommendation came
3  down, was there any meeting with the board -- an
4  interim meeting before the board made a decision
5  about termination?
6      A.  No; other than the fact I saw Dr. Sessoms
7  for a couple of minutes before some other meeting and
8  I -- he said he, he had it or something to that
9  effect --
10     Q.  Okay.
11     A.  -- and it was to be transmitted to the
12 board.  That's when I worked with Rob.
13     Q.  And once it was transmitted to the board,
14 there were no other meetings other than the meeting
15 about whether or not to terminate?
16     A.  Not that I recall.
17     Q.  Okay.  Tell me everything that happened
18 that you can recall at the meeting regarding
19 termination.
20     A.  The board received the ad hoc dismissal
21 committee recommendation at the meeting because it's
22 a pretty confidential matter.  We were in, I believe,
23 closed session, executive session.  They took some
24 time -- you know, especially -- there are those that

Page 72

1  are very careful.
2      Q.  Uh-huh.
3      A.  And I remember -- I don't remember the
4  names of everyone who was there, but they took some
5  time to read it.  I don't think they read it word for
6  word.  I think they were focusing on particular
7  sections, but they read it.
8          And Mr. Barros, who's particularly
9  concerned with the educational policy because he
10 heads up educational policy, was very concerned from
11 an academic standpoint.
12         They asked, as they were sort of
13 reading through it, what the recommendation of the
14 committee was.
15         I told them that they recommended --
16 they did not recommend discharge, that they -- they
17 recommended that he not be the chair, et cetera.
18     Q.  Uh-huh.
19     A.  And I pointed out in the document where
20 those things were.
21         I believe that I said our
22 recommendation is reflected in the transmittal letter
23 from the president; it was still discharge.  There
24 was some discussion between committee members.  But I

Page 73

1  don't remember what, exactly what that was.
2          Ultimately they, they decided to --
3  that discharge was appropriate.  And at that point
4  I -- we finished our meeting, and I went back to
5  counsel and had further discussions.
6      Q.  Did the board ask Dr. Sessoms any
7  questions at that meeting?
8      A.  I, I don't remember -- I don't remember
9  whether -- Dr. Sessoms didn't really say that much.
10 It would have been more general in nature about, you
11 know, the institution, you know, the change, that
12 this is the direction we have to follow for benefit
13 of the institution.
14         I don't remember him being, him
15 getting into one-on-one with the question-and-answer
16 with anyone.  They seemed, for the most part,
17 satisfied with what they were reading and the answers
18 that they were getting to the questions they were
19 posing or being redirected back to parts of the, the
20 committee's decision.
21     Q.  Uh-huh.  I want you to turn your attention
22 to page 18 of the ad hoc dismissal committee hearing
23 report, Items P and Q on page 18.  Was there any
24 discussion with the board about items P and Q?

Page 74

1    A.  Well -- bear with me one second.
2    Q.  Sure.  Take your time.
3    A.  The board was concerned that others who
4  may have engaged in similar activity would be
5  similarly treated.  At that time we were not aware of
6  anyone else, had no substantiation that anybody else
7  has done anything like this.  And, in fact, that's
8  still true today.
9         Dr. Sessoms' conversation was
10  generally about the need for academic integrity in
11  grading policies; and the board supported that.  Much
12  of Dr. Gorum's contention is that in a past
13  administration -- and this was borne out both from
14  the brief and in the ad hoc dismissal committee's
15  report, things were overlooked or, you know, not, not
16  dealt with when there was a breach of the policy or
17  procedure from a disciplinary perspective.
18         So the only conversation was really
19  about holding people accountable and Dr. Sessoms'
20  talking about his, you know, value placed on that.
21    Q.  So to your knowledge, did anyone, to your
22  recollection, bring up Items P and/or Q?
23    A.  Not by letter.
24    Q.  Okay.  The subject matter of P and Q?

Page 75

1    A.  And that's what I just described.
2    Q.  Okay.  Let me turn your attention to
3  Committee Recommendation No. 1, which is also on
4  page 18.  And toward the end of it, it states, We
5  strongly feel that Dr. Gorum's case -- do you see
6  that -- is the tip of the iceberg?
7    A.  Uh-huh.
8    Q.  We strongly feel that Dr. Gorum's case is
9  the tip of the iceberg and he is, in fact, the
10  scapegoat, albeit a blamable scapegoat, whose
11  investigation we hope has uprooted the roots of the
12  poisonous tree and brought down all the poisonous
13  fruits.  We hope so.
14         Was there any discussion regarding
15  that statement?
16    A.  No.
17    Q.  Okay.  Was there any discussion about
18  Dr. Gorum being a scapegoat before the board?
19    A.  Not that I recall.
20    Q.  Was there anyone on the board that raised
21  or seemed to be in favor of Dr. Gorum keeping his
22  job?
23    A.  No.
24    Q.  I apologize.  I don't have copies.  But

Page 76

1  let me show you what was previously marked as
2  Sessoms 4 during Dr. Sessoms' deposition.  And it's a
3  copy of Dr. Gorum's post0hearing brief, which you
4  called my brief, which it is.
5         And I'd like you to look at Bates
6  stamped pages 03693, Item 4, and 03697, Item 12.  And
7  these are summaries of testimony of Joyce Bowers and
8  Johnny Toliver related to the grade-changing
9  practices.  I wanted to ask you --
10    A.  Okay.
11    Q.  I'll let you read it, but I wanted to know
12  whether there were any questions about it before the
13  board and whether -- and some other questions.
14    A.  So you've given me --
15    Q.  Just No. 4.  I just dog-eared it for you.
16  No. 4 and then No. 12 on the other page.
17         MR. DUSTON:  Why don't we do one at a
18  time.
19         MR. ZEFF:  Sure.
20         THE WITNESS:  Okay.
21  BY MR. ZEFF:
22    Q.  Okay.  Item 4 discusses Joyce Bowers'
23  testimony.  And Joyce Bowers, I believe, said that
24  the grade-change issues were widespread.  Do you see

Page 77

1  that, "pretty darned widespread at DSU"?
2    A.  Actually, not grade-change issues but
3  chairs changing students' grades.
4    Q.  Okay.  To your knowledge, has anyone
5  discussed or interviewed Joyce Bowers after the
6  ad hoc dismissal committee hearing about that
7  statement that she made?
8    A.  No.
9    Q.  No one has?
10    A.  Not that I'm aware.
11    Q.  Okay.  And approximately when after she
12  made this statement -- and I'll represent to you this
13  was in, I believe, August of 2004, approximately when
14  after August of 2004 was Miss Bowers disciplined?
15    A.  I don't recall.
16    Q.  Do you know when her last day of
17  employment at DSU was?
18    A.  There were several.
19    Q.  Okay.
20    A.  She, she left employment and then, I
21  believe, eventually resigned.
22    Q.  Was she terminated?
23    A.  I believe there was a termination action,
24  but we mutually agreed subsequent to that that it

MARK FARLEY

Page 78

1  would go in the system as a resignation. Again,
2  you've asked for the document.
3      Q.  Yes.
4      A.  I don't remember exactly what the terms
5  were, but we'll certainly work with counsel to
6  disclose that.
7      Q.  Thank you.  Then if you can turn to page
8  8, No. 12.  I'm sorry.  If I could have this back one
9  more time.  I apologize.  It is No. 12.  Dr. Toliver
10 says that he knew that chairs were changing grades.
11 And please take a look at that.
12     A.  I don't understand your question.
13     Q.  Read No. 12.
14         MR. DUSTON:  12 or 11 or both?  You
15 just want paragraph 12?
16 BY MR. ZEFF:
17     Q.  You can read both if you like, if that's
18 what you want to read for context.
19     A.  Okay.
20     Q.  Okay.  You'd agree that Dr. Toliver also
21 said that chairs in the past had a practice of
22 changing other faculty members' grades?
23     A.  The issue is -- yes, he is saying that
24 they could change grades.  It is not clear to me that

Page 79

1  he was giving permission to change grades without the
2  consent of the instructors or that he was giving
3  permission to enter grades by misrepresenting the
4  instructor's signature.  And that was in an
5  administration prior to Dr. Sessoms.  So while, yes,
6  the page says, accurately reflects, I'm sure, his
7  testimony -- I wasn't there --
8      Q.  Uh-huh.
9      A.  -- it's hard for me not to respond to it.
10     Q.  Well, has anyone, to your knowledge, gone
11 back to talk to Dr. Toliver to find out who those
12 professors were that changed grades?
13     A.  Dr. Toliver's comments reflect what the
14 practice was at the time.
15     Q.  Okay.
16     A.  Since Glenn Parker came here -- and he was
17 here before I was -- there was an effort to, you
18 know, clarify in the catalog, to remind people of the
19 processes.  Dr. Sessoms is the new president.  Things
20 had changed.
21         So, no, to answer your question, I'm
22 not aware that someone has gone back to talk to
23 Dr. Toliver.
24     Q.  With regard to the students whose grades

Page 80

1  were changed by Dr. Gorum, what happened to those
2  grades?
3      A.  Dr. Bell and, I believe, Dr. Skelcher were
4  involved in -- and Mr. Parker were involved in
5  considering those grade changes.  And I don't frankly
6  remember on a detailed basis exactly what happened.
7      Q.  Do you know whether any of the grades were
8  changed back?
9      A.  I don't.
10     Q.  Do you know whether or not there were any
11 challenges by any of the students?
12     A.  I know that there were discussions with
13 students.  I don't recall what those outcomes were.
14     Q.  Do you recall that there was a period of
15 time -- I'm jumping around, trying to clean up a
16 little bit.
17     A.  Okay.
18     Q.  Do you recall there was a period of time
19 between when the briefs of the parties were submitted
20 and when the ad hoc dismissal committee hearing
21 report actually was issued?
22     A.  Yes.
23     Q.  It was fairly significant, actually.  Do
24 you know -- I'll take that back and actually give you

Page 81

1  the time on it.
2      A.  Sure.
3      Q.  Were you involved or did you have any
4  contact with anyone about that length of time; that
5  is, what's taking so long or where's the report or
6  that sort of discussion?
7      A.  I think the whole darn thing took too
8  long.
9      Q.  Okay.
10     A.  I've learned to become patient about that
11 point.
12         (Discussion held off the record.)
13         MR. ZEFF:  I don't have anything
14 further.
15         (Deposition concluded at 12:04 p.m.)
16         (Reading and signing was reserved.)



**WILCOX & FETZER LTD.**

## In the Matter Of:

## Gorum

### v.

## Sessoms and Board of Trustees of Delaware State University

### C.A. # 06-565-GMS

Transcript of:

# Wendell Gorum, Ph.D.

**Volume # 1**

**June 6, 2007**

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

C 064

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum, Ph.D.

| Page 54 | Page 56 |
|---|---|
| 1   A.  Because the university was offering a package | 1   the administration about contract options? |
| 2   deal of half the salary and I had about 60 vacation | 2   A.  I discussed it with Coleman or his assistant. |
| 3   days and four to five sick leave days, that would have | 3   I can't remember his name. |
| 4   been tantamount to one year's salary to retire early. | 4   Q.  Sheila Davis? |
| 5   Q.  This was an early retirement incentive package | 5   A.  Yes.  And I don't know which one told me about |
| 6   that Delaware State was offering to various | 6   the procedure, but that's what I wanted to do. |
| 7   professors? | 7      At some point Sandy Arnell had indicated |
| 8   A.  That's correct. | 8   that she was losing money by not retiring.  She was |
| 9   Q.  It was in writing, correct? | 9   past the age of retirement and so the best deal was to |
| 10   A.  Yes. | 10   retire and then still contract with the university and |
| 11   Q.  It had with it approximately six months pay and | 11   continue to work.  That's what she did and that's what |
| 12   also allowed you to cash out at that point your | 12   I had in mind to do. |
| 13   accrued unused vacation and sick days, correct? | 13   Q.  Because of something with the state pension and |
| 14   A.  Yes. | 14   how it worked? |
| 15   Q.  When was it that you applied for that package? | 15   A.  That's correct. |
| 16   A.  March or February.  There was a deadline and I | 16   Q.  Dr. Gorum, what is your date of birth? |
| 17   made the deadline. | 17   A.  4-2-41. |
| 18   Q.  February or March of two thousand -- | 18   Q.  Lori Crawford -- any other knowledge that |
| 19   A.  Four. | 19   Mr. Coleman has other than the retirement package? |
| 20   Q.  Four. | 20   A.  Not that I remember. |
| 21   A.  Yeah.  I think that's when it was. | 21   Q.  He would have general knowledge about the scope |
| 22   Q.  This would have been to leave effective what | 22   of the package and the fact that you applied for it? |
| 23   date? | 23   A.  And he was in charge of the early retirement |
| 24   A.  To retire? | 24   package. |

| Page 55 | Page 57 |
|---|---|
| 1   Q.  Yes. | 1   Q.  All right.  So Ms. Lori Crawford, when was your |
| 2   A.  May 15th. | 2   last communication with her? |
| 3   Q.  So the retirement would have been effective at | 3   A.  Before the hearing. |
| 4   the end of the 2003-04 academic year, correct? | 4   Q.  What knowledge does Ms. Crawford have |
| 5   A.  Yes. | 5   regarding -- |
| 6   Q.  You had applied for it and desired to take that | 6   A.  She had grade incidents and grade changing in |
| 7   package when it was offered, correct? | 7   her department. |
| 8   A.  Yes. | 8   Q.  Did she claim or tell you that as chair she had |
| 9   Q.  Your wife was also offered that package? | 9   changed grades of other professors? |
| 10   A.  Yes.  And she took it. | 10   A.  She could have.  All I know or remember is she |
| 11   Q.  She took it? | 11   was one of the chairs who indicated that it had |
| 12   A.  (The witness nodded.) | 12   happened and that she was willing to testify. |
| 13   Q.  Do you recall approximately how many professors | 13   Q.  But when you say, "it had happened," that there |
| 14   took that package? | 14   had been grade change issues -- |
| 15   A.  Quite a few.  More than fifteen. | 15   A.  Grade changes. |
| 16   Q.  What were your plans after that package had | 16   Q.  -- but the details of those you don't know? |
| 17   been accepted? | 17   A.  I just don't remember at this point. |
| 18   A.  I would then work on a contract. | 18   Q.  Do you know where Ms. Crawford is now located? |
| 19   Q.  A contract with whom? | 19   A.  She still is employed at Delaware State as far |
| 20   A.  The university. | 20   as I know. |
| 21   Q.  That you would retire as a full professor and | 21   Q.  Dr. Davis, when was the last time you talked to |
| 22   then come back as a contract professor? | 22   Dr. Davis? |
| 23   A.  Yes. | 23   A.  Within the last two weeks. |
| 24   Q.  What discussions did you have with anybody in | 24   Q.  I actually want to group together all four, all |

15  (Pages 54 to 57)



1              DELAWARE STATE UNIVERSITY

2                 GRIEVANCE HEARING

3

4   IN RE:  DELAWARE STATE UNIVERSITY
                    v.
5           WENDELL GORUM, Ph.D.          ORIGINAL

6

7               Grievance hearing taken pursuant to

8   notice before Gloria M. D'Amore, Registered Professional

9   Reporter, at Delaware State University, 1200 N. DuPont

10  Highway, MBNA America Building, Dover, Delaware, on

11  Monday, August 30, 2004, beginning at approximately 10:40

12  a.m., there being present:

13  APPEARANCES:

14                    BOARD MEMBERS:
                      DR. ACKAH, CHAIR
15                    FILIPPO TOSCANO
                      EDWARD JACKSON
16                    LAPOINTE DAVIS

17                    FROST & ZEFF
                      BY:  GREGG L. ZEFF, ESQUIRE
18                         Pier Five at Penn's Landing
                           Philadelphia, P.A. 19106-1492
19                    Attorney for Wendell J. Gorum

20

21

22

**C 066**



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

65

1    minute.

2                    (Off the record at, approximately, 11:45

3    a.m.)

4                    (Back on the record at, approximately,

5    12:00 p.m.)

6                    MR. DUSTON:  We are going to call

7    Dr. Wickham.

8                    DEWAYNE WICKHAM, having first been duly

9    sworn according to law, was examined and testified as

10   follows:

11                   (DIRECT EXAMINATION)

12   BY MR. DUSTON:

13       Q.    Professor Wickham, as background for the

14   Committee, who is your current employer?

15       A.    Delaware State University.

16       Q.    What is your position?

17       A.    I hold a position as scholar in residence and

18   distinguished professor of journalism.

19       Q.    How long have you been employed by Delaware

20   State?

21       A.    I began my employment at Delaware State in

22   January 2001.

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

78

```
 1   students grades, how could the Department of Mass

 2   Communication contact you between the time that you left

 3   and the time you were back the next semester?

 4        A.   I have a full-time assistant director of the

 5   institute.  I have a full-time assistant director of the

 6   institute who is located in EH Room 268.  She is in the

 7   office five days a week.

 8        Q.   So, she would have been back on campus as soon

 9   as the campus was re-opened in January?

10        A.   She would have been on campus up until the

11   official start of the Christmas break and back when it

12   resumed.  Yes.

13        Q.   Did any of your other contact information

14   change during that time?

15        A.   No.  My home office and my Cellular phone had

16   been the same since 2001, when I started on campus.

17        Q.   Do you know whether Dr. Gorum is listed in any

18   records as a co-teacher on this course, or having any

19   authority over the ethics and media course?

20        A.   Well, to my knowledge, he is not listed as a

21   co-teacher.  And as to whether he has authority over

22   that, I am not sure I am the proper person to say.
```

C 068

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

79

1      Q.    It is not listed as a secondary name as a

2  course instructor, to your knowledge?

3      A.    No.

4      Q.    Did Dr. Gorum ever talk to you about these

5  four students prior to submitting the grade change forms

6  to the registrar office?

7      A.    I have no recollection of any such

8  conversation.

9      Q.    Turn back to Exhibit 11, which are the four

10  forms.  I'm just confirming that's your signature.

11          Did you see any of these forms before

12  they were submitted to the registrar's office?

13      A.    I did not.

14      Q.    To your knowledge, did Dr. Gorum contact you

15  or make any effort to contact you prior to January 8,

16  2004?

17      A.    No.

18      Q.    Did anyone else from the University contact

19  you, or leave a message with you regarding these four

20  students and these four sets of grades before these forms

21  were submitted to the registrar's office?

22      A.    No.

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

80

1        Q.    What was your reaction when you received

2    Mr. Parker's telephone call and E-mail about these grade

3    changes?

4                    MR. ZEFF:    Objection.    What possible

5    relevance would that have?

6                    DR. ACKAH:    Overruled.    His objection is

7    overruled.    You can answer.

8                    MR. WICKHAM:    I was surprised.

9    BY MR. DUSTON:

10       Q.    What was your understanding, as an instructor,

11   who has been here for four years, on the process by which

12   a grade could be changed for a student of one of your

13   classes?

14       A.    In the past, I had conversation with Dean

15   Frederick regarding a student who had some concern about

16   a grade.    And in the course of that conversation,

17   Dr. Frederick said to me that, in fact, grades could be

18   changed, but the student had gone to Dr. Frederick to

19   raise some questions about a grade.    He said he would not

20   do it without consultation with the instructor.    And

21   after he and I talked, the grade was not changed.    So, it

22   was my understanding that grades would only be changed

1    after consultation between the instructor and the

2    appropriate authority.

3        Q.    Is your contract in two positions, an annual

4    contract or a per semester contract?

5        A.    It is an annual contract.  July 1st through

6    June 30th.

7        Q.    So, during this time period, you were under an

8    annual contract with the University for the entire year,

9    all 2003 and the spring of 2004?

10       A.    Yes.

11       Q.    It was known you would be teaching the same

12   course and working with the institute that spring?

13       A.    Correct.

14                MR. DUSTON:  I have no other questions.

15                (CROSS EXAMINATION)

16   BY MR. ZEFF:

17       Q.    Good afternoon, Professor Wickham.  I am Greg

18   Zeff.  I represent Dr. Gorum.  I have a couple of

19   questions for you.

20                The first one is, back on January 8,

21   2004, what phone numbers did you have if somebody wanted

22   to contact you from Delaware State University?

Case 1:06-cv-00565-GMS    Document 45    Filed 10/03/2007    Page 76 of 109
IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

82

1      A.    You want the number, actually?

2      Q.    Tell me the numbers and where they ring to?

3      A.    (410)-902-1557.  That is my home office.

4  (410)-274-9908 is my Cell phone.  Then, obviously, the

5  University number.  857-7629.  I taught that semester on

6  Tuesdays and Thursdays.  My class was from one to 2:15.

7  I generally arrived on campus at 7:30 a.m. and did not

8  depart campus before five p.m. on those two days.

9      Q.    Did you have any other offices at that time

10  where you could be reached at?

11      A.    The home office that I gave you.  Yes.

12      Q.    In addition to working at Delaware State

13  University at this time, did you hold any other

14  employment?

15      A.    Yes.  I was then and I am now a syndicated

16  columnist.

17      Q.    For who?

18      A.    U.S.A. Today and Gannett, which is the parent

19  company of U.S.A. Today.

20      Q.    Do you have any idea where you were on January

21  8, 2004 when these grade request forms were filled out?

22      A.    No.  But I was always reachable by my Cell

1    phone.

2          Q.    You mentioned both in the document, in your

3    letter or E-mail response and here today that you have no

4    recollection of a conversation with Dr. Gorum about any

5    of these students grade changes.

6                    Is it possible that he did talk to you,

7    but you just don't remember?

8          A.    I don't think so.  I would have remembered a

9    conversation about changing a grade of one of my

10   students.  I think there would have been a lot of

11   discussion about that topic because of all that was asked

12   of the students.  And particularly the case of Mr. Miji

13   because, in fact, I put the athletic department on notice

14   that he was in academic peril in my class.

15         Q.    Mr. Miji, do you remember what he looks like?

16         A.    Tall, slender.  Sat in the back of my class,

17   far right-hand corner.  I believe he plays basketball.

18                    DR. ACKAH:  Mr. Zeff, are you done?

19                    MR. ZEFF:  I have one more thing.

20   BY MR. ZEFF:

21         Q.    Did students ever comment to you or explain to

22   you that you were difficult to get a hold of when you

IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON MONDAY, AUGUST 30, 2004

84

1  were not on campus?

2        A.    No.   I generally gave students -- I generally

3  gave students both my home telephone number and my office

4  telephone number.   And I supplied them usually with my

5  E-mail address.   But, as I said, when I was on campus,

6  two days a week, I think the hours that I put in in those

7  two days were probably comparable to what most professors

8  put in in a week.

9        Q.    When you were not on campus, did anybody ever

10  tell you that they had a difficult time reaching you?

11        A.    No.

12        Q.    Do you have a secretary?

13        A.    I have an assistant director of the institute.

14        Q.    Other than the assistant director that is here

15  on campus, do you employ anyone else as a secretary

16  anywhere else?

17        A.    I have a secretary at my home office.

18        Q.    So, if someone calls your home office, they

19  might reach your secretary?

20        A.    She is there from nine to five.   I also have

21  an answering machine that would record any messages that

22  would have been left.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

232

1              (Whereupon, a brief recess was taken.)

2              DR. ACKAH:   Okay.   We are in session

3    now.

4              MR. ZEFF:   Thank you.   Has she been

5    sworn?

6    Whereupon,

7              JOYCE BOWERS

8    having been first duly sworn, was examined and

9    testified as follows:

10             DIRECT EXAMINATION

11   BY MR. ZEFF:

12        Q.   Good afternoon, Ms. Bowers.

13        A.   Good afternoon.

14        Q.   Thank you for your patience.

15             Can you tell the Panel Members for

16   what period of time you've worked for Delaware State

17   University?

18        A.   Twenty-nine years and two months.

19        Q.   In addition to the twenty-nine years and

20   two months, did you also work here prior to that 29

21   years?

22        A.   I worked for four years as a student

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

251

1          THE WITNESS:  No.  Not if they were to

2  come in and say that.  Absolutely not.  You're saying

3  if the Chair came in saying they could not reach

4  their -- no, if they're going to come in and say

5  that, no.  We will not accept it.

6          DR. ACKAH:  If they were to come in

7  and say that, would you accept it?

8          THE WITNESS:  No, we would not.

9          DR. ACKAH:  But you just said you

10  trust their integrity.  It's the Chair.

11          THE WITNESS:  Because when the Chair

12  comes in, we're assuming the Chair has already talked

13  with his or her faculty member.  Now if the Chair is

14  dumb enough to come in and -- I'm sorry, if the Chair

15  comes in and says, I tried to reach the faculty

16  member, but I couldn't I'd have to tell him, I'm

17  sorry, I can't accept this.  You're telling me you've

18  not been authorized to put in this change.  So I

19  cannot accept it.

20          DR. ACKAH:  Okay.  But assuming this

21  student needs to graduate.  The faculty member cannot

22  be reached.  What do you do?

Case 1:06-cv-00565-GMS    Document 45    Filed 10/03/2007    Page 81 of 109
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

189

1    to you, Dr. Tolliver.

2                    DR. TOLLIVER:  Nice talking to you.

3                    DR. ACKAH:  And we have a lady here

4    who's helping us.

5                    DR. TOLLIVER:  Okay.

6                    MR. ZEFF:  And can we -- just for the

7    record can we verify that the panel recognizes Dr.

8    Tolliver's voice.

9                    DR. ACKAH:  Oh, yeah.  We know his

10   voice.

11                   MR. ZEFF:  Okay.

12   Whereupon,

13                   JOHNNY TOLLIVER, Ph.D., having first

14   been duly sworn according to law, was examined and

15   testified as follows:

16                   DIRECT EXAMINATION

17   BY MR. ZEFF:

18       Q.   Dr. Tolliver, can you just very briefly

19   tell the Panel here what your experience at Delaware

20   State was.

21       A.   Well, at Delaware State I came in in 1993

22   as Dean of the -- at that time, School of Arts and

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

209

1        Q.    And if they were going to, and even if the
2    instructor of record disagreed, if the Chair felt it
3    was appropriate, did you empower Chairs to simply
4    turn in such grades to the Registrar's Office without
5    consultation with the instructor of record, and
6    without the knowledge of the Dean?
7        A.    No.
8        Q.    Now, if the Chair had said, I was -- the
9    student was registered in this class, they showed up
10   there, they were awarded a grade by the instructor
11   but, in fact, it was a purge problem or some other
12   situation where the student had a reason why they
13   couldn't attend class, and the Chair again fixed the
14   problem, was that within the latitude that they were
15   given without consultation with that instructor?
16       A.    The latitude would fit the problem, and I
17   would assume that they would consult with the
18   instructor.
19       Q.    But did -- but did the latitude for the
20   Chair include skipping by the consultation with the
21   instructor and just making a grade change if the
22   Chair thought it was appropriate?

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

210

1      A.    No, we didn't -- I wouldn't condone that.

2      Q.    Now, what about with adjuncts?  If you had

3  somebody, same situation, the Adjunct or

4  under-contract faculty member has left for the

5  semester but is reachable; that person is off campus,

6  is expected back on the following semester, and

7  students come to the Chair and say, I don't think I

8  had -- I got the right grade in this class, was the

9  Chair empowered without the actual approval of the

10  instructor to simply go in and change the grade?

11      A.    All right.  In all of the cases that you

12  have cited, I would expect the Chair to have more

13  than just the student's word whether he or she

14  deserved a better grade.  A student would have to

15  produce some kind of documentation to show that he or

16  she deserved a better grade.

17      Q.    Now, that --

18      A.    Now, the process would involve, in my

19  understanding of the grievance process, the student

20  would go to the faculty member and the faculty member

21  is supposed to respond to it.

22           If you cannot reach that faculty

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

213

1  change for another instructor, or could the Chair

2  just simply walk it down to the Registrar's Office?

3      A.   In some cases, like I said, it was

4  happening and there was nothing -- I didn't have the

5  evidence that something had gone awry and there was

6  some things going on -- these things go on at college

7  and university campuses all the time --

8      Q.   Dr. Tolliver, my question -- let me

9  rephrase it, what was your expectation, not whether

10 it went on.

11     A.   Okay.

12     Q.   What did you expect?

13     A.   My expectation would be that in a case

14 like that the signatures would be procured, yes.

15     Q.   And did you in any of your Deans' meetings

16 or Chairs' meetings, ever -- when you say, empowered

17 or gave latitude to your Chairs, ever tell them, in

18 situations like this, you can simply change the

19 grade, submit the form in yourself and not contact

20 me?

21     A.   No, I never said that.

22     Q.   Now, in the case of a -- one of those

C 080

Case 1:06-cv-00565-GMS    Document 45    Filed 10/03/2007    Page 85 of 109
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

214

1    professors, particularly an adjunct -- you gave the

2    description of an adjunct that caused lots of

3    problems, or who really went out of line, did you

4    ever discuss or empower Chairs to simply go ahead

5    and, on their own initiative, fix or modify grades

6    again without consultation with the Dean?

7         A.    No, I never did that.

8         Q.    Can you ever think of a situation in which

9    you had a problem like that, and you simply turned

10   over to the Chair and said, whatever you think is

11   appropriate, handle it whatever way you want, change

12   whatever grades you want and, then, don't worry about

13   needing any further approval, just submit the grade

14   changes?

15        A.    No, I never said that.

16             DR. ACKAH:  There's something here, as

17   the Provost or as the Dean?

18   BY MR. DUSTON:

19        Q.    Let me start with as the Dean.

20             DR. ACKAH:  As the Dean.

21   BY MR. DUSTON:

22        Q.    As a Dean?

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

215

1        A.    No, I never did that.

2        Q.    You would expect at least, even if you

3   didn't sign them, to be told how all these students'

4   problems were being resolved, and --

5        A.    Right.

6        Q.    -- and what basis the Chair had for either

7   changing grades or correcting them, and how they were

8   going to fix the problem?

9        A.    Right.

10       Q.    And were you aware of any of your Deans

11  that you ever simply empowered to -- let me rephrase

12  it.

13             If a Dean -- as Provost, do you know

14  of any Deans who -- if you had a Dean who simply told

15  the Chairs, in these situations just go ahead and fix

16  the problems and handle it and don't bother me with

17  the details, how would you have responded?

18       A.    Well, I would have told the Dean that he

19  or she would have to get involved because I would

20  want to know how that Chair was going to fix the

21  problem.

22       Q.    Because you faced potential student

Case 1:06-cv-00565-GMS    Document 45    Filed 10/03/2007    Page 87 of 109
HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

216

1    protests and grade appeals and due process and how

2    you were going to clean up this problem?

3         A.    Right.

4         Q.    In the case of -- a different situation,

5    if you have students who, late in the semester, have

6    not gotten into a class, or need to change classes,

7    do you know of situations in which students were not

8    registered at all in a particular course, practicum,

9    internship, otherwise during the semester, were not

10   on the roster, and simply got registered and grades

11   added afterwards by a Chair on the Chair's authority?

12        A.    No, I don't know offhand.  I wouldn't know

13   that.

14        Q.    Is that within the latitude of what you

15   empowered Chairs to do, to deal with any kind of

16   purge or even other situations, to simply set up

17   independent studies and, then, add people

18   retroactively later to courses that they weren't

19   enrolled in at the time?

20        A.    I would not approve of internships.

21   Independent study is something different.  But

22   internships, no --

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

90

1              MR. DUSTON:  This is a complaint that

2     was filed last April and is before Dean Skelcher

3     right now --

4              DR. GWANMESIA:  Okay.

5              MR. DUSTON:  -- and I believe has been

6     resolved, but I can let the Dean speak to that if you

7     want.

8              MR. ZEFF:  I don't have anything

9     further.

10              MR. DUSTON:  Nothing more for Dean

11     Frederick.

12              DR. ACKAH:  Dr. Frederick, thank you.

13              THE WITNESS:  Thank you.

14              (Witness excused)

15     Whereupon,

16              WENDELL GORUM, Ph.D.,

17     having previously been duly sworn according to law,

18     was examined and testified as follows:

19              DIRECT EXAMINATION (Cont'd)

20     BY MR. ZEFF:

21        Q.   Dr. Gorum was -- have we completed our

22     discussion of the practicum and how you were handling

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

108

1        A.    Not to me, no.

2        Q.    All right.  What was the first

3    communication you had with Mr. Fleming, Mr. McClain,

4    Mr. Domichi's(ph.) and Mr. Olifant(ph.) regarding Dr.

5    Wickham -- Professor Wickham's grades?

6        A.    What was the first --

7        Q.    All right.  Let me rephrase that.  Did any

8    of these students come to you between the time that

9    these grades were given, December 16th, and January

10   8th, 2004, when the grade changes were submitted?

11       A.    Yes.

12       Q.    Which students came and talked to you?

13       A.    I talked to McClain, Olifant and Domichi.

14       Q.    Okay.  You didn't talk to Howard Fleming?

15       A.    I don't remember, but I'm sure I did.

16       Q.    Okay.  What was the nature of your

17   conversation with Mr. McClain?

18       A.    Basically -- I don't remember the details,

19   but that was the -- one of the quizzes in which he

20   and others tried to take during the summer.  The

21   class did not meet because there were not enough

22   students.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

109

1          I gave them work to do, gave them the

2     book, and I also -- I'm sure I told them -- told them

3     they could probably get something out of --

4     additional out of the class by sitting in on the

5     class.

6          Q.    All right.  Now, is that true for all

7     these students?

8          A.    I don't remember all of them, but --

9          Q.    Who do you remember telling you -- who do

10    you remember telling that -- well, let me rephrase

11    this:  What you're essentially saying is that with

12    Mr. McClain, at least, when he couldn't take this

13    course and register for it during the summer, you

14    told him, essentially, do it independent study with

15    me, here's the book, you might get something out of

16    sitting in the class next fall?

17         A.    That's correct.

18         Q.    But you also told Mr. McClain he didn't

19    have to sit in class with Professor Wickham, right?

20         A.    That's correct.

21         Q.    He didn't have to do that.  Did you tell

22    any of these other three students that they didn't

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

110

1      have to attend the class?

2          A.    Domichi was the same way.

3          Q.    What about Mr. Olifant?

4          A.    I don't remember.  I know who he is, but I

5      don't remember.

6          Q.    All right.  With Mr. Domichi and Mr.

7      McClain, what work did you oversee their performance

8      in Ethics in the Media?

9          A.    Details I cannot remember, but I just

10     recall giving them a book to read and they had to

11     write a report or paper on something.

12         Q.    So now you did not have a class for them

13     to register in over the summer, correct?

14                You gave them a textbook and said, you

15     have to write a report for this class?

16         A.    I gave them -- assigned them something to

17     do, yes.

18         Q.    And how many assignments did they

19     complete?

20         A.    To be honest, I don't know.

21         Q.    There's an established syllabus for Ethics

22     in the Media that is commonly used, isn't there?

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

111

1        A.    Yes, but this is his syllabus, and I

2    believe I taught this course and it's taught

3    differently.

4        Q.    All right.  Did you give a syllabus to Mr.

5    Domichi and Mr. McClain of what they had to do?

6        A.    No.

7        Q.    Did you outline a basis on which you would

8    award a grade to them?

9        A.    Yes.

10        Q.    What did you tell them they had to do to

11    earn a grade?

12        A.    I don't remember exactly what I told them.

13        Q.    They had to produce a report --

14        A.    A paper.

15        Q.    They did not have to attend class, if they

16    chose not to?

17        A.    It was optional.

18        Q.    It was optional.  And did you tell them

19    when and how they would get a grade in that

20    particular class?

21        A.    Yes, I told them I would tell the

22    professor, which we typically do, and that I would

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

112

1  give the grade to him.

2      Q.    And what about Mr. Fleming and Mr.

3  Olifant?

4      A.    It was the same thing.  Olifant was a

5  football player, and they were all trying to get the

6  class through the summer.

7      Q.    Well, why did they all need to take the

8  class during the summer?

9      A.    Because they were trying to graduate.

10     Q.    Were they trying to graduate or were they

11 trying to be eligible to -- why couldn't they just

12 take it in the fall?

13     A.    Because they had -- most athletes will

14 take a reduced or a minimal number of credits just to

15 be eligible and usually go to summer school to try to

16 stay on course.

17     Q.    All right.  So was Mr. Fleming an athlete

18 as well?

19     A.    I don't think so.

20     Q.    Okay.  So --

21     A.    I don't remember who he -- I mean, I don't

22 remember his face.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

113

1       Q.  So you have three athletes for whom you

2  made special arrangements because they were athletes

3  to do them independent study and, then, put them in

4  Professor Wickham's class in the fall so they could

5  take a reduced load during the fall?

6            MR. ZEFF:  Objection to form.

7  BY MR. DUSTON:

8       Q.  Is that --

9            DR. ACKAH:  Robert, can you restate

10  that, please.  I want to hear the objection.

11           MR. ZEFF:  Because they were athletes.

12  BY MR. DUSTON:

13       Q.  Did you offer -- did you offer the option

14  of taking a reduced load to every student in your

15  Department?

16       A.  No, they weren't taking a reduced load.

17       Q.  All right.  Let me rephrase that.  Did you

18  offer the option of doing independent study of Ethics

19  in the Media to anybody besides athletes?

20       A.  I would have offered it to anyone who had

21  come to me.

22       Q.  So anybody who came to you and said, I

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

114

1    don't want to take it with Professor Wickham, I'd

2    like to do this independent study over the summer and

3    get my grade from you, you would have done that?

4         A.    Yes.

5         Q.    And in any of those cases you'd just

6    assign the grade in Professor Wickham's class?

7         A.    Correct.

8         Q.    And you would simply tell Professor

9    Wickham, you're going to assign the grade 'cause

10   you're doing them independent study?

11        A.    Yes.

12        Q.    And had he approved that in the past?

13        A.    I'm not sure that I did it -- I'm not sure

14   that I did it with him, but in most instances, just

15   about every professor in the department had operated

16   that way.

17        Q.    For any -- well, any class, straight

18   classroom class --

19        A.    No, not from any class.  Usually classes

20   that we offer during the summer that did not go.

21        Q.    All right.  Now, is this a class that

22   normally you would have offered during the summer or

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

115

1    not?

2         A.   We had offered many classes during the

3    summer and none of them were taught.

4         Q.   Did you do this at the request of one of

5    the coaches?

6         A.   Could have.  I work with the athletes.

7         Q.   And so the three of them were told by you

8    they didn't have to attend Professor Wickham's class,

9    and that it did not matter what grade he assigned

10   them, you would go ahead and give them a grade based

11   upon their work directly for you, correct?

12        A.   Correct.

13        Q.   Where in the world do you get the

14   authority -- let me rephrase that.

15             What's the basis for your authority to

16   provide independent studies which you then give

17   people grades in other classes?

18        A.   Any class that's not offered can be

19   offered as independent study.

20        Q.   And what's the proper procedure for doing

21   that?

22        A.   Proper procedure?

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

116

1        Q.    Is there a procedure for having an

2    independent study number?

3        A.    We do not have an independent study

4    number.

5        Q.    So it's your position that any Chair can

6    take any class in the University and offer it

7    independent study and, then, put the student in,

8    assign a grade, even though there's another

9    instructor of record?

10                MR. ZEFF:   The University.

11   BY MR. DUSTON:

12        Q.    Here at Delaware State.

13                MR. ZEFF:   His department?

14                MR. DUSTON:   No, I want to ask about

15   the University first.

16                THE WITNESS:   I can't speak for the

17   University, but --

18   BY MR. DUSTON:

19        Q.    But it's your position that in the Mass

20   Comm Department you could offer any course

21   independent study at your discretion and, then,

22   assign a grade without the student attending the

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

125

1    Q.    And you didn't actually teach classes with

2    these four students, correct?

3    A.    No.

4    Q.    All right.  They were --

5    A.    We did meet.  The students came to my

6    office and we discussed.

7    Q.    Now, having allegedly told Mr. Wickham

8    sometime during the semester that these students were

9    independent study, did you contact him between

10   December 16th and January 8th to tell him, in fact,

11   you saw his grades and you were changing his grades

12   for these four students?

13   A.    Yes.

14   Q.    When did you make that telephone call?

15   A.    On the 8th of January.

16   Q.    And where did you make that phone call

17   from?

18   A.    From -- from the Records Office.

19   Q.    Now, your counsel has what we just

20   submitted.

21         Now, the other day you went down and

22   pointed to me which telephone you used in the Records

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

126

1    Office, correct?

2               That is Extension 7930.  And this is a

3    --

4               MR. ZEFF:  He showed you the desk.

5               MR. DUSTON:  He showed me the desk and

6    he showed me the telephone.

7               MR. ZEFF:  There was a phone on the

8    desk.

9    BY MR. DUSTON:

10        Q.    There's a phone on the desk, and this was

11   the record for all phone calls during the month of

12   January, this top two pages, for that phone call --

13   for that phone number that's on that phone on that

14   desk.

15        A.    This is not the only number that's on that

16   desk.

17        Q.    This is the only --

18        A.    That other phone had -- I mean, that

19   particular phone had three or four lines because

20   anyone sitting at that desk could answer any calls

21   that --

22        Q.    And I requested the University to take the

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

127

1  numbers of those lines and to call them, and they

2  were all processed under number 7930.

3              It's your position that it just must

4  be some other line, correct?

5      A.    I made calls on that desk.

6      Q.    So it is to Professor Wickham that you

7  made a call from that desk on whatever line, that

8  doesn't show up on the University's records?

9      A.    That is correct.  As I said, there are

10 other lines.  It's more than one line.

11             DR. ACKAH:  Can you show me that

12 telephone number again, please.

13             MR. DUSTON:  The first two pages --

14 Dr. Ackah, the first two pages were what we received

15 from Line 7930, which is the only number which is

16 processed, I've been told, from that phone in the

17 Registrar's Office.

18             The next three pages Dr. Gorum said --

19 BY MR. DUSTON:

20     Q.    You made a request from us, didn't you,

21 that it may have -- it might have been calls from

22 your office as well?

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

128

1          A.     From my office or my cell phone, yes.

2                 MR. DUSTON:  Okay.  Well, we also

3    requested -- the next three pages are the January

4    calls from his office and that is Extension 6586.

5    BY MR. DUSTON:

6          Q.     Correct?

7          A.     Um-hum.

8          Q.     And the cell phone records, you stated

9    that you've requested for January 8th as well.

10                But your testimony is, for Professor

11   Wickham, it was, in fact, from that phone --

12         A.     That's correct.

13         Q.     -- in the Registrar's Office, and you know

14   -- you heard Professor Wickham deny?

15         A.     Yes.

16         Q.     Which phone number did you call him on?

17         A.     I called -- I first called him at his

18   office on campus.  And the secretary gave me his cell

19   phone number and office telephone number.  His

20   secretary is a major, and she gave me the number.

21         Q.     And it's your testimony under oath that

22   you then called Professor Wickham?

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

129

1      A.    Yes.

2      Q.    Tell me about that conversation?

3      A.    I can't remember it specifically, but I

4  was calling regarding the grades, and actually --

5  that's why I say this is a good name, I called Dr.

6  King first and he is the one who suggested that I

7  call the people.

8      Q.    When you say, call the people, call

9  everybody whose grades you were changing, because Dr.

10 King probably thought it was appropriate before you

11 submitted the grade changes that you speak to the

12 instructors, correct?

13          Now, did you go through with Professor

14 Wickham all four of these students?

15     A.    I informed him during the semester.

16     Q.    Did you go through with Professor Wickham

17 and say, I am changing Carey Fleming's grade from an

18 F to a C, Kenneth McClain's from an F to a C, Joe

19 Domichi's from a D to a C and Sheron Olifant's from a

20 D to a C?

21     A.    I don't know exactly what I told him, but

22 I informed him.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

130

1          Q.    What did you inform him?

2          A.    That the students had taken the class as

3    an independent study class.

4          Q.    Did you identify which students?

5          A.    I'm sure I did.

6          Q.    Did you inform him the basis for the work

7    that you -- that they had done?

8          A.    Probably not.

9          Q.    Did he consent to your changing the

10   grades?

11         A.    He didn't say anything one way or another.

12         Q.    Where was he when you called him?

13         A.    He was at the 410 number.

14         Q.    No, where was he physically located, do

15   you know?

16         A.    No, I don't.

17              DR. DAVIS:  When you say -- when you

18   were asked if Professor -- this particular professor

19   gave you his consent to issue a grade change --

20              THE WITNESS:  I didn't ask for his

21   consent.

22              DR. DAVIS:  Well, that's what I was

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

131

1   going to ask you about.  You didn't ask for his

2   consent.

3                    THE WITNESS:  No.

4                    DR. ACKAH:  What was the question?

5                    DR. DAVIS:  Did Dr. Gorum ask Mr.

6   Wickham for his consent.

7                    DR. ACKAH:  Oh, he did.

8                    DR. DAVIS:  No, he said, he did not

9   ask for his consent.

10                   DR. ACKAH:  Is that what you said?  I

11  know I thought you said you did, but you didn't

12  respond --

13                   DR. DAVIS:  That's what I asked him,

14  did -- what's his name -- go ahead, ask the question

15  again.

16  BY MR. DUSTON:

17       Q.    Did Professor Wickham give his consent to

18  your changing grades for which he had submitted as

19  instructor of record?

20                   DR. DAVIS:  Right, and he said, no.

21                   MR. ZEFF:  That's not what he's

22  saying.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

150

1    BY MR. DUSTON:

2        Q.    Okay.    Dr. Gorum, had any students

3    complained to that point to Dean Frederick about

4    Professor Wickham?

5        A.    Not that I know of.

6        Q.    No.    And, in fact, these four students

7    wouldn't have complained because these were four that

8    you were doing independent study with, correct?

9                So why would you -- and as far as you

10    were concerned, you had the right without talking to

11    Professor Wickham to just change the grades, didn't

12    you, 'cause they were your independent study

13    students.

14                Let me rephrase that.    You put these

15    students in independent study in your position as

16    Chair, correct?

17        A.    Correct.

18        Q.    And it was your position that you would

19    simply give them the grades for that course, and

20    assign it to the -- even though they were registered

21    with Professor Wickham's class, right?

22        A.    Yes.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

151

1      Q.    And by your statement, you didn't need

2    Professor Wickham's consent or knowledge, did you?

3      A.    Correct.

4      Q.    Okay.  So just -- just so the Committee's

5    clear, because you had put them in independent study,

6    even though he was instructor of record, and they

7    were on his roster, it is your position that you did

8    not need Professor Wickham's consent.  You could

9    simply make that grade change and that you have the

10   authority to do that; is that correct?

11     A.    I suppose I would not phrase it in that

12   way.

13     Q.    Well, if --

14            DR. ACKAH:  What was your response?

15            THE WITNESS:  My response, I said I

16   wouldn't phrase it in that way.

17   BY MR. DUSTON:

18     Q.    Okay.  How would you phrase it?

19     A.    Students we have -- and Mr. Wickham is not

20   the only one, students who take classes during the

21   summer in independent study and grades are given at a

22   subsequent time.

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

205

1        Q.    And Kenneth McClain was doing independent

2    study as well.  All of them were doing independent

3    study with you and Mr. Dodson, one or the other?

4        A.    It didn't necessarily have to be over the

5    summer.

6        Q.    And all of them were registered in one of

7    Mr. Dawkins' courses during the fall and carried on

8    his grade roster, correct?

9        A.    Um-hum.

10       Q.    And all of them were issued final grades

11   by Mr. Dawkins, correct?

12       A.    Yes.

13       Q.    Is it your testimony that you informed him

14   during the fall that all these students would not be

15   showing up for his class, and that you were grading

16   them independent study?

17       A.    Yes.

18       Q.    And did he say that -- did he consent to

19   that during the semester?

20       A.    Consent to it?

21       Q.    Yes.

22       A.    I told him -- I mean, it's not something

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON FRIDAY, OCTOBER 29, 2004

206

1    you consent to.  I just told him, these students took

2    the course and we signed them up in the fall.

3                    And at the end of the semester I went

4    back to him.

5         Q.   When during the end of the semester did

6    you go back to Mr. Dawkins?

7         A.   At the end of the semester.

8         Q.   Before or after the grades had been

9    issued?

10        A.   It was after.

11        Q.   How long afterward?

12        A.   One or two days.

13        Q.   So several days after he -- one or two

14   days after he issued his grades in December, you went

15   back to him.  What did you -- what did you tell him,

16   or what did he say?

17        A.   I told him about those -- I reminded him,

18   and asked him if he remembered, and I tried to have

19   him recollect how one group had promised to donate

20   money to the Department.  And he remembered that.

21        Q.   But he did not remember at that point

22   having agreed that all these students would have

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-565-GMS |
| v. | ) | |
| | ) | |
| ALLEN L. SESSOMS, Ph.D., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOARD OF TRUSTEES OF | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

### CERTIFICATE OF SERVICE

I, Michael R. Robinson, hereby certify that on October 3, 2007, I caused a true and

correct copy of the foregoing SUPPLEMENTAL APPENDIX IN SUPPORT OF

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT to be served electronically via

CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Gilbert Shelsby, Esq.  
Michael J. Logullo, Esq.  
SHELSBY & LEONI  
221 Main Street  
Stanton, DE 19804  

Gregg L. Zeff, Esq.  
FROST & ZEFF  
Pier 5 at Penn's Landing  
7 North Columbus Boulevard  
Philadelphia, PA 19106  

Michael R. Robinson (#4452)  
SAUL EWING LLP  
222 Delaware Avenue, Suite 1200  
P.O. Box 1266  
Wilmington, Delaware 19899-1266  
(302) 421-6800  
mrobinson@saul.com  

552307.1 10/3/07