IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,

Plaintiff,

v.

ALLEN L. SESSOMS, Ph.D.,

and

BOARD OF TRUSTEES OF DELAWARE STATE UNIVERSITY,

Defendants.

Civil Action No. 06-565-GMS

**DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING THE ALLEGED CONDUCT OF OTHER FACULTY WHO WERE NOT "SIMILARLY SITUATED" AND THE ALLEGED FAILURE TO INVESTIGATE SUCH FACULTY.**

1. Pursuant to Federal Rules of Evidence 401, 402 and 403, Defendants Allen L. Sessoms, Ph. D. ("President Sessoms") and the Board of Trustees of Delaware State University ("DSU") move this Court for an order in limine barring Plaintiff Wendell Gorum, Ph. D. from offering testimony or evidence concerning other current or former DSU Faculty (Deans, Chairs and Professors) who allegedly engaged in similar conduct to what the AHDC found was good cause for termination, unless Plaintiff is first able to establish that those individuals were "similarly situated in all respects."

2. Defendants also move for an order in limine barring Plaintiff and his counsel from offering any testimony, evidence, argument or cross-examination on their novel claim that Defendants' "failure to investigate" vague allegations by Dr. Gorum that DSU professors may have engaged in past conduct that violated DSU policies on grade adjustments is relevant and probative on the issue of disparate treatment or pretext.

3.    The Ad Hoc Dismissal Committee found unequivocally that Dr. Gorum had impermissibly tampered with student grades on forty-six occasions, almost all of them after President Sessoms became President and a new Registrar hired, and that these actions constituted good cause for termination under the Collective Bargaining Agreement. The AHDC recommended, however, that Dr. Gorum receive severe sanctions short of termination because, inter alia, former DSU administrations may have created an atmosphere of laxity and confusion that perpetuated and encouraged random and uncontrolled manipulation of student grades. The AHDC Report did not identify any other current or former DSU faculty member who may have engaged in such conduct, or provide specific examples. Indeed, during the hearing, the AHDC expressly precluded Dr. Gorum from naming names. (10/29/04 AHDC Tr. at 102-105, attached as Ex. A).

4.    More than a year after his termination, Dr. Gorum identified by name in his deposition several other DSU faculty (Deans, Chairs and professors) who he contends either adjusted grades in violation of DSU policies, or whom he believes have knowledge of such conduct by others. During cross-examination, Dr. Gorum was unable to substantiate this allegation with any concrete information about what these professors allegedly did—what conduct, which students, when this occurred, whether they had approval of Deans, etc. (See, e.g., Gorum Dep at 29-30, 40-42, 76-77, and generally Defs' Mem. in Support of Summary Judgment, D.I. 39 at 33-34.

5.    Federal courts routinely consider what is probative circumstantial evidence in discrimination and retaliation cases when there is an allegation of disparate treatment, i.e., that other employees in different protected classes, or who did not engage in protected activity, were treated less severely than the plaintiff. The consensus standard is that the treatment of other

employees before or after the challenged adverse action is not probative of unlawful motivation or otherwise relevant unless the comparators are similarly situated *in all respects*. E.g., Tucker v. Merck & Co., 131 Fed. Appx. 852, 859, 2005 U.S. App. LEXIS 9087, at *14 (3d Cir. 2005) (attached as Ex. B); Deguzman v. New Jersey, 113 Fed. Appx. 438, 441, 2004 U.S. App. LEXIS 21008, at ** 7-8 (3d Cir. 2004) (attached as Ex. C); Scott v. University of Delaware, 601 F.2d 76, 81 (3d Cir. 1979) (allegations that other employees were treated better is not probative of discrimination where their conduct and circumstances were not comparable to plaintiff's). This requires Plaintiffs to show, prior to allowing the jury to hear evidence concerning comparators, the nature and circumstances of their conduct, and that this conduct was known by and disciplinary decisions made by *the same decisionmakers*. When the prior decisions were made before a new supervisor was brought in and started to "clean house" the evidence is not considered relevant or probative of the motives of the new supervisor. Even then, such evidence is often excluded or curtailed under Fed. R. Evid. 403 because of the risk that it would spin off a series of mini-trials.

6. In his Opposition to Defendants' Motion for Summary Judgment Dr. Gorum chose not to introduce any specific evidence of disparate treatment, and it does not appear he can do so. He has made no attempt to prove that any other Department Chair was similarly-situated to Dr. Gorum, and that *President Sessoms* treated that person differently. Instead, Plaintiff makes the argument, which he began during his cross-examination, that President Sessoms and DSU have "failed to investigate" whether or not other professors engaged in grade tampering. This argument might have some merit if Plaintiff had handed over one of his former colleagues on the proverbial silver platter, with details and prior admissions showing the same type of conduct the AHDC found that he had committed, and this was ignored by President Sessoms. There is no such evidence. Vice

President Mark Farley has testified that the Registrar has continued to watch for discrepancies, and his office *is* looking at Dr. Gorum's allegations, but given the vague nature of his testimony. Whatever some faculty may have done in the distant past, Dr. Gorum has not alleged, and DSU is not aware, any other faculty member who engaged in as many serious violations of policy, once on notice of the rules under the new Administration, as Dr. Gorum. The AHDC stated:

> This committee finds it difficult to understand why Dr. Gorum can not comprehend the long term devastating impact and ramifications of his randomly and indiscriminately assigning grades to students who clearly have not acquired the subject matter in the course. The committee has assessed Dr. Gorum's true motive was to selectively help student-athletes to inappropriately meet NCAA requirements. This is highly unprofessional and unethical.

(AHDC Rep. at 10) (attached as Ex. D). In the only other specific examples discussed in the AHDC Report, there were extenuating circumstances or relevant approvals were obtained. For example, the Committee noted Dr. Gorum's reliance on Dr. King's testimony regarding circumstances in which he (Dr. King) was told to adjust grades under the prior administration, but concluded that "Dr. Gorum's case does not fit in to any category that permitted him to change grades in course taught by other instructors." (AHDC Rep. at 9). There is nothing on the record indicating that President Sessoms was aware of even the likelihood that other professors had committed infractions of the nature or magnitude of Dr. Gorum's when he made his recommendation, or at any time since, so mere allegations of past violations are not relevant to his motives. See Mason v. Southern Illinois University, 233 F.3d 1036, 1047 (7th Cir. 2000) (manager's failure to stop to racist conduct by co-workers does not establish racial animus toward plaintiff if she was not aware of it).

7. Plaintiff has indicated his intent, through cross-examination, to argue that anything less than a wholesale effort to root out every past violation of policy is evidence that President Sessoms is lying about his reasons for this recommendation. President Sessoms has compared

himself to the "new Sheriff in town," and faculty were put on notice that policies would be enforced. Dr. Gorum is the first tenured faculty member caught committing serious violations of policies, and it is undisputed that this was uncovered in the course of a routine audit by the NCAA Officer and then the new Registrar. Dr. Gorum conceded that the investigation and his suspension pending investigation were not retaliatory. Defendants' failure to investigate further after terminating Dr. Gorum has no probative value with regard to President Sessoms' motive for Dr. Gorum's termination and is inadmissible under Rule 402.

8. Further, such evidence would be highly prejudicial to Defendants. There is a superficial appeal to the argument that if President Sessoms really did not take grade tampering seriously he should have engaged in a witch hunt for other professors who might have done the same thing under prior administrations. That appeal could easily induce jurors to be confused, where there is no evidence that any individuals were, in fact, similarly-situated to Plaintiff. Accordingly, any probative value from the entire "failure to investigate" argument is substantially outweighed by the risk of undue prejudice and jury confusion, and should be excluded under Rule 403.

WHEREFORE, Defendants respectfully request that this Court exclude any evidence or argument concerning alleged conduct of other DSU faculty who were not "similarly situated" to Dr. Gorum, and to Defendants' "failure to investigate" possible instances of grade tampering by other faculty.

/s/ Michael R. Robinson
Kimberly L. Gattuso (No. 3733)
Michael R. Robinson (No. 4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, Delaware 19899-1266
(302) 421-6800
kgattuso@saul.com; mrobinson@saul.com
*Counsel for Defendants*

OF COUNSEL

Robert L. Duston
SAUL EWING LLP
2600 Virginia Avenue, N.W., Suite 1000
Washington, DC 20037-1922
(202) 333-8800
rduston@saul.com
November 26, 2007

# Exhibit A

IN RE: DELAWARE STATE UNIVERSITY

V.

WENDELL GORUM, Ph.D.

REPLACEMENT COPY

Continuation of the grievance hearing, taken pursuant to notice before Tanya M. Congo, a Notary Public and Certified Professional Reporter, at Delaware State University, MBNA Building, Conference Room 309, 1200 North DuPont Highway, Dover, Delaware, on Friday, October 29, 2004, beginning at approximately 10:05 a.m., there being present:

APPEARANCES:

SCHMELTZER, APTAKER & SHEPARD, P.C.
The Watergate, Suite 1000
2600 Virginia Avenue N.W.
Washington, DC 20037-1922
BY: ROBERT DUSTON, ESQUIRE
Attorney for Delaware State University

FROST & ZEFF
430 Route 70 West
Cherry Hill, NJ 08002
BY: GREGG L. ZEFF, ESQUIRE
Attorney for Dr. Gorum

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

THE WITNESS: Yeah. That's what it was about.

DR. GWANMESIA: And you were specifically told that you should not contact them?

THE WITNESS: That's correct.

DR. GWANMESIA: I just wanted to clarify.

DR. ACKAH: If there are no more questions for Dr. Gorum, I suggest we take our break now and come back at 1 o'clock.

DR. DAVIS: May I ask just one brief question.

Dr. Gorum, to your knowledge, were there other Chairs on campus doing the same kind of things with respect to changing other instructors' grades?

THE WITNESS: Yes.

DR. DAVIS: And I know we've all said -- and I mean it's been the consensus that it's a common practice, but do you know of specific situations in which Chairs were changing other instructors' grades or instructors' grades in the

same fashion?

MR. DUSTON: Without consultation, I assume?

DR. DAVIS: Yes.

THE WITNESS: Yes. I had seven Chairs call me and tell me they did the same things in the same semesters that I did. And I actually --

MR. DUSTON: And I'd like them all identified for the record.

THE WITNESS: Because of reprisals I would be reluctant to identify them.

MR. ZEFF: And just so we're clear --

DR. ACKAH: No, I want to know --

THE WITNESS: And put them in harm to subpoena them.

DR. ACKAH: -- why would they call you? What --

THE WITNESS: Because it was sympathy. They were being sympathetic.

MR. ZEFF: Right.

DR. DAVIS: They'd say, well, you know, you're being charged with this, and I've been

doing the same kind of thing --

THE WITNESS: That's correct.

MR. ZEFF: You know, if --

DR. GWANMESIA: Dr. Davis, did you do that when you were a Chair?

MR. DUSTON: Dr. Ackah, I would strongly object and move that that testimony be stricken and excluded.

Either this Committee should figure out from those professors whether the situations were identical to what is here, or you should not consider at all the allegation of common practice. Because we have fifty different students with different kinds of situations, and unless you prove that they were done in the same way without consultation, the Committee should not consider the allegation that it's a common practice.

MR. ZEFF: Mr. Chair --

DR. ACKAH: If you think about it, if we try to include this in our deliberation, we may be compelled to bring in different persons to testify and, then, thereby incriminate them, so we will not

consider this.

MR. ZEFF: And I'd just like to point out that earlier in the proceedings, Dean Frederick, in his first testimony, said there was -- or Bell, I don't know who it was, said there was an ongoing investigation into another professor and you would not allow that professor to be named.

MR. ACKAH: Exactly. That's why we won't go into that.

MR. ZEFF: And so if you're going to do one, I would ask for the other.

DR. ACKAH: No, no names. No names. We don't have that power.

Okay. Let's come back at 1 o'clock and, hopefully, we should be able to wrap up everything today.

(Recess)

DR. ACKAH: We're going to start with Robert cross-examining Dr. Gorum.

MR. ZEFF: Yes.

CROSS-EXAMINATION

BY MR. DUSTON:

# Exhibit B

LEXSEE 2005 U.S. APP. LEXIS 9087

**TROY TUCKER, Appellant v. MERCK & CO, INC.**

**NO. 04-3023**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*131 Fed. Appx. 852*; *2005 U.S. App. LEXIS 9087*

**April 19, 2005, Submitted Under Third Circuit LAR 34.1(a)**
**May 19, 2005, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From the United States District Court For the Eastern District of Pennsylvania. (D.C. No. 03-cv-05015). District Judge: Honorable James T. Giles.
*Tucker v. Merck & Co., 2004 U.S. Dist. LEXIS 11222 (E.D. Pa., June 17, 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee filed a suit against defendant employer under *42 U.S.C.S. § 1981*, alleging that he was subjected to a racially hostile work environment and to numerous instances of disparate-treatment racial discrimination. The employee appealed after the United States District Court for the Eastern District of Pennsylvania found that he had not established a prima facie case on either claim and granted summary judgment to the employer.

**OVERVIEW:** The employee alleged several incidents of alleged racial discrimination, including the employer's refusal to simultaneously pay for two outside courses of study, its requirement that he provide additional documentation to support a disability leave, a restriction on the number of personal leave days the employee could take, two unsatisfactory employment evaluations, and the employer's alleged failure to satisfactorily investigate his discrimination claims. The employee relied on these same incidents to support his hostile work environment claim. The district court found that the employee had failed to establish a prima facie case because none of the incidents cited in his complaint constituted an adverse employment action, he failed to show that any similarly situated employees were treated differently than he was, and there was no evidence of discriminatory intent on the employer's part. The court found no error. The employer had, in fact, paid for the outside courses, the disability leave, and 17 personal days; the employee received raises despite the unsatisfactory evaluations. The employee produced no evidence that any of the employer's decisions were racially motivated.

**OUTCOME:** The court affirmed the district court's judgment.

**COUNSEL:** For TROY TUCKER, Appellant: Robert T. Vance, Jr., Philadelphia, PA.

For MERCK & CO INC, Appellee: Judith E. Harris, Bacardi E. Jackson, Morgan, Lewis & Bockius, Philadelphia, PA.

**JUDGES:** Before: ROTH, FUENTES and BECKER, Circuit Judges.

**OPINION BY:** BECKER

**OPINION**

[*854] BECKER, *Circuit Judge.*

Troy Tucker sued Merck, his employer, under *42 U.S.C. § 1981*, claiming numerous instances of disparate-treatment racial discrimination, in addition to a claim that he was subjected to a racially hostile work environment. The District Court for the Eastern District

of Pennsylvania found that Tucker had not made out a prima facie case of race discrimination or a hostile work environment, and granted summary judgment to Merck. Tucker now appeals, and we affirm.

I

Tucker's *§ 1981* employment discrimination claim is analyzed under the same framework as [**2] sexual discrimination claims under *Title VII of the Civil Rights Act of 1964*. *Schurr v. Resorts Int'l Hotel Inc., 196 F.3d 486, 499 (3d Cir. 1999)*. This framework was set out in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. Under this test, the plaintiff bears the responsibility of making a prima facie case of discrimination. This is done by showing (1) [*855] that he is a member of a protected class, (2) that he was subject to an adverse employment action, and (3) that similarly situated members of other racial classes were treated more favorably.

An adverse employment action has been defined by the Supreme Court:

> A tangible employment action constitutes a significant change in employment status, such as hiring, firing failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. . . . A tangible employment action in most cases inflicts direct economic harm.

*Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-62, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)*. Our Court has defined an "adverse employment action" under Title VII as "an action [**3] by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004)* (quoting *Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)*; and *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997))*.

We have jurisdiction pursuant to *28 U.S.C. §§ 1291, 1331 & 1343*.

II

Tucker, who is African-American, alleges that a number of decisions taken by Merck constituted adverse employment actions.

A

Merck has a policy of providing educational assistance to its employees. The policy allows employees to get tuition money for degree and non-degree courses that are relevant to their current work at Merck, or to other Merck jobs for which management thinks they might be qualified. Eligibility is at the discretion of management.

In May 2002, Tucker requested assistance to attend computer network certification courses. Tucker's supervisor denied the request because the courses did not relate to Tucker's current position at Merck, or to a potential future position for him. Tucker [**4] then asked for assistance to attend a Pharmaceutical MBA program. This request was approved. Because the course included classes during work hours, Tucker's supervisor asked Tucker to sign an "Alternative Work Arrangement" ("AWA") document drafted by a human resources employee.Tucker refused. Merck nonetheless continued to pay for his Pharmaceutical MBA.

In the summer of 2003, Tucker requested approval to obtain a nursing degree. This request was approved, but his supervisors informed Tucker that he could only receive assistance for one program at a time. Tucker had never planned to do both programs at a time; he was going to "put the MBA on hold in order to fulfill the [nursing] program." (App. 139.) He then did exactly that. No other Merck employee ever seems to have been approved for educational assistance to pursue two degree programs at the same time.

Tucker claims that the AWA and the refusal to fund both the MBA and the nursing degree at the same time are adverse employment actions. We disagree. Neither cost Tucker anything--he never signed the AWA (and even if he had it would not have been an adverse action), and he never had any plans to pursue both degrees at the same [**5] time. The denial of funding for the network certificate also was not an adverse employment decision, as it was not a significant change in employment status or a "significant change in benefits." No negative action was taken; Tucker was simply denied a discretionary [*856] benefit worth some $ 2,197. The MBA courses that he eventually took instead cost Merck some $ 3,855, more

than the cost of his original request. Even if the denial of funding was an adverse action, however, Tucker has not made out a prima facie case of discrimination. Tucker's supervisors were following Merck's stated policy, and Tucker has not even alleged that any members of other racial groups were treated more favorably.

B

Tucker went on short-term disability leave on September 17, 2002, allegedly due to stress caused by a hostile work environment. His doctor submitted documentation on October 4, which his Merck disability case manager determined was insufficient. On October 25, 2002, more than a month after Tucker went on disability, he received a letter noting the lack of documentation and demanding that Tucker's doctor and therapist provide documentation that day in order to avoid termination. Tucker's medical [**6] professionals did so, and he did not come back to work. He was not terminated.

In November 2002, Tucker's disability case manager learned that Tucker was attending his classes while still on disability leave. Concerned that this might indicate fraud, she contacted Tucker's therapist, who told her that this was consistent with his disability. The case manager, who had never met Tucker, took no further action. Tucker remained on short-term disability for about four and a half months, returning to work on February 3, 2003. He received all the disability benefits that he claimed during this time.

Tucker claims that these incidents show an intent to discriminate against him. None of them are even arguably adverse employment actions, however, and he has provided no evidence that anyone else was treated more favorably. Therefore, he has not made out a prima facie case of a *§ 1981* violation.

C

Merck allows employees to take paid leave days without using vacation time. Four types of paid personal absence are typically allowed: death in the immediate family, care for a sick relative, medical or dental appointments, and "legal or civic obligations," such as "closing on a house, jury duty, [**7] etc.," that are "unable to be arranged during non-working times." (App. 414.) The employee's immediate supervisor determines whether to grant a personal day. There is no maximum, but supervisors are advised to limit use of personal days. On average, Merck employees take four or five personal days each year.

Tucker took seventeen personal days in 2003. In part, this was because of a lawsuit that he and his wife had previously filed against Merck, alleging defamation and invasion of privacy in connection with Merck's decision to terminate Tucker's wife. *See Tucker v. Merck & Co., Inc., 102 Fed. Appx. 247 (3d Cir. 2004)* (not precedential opinion) (affirming summary judgment against the Tuckers). Tucker requested paid personal days to attend his own deposition, and those of other witnesses in that case. Tucker's supervisor granted Tucker a personal day for his own deposition, but not for the others. Similarly, when he filed the instant suit, Tucker requested seven or eight personal days to attend depositions. Merck again granted him a personal day to attend his own deposition, but not others. Tucker attended all of the depositions, taking vacation days when he was denied [**8] personal days.

Tucker's supervisor testified that he generally did not require a reason for an employee to take a personal day, but he did require reasons of Tucker, who had [*857] taken an unusual number of personal days. (App. 182.) Indeed, Tucker apparently took five personal days in his first month back from work after medical leave (App. 31), and missed a total of nine and a half of his first nineteen days back from disability leave (App. 25). At some point in summer or fall 2003, after taking 17 personal days, Tucker was told that he would not be granted any more paid personal days in 2003 for any reason, and that he would need to take vacation or unpaid time to attend to any more personal matters.

Tucker claims disparate treatment, pointing out that seven other employees in his division accumulated more than five personal days in 2003, and none were subjected to similar monitoring. Merck replies that none of those seven employees took more than 8.5 personal days, and argues that they were thus not similarly situated. We agree with Merck: Tucker was allowed *twice* as many personal days as any other employee in his division, and therefore cannot point to anyone, of any racial group, [**9] who was treated more favorably than he was. Moreover, several cases hold that requiring an employee to take a vacation day rather than a personal day does not constitute an adverse employment action. *See Cantrell v. Jay R. Smith Mfg. Co., 248 F. Supp. 2d 1126, 1138 n.29*

*(M.D. Ala. 2003)*; *Montgomery v. City of Birmingham, 2000 U.S. Dist. LEXIS 11491, No. 98-AR-2100-S, 2000 WL 1608620, *7 (N.D. Ala. Jan. 20, 2000)*. At least in this case, such a requirement is not "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment," especially given that Tucker was in fact allowed seventeen personal days.

D

Tucker's 2002 and 2003 employment evaluations were unsatisfactory: Tucker was in the bottom half of his group in 2002, and was the lowest ranked analyst in 2003. Tucker alleges that these evaluations were unfair and motivated by racism.

Tucker points to the fact that his supervisor, Timothy Lynch, kept notes of his interactions with Tucker, which he did not do with any other analyst. Tucker considers this evidence of Lynch's racism, which he thinks tainted his evaluations. Lynch testified that he took the notes because he "was aware [**10] that Troy was involved with litigation with the company and I felt a bit threatened by him. I felt like I needed to keep some records to protect myself." (App. 185.) Tucker was suing Merck at the time, and had also sent various letters to Merck officers alleging racial discrimination. Lynch's explanation is perfectly reasonable, and Tucker offers no reason to think that Lynch's notes were made for any purpose but to protect himself from a litigious employee.

It is also far from clear that these evaluations constituted adverse employment actions. The District Court found that they did not, noting that Tucker received raises of over $ 5,000 in each of those years; that he received bonuses of $ 2,088 in 2002 and $ 1,356 in 2003; and that Tucker presented no evidence that these amounts were different either from what white contract analysts got or from what Tucker got prior to his 2002 evaluation. (App. 32.) There is thus no evidence that the negative evaluations had any impact on Tucker's compensation or terms of employment. A negative evaluation, by itself, is not an adverse employment action. *See Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001)*. Indeed, even [**11] a negative evaluation that leads to a lower than expected merit wage increase or bonus probably does not constitute an adverse employment action. *See Rabinovitz v. Pena, 89 F.3d 482, 488-489 (7th Cir.1996)*; *EEOC v. Wyeth Pharm., 2004 U.S. Dist. LEXIS 4382, No. Civ. A. 03-2967, 2004 WL 503417, *2 n.3 (E.D. Pa. 2004)*.

[*858] Even if the evaluations were adverse employment actions, Tucker presented no evidence that anyone similarly situated had been treated more favorably. As Merck puts it, "all that Mr. Tucker offers in support of his claim is his belief that his ratings should have been higher." Merck has offered detailed descriptions of how the evaluations were created and justified. [1] Here, again, Tucker has failed to present a prima facie case.

1 The evaluations contain specific criticisms of Tucker's timeliness, responsiveness, thoroughness, and depth of knowledge. Lynch found numerous errors in his spreadsheets and criticized him for taking a passive and minor role in various projects. Lynch also noted that Tucker was often late for work, not at his desk, reading school textbooks during work hours, or actually asleep at his desk. (App. 388-408.)

[**12] E

In December 2002, Tucker sent a memorandum to various Merck executive officers alleging racial discrimination and demanding an investigation. This letter was referred to Michael Cavalier, a Senior Director of Human Resources, who wrote to Tucker to tell him that he would handle the investigation. Cavalier also told Tucker that he should address his correspondence about the investigation only to Cavalier. Tucker continued to address correspondence to Merck executive officers; Cavalier warned him that this could result in discipline, although Tucker was never actually disciplined. Tucker argues that the requirement that he address his concerns to Cavalier, not the executives, violated Merck's "Open Door Policy" (which "encouraged employees to bring their concerns directly to management"). Tucker provides little support for this argument, and at all events such a violation would not constitute an adverse employment action.

Cavalier's inquiry found no evidence of racial discrimination. Tucker alleges that the investigation was insufficient, but he has not pointed to any evidence of discrimination that Cavalier missed or undervalued. Even if Tucker were right, however, that Cavalier's [**13] investigation was inadequate, he does not explain how that could constitute an adverse employment action. We think it cannot.

III

In addition to his disparate-treatment claims, Tucker alleges that the incidents discussed above created a hostile work environment. We have explained the hostile environment cause of action as follows:

> To bring an actionable claim for [racial] harassment because of an intimidating and offensive work environment, a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working *environment* which is severe enough to affect the psychological stability of a minority employee." We hold that five constituents must converge to bring a successful claim for a . . . hostile work environment under *[§ 1981]*: (1) the employees suffered intentional discrimination because of their [race]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [race] in that position; and (5) the existence of respondeat superior liability.

*Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990)* [**14] (citation omitted).

Tucker alleges that the facts outlined above constituted pervasive and regular discrimination, which occurred regularly since June 2002 and which caused him stress and anxiety. He alleges no facts [*859] other than those set forth above; in particular, he does not allege that anyone ever said or did anything overtly racist to or about him.

The District Court reviewed the caselaw and determined that Tucker had no evidence to support a hostile work environment claim. Isolated incidents of racial harassment will not create such a claim. *See, e.g., Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 482 (3d Cir. 1997)*. We find the District Court's conclusions here persuasive:

> In his hostile work environment claim, plaintiff cannot cite a single incident involving the utterance of a racial epithet, the use of a racist symbol, or *any* direct comment concerning race. Rather, plaintiff raises eight separate incidents where Merck made determinations regarding benefits issues raised by him. These incidents were each employment decisions or actions not linked directly with conduct regarding race. As discussed earlier, plaintiff failed to establish a [**15] prima facie case of intentional discrimination for each of the decisions. He has no direct evidence of discrimination and points to no similarly situated individual treated more favorably. Plaintiff's subjective disagreement with these decisions, and even his opinion that they were racially motivated and were offensive, is insufficient as a matter of law to establish a hostile work environment.

(App. 35.) Tucker has not produced any evidence that any decision ever taken by Merck was racially motivated; indeed, several of the actions he complains of were taken by Merck employees who had never met Tucker and were unaware of his race. Tucker cannot contend that the benefits decisions he complains about constituted harassment, intimidation, or hostility. Thus he has not made a prima facie case of hostile-work-environment discrimination.

The judgment of the District Court will be affirmed.

# Exhibit C

LEXSEE 2004 U.S. APP. LEXIS 21008

**DR. VIRGINIA DEGUZMAN, Appellant v. STATE OF NEW JERSEY, Department of Military and Veterans Affairs; LUCILLE HERTEL; DORIS NEIBART; JAVED YOUSAF; LOUIS LAMOLA; JOSEPH LOUDERMILK**

**No. 03-4436**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*113 Fed. Appx. 438*; *2004 U.S. App. LEXIS 21008*

**September 30, 2004, Submitted Under Third Circuit Lar 34.1(a)**
**October 8, 2004, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY. D.C. Civil No. 00-cv-02943. District Judge: The Honorable William J. Martini.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendants, her former employer, a chief executive officer, and others, alleging violations of Title VII, the New Jersey Law Against Discrimination, the New Jersey Conscientious Employee Protection Act, § 301 of the Labor Management Relations Act, and the U.S. and New Jersey Constitutions. The United States District Court for the District of New Jersey granted defendants summary judgment; the employee appealed.

**OVERVIEW:** The employee, a Filipino physician, was terminated for failing to properly monitor medical testing of a patient, causing the patient to suffer a drug overdose. The appellate court held that the employee established a prima facie case of discrimination based on her gender and race or national origin, but defendants articulated a legitimate reason for terminating her and she failed to prove that this reason was pretextual; therefore, her Title VII and New Jersey Law Against Discrimination claims were properly dismissed. As she failed to prove a causal link between adverse employment actions and the grievances or discrimination charges she filed, her retaliation claim was properly dismissed. Because she did not establish a causal link between her free speech activity and defendants' adverse employment actions, her claims under the New Jersey Conscientious Employee Protection Act and the *First Amendment* failed. Finally, since under the collective bargaining agreement employees could be disciplined only for just cause, and defendants' reason for her termination constituted such just cause, her claim under § 301 of the Labor Management Relations Act was properly dismissed.

**OUTCOME:** The judgment was affirmed.

**COUNSEL:** For VIRGINIA DEGUZMAN, Appellant, Paul I. Weiner, Weiner & Katz, Livingston, NJ.

For STATE OF NJ, Department of Military and Veterans Affairs, LUCILLE HERTEL, DORIS NEIBART, JAVED YOUSEF, LOUIS LAMOLA, JOSEPH LOUDERMILK, Appellee: Angela Foster, Office of Attorney General of New Jersey, Department of Law and Public Safety, Trenton, NJ.

**JUDGES:** Before: ROTH, BARRY, and CHERTOFF, Circuit Judges.

**OPINION BY:** BARRY

**OPINION**

[*439] BARRY, Circuit Judge

Plaintiff Dr. Virginia DeGuzman brought suit against defendants State of New Jersey - Department of Military and Veterans Affairs; Lucille Hertel; Doris Neibart; Javed Yousaf; Louis Lamola; and Joseph Loudermilk, alleging various forms of employment discrimination. The District Court granted summary judgment in favor of defendants. We will affirm.

**I.**

Because we write only for the parties who are familiar with the facts [**2] of this case, our summary of the facts will be brief. Plaintiff is a Filipino female physician, who began work at the New Jersey Veterans Memorial Home (the "Home") in June 1992. During her employment, she filed a number of grievances with her Union against the Home. One of the grievances was triggered by an incident on April 11, 1997, when defendant Doris Neibart, the CEO of the Home, allegedly yelled at plaintiff in public because plaintiff refused to sign an agreement which would have allowed a nurse practitioner to provide primary care to patients under the direction of a physician. Plaintiff also filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The first charge, which was later withdrawn, was filed on March 8, 1995, and the second charge was filed on August 22, 1997.

During her tenure at the Home, plaintiff was disciplined on a few occasions. In May 1998, she received a notice of suspension for failure to follow-up on a swallowing evaluation of a patient, which allegedly resulted in a "choking incident." On September 8, 1999, plaintiff was terminated because of her alleged failure to monitor medical testing of a patient, which caused [**3] the patient to suffer a Coumadin overdose. According to the records, the appropriate medical tests were not conducted on the patient for two months.

Plaintiff brought this action in the United States District Court for the District of New Jersey alleging violations of Title VII, the New Jersey Law Against Discrimination, the *New Jersey Conscientious Employee Protection Act*, the *First Amendment to the U.S. Constitution* and the New Jersey Constitution, and the *Labor Management Relations Act*. Defendants moved for summary judgment, and the District Court granted the motion. Plaintiff filed a timely appeal. We have jurisdiction pursuant to *28 U.S.C. § 1291*.

**II.**

Our review of a grant of summary judgment is plenary. *Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)*. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact," and where, viewing the facts in the [*440] light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Id.; [**4] *Fed. R. Civ. P. 56(c)*.

Plaintiff argues that the grant of summary judgment on her discrimination claims was erroneous. To succeed on a Title VII claim (and a *New Jersey Law Against Discrimination* claim is similarly analyzed), a plaintiff must initially establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position; and (3) nonmembers of the protected class were treated more favorably. See *Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000)*. Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. Id. If the defendant meets its burden of persuasion, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)*. A plaintiff may prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, [**5] or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id. at 413* (quoting *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-1109 (3d Cir. 1997))*. She may also defeat a motion for summary judgment if she demonstrates that "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. (quoting *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994))*.

Here, the District Court found that plaintiff established a *prima facie* case of discrimination based on her gender and race or national origin. It also found that defendants articulated a legitimate reason for terminating her, *i.e.*, she failed to properly monitor medical testing of a patient, which caused the patient to suffer a Coumadin overdose. The District Court concluded, however, that plaintiff failed to meet her burden of proving that

defendants' proffered reason was pretextual. Thus, it granted summary judgment on the discrimination claims.

Plaintiff concedes that "the central issue in this [**6] case is whether [her] termination for the Coumadin incident was actually a pretext for discrimination and retaliation" and that "all of [her] other claims rise or fall depending on the answer to this question." Appellant's Reply Br. at 1. In this regard, the record reflects that: (1) the Coumadin overdose incident occurred; (2) the patient who suffered the overdose was under plaintiffs care at the time of the incident; (3) plaintiff failed to notice that the medical tests were not performed for two months; (4) defendants investigated the incident; and (5) plaintiff was terminated as a result of the incident. Plaintiff has simply not presented sufficient evidence to support any claim of pretext.

Plaintiff, nevertheless, asserts that she should not have been terminated because this was her first patient care incident and, under the Home's operating procedures, one patient care issue was not a ground for termination. According to plaintiff, the choking incident in 1998, which resulted in her previous suspension, never actually occurred but was fabricated by defendants. Among other things, she contends that there were no witnesses to that incident. This is simply incorrect, as the [**7] District Court found, although surely the investigation could have been documented more thoroughly. And, as the District Court [*441] also found, there is no question of material fact as to whether the choking incident itself was fabricated. The record includes a report by Dr. Yousaf, which explicitly states that based upon his review of the medical chart of the patient who choked, plaintiff failed to follow up on an order she had given four months earlier to evaluate the ability of that patient to swallow.

Plaintiff also alleges that defendants' proffered reason for terminating her was pretextual because the Coumadin incident was caused by a systemic breakdown. This allegation, however, does not cast sufficient doubt on defendants' proffered reason. Even if we assume that the floor nurses failed to perform their jobs, it is undisputed that plaintiff was the physician responsible for the patient's care at the time of the incident.

Plaintiff contends, next, that the District Court erred in finding that there was insufficient evidence from which a factfinder could reasonably conclude that invidious discrimination was more likely than not a motivating cause of defendants' actions. She claims [**8] that she was treated differently than other similarly situated employees in the following ways: (1) her termination was much more severe than the discipline of the nurses that were involved in the Coumadin overdose incident; and (2) she was the only doctor who was disciplined, even though other physicians, such as Dr. Yousaf, had patient care issues. The evidence does not support these contentions. For starters, it is not clear that nurses and physicians were "similarly situated employees." Even if we were to assume that they were, the record indicates that nurses were disciplined for similar conduct. In addition, as the District Court found, the record does not indicate that Dr. Yousafs alleged negligence in handling patients was comparable to that of plaintiff in the Coumadin overdose incident.

Plaintiff also contends that the District Court erred in granting summary judgment on the retaliation claim. To establish a *prima facie* case of retaliation, she must demonstrate that: (1) she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected [**9] activity and the adverse action. *Weston v. Cmmw. of Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).* If she succeeds in establishing a *prima facie* case, the burden-shifting framework applies.

The District Court correctly found that although plaintiff satisfied the first two prongs of the *prima facie* case, she failed to raise an issue of material fact giving rise to an inference of a causal link between adverse actions she received and the various grievances and charges of discrimination she filed. The Court properly took into account the totality of circumstances in finding that the adverse actions "occurred in response to different incidents, none of which can be linked to plaintiffs complaints about discrimination." Among other things, the Court considered the lack of any evidence that defendants ever mentioned the grievances or the EEOC charges to plaintiff, as well as the lapse of time between plaintiffs filing of the EEOC charges and the termination. [1]

1 Plaintiff also appeals the District Court's grant of summary judgment on her claims under the *New Jersey Conscientious Employer Protection Act* and the *First Amendment*. The District Court did not err. Plaintiff failed to establish a causal

link between her free speech activity and defendants' adverse actions.

[**10] Finally, plaintiff argues that the District Court erred in granting summary judgment on her claim under *§ 301 of the Labor Management Relations Act.* To succeed [*442] on that claim, plaintiff "must prove the same two facts to recover money damages: that the employer's action violated the terms of the collective-bargaining agreement and that the union breached its duty of fair representation." *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 564, 108 L. Ed. 2d 519, 110 S. Ct. 1339 (1990).* The District Court properly found that a triable issue of fact did not exist as to the first requirement. The collective bargaining agreement provided that "discipline of an employee shall be imposed only for just cause." Here, defendants' reason for plaintiff's termination constituted such just cause.

**III.**

For the foregoing reasons, we will affirm the judgment of the District Court.

# Exhibit D

# Delaware State University

*Versus*

# Wendell Gorum Ph.D.

## Report of the Ad Hoc Committee Hearing

**Conducted on**

**August (30, 31); September (28, 29); October (27, 28, 29) 2004**

In summary, the committee has determined and is convinced that Dr. Wendell Gorum effected grade adjustments by submitting *Change of Grade* forms, *Missing Grade* forms, *and Removal of Incomplete* forms for 48 Mass Communications students, as alleged by DSU. Secondly, that he effected these changes without the approval or permission of the instructors who taught the courses and without the signature of the appropriate dean, which is Dr. Frederick as contained in the University Catalog (**Catalog 2001-2003, pg. 25**).

## DID DR. WENDELL GORUM COMMIT ANY VIOLATIONS IN THE PROCESS OF THE GRADE ADJUSTMENTS?

Dr. Gorum's defense on the issue of violating university policies some how contradicts his argument that he did not *adjust* students' grades as charged by the university. Dr. Gorum argues that the motives for his actions are relevant to the finding of facts, because all his actions were taken in the best interest of the students and in accordance with past practices and goals of DSU which were *designed to encourage and promote graduation rates and maintain scholarship*. Secondly, Dr. Gorum asserts that some his actions were taken to resolve grade issues for students who were wrongfully purged from the system by DSU. Yet, the committee can not identify a single student out of the 48, whose grade was *modified* to accommodate financial purge. The committee agrees that motives are relevant and necessary, and especially if they provide the bases for assessing the guilt, as well as the magnitude or severity, of the violations, for example as presented by the university.

The committee disagrees with Dr. Gorum's argument that his "motive in changing students grades was predicated on his desire to help students and DSU, or that his modification of grades were in the best interest of the students. This committee finds it difficult to understand why Dr. Gorum can not comprehend the long term devastating impact and ramifications of his randomly and indiscriminately assigning grades to students who clearly have not acquired the subject mattor in the course. The committee has assessed that Dr. Gorum's true motive was to selectively help student-athletes to inappropriately meet NCAA requirements. This is highly unprofessional and unethical.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | ) | |
| Plaintiff, | ) | Civil Action No. 06-565-GMS |
| v. | ) | |
| ALLEN L. SESSOMS, Ph.D., | ) | |
| and | ) | |
| BOARD OF TRUSTEES OF DELAWARE STATE UNIVERSITY, | ) | |
| Defendants. | ) | |

## CERTIFICATION OF COUNSEL IN ACCORDANCE WITH L.R. 7.1.1

I, Michael R. Robinson, hereby certify that Defendants' counsel has made reasonable efforts to reach agreement with the opposing attorneys on the matters set forth in DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING THE ALLEGED CONDUCT OF OTHER FACULTY WHO WERE NOT "SIMILARLY SITUATED" AND THE ALLEGED FAILURE TO INVESTIGATE SUCH FACULTY.

/s/ Michael R. Robinson
Michael R. Robinson (#4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
mrobinson@saul.com

Dated: November 26, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WENDELL GORUM, Ph.D.,

Plaintiff,

v.

ALLEN L. SESSOMS, Ph.D.,

and

BOARD OF TRUSTEES OF DELAWARE STATE UNIVERSITY,

Defendants.

Civil Action No. 06-565-GMS

**CERTIFICATE OF SERVICE**

I, Michael R. Robinson, hereby certify that on November 26, 2007 I caused a true and correct copy of the foregoing DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING THE ALLEGED CONDUCT OF OTHER FACULTY WHO WERE NOT "SIMILARLY SITUATED" AND THE ALLEGED FAILURE TO INVESTIGATE SUCH FACULTY to be served electronically via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Gilbert Shelsby, Esq.
Michael J. Logullo, Esq.
SHELSBY & LEONI
221 Main Street
Stanton, DE 19804

Gregg L. Zeff, Esq.
FROST & ZEFF
Pier 5 at Penn's Landing
7 North Columbus Boulevard
Philadelphia, PA 19106

/s/ Michael R. Robinson

Michael R. Robinson (#4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800 phone
(302) 421-6813 fax
mrobinson@saul.com