## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-565-GMS |
| v. | ) | |
| | ) | |
| ALLEN L. SESSOMS, Ph.D., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOARD OF TRUSTEES OF | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION IN LIMINE TO
### EXCLUDE EVIDENCE PRESENTED TO THE AD HOC COMMITTEE AND OTHER
### EVIDENCE UNKNOWN TO PRESIDENT SESSOMS AT THE TIME HE
### RECOMMENDED PLAINTIFF'S TERMINATION

Pursuant to Federal Rules of Evidence 401, 402 and 403, Defendants Allen L. Sessoms,

Ph. D. ("President Sessoms") and the Board of Trustees of Delaware State University ("DSU")

move this Court for an order *in limine* barring Plaintiff Wendell Gorum, Ph. D. from offering any

testimony or other evidence that he previously presented to the Ad Hoc Dismissal Committee

(AHDC), subsequently discovered evidence, or arguments concerning such evidence, that were

not known to President Sessoms on April 15, 2005 when he made the recommendation that

Plaintiff claims violated his rights under Section 1983. The parties' estimate of a seven-day jury

trial was based upon Plaintiff's plan to re-introduce to the jury all of the exhibits and many of the

witnesses previously produced before the AHDC, and will be reflected in Plaintiff's proposed

exhibit and witness lists. Prior testimony or evidence not known to President Sessoms is

irrelevant and inadmissible. When such evidence is properly excluded, this case is no more than

a three-day trial.

1.      On April 14, 2005, President Sessoms recommended to the DSU Board of

Trustees that Dr. Gorum be terminated for altering student grades and giving students grades in

courses he did not teach and, in many cases, in which the students were not enrolled.  President

Sessoms stated that he based that recommendation on the findings and conclusions of the Ad

Hoc Dismissal Committee, while rejecting their recommendation of mitigated sanctions.

President Sessoms has testified—and Plaintiff will not be able to rebut—that the President did

not look at the transcripts or exhibits and was not present for any testimony other than his own;

he relied upon the AHDC Report, as well as the recommendations of Vice President Mark

Farley.  The sole issue for trial is Plaintiff's claim that President Sessoms was impermissibly

motivated by Plaintiff's alleged First Amendment protected conduct, and that his articulated

reason—doctoring grades—was actually a pretext for retaliation based on his alleged First

Amendment activity.

2.      Plaintiff seeks to cast doubt on the legitimacy of President Sessoms' articulated

rationale by calling into question the merits of some of the findings of fact and conclusions made

by the AHDC by, *inter alia*, relying on facts and circumstances that were unknown to President

Sessoms at the time he determined that termination was warranted.  This evidence includes

hundreds of pages of exhibits presented at the AHDC  hearing and the testimony of an unknown

number of former DSU students and employees who testified before the AHDC.  This could

involve reading hundreds of pages from the hearing transcript if these witnesses are unavailable

for trial.  Alleged facts and circumstances unknown to President Sessoms at the time he decided

to recommend termination simply are not, and cannot be, relevant to the genuineness of his

motives.  Further, the prejudicial effect of such evidence will outweigh any relevance it might

have because it is likely to induce the jury to second-guess President Sessoms' recommendation

based on its own independent evaluation of the facts at trial, which is not the proper standard for assessing liability when motive is at issue.

3.      It is well-settled that, when determining the alleged motivation of a decisionmaker, it is the perception of the decisionmaker that is relevant. Schaffner v. Glencoe Park District, 256 F.3d 616, 622 (7th Cir. 2001). Where there is no evidence that a decisionmaker was aware of factors allegedly pertinent to the decision when it was made, evidence regarding those factors is irrelevant. Black v. Southeastern Transp. Authority, 2006 U.S. Dist. LEXIS 72022 (E.D. Pa. 2006) (attached as Ex. A) (opinions of co-workers regarding employee's skills irrelevant where there was no evidence they were made known to decisionmaker). See also Brown v. Trustees of Boston University, 891 F.2d 337, 348-349 (1st Cir. 1989) (in sex discrimination case challenging tenure decision, evidence of candidate's credentials that was not in tenure file was inadmissible); Kotas v. Eastman Kodak Co., 1997 U.S. Dist. LEXIS 13839 (E.D. Pa. 1997) (attached as Ex. B) (evidence of ages of employees in and outside group selected for termination in reduction in force inadmissible where there was no evidence that decisionmaker had any knowledge of employee ages). Evidence of facts unknown to President Sessoms at the time he made his April 14, 2005 recommendation to the DSU Board are irrelevant and inadmissible under Federal Rule of Civil Procedure 402. To the extent that Plaintiff wishes to challenge President Sessoms' recommendation based on any facts or contentions other than what is contained in the AHDC Report, he must, at minimum, establish as a predicate to admissibility, with regard to each and every such fact or contention, that President Sessoms was aware of it at the time he made his recommendation.

4.      Allowing Dr. Gorum to challenge President Sessoms' articulated reason for his recommendation based on facts or details unknown to him will mislead the jury and unfairly

prejudice Defendants. The Committee concluded that Dr. Gorum's conduct constituted good cause for discharge. Plaintiff does not contend that the investigation into his misconduct, his suspension pending the investigation, or the AHDC Report were retaliatory. Plaintiff now wants to introduce into evidence exhibits, testimony and contentions placed before the Ad Hoc Dismissal Committee and then re-argue to the jury that it should accept his view that there was insufficient cause for termination.

5.      It is well-established that the ultimate issue in a retaliation case is whether or not the decisionmaker was motivated by the employee's protected conduct, not whether or not his decision was "right." An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." DeLuca v. Allied Domecq Quick Service Restaurants, 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006) (attached as Ex. C), citing Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir.1998); accord Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984). It is not the role of a court to "sit as a super-personnel department" to second-guess business decisions. Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) (courts should not question wisdom of employer's reliance on a certain explanation for action, but only whether explanation is honest). Asserting that a report on which a decisionmaker relied is "flawed" does not raise the inference that the basis for the decision was pretextual unless those flaws were known to the decisionmaker at this time. DeLuca, 2006 WL 1662611, at *10, citing Williams v. Brooklyn Union Gas Co., 819 F. Supp. 214, 225 (E.D.N.Y. 1993).

6.      Permitting Plaintiff to introduce any evidence other than the AHDC Report itself is likely to mislead the jury into believing that its role is to reevaluate *de novo* President

Sessom's recommendation that Dr. Gorum be terminated and that it may find in Plaintiff's favor if it disagrees with that recommendation. This would be highly prejudicial to Defendants because it would subject Defendants' conduct to a far higher standard of review than the law requires and create the risk of liability based simply on placing a recommendation regarding appropriate academic conduct in the hands of individuals who are not qualified to make it. Accordingly, any probative value of evidence concerning alleged facts unknown to President Sessoms at the time he made the recommendation that Dr. Gorum be terminated is outweighed by the danger of unfair prejudice and misleading the jury and is therefore inadmissible under Federal Rule of Civil Procedure 403.

WHEREFORE, Defendants respectfully request that this Court exclude any evidence of any alleged facts bearing on the recommendation that Dr. Gorum be terminated that were not known to President Sessoms at the time the recommendation was made.

**SAUL EWING LLP**

**OF COUNSEL**

/s/ Michael R. Robinson
                                        
Kimberly L. Gattuso (No. 3733)

Robert L. Duston                        Michael R. Robinson (No. 4452)
SAUL EWING LLP                          222 Delaware Avenue, Suite 1200
2600 Virginia Avenue, N.W.              P.O. Box 1266
Suite 1000                              Wilmington, Delaware 19899-1266
Washington, DC 20037-1922               (302) 421-6800
(202) 333-8800                          kgattuso@saul.com
rduston@saul.com                        mrobinson@saul.com
                                        *Counsel for Defendants*

Dated: November 26, 2007

# <u>Exhibit A</u>

LEXSEE 2006 U.S. DIST. LEXIS 72022

**EUGENE BLACK v. SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

CIVIL ACTION NO. 05-3411

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2006 U.S. Dist. LEXIS 72022*

**October 3, 2006, Decided
October 3, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Black v. SEPTA, 2006 U.S. Dist. LEXIS 71941 (E.D. Pa., Oct. 3, 2006)*

**PRIOR HISTORY:** *Black v. SEPTA, 2006 U.S. Dist. LEXIS 67792 (E.D. Pa., Sept. 20, 2006)*

**COUNSEL:** [*1] For EUGENE BLACK, Plaintiff: MICHAEL A. CANCELLIERE, JR., LEAD ATTORNEY, HOWARD, BRENNER & NASS, PC, PHILADELPHIA, PA.

For SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, Defendant: NATALIE KLYASHTORNY, LEAD ATTORNEY, SAUL M. KRENZEL & ASSOCIATES, PHILADELPHIA, PA; ROBERT J. HAURIN, LEAD ATTORNEY, SAUL H. KRENZEL & ASSOCIATES, PHILADELPHIA, PA; SAUL H. KRENZEL, LEAD ATTORNEY, SAUL H. KRENZEL & ASSOCIATES, PHILADELPHIA, PA.

**JUDGES:** JACOB P. HART, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JACOB P. HART

**OPINION**

*MEMORANDUM AND ORDER*

JACOB P. HART

UNITED STATES MAGISTRATE JUDGE

The Defendant has filed a Motion in Limine to Preclude Opinion Testimony regarding the Qualifications of Applicants for the NSS Position. The Plaintiff has proffered the testimony of co-workers that they considered him the most qualified for the position. The Defendant contends that the opinions of the co-workers regarding the qualifications of the applicants is irrelevant. We agree.

There is absolutely no evidence in the record that the co-workers whose testimony is proffered made the decision-makers aware of their opinions. The court will not sit as some type of appellate human resources [*2] department. There is no indication that the evidence which Plaintiff now proffers in support of his ability to perform the Network Specialist job was presented to the three decision-makers at the time. Similarly, there is no evidence that Mr. McCann ever made the decision-makers aware of his disdain for Mr. Tran's abilities.

In short, the opinions of Plaintiff's co-workers are irrelevant. "It is the perception of the decision maker which is relevant." *Schaffner v. Glencoe Park Dist., 256 F.3d 616, 622 (7th Cir. 2001)*(quoting *Dale v. Chicago Tribune Co., 797 F.2d 458, 464-65 (7th Cir. 1986)*). Barring evidence that the decision makers were made aware of the co-workers' opinions regarding Plaintiff's abilities and qualifications, their testimony on the subject is irrelevant to the decision-making process.

To the extent the Defendant seeks to exclude

testimony from Plaintiff's Septa co-workers concerning his experience at another job, the Plaintiff has informed the court that he will be presenting such evidence through his own testimony and a supervisor at his other job. Therefore, with respect to that issue, the Motion is moot.

An appropriate Order [*3] follows.

### ORDER

AND NOW, this 3rd day of October, 2006, upon consideration of the Defendant's Motion in Limine to Preclude Opinion Testimony Regarding the Qualifications of Applicants for the NSS Position, the response, thereto, and for the reasons stated in the accompanying Memorandum, IT IS HEREBY

ORDERED that the Motion is GRANTED IN PART. To the extent the Defendant sought to exclude testimony from co-workers regarding Plaintiff's qualifications or the qualifications of the other candidates, the Motion is GRANTED. To the extent the Defendant sought to exclude testimony from Septa co-workers regarding Plaintiff's experience at another employer, the Motion is DISMISSED AS MOOT.

BY THE COURT:

JACOB P. HART

UNITED STATES MAGISTRATE JUDGE

# Exhibit B

LEXSEE 1997 U.S. DIST. LEXIS 13839

**SHEILA M. KOTAS, Plaintiff, v. EASTMAN KODAK COMPANY, Defendant.**

**CIVIL ACTION NO. 95-CV-1634**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1997 U.S. Dist. LEXIS 13839; 7 Am. Disabilities Cas. (BNA) 522*

September 3, 1997, Decided
September 4, 1997, Filed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer moved for judgment as a matter of law or a new trial on plaintiff employee's disability discrimination claim after the jury awarded her punitive damages. The employee moved for a new trial on her age discrimination claim after the jury awarded judgment to the employer. The employee moved for a new trial on the issue of compensatory damages on her disability discrimination claim and for reinstatement and attorney fees.

**OVERVIEW:** The employee filed an action against the employer, alleging age and disability discrimination. The jury awarded judgment on the age discrimination count and awarded punitive damages to the employee on the disability discrimination count. The employer moved for judgment as a matter of law on the employee's disability claim or for a new trial on the claim. The employee moved for a new trial on her age discrimination claim and the compensatory damages portion of her disability discrimination claim. The employee also moved for reinstatement and attorney fees and costs. After reviewing the evidence, the court found that the employee failed to demonstrate that she was disabled or that the employer considered her to be disabled. She failed to satisfy her initial burden of proving that she was a qualified person with a disability. The court further found that the jury's verdict, which awarded punitive damages to the employee, was against the great weight of the evidence. Finally, the court found that the jury did not err in awarding judgment to the employer on the employee's age discrimination claim.

**OUTCOME:** The employer's motion for judgment as a matter of law on the employee's disability discrimination claim was granted. The employee's motion for a new trial on the issue of compensatory damages on her disability discrimination claim was dismissed as moot. The employee's motion for a new trial on her age discrimination claim was denied. The employee's motion for reinstatement and for attorney fees and costs was dismissed as moot.

**COUNSEL:** [*1] For SHEILA M. KOTAS, PLAINTIFF: RICHARD A. ASH, LYMAN AND ASH, PHILA, PA USA.

For SHEILA M. KOTAS, PLAINTIFF: MARGARET S. PHIAMBOLIS, MARGARET S. PHIAMBOLIS, ESQUIRE, SPRING HOUSE, PA USA.

For EASTMAN KODAK COMPANY, DEFENDANT: JEROME A. HOFFMAN, LINDA S. DWOSKIN, DECHERT, PRICE & RHOADS, PHILA, PA USA.

**JUDGES:** JAMES McGIRR KELLY, J.

**OPINION BY:** JAMES McGIRR KELLY

**OPINION**

*MEMORANDUM*

**J.M. KELLY, J.**

**SEPTEMBER 3, 1997**

Page 2

1997 U.S. Dist. LEXIS 13839, *1; 7 Am. Disabilities Cas. (BNA) 522

Presently before the Court are the following post-trial motions in the above-captioned case: Defendant's Motion for Judgment as a Matter of Law on Plaintiff's disability discrimination claim; Defendant's Alternative Motion for a New Trial on Plaintiff's disability discrimination claim; Plaintiff's Motion for a New Trial in Part and to Alter and Amend Judgment accordingly; Plaintiff's Motion for Reinstatement; and Plaintiff's Motion for Attorneys' Fees and Costs. Also before the Court are all Responses, Replies and Supplemental Briefings received in relation to these Motions. For the following reasons, Defendant's Motion for Judgment as a Matter of Law will be granted, in the alternative, Defendant's Motion for a New Trial on the disability discrimination [*2] claim is conditionally granted; Plaintiff's Motion for a New Trial on her age discrimination claim is denied. Plaintiff's Motion to alter and amend the verdict; her Motion for Reinstatement; and her Motion for Attorney's Fees and Costs will be dismissed as moot.

I. *Background*

Sheila Kotas ("Plaintiff") was employed by Eastman Kodak ("Kodak" or "Defendant") for twenty-five years, starting in 1968, until her termination in 1993. For the last sixteen of those years, Plaintiff was employed as a customer support representative ("CSR") in the Atlantic Branch of Kodak's Office Imaging ("OI") Division. Her position entailed training purchasers of Kodak copier machines in the use of their equipment. Although most of her work was done at customers' facilities, Plaintiff worked out of Kodak's Horsham, Pennsylvania office. At the time of her discharge, Plaintiff was forty-six years old.

Plaintiff has suffered from chronic back pain since the early 1980s. In 1991, her back impairment was diagnosed as a herniated disk. Over time, Plaintiff's back condition worsened and she spent several weeks off work in 1991 after her physician prescribed bed rest. When Plaintiff returned to work, her [*3] back condition again worsened and her physician recommended that she undergo back surgery to correct the herniated disk. Plaintiff scheduled surgery for the Spring of 1991. Subsequently, Plaintiff decided to cancel her scheduled surgery and to pursue other treatment techniques, such as physical therapy, for her symptoms. (N.T. Day 5, pp. 63-65).

In 1991, Kodak introduced two new, advanced

copier models, the 1575 and the 2100. Each branch of the OI Division received a notice that all CSRs and sales representatives would be scheduled to travel to Rochester for a one week training course on the two machines. When Plaintiff received the notice regarding her scheduled training, she told Leonard Morris ("Morris"), then the District Sales Manager, that she would not be available on the proposed date due to her scheduled back surgery and requested that he attempt to reschedule her training for later in August, when Plaintiff would have returned from her surgery. Morris advised her that he would look into it. After Plaintiff decided to cancel her scheduled surgery, she told Morris that she would be able to attend her scheduled training session after all. At this time, he was informed that [*4] all of the training slots were filled and that Plaintiff would be unable to attend the training course. He said he investigate into other training opportunities, but Plaintiff received no training on the new machines at this time. (N.T. Day 5, pp. 64-66).

Plaintiff was concerned about her lack of training on the new models and repeatedly requested that she receive training on these models. By the Autumn of 1991, several of Plaintiff's accounts started receiving 1575 model copiers. Because she had not yet received formal training on the 1575 copier, Plaintiff requested that Meg Anker ("Anker"), the other CSR based in the Philadelphia area, perform the training, while Plaintiff observed. After this session and after studying the manuals and practicing in the Demonstration Room, Plaintiff was able to conduct basic training on the 1575 copier for the City of Philadelphia. In October, another of Plaintiff's accounts, Wyeth-Ayerst Laboratories received a 1575 copier. The training at Wyeth was intended to be for "key operators," who need training in the more complex functions of the copier. Plaintiff attempted to provide this training; however, the client was angry when it became apparent [*5] that Plaintiff was not fully knowledgeable about the functions of the copier. Following this incident, Plaintiff received a voicemail from Jim Brannigan, the new district sales manager, stating that all further training on the 1575 copier would be conducted by Anker, until the end of the year. Plaintiff was to be responsible for conducting all other training in both her own territory and Anker's territory. Starting in January 1992, Plaintiff again began to receive calls requesting training on the 1575 copier. (N.T. Day 5, pp. 106-17).

In January 1992, Plaintiff's back condition had

1997 U.S. Dist. LEXIS 13839, *5; 7 Am. Disabilities Cas. (BNA) 522

continued to worsen and she was forced to spend a week off work for bed rest. At this time, Plaintiff and her physician became convinced that surgery would be the only way to alleviate her condition, and surgery to correct her herniated disk was scheduled for April 1992. The surgery took place as scheduled and Plaintiff took several months off work to recuperate. Plaintiff returned to work in July 1992. Initially, her neurosurgeon imposed a two week restriction to light duty. Plaintiff found that she was too busy to maintain the restricted schedule, and she began working full-time, before the end of two [*6] weeks. Her Doctor's recommendation of light duty was not renewed. (N.T. Day 6, pp. 11-16). Several months after her surgery, Plaintiff's surgeon wrote to her general practitioner, to advise him of Plaintiff's condition. He stated, "she has definitely improved a great deal after surgery, but it has been a slow drawn out recovery process for her. I would expect her to continue to improve as the months pass." (N.T. Day 5, pp. 86-87). This letter was also forwarded to Defendant and placed in Plaintiff's medical file.

In the Summer of 1992, Kodak announced that a secretarial position would be eliminated in its Princeton Office, also located in the Atlantic Branch, due to the transfer of order entry functions to Rochester. That secretarial position was held by Melinda Ceralde ("Ceralde"), a twenty-five year old secretary. Fearing that she would be laid off, Ceralde contacted her supervisor, Jim Clifford, the Manager for the Atlantic Branch of OI Division about other opportunities with Kodak. Clifford advised Ceralde that he would look into making her a CSR. Clifford talked to Brannigan about the possibility of transferring Ceralde. Brannigan stated that he did have an opening for a CSR [*7] in the Philadelphia region because two of his CSRs had been on disability leave, recovering from surgery, for much of the Summer. [1] In August of 1992, Ceralde was assigned to the Philadelphia Office as a CSR trainee. During her first two weeks as a CSR, Ceralde received training from Cyril Ffolkes on Kodak's most recently released copiers, the 1575 and 2100 models. Although there was no reason why she could not have participated, Plaintiff was not informed of this potential training opportunity. There was, however, some concern that the training would be repetitive or too basic for Plaintiff. (N.T. Day 2, pp. 92-93, Day 3, pp. 99-103). After completing this initial training, Ceralde became a "floater", a CSR with no particular assigned territory, filling in where needed. On occasion, she traveled with Plaintiff and with Anker, observing training

sessions and also conducting training on both the 1575 model copier and other, older copier models. (N.T. Day 3, pp. 20-21).

> [1] Anker also took an extended absence during the Spring and Summer of 1992 in order to recover from a hysterectomy. Upon her return to work, she, too, fully resumed her normal duties. (N.T. Day 8, p.87).

[*8] Following Plaintiff's return from her back surgery, she discovered that a number of 2100 copiers were scheduled to be shipped to her clients. She testified that she became increasingly concerned about her lack of training on this machine and requested that Anker perform the first training session while she observed. When Plaintiff contacted Brannigan to request training on this machine, he suggested that she contact Steven Corey ("Corey"), a former CSR working out of Defendant's Princeton Office. Plaintiff met with Corey in the demonstration room of the Princeton Office twice and once again in the Philadelphia Office and received one-on-one instruction regarding the operation of the 2100 copier. When a large number of 2100 copiers were delivered to SEPTA, Plaintiff and Ceralde shared the training. After watching Ceralde perform the initial training session, Plaintiff observed that Ceralde seemed to have had more training on the 2100 copier because she knew more of the features and functions of the machine. Plaintiff did try to increase her skills by practicing in the demonstration room. She also asked Anker to work with her on the 2100 copier, but they were unable to find a [*9] time to meet. (N.T. Day 6, pp. 17-28). On January 7, 1993, Brannigan called a meeting with Ceralde and Plaintiff and told them to divide Plaintiff's former territory, so that Ceralde would have a fixed territory. As a result, Plaintiff no longer provided customer support for many of her former accounts in Chester and Montgomery Counties. (N.T. Day 6, pp. 30-34).

In 1992, Defendant continued to incur substantial financial losses, performing well below its operating plan (N.T. Day 7, p. 51). The company was forced to make significant cuts in costs and overheads. Initially, efforts were made to cut costs in the areas of travel and entertainment and by a freeze on the purchase of new equipment. The marketing staff at Defendant's headquarters in Rochester was also reduced by approximately one third. (N.T. Day 7, p. 53). By the end of 1992, Kodak officials determined that a nationwide

Page 4

1997 U.S. Dist. LEXIS 13839, *9; 7 Am. Disabilities Cas. (BNA) 522

reduction in force in the field staff of the OI division would also be necessary to cut costs in that division. Prior to undertaking this reduction in force, Defendant restructured the OI Division from ten branches nationwide to seven branches. The Atlantic Branch was consolidated with the Eastern Branch, [*10] effective January 1, 1993, under the leadership of David Rohrback ("Rohrback"), the Branch Manager for the former Eastern Branch. (N.T. Day 7, p. 62). Clifford, the Branch Manager for the former Atlantic Branch of the OI division, lost his position with the company during this restructuring. (N.T. Day 2, pp. 61-62).

Kodak officials determined that a twenty percent reduction in its field staff would be necessary to achieve the required cost savings. (N.T. Day 7, p. 56) In the OI Division, employees performing administrative, secretarial, CSR and logistical functions were targeted for lay-off. (N.T. Day 7, p. 57). These positions were selected because they did not generate revenue directly. Initially, supplemental employees in these positions were laid off. (N.T. Day 7, p. 133) In late December 1992 and January 1993, Kodak developed a Performance Appraisal Ranking ("PAR") Process to identify which permanent employees would be laid off. The PAR process was designed to provide a ranking of all employees within job classifications and wage bands based upon a weighted average of their last three performance reviews. [2] (N.T. Day 7, pp. 57-58). Employees were classified into wage bands based [*11] upon their salary level.

> [2] The PAR process used an algorithm in which the most recent Performance Appraisal ("PA") multiplied by 25, the previous PA multiplied by 5, and earliest PA, were added together and then 92 was subtracted from the total in order to calculate the PAR figure. Although an employee's PAR ranking would be largely determined by their most recent PA, other factors such as bumping rights and transfers meant there was no automatic correlation between a higher score on the most recent PA and a higher PAR ranking. (N.T. Day 7, pp. 116-20).

Human Resources officials worked with the Branch Managers to develop a Workforce Reduction Plan ("WRP"), identifying as excess those positions that could be eliminated. Those employees with the lowest PAR rankings within those positions identified as excess were the ones initially targeted for layoff. Accordingly, when the initial WRP was produced for each Branch, only the positions targeted for reduction would be identified and not the individual employee who [*12] would be laid off. (N.T. Day 7, pp. 70-71). The WRP was then sent to Rochester for matching of the identified positions with actual employees. (N.T. Day 7, p. 73). If a decision maker knew the results of the most recent performance appraisals, however, it would be possible for him or her to determine, with relative accuracy, which employees would be targeted for discharge. It was Plaintiff's contention throughout the trial that the objective PAR process was a sham that enabled decision makers to target undesirable employees while protecting younger, favored employees from discharge. (N.T. Day 7, pp. 120-25).

Barbara Mather, Human Resources Manager for Office Imaging, sales and marketing, based in Rochester, was assigned to work with the Branch Managers for the OI Division in developing a WRP for each branch. For the Eastern and former Atlantic Branch, she prepared the WRP with Rohrback. [3] (N.T. Day 7, pp. 137-143). Following the preparation of the PAR rankings, Rohrback identified the following positions for lay off:

> 1. A CSR from Philadelphia in the K4 to K6 range;
>
> 2. An administrative secretary from Morristown in the J7 to K2 range;
>
> 3. An administrative secretary [*13] from Philadelphia in the J7 to K2 range; and
>
> 4. An administrative secretary from Roseland in the J7 to K2 range.

(7/144- 146). Rohrback testified that these particular wage bands were selected through the PAR process because they were the ones which most accurately reflected the salaries earned by employees in the targeted positions. (N.T. Day 4, p. 92) He also stated in an affidavit, that he selected a CSR from the higher wage band for lay off because a reduction from that band would afford a greater cost saving. (N.T. Day 4, p. 96).

> [3] There was some evidence at trial that Clifford, the former Branch Manager for the Atlantic Branch was present at some of the meetings regarding the preparation of the WRP. While

1997 U.S. Dist. LEXIS 13839, *13; 7 Am. Disabilities Cas. (BNA) 522

Mather did not recollect his presence at any of the meetings, both Mather and Rohrback testified that they were the individuals responsible for developing the WRP for the Eastern Branch. (N.T. Day 4, pp. 70-71, Day 7, p. 143, Day 8, pp. 52-58).

The PAR ranking process clearly identified Plaintiff [*14] as the lowest-ranked CSR in the Philadelphia area in the K4 to K6 range. Indeed, Plaintiff was the lowest-ranked CSR in the combined Eastern and Atlantic Branches, in either the higher or the lower wage band. Furthermore, Plaintiff received the second lowest PAR ranking among the administrative personnel of the combined branches. [4] (N.T. Day 5, pp. 33-34, Day 7, pp. 73-77). Following the PAR process, the remaining CSRs in Philadelphia were Anker and the newly-trained Ceralde. Both Anker and Ceralde had higher PAR rankings than Plaintiff. Although she had been recently promoted to the position of CSR, Ceralde remained in a lower wage band than either Plaintiff or Anker. Because she was not in the K4 to K6 wage band, Ceralde was not considered for lay-off in the 1993 downsizing. [5] Apart from limited use as a tie breaker or in relation to bumping rights, seniority had no impact upon the PAR process for identifying employees for discharge. (N.T. Day 4, p. 97). Accordingly, under PAR, Plaintiff did not have a greater right to be retained as a CSR than the less experienced Ceralde.

> [4] The administrative employee receiving the lowest PAR ranking was Connie Johnson, an administrative secretary in Roseland, who was also identified for lay off during the PAR process. (N.T. Day 3, pp. 41-42, 163).

[*15]

> [5] According to Defendant, Ceralde received a three percent salary increase upon her promotion to the CSR position. Despite her promotion, she remained in the lower wage band during the PAR process. See Defendant's Opposition to Plaintiff Motion and Supplement to her Motion for a New Trial in Part and to Alter and Amend Judgment Accordingly, p. 5 n.5.

The WRP was completed by Rohrback and Mather in January 1993. On January 23, 1993 packages containing the discharge information and identifying the individuals to be discharged were sent to the district sales managers. Plaintiff received a voice mail instructing her

to meet with Brannigan in Defendant's Horsham office. Brannigan advised Plaintiff that she was being laid off in response to a need to cut costs in the division. Her discharge would become effective in sixty days, on March 23, 1993. Plaintiff was advised that she should stop working, immediately. She would, however, continue to receive her full salary and benefits for sixty (60) days. Plaintiff was also eligible for a severance package of benefits which included two weeks of pay [*16] for every year with the company, outplacement counseling and a retraining allowance. (N.T. Day 3, pp. 140-42, 146-50).

Plaintiff received a copy of the form termination letter advising her of the benefits that she would receive in the lay off. The letter also included information regarding an employee's right, during the sixty days preceding formal termination, to seek other positions with the company. The letter states, "if you wish to be considered for any future job openings in the company for which you may be qualified, you must submit a written request form to the Kodak employment office at the time of termination or at some later date." Defendant's Exhibit D-3. According to company policy, Brannigan should also have discussed the option to seek other positions with the company during his interview with Plaintiff. Plaintiff asserts, however, that he never discussed such an option with her. (N.T. Day 6, pp. 55-56, 131, 137, Day 7, pp. 10-13, 86-87). Plaintiff asked Kathy Riley, in the human resources department, about the availability of positions with Defendant's pharmaceutical division. She was advised that she would have to place a formal application with that division, and [*17] she did not pursue such a position, further. (N.T. Day 6, pp. 41-42).

Other employees, also targeted for lay off, were able to use this opportunity to locate other positions with the company. Jean Kutz, age twenty-six, and Joan Guarino, age sixty-three, were both able to fill open administrative secretary positions. Defendant's Exhibit, D-24. Carolyn Lundy, a thirty-year-old CSR targeted for lay off, was offered a position as an administrative CSR, because she had critical computer networking skills. Lundy declined this position. Because it was not known whether Plaintiff possessed the necessary computer skills, she was not offered this opportunity to remain with the company. (N.T. Day 4, pp. 153-54).

Plaintiff was deeply distressed by her discharge.

1997 U.S. Dist. LEXIS 13839, *17; 7 Am. Disabilities Cas. (BNA) 522

Although she had suffered previous episodes of depression, Plaintiff experienced severe depression following her discharge. She found herself crying uncontrollably and had difficulty sleeping. She began taking anti-depressant medication and seeing a therapist. This depression appears to have been quite debilitating for a number of months.

Following her discharge Plaintiff made some initial efforts to look for work. Plaintiff made some [*18] efforts to contact companies for whom she had provided customer support while at Kodak. She also sent out some resumes in response to newspaper advertisements listing customer support positions in suburban Philadelphia. After 48 weeks, Plaintiff's severance pay ended and she applied for unemployment benefits. On her application for benefits, Plaintiff stated that she was ready and available to work and was neither disabled nor perceived to be disabled. While on unemployment, Plaintiff continued to seek a customer service position in suburban Philadelphia. After her unemployment benefits had run out, Plaintiff located a part-time position, without benefits, as a telephone service representative for a company marketing a line of pharmaceutical products. At the time of trial she was still employed by the company, and her salary remained substantially below what she earned while employed by Defendant. (N.T. Day 6, 45-50, 136-40).

In July 1993, Plaintiff filed charges of age and disability discrimination and also interference with Plaintiff's rights under an employee welfare benefit plan, and an employee pension benefit plan with the Pennsylvania Human Rights Commission (PHRC), requesting [*19] that her charges also be filed with the Equal Employment Opportunity Commission (EEOC). (N.T. Day 6, pp. 6-7). The EEOC issued a right-to-sue letter in March 1995. On March 21, 1995 Plaintiff filed suit in this Court, alleging age and disability discrimination and also interference with employee rights under employee welfare and pension benefit plans. Plaintiff's allegations interference with her right to benefits were later voluntarily withdrawn. I denied Defendant's Motion for Summary Judgment as to the remaining claims of age and disability discrimination under the ADA, ADEA, and the PHRA.

A ten day jury trial was held in December 1995. At the end of Plaintiff's case, Defendant moved for Judgment as a Matter of Law on both Plaintiff's age and

disability claims. At trial, I denied this motion. After hearing all of the testimony, the Jury returned a verdict in favor of the Defendant on the age discrimination count. On the disability discrimination count, the Jury found that Defendant had discriminated against Plaintiff because it regarded her as disabled. The Jury elected to award no compensatory damages; however, it awarded Plaintiff $ 100,000 in punitive damages. Following the [*20] trial, Defendant renewed its Motion for Judgment as a Matter of Law on Plaintiff's disability claim. In the alternative, Defendant filed a Motion for a New Trial on the disability claim. Plaintiff also filed a Motion for a New Trial in Part and to Alter and Amend the Judgment Accordingly, seeking a new trial on her age discrimination claim and the compensatory damages portion of her disability discrimination claim. Plaintiff also filed Motions for Reinstatement and requesting Attorneys' Fees and Costs. In June 1996, all of these motions were placed in suspense pending the Third Circuit Court of Appeals' Decision in *Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996), cert. denied, U.S. , 117 S. Ct. 2532 (1997)*. Following the publication of the decision in *Sheridan*, these motions were removed from suspense in November 1996. Both Plaintiff and Defendant submitted additional briefing on these motions and oral argument was held on July 2, 1997.

## II. *Standard of Review* [6]

> 6  Because the questions presently before the Court arise in the form of post-trial motions, all reasonable and logical inferences will be drawn in favor of the nonmoving party. *See, Lightning Lube v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).*

[*21] In evaluating a motion for judgment as a matter of law pursuant to *Fed. R. Civ. P. 50*, this court must determine whether the evidence and all reasonable inferences, viewed in a light most favorable to the prevailing party, is sufficient, as a matter of law, to support the claim. *Bhaya v. Westinghouse Elec. Corp., 832 F.2d 258, 259 (3d Cir. 1987)*. This Court is not allowed to weigh the evidence, pass on the credibility of the witnesses or substitute its judgment for that of the jury. *Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110, 113 (3d Cir. 1987)*. "The question is not whether there is literally no evidence supporting the party against whom the verdict is directed, but whether there is

evidence upon which the jury could properly find a verdict for that party." *Lightning Lube v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)*(quoting *Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978))*. A motion for judgment as a matter of law is properly granted when there can be but one reasonable conclusion as the proper judgment. *National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491 (3d Cir. 1987)*.

Where a motion for judgment as a matter of law is accompanied [*22] by a motion for a new trial pursuant to *Rule 59 of the Federal Rules of Civil Procedure*, the court shall also rule on the motion for a new trial. *Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 253, 85 L. Ed. 147, 61 S. Ct. 189 (1940)*. When evaluating a motion for a new trial pursuant to *Rule 59*, the court shall grant such motion when the jury's verdict is against the great weight of the evidence, such that a miscarriage of justice will result if the verdict is allowed to stand. *Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991)*; *Whitted v. City of Philadelphia, 744 F. Supp. 649, 653 (E.D. Pa. 1990)*. It is not a proper basis to grant a new trial merely because the court would have reached a different verdict, but rather a new trial should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the court's] conscience." *Williamson, 926 F.2d at 1353*.

III. *Defendant's Motion for Judgment as a Matter of Law*

Defendant seeks judgment as a matter of law on Plaintiff's claim that she was discharged in violation of the ADA and [*23] the PHRA. The Jury found that a determinative factor in Plaintiff's discharge was Defendant's perception of her back condition as disabling. Defendant contends that this finding cannot be sustained as a matter of law because Plaintiff failed to present any evidence that Defendant regarded Plaintiff's back condition as a disability that substantially impaired her ability to work.

Defendant initially made its Motion for Judgment as a Matter of Law at the close of Plaintiff's evidence. At that time, in the midst of trial, I denied Defendant's Motion. Defendant then renewed its Motion for Judgment as a Matter of Law pursuant to *Rule 50(b)*. [7] Now, after having heard all of the testimony presented by both parties at trial, reviewing the parties' submissions on this matter, and hearing oral argument on Defendant's

renewed Motion for Judgment as a Matter of Law, I agree that Plaintiff failed to make the required preliminary showing that she is a disabled person under either the ADA or the PHRA. Accordingly, I will grant Judgment as a Matter of Law in favor of Defendant on Plaintiff's charge of disability discrimination.

[7] The Advisory Committee explicitly envisioned this situation:

> Often it appears to the court or to the moving party that a motion for judgment as a matter of law made at the close of the evidence should be reserved for a post-verdict decision. This is so because a jury verdict for the moving party moots the issue and because a preverdict ruling gambles that a reversal may result in a new trial that might have been avoided. For these reasons, the court may often wisely decline to rule on a motion for judgment as a matter of law made at the close of the evidence, and it is not inappropriate for the moving party to suggest such a postponement of the ruling until after the verdict has been rendered.

> In ruling on such a motion, the court should disregard any jury determination for which there is no legally sufficient evidentiary basis enabling a reasonable jury to make it. The court may then decide such issues as a matter of law and enter judgment if all other material issues have been decided by the jury on the basis of legally sufficient evidence, or by the court as a matter of law.

*Fed. R. Civ. P. 50(b)* advisory committee's note.

[*24] The ADA prohibits discrimination in employment against qualified individuals with disabilities because of their disabilities. *42 U.S.C. § 12112(a)*. [8] The PHRA prohibits an employer, *inter alia*, from refusing to hire, discharging, or otherwise discriminating against an

Page 8

1997 U.S. Dist. LEXIS 13839, *24; 7 Am. Disabilities Cas. (BNA) 522

employee on the basis of a non-job related handicap or disability. *43 Pa. Cons. Stat. Ann. § 955(a).* [9] Although the Pennsylvania courts are not bound by the interpretation of parallel provisions in federal employment discrimination statutes in their construction of the PHRA, *Harrisburg Sch. Dist. v. Pennsylvania Human Relations Comm'n, 77 Pa. Commw. 594, 466 A.2d 760, 763 (Pa. Cmwlth 1983),* Pennsylvania courts have typically interpreted the Pennsylvania statute in accord with the interpretation of the corresponding federal statute. *Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-84 (3d Cir. 1995), cert. denied, 135 L. Ed. 2d 1049,     U.S.    , 116 S. Ct. 2524 (1996).* Furthermore, the PHRA's definition of "handicap or disability" is substantially the same as the definition of "disability" under the ADA. *See Fehr* [*25] *v. McLean Packaging Corp., 860 F. Supp. 198, 200 (E.D. Pa. 1994).* The Parties have not disputed that Plaintiff's substantive claims under the ADA and the PHRA are coextensive.

8   The ADA provides in relevant part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*42 U.S.C. § 12112(a).*
9   The PHRA reads in relevant part:

> It shall be an unlawful discriminatory practice, . . . (a)For any employer because of race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar

or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

*43 Pa. Cons. Stat. Ann. § 955(a).*

[*26]   To make out a prima facie case of discrimination under the ADA, a plaintiff must establish:

> (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability.

*Milton v. Scrivner, Inc., 53 F.3d 1118, 1123 (10th Cir. 1995); see also Aucuff v. Six Flags Over Mid-America, Inc., 869 F. Supp. 736, 743 (E.D. Mo. 1994)(cited in Newman v. GHS, 60 F.3d 153, 157 (3d Cir. 1995)).* At trial, a plaintiff bears the burden of proof as to each of these elements. Only once an employee makes out her prima facie case, need an employer present evidence of a legitimate, nondiscriminatory reason for the adverse employment decision.

As a preliminary matter, to make out a claim of disability discrimination, a plaintiff must demonstrate that she has a disability. Under the ADA, a disability is defined as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an [*27] impairment; or (C) being regarded as having such an impairment.

1997 U.S. Dist. LEXIS 13839, *27; 7 Am. Disabilities Cas. (BNA) 522

*42 U.S.C. § 12102(2).* To be considered a disability, an impairment must substantially limit one or more major life activities. *42 U.S.C. § 12102(2)(A).* A substantial limitation exists if a plaintiff is "unable to perform a major life activity that the average population can perform . . . or . . . [is] significantly restricted as to the condition, manner or duration under which [she] can perform a particular major life activity as compared to" the average person. *29 C.F.R. § 1630.2(j)(1).* Whether an impairment substantially limits a major life activity is determined in light of:

> (i) The nature and severity of the impairment;

> (ii) The duration or expected duration of the impairment; and

> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

*29 C.F.R. § 1630.2(j)(2).*

At no point during these proceedings has Plaintiff contended that she is actually disabled. Rather, her claim relies solely upon the argument that Defendant regarded her as being substantially impaired in a major life activity. Under this prong of the [*28] ADA, an employee is entitled to protection against discrimination even if she does not have a substantially limiting impairment, provided she can show that her employer regarded her as having such an impairment. *See 29 C.F.R. § 1630.2(1).* An employee is regarded as substantially impaired if she:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

> (3) Has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting

impairment.

*Id.*

Major life activities are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *29 C.F.R. § 1630.2(i).* [10] Plaintiff's ADA claim was based upon the contention that Defendant regarded her back condition as substantially impairing her in the major life activity of working. As it relates [*29] to the major life activity of working,

> the term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*29 C.F.R. 1630.2(j)(3)(i)* (emphasis in the original). To demonstrate a substantial limitation on her ability to work, an employee must demonstrate that her condition, as perceived, substantially limits her ability to work in a class or broad range of jobs. [11] *29 C.F.R. § 1630.2(j)(3)(i); Wooten v. Farmland Foods, 58 F.3d 382, 385-86 (8th Cir. 1995).* The inability to perform the essential functions of a single job or a narrow category of jobs is not, however, a substantial limitation on the major life activity of working. *29 C.F.R. § 1630.2(j)(3)(i); Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir. 1994), cert. denied, 513 U.S. 1147, 115 S. Ct. 1095, 130 L. Ed. 2d 1063 (1995).* The Third Circuit has held that "if an individual [*30] is perceived to be but is not actually disabled, he or she cannot be considered a 'qualified individual with a disability' unless he or she can, without accommodation, perform all the essential as well as the marginal functions of the position held or sought." *Deane v. Pocono Medical Center,    F.3d   , 1997 U.S. App. LEXIS 22606, 1997 WL 500144 (3d Cir. Aug. 25, 1997).*

> 10    This list was designed only to be illustrative, however, and was not intended to be exclusive. *See Doe v. Kohn Nast & Graf, P.C., 862 F. Supp. 1310, 1320 (E.D. Pa. 1994)*(interpreting *29 C.F.R. § 1630.2(i)*).

1997 U.S. Dist. LEXIS 13839, *30; 7 Am. Disabilities Cas. (BNA) 522

11    In determining whether an individual is substantially impaired in the major life activity of working, a court can also consider:

> (A) the geographical area to which the individual has reasonable access;

> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*29 C.F.R. § 1630.2(j)(3)(ii)(A)-(C).*

[*31] Under these standards, Plaintiff's claim of disability discrimination in violation of the ADA and the PHRA fails as a matter of law. Plaintiff failed to introduce any evidence that Defendant regarded her back condition as substantially impairing her ability to work. Plaintiff can point to no direct evidence of disability discrimination by Defendant. Her supervisors and coworkers, while aware of her back condition, made no comments regarding her ability or inability to work as a result of her back condition.

It has long been recognized that it is often difficult for the victims of discrimination in the workplace to produce direct evidence of the discriminatory attitudes of their employer. *See e.g., Sheridan, 100 F.3d at 1071; Jackson v. University of Pittsburgh, 826 F.2d 230, 236 (3d Cir. 1987).* This recognition led to the development of a burden-shifting framework that enables plaintiffs to

prove employment discrimination through the use of circumstantial evidence and inferences. *See Price Waterhouse v. Hopkins, 490 U.S. 228, 271, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)*("The entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that [*32] direct evidence of intentional discrimination is hard to come by."); *see also Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081-82 (3d Cir. 1996)*(recognizing that cases charging employment discrimination are uniquely difficult to prove and often must rely upon circumstantial evidence).

In this case, however, Plaintiff has failed to produce any evidence, either direct or circumstantial, from which it is possible to infer that Defendant regarded Plaintiff as a disabled person, within the definition of the ADA. Indeed, the testimony at trial, much of it presented by the Plaintiff, clearly demonstrates that Plaintiff was treated fairly and without discrimination by both her immediate supervisors and the company as an entity. Upon her return from each of her back-related absences, Plaintiff acknowledged that she received fair and nondiscriminatory treatment, and was expected to resume all of her regular duties as a CSR. Thus, Plaintiff failed to satisfy her initial burden of proving that she is a qualified person with a disability.

At trial, Plaintiff presented evidence that she had suffered from a serious, chronic back impairment since 1980. Both Plaintiff and Defendant concur [*33] that Plaintiff's back impairment was not, in itself, disabling. Furthermore, both Plaintiff and Defendant concur that Plaintiff's immediate superiors were aware not only of the existence of Plaintiff's back condition [12], but also that its treatment had necessitated several absences from work, including an extended four month recovery from surgery to repair a herniated disk. It is significant to note, however, that when a plaintiff is proceeding on the basis of the perceived disability prong of the ADA, she cannot satisfy her burden of proving that she has a disability merely by demonstrating that her employer was aware of her impairment. *See Kelly, 94 F.3d at 109.* It is essential that she demonstrate, not only that her employer perceived her as having an impairment, but also that the employer regarded that impairment as imposing a substantial limitation on a major life activity. *See Kelly, 94 F.3d at 109* (visible and apparent limp insufficient to demonstrate that employee was substantially limited in the major life activity of walking); *Forrisi v. Bowen, 794 F.2d 931, 934 (4th Cir. 1986)*(employee known to suffer

Case 1:06-cv-00565-GMS    Document 49-3    Filed 11/26/2007    Page 12 of 18

Page 11

1997 U.S. Dist. LEXIS 13839, *33; 7 Am. Disabilities Cas. (BNA) 522

from acrophobia was unsuited for one position, but not regarded [*34] as substantially limited in the major life activity of working); *Howell v. Sam's Club # 8160/ Wal-Mart, 959 F. Supp. 260, 268 (E.D. Pa. 1997)*(known back impairment found not to impair employee in the major life activity of working although he was classified as twenty percent disabled by the Veterans' Administration).

> 12    At trial there was conflicting testimony regarding who had access to information regarding Plaintiff's back condition. While Plaintiff asserted that Dave Rohrback had access to all of Plaintiff's employment and health records, he denied any knowledge of her condition. Even drawing the reasonable inference that there would be some information relating, either directly or indirectly, to Plaintiff's back condition in her personnel file, this information, by itself, is insufficient to demonstrate that Rohrback perceived Plaintiff as substantially impaired.

Plaintiff failed to produce any evidence from which it might be possible to infer that Defendant regarded her back condition as a substantial [*35] impairment. At trial, there was only limited testimony relating Defendant's perception of Plaintiff's back condition. None of this evidence advances Plaintiff's argument that she was regarded as disabled.

Plaintiff missed three weeks of work to treat back pain in January and February of 1991. In March 1991, only a few weeks after her return from this absence, Plaintiff received a performance appraisal that rated her overall performance in 1990 as a "4", which reflects the satisfactory completion of all aspects of her position. [13] This is the same rating that she had received for the previous year, 1989. Plaintiff's performance in 1991 was also rated as a "4" overall. At trial, Plaintiff readily conceded that each of these performance appraisals was fair and non-discriminatory. (N.T. Day 7, p.6). Indeed, Defendant, by its own initiative, actually increased several of the individual ratings on her 1990 review to "5's", which reflected performance beyond the requirements of her position.

> 13    The performance appraisals rate employees on a scale of "1" to "7", with "7" as the highest score. A rating of "4" "is appropriate for individuals who regularly perform all assigned

responsibilities with independence and initiative, and achieve expected results on a continual basis." Copy Products Nonexempt Performance Appraisal, Exhibit 8-H in Support of Defendant's Renewed Motion for Judgment as a Matter of Law.

[*36] In the following year, 1992, Plaintiff missed approximately four months of work to recover from surgery to correct a herniated disk. Plaintiff returned to work in late July 1992, five months before she was laid off. Initially, Plaintiff returned to work with a limited, two-week restriction from her physician to light duty. Plaintiff testified that she was unable to keep to the restriction because she had too much work, and the restriction was never renewed. Defendant received a copy of a letter from Plaintiff's neurosurgeon to her general practitioner. This letter, which was placed in Plaintiff's medical file, stated that Plaintiff's surgery had been a success and that Plaintiff's condition had improved greatly since her surgery and that continued improvement was expected. While the surgeon acknowledged that Plaintiff's recovery had been slow, he anticipated continued improvement and released her from his care. In the remainder of her employment with Defendant, Plaintiff required no further absences to treat her back condition.

Following Plaintiff's return from surgery, there is no evidence that Defendant regarded her ability to perform the job requirements of a CSR as impaired. [*37] Plaintiff was provided with training on both the 2100 model copier and a newly released color copier. Plaintiff failed to make the necessary connection between her allegations that her training was less comprehensive than that received by Ceralde, and Defendant's perception of her back condition, to create the inference that her lack of training stemmed from Defendant's perception of her back condition as a substantial impairment. Upon her return to work, Plaintiff was also expected to continue providing customer support throughout her assigned territory.

Plaintiff was discharged in January 1993, as part of a nationwide reduction in force in the OI Division. At the time that she was discharged, Plaintiff received a letter detailing the rights and benefits that she would receive as a result of the lay-off. In addition, the letter advised her that she could submit a written request to the Kodak employment office if she wished to be considered for

Page 12

1997 U.S. Dist. LEXIS 13839, *37; 7 Am. Disabilities Cas. (BNA) 522

other positions with the company. This was the same opportunity that was provided to all employees who were to be laid off. Letter from Jim Brannigan to Sheila Kotas of January 21, 1993, Defendant's Exhibit, D-5. Even if this opportunity was [*38] not explicitly described to her by Brannigan, his omission neither negates the content of the letter nor, by itself, creates an inference of disability discrimination. Although Plaintiff made some initial inquiries regarding employment with Defendant's pharmaceutical division, she never filed the required formal application for continued employment, and her employment with the company was formally terminated on March 21, 1993. The fact that Plaintiff was offered the opportunity to pursue other positions with Defendant belies the argument that Defendant regarded her as substantially impaired in the major life activity of working.

Plaintiff was able to produce no evidence that Defendant perceived Plaintiff's back condition as permanently impairing her ability to work. The only testimony regarding Defendant's perception of Plaintiff's back condition, that suggests that Defendant perceived Plaintiff's condition as an impairment is unavailing because it is evidence of a temporary impairment, only. At most, Plaintiff was perceived as temporarily disabled during her back-related absences. As a matter of law, a short-term impairment does not constitute a disability under the ADA. See [*39] 29 C.F.R. § 1630.2(j)(2). In *McDonald v. Commonwealth of Pennsylvania*, the Third Circuit Court of Appeals held that a temporary inability to work after surgery does not constitute a disability under the parameters of the *ADA. 62 F.3d 92, 96 (3d Cir. 1995). See also Rakestraw v. Carpenter, 898 F. Supp. 386, 390 (E.D. Miss. 1995)*(holding that a back injury, perceived to be of limited duration, was not a disability under the ADA); *Paegle v. Department of Interior, 813 F. Supp. 61 (D.D.C. 1993)*(holding under the Rehabilitation Act, that employee recovering from temporary back injury was not handicapped).

Plaintiff was, at most, disabled, or perceived as disabled, only during those periods in which she was out of work to treat her back condition. Her last back-related absence was five months prior to her discharge. Although, on occasion, it is possible to infer that an employer has perceived a temporary condition as a permanent disability, there is no evidence that that occurred in this case. Unlike the plaintiff in *Zambelli v. Historic Landmarks Inc., 1995 U.S. Dist. LEXIS 3335,*

*1995 WL 116669 (E.D. Pa. Mar. 20, 1995)*, who was discharged within two hours of informing her employer that she required [*40] a leave of absence to undergo surgery, in this case there is no temporal proximity between Plaintiff's temporarily disabling condition and Defendant's adverse employment decision. Rather, Plaintiff was discharged a full five months after her return to full-time work.

Because it is apparent that Defendant understood the temporary nature of Plaintiff's impairment, and Plaintiff has been unable to show that Defendant perceived her as substantially impaired during those times that she was actually working, Plaintiff failed to prove that she is a disabled person, as defined by the ADA or the PHRA. Thus, Plaintiff failed to establish the initial element of her prima facie case, and is not entitled to claim the protections of either the ADA or the PHRA. Accordingly, it is held that Defendant is entitled to Judgment as a Matter of Law on Plaintiff's claims under the ADA and the PHRA. The Judgment entered on December 18, 1995 will be vacated and Judgment entered in favor of the Defendant. Plaintiff's Motion for a New Trial in Part and to Alter and Amend the Judgment Accordingly will be dismissed as moot with regard to her disability claim. In addition, because Plaintiff has not prevailed in [*41] her claim under the ADA, her Motions for Reinstatement, and Attorneys' Fees and Costs will also be dismissed as moot. *See 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(g)(1)*(reinstatement is an appropriate remedy when an employer has been intentionally engaging in an unlawful employment practice); 42 U.S.C. § 2000(e)-5(k)(prevailing party entitled to receive attorneys' fees and costs).

IV. *Defendant's Motion for New Trial*

As required by *Fed. R. Civ. P. 50(c)(1)* [14], I will also consider Defendant's alternative Motion for a New Trial pursuant to *Fed. R. Civ. P. 59*. Should my Judgment for the Defendant on Plaintiff's claims under the ADA and the PHRA be vacated or reversed, Defendant's Motion for a New Trial will be granted. The Jury's verdict finding Plaintiff's perceived disability to be a determinative factor in Defendant's decision to discharge her, was against the great weight of the evidence presented at trial. In instances where judgment as a matter of law is inappropriate, a trial court may still grant a new trial if the "verdict is against the great weight of the evidence." *Roebuck v. Drexel Univ., 852 F.2d 715 (3d Cir. 1988)*.

1997 U.S. Dist. LEXIS 13839, *41; 7 Am. Disabilities Cas. (BNA) 522

14 *Rule 50(c)(1)* provides in pertinent part:

> If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for new trial.

[*42] A new trial is warranted in this case because there is insufficient evidence to support the Jury's finding that Plaintiff was discharged in violation of the ADA and the PHRA. As I discussed in relation to the Motion for Judgment as a Matter of Law, *see supra*, there was no evidence, either direct or circumstantial, from which a reasonable jury could infer that Defendant perceived Plaintiff to be substantially impaired in the major life activity of working. Furthermore, Defendant produced substantial evidence that Plaintiff was laid off because she was the lowest ranked CSR, under the PAR process, in either the Eastern or Atlantic Branches of the OI Division. Plaintiff, herself, conceded that the performance appraisals upon which her ranking was based were fair and non-discriminatory. Plaintiff could offer little testimony to rebut Defendant's contention that her discharge resulted solely from her PAR ranking and not from the perception of Plaintiff as disabled. There was insufficient evidence of pretext for the Jury to conclude that Defendant's proffered reason for Plaintiff's discharge was not its true reason, and that illicit discrimination was its real motivation.

The nature [*43] of the Jury's verdict suggests that they departed from my instructions on the law. Although the Jury found that Defendant had discriminated against Plaintiff on the basis of a perceived disability, it awarded no compensatory damages for economic loss or emotional distress. It did, however award punitive damages in the amount of $ 100,000. The Jury's decision not to award compensatory damages is contrary to its finding of disability discrimination. There was substantial testimony regarding the economic losses Plaintiff had already incurred and also her anticipated future loss of income. (N.T. Day 6, pp. 94-130). Plaintiff also produced substantial evidence relating to the emotional distress and

depression she suffered after her lay off. Given its finding of disability discrimination, the Jury's decision not to award compensatory damages is puzzling. Furthermore, a review of the trial record fails to produce any evidence of outrageous conduct by the Defendant upon which the Jury could base a finding of punitive damages. *See, e.g., Bennis v. Gable, 823 F.2d 723 (3d Cir. 1987)*(punitive damages require evidence of outrageous conduct beyond that which is required to demonstrate liability).

[*44] I am forced to conclude that the Jury allowed its understandable sympathy for the Plaintiff to overcome my instructions on the law. Plaintiff was long-term employee of the Defendant, who had worked for the company for almost twenty-five years, and it was clearly apparent that her discharge had been a difficult and distressing event, from which she still may not have fully recovered. Jurors may not, however, allow their sympathies to sway their verdict. They are charged to follow and uphold the law. *See Rush v. Scott Specialty Gases, Inc., 930 F. Supp. 194, 197 (E.D. Pa. 1996)*("A court may also grant a new trial if the verdict was . . . influenced by extraneous matter such as passion, prejudice, sympathy or speculation.")(citations omitted), *reversed on other grounds, 113 F.3d 476 (3d Cir. 1997)*. Because the finding that Defendant's perception of Plaintiff as disabled was a determinative factor in the decision to discharge her, is against the great weight of the evidence, should my decision to award Defendant Judgment as a Matter of Law on Plaintiff's ADA and PHRA claims be vacated or reversed, I will conditionally grant Defendant's alternative Motion for a New Trial on Plaintiff's [*45] disability discrimination claim.

V. *Plaintiff's Motion for a New Trial*

Plaintiff has also filed a Motion for a New Trial under *Fed. R. Civ. P. 59(a)* on her claim of age discrimination in violation of the ADEA and the PHRA. 15 In rendering its verdict, the Jury found that Plaintiff's age was not a determinative factor in Defendant's decision to discharge her. Plaintiff asserts that this verdict is against the weight of the evidence and that it would be a miscarriage of justice to allow the verdict to stand. Although Plaintiff has advanced a number of rationales for vacating the Jury's verdict, I can find no reasonable basis for granting a new trial on this claim.

> 15   As discussed in relation to Plaintiff's ADA claim, *see supra*, there is no dispute that Plaintiff's substantive claims under the ADEA and the

PHRA are coextensive.

A. *Motion in Limine*

Prior to the start of trial, I granted Defendant's Motion in Limine, preventing Plaintiff from introducing information relating to the salaries earned [*46] by employees other than Plaintiff. Plaintiff argues that my Order granting the Motion in Limine prevented her from introducing evidence relating to the salary of Ceralde and was prejudicial error. Plaintiff asserts that this Order prevented her from demonstrating the pretextual nature of Defendant's proffered cost savings justification for the adverse employment decision suffered by Plaintiff.

Following the Supreme Court's decision in *Hazen Paper v. Biggins*, plaintiffs are barred from using a disparate impact analysis to demonstrate employer liability for age discrimination. *507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993)*. Plaintiffs may not, for example, equate the decision to discharge more highly paid, more senior, and typically, older workers with age discrimination. While such actions may violate other federal discrimination statutes, including ERISA, such conduct, alone, does not constitute age discrimination. *Id. at 610-13*. I precluded the admission of testimony regarding Ceralde's and others' salaries, in order to avert any possible conflict with the strictures of *Hazen Paper*.

At trial, Plaintiff argued that she sought to introduce evidence regarding Ceralde's salary, not to demonstrate [*47] age discrimination, itself, but rather to rebut Defendant's proffered reason for her discharge. Because Defendant discharged Plaintiff as part of a reduction in force designed to cut costs in the OI division, Plaintiff anticipated that Defendant would argue that the decision to discharge a CSR from the higher wage band, rather than the lower wage band, was made as a cost saving measure. Thus, she wished to introduce information regarding Ceralde's salary. She hoped to suggest to the Jury that because the salary differential between herself and Ceralde was minimal, Defendant's cost-savings argument was pretextual. Plaintiff is correct that the use of this information to rebut a proffered legitimate reason for Plaintiff's discharge would not violate the rule announced by *Hazen Paper*. I advised the Plaintiff that if Defendant argued that Plaintiff was selected for discharge to save money, I would permit the introduction of evidence regarding Ceralde's salary, but until Defendant made a cost savings argument, evidence of Ceralde's salary was irrelevant. (N.T. Day 3, p. 44).

At trial, there was substantial evidence introduced that the higher wage band was selected because CSRs are [*48] typically grouped in this band. Plaintiff introduced into evidence Rohrback's affidavit in which he stated that he selected the higher wage band, in part, because more CSRs were located in this band. He also stated, however, that the higher wage band was selected because it would afford a greater cost-savings at a time when the company needed to cut costs. (N.T. Day 4 p. 96). In the midst of trial, I determined that given the dictates of *Hazen Paper*, any information regarding Ceralde's lower salary was likely to be misconstrued by the Jury and used as evidence of age discrimination, itself, rather than merely as a rebuttal of a cost savings argument. *Fed. R. Evid. 403* (permitting the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury"). I declined to alter my initial ruling on the Motion in Limine. It is significant to note that other than this transitory reference to Rohrback's affidavit, Defendant never argued that the higher wage band was selected because it would afford more substantial cost savings. Accordingly, Plaintiff did not need to introduce this information in order [*49] to rebut a detailed cost savings argument.

Furthermore, Plaintiff failed to establish any foundation for this testimony. She introduced no evidence from which a reasonable jury could infer that Rohrback, the ultimate decision maker, had any knowledge of the ages and identities of any of the Atlantic Branch CSRs in either the higher or lower wage band. Accordingly, there was no foundation for the argument that the cost savings explanation was used as a pretext for age discrimination against Plaintiff.

Finally, the cost savings argument made by the Defendant was not spurious, as contended by the Plaintiff. At the time of her discharge, Plaintiff's base salary was approximately $ 29,500. In contrast, Ceralde was earning $ 21,000 at the end of 1992. Plaintiff contends that Ceralde's salary was subsequently raised to $ 26,000 shortly after Plaintiff's lay off. (N.T. Day 3, pp. 43-44). [16] Although Defendant denies that Ceralde received an increase this large, a savings of $ 3,500, in excess of ten percent of Plaintiff's salary, is not the insubstantial savings alleged by Plaintiff. The finder of fact in an employment discrimination case is not permitted to substitute its subjective judgment [*50] for that of the employer in determining whether or not the

1997 U.S. Dist. LEXIS 13839, *50; 7 Am. Disabilities Cas. (BNA) 522

proffered explanation for the managerial decision is reasonable. Rather, the finder of fact is limited to determining the question of whether the proffered reason is a pretext for the employer's true, discriminatory motives. *See Ezold v. Wolf, Block, and Solis-Cohen, 983 F.2d 509, 512 (3d Cir. 1992).* Accordingly, Plaintiff suffered little or no prejudice as a result of my refusal to permit the introduction of evidence relating to Ceralde's salary.

> 16    Defendant contests the timing of Ceralde's raise. It claims that she received a raise following her promotion, but prior to the 1993 lay off. Defendant also contends that there remained a 13% salary differential between Plaintiff and Ceralde. Defendant's Opposition to Plaintiff's Motion and Supplement to her Motion for a New Trial in Part and to Alter and Amend Judgment Accordingly, p. 5 n.5.

B. *Jury Instruction*

Plaintiff asserts that she is entitled to a New Trial on her allegations of age discrimination, [*51] because I declined to instruct the Jury that a preponderance of the evidence is established by a weight of evidence that just tips the scales in favor of one party. (N.T. Day 9, p. 38). I did, however, fully instruct the Jury regarding the meaning of the term "a preponderance of the evidence." 17 My failure to instruct them using the analogy of scales, does not make this instruction inadequate or prejudicial. *See Link v. Mercedes Benz, 788 F.2d 918, 922 (3d Cir. 1986)*(holding that a judge's ruling on jury instructions should be reversed only if it does not fairly and adequately submit to the jury and, thereby, confuse or mislead the jury). At oral argument on this motion, Plaintiff's counsel, herself, conceded that my failure to use this analogy was neither an error nor a miscarriage of justice sufficient to warrant a new trial.

> 17    The instruction I gave was as follows:

> > To establish by the preponderance of the evidence, is to prove something is more likely so than not so. In other words, a preponderance of the evidence when compared and considered with that evidence opposed to it, has a more convincing force and produces in your mind a belief that

that which is sought to be proven, is more likely true than not true.

> So you have this debate between these parties and the test is as to each of the elements -- and I will get into them -- is it more likely so that this element is proven or not proven.

(N.T. Day 9, p.14).

[*52]  C. *Plaintiff's Request for Additional Discovery*

Plaintiff contends that the Court erred in refusing to reopen discovery so that she could take additional depositions during the trial. Plaintiff asserts that Defendant's late production of certain documents and also the existence of inconsistencies between employee declarations and earlier produced corporate documents necessitated this reopening of discovery. Plaintiff's request to reopen discovery was initially attached to a request to file a surreply to Defendant's Motion for Summary Judgment. Prior to ruling on this motion, I denied Defendant's Motion for Summary Judgment. During the trial, however, I granted Plaintiff's Motion to take additional depositions. I permitted her to depose or redepose any witnesses that Defendant intended to call at trial on the subject of the late produced documents, only. Accordingly, Plaintiff was permitted to take the depositions of Joan Guarino and Jean Ficetola Furfero during a break in trial. She was also permitted to redepose Barbara Mather. Her request to depose Jean Kutz and Carolyn Lundy was denied because these persons were not called at trial.

Plaintiff asserts that she was unduly prejudiced [*53] by this restriction upon the reopening of discovery. She claims that due to this restriction, she was unable to gather the information necessary to show that younger workers received preferential treatment in the downsizing, because they were advised of the sixty period in which they could seek alternative positions within Kodak. In contrast, Plaintiff states she was never told, either by Brannigan or Riley that she had sixty days to search within the company. Thus, unlike younger employees, such as Jean Kutz and Carolyn Lundy, who were offered other positions with the Defendant, Plaintiff was discharged.

The decision on whether or not to permit the

reopening of discovery is committed to the sound discretion of the District Court. *See Habecker v. Clark Equipment Co., 942 F.2d 210, 218 (3d Cir. 1991).* In addition, *Rule 26(b)(2)(ii) of the Federal Rules of Civil Procedure* permits a court to limit discovery if "the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought." Because the corporate documents were, in fact, produced late, I granted the Plaintiff the opportunity to take depositions, of those witnesses who would be called [*54] at trial, limited to the area of these newly-produced corporate documents. I determined that this limited discovery was warranted because the documents in question appeared to be inconsistent with earlier-produced documents. I wanted, however, to avoid the situation of reopening discovery entirely in the midst of trial. Accordingly, I limited discovery to the narrow range of issues presented by the documents.

Ficetola Furfero and Guarino had no knowledge of the documents, and Plaintiff was unable to obtain any further information within the parameters of my extension of discovery. To the extent that Plaintiff had hoped to demonstrate a disparity between the treatment of older and younger workers in the 1993 reduction in force, this discovery should have taken place during the normal period for discovery. Guarino, Kutz and Lundy were each listed on the WRP prepared by Rohrback and Mather as employees targeted for discharge. Plaintiff also had access to information that all three remained with the company after March 1993. Similarly, Ficetola-Furfero's transfer to the Princeton office was clearly indicated on the WRP. Furthermore, information regarding these employees was produced in [*55] the deposition testimony of several witness, including Barbara Mather. Despite access to this information, Plaintiff chose not to pursue this angle of her case, during the normal discovery period. She cannot, therefore, decide in the midst of a jury trial that she has made a strategical error by ignoring this facet of her claim and hope to reopen discovery. The limited Order reopening discovery provided the appropriate balance between Plaintiff's right to gather information about newly-received documents and the need to proceed with the trial. Accordingly, Plaintiff was not unduly prejudiced by this restriction on discovery.

### D. *The Weight of the Evidence*

There is no question that Plaintiff made out a prima facie case of age discrimination in violation of the ADEA and the PHRA. Plaintiff demonstrated that she was a qualified person, over age forty, who suffered an adverse employment consequence, and was, to all intents and purposes, replaced by a very much younger employee. *See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995).* Finding that Plaintiff had satisfied her initial burden of proof, during the trial I denied Defendant's Motion for Judgment as [*56] a Matter of Law. (N.T. Day 8, p. 16). Making out a prima facie case is not, however, sufficient to make out a claim of employment discrimination. The employer also has the opportunity to present a legitimate, non-discriminatory rationale for the employment decision. The burden remains upon the Plaintiff, at all times, to prove that the employer's proffered reason was pretextual and that the true motivation behind her discharge was illicit discrimination. *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).*

The Jury's finding of no age discrimination, was made with full knowledge of the most compelling evidence against the Defendant. Plaintiff was discharged at age 46, after twenty-five years with the company. She was replaced by a much younger and less experienced employee. As Ceralde was called to testify during Plaintiff's case, the Jury had a full opportunity to observe the marked difference in the age and experience of the two women. Despite this telling juxtaposition, the Jury held that age discrimination was not a factor in Plaintiff's discharge.

Plaintiff failed to provide any substantial evidence to rebut the Defendant's primary, legitimate explanation for her discharge. [*57] Defendant consistently argued that Plaintiff was selected for lay off as part of a neutral PAR ranking process. Plaintiff along with all of the other support staff in the OI division received a PAR ranking based upon a weighted average of her last three performance appraisals. Plaintiff, herself, readily acknowledges that each of these performance reviews was a fair and non-discriminatory appraisal of her performance. On the basis of her PAR ranking, Plaintiff was the lowest-ranked CSR in the combined Atlantic and Eastern Branches. She was also the lowest-ranked CSR in both the higher and lower wage bands. On the basis of this ranking, Plaintiff was targeted for discharge.

Plaintiff's argument that the PAR process was a sham is unavailing. Plaintiff attempted to argue that, despite its superficial appearance of neutrality and anonymity, under

1997 U.S. Dist. LEXIS 13839, *57; 7 Am. Disabilities Cas. (BNA) 522

the PAR process, decision makers were aware of which employees were targeted for lay off from the beginning. Accordingly, the decision makers could choose which positions and wage grades to select in order to protect favored employees. The Jury's verdict demonstrates, however, that it did not accept the Plaintiff's view that the PAR process was [*58] a sham. Ultimately, Plaintiff failed to overcome the reality that even if her identity was apparent throughout the PAR process, she was lowest-ranked CSR in the branch. Thus, Plaintiff is unable to demonstrate that Jury's finding was against the great weight of the evidence.

### VI. Conclusion

Because the Plaintiff failed to produce any evidence that she was a disabled, as defined by the ADA and the PHRA, the Defendant's Motion for Judgment as a Matter of Law will be granted. In the alternative, because the Jury's finding of disability discrimination is against the great weight of the evidence, I will conditionally grant the Defendant's Motion for a New Trial. Accordingly, Plaintiff's Motion for a New Trial in Part and to Alter and Amend the Judgment Accordingly, as it relates to her claim of disability discrimination, will be dismissed as moot. Plaintiff's Motions for Reinstatement and for Attorneys' Fees will also be dismissed as moot. Plaintiff's Motion for a New Trial in Part and to Alter and Amend the Verdict Accordingly will be denied because the Jury's verdict was not against the great weight of the evidence, nor was Plaintiff prejudiced by my rulings on Defendant's Motion [*59] in Limine, Plaintiff's Proposed Jury Instructions, or the reopening of discovery.

An appropriate Order follows.

### ORDER

AND NOW, this 3rd day of September, 1997, upon consideration of the Motion of Plaintiff, Eastman Kodak Company, for Judgment as a Matter of Law; the Motion of Plaintiff, Sheila M. Kotas, for a New Trial in Part and to Alter and Amend the Judgment Accordingly, Plaintiff's Motion for Reinstatement; Plaintiff's Motion for Attorneys' Fees and Costs; all Responses, Replies and Supplemental Briefings received thereto; and for the reasons stated in the foregoing Memorandum of law, it is hereby ORDERED that:

1. Defendant's Motion for Judgment as a Matter of Law is GRANTED. The Judgment entered on December 18, 1995 is VACATED and Judgment ENTERED in favor of Defendant.

2. Plaintiff's Motion for a New Trial in Part and to Alter and Amend the Judgment Accordingly, is DISMISSED as moot as it relates to compensatory damages portion of her claim under the ADA and the PHRA.

3. Plaintiff's Motion for a New Trial in Part and to Alter and Amend the Judgment Accordingly, is DENIED as it relates to her claim under the ADEA and the PHRA.

4. Plaintiff's [*60] Motion for Reinstatement is DISMISSED as moot.

5. Plaintiff's Motion for Attorneys' Fees and Costs is DISMISSED as moot.

BY THE COURT:

**JAMES McGIRR KELLY, J.**

# Exhibit C



Not Reported in F.Supp.2d                                                                                      Page 1

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

**H**
DeLuca v. Allied Domecq Quick Service
Restaurants
E.D.N.Y.,2006.

United States District Court,E.D. New York.
Warren DeLUCA, Plaintiff,
v.
ALLIED DOMECQ QUICK SERVICE
RESTAURANTS, Defendant.
**No. 03-CV-5142 (JFB)(AKT).**

June 13, 2006.

Saul D. Zabell, Esq., Zabell & Associates, P.C.,
Bohemia, NY, for Plaintiff.
Robert L. Zisk, Esq., and Tristan B.L. Siegel, Gray,
Plant, Mooty, Mooty & Bennett, P.A., and Robert
L. Duston, Esq., Schmeltzer, Aptaker & Shepard,
P.C., Washington, D.C., for Defendant.

MEMORANDUM AND ORDER
JOSEPH F. BIANCO, District Judge.
*1 Plaintiff Warren DeLuca brings this action
alleging employment discrimination based on his
age and retaliation in violation of the Federal Age
Discrimination in Employment Act, 29 U.S.C. §§
621 *et seq.* (the "ADEA"), and the New York State
Human Rights Law, N.Y. Exec. § 296(1) ("NYHRL
"). Plaintiff alleges that Allied Domecq Quick
Service Restaurants [FN1] ("Dunkin' Donuts" or "
Dunkin' ") disc-riminated against him by
reassigning him, firing him, and later denying him a
Dunkin' Donuts franchise because of his age and in
retaliation for his complaints about defendant's
actions. (*See* Compl. ¶¶ 15, 19-21, 22, 24-26.)
Defendant moves for summary judgment. For the
reasons that follow, defendant's motion is granted in
part and denied in part.

> FN1. The defendant is a publicly traded
> United Kingdom company. The claims at

issue in this case concern plaintiff's
employment by Dunkin' Donuts,
defendant's wholly-owned subsidiary. (*See*
Mag. Judge James Orenstein's Rep. &
Rec., 1 n. 1 (Feb. 24, 2006); Def.'s Rule
56.1 Statement ¶ 11.)

I. BACKGROUND

A. THE FACTS

Construed in a light most favorable to plaintiff, the
non-moving party, the facts are as follows:

Dunkin' is an international franchisor of quick
service restaurants. (Def.'s Rule 56.1 Statement ("
Def.'s 56.1") ¶ 11.) [FN2]Franchisees are licensed to
operate under the Dunkin' Donuts system. (*Id.*)
Plaintiff Warren DeLuca was born on March 18,
1957, and was hired in April 1994, by Andrew
Wiltshire, a Dunkin' general manager. (*Id.* ¶¶ 1,
3.) DeLuca was fired on June 5, 2002.(*Id.* ¶ 7.)

> FN2. Where one party's 56.1 Statement is
> cited, the other party does not dispute the
> facts alleged.

1. DeLuca's employment from 1994 until 1998

DeLuca was hired as a business consultant, serving
as the first level of supervision over sixty to seventy
Dunkin' Donuts franchises. (*Id.* ¶ 20.)DeLuca
worked primarily in the tri-State area of New York,
New Jersey, and Connecticut. (*Id.* ¶ 21.)When
DeLuca started his employment with Dunkin', he
reported to Wiltshire. (*Id.* ¶¶ 4, 21.)Following a
subsequent reorganization, DeLuca reported to a
director of retail operations, who in turn, reported to
a senior market executive, the highest position in
each market. (*Id.* ¶ 21.)

Shortly after DeLuca started his employment with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

Dunkin', he applied to become a franchisee. (Pl.'s 56.1 Counter-Statement ("Pl .'s 56.1") ¶ 22.) Although Wiltshire encouraged DeLuca to become a franchisee, another Dunkin' supervisor, Tony Pellizzi, Sr., denied DeLuca's application because DeLuca was doing a superior job as a business consultant. (*Id.* ¶ 22.)After DeLuca's application was denied, his sisters applied for, and were permitted to become, Dunkin' franchisees. (Def.'s 56.1 ¶ 22.)

In April 1996, DeLuca was promoted to general manager. (*Id.* ¶ 23.)Wiltshire encouraged and supported DeLuca's promotion and, indeed, for a brief period following DeLuca's promotion, he and Wiltshire were peers. (*Id.* ¶¶ 23, 25; Pl.'s 56.1 ¶ 23.) On or about September 1996, DeLuca's job title changed from general manager to director of retail operations. (Def.'s 56.1 ¶ 24.) This change of job title did not represent a promotion or change in salary for DeLuca. (Pl.'s 56.1 ¶ 24.) Also in the Fall of 1996, Wiltshire was promoted to senior market executive. (Def.'s 56.1 ¶ 25.)

*2 At some point in the late 1990s, and continuing throughout DeLuca's employment, Dunkin' rated its franchises based on an A, B, or C scale. (*Id.* ¶ 26.)A and B-rated franchises qualified for expansion, while Crated franchises were franchises that did not meet Dunkin' standards. (*Id.*)

As part of Dunkin's reorganization, the position of director of retail operations (DeLuca's position) was made responsible for either A and B-rated franchises, or C-rated franchises. (*Id.* ¶ 27.)When DeLuca became director of retail operations, he initially oversaw A and B-rated franchises. (*Id.* ¶ 28.)DeLuca performed well in this position, and received high performance ratings from Wiltshire. (*Id.*)

### 2. DeLuca's 1998 Reassignment

At some point after December 9, 1998, DeLuca was reassigned by Wiltshire from overseeing A and B-rated franchises to overseeing C-rated franchises. (*Id.* ¶ 29.)DeLuca was happy with this decision because overseeing C-rated franchises presented a

greater challenge and responsibility for DeLuca, as well as the opportunity to earn larger bonuses. (Pl.'s 56.1 ¶ 29.) DeLuca informed Wiltshire of this, and Wiltshire indicated that he was satisfied with DeLuca's work. Wiltshire also said to DeLuca that, by transferring him to C-rated franchises, there would not be any potential conflict of interest with his sisters' stores, which were all A-rated. (*Id.* ¶¶ 26, 29; Def.'s 56.1 ¶ 31.)

In his new capacity as director of retail operations over C-rated franchises, DeLuca supervised several business consultant specialists, including Lou Beccarelli. (Def.'s 56.1 ¶ 32.) In November 2000, DeLuca completed a performance review of Beccarelli, writing that "Lou is ... ready to assume a director role within the market and will be endorsed for a director position when one becomes available should his current performance continue. Outstanding leadership abilities."(*Id.* ¶ 33.)DeLuca's recommendation of Beccarelli was for A/B-rated franchises only. (Pl .'s 56.1 ¶ 33.)

### 3. DeLuca's Fall 2000 Reassignment

In the Fall of 2000, a director position overseeing A/B-rated franchises became available in the New York market overseen by Wiltshire. (Def.'s 56.1 ¶ 34.) DeLuca recommended Beccarelli for this position. (*Id.*) Based on the adversarial nature of Beccarelli's past dealing with C-rated franchises, DeLuca limited his recommendation of Beccarelli to A/B-rated franchises. (Pl.'s 56 .1 ¶ 34.) Wiltshire did not assign Beccarelli to the open director position overseeing A/B-rated franchises. Rather, he transferred DeLuca to this position and promoted Beccarelli as director over the C-rated franchises. (*Id.* ¶ 35; Def.'s 56.1 ¶ 35.) This reassignment took effect at some point in August or September 2000. (Def.'s 56.1 ¶ 35.)

DeLuca was concerned about Wiltshire's decision to reassign him to oversee A/B-rated franchises. (*Id.* ¶¶ 35, 36; Pl.'s 56.1 ¶ 35.) Because DeLuca's sisters were franchisees of A/B-rated stores, there was a greater potential for a conflict of interest because of DeLuca's supervision of business consultants who oversaw his sisters' stores. (Def.'s

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 3

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

56.1 ¶ 35.) DeLuca advised several Dunkin' employees, including Wiltshire, Pellizzi, Beccarelli, and others, that he should remain overseeing C-rated franchises because of potential conflicts. (Pl.'s 56.1 ¶ 35.) To address DeLuca's concerns, Wiltshire offered to serve as an intermediary between DeLuca and his sisters' stores to avoid any conflicts of interest. (*Id.*)

### 4. Dunkin's Conflict of Interest Policies

*3 Throughout DeLuca's employment with Dunkin', various policies were in place prohibiting employees from being involved in situations creating an actual or perceived conflict of interest. (Def.'s 56.1 ¶ 41.) These policies are included, *inter alia*, in the (1) March 4, 2002 Code of Conduct; (2) the Global Employee Workplace Policies Manual, dated 2000; (3) the Business Code of Ethics and Standards of Conduct, dated August, 1999; (4) the Interests of Employees and Their Relatives in Franchisee Businesses, dated April 7, 1994; and (5) the Dunkin' Donuts Code of Ethics Policy. (*Id.* ¶ 42.)DeLuca asserts that he was not aware of these policies, nor was he ever provided with a written copy of any of these policies. (Pl.'s 56.1 ¶ 41.)

Dunkin' amended the Code of Conduct in 2002 to incorporate a revised Code of Conduct that its parent company had issued. (Def.'s 56.1 ¶ 43.) Additional training attended by DeLuca was conducted in 2002 to highlight the importance of the Code of Conduct. (*Id.*; Pl.'s 56.1 ¶ 43.)

### 5. Conflicts of Interest With DeLuca and His Sisters' Stores

Even though Wiltshire told DeLuca he would serve as an intermediary between him and his sisters to avoid conflicts of interest, DeLuca claims that Wiltshire ordered him to interact with his sisters' franchises on Dunkin's behalf. (Pl.'s 56.1 ¶ 38.) Specifically, Wiltshire ordered DeLuca to contact one of his sisters and gauge her interest in purchasing used kitchen equipment from a Dunkin' training facility. (*Id.*) In another incident, a business consultant supervised by Wiltshire asked DeLuca to get involved in the negotiation of a lease on behalf of his sisters. (*Id.*) Separately, Wiltshire discussed with DeLuca, his sisters' interest in a group of stores referred to as the "Passavea" network. (*Id.*) These conflicts were discussed at length in a report prepared by Michael Mershimer (the "Mershimer Report") responding to complaints by several individuals about improprieties in the New York market.(*Id.*; Def.'s 56.1 ¶ 54.)

### 6. The Mershimer Meeting and Report

In November 2001, Mershimer, then Dunkin's Director of Loss Prevention, held a meeting in New Jersey because he had received a complaint that several individuals in the New York market were improperly receiving gifts from a vendor. (Def.'s 56.1 ¶¶ 49, 50.) The complaint was directed generally toward the New York market, and both Wiltshire and DeLuca, among others, attended the meeting. (*Id.* ¶ 51.)At this meeting, Mershimer discussed the complaint and Dunkin's guidelines for accepting gifts. (*Id.* ¶ 52.)Mershimer also informed those in attendance that there would be another meeting taking place to discuss a revised Code of Conduct. (*Id.*) DeLuca was not directly implicated in any wrongdoing, and was not subjected to any discipline as a result of this meeting. (*Id.*)

Thereafter, in early 2002, DeLuca attended a meeting hosted by Mershimer to discuss the revised Code of Conduct. (*Id.* ¶ 45.)Many who attended this meeting questioned Mershimer about practices engaged in by the New York market. (Pl.'s 56.1 ¶ 45.) DeLuca repeatedly questioned Mershimer regarding golf outings because DeLuca knew that Mershimer often accepted golf trips from vendors and franchisees of Dunkin'.(*Id.*) After this exchange, Mershimer advised DeLuca, through Beccarelli, that DeLuca had better "back-off." (*Id.*)

*4 At approximately the same time as this meeting, a number of individuals advised Mershimer that there were "issues" in the New York market that should be investigated. (Def.'s 56.1 ¶ 54.) Mershimer's superiors asked him to look into

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

allegations of alleged improprieties and conflicts of interest in the New York market. (*Id.*) One of the allegations was that DeLuca and Pellizzi had engaged in nepotism. (*Id.* ¶ 55.)In connection with this investigation, Mershimer conducted in-person interviews with DeLuca, Wiltshire, Beccarelli, and others, and gathered relevant documents and e-mail. [FN3](*Id.* ¶ 57.)

> FN3. Plaintiff does not contest the fact that this investigation took place. Plaintiff does, however, contend that the report was "inaccurate and incomplete," that Mershimer did not discuss the specific allegations against DeLuca with Wiltshire, and that Wiltshire "took no responsibility and maintained no accountability for events referenced in the investigation. (Pl.'s 56.1 Statement ¶ 57.)

The Mershimer Report made, *inter alia,* the following findings as to DeLuca:
(1) DeLuca was negotiating lease terms for his sister with a broker and landlord in early 2001. Wiltshire investigated this and gave DeLuca a verbal warning, and also stated that he had discussed with DeLuca in the past the need for him to maintain "arms length" regarding his sisters' business. DeLuca acknowledged the warning but disagreed with the presumption that the situation posed a conflict. Wiltshire did not turn this situation over to human resources or loss prevention for an independent investigation. In retrospect, he commented that he should have turned the matter over. DeLuca was also involved in the negotiation of the sale of a number of stores for his sisters. (Def.'s Mem. Ex. 4F.)
(2) DeLuca sent an e-mail offering $1,000 spot award if five tasks were completed expeditiously. All but one involved DeLuca's sisters' stores, and would likely result in a financial benefit to his sister in the form of increased sales. (*Id.*)
(3) DeLuca's wife reportedly made several telephone calls on behalf of his sisters to correct payment discrepancies. She did this on a volunteer basis. In a conversation with Ray Raymond and Mershimer, DeLuca did not acknowledge that this was a conflict because his wife was not on his

sisters' payroll, and was only occasionally helping. (*Id.*)
(4) Wiltshire reported to Mershimer that DeLuca "sat in on" a responsibility meeting for his sisters' Mineola store. A meeting such as this is not typically attended by someone in DeLuca's position. (*Id.*)

The Mershimer Report also discussed a conflict involving Pellizzi and Pellizzi's son, wherein Pellizzi allegedly assisted and facilitated the sale of a network of stores to his son. (Pl.'s 56.1 ¶ 42.) Pellizzi was not fired for this action. (*Id.*)

RoJean DeChantal, Dunkin' senior vice president and human resources officer, was one of the executives who was aware of Mershimer's investigation and report. (Def.'s 56.1 ¶ 58.) DeChantal later relied exclusively on Mershimer's report in making her decision with regard to DeLuca. (Pl.'s 56.1 ¶ 58.)

### 7. Dunkin' Fires DeLuca

Following Mershimer's Report, DeChantal, Dunkin's senior vice president for human resources, reviewed the Report to decide the appropriate action to take in light of the Mershimer's findings. (Def.'s 56.1 ¶ 60.) DeChantal did not personally know DeLuca during this time. (*Id.* ¶ 66.)DeChantal did not conduct her own investigation. (Pl.'s 56.1 ¶ 60.)

*5 Based on DeChantal's review of Mershimer's Report, she concluded that DeLuca had committed serious violations of Dunkin's code of conduct in connection with the franchises operated by his sisters. (*Id.* ¶ 61.)On or about June 5, 2002, Dunkin' fired DeLuca, concluding it had "lost trust" in his judgment. (Def.'s 56.1 ¶ 69.)

At the time of DeLuca's dismissal, he was forty-five years old, and DeChantal was fifty-six years old. (*Id.* ¶ 63.)DeLuca does not know if DeChantal was aware of his age. (DeLuca Dep. at 219-20.)

As a result of the findings of Mershimer's report, Wiltshire was reprimanded. In addition, Pellizzi,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

who was fifty-eight at the time, was not fired by DeChantal because he had not been previously warned.[FN4](Def.'s 56.1 ¶ 68.)

> FN4. According to Mershimer's report, DeLuca had been warned by Wiltshire in early 2001 when DeLuca negotiated the lease terms for his sister. (Def.'s Mem. Ex. 4F.)

Shortly after DeLuca was fired, Dunkin' held meetings about rules and regulations concerning conflicts of interest. (Def.'s 56.1 ¶ 70.) According to DeLuca's deposition testimony, someone who attended the meetings referred to them as the " DeLuca Meetings." (DeLuca Dep. at 283.)

### 8. DeLuca Applies for a Franchise

At some point prior to February 2003, DeLuca applied to become a Dunkin' Franchisee.[FN5] (DeLuca Dep. at 173.) DeLuca did not express an interest in a particular franchise. (Def.'s 56.1 ¶ 71.) Because of the circumstances surrounding DeLuca's termination, Joseph Benny, Dunkin's franchise licensing manager, discussed DeLuca's application with Wiltshire, and one of them brought DeLuca's request to the attention of Arthur Anastos, who was legal counsel for the New York market. (*Id.* ¶ 73.)Anastos later referred DeLuca's application to Dunkin's General Counsel Steven Horn. (Pl.'s 56.1 ¶ 71.)

> FN5. Defendant asserts DeLuca merely " expressed an interest," while plaintiff counters that DeLuca "formally" applied. DeLuca's deposition testimony indicates he "applied" for a franchise, and Dunkin' submitted an affidavit that it has no record of DeLuca formally applying. (DeLuca Dep. at 173; Horn Decl. ¶ 11.)

In February 2003, Benney informed DeLuca that his application had been denied. (Pl.'s 56.1 ¶ 71.) The decision to deny DeLuca a franchise was made by Steven Horn. (*Id.*) It was unusual for Horn to be consulted with respect to a pending franchisee application, as he might only hear about an application "from time to time." (*Id.*) In addition, Jack Laudermilk, an associate general counsel at Dunkin' was also involved. (*Id.*) This was also atypical.(*Id.*)

According to Horn, the decision to deny DeLuca's application was based on the fact that DeLuca had been terminated for cause, and based on " characteristics of persons we would want to hire as franchisees who were former employees."(Horn Dep. at 15-16.) Although Dunkin' does not maintain a written policy concerning potential franchisees who had been fired for cause, there was a policy, as described by Horn:

[U]pper management, higher management of this company, since I've been involved in the company, would not look favorably upon franchising an employee who had been fired for cause. If it was brought to the attention of ... the enterprise leadership team, we might look to the particular circumstances.... I can say with confidence that the upper levels of management in this company would not look favorably on enfranchising someone who had been fired under the circumstances that were involved in [DeLuca's] discharge. So I was confident in making the judgment when it was brought to my attention for a decision.

*6 (Horn Dep. at 70-71.) Horn testified that he does not recall whether he had knowledge of the existence of DeLuca's EEOC Charge when he made the decision to deny DeLuca's franchise application. (Horn Decl. ¶ 15.)

Another franchise owner, Ever Santana, was terminated for cause, and then later permitted to become a part franchise owner. (*Id.* ¶ 16; DeLuca Dep. at 207-08.) The franchise application of Santana was not referred to the legal department. (Horn Decl. ¶ 85 .)

### B. PROCEDURAL HISTORY

Plaintiff filed a complaint in this action on October 9, 2003, within 90 days of receiving his right to sue letter from the EEOC. Plaintiff's complaint alleges

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

violations of the ADEA and NYHRL based on defendant's alleged unlawful employment actions based on plaintiff's age, and retaliation following complaints made by plaintiff against defendant. The case was originally assigned to the Honorable Denis R. Hurley and, on September 9, 2004, the case was reassigned to the Honorable Dora L. Irizarry. The parties engaged in discovery, and on August 4, 2005, defendant moved for summary judgment. On April 12, 2006, this case was reassigned to the undersigned. Oral argument was held on May 25, 2006.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."FED.R.CIV.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."*Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a

*genuine issue for trial."Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson, "[i]f* the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."*Anderson,* 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted); *Tufariello v. Long Island R.R.,* 364 F.Supp.2d 252, 256 (E.D.N.Y.2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts."*BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

### B. AGE DISCRIMINATION UNDER THE ADEA
FN6

> FN6. Claims of age discrimination brought under New York State law are analyzed using the same framework as claims brought under the ADEA, and the outcome under state law will be the same as the outcome under the ADEA. *See Smith v. Xerox Corp.,* 196 F.3d 358, 363 n. 1 (2d Cir.1999).

*\*7* The ADEA states, it is "unlawful for an employer ... to discharge an individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."29 U.S .C. § 623(a)(1). Because plaintiff presents no direct evidence of discriminatory treatment based on his age, the Court reviews his ADEA claim under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

*Douglas Corp. v. Green,* 411 U.S. 792 (1973).*See Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005). To establish a *prima facie* case of age discrimination, a plaintiff must demonstrate that: " (i) at the relevant time the plaintiff was a member of the protected class; (ii) the plaintiff was qualified for the job; (iii) the plaintiff suffered an adverse employment action; and (iv) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as the fact that the plaintiff was replaced by someone ' substantially younger.' " *Roge v. NYP Holdings, Inc.* 257 F.3d 164, 168 (2d Cir.2001) (quoting *O'Conner v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 313 (1996)). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and *"de minimis." See Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001).

Once a plaintiff establishes a *prima facie* case of discrimination "the burden of production [shifts] to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action."*Woodman,* 411 F.3d at 76 (citing *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 91 (2d Cir .2001)). If the defendant articulates a legitimate, nondiscriminatory reason, plaintiff must then prove that defendant's articulated reasons are pretextual. *See id.* at 76."In short, the ultimate burden rests with the plaintiff to offer evidence 'sufficient to support a reasonable inference that prohibited [age] discrimination occurred.' " *Id.* (citing *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 156 (2d Cir.2000)).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa,* 539 U .S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies *"McDonnell Douglas's* minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation ... was false." *James,* 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which

a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.;Connell,* 109 F.Supp.2d at 207-08.

*8 As the Second Circuit observed in *James,*"the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove-particularly discrimination."233 F.3d at 157; *see Lapsley v. Columbia Univ.,* 999 F.Supp. 506, 513-16 (S.D.N.Y.1998) (advocating elimination of *McDonnell Douglas* test in favor of simplified approach focusing on ultimate issue of whether sufficient evidence exists to permit jury to find discrimination); *see also Norton v. Sam's Club,* 145 F.3d 114, 118 (2d Cir.1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### 1. APPLICATION AS TO PLAINTIFF'S TERMINATION[FN7]

FN7. In addition to claiming discrimination based on his termination in June 2002, plaintiff alleges that defendant discriminated against him based on his age by transferring him in 2000. This claim is dismissed for two reasons. First, it is time-barred. Acts such as job transfers, or demotions, are discrete acts, and thus independently subject to a 300-day time limitation. *Nat'l R.R. Pass. Corp. v. Morgan,* 536 U.S. 101, 112-13 (2002); See 42 U.S .C. § 2000e-5(e)(1); *Forsyth v. Fed'n Employment and Guidance Serv.,* 409 F.3d 565, 572 (2d Cir.2005); *Elmenayer v. ABF Freight Sys., Inc.,* 318 F.3d 130, 133 (2d Cir.2003); *Harris v. City of New York,* 186 F.3d 243, 247 n. 2 (2d Cir.1999) (noting that in New York, a plaintiff must file an administrative charge

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

within 300 days of knowing or having reason to know of the alleged discriminatory act). Plaintiff filed his EEOC in November 2002. Thus, the discrete act by defendant of transferring plaintiff in 2000 falls well beyond the 300-day time limitation. *See Forsyth,* 409 F.3d at 572 ("Discrete discriminatory acts are time-barred, notwithstanding the fact that 'they are related to acts alleged in timely filed charges,' if they fall outside of the limitations period.") (quoting *Morgan,* 536 U.S. at 113). Second, DeLuca's 2000 transfer was not, as a matter of law, an unlawful employment action. DeLuca's transfer was for a position at the same level as his former position, and he received a $20,000 raise. *See Galabaya v. New York City Bd. of Educ.,* 202 F.3d 636, 649 (2d Cir.2000). Hence, that claim is dismissed.

Plaintiff alleges discrimination in connection with his termination in June 2002. As set forth below, defendant has demonstrated that it is entitled to summary judgment on this claim because no reasonable jury could find age discrimination based on the facts in this case.

At the outset, the Court assumes the plaintiff has made out the *prima facie* case required by *McDonnell Douglas.*In response, Dunkin' has established a legitimate nondiscriminatory reason for DeLuca's dismissal, namely, that DeLuca was fired by Dunkin' following an investigation that uncovered a violation of Dunkin's Code of Ethics with regard to his dealings with his sisters' stores. Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find age discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir.1997); *see also Tomney v. Int'l Ctr. for the Disabled,* 357 F.Supp.2d 721, 742 (S.D.N.Y.2005); *Siano v. Haber,* 40 F.Supp.2d 516, 520 (S.D.N.Y.), *aff'd mem.,*201 F.3d 432 (2d Cir.1999); *Lapsley,* 999 F.Supp. at 515. First, the Court evaluates the plaintiff's evidence, then the defendant's evidence,

and then the evidence as a whole.

a. Plaintiff's Evidence of Age Discrimination

Plaintiff submits the following as evidence of defendant's discrimination based on his age:

First, plaintiff was forty-five years old when he was fired. *See Williams v. Brooklyn Union Gas Co.,* 819 F.Supp. 214, 225 (E .D.N.Y.1993) (holding plaintiff must come forward with more than his age). Second, plaintiff was fired based solely on Mershimer's report, which was incomplete and inaccurate. Third, other employees, including Pellizzi and Wiltshire, were implicated in wrongdoing by Mershimer's report, but they were not fired. Finally, plaintiff argues that Mershimer held a grudge against him, based on DeLuca's confrontation at the meeting in early 2002.

b. Defendant's Evidence of Non-discriminatory Animus

*9 Defendant submits the following evidence of non-discriminatory animus:

First, plaintiff's conduct violated Dunkin's policies regarding conflicts of interest and, based on the facts uncovered by Mershimer, DeLuca had been previously warned about potential conflicts of interest regarding his sisters' stores. Second, the person who made the decision to fire plaintiff, DeChantal, did not even know plaintiff, much less his age, and made her decision solely based on Mershimer's report. Third, although neither Pellizzi nor Wiltshire were fired based on their conduct, DeChantal found that Pellizzi (who was fifty-eight at the time) had not been previously warned, and Wiltshire was given a warning. Fourth, plaintiff has failed to submit any evidence, beyond the fact he is forty-five years old, that he was discriminated against based on his age.

c. Evidence as a Whole

Considering the evidence as a whole, the Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 9

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
(Cite as: Not Reported in F.Supp.2d)

concludes that no reasonable juror could find that plaintiff was fired based on his age. Indeed, the undisputed evidence is that DeChantal was the individual who made the decision to fire plaintiff, relying entirely on Mershimer's report. (See Pl.'s 56.1 ¶¶ 60, 61.) Although plaintiff argues that this fact supports an inference of discrimination based on his age, the fact that the decision to fire plaintiff was made by someone who did not even know plaintiff's age, based entirely on a report that even plaintiff admits on its face shows violations, supports a finding that plaintiff was not fired based on his age. See Norton, 145 F.3d at 120. An " employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir.1984). See also Norton, 145 F.3d at 120 ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age."); Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir.1988); Slatky v. Healthfirst, Inc., 2003 U.S. Dist. LEXIS 20608 (S.D.N.Y.2003) ( "The employer could terminate the plaintiff for a good reason, a bad reason, or no reason at all, so long as it was not a discriminatory reason.") (citing Freeman v. Package Mach. Co., 865 F.2d 1331, 1341 (1st Cir.1988)) ("ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision does not stem from the person's age."); State Div. of Human Rights ex rel. Cottongim v. County of Onondaga Sheriff's Dep't., 528 N.Y.S.2d 802, 804 (N.Y.1988) (finding under Human Rights Law that employee "could lawfully have been discharged for any reason or for no reason, but not for a statutorily impermissible reason").

Plaintiff's fundamental position concerning Mershimer's report is that it was flawed and, therefore, DeChantal's conclusions regarding DeLuca must be "false" and "pretextual." (See Pl.'s Opp. at 14.) Even assuming Mershimer's report was flawed or false, there is nothing to suggest that the decision was a pretext for age discrimination. See Norton, 145 F.3d at 120. Significantly, plaintiff points to no comment, action, or fact that even

remotely suggests defendant's decision to fire him was based on his age except the fact that he was forty-five years old. Such evidence is insufficient in this case to withstand defendant's motion for summary judgment. Williams, 819 F.Supp. at 225.

*10 Similarly, the fact that Pellizzi, who was fifty-eight years old at the time, received a lesser punishment than DeLuca is further evidence that DeChantal was not discriminating based on age. Rather, the Pellizzi evidence supports defendant's argument that DeChantal fired DeLuca because he had previously been warned, and gave Pellizzi a lesser sanction. No reasonable jury could find that DeChantal, who did not know DeLuca, and who relied exclusively on Mershimer's report in considering whether to fire plaintiff, actually fired him because of his age.

Finally, although not dispositive, the fact that DeChantal was fifty-six, and Wiltshire is only three months younger than DeLuca creates a presumption that the decision to fire DeLuca was not based on his age. See Connell v. Consol. Edison Co. of N.Y., Inc., 109 F.Supp.2d 202, 210 (S.D.N.Y.2002) (finding plaintiff's evidence of age discrimination " thin" when, in part, the decision-makers were also in the protected age category); Morris v. N.Y. City Dep't of Sanitation, No. 99 Civ. 4376, 2003 U.S. Dist. LEXIS 5146, at *25 (S.D.N.Y. March 31 2003); Pisana v. Merrill Lynch & Co., 1995 U.S. Dist. LEXIS 10296, at *14 (S.D.N.Y. July 20, 1995) ("The fact that ... decision makers were close to [plaintiff's] age, or older, weakens any suggestion of age discrimination.") (citing Williams v. Brooklyn Union Gas Co., 819 F.Supp. 214, 225 (E.D.N.Y.1993)).

For these reasons, no reasonable jury could find that plaintiff was fired because of his age. Indeed, the only reasonable conclusion is that plaintiff was fired based on DeChantal's review of Mershimer's report finding that plaintiff violated Dunkin's Code of Conduct. Thus, summary judgment dismissing plaintiff's age discrimination claims under the ADEA and NYHRL is granted.

C. RETALIATION[FN8]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 10

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
(Cite as: Not Reported in F.Supp.2d)

FN8. Defendant argues that plaintiff's retaliation claims based on its denial of a franchise application are not exhausted. ( *See* Def.'s Mem. at 18, 19.) Plaintiff's EEOC complaint alleges that defendant retaliated against him, although it does not allege retaliation based on defendant's denial of a franchise because the denial had not happened when the EEOC complaint was filed. The "reasonably related rule" in the Second Circuit "has been broadly construed to allow judicial redress for most retaliatory acts arising subsequent to an EEOC filing...."*Malarkey v. Texaco,* 983 F.2d 1204, 1209 (2d Cir.1993); *see also Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 178 (2d Cir.2005); *Butts v. City of New York Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir.1993), *superceded by statute on other grounds as stated inHawkins v. 1115 Legal Servs. Care,* 163 F.3d 684, 693 (2d Cir.1998). Here, the alleged retaliatory act is based on plaintiff's filing of an administrative complaint, and was near in time to the filing of that complaint. This is precisely the type of facts the Second Circuit has found to constitute " reasonably related" conduct. *See Butts,* 990 F.2d at 1401;*Malarkey,* 983 F.2d at 1209;*see also Soares v. Univ. of New Haven,* 175 F.Supp.2d 326, 330 (D.Conn.2001). Further, there has been no showing of prejudice to defendant in permitting plaintiff to pursue the claim in this lawsuit. *See Malarkey,* 983 F.2d at 1209. Hence, there is no basis for rejecting plaintiff's retaliation claim regarding the denial of his franchise application as not reasonably related to his EEOC complaint. *Id.*

### 1. Applicable Law

Title VII prohibits an employer from firing an employee in retaliation for having made a charge of discrimination. 42 U.S.C. § 2000e-3(a); *see also* N.Y. Exec. Law § 296(1)(e); N.Y.C. Admin. Code § 8-107(7)."Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.' " *Terry v. Ashcroft,* 336 F.3d 128, 140-41 (2d Cir.2003) (internal citations omitted). To establish a prima facie case of retaliation, DeLuca must show (1) he engaged in a protected activity; (2) defendant was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 66 (2d Cir.1998); *see Terry,* 336 F.3d at 141.

The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See*42 U.S.C. § 2000e-3; *see also Wimmer v. Suffolk Co. Police Dep't,* 176 F.3d 125, 134-35 (2d Cir.1991). Informal as well as formal complaints constitute protected activity. *See Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). Moreover, to establish that his activity is protected, DeLuca "need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed."*Sumner,* 899 F.2d at 209; *see also Grant v. Hazelett Strip-Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989).

*11 A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or ... (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."*Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000); *see also Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993).

Although the burden that a plaintiff must meet at the prima facie stage is minimal, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. *See Cronin v. Aetna Life Ins.,* 46 F.3d 196, 204 (2d Cir.1995).

### 2. Application [FN9]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

FN9. Plaintiff's complaint alleges retaliation by defendant for transferring him in 2000, and for investigating him. However, plaintiff's counsel implicitly concedes in his papers, and conceded at oral argument, that plaintiff never engaged in any protected activity prior to his firing. *See Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir.1997). Plaintiff has apparently abandoned these retaliation claims by failing to oppose defendant's motion, and for only including the denial of his franchise application as evidence of retaliation in the parties' joint pre-trial order. *See Blouin ex rel. Estate of Pouliot v. Spitzer,* 356 F.3d 348, 363 n. 9 (2d Cir.2004); *Lipton v. County of Orange,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004); *Arbercheski v. Oracle Corp.,* No. 05 Civ. 591(DLC), 2005 WL 2290206, at *3 (S.D .N.Y. Sept. 19, 2005). In any event, to the extent plaintiff alleges defendant retaliated against him by transferring or investigating him, those claims are dismissed as plaintiff has failed to put forth any evidence that he engaged in a protected activity prior to these actions by defendant.

Retaliation claims are similarly governed by the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas. Terry,* 336 F.3d at 141 (2d Cir.2003). The Court finds that plaintiff has made out the *prima facie* case required by *McDonnell Douglas.* Plaintiff filed an EEOC complaint, Dunkin' was aware of the EEOC complaint, and the filing of the EEOC complaint was close in time to the denial of a franchise. (*See, e .g.,* May 25, 2006 Oral Arg. Tr. at 9.) The dispute is whether the denial of a franchise can constitute an adverse employment action.

Defendant argues that its decision to deny a franchise application to a former employee cannot constitute an adverse employment action as a matter of law. The Court disagrees. The denial of a franchise application in the instant case could constitute a retaliatory adverse employment action. An employer's denial of a former employee's franchise application is in the same realm of acts such as "blacklisting" an employee or refusing to write a letter of recommendation, both of which the Second Circuit has found sufficient to state a cause of action based on retaliation. *See Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir.1979) (holding that "blacklisting" an employee is sufficient to state a cause of action based on retaliation); *Pantchenko v. C.B. Dolge Co .,* 581 F.2d 1052, 1055 (2d Cir.1978) (holding that an employer's refusal to give employee a letter of recommendation is sufficient to state a cause of action for retaliation); *see also Sarno v. Douglas Elliman-Gibbons & Ives,* 183 F.3d 155, 160 (2d Cir.1999); *Cohen v. S. U.P.A. Inc.,* 814 F.Supp. 251, 261 (N.D.N.Y.1993).

Although a franchise relationship may not constitute an "employment" relationship, the Second Circuit case law on retaliation cannot be construed so narrowly as to strictly require disruption of a future "employment" relationship, as opposed to some other analogous business relationship. The hallmark of these cases is that the alleged retaliation *arose out of* the former employment. *See, e.g., Cohen,* 814 F.Supp. 251, 261 (holding that, to survive summary judgment, alleged retaliation need only show "employer's use of discrimination in connection with a prospective, present or past employment relationship to cause harm to another") (quoting *Pantchenko,* 581 F.2d at 1055); *Patel v. Lutheran Med. Ctr.,* 753 F.Supp. 1070, 1073 (E.D.N.Y.1991) ( "The Second Circuit has held that federal antidiscrimination statutes such as the ADEA, prohibit 'discrimination related to or arising out of an employment relationship, whether or not the person being discriminated against is an employee at the time of the discriminatory conduct.' ") (quoting *Pantchenko,* 581 F.2d at 1055).

*12 Therefore, if an employer retaliates against a former employee for engaging in protected activity by attempting to deny the former employee an ability to enter into a subsequent business relationship, such conduct is actionable regardless of whether that future business relationship is employer/employee, independent contractor or consultant, or some other analogous business relationship. *See Caruso v. Peat, Marwick, Mitchell & Co.,* 664 F.Supp. 144, 150 (S.D.N.Y.1987)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 12

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
(Cite as: Not Reported in F.Supp.2d)

(discontinuation of a contract with an employee working as a consultant after termination stated cause of action for retaliation); *accord Passer v. Am. Chem. Soc'y,* 935 F.2d 322, 331 (D.C.Cir.1991) (finding that "the statute does not limit its reach only to acts of retaliation that take the form of cognizable employment actions").

Here, under the circumstances of this case, the Court concludes that defendant's denial of a franchise application to DeLuca, a former employee, constitutes an adverse employment action.[FN10] *See Silver,* 602 F.2d at 1090 (discrimination statutes "furnish a remedy against discrimination in employment, no matter what specific form the invidious practice takes").

> FN10. In its papers and at oral argument, defendant also argues that because of the unique statutory and legal relationship between a corporation and its franchisee, the denial of a franchise cannot constitute an unlawful employment action. In other words, defendant argues that it is entitled to broad discretion, in part, because its relationship with its franchisees is heavily regulated and lasts for many years. The Court rejects this argument. An employer, if it is acting in an illegal retaliatory manner towards a former employee, is not protected from liability simply based on the fact that a franchisee relationship will be heavily regulated and potentially last for many years.

Having found that plaintiff has met his *prima facie* case, the Court proceeds to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find retaliation. Defendant has articulated a legitimate, nondiscriminatory reason for denying plaintiff's franchise application, contending that, based on the circumstances leading to his firing, he was not the type of person Dunkin' wanted to allow to have a franchise.

Notwithstanding defendant's nondiscriminatory reason for denying plaintiff's franchise application,

defendant's motion for summary judgment as to plaintiff's retaliation claim is denied. There are issues of fact as to whether DeLuca's application to become a franchise was handled in a different manner by Dunkin' because DeLuca had engaged in a protected activity. *See Goldschmidt v. New York State Affordable Hous. Corp.,* 380 F.Supp.2d 303, 318-19 (S.D.N.Y.2005) ("All too often ... employers react negatively to the assertion of a claim and consequently turn a weak discrimination case into a strong retaliation case."); *Alvarez v. City of New York,* 31 F.Supp.2d 334, 344 (S.D.N.Y.1998); *see also Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 762 (2d Cir.1998).

The parties do not dispute that DeLuca's franchise application was handled differently than other applications. This was, according to defendant, for good reason, given the fact that DeLuca was recently fired for cause. On the other hand, DeLuca asserts that the reason his franchise application was dealt with differently than other applications was because he had filed a discrimination claim with the EEOC. In support of that argument, plaintiff points to the fact that, not only was his application treated differently than other franchise applications generally, but it was treated differently than a similarly situated former employee who was fired for cause and, nonetheless, received a franchise. In particular, Ever Santana was terminated for cause, and then later was permitted to become a part franchise owner. Courts have consistently held that one way to establish a claim of retaliation is to show that the complaining employee is treated differently than other employees who did not engage in a protected activity. *See Knight v. City of New York,* 303 F.Supp.2d 485, 498-99 (S.D.N.Y.2004); *see also DeCintio v. Westchester County Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987) (discrimination can be established "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct"). Although defendant has presented an explanation for why plaintiff's application was handled differently than Santana's, a reasonable jury could find, based on this evidence, that at least one reason DeLuca's application was handled in this manner, and eventually rejected, was in retaliation for his filing an EEOC complaint. Thus, defendant's motion for summary judgment on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 13

Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652
**(Cite as: Not Reported in F.Supp.2d)**

plaintiff's retaliation claim is denied.[FN11]

> FN11. Pending before this Court is a Report and Recommendation issued by Magistrate Judge James Orenstein recommending to this Court that it exclude as evidence certain statements made by an associate general counsel for Dunkin' in a mediation session. Both parties have timely filed objections to Magistrate Judge Orenstein's Report and Recommendation. As noted above, without relying on these statements, sufficient issues of fact exist as to plaintiff's retaliation claim to withstand a motion for summary judgment. As these alleged statements are not relied upon by the Court in this decision, it is now purely an evidentiary issue for trial. The Court will decide it, in conjunction with other motions *in limine* submitted by the parties, in a schedule to be established by the Court when a trial date is set.

### IV. CONCLUSION

**\*13** For the reasons set forth above, defendant's motion for summary judgment is granted in part and denied in part. The remaining claims are those alleging retaliation by defendant following plaintiff's filing of an EEOC complaint. The parties shall appear by telephone for a final pre-trial conference on June 20, 2006, at 10:00 a.m., to set a date for trial. Plaintiff shall initiate the telephone call and call Chambers at 631-712-5670 when all of the parties are on the line.

SO ORDERED.

E.D.N.Y.,2006.
DeLuca v. Allied Domecq Quick Service Restaurants
Not Reported in F.Supp.2d, 2006 WL 1662611 (E.D.N.Y.), 88 Empl. Prac. Dec. P 42,652

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,     )
                                    )

        Plaintiff,       )

                                    )     Civil Action No. 06-565-GMS

        v.               )

                                    )

ALLEN L. SESSOMS, Ph.D.,     )

                                  )

        and            )

                                  )

BOARD OF TRUSTEES OF     )
DELAWARE STATE UNIVERSITY,  )

                                  )

        Defendants.     )

## CERTIFICATION OF COUNSEL IN ACCORDANCE WITH L.R. 7.1.1

I, Michael R. Robinson, hereby certify that Defendants' counsel has made reasonable efforts to reach agreement with the opposing attorneys on the matters set forth in Defendants MOTION IN LIMINE TO EXCLUDE EVIDENCE PRESENTED TO THE AD HOC COMMITTEE AND OTHER EVIDENCE UNKNOWN TO PRESIDENT SESSOMS AT THE TIME HE RECOMMENDED PLAINTIFF'S TERMINATION.

                                  /s/ Michael R. Robinson
                                  Michael R. Robinson (#4452)
                                  SAUL EWING LLP
                                  222 Delaware Avenue, Suite 1200
                                  P.O. Box 1266
                                  Wilmington, Delaware 19899-1266
                                  (302) 421-6800
                                  mrobinson@saul.com

Dated:  November 26, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,                    )
                                         )
      Plaintiff,                   )
                                         )    Civil Action No. 06-565-GMS
     v.                              )
                                         )
ALLEN L. SESSOMS, Ph.D.,                 )
                                         )
      and                          )
                                         )
BOARD OF TRUSTEES OF                     )
DELAWARE STATE UNIVERSITY,               )
                                         )
      Defendants.                  )

## <u>CERTIFICATE OF SERVICE</u>

I, Michael R. Robinson, hereby certify that on November 26, 2007 I caused a true and

correct copy of the foregoing DEFENDANTS' MOTION IN LIMINE TO EXCLUDE

EVIDENCE PRESENTED TO THE AD HOC COMMITTEE AND OTHER EVIDENCE

UNKNOWN TO PRESIDENT SESSOMS AT THE TIME HE RECOMMENDED

PLAINTIFF'S TERMINATION to be served electronically via CM/ECF system and first class,

U.S. Mail, postage prepaid, upon the following:

Gilbert Shelsby, Esq.               Gregg L. Zeff, Esq.
Michael J. Logullo, Esq.          FROST & ZEFF
SHELSBY & LEONI               Pier 5 at Penn's Landing
221 Main Street                   7 North Columbus Boulevard
Stanton, DE 19804              Philadelphia, PA 19106

                              <u>/s/ Michael R. Robinson</u>
                              Michael R. Robinson (#4452)
                              SAUL EWING LLP
                              222 Delaware Avenue, Suite 1200
                              P.O. Box 1266
                              Wilmington, Delaware 19899-1266
                              (302) 421-6800
                              mrobinson@saul.com