IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,                )
                                     )
            Plaintiff,               )
                                     )        Civil Action No. 06-565-GMS
        v.                           )
                                     )
ALLEN L. SESSOMS, Ph.D.,             )
                                     )
            and                      )
                                     )
BOARD OF TRUSTEES OF                 )
DELAWARE STATE UNIVERSITY,           )
                                     )
            Defendants.              )

## DEFENDANTS' MOTION IN LIMINE TO
## EXCLUDE EVIDENCE BASED ON HEARSAY

Defendants, Allen L. Sessoms, Ph. D. ("President Sessoms") and the Board of Trustees of

Delaware State University ("DSU"), move this Court, pursuant to Federal Rules of Evidence 801

and 802, for an order *in limine* barring Plaintiff Wendell Gorum, Ph. D. ("Dr. Gorum") from

offering into evidence, referring to at trial or introducing hearsay testimony, or from offering into

evidence any testimony based on opinions or conclusions to which Plaintiff and his wife have

previously testified that are based solely on hearsay. While it may seem unusual to file a Motion

*in Limine* on such a basic issue of evidence, our experience having heard Plaintiff testify in two

forums is that most of what Plaintiff believes to have happened and what he will testify to is not

based upon personal information. Therefore, Defendants believe a strong cautionary instruction

is appropriate to Plaintiff and his counsel prior to trial. In support of this Motion, Defendants

state as follows:

1.      Dr. Gorum instituted this action under 28 U.S.C. §1983 alleging that Defendants

retaliated against him for speech that was protected under the First Amendment. As narrowed in

Plaintiff's Answering Memorandum of Law in Opposition to Summary Judgment ("Pltf. Opp.") (D.I. 43), Plaintiff alleges that when President Sessoms recommended to the DSU Board that Dr. Gorum be terminated, contrary to the lesser sanctions recommend by the Ad Hoc Dismissal Committee, President Sessoms was motivated by unlawful retaliatory animus for prior acts that Dr. Gorum contends were protected by the First Amendment. As set forth more fully in Defendants' Opening Memorandum in Support of Defendants' Motion for Summary Judgment ("Defs' SJ Mem.") (D.I. 39), in order for Dr. Gorum to succeed on his claims, he must demonstrate that he engaged in "protected activities," that such actions were known by President Sessoms, and that retaliation for those protected activities was a substantial or motivating factor in President Sessoms' recommendation to the DSU Board. See Defs' SJ Mem. at 21-22. When Plaintiff and his wife were questioned at their depositions regarding Dr. Gorum's "protected activities," President Sessoms' alleged knowledge, and the basis for his claim of retaliatory animus, Plaintiff and his wife both relied on hearsay statements – some of which contain numerous layers of hearsay – in an effort to create "evidence" that he did indeed engage in a protected activity of which the Defendants were aware. Such "evidence" is repeated throughout his answering papers. Similarly, many of the issues that Plaintiff intends to raise as circumstantial evidence of pretext, such as claims that similarly-situated individuals have been treated differently, are also based on hearsay. See Defs' SJ Mem. at 33-34 and Reply Memorandum in Further Support of Defendants' Motion for Summary Judgment at 20 (D.I. 44). Under the rules of evidence, Dr. Gorum should be precluded from relying upon or introducing at trial any testimony based on hearsay.

**Plaintiff is Barred From Offering Testimony Based on Hearsay by Fed. R. Evid. 802**

2.      Fed. R. Evid. 802 expressly provides that "[h]earsay is not admissible except as provided by these rules . . . ." Fed. R. Evid. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801.

3.      Based upon his prior testimony, both in deposition and before the Ad Hoc Dismissal Committee, this Court can anticipate that Plaintiff will rely extensively on hearsay testimony to establish key elements of his claims, including alleged knowledge of President Sessoms. Similarly, when introducing deposition testimony from witnesses who are unavailable for trial, Defendants anticipate that much of that testimony will, in turn, be based upon inadmissible hearsay. The following examples[1] highlight Dr. Gorum's penchant for relying on hearsay to substantiate his claims:

- In support of his claim that President Sessoms had knowledge that Dr. Gorum allegedly opposed the hiring of President Sessoms during the search process, Dr. Gorum relies on double and triple hearsay regarding Dr. Osei and Dean Frederick. See Pltf. Opp. at 28 and Defs' SJ Mem. at 23.

- Dr. Gorum again relies solely on hearsay from unidentified parties to support his claims that there was an alleged invitation extended to President Sessoms to speak at a fraternity alumni prayer breakfast, that

---

[1]      The highlights of Dr. Gorum's testimony represent only a few of the many examples detailed in Defendants' SJ Memo. and Defendants' SJ Reply Memo.

such an invitation was revoked, and that President Sessoms was aware of the revocation. See Defs' SJ Mem. at 23.

- As evidence of retaliatory animus by President Sessoms, Dr. Gorum once again relies upon inadmissible hearsay statements from three individuals. See Pltf. Opp. at 5, 30 and Defs' SJ Mem. at 34-35.

4.      It is well settled that "the party seeking to introduce testimony into evidence bears the burden of establishing its admissibility." Falco v. Alpha Affiliates, Inc., C.A. No. 97-494, 2000 WL 727116, at *13 (D.Del. Feb. 9, 2000) (Exhibit A hereto); see also In re Japanese Elec. Prod. Antitrust Litig., 723 F.2d 238, 288 (3d. Cir. 1983).

5.      It is indisputable that the testimony upon which Dr. Gorum relies constitutes inadmissible hearsay under Fed. R. Evid. 801. None of the enumerated hearsay exceptions under Fed. R. Evid. 803 or 804 applies, nor has Dr. Gorum attempted to contend otherwise, at least on Summary Judgment. Lastly, and perhaps more importantly, the fact that much of the hearsay testimony is from unidentified sources confirms that there is no indication of reliability or trustworthiness so as to allow admission of this testimony under the residual exception to the hearsay rule. See Fed. R. Evid. 807.

6.      Defendants believe these concerns can and should be addressed by Motion *in Limine.* In many cases it is not the questions of counsel that will call for hearsay, but the anticipated responses of the Plaintiff and his wife. Even then, the nature of Plaintiff's reliance on inadmissible hearsay and speculation was often not clear until cross-examination; he would simply testify, for example, to the "fact" that President Sessoms "knew" a certain fact. We request that the Court issue appropriate cautionary instructions and, with the most important elements where Plaintiff has previously relied on hearsay, to require Plaintiff to establish outside

the jury that his allegations are based upon admissible evidence before testifying to opinions and conclusions.

WHEREFORE, Defendants Allen L. Sessoms, Ph. D. and the Board of Trustees of Delaware State University respectfully request that this Court preclude Plaintiff Wendell Gorum, Ph. D. from offering into evidence, referring to at trial or introducing any evidence based solely on hearsay testimony.

**SAUL EWING LLP**

**OF COUNSEL**

Robert L. Duston
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037-1922
(202) 333-8800
rduston@saul.com

Dated: November 26, 2007

/s/ Michael R. Robinson
Kimberly L. Gattuso (No. 3733)
Michael R. Robinson (No. 4452)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
kgattuso@saul.com
mrobinson@saul.com

*Counsel for Defendants*

# Exhibit A



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Falco v. Alpha Affiliates, Inc.
D.Del.,2000.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
FALCO, a Delaware partnership, Plaintiff,
v.
ALPHA AFFILIATES, INC., a Delaware
corporation, William J. McGrath and Thomas J.
Elliott, Defendants.
**No. Civ.A. 97-494.**

Feb. 9, 2000.

Janet Z. Charlton of Young, Conaway, Stargatt &
Taylor, Wilmington, Delaware; for plaintiff.
Mark A. Kearney of Elliott Reihner Siedzikowski &
Egan, P.C., Blue Bell, Pennsylvania; Kathleen M.
Miller, of Smith Katzenstein & Furlow LLP,
Wilmington, Delaware; for defendant Elliott.

*MEMORANDUM OPINION*
SCHWARTZ, Senior J.

I. Introduction

*1 Falco, a Delaware partnership and landlord,
brought the present action to collect damages under
a terminated commercial lease against Tenant Alpha
Affiliates ("Alpha"), an insolvent Delaware
corporation, and its principals William J. McGrath
and Thomas J. Elliott. McGrath and Elliott executed
the lease both as officers of Alpha and individually
as guarantors. Elliott filed cross-claims against
McGrath and counterclaims against Falco. Alpha
and McGrath have not entered appearances. Trial is
scheduled to commence on February 14, 2000.

Falco filed one and Elliott filed two Motions in
Limine which together raise five issues. First, Elliott
asks the Court to declare that he and Falco have
certain rights, duties, and remedies under the
guaranty provision. Second, Falco challenges the

admissibility of negotiations leading up to Elliott
signing the guaranty under the parol evidence rule.
Third, Falco requests the Court enter an order that
Elliott and McGrath are jointly and severally liable
for the amounts due under the guaranty. Fourth,
Elliott challenges the admissibility of certain
invoices as being inadmissible hearsay. Fifth, Elliott
requests the Court to order that his counterclaim for
rescission of the guaranty obligation be submitted to
the jury by special interrogatory.

The Court holds as follows. First, the Court clarifies
the rights, duties, and remedies of Elliott under the
guaranty provision, as discussed in detail below.
Second, the extrinsic evidence of prior negotiations
will be admissible at trial for the sole purpose of
proving fraudulent or material misrepresentations
inducing Elliott to enter into his personal guaranty
of the Lease. Third, if liable for the amounts due
under the guaranty, Elliott and McGrath are jointly
and severally liable, and no jury instruction will be
given to apportion liability in conjunction with an
instruction on joint and several liability. However,
an appropriate instruction will be given with respect
to Elliot's crossclaim against McGrath for
contribution. Fourth, the invoices prepared by Falco
and the third party invoices received by Falco will
be admissible if Falco can provide sufficient
testimony to lay a foundation for their admission, as
outlined in this opinion. The Court does not rule on
the admissibility of invoices prepared by Falco's
attorneys.[FN1]Fifth, the facts underlying the
rescission claim will be decided by the jury, but
whether rescission is warranted will be determined
by the Court.

FN1. See, *infra,* note 20.

II. Facts

A more detailed statement of the background facts
can be found in the Court's opinions on a motion to
dismiss, Docket Item ("D.I.") 9, and a motion for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

summary judgment, D.I. 40.

On July 14, 1994, the Lease and Rider were entered into by Falco, by its partner Lloyd Schmeusser, and Alpha, by its principals Elliott and McGrath. Paragraph 3 of the Rider required Alpha to deposit $18,445.86 cash as a security deposit. Lease ¶ 4; Rider ¶ 3. After 45 days, Alpha was required to provide substitute security in the form of a performance bond in the amount of $110,675 .10, an irrevocable letter of credit, or the personal guarantees to the Lease by Elliott and McGrath. Rider ¶ 3.[FN2] Alpha never paid the security deposit and Falco declared a termination of the Lease.

> FN2. Paragraph 3 of the Rider provides:
> Tenant shall deposit with Landlord upon execution hereof the sum of eighteen thousand four hundred forty-five dollars and eighty-six cents ($18,445.86) as the security deposit provided for in Paragraph 4. Within forty-five (45) days of the date hereof, Tenant shall provide for the benefit of landlord as substitute security, a performance bond in the sum of $110,675.10 (representing one year's Basic Rent and estimated additional rent pursuant to paragraphs 6, 7, 8 and 9) with an insurance or surety company licensed to do business in the State of Delaware acceptable to Landlord in the reasonable exercise of Landlord's discretion and in a form acceptable to Landlord in the reasonable exercise of the Landlord's discretion, which performance bond shall be a substitute for the $18,445.86 security deposit, which sum shall be refunded by Landlord to Tenant upon the effective date of the surety bond. Failure to provide the performance bond as aforesaid shall constitute an event of default under Paragraph 21 of this Lease permitting Landlord to immediately terminate this Lease by serving a written notice upon Tenant without affording Tenant an opportunity to remedy the default. The performance bond and the amount thereof

shall be subject to all of the terms and conditions of Paragraph 4 of this Lease. As an additional substitute for this security, Landlord will accept an irrevocable Letter of Credit in lieu of the above stated Security Bond or Landlord will accept the personal guarantees of the principals of Alpha, Inc., Thomas J. Elliott and William J. McGrath, to this Lease Agreement.

*2 On August 4, 1994, the parties met to discuss the termination. Elliott and McGrath executed new signature lines on the Lease which read:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

/s/ William
J. McGrath
8/4/94
Guarantor
   (Date)
William J.
McGrath
-Indiv
idually
S.S.       #
         187-4
         4-5051

/s/ Thomas
J. Elliott
8/4/94
Guarantor
   (Date)
Thomas J.
Elliott
-Indiv
idually
S.S.       #
         175-4
         0-6878

McGrath and Elliott, along with Schmeusser, also signed an "Amendment to Rider" dated August 4, 1994, which states:

Par 3 of said Rider is amended as follows:

On even date herewith William J. McGrath (" McGrath") and Thomas J. Elliott ("Elliott") signed individual guarantees for the above referenced lease.

On or before September 15, 1994, McGrath and Elliott have the option to provide to Falco the performance bond, or irrevocable letter of credit referenced in Par. 3 of the Rider, as substitute Security for these personal guarantees.

In the event said performance bond or irrevocable letter of credit is not provided, the personal guarantees shall remain in effect.

D.I. 32, Exh. E; D.I. 33, Exh. B. On August 5, Falco informed Alpha, "Per our discussions and agreements on August 4, 1994 regarding the above referenced Lease Agreement, my August 3, 1994 letter terminating your Lease is effectively

withdrawn."D.I. 32, Exh. F.

Alpha defaulted on the Lease in early 1995, failing to pay rent in January and February 1995. D.I. 32, Exh. H. Falco informed Alpha that if it did not cure the deficiency within 30 days, it would terminate the lease on March 20, 1995.*Id.* In April 1995, Falco brought an action in Delaware Superior Court, New Castle County, for rent in the amount of $20,105.98, the rent due as of March 20, 1995, " together with rent and other amounts that have accrued since March 20, 1995."D.I. 32, Exh. I. Falco obtained a default judgment against Alpha in that action. D.I. 1, ¶ 8.

On July 23, 1997, Falco brought the present action against Alpha for rent continuing to owe on the Lease and against McGrath and Elliott as guarantors. Elliott filed a crossclaim against McGrath for indemnification and contribution, and a four count counterclaim against Falco alleging: (I) fraudulent non-disclosure; (II) breach of contract;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 4

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(III) breach of the implied covenant of good faith; and (IV) rescission. Trial is scheduled to commence on February 14, 2000.

### III. Discussion

### A. Rights, Duties, and Remedies of Falco and Elliott Under Guaranty Provision

Elliott asks the Court to declare that Falco and Elliott have the following rights and duties under the Lease: (1) Elliott, as a conditional guarantor, has a right to receive notice of Alpha's default and that Falco's failure to provide notice releases Elliott from his guaranty; (2) Falco owed Elliott a duty of reasonable care and diligence and breached that duty by improperly dealing with Alpha and selling Alpha Affiliate's printing equipment; (3) Falco may not recover from Elliott the costs associated with pursuing the debts of Alpha from Alpha; and, (4) Elliott had the right to revoke his guaranty. Falco responds that: (1) Elliott has no right to receive notice of Alpha's default because Elliott was an absolute guarantor; (2) if Elliott was entitled to notice, his remedy is only a release of the guaranty to the extent of his damage; (3) Falco may recover from Elliott the costs of retaking the premises from Alpha; and, (4) Falco owes Elliott no duty of reasonable care and diligence.

*3 Both Falco and Elliott rely upon Delaware case law which distinguishes between the duties owed to absolute and conditional guarantors. *See Ajax Rubber Co. v. Gam,* 151 A.2d 828, 832 (Del.Super.1924); *Gaylords, Inc. v. Tollins, Inc.,* 1984 Del.Super. LEXIS 720,*4- *6 (Del.Super.1984). A guaranty is conditional if some event, other than default of the principal obligor, must occur before the guarantor becomes liable. *See id.*The most common type of conditional guaranty is one where the obligee must attempt to collect from the principal obligor before the guarantor. *See id.*If the guaranty is absolute, the obligee need not attempt to collect from the primary obligor before the guarantor. *See id.*Under these Delaware cases, the obligee must give notice of the principal obligor's default only to a conditional guarantor. *See*

*id.*

However, the modern trend, as recited in the Restatement (Third) of Suretyship and Guaranty, is to abolish the distinction between absolute and conditional guarantors for purposes of determining the guarantor's rights and instead focus on his suretyship status.[FN3]*See* Restatement (Third) of Suretyship and Guaranty, Introductory Note; § 1, comment c. The Delaware Supreme Court has not spoken to this issue. Were this case not on the eve of trial, the Court would certify this question to the Delaware Supreme Court.[FN4]However, in the interests of going forward with the trial, the Court will predict how the Delaware Supreme Court would decide this issues. *See Farris v. JC Penney Co., Inc.,* 176 F.3d 706, 713 (3d Cir.1999).

> FN3. The distinction between these obligations has been retained for purposes of determining contractual rights. *See* Restatement (Third) of Suretyship and Guaranty § 15. A "guarantor of collection" is equivalent to the common law conditional guarantor and requires the obligor to first attempt to collect from the primary obligor. *See id.* at § 15(b). A " guarantor" is equivalent to the common law absolute guarantor and is liable upon default of the primary obligor, even if the obligee does not attempt to collect from the primary obligor. *See id.* at § 15(a). A " surety" is jointly and severally liable with the primary obligor for the underlying obligation, regardless of whether the primary obligor defaults. *See id.* at § 15(c).

> FN4. Trial is scheduled to commence on February 14, 2000.

In order to predict the decision of the Delaware Supreme Court, this Court considers decisions of the lower Delaware courts, federal court decisions interpreting Delaware law, state and federal decisions under other analogous state law, considered dicta, scholarly works, and any other reliable indicia of how the Delaware Supreme Court would decide this issue. *See Farris v. JC Penney*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 5

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*Co., Inc.,* 176 F.3d 706, 713 (3d Cir.1999); *2-J Corp. v. Tice,* 126 F.3d 539, 541 (3d Cir.1997). Moreover, "[w]e do not disregard a decision of an intermediate appellate state court on an issue of controlling state law unless we are 'convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co.,* 177 F.3d 210, 227 (3d Cir.1999).

This Court predicts the Delaware Supreme Court would adopt the Restatement view of abolishing the distinction between absolute and conditional guarantors. First, the Delaware Supreme Court has previously adopted the views of the predecessor to the Restatement (Third) of Suretyship and Guaranty, the Restatement (First) of Security. *See Royal Indem. Co. v. Alexander Industries, Inc.,* 211 A.2d 919 (Del.1965); *Frank C. Sparks Co. v. Huber Baking Co.,* 96 A.2d 456 (Del.1953). Also, the lower Delaware courts have adopted the Restatement (First) of Security in at least six cases. [FN5]In one of those cases, the Chancery Court adopted the Restatement (First) of Security § 82, which was the predecessor to section 1 of the Restatement (Third) of Suretyship and Guaranty, which abolished the distinction between absolute and conditional guarantors. *See Gellis,* 322 A.2d at 291.

> FN5.*See Stewart v. Bank of Delaware,* 1992 WL 423940 (Del.Super.1992); *Federal Deposit Ins. Corp. v. Bloom,* 1986 WL 221 (Del.Super.1986); *Kent County Levy Court v. International Underwriters, Inc.,* 1985 WL 149635 (Del.Ch.1985) *Gellis v. S. Gellis & Co., Inc.,* 322 A.2d 287 (Del.Ch.1974); *Sussex Finance Co. v. Goslee,* 82 A.2d 743 (Del.Super.1951); *Theisen v. Hoey,* 58 A.2d 569 (Del.Ch.1948).

*\*4 In addition, the Restatement (Third) of Suretyship and Guaranty cites a number of jurisdictions which abolished the distinction prior to publication of the Restatement (Third) of Suretyship and Guaranty. *See id.* at § 1, Reporters Notes. Also, a Westlaw search revealed that at least

ten cases from other jurisdictions have cited section 1 of the Restatement (Third) of Suretyship and Guaranty,[FN6] and at least 51 cases have cited other sections of the Restatement (Third) of Suretyship and Guaranty. As a consequence, this Court predicts that the Delaware Supreme Court would abolish the distinction between absolute and conditional guarantors and follow the Restatement view of rights and remedies based upon suretyship status..

> FN6.*AmTote Intern., Inc. v. PNGI Charles Town Gaming Ltd. Liability Co.,* 66 F.Supp.2d 782 (N.D.W.Va.1999); *Chemical Bank v. Meltzer,* 712 N.E.2d 656, 690 (N.Y.1999); *Striar v. American Medical Intern., Inc.,* 695 N.E.2d 1079 (Mass.App.Ct.1998); *In re Spirco, Inc.,* 221 B.R. 361 (W.D.Pa., Apr 13, 1998); *Chemical Bank v. Meltzer,* 245 A.D.2d 214, 666 N.Y.S.2d 624 (N.Y.A.D.1997); *Guarantee Co. of North America v. City of Cleveland,* 1997 WL 614406 (N.D.Ohio 1997); *Matter of Liquidation of Integrity Ins. Co .,* 685 A.2d 1286 (N.J.1996); *Transamerica Premier Ins. Co. v. U.S.,* 32 Fed.Cl. 308 (Fed.Cl.1994); *L & A Contracting Co. v. Southern Concrete Services, Inc.,* 17 F.3d 106 (5th Cir.1994) *People Nat. Bank, Kingfisher, Oklahoma v. U.S.,* 30 Fed.Cl. 391 (Fed.Cl.1994).

Given this prediction, the Court will now discuss: (1) Elliott's suretyship status under the Lease; (2) Elliott's rights and remedies against Falco; and, (3) Falco's right to collect certain costs from Elliott.

### 1. Elliott's Suretyship Status

In order for the guarantor's rights to attach, he must have "suretyship status," which is defined as:
(a) pursuant to contract (the "secondary obligation" ), an obligee has recourse against a person (the " secondary obligor") or that person's property with respect to the obligation (the "underlying obligation ") of another person (the "principal obligor") to that obligee; and
(b) to the extent that the underlying obligation or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the secondary obligation is performed the obligee is
not entitled to performance of the other obligation;
and
(c) as between the principal obligor and the
secondary obligor, it is the principal obligor who
ought to perform the underlying obligation or bear
the cost of performance.

Restatement (Third) of Suretyship and Guaranty § 1
. In this case, Falco is the obligee, Alpha is the
primary obligor, and Elliott and McGrath are both
secondary obligors. All of the obligations owed by
Alpha to Falco under the Lease are collectively the
underlying obligation. As discussed in more detail
in Section III.B.1, *infra,* Elliott's guaranty is
unambiguously a secondary obligation for all of the
amounts due under Alpha's underlying obligation
under the Lease. Therefore, Elliott has suretyship
status under the Lease, regardless of whether
Elliott's guaranty is conditional or unconditional.
*See id.*

### 2. Elliott's Rights and Remedies

Since Elliott has suretyship status, his rights and
remedies concerning notice of Alpha's default,
Falco's dealings with Elliott, Falco's sale of the
equipment, and Elliot's right to revoke his guaranty
are governed by four provisions of the Restatement
(Third) of Suretyship and Guaranty: § 12 regarding
voidability of the lease due to misrepresentations; §
16 regarding continuing guaranties; § 37 regarding
impairment of suretyship status; and, § 47 regarding
nondisclosure of events.

### a. Section 12: Voidability due to Misrepresentations

Section 12 outlines the general rule that a secondary
obligation is voidable due to a fraudulent or
material misrepresentation by the obligee that
induces the secondary obligor to enter into the
secondary obligation. *See* Restatement (Third) of
Suretyship and Guaranty § 12.[FN7] Delaware law is
in accord with the Restatement (Third) of
Suretyship and Guaranty insofar as it holds
contracts voidable if they were procured based upon
fraudulent misrepresentations. *See Anglin v.*

*Bergold,* 565 A.2d 279, 1989 WL 88265,*2
(Del.1989) (citing *Scott Douglas Corp. v.
Greyhound Corp.,* 304 A.2d 309, 317
(Del.Super.1973)). Although the Court has found
no Delaware case which holds guaranty obligations
voidable due to material misrepresentations, this
Court predicts that the Delaware Supreme Court
will adopt the Restatement view and find guaranty
obligations voidable on both grounds.

> FN7.Restatement (Third) of Suretyship
> and Guaranty § 12 provides:
> (1) If the secondary obligor's assent to the
> secondary obligation is induced by a
> fraudulent or material misrepresentation by
> the obligee upon which the secondary
> obligor is justified in relying, the
> secondary obligation is voidable by the
> secondary obligor.
> (2) If the secondary obligor's assent to the
> secondary obligation is induced by a
> fraudulent or material misrepresentation by
> either the principal obligor or a third
> person upon which the secondary obligor
> is justified in relying, the secondary
> obligation is voidable by the secondary
> obligor unless the obligee, in good faith
> and without reason to know of the
> misrepresentation, gives value or relies
> materially on the secondary obligation.
> (3) Subject to subsections (4) and (5), if,
> before the secondary obligation becomes
> binding, the obligee:
> (a) knows facts unknown to the secondary
> obligor that materially increase the risk
> beyond that which the obligee has reason
> to believe the secondary obligor intends to
> assume; and
> (b) has reason to believe that these facts
> are unknown to the secondary obligor; and
> (c) has a reasonable opportunity to
> communicate them to the secondary
> obligor;
> the obligee's nondisclosure of these facts to
> a secondary obligor constitutes a material
> misrepresentation.
> (4) For purposes of subsection (3), whether
> the obligee has reason to believe that (i)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

facts unknown to the secondary obligor materially increase the risk beyond that which the secondary obligor intends to assume and (ii) such facts are unknown to the secondary obligor, shall be determined in light of the obligee's reasonable beliefs as to:
(a) the nature of the secondary obligor's relationship to the principal obligor;
(b) the nature of the secondary obligor's business; and
(c) the secondary obligor's ability to obtain knowledge of such facts independently in the exercise of ordinary care.
(5) Notwithstanding subsection (3), if the secondary obligor controls the principal obligor, is controlled by the principal obligor, or is under common control with the principal obligor, nondisclosure to the secondary obligor by the obligee of facts
(a) about the principal obligor;
(b) known or disclosed to the principal obligor; or
(c) about the underlying obligation that the obligee is under no duty to disclose to the principal obligor
does not constitute a material misrepresentation.
(6) For purposes of this section, if the contract creating the secondary obligation is a continuing guaranty (§ 16), the continuing guarantor is treated as having assented to a secondary obligation with respect to each underlying obligation of the principal obligor at the time that underlying obligation was incurred.

*5 Under § 12, unless the secondary obligation is a " continuing guaranty," as defined in § 16, voidability applies only to misrepresentations that the obligee makes prior to or contemporaneous with the time that the guarantor enters into the secondary obligation. As discussed in detail in Section III.A.1.c, *infra*, Elliot's guaranty is not a " continuing guaranty" as defined in Restatement (Third) of Suretyship and Guaranty § 16. Therefore, Falco's duty under § 12 to not make fraudulent or material misrepresentations is limited to representations it made to Elliott prior to and

contemporaneous with the time he signed the guaranty.

The factual record is not sufficiently developed for the Court to resolve, as a matter of law, whether Falco breached its duty to not make fraudulent or material misrepresentations to Elliott. However, as discussed in more detail in Section III.B.2, *infra*, Elliott may introduce extrinsic evidence to the Lease in order to prove a claim under § 12. If Elliott can prove fraudulent or material misrepresentations, his guaranty is voidable at his option.

b. Section 16: Continuing Guaranty and Right of Termination

Elliott argues that he had the power to terminate his guaranty at any time during the course of the Lease. As a general rule, once the guarantor's offer to guarantee is accepted by the obligee, it is a contract, and is not terminable unilaterally by the guarantor. *See, e.g., Danby v. Osteopathic Hospital Ass'n,* 101 A.2d 308, 312-13 (Del.Ch.1954). In this case, there is no question that Falco accepted Elliot's offer to guarantee the Lease when they executed the new signature page and Amendment to Rider on August 4, 1996.

However, both the Restatement (Third) of Suretyship and Guaranty § 16 and Delaware law provide an exception to this rule and allow a guarantor to terminate the guaranty if it is a " continuing guaranty ." *See* Restatement (Third) of Suretyship and Guaranty § 16; [FN8] *Elysian Federal Savings Bank v. Sullivan,* 1990 WL 20737, *5 (Del.Ch.1990); *Danby,* 101 A.2d at 177-78; *Cooling v. Springer,* 30 A.2d 466, 469 (Del.Super.1943). Section 16 defines a "continuing guaranty" as "a contract pursuant to which a person agrees to be a secondary obligor for all future obligations of the principal obligor to the obligee." Restatement (Third) of Suretyship and Guaranty § 16. Likewise, Delaware law defines a "continuing guaranty" as " one which is not limited to a single transaction, but which contemplates a future course of dealing, covering a series of transactions, and generally for an indefinite time." *Cooling,* 30 A.2d at 469. The theory is that a continuing guaranty is an offer to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

guarantee a series of future obligations, which the primary obligor has not yet entered into. *See id.* Since the guaranty is not accepted until the primary obligor enters into each future obligation, the guarantor may revoke his offer to guaranty as to any future obligation not yet executed. *See id.* The guarantor remains liable for obligations already entered into prior to the revocation. *See id.*

> FN8.Section 16 provides:
> A continuing guaranty is a contract pursuant to which a person agrees to be a secondary obligor for all future obligations of the principal obligor to the obligee. A continuing guaranty is terminable, and may be terminated by the continuing guarantor by notice to the obligee. If the continuing guarantor is a natural person, the continuing guaranty is terminated by the death of the continuing guarantor unless the continuing guaranty provides otherwise. Upon termination of a continuing guaranty, the continuing guarantor remains a secondary obligor with respect to obligations of the principal obligor incurred prior to termination and becomes a secondary obligor with respect to obligations of the principal obligor incurred by extensions of credit to the principal obligor after termination pursuant to a commitment that became binding before termination. Otherwise, the continuing guarantor does not become a secondary obligor with respect to any obligations incurred by the principal obligor after termination.
> *Id.*

*6 Whether the guaranty is a continuing guaranty is a matter of contract interpretation, which is a matter of law for the Court. *See Pellaton v. Bank of New York,* 592 A.2d 473, 477 (Del.1991). Elliott asserts that his guaranty is a continuing guaranty because, under the Lease, Alpha could incur further indebtedness after he signed the guaranty due to costs that were not fixed at the time he signed the guaranty. These costs presumably include, but are not limited to, tax liability (Lease ¶ 6); insurance

liability (¶ 7); snow removal, parking lot maintenance, etc. (¶ 8); utilities (¶ 9); and, termination damages (¶ 22). Elliott has not cited, and the Court has not located, a single case to support a guaranty for a lease being a continuing guaranty because of future debts specified in the Lease but not yet incurred.

Courts generally find continuing guaranties in two categories of cases. First, if a lease gives the tenant an option to extend the term, a guaranty for the lease is a continuing guaranty as to the extension and can be revoked as to the extension before the lease is extended. *See, e.g., Flexi-Van Leasing, Inc. v. Isaias,* 23 F.Supp.2d 419, 423-24 (S.D.N.Y.1998). Second, if a guarantor guarantees all future loans or leases entered into by the primary obligor, the guaranty is continuing and revocable as to all loans or leases not yet entered into by the primary obligor. *See, e.g., Elysian,* 1990 WL 20737 at *5.

Elliot's guaranty has none of the characteristics of the continuing guaranties in those cases. The guaranties in those cases involved future debts that the primary obligor had not yet contracted to incur. In contrast, Alpha contracted with Falco to incur all of the debts enumerated in the Lease for the five year term of the Lease prior to Elliott executing his guaranty. In addition, the continuing guaranties in the other cases cover only future indebtedness which can be incurred at the option of the primary obligor. In this case, Alpha's additional indebtedness would not be incurred at the option of Alpha, but rather, is caused by outside forces, such as tax laws, insurance rates, and snowfall amounts. Finally, Alpha does not have the right to enter into any additional obligations not listed in the Lease. Therefore, even though the exact amounts are not fixed, Elliot's guaranty is for all of the obligations stated in the Lease. His obligation is not a continuing guaranty and could not have been terminated once it was accepted by Alpha and Falco on August 4, 1994.

c. Section 37: Impairment of Suretyship Status

Section 37 sets forth the general rule that an obligor may not impair the suretyship status of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

secondary obligor. *See* Restatement (Third) of Suretyship and Guaranty § 37.[FN9] The rule enumerates several types of impairment of suretyship status, which are detailed in §§ 39-43. It also contains a catch-all provision for other types of impairments, detailed in § 44. Section 37 also sets forth the remedies that a secondary obligor has against the obligee, including discharge of all or part of his obligation. *See id.* Although the Delaware Supreme Court has not adopted this provision, this Court predicts, for the reasons stated earlier, the Delaware Supreme Court would do so.

FN9. Section 37 provides:
(1) If the obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance, the secondary obligor is discharged as described in subsections (2) and (3), and the secondary obligor has a claim against the obligee as described in subsection (4). An act that increases the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance is an "impairment of suretyship status."
(2) If the obligee fundamentally alters the risks imposed on the secondary obligor by:
(a) releasing the principal obligor from a duty other than the payment of money (§ 39(c)(iii); or
(b) agreeing to a modification of the duties of the principal obligor that either amounts to a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed on the secondary obligor prior to modification (§ 41(b)(i));
the secondary obligor is discharged from any unperformed portion of the secondary obligation as more fully set forth in those sections.
(3) If the obligee impairs the secondary obligor's recourse against the principal

obligor by:
(a) releasing the principal obligor from a duty to pay money (§ 39(c)(ii));
(b) granting the principal obligor an extension of time for performance of its duties pursuant to the underlying obligation (§ 40(b));
(c) agreeing to a modification of the duties of the principal obligor, other than a release or an extension of time, that does not amount to a substituted contract or impose risks on the secondary obligor fundamentally different from those imposed on the secondary obligor prior to modification (§ 41(b)(ii));
(d) impairing the value of an interest in collateral securing the underlying obligation (§ 42);
(e) failing to institute an action before expiration of the statute of limitations governing the underlying obligation (§ 43); or
(f) any other act or omission that impairs the principal obligor's duty of performance, the principal obligor's duty to reimburse, or the secondary obligor's right of restitution or subrogation (§ 44);
the secondary obligor is discharged from its duties pursuant to the secondary obligation to the extent set forth in those sections in order to prevent the impairment of recourse from causing the secondary obligor a loss.
(4) If the obligee impairs the secondary obligor's suretyship status
(a) after the secondary obligor performs any portion of the secondary obligation; or
(b) before the secondary obligor performs a portion of the secondary obligation, if the secondary obligor then performs:
(i) without knowledge of such impairment;
(ii) for the benefit of an intended beneficiary who can enforce the secondary obligation notwithstanding such impairment; or
(iii) under business compulsion;
the secondary obligor has a claim against the obligee with respect to such performance to the extent that such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

impairment would have discharged the secondary obligor with respect to that performance.
Restatement (Third) of Suretyship and Guaranty § 37.

*7 At this stage the facts are not well enough developed to determine whether Falco's alleged failure to give notice of Alpha's default to Elliott; alleged improper dealing with Elliott; and sale of Alpha's printing equipment, constitute an impairment of Elliot's suretyship status under § 37. It seems clear to the Court that it would not constitute an impairment under any of the enumerated impairments in §§ 39-41 and 43.[FN10] Also, assuming Alpha's obligations under the Lease were not secured by a security interest in collateral, there would not be an impairment of Elliot's suretyship status by an impairment of collateral, under section 42.[FN11]

FN10. These are:
(a) releasing the principal obligor from a duty to pay money (§ 39(c)(ii));
(b) granting the principal obligor an extension of time for performance of its duties pursuant to the underlying obligation (§ 40(b));
(c) agreeing to a modification of the duties of the principal obligor, other than a release or an extension of time, that does not amount to a substituted contract or impose risks on the secondary obligor fundamentally different from those imposed on the secondary obligor prior to modification (§ 41(b)(ii));
(d) impairing the value of an interest in collateral securing the underlying obligation (§ 42);
(e) failing to institute an action before expiration of the statute of limitations governing the underlying obligation (§ 43).
*Id.* at § 37.

FN11. Section 42 provides:
(1) If the underlying obligation is secured by a security interest in collateral and the obligee impairs the value of that interest,

the secondary obligation is discharged to the extent that such impairment would otherwise increase the difference between the maximum amount recoverable by the secondary obligor pursuant to its subrogation rights (§§ 27-31) and the value of the secondary obligor's interest in the collateral.
(2) Impairing the value of a security interest in collateral includes:
(a) failure to obtain or maintain perfection or recordation of the interest in collateral;
(b) release of collateral without substitution of collateral of equal value or equivalent reduction of the underlying obligation;
(c) failure to perform a duty to preserve the value of collateral owed to the principal obligor or the secondary obligor; and
(d) failure to comply with applicable law in disposing of collateral.
*Id.* at § 42.

However, these actions may constitute an impairment under the catch-all provision in § 44, which reads:
If otherwise than described in §§ 39-43 the obligee impairs the principal obligor's duty of performance ( § 21), the principal obligor's duty to reimburse (§§ 22-25), or the secondary obligor's right of restitution (§ 26) or subrogation (§§ 27-31), the secondary obligor is discharged from its duties pursuant to the secondary obligation to the extent that such impairment would otherwise cause the secondary obligor a loss.

*Id.* at § 44. However, the factual record is not well enough developed to determine as a matter of law whether these acts constitute an impairment of Elliot's suretyship status. As such, the parties will be permitted to introduce evidence at trial to prove or disprove whether Elliot's suretyship status has been impaired.

### d. Section 47: Non-Disclosure of Events

Section 47 gives the secondary obligor the right to terminate the contract upon non-disclosure of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

certain events by the obligee, but only if the contract gives the secondary obligor the power to terminate the guaranty upon occurrence of that event. *See* Restatement (Third) of Suretyship and Guaranty § 47.[FN12] The Lease nowhere gives Elliott the right to terminate his guaranty for any reason. Therefore, assuming the Delaware Supreme Court were to adopt this section, it would not provide any recourse for Elliott.

>      FN12. This section provides:
>      If, pursuant to the terms of the contract creating the secondary obligation, the secondary obligor has the power, upon the occurrence of a specified event, to terminate the secondary obligation with respect to subsequent defaults of the principal obligor on the underlying obligation or subsequently incurred duties of the principal obligor, and:
>      (a) such event occurs;
>      (b) the obligee knows such event has occurred; and
>      (c) the obligee has reason to know that the occurrence of such event is unknown to the secondary obligor;
>      the secondary obligor is discharged from the secondary obligation with respect to defaults of the principal obligor that occur, or duties of the principal obligor incurred, thereafter and before the secondary obligor obtains knowledge of the occurrence of the event.
>      *Id.*

**3. Falco's Right to Collect Certain Costs from Elliott**

It is unclear what costs that the parties dispute that Falco has a right to recover from Elliott. Elliott argues that Falco may not charge him for "costs associated in pursuing the debts of the principal debtor, Alpha Associates." D.I. 34 at 4. Without responding directly to Elliot's argument, Falco contends that it may recover its costs associated with eviction of Alpha and sale of its equipment. D.I. 60 at 5-6. In reply, Elliott asserts that he is not liable for any "expenses or costs outside the Lease Agreement."

As discussed in more detail in Section III.B.1, *infra,* Elliott is unambiguously liable as guarantor for all amounts due under the terms of Lease for the entire five year term of the Lease. This includes, but is not limited to, payment of rent (¶ 3); taxes (¶ 6); insurance (¶ 7); snow removal, parking lot maintenance, grass cutting, landscaping, security, common area electric, and other common area charges (¶ 8); utilities (¶ 9); repairs and maintenance (¶ 13); and, damages due to Tenant's default (¶ 22). Thus, Elliott is liable for all costs and expenses to the extent they are provided for in the Lease. Without knowing exactly what costs and expenses the parties seek to admit or exclude, and not being advised what other Lease provision they assert to be relevant, the Court cannot rule on whether they fall within the terms of Elliot's guaranty of the Lease.

**B. Admission of Parol Evidence**

**\*8** Elliott seeks to introduce evidence of negotiations between him and Falco, prior to his executing the guaranty provision for the Lease on August 4, 1996. Under Delaware law, the parol evidence rule generally bars the admission of extrinsic evidence of prior or contemporaneous contract negotiations to interpret the meaning of, vary the terms of, or create ambiguity in a contract. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997). However, Elliott asserts that the evidence is admissible under two exceptions to the parol evidence rule: (1) to interpret ambiguous contract terms, *see id.;* and/or (2) to prove one party was fraudulently induced to enter the contract. *See Anglin v. Bergold,* 565 A.2d 279, 1989 WL 88265,[\*2] (Del.1989) (citing *Scott Douglas Corp. v. Greyhound Corp.,* 304 A.2d 309, 317 (Del.Super.1973)). The Court finds that the lease is not ambiguous but that the parol evidence is admissible for the purpose of proving fraudulent inducement.

**1. Ambiguity in Lease**

Guaranty obligations are interpreted according to the same standards as general contracts. *See*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 12

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Restatement (Third) of Suretyship and Guaranty §
14. The interpretation of language in a contract is a
matter of law, in which the Court interprets the
meaning of contract terms based solely on the
contract itself. *See Pellaton v. Bank of New York,*
592 A.2d 473, 477 (Del.1991); *Mesa Partners v.
Philips Petroleum Co.,* 488 A.2d 107, 113
(Del.Ch.1984). The Court may not consider the
proffered parol evidence in determining whether the
contract term is ambiguous. *See id.* However, if the
Court finds the contract term to be ambiguous, then
the parol evidence is admissible to help interpret the
meaning of the term and the interpretation becomes
a question for the trier of fact. *See id.*

To determine whether a contract term is ambiguous,
the test is whether it "is reasonably susceptible to at
least two possible meanings." *Eagle Industries,* 702
A.2d at 1231. A contract term is not ambiguous
simply because the parties cannot agree on the
meaning. *See Rhone-Poulenc Basic Chemicals Co.
v. American Motorists Insurance Co.,* 616 A.2d
1192, 1196 (Del.1992). Moreover, the Court is not
bound by the meaning that the parties ascribe to the
contract terms. *See Eagle Industries,* 702 A.2d at
1231.

Here, the parties dispute the scope of the guaranty
executed by Elliott. Falco asserts that the guaranty
is unambiguous and that Elliott personally
guaranteed all amounts due under the lease by
Alpha. Elliott counters that his guaranty was only
for the $18,445.86 security deposit, or the Lease is
at least ambiguous as to whether he guaranteed all
amounts due under the Lease or only the security
deposit. The Court finds the Lease is unambiguous
that Elliott guaranteed all amounts due under the
entire Lease.

In the original Lease, before Elliott executed the
guaranty, paragraph 3 of the Rider [FN13]
unambiguously explained that Elliott's guaranty
would be for all sums due under the Lease.
Paragraph 3 provided that Alpha deposit an
$18,445.86 cash security deposit with Falco on the
date of the execution of the Lease. After that date,
Alpha had 45 days to provide "substitute security,"
in exchange for the cash security deposit, in one of
three forms: (1) a performance bond for

$110,675.10, (2) an irrevocable letter of credit for
$110,675.10, or (3) "the personal guarantees of the
principals of Alpha, Inc., Thomas J. Elliott and
William J. McGrath, to this Lease Agreement." This
language is clear that the guaranty is for "the Lease
Agreement," not for the security deposit. Nowhere
does the Lease or Rider limit the scope of the
guaranty to only the security deposit. In addition,
paragraph 3 unambiguously stated that the guaranty
for the lease would be a substitute security for the
$18,445.86 cash security deposit, not that the
guaranty would be for the cash security deposit.

> FN13. See Facts, section II, *supra,* for full
> text of Rider ¶ 3.

*9 Moreover, under the terms of paragraph 3, it
would defy all logic for the guaranty to be limited to
only the $18,445.86 cash security deposit. Although
Falco was willing to accept $18,445.86 in cash as
the security deposit to start the Lease, the Lease
provides for substitution with three non-cash
alternatives. The first two alternatives, the
performance bond and the letter of credit, were for
substantially more money than the cash security
deposit. Given the history of nonpayment, it is
illogical that Falco would accept a personal
guaranty, in lieu of cash, in the same amount as the
cash security deposit. Rather, paragraph 3 is clear
that the guaranty was for the entire Lease.

The new signature page also leads to the
unambiguous conclusion that Elliott's guaranty was
for the entire Lease. Unless the contract indicates
otherwise, the use of the terms "guarantor" and "
guaranty" mean that the signatory to the guaranty is
liable, as a secondary obligor, for the entire
obligation that the principal obligor has under the
contract. *See* Restatement (Third) of Suretyship and
Guaranty § 15(a). Alpha, as Tenant, was the
principal obligor for all amounts due under the
Lease and Elliott signed as "Guarantor." Moreover,
other provisions in the Lease and Rider refer to
Elliot's obligation as a "guaranty." In addition, the
Lease contains no limitation or intimation that
Elliott's guaranty is for only the security deposit. It
is concluded the Lease language unambiguously
indicates that Elliott is a secondary obligor for the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 13

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

entire obligation of Alpha and is liable for the full amount due under the Lease.

Finally, the Amendment to Rider unambiguously verifies that Elliot's guaranty was for the entire Lease. The Amendment to Rider states that Elliott and McGrath "signed individual guarantees *for the above referenced lease."* (emphasis added). It does not state that the guaranty is solely for the security deposit. Moreover, the Amendment to Rider preserved Elliott's option of substituting the performance bond or the irrevocable letter of credit, as provided in paragraph 3 of the original Rider, for his personal guaranty. Because the Amendment to Rider references the substitute security options to paragraph 3 of the Rider, it indicates that the guaranty has the same scope as provided in paragraph 3 of the Rider, which is for the entire Lease. It follows the Amendment to Rider also unambiguously shows that Elliot's guaranty was for the entire Lease.

Because all aspects of the Lease unambiguously define the scope of the guaranty as a guaranty for the entire Lease, the parol evidence rule bars the admission of extrinsic evidence to prove the scope of the guaranty.

2. Fraud

Another exception to the parol evidence rule's ban on extrinsic evidence of prior or contemporaneous negotiations is to prove that the contract is void or voidable due to fraud. *See Anglin,* 1989 WL 88265, at *2. The rationale for the exception is that, if fraudulent misrepresentations induced a party to enter the contract, then there was no mutual assent, no contract, and the parol evidence rule does not apply. *See James River-Pennington, Inc. v. CRSS Capital, Inc.,* 1995 WL 106554,*6 (Del.Ch.1995). The Restatement (Third) of Suretyship and Guaranty § 12 provides that guaranty provisions are voidable, not only due to fraudulent misrepresentations, but also due to material misrepresentations.[FN14] This Court predicts that the Delaware Supreme Court will adopt the Restatement view, and will find guaranty provisions voidable due to both fraudulent and material

misrepresentations. Accordingly, extrinsic evidence is admissible to prove that an obligee fraudulently or materially misrepresented facts which induced a guarantor to enter into a guaranty. However, it is not admissible to prove fraudulent or material misrepresentation in connection with the obligee's performance. *See James River-Pennington, Inc.,* 1995 WL 106554 at *6.

FN14.*See* note 6, *supra,* for text of § 12.

*10 Elliott has not pled a defense of fraudulent or material misrepresentations inducing him to enter into the guaranty provisions. D.I. 12. However, Elliott has asserted a counterclaim against Falco for "Fraudulent Nondisclosure." *Id.* at ¶¶ 25-35. Although this counterclaim relates primarily to Falco's fraudulent misrepresentations in performing its obligations under the Lease, it can also plausibly be read to include a claim for fraudulent or material misrepresentations inducing him to enter the guaranty. Elliott claims that Falco "intentionally and fraudulently concealed material facts to fraudulently induce [Elliott] into continuing his alleged relationship with [Falco]" and that this occurred "from July 1994." *Id.* at ¶¶ 27-28. Paragraphs 29-35 further elaborate on these allegations. Since Elliott did not sign the guaranty until August 4, 1994, the counterclaim can be read to allege that Falco's fraudulent and material misrepresentations induced Elliott into continuing his relationship with Falco by signing the guaranty.

Therefore, extrinsic evidence of prior or contemporaneous negotiations leading up to Elliott's signing the guaranty will be admissible for the limited purpose of proving fraudulent or material misrepresentations inducing him to enter into it. *See James River-Pennington,* 1995 WL 106554, at *6. Whether Elliott was induced to enter the guaranty becomes an issue for the trier of fact. *See Fort Howard Cup Corp. v. Quality Kitchen Corp.,* 1992 WL 207276,*3 (Del. Ch.1992). However, the extrinsic evidence will not be admissible to prove fraudulent or material misrepresentations in Falco's performance of the Lease obligations, or for any other purpose.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

In conclusion, the extrinsic evidence of prior negotiations will be admissible at trial for the sole purpose of proving fraudulent or material misrepresentations inducing Elliott to enter into his personal guaranty of the Lease. It will not be admissible to prove the scope of the guaranty, in which Elliott unambiguously guaranteed all amounts due under the lease, or for any other purpose. If Falco desires, it may submit a proposed limiting jury instruction to be given upon its request at the time defendant Elliott offers the evidence of the negotiations leading up to agreement on the original lease.

### C. Joint and Several Liability of Elliott and McGrath

Falco requests the Court enter an order that Elliott and McGrath are jointly and severally liable for the amounts due under the guaranty. In response, Elliott argues that he and McGrath are severally, but not jointly, liable on the guaranty. In the alternative, Elliott requests that the Court submit a special interrogatory to the jury regarding apportionment of damages between him and McGrath. For the following reasons, the Court holds that Elliott and McGrath are jointly and severally liable and that Elliott is not entitled to a special interrogatory apportioning liability in conjunction with an instruction on joint and several liability.

**\*11** This dispute centers on whether Elliott and McGrath are jointly and severally liable, or only severally liable, on the guaranty provisions of the Lease. The difference between joint, several, and joint and several liability for obligations under a contract is as follows:
Copromisers are liable "jointly" if all of them have promised the entire performance which is the subject of the contract. The effect of a joint obligation is that each joint promisor is liable for the whole performance jointly assumed. It has been said that persons who bind themselves jointly for the performance of one entire duty become sureties for one another for performance of the contract....
When a "several" obligation is entered into by two or more parties in one instrument, it is as though each has executed separate instruments. Under these circumstances, each party is bound separately for

the performance which he or she promises, and is not bound jointly with anyone else.
A "joint and several" contract is a contract with each promisor and a joint contract with all, so that all parties having a joint and several obligation are bound jointly as one party, and also severally as separate parties at the same time.

Richard A. Lord, 12 Williston on Contracts § 36:1 (4th ed. 1999) ("Williston").

Delaware statutory law provides that "[a]n obligation or written contract of several persons shall be joint and several, unless otherwise expressed."6 Del.Code § 2701. This presumption of joint and several liability can only be rebutted by evidence revealing the objective intent of the parties to have a different type of obligation. *See*Williston, §§ 36:2, 36:3; Restatement (Second) of Contracts §§ 288, 289. The intent of the parties is revealed by the language of the contract, the subject matter, and the circumstances surrounding creation of the obligation. *See id.*

Moreover, this presumption is also embraced by the Restatement (Third) of Suretyship and Guaranty, which provides:
When there is more than one secondary obligor with respect to the same underlying obligation, each secondary obligor is liable to the obligee in accordance with the terms of its secondary obligation, provided that the obligee's aggregate recovery from all secondary obligors with respect to an underlying obligation may not exceed the amount of the underlying obligation plus any additional amounts recoverable pursuant to the terms of the secondary obligations.

Restatement (Third) of Suretyship and Guaranty § 52. Under this section, it is presumed that, absent language to the contrary, an obligee can recover the entire amount of the guaranty from either or both of the secondary obligors.

The Court finds no evidence sufficient to rebut the presumption of joint and several liability. First, the text of the Lease and Rider contains no language indicating that Elliott and McGrath are separately liable for individual shares of the guaranty. To the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

contrary, paragraph 3 of the Rider states that, as substitute security, Falco would only accept the personal guarantees of both Elliott and McGrath. Also, the revised signature page contains the signatures of both Elliott and McGrath as guarantors with no mention of them having separate obligations, such as "guarantor for 50%." Moreover, the Amendment to Rider states that Falco had accepted the personal guaranties of Elliott *and* McGrath and that Elliott *and* McGrath have the option of dissolving the personal guaranties by posting a performance bond or letter of credit. However, there is no mention of divisibility of any obligation between Elliott and McGrath. Since the language of the contract reveals no evidence of intent of only several liability, the presumption of joint and several liability governs.

*12 Second, as to the surrounding circumstances, the only evidence that Elliott has proffered to rebut the presumption of joint and several liability is that he and McGrath signed the guaranty successively and independently of each other. Even if they signed successively and independently of each other, [FN15] that is not enough to rebut the presumption of joint and several liability. Elliott relies upon language in *Lamson v. Habbart*, 43 A.2d 249 (Del.1945), which held that "[i]f each indorser successively and independently indorsed, then their obligation is several ... and distinct."*Id.* at 250.However, *Lamson* involved the liability of successive indorsers on a negotiable instrument. In finding successive indorsers only severally liable, the court relied upon a holding that the Delaware statutory presumption in favor of joint and several liability does not apply to negotiable instruments . [FN16]*See id.*Since this Lease and Rider are not negotiable instruments, the exception to 6 Del.Code § 2701 for successive indorsement does not apply. Thus, Elliott has proffered no evidence sufficient to prove that he and McGrath had any intent other than the presumed intent of joint and several liability.

> FN15. This could be a difficult proposition in itself since they both signed on the same date.
>
> FN16. This decision was actually based on

a precursor to 6 Del.Code § 2701, which provides, with identical language, that "an obligation, or written contract, of several persons, shall be joint and several, unless otherwise expressed."*Id.* (citing Section 3108 of Revised Code of 1935).

Although the Court finds Elliott and McGrath jointly and severally liable, Elliott also requests a special jury interrogatory to apportion damages between him and McGrath. The cases cited by Elliott are all inapplicable as they are tort cases, from other jurisdictions, which hold that an apportionment instruction is appropriate only when the defendants are severally, but not jointly, liable. *See Higginbotham v. Ford Motor Co.,* 540 F.2d 762, 772-773 (5th Cir.1976); *In re Thirteen Chapter 7 Cases of Former Trustee Germain,* 182 B.R. 375, 378 (Bank.D.Conn.1995); *Reilly v.. DiBianco,* 507 A.2d 106, 113 (Conn.App.1986). In contrast, this is a contract case where the defendants are jointly and severally liable. Moreover, under Delaware law, if parties to a contract are jointly liable, the jury must make only one award and may not apportion damages between the parties. *See Willard F. Deputy & Co. v. Hastings,* 123 A. 33, 35 (Del.Super.1923).

Accordingly, the Court will enter an order that, if liable for the amounts due under the guaranty, Elliott and McGrath are jointly and severally liable. The Court will not permit a special jury interrogatory to apportion damages between Elliott and McGrath in conjunction with joint and several liability.

### D. Whether Invoices are Hearsay

Elliott objects to three sets of invoices which Falco seeks to admit into evidence: (1) invoices from Falco to Defendants for work allegedly performed on the premises by Falco (F0006, 0010, 0021, 0042, 0045) (the "Falco invoices"); (2) invoices from third parties to Falco for work allegedly performed on the premises by third parties, such as pest control experts, plumbers, locksmiths, and electricians (F0007, 0012, 0018, 0048) (the "third party invoices"); and (3) invoices from Falco's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

attorneys to Falco for legal services (F0011, 0013-0014, 0019-0020, 0047, 0049-0067) (the " attorney invoices"). Falco seeks to admit these invoices as evidence of operating expenses chargeable to Defendants under the terms of the lease. Elliott challenges the admissibility of these documents as being hearsay and therefore inadmissible under Fed.R.Evid. 802.[FN17] D.I. 30 at 11. Falco concedes, and the Court agrees, that each invoice contains hearsay.[FN18]

> FN17.Rule 802 provides: "Hearsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." Fed.R.Evid. 802. Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

> FN18. Each invoice contains out of court statements which are being offered the truth of those statements. *See*Fed.R.Evid. 801(c). For example, F0012 is an invoice from Anthony M. Buzas, Apiculturist to Falco, containing out of court statements by Buzas that he charged $600.00 for removing two colonies of bees from the premises. This document is being offered to prove that Buzas removed the bees from the premises and that the charge for the removal was $600.00.

**\*13** Falco asserts these invoices are admissible pursuant to the business records exception to the hearsay rule, Fed.R.Evid. 803(6), which provides:
A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the

custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

To obtain admission under Rule 803(6), a custodian of records or other qualified witness must provide testimony sufficient to lay a foundation that: (1) the person who wrote the records had personal knowledge of the contents of the records; (2) the records were made contemporaneously with the actions recorded; (3) the records were made in the ordinary course of business; and (4) the records were regularly kept by the business. *See United States v. Pellulo,* 964 F.2d 193, 200 (3d Cir.1992).

Falco, the party seeking to introduce the testimony into evidence, bears the burden of establishing its admissibility. *See In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d 238, 288 (3d Cir1983). If the custodian of records or other qualified witness provides testimony that the invoices fulfill each requirement of the rule, the Court has discretion whether to admit them into evidence. *See United States v. Furst,* 886 F.2d 558, 571 (3d Cir.1989). Falco proffers that a representative of Falco will be able to provide sufficient testimony to fulfill the requirements of Rule 803(6). D.I. 55 at 9. [FN19]

> FN19."A representative of Falco will testify that these various services were ordered by Falco in the ordinary course of business, were generally supplied, the invoices were routinely received and paid substantially contemporaneous with the services that were provided and it was Falco's regular practice to keep a copy of the invoice in a file for each building owned by Falco so that the costs could be documented and billed to the individual tenants."*Id.*

Elliott counters with three arguments as to why the invoices do not fall under the Rule 803(6) business records exception. First, as to all three groups of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 17

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

invoices, Elliott asserts they are inadmissible because they were not prepared in the ordinary course of business, but rather in anticipation of litigation. Second, as to one Falco invoice, F0042, Elliott contends that it was not prepared contemporaneously with the work performed and it lacks trustworthiness. Finally, as to the third party invoices and attorney invoices, Elliott asserts that a Falco representative cannot serve as the witness to lay the foundation for admission of these documents.

The Court declines to make any ruling on the admissibility of the challenged attorney invoices because they are not relevant to the issues to be tried to the jury.[FN20] However, if Falco introduces testimony sufficient to fulfill the requirements of Rule 803(6), as discussed in more detail below, the Court holds that the Falco invoices and the third party invoices will be admissible.

> FN20. The parties stipulated that "[a]ll proof of attorney's fees and costs incurred shall be severed from the jury trial." D.I. 66.

### 1. All Invoices: Whether Prepared in Ordinary Course of Business

*14 One of the requirements of Rule 803(6) is that the records be prepared in the ordinary course of business. *See Pellulo,* 964 F.2d at 200. Records that are prepared in anticipation of litigation do not fulfill this requirement. *See United States v. Casoni,* 950 F.2d 893, 911, n.10 (3d Cir.1991). Elliott asserts all of the invoices were prepared in anticipation of litigation. He argues the third party invoices are based on work ordered by Falco in anticipation of litigation. In addition, Elliott asserts one Falco invoice (F0042) for supervision work in December and January, 1996, was prepared in anticipation of litigation because it is dated February 9, 1996. D.I. 61 at 8. However, if Falco can adduce credible testimony at trial that all invoices were prepared in the ordinary course of business, the invoices will fulfill this requirement of Rule 803(6).

### 2. Falco Invoice F0042

This is an invoice, dated February 9, 1996, from Falco to Alpha for supervision and labor during the months of December 1995 and January 1996.

#### a. Contemporaneousness

Rule 803(6) requires that the business record be "made at or near the time" of the time the acts in the record are performed. Elliott argues that this invoice, prepared February 9, 1996, was not contemporaneous with work performed in December 1995-January 1996. He may or may not be correct. This objection to Falco Invoice F0042 will have to be resolved at trial.

#### b. Trustworthiness

Rule 803(6) provides that otherwise admissible business records are inadmissible if they "indicate lack of trustworthiness." Elliott contends that this invoice is not trustworthy because there is no way of verifying the figures on the invoice or whether the acts were actually done. To indicate a lack of trustworthiness, Elliott points out that 56 hours to "turn out the lights" is excessive.

However, the invoice charges Falco $3,360.00 for 56 hours of supervision at $60.00/hour in December and January to do more than just turn out the lights: To oversee contractors removing equipment from the building from auction sale. Open building, lock up building control security, turn off lighting, control heating systems, watch for damage to doors etc. during removal; oversee and supervise clean up work same duties as above. Have drums of ink and other hazardous waste material removed.

The invoice also charges $864.00 for 32 hours of labor at $27.00/hour "to remove studs left in concrete floor to bolt down printing press equipment." The Court finds nothing untrustworthy on the face of the document. So long as Falco can adduce credible testimony from the custodian of records or other qualified witness that the work was actually performed and that the amounts charged are accurate, the invoice will be deemed trustworthy.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 18

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

### 2. Third Party Invoices: Whether Falco Representative Can Serve as Custodian or Other Qualified Witness

Rule 803(6) requires that the "custodian or other qualified witness" provide testimony sufficient to lay a foundation for admissibility of the records. Elliott argues that because the third party invoices were prepared by third parties, they are not the business records of Falco and a Falco representative cannot serve as the "custodian or other qualified witness" needed to provide the foundation for the invoices.

*15 However, the custodian or other qualified witness need not be the person that created the records. *See Pellulo,* 964 F.2d at 201. Moreover, the phrase "other qualified witness" should be given its broadest possible interpretation. *See id.* The witness need not be a member or employee of the entity that created the records. *See id.* Circumstantial evidence of the elements of Rule 803(6) is sufficient to lay a foundation for admissibility. *See Furst,* 886 F.2d at 572. Under certain circumstances, Rule 803(6) permits the admission of business records through the testimony of a witness not affiliated with the third party entity that created the records. *See United States v. Sokolow,* 91 F.3d 396, 403 (3d Cir.1996); *United States v. Reilly,* 33 F.3d 1396, 1414 (3d Cir.1994).

In a series of cases, the Third Circuit Court of Appeals has examined the admissibility of third party created records and defined the contours of testimony required to lay a foundation for admission of those records. This line of cases permits the admission of third party records incorporated into the business records of an entity, under Rule 803(6), if a "custodian or other qualified witness" from that entity testifies to three requirements. First, the entity must regularly incorporate the third party records into its own records kept in the regular course of business activity. Second, the entity must rely on the accuracy of the third party records. Third, and most important, the witness must be able to vouch for the accuracy of the third party records.

For example, in *Sokolow,* the Court admitted the

records of an insurance claims adjuster that were, in large part, derived from records supplied to the claims adjuster by a third party insurer. *See Sokolow,* 91 F.3d at 404-04. The records were supported by testimony of an employee of the adjuster who was familiar with the process of incorporating and verifying the records. *See id.* at 403.In admitting the records, the Court stressed three factors: the adjuster's ordinary business practice of incorporating the insurers records into its own records; the reliance of the adjuster on the records; and, the "adequate verification or other assurance of accuracy" of the insurer's records. *See id.* at 403.

Similarly, in *United States v. Console,* the Court admitted an Accident Book which contained a list of a physician's patients and the dates of their first visit to his office. *See* 13 F.3d 641, 656-58. According to the custodian of records for the physician's office, this information was based upon statements made by patients which were incorporated into the records. *See id.* at 657-58.The Court held that, because the office relied on the accuracy of the Accident Book and because the office used procedures to verify patient statements, the incorporated records were admissible pursuant to Rule 803(6).*See id.*

In addition, in *Reilly,* the Court admitted a set of radio telegrams that were received by a ship from third party sources. *See Reilly,* 33 F.3d at 1414. The records were supported by testimony of a radio operator for the ship who was responsible for receiving, decoding, and documenting all incoming messages. *See id* .Although the Court found the incoming telegrams independently admissible under another exception, the Court emphasized that they would be admissible under Rule 803(6) if a representative of the ship could verify their accuracy. *See id.*

*16 Also, in *Furst,* the Court refused to admit commodity trade records generated by a commodity trader based upon testimony of two representatives of banks that had incorporated these records into their own records. *See Furst,* 886 F.2d at 570-72. Each witnesses testified that his bank had a regular business practice of incorporating the records into

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

its own records and relying on the accuracy of the records in generating its own reports. *See id.* at 570-71.However, the Court excluded the evidence because neither witness could testify as to the accuracy of the commodity trade records in that neither witness could vouch for the fact that the trades as reported actually occurred. *See id.* at 570-72.

Finally, in *Pellulo,* the Court rejected the admission of certain bank records based on testimony by a government agent who had investigated wire transfers in the bank. *See Pellulo,* 964 F.2d at 201. The rejection occurred because the agent could not vouch for the underlying accuracy of the records. *See id.*

The Third Circuit Court of Appeals cases may be synthesized as generally requiring a showing of incorporation, reliance, and verification of trustworthiness of the incorporated records. Moreover, other circuits have recognized similar criteria, under Rule 803(6), for when third party records are admissible.[FN21]Two of these cases from other circuits are particularly analogous to the facts of this case. First, in *Falcon Jet Corp. v. King Enterprises, Inc.,* a construction company introduced third party invoices for work done on the premises in order to prove the amount of work done so that it could hold the defendant liable for the work. *See*678 F.2d 73, 77 (8th Cir.1982). The Court admitted the evidence under Rule 803(6) because the invoices were "sufficiently trustworthy." *See id.*

> FN21.*See United States v. Doe,* 960 F.2d 221, 223 (1st Cir.1992) (business must show (1) incorporation into its own records and (2) reliance on the third party records); *United States v. Jakobetz,* 955 F.2d 786, 801 (2d Cir.1992) (witness must show: (1) regular incorporation of third party records; and (2) reliance upon records in day to day operations); *United States v. Ullrich,* 580 F.2d 765, 771 (5th Cir.1978) (witness must show (1) incorporation of third party records; (2) reliance on third party records; and (3) taking steps to confirm their accuracy); *Falcon Jet Corp.*

*v. King Enterprises, Inc.,* 678 F.2d 73, 76 (8th Cir.1982) (third party records admissible if witness can demonstrate trustworthiness); *MRT Construction, Inc. v. Hardrives,* 158 F.3d 478, 483 (9th Cir.1998) (witness must show: (1) incorporation of third party records in the ordinary course of business, (2) reliance upon the records for their accuracy; and (3) substantial interest in the records' accuracy); *United States v. Parker,* 749 F.2d 628, 633 (11th Cir.1984) (witness must show (1) incorporation of third party records and (2) trustworthiness of records); *Air Land Forwarders, Inc. v. United States,* 172 F.3d 1338, 1343 (Fed.Cir.1999) (incorporating entity must prove: (1) reliance upon accuracy of incorporated records and (2) circumstantial evidence of the records' trustworthiness).

Similarly, in *United States v. Doe,* the government sought to introduce an invoice for a gun, generated by a gun manufacturer, found in the files of a gun shop, and containing a handwritten notation " Received 12-11-86." *See*960 F.2d 221, 222-23 (1st Cir.1992). The gun shop owner testified that he saved all gun receipts, that the handwriting was his, and that he relied on gun receipts to prove that he had actually received the guns. *See id.*The Court found his testimony sufficient to lay a foundation for admissibility under Rule 803(6).*See id.*

In this case, Falco has proffered that a Falco representative will testify that the third party invoices were regularly incorporated into Falco's files and that Falco relied upon these records to bill its tenants for work done on the property. If Falco adduces such testimony, it will meet the first two requirements for incorporated third party business records under Rule 803(6). Falco also proffers that the witness will testify that the services billed were performed, that the amounts billed were accurate, and that the invoices were routinely received and paid contemporaneous with the services being performed. If Falco does all it represents it will do, the third party invoices will be admissible pursuant to Rule 803(6).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

### E. Whether Rescission Counterclaim Is Decided by Jury

**\*17** Elliott requests the Court to order that his counterclaim for rescission of the guaranty obligation be submitted to the jury by special interrogatory. Falco counters that there is no right to have this equitable claim go to the jury. The Court holds that facts underlying the rescission claim will be decided by the jury, but that the decision whether to rescind will be decided by the Court.

Count IV for Rescission incorporates all of the allegations of Counts I-III and demands rescission of any personal guaranty obligation he may have under the lease. Underlying Count IV are allegations that: Falco made fraudulent or material misrepresentations which induced Elliott to sign the guaranty, D.I. 12 at ¶ 27; Falco fraudulently failed to disclose material information to Elliott during the course of the lease to allow him to fulfill his guaranty obligations, *id.* at ¶¶ 28-35; Falco breached the lease by failing to provide written notice of default, termination, cure, or sale of collateral, *id.* at ¶ 39; and, Falco breached the implied covenant of good faith and fair dealing implicit in the lease, *id.* at ¶¶ 42-43.

The Seventh Amendment provides that "[i]n suits at common law, where the amount in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."U.S. Const. Amend. VII. Rule 38(a) of the Federal Rules of Civil Procedure is coextensive with the Seventh Amendment, providing that "[t]he right of trial by jury as declared by the Seventh Amendment to the Constitution ... shall be preserved to the parties inviolate."Fed.R.Civ.P. 38(a). The phrase "suits at common law" means that the jury trial right attaches only in cases involving legal, as apposed to equitable, claims. *See Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 41 (1989); *Billing v. Ravin, Greenberg & Zackin, P.A.,* 22 F.3d 1242, 1245 (3d Cir.1994). Determining whether a claim is legal or equitable involves a two part test:

First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and

determine whether it is legal or equitable in nature. The second stage of this analysis is more important than the first.

*Billing,* 22 F.3d at 1245 (quoting *Granfinanciera,* 492 U.S. at 42).

In a diversity action asserting state law claims, the right to trial by jury is to be determined according to federal law. *See Simler v. Conner,* 372 U.S. 221, 222 (1963); *In re City of Phila. Litig.,* 158 F.3d 723, 726 (3d Cir.1998). The Third Circuit Court of Appeals has held that an action for rescission of a contract is an equitable, not a legal, remedy for which there is no right to a jury trial. *See Plechner v. Widener College, Inc.,* 569 F.2d 1250, 1257 (3d Cir.1977); [FN22]*accord Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp.,* 159 F.3d 412, 419 (9th Cir.1998); *Scheurenbrand v. Wood Gundy Corp.,* 8 F.3d 1547, 1551 (11th Cir.1993); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.,* 835 F.2d 45, 46 (2d Cir.1987). It follows Elliott has no right to have the jury decide his counterclaim for rescission.

> FN22. In *Plechner,* the relevant claim was for "replevin of the stock issued to defendant Widener College and ordering its delivery to plaintiff for cancellation."*Id.* at 1256.The Court held that this claim for replevin and cancellation was really a mislabeled claim for rescission. *See id.* at 1257.

**\*18** Since this case contains counterclaims sounding at law, for fraud, breach of contract, and breach of the duty of good faith, triable to the jury, Elliott urges that the equitable counterclaim for rescission should also be decided by the jury.[FN23]The Court agrees with Elliott that many, but not all, of the alleged facts underlying the equitable counterclaim are the same as that underlying the counterclaims triable to the jury. The equitable counterclaim for rescission also alleges deficiencies in notice and impairing collateral. However, when, as here, there are three counterclaims sounding at law underlying the equitable counterclaim seeking rescission, the jury first decides the questions of fact and then the judge decides whether rescission is an appropriate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

remedy. *See Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.,* 890 F.2d 165, 170 (9th Cir.1989); *accord Horbach v. Kaczmarek,* 988 F.Supp. 1126, 1127 (N.D.Ill.1997) (in a rescission claim under Illinois law, the underlying factual matter of whether there was substantial non-performance is a question for the trier of fact).[FN24] Accordingly, in this case, the jury will decide the counterclaims sounding at law underlying the rescission counterclaim and the Court will then decide whether rescission is an appropriate remedy. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479-80 (1962).

> FN23. Although not raised by either party, the Court is somewhat troubled that Elliott has maintained claims for fraud, breach of contract, and rescission of the contract in the same action. A cursory review of Delaware law indicates that, although remedies may be pursued in the alternative, at some point, the plaintiff must make an election of remedies. If the plaintiff has a claim for fraudulently inducing entry into a contract, the plaintiff must elect between a tort action for fraud or an action for rescission of the contract. *See E.I. duPont Nemours and Co. v. Florida Evergreen Foliage,* 1999 WL 1219961 at \*1,\*9 (Del.1999); *Tam v. Spitzer,* 1995 WL 510043, at \*10 (Del.Ch.1995). Likewise, if the contract is breached, the non-breaching party must elect from affirming the contract and suing for damages or bringing an action to rescind the contract. *See Brand v. Ogden Power Co.,* 111 A. 370, 374 (Del.Super.1920).

> FN24. In *Horbach,* the Court fails to mention who decides the ultimate question of whether to rescind. *See* 988 F.Supp. at 1127.

Elliott also relies on *Canning v. Star Publishing Co.,* 138 F.Supp. 843 (D.Del.1956), to argue that the equitable counterclaim for rescission should be tried to the jury since the other counterclaims sounding at law are being tried to the jury. However, in

*Canning,* decided prior to *Simler v. Conner,* 372 U.S. 221 (1963), the court relied upon Rule 42(b), regarding consolidation of separate trials, not the right to trial by jury under Rule 38(a).*See id.* at 846-47 (citing Fed.R.Civ.P. 42(b)). The court held, because a rescission claim would require a separate trial from the legal claims, the court should exercise its powers under Rule 42(b) and have a single trial on all claims to the jury. *See id.* The prospect of a separate trial is not present in this case. After the facts underlying the counterclaims sounding at law are tried to the jury, the Court will decide whether rescission is an appropriate remedy.

For the foregoing reasons, the Court will enter an order that the facts underlying the fraudulent non-disclosure, breach of contract, and breach of good faith and fair dealing be tried to the jury and that the issue of whether to rescind the guaranty obligation be tried to the Court.

### IV. Conclusion

The Court will enter an order consistent with the holdings rendered in this memorandum opinion.

D.Del.,2000.
Falco v. Alpha Affiliates, Inc.
Not Reported in F.Supp.2d, 2000 WL 727116 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,            )
                                 )
            Plaintiff,           )
                                 )        Civil Action No. 06-565-GMS
        v.                       )
                                 )
ALLEN L. SESSOMS, Ph.D.,         )
                                 )
        and                      )
                                 )
BOARD OF TRUSTEES OF             )
DELAWARE STATE UNIVERSITY,       )
                                 )
            Defendants.          )

## CERTIFICATION OF COUNSEL IN ACCORDANCE WITH L.R. 7.1.1

I, Michael R. Robinson, hereby certify that Defendants' counsel has made reasonable

efforts to reach agreement with the opposing attorneys on the matters set forth in Defendants

MOTION IN LIMINE TO EXCLUDE EVIDENCE BASED ON HEARSAY.

/s/ Michael R. Robinson
Michael R. Robinson (#4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
mrobinson@saul.com

Dated: November 26, 2007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-565-GMS |
| v. | ) | |
| | ) | |
| ALLEN L. SESSOMS, Ph.D., | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BOARD OF TRUSTEES OF | ) | |
| DELAWARE STATE UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

### CERTIFICATE OF SERVICE

I, Michael R. Robinson, hereby certify that on November 26, 2007 I caused a true and correct copy of the foregoing DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE BASED ON HEARSAY to be served electronically via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Gilbert Shelsby, Esq.
Michael J. Logullo, Esq.
SHELSBY & LEONI
221 Main Street
Stanton, DE 19804

Gregg L. Zeff, Esq.
FROST & ZEFF
Pier 5 at Penn's Landing
7 North Columbus Boulevard
Philadelphia, PA 19106


/s/ Michael R. Robinson
Michael R. Robinson (#4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
mrobinson@saul.com