IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., <br><br> Plaintiff, <br><br> E. <br><br> ALLEN L. SESSOMS, Ph.D. <br><br> and <br><br> BOARD OF TRUSTEES OF DELAWARE STATE UNIVERSITY, <br><br> Defendants. | CIVIL ACTION <br><br> NO. 06-565-GMS <br><br><br> JURY TRIAL DEMANDED |

---

## PLAINTIFF'S TRIAL BRIEF

---

**SHELBY & LEONI**

BY: MICHAEL LOGULLO, ESQUIRE
221 Main Street
Stanton, DE 19804
(302) 995-6210 Ext. #108
(302) 995-6121 (fax)
mlogullo@mslde.com

*Counsel for Plaintiff*

DATED:  November 26, 2007

**FROST & ZEFF**

BY: GREGG L. ZEFF, ESQUIRE
Pier 5 at Penn's Landing
7 N. Columbus Boulevard
Philadelphia, PA 19106
(215) 351-3333
(215) 351-3332
gzeff@frostzeff.com

*Counsel for Plaintiff*

A.   NATURE OF THE CASE

This case alleges that Defendant Dr. Allen Sessoms retaliated against Plaintiff Dr. Wendell Gorum in violation of Plaintiff's First Amendment rights pursuant to 42 U.S.C. §983.

B.   CONTESTED FACTS

Plaintiff adopts and incorporates the Statement of Facts from Plaintiff's Answering Brief to Defendant's Motion for Summary Judgment.

Additionally, Plaintiff notes that this matter involves three areas of protected speech activity; 1) Gorum speaking out against Dr. Sessoms' appointment; 2) Gorum representing a student athlete against the University; and 3) Gorum revoking Dr. Sessoms' invitation to speak at a public function.

C.   PLAINTIFF'S THEORY OF LIABILITY

To advance a claim of retaliation under § 1983 and the First Amendment, Plaintiff must prove (1) that he engaged in protected conduct; (2) that he was retaliated against; and (3) that the protected conduct was a substantial or motivating factor in the retaliation. 42 U.S.C. § 1983. See Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S 274 (1977); Baldassare v. New Jersey, 250 F.3d 188, 194(3d Cir. 2001); Fultz v. Dunn.

### 1.  Dr. Gorum's Speech Was a Matter of Public Concern

Dr. Gorum's speech was a matter of public concern. It related to matters of political and social concern to the community. In analyzing whether an employee's speech addresses public concern, a court must determine whether it can be "fairly considered as relating to any matter of political, social or other concern to the community Swartzwelder v. McNeilly, 297 F.3d 228, 235 (3d Cir. 2002); Connick v. Myers, 461 U.S. 138, 147, 75 L.Ed. 2d 708(1983). The inquiry is

a legal one, to be analyzed in the context of a given statement, as revealed by the whole record. Stiner v. University of Delaware, 243 F. Supp. 2d 106, 111, (D.Del.2003). Dr. Gorum's protected activities must be viewed together, in the context of all the circumstances surrounding his termination, including the findings of the Disciplinary Committee and the tolerance of similar actions by other faculty. The Court must also analyze the public impact and perception of Dr. Gorum's speech and actions. The selection of a state university president, the expulsion of its football star, and the attendance at a prestigious political event all had considerable public impact and received substantial public attention.

The Third Circuit has noted that "it is particularly important that in cases dealing with academia, the standard applied ... should be the one applicable to the rights of teachers and students 'in light of the special characteristics of the school environment'" Trotman v. Board of Trustees of Lincoln University, 635 F.2d 216 (3d Cir. 1980), quoting Tinker v. Des Moines Independent Community School District, 393 U.S. 503, S.Ct. 733 (1960). In Trotman, several professors and the president were engaged in a protracted dispute about a number of university policies. In response, the president sent telegrams to the faculty, threatening their jobs. The court was concerned about the chilling effect the President's retaliatory actions had on free speech in a university context. In Tinker, the Supreme Court urged that neither "students nor teachers shed their Constitutional rights at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years." 393 U.S. 503, 506. The Court again stressed the importance of freedom of speech in academia in Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957), "the essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who

guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." Friedman v. Beame, 558 F.2d 1107 (2d Cir.1977).

### 2. Dr. Gorum's Assistance to DeShaun Morris Was Protected Conduct.

Dr. Gorum's association with and defense of a student expelled from the University and its football team received considerable public attention. A professor's ability to associate with and support his students without fear of retaliation is a matter of public concern. In December, 2002, student DeShaun Morris admitted having a firearm in his dorm room. Morris sought out Dr. Gorum to assist him in his defense because Gorum had become the *de facto* student discipline advisor as a result of his efforts to draft a student disciplinary code and process for DSU.

Dr. Gorum served as Morris' advisor during the university's internal judicial proceedings. Morris was suspended for the Spring 2003 semester, allowed to take summer classes and resume his classes and membership on the football team in Fall 2003. However, in July 2003, shortly after Defendant Sessoms assumed the presidency, he changed Morris' punishment to a year's suspension and complete expulsion from the football team. Defendant Sessoms announced this modification to Morris' disciplinary sentence by having his secretary call Dr. Gorum. (Morris Dep. at 87) (B0130). Morris requested Gorum assist him with this new punishment. Gorum hired and paid a $600 retainer to an attorney to represent Morris. (Gorum Dep. at 175-176) (B0024). Gorum spent his own time and money with Morris and his lawyer, lending substantial assistance and support in Morris' lawsuit against the University. He assisted Morris and his lawyer in developing his case and soliciting witnesses. Punishment in retaliation for exercising

3

one's right to access the court may constitute a First Amendment violation. <u>Hydrick v. Hunter</u>, 466 F. 3d 676, 692 (9th Cir. 2006).

Even if Dr. Gorum's conduct is not considered "speech", it is conduct covered by the First Amendment's protection of free association. <u>Shelton v. Tucker</u>, 364 U.S. 479 (1960), <u>Rennie v. Klein</u>, 653 F.2d 836 (3d Cir. 1981). The Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, *petition for the redress of grievances*, and the exercise of religion. <u>Roberts v. Jaycees</u>, 468 U.S. 609, 617 (1984) (emph. added).

Dr. Gorum's involvement with DaShaun Morris qualifies as a protected free association. "Attending meetings on necessary legal steps and associating for the purpose of assisting persons seeking legal redress are modes of expression and association protected by the First Amendment" <u>Copp v. Unified Sch. Dist. No. 501</u>, 882 F.2d 1547 (10th Cir. 1989) (allowing a police officer to pursue a First Amendment claim where he alleged that he was fired him for assisting his wife in filing a sex discrimination claim against his employer); <u>NAACP v. Button</u>, 371 U.S. 415(1963) (finding a regulation prohibiting NAACP members from assisting political parties to litigation violative of First Amendment). The Supreme Court has held that nowhere is the protection of First Amendment freedoms more important than in American schools. <u>Shelton v. Tucker</u>, 364 U.S. 479 (1960). Further, the Supreme Court has held that nowhere is the protection of First Amendment freedoms more important than in American schools. <u>Shelton v. Tucker</u>, 364 U.S. 479 (1960).

4

3.  **Dr. Gorum's Revocation of Dr. Sessoms' Invitation to the Martin Luther King Prayer Breakfast Was Speech and Conduct on a Matter of Public Concern**

Another instance of protected activity was Dr. Gorum's cancellation of Defendant Sessoms' speech at the 2004 Martin Luther King Alumni Prayer Breakfast. The MLK Breakfast, hosted by the Delaware State chapter of Alpha Phi Alpha, is a recognized public event of political significance in the State of Delaware. Invitees in 2004 included Governor Ruth Ann Minner, Mayor James Hutchinson, U.S. Senators Joseph Biden and Thomas Carper, Representative Michael Castle and several State and Federal Judges. (Wm. Torian letters 12/12/03) (B0029-B0039).

The 2004 Breakfast was the organization's 20th anniversary event, and promised to be an assemblage of influential members of the University community as well as local and national politicians and dignitaries. When Dr. Gorum arranged for the Dean of Howard University to speak at the Breakfast instead of Defendant Sessoms, he engaged in conduct relating to a matter of social and political importance. Not only was Dr. Sessoms disinvited from a prominent event, the cancellation served as a public notice of the new President's lack of support on campus. (J. Gorum Dep. at 44) (B0006). Instead of canceling the appearance of Howard University's Dean of the School of Dentistry, Dr. Gorum disinvited his own President. Defendant Sessoms had only been in office for one semester and was already being shunned and upstaged by one of the University's most popular professors.

Dr. Gorum exercised his First Amendment right to chose the speaker at this political and religious public event. The Constitution protects this activity.

5

4.  **Dr. Gorum's Withdrawal of Support for Defendant Sessoms' Candidacy for President of the University Was Speech on a Matter of Public Concern.**

Dr. Gorum was part of the interviewing committee during the search for a new University President following former president DeLauder's retirement. At the faculty senate, Dr. Gorum recommended a continuation of the search for a new president rather than a vote for Defendant Sessoms. (W. Gorum Dep. at 48) (B0132). The faculty voted not to reopen the search, but the vote was very close. This speech as well was protected. See, Trotman v. Board of Trustees of Lincoln U., supra.

D.  **A REASONABLE INFERENCE EXISTS THAT DEFENDANT SESSOMS WAS AWARE OF DR. GORUM'S PROTECTED ACTIVITY**

Defendant Sessoms claims to have no knowledge whatsoever about any of Dr. Gorum's protected actions and speech. (Sessoms Dep. at 34) (B0143). However, circumstantial evidence and direct witness testimony contradict this assertion. Dr. Gorum's actions were of such a high profile nature, that it is difficult to believe Dr. Sessoms was oblivious, especially when much of Gorum's speech concerned Sessoms directly. Further, in light of the selective discipline taken against Dr. Gorum, against the AHDC's studied recommendations, Defendant Sessoms fired Gorum precisely because he was angered by Gorum's protected actions. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 94 (2003).

For each of Gorum's protected activities, there is a reasonable inference that Sessoms was aware of and was upset by the Professor's speech. Several of Dr. Gorum's colleagues alerted him that Gorum's vote to reopen the presidential search had "gotten back to Sessoms and he was upset about it" (W. Gorum Dep. at 48) (B0132). The committee meetings regarding the

presidential search were open meetings, with recorded minutes, and anyone with an interest in the proceedings would be able to attend or otherwise discover what was discussed. (Osei Dep. at 7) (B0015).

Professor Osei-Mensah was allegedly promised a deanship at the University in return for his assistance to Defendant Sessoms (J. Gorum Dep. at 58) (B0005). Dr. Osei-Mensah was one of several of Sessoms' supporters on the search committee, who later reported to the new President which of the faculty had been in support of his candidacy. (J. Gorum Dep. at 58) (B0005). Another of Sessoms' supporters was Dean Tommy Frederick, who allegedly gave the President a regular report on faculty issues and discussions. (W. Gorum Dep. at 118) (B0073).

Sessoms claims not to have any contact with retired President DeLauder since June 2003, but according to Dr. Smith, Chairman of the Board of Trustees, DeLauder frequently returned to campus to help with Sessoms' transition. (Sessoms Dep. at 31) (B0144). Before Dr. DeLauder's retirement, he remained on campus during Dr. Sessoms' transition into the President's office. (Smith Dep. at 18) (B0145). A reasonable inference may be drawn that a succeeding President would draw upon the wisdom and knowledge of the retiring President during the transition. Sessoms denies having any substantive conversations with his predecessor. (Sessoms Dep. at 31) (A-0144). The Board Chairman's contradicting statement raise serous factual questions about what the President knew about the campus and its leaders when he took over.

Dr. Sessoms claims to have no knowledge of his invitation to the 2004 Martin Luther King Jr. Prayer Breakfast, nor of the event at all. (Sessoms Dep. at 14) (B0025). The testimonies of several individuals contradict Defendant Sessoms' claim of total ignorance of the Breakfast. (J. Gorum Dep., affd of Torian and Shelton) (B0131). It is difficult to believe that the University

President has no knowledge of a distinguished, annual event on his campus, one that draws some of the state's preeminent citizens. Further, Dr. Sessoms was invited to attend by Jacquelyne Gorum and invited to speak by Cecil Wilson, who later had to rescind the invitation. Cecil Wilson, former president of the Delaware NAACP, was hired to assist Dr. Sessoms acclimate to the university. (W. Gorum Dep. at 125-126) (B0040-B0041). Because Gorum, as head of the search committee, spoke directly to Wilson in ordering the revocation of Sessoms' invitation, it is highly likely that Wilson told Sessoms of Gorum's role in the decision. (W. Gorum Dep. at 129) (B0146). Further, Wilson told Gorum that Sessoms had already agreed to come. (W. Gorum Dep. at 130) (B0148).

Dr. Sessoms did not attend the event, not because he was unaware of it, but most likely because he was upset about the revocation of his invitation to speak. As the new president of the University, his absence was conspicuous, and many in attendance gathered that he was upset. (J. Gorum Dep. at 43) (B0006). A reasonable inference may therefore be drawn that Defendant Sessoms was upset at Dr. Gorum, who was responsible for inviting a different speaker and directing the revocation of Dr. Sessoms' invitation.

### E. DEFENDANT SESSOMS IS NOT ENTITLED TO QUALIFIED IMMUNITY

Defendant asserts that he is entitled to qualified immunity. A state official is immune from a § 1983 claim if a reasonable person in her position could have believed that her actions were proper in light of existing law. Such immunity is not available, however, where, in light of the existing law, the unlawfulness should have been apparent. Id. Anderson v. Creighton, 483 U.S. 635, 640 (1987).

F.  **A REASONABLE INFERENCE EXISTS THAT DEFENDANT SESSOMS WAS MOTIVATED BY RETALIATORY ANIMUS**

Defendants argue that no causal connection between Dr. Gorum's protected activity and the alleged adverse employment action exists. (Defendant's Brief at 29). A review of the record demonstrates that a reasonable jury could find that Defendant Sessoms was motivated by retaliatory animus when he recommended Dr. Gorum's termination to the Board.

Defendant Sessoms' knowledge of Dr. Gorum's protected activities, together with the recommendation and misinformation he gave the Board of Trustees concerning Gorum's termination create a strong inference that Sessoms acted in retaliation. Sessoms was aware of Gorum's actions, especially those that adversely affected him. It is reasonable to infer that Sessoms would have been upset at Gorum, who openly did not support his candidacy and took other actions that undermined Sessoms' authority. Gorum challenged Sessoms' disciplinary actions, supported a student in his lawsuit against the University, and publicly humiliated the new President by ordering the revocation of his invitation to the Martin Luther King Jr. Prayer Breakfast. All of these actions had a considerable negative impact on Defendant Sessoms

The President's dismissal of the Report of the AHDC demonstrates pretextual conduct and improper motivation. The AHDC found that inappropriate grade changes were being made by other faculty and even members of the registrar's office. (Smith Dep. at 62) (B0134). At least seven chairs of different departments told Dr. Gorum that they had engaged in similar conduct, and offered their support to him. (W. Gorum Dep. at 27) (B0137). Many professors changed grades in a similar manner as Gorum but were never challenged or censured. (W. Gorum Dep. at 29) (B0138). The AHDC report indicated that further investigation into allegations of other

9

violations should follow. However, despite the serious nature of the University's widespread grade change violations, no report of any kind has been issued regarding further investigations into the problem. (Smith Dep. at 57) (B0139). The President told the Board of Trustees that an investigation was ongoing. Yet, no interim or oral report has been made to the Board in three years. If such an investigation were ongoing, Board Chairman Smith believes he would have received some indication. Provost Bell has also testified that he has no knowledge of any investigation. As Chief Academic Officer, Provost Bell would be expected to know or be informed of an investigation into grade changes and irregularities was ongoing. A jury could reasonable conclude that no investigation into any other faculty member or grade change has ever occurred. If no one else has been subjected to investigation, why was Dr. Gorum? A jury could find, as the AHDC found, that Dr. Gorum was singled out to be a scapegoat and selectively prosecuted. Despite Sessoms' knowledge of the mitigating factors regarding no viable grade change procedures and widespread administrative knowledge, he recommended termination for Dr. Gorum to remove a person who had spoken out against him.

     Other faculty at DSU have feared retaliation from Defendant Sessoms. (W. Gorum Dep. at 25) (B0136). Dr. Aubrey, former director of the testing center, related to Dr. Gorum information regarding student and faculty evaluations in connection with the University's investigation of grade changes. (W. Gorum Dep. at. 22) (0135). Dr. Aubrey said that he felt threatened and intimidated because of his assistance to Dr. Gorum. He was in fear for his job, and believed his telephone was being tapped. (W. Gorum Dep. at 25) (B0136). Dr. Gorum was warned by several colleagues that Defendant Sessoms had directed other faculty members to gather incriminating information on Dr. Gorum (W. Gorum Dep. at 48) (B0149).

The timing of the investigation is also relevant to Sessoms' motivation and intent. In Farrell v. Planters Lifesavers Co., the Court discussed whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of causal connection for the purpose of a prima facie case of retaliation. 206 F.3d 271, 278 (3d Cir. 2000). In Farrell, Id. the Court explained "[the] analysis is essentially fact based." The Court stated that they had ruled differently on the issue in their case law depending on how proximate the events actually were and the context in which the case came before them. Id. The Court cautioned that each case must be considered with a careful eye to the specific facts and circumstances encountered. Id. at n. 5 (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)).

Defendant claims there is no temporal proximity because his recommendation to the Board was submitted in April 2005, and the DeShaun Morris case ended in October 2003. (Defendant's Brief at 28) Defendant ignores some key facts in selecting those dates as guideposts. The controversy surrounding Mr. Morris was not the last event that Dr. Gorum spoke about. The MLK Breakfast was slated for January 19, 2004 (letter of Wm Torian, 12/12/2003) (B0029). The first action the administration took against Dr. Gorum concerning grade changes occurred on March 5, 2004, only 1 ½ months after the Prayer Breakfast. Situations involving a lapse of up to two months have been found to exhibit enough temporal proximity that, along with other evidence, are sufficient to establish causation. Williams v. Phila. Hous.Auth., 380 F.3d 751, 780 (3d Cir. 2004), Thomas v. Town of Hammonton, 351 F.3d 108, 114(3d Cir. 2003).

11

G.  **DEFENDANTS' STATED REASON FOR PLAINTIFF'S DISCHARGE IS PRETEXTUAL**

The retaliatory animus and the pretext in this matter work hand-in-hand. It is well established that a Plaintiff has the burden of demonstrating a prima facie case of retaliation. Once this is established, the Defendant must demonstrate a non-discriminating reason(s) for its action. The burden then shifts to the Plaintiff to demonstrate that this action was pretextual. Mt. Healthy City Sch. Dist. Bd. of Ed., supra.

Here, it is submitted that President Sessoms improperly influenced the Board of Trustees because of his retaliatory animus towards Dr. Gorum. "It is plainly permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decision making process and thus allowed discrimination to infect the ultimate decision." Roebuck v. Drexel University, 852 F. 2d 715, 727 (3d Cir. 1988), quoting Abramson v. William Patterson College, 260 F.3d 265, 283 (3d Cir., 2001). Generally, whether the proffered reasons for termination are pretextual is left to the jury. Watters v. City of Philadelphia, 55 F.3d 886, 892 n. 3 (3d Cir. 1995). Revealing discrepancies in the proffered reasons can also constitute evidence of the causal link. See Farrell v. Planter's Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000). Plaintiffs need not cast doubt on each proffered reason in a vacuum. If Defendants proffer several legitimate reasons, and Plaintiffs manage to cast substantial doubt on a fair number of them, Plaintiffs may not need to discredit the remainder. That is because the fact finder's rejection of some of Defendants' proffered reasons may impede the employer's credibility seriously enough so that a fact finder may rationally disbelieve the remaining proffered reasons,

12

even if no evidence undermining those remaining rationales in particular is available. Abramson, 260 F.3d at 283, Igwe v. E.I. DuPont De Nemours & Co., 180 Fed. Appx. 353 (3d Cir. 2006).

Dr. Gorum has ample support for his contention that Defendants reason for his dismissal was pretextual. Although Dr. Sessoms' suspension of Dr. Gorum pending the AHDC Hearing may have been severe, it was initially done with pay and is not contested. The pretextual action in this matter is Dr. Sessoms' recommendation of termination and discussion with the Board. At the time of these actions, Sessoms had in his possession the AHDC Report, transcripts of those proceedings, the Post-Hearing Briefs of the parties and access to all of the witnesses and AHDC members. He chose to ignore issues of conflict in the grade changing process raised by the AHDC which cast great doubt on whether Dr. Gorum had committed a violation worthy of termination.

The AHDC uncovered a long history of gaping disparities between official grade change policy and actual practice at DSU. (Ackah Dep. at 20) (B0150). The Committee noted that many faculty and members of the Registrars and President's Office either committed or condoned the unofficial practices. Committee member Ackah noted, "the administration was also responsible ... it had been endemic for a long time and no one did anything. (Ackah Dep. at 20) (B0150) (AHDC Report at 18) (B0106). Furthermore, the AHDC report did not reveal the rationale behind much of the grade change procedures. (J. Gorum Dep. at 45) (B0151). For example, students whose summer courses were cancelled were frequently allowed to take those classes as an independent study. For crediting purposes, their names were listed in the following semester's roster for that course. Thus, instructors in the fall or spring semester who were unfamiliar with the practice claimed that Dr. Gorum was giving grades to no-show students.

13

(B.Skelcher letter to Dr. Tolliver, 12/2000, Gorum 0087) (B00152).

Because the grade change policy violations were commonplace in an "atmosphere of subtle encouragement to violate procedures" and because the changes were made in an attempt to fix mistakes in the registration system, the AHDC strongly recommended Dr. Gorum be retained. (AHDC Report at 16, 18) (B0133, B0106). The committee cautioned that Dr. Gorum should not be treated as a scapegoat (AHDC Report at 16) (B0106). However, when Defendant Sessoms made his recommendation to the Board of Trustees, marginalized these key findings of the AHDC. The Board knew only that Gorum had violated policy; they did not understand that it had long been a common, condoned practice throughout the university, nor did they know of the reasons these practices had become necessary. Defendant Sessoms presented Dr. Gorum's case in a false light. He did not alert the Board of Trustees to any of the background facts because he intended to have Dr. Gorum fired. Defendant Sessoms seized the opportunity presented by the Registrar's discovery of the grade change violations to remove a disfavored employee.

Defendant Sessoms characterized Dr. Gorum's conduct as causing "immediate and substantial harm to the University" (Sessoms letter to Gorum, 3/5/04) (B0107). He told the Board of Trustees that Dr. Gorum violated a written grade change policy despite the AHDC's insistence that no clear and effective policy existed (See Claiborne Smith dep at 50) (B0153). Dr. Akah's Chair of the AHDC called President Sessoms' actions "draconian." (Ackah Dep. at 42-43) (B0161-B0162).

### H. DAMAGES

Plaintiff seeks compensatory and punitive damages from Dr. Sessoms. Plaintiff seeks the equitable remedy of reinstatement from DSU.

14

1. **Dr. Gorum Has Suffered Lost Wages As Follows:**

    a. **Salary**

    Dr. Gorum earned $96,000.00 per year as a full Professor, including summers and overloads at Delaware State University. Since termination he has earned a total of $150,000.00 from Claflin College ($75,000.00 annually for two years). He is currently unemployed. Dr. Gorum seeks lost wages equal to the difference between $96,000.00 per annum and what he has earned up until the time of trial.

    b. **Benefits and Costs**

    Dr. Gorum was required to move away from his family when he worked at Claflin requiring additional out-of-pocket losses for lodging including $650.00 in rent and $200.00 in utility bills per month for two years. Dr. Gorum has also been required to pay for a supplemental medical insurance policy.

|  |  |
|---|---|
| **OF COUNSEL**<br>Gregg L. Zeff, Esquire<br>FROST & ZEFF<br>Pier 5 at Penn's Landing, 2nd Floor<br>Philadelphia, PA 19106<br>(215) 351-3333<br>gzeff@frostzeff.com | Respectfully submitted,<br><br>*s/ Michael J. Logullo*<br>Michael J. Logullo (DSBA No. 3851)<br>**SHELSBY AND LEONI**<br>221 Main Street<br>Stanton, DE 19804<br>(302) 995-6210<br>mlogullo@mslde.com |

DATED: November 26, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **WENDELL GORUM, Ph.D.,** | CIVIL ACTION |
| Plaintiff, | |
| | NO.   06-565-GMS |
| F. | |
| ALLEN L. SESSOMS, Ph.D. | |
| | JURY TRIAL DEMANDED |
| and | |
| BOARD OF TRUSTEES OF DELAWARE STATE UNIVERSITY, | |
| Defendants. | |

**CERTIFICATE OF SERVICE**

I, Michael J. Logullo, hereby certify that on November 26, 2007 I caused a true and correct copy of the foregoing **PLAINTIFF'S PRE-TRIAL BRIEF** to be served electronically via CM/ECF system upon the following:

Robert L. Duston, Esq.
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037-1922

Michael R. Robinson, Esq.
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266

/s/ *Michael J. Logullo*
Michael J. Logullo (DSBA No. 3851)
**SHELSBY AND LEONI**
221 Main Street
Stanton, DE 19804
mlogullo@mslde.com