# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,            )
                                 )
    Plaintiff,               )
                                 )    Civil Action No. 06-565-GMS
    v.                       )
                                 )
ALLEN L. SESSOMS, Ph.D.,         )
                                 )
    and                      )
                                 )
BOARD OF TRUSTEES OF             )
DELAWARE STATE UNIVERSITY,       )
                                 )
    Defendants.              )

## DEFENDANTS' TRIAL BRIEF

**OF COUNSEL**

Robert L. Duston
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037-1922
(202) 333-8800
rduston@saul.com

DATED: November 26, 2007

Kimberly L. Gattuso (No. 3733)
Michael R. Robinson (No. 4452)
SAUL EWING LLP
22 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
kgattuso@saul.com
mrobinson@saul.com
*Counsel for Defendants*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................................... ii

NATURE OF THE CASE ......................................................................................................... 1

STATEMENT OF CONTESTED FACTS DEFENDANTS EXPECT TO PROVE ............................. 2

DEFENDANTS' THEORY OF DEFENSE AND OF ANTICIPATED MOTION FOR
DIRECTED VERDICT ............................................................................................................. 4

    I.     The DSU Board Should Be Dismissed Because there Is No Case or Controversy
         and Injunctive Relief is Not Appropriate. ................................................................... 5

    II.    None of Dr. Gorum's Identified Speech or Conduct Is "Protected Activity". .............. 5

    III.   Dr. Gorum Cannot Overcome President Sessoms' Qualified Immunity From Suit...... 7

    IV.   Dr. Gorum Cannot Meet His Burden of Proof, Through Admissible Evidence, that
         President Sessoms Was Aware of His Alleged "Protected Activity". ........................... 9

    V.    Dr. Gorum Will Be Unable to Produce Sufficient Evidence From Which a
         Reasonable Jury Could Infer that any Activities the Court Finds Are "Protected"
         Under the First Amendment Were a Substantial or Motivating Factor Behind
         President Sessoms' Recommendation. .......................................................................... 9

    VI.   President Sessoms and the Board Are Entitled to the Benefit of the Deference
         Traditionally Accorded to Universities in Academic Matters. ...................................... 11

    VII.  President Sessoms and the Board Would Have Taken the Same Actions in the
         Absence of Any Protected Activity. ............................................................................. 12

DEFENDANTS' STATEMENT REGARDING DAMAGES/RELIEF ............................................... 12

    I.     President Sessoms Cannot Be Held Liable for Damages Arising from Actions
         other than His Own, Including the Board's Termination, and Plaintiff Will Not Be
         Able to Meet His Burden of Proving Any Other Damages Proximately Caused By
         the Recommendation. .................................................................................................. 12

    II.    Other Defenses to Economic Damages From Plaintiff's Termination. ......................... 14

    III.   Defenses to Other Forms of Compensatory Damages. .................................................. 14

    IV.   Plaintiff Cannot Meet the Standard for Punitive Damages. ........................................... 15

## TABLE OF AUTHORITIES

### CASES

Page

Abramson v. William Patterson College, 260 F.3d 265 (3d Cir. 2001) ..........................................13

Ambrose v. Township of Robinson, 303 F.3d 488 (3d Cir. 2002) ...................................................9

Azzaro v. County of Allegheny, 110 F.3d 968 (3d Cir. 1997) ........................................................6

Blum v. Witco Chemical Corp., 829 F.2d 367 (3d Cir. 1987)........................................................14

Bonenberger v. Plymouth Township, 132 F.3d 20 (3d Cir. 1997) .............................................7, 12

Brennan v. Norton, 350 F.3d 399 (3d Cir. 2003)............................................................................8

Brown v. Armenti, 247 F.3d 69 (3d Cir. 2001) ...............................................................................6

C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159 (3d Cir. 2005) .................................................7, 12

Carter v. Delaware State Univ., 2002 U.S. Dist. LEXIS 4721 (D. Del. Mar. 21, 2002) ..............12

City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981) ......................................................15

Connick v. Myers, 461 U.S. 138, 103 S. Ct. 1684 (1983)...........................................................6, 7

Conway v. Hercules, Inc., 831 F. Supp. 354 (D. Del. 1993) ........................................................14

Dillon v. Coles, 746 F.2d 998 (3d Cir. 1984) .................................................................................5

Eckerd v. Indian River School Dist., 475 F. Supp. 1350 (D. Del. 1979).....................................14

Finch v. Hercules, Inc., 865 F. Supp. 1104 (D. Del. 1994) .........................................................11

Galda v. Bloustein, 686 F.2d 159 (3rd Cir. 1982), cert. denied, 475 U.S. 1065 (1986)...............11

Galdieri-Ambrosini v. Nat'l Realty & Devel. Corp., 136 F.3d 276 (2d Cir. 1998).........................5

Garcetti v. Ceballos, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) ....................................................5

Green v. Philadelphia Housing Authority, 105 F.3d 883 (3d Cir.)................................................6

Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982).............................................9, 10, 11

Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006) ...............................................2, 8

Hindorff v. Westinghouse Elec. Corp., 1990 WL 29719 (E.D. Pa. Mar. 15, 1990).....................14

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) ............................................................6

Johnson v. George, 2007 U.S. Dist. LEXIS 42465 (D. Del. June 11, 2007) .................................6

Kerns v. Dukes, 153 F.3d 96 (3d Cir. 1998) ................................................................................5

Krough v. Cessford Constr. Co., 336 F.3d 710 (8th Cir. 2003) .....................................................10

Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) ...................................................5

Mauriello v. Univ. of Medicine & Dentistry of New Jersey, 781 F.2d 46 (3d Cir. 1986) ............12

McKee v. Hart, 436 F.3d 165, 169 (3d Cir. 2006) .................................................................7, 8, 9

Mejia v. City of New York, 119 F. Supp. 2d 232 (E.D.N.Y. 2000) ...............................................11

Memphis Community School Dist. v. Stachura, 477 U.S. 299, 106 S. Ct. 2537 (1986) ..............14

Miller v. Delaware Dept. of Probation and Parole, 158 F. Supp. 2d 406 (D. Del. 2001) ..............11

Mt. Healthy City Such. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S. Ct. 568 (1977) ......2, 5, 9

Pickering v. Bd. of Educ., 391 U.S. 563, 88 S. Ct. 1731 (1968) .....................................................6

Regents of University of Michigan v. Ewing, 474 U.S. 214, 106 S. Ct. 507 (1985).....................12

Rodriguez v. Ritchie, 539 F.2d 394 (5th Cir. 1976) .....................................................................11

Roebuck v. Drexel University, 852 F. 2d 715 (3d Cir. 1988).......................................................13

Rumsfeld v. Forum for Academic & Inst. Rights, 390 F.3d 219 (3rd Cir. 2004).........................11

Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001) .................................................................7

Shanklin v. Fitzgerald, 397 F.3d 596 (8th Cir. 2005) ..................................................................10

Smith v. Wade, 461 U.S. 30 (1983)..............................................................................................15

Sprague v. American Bar Ass'n, 276 F. Supp.2d 365 (E.D. Pa. 2003) .........................................15

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000) ......................................................................8, 9

U.S. v. Brown Univ., 5 F.3d 658 (3rd Cir. 1993) .........................................................................11

Walden v. Georgia-Pacific Corp., 126 F.3d 506 (3d Cir. 1997)...................................................11

Watters v. City of Philadelphia, 55 F.3d 886 (3d Cir. 1995).........................................................2

## RULES

Fed. R. Civ. P. 50 ..........................................................................................................................4

**NATURE OF THE CASE**

Plaintiff, Dr. Wendell Gorum was terminated in April 2005 by the Board of Trustees of Delaware State University ("DSU Board" or "Board") from his position as Professor of Mass Communications. He filed this action on September 12, 2006 under 28 U.S.C. § 1983 ("Section 1983"), alleging that Defendants had engaged in retaliation for speech protected under the First Amendment. (D.I. 1). Dr. Gorum concedes that DSU is a state instrumentality immune from suit for damages under the Eleventh Amendment, and he has no claim the members of the Board engaged in retaliation. The Board is a party purely to provide injunctive relief; (D.I. 14 at ¶8).[1] Allen L. Sessoms, Ph.D., President of DSU ("President Sessoms") is being sued in his individual capacity for compensatory and punitive damages. (Id. at ¶7).

Plaintiff has conceded that the investigation that began in early 2003 of grade changes, Plaintiff's March 2003 suspension by President Sessoms, and the subsequent suspension without pay, were *not* acts of retaliation. Plaintiff also concedes that he made grade adjustments in violation of DSU policies and procedures. (Pltf's Ans. Memo of Law in Opp. to Motion for Summary Judgment, D.I. 43 ("Pltf's Opp.") at 8-9, 13-14). It is undisputed that the jointly selected Ad Hoc Dismissal Committee (AHDC), made up of other faculty, made findings of fact and conclusions that Dr. Gorum committed actions that constituted "good cause" for termination under the Collective Bargaining Agreement, but then recommended that the Board impose a lesser sanction. The only alleged act that Plaintiff claims is retaliation is President Sessoms' oral and written recommendations to the Board on April 15, 2005, that termination was the appropriate sanction for the conduct described in the AHDC Report

---

[1]      The parties stipulated that the DSU Board could be named, in lieu of naming the individual members in their official capacities, as a convenience to the parties and the Court (D.I. 15); this does not change the standard or waive immunity.

To state a retaliation claim under Section 1983, a plaintiff must produce evidence that (1) he engaged in conduct protected under the First Amendment; (2) the defendant took an adverse employment action against him; and (3) there was a causal connection between those actions, i.e., the protected conduct was a "substantial or motivating factor" in the adverse action. Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006); Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995). A defendant may then defeat the claim by demonstrating that it would have taken the same adverse action in the absence of the protected conduct. Mt. Healthy City Such. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568 (1977).

Plaintiff claims that he engaged in several protected activities. Whether any of these activities are protected are questions of law for the Court, to be determined before the case is submitted to the jury. President Sessoms has qualified immunity from suit. The question of whether he has lost that immunity, or whether his recommendation is an "adverse action," are also questions of law for the Court. The ultimate issues of fact on the merits are whether President Sessoms was aware of any of any speech by Dr. Gorum the Court finds is protected and, if so, whether protected speech was a substantial or motivating reason why he recommended termination. Defendants do not believe Plaintiff has or can present admissible evidence to support all of the elements of his claim. If so, Defendants expect to prove that the President would have made the same recommendation even in the absence of any retaliatory motive.

## STATEMENT OF CONTESTED FACTS DEFENDANTS EXPECT TO PROVE

1.      That all of the alleged protected activities were in connection with Plaintiff's role as a DSU faculty member (a mixed question of fact and law for the Court).

2.      That the nature and extent of Dr. Gorum's alleged protected activities were not on matters of public concern (a question of law).

3.    That the activities of Dr. Gorum in connection with the *Morris* lawsuit were reasonably likely to cause disruption to the operations of DSU (a question of law).

4.    President Sessoms was not aware of any of the alleged protected activities.

5.    President Sessoms never received and/or was never aware of any invitation to speak at the January 2004 DSU Fraternity Alumni Breakfast, or of its alleged evocation.

6.    President Sessoms was not aware of the March 2003 motion made before the Faculty Senate to re-open the search.

7.    Dr. Gorum's allegedly protected activities were not a substantial or motivating factor in President Sessoms' decision to recommend the sanction of termination, and his articulated reasons for recommending termination are not a pretext for retaliation for any protected activities.

8.    President Sessoms would have made the same recommendation in the absence of Dr. Gorum's alleged protected activities.

9.    President Sessoms reasonably believed that his actions were proper in light of existing law. President Sessoms did not act with an intent or malice to violate Dr. Gorum's First Amendment rights, or with reckless or callous disregard for those rights.

10.    President Sessoms relied extensively on the advice and recommendations of Vice President Mark Farley in making his recommendations. There is no claim that Vice President Farley acted out of any retaliatory motive. Vice President Farley had been closely involved throughout the investigation, and worked closely with and relied upon the advice of counsel in evaluating the AHDC Report and in recommending termination.

11.    President Sessoms relied extensively on the findings of fact of the AHDC that there was "good cause" for termination, and on its findings concerning Dr. Gorum's actions.

12.     The DSU Board made an independent evaluation of all issues, taking into consideration the recommendations (oral and written) of President Sessoms, Vice President Farley and the AHDC Report, and made an independent judgment that termination was the appropriate sanction, rejecting the AHDC's rationale for mitigation.

13.     Dr. Gorum had intended to accept an early retirement package and retire from DSU effective July 1, 2003. Under that package he would have been entitled to no more than one year's salary. There was no reasonable expectation that Dr. Gorum would have continued to work at DSU after July 1, 2003.

14.     Dr. Gorum did not take reasonable steps to secure comparable employment and turned down or declined to pursue higher paying comparable positions. Dr. Gorum has since left the Higher Education field.

15.     President Sessoms' recommendation was not the direct or proximate cause of any compensatory damages to Dr. Gorum. To the extent that Dr. Gorum's reputation has been damaged, or that he has suffered or is continuing to suffer any emotional distress, these were caused by alternative factors, including but not limited to his own actions; acts of third parties, including the AHDC and the Board; actions that are not alleged to be retaliatory, such as his suspension; subsequent publicity of this termination, which is outside the scope of this lawsuit; pre-existing health and personality factors; and Dr. Gorum's failure to seek proper treatment.

## DEFENDANTS' THEORY OF DEFENSE AND OF
## ANTICIPATED MOTION FOR DIRECTED VERDICT

Defendants' theory of defense, and the basis for anticipated motion for directed verdict, have been previously briefed on Defendants' Motion for Summary Judgment (D.I. 39 and 44), now pending before the Court. A motion for directed verdict—or motion for judgment as a matter of law ("JMOL") pursuant to Fed. R. Civ. P. 50—will be brought by the Defendants on

the grounds that the evidence cannot support a jury verdict on retaliation for First Amendment activities. See Galdieri-Ambrosini v. Nat'l Realty & Devel. Corp., 136 F.3d 276 (2d Cir. 1998); see also Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

## I.    The DSU Board Should Be Dismissed Because there Is No Case or Controversy and Injunctive Relief is Not Appropriate.

The DSU Board, an entity protected by the Eleventh Amendment, is named in their Official Capacities for the purposes of effectuating "prospective injunctive relief." Plaintiff is not alleging that the Board Members violated his Constitutional rights or acted with retaliatory animus. (D.I. 14 at ¶8; D.I. 15). Nor has Plaintiff alleged that the Board, individually or collectively, can be held liable under any theory of respondeat superior for the acts of President Sessoms. Any such theory would violate the Eleventh Amendment, except for prospective injunctive relief. Injunctive relief is available under Section 1983 only when there is no adequate remedy at law. Kerns v. Dukes, 153 F.3d 96, 111 n.6 (3d Cir. 1998). Aside from Dr. Gorum's own testimony that he has no desire to return to DSU, and his prior retirement plans, there is an adequate remedy at law, because monetary damages for back pay and/or front pay are available remedies. Dillon v. Coles, 746 F.2d 998 (3d Cir. 1984).

## II.    None of Dr. Gorum's Identified Speech or Conduct Is "Protected Activity".

Dr. Gorum cannot carry his burden of proof that his conduct was Constitutionally protected. Mt. Healthy City Such. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568 (1977). Under Garcetti v. Ceballos, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006), courts must evaluate three factors in determining whether activity is protected under the First Amendment: (1) whether the employee spoke as a citizen, not as an employee; (2) whether the statement involved a matter of public concern, and (3) whether, under the Connick/Pickering

balancing test,[2] the manner and content of the speech exceeded the government's interest in

avoiding disruption in the workplace.  There is also a threshold issue of whether there was

"speech."  These are all question of law for the Court.  <u>Azzaro v. County of Allegheny</u>, 110 F.3d

968, 975 (3d Cir. 1997) (en banc); <u>Green v. Philadelphia Housing Authority</u>, 105 F.3d 883 (3d

Cir.), <u>cert. denied</u>, 522 U.S. 816, 118 S. Ct. 64 (1997).

  Each of Plaintiff's three activities fail to meet one or more of the requirements to qualify

for First Amendment protection.  Some of Dr. Gorum's assistance to student DaShaun Morris

did not constitute "speech."  In the context of DSU' joint governance system, and on the facts

that will be presented, all of Dr. Gorum's allegedly protected activities were pursuant to his

official duties as a DSU faculty member, and not as a "private citizen," within the meaning of

*Garcetti.*  None of these actions were on matters of public concern.  An employee's speech

addresses a matter of public concern when it can be "fairly considered as relating to any matter

of political, social, or other concern to the community," taking into account the "content, form,

and context of a given statement."  <u>Connick v. Myers</u>, 461 U.S. at 146; <u>Holder v. City of</u>

<u>Allentown</u>, 987 F.2d 188, 195 (3d Cir. 1993).  This is a functional test, asking where there is a

public benefit in reporting a matter.  <u>Brown v. Armenti</u>, 247 F.3d 69, 76 (3d Cir. 2001).

(professor's criticism of a University's administrative decision was not a matter of public

concern); <u>see</u> <u>also</u> <u>Johnson v. George</u>, C.A. No. 05-157-MPT, 2007 U.S. Dist. LEXIS 42465, at

*21 (D. Del. June 11, 2007) (attached hereto as Ex. A).  The comments regarding the faculty

search were of personal interest to the faculty; DaShaun Morris' internal administrative appeals

and his subsequent lawsuit were on purely personal concerns to Morris; and the issue of who to

---

[2]  See <u>Connick v. Myers</u>, 461 U.S. 138, 146, 103 S. Ct. 1684 (1983); <u>Pickering v. Bd. of</u>
<u>Educ.</u>, 391 U.S. 563, 568, 88 S. Ct. 1731 (1968).

invite to speak to the DSU Fraternity Alumni Breakfast, and how to address an allegedly
duplicative invitation, were of personal concern to that organization's planners.

Speech is not considered protected (and a public employer may dismiss an employee for
speech addressing a matter of public concern) if the state's interest (as an employer) in
promoting the efficiency of its operations outweighs the employee's interest (as a citizen) in
commenting upon matters of public concern. Connick, 461 U.S. at 142. A public employer
need only show a significant potential disruption as a result of the plaintiff's speech, as opposed
to actual disruption, to outweigh the employee's speech interest. Any interest Dr. Gorum may
have had in connection with his assistance to DaShaun Morris during his lawsuit were
substantially outweighed by the potential disruption of that suit. .

## III.    Dr. Gorum Cannot Overcome President Sessoms' Qualified Immunity From Suit.

As a state official, President Sessoms has qualified immunity from suit. "Qualified
immunity insulates government officials performing discretionary functions from suit insofar as
their actions could reasonably be thought consistent with the rights they are alleged to have
violated." McKee v. Hart, 436 F.3d 165, 169 (3d Cir. 2006). To determine whether an official
has lost his or her qualified immunity, the court must first decide whether a Constitutional right
would have been violated on the facts alleged, and then whether the right was clearly established
at the time of the action. See Saucier v. Katz, 533 U.S. 194, 201-02, 121 S. Ct. 2151 (2001).
Only if both answers are "yes" does a government official lose his right to immunity from suit.
Id. The plaintiff must also prove that this individual defendant participated in the alleged
Constitutional violation. C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005);
Bonenberger v. Plymouth Township, 132 F.3d 20, 23-25 (3d Cir. 1997). These are issues of law
to be analyzed by the Court based upon the scope of the Amended Complaint.

President Sessoms' recommendation is not actionable, i.e. it did not rise to the level of a

Constitutional violation.  As detailed below in the discussion of Damages, Part I, President

Sessoms cannot be held personally liable for the decision of the Board.  The Third Circuit Court

of Appeals has permitted claims against supervisors only when the supervisors' *own* actions rose

to the level of a constructive discharge, e.g., Hill v. Borough of Kutztown, 455 F.3d 225, 240 (3d

Cir. 2006), or involved a *pattern* of retaliatory harassment, e.g., Suppan v. Dadonna, 203 F.3d

228, 234-35 (3d Cir. 2000).  The test is whether "the alleged retaliatory conduct was sufficient to

deter a person of ordinary firmness from exercising his First Amendment rights."  Id. at 235.

Criticism, verbal reprimands, a series of comments, or even false allegations by a supervisor or

employer have been held not to rise to the level of an adverse action sufficient to deprive a

person of "his or her Constitutional rights."  McKee, 436 F.3d at 170-71, citing Suarez Corp.

Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000) .  Accord Brennan v. Norton, 350 F.3d

399, 412 (3d Cir. 2003).  Here, the only alleged action was a recommendation made in a

confidential communication to the Board, not known by the Plaintiff, by someone without

authority to hire and fire.  This is not actionable under existing law.  McKee, 436 F.3d at 171.

Second, in order to overcome qualified immunity the rights allegedly violated must be

"clearly established rights," i.e., "with contours sufficiently clear that a reasonable official would

understand that what he is doing violates that right."  McKee, 436 F.3d at 171, citing

McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001).  General knowledge that employees

are protected from retaliation for exercising their First Amendment rights is not enough.  "There

must be sufficient precedent at the time of the action, factually similar to the plaintiff's

allegations, to put [the] defendant on notice that his or her conduct is Constitutionally

prohibited."  McKee, 436 F.3d at 171.  This analysis "must be undertaken in light of the specific

context of the case." Id., citing Brosseau v. Haugen, 543 U.S. 194, 125 S. Ct. 596 (2004). Given

the facts and law outlined above, none of the elements of Dr. Gorum's claim were clearly

established in May 2005. This is especially true in the context of a University President's private

communications to the Board of Trustees regarding the seriousness of grade changes, the

findings of the AHDC, and the appropriate sanction. These are a classic discretionary function

by a public official on academic issues to which federal courts traditionally give great deference.

Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). Nothing in the case law would

have put President Sessoms on notice that this action could be considered a violation of

Dr. Gorum's rights.

**IV.**     **Dr. Gorum Cannot Meet His Burden of Proof, Through Admissible Evidence, that President Sessoms Was Aware of His Alleged "Protected Activity".**

In order "for protected conduct to be a substantial or motivating factor in a decision, the

decision makers must be aware of the protected conduct." Ambrose v. Township of Robinson,

303 F.3d 488, 493 (3d Cir. 2002), citing Allen v. Iranon, 283 F.3d 1070, 1076 (9th Cir. 2002).

Defendants' anticipate that at the close of Plaintiff's case he will have been unable to meet his

burden of proof on this issues through admissible evidence. .

**V.**      **Dr. Gorum Will Be Unable to Produce Sufficient Evidence From Which a Reasonable Jury Could Infer that any Activities the Court Finds Are "Protected" Under the First Amendment Were a Substantial or Motivating Factor Behind President Sessoms' Recommendation.**

It is Dr. Gorum's burden to produce sufficient admissible evidence from which a

reasonable jury could conclude that his protected speech (i.e., whatever the Court finds meets the

3-part test for "protected activity") was a "substantial or motivating factor" in the action he

challenges, the President Sessoms' recommendation of a stronger sanction than was

recommended by the Ad Hoc Dismissal Committee. See Suppan, 203 F.3d at 235, citing Mt.

Healthy, 429 U.S. at 287. President Sessoms has denied any knowledge of the alleged protected

activities, or of Dr. Gorum's alleged role, or that any of those alleged actions were a motivating factor in his recommendation. There is no direct evidence that President Sessoms acted with retaliatory motives; and he has articulated a legitimate, non-retaliatory reason for recommending the sanction of termination. Dr. Sessoms will testify that he concurred with the findings of the AHDC that there was "good cause" for termination under the CBA, but rejected the recommendation that this sanction be mitigated, relying on his own views of the seriousness of the violations, and the recommendations of Vice President Mark Farley.

Defendants anticipate that Plaintiff will raise arguments, similar to those made in opposition to Defendants' Motion for Summary Judgment, as to why a jury can infer causation or pretext. Some of these issues are subject to pending Motions in Limine, such as the alleged failure to investigate vague allegations against other faculty. On its Motion for Directed Verdict, and in the jury instructions, Defendants will be entitled to a presumption that the 1-2 year gap between the alleged protected activities and the April 15, 2005 recommendation was so long that there was no causal connection. See, e.g., Krough v. Cessford Constr. Co., 336 F.3d 710, 712 (8th Cir. 2003) (nine months); Shanklin v. Fitzgerald, 397 F.3d 596, 604 (8th Cir. 2005) (10 months).

Since this case is not an appeal under the CBA, it is *not* the jury's role to decide whether there was "adequate cause" under the CBA. The jury is not permitted to second-guess the business judgments of President Sessoms or the Board, or whether their reasons were good or bad, so long as President Sessoms did not act based on the illegal retaliatory motive claimed by the plaintiff. See Harlow v. Fitzgerald, 457 U.S. at 818. Dr. Gorum has admitted making grade changes that violated DSU policies and procedures. The Ad Hoc Dismissal Committee Report stated that Dr. Gorum had violated the CBA, and that these violations were serious enough to be

"good cause" for termination. (AHDC Rep. at 16). The AHDC Report considered and rejected all of Dr. Gorum's defenses. (AHDC Rep. at 6-13). The President, Vice President and Board will testify that the saw no reason to question the accuracy of the findings or conclusions regarding Dr. Gorum. When the evidence shows that decision makers acted based on the evidence available, there is no liability, even if the information turns out to be false. See, e.g., Rodriguez v. Ritchie, 539 F.2d 394, 407 (5th Cir. 1976); Mejia v. City of New York, 119 F. Supp. 2d 232, 262-63 (E.D.N.Y. 2000); Finch v. Hercules, Inc., 865 F. Supp. 1104 (D. Del. 1994). Evidence of alleged errors or omissions in an investigation, or information that was not reviewed by the decision makers, is not considered relevant or admissible on the issue of their motive or pretext. Walden v. Georgia-Pacific Corp., 126 F.3d 506, 514-15 (3d Cir. 1997).

Defendants also are filing a Motion in Limine on alleged "comparators." In order to show disparate treatment between Dr. Gorum and others, the comparators must be similarly situated in all respects, including knowledge by President Sessoms. Miller v. Delaware Dept. of Probation and Parole, 158 F. Supp. 2d 406, 411 (D. Del. 2001). That same motion addresses Plaintiff's spurious claim that the alleged failure of DSU to investigate vague claims of alleged violations during prior administration is probative of pretext.

**VI.     President Sessoms and the Board Are Entitled to the Benefit of the Deference Traditionally Accorded to Universities in Academic Matters.**

In evaluating the parties claims and defenses this Court must weigh the traditional deference given to the judgments of Universities, especially in academic-related decisions such as the hiring, promotion and termination of faculty. Harlow v. Fitzgerald, 457 U.S. at 818; Galda v. Bloustein, 686 F.2d 159, 166 (3rd Cir. 1982), cert. denied, 475 U.S. 1065 (1986); Rumsfeld v. Forum for Academic & Inst. Rights, 390 F.3d 219, 234 n.13 (3rd Cir. 2004), cert. granted, 544 U.S. 1017 (2005); U.S. v. Brown Univ., 5 F.3d 658, 678 (3rd Cir. 1993). Dr. Gorum was

discharged for failing to follow procedures for changing the grades of other instructors without

their consent, undermining the integrity of the grading process and threatening the value of the

DSU, falls into one of the core decisions warranting deference. Mauriello v. University of

Medicine & Dentistry of New Jersey, 781 F.2d 46, 50 (3d Cir. 1986), quoting Regents of

University of Michigan v. Ewing, 474 U.S. 214, 225, 106 S. Ct. 507 (1985).

**VII.    President Sessoms and the Board Would Have Taken the Same Actions in the Absence of Any Protected Activity.**

Defendants can also prevail by showing as an affirmative defense that they would have

taken the same actions in the absence of protected conduct. See, e.g., Carter v. Delaware State

Univ., C.A. No. 99-672 GMS, 2002 U.S. Dist. LEXIS 4721, at *6-7 (D. Del. Mar. 21, 2002)

(attached hereto as Ex. B). President Sessoms, supported by Vice President Farley, can meet this

burden. President Sessoms has consistently explained his view that these grade adjustments

threatened the very integrity of the grading process, the rights of other professors, the reputation

DSU, and that termination was the appropriate sanction for even one violation. President

Sessoms, Vice President Farley and the Board unanimous concurred that even if had been other

incidents under prior administrations, this did not excuse the severity of Dr. Gorum's conduct.

## DEFENDANTS' STATEMENT REGARDING DAMAGES/RELIEF

**I.    President Sessoms Cannot Be Held Liable for Damages Arising from Actions other than His Own, Including the Board's Termination, and Plaintiff Will Not Be Able to Meet His Burden of Proving Any Other Damages Proximately Caused By the Recommendation.**

As noted above, under principles of qualified immunity, a governmental official cannot

be held liable for the acts of others; plaintiff must prove that President Sessoms participate in

some Constitutional deprivation. See, e.g., C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 173

(3d Cir. 2005); Bonenberger v. Plymouth Township, 132 F.3d 20, 23-25 (3d Cir. 1997). The

DSU Board is the only entity with legal authority to hire and fire professors. It is Defendants'

position that this aspect of qualified immunity protects Allen Sessoms from being held liable for damages in his *individual* capacity for any actions by the Board, even if such results (termination were foreseeable).[3]  Plaintiff's theory is based upon an erroneous application of two Title VII cases, Abramson v. William Patterson College, 260 F.3d 265, 283 (3d Cir. 2001) and Roebuck v. Drexel University, 852 F. 2d 715, 727 (3d Cir. 1988).  Those cases cite and follow a principle of federal discrimination law that if an employer makes a decision influenced by the discriminatory or retaliatory recommendations or influence of a lower level supervisor, the employer can be held liable under principles of respondeat superior.  Whatever the current validity of that theory in light of more recent Supreme Court decisions, it is a creation of Title VII law, where there is no liability of individual supervisors.  Neither of these cases involved Section 1983 or qualified immunity, and neither addressed the question of whether supervisors could be held liable for the subsequent acts of their employers—only respondeat liability of the employer.  Here, the Board cannot be held liable for back pay, front pay or other economic damages for its actions under the Eleventh Amendment.

If Dr. Sessoms' recommendation standing alone is actionable under Section 1983, he can only be liable for the consequences of that action, not any damages flowing from the Board's decision.  According to his prior testimony, all of Plaintiff's alleged damages flow from acts prior to the recommendation (e.g., his suspension), from the termination itself, or from other actions that are not part of this case, such as alleged damage to his reputation resulting from the NCAA investigation in 2006.  See, e.g., Pltf's Interrog. Resp. No. 10.

---

[3]      A different analysis might apply if Plaintiff had chosen to sue the Board and President Sessoms in their official capacities for jointly engaging in retaliation, and seeking only injunctive relief. In that case, there termination decision would have been the alleged adverse action. Here, the only alleged retaliatory acts is the President's recommendation, and there is no claim that the Board was involved in any retaliation.

## II.    Other Defenses to Economic Damages From Plaintiff's Termination.

It the Court rules that Dr. Gorum can recover from President Sessoms, in his individual capacity, damages arising from his termination, Dr. Gorum must still prove his damages with reasonable particularity and without speculation.  See Memphis Community School Dist. v. Stachura, 477 U.S. 299, 305, 106 S. Ct. 2537, 2542 (1986).  See also Eckerd v. Indian River School Dist., 475 F. Supp. 1350 (D. Del. 1979).  The starting point for the calculation of back pay, as in other employment cases, is the amount of lost wages and benefits the Plaintiff would have reasonably have been expected to earn, less all interim earnings.  Conway v. Hercules, Inc., 831 F. Supp. 354 (D. Del. 1993); Hindorff v. Westinghouse Elec. Corp., C.A. No. 89-5831, 1990 WL 29719 (E.D. Pa. Mar. 15, 1990) (attached hereto as Ex. C).  Plaintiff cannot recover for lost wages prior to April 15, 2005, since he is not challenging his suspension.  Plaintiff claims that he intended to take early retirement effective July 1, 2004.  Plaintiff became ineligible for that package because he failed to pursue that option while he was on suspension, not because of his April 2005 termination, and so cannot recover the lost value of that package.  Defendants expect the evidence to show that based upon Dr. Gorum's retirement plans, he had no reasonable expectation of continued employment after July 2004.  Plaintiff also had a duty to reasonably mitigate his damages.  Defendants expect to show, as an affirmative defense, that there were comparable jobs available after April 15, 2005, and that Plaintiff did not act reasonably, so he is estopped from seeking any form of back pay.  See Blum v. Witco Chemical Corp., 829 F.2d 367, 373-74 (3d Cir. 1987)

## III.    Defenses to Other Forms of Compensatory Damages.

Plaintiff is seeking damages for injury to his reputation.  Such damages must be measured by the perception of others, rather than himself because "'reputation is the estimation in which one's character is held by his neighbors or associates' Restatement, Torts § 577,

comment b (1938)." Sprague v. American Bar Ass'n, 276 F. Supp.2d 365, 369-70 (E.D. Pa. 2003), citing Gaetano v. Sharon Herald Co., 426 Pa. 179, 231 A.2d 753, 755 (1967). Plaintiff must also prove that President Sessoms' recommendation was the proximate cause of any loss, not matters that our outside this lawsuit or were not retaliation. Plaintiff has not identified any unbiased witnesses on this issue, and his prior testimony is that his perceived damages were caused by other actions.

Plaintiff is also seeking to damages for emotional distress. Defendant does not expect that Plaintiff will be able to meet his initial burden of proving, without undue speculation, any compensatory damages proximately caused by President Sessoms' recommendation rather than other actions outside this lawsuit. If he does meet his initial burden, Defendants are prepared to show Plaintiff that failed to mitigate his damages by seeking appropriate treatment.

## IV.    Plaintiff Cannot Meet the Standard for Punitive Damages.

Governmental entities and public officials acting in their official capacities are immune from liability for punitive damages. City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981). To obtain punitive damages, there must be evidence that President Sessoms, in his individual capacity, acted either intentionally of maliciously to violate Dr. Gorum's First Amendment rights, or with reckless or callous disregard or indifference to his Constitutional rights. Smith v. Wade, 461 U.S. 30 (1983). No such evidence exists.

/s/ Michael R. Robinson
Kimberly L. Gattuso (No. 3733)
Michael R. Robinson (No. 4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
kgattuso@saul.com
mrobinson@saul.com

**OF COUNSEL**
Robert L. Duston
SAUL EWING LLP
2600 Virginia Avenue, N.W.
Suite 1000
Washington, DC 20037-1922
(202) 333-8800
rduston@saul.com
DATED:  November 26, 2007

# **<u>Exhibit A</u>**

LEXSEE 2007 U.S. DIST. LEXIS 42465

MARGUERITE A. JOHNSON, Plaintiff, v. ORLANDO J. GEORGE, JR., and DELAWARE TECHNICAL AND COMMUNITY COLLEGE, Defendants.

Civil Action No. 05-157-MPT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2007 U.S. Dist. LEXIS 42465*

June 11, 2007, Decided

**PRIOR HISTORY:** *Johnson v. George, 2007 U.S. Dist. LEXIS 35344 (D. Del., May 15, 2007)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendants, her former employer and a supervisor, alleging a free speech violation, retaliation and wrongful termination, that she was wrongfully deprived of a property interest by being placed on administrative leave without a grievance procedure, and that she was denied procedural due process with respect to a pretermination hearing. Defendants moved for summary judgment. The employee contested the motion.

**OVERVIEW:** The employee was a campus director of a community college. After she made especially antagonistic comments during a departmental meeting regarding a new campus policy, she was placed on paid administrative leave pending an investigation. A grievance was denied on the basis that such leave was not grievable. An investigation revealed that the employee abused her position by using personnel and materials for personal reasons, misused a college credit card, and was abusive toward employees. After a pretermination hearing, wherein the employee was permitted to present evidence to an independent impartial hearing officer, she was terminated. The court granted summary judgment for defendants. The employee's comments at the meeting were not protected speech because it did not target matters of public concern. The employee received due process because she had six months notice of the charges and an opportunity to present evidence at a hearing. There was no substantive due process violation because the termination decision was not malicious, arbitrary, or

irrational. Defendants were entitled to qualified immunity since there was no violation of clearly established constitutional rights.

**OUTCOME:** The court granted defendants' summary judgment motion.

**COUNSEL:** [*1] Gary W. Aber, Esquire, Aber, Goldlust, Baker and Over, Wilmington, Delaware, Attorney for Plaintiff.

David H. Williams, Esquire, Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, Attorney for Defendants.

**JUDGES:** Mary Pat Thynge, U.S. Magistrate Judge.

**OPINION BY:** Mary Pat Thynge

**OPINION**

**AMENDED MEMORANDUM OPINION**

June 11, 2007

**Mary Pat Thynge, U.S. Magistrate Judge**

**I. INTRODUCTION**

This is an employment discrimination case. On March 15, 2005, Marguerite A. Johnson ("Johnson") filed a complaint [1] against Orlando J. George, Jr., ("George") and the Delaware Technical and Community College (the "College" or collectively, "Defendants") alleging violation of her right of free speech under the *First*

2007 U.S. Dist. LEXIS 42465, *1

*Amendment* and *42 U.S.C. § 1983.* Johnson claims that her comments led to retaliatory action resulting in her wrongful termination. Johnson alleges that she was wrongfully deprived of a property interest by being placed on administrative leave from the College without a grievance procedure, and was denied her procedural due process rights in the events prior to and during a termination hearing.

1  D.I. 1.

[*2]  In support of their motion for summary judgment, Defendants argue that Johnson's statements are not protected under the *First Amendment*, that paid administrative leave does not deprive her of property rights, and procedural due process was more than adequate. This is the court's determination of that motion.

## II. BACKGROUND

Delaware Technical and Community College is a state-wide institution of higher education with campuses in Wilmington, Stanton, Dover (the Terry Campus) and Georgetown. Johnson began her employment 1970 as a GED Instructor and ultimately rose to one of the top leadership positions at the College in 1994. Johnson's success over the years was attributed to her being "a tough cookie who didn't pull punches." [2] Detracting from her successful record were reports of a change in Johnson's behavior. [3] In a November 26, 2002 letter to Johnson, [4] George expressed concern that her behavior was "all too frequently out of control," and asked that she either take remedial steps to correct her behavior or submit to a thorough investigation of the allegations. Ultimately, Johnson agreed to engage an outside consulting firm for counseling and behavior modification. [*3] Allegations of Johnson's abusive, contrary and disrespectful behavior to both colleagues and subordinates continued through 2004. [5]

2  D.I. 115 at 5.
3  D.I. 108 at 3 (George first started hearing complaints about Johnson's behavior in 2002).
4  D.I. 109 at 128 (That letter also states that George was "deeply concerned because the unacceptable behavior described is strikingly similar to many anecdotal reports I have received concerning your behavior").
5  D.I. 108 at 6.

The complaints surfaced a final time in a report to George of Johnson's antagonistic comments during a departmental meeting. The meeting took place, in part, to introduce a new campus-wide technology policy. Prior to the meeting, and in an effort to consolidate business practices, the President's Council [6] decided to reorganize the Campus Information Technology ("IT") Division. With his Vice-Presidents' advice and agreement, George established the new IT strategy and leadership program, which included a directive to strictly support [*4] and follow the new IT director and his agenda. [7] During the November 19, 2004 meeting of the Terry Campus Department Chairs, Johnson's comments "left many with the sense that [she] was unaware of the changes brought about by the reorganization." [8] It was reported to George that Johnson's questions were antagonistic and inconsistent with those of a Campus Director, and expressed a negative attitude toward the new IT policy and disdain for Mr. Shoudy. [9]

6  The President's Counsel constituents were George and the six Vice-Presidents (including Johnson). During the latter half of 2005, George was the President of the College and Johnson was a Vice-President and Director of the Terry Campus.
7  D.I. 108 at 4 (Mr. Peter Shoudy, the school's Chief Technology Officer).
8  D.I. 109 at 33.
9  *Id.*

George, once again, suggested that an investigation be made into the allegations of improper conduct by Johnson to "get to the bottom and determine whether or not [the] incidents have any substance to [*5] them." [10] He suggested that Johnson either take an administrative leave while the investigation was ongoing, or alternately, accept an early retirement from her position. Johnson replied that neither option was acceptable. [11] On January 3, 2005, George placed Johnson on administrative leave with full pay and benefits, pending an investigation which focused on the allegations about her behavior. In a confidential memorandum, George asked that Johnson gather her personal belongings and leave at the end of that day. The memo stipulated that she neither talk to College employees to discuss the investigation, nor visit College facilities without prior permission. [12] A general announcement was issued stating that Johnson was on administrative leave and that Daniel Simpson would be acting director of the Terry Campus. Johnson subsequently filed a grievance with Human Resources,

2007 U.S. Dist. LEXIS 42465, *5

which was denied on the basis that paid administrative leave is contractually a non-disciplinary and non-grievable action, [13] because Johnson was not adversely affected by the leave. [14] On March 15, 2005, Johnson filed the present matter.

[*6]
> 10   D.I. 108 at 6.
> 11   D.I. 116 at 49.
> 12   *Id.* at 50.
> 13   D.I. 119 at 3.
> 14   D.I. 109 at 87.

An investigation was undertaken by the College's attorney, David Williams, Esq., and an accountant from the Santora Baffone CPA Group. The investigation uncovered that Johnson abused her position at the Terry Campus by using personnel and materials for personal reasons, misused a College issued credit card, and was abusive toward employees. The CPA Group produced a report (the "Santora Report") outlining the abuses and sent it to Johnson on April 15, 2005. As a result of the investigation, George determined that a pre-termination hearing was in order. On April 26, 2005, upon the recommendation of counsel, the College's Board of Trustees adopted new rules of procedure for conducting termination proceedings to protect Johnson's due process rights, [15] which afforded rights that were not included in the College's Personnel Policy Manual. [16] Specifically, the new rules provided:

> 1. Notice of the reasons for termination.
>
> 2. A hearing before an independent, impartial Hearing Officer.
>
> 3. The right [*7] to confront and cross-examine witnesses testifying under oath.
>
> 4. The creation of a stenographic record.
>
> 5. The burden of the College to establish one or more reasons for termination by a preponderance of the evidence.
>
> 6. The preparation of a written decision by the Hearing Officer.

> 7. A binding and final decision by the Hearing Officer. [17]

On the following day, Johnson was sent notification of the College's intention to terminate her employment which included the grounds for termination and the new hearing procedures.

> 15   D.I. 109 at 30 (George Deposition, November 30, 2005).
> 16   D.I. 108 at 9 (The College's Personnel Manual afforded notice of the reasons for termination, affidavits from persons supporting termination, a hearing presided over by the College's chief legal counsel, no right to address or cross-examine witnesses at the hearing, and a final recommendation by counsel to the Vice-President).
> 17   D.I. 109 at 43 (The new rules for a pre-termination hearing were to assure that a Vice-President would receive a hearing before an independent and impartial decision maker).

[*8] On May 11, 2005, retired Delaware Superior Court Judge Vincent Bifferato was appointed as the hearing officer in the matter. [18] On June 17, 2005, the College identified its witnesses and on June 28, 2005, Johnson received the College's hearing exhibits, and affidavits from witnesses. On the following day in a two-day hearing, the College presented 13 witnesses and 30 exhibits. Through counsel, Johnson cross-examined the College's witnesses. Johnson testified on her own behalf and presented 6 witnesses and 47 exhibits. Judge Bifferato reviewed the eight page report from the Santora Baffone Group to determine if Johnson's actions were consistent with College policy. The audit conducted by Santora Baffone was in accordance with standards established by the American Institute of Certified Public Accountants. [19] On July 19, 2005, after reviewing the evidence presented at the hearing, including the exhibits, Judge Bifferato issued a decision that Johnson be terminated for cause. He found that the College met its burden of proof by a preponderance of the evidence that "Johnson inappropriately used College personnel and materials for personal matters" and that "Johnson did not fully and [*9] equitably replay [sic] the College for such labor and materials." [20] In addition, he commented that Johnson followed a "pattern of abuse in the use of [her] College [issued] credit card." [21] Finally, he concluded that Johnson's actions clearly met the requirements for

termination outlined in her employment contract. [22] Consistent with the findings of Judge Bifferato, Johnson's employment was terminated on July 19, 2005.

> 18    Bifferato was recommended by Hope Murray, head of Human Relations, and selected by George.
> 19    D.I. 109 at 46 (The report was reviewed by the State of Delaware Office of Auditor of Accounts. In the report, dated November 10, 2005, the Auditor concurred with the findings of the CPA Group and referred the case to the Office of Attorney General for the State of Delaware for review and any further action). D.I. 109 at 212.
> 20    D.I. 116 at 109.
> 21    *Id.* at 110.
> 22    *Id.* at 111.

## III. LEGAL STANDARD

Summary Judgment

A grant of summary judgment [*10] pursuant to *Fed. R. Civ. P. 56(c)* is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [23] A *Rule 56(c)* movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of evidence to support the nonmoving party's case." [24] "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." [25] To avoid summary judgment, a plaintiff must offer "concrete evidence from which a reasonable [trier of fact] could return a verdict in his favor" and may not rely on unsupported assertions or conclusory allegations. [26] Even so, the nonmovant must be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the nonmovant. [27]

> 23    *Lujan v. National Wildlife Federation, 497 U.S. 871, 884, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).*
>
[*11]
> 24    *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*
> 25    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.*

> *Ed. 2d 538 (1986).*
> 26    *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*
> 27    *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992).*

*First Amendment* Protection

The United States Supreme Court's decision in *Garcetti v. Ceballos* [28] addresses whether a public employee's speech is protected under the *First Amendment*. In prior opinions, the Court "identified two inquires to guide interpretation of the constitutional protections accorded to public employee speech." [29] The first requires determining if the employee was speaking "as a citizen on a matter of public concern." [30] If not, there is no motivation for retaliatory action and therefore, no cause of action. [31] The second question is whether the employer had adequate justification to restrict the speech, relating the content of the speech to the employer's interest in promoting efficiency for the public [*12] service it performs. [32] Ultimately, the burden of showing that the speech is protected rests with the employee. [33] In *Garcetti*, the Court maintains the delicate balance of interests between when an employee speaks as a citizen addressing a matter of public concern, and when an employee is "simply performing [her] job duties, [where] there is no warrant for a similar degree of scrutiny." [34] It reasons that public employees occupy trusted positions in society, and therefore, when they speak out against government policy, the speech can impair the proper performance of government functions. [35] It found that "the *First Amendment* does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." [36] While the dissent in *Garcetti* argued that the need for balance does not disappear "when an employee speaks on matters his job requires him to address," [37] an employee "should not prevail on balance unless he speaks on a matter of unusual importance and satisfies high standards of responsibility in the way he does it." [38] Eligible subject matter for comment would include: "official dishonesty, deliberately unconstitutional [*13] action, other serious wrongdoing, or threats to health and safety." [39]

> 28    *Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).*
> 29    *Id. at 1958* (citing *Pickering v. Bd. of Educ.,*

2007 U.S. Dist. LEXIS 42465, *13

*391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)).*
30  *Id.*
31  *See Mt. Healy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).*
32  *See Garcetti, 126 S. Ct. at 1957.*
33  *See Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995).*
34  *Garcetti, 126 S. Ct. at 1961.*
35  *See Id. at 1958.*
36  *Id. at 1954.*
37  *Id. at 1961.*
38  *Id. at 1967.*
39  *Id.*

Procedural Due Process

A government employee may be deprived of a property interest if not afforded due process in termination proceedings. The State cannot deny an expectation of continued employment without due process of law. [40] The *Fourteenth Amendment* [*14] does not, itself, create property rights, but rather, protects rights granted employees. [41] Property rights are determined from sources independent of the Constitution, such as, a state law or employee contract. [42] Prior to termination, a government employee is generally entitled to "notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." [43] Notice is sufficient if "1) it apprises the vulnerable party of the nature of the charges and general evidence against him, and 2) if it is timely under the particular circumstances of the case." [44] A simple statement providing notice of the charges and nature of the evidence is enough. [45] The specificity required should provide the "opportunity to determine what facts, if any, within [the plaintiff's] knowledge might be presented in mitigation of or in denial of the charges." [46] While advance notice is not required, "the timing and content of notice . . . will depend on appropriate accommodation of the competing interests involved." [47]

40  *See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*
[*15]
41  *Id.*
42  *See Board of Regents v. Roth, 408 U.S. 564,*

*577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972).*
43  *Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*
44  *Gniotek v. City of Philadelphia, 808 F.2d 241, 244 (3d Cir. 1986).*
45  *See Id.*
46  *Id.*
47  *Goss v. Lopez, 419 U.S. 565, 579, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975).*

IV.  POSITIONS  OF  THE  PARTIES  AND ANALYSIS

The College defends its conduct by arguing that Johnson's statements were made pursuant to her official duties, and she was not speaking as a citizen on a matter of concern for *First Amendment* purposes. It maintains that Johnson was not denied due process in the investigation and subsequent termination hearing and was not subject to adverse action as a result of having to choose between early retirement and paid administrative leave. Johnson disagrees. She contends that she was denied due process throughout her administrative leave and in her pre-termination hearing.

Johnson's Speech as Government Employee

The College explains that Johnson was a high ranking [*16] official with a leadership position during the Terry Campus meeting for Department Chairs. It asserts that Johnson's speech projected a lack of support for the new IT director and his policies, an area within her authority as Director of the Terry Campus. It states that personnel matters and department reorganizations are areas of concern for a campus Director, and not the general citizenry.

Johnson argues it was not her job to manage, direct or control the IT department, and therefore, her comments were outside of her job responsibilities. She argues that as a Vice President, she was not required to attend every meeting on campus, nor supervise the IT department. She adds that she was not a regular attendee of Department Chair meetings and therefore, attendance was not part of her daily professional activities as Director. Johnson contends that she acted appropriately in discussing public concerns for the IT system at the meeting and was not subversive or insubordinate. In the alternative, she argues that if her comments are characterized as subversive and insubordinate, the

characterization supports that she must have "acted outside of her job duties in raising those issues." [48] [*17]

48 D.I. 115 at 35.

In *Garcetti,* the Court concludes that when government employees speak in an official capacity and are "simply performing their job duties," [49] they have no *First Amendment* right, and the court need not balance that right and an employer's prerogative to restrict it. Johnson rationalizes the *Garcetti* opinion as "narrow," of "limited scope" and "inapplicable," explaining that a government employee's speech is always protected from discipline, except, when acting within the defined limits of her job description or as part of her specific, daily professional activities. Johnson's characterization is unpersuasive. *Garcetti* explains that the *"First Amendment* protects a public employee's right, in *certain* circumstances, to speak as a citizen addressing matters of public concern." [50] Johnson was acting in her capacity as the Campus Director, with overall responsibility for the needs of the students and faculty of the campus when attending and participating in the Department Chair [*18] meetings, the purpose of such included review of the College IT program, as well, as other campus related matters. Johnson argues that because she did not regularly attend these meetings, that they do not fall within her employment responsibilities. Johnson's logic of how attending a faculty meeting could be described as outside of her official capacity is unpersuasive. There is no indication that the public was invited to attend or participate in such meetings and there is no evidence that the meeting in question addressed matters unrelated to College issues. Following Johnson's argument to its logical conclusion means that *all* College matters are public issues. That argument eviscerates the principles of *Garcetti* because Johnson would always be addressing public concerns just by her position as a government employee.

49 *Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951, 1961, 164 L. Ed. 2d 689 (2006).*
50 *Id. at 1957* (emphasis added).

Johnson contends that since she was not responsible for [*19] managing the IT department, her attendance was not required, nor within her employment duties. [51] Her argument is nonsensical, and contradicts Johnson's own admission of concern over the new IT strategy and its impact on campus services. In *Garcetti,* "[r]estricting speech that owes its existence to a public employee's

professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." [52] Johnson was responsible for the Terry Campus, and her attendance at the Chairpersons meeting is consistent with that role. Therefore, the College did not infringe Johnson's liberties by subjecting her to any resultant discipline for her conduct.

51 D.I. 115 at 34.
52 *Garcetti, 126 S. Ct. at 1960.*

Johnson's Speech as a Matter of Public Concern

The College maintains that Johnson's statements do not address any misuse of College funds [*20] or allegations of wrong-doing, and therefore were not a matter of public concern. It contends that Johnson's statements regarded personnel and operational matters or "personnel squabbles," are not matters of public interest and do not meet the definition of speech protected by the *First Amendment.* It submits that a dispute over departmental reorganization is, in essence, a power struggle between departments. Assuming such speech is protected, it argues that Johnson's speech was not a basis of Judge Bifferato's decision and not a motivating factor in the decision to terminate her employment.

Johnson argues that the subject matter of the meeting was one of public concern. She states that the IT department affected how the administrators, students and the outside public would interact with the school, and therefore automatically is a matter of public concern. Johnson admits that she had previous issues with the IT department and that her statements were relevant to how that department offered service to the Terry Campus. [53] Finally, in an affidavit dated July 17, 2006, Johnson suggests that the College offered off-campus interactive computerized classes through the IT department and [*21] as a result, her comments dealt with issues related to the public. [54]

53 D.I. 115 at 8.
54 D.I. 116 at 334.

Criticism of the College's IT strategy and leadership is not the type of speech protected by the *First Amendment* according to *Garcetti* and its progeny. The structure and function of the IT department are issues for the College faculty, staff and students, but such

Case 1:06-cv-00565-GMS    Document 57-2    Filed 11/26/2007    Page 8 of 12

Page 7
2007 U.S. Dist. LEXIS 42465, *21

communications are not matters of *public* concern. *Garcetti* explains that "[o]fficial communications have official consequences, creating a need for substantive consistency and clarity" and a supervisor's communications must be "accurate, demonstrate sound judgment, and promote the employer's mission." [55] Johnson's comments at the Directors meeting did not "promote the employer's mission" because they questioned an agreed upon policy set forth by the College. If Johnson's superiors thought her comments were "inflammatory or misguided, they had the authority to take proper corrective action." [56] In his role as president of [*22] the College and Johnson's superior, George generated consensus regarding the new IT strategy, hired a program manager, and specifically called for the Vice Presidents to support the new policies. Johnson's comments were critical of the program, failed to promote the College's mission, and were subject to corrective measures. Even if the court balances Johnson's right to express her opinions with the College's needs, her comments are not protected speech. Her criticisms did not address nor were directed to "official dishonesty, deliberately unconstitutional action, other serious wrongdoing, or threats to health and safety." [57] Simply, Johnson's statements expressed her disapproval for George's choice of an IT director and his programs. Speech directed to internal personnel and operational matters is not protected by the *First Amendment*.

    55  *Garcetti, 126 S. Ct. at 1960.*
    56  *Id.*
    57  *Id.*

In conclusion, Johnson acted in her role as director of the Terry Campus by her attendance [*23] and participation in the meeting of faculty chairpersons. She spoke on certain issues as director of the Campus. Her comments projected her dissatisfaction with the College's choice in leadership and the IT strategy. Her speech did not target matters of public concern. Therefore, no genuine issue of material fact exists. Johnson's comments during the Campus Chairperson's meeting do not fall within any *First Amendment* protection.

Procedural Due Process

The College contends that the hearing procedures afforded Johnson exceeded the minimal due process required by the *Due Process Clause of the 14th Amendment* and under her employment contract. First, it explains that since Johnson was suspended with pay, she

was not being disciplined, nor was she denied a property or liberty interest and therefore, no process was mandated before placing her on leave. It also states that she received advance notice of the charges against her in the Santora Report. [58] Witnesses were identified by the College on June 17, 2005, eleven days before the hearing. Johnson was provided with over one thousand pages of documents, in addition to the exhibits the College planned to rely on at the hearing. [*24] The College maintains that the process was both fair and adequate because Judge Bifferato was appointed as the hearing officer, and the College Trustees agreed to be bound by his decision.

    58    The Santora Report included a detailed explanation of the allegations of improper conduct and misuse of College funds.

Johnson proposes that she has a constitutionally protected property interest in her employment and that the unfair nature of the proceedings denied her due process. [59] She contends that the College denied her due process rights by placing her on administrative leave without the right to a grievance procedure, and that the College's actions stigmatized her and damaged her professional reputation. She argues that her paid administrative leave was a disciplinary action, and a grievance procedure was guaranteed by her employment contract. Johnson complains that she was also denied the right to speak to College employees while the investigation was underway, and therefore, the investigation was generally unfair [*25] to her. She contends that the investigation and the Santora Report was "riddled with errors, omissions and contradictory facts" implying that the College manipulated the decision making process, resulting in a decision that was "intrinsically flawed." [60] Johnson alleges that she was unable to refute the testimony against her because the College refused to "provide specifics concerning such testimony." [61] She also reasons that changes made by Defendants to the pre-termination hearing process did not eliminate the College's prior contractual obligation to provide her with affidavits from witnesses. Finally, she claims her procedural due process rights were violated because she did not receive a description of the evidence to be used to prove her abuse of employees.

    59  D.I. 115 at 41.
    60  D.I. 115 at 42.
    61  *Id.* at 44.

Johnson's contention, that she was deprived of a property interest as a result of the College's termination procedure, is unsubstantiated. The court recognizes that Johnson has a [*26] property interest in her continued employment and turns to the issue of what process Johnson is due. The United States Supreme Court in *Cleveland Bd. of Educ. v. Loudermill*, states that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." [62] While the hearing "need not be elaborate," it must provide the "determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." [63] The adequacy of the hearing is dependant on the importance of the property interest being denied and the property right to one's livelihood is extremely important. [64] If post-termination proceedings are non-existent, then a more elaborate pre-termination hearing is required. [65]

> [62] *470 U.S. 532, 538, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)*.
> [63] *Id. at 545*.
> [64] See *Hameli v. Nazario, 1994 U.S. Dist. LEXIS 20523, 1994 WL 827787, *4 (D. Del. Sept. 2, 1994)*.
> [65] *Id.*

[*27] Although "advance notice is not a per se requirement of due process," [66] Johnson received ample notice of the charges and had a reasonable opportunity to prepare a response. Johnson was aware that her activities were under investigation more than six months prior to the hearing. Two and a half months prior to the hearing, Johnson received the Santora Report which outlined the allegations of financial abuse which were the basis for her dismissal. Two weeks before the hearing, the College provided notice of the witnesses it was going to call, and days before, the College offered all of the materials and demonstratives used at the hearing. Therefore, notice was sufficient as it provided the nature of the charges and the evidence against her, and was timely under the circumstances of the case.

> [66] *Morton v. Beyer, 822 F.2d 364, 369 (3d Cir. 1987)*.

Prior to April 2005, the College did not have guidelines for conducting a pre-termination hearing for a Campus Vice-President. The College's Board of [*28]

Trustees approved the new guidelines to insure that both parties would be represented fairly and due process procedures were followed. During the two day hearing, Johnson was provided an opportunity to respond to the charges against her. The Constitution requires a proceeding to be "appropriate under the circumstances; [but] it does not require confrontation and cross examination in every proceeding." [67] The purpose of such a proceeding is to determine "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." [68] At the pre-termination hearing Johnson could call and cross-examine witnesses and present evidence. Johnson was represented by counsel, and she was able to test the truthfulness of the accusations against her. Johnson testified on her own behalf and proffered 6 witnesses and 47 exhibits. Retired Superior Court Judge Bifferato, whose decision in the matter was final, reviewed all of the material presented. He found that there were reasonable grounds to believe that the charges against Johnson were true and supported her dismissal. In his report, the Judge determined that the College met its burden of [*29] proof by a preponderance of the evidence that "Johnson inappropriately used College personnel and materials for personal matters" and portrayed a "pattern of abuse in the use of [her] College [issued] credit card." [69] He concluded that Johnson's actions clearly met the requirements for termination outlined in her employment contract. [70] In conclusion, the hearing procedures afforded Johnson the due process provided by her employment contract and under the *14th Amendment*.

> [67] *Hameli v. Nazario, 1994 U.S. Dist. LEXIS 20523, 1994 WL 827787, *6 (D. Del. Sept. 2, 1994)*.
> [68] *Doherty v. Delaware, 424 F. Supp. 2d 729, 734 (D. Del. 2006)*.
> [69] D.I. 116 at 213.
> [70] *Id.* at 214.

Substantive Due Process

Johnson claims that her substantive process rights were denied because the termination hearing did not "meet the basic requirements of speaking the truth." [71] She primarily focuses on the Santora Report, claiming that because it is "riddled with errors" and "not designed to seek the truth, [*30] " Judge Bifferato's decision is intrinsically flawed and unfair. [72] Johnson links her

2007 U.S. Dist. LEXIS 42465, *30

substantive due process argument to a violation of procedural due process by claiming that she was stigmatized by negative newspaper articles about the investigation and dismissal. [73] Johnson also suggests that Judge Bifferato may have been biased because of an alleged conflict of interest. [74]

71    Johnson argues, essentially for the first time in a lengthy *surreply* brief of thirty-four pages that the evidence at the pre-termination hearing was false and incomplete. In her fifty page answering brief (in excess of the page limitation authorized under the court's local rules), she alludes to a possible substantive due process claim. No where in her original or amended complaints is a substantive due process claim raised. Further, those complaints are absent of any allegations of fraud, which under the Federal Rules of Civil Procedure ("FRCP"), specifically *Rule 9*, are to be pled with specificity. Therefore, no notice of a substantive due process claim was provided. Johnson points to no discovery directed to such a claim.

The primary evidence Johnson alleges as false is the Santora Report, a document she possessed for over two and a half months before the pre-termination hearing. Johnson cross-examined the investigator and author, David Dwyer, during that hearing.

Johnson knew or should have known of a substantive due process claim *before* this action was filed. Johnson's back door amendment to the pleadings is inconsistent with FRCP and the Local Rules of Civil Practice and Procedure of this court.

[*31]

72    D.I. 115 at 42.

73    *Id.* at 48.

74    The firm with whom Judge Bifferato is associated as senior counsel represented the College in four matters which arose in the 1994-1996 time frame, nine to eleven years before the Johnson pre-termination hearing and four to six years before Judge Bifferato retired from the bench in April 2000. *See* www.courts.delaware.gov. The only reported matter ended in 1999, six years before the pre-termination hearing. Obviously, Judge

Bifferato was not involved with the firm before his retirement. Moreover, a member of the firm served as a mediator in 2004 in a case in which the College was one of four of parties, which suggests that the firm was not representing and had not recently represented the College. Clearly, Judge Bifferato never represented any party in the present matter. Johnson never states that Judge Bifferato was biased: rather, she suggests that the selection process was partial.

To support a violation of substantive due process, government action must be so "ill conceived or malicious that it shocks the conscience" [75] or "arbitrary [*32] or irrational," [76] exceeding negligence and indifference to "reach a level of gross negligence." [77] "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." [78] In a substantive due process matter, a properly supported motion for summary judgment will require the nonmovant to produce some (more than a "scintilla") evidence in support of his position. [79]

75    *Miller v. Philadelphia, 174 F.3d 368, 374 (3d Cir. 1999).*

76    *Duffy v. Bucks, 7 F. Supp. 2d 569, 576 (E.D. PA 1999).*

77    *Miller, 174 F.3d at 376.*

78    *Id.*

79    *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

The College's decision to terminate Johnson's employment cannot be described as malicious, arbitrary or irrational. Johnson was placed on paid administrative leave. She was not arbitrarily dismissed for her alleged behavior. Johnson was provided with a pre-termination [*33] hearing. The evidence proffered at the hearing supports Judge Bifferato's findings. Johnson argues that the Santora Report was false because it focuses on her abuses of College policy and not her merit-worthy behavior. [80] She claims that the procedure set forth by the College, limited the review, and therefore, rendered the analysis inaccurate. The investigation was to determine whether Johnson had violated College policy. The Santora Report determined that she had by converting College resources for her personal use. Johnson had over two months to prepare to rebut the charges and to counter

the report. She had the opportunity to present facts and evidence at the hearing to address the alleged inaccuracies. An independent hearing officer determined the charges were founded.

80   D.I. 115 at 14.

Finally, Johnson's argument that a denial of procedural due process directly results in a violation of substantive due process is a misinterpretation of case law. 81 Substantive due process violations must be supported [*34] with facts that Defendants acted "arbitrarily or irrationally" in a way that would "shock the conscience" of the court. Implying that Johnson might have been stigmatized by the College's actions does not meet this burden. Nothing Johnson has presented rises to the level of a substantive due process claim.

> 81   Johnson's answer brief states: "In addition, the Court had found that in addition to the termination (on procedural due process) was without basis and fact. Accordingly, a violation of the substantive due process has also been established." *Morris v. Bd. of Edu. Of Laurel Sch. Dist., 401 F. Supp. 188, 211 (D. Del. 1975).* The facts in *Morris* are clearly distinguishable. There, the court held that the defendant breached the plaintiff's contract and violated her *14th Amendment* rights because it denied her the opportunity to be heard and failed to advise her of the charges (which the court determined were unfounded). As a result, the plaintiff's procedural and substantive due process rights were determined to be violated.

[*35] As a result, Johnson fails to state a viable substantive due process claim.

Qualified Immunity

Defendants assert that the doctrine of qualified immunity requires dismissal of the case against George since his conduct in performing his discretionary duties did not violate Johnson's statutory or Constitutional rights. Defendants contend that George is protected from civil liability, as long as, he did not knowingly violate Johnson's Constitutional rights. They note that "Johnson has not sufficiently alleged a violation of even colorable constitutional or statutory rights, much less 'clearly established' ones." 82

82   D.I. 108 at 27 (citing *Kodrea v. City of Kokomo, Indiana, 458 F. Supp. 2d 857, 2006 WL 1750071, at *12 (S.D. Ind. 2006)*).

Johnson concludes that if her "*First Amendment* rights were violated, it follows that those rights were clearly established [and] the defendant does not have qualified immunity." 83 Johnson contends that George would have reasonably known, because he had the advice of [*36] his attorneys, that denying her a grievance procedure and subjecting her to administrative leave would be a violation of the *First Amendment*.

83   D.I. 115 at 48.

Generally, government officials are protected from civil liability when their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." 84 "The question is whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights." 85 The issue of qualified immunity requires a "careful examination of the record (preferably by the district court) to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)." 86 When public officials, however, "invoke administrative processes for a legitimate purpose, they are acting in conformity with the Constitution and cannot be violating 'clearly established' law (because they are not [*37] violating the law at all)." 87

> 84   *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*.
> 85   *Grant v. City of Pittsburgh, 98 F.3d 116, 121 (3d Cir. 1996)* (emphasis in original)(citing *Anderson v. Creighton, 483 U.S. 635, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*).
> 86   *Id. at 122.*
> 87   *Id. at 125.*

Based upon a careful review of the facts, Defendants have established that George's conduct did not violate Johnson's clearly established rights. First, George acted to preserve Johnson's due process rights during the investigation and pre-termination hearing. George admitted that "it was counsel's advice to me as president that in order to protect Dr. Johnson's due process rights, that I should ask the Board of Trustees to adopt these rules of procedure." 88 Instead of clearly violating

2007 U.S. Dist. LEXIS 42465, *37

Johnson's rights, George sought and applied counsel's recommendations to preserve Johnson's property interest and due process rights. George provided Johnson with notice of the charges against her and [*38] an opportunity to be heard. He supported the College Board's approval of the revised hearing process that focused on providing Johnson with a fair and impartial hearing. George authorized the appointment of an independent hearing officer, whose recommendation would be final. Finally, George had a legitimate purpose in placing Johnson on administrative leave and proceeding with a pre-termination hearing. Johnson was forewarned that her behavior would lead to an investigation of allegations of abuse. George ordered the investigation which required the temporary removal of Johnson from her position. The resultant report and findings of abuse directed the termination proceeding. These actions were not improper, nor infringe clearly established rights. As a result, the doctrine of qualified immunity applies to George.

    88   D.I. 109 at 31.

**V. CONCLUSION**

For the reasons stated above, the College's motion for summary judgment is GRANTED. An appropriate order consistent with this memorandum will follow.

**[*39] ORDER**

At Wilmington this 11th day of **June, 2007.**

IT IS ORDERED that the Memorandum Opinion dated May 15, 2007 be corrected to substitute "*42 U.S.C. § 1983*" for the incorrect cite "43 U.S.C. § 1493" in the first sentence of the decision.

IT IS ALSO ORDERED that footnote number 26 be corrected to substitute citation "*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).*" for the incorrect cite "*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 343, 356 (1986) ."

/s/ Mary Pat Thynge

UNITED STATES MAGISTRATE JUDGE

# **<u>Exhibit B</u>**

LEXSEE 2002 U.S. DIST. LEXIS 4721

**DR. KATHLEEN CARTER, Plaintiff, v. DELAWARE STATE UNIVERSITY, DR.
WILLIAM B. DELAUDER, PRESIDENT, DR. JOHNNY TOLLIVER, DEAN
JACQUELYN W. GORUM, DR. ALETA HANNAH and DELAWARE STATE
UNIVERSITY BOARD OF TRUSTEES, Defendants.**

**C.A. No. 99-642 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2002 U.S. Dist. LEXIS 4721*

**March 21, 2002, Decided**

**SUBSEQUENT HISTORY:** *Affirmed by Carter v. Del. State Univ., 2003 U.S. App. LEXIS 7219 (3d Cir. Del., Apr. 16, 2003)*

**DISPOSITION:**    [*1] Summary judgment ENTERED in favor of the individual defendants on the § 1981 and *§ 1983* claims in Counts II and III.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff professor filed a *First Amendment* retaliation claim under *42 U.S.C.S. § 1983*. Defendants university president and board of trustees requested a judgment in their favor, arguing the professor's speech was not protected and it was not a substantial factor in the decision to deny tenure. The defendants also argued that other permissible factors supported their decision. The professor argued questions of fact remained as to motivation.

**OVERVIEW:** The professor's critical remarks about scheduling policies to her class were entitled to *First Amendment* protection. She alleged that the president admitted that her classroom statements were considered in the tenure process. If true, the court found the denial of tenure was at least partially based on the professor's remarks. Thus, the speech was a substantial or motivating factor in the decision. The other factors were her service on a committee and her neutral evaluations, none of which were related to speech. Although the neutral evaluation and her performance on the committee were unrelated to speech, they were directly related to job performance. Her neutral evaluation and allegedly poor

committee service established that her performance was, at times, marginal. Thus, there were sufficient grounds to deny tenure in the absence of her speech. She never provided any facts to rebut the assertions that her evaluations were neutral and that her performance on the committee was allegedly inadequate. If the president's decision would have remained the same in the absence of the professor's comments, it was sufficient. The court found that the decision would have been the same.

**OUTCOME:** The court entered summary judgment in favor of the defendants.

**COUNSEL:** For KATHLEEN CARTER, Dr., plaintiff: Laurence V. Cronin, Smith, Katzenstein, & Furlow, Wilmington, DE.

For WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, ALETA HANNAH, Dr., DELAWARE STATE UNIVERSITY BOARD OF TRUSTEES, defendants: John D. Balaguer, White & Williams, Wilmington, DE.

For WILLIAM H. DELAUDER, Dr., JOHNNY TOLLIVER, Dr., JACQUELYNE W. GORUM, defendants: Christian J. Singewald, White & Williams, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory Moneta Sleet

## OPINION

## MEMORANDUM AND ORDER

On February 27, 2002, the court issued a memorandum and order disposing of all of the plaintiff's claims in the case except her § 1981 and *§ 1983* claims against the individual defendants in their official capacities. (D.I. 142 at 19-20.) On February 28, 2002, the court held a teleconference wherein the parties discussed how the remaining claims should proceed. Subsequent to the teleconference, the parties agreed that the § 1981 claim is not viable in light of the court's ruling on the Title VII claim. [*2] (D.I. 143.) However, the parties continue to dispute the validity of the *§ 1983* claim.

The defendants request an order entering judgment in their favor on the *§ 1983* claims. (D.I. 143, D.I. 145.) The defendants argue that the plaintiff cannot establish the elements of her *First Amendment* retaliation claim under *§ 1983* because her speech was not protected and it was not a substantial factor in the tenure decision. The defendants further submit that even if the plaintiff's speech was protected and that speech was a substantial factor in their decision to deny her tenure, other permissible factors support their decision to deny tenure to the plaintiff. The plaintiff argues that the claim is valid because questions of fact remain as to the motivation behind the decision. The court agrees with the defendant that the *§ 1983* claims should be dismissed. Therefore, the court will enter an order dismissing both the § 1981 and *§ 1983* claims against the defendants.

## II. STANDARD OF REVIEW [1]

> 1   The facts of this case are fully set forth in the court's previous memorandum and order and will not be repeated here. (*See* D.I. 142 at 4-7.)

[*3] Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. When deciding a motion for summary judgment, the court must

evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999)*. The nonmoving party, however, must demonstrate the existence of a material fact -- not mere allegations -- supplying sufficient evidence for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace, 101 F.3d 947, 951 (3d Cir. 1996)* (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not [*4] match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)* (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson, 477 U.S. at 249-50.* [2]

> 2   Although proper summary judgment briefs have not been filed on the present issues, treating this matter a motion for summary judgment is appropriate for three reasons. First, since summary judgment motions have already been filed in this case, the plaintiff is on notice that her claims may be dismissed in this manner. Second, the defendants' remarks after the summary judgment motion indicate that they seek judgment in their favor on the *§ 1983* claims. (*See* D.I. 143 at 2 (noting that defendants will "provide a response and application for entry of judgment" after the plaintiff writes to the court)). Finally, the plaintiff argues that the court cannot dismiss her claims because issues of fact remain. (D.I. 144 at 2,4.) (arguing that claims should go to jury). Therefore, summary judgment is appropriate.

## [*5] III. DISCUSSION

In order to establish that she was denied tenure in retaliation for exercising her *First Amendment* rights, Carter must first demonstrate that her speech was protected. *See Green v. Philadelphia Housing Authority, 105 F.3d 882, 885 (3d Cir. 1997)*. She must then establish that her protected speech was a substantial or motivating factor behind the alleged retaliation. *See id.* Finally, if Carter can establish these two elements, the burden will then shift to the defendants to demonstrate that the same action would have been taken if the speech had not occurred. *See id.*

2002 U.S. Dist. LEXIS 4721, *5

The parties do not dispute that Carter made certain unfavorable remarks about DSU's scheduling policies to her class. Instructors' remarks about university policies, even those critical of the university, are entitled to *First Amendment* protection. *See Eichman v. Indiana State University Bd. of Trustees, 597 F.2d 1104, 1108 (5th Cir. 1979)* (finding that district court erred in holding that professor's statements criticizing university's scheduling and curriculum were outside the scope of *First Amendment* protection). Thus, the court finds that the plaintiff's [*6] speech was protected.

The court further finds that the speech was a substantial or motivating factor in the tenure decision. A substantial or motivating factor need not be the only factor. Rather, a substantial or motivating factor is one that played "some substantial role" in the decision making process. *See Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000)*. In the present case, Carter alleges that DeLauder admitted that her classroom statements were considered in the tenure process. Accepting Carter's allegation as true, the court finds that the denial of tenure was at least partially based on Carter's remarks. Therefore, Carter's speech was a substantial or motivating factor in the defendants' decision to deny her tenure.

Since Carter has demonstrated that her protected speech was a motivating factor in the tenure decision, the defendants must demonstrate by a preponderance of the evidence they would have taken the same action in the absence of the protected conduct. *See id. at 235*. The defendants have carried this burden. The court noted in its previous order that Carter's speech was one of four factors that motivated the tenure decision. (D. [*7] I. 142 at 11.) The other three factors were her service as department chair, her service on the NCATE committee, and her neutral evaluations. (*Id.*) [3] None of these considerations were related to Carter's speech. A university may deny tenure for any non-discriminatory reason. *See Parate v. Isibor, 868 F.2d 821, 827 (6th Cir. 1989)* ("The university may dismiss a non-tenured professor for any reason, or no reason, and the professor has no recourse unless such dismissal abridges his exercise of a constitutionally protected right."). Here, although Carter's neutral evaluation and her performance on the NCATE committee were unrelated to her speech, they were directly related to her job performance. *See Coats v. Pierre, 890 F.2d 728, 733 (5th Cir. 1990)* (noting that the reasons for denial of tenure "[bore] at least some relation to [the professor's] effectiveness as a

faculty member"). *See also Gerhart v. Hayes, 217 F.3d 320, 322 (5th Cir. 2000)* (finding that plaintiff's job performance was inadequate and she would have been denied tenure in the absence of her speech). Carter's neutral evaluation and allegedly poor NCATE service [*8] establish that her performance was, at times, marginal. Thus, the factual record supports a finding that there were sufficient grounds to deny Carter tenure in the absence of her speech.

> 3   The court will not consider Carter's service as department chair for the reasons stated in the previous memorandum. (*See* D.I. 142 at 12.)

Carter argues that the court should deny summary judgment because there are issues of fact regarding DSU's motivation for denying tenure. However, Carter never provided any facts to rebut the assertions that her evaluations were neutral and that her performance on the NCATE committee was allegedly inadequate. [4] Thus, Carter has failed to create a genuine issue of material fact on these points as is her burden. Therefore, there is no impediment to granting summary judgment in favor of the defendants on this claim. [5] [6]

> 4   Indeed, rather than disputing the fact that her evaluations were neutral, Carter attempted to use this fact as proof of Dr. Hannah's racial bias against her.

[*9]

> 5   Carter argues that the defendants cannot claim they would have terminated her on other grounds because DeLauder did not know about her evaluations or her allegedly poor NCATE performance at the time he made his initial negative tenure recommendation. The court rejects this argument. The law on retaliation does not state that the protected speech cannot be considered -- it only requires proof that the defendants' decision would have been the same in the absence of the speech. Thus, if DeLauder's decision would have remained the same in the absence of Carter's comments, it is sufficient. Since the court finds that the decision would have been the same, Carter's argument on this point is rejected.
>
> 6   The court recently held that the final two prongs of a *first amendment* retaliation claim were questions of fact. See *Springer v. Henry, 2002 U.S. Dist. LEXIS 3975*, No. 00-885(GMS), 2002

WL 389136 (D. Del. Mar. 11, 2002). This case is distinguishable from *Springer*, however. In *Springer*, there were several areas of contested fact. In the present case, as previously explained, Carter does not dispute the outcome-determinative facts. Therefore, the court finds that although summary judgment was not appropriate in *Springer*, it is appropriate in this case.

[*10] **IV. CONCLUSION**

For all of the foregoing reasons, the court will grant summary judgment in favor of the defendants on the § 1981 and *§ 1983* claims.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1. Summary judgment be and hereby is ENTERED in favor of the individual defendants on the § 1981 and *§ 1983* claims in Counts II and III.

2. The clerk shall close this case.

Dated: March 21, 2002

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# <u>Exhibit C</u>



Not Reported in F.Supp.                                                        Page 1

Not Reported in F.Supp., 1990 WL 29719 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

▷
Hindorff v. Westinghouse Elec. Corp.
E.D.Pa.,1990.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
James W. HINDORFF,
v.
WESTINGHOUSE ELECTRIC CORPORATION.
**CIV. A. No. 89-5831.**

March 15, 1990.

Alan B. Epstein, Jablon, Epstein & Wolf, Philadelphia, Pa., for plaintiff.
Michele D. Brown, Dona S. Kahn, Harris & Kahn, Philadelphia, Pa., for Westinghouse Electric Corporation.

*MEMORANDUM-ORDER*
RICHARD A. POWERS, III, United States Magistrate.

### I. *PROCEDURAL HISTORY*

*1 The jury trial in this matter, under the Age Discrimination in Employment Act (hereinafter ADEA), 29 U.S.C. §§ 621-634, was held before the undersigned on February 13, 1990. The jury returned a verdict of liability in favor of the plaintiff, James W. Hindorff, on February 16, 1990. By stipulation of counsel, the issues of equitable relief and monetary damages were to be determined by the Court upon the finding of liability against the defendant, Westinghouse Electric Corporation. This Memorandum and Order resolves the damages issue in this case under the ADEA.

### II. *DISCUSSION*

Upon prevailing on his ADEA claim, the plaintiff is entitled to be restored to the economic position he would have held but for the intervening discriminatory conduct of Westinghouse. *Rodriguez v. Taylor,* 569 F.2d 1231, 1238 (3d Cir.1977), *cert. denied,*436 U.S. 913 (1978). In comport with the "make whole" spirit of the ADEA and the relief provisions of the Act,[FN1] an award of back pay, appropriate reinstatement and attorney's fees [FN2] will be ordered.

#### A. *Back Pay*

The calculation of a back pay award will be assessed as of the date of plaintiff's termination [FN3] to the date of trial. *Wehr v. Burroughs Corp.,* 619 F.2d 276, 283 (3d Cir.1980). Therefore, for a twenty-eight and one-half (28 1/2 ) month period, at the rate of a Senior Programmer Analyst position, the highest position advertised and available for relocating, which is $4,267.00 monthly, the back pay award will be assessed at $121,609.50.[FN4]

#### B. *Offsets*

An award of back pay is systematically reduced by the amount the plaintiff received through other interim employ. *Rodriguez,* 569 F.2d at 1243 n. 23. Therefore, his lost wages from Westinghouse must be reduced by the amount plaintiff earned at Delaware Valley HMO, plaintiff's current employer. As evidenced by plaintiff's W-2 forms (Plaintiff's Exhibits 41(a)-(c)), he earned the following: $11,961.55 for 1987; $47,769.21 for 1988; and $50,934.80 for 1989.[FN5] In addition, as agreed by counsel for both parties [FN6], Mr. Hindorff earned approximately $4,244.57 per month in 1990. Therefore, the total earnings plaintiff received from Delaware Valley HMO until the date of trial is $117,032.41. This amount will be offset against plaintiff's total lost wages, an amount of $121,609.50, for a difference of $4,577.09.[FN7]

At the legal rate of interest in Pennsylvania, six percent (6%),[FN8] this amount accrues to $5,229.33.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1990 WL 29719 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

### C. *Reinstatement*

Plaintiff shall be reinstated to a position in Westinghouse Electric Corp. in lieu of front pay benefits. 29 U.S.C. § 626(b). The position shall constitute an available employment slot in the Northeastern United States at a pay rate of no less than that of a Senior Programmer Analyst as advertised in April of 1987. In addition to the position reinstatement, plaintiff must also be given the opportunity to contribute to the Westinghouse Pension Plan in an amount consistent with his reinstated position for the time period beginning in September of 1987 until the present.

### D. *Attorney's Fees*

*2 As indicated *supra,* the calculation and award of plaintiff's attorney's fees shall be deferred until final disposition of all post-trial motions in this case.

### III. *CONCLUSION*

Accordingly, Westinghouse shall pay the plaintiff a sum of $5,229.33 for lost wages and shall reinstate the plaintiff to an appropriate position within Westinghouse's Northeastern United States region. Implicit in plaintiff's reinstatement is the right of plaintiff to make monetary contributions equal to an amount plaintiff would have contributed had he been relocated and not terminated in September of 1987.

An appropriate Order follows.

### *ORDER*

Now, this 15th day of March, 1990, after careful consideration of Plaintiff's Motion to Amend the Judgment and Defendant's Proposed Findings and Conclusions on Damages, IT IS ORDERED that the motion is GRANTED and the Judgment is AMENDED as follows:

1. The defendant shall pay $5,229.33 to the plaintiff, representing plaintiff's total lost earnings

from Westinghouse.

2. The defendant shall reinstate the plaintiff to an appropriate position at a facility of defendant in the Northeastern United States, with the right to make monetary contributions to the Westinghouse Pension Fund to achieve a current status under the pension plan.

> FN1. 29 U.S.C. § 626(b)*incorporating*29 U.S.C. §§ 211(b), 216(b)-(c), 217 and 626(c).

> FN2. The attorney's fees portion of this award shall be computed by plaintiff's counsel and submitted to the Court, with an affidavit, upon the complete disposition of this case. *See Rogers v. Exxon Research & Engineering Co.,* 550 F.2d 834, 842 (3d Cir.1977).

> FN3. Plaintiff's effective termination was on September 30, 1987. Although plaintiff left Westinghouse's employ several weeks earlier, he still received a salary from Westinghouse until the end of September, 1987. *See* Defendant's Proposed Findings and Conclusions on Damages, p. 2.

> FN4. Plaintiff's contention that he would have received a "minimal merit increase" of three percent (3%) for 1988 and 1989 is speculative and will not be added on the award since both sides stipulated that the shutdown of defendant's Broomall facility was for valid economic reasons. This strongly militates against the award of any merit salary increases at the Monroeville facility as an expected incident of employment at the new site.
> Furthermore, defendant's assertion that the relocation positions at Monroeville were eliminated in or before December, 1988 and, therefore, plaintiff's job, had he transferred, would have been eliminated, is purely speculative. As such, it will not be entertained for the calculation of damages.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 3

Not Reported in F.Supp., 1990 WL 29719 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

> FN5. Defendant's contention that the offset should include Delaware Valley HMO's matching contributions is accepted and I note that such is subsumed in the W-2 form figures used to assess the total offset.

> FN6. On March 12, 1990, the parties' counsel agreed that Mr. Hindorff's wages for 1990 should be calculated on the basis of his 1989 W-2 form, Plaintiff's Exhibit 41(c).

> FN7. An offset will not be made to account for plaintiff's early retirement pension from Westinghouse. *See Dreyer v. Arco Chemical Co., Div. of Atl. Richfield,* 801 F.2d 651, 653, n. 1 (3d Cir.1986).

> FN8. 41 P.S. § 202 (1974).

E.D.Pa.,1990.
Hindorff v. Westinghouse Elec. Corp.
Not Reported in F.Supp., 1990 WL 29719 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

WENDELL GORUM, Ph.D.,      )
                               )
        Plaintiff,       )
                               )     Civil Action No. 06-565-GMS
       v.             )
                               )
ALLEN L. SESSOMS, Ph.D.,    )
                               )
        and         )
                               )
BOARD OF TRUSTEES OF      )
DELAWARE STATE UNIVERSITY,  )
                               )
        Defendants.    )

### CERTIFICATE OF SERVICE

I, Michael R. Robinson, hereby certify that on November 26, 2007 I caused a true and

correct copy of the foregoing **DEFENDANTS' PRE-TRIAL BRIEF** to be served electronically

via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

| | |
|---|---|
| Gilbert Shelsby, Esq. | Gregg L. Zeff, Esq. |
| Michael J. Logullo, Esq. | FROST & ZEFF |
| SHELSBY & LEONI | Pier 5 at Penn's Landing |
| 221 Main Street | 7 North Columbus Boulevard |
| Stanton, DE 19804 | Philadelphia, PA 19106 |

/s/ Michael R. Robinson
Michael R. Robinson (#4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
mrobinson@saul.com