**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

WENDELL GORUM, Ph.D.,                :
                                     :
                Plaintiff,           :
                                     :        Civil Action No. 06-565-GMS
        v.                           :
                                     :
ALLEN L. SESSOMS, Ph.D.,             :
        And                          :
                                     :
BOARD OF TRUSTEES OF                 :
DELAWARE STATE UNIVERSITY,           :
                                     :
                Defendants.          :

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE
EVIDENCE PRESENTED TO THE AD HOC DISMISSAL COMMITTEE AND OTHER
EVIDENCE UNKNOWN TO PRESIDENT SESSOMS AT THE TIME HE
RECOMMENDED PLAINTIFF'S TERMINATION**

Plaintiff, Wendell Gorum, Ph.D., by and through his attorneys, Gregg Zeff, Frost & Zeff

and Michael J. Logullo, Shelsby & Leoni, hereby responds to Defendant's Motion In Limine to

exclude evidence presented to the Ad Hoc dismissal committee and other evidence unknown to

President Sessoms at the time he recommended Plaintiff's termination and states as follows:

1.      Defendants claim that the information produced at the Ad Hoc Disciplinary

Committee's seven day long hearing should be excluded because Sessoms had neglected to

review any of it at the time he made his recommendation to terminate Plaintiff.  However,

because the information was presented to Defendant for his review, it is important for the fact

finder to learn the kinds of mitigating evidence that Sessoms deliberately ignored and kept from

the ultimate decisionmaker, the Board of Trustees.

2.      Sessoms will likely testify at trial that the information he read convinced him that

Dr. Gorum should be terminated.  It is highly relevant, therefore, that Plaintiff be allowed to

present the information that Sessoms deliberately ignored, information that cleared or mitigated in favor of Dr. Gorum and supported the AHDC's recommendation not to terminate him.

3.      Information from the AHDC Hearing is relevant to demonstrate that Defendants' reasons for terminating Plaintiff were pretextual.    Relevant evidence is any evidence with a tendency to make the existence of any fact of consequence to the action more or less probable. F.R.E. 401. Here, the content of the hearings helps to establish Defendant Sessoms' bias against Plaintiff. The hearing transcripts, which Defendant Sessoms chose not to read or forward to the Board, demonstrates his bias against Plaintiff. Sessoms ignored information that supported the AHDC's recommendation not to terminate Gorum. Nor did Sessoms forward any of this highly relevant information to the Board of Trustees, who ultimately made the decision to terminate Gorum.

4.      Much of the evidence produced during the seven days of hearings before the AHDC was of a mitigating character, and likely would have influenced the Board's decision. The content of the AHDC hearings is relevant to show that Sessoms was uninterested in information that could clear Dr. Gorum or mitigate his punishment. Sessoms' inadequate, superficial review of the AHDC record suggests that he was not impartial in recommending Gorum's termination. If Sessoms was interested in making a fair, impartial decision on a tenured faculty member's termination, it is arguable that he would want all the facts before him. The information that Sessoms disregarded is relevant to establish his bias against Dr. Gorum. The full content of the hearings will demonstrate that Sessoms was uninterested in reaching an impartial decision about Dr. Gorum.

5.      Thus, under F.R.E. 401, the content of the hearings is relevant because it makes a consequential fact, Defendant Sessoms' bias against Gorum, more probable than it would be without the evidence. The evidence need not be conclusive on the issue, or even particularly strong evidence. Douglass v. Eaton Corp., 956 F.2d 1339 (6th Cir. 1992). As long as the

reasonable fact finder would find the probability of a consequential fact to be altered one way or the other, the evidence is relevant and should be admitted.

6.     Defendants cite Schaffner v. Glencoe Park, 256 F. 3d 616 (7th Cir. 2001) and Black v. SEPTA, 2006 U.S. Dist LEXIS 72022 (E.D. Pa. 2006) for the proposition that facts outside a decisionmaker's awareness should not be considered relevant to his motivation. However, Sessoms was unfamiliar with the record of the AHDC hearings because he deliberately avoided reading it. He could not have been unaware that days of testimony were recorded because he testified before the committee. He was presented with the full record, but only read the brief summary report.

7.     This case is also factually distinguishable from Schaffner and Black because in both cases, the information deemed irrelevant was the plaintiff's own opinion of her performance and the plaintiff's co-workers opinions. The court in both cases held that only the decisionmaker's perception was relevant to his motivation. Thus, those cases do not address the instant situation in which a decisionmaker ignores pertinent information and prevents it from reaching the ultimate decisionmakers.

8.     Defendants also rely on Brown v. Trustees of Brown University, 891 F.2d 337 (1st Cir. 1989) and Kotas v. Eastman Kodak Co., 1997 US Dist LEXIS 13839 (E.D. Pa. 1997), in which there was no evidence that the decisionmaker was aware of certain information. Unlike the instant case, the plaintiffs in Brown and Kotas were referring to information that was simply not in the file given to the decisionmakers. Sessoms, in contrast, had access to a volume of pertinent testimony and mitigating factors but neither read them or forwarded them to the Board of Trustees for their decision.

9.     The information that Defendant Sessoms ignored comes from the AHDC's public hearing, held in seven sittings from August 30 -31, September 28-29, and October 27-29, 2004, (AHDC Report at 4) (B0104), See Exhibit A. After hearing extensive testimony from seventeen

3

witnesses and reviewing extensive documentary evidence, the committee produced a twenty page report. The report concluded that there existed a chaotic state of practices and procedures for changing student grades at DSU, See Exhibit B (AHDC Report at 14) (B0105). Dr. Johnny Tolliver, former Provost and VP of Academic Affairs, testified that when students were wrongly erased or "purged" from the system, Chairs were allowed to evaluate their course work and assign grades. The report based this finding on Provost Tolliver's testimony that Dean Tommy Frederick allowed this practice in the College of Arts and Sciences, in which Dr. Gorum taught Mass Communications, See Exhibit B (AHDC Report at 14) (B0105).

10.    Contrary to Dean Frederick and Defendant Sessoms' positions, Dr. Tolliver acknowledged the significance of a Chair's motivation in changing student grades, particularly in light of common practice at DSU. "It's important to know that he or she is being motivated for good reason", Tolliver stated. "And all the good reason is for the benefit of the student. That is not to say you want to give students grades, but if students truly earn grades that are better than what a faculty member may award, then, you do want to take steps to try to make sure that the student gets the grade that he or she earns", See Exhibit C (10/27/04 AHDC Tr. at 232-233) (B0059-0060). If a Chair changed students' grades based on good intentions, as described above, Dr. Tolliver does not consider such actions to constitute a dismissible offense. "People violate procedures all the time", he remarked. "I've been in this business long enough to know that people violate procedures even as simple as missing a step in the line of authority to try to get some things done ... So, no, I wouldn't consider that a dismissible offense", See Exhibit C (10/27/04 AHDC Tr. at 233) (B0059).

11.    The Committee found that the prior administration had a different understanding of the rules regarding grade changes. It created an atmosphere of "lack of rule enforcement ... that perpetuated and encouraged random and uncontrolled manipulation of student grades", See Exhibit B (AHDC Report at 14) (B0105). "We strongly feel that Dr. Gorum's case is the tip of

4

the iceberg, and he is in fact the scapegoat ... whose investigation we hope has uprooted the roots of the poisonous tree and brought down all the poisonous fruit. We believe he deserves a severe sanction but short of dismissal", See Exhibit D (AHDC Report at 18) (B0106).  The report continued, "this Committee is convinced that DSU university administration engaged in practices and procedures that encouraged and promoted inappropriate manipulation of student grades", See Exhibit D (AHDC Report at 18) (B0106). "Although DSU has established policies regarding student grade change, practices and procedure were in such significant conflict with those policies as to render them ineffective", See Exhibit D (AHDC Report at 18) (B0106).

      12.    The President read the AHDC Report and recommended termination to the Board. Sessoms did not attend the AHDC Hearings (though he did testify), See Exhibit E (Sessoms Dep. At 46) (B0027).  He did not read the transcript of the hearing or the post-trial briefs, See Exhibit F, Id at 47 (B0028).  He did not read the testimony quoted above, which better explains the prevailing practices of rampant grade changes.  He was not aware at the time of his decision that his dean, Dean Frederick, gave testimony contradictory to that of the Vice-President Provost Tolliver, Former Chair Dr. King and Dr. Gorum. Id at 80-81 (B0112-B0013).[1]  He has and had no idea what evidence or testimony was presented that demonstrated that DSU did not follow its own rules or that Provost Tolliver admitted this at the Hearing.  Id. at p. 77-8 (B0110-0111).[2] President Sessoms did not and does not know what department chairs were told to do about student purges. Id. at 80-81 (B0112-B0113).  Sessoms never spoke to Gorum about this matter. Id. at p. 43 (B0114).   Despite the above, Dr. Sessoms chose to ignore the AHDC=s

---

[1]By inference, it should also be assumed then that President Sessoms had no knowledge that Dean Frederick called Dr. Gorum and Dr. Tolliver liars or that students and Dr. King agreed with Gorum and Tolliver=s version of events.

[2]Mark Farley, Vice-President of Human Resources, has admitted that Dr. Tolliver=s comments about grade changing practices reflect what the practice was at the time. (Farley Dep. at 4 and 79)

recommendation that Dr. Gorum be reinstated.

13.    Because Sessoms did not review this evidence, he and the Board were not aware that Dean Frederick gave testimony contradictory to that of Vice-President Provost Tolliver, Former Chair Dr. King and Dr. Gorum. Id at 80-81 (B0112-B0013).[3]  He has and had no idea what evidence or testimony was presented that demonstrated that DSU did not follow its own rules or that Provost Tolliver admitted this at the Hearing. Id. at p. 77-8 (B0110-0111).[4] President Sessoms did not and does not know what department chairs were told to do about student purges. Id. at 80-81 (B0112-B0113). Sessoms never spoke to Gorum about this matter. Id. at p. 43 (B0114). Because he ignored this information, Dr. Sessoms did not follow the AHDC=s recommendation that Dr. Gorum be reinstated. For the reasons stated above, the evidence in question is relevant to the issue of Dr. Sessoms' bias against Dr. Gorum, and therefore should not be excluded.

**WHEREFORE,** Plaintiff, Wendell Gorum, Ph.D. respectfully requests the Court to deny Defendant's Motion In Limine to exclude evidence presented to the Ad Hoc dismissal committee and other evidence unknown to President Sessoms at the time he recommended Plaintiff's Termination.

**SHELSBY & LEONI**

**OF COUNSEL**

Gregg L. Zeff, Esquire

/s/ *Michael J. Logullo*
MICHAEL J. LOGULLO, ESQUIRE
Mlogullo@mslde.com

---

[3]By inference, it should also be assumed then that President Sessoms had no knowledge that Dean Frederick called Dr. Gorum and Dr. Tolliver liars or that students and Dr. King agreed with Gorum and Tolliver=s version of events.

[4]Mark Farley, Vice-President of Human Resources, has admitted that Dr. Tolliver=s comments about grade changing practices reflect what the practice was at the time. (Farley Dep. at 4 and 79)

Gzeff@frostzeff.com
Frost & Zeff
Pier 5 at Penn's Landing
2nd Floor
Philadelphia, PA  19106
(215) 351-3333
*Attorney for Plaintiff*

Dated: December 7, 2007

221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*

E X H I B I T    A

Filippo Toscano Ph.D. (Associate Professor, English Foreign Languages; *Associate Chair*)

Gabriel D. Gwanmesia Ph.D (Professor, Physics & Pre-Engineering)

Lapointe Davis Ph.D. (Professor, Music and Visual and Performing Arts)

Edward Jackson Ph.D. (Professor, English Foreign Languages)

## HEARING

The hearing, including presentation of all witnesses by the University and Dr. Gorum was completed in seven sittings:

- August 30, 2004
- August 31, 2004
- September 28, 2004
- September 29, 2004
- October 27, 2004
- October 28, 2004
- October 29, 2004

All hearings took place in the MBNA building at DSU. Each session lasted from about 8 a.m to 4:30 pm with a one hour break at about noon. Dr. Wendell Gorum was represented by Mr. Gregg L. Zeff, attorney with Greg and Zeff in Philadelphia, while Mr. Robert Duston, of Schmeltzer, Aptaker & Shepard, and PC in Washington DC was counsel for Delaware State University. In accordance with the CBA, "verbatim recording of all testimonies" was taken by Ms. Tanya M. Congo, a Notary and Certified Professional Reporter. Although Dr. Gorum opted for a public hearing, apart from those listed above and the committee members, no outside person attended any of the hearings.

## DOCUMENTARY EVIDENCE AND WITNESSES

Both DSU and Dr. Wendell Gorum presented an extensive assortment of documentary evidence to the committee in support of their positions. In addition to Dr. Gorum's personal testimony, the committee heard testimony from a total of seventeen (17) witnesses – eight (8) for the university and nine (9) for Dr. Gorum, as outlined below.

4

B0104

DSU-02459

EXHIBIT  B

## DID DSU POLICIES DIFFER FROM PRACTICES AND PROCEDURES FOR STUDENT GRADE ADJUSTMENTS?

Notwithstanding the reprehensible actions of Dr. Gorum as outlined above, the committee was quite troubled and disappointed by the indirect role of former DSU administration in creating an atmosphere of pervasive laxity, lack of rule enforcement, and the absence of accountability at all levels that perpetuated and encouraged random and uncontrolled manipulations of student grades.

The chaotic state of practices and procedures for changing student grades at DSU was clearly summed up by Mr. Glenn Parker, DSU registrar who testified that on a scale of one to ten regarding procedures and practices at the Registrar's office, he would rank DSU as a five, based on his prior experience at other academic institutions (Trans 8/30/04, pg 139). According to Dr. Johnny Tolliver, former Provost and Vice President of Academic Affairs, when for example students were inappropriately purged from the system, chairs were allowed to evaluate their course work and assign grades. He emphatically stated in reference to Dr. Tommy Frederick, "... *as far as I know was allowing -- this when I was Provost- he was allowing chairs in the College of Arts and sciences to do the same.*" (Trans 10/27/04). Depending on a particular Chair's relationship with the staff in the Office of Records, in some instances he or she would go directly to the Record's Office and make grade changes without signatures from the Dean or the Vice President (Trans 10/27/04 pg 199).

There are several examples of inconsistencies in the administration's response to student academic problems and issues. For example, although not the covert "official policy", the administration often gave permission to some students to be given "special" assignments to improve their grades. Upon cross examination by counsel Zeff, Dr. Kenneth Bell, Former Acting Provost indicated that "*that would have been acceptable to me*" if Dr. Frederick had given Dr. Gorum permission to change Dr Osei-Mensah's grades. On the contrary, Dr. Sessoms in response to the same question said "Dean's *can't instruct somebody to change somebody else's grade*". It is quite obvious to this committee that there is a pervasive lack of consensus on how to react to any given situation regarding student grade problems.

14

B0105

DSU-02469

E X H I B I T   C

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

59 (Pages 233 to 236)

233

1  the grade that he or she earns.
2      Q.  So if the Chair violates procedure, but is
3  motivated by what you've just described, good
4  intentions, would you consider that to be a violation
5  for the terminating of a faculty member?
6      A.  No.
7      Q.  Why not?
8      A.  People violate procedures all the time.  I
9  know that.  I've been in this business long enough to
10  know that people violate procedures even as simple as
11  missing a step in the line of authority to try to get
12  some things done.  Sometimes you have to do that in
13  order to get things done.
14          So, no, I wouldn't consider that a
15  dismissable offense.  It may require the removal of
16  that person as a department Chair, but depending on
17  the violation of procedure, how serious the breach
18  is, that would be the extent of the sanctions for
19  that.
20      Q.  And the basis for your opinion that that
21  would be the sanction, does that have anything to do
22  with any precedent at Delaware State?

234

1      A.  No, my precedent as a professional both as
2  in the military and higher education, and even in the
3  military there's violations of procedures in order to
4  get things done.
5      MR. ZEFF:  I don't have anything
6  further.
7      DR. DAVIS:  I have one.  Yes, I would
8  like to know, Dr. Tolliver, during the time at which
9  you were Dean and Provost at Delaware State
10  University, did Dr. Gorum, to your knowledge, ever
11  engage in any type of academic misconduct?
12      THE WITNESS:  Not to my knowledge.
13      DR. JACKSON:  Dr. Tolliver --
14      THE WITNESS:  Yes.
15      DR. JACKSON:  -- sometimes we violate
16  procedures and we don't know we're violating them.
17  That's possible, isn't it?
18      THE WITNESS:  Right, that is.
19      DR. JACKSON:  And sometimes they told
20  me things that are in the catalog I was not aware of,
21  and the Chairman did not make me aware of it.  So the
22  onus should not be on the faculty member; is that

235

1  correct?
2      THE WITNESS:  The onus should not be
3  on the faculty member?
4      DR. JACKSON:  If the Department Chair
5  does not tell me that there's a policy in the catalog
6  or in the contract, where does the onus belong?
7      THE WITNESS:  You know, in terms of
8  leadership, the person who is in charge of the unit
9  has to accept responsibility for everything that
10  happens or does not happen in that unit, even if a
11  person in that unit does not know something.  So I
12  would place the onus on the Chair.
13      DR. JACKSON:  Thank you.
14      DR. ACKAH:  All right.  Dr. Tolliver,
15  though we miss you and we want to go on, we will let
16  you go.
17      THE WITNESS:  Okay.
18      DR. ACKAH:  Thank you very much for --
19      THE WITNESS:  Thank you.
20      DR. ACKAH:  -- making time to meet us.
21  Dr. Tolliver, let me warn you, if it's possible -- if
22  it's necessary, we might recall you.  I'm hoping that

236

1  we won't have to go to that extent.
2      THE WITNESS:  Okay.
3      DR. ACKAH:  Thank you very much and
4  good night.
5      THE WITNESS:  All right.  Good night
6  and take care.
7      (Witness excused)
8      DR. ACKAH:  Oh, boy.  Thank you
9  everybody.  It's a tiring day.
10  Tomorrow, what do we have first thing?
11      MR. ZEFF:  I have to be in Court at
12  exactly 9 o'clock for something that should take
13  fifteen minutes.  I would hope to be here by 11:00.
14      DR. GWANMESIA:  Tomorrow?
15      MR. ZEFF:  Tomorrow.  Is that --
16      DR. ACKAH:  How many witnesses do you
17  have for us?
18      MR. ZEFF:  We have Dr. King --
19      MR. DUSTON:  Do you want to put on
20  your other two before you do Dr. Gorum?
21      MR. ZEFF:  Depending on what time you
22  finish, we can use Dr. Gorum to fill in any time.  We

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

58 (Pages 229 to 232)

229

1 people would be suspended pending a hearing before an
2 ad hoc dismissal committee.
3     MR. ZEFF: Were any of them a Chair?
4     THE WITNESS: As I recall -- just wait
5 a minute. No.
6     MR. ZEFF: I'm sorry. I just wanted
7 to clarify that.
8     THE WITNESS: No, neither one of them
9 was a Chair.
10     DR. GWANMESIA: Did the action that
11 you take to suspend the individual, is it based on
12 your judgment of the severity of the crime, or is it
13 based on the Collective Bargaining Agreement?
14     THE WITNESS: Oh, it's based on the
15 severity of what I consider to be the violation and,
16 also, what is in the Collective Bargaining Agreement.
17 BY MR. DUSTON:
18     Q. And just so that the Committee can compare
19 your views to the others in the Administration, how
20 severe or not do you view a Chair changing the grades
21 of an instructor of record without consultation with
22 that instructor, and without --

230

1     A. I don't think it would -- I don't think it
2 warrants dismissal.
3     DR. ACKAH: Robert, how much time --
4 how much more time do you have?
5     MR. DUSTON: I have no further
6 questions for Dr. Tolliver.
7     DR. ACKAH: Any rebuttal?
8     MR. ZEFF: I do have just a couple.
9 It's not going to take very long.
10     DR. ACKAH: Just a couple, please.
11     REDIRECT EXAMINATION
12 BY MR. ZEFF:
13     Q. Dr. Tolliver, is it -- just so we're
14 clear, is it your testimony that a Chair of a
15 department may be terminated as a faculty member for
16 actions they take as a Chair?
17     A. It may be if those actions are criminal.
18     Q. Other than criminal action, may they be
19 terminated for actions they take as a Chair?
20     A. If they are severe enough that I would
21 consider recommending that they be dismissed for
22 cause.

231

1     Q. Okay. You mentioned that there were some
2 problems with a Delaware Tech adjunct, do you recall?
3     A. Correct.
4     Q. And those problems involve -- it sounded
5 like improper grades being submitted, the grades just
6 didn't make sense?
7     A. Well, it went beyond that. I understand
8 she was not teaching the students well. She was very
9 disrespectful to the students. She was not teaching
10 the students well. She was disrespectful to the
11 students, and her grades we thought were very severe
12 based on what we knew about what she was doing with
13 the students.
14     Q. Were you the Dean or the Provost at that
15 time?
16     A. I don't remember.
17     Q. Did you ask Dr. Gorum to handle that
18 situation?
19     A. I don't remember if I asked Dr. Gorum to
20 handle that situation because I can't remember
21 whether I was Dean or Provost.
22     Q. Let me move on and just kind of wrap up.

232

1 There were -- you've talked about a lot of practices
2 and a lot of policies. Were the two the same at
3 Delaware State with regard to grades?
4     A. No.
5     Q. Were there a lot of practices that were
6 being followed that were contrary to the policies?
7     A. Absolutely. That was always a big problem
8 at Delaware State.
9     Q. And was it important to you whether you
10 were the Dean or the Provost to determine what the
11 Chair's motivation was --
12     A. Yes.
13     Q. -- behind changing a grade?
14     A. Yes, it was.
15     Q. Why's that important?
16     A. Well, it's important to know that he or
17 she is being motivated for good reason. And all the
18 good reason is for the benefit of the student. That
19 is not to say you want to give students grades, but
20 if students truly earn grades that are better than
21 what a faculty member may award, then, you do want to
22 take steps to try to make sure that that student gets

E X H I B I T     D

o. Dr. Gorum's actions violated the rights of students to a fair and impartial evaluation in the educational process.

p. This Committee is convinced that DSU university administration engaged in practices and procedures that encouraged and promoted inappropriate manipulation of student grades.

q. Although DSU has established policies regarding student grade change, practices and procedures were in such significant conflict with these policies as to render then ineffective.

## COMMITTEE'S RECOMMENDATIONS

1. The committee resolves that although Dr Gorum's unprofessional behavior is highly reprehensible, we do not recommend outright dismissal. We base our decision on the premise that the administration at Delaware State University, prior to Dr Sessoms term, had failed to stringently enforce accountability and violations of professional conduct, and thus created a climate within which several unit members violated university professional ethics. But for the grave, *outright misrepresentation on signatures* on forms submitted to the Registrar's office, some of the charges against Dr Gorum were endemic at DSU, and some sectors of the administration either by commission or omission participated in it. We strongly feel that Dr Gorum's case is the tip of the iceberg, and he is, in fact, the scapegoat (albeit a blamable scapegoat) whose investigation we hope has uprooted the roots of the poisonous tree and brought down all the poisonous fruits. We hope so!

We must emphasize that this is not to condone Dr Gorum's conduct. We believe he deserves a severe sanction but short of dismissal.

2. The committee joins the University's decision to relieve Dr Gorum of his position as chair. We join in this decision because we do not agree with Dr Gorum that he acted

18

B0106

DSU-02473

EXHIBIT E

Allen Sessoms, Ph.D.

45

46

1  outcome was.

2    Q.   Did you share with the board Sessoms 3, this

3  letter of March 5, 2004?

4    A.   I didn't share with the board and I don't share

5  with the board legal documents that counsel may have.  I

6  don't keep copies of these documents.  I have nothing to

7  share.

8    Q.   You think counsel may have -- are you referring

9  the Mark Farley?

10   A.   Mark Farley may have.  I don't recall whether he

11 did or not.

12   Q.   Were you involved at all in the selection of the

13 ad hoc committee?

14   A.   No.

15   Q.   Who was?

16   A.   I don't know.  There is a process in the CBA,

17 whatever the process was.  It might have been the

18 provost and counsel.  But I don't know that for sure

19 because I wasn't involved at all.

20   Q.   And were you informed at all during the hearing

21 process of what was going on in the hearing other than

22 through counsel?

23   A.   No.

24   Q.   Prior to appearing at the hearing, did you

E X H I B I T    F

Allen Sessoms, Ph.D.

47

1   review any documents in preparation for the hearing?

2      A.   I don't recall.  I don't recall.  I have no

3   idea.

4      Q.   After the hearings, there were a number of

5   documents generated.  There was a brief that I prepared,

6   a brief that your counsel prepared.  There was extensive

7   notes of testimony, transcripts.  And there was a report

8   by the committee itself.  Did you review any of that

9   documentation?

10     A.   The only documentation I would have reviewed was

11  the report by the committee, its final report.

12     Q.   Did you do that?

13     A.   I did it, yes.  I don't recall when.  I

14  certainly did it.

15     Q.   And did you have any discussions with anyone

16  about that committee report other than your counsel?

17  Let me caution you that conversations with your counsel,

18  please, don't tell me.  And I'm not going to keep

19  repeating that.

20     A.   Okay.  No.

21     Q.   Have you become aware, at any time, that the

22  report by the committee may not have been the consensus

23  of the committee?

24     A.   I only have the report of the committee and

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

WENDELL GORUM, Ph.D.,                                :
                                                     :
            Plaintiff,                               :
                                                     :
                                                     :            Civil Action No. 06-565-GMS
            v.                                       :
                                                     :
                                                     :
ALLEN L. SESSOMS, Ph.D.,                             :
            And                                      :
                                                     :
BOARD OF TRUSTEES OF                                 :
DELAWARE STATE UNIVERSITY,                           :
                                                     :
            Defendants.                              :
                                                     :

### CERTIFICATE OF SERVICE

I, Michael J. Logullo, Esquire, hereby certify that on December 7, 2007 I caused a true and correct copy of the foregoing **Plaintiff's Response to Defendants' Motion in Limine to Exclude Evidence Presented to the Ad Hoc Dismissal Committee and Other Evidence Unknown to President Sessoms at the Time He Recommended Plaintiff's Termination** to be served electronically via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Robert L. Duston, Esquire                Kimberly L. Gattuso, Esquire
Saul Ewing, LLP                          Michael R. Robinson, Esquire
2600 Virginia Avenue, NW                 SAUL EWING LLP
The Watergate, Suite 1000                222 Delaware Avenue, Suite 1200
Washington, DC 20037                     Wilmington, DE 19801
(202) 333-8800                           (302) 421-6800
rduston@saul.com                         kgattuso@saul.com
                                         mrobinson@saul.com

**SHELSBY & LEONI**

 /s/ Michael J. Logullo
MICHAEL J. LOGULLO, ESQUIRE
Mlogullo@mslde.com
221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*

1