**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

WENDELL GORUM, Ph.D.,

      Plaintiff,

         v.

ALLEN L. SESSOMS, Ph.D.,
    And

BOARD OF TRUSTEES OF
DELAWARE STATE UNIVERSITY,

      Defendants.

Civil Action No. 06-565-GMS

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE**
**EVIDENCE REGARDING THE ALLEGED CONDUCT OF OTHER FACULTY WHO**
**WERE NOT "SIMILARLY SITUATED" AND THE ALLEGED FAILURE TO**
**INVESTIGATE SUCH FACULTY**

Plaintiff, Wendell Gorum, Ph.D., by and through his attorneys, Gregg Zeff, Frost & Zeff and Michael J. Logullo, Shelsby & Leoni hereby responds to Defenant's Motion In Limine to exclude evidence and states as follows:

1.      Dr. Gorum cited the practices of Professor King, Dean Tolliver and Assistant Registrar Joyce Bowers as persons with knowledge that Dr. Gorum's grade changing procedures were widespread amongst chairs and administrators. Dr. Gorum, as the chair of Mass Communications, had no other faculty at his level in his department. Instead, he compares his conduct to a similarly situated Department Chair and the Provost/Vice President of Academic Affairs and Dean of his school of Arts and Sciences.

2.      Professor James Scott King, a former chair of the English Department, is similarly situated to Gorum because they are both professors and department chairs. Additionally, they teach in similar disciplines, Mass Communications and English. Dr. King, a former Chair of the

English Department for thirty-two years, had knowledge of the policies and practices relating to Chairs changing grades at DSU. "As a department we served about 1400 students per semester", See Exhibit A (10/27/04 AHDC Tr. at 151) (B0089). King was extremely familiar with the problems that purging caused at DSU, and particularly in the English Department. "... School's purge ran anywhere from semester to semester, anywhere from 20% to 30, 33, 35%", he explained, See Exhibit B (10/27/04 AHDC Tr. at 142) (B0052). King reiterated Bower' testimony that when Mass Communications students were purged from their courses, they would be enrolled in internships and practicums. "It varied who would actually instruct or supervise the students", he explained. "But all the grades would be ... turned into me because I was the teacher of record ... And this was done throughout the history basically of the Mass Comm program", See Exhibit C (10/27/04 AHDC Tr. at 146) (B0053). In addition, there were prior instances when King, as Chair, changed another professor's grade because he or she could not be reached, See Exhibit A (10/27/04 AHDC Tr. at 149-150) (B0089). "This commonly happened because as a Department we served about 1400 students per semester, and there are going to be errors. So we handle them", See Exhibit A (10/27/04 AHDC Tr. at 150) (B0089). King never requested a grade change from the Dean in processing these forms. In fact, prior to March 3, 2004, no grade change request forms that King completed as Chair were ever returned to him for lacking the Dean's signature, See Exhibit D (10/27/04 AHDC Tr. at 186) (B0056).

3.     Another comparator, Provost/Vice President of Academic Affairs and former Dean, Dr. Johnny Tolliver, is similarly situated because, like Gorum, he has a supervisory and advisory role over other professors. Both of these comparators have experienced the same problems changing grades at DSU. Dr. Johnny Tolliver testified to his experiences as the Dean of Arts and Sciences, Acting Vice President of Academic Affairs and Provost and Vice President of Academic Affairs, See Exhibit E (10/27/04 AHDC Tr. at 190) (B0050). During his tenure at DSU, Tolliver experienced many of the same problems with grade processing, particularly with

2

adjunct professors who leave campus before the administration discovered problems with the grades they assigned. "In those cases we ... gave latitude to the Department Chairs to try to rectify those situations ... in many cases where students were purged improperly, we gave wide latitude to the Department Chairs to make sure that those students were restored. In some cases students had not - who had scholarships, for instance, and those scholarships had not been posted to their accounts and were purged, and those faculty members took it upon themselves, with our blessings, of course, to get those students restored as quickly as possible", See Exhibit E (10/27/04 AHDC Tr. at 191-192) (B0050). On other occasions, resolution of student grades involved a Chair evaluating a student's course work and assigning him or her a grade, which was also common practice at DSU, See Exhibit F (10/27/04 AHDC Tr. at 202) (B0057).

4.     Plaintiff also relies on the testimony of former Registrar Joyce Bowers to establish that similarly situated employees were treated differently. Although not a similarly situated employee to Gorum, Bowers has extensive knowledge of the grading policies at DSU due to her 29 years of experience in the Registrar's office. She testified to the practices of Department Chairs similarly situated to Dr. Gorum. Her testimony demonstrated that many other Chairs engaged in the same conduct as Gorum yet escaped discipline or censure.

5.     Bowers worked as a secretary, senior secretary and records systems officer and assistant registrar, See Exhibit G (9/29/04 AHDC Tr. at 233) (B0082). Bowers was involved in processing grade changes at DSU in her last 10 years as Assistant Registrar, and as such was able to testify to the school's history of scheduling, registration and grade change issues, See Exhibit G (9/29/04 AHDC Tr. at 234-235) (B0082).

6.     One of Bower's primary responsibilities as Assistant Registrar was to accept or reject grade change forms submitted by instructors, See Exhibit H (9/29/04 AHDC Tr. at 262) (B0086). According to Bowers, Department Chairs such as Dr. Gorum have frequently signed grade forms in lieu of an instructor since the time she was a student at DSU, thirty-three years

3

ago, See Exhibit I (9/29/04 AHDC Tr. at 244) (B0083). Bowers further remarked that the practice of Chairs changing student grades is "pretty darn widespread" at DSU, See Exhibit J (9/29/04 AHDC Tr. at 267) (B0087). When professors could not be reached to discuss changing their students grades, Chairs also signed grade change forms when student were purged from course rosters for owing money to DSU, See Exhibit K (9/29/04 ADHC Tr. at 250) (B0084). Since purging was extremely problematic and widespread at the University, a Chair would provide a grade under these circumstances, and the Registrar's office would officially register the student in the class upon receipt of payments owed so that a student could receive a grade, See Exhibit K (9/29/04 AHDC Tr. at 250) (B0084).

7.     Bowers noted that Chairs also signed grade change forms for students who participated in summer internships and practicums at DSU. These instances occurred when students enrolled in summer courses that were cancelled. Since students frequently needed to take a summer class required for graduation, Chairs remedied the situation by allowing them to complete a summer internship or practicum for academic credit instead. A student's name would then be added to the roster of a fall course that resembled his or her summer internship, although he or she would not actually attend the fall course. At the end of the fall semester, the student would receive a grade for the internship or practicum that he or she had completed, See Exhibit L (9/29/04 AHDC Tr. at 257-8) (B0085). This enrollment practice was widespread among departments that offered practicums and internships. "It's never been a problem where the Chair submits the grade change for the instructor", explained Bowers. "This has been occurring for as long as I've been here, for twenty-nine years and two months", See Exhibit M (9/29/04 AHDC Tr. at 271) (B0088).

8.     Dr. Gorum has presented two similarly situated employees who were treated more favorably supplemented their testimony with that of the Registrar, who was familiar with the practices of numerous other similarly situated professors.     Evidence of conduct by these

similarly situated employees should therefore not be excluded.

**WHEREFORE,** Plaintiff, Wendell Gorum, Ph.D. respectfully requests the Court to deny

Defendant's Motion In Limine to exclude evidence Regarding the Alleged Conduct of Other

Faculty Who Were Not "Similarly Situated" and the Alleged Failure to Investigate Such Faculty.


**SHELSBY & LEONI**


**OF COUNSEL**

Gregg L. Zeff, Esquire
Gzeff@frostzeff.com
Frost & Zeff
Pier 5 at Penn's Landing
2nd Floor
Philadelphia, PA  19106
(215) 351-3333
*Attorney for Plaintiff*

Dated: December 7, 2007

 */s/ Michael J. Logullo*
MICHAEL J. LOGULLO, ESQUIRE
Mlogullo@mslde.com
221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*

EXHIBIT  A

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

38 (Pages 149 to 152)

149

1 have any problem?
2          Were they ever sent back to you?
3          DR. JACKSON: No.
4          THE WITNESS: That was the practice.
5 BY MR. ZEFF:
6     Q. Now, had you ever been involved in a
7 situation as Chair where you have changed another
8 professor's grade?
9     A. Yes.
10    Q. How did you handle those situations?
11    A. I've had, say, a teacher on vacation and a
12 student comes in and says -- and I'll give you one
13 example specifically.
14          Ms. Lawson had gone to California. A
15 student came in and said, I thought I was getting an
16 A. And I can't remember whether he got a B or a C.
17 But I said, well -- we tried to reach Ms. Lawson and
18 we could not reach her. And his mother was with him,
19 and he says, well, he has to keep a three point, his
20 scholarship is depending upon this.
21          I said, well, we'll go in Ms. Lawson's
22 office. Her grades are always by the numbers.

150

1          We went through, and she -- clearly,
2 she had made an error in calculation. Instead of
3 7.5, she did .75. So I changed the grade.
4          Another instance with Ms. Reynolds
5 when she says, with the term paper I'm being rough on
6 this thing, misspellings, because you're word
7 processing them, you can always put spell check on.
8 So if you have three misspelled words, I'm not even
9 going to read anymore of the paper, that's it.
10          The student misused their, T-H-E-I-R,
11 and T-H-E-R-E. So we call -- well, is it a
12 misspelled word or is it the wrong use of the word.
13 And a word processor will not make the distinction
14 between those two.
15          And we kind of laughed about it. And
16 we went on -- I went on because she was in D.C. at
17 that time, and changed the grade.
18          I mean, sometimes a teacher will call
19 and say, I made an error, will you do this. The
20 teacher might be in Wilmington.
21          I did put on the form, requested by
22 telephone, and signed that name and put my name

151

1 behind it and, then, signed it again.
2          So this happens commonly because as a
3 Department we served about 1400 students per
4 semester. And there are going to be errors. So we
5 handle them.
6          DR. GWANMESIA: Were these grade
7 changes ever -- did you ever go through the Dean?
8          Did you ever request the permission of
9 the Dean before changing, or could you do that --
10         THE WITNESS: I have never requested a
11 grade change from the Dean.
12         DR. GWANMESIA: Regardless of how long
13 it has been since the grade was awarded?
14         Because in the case of change of a
15 grade by faculty three weeks after the grade has been
16 assigned you could -- the faculty could just change
17 it with the signature of the Chair, right?
18         THE WITNESS: Right.
19         DR. GWANMESIA: But in the case where
20 you could verify that the students were right, you
21 didn't need to have authorization from the Dean, did
22 you?

152

1          THE WITNESS: No. And even after.
2 Say a student had been away a year, and not enrolled
3 in school, all we had to do was call the Dean and
4 tell him, and he would say, handle it.
5          DR. GWANMESIA: But no formal
6 application, no forms were completed as long as --
7          THE WITNESS: If there was a form, and
8 I can't remember these cases specifically 'cause we
9 have not had that many of them, my student worker
10 would walk it over to the Dean and he would sign it
11 and forward it to the Records Office.
12          And I do remember a couple of cases
13 like that.
14          DR. DAVIS: When the Dean said -- made
15 that statement, did you understand that you had the
16 authority to change a grade?
17          When he said, you know, you called the
18 Dean?
19          THE WITNESS: Right. When he says,
20 handle it?
21          DR. DAVIS: Handle it, yes.
22          THE WITNESS: Yes, that my signature

E X H I B I T   B

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

36 (Pages 141 to 144)

141

1 purged either because they had pre-registered and
2 were not coming back, and had somehow informed the
3 school of such, or they owed some money.
4          The problem with that is that somehow
5 the Business Office made no distinction between, and
6 this was until later years, and probably even last
7 year, owing $1.00 or owing $10,000.00. It was, if
8 there were anything owed, you were purged.
9          And, then, the student would have to,
10 somehow, go around, get everything straight and be
11 readmitted to the class.
12          The problem with that is that once a
13 student is purged, that class is open and Chairs and
14 teachers usually put other students in those slots.
15          So a student had to literally go
16 around and go from instructor to instructor and try
17 to get back in that class, or get in another class if
18 a teacher were to accept him or her.
19      Q. How long was this purge process going on?
20      A. In terms of years?
21      Q. Yes.
22      A. Basically, I would say, at least twenty

142

1 years.
2      Q. And was it going on up to and including
3 2003/2004?
4      A. Yes, it was.
5      Q. And for a period of time, Dr. Gorum was
6 Director of Mass Comm under your auspices as Chair?
7      A. Yes, English and Mass Communications
8 Departments were combined.
9      Q. Were there problems or issues related to
10 purges while Mass Comm was with English?
11      A. Yes.
12      Q. What types of problems were there, and
13 what did you do about them?
14      A. Well, we had a lot of Mass Comm and
15 English majors -- I guess the school's purge ran
16 anywhere from semester to semester, anywhere from 20
17 to 30, 33, 35 percent.
18      Q. Thirty-five percent of the students in the
19 school, in DSU, would be purged on occasion?
20      A. Yes. And I said, for a number of reasons.
21 A lot of times a student's check, say if you were
22 getting some money from a church, might be sitting in

143

1 student accounts, and not put on the account bill
2 yet. So that student would automatically be purged.
3          Financial aid might be here, but it
4 has not been posted yet. So that student would still
5 be purged. So you had any number of reasons. And a
6 student, legitimately, may not have had the money,
7 especially during those times when there was no
8 deferred payment, and that type of thing.
9          MR. DUSTON: Dr. Ackah, before Dr.
10 King goes any further, I'm just going to
11 conditionally object to the line of testimony unless
12 it's linked up later that some or more of these fifty
13 students actually were purged from the system,
14 because all this is very interesting, but unless the
15 evidence is there that some of the fifty students
16 whose grade changes are at issue, were, in fact,
17 purged and that was the link, then it's not relevant.
18          DR. ACKAH: I think I'm going to have
19 to overrule that, but I can see where he's coming
20 from. I think he's trying to get your point and link
21 it with --
22          MR. ZEFF: We will both link it and

144

1 use this as background.
2          MR. DUSTON: As long as it is later
3 linked up to actual evidence the students were purged
4 --
5          DR. ACKAH: We need evidence or --
6          MR. ZEFF: It will be relevant.
7          DR. ACKAH: Yes.
8 BY MR. ZEFF:
9      Q. Okay. If you could explain what -- so
10 would all of these students who were purged, be
11 purged at the same time in a semester?
12      A. I don't know about -- I'll say during the
13 same time period, yes.
14      Q. Okay. What would you do about it as
15 Chair?
16      A. As Chair when the student corrected
17 whatever problem existed, we had to try to get that
18 student back in class, or if not those specific
19 classes, enough classes to make him a full-time
20 student.
21      Q. What would you do in order to do that?
22      A. Any number of things. We would call and

EXHIBIT   C

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

37 (Pages 145 to 148)

145

1  ask the teacher, would the teacher accept him. If
2  the teacher did not accept them, we tried to put them
3  in another class. If it were classes within the
4  English Department, we might put them in another
5  teacher's class, if a particular teacher were not
6  willing to take that student and help them.
7       And for Mass Comm majors, when they
8  couldn't get another class, we'd sometimes put them
9  in an internship, sometimes in practicum.
10     Q.  Under whose name would the students
11  ultimately get a grade, under these circumstances?
12     A.  Whoever was listed for teaching
13  internships. Say if I were listed for teaching
14  internships and the student would be put into an
15  internship, I would have one for fifty.
16     But if the student were a public
17  relations student, they student might be put under
18  Marcia Taylor.
19     If the student were a radio student,
20  the student would be put under Kopano or Gorum.
21     If the student were a television
22  student, he might be put under Gorum or Kopano or

146

1  Eric Dodson.
2       So it varied who would actually
3  instruct or supervise the students. But all the
4  grades would be put -- turned into me because I was
5  the teacher of record.
6     Q.  Now, were there times when the teacher of
7  record would not even know the name of the student on
8  their roster?
9     A.  Yes.
10    Q.  How would that come about?
11    A.  Because someone else was actually
12  supervising the student. You were just recordkeeping
13  and turning in the grade and the course was under
14  you. And this was done throughout the history
15  basically of the Mass Comm program.
16    Q.  You were the Chair of that program?
17    A.  Yes.
18    Q.  And was this done under your supervision?
19    A.  Yes.
20    Q.  And with your permission?
21    A.  Yes.
22    Q.  And did Dr. Gorum -- was Dr. Gorum aware

147

1  of these practices?
2     A.  Yes.
3     Q.  Okay. Were your Deans aware of these
4  practices?
5     A.  Yes.
6     Q.  Dean Frederick?
7     A.  Yes.
8     Q.  How do you know Dean Frederick was aware?
9     A.  Because I told him. And he knew how it
10  was set up from the very beginning.
11    Q.  Did you go to Dean Frederick to get his
12  signature each time you made one of these changes?
13    A.  No, because the changes were made within
14  the first three weeks of the semester. And it has
15  always been the policy that if a teacher changes the
16  grade within the first three weeks of the semester,
17  and it were an error in recording or an error in
18  calculation, it was always done within the
19  Department.
20    Q.  Did Dean Frederick know this?
21    A.  Yes.
22    Q.  Was this a practice that Dean Frederick

148

1  was aware of?
2     A.  Yes.
3     MR. DUSTON:  Which practice?
4     MR. ZEFF:  The practice of the first
5  three weeks.
6  BY MR. ZEFF:
7     Q.  How do you know that?
8     A.  How do I know?
9     Q.  Yes.
10    A.  Because it was a common practice.
11  Everybody did it, okay.
12    DR. JACKSON:  I have a question. We
13  have a catalog saying something different, and, then,
14  they started enforcing the catalog about two years
15  ago.
16    THE WITNESS:  No, not two years ago,
17  last year. Now, I'll ask you a question. As a
18  faculty member, in the first three weeks of the
19  semester, who signed your grade changes?
20    DR. JACKSON:  Wasn't it the Department
21  Chair?
22    THE WITNESS:  Yes. And did you ever

EXHIBIT  D

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

47 (Pages 185 to 188)

---

**185**

1    Are they aware of this kind of
2  situation?
3    THE WITNESS: Yes, 'cause sometimes
4  they call the Dean, and the Dean refers them to you.
5    DR. DAVIS: Well, according to Dr.
6  Frederick's testimony, you submitted a number of
7  grade changes towards the end of the semester, Spring
8  semester, and he sent them back.
9    THE WITNESS: I did?
10    DR. DAVIS: No, Dr. Frederick did.
11    THE WITNESS: That I submitted a
12  number of grade changes to him?
13    DR. GWANMESIA: And he sent it back.
14    THE WITNESS: Yeah, that was the first
15  time he ever sent any back, and that was simply
16  because of Dr. Gorum's case.
17  BY MR. ZEFF:
18    Q.  Let me direct your attention, actually, to
19  the black binder, page number 35. I believe that's
20  what's being referred to.
21    DR. JACKSON: The black binder in
22  front of you.

---

**186**

1  BY MR. ZEFF:
2    Q.  The black binder, page 35.
3    A.  Page --
4    Q.  Thirty-five.
5    A.  Okay.
6    DR. GWANMESIA: This did not actually
7  come from Dean Frederick. It came from the
8  Registrar.
9    THE WITNESS: Are these the forms?
10    MR. ZEFF: No, they're not.
11  BY MR. ZEFF:
12    Q.  But did you ever receive a copy of this
13  correspondence, which is from Len Parker?
14    A.  I don't recall receiving it, but I won't
15  say that I didn't receive this, but if I did, it was
16  the first time that I've ever received one from him
17  in this time frame.
18    Q.  So previous to March 3, 2004 had you ever
19  had your grade change request forms returned to you
20  for the Dean's signature?
21    A.  No.
22    MR. ZEFF: I don't have anything

---

**187**

1  further.
2    MR. DUSTON: Actually, could I request
3  a two-minute break before we start with Dr. King.
4    (Recess)
5    MR. ZEFF: While we're taking our
6  break, we keep pushing Dr. Tolliver off, who we now
7  told 3:15.
8    MR. DUSTON: Well, sorry. You spent
9  an hour with Dr. King --
10    MR. ZEFF: Yeah, I don't know how we
11  want to do this. Dr. King is easily available.
12    MR. DUSTON: If you want to call Dr.
13  King back to be available for redirect by me tomorrow
14  morning at 10:00 a.m., that's fine. We can take Dr.
15  Tolliver right now, and I'm happy to do my
16  cross-examination of Dr. King in the morning.
17    MR. ZEFF: Thank you. I think we
18  would like to do -- just so we're clear, I guess
19  Tolliver would, then, be the last witness today?
20    DR. ACKAH: Probably, because it's
21  almost 3:15.
22    MR. ZEFF: Okay. As long as Dr.

---

**188**

1  King's available in the morning for that.
2    (Discussion off the record)
3    MR. ZEFF: Hello. Can you hear me?
4    DR. TOLLIVER: Yes, I can.
5    MR. ZEFF: Let me see. We're in the
6  hearing, so let's just test out and see how well you
7  hear everybody.
8    DR. ACKAH: Dr. Tolliver, good
9  afternoon. This is Dr. Ackah.
10    DR. TOLLIVER: Okay. Yes --
11    DR. GWANMESIA: And this is Gabriel
12  Gwanmesia here.
13    DR. JACKSON: Dr. Jackson.
14    DR. TOSCANO: Fil Toscano.
15    DR. TOLLIVER: Okay.
16    DR. DAVIS: Lapointe Davis.
17    DR. TOLLIVER: Okay.
18    DR. ACKAH: Do you remember all of us?
19    DR. TOLLIVER: Yes.
20    DR. ACKAH: Thank you. And the
21  University's attorney is --
22    MR. DUSTON: Rob Duston. Nice to talk

---

EXHIBIT E

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

48 (Pages 189 to 192)

189

1  to you, Dr. Tolliver.
2  　　　DR. TOLLIVER: Nice talking to you.
3  　　　DR. ACKAH: And we have a lady here
4  who's helping us.
5  　　　DR. TOLLIVER: Okay.
6  　　　MR. ZEFF: And can we -- just for the
7  record can we verify that the panel recognizes Dr.
8  Tolliver's voice.
9  　　　DR. ACKAH: Oh, yeah. We know his
10 voice.
11 　　　MR. ZEFF: Okay.
12 Whereupon,
13 　　　JOHNNY TOLLIVER, Ph.D., having first
14 been duly sworn according to law, was examined and
15 testified as follows:
16 　　　DIRECT EXAMINATION
17 BY MR. ZEFF:
18 　　Q.  Dr. Tolliver, can you just very briefly
19 tell the Panel here what your experience at Delaware
20 State was.
21 　　A.  Well, at Delaware State I came in in 1993
22 as Dean of the -- at that time, School of Arts and

190

1  Sciences. And in 1997 I assumed the position of
2  Acting Vice President of Academic Affairs. And in
3  the Spring of '98 I was appointed Provost and Vice
4  President of Academic Affairs.
5  　　Q.  And in those various capacities, did you
6  have the opportunity to deal with submitting grades
7  and grade change issues related to students?
8  　　A.  Yes. When I first came to Delaware State,
9  the practice was that during that period of time
10 after the regular submission of grades, that faculty
11 members could go to the Registrar's Office and change
12 grades themselves.
13 　　　There was a general practice of
14 Chairs, especially, making grade changes without
15 signatures from Deans or the Provost, but going
16 directly to the Registrar's Office and making those
17 changes themselves.
18 　　　We tried to bring some control to that
19 while I was there, and we did to the extent where
20 certain grade changes did require the signature of a
21 Dean -- signatures of the Dean and the Provost in
22 order for the Records Office to accept them.

191

1  　　Q.  Which changes required those signatures?
2  　　A.  Letter grade changes from like C to A or D
3  to B, or something like that.
4  　　　But even in cases like -- those were
5  routine cases where a faculty member may have been
6  changing the grade of one student, or requesting a
7  grade change for one student.
8  　　　But in some cases we had some serious
9  problems with adjuncts, especially, who might come to
10 Delaware State and teach for a semester and, then,
11 create some real problems with the grades that he or
12 she may have submitted.
13 　　　And in those cases we used the -- gave
14 latitude to Department Chairs to try to rectify those
15 situations. And I'm aware of several cases that were
16 like that.
17 　　Q.  Are you also aware of giving Department
18 Chairs latitude with regard to purges?
19 　　A.  There -- with respect to purging, those
20 were done through the enrollment and financial
21 offices for students who had not paid by a certain
22 date.

192

1  　　　But in many cases where students were
2  purged improperly, we gave wide latitude to the
3  Department Chairs to make sure that those students
4  were restored.
5  　　　In some cases students had not -- who
6  had scholarships, for instance, and those
7  scholarships had not been posted to their accounts
8  and were purged, and those faculty members took it
9  upon themselves, with our blessings, of course, to
10 get those students restored as quickly as possible.
11 　　Q.  And did that wide authority include
12 allowing Chairs to register students for other
13 courses, or give them grades -- place grades in other
14 courses that weren't necessarily the course that they
15 had taken?
16 　　A.  I don't know if we had instances where a
17 Chair would put grades -- give students grades in
18 courses they had not taken. Now, I don't recall
19 that.
20 　　　I do know that in some cases there may
21 have been some instances where students had taken
22 courses and did not receive grades, or those grades

E X H I B I T    F

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, OCTOBER 27, 2004

51 (Pages 201 to 204)

---

201

1       DR. ACKAH: -- as a faculty, are you
2   talking about Federal punishment -- what is --
3       THE WITNESS: No, I mean whatever that
4   person may have done as Chair, we did not consider in
5   dealing with that person as a faculty member.
6       DR. GWANMESIA: Oh, okay.
7       THE WITNESS: Okay. And I'm saying
8   that the only -- unless a person did some --
9   committed some criminal act as Chair, then, of
10  course, we would still have to strip him of the Chair
11  and, then, deal with the person as a faculty member,
12  okay.
13      And that's the way it was because of
14  the Collective Bargaining Agreement. You had to deal
15  with the person as the Chair.
16      And even where I am now, if we're
17  going to do -- if a faculty member -- I'm sorry, if a
18  Chair commits something that is considered unethical
19  or criminal, then what we do is, strip that person of
20  the Chair.
21      MR. DUSTON: Objection. Relevance.
22      THE WITNESS: And, then deal with that

---

202

1   person as a faculty member, especially if what he or
2   she did was criminal.
3       DR. ACKAH: Okay.
4       DR. DAVIS: Dr. Tolliver --
5       THE WITNESS: Yes.
6       DR. DAVIS: -- did the resolution of
7   these grade issues sometimes include Chairs taking
8   students' course work, evaluating the course work
9   and, then, assigning a grade to the course for the
10  student?
11      THE WITNESS: Yes, it did.
12  BY MR. ZEFF:
13      Q.  Did Dr. Frederick, either as a Chair or
14  Dean, know about these practices that you've been
15  describing?
16      A.  He should have.
17      Q.  When you say, he should have, what do you
18  mean?
19      A.  Well, in some cases we -- even when he was
20  a Department Chair, as I recall, we had to deal with
21  some instances where his students may have received
22  an unfair grade. And when I was Provost, we dealt

---

203

1   with a few cases where we had to deal with that, and
2   Tommy was right there. He knew about it.
3       I never did anything that did not
4   include the Deans knowing about it.
5       Q.  Did -- you mentioned earlier that there
6   were instances where you were aware Chairs were going
7   in and changing grades, and you said that you could
8   have disciplined them by firing them as Chair. Why
9   --
10      A.  No, I didn't --
11      DR. ACKAH: He didn't say that.
12      THE WITNESS: You're right, we could
13  have.
14  BY MR. ZEFF:
15      Q.  Okay. Could have, that's what I said.
16      A.  But we didn't.
17      Q.  But you didn't. Why didn't you?
18      A.  Well, in one case I know the President
19  felt that it would be less bothersome to just let it
20  go and try to deal with it, because then we would
21  have had to deal with a backlash from alumnae, and he
22  did not want to deal with that.

---

204

1       Q.  Okay. And in the other cases?
2       A.  That is the one particular case that I --
3   that is vivid in my mind. I can't really recall the
4   others.
5       Q.  Okay. But you know there were others?
6       A.  Yeah, I know there were others.
7       Q.  And none of those Chairs were disciplined?
8       A.  I may not have even known about them. We
9   knew the practice was going on, but -- you see, the
10  Registrar's Office was not under my control.
11      Because of the new organization that
12  went into effect in 1998 when I became Provost, the
13  Registrar's Office was moved from Academic Affairs to
14  Enrollment Management, and so I knew -- I knew less
15  and less about what was going on between faculty and
16  Chairs and the Registrar's Office at that point, than
17  when it was under Academic Affairs.
18      Q.  Okay. By the way, I don't think I
19  established, where are you now?
20      Where are you employed?
21      A.  I'm employed at Southern University, Baton
22  Rouge.

---

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY          B0057
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539

EXHIBIT   G

**233**

1  worker in the Records Office when I was
2  matriculating, from '69 through '73.
3      Q.  And in what capacity have you worked those
4  29 years, what have you done?
5      A.  You mean positions?
6      Q.  Yeah, you can just do it briefly.
7      A.  I'm going to make it brief, trust me.
8  Secretary, Senior Secretary, Records Systems Officer,
9  Assistant Registrar.
10     Q.  For what period of time did you work for
11 the Registrar's Office?
12     A.  Twenty-nine years and two months.
13     Q.  So all of your positions were within the
14 Registrar's Office?
15     A.  That's correct.
16     Q.  Including the secretary position?
17     A.  Yes.
18     Q.  Are you familiar with the system through
19 which grades are changed or supplemental grades are
20 added in and grades are changed to grades?
21         MR. DUSTON:  During which period of
22 time?

**234**

1         MR. ZEFF:  I'm about to get to that.
2  And if the panel will allow me to lead, a lot of this
3  has already been testified to, so I'm going to skip
4  around and if the panel has any questions about
5  procedures, please --
6         DR. ACKAH:  Go ahead.
7         MR. ZEFF:  We've already had a lot of
8  testimony about it. She's our expert on it though.
9  BY MR. ZEFF:
10     Q.  Now, can you tell me for what period of
11 time have you been doing grade changes and that sort
12 of thing?
13     A.  Over the 29 years, during various -- oh,
14 I'm sorry.
15     Q.  That's okay.
16     A.  I'm sorry. Over the 29 years during
17 various years it's been maybe five to seven years and
18 then maybe I did not do them for maybe three to five
19 years, then I'm right back doing them. So I would
20 say over the 29 year period, for at least 20 years,
21 maybe a little better than 20 years.
22     Q.  In the past 10 years have you had any

**235**

1  dealings with grade changes and the like?
2      A.  Since '94, that's about all that I've
3  done.
4      Q.  And what percentage, if you know of the
5  grade changes and the Incomplete changes and the
6  supplemental grades, have you, yourself processed
7  versus someone else in the Registrar's Office?
8      A.  Until you said supplemental grades,
9  because those are grades that come out during final
10 grades. Other than supplemental grades, I would say
11 90, at least 95 percent of the grades I do.
12     Q.  So you do 95 percent of the grade changes
13 and changes of Incompletes?
14     A.  Yes.
15     Q.  For the last ten years?
16     A.  That's correct.
17     Q.  Up until when?
18     A.  Up until I was terminated in March of
19 2004.
20     Q.  Okay. Now can you tell the Panel Members
21 who, over the last ten years, has had the authority
22 based on your practices --

**236**

1         MR. DUSTON:  Objection to the use of
2  the word "authority."
3         MR. ZEFF:  All right.
4         DR. ACKAH:  Overruled.
5  BY MR. ZEFF:
6      Q.  Who has had the authority based on your
7  practices to make a grade change?
8      A.  You mean other than myself?
9      Q.  Okay.
10     A.  I mean, the authority lies with the
11 Registrar at first. Then with myself, Mrs. -- do you
12 want names or titles?
13     Q.  Just titles is fine.
14     A.  Okay, I'm sorry. The Registrar, the
15 Assistant Registrar, which would be yours truly. The
16 -- I'm trying to think of her title -- Associate
17 Registrar and then -- I'm trying to think of Mrs.
18 Jones' title. I have to give a name, I'm sorry.
19     Q.  That's okay. People in the Registrar's
20 Office.
21     A.  Four people in the Records Office.
22     Q.  Are the only ones allowed to do that?

EXHIBIT  H

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

66 (Pages 261 to 264)

**261**

1  What is it called now? Excuse me? It's what used to
2  be Business Administration. Let's say it that way.
3      Q.  Do you know how many Mass Communications
4  majors there were January, 2004?
5      A.  Well, my answer would be a guess. I know
6  it was --
7      Q.  I don't want you to get a guess.
8      A.  Well, there -- no, I do not.
9      Q.  Okay. Were you involved at all in
10 processing any of the Change of Grade Forms for
11 Wendell Gorum in the January, 2004 time frame?
12     A.  Yes.
13     Q.  Do you remember receiving a stack of forms
14 from him?
15     A.  I most certainly do.
16     Q.  Were you actually present when he dropped
17 those off at your office?
18     A.  Yes. And he came by like at about 4:29.
19 Yes. Yeah, I remember very specifically.
20     Q.  And what did you do?
21     A.  I took them and told him they would be
22 going in tomorrow morning because I got off at 4:30.

**262**

1      Q.  And you would put them in the next day?
2      A.  I certainly did.
3      Q.  Did you review them all before you put
4  them in?
5      A.  I certainly did.
6      Q.  At that time did you have the discretion
7  to reject any of those requested changes if you felt
8  they were improper?
9      A.  Yes, I did.
10     Q.  And did you reject any of them?
11     A.  I think I may have rejected one or two, at
12 which time he submitted the copies of the drop slips.
13 Unfortunately, ours are not in alphabetical order
14 anymore in Records.
15     Q.  So there were several of them that were
16 changed from F to W based on receiving drop slips?
17     A.  That's correct.
18     Q.  And do you know what's happened to any of
19 those drop slips that were submitted? In other
20 words, are they kept on file somewhere? Would there
21 be a record of those drop slips somewhere?
22     A.  Yeah, they're on file, just not in

**263**

1  alphabetical order.
2      Q.  Okay. So it would be very difficult to
3  find them?
4      A.  Yes, very difficult.
5      Q.  How difficult? Why would it be difficult?
6      A.  We're talking about going through like
7  five to ten thousand sheets of paper.
8      Q.  Oh, God. Okay.
9      A.  Because some students may come in and make
10 10 or 15 changes and they need an add slip for each
11 one they drop.
12     Q.  And those are not in alphabetical order?
13     A.  No, they are not.
14     Q.  So when Dr. Gorum gave you these change of
15 grade forms, some of them included changing F's to
16 W's or changing F's to I's or whatever it was, if you
17 needed further documentation, you had -- you got it
18 from him?
19     A.  I would ask him for that documentation.
20     Q.  And you received that documentation?
21     A.  If I put the change in, I received it. If
22 I didn't put the change in, I did not receive it.

**264**

1      DR. DAVIS:  Was it the University's
2  practice or policy, you can tell me if it was both,
3  for instructors to be able to issue a withdrawal or
4  is it the Records Office's responsibility to issue a
5  withdrawal.
6      THE WITNESS:  I wish I could really
7  answer simply, Dr. Davis, but over the years the
8  responsibility has fluctuated from the Provost down
9  to the instructor.
10     DR. DAVIS:  And the reason I ask is
11 that I always thought it was the Records Office's
12 responsibility, because faculty for the most part
13 would not know that a student has withdrawn from
14 their course. Unless he comes in and says, I've
15 withdrawn.
16     THE WITNESS:  Let me give you an
17 instance that's going to jog your memory.
18     DR. DAVIS:  Okay.
19     THE WITNESS:  A Dean can write the
20 Records Office and say withdraw this student from
21 this or these courses. At which time we would have
22 to do it. The Provost can write a letter to the

E X H I B I T     I

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

61 (Pages 241 to 244)

241

1    Q.  Sure, go ahead.  Use any names you want.
2    A.  At the time Jean Wilson retired, who was
3  the former Registrar in 1991, Mrs. Wilson was a
4  stickler for detail and following policy.  She
5  required all the signatures any time of the semester.
6  It didn't matter when it was.
7    Q.  So how long was that?
8    A.  She retired, if I'm not mistaken, in 1991.
9  I think it was.  The very first year that early
10  retirement package was offered.  I think it was '91.
11        DR. DAVIS:  That was 1990.
12        THE WITNESS:  Hum?
13        DR. DAVIS:  I said that was 1990.
14        THE WITNESS:  Then that would be the
15  year she retired.  Thank you.
16  BY MR. ZEFF:
17    Q.  For what period of time were all
18  signatures requires at all times, when she was in
19  charge?
20    A.  Yes.
21    Q.  How long was she in charge?
22    A.  Oh, Jesus.  I'm sorry.

242

1    Q.  That's okay.
2        DR. ACKAH:  We didn't hear that.
3        THE WITNESS:  She was here when I was
4  I student.
5  BY MR. ZEFF:
6    Q.  Okay.
7    A.  I'm sorry.  I don't know, the former
8  Registrar when I came in as a student was Fred
9  Franklin.  He's now deceased and I don't know when
10  Mrs. Wilson became Registrar.
11        DR. ACKAH:  Is there a point to going
12  all the way back?
13        MR. ZEFF:  I'm just trying to get some
14  background here.  I'll be glad to move on.
15  BY MR. ZEFF:
16    Q.  Well, since 1991, the only signature that
17  was required to change a grade would be the
18  professor's signature involved?
19    A.  That's the way it started being done, that
20  is correct.  After her retirement.
21        DR. ACKAH:  Up to 2004?
22  BY MR. ZEFF:

243

1    Q.  Up to 2004?
2    A.  Yes.
3    Q.  Okay.  So that's more than 10 years?
4    A.  Yes.
5    Q.  That's the way it was?
6    A.  Yes.  Yes.
7    Q.  After that three week period what
8  signatures would be required?
9    A.  If I was looking at the form --
10    Q.  Let me show you the form, which is Exhibit
11  5, would that be the form?
12    A.  That's correct, that would be it.
13    Q.  Okay.
14    A.  After the three week period it would be
15  the Instructor, the Chair and the Dean.
16    Q.  Now --
17        DR. ACKAH:  Which page is that,
18  please?
19        MR. ZEFF:  Five in the black -- in the
20  white notebook.
21        DR. GWANMESIA:  White.
22        DR. TOSCANO:  White notebook.

244

1  BY MR. ZEFF:
2    Q.  If after three weeks the Change of Grade
3  Request Form came in without the Chair -- without the
4  Instructor, Chair and Dean's signature, what would
5  you do?
6    A.  I mean, whose signature would be on -- I'm
7  sorry, to answer the question.
8    Q.  If all of these signatures were not on
9  there after the three week period --
10    A.  I wouldn't put it in until I had received
11  all the signatures.  I'd send it back to either the
12  Chair and/or the Dean for the signatures and then I
13  would enter them.
14    Q.  Was it also a practice at Delaware State
15  University in the last ten years relating to whether
16  a Chair could sign in lieu of an Instructor signing?
17    A.  That could go back to when I was a
18  student.  The Chair has signed more than once for the
19  instructor.  That's never been a problem.
20    Q.  And without --
21        DR. ACKAH:  Since when did this form
22  come into use?  Because I've not seen it between 1991

# EXHIBIT   J

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

6 (Pages 265 to 268)

**265**

1   Records Office that says the same thing. And the
2   Records Office does what the Provost or the Dean
3   says. And I'm sure you're familiar with that.
4        DR. DAVIS: I thought -- it was my
5   assumption that when your office saw that a student
6   -- well, isn't there a withdrawal slip that the
7   student must complete or form in the Records Office,
8   which would give you official information that, yes,
9   the student has indeed withdrawn from a class?
10       THE WITNESS: Sure there's a form.
11       DR. DAVIS: In most cases, students
12   will do this so they won't lose money --
13       THE WITNESS: Sure there is. But I'm
14   saying when there isn't -- when that form is not
15   there, then if a Dean writes and says withdrawn or
16   the Provost, then it doesn't matter if the form is
17   there or not.
18       DR. DAVIS: But on the grade roster,
19   an instructor should not pencil in a W; is that
20   correct?
21       THE WITNESS: Yeah, you're absolutely
22   -- unless they have the official withdrawal for the

**266**

1   student. They shouldn't, but they certainly do it,
2   as you're well aware. Yeah.
3        DR. JACKSON: This is a wide-spread
4   practice?
5        THE WITNESS: Uh-hum.
6        DR. JACKSON: It's a wide-spread
7   practice. Why do you think the President would
8   terminate someone on something that is wide-spread?
9        THE WITNESS: Do you really want me to
10   answer that?
11       DR. ACKAH: She really can't answer
12   for --
13       THE WITNESS: I can speculate. It's
14   probably because he doesn't know how wide-spread a
15   practice it really is. I can only assume he doesn't
16   know.
17   BY MR. ZEFF:
18       Q. Can you tell us how wide-spread it is.
19       MR. DUSTON: Can I ask which
20   wide-spread practice you're referring to?
21       DR. JACKSON: Changing of grades.
22       MR. DUSTON: Well, no. The question

**267**

1   is changing grades with or without the instructor's
2   consent. And that's what --
3        THE WITNESS: That's pretty darn
4   wide-spread -- I mean, that's pretty wide-spread as
5   well.
6        MR. DUSTON: I'll hold my questions.
7        MR. ZEFF: Let me break that -- go
8   ahead.
9        DR. DAVIS: Do you consider, and this
10   is a matter of how you perceive -- the request for a
11   grade change, is that the same as an instructor
12   making a grade change?
13       MR. ZEFF: In other words, this form
14   says "request"?
15       THE WITNESS: Yeah, that's the same
16   thing. They're one and the same.
17       DR. DAVIS: Would that be looked upon
18   in the same fashion if an instructor had the ability
19   to go into the system and change students' grades?
20       THE WITNESS: I can't answer that.
21       DR. DAVIS: Earlier you said --
22       THE WITNESS: I don't think the day is

**268**

1   going to ever come when we're going to let you-all go
2   into the system and change grades.
3        DR. DAVIS: No, no --
4        THE WITNESS: I mean, I could be
5   wrong, but --
6        MR. ZEFF: Do you mean Dr. Davis or
7   everybody?
8        THE WITNESS: I'm sorry. I don't mean
9   Dr. Davis, personally. I don't think that day is
10   going to come.
11       DR. DAVIS: The point I'm getting at
12   is that Dr. Gorum submitted requests for grade
13   changes that had to be approved by you, so that they
14   could be physically entered into the system, that's
15   when the grade changes took place.
16       MR. ZEFF: That was my point earlier
17   at one of the other hearing dates, yes.
18       THE WITNESS: I thought we had cleared
19   that up. His change came in, if I recall -- I don't
20   remember the exact date, but I know it was right
21   after we had gotten back from the Christmas holiday.
22       MR. ZEFF: But the point is Dr. Gorum

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026 (410).

B0087

EXHIBIT  K

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

63 (Pages 249 to 252)

249

1 graduate?
2     A. Sure. Every year.
3     Q. And what happens?
4     A. We contact the Chair.
5     Q. And what happens?
6     A. I'm not quite sure honestly.
7     Q. What do the Chairs do when you contact
8 them and say a student is short a few credits to
9 graduate?
10    A. I mean, I can only speculate, because I've
11 never been a --
12    Q. I don't want you to speculate, but do they
13 come to your office?
14    A. Sure, they come to our office and they
15 submit a grade.
16    Q. They submit a grade?
17    A. For that student.
18    Q. Would that student have been registered
19 previously for any particular course?
20    A. Sometimes they were. Sometimes they
21 weren't.
22    Q. Can you explain that?

250

1     A. Yeah. It may be a case where the student
2 had financial problems. Where he or she had been
3 purged from the system and maybe that student didn't
4 get his money together until the end of the semester,
5 which is not uncommon at Delaware State. So we
6 couldn't receive the grade until the student had been
7 officially registered, which means payment had been
8 made. That's registration; payment.
9     Q. And a Chair would come and give a grade
10 under those circumstances?
11    A. Sure.
12    DR. ACKAH: Is it the responsibility
13 of your office to chase a faculty member for his or
14 her grade?
15    THE WITNESS: We contact the Chair and
16 we ask the Chair to contact his or her faculty
17 member.
18    DR. ACKAH: Great. So assuming a
19 Chair comes in and tells you, I have not been
20 successful in reaching my faculty member and the
21 Chair gives the grade, then the grade needs to be
22 changed. Now would you accept that from the Chair?

251

1     THE WITNESS: No. Not if they were to
2 come in and say that. Absolutely not. You're saying
3 if the Chair came in saying they could not reach
4 their -- no, if they're going to come in and say
5 that, no. We will not accept it.
6     DR. ACKAH: If they were to come in
7 and say that, would you accept it?
8     THE WITNESS: No, we would not.
9     DR. ACKAH: But you just said you
10 trust their integrity. It's the Chair.
11    THE WITNESS: Because when the Chair
12 comes in, we're assuming the Chair has already talked
13 with his or her faculty member. Now if the Chair is
14 dumb enough to come in and -- I'm sorry, if the Chair
15 comes in and says, I tried to reach the faculty
16 member, but I couldn't I'd have to tell him, I'm
17 sorry, I can't accept this. You're telling me you've
18 not been authorized to put in this change. So I
19 cannot accept it.
20    DR. ACKAH: Okay. But assuming this
21 student needs to graduate. The faculty member cannot
22 be reached. What do you do?

252

1     THE WITNESS: How do I -- okay, I'm
2 sorry. I would not know that the faculty member
3 could not be reached unless the Chair physically came
4 into the office and said to me, I could not reach
5 this faculty member. It's only then we would know.
6     DR. ACKAH: That's what I'm saying.
7     THE WITNESS: Then we would not accept
8 the grade. But if they come in and bring a grade, we
9 can only assume they haven't reached that faculty
10 member. But if they come in and admittedly said,
11 look, I couldn't reach him, but I'm going to put in a
12 grade, we would not accept it. We can't accept that.
13    DR. DAVIS: Would you accept it if the
14 Dean's Office after having tried to contact the
15 faculty member in question, issued a grade because of
16 his inability to reach this person?
17    THE WITNESS: We've done that in the
18 past. Yeah, we have. From a Dean, not from a Chair.
19 From a Dean, not from a Chair.
20    DR. JACKSON: Are you saying that a
21 Dean has the power of changing grades?
22    DR. DAVIS: Or to issue a grade --

# E X H I B I T    L

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

65 (Pages 257 to 260)

257

1    THE WITNESS: Yeah, I mean, it would
2  be in agreement. I can honestly say that it would be
3  in agreement between the two, but they knew we
4  couldn't add and drop, but they'd say, I'm going to
5  let this kid stay in my class. But don't -- and
6  sometimes it worked out fine, it wasn't a problem.
7  Sometimes that other faculty member forgot that
8  student was going to the other class and give him an
9  F. So we would have to switch that around, where the
10  student would receive the grade from the instructor
11  whose course he actually attended.
12    DR. ACKAH: So on paper it would not
13  look improper.
14    THE WITNESS: Well, it would be
15  improper in that they didn't add or drop before the
16  deadline. That would be the only improper part of
17  it. And then we also have students who -- and
18  there's certainly practice where this happens, we
19  take like an internship during the summer --
20    MR. ZEFF: Or a practicum.
21    THE WITNESS: Or a practicum,
22  whichever you want to call it and like I said, it

258

1  only affects maybe about -- I would say five -- maybe
2  five to seven departments. And summer school, and I
3  don't know if it still works this way, I wasn't here
4  this past summer, you have to have a minimal number
5  of students in order for the course to go.
6    So they would let the student take or
7  be like a corroborating teacher for the student
8  during the summer, even though the course wasn't
9  being offered, the student would do his or her
10  internship, particularly those students who -- in
11  history and political science, I am going to say that
12  department, because they would work during the
13  summer.
14    DR. ACKAH: My department, too.
15    THE WITNESS: Your department. Well,
16  good, great, your department as well. Then that
17  course would be offered maybe in the fall and at that
18  time, that's when the student would be added to that
19  roster to receive his or her grade that they had
20  earned during the summer.
21  BY MR. ZEFF:
22    Q. And would that instructor in the fall

259

1  necessarily be the same instructor that it was in the
2  summer?
3    A. Not necessarily, but the course would be
4  the same.
5    Q. Okay. So there would be occasions where
6  an instructor would have a student on their roster,
7  who they didn't know and never showed up for their
8  class?
9    A. That's correct.
10    Q. Who they may give an F to who deserves a
11  grade because they completed the course over the
12  summer?
13    A. That's correct. That's something the
14  faculty members would have to work out.
15    DR. ACKAH: And in that case, it is
16  the student's responsibility to explain this to the
17  professor?
18    THE WITNESS: I would agree with you
19  on that. But they didn't always do that and that's
20  why we sometimes had problems.
21  BY MR. ZEFF:
22    Q. In the course of your career, are the

260

1  Chairs of the departments involved in straightening
2  out these types of situations?
3    A. Sure. That's their jobs. Yes.
4    Q. Okay. And have their been situations
5  where persons have received failing grades for work
6  that they completed over the summer even though they
7  weren't in the class and the Chair had to come and
8  straighten it out?
9    A. Yes.
10    Q. And was Mass Communications one of the
11  departments where that sort of thing happened?
12    A. Yes, amongst others.
13    Q. Okay. And by the way, what's the largest
14  department on campus, if you know? At the time you
15  left.
16    A. It would be management.
17    DR. GWANMESIA: That's the school.
18    THE WITNESS: School, I'm sorry.
19  BY MR. ZEFF:
20    Q. Largest department.
21    A. Well, what is the name, the new name of
22  the Business Department? I used to call it Business.

E X H I B I T     M

HEARING IN RE: DELAWARE STATE UNIVERSITY v. WENDELL GORUM, Ph.D.
CONDUCTED ON WEDNESDAY, SEPTEMBER 29, 2004

68 (Pages 269 to 272)

269

1  didn't change the grades, you did?
2           THE WITNESS:  Yeah.  Dr. Gorum can't
3  change the grade physically in the computer.  I do
4  that.
5           DR. ACKAH:  That's --
6           THE WITNESS:  No instructor can.
7           DR. ACKAH:  Yeah, but --
8           THE WITNESS:  You can't.
9           DR. ACKAH:  -- she -- sorry, he does
10 this on paper?
11          THE WITNESS:  Yes.  This form.
12          DR. ACKAH:  The form?
13          THE WITNESS:  Yes.
14          DR. ACKAH:  But it doesn't take effect
15 until you enter it into the system?
16          THE WITNESS:  That's correct.
17 BY MR. ZEFF:
18     Q.  And you're not a rubber stamp --
19     A.  No.
20     Q.  -- you have some discretion as to whether
21 --
22     A.  Yes, I do.

270

1           DR. JACKSON:  Once I put a grade into
2  that system, that grade is there.  If I go back and
3  try to change that grade, I can't.
4           THE WITNESS:  You can't.  You can't.
5           DR. JACKSON:  You can change a grade
6  on this new system, but you can't change it on the
7  old system, unless it's been approved.
8           THE WITNESS:  You're right.  You
9  cannot change it.  And when I say you, I mean a
10 faculty member.
11          DR. JACKSON:  I know sometimes you go
12 there and look at the grade and want to change it and
13 then they say we have a new system --
14          THE WITNESS:  No, I don't think you're
15 ever going to be able to change it, but you can come
16 to the Records Office and submit this form and we
17 will change it for you.
18 BY MR. ZEFF:
19     Q.  A couple of questions I want to follow up
20 on.  We were talking about some wide-spread
21 practices, one of which -- let me ask you this:  Has
22 it been a wide-spread practice at Delaware State that

271

1  the Chair with the consent of a faulty member would
2  sign a Change of Grade Request Form in lieu of the
3  faculty member who actually taught the course?
4     A.  When you say wide-spread, because I can
5  almost think of who the Chairs are, some Chairs just
6  do not do it.
7     Q.  Okay.
8     A.  For whatever reason, they say, no, I'm not
9  doing it.
10    Q.  Okay.
11    A.  But I know -- I know maybe about five
12 departments where the Chair, it's never been a
13 problem where the Chair submits the grade change for
14 the instructor.
15    Q.  For what period of time?
16    A.  As long as I've been here, for twenty-nine
17 years and two months.
18    Q.  Is that what you meant earlier by
19 wide-spread?  You used the term, that's why I wanted
20 to --
21    A.  Yeah, maybe that's what I meant.
22    Q.  Okay.  Has there also been a practice of

272

1  Chairs changing students' grades in lieu of the
2  instructor changing it without the instructor's
3  consent.
4           MR. DUSTON:  How would she know that
5  unless they had --
6           THE WITNESS:  Oh, I know of one case.
7  Trust me, I do.
8           MR. DUSTON:  So you do know of one
9  case --
10          THE WITNESS:  Yes, I do.  And I can --
11 as a matter of fact, my God, that was a Dean.  I
12 think she was Dean at the time.
13          MR. DUSTON:  And that example, if she
14 knows of one instance --
15          THE WITNESS:  And I know the faculty
16 member whose grade it was that she changed.
17          MR. DUSTON:  Please tell us about it.
18          THE WITNESS:  Do you want the names?
19          MR. DUSTON:  Yes.
20          THE WITNESS:  The Dean I do believe
21 was Cynthia Hammond.  The instructor was Alida Hanna
22 and Dr. Tolliver got all stuck in the middle of it,

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WENDELL GORUM, Ph.D., | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 06-565-GMS |
| v. | : | |
| ALLEN L. SESSOMS, Ph.D.,<br>And | : | |
| BOARD OF TRUSTEES OF<br>DELAWARE STATE UNIVERSITY, | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I, Michael J. Logullo, Esquire, hereby certify that on December 7, 2007 I caused a true and correct copy of the foregoing **Plaintiff's Response to Defendants' Motion in Limine to Exclude Evidence Regarding the Alleged Conduct of Other Faculty Who Were Not "Similarly Situated" and the Alleged Failure to Investigate Such Faculty** to be served electronically via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Robert L. Duston, Esquire
Saul Ewing, LLP
2600 Virginia Avenue, NW
The Watergate, Suite 1000
Washington, DC 20037
(202) 333-8800
rduston@saul.com

Kimberly L. Gattuso, Esquire
Michael R. Robinson, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
(302) 421-6800
kgattuso@saul.com
mrobinson@saul.com

**SHELSBY & LEONI**

_/s/ Michael J. Logullo_
MICHAEL J. LOGULLO, ESQUIRE
Mlogullo@mslde.com
221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*

1