IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., <br><br> Plaintiff, <br><br> v. <br><br> ALLEN L. SESSOMS, Ph.D., <br> And <br><br> BOARD OF TRUSTEES OF <br> DELAWARE STATE UNIVERSITY, <br><br> Defendants. | Civil Action No. 06-565-GMS |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EVIDENCE BASED ON CHANGED OR ABONDONED THEORIES**

Plaintiff, Wendell Gorum, Ph.D., by and through his attorneys, Gregg Zeff, Frost & Zeff and Michael J. Logullo, Shelsby & Leoni, hereby responds to Defendant's Motion In Limine to exclude evidence and states as follows:

1.  Defendants claim that Plaintiff failed to preserve several theories from his Amended Complaint in his Opposition Motion and therefore has abandoned these theories. Defendants also claim Gorum has added new theories and should be precluded from asserting them at trial. Defendants note that Gorum's support for the reopening of the presidential search and his involvement in the MLK breakfast were not included in his Amended Complaint. However, Rule 8(a) of the Federal Rules of Civil Procedure requires notice pleading only. The Plaintiff's complaint need only provide short and plain statements of the basis for jurisdiction, the claim, and the relief sought. Fed. R. Civ. P. 8 (a), Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

2.  Even though Plaintiff is not required to give more than notice pleading in his

1

complaint, he gave Defendant notice of his arguments regarding the presidential search and the MLK breakfast in his Opposition Motion. The Motion states, "Another instance of protected activity was Dr. Gorum's cancellation of Defendant Sessoms' speech at the 2004 Martin Luther King Alumni Prayer Breakfast" (Opp. Motion 26). About the presidential search, the Motion states, "At the faculty senate, Dr. Gorum recommended a continuation of the search for a new president rather than a vote for Defendant Sessoms ... This speech as well was protected" (Opp. Motion 27).

3. Furthermore, Plaintiff gave notice of these theories in his deposition. When Defense counsel asked Dr. Gorum what rights of his Defendant Sessoms violated, Gorum answered, "speech...He knew I was the leader among students, faculty and staff members. And he was out to stop me", See Exhibit A (Dep. of Gorum, 48). Counsel then asked Dr. Gorum, "Let's walk through the four instances, and you tell me what speech rights they involved", See Exhibit B (Dep. of Gorum, 49). Dr. Gorum answered by citing his revocation of the breakfast invitation, his reputation on campus as a leader, and his assistance to DaShaun Morris, See Exhibit C (Dep. of Gorum, 50-55).

4. Additionally, Defendant characterizes Plaintiff's argument that he was terminated because of his reputation as a "rabble rouser" and "power broker" as a separate, specific theory. Because this theory was never introduced in either the Amended Complaint or the Opposition Motion, Defendants argue that it is an abandoned theory. In fact, Plaintiff did not advance this information about his reputation as a theory or a specific protected activity, but simply as a description of his reputation. Plaintiff gained this reputation as a result of his protected activities, namely his support for students such as DaShaun Morris, his vote to reopen the presidential search and his involvement in the MLK event. These are the three specific protected activities that Plaintiff alleges; his reputation is simply a result of them. Because it is not a new and separate theory, it should not be excluded.

2

5.     Defendants argue that the framing of Gorum's assistance to Morris as protected association rather than speech is outside the scope of his Amended Complaint and must be excluded. Again, the Amended Complaint needed only satisfy the simple requirements of Rule 8(a) of the Federal Rules of Civil Procedure. Gorum's protected association with student DaShaun Morris is mentioned in both his deposition and his Opposition Motion. "Dr. Gorum's involvement with DaShaun Morris qualifies as a protected free association" (Opp. Motion 25). In Gorum's deposition, Defense counsel asked him, "In your activities with Mr. Morris ... is there any specific speech – words, comments, statements – that you contend motivated the president? Or was it just your assistance to Mr. Morris?" Gorum answered, "the assistance", See Exhibit C (Deposition of Gorum, 55).

6.     Defendants are on full notice of all of the aforementioned arguments or theories, either from discovery materials or Plaintiff's Motion in Opposition to Summary Judgment. Plaintiff is willing to further amend his complaint if the court wishes, but contends that further specificity in the complaint is not necessary.

**WHEREFORE,** Plaintiff, Wendell Gorum, Ph.D. respectfully requests the Court to deny Defendant's Motion In Limine to exclude evidence based on changed or abandoned theories.

**SHELSBY & LEONI**

**OF COUNSEL**

Gregg L. Zeff, Esquire
Gzeff@frostzeff.com
Frost & Zeff
Pier 5 at Penn's Landing
2nd Floor
Philadelphia, PA  19106
(215) 351-3333
*Attorney for Plaintiff*

/s/ Michael J. Logullo
MICHAEL J. LOGULLO, ESQUIRE
Mlogullo@mslde.com
221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*

Dated: December 7, 2007

# EXHIBIT A

WENDELL GORUM, Ph.D.

1  administrative council, dean's council. And so it
2  really didn't matter what the board said or
3  recommended.
4      Q.  And that goes, Dr. Gorum, to whether or
5  not he had made the decision earlier, but not to my
6  question which was, What evidence do you have that
7  when he fired you -- for whatever motives -- he knew
8  that those motives violated your First Amendment
9  rights?
10          MR. ZEFF:  Objection to the form.
11          THE WITNESS:  Well, he knew that they
12  violated my rights. And he had expressed on many
13  occasions that he refused to abide by the collective
14  bargaining agreement.
15  BY MR. DUSTON:
16      Q.  Okay. So which of your rights did he know
17  he was violating?
18      A.  Speech.
19      Q.  Okay.
20      A.  He knew I was the leader among students,
21  faculty, and staff members. And he was out to stop
22  me.
23          MR. DUSTON:  Let's go off the record
24  right now. I may have a few follow-up questions;

# EXHIBIT B

```
 1  but, otherwise, we'll take Dr. Ackah.
 2              (The deposition adjourned at 2:18 p.m.
 3  and resumed, following the deposition of Dr. Ackah,
 4  at 3:44 p.m., as follows:)
 5  BY MR. DUSTON:
 6       Q.   Dr. Gorum, in your last answer, I was
 7  asking about what rights you believe that Dr. Sessoms
 8  violated.  You have mentioned your speech rights, and
 9  you mentioned your rights under the collective
10  bargaining agreement.
11              And when asked what evidence, you
12  pointed specifically to your activities as a union
13  member and a leader of the union --
14       A.   Uh-huh.
15       Q.   -- is that correct?
16       A.   Yes.
17       Q.   And in past -- in your prior testimony,
18  you gave your activities as a union leader as one
19  example of your reputation on campus; correct?
20       A.   Correct.
21       Q.   Now, I specifically want to go back to
22  focus on your speech activities.  Be as specific as
23  possible.  Let's walk through the four instances, and
24  you tell me what speech rights they involved.  With
```

# EXHIBIT C

50

WENDELL GORUM, Ph.D.

1   your activities as a union member, what specific
2   speech do you claim that President Sessoms retaliated
3   against you for?
4        A.   I'm -- I have to -- I'm not clear on the
5   question, the background.
6        Q.   Well, here, let me go through them the way
7   you did before.
8        A.   Uh-huh.
9        Q.   With the revocation of the invitation to
10  the prayer breakfast --
11       A.   Uh-huh.
12       Q.   -- what speech, what specific words or
13  actions do you claim it was that were protected?
14            MR. ZEFF:   Objection.  I believe it's
15  been asked and answered.
16            You can answer it again.
17            MR. DUSTON:   Well, I'm trying to
18  figure out what the speech was.
19  BY MR. ZEFF:
20       Q.   Was it what you told Mr. Wilson?  Or was
21  it what you told the alumni?  Or was it just the fact
22  that the invitation was taken away?
23            MR. ZEFF:   Same objection.
24            You can answer.

51

WENDELL GORUM, Ph.D.

1  BY MR. DUSTON:
2      Q.  Let me ask the question differently.
3  Dr. Gorum, can you distinguish in your mind any of
4  the incidents that were involved in that incident?
5  Or was it the entire incident, the fact of the
6  revocation and everything around it that you think
7  motivated the president?
8      A.  I think that's one of many activities.
9      Q.  And --
10     A.  And --
11     Q.  And it was the whole incident; correct?
12     A.  Yes.  Yeah.
13     Q.  Okay.
14     A.  I, I was told by someone -- and I'm
15  assuming it was Drexel -- in the president's
16  office --
17     Q.  Dr. Gorum, I really am trying not to
18  repeat, and I'm trying not to get at the evidence
19  that the president knew or that he was angry.  I'm
20  trying to get at which of your actions, what you
21  did --
22     A.  Oh.
23     Q.  -- you think motivated the president.
24     A.  What I did?

WENDELL GORUM, Ph.D.

1  Q. What you did that you think motivated the
2  president.
3  A. Uh-huh.
4  Q. And it was the entire incident where the
5  invitation was revoked; correct?
6  A. Yes.
7  Q. With your reputation on campus --
8  A. Uh-huh.
9  Q. -- is it fair to characterize your prior
10 testimony that it was all, your entire reputation as
11 a leader, not any one specific or series of specific
12 activities?
13 A. Yes. And I have to comment.
14 Q. Okay.
15 A. Anyone coming into a new position who
16 would assess the situation and you want to know who
17 the movers, the shakers, the leaders, et cetera. And
18 I'm certain that that was done.
19 Q. Right.
20 A. So in that sense, yes.
21 Q. But it's the entire reputation. It is not
22 any one specific professor or any one specific
23 activity or any one specific thing you did that
24 motivated the president but the entire reputation, in

1  your opinion?
2      A.   Yeah.  I -- see, I was told there was a
3  hit list and I was on it, and there were a couple
4  other people who were on it who subsequently were let
5  go.
6      Q.   Okay.  Who else was on that hit list?
7      A.   Carl Wyche, chief of police; what is his
8  name?  Vice president of business and finance.  Vice
9  president of student affairs.
10     Q.   And the vice president of student affairs
11 was Dr. Charles Smith?
12     A.   Charles Smith.
13     Q.   All right.  When were you told that this
14 hit list existed?
15     A.   At -- exactly when, I can remember talking
16 to Dr. Wyche at a graduation party, which had to be
17 in May.
18     Q.   This is Dr. Wyche?
19     A.   Yeah.  He's a doctor.
20     Q.   Carl Wyche?
21     A.   Carl Wyche, the chief of police.
22     Q.   So when you say it was in May, May of
23 which year?
24     A.   2004.

WENDELL GORUM, Ph.D.

1   Q.   So this is May 2004, after you had been
2   suspended --
3   A.   Uh-huh.
4   Q.   -- the chief of police told you what?
5   A.   No.  I told him I heard that there was a
6   hit list and that he too was on it; the athletic
7   director was also on it.
8   Q.   And that was who?
9   A.   Hallie Gregory.
10  Q.   And who told you about this hit list?
11  A.   I don't know who told me.  I don't know
12  whether Akwasi or the person, the executive assistant
13  to the president.  I can't think of his name.
14  Q.   Drexel Hall?
15  A.   Yeah, Drexel, yes.  But somebody
16  definitely told me.  And Sheila Davis had also
17  brought it up.
18  Q.   Did she specifically mention a hit list?
19  Is this something --
20  A.   No.  She just told me, I heard they were
21  out to get you.
22  Q.   Now, you've repeated that before.  When
23  did you hear about this hit list from somebody?  Do
24  you know when --

WENDELL GORUM, Ph.D.

```
 1        A.    It had to be -- as I said, I went to a --
 2    I can recall going to a graduation party, and Carl
 3    happened to have been there.  And we discussed it, so
 4    it had to -- I don't know when I heard about it.  At
 5    least --
 6        Q.    And that was after your suspension?
 7        A.    That's correct.
 8        Q.    And is it your contention that any of
 9    these other people were on this hit list because of
10    their speech activities or for some other reason?  Or
11    do you even know?
12        A.    I don't know.
13        Q.    In your activities with Mr. Morris, in his
14    lawsuit --
15        A.    Uh-huh.
16        Q.    -- is there any specific speech -- words,
17    comments, statements -- that you contend motivated
18    the president?  Or was it just your assistance to
19    Mr. Morris?
20        A.    The assistance.
21        Q.    Including hiring an attorney?  All of the
22    assistance taken together; correct?
23        A.    Yes.
24              MR. DUSTON:  All right.  No further
```

J. W. Gorum, Ph.D.

1   Q.   And that was in 1989?
2   A.   Yes.
3   Q.   Did you have different jobs while you were
4   at Delaware State or is that the only one?
5   A.   I came in as the director of the
6   undergraduate program, and that was a year we were
7   going through self-study for accreditation. The
8   accreditation, we had a site visit and we were
9   successfully reaccredited. And then that summer I got
10  a call at home asking me to -- friends, to apply for
11  the deanship. I didn't even know they were going
12  through a restructuring. And so I did apply to be the
13  dean of the School of Professional Studies, and that
14  was my position from when I was selected in winter of
15  '91. And I started then after the semester was over
16  in '91 and held that position until I retired.
17  Q.   And while you were at Delaware State working
18  in those administrative positions, did you also teach
19  courses?
20  A.   I taught full-time, of course, when I --
21  well, I shouldn't say full-time. I taught and then
22  had a release to be the administrator of the
23  undergraduate program for that first year. Actually,
24  for the first two years.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., | : |
| Plaintiff, | : |
| v. | : Civil Action No. 06-565-GMS |
| ALLEN L. SESSOMS, Ph.D., And | : |
| BOARD OF TRUSTEES OF DELAWARE STATE UNIVERSITY, | : |
| Defendants. | : |

## CERTIFICATE OF SERVICE

I, Michael J. Logullo, Esquire, hereby certify that on December 7, 2007, I caused a true and correct copy of the foregoing **Plaintiff's Response to Defendants' Motion in Limine to Exclude Evidence Based on Changed or Abandoned Theories** to be served electronically via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

Robert L. Duston, Esquire
Saul Ewing, LLP
2600 Virginia Avenue, NW
The Watergate, Suite 1000
Washington, DC 20037
(202) 333-8800
rduston@saul.com

Kimberly L. Gattuso, Esquire
Michael R. Robinson, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
(302) 421-6800
kgattuso@saul.com
mrobinson@saul.com

**SHELSBY & LEONI**

 /s/ Michael J. Logullo
MICHAEL J. LOGULLO, ESQUIRE
Mlogullo@mslde.com
221 Main Street
Stanton, DE 19804
(302) 995-6210
*Attorney for Plaintiff*

1