IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., ) | |
|     Plaintiff, ) | |
| v. ) | Civil Action No. 06-565-GMS |
| ALLEN L. SESSOMS, Ph.D., ) | |
|     and ) | |
| BOARD OF TRUSTEES OF ) | |
| DELAWARE STATE UNIVERSITY, ) | |
|     Defendants. ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION IN LIMINE TO
EXCLUDE EVIDENCE BASED ON CHANGED OR ABANDONED THEORIES**

Defendants have moved in Limine (D.I. 47) for an order barring Plaintiff Dr. Wendell Gorum from offering into evidence testimony relating to changed or abandoned theories. Plaintiff's Response (D.I. 63) does not challenge the general principle of law cited by Defendants that evidence relating to abandoned theories is not relevant or admissible, nor is evidence relating to theories that are outside the scope of the Amended Complaint. Plaintiff filed no opposition to three issues, impliedly conceding that they had been abandoned. See D.I. 47, Arg. III (limiting the adverse action to April 14, 2005 recommendation); IV (abandoned theory on disagreement among the Ad Hoc Dismissal Committee or alleged tampering) and V (no evidence regarding post-termination injury to reputation). Defendants did not believe these issues were in dispute, but filed this Motion to preclude Dr. Gorum from testifying about these issues.

Defendants' second argument seeks to preclude Plaintiff from pursuing the legal theories that his actions were protected under the First Amendment as freedom of association or petition for redress of grievances. It is well-settled that these are distinct causes of action with different elements and different defenses than retaliation for the exercise of free speech. See Salvation Army v. Dept. of Cmty. Affairs of State of N.J., 919 F.2d 183, 199 (3d. Cir. 1990) (noting that "it is apparent that the right to free speech has different contours than the right to free exercise of

religion, and, accordingly, the right of expressive association has different contours depending upon the activity in which a group is engaged."). Section 1983 cases involving suit against state officials with qualified immunity also have, in essence, heightened pleading requirements for specificity, so that the Court can determine whether or not the specific actions alleged may constitute a violation. An allegation that Defendants retaliated for exercise of the right of free speech does not put Defendants, or the Court, on notice of alleged violations of other legal rights protected under the First Amendment. Such theories can only be raised by a timely motion for leave to amend, which did not occur. See Inline Connection Corp. v. AOL Time Warner Inc., 237 F.R.D. 361, 370 (D.Del. 2006) (denying the defendants' motion to amend its counterclaim to assert new theories on basis that plaintiff "would be surprised by these amendments and unduly prejudiced by having to defend against these new theories were they introduced as this stage . . ."). Plaintiff's only argument in response is that when Defendants specifically asked Plaintiff to describe the words ("speech") that Dr. Gorum claims were protected in connection with DaShaun Morris, Dr. Gorum conceded that there were no specific words, just his overall "assistance." If that was his theory, Plaintiff should have amended his Complaint.

The final argument, and the one primarily challenged by Plaintiff, relates to his protected activities. Dr. Gorum is very clear in his deposition testimony that he believed there were *four* reasons or activities that he thought motivated President Sessoms' recommendation of discharge. One of those, clearly stated on several occasions, was his past "reputation." (W. Gorum 6/6/07 Dep. at 112-116, 119-124, W. Gorum 6/26/07 Dep. at 159, 194, attached as Exh. A). Plaintiff concedes that he is *not* advancing this as a separate protected activity. (D.I. 63 at ¶ 4). At a minimum, Defendants are entitled to a cautionary instruction. More importantly, given Plaintiff's allegation that his alleged reputation pre-dated all of the activities here, and motivated

President Sessoms from the outset, the evidence is not only irrelevant under Rule 403, but should be excluded under Rule 404.

This leaves the question of the two activities (the Presidential Search and the Alumni Prayer Breakfast) that were left out of the Amended Complaint, and Plaintiff's initial discovery responses, then first raised during Plaintiff's deposition and briefed by the parties on Defendants' Motion for Summary Judgment. For the reasons outlined above, in a Section 1983 case involving a state official, it undermines the efficacy of qualified immunity to simply cite Fed. R. Civ. P. 8(a) and the principles of notice pleading. Had Plaintiff disclosed these issues in his discovery responses, or filed timely supplements and sought leave to amend back following his June 6, 2007 deposition, the Court would likely have granted leave to amend. The fact that Defendant chose to brief these additional theories in its Motion for Summary Judgment does not change the fact that: (1) this case was filed in September, 2006; (2) we are a week from the final Pre-trial Conference; and (3) Plaintiff never sought leave to pursue retaliation claims against a state official for actions never identified in the Amended Complaint.

WHEREFORE, for the reasons stated above as well as in their Motion in Limine to Exclude Evidence Based on Changed or Abandoned Theories, Defendants respectfully request that the Court preclude Dr. Gorum from offering into evidence, referring to at trial or introducing any evidence based on his changed or abandoned theories.

| OF COUNSEL | /s/ Michael R. Robinson |
|---|---|
| Robert L. Duston | Kimberly L. Gattuso (No. 3733) |
| SAUL EWING LLP | Michael R. Robinson (No. 4452) |
| 2600 Virginia Avenue, N.W. | SAUL EWING LLP |
| Suite 1000 | 222 Delaware Avenue, Suite 1200 |
| Washington, DC 20037-1922 | Wilmington, Delaware 19899-1266 |
| (202) 333-8800 | (302) 421-6800 |
| rduston@saul.com | kgattuso@saul.com |
| | mrobinson@saul.com |
| Dated: December 12, 2007 | *Counsel for Defendants* |

# EXHIBIT A

Case 1:06-cv-00565-GMS    Document 64-2    Filed 12/12/2007    Page 1 of 14

1    bargaining agreement the way that he wanted to and in
2    many instances I, along with many of the other faculty
3    members in the union felt that he violated the
4    collective bargaining agreement. And I am a
5    spokesperson and I say what I believe and feel.
6    Q.    So do you believe that one of Dr. Sessoms'
7    motives was because of things that you had said or
8    done about the collective bargaining agreement?
9    A.    Yes. That's part of it, yes.
10            And I also believe that he was fed
11   information about my activities prior to his coming.
12   I questioned Dr. DeLauder also.
13   Q.    What other things, what things did you do, if
14   any, after President Sessoms came that you think are
15   examples of conduct or behavior that President Sessoms
16   didn't like and wanted to retaliate against?
17   A.    At a faculty reception that was sponsored by
18   the board of trustees, I was chaired -- I mean I was
19   cornered by the chair of the board and the assistant
20   chair of the board. They asked me a question: What
21   did I think of them and everything? And of course I
22   was somewhat guarded.
23            But the impression I came away with was
24   that, well, it was just not a favorable impression. I

Wendell Gorum, Ph.D.

113

1  had to be guarded in what I had to say to them and I
2  thought I was marked and this is what I had been told
3  by others.
4      Q.   And this was how early in the process?
5  September?  August?
6      A.   September.
7      Q.   September.  It would be September 2003, shortly
8  after the president came on board?
9      A.   That's correct.
10     Q.   And you felt that you had been marked at that
11 point by either the fact that they were talking to you
12 at this reception --
13     A.   Well, the manner in which they talked to me and
14 they also knew I was behind trying to get them to
15 reopen the search.
16     Q.   Did they talk --
17     A.   I was told that they did not like having
18 faculty question their judgment in the selection
19 process.  Dr. Osei said that and he was a member of
20 the search committee.
21     Q.   In your opinion, has Dr. Hough been retaliated
22 against?
23     A.   I really don't know.  I mean, I don't --
24     Q.   He was the leader of that, he was one of the

Case 1:06-cv-00565-GMS   Document 64-2   Filed 12/12/2007   Page 4 of 14
Wendell Gorum, Ph.D.

114

1   spokespeople in favor of reopening the search,
2   correct?
3      A.   Mm-hmm.
4      Q.   To your knowledge, has Dr. Hough been
5   subjected to --
6      A.   I don't know.  I have not had any contact with
7   him.
8      Q.   Can you give me any specific examples between
9   the time that President Sessoms started and your
10  termination where you opposed certain interpretations
11  of the collective bargaining agreement?
12     A.   I would have to go back and look at notes
13  because there were many and I just cannot.  I can't
14  even think of one right now.  I'm sorry.
15     Q.   So it's your position that you took positions
16  regarding interpretations of the collective bargaining
17  agreement, right?
18     A.   You know, it was, it was the position of the
19  union itself.  It wasn't so much it was a personal
20  position, yeah.
21     Q.   Now, you viewed yourself as a spokesperson for
22  the union in its dealings --
23     A.   I was a unit member, yes.
24     Q.   Did you have a position with the union, with

1  the unit at the time?
2  A.  I don't think so.  I don't think so, not at
3  that time.
4  Q.  Did you ever have direct conversations with
5  President Sessoms over union-related issues?
6  A.  No.
7  Q.  Did anyone ever inform you that President
8  Sessoms perceived you as being a spokesperson for the
9  union?
10  A.  Someone told me that they saw me as either a
11  rebel rouser or a leader, yes, that was told to me.
12  Q.  Well, someone said they, some unknown they
13  viewed you as a rebel rouser?
14  A.  Yes.
15  Q.  Was it specifically referred to President
16  Sessoms or was it to the administration in general?
17  A.  To Sessoms.
18  Q.  You don't know who it was?
19  A.  No, I really do not.
20  Q.  You don't know the basis for that perception?
21  You don't know what they were basing their statement
22  on?
23  A.  At that time there was a lot of conflict in
24  interpretations and in the way people were treated.

1  So -- and I'm sure that it emanated from the climate.

2  Q.   In fact, there were a lot of professors who
3  were troubled by some of the changes that President
4  Sessoms was implementing, correct?

5  A.   Yes.

6  Q.   And there was a lot of public discussion and
7  criticism, correct?

8  A.   Yes and no.  When I say yes and no, many people
9  privately would complain but publicly would not.

10  Q.   Can you give me any examples of where you
11  publicly took positions in your own name or on behalf
12  of the union concerning actions by President Sessoms?

13  A.   I cannot recall right now.  That I have to
14  think about.  It really has been a long time.  I would
15  have to go back and look at notes and issues.

16  Q.   What notes would you be able to look at to
17  refresh your recollection on whether or not there were
18  things that you publicly did critical of President
19  Sessoms?

20  A.   The minutes of the collective bargaining
21  agreement.

22  Q.   The minutes of the union meetings?

23  A.   Yes.  That would refresh my memory.

24  Q.   Let's assume that the minutes of the union

Case 1:06-cv-00565-GMS   Document 64-2   Filed 12/12/2007   Page 7 of 14
Wendell Gorum, Ph.D.

119

1   Which specific -- first of all, what's the basis for
2   that?
3       What's the basis for your claim that
4   Dr. Sessoms was given information by others concerning
5   your role on campus before he arrived?
6   A.  When I arrived on campus I guess in '89, every
7   chair of the faculty senate and everything else, in
8   other words, there were no blacks in any position, and
9   I met with 20 black faculties, faculty members in my
10  home to organize, to deal with issues on campus.
11  Q.  Dr. Gorum, my question -- and I want to stay
12  focused right now on President Sessoms.
13      My question was:  How do you know whether
14  or not President Sessoms was given information after
15  he arrived about your activities and role prior to the
16  time that he was president?
17  A.  I don't know that someone gave it to him.
18  Q.  You don't know?
19  A.  Yeah.
20  Q.  So although you have actions that you took,
21  maybe many actions over the years that were advocacy
22  or in opposition to the administration -- let's
23  stipulate.
24      You believe that prior to President

Case 1:06-cv-00565-GMS   Document 64-2   Filed 12/12/2007   Page 8 of 14
Wendell Gorum, Ph.D.

120

1   Sessoms you took actions that were opposed to the
2   administration, right?
3   A.   Mm-hmm.
4   Q.   And you were engaged on advocacy on behalf of
5   other faculty?
6   A.   And students.
7   Q.   And students. And that that had been a role
8   that you had believed that you had done for many
9   years, correct?
10   A.   Yes.
11   Q.   Now, are you claiming that those actions that
12   you had done through the years before President
13   Sessoms arrived were factors in President Sessoms'
14   decision to recommend your termination?
15   A.   I was trying to respond to your question in
16   terms of how did he know about my activities, right?
17   Q.   And you said you don't know if he did.
18   A.   Well, subsequently, yes. But historically I
19   would think anybody on campus would know about those
20   activities, including Dr. Frederick, who was part of
21   that group that we organized.
22   Q.   But I'm now talking about are you claiming
23   today that among the reasons that President Sessoms
24   really used in deciding to recommend your termination

Case 1:06-cv-00565-GMS    Document 64-2    Filed 12/12/2007    Page 9 of 14
Wendell Gorum, Ph.D.

121

1  was activities that you had taken before he arrived?
2  Let's call them advocacy activities on campus.
3      A.   In terms of your question, activities, no.
4           It was the reputation that he was probably
5  aware of.  Specific activities?
6      Q.   So as far as you know, President Sessoms was
7  not motivated because of any specific incident or
8  specific student grievance, but you believe he was
9  motivated by your reputation as an advocate and a
10 spokesperson?
11          MR. ZEFF:  Objection.
12     A.   I didn't see it that way.
13     Q.   Okay.  I'm trying to understand what you meant.
14          You said he may have been motivated -- do
15 you believe he was motivated to fire you by your
16 reputation?
17     A.   In part.
18     Q.   Then describe --
19     A.   I think I listed them.  I said that he reacted
20 to the handling or help that I gave to DeShawn Morris.
21 I think he reacted to the fact that I tried to have
22 the search reopened during the interview process.
23 Everybody thought we sort of had an exchange and they
24 thought well, how do you know him and all this?  That

1  wasn't it. He just wasn't answering the questions.

2  Q. And you said he was motivated, in part, by the
3  disinvitation on the breakfast?

4  A. That's correct.

5  Q. You have also now said he was motivated, in
6  part, by your reputation on campus?

7  A. Well, what I meant by that is I had always
8  worked with faculty and with students and everybody
9  knew it and I can't tell you about specific activities
10 that I did. It was just the reputation that I was a
11 leader in that area is what I'm trying to get across.

12 Q. But do you believe that one of the factors that
13 Dr. Sessoms used in recommending your termination was
14 your reputation as a leader or as a spokesperson?

15 A. Yes.

16 Q. Do you have any direct or indirect information
17 other than the rebel rouser comment about what
18 Dr. Sessoms may have perceived as your reputation?

19 A. Dr. Sessoms made several references to getting
20 rid of a full professor even at the news conference
21 and they were derogatory. There was a news conference
22 I think in November 2006, yeah, 2006.

23 Q. So I understand what you perceive the
24 reputation was, would you describe for me again your

1  own view of your reputation that you think negatively
2  affected Dr. Sessoms or affected Dr. Sessoms'
3  decision? You have used the term leader. You have
4  used the term spokesperson.
5           Is there any other aspect of your
6  reputation that you think influenced President
7  Sessoms?
8  A.   I would have to go back to the articles that
9  were in the newspaper and the comments that
10 Dr. Sessoms made at the press conference.
11 Q.   We're talking about the articles after the NCAA
12 investigation?
13 A.   No. No. No. No. Dr. Sessoms called a press
14 conference and accused someone of changing grades, a
15 full professor, and doing all of these things and
16 hacking into the computer to change grades.
17 Q.   Okay.
18 A.   And eventually of course the press wanted to
19 know who this person was, yeah.
20 Q.   Dr. Gorum --
21 A.   And I'm saying that to me --
22 Q.   So those are those quotes.
23 A.   Right.
24 Q.   But other than those quotes, I just want to

1  make certain I understand your perception of your
2  reputation was as a leader of the faculty and as a
3  spokesperson for the faculty. Is that correct?
4  A. Yes.
5  Q. Are there any other aspects of your reputation
6  at DSU that you think affected President Sessoms'
7  decision?
8  A. I can't think of anything right now.
9  Q. Let's focus on the Alpha breakfast.
10          If I can summarize, this is an annual
11  Martin Luther King, Jr. Prayer Breakfast that was
12  sponsored by as I recall the Alpha fraternity alumni?
13  A. Yes.
14  Q. And what was your role in organizing that
15  annual breakfast?
16  A. I was responsible for selecting the speaker.
17  Q. So this was the alumni association or the Alpha
18  alumni that sponsored this every year?
19  A. Yes. It's a fraternity and there is an
20  undergraduate chapter and there is a graduate chapter
21  and I was a member of the graduate chapter.
22  Q. You were a member of the graduate chapter and
23  you were also the advisor to the undergraduate
24  chapter. Is that correct?

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

### Page 158

1  WENDELL GORUM,
2  having been previously sworn as a witness,
3  was resumed on examination and testified
4  further as follows:
5  BY MR. DURSTON:
6  Q. Mr. Gorum, we are continuing your deposition.
7  You understand that you are still under oath, correct?
8  A. Yes.
9  Q. My understanding of your claim is that you are
10 suing on the grounds that your termination was because
11 of protected activities under the first amendment; is
12 that correct?
13 A. That's correct.
14 Q. And your contention is that none of the issues
15 from the ad hoc committee had anything to do with the
16 reason for your termination?
17    MR. ZEFF: Objection to form.
18 BY MR. DURSTON:
19 Q. Do you have any reason to believe that the
20 conclusions of the ad hoc committee and those findings
21 were not part of the motive behind why you were
22 terminated?
23 A. I really don't know.
24 Q. So it's possible there could have been mixed

### Page 159

1  motives and that was one of the motivations?
2  A. Yes.
3  Q. But it's your claim that you would not have been
4  terminated if it weren't for your activities under the
5  first amendment?
6  A. That is correct.
7  Q. And during your prior testimony, you identified
8  three specific issues, which was your involvement in
9  DeShawn Morris' lawsuit and generally his activities.
10 A. Yes.
11 Q. The issue with the Alpha breakfast invitation
12 and your involvement in opposing the president's hiring
13 and urging that the search be reopened. And you
14 generally described a fourth factor, which was your role
15 as a spokesperson or a representative of students and
16 the faculty; is that correct?
17 A. That's correct.
18 Q. I don't want to put words in your mouth. I'm
19 trying to get a term that sort of characterizes that
20 last role and how you saw your role on campus. And you
21 used a couple different terms. What phrase do you think
22 best fits that activity?
23 A. I can't think of a phrase per se. I can maybe
24 pinpoint an activity. I had represented the faculty to

### Page 160

1  the board who had appealed a ruling as an example.
2  Maybe it was to the board, a committee of the board.
3  Q. In general, whether it's as a spokesperson or as
4  an advocate, maybe advocate, your advocacy work on
5  behalf of faculty and students sort of sums up some of
6  the activities?
7  A. It does. But I did it because -- not because I
8  was seeking work.
9  Q. Okay. We fairly exhaustively covered the
10 details of the Alpha breakfast issue. You gave me the
11 facts of what happened and who and why. My
12 understanding was that was not part of your official job
13 responsibilities as a professor or chair. Your role in
14 the Alpha fraternity was separate from your role as
15 professor and chair?
16 A. That's correct.
17 Q. And that particular activity was something that
18 could be performed by any member of the alumni and
19 didn't have to be on the faculty of DSU? Let me
20 rephrase that.
21    You were on the speakers committee or on
22 the -- you were basically helping chair the committee to
23 set up the breakfast, correct?
24 A. I chaired it.

### Page 161

1  Q. You chaired it?
2  A. Yeah.
3  Q. And were you chairing it because, in part, you
4  were on the faculty at DSU that is where it's held?
5  A. No. I met with the fraternity.
6  Q. If something had happened, a lawsuit arising out
7  of the breakfast itself, do you know or believe whether
8  DSU's insurance would have covered you for that
9  activity?
10 A. Yes. Not DSU. The fraternity has its own
11 insurance.
12 Q. Do you know or have an opinion whether DSU's
13 insurance would have --
14 A. I doubt it. Because it was not even at DSU.
15 Q. Where was it held?
16 A. Modern Maturity Center.
17 Q. In preparing in connection with that activity,
18 did you use any resources of DSU, copiers, mailing,
19 postage, anything?
20 A. No.
21 Q. Now, without getting into the legal details of
22 what constitutes speech or action protected by the first
23 amendment, I want to make certain I know what part of
24 what happened you think motivated the president. What

2 (Pages 158 to 161)

Gorum v. Sessoms and Board of Trustees of Delaware State University
Wendell Gorum

Page 194

1  terms, was your role as a spokesperson and advocate in
2  the past, sort of your reputation in a role similar to
3  that you performed with Mr. Morris but also representing
4  other students and faculty, correct?
5      A. Yes.
6      Q. And you say at various times in the past you
7  have appeared before the board on different matters?
8      A. Yes.
9      Q. Give me an example of a couple of them.
10     A. Boards?
11     Q. Boards.
12     A. I represented faculty members who had about 100
13  publications and could not be promoted to a full
14  professor who had received a Fulbright and a Nissan
15  fellowship.
16     Q. So appearing before the tenure and promotion
17  committee, did you ever have appearances before the full
18  board?
19     A. Yes.
20         MR. ZEFF: That's what he was talking about.
21  BY MR. DURSTON:
22     Q. Which case was this?
23     A. Ikein. Dr. Augustine Ikein.
24     Q. How long ago was that, five years, maybe longer?

Page 195

1      A. I don't know. It was during that period, yes.
2      Q. Prior to President Sessoms?
3      A. I'm almost sure it was during also. I don't
4  remember. I just know I represented him before the
5  board.
6      Q. Now, what is the basis for your claim that
7  Dr. Sessoms was aware of your role and reputation as an
8  advocate and spokesperson?
9      A. What?
10     Q. You claim that Dr. Sessoms knew that you were an
11  advocate and spokesperson and that was one of the
12  reasons he was out to get you, correct?
13     A. Everything is what people told me. For example,
14  they want to know why, who made me the spokesperson for
15  the Africans, statements such as that. Now I didn't
16  hear him say it, but this is what came to me from
17  others.
18     Q. Now the quote who made him the spokesperson for
19  the Africans, as I recall, dates back to President
20  DeLauder, correct?
21     A. Yes.
22     Q. I'm referring to Dr. Sessoms' knowledge, whether
23  he shared that view or whether he was aware of that
24  reputation.

Page 196

1      A. I think that will best come from Dr. Osei. I
2  think he may or may not be able to give an indication.
3      Q. So --
4      A. He gave an assessment.
5      Q. Other than Dr. Osei and what he might say, is
6  there anything else that you have orally, in writing,
7  whatever anybody has told you, to indicate that
8  President Sessoms knew that you were considered a
9  spokesperson and advocate within the community?
10     A. I can't think of it at this time.
11     Q. Are you seeking reinstatement to the position as
12  chair of the department or just as a faculty member?
13     A. Neither.
14     Q. Neither? You are not looking to return to
15  Delaware State University at this point?
16     A. No.
17        MR. DURSTON: Off the record.
18        (Discussion off the record.)
19  BY MR. DURSTON:
20     Q. Dr. Gorum, why aren't you seeking reinstatement
21  or why don't you desire it?
22     A. I may come around to it. But right now I am
23  angry. I am hurt. I feel I gave my all to the
24  university. I believe that I did nothing that anyone

Page 197

1  else would not have done. What I did I did with the
2  encouragement and knowledge of the dean who encouraged
3  me to do it. So I did nothing for self gain. So, in
4  that sense, it would take some thinking and some for me
5  to come around.
6      Q. Dr. Gorum. I'm not offering you the position.
7  Nobody is offering you the position.
8      A. No. But I thought I explained.
9      Q. I think you did. So if next week the judge were
10  to rule in your favor that your rights had been violated
11  and orders remedy that Delaware State University return
12  you to the position as a faculty member, as of right
13  now, that is not something you would accept?
14     A. If it's the judge's order, I could accept it for
15  a day and retire.
16     Q. If the judge says that your only remedy other
17  than back-pay and attorneys' fees was to be reinstated
18  to your job, is that something that you would want to
19  return to do?
20        MR. ZEFF: I'm going to object. Not to the
21  extent that it's a poor question, but that's an
22  open-ended situation. Hypothetically for what period of
23  time, under what circumstance? If the judge orders it
24  without retaliation --

11 (Pages 194 to 197)

Wilcox and Fetzer, Ltd.      Registered Professional Reporters           302-655-0477

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D.,<br>　　Plaintiff,<br>　　v.<br>ALLEN L. SESSOMS, Ph.D.,<br>　　and<br>BOARD OF TRUSTEES OF<br>DELAWARE STATE UNIVERSITY,<br>　　Defendants. | )<br>)<br>)  Civil Action No. 06-565-GMS<br>)<br>)<br>)<br>)<br>)<br>) |

## CERTIFICATE OF SERVICE

I, Michael R. Robinson, hereby certify that on December 12, 2007 I caused a true and correct copy of the foregoing DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION IN LIMINE TO EXCLUDE EVIDENCE BASED ON CHANGED OR ABANDONED THEORIES to be served electronically via CM/ECF system and first class, U.S. Mail, postage prepaid, upon the following:

| | |
|---|---|
| Gilbert Shelsby, Esq.<br>Michael J. Logullo, Esq.<br>SHELSBY & LEONI<br>221 Main Street<br>Stanton, DE 19804 | Gregg L. Zeff, Esq.<br>FROST & ZEFF<br>Pier 5 at Penn's Landing<br>7 North Columbus Boulevard<br>Philadelphia, PA 19106 |

/s/ Michael R. Robinson
Michael R. Robinson (#4452)
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, Delaware 19899-1266
(302) 421-6800
mrobinson@saul.com

554345.1 12/12/07