IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 06-565 (GMS) |
| v. | ) |
| | ) |
| ALLEN S. SESSOMS, Ph.D., | ) |
| | ) |
| and | ) |
| | ) |
| BOARD OF TRUSTEES OF | ) |
| DELAWARE STATE UNIVERSITY, | ) |
| | ) |
| Defendants. | ) |

**<u>MEMORANDUM</u>**

**I.    INTRODUCTION**

On March 21, 2007, the plaintiff, Wendell Gorum, Ph.D., filed this action seeking declaratory, monetary, and injunctive relief against the President of Delaware State University (the "University" or "DSU"), Allen S. Sessoms, PhD., and the Board of Trustees of the University (the "Board"). (D.I. 14 ¶¶ 1-2.) Gorum alleges violations of 42 U.S.C. § 1983 (2003), specifically, that Sessoms retaliated against him for engaging in speech and association protected under the First Amendment. The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4). Pending before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (D.I. 38.) For the following reasons, the court will grant the defendants' motion.

1

## II.     BACKGROUND

Founded in 1890, DSU is a land-grant college and public university with three campuses and almost 4,000 students. The University is an instrumentality of the state, and has the rights and powers of a corporation under Delaware law. (D.I. 14 at 3); 14 Del. C. § 6503. The Board governs the University. (D.I. 14 at 3.) Sessoms became the University's president on July 3, 2003, after a selection process involving students, staff, and alumni. (D.I. 39.) Gorum, a DSU professor and department chair until his dismissal in 2005, filed this action on September 12, 2006, against Sessoms and the Board.[1] (D.I. 1; D.I. 15.) Gorum claims that Sessoms retaliated against him after he engaged in speech and association protected under the First Amendment to the United States Constitution. (D.I. 1; D.I. 14 (amended complaint).)

Gorum was a tenured professor at the University. He taught at DSU from 1989 until 1996, and, after a one-year sabbatical, from 1997 until his suspension in 2004. During the latter period, Gorum was Department Chair and Professor of the Mass Communications Department. (D.I. 39 at 5.) According to the complaint and his testimony at deposition, Gorum's professional duties extended beyond the classroom. For example, Gorum participated in the faculty senate's search process in 2003 for the next president of the University. (D.I. 14 at 3-4.) When the faculty senate had narrowed its search to three finalists, including Sessoms, Gorum alleges that he spoke out. According to the complaint, Gorum voiced opposition to the finalists before the faculty senate's final vote in March 2003, and proposed reopening the search. (D.I. 14 at 4; *cf.* D.I. 40 at A107 (faculty senate minutes of meeting in question).)

---

[1] Gorum does not allege that any action by the Board was retaliatory. Rather, Gorum brings suit against each Board member in their individual capacity strictly for prospective injunctive relief. (D.I. 15.) For procedural convenience, the parties stipulated to Gorum's naming and serving the Board in lieu of each Board member individually. (*Id.*)

Gorum also assumed and performed administrative duties with respect to student discipline. According to his brief in opposition, Gorum's faculty duties included acting as student adviser to "all DSU students with disciplinary problems." (D.I. 43 at 4-5.) The position of student adviser is defined in the DSU student handbook. (D.I. 40 at A68ff., 78.) One of Gorum's advisees was DSU student DaShaun Morris, an NCAA All-American football player. (D.I. 14 at 4-5.) In December 2002 Morris violated the DSU student code of conduct's zero-tolerance policy against weapons possession. (*Id.*) During the disciplinary process, Morris admitted to possessing a firearm on campus and was suspended pursuant to the University's no-tolerance policy. (*Id.*) With Gorum as his student adviser, Morris appealed this decision to the president of the University, William DeLauder, Ph.D. President DeLauder reduced Morris' punishment and restored his eligibility to play football. (*Id.*) Soon thereafter, Sessoms became president and reinstated Morris' previously imposed suspension. (*Id.*) Gorum recommended that Morris hire a lawyer and sue the University. In fact, Gorum hired a lawyer for Morris, and paid that lawyer's $600 retainer. (*Id.*)

Gorum also acted as adviser to the DSU chapter of the Alpha Phi Alpha fraternity. (D.I. 40 at A213 (Gorum Dep.).) According to the complaint, Gorum helped organize the fraternity's 2004 Martin Luther King, Jr. Prayer Breakfast and served as chair of the annual event's speakers committee. (D.I. 14 at 5-6.) For the 2004 Breakfast, Gorum on behalf of the committee invited Dr. Ryle Bell, Dean of Howard University School of Dentistry. (*Id.*) Sometime afterwards, according to the complaint, another committee member mistakenly invited Sessoms to speak without consulting other committee members. (D.I. 43 at 6.) The other member did so even though Gorum had already arranged a speaker, and even though DSU's former president and

Alpha alumnus, Dr. DeLauder, had never been invited to speak at the event. (D.I. 40 at A214 (Gorum Dep.).) Consequently, Gorum states that he was compelled to instruct that member to "revoke" Sessoms' invitation to speak. (*Id.*)

In January 2004, after the discovery of a grade irregularity on a DSU athlete's transcript, the University's Registrar began an investigation. The Registrar determined that Gorum had changed this and other students' final grades in violation of DSU policy. (D.I. 39 at 6; D.I. 40 at A20-46.) Indeed, the investigation revealed that, without the professor-of-record's permission, Gorum had altered many students' grades substantially for the better, in some cases changing withdrawals or failing grades to passing grades, and in others awarding passing grades to students who had not attended or done any work for the class. (D.I. 40 at A20-46 (Ad Hoc Disciplinary Committee report).) When questioned, Gorum admitted his actions and that they violated DSU policies and procedures. Sessoms thus began dismissal proceedings, writing to Gorum that his violations had "caused immediate and substantial harm to the University." (D.I. 40 at A129 (March 5, 2004 letter from Sessoms to Gorum as to termination).)

In response, Gorum exercised his right under the collective bargaining agreement (the "CBA") between DSU and its faculty to a hearing before an Ad Hoc Disciplinary Committee ("AHDC"). (D.I. 40 at A47-67 (CBA excerpts).) Under the CBA, tenured professors cannot be terminated without proof by clear and convincing evidence that there is "adequate cause" for termination. (D.I. 40 at A47-67 (CBA excerpts).) The AHDC's procedure, as required by the CBA, was rigorous. It included pre-hearing discovery, eight days of hearings under oath with verbatim transcripts, and post-hearing briefing. (See D.I. 39 at 8.) Both Gorum and the University were represented by counsel throughout the process. (*Id.*) At the end of the process,

the AHDC produced a 20-page report summarizing its conclusions. (D.I. 40 at A20-46.) Gorum concedes, as noted previously, that he changed the grades against official policy. (D.I. 43 at 38.) Nevertheless, Gorum argued at the hearings that DSU policy was vague and that he had obtained consent for all of his grade changes. (D.I. 40 at A39.) The AHDC rejected Gorum's arguments and defenses, finding both that University policies and procedures as to grade changes were sufficiently clear, and that Gorum was aware of those policies and procedures. (*Id.* at A38-39.) The AHDC found 48 grade changes by Gorum that violated DSU policy, "undermine[d] the very tenets of the educational profession and [rose] to a level deserving condemnation by the academic community," and were adequate cause for termination. (*Id.* at A38-A40.) The AHDC also noted that responsibility for such violations was not limited to Gorum. (D.I. 43 at 18.) Consequently, despite finding severe violations of University policy and adequate cause for termination, the AHDC recommended that Gorum be placed on probation for two years. (D.I. 43 at 18.)

Sessoms disagreed with the AHDC's recommendation. Sessoms presented the AHDC's findings to the Board, but recommended that Gorum's employment with the University be terminated due to the severity of his violations. (D.I. 43 at 19-20; D.I. 40 at A143-45 (memorandum from Sessoms to Board regarding AHDC hearings and Sessoms' recommended sanction).) The Board unanimously adopted Sessoms' recommendation at the April 14, 2005, Board meeting. (D.I. 40 at A146.) The Board's Chairman then notified Gorum by letter dated April 21, 2005, of his dismissal and his right to make oral arguments before the Board appealing the Board's decision. (*Id.* at A147.) Gorum did not exercise this right.

### III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, determines that the Rule 56(c) standard has been met. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).

### IV.  DISCUSSION

#### A. First Amendment Retaliation

To avoid the imposition of summary judgment for his First Amendment retaliation claim, Gorum must adduce sufficient record evidence to raise a genuine issue that: (1) his activities were protected by the First Amendment, and (2) the protected activity was a substantial factor in the alleged retaliatory action. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). Even assuming Gorum makes these two showings, Sessoms and the Board may defeat Gorum's claim by showing that Sessoms would have taken the same action in the absence of Gorum's alleged protected conduct. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Gorum claims that he engaged in three "individual exercises of First Amendment activity": (1) voicing opposition to the finalists during the presidential selection process; (2)

revoking Sessoms' invitation to speak at the 2004 Breakfast; and (3) assisting Morris with his defense to the charge of weapons possession. (D.I. 14; D.I. 43.) Gorum further contends that these activities caused Sessoms to retaliate against him on April 14, 2005, by recommending his termination to the Board despite the AHDC's recommendation that Gorum be placed on a period of probation.[2] (D.I. 43 at 39; D.I 14.)

The defendants dispute these claims on several grounds. (D.I. 39.) Initially, Sessoms and the Board argue that the applicable statute of limitations, insufficient pleadings, and certain statements Gorum has made restrict his available claims and remedies. (*Id*. at 14-17.) Sessoms and the Board further argue that Gorum's alleged activities were not protected by the First Amendment. They claim that Gorum's speech was not protected because he spoke pursuant to his official duties as a public employee. *Foraker v. Chaffinch*, 501 F.3d 231, 243 (3d Cir. 2007) (citing *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006)). Even if there was protected activity, Sessoms and the Board contend, that activity was not a substantial factor in the alleged retaliation. (D.I. 39 at 21-24.) Moreover, Sessoms and the Board argue that Sessoms would still have recommended Gorum's termination, even in the absence of any protected activity. (D.I. 39 at 36.)

The court will address these issues in turn.[3]

### B.  Gorum's Revised Claims Are Not Time-Barred

Section 1983 claims are subject to the statute of limitations for personal injury actions in the state in which the action arises. *O'Connor v. City of Newark*, 440 F.3d 125, 126 (3d Cir.

---

[2] Gorum concedes that neither the grade tampering investigation nor the AHDC hearing was retaliatory.[2] (D.I. 43 at 38.) Sessoms' recommendation to the Board is the sole act of alleged retaliation at issue in this case. (*Id.*)
[3] Because of the following findings, the court need not address certain other issues raised in Dr. Sessoms and the Board's motion for summary judgment.

2006). Delaware's two-year statute of limitations therefore applies to Gorum's claims. 10 Del C. §8119. Gorum filed his complaint on September 12, 2006, so any claims based on actions occurring before September 12, 2004, are barred by the statute of limitations.[4] In his answering brief, Gorum clarified the scope of the alleged retaliatory acts: he claims that only Sessoms' letter and recommendation to the Board on April 14, 2005, were retaliatory. (D.I. 43 at 38.) Gorum's claims as stated in his answering brief, therefore, are not barred by the statute of limitations.

### C. Gorum Sufficiently Pleaded First Amendment Speech and Association Claims

Defendants argue that the court should refuse to consider claims and theories outside the scope of Gorum's pleadings, specifically those based on violations of his freedom of association. (D.I. 39.) But Gorum's complaint alleges retaliation against him for engaging in protected speech and association in violation of his First Amendment rights. (*E.g.*, D.I. 14 ¶32.) The defendants do not, nor could they, assert they suffered any prejudice from a lack of notice as to the nature of Gorum's claims in this regard. The court finds, therefore, rejects this argument.

### D. Gorum's Alleged Protected Activities

To prove his First Amendment retaliation claim, Gorum must demonstrate that his activities were protected by the First Amendment. *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). Gorum alleges that he engaged in three protected activities: speaking out during the presidential selection process, withdrawing Sessoms' invitation to speak at the 2004 Breakfast, and acting DaShaun Morris' student adviser during his disciplinary proceedings and

---

[4] Gorum does not assert that the limitations period is tolled. (D.I. 43 at 38.)

subsequent suspension. (D.I. 43 at 21-25.) The defendants contend that none of these activities were protected by the First Amendment. Relying on the Supreme Court's holding in *Garcetti v. Ceballos*, the defendants argue that Gorum's alleged speech occurred within the context of his responsibilities as a member of the faculty, and was not, therefore, protected by the First Amendment. *Garcetti*, 126 S. Ct. at 1960.

In *Garcetti*, the Supreme Court considered whether First Amendment protection applies to a public employee who makes statements pursuant to his job responsibilities. *Id.* at 1955. The Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 126 S. Ct. at 1960; *see Foraker v. Chaffinch*, 501 F.3d 231, 238ff. (3d Cir. 2007) (discussing *Garcetti*).

Thus, the court must determine whether during any of the three areas of activity in question, Gorum spoke as a public employee or a citizen.

### 1. The Faculty Search for President

Gorum claims to have voiced opposition to the final three candidates for university president, and proposed that the search be reopened. (D.I. 43 at 3-4.) When he did so, Gorum argues, he engaged in activity protected under the First Amendment. The defendants argue that Gorum spoke pursuant to his official duties. (D.I. 39 at 18.) Gorum was Chair of the Mass Communications Department and member of the faculty senate. (D.I. 43 at 27.) Thus, the record evidence reveals that Gorum was both privileged and required, as part of his official duties, to participate in the search for a new president. (*E.g.*, D.I. 40 at A215 (Gorum Dep.).) Moreover,

Gorum does not dispute this fact or the defendants' contention in his opposition brief. Indeed, his brief makes no mention whatsoever of *Garcetti* or the developing line of cases in this area. (D.I. 43); *cf. Foraker*, 501 F.3d at 243-44. Further, regardless of whether he concedes this issue or not, Gorum has failed to present affirmative evidence to defeat the defendants' properly supported argument that Gorum spoke as an employee, not a citizen. *See Anderson*, 477 U.S. at 256-57 (non-moving party must present affirmative evidence to defeat properly supported summary judgment motion).

The court therefore finds that Gorum spoke as a public employee pursuant to his official duties when he "voiced opposition" to the three candidates, and voted to reopen the search. (D.I. 43 at 3-4.) The Constitution does not insulate this kind of speech and provide Gorum the protection he seeks.[5] *Hill v. Borough of Kutztown*, 455 F.3d 225, 242 (3d Cir. 2006) (plaintiff's First Amendment retaliation claim failed where plaintiff conceded speech was made pursuant to official duties); *Foraker*, 501 F.3d at 239-41.

### 2. The 2004 Delaware State University Alpha Pi Alpha Martin Luther King, Jr., Prayer Breakfast

Gorum also claims that when he "disinvited" Sessoms from speaking at the 2004 Breakfast, he engaged in expressive activity protected by the First Amendment. (D.I. 43 at 26-27.) Sessoms and the Board again argue that Gorum's spoke and acted as a public employee, not a citizen. The defendants assert that Gorum's role in selecting the 2004 Breakfast's speaker was pursuant to his duties as a DSU professor. They maintain that because Gorum was an official

---

[5] Even if Gorum had successfully shown that he spoke as a citizen, not a public employee, his claim with respect to this alleged protected activity still fails. Gorum did not raise a genuine issue of fact as to Dr. Sessoms' awareness of his voting against the three finalists and for reopening the selection process. (*See* D.I. 43 at 28-30 (relying on hearsay and speculation).) The defendants argue that, absent such awareness, the alleged protected activity cannot be a substantial or motivating factor in his retaliation. *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002). The court agrees.

10

adviser to the undergraduate Alpha chapter, his involvement in selecting a speaker was pursuant to his official duties and therefore not protected by the First Amendment. (D.I. 39 at 18.)

Gorum does not contest these points in his opposing brief. (D.I. 43.) Thus, the court again finds that Gorum has conceded that his speech and conduct with respect to the 2004 Breakfast speaker selection committee were pursuant to his official duties as a faculty member, i.e., a public employee. *Cf. Garcetti*, 126 S. Ct. at 1961 (holding that [t]he proper inquiry [as to the scope of an employee's duties] is a practical one"). This activity therefore falls outside the protection of the First Amendment. *Borough of Kutztown*, 455 F.3d at 242; *Foraker*, 501 F.3d at 239-41. As a result, Gorum's First Amendment retaliation claim with respect to withdrawing Sessoms' invitation fails as a matter of law.

### 3. Acting as DeShaun Morris' Student Adviser

Finally, Gorum claims that his advice to DSU student DaShaun Morris student was either speech or association protected by the First Amendment. (D.I. 43 at 24-26.) Gorum portrays his assistance as one extended activity, (D.I. 43), while the defendants divide it into two: Gorum's serving as Morris' student adviser during the disciplinary proceedings, and Gorum's retention of an attorney to sue DSU on Morris' behalf. (D.I. 39 at 19.)

The defendants again assert that *Garcetti* dictates the dismissal of this claim. Again, the court agrees. As before, Gorum fails to distinguish official from unofficial speech. As a result, the court agrees with the defendants, and will dismiss this portion of Gorum's speech-related claim of retaliation.

This leaves only Gorum's association with Morris as it relates to Morris' lawsuit against the University. (D.I. 43 at 25-26.) The court need not address whether Gorum's involvement

11

with Morris' lawsuit is protected activity, however.  As discussed below, Gorum's claim fails on other grounds.

### E.  Whether Protected Activity Was a Substantial Factor in the Retaliation

Even assuming Gorum's involvement with Morris' lawsuit was activity protected under the First Amendment, Gorum must present evidence showing that the involvement was a substantial factor in Sessoms' recommendation to the Board.  *Borough of Kutztown*, 455 F.3d at 241.  Sessoms denied knowledge of Gorum's involvement in Morris' lawsuit when he made his recommendation.  (D.I. 40 at A171.)  In addition, Gorum does not present record evidence showing that Sessoms knew of Gorum's involvement.  (*See* D.I. 43 at 30-31; *cf.* D.I. 40 A225.)  Indeed, Gorum himself describes this activity as limited to paying the attorney's retainer and attending a few private meetings.  (D.I. 40 at A225.)  Gorum's activities relating to Morris' lawsuit cannot, of course, have been a substantial factor in Sessoms' recommendation if Sessoms did not know about them.  *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).  Gorum has failed to create a genuine issue as to whether Sessoms did.  Thus, the defendants are entitled to summary judgment on this ground as well.

### F.  Taking the Same Actions in the Absence of Protected Conduct

As noted at the beginning of this discussion, Gorum's claims would fail even absent the above findings.  This is so because Gorum's claims will not stand if the defendants can show that Sessoms would have recommended Gorum's termination to the Board even if Gorum had not engaged in any activity protected under the First Amendment.  *Borough of Kutztown*, 455 F.3d at 241.  The court finds that the defendants have made such a showing.  *Id.*; (D.I. 39 at 37; D.I. 44

at 20.)

It is undisputed that Gorum changed students' grades in violation of DSU policy. (D.I. 43 at 38.) These grade changes were grounds for termination. (D.I. 40 at A38.) From when Sessoms first learned of these severe violations until he made his recommendation to the Board, Sessoms consistently stated that termination was the appropriate punishment for violations of this magnitude. (D.I. 40 at A129, A143-45, A175, A178.) Gorum does not contest these points in his opposing brief. (D.I. 43.) Indeed, Gorum does not contest that Sessoms would have recommended his termination to the Board, even in the absence of Gorum's involvement with Morris (or any other activity, for that matter). (D.I. 43.) Thus, there is no genuine issue as to whether Sessoms would have recommended Gorum's termination to the Board even if Gorum had engaged in none of the activities he claims to be protected under the First Amendment. *Borough of Kutztown*, 455 F.3d at 241. As a result, the defendants are entitled to summary judgment on Gorum's First Amendment retaliation claims. *Id.*; *see Carter v. Delaware State Univ.*, 2002 U.S. Dist. LEXIS 4721, *aff'd*, 2003 U.S. App. LEXIS 7219 (3d Cir. 2003) (summary judgment to defendants on First Amendment retaliation claim where plaintiff did not provide facts rebutting defendants' assertions that defendants would done same acts absent protected conduct).)

**VI.     CONCLUSION**

       For the aforementioned reasons, the court will grant the Defendants' motion for summary judgment.


Dated:  February 12, 2008                    /s/ Gregory M. Sleet
                                              CHIEF, UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WENDELL GORUM, Ph.D., | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 06-565 (GMS) |
| v. | ) |
| | ) |
| ALLEN S. SESSOMS, Ph.D., | ) |
| | ) |
| and | ) |
| | ) |
| BOARD OF TRUSTEES OF | ) |
| DELAWARE STATE UNIVERSITY, | ) |
| | ) |
| Defendants. | ) |

## **ORDER**

IT IS HEREBY ORDERED THAT:

 1. The Defendants' motion for summary judgment (D.I. 38) is GRANTED.



Dated: February 12, 2008         /s/ Gregory M. Sleet
                                CHIEF, UNITED STATES DISTRICT JUDGE